# In the United States Court of Appeals
## for the First Circuit

ASSOCIATION TO PRESERVE AND PROTECT LOCAL
LIVELIHOODS; B.H. PIERS, L.L.C.; GOLDEN ANCHOR, L.C., d/b/a
Harborside Hotel; B.H.W.W., L.L.C.; DELRAY EXPLORER HULL
495 LLC; DELRAY EXPLORER HULL 493 LLC; ACADIA
EXPLORER 492, LLC,
*Plaintiffs – Appellants/Cross-Appellees,*
and
PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION,
*Plaintiff-Intervenor – Appellant/Cross-Appellee,*

v.

CHARLES SIDMAN,
*Defendant-Appellee/Cross-Appellant,*

TOWN OF BAR HARBOR, a Municipal
Corporation of the State of Maine,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Maine, No. 1:22-CV-00416-LEW
Hon. Judge Lance E. Walker

## ADDENDUM

John S. Kingston
THOMPSON COBURN LLP
One U.S. Bank Plaza
St. Louis, Missouri 63101
(314) 552-6000 (main)

C. Jonathan Benner
Kathleen E. Kraft
THOMPSON COBURN LLP
1909 K Street N.W., Suite 600
Washington, D.C. 20006
(202) 585-6900 (main)

*Counsel for Plaintiff-Intervenor – Appellant/Cross-Appellee*

# Table of Contents

Amended Decision and Order, ECF No. 206 ........................ Add. 001

District Court Judgment, ECF No. 207 ........................ Add. 062

Commerce Clause, U.S. Constitution Art. I, § 8, cl. 3 ........... Add. 064

Supremacy Clause, U.S. Constitution Art. VI, cl. 2 ............ Add. 065

6 U.S.C. § 211 ........................ Add. 066

33 U.S.C. § 5 ........................ Add. 087

46 U.S.C. § 3303 ........................ Add. 089

46 U.S.C. § 3501 ........................ Add. 090

46 U.S.C. § 70006 ........................ Add. 092

33 C.F.R. § 101.112 ........................ Add. 094

33 C.F.R. § 104.200 ........................ Add. 095

33 C.F.R. § 105.200 ........................ Add. 097

33 C.F.R. § 105.237 ........................ Add. 099

33 C.F.R. § 110.130 ........................ Add. 101

46 C.F.R. part 2 ........................ Add. 102

46 C.F.R. part 70 ........................ Add. 131

46 C.F.R. part 71 ........................ Add. 137

Bar Harbor Land Use Ordinance, Article VII ............... Add. 157

Maine Constitution Art. 8, pt. 2, § 1 ........................ Add. 161

30-A M.R.S. § 3001 ........................ Add. 162

30-A M.R.S. § 3009 ........................ Add. 164

Maine State Pilotage Act (selected sections) ........................Add. 169

Todd Gabe, *Measurement and analysis of neighborhood
        congestion: Evidence from sidewalk pedestrian traffic
        and walking speeds*, DX 319 ........................................Add. 173

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, B.H. PIERS, L.L.C., GOLDEN ANCHOR L.C., B.H.W.W., L.L.C., DELRAY EXPLORER HULL 495 LLC, DELRAY EXPLORER HULL 493 LLC, and ACADIA EXPLORER 492 LLC, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| | ) | No. 1:22-cv-00416-LEW |
| PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION, | ) ) ) | |
| Plaintiff-Intervenor, | ) ) | |
| v. | ) ) ) | |
| TOWN OF BAR HARBOR, | ) ) ) | |
| Defendant, | ) ) ) | |
| CHARLES SIDMAN, | ) ) ) | |
| Defendant-Intervenor | ) | |

## AMENDED[1] DECISION AND ORDER

In this action, a group of Bar Harbor businesses and business owners who seek to preserve commercial relationships with cruise lines and their passengers challenge a local exercise of popular sovereignty by the people of Bar Harbor who seek to curtail cruise ship

---

[1] This Amended Decision and Order exclusively corrects typographical errors.

visitation to maintain a certain quality of local life. The resulting controversy is of constitutional dimension and tenders a host of questions, but chiefly asks whether a municipality with privately owned port facilities can restrain interstate cruise ship commerce for local welfare ends or must make way and permit whatever level of commerce the local market can support.

The matter proceeded to a bench trial following the Court's issuance of an expedited schedule and Plaintiffs' withdrawal of a motion for preliminary injunction. The Town of Bar Harbor has agreed not to enforce the challenged land use ordinance pending the outcome of litigation. Following a three-day trial in July 2023, the parties submitted closing arguments in writing. Based on my consideration of the evidentiary record, the arguments of counsel, and the law, judgment will enter in favor of the Defendant Town of Bar Harbor on every count but one, and even as to that one count, judgment will enter partially for the Town, as only limited declaratory relief is awarded in recognition of a partial preemption problem, without affording Plaintiffs and Plaintiff-Intervenor the relief they are seeking.

## FINDINGS

### The Parties

The Plaintiffs in this action are the Association to Preserve and Protect Local Livelihoods ("APPLL"); B.H. Piers, L.L.C.; Golden Anchor, L.C., doing business as Harborside Hotel; BHWW LLC, doing business as Bar Harbor Whale Watch; Delray Explorer Hull 495 LLC; Delray Explorer Hull 493 LLC; and Acadia Explorer 492, LLC.

Add. 002

APPLL is a business league comprised of members who own or operate businesses in Bar Harbor and seek to capitalize on the economic opportunities associated with the provision of goods and services to cruise ship passengers.  APPLL members include owners and employees of local restaurants, retail stores, and tour-related businesses.

The Delray Explorer Hulls and the Acadia Explorer are tender vessels owned by similarly named limited liability companies.  The vessels carry cruise ship passengers from cruise ships anchored in Frenchman Bay to Bar Harbor.  B.H. Piers and Golden Anchor own piers in Bar Harbor where the tender vessels disembark and embark cruise ship passengers.  BH Piers operates the pier located at 1 West Street, known as Harbor Place.  Golden Anchor operates the pier located at 55 West Street.  The pier owners have received approval from the Coast Guard for the use of the piers for this purpose.

BHWW is a limited liability company doing business as Bar Harbor Whale Watch Company.  BHWW coordinates whale watching tours to cater to the cruise lines' passengers.

The Penobscot Bay and River Pilots Association appears in this matter as Intervenor-Plaintiff.  The Pilots Association is a private corporation that provides pilotage services in a region that extends 75 miles from Boothbay Harbor to Frenchman Bay and 75 miles from the west pilot station on Penobscot Bay to the Penobscot River Port of Brewer.  By law, foreign-flagged and certain domestic cruise ships must be piloted within Frenchman Bay by a local pilot who is familiar with the Bay and its channels.  Pilots board cruise ships (and other large vessels) eight to twelve miles offshore and direct navigation to anchorage grounds in Frenchman Bay (or to other destinations in Penobscot Bay).  The

anchorage grounds in Frenchman Bay are roughly two miles from the Bar Harbor waterfront and piers. The Pilots Association's pilotage operations are regulated by the Maine Pilotage Commission. In response to the expansion of cruise vessel traffic, the Pilots Association has invested in vessels and has expanded its employment of pilots. In particular, the Pilots Association now has a dedicated crew and purpose-built vessel to handle the piloting demands associated with cruise vessel traffic in Frenchman Bay. Fees for piloting services are established by law and are a function of the size of the vessel. Ex. 39. The larger the ship, the greater the fee.

The Defendant is the Town of Bar Harbor. Bar Harbor is, among other things, a Class A port of entry for foreign-flagged cruise vessels reentering the United States and a popular port-of-call on North Atlantic cruise ship itineraries. Bar Harbor is governed by a Town Council. The Bar Harbor Town Council has sponsored a cruise ship committee for more than a dozen years, but recently disbanded the committee. The Town of Bar Harbor has a year-round population of roughly 5,500 persons, a number comparable to the lower berth capacity (a rough measure of passenger capacity) of a solitary large cruise ship.

One of the residents of Bar Harbor is Charles Sidman, Intervenor Defendant. Mr. Sidman owns an art gallery in town. Mr. Sidman was a primary proponent and co-author of the initiative that resulted in the land use ordinance challenged in this case.

<u>Non-Parties of Note</u>

Among the cruise lines that visit Bar Harbor are several lines owning foreign-flagged cruise vessels. When they call, these vessels typically spend about nine hours at

anchorage, enough time for passengers to clear customs and participate in a shore visit of reasonable duration.

The State of Maine has two other Class A ports of entry, Eastport and Portland. Neither is as proximate to Acadia National Park as Bar Harbor.  If a cruise ship called in Eastport or Portland, travel by motor coach to reach and return from Acadia National Park would consume much of the day.

The Maine Office of Tourism is a marketing agency for the State of Maine. CruiseMaine, part of the Maine Office of Tourism, promotes cruise communities in Maine and Maine-based cruise ship tourism in general.  CruiseMaine engages with cruise lines and the cruise industry trade association and sometimes functions as a municipality-to-cruise-line liaison.  The Maine Office of Tourism and CruiseMaine perceive cruise travel as a positive type of tourism for Maine because it introduces many first-time visitors to Maine from a broader geographical region as compared to visitors who travel by land, most of whom are from east coast states and Canada.  CruiseMaine maintains a software platform called the PortCall system, https://maine.portcall.com.  Through the PortCall system, CruiseMaine posts real-time data related to vessel movements and port operations. State funding supports CruiseMaine.

Carnival, Royal Caribbean, and Norwegian are among the cruise line companies that are active in New England and market cruise itineraries that feature Bar Harbor as a marquee port.  These three cruise lines are noted because they operate foreign-flagged vessels and operate some of the largest cruise vessels that call in Bar Harbor and elsewhere

5

Add. 005

along the Maine coast.[2]  The foreign-flagged lines see Bar Harbor as the most convenient and desirable port of entry when coming from foreign waters (such as Canadian waters).

<u>Background Facts</u>

The Town of Bar Harbor lies on the shores of Frenchman Bay in the North Atlantic on the eastern side of Mount Desert Island.  The Town is nestled in an area of great scenic beauty abutting Acadia National Park, a national asset that the Park Service refers to as the Crown Jewel of the North Atlantic Coast.  Given Bar Harbor and Acadia National Park's placement and prominence among other North Atlantic attractions accessible by sea, the cruise ship industry regards Bar Harbor as a marquee destination, the kind which appeals to customers and around which an appealing cruise itinerary can be built.

Although Bar Harbor had long experienced healthy tourist seasons, in the 2000s there was room for growth.  Additionally, the season was limited to the period between Memorial Day and Labor Day.  Local businesses and their representatives on the Town Council hoped to expand the tourist season and saw cruise tourism as one means of doing so.

In 2006, the Maine Department of Transportation, the Maine Port Authority, and the Town of Bar Harbor joined in a task force to commission a cruise tourism destination management plan for Bar Harbor.  The authors of the management plan proposed architectural and engineering improvements to develop the Town to facilitate expanded

---

[2] MSC Cruises is a fourth cruise line that fits the description.  The executive director of CruiseMaine characterized the domestic cruise lines as "smaller."  In addition to Bar Harbor, Eastport, Portland, and Rockland have ports suited to larger foreign vessels.  Only Bar Harbor and Portland have significant traffic involving foreign cruise vessels seeking a Class A port of entry, with Bar Harbor and Portland having roughly 60% and 40%, respectively.

cruise ship passenger access, chiefly by means of improved pier facilities. Ex. 260. In 2008, the Town accepted a recommendation from the task force to embody a cruise ship committee and establish a policy of daily cruise passenger caps of 3,500 passengers for the peak-tourism, summer months of July and August, and 5,500 passengers for the shoulder-season months of May, June, September, October, and November. The cruise ship lines were receptive to the invitation and amenable to the passenger caps, and cruise ships began to call in Frenchman Bay in ever-increasing numbers. Local enterprise and investment gradually expanded to meet the increased demand for passenger tendering and other local services.

The Town established its daily passenger caps largely by reference to the lower berth capacities of existing cruise vessels. The caps were understood to be "voluntary" in that they were mutually acceptable to the then-existing Council and the cruise lines. The Council and the cruise line industry were able to agree that cruise line passengers generally would not be well served in Bar Harbor if two or more cruise ships each with an especially large lower berth capacity were to disembark on the same day, even during the quieter shoulder season. They also recognized that it was sensible to lower the cap during Bar Harbor's peak summer season, given the competing demand for local services generated by peak, land-based tourism. The progenitors of Bar Harbor's cruise ship management plan also understood that cruise ship visitations impose certain municipal burdens,[3]

---

[3] Bar Harbor maintains a per-passenger fee structure for cruise ship visits. Ex. 29. The Town has used the fees generated in this manner (roughly $1 million per year) to fund town salaries and enlarge its police force, among other things. The increase in personnel, particularly law enforcement, is itself indicative of the localized impacts of increased traffic.

including congestion, that can detract from the character of the Town and reduce the quality of life for residents.  To manage the cap, the Town instituted a reservation system overseen by its harbormaster.  When the new reservation system was first instituted, cruise ship visits were not yet a daily phenomenon, despite the reference to "daily" caps.

Over the past 15 years, Bar Harbor has experienced a steady growth in its tourist season, due chiefly to its proximity to Acadia National Park.  In 2021, Acadia National Park attracted roughly four million visitors.  For many of these visitors, a trip to Acadia includes a visit to downtown Bar Harbor.  Meanwhile, more and larger cruise ships anchored in Frenchman Bay and cruise ship passenger visitation levels started to approach or meet the established daily caps on an ever-increasing and consistent basis.  Although cruise ship passengers account for a limited portion of the total number of annual visitors to greater Bar Harbor and Mount Desert Island, they arrive at a destination that is already blessed and burdened by land-based tourism and at a waterfront of rather limited area.  Cruise ship passenger traffic also has a pronounced impact on and near the waterfront, including the eastern portion of West Street and the northern portion of Main Street.

Over the same period of years, the process of tendering passengers to shore has become a more efficient operation.  In the early years, the Tender Parties (i.e., the pier owners, tender-vessel LLCs, and BHWW) would augment the cruise lines' tender operations so that passengers came ashore in a variety of ships, including whale watch ships.  In 2017, the Tender Parties designed and built three vessels dedicated to tendering cruise ship passengers.  They also invested in barges to facilitate the movement of passengers from the cruise ships to the tender vessels.  While these developments are

commendable from the standpoint of market efficiency, part of the transactional cost is that the demand for tender operations means that cruise ship tenders have become the dominant harbor traffic during the expanded cruising season.[4]

For some, the expansion of tourism resulted in a return on planning and investment. For others, it resulted in a growing disaffection with municipal life.  Increasingly, town leaders heard from constituents who were experiencing this disaffection.[5]  Then came COVID.  During the visitation-hiatus brought about by COVID quarantine orders—which restrictions impacted both land and sea visitation to Bar Harbor and Acadia National Park—some residents of Bar Harbor were reminded that there are measures of a municipality's success other than its volume of business.

In January of 2021, Bar Harbor commissioned a marketing research firm to perform a quantitative study and write a report concerning local opinions.[6]  Ex. 323.  The survey

---

[4] Each of the three tender vessels is licensed to hold 149 passengers and they steadily rotate into and out of the harbor in roughly 30-minute intervals, primarily disembarking passengers onto the piers mid-morning and embarking them again in the afternoon, though passengers move back and forth throughout the day. Consequently, there are times of day that involve more intense movement of people in either direction, not unlike the tide, albeit more regular in terms of timing.  Foreign-flagged vessels, for example, arrive mid-morning and spend on average nine hours at anchorage.  Their passengers spend on average six to seven hours on land in various locations, including downtown Bar Harbor.  In the morning, passengers congregate near the piers and waterfront, including at motor coach staging areas, while some passengers walk into the Town.  Passengers may be in any number of locations during the day, such as on a whale watch tour or an Acadia bus tour, or at a local restaurant or business.  In the afternoon, passengers (and their assorted conveyances) again congregate near the piers to obtain passage back to their cruise ship.

[5] Town Council Chair Valerie Peacock testified that in 2020 and continuing residents of Bar Harbor have expressed strong feelings of angst over the perceived negative impact of the cruise ship industry, but also concern over the expansion of tourism in general.  July 13 Tr. at 112–13, 121–25.

[6] Pan Atlantic Research's study surveyed year-round and seasonal residents, property owners, and business owners of Bar Harbor to examine what they thought about sea-based tourism.  *See generally* Ex. 323. Overcrowding, too many ships/tourists, and environmental concerns ranked among the most popular answers to Bar Harbor's greatest challenges in managing cruise ship tourism.  Ex. 323 at 29; *see also* July 13 Tr. at 212:14–214:9 (describing the increased street traffic and congestion at the waterfront when cruise ships arrive).

had a healthy response rate.  Many respondents voiced concern for the congestion[7] caused by cruise ship visits and ranked cruise ship tourism a net negative for the Town.  The growing concern over popular sentiment was also acknowledged by the cruise industry.  In July of 2021, the president of the Cruise Lines International Association proposed new passenger caps as part of a "negotiation" with the Town.  The proposal, accepted by the Town Council, involved a daily passenger reduction for the shoulder season[8] and a new monthly cap of 65,000 visitors specifically to address concerns of capacity.  Although public pressure was growing, the Bar Harbor Town Council, ultimately, was not then constituted to provide the pressure relief that many citizens hoped for.[9]

On February 15, 2022, the Council approved the formation and membership of a new working group to explore the modification of the daily passenger limits for the 2023 and 2024 cruise seasons.[10]  On August 16, 2022, the Town Council accepted the task force's recommendation to enter into a memorandum of agreement ("MOA") with each

---

[7] Congestion is not exclusively a matter of pedestrian congestion on sidewalks.  Congestion includes vehicular congestion and overcrowding of stores, parks, and other public spaces.

[8] By 2019, it was a misnomer to describe the months of September and October as a "shoulder season" when describing the volume of cruise ship passengers coming ashore in Bar Harbor.  In fact, over 60 percent of Bar Harbor's annual cruise ship passenger visits occur in September and October.  September and October are also the months that see the most visitation by the very largest vessels (>3,500 passengers).  *See, e.g.*, Ex. 165.  According to CruiseMaine's director, the number of cruise visitors entering Bar Harbor in September and October is roughly equivalent to the number of tourists on town streets in June and July.

[9] At trial, counsel for Plaintiffs worried that testimony concerning public disaffection and council activities (much of Chair Peacock's testimony) was an attempt to construct a false legislative history in support of the Ordinance.  I have not interpreted the testimony in that fashion.  Rather, the testimony related some of the contemporaneous local history that set the stage for the success of the Initiative.

[10] Separately, the Bar Harbor Cruise Ship Committee was already corresponding with the Cruise Lines International Association to explore ways of reducing cruise visitation.  Ex. 214.

cruise line and directed the preparation of a form MOA for circulation.[11]  The resulting MOA withdrew the months of April and November from the Town's reservation system, lowered daily passenger caps from 5,500 to 3,800 for the months of May, June, September, and October (with a +200-passenger leeway), and instituted a new monthly cap of 65,000. In September and October of 2022, the Town entered into MOAs with American Cruise Lines, Disney Cruise Lines, Holland America Line, Hurtigruten Expeditions, Norwegian Cruise Line, Pearl Seas Cruises, Princess Cruises, Rogay Caribbean Cruises, Seabourn Cruise Line, Viking Cruises, and Windstar Cruises Marshall Islands.

While the Town Council publicly pursued its voluntary measures, a group of local residents formed a petitioning committee to advance a citizens' initiative that would achieve more significant reductions by mandatory means.  Their initiative proposed amending the Bar Harbor Code to require a permit to disembark cruise ship passengers "on, over, or across any property located within the Town of Bar Harbor."  Ex. 243A.  It also specified that "no more than 1,000 passengers, in the aggregate, may disembark on a single calendar day."  *Id.*  The Initiative called for a $100 minimum penalty per excess unauthorized disembarkation, which would be assessed against the property owners (the Pier Operators).  The Initiative states that the harbormaster shall develop rules and regulations to establish a reservation system for disembarkation, a mechanism for counting and tracking disembarkations, a procedure for reporting violations, and "any other

---

[11] Two weeks prior, on August 2, 2022, the Town Council went into executive session to discuss the citizens' petition that would become the Ordinance but was, at that time, still in need of voter approval. Exs. 207–210.  The Town Council also conducted a workshop on that date to discuss the future of cruise tourism in Bar Harbor.  Among other matters under consideration were cautionary litigation warnings from the Cruise Lines International Association.  Ex. 211.

provisions" deemed necessary. *Id.* By the time the Initiative went to vote, the citizens'

group had revised it by substituting the word "persons" for "passengers." Ex. 243B. They

did this based on a group member's observation that cruise ships carry a great many

crewmembers as well as passengers. The group decided it would be best to use the term

persons to capture both passengers and crew. Ex. 230.

The Initiative included a lengthy statement of purpose focusing on quality of life,

but also expressing concern for public safety and the commercial interests of businesses

other than those seeking the patronage of cruise ship passengers.

Concerning quality of life, the Initiative's sponsors wrote:

> Underlying this proposed amendment is the fact that, in recent years, the
> Town has been a popular port of call for cruise ships of varying sizes, from
> which passengers disembark via tender boats that offload passengers directly
> into the downtown area. The large numbers of passengers have overwhelmed
> the downtown area, resulting in excessive congestion and traffic on public
> streets and sidewalks, frequent overcrowding of parks and other public
> spaces, and inundating local amenities and attractions, all of which result in
> a diminished quality of life for Town residents.

Ex. 243A. Concerning public safety and other business interests, the sponsors wrote:

> The unchecked and continued influx of disembarking cruise ship passengers
> in the downtown area jeopardizes the Town's ability to deliver municipal
> services to Town residents and visitors (for example, cruise ship passengers),
> including the provision of public safety services (police and fire), emergency
> medical services (EMS), in-patient and out-patient services at local hospitals,
> pandemic control measures, and public sanitation services, and also impacts
> the ability of local shops, restaurants, and other businesses to attract and
> serve customers.

*Id.* The sponsors then summarized:

> A town-wide survey was conducted in 2021, showing that a majority of
> respondents believe that the volume of disembarking cruise ship passengers
> is too high and has a negative impact on the Town and the health, safety and
> welfare of its residents.

*Id.*

The Initiative was listed as an article on the warrant for Bar Harbor's November 8, 2022, special town meeting.  A majority of the registered voters who voted supported the article.  Bar Harbor now has a land use ordinance that establishes a disembarkation cap of 1,000 persons per day.

During trial, Mr. Sidman testified that the 1,000-person cap was not the product of "a rigorously defensible finding or study or calculation."  July 13 Tr. at 312:20–21.  The group proposed various caps, some higher, but ultimately arrived at 1,000 persons.  In communication with other members of his group, Mr. Sidman expressed a preference for smaller cruise ships because the passengers on smaller cruise ships tend to be more well-to-do.  He also expressed a dislike of "the biggies," meaning the larger cruise ships.

<u>Subsequent Rulemaking</u>

A variety of details remain for purposes of sorting out the best approach to implementing the Ordinance.  These include proposed rulemaking to exclude crew from the 1,000-person limit (for reasons that will be explained shortly), determining how best to monitor passenger volume, and determining how to proceed in the event the limit is disregarded by the Pier Owners.  *See*, *e.g.*, Exs. 66, 204.  However, at present implementation and rulemaking are suspended pending this immediate facial challenge to the Ordinance.

<u>Findings Concerning the Initiative's Stated Purposes</u>

To the extent the Initiative expresses concern for public safety due to congestion located anywhere other than the waterfront, West Street and lower Main Street, there is no

empirical data to enable a fact finder to allocate responsibility for a degradation in overall municipal public safety between cruise and land-based tourism.  But at the waterfront, the press of cruise ship passengers is sufficient to raise safety concerns.  Indeed, the initiative sponsors' stated concern for public safety is echoed by the cruise industry.  Ex. 32 §§ 5.3, 5.4.  However, at least to date there does not appear to be an incident illustrating any past failure in the delivery of public services occasioned by passenger congestion at the waterfront.

Where the stated purposes have greater significance is in regard to congestion and all that congestion entails, such as overtaxed public facilities, long lines, crowded sidewalks and businesses, slowed traffic, and the like.  To be fair, some days with pronounced congestion in Bar Harbor may occur when a cruise ship is not at anchorage.  Nighttime congestion may be particularly bad on some evenings, despite the absence of cruise ship passengers.  But the idea proposed by Plaintiffs and Plaintiff-Intervenor that cruise ship traffic has a negligible impact on local conditions is disingenuous.  What video evidence was presented by Plaintiffs or Plaintiff-Intervenor was more in the nature of pro-cruise marketing material that was not representative of the daily impact of cruise-related visitation and, instead, depicted quieter moments on quieter days.

It is not the fault of cruise ship passengers that the area is congested; it simply is the reality of conditions existing on the ground.  Cruise ship passengers come ashore in an area of limited space nestled between the Public Pier and Harborside Hotel.  One of the piers over which cruise ship passengers travel sits at the east end the harbor, adjacent to the Public Pier, near the juncture of Main Street and West Street.  The other pier sits at the

west end of the harbor.  Between them is a short stretch of commercialized waterfront along West Street.  The passengers' impact on the relatively confined waterfront area is marked,[12] though their spillover impact on the Town more widely is best described as cumulative. But even further up Main Street and in public areas the impact is real and tangible to locals who visit the downtown.

As attested to by witnesses Dr. Bill Horner, Nathan Young, and Seth Libby, the press of people in the downtown intensifies on cruise ship days.  Dr. Horner described it as a dramatic growth in the press of people with a tremendous amount of traffic, particularly in the waterfront area.  Mr. Young described sidewalks busy enough that he prefers to walk in the street when he has to go downtown on a cruise ship day.  Mr. Libby described the scene similarly, stating that cruise ship visits produce greater crowding.  The witnesses also testified that they avoid the downtown on cruise ship days due to the extent of the congestion.  Horner, Libby, and Young all testified that they voted in favor of the initiative because they felt that elected officials had failed to act in a timely or meaningful manner to curtail the impact of cruise ship visits.  I find that these witnesses provided a fair and accurate assessment of the impact of cruise ship visits in terms of both the intensification of congestion and the undesirability of a trip downtown for many residents on "cruise ship days," which increasingly means most days of the cruise ship season.[13]

---

[12] *See*, *e.g.*, Ex. 32 § 5.3.  Congestion is bad enough that the Cruise Line Industry Association has proposed that Bar Harbor give over to cruise passenger traffic most of the public pier as well.  *Id.* at §§ 5.3, 5.8.  This would effectively give over the vast majority of Bar Harbor's waterfront to the primary function of facilitating cruise ship passenger arrival and departure during the cruising season.

[13] Plaintiffs and Plaintiff-Intervenor offered the testimony of Professor Todd Gabe, Ph.D., of the University of Maine, who studied congestion in Bar Harbor's tourist district.  One study occurred at the tail end of August and essentially concluded that allowing 680 *additional* cruise ship passengers (i.e., more than the

Congestion in downtown Bar Harbor is a seasonal fact of life, but it is empirically exacerbated by the regular morning and afternoon pulse of cruise ship passengers and the tour buses and other vehicles[14] that arrive to cater to them.  In addition, fall congestion is largely a function of cruise ship visitation, resulting in an undeniable change to the annual rhythm of municipal life.  Cruise ship passenger visitations may well be viewed by rational voters as indulgent and burdensome surplusage in an already taxed ecosystem.  In this sense, the initiative sponsors' stated concern for generalized welfare and quality-of-life considerations is neither unsubstantiated nor unrelated to the unique congestion problem associated with high-berth cruise tourism, let alone arbitrary and irrational.[15]

<u>Findings Concerning the Ordinance's Impacts</u>

Most of the cruise lines that schedule visits to Bar Harbor plan visits in cruise ships having a lower berth capacity in excess of 1,000.  Only 27 of the 134 ships scheduled to make calls in the 2023 season would be able to disembark their entire complement of passengers without exceeding the cap.  It appears unlikely that a cruise line will schedule

---

[14] daily 3,500 passenger cap for August) would result in only a negligible *further* experience of congestion in a town already impacted by land-based tourism and the baseline 3,500 cruise ship passengers.  Ex. 319 at 2.  Professor Gabe also spent a number of days walking about Bar Harbor and recording his subjective experience at various times and locations.  About half of the walks he took were "at times early in the morning, during months outside the peak tourism seasons and in inclement weather, or at places located on the outskirts of the tourism district."  Ex. 319 at 6.  I did not find Professor Gabe's testimony or reports to be helpful in terms of achieving whatever finding Plaintiffs and Plaintiff-Intervenor intended me to draw.

[14] *See, e.g.*, Ex 12A; Ex. 32 § 4.2.  In addition to tour buses, there are vans, minibuses, motor coaches, taxis, and bike tours.  While the pulses of congestion are most keen in the mid-morning and afternoon, there is a greater mid-day press as well, which the restaurateur members of APPLL seek to capitalize on.

[15] Plaintiffs insist that the Town of Bar Harbor must prove that the Ordinance can be based on a finding that the one-thousand-and-first passenger disembarked and every passenger who follows is somehow a "noxious" or "toxic" threat to the well-being of the Town.  *See, e.g.*, Pls.' Reply Br. at 6, 16, 20, 34.  I do not believe that is the test.  The Ordinance is obviously designed to draw a line between levels of impact occasioned by the berth capacities of cruise ships, not the relative innocuousness or noxiousness of individuals.

a port call for purposes of a shore visit if it cannot disembark its ship's entire complement of passengers on a single day. Consequently, in terms of the volume of visitors disembarking from cruise ships, the likely avoidance of the large vessels will reduce passenger visitation volume by a significant percentage, likely north of 80 and possibly as high as 90 percent (in the short term) compared with the peak numbers experienced in 2022 and 2023.

Cruise lines with large ships will, necessarily, adjust their itineraries and reroute high-berth ships to other ports. Plaintiffs would likely feel a financial impact occasioned by reduced cruise passenger patronage. The pier and tender boat operators will likely lose fees, the APPLL members will likely experience a reduction in business and will perhaps close during the shoulder season or retain fewer employees in those months, and the Pilots Association will have decisions to make related to maintaining personnel, vessels, and equipment without the revenue generated by regular piloting of the largest cruise ships into and out of Frenchman Bay.

Because no ecosystem is static, presumably some cruise lines will adjust practices to maximize utilization of the new caps. However, the record does not contain evidence that would allow for a reliable calculation on that score, nor would I expect it to.[16] There is no evidence to suggest, for example, that the cruise lines with the smaller ships have

---

[16] The cruise industry stated in 2019 that it "is poised to continue its overall expansion, adding new ships faster than retiring them." Ex. 32 § 6. "The demographics of the passengers seeking cruises in a given area will largely dictate the size and amenities of vessels. Vessels should be considered moveable high-value assets for generating shareholder profits. To this end, cruise companies will evaluate the yield achievable by a ship assignment in a given market." *Id.* Conceivably, if, as the cruise lines evidently fear, more municipalities impose capacity restrictions, then certain cruise lines will reconsider their decision to focus on maximization of economies of scale in cruise ship design.

either a sufficient number of ships or that their cruises are in sufficient demand to approach the caps on a regular daily basis.  Even if visitation is eventually maximized under the Ordinance, the overall number of cruise ship passenger visits would be significantly less than the level of visitation experienced in 2022 and 2023 and less than a third of the level authorized under the recent MOAs.

<div align="center">

**DISCUSSION**

</div>

Plaintiffs allege in their Complaint (ECF No. 1) that Bar Harbor's new Ordinance is preempted by operation of the United States Constitution's Supremacy Clause (Count 1), violates the Commerce Clause (Count 2), and offends "substantive due process" (Count 3).  Plaintiff-Intervenors similarly allege in their Complaint-in-Intervention (ECF No. 43) that the ordinance violates the Supremacy Clause (Count 1) and the Commerce Clause (Count 2), but additionally allege that the ordinance is preempted under the Maine Constitution based on alleged conflict with Maine's statutory pilotage system (Count 3) and its statutory economic and community development program (Count 4).

I address the Maine Constitution first before turning to the federal claims.

## A.    The Maine Constitution

The Maine Constitution affords municipalities home rule authority.   "The inhabitants of any municipality shall have the power to alter and amend their charters on all matters, not prohibited by Constitution or general law, which are local and municipal in character.  The Legislature shall prescribe the procedure by which the municipality may so act."  Me. Const. art. VIII, pt. 2, § 1.  Home rule authority has been conferred on Maine municipalities by the Maine Legislature to the maximum extent of the Legislature's power

<div align="center">18</div>

to grant it, excepting only home rule authority that is elsewhere denied expressly or by clear implication in Maine law, *see* 30-A M.R.S. § 3001, or where "the municipal ordinance in question would frustrate the purpose of any state law," *id.* § 3001(3). When the exercise of home rule is challenged, the municipal power authorized under Maine law is to be "liberally construed to effect its purposes" and courts must apply a "rebuttable presumption that any ordinance . . . is a valid exercise of a municipality's home rule authority." *Id.* § 3001(1), (2).

The Maine Constitution also extends to each Maine municipality the authority to provide for their electors to exercise "the direct initiative . . . in regard to its municipal affairs." Me. Const. art IV, pt. 3, § 21. The authority of municipal electors (i.e., voters) to legislate by means of a direct initiative is coextensive with the authority of the municipality to exert its home rule authority. *Portland Reg'l Chamber of Commerce v. City of Portland*, 253 A.3d 586, 592–93 (Me. 2021). It was thus an exercise of home rule authority when the petition committee circulated the initiative that resulted in Bar Harbor's challenged Ordinance.

Plaintiff-Intervenor does not contend that the petition process and resulting initiative exceeded any state or municipal law or rule insofar as the Ordinance's enactment is concerned. Nor does it contend that the initiative is not an exercise of home rule authority involving municipal affairs. Instead, Plaintiff-Intervenor contends that the Ordinance prevents the accomplishment of state priorities articulated in state laws respecting the establishment of a system of pilotage and a program of economic and community development. Challenges involving the "implied" prohibition "must be evaluated on a

case-by-case basis by examining the language of the ordinance and any statutes enacted by the Legislature." *Id.* at 593.

In Maine Revised Statutes Title 38 the Maine Legislature has declared a policy and purpose "to provide for a system of state pilotage in order to provide maximum safety from the dangers of navigation," "to maintain a state pilotage system devoted to the preservation and protection of lives, property, the environment and vessels," and "to insure the availability of pilots" 38 M.R.S. § 85. The pilotage statute then goes on to define terms, outline jurisdiction, specify the vessels that must take pilots, prohibit piloting without a license, establish a pilotage commission and outline its duties, and set up a system of licensure for pilots. None of these statutory provisions prohibits a municipality from enacting an ordinance that restricts local passage from private piers onto municipal property. Nor does the Ordinance conflict with the objective of the Legislature when it comes to pilotage. Pilots remain free to conduct their profession and to pilot vessels within the region, including by piloting them to Frenchman Bay anchorages. Nothing in the pilotage statute can reasonably be construed as a legislative intention, express or implied, to divest municipalities of home rule authority over local, land-based, police power concerns whenever the exercise of that authority could foreseeably impact the volume of business available to pilots. The establishment of a pilotage system is not an implicit statutory surrogate for compulsory, maximal municipal participation in cruise tourism.

Plaintiff-Intervenor also argues that Maine's statutory intention of "formulat[ing] and implement[ing] economic development policies and programs" that are coordinated among the State's several agencies and various "municipal and regional economic efforts,"

20

5 M.R.S. § 13052, will not tolerate an exercise in municipal home rule that curtails cruise tourism.  With the statute in question, the Maine Legislature organized a Department of Economic and Community Development.  *Id.* §§ 13054, 13055.  The Department is empowered to, among other things, implement policies and programs, work with other organization including municipalities, conduct planning and research, communicate with the private sector, prepare and distribute publications, and implement programs assigned to it by the Governor or Legislature.  *Id.* § 13056.  The Department's Office of Tourism is empowered to engage in promotional and informational activities, encourage development, review and comment activities, and similar activities.  *Id.* §§ 13090-C, 13090-E.  However, it has no power to compel or even regulate municipal engagement with cruise line tourism.

While the Department and the Office have rule-making authority, Plaintiff-Intervenor does not rely on any rules to support its preemption claim.  Instead, Plaintiff-Intervenor argues that any municipal action inconsistent with greater economic development necessarily prevents coordination as well as economic and community development.  The argument is essentially that through declaration of an economic and community development goal and creation of a related department and tourism office, the Maine Legislature has imposed a duty on every municipality and political subdivision to act in the best interest of the Chamber of Commerce.  Of course, if the maximization of commerce were compulsory, a vast body of zoning and land use regulation would not be worth the paper it is written on.  To be certain, most municipalities yearn for the types of burdens of fortune that Bar Harbor experiences.  The broad and undifferentiated aspiration toward commercial health made manifest by the Legislature's creation of the Office of

Tourism and CruiseMaine is sensible and one supposes is in league with the desires of most municipalities most of the time.  However, the picture of commercial development is not painted in primary colors alone but rather exists in a pastiche of other municipal considerations.  A municipality that rationally exercises its home rule authority in a manner which is modestly in tension with the highest marginal commercial harvest, the type which is the sine qua non of the tourism office, is not an outlaw.

The fact is that the Legislature has not empowered these instrumentalities to override municipal home rule authority.  The Legislature has not even empowered these instrumentalities to wield the interstitial power of a special master or an ombudsman in matters of municipal and cruise line conflict.  If it had, then some manner of administrative process would have preceded before or alongside this litigation.  Yes, CruiseMaine may support, educate, promote, and play the part of a sales broker when it comes to cruise tourism, but decidedly missing from the enumerated powers is the power to trump home rule authority to dictate acceptable levels of municipal participation in cruise tourism.

Nor can the mere existence of the Department or its tourism-focused instrumentalities be regarded as an implied prohibition against a local municipal determination to reduce engagement with the cruise line industry.  Public bodies may exercise only the powers conferred upon them by law.  The conferral of powers must be found "in the enabling statute either expressly or by necessary inference as an incidence essential to the full exercise of powers specifically granted." *Hallissey v. Sch. Admin. Dist. No. 77*, 755 A.2d 1068, 1072 (Me. 2000).  The derogation of home rule authority must rest on something more immediate and direct than the Legislature's pro-commerce

22

**Add. 022**

proclamations and the institution of a body tasked with broadly supporting and promoting, but not regulating, tourism. If home rule authority is to be overcome it ought to be based on something with a little more starch, such as the text of the law. As is so often the case, when textual (i.e., legal) support for a challenge to home rule authority is lacking, an invitation is made to the court to begin at the intellectual equivalent of divining legislative intent from high upon the pillars, which is to say, an appeal toward sophistry. To be certain, for some there is an intoxicating appeal to wielding such authority, acting as a sort of judicial "God of the gaps" and the line is long of those only too eager to cast their light upon the unwashed masses to shepherd us through the darkness left by the democratic process. For ease of analysis, this case does not present a close call of implied prohibition of home rule. Any argument of implied prohibition of municipal home rule authority must be attended by a particularly muscular example of how the purpose of the enabling legislation is at cross purposes with the home rule. The analysis cannot be one of contingencies or at least if it is, must ultimately be tethered to the noncontingent, a prime mover example in the law that demonstrates how home rule errs.

The Legislature should not be viewed as having impliedly prohibited the exercise of municipal home rule authority in an area that the Legislature has not even attempted to regulate in any direct manner. Even in areas that the Legislature has regulated directly, municipal home rule authority is not so easily preempted. *See*, *e.g.*, *Portland Reg'l Chamber*, 253 A.3d at 591 (upholding Portland's minimum wage ordinance despite existence of state minimum wage statute); *Portland Pipe Line Corp. v. City of S. Portland*, 240 A.3d 364, 368 (Me. 2020) (holding that Maine Coastal Conveyance Act, which

involved the State's exercise of police power in matters of oil transfers, did not preempt a local ordinance that prohibited an activity even though the Maine Department of Environmental Protection ("DEP") had issued an approval that allowed for but did not require the activity in question); *E. Perry Iron & Metal Co.*, *Inc. v. City of Portland*, 941 A.2d 457, 463 (Me. 2008) (upholding municipal regulation of junkyard in absence of evidence that it frustrated the purposes of Maine's Solid Waste Act); *Smith v. Town of Pittston*, 820 A.2d 1200, 1201 (Me. 2003) (4-3) (upholding municipal ordinance banning the spread of septage in the Town of Pittston despite existence of DEP rules establishing minimal performance criteria for such spreading, DEP's award of permit application to conduct such spreading, and legislative intent to encourage development of affordable, environmentally suitable waste disposal sites).  When it comes to the growth of tourism in Maine there simply is no state-sanctioned regulatory scheme to frustrate, only a broadly worded aspirational objective of regional economic coordination and an associated initiative of the Office of Tourism to support, educate, and promote cruise communities.

Plaintiff-Intervenor's claims of preemption under the Maine Constitution (Complaint in Intervention Counts 3 and 4) fail.

## B.   The United States Constitution

Plaintiffs and Plaintiff-Intervenor mount challenges to Bar Harbor's Ordinance based on the Supremacy Clause and the Commerce Clause.  Pls.' Compl. Counts 1–2; Compl. in Intervention Counts 1–2.  Plaintiffs add a claim under the Due Process Clause.  Pls.' Compl. Count 3.  I begin my review with the Supremacy Clause, move on to the Due Process Clause, and finish with the Commerce Clause.

24

Add. 024

### 1.    *The Supremacy Clause*

The Supremacy Clause provides that "the Laws of the United States . . . and all Treaties made . . . under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  Due to the Supremacy Clause, when Congress enacts a statute, state law is preempted to the extent of any conflict with the federal statute.  *Haaland v. Brackeen*, 599 U.S. 255, 287 (2023).  Sometimes a federal statute will expressly preempt state law, but preemption also can arise "by virtue of restrictions or rights that are inferred from statutory law."  *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020).  Preemption can result, for example, based on the inference that Congress has effectively occupied the field in a certain area of regulation even though Congress has not announced a preemptive intention.  *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 633 (1973).  Preemption can also result based on the existence of competing commands, allowances, or standards in federal and state law.  "If federal law 'imposes restrictions or confers rights on private actors' and 'a state law confers rights or imposes restrictions that conflict with the federal law,' 'the federal law takes precedence and the state law is preempted.'"  *Garcia*, 140 S. Ct. at 801 (quoting *Murphy v. National Collegiate Athletic Assn.*, 138 S. Ct. 1461, 1480 (2018)).  However, "[i]nvoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law."  *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019).

"'[T]he basic question involved in [Supremacy Clause] cases . . . is never one of

interpretation of the Federal Constitution but inevitably one of comparing two statutes." *Swift & Co. v. Wickham*, 382 U.S. 111, 120 (1965). "[F]or the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws." *Hillsborough Cnty.*, *Fla. v. Automated Med. Laboratories*, *Inc.*, 471 U.S. 707, 713 (1985).

### a.   Federal regulation of maritime matters

Plaintiffs point to the many ways in which federal law applies to vessels, seafarers, and ports or "maritime terminal facilities" to argue that there is no room for a municipality to restrict shore access via port facilities. The cited federal law, rules, and regulations, however, do nothing to legislate in the area of cruise tourism (or even—with one exception—landward passage). Plaintiffs cite the Federal Maritime Transportation Security Act, 46 U.S.C. §§ 70101-70132, which governs "port security," and the entire Coast Guard Authorization Act, Pub. L. 111-281, 124 Stat. 2905 (Oct. 15, 2010), which as the title suggests authorizes appropriations for the Coast Guard. Bar Harbor's Ordinance clearly does not compete with federal law in the area of port security or Coast Guard operations.[17]

Plaintiff-Intervenor advances similar preemption arguments to those pressed by Plaintiffs but shifts the focus slightly to contemplate the regulatory burdens imposed on

---

[17] In Plaintiffs' rundown of federal law touching on vessels and maritime facilities, they cite 33 C.F.R. § 105.105(a)(2) for the proposition that Coast Guard regulations under the Maritime Transportation Security Act are intended to be preemptive. Pls.' Br. at 20. The reference is perplexing because it merely states that the requirements of maritime security for facilities apply to the owner or operator of a facility that receives vessels certified to carry more than 150 passengers, yet Plaintiffs have elsewhere informed the Court that the tender vessels are licensed to hold 149 passengers. In any event, clearly the Bar Harbor Ordinance was not drawn to impose competing security standards for maritime facilities.

cruise lines and pilots.  The Pilots Association argues that because "[t]he federal presence in the area of navigation, safety, and environmental protection is extensive, pervasive, demanding, and complex," and "follows a vessel from its design phase through its ultimate scrapping," and "link[s with] a series of international agreements dependent upon the predictability of access to ports," and involves oversight by the Coast Guard, Customs and Border Protection, the Centers for Disease Control and Prevention, the Environmental Protection Agency, and the Federal Maritime Commission, "[l]ocal restrictions on vessel operations . . . pose a direct threat to the necessary uniformity of federal oversight and the efficient operation of cruise . . . vessels."  Pl.-Int.'s Br. at 9–10 (ECF No. 190).  This language checks off the lawyerly rhetoric box but fails to tease out any actual conflict.  The Ordinance simply does not purport to regulate vessel requirements or make the operation or navigation of cruise vessels any less safe, environmentally sound, or efficient.  Nor does it interfere in any way with the performance of cruise line oversight by the Coast Guard, CBP, CDC, EPA, or the FMC.  Nor can it be said that any one of the identified agencies has attempted to occupy the regulatory field when it comes to balancing competing interests related to a municipality's participation in cruise tourism.  Federal regulation in this arena is not even extant, let alone pervasive.  *City of Burbank v. Lockheed Air Terminal Inc*., 411 U.S. 624, 633 (1973) ("It is the pervasive nature of the scheme of federal regulation of aircraft noise that leads us to conclude that there is pre-emption.").

Plaintiffs and Plaintiff-Intervenor's invocation of all the many ways that federal law touches upon maritime traffic is precisely the kind of "brooding federal interest" mentioned in *Hillsborough*, 471 U.S. at 713.  As such, it does not suffice to support the preemption of

Bar Harbor's disembarkation restriction.[18]

> ### b.  Seafarer shore access

When Plaintiffs and Plaintiff-Intervenors do dive down into the maritime regulations to retrieve something specific, the palatable[19] oyster they surface with is a preemptive maritime security regulation that requires the owners or operators of maritime facilities (such as Plaintiff Pier Owners) to ensure shore access for seafarers who wish to transit from a vessel through or over regulated facilities.  33 C.F.R. § 105.237.[20]

> (a) Access required.  Each facility owner or operator must implement a system . . . for providing access through the facility that enables individuals to transit to and from a vessel moored at the facility and the facility gate in accordance with the requirements in this section.  The system must provide timely access as described in paragraph (c) of this section and incorporate the access methods described in paragraph (d) of this section at no cost to the individuals covered.
>
> (b) Individuals covered.  The individuals to whom the facility owner or operator must provide the access described in this section include—

---

[18] Plaintiffs muse in their post-trial brief that the Ordinance is unenforceable because the Pier Owners lack the authority to stop or turn back cruise ship passengers who arrive at the pier. Pls.' Br. at 31 n.27 (also noting that this point is "not part of this legal challenge").  The idea that the Pier Owners cannot lawfully comply ignores the reality that cruise ship passengers (and crew) arrive at the piers pursuant to a prearranged reservation system and have long done so with the understanding that a free-for-all would result in chaos and passenger dissatisfaction with the shoreside experience.  Besides, compliance should present no difficulty as we are assured by Plaintiffs and Plaintiff-Intervenor that oversized cruise ships will no longer call at Bar Harbor.

[19] Plaintiff-Intervenor also cites 33 U.S.C. § 5, which prohibits the levying of tolls "or any other impositions whatever," upon vessels, water craft, or their passengers or crew, by "any non-Federal interest, if the vessel or water craft is operating on any navigable waters subject to the authority of the United States."  Pl.-Int.'s Reply Br. at 12.  This oyster has spoiled.  The argument is waived for purposes of this litigation since it was first raised in a reply brief.  But in any event, the Ordinance is designed to prevent excessive disembarkations from cruise ships, subject to a fine imposed against the pier owner to ensure compliance. It is not a toll, fee, or other imposition directed toward cruise ships or their passengers and crew associated with their use or enjoyment of navigable waters.

[20] The regulations provide that part 105 has preemptive effect "insofar as a State or local law or regulation applicable to the facilities . . . would conflict with the regulations in part 105, either by actually conflicting or by frustrating an overriding Federal need for uniformity."  33 C.F.R. § 101.112(b).

(1) Seafarers assigned to a vessel at that facility;

(2) Pilots; and

(3) Representatives of seafarers' welfare and labor organizations.

*Id.* § 105.237. Cruise ship passengers are not seafarers. Seafarers are persons "assigned to a vessel" (i.e., crew) or "pilots" or "[r]epresentatives of seafarers' welfare and labor organizations." *Id.* § 105.237(b); *see also id.* § 96.250(f)(4) (providing that safety management systems include personnel procedures ensuring that "[e]ach vessel is properly crewed with qualified, certificated and medically fit seafarers").

Because the Bar Harbor Ordinance is drawn as a restriction on the numbers of "persons" and not just "passengers" who may be disembarked on or over municipal land, Plaintiffs and Plaintiff-Intervenor proclaim a victory. I agree with Plaintiffs and Plaintiff-Intervenor (and evidently with Defendant and Defendant-Intervenor) that the Ordinance cannot stand as a barrier to seafarers' shore access when a seafarer is assigned to a vessel moored at either pier facility owned by the Plaintiff Pier Owners. To the extent the Ordinance might be read to require a different conclusion, it cannot be enforced. However, it does not follow that the entire Ordinance is invalidated or that any meaningful relief is to be awarded in this litigation as a result of the limited (and hypothetical) preemption occasioned by the seafarers' access regulation.

The scope of preemption "is guided by the rule that the purpose of Congress is the ultimate touchstone in every pre-emption case." *Altria Group*, *Inc. v. Good*, 555 U.S. 70, 76 (2008) (cleaned up). "That approach is consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety." *Medtronic, Inc. v.*

*Lohr*, 518 U.S. 470, 485 (1996); *see also Consumer Data Indus. Ass'n v. Frey*, 26 F.4th 1, 12 (1st Cir. 2022) (remanding for district court to analyze the scope of a federal law's preemptive impact), *cert. denied*, 143 S. Ct. 777 (2023). Here, the purpose of the federal regulation is to assure seafarer access to shore when seafarers are aboard and assigned to a vessel moored at the regulated facility. Consequently, the preemptive reach of the federal seafarers' access regulation extends no farther than to a controversy involving an attempt by Bar Harbor to deny shore access to a seafarer on a vessel moored at either facility.

This case does not present any actual controversy of that (or any other actual) kind. Moreover, even if the conflict preemption associated with the seafarers' access regulation is appropriately resolved in the context of this litigation, it would not achieve the result that Plaintiffs and Plaintiff-Intervenor seek, which is total invalidation of the Ordinance. A limited invalidation of the Ordinance for purposes of seafarers' access would not render the Ordinance an ineffective instrument to impose a disembarkation cap against cruise ship passengers, since passengers are not seafarers.

Plaintiffs and Plaintiff-Intervenor insist nonetheless that invalidation of the Ordinance based on its use of the word "persons" instead of "passengers" should be total. I digress to address this assertion, though it is unavailing. The genesis of the digression is the fact that Bar Harbor has indicated that it will author a rule that limits the Ordinance by recognizing an exception for shore access for seafarers. When a state, municipality or local agency interprets or enforces a law in a manner that avoids a conflict with federal law, ordinarily mere facial constitutional challenges are effectively deflected. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 456 (2008); *Ward v. Rock Against*

*Racism*, 491 U.S. 781, 795–96 (1989); *McGuire v. Reilly*, 386 F.3d 45, 58 (1st Cir. 2004). However, here the Ordinance's use of "persons" unambiguously extends to seafarers, so it is "not readily susceptible to a narrowing construction." *Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 35 (1st Cir. 1999).

Plaintiffs also cite Maine Supreme Judicial Court opinions that they say preclude efforts by a municipality to confine the reach of a citizen initiative by means of a rulemaking process. They contend that the only available fix requires an initiative and election do-over. The cases Plaintiffs cite do not support the proposition. *See Wawenock, LLC v. Dep't of Transp.*, 187 A.3d 609, 618 (Me. 2018) (discussing methods of interpreting the "will of the people" when construing citizen initiatives); *Davis v. SBA Towers II, LLC*, 979 A.2d 86, 92–93 (Me. 2008) ("Although Gridcom argues that the Planning Board's decision to redefine the term was also procedurally improper, we need not address this claim."). And while Plaintiffs correctly observe that Maine law requires that an ordinance be revised "only by following the procedure required for its original enactment," 30-A M.R.S. § 3004(4), it does not compel that an ordinance be invalidated *in toto* based on a limited conflict with federal law. The default rule of constitutional jurisprudence is to the contrary, and here it takes little imagination to appreciate that the voters of Bar Harbor intended and would prefer that the Ordinance remain operative as to passengers rather than be invalidated as to passengers. *See Town of Windham v. LaPointe*, 308 A.2d 286, 292 (Me. 1973); *see also Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329–30 (2006).

In summary, yes, the Ordinance has the potential to conflict with the preemptive

seafarers' access regulation and requires that Bar Harbor avoid any application of the Ordinance that would run afoul of 33 C.F.R. § 105.237.  However, the limited conceptual conflict does not achieve the result that Plaintiffs and Plaintiff-Intervenor are after, which is total invalidation of the Ordinance.[21]

    c.  Customs and immigration

Plaintiff-Intervenor also argues that the Ordinance "obstructs customs and immigration screening of entrants to the United States." Pl.-Int.'s Br. at 14.  The idea is that cruise itineraries in the North Atlantic often include calls in Canadian ports before returning to U.S. waters, so if the first port of call in the U.S. chosen by the cruise ship's captain is Bar Harbor, then Bar Harbor must permit unrestricted disembarkation from the cruise ship as a logical consequence of any immigration and customs inspection that transpires aboard the ship while it is anchored in Frenchman Bay.

The conflict is imagined, not real.  The Ordinance does not prohibit or otherwise prevent entry to the United States.  Anyone admitted to the United States by CPB through a process that transpires aboard ship in Frenchman Bay may enter the United States, including in Bar Harbor.  The Ordinance does not impose an additional condition for admission or otherwise purport to supply a basis for exclusion from the United States, it

---

[21] Plaintiffs and Plaintiff-Intervenor fail to articulate a set of circumstances in which an as-applied challenge by a seafarer necessarily would arise and hypothetical notions about what might transpire do not suffice since "litigants mounting a facial challenge to a statute normally 'must establish that *no set of circumstances* exists under which the [statute] would be valid.'" *United States v. Hansen*, 599 U.S. 762, 769 (2023) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987), and discussing the exception for overbroad restraints on free speech)).  Assuming reservations are booked and tendering arrangements are made such that a combined total of more than 1,000 passengers and seafarers would be disembarked on a given day, further constitutional litigation based on the preemptive force of 33 C.F.R. § 105.237 is susceptible to avoidance when the Court is assured that the handling of any such scenario will be addressed in advance by the Town's rulemaking process in recognition of the partial preemption of the Ordinance.  The facial challenge presented in this litigation should not prevent that process from unfolding.

imposes only a limitation on local disembarkations and a fine for excessive disembarkations, regardless of the admission status of persons disembarked.[22] Nevertheless, Plaintiff-Intervenor likens this case to *Takashi v. Fish & Game Commission*, 334 U.S. 410 (1948), and *Maine Forest Products Council v. Cormier*, 586 F. Supp. 3d 22 (D. Me. 2022). Pl.-Int.'s Br. at 14–16. This case is unlike either.

In *Takashi*, the Supreme Court invalidated, on a variety of grounds, a discriminatory California law that banned lawful residents ineligible for citizenship from engaging in commercial fishing. 334 U.S. at 413–415, 422. Plaintiff-Intervenor says the Ordinance similarly discriminates. The discrimination argument relies on the fact that the largest cruise ships are all foreign-flagged vessels and the fact that all cruise ships customarily carry passengers who are foreign nationals. However, the Ordinance is not drawn in discriminatory language and nothing that transpired at trial betrayed a discriminatory purpose to exclude foreign-flagged vessels or the citizens of other nations. The Ordinance is drawn with the passenger capacity of ships in mind, not the nationality of the ships' owners or passengers.

In *Cormier*, Judge Woodcock issued a preliminary injunction enjoining enforcement of a protectionist state statute designed to prevent foreign workers from

---

[22] It bears repeating that cruise ships with passenger capacities in excess of 1,000 will likely not have Bar Harbor on their itineraries. Visitation at a port is arranged many months in advance, with local, daily passenger caps in mind. Consequently, the imagined conflict between an admission decision and a refusal to allow disembarkation (or imposition of a fine on the Pier Owners for excessive disembarkations) is entirely at odds with the actual practices long observed in Bar Harbor in relation to pre-scheduled port calls. Plaintiff-Intervenor also neglected to call an expert witness to substantiate its hypothetical customs scenario of a cruise ship returning from foreign waters intent on making an appointment with CPB in Frenchman Bay as a means of forcing an unreserved port call in Bar Harbor (assuming CBP would even condone such a maneuver).

Add. 033

engaging in the intrastate transportation of forest products.  There, the federal regulatory regime for alien work visas resulted in the issuance of work visas for the performance of specific jobs identified as part of a certification process and based on the Department of Labor's specific findings that domestic workers were not available in sufficient numbers and employment of the aliens would not negatively impact local wages and work conditions.  *Id.* at 39–41 & n.12.  In that context, the federal government's occupation of the field of foreign worker authorization was manifest, as was the conflict between the Maine act and federal law.  *Id.* at 46.  That is not the situation in this case.  There is no evidence in this case or cited law demonstrating that cruise lines obtain advance federal authorization to disembark their entire complement of passengers specifically in Bar Harbor.  Cruise lines present their passengers for inspection when they arrive at the Class A port designated on their own itineraries.  Cruise lines are not required by federal law to apply for preauthorization to call at a particular port, let alone to disembark every passenger upon arrival.  Nor does CPB make specific findings based on any federal law or regulation that cruise line passengers may disembark in any particular location in any particular numbers based on the cruise ship's passenger capacity and local conditions.

Plaintiff-Intervenor's customs- and immigration-based arguments for preemption fail to make way.

### d.  Anchorages

Finally, Plaintiff-Intervenor argues that because the Secretary of Homeland Security has established federal anchorages in Frenchman Bay for purposes of safe navigation, *see* 46 U.S.C. § 70006; 33 C.F.R. § 110.130, the Ordinance's regulation of onshore

disembarkation is preempted since large cruise ships with North Atlantic itineraries will otherwise have rare occasion to use the anchorages.  Pl.-Int.'s Br. at 17–18.  This final Supremacy Clause challenge is like the others.  It fails to support an inference of federal field preemption expansive enough to blockade local regulation in matters of cruise line passenger shore access.  It also fails to expose any actual conflict between federal and state law as the Ordinance imposes no restriction whatsoever on Frenchman Bay anchorage access.  Cruise ships of whatever size are free to anchor in Frenchman Bay.  If cruise lines chose not to anchor in Frenchman Bay because of the Ordinance, that is a function of the cruise lines' own cost and benefit calculations.  By the mere act of establishing anchorages the Secretary of Homeland Security has not conferred a charter of privileges on cruise lines to disembark their entire complement of passengers in any municipality in which there are pier operators who would welcome them.   Like the other shots fired in Plaintiff-Intervenor's Supremacy Clause fusillade, the final shot fails to sink the Ordinance.

### 2.    *The Due Process Clause*

Plaintiffs, but not Plaintiff-Intervenor, claim that the Ordinance offends the Due Process Clause.  The Fourteenth Amendment prohibits the States from "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  Around the dawn of the Twentieth Century—an era sometimes described as the "*Lochner* era" by Supreme Court historians—the Supreme Court instilled in the Due Process Clause substantive overtones based on a natural-law preoccupation with the freedom to contract.  Essentially, if two parties were willing to engage in a commercial relationship, an expression of their individual liberty, what should stand in their way or interfere with their

decisions about how to structure the relationship?  According to the Court, not the majority of their peers acting through their elected representatives.  *See*, *e.g.*, *Allgeyer v. Louisiana*, 165 U.S. 578 (1897) (invalidating a law regulating marine insurance); *Lochner v. New York*, 198 U.S. 45 (1905) (invalidating a labor law designed to limit the hours worked by bakers); *Adkins v. Children's Hosp. of the D.C.*, 261 U.S. 525 (1923) (invalidating a law establishing a board and an investigative and consultative process to establish minimum wages for women).

When we speak of the *Lochner* Era's substantive due process jurisprudence today, it is mostly to express bewilderment that the Court engaged in such a freehanded practice of judicial policymaking in favor of those having commercial advantage in the marketplace, or else to extol the noteworthy dissents of the era, such as the work of Justice Oliver Wendell Holmes in *Lochner* and the work of Justice Holmes and Chief Justice William Howard Taft in *Adkins*.  It reminds us, and is worthy of perennial reminding, that judicial policymaking is an insidious, antidemocratic, and narcissistic instinct still very much alive that must be resisted.  Lessons from the *Lochner*-era season of judicial mischief making that are worthy of mention include the observance that "[t]he 14th Amendment does not enact Mr. Herbert Spencer's Social Statics," *Lochner*, 198 U.S. at 75; that a court should avoid "pricking out a line in successive cases" when the process is akin to legislative policymaking, *Adkins*, 261 U.S. at 562 (Taft, C.J., dissenting); that the substantive "contours" of the Due Process Clause are decidedly "vague" in relation to the freedom to contract, *id.* at 568 (Holmes, J., dissenting); that when it comes to liberty "pretty much all law consists in forbidding men to do some things that they want to do," *id.*; and that

deciding whether a law's benefits are worth its costs is a matter assigned to the legislative rather than the judicial branch of government, *id.* at 571.

When the Supreme Court finally abandoned using the freedom to contract as an antidemocratic talisman, it reaffirmed what a great many of its other decisions had long established, summing up the concern over individual liberty as follows:

> [F]reedom of contract is a qualified, and not an absolute, right. There is no absolute freedom to do as one will or to contract as one chooses. The guarantee of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to the government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulation and prohibitions imposed in the interest of the community.

*W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 392 (1937).

And so it comes as something of a surprise that I now consider a due process challenge to the Bar Harbor Ordinance that pits the Plaintiffs' freedom to contract[23] against restrictions imposed in the interest of the community. But to their credit, Plaintiffs do not come right out and say it. Instead, they adopt the language of modern due process standards, contending that there is no "rational nexus" between the Ordinance's "purpose and standards and the processes . . . employe[d] to achieve [them]." Pls.' Br. at 52 (ECF No. 191) (citing *Pennell v. City of San Jose*, 485 U.S. 1, 11 (1988) (upholding municipal rent control ordinance over a due process challenge)).

When it comes to the evaluation of the existence of a rational nexus, "courts should

---

[23] Plaintiffs have also asserted that the Ordinance unlawfully restrains the non-party cruise lines' and their passengers' right to travel. Presumably the freedom to travel is no more sacrosanct than the freedom to contract. I can see no reasons why natural law would elevate one over the other. Plaintiffs did not assert that the Ordinance violates individuals' right to travel in their complaint; instead, they raised this issue for the first time in their post-trial brief in a perfunctory fashion. Consequently, I do not consider the freedom to travel in this Decision and Order.

refrain from substituting their regulatory wisdom for that of the legislature. *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 483 (1st Cir. 2009).  "[A] court's Due Process inquiry should be satisfied '[i]f the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory.'" *Id.* (quoting *Nebbia v. New York*, 291 U.S. 502, 537 (1934)).  "This inquiry should focus on whether a program's procedures are inadequate or whether, overall, a program is arbitrary, discriminatory or irrelevant to a legitimate legislative goal." *Id.* (internal quotation marks omitted).

Plaintiffs argue that the Ordinance defies the rational nexus requirement because it imposes a strict limit of 1,000 persons per day "for every single day of the year," without accounting for seasonal variation in the congestion experienced in Bar Harbor as the result of tourism.  Pls.' Br. at 53.  In support of their position, Plaintiffs emphasize that Mr. Sidman testified that the fixed restriction to 1,000 persons daily was not the product of "a rigorously defensible finding or study or calculation," July 13 Tr. at 312:20–21, and that his group "just didn't want to get into various limits at different times of the year." *Id.* at 313:24–25.

Plaintiffs' argument is that because Bar Harbor long employed different summer-season and shoulder-season caps it is now irrational for Bar Harbor to do otherwise.  I am not convinced that adopting this rationale would be any different than imposing by judicial fiat the rule that a fixed cap is unwise policy and therefore unconstitutional because it fails to maximize tourism—because, in effect, it is my opinion or another judge's opinion that the Ordinance's local benefits are not worth their costs.  That might as well be said about

fixing a minimum wage or imposing rent control.  It is of course rational to propose that passenger caps rise and fall inversely to land-based tourism, but it does not follow that a fixed cap is therefore irrational.[24]  The Constitution "is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar, or novel, and even shocking, ought not to conclude our judgment upon the question." *Lochner*, 198 U.S. at 75–76 (1905) (Holmes, J., dissenting).  The Due Process Clause does not compel Bar Harbor to eliminate visitation lulls during the shoulder season by means of increased cruise ship visitation.  Nor, to my knowledge, does the Due Process Clause forbid municipalities from enacting ordinances that have the effect of preserving seasonal fluctuations in the blessings and burdens of tourism.  Though Plaintiffs evidently see it as their constitutional right to maximize the burden that their commercial activity imposes on the commons, at least up to a level that approaches their capacity to serve, they have not cited any authority for that proposition.

The Ordinance's 1,000-person daily cap reduces the profit that can be achieved from commercial engagement with cruise lines and cruise ship passengers, but it also preserves that engagement to a degree.  Is it irrational for the citizens of Bar Harbor to desire a passenger cap that enhances their own relative enjoyment of their community during the summer and shoulder seasons while maintaining a measure of cruise tourism commerce?  I cannot say that it is.  If I were to conclude otherwise, I would simply be ratifying the

---

[24] I am not concerned here with the alleged irrationality of a "year-round" cap because this case does not involve year-round cruise ship traffic.  When the Ordinance came into being, the MOAs between the Town and the cruise lines involved a season beginning in May and ending in October.  The cruise lines have voluntarily passed on visitation between November 1 and April 30.

Plaintiffs' policy preference as being in league with my own, not because the Ordinance is discordant with the Due Process Clause.  I adhere to an antiquated notion that judges should not allow robes to suffocate a sense of judicial humility by steering wildly outside their lane into the role delegated to elected representatives.  Whether the Ordinance is the wisest expression of democratic will is a question for which the Constitution does not hold the answer.  What may seem like a sensible policy today may strike voters as needing some renovation down the road.  This is merely a *Schoolhouse Rock*-level civics lesson that nevertheless bears repeating in constitutional challenges that more appear to challenge the marginal wisdom of the law than satisfy the more capacious test of whether it offends the Constitution.  Even if I were equipped to play the role of the Oracle of Delphi to answer the question of whether the Ordinance is sensible, which I am not, that is not the role assigned to me by the Constitution, contemporary trends notwithstanding.

Plaintiffs argue that it is discriminatory that the amelioration of congestion falls exclusively on them, without imposing restrictions on other accommodations or tourists who contribute to the problem.  Based on my review of the record, I am not persuaded that the Ordinance discriminates in an irrational manner.  Congestion in Bar Harbor is real and is experienced throughout the summer and fall months.  When the Pier Owners and Tender LLCs disembark several thousand persons on a daily basis, they substantially burden Bar Harbor's waterfront and intensify the experience of congestion more widely.

Cruise line passenger traffic stands out as worthy of special consideration for a variety of reasons.  For purposes of this context, among these reasons are the industry's own longstanding selective and voluntary approach to municipal engagement and its

Add. 040

acknowledged need for management by means of a reservation system that employs caps. Land-based tourism is not equally amenable to management and Plaintiffs have not suggested any ready means of stemming that particular stream of visitation. Cruise-based tourism is also unlike land-based tourism in that cruise ships carry passengers in numbers quite unlike any land-based conveyance. While cruise lines evidently consider local conditions in terms of the capacity of the area to provide their passengers with goods and services, they are not deterred by local "no vacancy" conditions that would deter land-based visitors. Upon arrival, cruise line passengers congregate in volume, in relatively intense morning and afternoon waves, though they also enhance congestion throughout the day. When they arrive, they are joined by a caravan of the vehicles that cater to them, congesting the waterfront area with buses, minibuses, vans, motor coaches, and taxis. Their arrival demands significant attention by municipal authorities, mostly law enforcement personnel hired to manage the press of people and conveyances. Cruise lines also have the relatively unique ability to transform the shoulder season, calling in Bar Harbor on a near daily basis in especially large cruise ships. These are distinct features of cruise tourism in Bar Harbor that make differential treatment rational.

Ultimately, the costs and benefits of the various features of cruise tourism and the 1000-person daily passenger cap do not boil down to a neat finding of arbitrariness, irrationality, irrelevance, or discrimination. A rational voter could take these features into consideration and conclude that a 1,000-passenger cap is an appropriate means of recalibrating the Town's approach to this very local concern.

### 3.      *The Commerce Clause*

Among the powers the Constitution vests in Congress is the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art I, § 8.  The conferral upon Congress of the power to regulate commerce clearly authorizes Congress to override competing regulations adopted by the states, but it also acts as a bulwark against state and local regulations that would, if permitted to stand, either discriminate against foreign and interstate commerce for local protectionist purposes or produce a Balkanized system in which commerce among the states and with other nations is overburdened by a need to satisfy multifarious regulations imposed by different states on the very same commercial activity.  *Camps Newfound/Owatonna*, *Inc. v. Town of Harrison*, *Me.*, 520 U.S. 564, 571, 576–77 (1997) (concerning discriminatory regulation); *Bibb v. Navajo Freight Lines*, *Inc.*, 359 U.S. 520, 523–530 (1959) (concerning regulation inimical to the orderly movement of good across state lines).  The bulwark against pernicious regulation is varyingly described as the "dormant" Commerce Clause or the "negative command" of the Commerce Clause.  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023).  Judicial decisions discussing the dormant Commerce Clause are legion and not all of the precedent fits neatly into the categories outlined above.

Plaintiff-Intervenor breaks its argument into three overarching assertions with subparts.  Pl.-Int.'s Br. at 18–44.  The first contention is that the Bar Harbor Ordinance is protectionist and discriminatory.  *Id.* at 22–38.  The second contention is that the burdens of the Ordinance far exceed the local benefits.  *Id.* at 38–43.  The third is that the Ordinance violates the Foreign Commerce Clause.  *Id.* at 43–44.  Plaintiffs, on the other hand, advance

their position under twelve headings, three of which are prefatory.  Pls.' Br. at 22–52.  The resulting nine arguments cover a similar range of subjects and bounce back and forth thematically.  I address Plaintiff-Intervenor's and Plaintiffs' arguments together but impose my own outline.

### a.  Discrimination against foreign commerce

"'[T]he' Commerce Clause is really three distinct Clauses rolled into one: a Foreign Commerce Clause, an Interstate Commerce Clause, and an Indian Commerce Clause." *Haaland v. Brackeen*, 599 U.S. 255, 320 (2023) (Gorsuch, J., concurring).  Each clause is construed to effectuate its purposes, resulting in differing applications.  *Id.*  Here, the contention is that the Ordinance discriminates against foreign commerce because cruise lines conduct an international operation, some utilizing exclusively foreign-flagged vessels, and their vessels frequently call in the ports of two or more nations during a solitary tour.  Plaintiffs assert that cruise lines have the right to call on any Class A port that is convenient, such as the Port of Bar Harbor, and, consequently, the Ordinance disrupts the flow of foreign commerce.  Pls.' Br. at 51.  Plaintiff-Intervenor agrees, arguing that the Ordinance overwhelmingly burdens foreign commerce because the largest ships are foreign-flagged, and it is essential that there be uniformity in regulation.  Pl.-Int.'s Br. at 43.

These assertions lack persuasive force.  The Ordinance does not discriminate on the basis of a "foreign" attribute.  The Ordinance is indifferent to whether passengers arrive on foreign-flagged vessels or are themselves citizens of foreign states.  The Ordinance also is silent on the subject of foreign navigation.  The Ordinance imposes a capacity limitation

on the disembarkation of passengers regardless of the origin of the vessel carrying them or the itinerary that informs the vessel's movements. The imposition of a restriction on local daily disembarkations into a small town does not meddle in an area of commerce that must of necessity be ironed out between nations.[25]

There is no cause to think that the ability of municipalities to govern the extent of their participation in cruise tourism for local welfare reasons will undermine the cruise tourism industry or result in cruise lines having to modify their vessels, crews, passenger capacities or anything else in order to continue plying the seas to visit whatever nations, states, and municipalities remain on their itineraries, of which there are, evidently, a great many. If anything, permitting municipalities to establish terms and conditions on local participation in cruise tourism may encourage more municipalities to consider participation, knowing that they will not thereby be compelled to accommodate whatever level of traffic the cruise lines and their local partners wish to impose. That more ports may be open to smaller vessels is to be expected rather than condemned on "constitutional" grounds.

The record fails to justify the notion that there is a need for uniformity[26] in the terms and conditions of municipal partnering with the cruise tourism industry, let alone that

---

[25] This case is unlike *Henderson v. Mayor of the City of New York*, in which the Supreme Court struck down a state statute that imposed certain financial obligations on ship owners whose ships carried foreign subjects migrating to the United States, explaining that the terms of our Nation's immigration policy, 92 U.S. 259, 270 (1875), "require exclusive legislation by Congress," as the subject "in an eminent degree . . . concerns our international relations." *Id.* at 273.

[26] Plaintiffs assert: "No other significant port physically capable of disembarking passengers from similar-sized vessels restricts disembarkation in the same manner as the Ordinance." Pls.' Br. at 30. The statement not only admits that other ports impose restrictions, but also is so laden with qualifiers that its meaning is uncertain. No party introduced the kind of evidence that would enable me to unpack this assertion, let alone give it any weight in my analysis.

Add. 044

uniformity is necessary to foreign (or interstate) commerce.  Congress has not seen fit to

regulate the terms and conditions of municipality and cruise line engagement and it is not

at all apparent or even probable that allowing municipalities the ability to regulate their

level of engagement will undermine the ability of any of the several coastal states to

participate fully in cruise tourism involving every size cruise ship imaginable and bearing

whatever flag.  What this case really involves is the contention that cruise lines are able to

compel local accommodation of their private assessment of the ideal economies of scale

for cruise tourism.  *See* Pl.-Int.'s Br. at 30–31; Pls.' Br. at 26.  The Foreign Commerce

Clause does not demand such a result.[27]

### b.   Discrimination-qua-protectionism

At the "very core" of the Supreme Court's Commerce Clause jurisprudence lies an

"anti-discrimination principle." *Nat'l Pork Producers Council*, 598 U.S. at 369.  The anti-

discrimination principle "prohibits the enforcement of state laws driven by economic

protectionism." *Id.* (cleaned up).  Protectionist state and local laws are those that impose

restrictions or grant benefits that favor in-state or local economic interests and disadvantage

their out-of-state competitors.  *Id.*  Such measures are barred by the negative command of

the dormant Commerce Clause because the alternative would result in the existence of

state-by-state protectionist initiatives and reprisals that would prevent the operation of a

---

[27] Cases cited in support of the "foreign commerce" argument are distinguishable.  *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) (holding that state law boycotting companies that do business with Burma violated Supremacy Clause); *United States v. Locke*, 529 U.S. 89 (2000) (holding Washington law regulating oil tankers was preempted in part by comprehensive federal regulatory regime and remanding for further consideration of certain state regulations); *Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue and Fin.*, 505 U.S. 71 (1992) (invalidating state corporate tax law that gave preferential tax treatment to dividend-income received from domestic subsidiaries versus dividends from foreign subsidiaries).

national, cohesive and competitive marketplace.   *Id.* at 371–73 (discussing cases illustrating this core concern).  Thus:

> We have understood this construction to serve the Commerce Clause's purpose of preventing a State from retreating into economic isolation or jeopardizing the welfare of the Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear.  The provision thus "'reflect[s] a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.'"

*Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179–80 (1995); *see also H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 539 (1949); *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 522 (1935).  The Framers feared interstate commercial strife, not impartial regulations enacted for local welfare ends, with which they were no doubt familiar.

State and local regulations that are not protectionist in purpose or effect are not prohibited by the negative command of the Commerce Clause simply because they impact an out-of-state economic interest associated with commerce.   *Nat'l Pork Producers Council*, 598 U.S. at 374.  After all, "[i]n our interconnected national marketplace, many (maybe most) state laws have the practical effect of controlling extraterritorial behavior," *id.* (internal quotation marks omitted), including "an immense mass of inspection laws, quarantine laws, and health laws of every description that have a considerable influence of commerce outside their borders."  *Id.* at 375 (cleaned up, quotation marks omitted);[28] *see*

---

[28] In *National Pork Producers Council v. Ross*, the Supreme Court rejected a challenge to a California law requiring that all pork sold in California derived from breeding pigs or their offspring be raised according

**Add. 046**

*also Camps Newfound/Owatonna*, 520 U.S. at 596 ("In our zeal to advance [open markets] we must take care not to overstep our mandate, for the Commerce Clause was not intended 'to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country.'" (Scalia, J., dissenting) (quoting *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 443–444 (1960)).

Plaintiffs argue that Bar Harbor's Ordinance is facially and per se discriminatory and protectionist because it impacts only travelers arriving by sea, without attempting to regulate the congestive impact of land-based travelers. Pls.' Br. at 28 (citing *Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 344 n.6 (1992) (explaining that a per se rule of invalidity applies "not only to laws motivated solely by a desire to protect local industries from out-of-state competition, but also to laws that respond to legitimate local concerns by discriminating arbitrarily against interstate trade")). In *Hunt*, the Supreme Court struck down an Alabama law that imposed fees on the deposit of out-of-state hazardous waste (but not in-state hazardous waste) in an in-state commercial landfill, classifying the law as a facial violation of the Commerce Clause. 504 U.S. at 336–37; *see Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93, 98–99 (1994) (invalidating protectionist surcharge imposed on solid waste trucked from out of state destined for in-state landfill). However, unlike these protectionist circumstances, the circumstances here involve a

---

to certain standards. 598 U.S. at 365. The law did not discriminate based on the state or country of origin of the pork, but the impact of the law was felt predominantly by producers operating outside of California, most if not all of whom want to access California's enormous marketplace. *Id.* at 367. The Supreme Court affirmed the dismissal of the case at the pleading stage for lack of any plausible inference of a discriminatory/protectionist purpose or effect. *Id.* at 368, 391.

neutral regulation that applies regardless of the state of origin of those passengers arriving after exhaustion of the 1,000-person limitation. Additionally, the supposed preference afforded to land-based travelers is not one that is conditioned on the state or national citizenship of land-based travelers.[29]

The burdens and benefits of Bar Harbor's Ordinance do not discriminate based on the interstate or international character of those persons seeking to participate in the local economy. The burden is not imposed because of the interstate nature of the traffic but rather because of various features of that traffic, already discussed, that hamper the experience of local welfare. Like Californians' decision to prohibit traffic in certain food products produced under locally disfavored conditions, *Nat'l Pork Producers Council*, 598 U.S. at 363, Bar Harbor's voters have decided to regulate traffic in persons based on that traffic's distinctive contribution to locally disfavored conditions. Doing so, they have not advanced any discernable local commercial interest. In fact, a primary consequence of the Ordinance is to frustrate local commercial interests.

Nor have the voters of Bar Harbor engaged in a parochial or isolationist exercise. They have, instead, engaged in the exercise of imposing a restriction based on their first-hand experience of the relative deleterious impact of high-volume disembarkations at the waterfront while remaining open to the entire world's visitation. In both purpose and effect, they have acted only to limit the extent to which Bar Harbor must be victim to its

---

[29] Another oft-cited precedent under the discrimination heading is *Hughes v. Oklahoma*, 441 U.S. 322 (1979), in which the Supreme Court invalidated a state law that prohibited the out-of-state sale of locally grown minnows, effectively hoarding them for local purchase. *Id.* at 336–37. This case is unlike *Hughes*. Bar Harbor is not hoarding local resources for local consumption. Bar Harbor is open to global traffic.

own success, while continuing to welcome travelers from every corner of the world.  These on-the-ground realities are quite unlike the isolationist and protectionist circumstances discussed in the expansive corpus of dormant Commerce Clause jurisprudence.

Plaintiffs and Plaintiff-Intervenor persist by arguing that the Ordinance is discriminatory and protectionist because it has the effect of favoring hotels and other land-based overnight accommodations.  They explain that cruise lines are in competition with land-based accommodations because they are competing for the patronage of travelers seeking to visit a particular destination.  Pl.-Int.'s Br. at 35–36; Pls.' Br. at 28, Pl.-Int.'s Reply Br. at 27–28 (ECF No. 199).  However, the Ordinance is not drawn to effectuate an advantage for local hoteliers, and I do not find that the Ordinance in fact produces such a result.[30]  I have no evidence from which to draw the conclusion other than the testimony of former or current cruise line executives who stated that cruise lines compete in the hospitality sector against land-based accommodations for the consumer's discretionary travel dollar.  As interesting as the testimony was, it was reductionist in the extreme.  The same comparison might be drawn between two non-Californian producers of pork products seeking to place their products in California stores, where one complies with California law and the other does not.  Or we might compare a non-Californian producer of pork products with a Californian producer of beef products.  In either example, the producers compete for dollars directed toward meat consumption, yet that obvious point did not

---

[30] Plaintiff-Intervenor also argues that the Ordinance is protectionist because reduced waterfront traffic will enable the Town to collect more paid parking revenue and because Mr. Sidman stated that he preferred smaller ships with their more well-to-do passengers.  Pl.-Int.'s Br. at 26.  The paid parking contention is a straw grasp and as such does not warrant serious consideration.  As for Mr. Sidman's personal opinion about passengers arriving on smaller ships, there is no evidence to support a finding that his opinion informed the public's assessment of the Ordinance's merits or that his opinion is "protectionist" in nature.

inform the Supreme Court's evaluation of the merits in *National Pork Producers Council*.
I can see no reason why it should control here. Reducing the constitutional inquiry so that
discrimination is found and heightened standards are imposed whenever one product or
service is impacted by a regulation but a competing product or service is not is a recipe for
widescale elimination of state and local regulations impacting the provision of goods and
services.[31]

### c.   Arteries of Commerce

Finally, the negative command of the Commerce Clause means that state and local
governments have restricted power to issue legislation or regulations that serve to slow or
obstruct the flow of commerce. *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2089–90
(2018). Obstructions that are protectionist in nature are routinely struck down, as discussed
in the preceding section. Like the concern over protectionist measures that stack the deck
in favor of in-state economic interests, the concern for the health of the Nation's arteries
ensures that the Nation avoids economic Balkanization, meaning the isolation of
neighboring states into separate economic units. *Id.* at 2089. Unlike discriminatory
scenarios, classic "free-flow" commerce cases are cases in which a state enacts a law
evenhandedly to regulate in-state economic activity (*e.g.*, trucking), but does so in a manner
that prevents operation of the enterprise within the enacting state according to a standard
observed in neighboring or surrounding states, effectively halting interstate transportation

---

[31] The argument also disregards the fact that travelers staying in hotels are dispersed throughout the Town
and Mount Desert Island. They do not impact the waterfront the same way that cruise lines and their
passengers do. Many land-based tourists intent upon visiting Acadia National Park may well avoid Bar
Harbor's waterfront (and its downtown) for the same reason that local citizens do.

through that state.  *See Kassel v. Consolidated Freightways Corporation of Delaware*, 450 U.S. 662, 671 (1981) (invalidating Iowa law barring trucks longer than 60 feet); *S. Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761 (1945) (invalidating state law that prohibited the operation of interstate trains having more than a certain number of railroad cars).  Less common, but similarly concerning cases arise out of a state's creation of a monopolistic enterprise that prohibits competition.  *See*, *e.g.*, *Buck v. Kuykendall*, 267 U.S. 307, 315–16 (1925) (invalidating state law prohibiting common carriers from using highways to carry persons between Seattle, Washington and Portland, Oregon without first obtaining a certificate of public convenience and necessity from the State of Washington, where issuance of a certificate to one carrier for purposes of a given route precluded issuance of a certificate to another carrier for the same route).  The Ordinance does not fit into either category.

Plaintiffs argue that the Ordinance clogs "the arteries of commerce" by impeding "the ability of large cruise ships to move persons from port to port according to itineraries that are interstate and frequently international."  Pls.' Br. at 26.  They emphasize that cruise lines are engaged in the transportation of persons free to travel as they see fit.  *Id.* at 26–27.  Plaintiff-Intervenors observe that the Commerce Clause exists in part to ensure open access to the facilities of interstate traffic and the free flow of persons and property without undue restraint.  Pl.-Int.'s Br. at 19–23.

The record in this case demonstrates that the Ordinance does indeed stem the flow of interstate commercial activity by reducing the daily volume of persons disembarked into Bar Harbor from cruise ships.  However, the mere fact that a state or local law impedes the

free flow of commerce does not result in an automatic finding of invalidity. "State laws that 'regulat[e] even-handedly to effectuate a legitimate local public interest . . . will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Wayfair*, 138 S. Ct. at 2091 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). The burden-benefit calculus recognizes that, "in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it." *S. Pac. Co.*, 325 U.S. at 767.[32] When considering whether local regulation comes within the residuum of state power, courts may consider factors such as whether the matter regulated is a localized concern, the extent to which the regulation interferes with national commerce, and the incentive at the national level to attempt to regulate what would amount to multifarious and diverse local concerns. *Id.*; *Duckworth v. Arkansas*, 314 U.S. 390, 394 (1941); *see also Sproles v. Binford*, 286 U.S. 374, 390 (1932) (recognizing "the established principle that in matters admitting of diversity of treatment, according to the special requirements of local conditions, the states may act within their respective jurisdictions until Congress sees fit to act."). "But ever since *Gibbons v. Ogden*, [22 U.S. (9 Wheat.) 1 (1824)], the states have

---

[32] *See National Pork Producers Council*, 598 U.S. at 375 (recognizing "the usual legislative power of a State to act upon persons and property within the limits of its own territory, a feature of our constitutional order that allows different communities to live with different local standards" (internal quotation marks and citation omitted)); *Maine v. Taylor*, 477 U.S. 131, 151 (1986) ("The Commerce Clause significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce, but it does not elevate free trade above all other values. As long as a State does not needlessly obstruct interstate trade or attempt to place itself in a position of economic isolation, it retains broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources." (internal quotation marks omitted)).

not been deemed to have authority to impede substantially the free flow of commerce from state to state, or to regulate those phases of the national commerce which, because of the need of national uniformity, demand that their regulation, if any, be prescribed by a single authority." *S. Pac. Co.*, 325 U.S. at 767.[33]

I reject the contention that the question of a local municipality's relative tolerance of cruise tourism based on local conditions is an aspect of the national commerce that requires the national uniformity that only Congress can provide. There are a great many varieties of port facilities and communities that house them. Cruise tourism, based on the record before me, is a function of cruise line and local community collaboration.[34] *See*, *e.g.*, Exs. 32 & 161. It has always proceeded on that basis in Bar Harbor. *See*, *e.g.*, Ex. 260 at 1 (Bar Harbor Cruise Tourism Destination Management Plan, "prepared for the use of the Town of Bar Harbor residents, stakeholders, municipal agencies and cruise industry partners"). I have no reason to conclude that it does not proceed on a similar basis elsewhere. The parties are agreed that different municipalities impose a variety of constraints, such as caps and limited cruise ship days, though no party has attempted to canvas the variety of measures employed by domestic municipalities for purposes of this litigation.[35] In any event, this case illustrates that the impact of cruise tourism on local

---

[33] *Gibbons v. Ogden* is a formative Commerce Clause decision that struck down a New York enactment that granted one company the exclusive right to navigate coastal waters in vessels powered by steam, which enactment was in direct conflict with the federal government's grant of coasting licenses to other steamboat owners. 22 U.S. at 221.

[34] For example, Rockland has "a very limited number of slots that it allows for ships over a lower berth capacity of 500." Ex. 195 at 56. Rockland permits only "six bookings per year per season unless" it "authorize[s] a waiver to add any ships beyond that." *Id.*

[35] This phenomenon may well suggest a nationwide interest among cruise tourism communities to impose restrictions. *Cf. Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 128 (1978) ("The evil that appellants

53

living conditions is a hyperlocal concern that is not well suited to a one-size-fits-all regulatory approach at the federal level.

Furthermore, Bar Harbor is regulating a "matter[ ] of local concern" in both "character and effect." *S. Pac. Co.*, 325 U.S. at 767. The history of cruise tourism at Bar Harbor demonstrates the unique challenges that cruise tourism imposes on Bar Harbor. These challenges gave rise to a democratic effort, where the voters weighed the relevant local commercial and noncommercial interests and ultimately adopted the Ordinance. Modern-day, board-directed cruise practices (particularly those of foreign-flagged cruise lines[36]) do not allow much room for smaller municipalities to manage their local experiences based on daily limits on the number of passengers coming ashore. Cruise lines are utilizing ever larger vessels to achieve unprecedented economies of scale, principally for shareholder profit. At the same time, cruise lines will not call at a port unless the entire complement of passengers is permitted to come ashore.[37] These characteristics of cruise tourism make it unworthy of overly solicitous judicial action that would negate an exercise in democratic self-determination that is better informed of existing, localized conditions. Nothing in the Constitution dictates municipal obeisance to the economies of scale of cruise tourism. Nor, as far as I can tell, does the dormant Commerce Clause legislate adherence

---

perceive in this litigation is not that the several States will enact differing regulations, but rather that they will all conclude that divestiture provisions are warranted.").

[36] The representative voices of cruise tourism offered at trial, like Plaintiffs' and Plaintiff-Intervenor's briefing, did not speak to a need for moderation but rather have thematically favored catering to the interests of the cruise lines with the very largest capacity vessels. Those cruise lines happen to conduct their trade with foreign-flagged vessels.

[37] *But see* Ex. 193 at 8–9. Chris Martin, Director of Port Operations for Holland America, testified at his deposition that Holland America stops at ports that limit the number of passenger disembarkations, such as in Bergen, Norway. *Id.*

to neoclassical liberalism any more than the Due Process Clause compels observation of Mr. Herbert Spencer's Social Statics.

In the absence of federal or state law dictating the outcome, reasonable citizens at the municipal level will come to different conclusions about the proper balance between unabated cruise tourism and relative calm, and the outcome of their democratic process is the best measure of the polity's tolerance in light of local conditions. For this reason, I conclude that non-discriminatory and non-monopolistic state laws and local regulations that have the impact of restraining outsize cruise tourism do not deserve per se invalidation or a heightened standard of review through which judges rather than citizens become the final arbiters of the terms by which cruise tourism will be conducted in every port in the Nation. In other words, "[c]ompelling reasons justify treating these laws differently from laws favoring particular private businesses over their competitors." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 342 (2007) (relying, in part, on *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) ("The States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons" (internal quotation marks omitted))).

### d. Burdens versus benefits

Although the Bar Harbor Ordinance "regulates even-handedly to effectuate a legitimate local public interest" while imposing "incidental" effects on commerce, it remains necessary to determine whether "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. Under this

standard, "the extent of the burden that will be tolerated will . . . depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.* But even so, "[p]reventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of 'extreme delicacy,' something courts should do only 'where the infraction is clear.'" *Nat'l Pork Producers Council*, 598 U.S. at 390 (quoting *Conway v. Taylor's Executor*, 66 U.S. (1 Black) 603 (1862)).

The parties disagree as to whether the Ordinance's burdens on commerce are clearly excessive in comparison to the local benefits. Plaintiffs and Plaintiff-Intervenor view the Ordinance's benefits as purely speculative and Bar Harbor's interest in reducing cruise tourism as illegitimate. On the other hand, Bar Harbor and Mr. Sidman characterize the Ordinance as imposing a burden on the cruise industry's business model rather than on interstate commerce. To the extent that the Ordinance does affect commerce, they argue that its burdens are not clearly excessive in relation to the local benefits.

I first consider the Ordinance's burdens on commerce. There is no doubt that the Ordinance will have some effect on commerce since almost 80% of the cruise ships that presently visit Bar Harbor have a lower berth capacity in excess of 1,000 and are thus unlikely to call at Bar Harbor.[38] But it is impossible to predict the Ordinance's precise consequences. The Ordinance continues to permit the daily disembarkation of persons traveling by cruise ship in large numbers, even if those numbers are inadequate to

---

[38] As of December 2022, 107 of the 134 cruise vessel calls for the 2023 cruise season were scheduled for vessels that have a lower birth capacity in excess of 1,000. Ex. 8.

accommodate most of the cruise ships plying the Atlantic seaboard these days.  Milton
Friedman and the Chicago school would recoil at the claim made by business interests that
the free market economy of private actors cannot adapt to the limitation at the Bar Harbor
waterfront, and who instead seek snug harbor behind a constitutional challenge that strikes
me as not well fitted to the facts on the ground.  Given the attractiveness of the port of Bar
Harbor, it is to be expected that cruise enthusiasts intent of reaching Bar Harbor will find
a cruise line to carry them there.  Some cruise lines already offer suitable vessels with Bar
Harbor itineraries.  Other cruise lines no doubt will adjust to serve the emerging market
charted by municipalities interested in following Bar Harbor's example by accommodating
cruise tourism subject to more constituency-pleasing passenger caps (something that is
unlikely to develop so long as cruise lines and their proxies threaten constitutional litigation
over limited access).  *See id.* at 385 (plurality opinion) ("But from all anyone can tell, *other*
out-of-state competitors seeking to enhance their own profits may choose to modify their
existing operations or create new ones to fill the void.").

Insofar as the Ordinance causes visitors to travel to Bar Harbor through other means,
like smaller cruise ships, the Ordinance is best described as burdening the cruise line
industry's business model, rather than interstate commerce.  *See Exxon Corp. v. Governor
of Maryland*, 437 U.S. 117, 127 (1978) (reasoning that Maryland's law prohibiting
petroleum producers from operating retail gas stations in-state did not unduly burden
commerce because "interstate commerce is not subjected to an impermissible burden
simply because an otherwise valid regulation causes some business to shift from one
interstate supplier to another" when "there [was] no reason to assume that their share of

Add. 057

the entire supply [would] not be promptly replaced" by other companies).  Unfortunately for Plaintiffs and Plaintiff-Intervenor, the Commerce Clause does not protect the cruise line industry's "particular structure [and] methods of operation."  *Id.*  While the Ordinance will likely cause visitation to Bar Harbor to decrease, thereby affecting interstate commerce, it is impossible to know exactly how many fewer visitors will travel to Bar Harbor.  Thus, I conclude that the Ordinance will impose an uncertain burden on interstate commerce.

I next consider the Ordinance's local benefits.  I reject Plaintiffs and Plaintiff-Intervenor's arguments that Bar Harbor's proffered interests in lessening congestion and conserving municipal resources are illegitimate.[39]  Courts have held that similar local interests are legitimate in a variety of contexts.  *See*, *e.g.*, *Maine v. Taylor*, 477 U.S. 131, 151 (1986) ("The Commerce Clause significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce, but it does not elevate free trade above all other values" [because] States "retain[ ] broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources.");  *Memphis v. Greene*, 451 U.S. 100, 126–27 (1981) (describing a city's "decision to reduce the flow of traffic" as "legitimate" and the "residential interest in comparative tranquility" as "unquestionably legitimate" in analyzing a claim under the Thirteenth Amendment);[40]

---

[39] On this point, they rely on *Young v. Coloma-Agaran*, No. 1:00-CV-00774-HG-BMK, 2001 WL 1677259, at *11 (D. Haw. Dec. 27, 2001) (stating that "[e]liminating the presence of tourists from the Bay is not a proper reason for the Ban as it directly contradicts the very purpose of the Commerce Clause"), *aff'd*, 340 F.3d 1053 (9th Cir. 2003).  The district court cited no authority for this proposition, and while the Ninth Circuit affirmed the district court, the Ninth Circuit decided the case on alternative grounds and thus did not opine on the Commerce Clause.

*Tart v. Massachusetts*, 949 F.2d 490, 501 (1st Cir. 1991) (discussing the legitimate local interest in promoting public health).  Insofar as the Ordinance reduces the number of persons who visit Bar Harbor by cruise ship, the Ordinance commensurably advances Bar Harbor's local interest in lessening congestion—particularly at the waterfront, over which the cruise industry will otherwise domineer.  This noneconomic benefit, while not precisely measurable, is both real and reasonably well calibrated to ameliorate the particularized excesses of modern cruise tourism and how it interfaces with Bar Harbor's waterfront.

In short, the Ordinance imposes some burden on the "free flow" of commerce, but that burden is impossible to quantify.  The 1,000-person limitation is a significant downshift from the passenger caps previously observed in Bar Harbor.  But that downshift also promotes noneconomic interests.[41]  Bar Harbor with the MOA passenger limits and Bar Harbor with the 1,000 daily passenger limit are significantly different places.  The voters of Bar Harbor "weigh[ed] the relevant 'political and economic' costs and benefits for themselves," and the voters evidently decided that the noneconomic benefits of the Ordinance favored adopting it.  *Nat'l Pork Producers Council*, 598 U.S. at 382 (plurality opinion) (quoting *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 279 (1978)).  Considering the

---

[40] The circumstances in *Greene* gave rise to a lively dissent based on the observation that the interest in comparative tranquility can be a pretext for walling off white communities from communities of color. *Greene*, 451 U.S. at 136 (Marshall, J., dissenting).  Unlike *Greene*, this case has no undertones of invidious discrimination.

[41] Plaintiffs and Plaintiff-Intervenor see the impact on the movement of vessels and persons as burdens so weighty as to compel per se invalidation of the Ordinance.  Obviously, I have not viewed it the same way. The lead authority they cite is *Edwards v. California*, 314 U.S. 160 (1941), in which California attempted to minimize the extent to which it would bear the burden of indigent migration secondary to the Dust Bowl—a "grave and perplexing social and economic dislocation" (i.e., the greatest natural disaster of our Nation's history), *id.* at 173.  The analogy between Dust Bowl migration and cruise tourism is strained, to say the least.

intimate "nature of the local interest[s]" involved in Bar Harbor's decision to limit cruise tourism, I cannot say that the Ordinance imposes a burden on commerce that "is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142.[42]

## CONCLUSION

For the reasons set forth above, I conclude as follows:

The challenged Bar Harbor Ordinance, Bar Harbor Code Chapter 125, Article VII, Section 125-77, is a lawful exercise of home rule authority under the Maine Constitution and is not preempted by state law.

The Ordinance does not violate the Due Process Clause or the Commerce Clause of the United States Constitution.

The Ordinance is in part conflict preempted under the Supremacy Clause. Specifically, the 1,000-person cap is conflict preempted insofar as seafarer shore access is concerned. But insofar as cruise ship passengers are concerned, the 1,000-person cap survives challenge under the Supremacy Clause.

Based on these legal conclusions, judgment will enter for the Town of Bar Harbor on Counts II and III of Plaintiffs' Complaint and on Counts II, III, and IV of Plaintiff-Intervenor's Complaint in Intervention. As for the Supremacy Clause claims stated in the first counts of the Plaintiffs' Complaint and the Plaintiff-Intervenor's Complaint in Intervention, judgment will enter IN PART for the Town of Bar Harbor, as Plaintiffs and

---

[42] *Cf. Nat'l Pork Producers Council*, 598 U.S. at 382 (plurality opinion) (describing that weighing out-of-state producers' costs of compliance against the moral and health interests of California's residents as "a task no court is equipped to undertake" and stating that in "a functioning democracy, policy choices like these usually belong to the people and their elected representatives").

Add. 060

Plaintiff-Intervenor fail to demonstrate cause to invalidate the Ordinance insofar as it operates as a restriction on passenger disembarkations, and IN PART for Plaintiffs and Plaintiff-Intervenor, as they have demonstrated that the Ordinance is partially preempted in relation to seafarer shore access, although it is by no means self-evident that any material alteration of the legal relationship of the parties has thereby been achieved.

SO ORDERED.

Dated this 1st day of March, 2024.

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, et al., Plaintiffs, | ) ) ) ) ) | |
| PENOBSCOT BAY & RIVER PILOTS ASSOCIATION, Intervenor-Plaintiff | ) ) ) ) | |
| v. | ) ) | Civil No. 1:22-cv-00416-LEW |
| TOWN OF BAR HARBOR, Defendant, | ) ) ) ) | |
| CHARLES SIDMAN Intervenor-Defendant | ) ) ) | |

JUDGMENT

Pursuant to the Amended Decision and Order entered by U.S. District Judge Lance E. Walker on March 1, 2024,

JUDGMENT is hereby entered IN PART for the Defendant, Town of Bar Harbor, and IN PART for Plaintiffs, Association to Preserve and Protect Local Livelihoods, B.H. Piers LLC, Golden Anchor LC, B.H.W.W. LLC, Delray Explorer Hull 495 LLC, Delray Explorer Hull 493 LLC, Acadia Explorer 492 LLC and Plaintiff Intervenor, Penobscot Bay and River Pilots Association, as to Count I.

JUDGMENT is hereby entered for Defendant, Town of Bar Harbor, on Counts II and III of Plaintiffs' Complaint and on Counts II, III, and IV of Plaintiff-Intervenor's Complaint in Intervention.

Add. 062

CHRISTA K. BERRY
CLERK


By:     /s/ Meghan York
        Deputy Clerk


Dated: March 1, 2024

United States Code Annotated
   Constitution of the United States
      Annotated
         Article I. The Congress

U.S.C.A. Const. Art. I § 8, cl. 3

Section 8, Clause 3. Regulation of Commerce

Currentness

The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes;

U.S.C.A. Const. Art. I § 8, cl. 3, USCA CONST Art. I § 8, cl. 3
Current through P.L. 118-70. Some statute sections may be more current, see credits for details.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Constitution of the United States
     Annotated
       Article VI. Debts Validated--Supreme Law of Land--Oath of Office

U.S.C.A. Const. Art. VI cl. 2

Clause 2. Supreme Law of Land

Currentness

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S.C.A. Const. Art. VI cl. 2, USCA CONST Art. VI cl. 2
Current through P.L. 118-70. Some statute sections may be more current, see credits for details.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Title 6. Domestic Security (Refs & Annos)
      Chapter 1. Homeland Security Organization
         Subchapter IV. Border, Maritime, and Transportation Security (Refs & Annos)
            Part B. U.S. Customs and Border Protection (Refs & Annos)

6 U.S.C.A. § 211

§ 211. Establishment of U.S. Customs and Border Protection;
Commissioner, Deputy Commissioner, and operational offices

Effective: March 15, 2022
Currentness

**(a) In general**

There is established in the Department an agency to be known as U.S. Customs and Border Protection.

**(b) Commissioner of U.S. Customs and Border Protection**

**(1) In general**

There shall be at the head of U.S. Customs and Border Protection a Commissioner of U.S. Customs and Border Protection (in this section referred to as the "Commissioner").

**(2) Committee referral**

As an exercise of the rulemaking power of the Senate, any nomination for the Commissioner submitted to the Senate for confirmation, and referred to a committee, shall be referred to the Committee on Finance.

**(c) Duties**

The Commissioner shall--

**(1)** coordinate and integrate the security, trade facilitation, and trade enforcement functions of U.S. Customs and Border Protection;

**(2)** ensure the interdiction of persons and goods illegally entering or exiting the United States;

**(3)** facilitate and expedite the flow of legitimate travelers and trade;

**(4)** direct and administer the commercial operations of U.S. Customs and Border Protection, and the enforcement of the customs and trade laws of the United States;

**(5)** detect, respond to, and interdict terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States, in cases in which such persons are entering, or have recently entered, the United States;

**(6)** safeguard the borders of the United States to protect against the entry of dangerous goods;

**(7)** ensure the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland;

**(8)** in coordination with U.S. Immigration and Customs Enforcement and United States Citizenship and Immigration Services, enforce and administer all immigration laws, as such term is defined in paragraph (17) of section 1101(a) of Title 8, including--

**(A)** the inspection, processing, and admission of persons who seek to enter or depart the United States; and

**(B)** the detection, interdiction, removal, departure from the United States, short-term detention, and transfer of persons unlawfully entering, or who have recently unlawfully entered, the United States;

**(9)** develop and implement screening and targeting capabilities, including the screening, reviewing, identifying, and prioritizing of passengers and cargo across all international modes of transportation, both inbound and outbound;

**(10)** in coordination with the Secretary, deploy technology to collect the data necessary for the Secretary to administer the biometric entry and exit data system pursuant to section 1365b of Title 8;

**(11)** enforce and administer the laws relating to agricultural import and entry inspection referred to in section 231 of this title;

**(12)** in coordination with the Under Secretary for Management of the Department, ensure U.S. Customs and Border Protection complies with Federal law, the Federal Acquisition Regulation, and the Department's acquisition management directives for major acquisition programs of U.S. Customs and Border Protection;

**(13)** ensure that the policies and regulations of U.S. Customs and Border Protection are consistent with the obligations of the United States pursuant to international agreements;

**(14)** enforce and administer--

    **(A)** the Container Security Initiative program under section 205 of the Security and Accountability for Every Port Act of 2006 (6 U.S.C. 945); and

    **(B)** the Customs-Trade Partnership Against Terrorism program under subtitle B of title II of such Act (6 U.S.C. 961 et seq.);

**(15)** conduct polygraph examinations in accordance with section 221(1) of this title;

**(16)** establish the standard operating procedures described in subsection (k);

**(17)** carry out the training required under subsection (l);

**(18)** carry out section 218 of this title, relating to the issuance of Asia-Pacific Economic Cooperation Business Travel Cards; and

**(19)** carry out other duties and powers prescribed by law or delegated by the Secretary.

**(d) Deputy Commissioner**

There shall be in U.S. Customs and Border Protection a Deputy Commissioner who shall assist the Commissioner in the management of U.S. Customs and Border Protection.

**(e) U.S. Border Patrol**

**(1) In general**

There is established in U.S. Customs and Border Protection the U.S. Border Patrol.

**(2) Chief**

There shall be at the head of the U.S. Border Patrol a Chief, who shall--

**(A)** be at the level of Executive Assistant Commissioner within U.S. Customs and Border Protection; and

**(B)** report to the Commissioner.

**(3) Duties**

The U.S. Border Patrol shall--

**(A)** serve as the law enforcement office of U.S. Customs and Border Protection with primary responsibility for interdicting persons attempting to illegally enter or exit the United States or

goods being illegally imported into or exported from the United States at a place other than a designated port of entry;

**(B)** deter and prevent the illegal entry of terrorists, terrorist weapons, persons, and contraband; and

**(C)** carry out other duties and powers prescribed by the Commissioner.

## (f) Air and Marine Operations

### (1) In general

There is established in U.S. Customs and Border Protection an office known as Air and Marine Operations.

### (2) Executive Assistant Commissioner

There shall be at the head of Air and Marine Operations an Executive Assistant Commissioner, who shall report to the Commissioner.

### (3) Duties

Air and Marine Operations shall--

**(A)** serve as the law enforcement office within U.S. Customs and Border Protection with primary responsibility to detect, interdict, and prevent acts of terrorism and the unlawful movement of people, illicit drugs, and other contraband across the borders of the United States in the air and maritime environment;

**(B)** conduct joint aviation and marine operations with U.S. Immigration and Customs Enforcement;

**(C)** conduct aviation and marine operations with international, Federal, State, and local law enforcement agencies, as appropriate;

**(D)** administer the Air and Marine Operations Center established under paragraph (4); and

**(E)** carry out other duties and powers prescribed by the Commissioner.

**(4) Air and Marine Operations Center**

**(A) In general**

There is established in Air and Marine Operations an Air and Marine Operations Center.

**(B) Executive Director**

There shall be at the head of the Air and Marine Operations Center an Executive Director, who shall report to the Executive Assistant Commissioner of Air and Marine Operations.

**(C) Duties**

The Air and Marine Operations Center shall--

**(i)** manage the air and maritime domain awareness of the Department, as directed by the Secretary;

**(ii)** monitor and coordinate the airspace for unmanned aerial systems operations of Air and Marine Operations in U.S. Customs and Border Protection;

**(iii)** detect, identify, and coordinate a response to threats to national security in the air domain, in coordination with other appropriate agencies, as determined by the Executive Assistant Commissioner;

**(iv)** provide aviation and marine support to other Federal, State, tribal, and local agencies; and

**(v)** carry out other duties and powers prescribed by the Executive Assistant Commissioner.

## (g) Office of Field Operations

### (1) In general

There is established in U.S. Customs and Border Protection an Office of Field Operations.

### (2) Executive Assistant Commissioner

There shall be at the head of the Office of Field Operations an Executive Assistant Commissioner, who shall report to the Commissioner.

### (3) Duties

The Office of Field Operations shall coordinate the enforcement activities of U.S. Customs and Border Protection at United States air, land, and sea ports of entry to--

**(A)** deter and prevent terrorists and terrorist weapons from entering the United States at such ports of entry;

**(B)** conduct inspections at such ports of entry to safeguard the United States from terrorism and illegal entry of persons;

**(C)** prevent illicit drugs, agricultural pests, and contraband from entering the United States;

**(D)** in coordination with the Commissioner, facilitate and expedite the flow of legitimate travelers and trade;

**(E)** administer the National Targeting Center established under paragraph (4);

**(F)** coordinate with the Executive Assistant Commissioner for the Office of Trade with respect to the trade facilitation and trade enforcement activities of U.S. Customs and Border Protection; and

**(G)** carry out other duties and powers prescribed by the Commissioner.

**(4) National Targeting Center**

**(A) In general**

There is established in the Office of Field Operations a National Targeting Center.

**(B) Executive Director**

There shall be at the head of the National Targeting Center an Executive Director, who shall report to the Executive Assistant Commissioner of the Office of Field Operations.

**(C) Duties**

The National Targeting Center shall--

**(i)** serve as the primary forum for targeting operations within U.S. Customs and Border Protection to collect and analyze traveler and cargo information in advance of arrival in the United States to identify and address security risks and strengthen trade enforcement;

**(ii)** identify, review, and target travelers and cargo for examination;

**(iii)** coordinate the examination of entry and exit of travelers and cargo;

**(iv)** develop and conduct commercial risk assessment targeting with respect to cargo destined for the United States;

**(v)** coordinate with the Transportation Security Administration, as appropriate;

**(vi)** issue Trade Alerts pursuant to section 4318(b) of Title 19; and

**(vii)** carry out other duties and powers prescribed by the Executive Assistant Commissioner.

## (5) Annual report on staffing

### (A) In general

Not later than 30 days after February 24, 2016, and annually thereafter, the Executive Assistant Commissioner shall submit to the Committee on Homeland Security and the Committee on Ways and Means of the House of Representatives and the Committee on Homeland Security and Governmental Affairs and the Committee on Finance of the Senate a report on the staffing model for the Office of Field Operations, including information on how many supervisors, front-line U.S. Customs and Border Protection officers, and support personnel are assigned to each Field Office and port of entry.

### (B) Form

The report required under subparagraph (A) shall, to the greatest extent practicable, be submitted in unclassified form, but may be submitted in classified form, if the Executive Assistant Commissioner determines that such is appropriate and informs the Committee on Homeland Security and the Committee on Ways and Means of the House of Representatives and the Committee on Homeland Security and Governmental Affairs and the Committee on Finance of the Senate of the reasoning for such.

## (h) Office of Intelligence

**(1) In general**

There is established in U.S. Customs and Border Protection an Office of Intelligence.

**(2) Assistant Commissioner**

There shall be at the head of the Office of Intelligence an Assistant Commissioner, who shall report to the Commissioner.

**(3) Duties**

The Office of Intelligence shall--

**(A)** develop, provide, coordinate, and implement intelligence capabilities into a cohesive intelligence enterprise to support the execution of the duties and responsibilities of U.S. Customs and Border Protection;

**(B)** manage the counterintelligence operations of U.S. Customs and Border Protection;

**(C)** establish, in coordination with the Chief Intelligence Officer of the Department, as appropriate, intelligence-sharing relationships with Federal, State, local, and tribal agencies and intelligence agencies;

**(D)** conduct risk-based covert testing of U.S. Customs and Border Protection operations, including for nuclear and radiological risks; and

**(E)** carry out other duties and powers prescribed by the Commissioner.

**(i) Office of International Affairs**

**(1) In general**

There is established in U.S. Customs and Border Protection an Office of International Affairs.

**(2) Assistant Commissioner**

There shall be at the head of the Office of International Affairs an Assistant Commissioner, who shall report to the Commissioner.

**(3) Duties**

The Office of International Affairs, in collaboration with the Office of Policy of the Department, shall--

**(A)** coordinate and support U.S. Customs and Border Protection's foreign initiatives, policies, programs, and activities;

**(B)** coordinate and support U.S. Customs and Border Protection's personnel stationed abroad;

**(C)** maintain partnerships and information-sharing agreements and arrangements with foreign governments, international organizations, and United States agencies in support of U.S. Customs and Border Protection's duties and responsibilities;

**(D)** provide necessary capacity building, training, and assistance to foreign customs and border control agencies to strengthen border, global supply chain, and travel security, as appropriate;

**(E)** coordinate mission support services to sustain U.S. Customs and Border Protection's global activities;

**(F)** coordinate with customs authorities of foreign countries with respect to trade facilitation and trade enforcement;

**(G)** coordinate U.S. Customs and Border Protection's engagement in international negotiations;

**(H)** advise the Commissioner with respect to matters arising in the World Customs Organization and other international organizations as such matters relate to the policies and procedures of U.S. Customs and Border Protection;

**(I)** advise the Commissioner regarding international agreements to which the United States is a party as such agreements relate to the policies and regulations of U.S. Customs and Border Protection; and

**(J)** carry out other duties and powers prescribed by the Commissioner.

## (j) Office of Professional Responsibility

### (1) In general

There is established in U.S. Customs and Border Protection an Office of Professional Responsibility.

### (2) Assistant Commissioner

There shall be at the head of the Office of Professional Responsibility an Assistant Commissioner, who shall report to the Commissioner.

### (3) Duties

The Office of Professional Responsibility shall--

**(A)** investigate criminal and administrative matters and misconduct by officers, agents, and other employees of U.S. Customs and Border Protection;

**(B)** manage integrity-related programs and policies of U.S. Customs and Border Protection;

**(C)** conduct research and analysis regarding misconduct of officers, agents, and other employees of U.S. Customs and Border Protection; and

**(D)** carry out other duties and powers prescribed by the Commissioner.

## (k) Standard operating procedures

### (1) In general

The Commissioner shall establish--

**(A)** standard operating procedures for searching, reviewing, retaining, and sharing information contained in communication, electronic, or digital devices encountered by U.S. Customs and Border Protection personnel at United States ports of entry;

**(B)** standard use of force procedures that officers and agents of U.S. Customs and Border Protection may employ in the execution of their duties, including the use of deadly force;

**(C)** uniform, standardized, and publicly-available procedures for processing and investigating complaints against officers, agents, and employees of U.S. Customs and Border Protection for violations of professional conduct, including the timely disposition of complaints and a written notification to the complainant of the status or outcome, as appropriate, of the related investigation, in accordance with section 552a of Title 5 (commonly referred to as the "Privacy Act" or the "Privacy Act of 1974");

**(D)** an internal, uniform reporting mechanism regarding incidents involving the use of deadly force by an officer or agent of U.S. Customs and Border Protection, including an evaluation of the degree to which the procedures required under subparagraph (B) were followed; and

**(E)** standard operating procedures, acting through the Executive Assistant Commissioner for Air and Marine Operations and in coordination with the Office for Civil Rights and Civil Liberties and the Office of Privacy of the Department, to provide command, control, communication, surveillance, and reconnaissance assistance through the use of unmanned aerial systems, including the establishment of--

**(i)** a process for other Federal, State, and local law enforcement agencies to submit mission requests;

**(ii)** a formal procedure to determine whether to approve or deny such a mission request;

**(iii)** a formal procedure to determine how such mission requests are prioritized and coordinated; and

**(iv)** a process regarding the protection and privacy of data and images collected by U.S. Customs and Border Protection through the use of unmanned aerial systems.

**(2) Requirements regarding certain notifications**

The standard operating procedures established pursuant to subparagraph (A) of paragraph (1) shall require--

**(A)** in the case of a search of information conducted on an electronic device by U.S. Customs and Border Protection personnel, the Commissioner to notify the individual subject to such search of the purpose and authority for such search, and how such individual may obtain information on reporting concerns about such search; and

**(B)** in the case of information collected by U.S. Customs and Border Protection through a search of an electronic device, if such information is transmitted to another Federal agency for subject matter assistance, translation, or decryption, the Commissioner to notify the individual subject to such search of such transmission.

**(3) Exceptions**

The Commissioner may withhold the notifications required under paragraphs (1)(C) and (2) if the Commissioner determines, in the sole and unreviewable discretion of the Commissioner, that such notifications would impair national security, law enforcement, or other operational interests.

**(4) Update and review**

The Commissioner shall review and update every three years the standard operating procedures required under this subsection.

**(5) Audits**

The Inspector General of the Department of Homeland Security shall develop and annually administer, during each of the three calendar years beginning in the calendar year that begins after February 24, 2016, an auditing mechanism to review whether searches of electronic devices at or between United States ports of entry are being conducted in conformity with the standard operating procedures required under subparagraph (A) of paragraph (1). Such audits shall be submitted to the Committee on Homeland Security of the House of Representatives and the Committee on Homeland Security and Governmental Affairs of the Senate and shall include the following:

**(A)** A description of the activities of officers and agents of U.S. Customs and Border Protection with respect to such searches.

**(B)** The number of such searches.

**(C)** The number of instances in which information contained in such devices that were subjected to such searches was retained, copied, shared, or entered in an electronic database.

**(D)** The number of such devices detained as the result of such searches.

**(E)** The number of instances in which information collected from such devices was subjected to such searches and was transmitted to another Federal agency, including whether such transmissions resulted in a prosecution or conviction.

**(6) Requirements regarding other notifications**

The standard use of force procedures established pursuant to subparagraph (B) of paragraph (1) shall require--

(A) in the case of an incident of the use of deadly force by U.S. Customs and Border Protection personnel, the Commissioner to notify the Committee on Homeland Security of the House of Representatives and the Committee on Homeland Security and Governmental Affairs of the Senate; and

(B) the Commissioner to provide to such committees a copy of the evaluation pursuant to subparagraph (D) of such paragraph not later than 30 days after completion of such evaluation.

**(7) Report on unmanned aerial systems**

The Commissioner shall submit to the Committee on Homeland Security of the House of Representatives and the Committee on Homeland Security and Governmental Affairs of the Senate an annual report, for each of the three calendar years beginning in the calendar year that begins after February 24, 2016, that reviews whether the use of unmanned aerial systems is being conducted in conformity with the standard operating procedures required under subparagraph (E) of paragraph (1). Such reports--

(A) shall be submitted with the annual budget of the United States Government submitted by the President under section 1105 of Title 31;

(B) may be submitted in classified form if the Commissioner determines that such is appropriate; and

(C) shall include--

(i) a detailed description of how, where, and for how long data and images collected through the use of unmanned aerial systems by U.S. Customs and Border Protection are collected and stored; and

(ii) a list of Federal, State, and local law enforcement agencies that submitted mission requests in the previous year and the disposition of such requests.

**(l) Training**

The Commissioner shall require all officers and agents of U.S. Customs and Border Protection to participate in a specified amount of continuing education (to be determined by the Commissioner) to maintain an understanding of Federal legal rulings, court decisions, and departmental policies, procedures, and guidelines.

**(m) Short-term detention standards**

**(1) Access to food and water**

The Commissioner shall make every effort to ensure that adequate access to food and water is provided to an individual apprehended and detained at a United States port of entry or between ports of entry as soon as practicable following the time of such apprehension or during subsequent short-term detention.

**(2) Access to information on detainee rights at border patrol processing centers**

**(A) In general**

The Commissioner shall ensure that an individual apprehended by a U.S. Border Patrol agent or an Office of Field Operations officer is provided with information concerning such individual's rights, including the right to contact a representative of such individual's government for purposes of United States treaty obligations.

**(B) Form**

The information referred to in subparagraph (A) may be provided either verbally or in writing, and shall be posted in the detention holding cell in which such individual is being held. The information shall be provided in a language understandable to such individual.

**(3) Short-term detention defined**

In this subsection, the term "short-term detention" means detention in a U.S. Customs and Border Protection processing center for 72 hours or less, before repatriation to a country of nationality or last habitual residence.

**(4) Daytime repatriation**

When practicable, repatriations shall be limited to daylight hours and avoid locations that are determined to have high indices of crime and violence.

**(5) Report on procurement process and standards**

Not later than 180 days after February 24, 2016, the Comptroller General of the United States shall submit to the Committee on Homeland Security of the House of Representatives and the Committee on Homeland Security and Governmental Affairs of the Senate a report on the procurement process and standards of entities with which U.S. Customs and Border Protection has contracts for the transportation and detention of individuals apprehended by agents or officers of U.S. Customs and Border Protection. Such report should also consider the operational efficiency of contracting the transportation and detention of such individuals.

**(6) Report on inspections of short-term custody facilities**

The Commissioner shall--

**(A)** annually inspect all facilities utilized for short-term detention; and

**(B)** make publicly available information collected pursuant to such inspections, including information regarding the requirements under paragraphs (1) and (2) and, where appropriate, issue recommendations to improve the conditions of such facilities.

**(n) Wait times transparency**

**(1) In general**

The Commissioner shall--

**(A)** publish live wait times for travelers entering the United States at the 20 United States airports that support the highest volume of international travel (as determined by available Federal flight data);

**(B)** make information about such wait times available to the public in real time through the U.S. Customs and Border Protection website;

**(C)** submit to the Committee on Homeland Security and the Committee on Ways and Means of the House of Representatives and the Committee on Homeland Security and Governmental Affairs and the Committee on Finance of the Senate, for each of the five calendar years beginning in the calendar year that begins after February 24, 2016, a report that includes compilations of all such wait times and a ranking of such United States airports by wait times; and

**(D)** provide adequate staffing at the U.S. Customs and Border Protection information center to ensure timely access for travelers attempting to submit comments or speak with a representative about their entry experiences.

**(2) Calculation**

The wait times referred to in paragraph (1)(A) shall be determined by calculating the time elapsed between an individual's entry into the U.S. Customs and Border Protection inspection area and such individual's clearance by a U.S. Customs and Border Protection officer.

**(o) Other authorities**

**(1) In general**

The Secretary may establish such other offices or positions of Assistant Commissioners (or other similar officers or officials) as the Secretary determines necessary to carry out the missions, duties, functions, and authorities of U.S. Customs and Border Protection.

**(2) Notification**

If the Secretary exercises the authority provided under paragraph (1), the Secretary shall notify the Committee on Homeland Security and the Committee on Ways and Means of the House of Representatives and the Committee on Homeland Security and Governmental Affairs and the Committee on Finance of the Senate not later than 30 days before exercising such authority.

**(3) Rescue beacons**

Beginning in fiscal year 2019, in carrying out subsection (c)(8), the Commissioner shall purchase, deploy, and maintain not more than 250 self-powering, 9-1-1 cellular relay rescue beacons along the southern border of the United States at locations determined appropriate by the Commissioner to mitigate migrant deaths.

**(p) Reports to Congress**

The Commissioner shall, on and after February 24, 2016, continue to submit to the Committee on Homeland Security and the Committee on Ways and Means of the House of Representatives and the Committee on Homeland Security and Governmental Affairs and the Committee on Finance of the Senate any report required, on the day before February 24, 2016, to be submitted under any provision of law.

**(q) Other Federal agencies**

Nothing in this section may be construed as affecting in any manner the authority, existing on the day before February 24, 2016, of any other Federal agency or component of the Department.

**(r) Definitions**

In this section, the terms "commercial operations", "customs and trade laws of the United States", "trade enforcement", and "trade facilitation" have the meanings given such terms in section 4301 of Title 19.

<div align="center">

**CREDIT(S)**

</div>

(Pub.L. 107-296, Title IV, § 411, Nov. 25, 2002, 116 Stat. 2178; Pub.L. 114-125, Title VIII, § 802(a), Feb. 24, 2016, 130 Stat. 199; Pub.L. 115-79, § 4(a), Nov. 2, 2017, 131 Stat. 1260; Pub.L. 116-277, § 3, Dec. 31, 2020, 134 Stat. 3370; Pub.L. 117-103, Div. F, Title II, § 212, Mar. 15, 2022, 136 Stat. 322.)

6 U.S.C.A. § 211, 6 USCA § 211
Current through P.L. 118-70. Some statute sections may be more current, see credits for details.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
  Title 33. Navigation and Navigable Waters (Refs & Annos)
    Chapter 1. Navigable Waters Generally
      Subchapter I. General Provisions (Refs & Annos)

33 U.S.C.A. § 5

§ 5. Abolition of tolls on Government canals, canalized rivers,
etc.; expense of operation, repairs to and reconstruction of canals,
etc.; Panama Canal excepted; levies by non-Federal interest

Effective: December 12, 2003
Currentness

**(a)** No tolls or operating charges whatever shall be levied upon or collected from any vessel, dredge, or other water craft for passing through any lock, canal, canalized river, or other work for the use and benefit of navigation, now belonging to the United States or that may be hereafter acquired or constructed; and for the purpose of preserving and continuing the use and navigation of said canals and other public works without interruption, the Secretary of the Army, upon the recommendation of the Chief of Engineers, United States Army, is authorized to draw his warrant or requisition, from time to time, upon the Secretary of the Treasury to pay the actual expenses of operating, maintaining, and keeping said works in repair, which warrants or requisitions shall be paid by the Secretary of the Treasury out of any money in the Treasury not otherwise appropriated: *Provided,* That whenever, in the judgment of the Secretary of the Army, the condition of any of the aforesaid works is such that its entire reconstruction is absolutely essential to its efficient and economical maintenance and operation as herein provided for, the reconstruction thereof may include such modifications in plan and location as may be necessary to provide adequate facilities for existing navigation: *Provided further,* That the modifications are necessary to make the reconstructed work conform to similar works previously authorized by Congress and forming a part of the same improvement, and that such modifications shall be considered and approved by the Board of Engineers for Rivers and Harbors and be recommended by the Chief of Engineers before the work of reconstruction is commenced: *And provided further,* That nothing contained in this section shall be held to apply to the Panama Canal.

**(b)** No taxes, tolls, operating charges, fees, or any other impositions whatever shall be levied upon or collected from any vessel or other water craft, or from its passengers or crew, by any non-Federal

---

interest, if the vessel or water craft is operating on any navigable waters subject to the authority of the United States, or under the right to freedom of navigation on those waters, except for--

**(1)** fees charged under section 2236 of this title;

**(2)** reasonable fees charged on a fair and equitable basis that--

   **(A)** are used solely to pay the cost of a service to the vessel or water craft;

   **(B)** enhance the safety and efficiency of interstate and foreign commerce; and

   **(C)** do not impose more than a small burden on interstate or foreign commerce; or

**(3)** property taxes on vessels or watercraft, other than vessels or watercraft that are primarily engaged in foreign commerce if those taxes are permissible under the United States Constitution.

## CREDIT(S)

(July 5, 1884, c. 229, § 4, 23 Stat. 147; Mar. 3, 1909, c. 264, § 6, 35 Stat. 818; July 26, 1947, c. 343, Title II, § 205(a), 61 Stat. 501; Aug. 30, 1954, c. 1076, § 1(15), 68 Stat. 967; Pub.L. 107-295, Title IV, § 445, Nov. 25, 2002, 116 Stat. 2133; Pub.L. 108-176, Title VIII, § 829(a), Dec. 12, 2003, 117 Stat. 2597.)

33 U.S.C.A. § 5, 33 USCA § 5
Current through P.L. 118-70. Some statute sections may be more current, see credits for details.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 46. Shipping (Refs & Annos)
        Subtitle II. Vessels and Seamen
            Part B. Inspection and Regulation of Vessels
                Chapter 33. Inspection Generally

46 U.S.C.A. § 3303

§ 3303. Reciprocity for foreign vessels

Effective: August 9, 2004
Currentness

Except as provided in chapter 37 and section 3505 of this title, a foreign vessel of a country having inspection laws and standards similar to those of the United States and that has an unexpired certificate of inspection issued by proper authority of its respective country, is subject to an inspection to ensure that the condition of the vessel is as stated in its current certificate of inspection. A foreign country is considered to have inspection laws and standards similar to those of the United States when it is a party to an International Convention for Safety of Life at Sea to which the United States Government is currently a party. A foreign certificate of inspection may be accepted as evidence of lawful inspection only when presented by a vessel of a country that has by its laws accorded to vessels of the United States visiting that country the same privileges accorded to vessels of that country visiting the United States.

**CREDIT(S)**

(Pub.L. 98-89, Aug. 26, 1983, 97 Stat. 512; Pub.L. 102-587, Title V, § 5210(a), Nov. 4, 1992, 106 Stat. 5076; Pub.L. 104-324, Title XI, § 1111, Oct. 19, 1996, 110 Stat. 3970; Pub.L. 108-293, Title IV, § 411(b), Aug. 9, 2004, 118 Stat. 1046.)

46 U.S.C.A. § 3303, 46 USCA § 3303
Current through P.L. 118-70. Some statute sections may be more current, see credits for details.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

<div style="border:1px solid black; padding:1em;">

United States Code Annotated
   Title 46. Shipping (Refs & Annos)
      Subtitle II. Vessels and Seamen
         Part B. Inspection and Regulation of Vessels
            Chapter 35. Carriage of Passengers (Refs & Annos)

</div>

46 U.S.C.A. § 3501

§ 3501. Number of passengers

Currentness

**(a)** Each certificate of inspection issued to a vessel carrying passengers (except a ferry) shall include a statement on the number of passengers that the vessel is permitted to carry.

**(b)** The owner, charterer, managing operator, agent, master, or individual in charge of a vessel is liable to a person suing them for carrying more passengers than the number of passengers permitted by the certificate of inspection in an amount equal to--

  **(1)** passage money; and

  **(2)** $100 for each passenger in excess of the number of passengers permitted.

**(c)** An owner, charterer, managing operator, agent, master, or individual in charge of a vessel that knowingly carries more passengers than the number of passengers permitted by the certificate of inspection also shall be fined not more than $100, imprisoned for not more than 30 days, or both.

**(d)** The vessel also is liable in rem for a penalty under this section.

**(e)** An offshore supply vessel may not carry passengers except in an emergency.

**CREDIT(S)**

(Pub.L. 98-89, Aug. 26, 1983, 97 Stat. 519; Pub.L. 99-36, § 1(a)(2), May 15, 1985, 99 Stat. 67.)


46 U.S.C.A. § 3501, 46 USCA § 3501
Current through P.L. 118-70. Some statute sections may be more current, see credits for details.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 46. Shipping (Refs & Annos)
    Subtitle VII. Security and Drug Enforcement (Refs & Annos)
      Chapter 700. Ports and Waterways Safety
        Subchapter I. Vessel Operations

46 U.S.C.A. § 70006

Formerly cited as 33 USCA § 471

§ 70006. Establishment by Secretary of the department in which the
Coast Guard is operating of anchorage grounds and regulations generally

Effective: January 1, 2021

Currentness

**(a) In general.**--The Secretary of Homeland Security is authorized, empowered, and directed to define and establish anchorage grounds for vessels in all harbors, rivers, bays, and other navigable waters of the United States whenever it is manifest to the said Secretary that the maritime or commercial interests of the United States require such anchorage grounds for safe navigation and the establishment of such anchorage grounds shall have been recommended by the Chief of Engineers, and to adopt suitable rules and regulations in relation thereto; and such rules and regulations shall be enforced by the Coast Guard under the direction of the Secretary of Transportation: *Provided,* That at ports or places where there is no Coast Guard vessel available such rules and regulations may be enforced by the Chief of Engineers under the direction of the Secretary of Homeland Security. In the event of the violation of any such rules and regulations by the owner, master, or person in charge of any vessel, such owner, master, or person in charge of such vessel shall be liable to a penalty of up to $10,000. Each day during which a violation continues shall constitute a separate violation. The said vessel may be holden for the payment of such penalty, and may be seized and proceeded against summarily by libel for the recovery of the same in any United States district court for the district within which such vessel may be and in the name of the officer designated by the Secretary of Homeland Security.

**(b) Definition.**--As used in this section "navigable waters of the United States" includes all waters of the territorial sea of the United States as described in Presidential Proclamation No. 5928 of December 27, 1988.

## CREDIT(S)

(Added Pub.L. 116-283, Div. G, Title LVXXXV [LXXXV], § 8501(a)(6), Jan. 1, 2021, 134 Stat. 4745.)

46 U.S.C.A. § 70006, 46 USCA § 70006
Current through P.L. 118-70. Some statute sections may be more current, see credits for details.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

actions involving the movement of persons, cargo, vessel stores, or the provisions of port services to or from the vessel.

*Vessel Security Assessment (VSA)* means an analysis that examines and evaluates the vessel and its operations taking into account possible threats, vulnerabilities, consequences, and existing protective measures, procedures and operations.

*Vessel Security Plan (VSP)* means the plan developed to ensure the application of security measures designed to protect the vessel and the facility that the vessel is servicing or interacting with, the vessel's cargoes, and persons on board at the respective MARSEC Levels.

*Vessel Security Officer (VSO)* means the person onboard the vessel, accountable to the Master, designated by the Company as responsible for security of the vessel, including implementation and maintenance of the Vessel Security Plan, and for liaison with the Facility Security Officer and the vessel's Company Security Officer.

*Vessel stores* means—

(1) Materials that are on board a vessel for the upkeep, maintenance, safety, operation or navigation of the vessel; and

(2) Materials for the safety or comfort of the vessel's passengers or crew, including any provisions for the vessel's passengers or crew.

*Vessel-to-vessel activity* means any activity not related to a facility or port that involves the transfer of cargo, vessel stores, or persons from one vessel to another.

*Visual TWIC inspection* means the process by which the TWIC is authenticated, validated, and the individual presenting the TWIC is matched to the photograph on the face of the TWIC.

*Waters subject to the jurisdiction of the U.S.,* for purposes of this subchapter, includes all waters described in section 2.36(a) of this chapter; the Exclusive Economic Zone, in respect to the living and non-living resources therein; and, in respect to facilities located on the Outer Continental Shelf of the U.S., the waters superjacent thereto.

[USCG–2003–14792, 68 FR 39278, July 1, 2003]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting § 101.105, see the List of CFR

Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.govinfo.gov*.

§ 101.110 **Applicability.**

Unless otherwise specified, this subchapter applies to vessels, structures, and facilities of any kind, located under, in, on, or adjacent to waters subject to the jurisdiction of the U.S.

§ 101.112 **Federalism.**

(a) The regulations in 33 CFR parts 101, 103, 104, and 106 have preemptive effect over State or local regulation within the same field.

(b) The regulations in 33 CFR part 105 have preemptive effect over State or local regulations insofar as a State or local law or regulation applicable to the facilities covered by part 105 would conflict with the regulations in part 105, either by actually conflicting or by frustrating an overriding Federal need for uniformity.

[USCG–2007–28915, 81 FR 57708, Aug. 23, 2016]

§ 101.115 **Incorporation by reference.**

(a) Certain material is incorporated by reference into this subchapter with the approval of the Director of the Federal Register under 5 U.S.C. 552(a) and 1 CFR part 51. To enforce any edition other than that specified in paragraph (b) of this section, the Coast Guard must publish notice of change in the FEDERAL REGISTER and the material must be available to the public. All approved material is on file at the Office of the Coast Guard Port Security Directorate (CG-5P), Coast Guard Headquarters, 2100 2nd St., SW., Stop 7581, Washington, DC 20593–7581, or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: *http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html*. All material is available from the sources indicated in paragraph (b) of this section.

(b) The materials approved for incorporation by reference in this subchapter are as follows:

## Subpart B—Vessel Security Requirements

### §104.200 Owner or operator.

(a) Each vessel owner or operator must ensure that the vessel operates in compliance with the requirements of this part.

(b) For each vessel, the vessel owner or operator must:

(1) Define the security organizational structure for each vessel and provide all personnel exercising security duties or responsibilities within that structure with the support needed to fulfill security obligations;

(2) Designate, in writing, by name or title, a Company Security Officer (CSO), a Vessel Security Officer (VSO) for each vessel, and identify how those officers can be contacted at any time;

(3) Ensure personnel receive training, drills, and exercises enabling them to perform their assigned security duties;

(4) Inform vessel personnel of their responsibility to apply for and maintain a TWIC, including the deadlines and methods for such applications, and of their obligation to inform TSA of any event that would render them ineligible for a TWIC, or which would invalidate their existing TWIC;

(5) Ensure vessel security records are kept;

(6) Ensure that adequate coordination of security issues takes place between vessels and facilities; this includes the execution of a Declaration of Security (DoS);

(7) Ensure coordination of shore leave, transit, or crew change-out for vessel personnel, as well as access through the facility of visitors to the vessel (including representatives of seafarers' welfare and labor organizations), with facility operators in advance of a vessel's arrival. Vessel owners or operators may refer to treaties of friendship, commerce, and navigation between the U.S. and other nations in coordinating such leave;

(8) Ensure security communication is readily available;

(9) Ensure coordination with and implementation of changes in Maritime Security (MARSEC) Level;

(10) Ensure that security systems and equipment are installed and maintained;

(11) Ensure that vessel access, including the embarkation of persons and their effects, is controlled;

(12) Ensure that TWIC procedures are implemented as set forth in this subchapter, including:

(i) Ensuring that only individuals who hold a TWIC and are authorized to be in secure areas are permitted to escort;

(ii) Identifying what action is to be taken by an escort, or other authorized individual, should individuals under escort engage in activities other than those for which escorted access was granted; and

(iii) Notifying vessel employees, and passengers if applicable, of what parts of the vessel are secure areas, employee access areas, and passenger access areas, as applicable, and ensuring such areas are clearly marked.

(13) Ensure that restricted areas are controlled and TWIC provisions are coordinated, if applied to such restricted areas;

(14) Ensure that protocols consistent with §101.550(a) of this subchapter, for dealing with individuals requiring access who report a lost, damaged, or stolen TWIC, or who have applied for and not yet received a TWIC, are in place;

(15) Ensure that cargo and vessel stores and bunkers are handled in compliance with this part;

(16) Ensure restricted areas, deck areas, and areas surrounding the vessel are monitored;

(17) Provide the Master, or for vessels on domestic routes only, the CSO, with the following information:

(i) Parties responsible for appointing vessel personnel, such as vessel management companies, manning agents, contractors, concessionaires (for example, retail sales outlets, casinos, etc.);

(ii) Parties responsible for deciding the employment of the vessel, including time or bareboat charters or any other entity acting in such capacity; and

(iii) In cases when the vessel is employed under the terms of a charter party, the contract details of those documents, including time or voyage charters; and

(18) Give particular consideration to the convenience, comfort, and personal privacy of vessel personnel and their

381

Add. 095

ability to maintain their effectiveness over long periods; and

(19) If applicable, ensure that protocols consistent with §104.267 of this part, for dealing with newly hired employees who have applied for and not yet received a TWIC, are in place.

[USCG–2003–14749, 68 FR 39302, July 1, 2003, as amended by USCG–2003–14749, 68 FR 60513, Oct. 22, 2003; USCG–2006–24196, 72 FR 3579, Jan. 25, 2007; USCG–2013–0397, 78 FR 39173, July 1, 2013; USCG–2007–28915, 81 FR 57710, Aug. 23, 2016]

## §104.205  Master.

(a) Nothing in this part is intended to permit the Master to be constrained by the Company, the vessel owner or operator, or any other person, from taking or executing any decision which, in the professional judgment of the Master, is necessary to maintain the safety and security of the vessel. This includes denial of access to persons—except those identified as duly authorized by the cognizant government authority—or their effects, and refusal to load cargo, including containers or other closed cargo transport units.

(b) If, in the professional judgment of the Master, a conflict between any safety and security requirements applicable to the vessel arises during its operations, the Master may give precedence to measures intended to maintain the safety of the vessel, and take such temporary security measures as seem best under all circumstances. In such cases:

(1) The Master must, as soon as practicable, inform the nearest COTP. If the vessel is on a foreign voyage, the Master must promptly inform the Coast Guard via the NRC at 1–800–424–8802, direct telephone at 202–267–2675; Fax: 202–267–1322, TDD at 202–267–4477, or E-mail at *HQS-DG-lst-NRCINFO@uscg.mil* and if subject to the jurisdiction of a foreign government, the relevant maritime authority of that foreign government;

(2) The temporary security measures must, to the highest possible degree, be commensurate with the prevailing Maritime Security (MARSEC) Level; and

(3) The owner or operator must ensure that such conflicts are resolved to the satisfaction of the cognizant COTP, or for vessels on international voyages, the Commandant (CG–5P), and that the possibility of recurrence is minimized.

[USCG–2003–14749, 68 FR 39302, July 1, 2003, as amended at 68 FR 60513, Oct. 22, 2003; USCG–2006–25150, 71 FR 39208, July 12, 2006; USCG–2008–0179, 73 FR 35009, June 19, 2008; USCG–2013–0397, 78 FR 39173, July 1, 2013]

## §104.210  Company Security Officer (CSO).

(a) *General.* (1) Each vessel owner or operator must designate in writing a CSO.

(2) A vessel owner or operator may designate a single CSO for all its vessels to which this part applies, or may designate more than one CSO, in which case the owner or operator must clearly identify the vessels for which each CSO is responsible.

(3) A CSO may perform other duties within the owner or operator's organization, including the duties of a Vessel Security Officer, provided he or she is able to perform the duties and responsibilities required of a CSO.

(4) The CSO may delegate duties required by this part, but remains responsible for the performance of those duties.

(5) The CSO must maintain a TWIC.

(b) *Qualifications.* (1) The CSO must have general knowledge, through training or equivalent job experience, in the following:

(i) Security administration and organization of the company's vessel(s);

(ii) Vessel, facility, and port operations relevant to that industry;

(iii) Vessel and facility security measures, including the meaning and the consequential requirements of the different Maritime Security (MARSEC) Levels;

(iv) Emergency preparedness and response and contingency planning;

(v) Security equipment and systems and their operational limitations;

(vi) Methods of conducting audits, inspection and control and monitoring techniques; and

(vii) Techniques for security training and education, including security measures and procedures.

(2) In addition to knowledge and training in paragraph (b)(1) of this section, the CSO must have general

382

sfrattin on LAPCK6H6L3 with DISTILLER

Add. 096

the requested waiver. The Commandant (CG-5P) may grant, in writing, a waiver with or without conditions only if the waiver will not reduce the overall security of the facility, its employees, visiting vessels, or ports.

[USCG–2003–14732, 68 FR 39322, July 1, 2003; 68 FR 41916, July 16, 2003; USCG–2008–0179, 73 FR 35009, June 19, 2008; USCG–2010–0351, 75 FR 36282, June 25, 2010; USCG–2013–0397, 78 FR 39173, July 1, 2013; USCG–2014–0410, 79 FR 38432, July 7, 2014]

### § 105.135 Equivalents.

For any measure required by this part, the facility owner or operator may propose an equivalent as provided in § 101.130 of this subchapter.

### § 105.140 Alternative Security Program.

(a) A facility owner or operator may use an Alternative Security Program approved under § 101.120 of this subchapter if:

(1) The Alternative Security Program is appropriate to that facility;

(2) The Alternative Security Program is implemented in its entirety.

(b) A facility owner or operator using an Alternative Security Program approved under § 101.120 of this subchapter must complete and submit to the cognizant COTP a Facility Vulnerability and Security Measures Summary (Form CG–6025). The form is available at *https://www.dcms.uscg.mil/forms/*.

[USCG–2003–14732, 68 FR 39322, July 1, 2003, as amended by USCG–2020–0304, 85 FR 58278, Sept. 18, 2020]

### § 105.145 Maritime Security (MARSEC) Directive.

Each facility owner or operator subject to this part must comply with any instructions contained in a MARSEC Directive issued under § 101.405 of this subchapter.

### § 105.150 Right to appeal.

Any person directly affected by a decision or action taken under this part, by or on behalf of the Coast Guard, may appeal as described in § 101.420 of this subchapter.

## Subpart B—Facility Security Requirements

### § 105.200 Owner or operator.

(a) Each facility owner or operator must ensure that the facility operates in compliance with the requirements of this part.

(b) For each facility, the facility owner or operator must—

(1) Define the organizational structure of the security personnel and provide each person exercising security duties and responsibilities the support needed to fulfill those obligations;

(2) Designate, in writing, by name or by title, a Facility Security Officer (FSO) and identify how the officer can be contacted at any time;

(3) Ensure that a Facility Security Assessment (FSA) is conducted;

(4) Ensure the development and submission for approval of a Facility Security Plan (FSP);

(5) Ensure that the facility operates in compliance with the approved FSP;

(6) Ensure that the Transportation Worker Identification Credential (TWIC) program is properly implemented as set forth in this subchapter, including—

(i) Ensuring that only individuals who hold a TWIC and are authorized to be in the secure area in accordance with the FSP are permitted to serve as an escort;

(ii) Identifying what action is to be taken by an escort, or other authorized individual, in the event that individuals under escort engage in activities other than those for which escorted access was granted; and

(iii) Notifying facility employees, and passengers if applicable, of which parts of the facility are secure areas and which are public access areas, as applicable, and ensuring such areas are clearly marked.

(7) Ensure that restricted areas are controlled and TWIC provisions are coordinated, if applied to such restricted areas;

(8) Ensure that adequate coordination of security issues takes place between the facility and vessels that call on it, including the execution of a Declaration of Security (DoS) as required by this part;

406

Add. 097

(9) Ensure implementation of a system, in accordance with §105.237, coordinating shore leave for vessel personnel or crew change-out, as well as access through the facility for visitors to the vessel, as described in §105.237(b)(3), with vessel operators in advance of a vessel's arrival. In coordinating such leave, facility owners or operators may refer to treaties of friendship, commerce, and navigation between the U.S. and other nations;

(10) Ensure, within 12 hours of notification of an increase in MARSEC Level, implementation of the additional security measures required for the new MARSEC Level;

(11) Ensure security for unattended vessels moored at the facility;

(12) Ensure the report of all breaches of security and transportation security incidents to the National Response Center in accordance with part 101 of this chapter;

(13) Ensure consistency between security requirements and safety requirements;

(14) Inform facility personnel of their responsibility to apply for and maintain a TWIC, including the deadlines and methods for such applications, and of their obligation to inform Transportation Security Administration (TSA) of any event that would render them ineligible for a TWIC, or which would invalidate their existing TWIC;

(15) Ensure that protocols consistent with §101.550 of this subchapter, for dealing with individuals requiring access who report a lost, damaged, or stolen TWIC, or who have applied for and not yet received a TWIC, are in place; and

(16) If applicable, ensure that protocols consistent with §105.257, for dealing with newly hired employees who have applied for and not yet received a TWIC, are in place.

[USCG–2003–14732, 68 FR 39322, July 1, 2003, as amended at 68 FR 60541, Oct. 22, 2003; USCG–2006–24196, 72 FR 3582, Jan. 25, 2007; USCG–2013–0397, 78 FR 39173, July 1, 2013; USCG–2007–28915, 81 FR 57712, Aug. 23, 2016; USCG–2013–1087, 84 FR 12119, Apr. 1, 2019]

## § 105.205 Facility Security Officer (FSO).

(a) *General.* (1) The FSO may perform other duties within the owner's or operator's organization, provided he or she is able to perform the duties and responsibilities required of the FSO.

(2) The same person may serve as the FSO for more than one facility, provided the facilities are in the same COTP zone and are not more than 50 miles apart. If a person serves as the FSO for more than one facility, the name of each facility for which he or she is the FSO must be listed in the Facility Security Plan (FSP) of each facility for which or she is the FSO.

(3) The FSO may assign security duties to other facility personnel; however, the FSO retains the responsibility for these duties.

(4) The FSO must maintain a TWIC.

(b) *Qualifications.* (1) The FSO must have general knowledge, through training or equivalent job experience, in the following:

(i) Security organization of the facility;

(ii) General vessel and facility operations and conditions;

(iii) Vessel and facility security measures, including the meaning and the requirements of the different MARSEC Levels;

(iv) Emergency preparedness, response, and contingency planning;

(v) Security equipment and systems, and their operational limitations; and

(vi) Methods of conducting audits, inspections, control, and monitoring techniques.

(2) In addition to knowledge and training required in paragraph (b)(1) of this section, the FSO must have knowledge of and receive training in the following, as appropriate:

(i) Relevant international laws and codes, and recommendations;

(ii) Relevant government legislation and regulations;

(iii) Responsibilities and functions of local, State, and Federal law enforcement agencies;

(iv) Security assessment methodology;

(v) Methods of facility security surveys and inspections;

(vi) Instruction techniques for security training and education, including security measures and procedures;

(vii) Handling sensitive security information and security related communications;

407

sfrattini on LAPCK6H8L3 with DISTILLER

**Add. 098**

(e) At MARSEC Level 3, in addition to the requirements in this part, a facility owner or operator may be required to implement additional measures, pursuant to 33 CFR part 6, 160, or 165, as appropriate, which may include but are not limited to:

(1) Use of waterborne security patrol;

(2) Use of armed security personnel to control access to the facility and to deter, to the maximum extent practical, a transportation security incident; and

(3) Examination of piers, wharves, and similar structures at the facility for the presence of dangerous substances or devices underwater or other threats.

## § 105.235 Communications.

(a) The Facility Security Officer must have a means to effectively notify facility personnel of changes in security conditions at the facility.

(b) Communication systems and procedures must allow effective and continuous communications between the facility security personnel, vessels interfacing with the facility, the cognizant COTP, and national and local authorities with security responsibilities.

(c) At each active facility access point, provide a means of contacting police, security control, or an emergency operations center, by telephones, cellular phones, and/or portable radios, or other equivalent means.

(d) Facility communications systems must have a backup means for both internal and external communications.

## § 105.237 System for seafarers' access.

(a) *Access required.* Each facility owner or operator must implement a system by June 1, 2020 for providing access through the facility that enables individuals to transit to and from a vessel moored at the facility and the facility gate in accordance with the requirements in this section. The system must provide timely access as described in paragraph (c) of this section and incorporate the access methods described in paragraph (d) of this section at no cost to the individuals covered. The system must comply with the Transportation Worker Identification Credential (TWIC) provisions in this part.

(b) *Individuals covered.* The individuals to whom the facility owner or operator must provide the access described in this section include—

(1) Seafarers assigned to a vessel at that facility;

(2) Pilots; and

(3) Representatives of seafarers' welfare and labor organizations.

(c) *Timely access.* The facility owner or operator must provide the access described in this section without unreasonable delay, subject to review by the Captain of the Port (COTP). The facility owner or operator must consider the following when establishing timely access without unreasonable delay:

(1) Length of time the vessel is in port.

(2) Distance of egress/ingress between the vessel and facility gate.

(3) The vessel watch schedules.

(4) The facility's safety and security procedures as required by law.

(5) Any other factors specific to the vessel or facility that could affect access to and from the vessel.

(d) *Access methods.* The facility owner or operator must ensure that the access described in this section is provided through one or more of the following methods:

(1) Regularly scheduled escort between the vessel and the facility gate that conforms to the vessel's watch schedule as agreed upon between the vessel and facility.

(2) An on-call escort between the vessel and the facility gate.

(3) Arrangements with taxi services or other transportation services, ensuring that any costs for providing the access described in this section, above the service's standard fees charged to any customer, are not charged to the individual to whom such access is provided. If a facility provides arrangements with taxi services or other transportation services as the only method for providing the access described in this section, the facility is responsible to pay any fees for transit within the facility.

(4) Arrangements with seafarers' welfare organizations to facilitate the access described in this section.

411

(5) Monitored pedestrian access routes between the vessel and facility gate.

(6) A method, other than those in paragraphs (d)(1) through (5) of this section, approved by the COTP.

(7) If an access method relies on a third party, a back-up access method that will be used if the third party is unable to or does not provide the required access in any instance. An owner or operator must ensure that the access required in paragraph (a) of this section is actually provided in all instances.

(e) *No cost to individuals.* The facility owner or operator must provide the access described in this section at no cost to the individual to whom such access is provided.

(f) *Described in the Facility Security Plan (FSP).* On or before February 3, 2020, the facility owner or operator must document the facility's system for providing the access described in this section in the approved FSP in accordance with § 105.410 or § 105.415. The description of the facility's system must include—

(1) Location of transit area(s) used for providing the access described in this section;

(2) Duties and number of facility personnel assigned to each duty associated with providing the access described in this section;

(3) Methods of escorting and/or monitoring individuals transiting through the facility;

(4) Agreements or arrangements between the facility and private parties, nonprofit organizations, or other parties, to facilitate the access described in this section; and

(5) Maximum length of time an individual would wait for the access described in this section, based on the provided access method(s).

[USCG-2013-1087, 84 FR 12119, Apr. 1, 2019]

## § 105.240 Procedures for interfacing with vessels.

The facility owner or operator must ensure that there are measures for interfacing with vessels at all MARSEC Levels.

## § 105.245 Declaration of Security (DoS).

(a) Each facility owner or operator must ensure procedures are established for requesting a DoS and for handling DoS requests from a vessel.

(b) At MARSEC Level 1, a facility receiving a cruise ship or a manned vessel carrying Certain Dangerous Cargo, in bulk, must comply with the following:

(1) Prior to the arrival of a vessel to the facility, the Facility Security Officer (FSO) and Master, Vessel Security Officer (VSO), or their designated representatives must coordinate security needs and procedures, and agree upon the contents of the DoS for the period of time the vessel is at the facility; and

(2) Upon the arrival of the vessel at the facility, the FSO and Master, VSO, or their designated representative, must sign the written DoS.

(c) Neither the facility nor the vessel may embark or disembark passengers, nor transfer cargo or vessel stores until the DoS has been signed and implemented.

(d) At MARSEC Levels 2 and 3, the FSOs, or their designated representatives, of facilities interfacing with manned vessels subject to part 104, of this subchapter must sign and implement DoSs as required in (b)(1) and (2) of this section.

(e) At MARSEC Levels 1 and 2, FSOs of facilities that frequently interface with the same vessel may implement a continuing DoS for multiple visits, provided that:

(1) The DoS is valid for a specific MARSEC Level;

(2) The effective period at MARSEC Level 1 does not exceed 90 days; and

(3) The effective period at MARSEC Level 2 does not exceed 30 days.

(f) When the MARSEC Level increases beyond that contained in the DoS, the continuing DoS is void and a new DoS must be executed in accordance with this section.

(g) A copy of all currently valid continuing DoSs must be kept with the Facility Security Plan.

(h) The COTP may require, at any time, at any MARSEC Level, any facility subject to this part to implement a DoS with the VSO prior to any vessel-

21°22′37″ N. latitude, 157°56′19″ W. longitude; thence along the shoreline to the beginning point.

[CGD 76–186, 42 FR 62001, Dec. 8, 1977, as amended at 43 FR 21881, May 22, 1978; CGD14–90–01, 56 FR 13762, Apr. 4, 1991. Redesignated by USCG–2018–0533, 85 FR 8173, Feb. 13, 2020]

### § 110.129e Apra Harbor, Guam. (Datum: WGS 84)

(a) The waters bounded by a line connecting the following points:

| | |
|---|---|
| 13°27′45.5″ N | 144°39′34.8″ E |
| 13°27′32.0″ N | 144°39′36.3″ E |

and thence along the shoreline to the point of beginning.

(b) The waters bounded by a line connecting the following points:

| | |
|---|---|
| 13°26′53.6″ N | 144°40′03.8″ E |
| 13°27′04.0″ N | 144°40′04.8″ E |
| 13°27′04.0″ N | 144°40′09.8″ E |
| 13°27′10.0″ N | 144°40′09.8″ E |
| 13°27′10.0″ N | 144°40′23.8″ E |
| 13°26′51.0″ N | 144°40′23.8″ E |
| 13°26′51.0″ N | 144°40′06.0″ E |

and thence to the point of beginning.

[CGD14–89–01, 55 FR 27465, July 3, 1990. Redesignated by USCG–2018–0533, 85 FR 8173, Feb. 13, 2020]

## Subpart B—Anchorage Grounds

### § 110.130 Bar Harbor, Maine.

(a) *Anchorage grounds.* (1) Anchorage "A" is that portion of Frenchman Bay, Bar Harbor, ME enclosed by a rhumb line connecting the following points:

| Latitude | Longitude |
|---|---|
| 44°23′43″ N ................. | 068°12′00″ W; thence to |
| 44°23′52″ N ................. | 068°11′22″ W; thence to |
| 44°23′23″ N ................. | 068°10′59″ W; thence to |
| 44°23′05″ N ................. | 068°11′32″ W; returning to start. |

(2) Anchorage "B" is that portion of Frenchman Bay, Bar Harbor, ME enclosed by a rhumb line connecting the following points:

| Latitude | Longitude |
|---|---|
| 44°24′33″ N ................. | 068°13′09″ W; thence to |
| 44°24′42″ N ................. | 068°11′47″ W; thence to copied |
| 44°24′11″ N ................. | 068°11′41″ W; thence to |
| 44°24′02″ N ................. | 068°13′03″ W; returning to start. |

(b) *Regulations.* (1) Anchorage A is a general anchorage ground reserved for passenger vessels, small commercial vessels and pleasure craft. Anchorage B

is a general anchorage ground reserved primarily for passenger vessels 200 feet and greater.

(2) These anchorage grounds are authorized for use year round.

(3) Temporary floats or buoys for marking anchors will be allowed in all anchorage areas.

(4) Fixed moorings, piles or stakes are prohibited.

(5) Any vessels anchored in this area shall be capable of moving and when ordered to move by the Captain of the Port shall do so with reasonable promptness.

(6) The anchoring of vessels is under the coordination of the local Harbormaster.

[CGD–01–02–027, 67 FR 68518, Nov. 12, 2002]

### § 110.131 Sheepscot River in the vicinity of Edgecomb, Maine.

(a) *Anchorage grounds.* All of the waters enclosed by a line starting from a point located at the southwestern end of Davis Island at latitude 43°59.655′ N., longitude 69°39.617′ W.; thence to latitude 43°59.687′ N., longitude 69°39.691′ W.; thence to latitude 43°59.847′ N., longitude 69°39.743′ W.; thence to latitude 43°59.879′ N., longitude 69°39.559′ W.; thence to latitude 43°59.856′ N., longitude 69°39.488′ W.; thence to latitude 43°59.771′ N., longitude 69°39.585′ W.; thence to the point of beginning. DATUM: NAD 83

(b) *Regulations.* (1) This anchorage is reserved for vessels of all types, with drafts of 3 to 12 feet.

(2) These anchorage grounds are authorized for use from May through October.

(3) Vessels are limited to a maximum stay of 1 week.

(4) Fixed moorings, piles or stakes are prohibited.

(5) Vessels must not anchor so as to obstruct the passage of other vessels proceeding to or from other anchorage spaces.

(6) Anchors must not be placed in the channel and no portion of the hull or rigging of any anchored vessel shall extend outside the limits of the anchorage area.

Add. 101

to Commandant (CG–CVC) for appeals of decisions by the TVNCOE related to subchapter M of this chapter.

(d) Any person directly affected by a decision or action by an OCMI or District Commander may make a formal appeal pursuant to § 1.03–20 or § 1.03–25, respectively.

[USCG–2006–24412, 81 FR 40100, June 20, 2016]

## PART 2—VESSEL INSPECTIONS

### Subpart 2.01—Inspecting and Certificating of Vessels

Sec.
2.01–1  Applications for inspections.
2.01–3  Notification of inspection.
2.01–5  Certificate of inspection.
2.01–6  Certificates issued to foreign vessels.
2.01–7  Classes of vessels (including motorboats) examined or inspected and certificated.
2.01–8  Application of regulations to vessels or tankships on an international voyage.
2.01–10  Inspection requirements—domestic vessels.
2.01–13  Inspection requirements—foreign vessels.
2.01–15  Vessel repairs.
2.01–20  Suspension or revocation of certificates of inspection.
2.01–25  International Convention for Safety of Life at Sea, 1974.
2.01–30  Delegation of OCMI signature authority.
2.01–40  Passengers or persons in addition to crew on cargo or tank vessels.
2.01–45  Excursion permit.
2.01–50  Persons other than crew on towing, oyster, or fishing steam vessels.
2.01–60  Overtime compensation.
2.01–70  Right of appeal.
2.01–80  Vessel inspections in Alaska.

### Subpart 2.10—Fees

2.10–1  Applicability.
2.10–5  Exemptions.
2.10–10  Waivers.
2.10–20  General requirements.
2.10–25  Definitions.
2.10–101  Annual vessel inspection fee.
2.10–105  Prepayment of annual vessel inspection fees.
2.10–115  Changes in vessel service.
2.10–120  Overseas inspection and examination fees.
2.10–125  Fees for examination of foreign tankships.
2.10–130  Fees for examination of foreign mobile offshore drilling units.
2.10–135  Penalties.

### Subpart 2.20—Reports and Forms

2.20–40  Chief engineer's reports.
2.20–50  Repairs or alterations in lifesaving or fire prevention equipment.

### Subpart 2.45—Classification Society Activities

2.45–1  Definitions.
2.45–5  Incorporation by reference.
2.45–10  General.
2.45–15  Approval requirements.
2.45–20  Probation, suspension, and revocation.
2.45–25  Application for approval.
2.45–30  Penalties.

### Subpart 2.50—Penalties

2.50–1  Penalty procedures.

### Subpart 2.75—Approvals of Safety Equipment, Materials and Installations, and Qualifications for Construction Personnel

2.75–1  Approvals.
2.75–5  Certificates of approval.
2.75–10  Procedures for obtaining approvals.
2.75–15  Requirements and tests.
2.75–25  Portable fire extinguishers.
2.75–40  Suspension of approval.
2.75–50  Withdrawals or terminations of approvals and appeals.
2.75–60  Hazardous ships' stores.
2.75–70  Welding procedure and performance qualifications.

### Subpart 2.85—Load Lines

2.85–1  Assignment of load lines.

### Subpart 2.90—Plans, Drawings or Blueprints

2.90–1  General requirements.

### Subpart 2.95—Retention of Records by the Public

2.95–1  Certificates or documents issued by Coast Guard.
2.95–5  Certificates or documents issued by others.
2.95–10  Equipment or material required to be approved.

AUTHORITY: Sec. 622, Pub. L. 111–281; 33 U.S.C. 1903; 43 U.S.C. 1333; 46 U.S.C. 2103, 2110, 3306, 3703, 70034; Department of Homeland Security Delegation No. 0170.1(II)(77), (90), (92)(a), (92)(b); E.O. 12234, 45 FR 58801, 3 CFR, 1980 Comp., p. 277, sec. 1–105.

SOURCE: CGFR 65–50, 30 FR 16604, Dec. 30, 1965, unless otherwise noted.

EDITORIAL NOTE: Nomenclature changes to part 2 appear by USCG–2009–0702, 74 FR 49223, Sept. 25, 2009, and USCG–2013–0671, 78 FR 60144, Sept. 30, 2013.

Add. 102

## Subpart 2.01—Inspecting and Certificating of Vessels

### § 2.01–1  Applications for inspections.

(a) *Application forms.* (1) Applications for inspections of vessels required to be inspected under subtitle II, title 46 of the U.S. Code, title 46 and title 33 U.S. Code, or under 50 U.S.C. 198 shall be made by the master, owner, or agent on the following Coast Guard forms which are obtainable from the Officer in Charge, Marine Inspection, at any local U.S. Coast Guard Sector Office.

(i) CG–3752—Application for Inspection of U.S. Vessel.

(ii) CG–986—Application for Inspection of Foreign Vessel.

(2) These applications require information on name and type of vessel, nature of employment and route in which to be operated, and place where and date when the vessel may be inspected.

(b) *To whom submitted.* The completed form must be submitted to the Officer in Charge, Marine Inspection, in the Marine Inspection Zone within which the inspection is to be conducted.

(c) *New vessels.* Applications for inspection of new vessels must be preceded by the submission of applicable drawings or prints in accordance with the specific requirements in subchapters D (Tank Vessels), E (Load Lines), F (Marine Engineering), H (Passenger Vessels), I (Cargo and Miscellaneous Vessels), J (Electrical Engineering), K (Small Passenger Vessels Carrying More Than 150 Passengers Or With Overnight Accommodations For More Than 49 Passengers), L (Offshore Supply Vessels), O (Certain Bulk Dangerous Cargoes), S (Subdivision and Stability), and T (Small Passenger Vessels) of this chapter applicable to that particular type of vessel or type of service in which the vessel is proposed to be operated.

(d) *Foreign-built vessels.* (1) Those foreign-built vessels which are specifically authorized by public or private laws to engage in the coastwise trade, and those foreign-built vessels which are documented to engage in the foreign trade shall be inspected and certificated as required by law and/or the regulations in this chapter which are applicable to their class and employment.

(2) Foreign-built vessels are not permitted to engage in the U.S. coastwise trade (domestic trade) unless specifically authorized by law. Therefore, when foreign-built vessels are intended for use in the coastwise trade as defined by the U.S. Customs Service, such vessels will not be inspected and certificated unless specifically authorized by law to engage in coastwise trade.

[CG870FR 65–50, 30 FR 16604, Dec. 30, 1965, as amended by CGD 79–023, 48 FR 51006, Nov. 4, 1983; CGD 91–030, 60 FR 13563, Mar. 13, 1995; CGD 97–057, 62 FR 51041, Sept. 30, 1997; CGD 95–028, 62 FR 51194, Sept. 30, 1997; USCG–2006–25556, 72 FR 36329, July 2, 2007]

### § 2.01–3  Notification of inspection.

(a) At least 30 days prior to the expiration of the Certification of Inspection, a vessel's owner, charterer, managing operator, agent, master or individual in charge shall notify the Coast Guard if the vessel will be required to be reinspected for certification or will be operated in such a manner as to not require a Certificate of Inspection.

(b) The notification required by paragraph (a) shall be in writing and shall be submitted to the Officer in Charge, Marine Inspection for the Marine Inspection or Sector Office of the port that:

(1) Will be reinspecting and Certificating the Vessel;

(2) Issued the vessel's current Certificate of Inspection if the vessel's schedule is such that it is not known where the next reinspection will take place; or

(3) Issued the vessel's current Certificate of Inspection if the vessel will not be requiring reinspection for the issuance of a Certificate of Inspection.

[CGD 85–015, 51 FR 19340, May 29, 1986, as amended by USCG–1999–4976, 65 FR 6498, Feb. 9, 2000; USCG–2006–25556, 72 FR 36329, July 2, 2007]

### § 2.01–5  Certificate of inspection.

(a) *Issuance of certificates.* Upon completion of the inspection of a United States vessel, and on condition that the vessel and its equipment are approved by the inspector, a certificate of one or more of the following Coast Guard forms is issued by the Officer in Charge, Marine Inspection:

Add. 103

(1) CG–841—Certificate of Inspection.

(2) CG–854—Temporary Certificate of Inspection.

(b) *Description of certificates.* The certificates of inspection issued to United States vessels describe the vessel, the route the vessel may travel, the minimum manning requirements, the safety equipment and appliances required to be on board, the total number of persons that may be carried, and the names of the owners and operators. The period of validity is stated on the certificate. The certificate may be renewed by applying for inspection under §2.01–1.

(c) *Amending certificates.* When, because of a change in the character of the vessel or vessel's route, equipment, *etc.,* the vessel does not comply with the requirements of the Certificate of Inspection previously issued, an amended certificate may be issued at the discretion of the Officer in Charge, Marine Inspection, to whom a request is made.

[CGD 77–014, 44 FR 5316, Jan. 25, 1979, as amended by USCG–1999–4976, 65 FR 6498, Feb. 9, 2000; USCG–2004–18884, 69 FR 58341, Sept. 30, 2004; USCG–2010–0759, 75 FR 60000, Sept. 29, 2010]

### §2.01–6 Certificates issued to foreign vessels.

(a) *Issuance of a Certificate of Compliance (COC).* Foreign vessels of countries which are signatory to the International Convention for the Safety of Life at Sea, 1974, are issued a Certificate of Compliance (CG–3585) upon satisfactory completion of a compliance examination by the Officer in Charge, Marine Inspection:

(1) A foreign passenger vessel that is registered in a country which is signatory to the International Convention for the Safety of Life at Sea, 1974, visits U.S. ports with U.S. citizens as passengers or embarks passengers in U.S. ports, holds a valid Passenger Ship Safety Certificate, and, if applicable, holds a valid Polar Ship Certificate;

(2) A foreign vessel that is suitable for carriage of hazardous cargoes in bulk as defined in 46 CFR subchapter O and is in compliance with Tankship Cargo Venting and Handling Systems and Minimum Pollution Prevention Regulations and Transfer Procedures

(33 CFR parts 155, 156, 157, and 159), and Navigation Safety Inspection Regulations (33 CFR part 164);

(3) A foreign Mobile Offshore Drilling Unit that complies with standards listed in 33 CFR 143.207 and is engaged in U.S. Outer Continental Shelf activities;

(4) A foreign vessel that is suitable for carriage of cargoes as defined in 46 CFR subchapter D and is in compliance with Tankship Cargo Venting and Handling Systems and Minimum Safety Standards (SOLAS 74—46 CFR part 35), Pollution Prevention Regulations and Transfer Procedures (33 CFR parts 155, 156, 157, and 159), and Navigation Safety Regulations (33 CFR part 164).

(b) Foreign vessels of countries which are non-signatory to the International Convention for the Safety of Life at Sea, 1974, are issued a Temporary Certificate of Inspection (CG–854) and a Certificate of Inspection (CG–841), respectively, as described in §2.01–5. Any amendments to these certificates shall be accomplished in accordance with §2.01–5(c).

(c) *Description of COC.* CG–3585 describes the vessel's particulars, type of vessel examined, type of certificate(s) required by the International Convention for Safety of Life at Sea, 1974, the period of validity, subsequent exams required to maintain the certificates validity, the Officer in Charge, Marine Inspection zone where the exam was completed in and if there are any deficiencies as to applicable regulations at the time the vessel was examined. If there are deficiencies issued, they are listed in the examination record section of the COC.

[USCG–2010–0759, 75 FR 60000, Sept. 29, 2010; USCG–2016–0880, 82 FR 44118, Sept. 21, 2017]

### §2.01–7 Classes of vessels (including motorboats) examined or inspected and certificated.

(a) The regulations in this chapter concerning inspecting and certificating vessels are applicable to vessels (including motorboats) either as indicated in the following table 2.01–7(a) or, if the vessel is a towing vessel, as provided in paragraph (b) of this section.

Add. 104

TABLE 2.01-7(a)

| Method of propulsion, qualified by size or other limitation [1]<br><br>Column 1 | Vessels inspected and certificated under Subchapter D—Tank Vessels [2]<br><br>Column 2 | Vessels inspected and certificated under Subchapter H—Passenger Vessels [2 3 4 5] or Subchapter K or T—Small Passenger Vessels [2 3 4]<br><br>Column 3 | Vessels inspected and certificated under Subchapter I—Cargo and Miscellaneous Vessels [2 5]<br><br>Column 4 | Vessels subject to the provisions of Subchapter C—Uninspected Vessels [2 3 6 7 8]<br><br>Column 5 | Vessels subject to the provisions of Subchapter U—Oceanographic Vessels [2 3 6 7 9]<br><br>Column 6 | Vessels subject to the provisions of Subchapter O—Certain Bulk and Dangerous Cargoes [10]<br><br>Column 7 |
|---|---|---|---|---|---|---|
| (1) Motor, all vessels except seagoing motor vessels ≥300 gross tons. | All vessels carrying combustible or flammable liquid cargo in bulk.[5] | (i) All vessels carrying more than 12 passengers on an international voyage, except recreational vessels not engaged in trade.[7]<br>(ii) All vessels <100 gross tons that—<br>(A) Carry more than 6 passengers-for-hire whether chartered or not, or<br>(B) Carry more than 6 passengers when chartered with the crew provided, or<br>(C) Carry more than 12 passengers when chartered with no crew provided, or<br>(D) Carry at least 1 passenger-for-hire and are submersible vessels.[7]<br>(E) Carry more than 6 passengers and are ferries.<br>(iii) All vessels ≥100 gross tons that—<br>(A) Carry more than 12 passengers-for-hire whether chartered or not, or<br>(B) Carry more than 12 passengers when chartered with the crew provided, or<br>(C) Carry more than 12 passengers when chartered with no crew provided, or<br>(D) Carry at least 1 passenger-for-hire and are submersible vessels.[7]<br>(E) Carry at least 1 passenger and are ferries.<br>(iv) These regulations do not apply to—<br>(A) Recreational vessels not engaged in trade. | All vessels >15 gross tons carrying freight-for-hire, except those covered by columns 2 and 3. All vessels carrying dangerous cargoes, when required by 46 CFR part 98. | All vessels not covered by columns 2, 3, 4, and 6. | None ........................... | All vessels carrying cargoes in bulk that are listed in part 153, table 1, or part 154, table 4, or unlisted cargoes that would otherwise be subject to these parts.[12] |

(B) Documented cargo or tank vessels issued a permit to carry 16 or fewer persons in addition to the crew.

(C) Fishing vessels not engaged in ocean or coastwise service. Such vessels may carry persons on the legitimate business of the vessel[6] in addition to the crew, as restricted by the definition of passenger.[7]

| | | | | | | |
|---|---|---|---|---|---|---|
| (2) Motor, seagoing motor vessels ≥300 gross tons. | All vessels carrying combustible or flammable liquid cargo in bulk.[5] | (i) All vessels carrying more than 12 passengers on an international voyage, except recreational vessels not engaged in trade.[7]<br><br>(ii) All ferries <100 gross tons carrying more than 6 passengers and all ferries ≥100 gross tons that carry at least 1 passenger.<br>(iii) These regulations do not apply to—<br>(A) Recreational vessels not engaged in trade.<br>(B) Documented cargo or tank vessels issued a permit to carry 16 or fewer persons in addition to the crew.<br>(C) Fishing vessels not engaged in ocean or coastwise service may carry persons on the legitimate business of the vessel[6] in addition to the crew, as restricted by the definition of passenger.[7] | All vessels, including recreational vessels not engaged in trade. This does not include vessels covered by columns 2 and 3, and vessels engaged in the fishing industry. | All vessels not covered by columns 2, 3, 4, 6, and 7. | All vessels engaged in oceanographic research. | All vessels carrying cargoes in bulk that are listed in part 153, table 1, or part 154, table 4, or unlisted cargoes that would otherwise be subject to these parts.[12] |
| (3) Non-self-propelled vessels <100 gross tons. | All vessels carrying combustible or flammable liquid cargo in bulk.[5] | (i) All vessels that—<br>(A) Carry more than 6 passengers-for-hire whether chartered or not, or<br>(B) Carry more than 6 passengers when chartered with the crew provided, or<br>(C) Carry more than 12 passengers when chartered with no crew provided, or | All manned barges except those covered by columns 2 and 3. | All barges except those covered by column 3. | None | All tank barges carrying cargoes listed in Table 151.05 of this chapter or unlisted cargoes that would otherwise be subject to part 151.[1 11 12] |

TABLE 2.01–7(a)—Continued

| Method of propulsion, qualified by size or other limitation [1] | Vessels inspected and certificated under Subchapter D—Tank Vessels [2] | Vessels inspected and certificated under Subchapter H—Passenger Vessels [2 3 4 5] or Subchapter K or T—Small Passenger Vessels [2 3 4] | Vessels inspected and certificated under Subchapter I—Cargo and Miscellaneous Vessels [2 5] | Vessels subject to the provisions of Subchapter C—Uninspected Vessels [2 3 6 7 8] | Vessels subject to the provisions of Subchapter U—Oceanographic Vessels [2 3 6 7 9] | Vessels subject to the provisions of Subchapter O—Certain Bulk and Dangerous Cargoes [10] |
|---|---|---|---|---|---|---|
| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 |
| | | (D) Carry at least 1 passenger-for-hire and is a submersible vessel.[7] (E) Carry more than 12 passengers on an international voyage. (F) Carry more than 6 passengers and are ferries. | | | | |
| (4) Non-self-propelled vessels ≥100 gross tons. | All vessels carrying combustible or flammable liquid cargo in bulk.[5] | (iii) All vessels that— (A) Carry more than 12 passengers-for-hire whether chartered or not, or (B) Carry more than 12 passengers when chartered with the crew provided, or (C) Carry more than 12 passengers when chartered with no crew provided, or (D) Carry at least 1 passenger-for-hire and is a submersible vessel.[7] (E) Carry more than 12 passengers on an international voyage. (F) Carry at least 1 passenger and are ferries | All seagoing barges except a seagoing barge that is covered by column 2 or 3, or that is unmanned for the purposes of operating or navigating the barge, and that carries neither a hazardous material as cargo nor a flammable or combustible liquid, including oil, in bulk quantities of 250 barrels or more. | All barges except those covered by columns 3 and 6. | All seagoing barges engaged in oceanographic research. | All tank barges carrying cargoes listed in Table 151.05 of this chapter or unlisted cargoes that would otherwise be subject to part 151.[1 11 12] |
| (5) Sail [13] vessels ≤700 gross tons. | All vessels carrying combustible or flammable liquid cargo in bulk.[5] | (i) All vessels carrying more than 12 passengers on an international voyage, except recreational vessels not engaged in trade.[7] (ii) All vessels <100 gross tons that— (A) Carry more than 6 passengers-for-hire whether chartered or not, or (B) Carry more than 6 passengers when chartered with the crew provided, or | All vessels carrying dangerous cargoes, when required by 46 CFR part 98. | All vessels not covered by columns 2, 3, 4, and 6. | None .......................................... | All vessels carrying cargoes in bulk that are listed in part 153, table 1, or part 154, table 4, or unlisted cargoes that would otherwise be subject to these parts.[12] |

(C) Carry more than 12 passengers when chartered with no crew provided, or

(D) Carry at least 1 passenger-for-hire and are submersible vessels.[7]

(E) Carry more than 6 passengers and are ferries.

(iii) All vessels ≥100 gross tons that—

(A) Carry more than 12 passengers-for-hire whether chartered or not, or

(B) Carry more than 12 passengers when chartered with the crew provided, or

(C) Carry more than 12 passengers when chartered with no crew provided, or

(D) Carry at least 1 passenger-for-hire and are submersible vessels.[7]

(E) Carry at least 1 passenger and are ferries.

(iv) These regulations do not apply to—

(A) Recreational vehicles not engaged in trade.

(B) Documented cargo or tank vessels issued a permit to carry 16 or fewer persons in addition to the crew.

(C) Fishing vessels, not engaged in ocean or coastwise service. Such vessels may carry persons on the legitimate business of the vessel[8] in addition to the crew, as restricted by the definition of passenger.[7]

| (6) Sail[13] vessels >700 gross tons. | All vessels carrying combustible or flammable liquid cargo in bulk.[5] | (i) All vessels carrying passengers or passengers-for-hire, except recreational vessels.[7] (ii) All ferries that carry at least 1 passenger | All vessels carrying dangerous cargoes, when required by 46 CFR part 98. | All vessels not covered by columns 2, 3, 4, and 6. | None | All vessels carrying cargoes in bulk that are listed in part 153, Table 1, or part 154, Table 4, or unlisted cargoes that would otherwise be subject to these parts.[12] |

TABLE 2.01–7(a)—Continued

| Method of propulsion, qualified by size or other limitation [1] | Vessels inspected and certificated under Subchapter D—Tank Vessels [2] | Vessels inspected and certificated under Subchapter H—Passenger Vessels [2 3 4 5] or Subchapter K or T—Small Passenger Vessels [2 3 4] | Vessels inspected and certificated under Subchapter I—Cargo and Miscellaneous Vessels [2 5] | Vessels subject to the provisions of Subchapter C—Uninspected Vessels [2 3 6 7 8] | Vessels subject to the provisions of Subchapter U—Oceanographic Vessels [2 3 6 7 9] | Vessels subject to the provisions of Subchapter O—Certain Bulk and Dangerous Cargoes [10] |
|---|---|---|---|---|---|---|
| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 |
| (7) Steam, vessels ≤19.8 meters (65 feet) in length. | All vessels carrying combustible or flammable liquid cargo in bulk.[5] | (i) All vessels carrying more than 12 passengers on an international voyage, except recreational vessels not engaged in trade.[7]<br><br>(ii) All vessels <100 gross tons that–<br>(A) Carry more than 6 passengers-for-hire whether chartered or not, or<br>(B) Carry more than 6 passengers when chartered with the crew provided, or<br>(C) Carry more than 12 passengers when chartered with no crew provided, or<br>(D) Carry at least 1 passenger-for-hire and are submersible vessels.[7]<br>(E) Carry more than 6 passengers and are ferries.<br>(iii) All vessels ≥100 gross tons that–<br>(A) Carry more than 12 passengers-for-hire whether chartered or not, or<br>(B) Carry more than 12 passengers when chartered with the crew provided, or<br>(C) Carry more than 12 passengers when chartered with no crew provided, or<br>(D) Carry at least 1 passenger-for-hire and are submersible vessels.[7]<br>(E) Carry at least 1 passenger and are ferries.<br>(iv) These regulations do not apply to— | All tugboats and towboats. All vessels carrying dangerous cargoes, when required by 46 CFR part 98. | All vessels not covered by columns 2, 3, 4, and 6. | None ...................................... | All vessels carrying cargoes in bulk that are listed in part 153, table 1, or part 154, table 4, or unlisted cargoes that would otherwise be subject to these parts.[12] |

| (8) Steam, vessels >19.8 meters (65 feet) in length. | All vessels carrying combustible or flammable liquid cargo in bulk.[5] | (A) Recreational vessels not engaged in trade. (B) Documented cargo or tank vessels issued a permit to carry 16 or fewer persons in addition to the crew. (C) Fishing vessels not engaged in ocean or coastwise service. Such vessels may carry persons on the legitimate business of the vessel[6] in addition to the crew, as restricted by the definition of passenger.[7] (i) All vessels carrying more than 12 passengers on an international voyage, except recreational vessels not engaged in trade.[7] (ii) All vessels <100 gross tons that— (A) Carry more than 6 passengers-for-hire whether chartered or not, or (B) Carry more than 6 passengers when chartered with the crew provided, or (C) Carry more than 12 passengers when chartered with no crew provided, or (D) Carry at least 1 passenger-for-hire and are submersible vessels.[7] (E) Carry more than 6 passengers and are ferries. (iii) All vessels ≥100 gross tons that— (A) Carry more than 12 passengers-for-hire whether chartered or not, or (B) Carry more than 12 passengers when chartered with the crew provided, or (C) Carry more than 12 passengers when chartered with no crew provided, or | All vessels not covered by columns 2, 3, 6, and 7. | None .................................... | All vessels engaged in oceanographic research. | All vessels carrying cargoes in bulk that are listed in part 153, Table 1, or part 154, Table 4, or unlisted cargoes that would otherwise be subject to these parts.[1 2] |

TABLE 2.01–7(a)—Continued

| Method of propulsion, qualified by size or other limitation [1] | Vessels inspected and certificated under Subchapter D—Tank Vessels [2] | Vessels inspected and certificated under Subchapter H—Passenger Vessels [2 3 4 5] or Subchapter K or T—Small Passenger Vessels [2 3 4] | Vessels inspected and certificated under Subchapter I—Cargo and Miscellaneous Vessels [2 5] | Vessels subject to the provisions of Subchapter C—Uninspected Vessels [2 3 6 7 8] | Vessels subject to the provisions of Subchapter U—Oceanographic Vessels [2 3 6 7 9] | Vessels subject to the provisions of Subchapter O—Certain Bulk and Dangerous Cargoes [10] |
|---|---|---|---|---|---|---|
| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 |
| | | (D) Carry at least 1 passenger-for-hire and are submersible vessels.[7] | | | | |
| | | (E) Carry at least 1 passenger and are ferries. | | | | |
| | | (iv) These regulations do not apply to— | | | | |
| | | (A) Recreational vehicles not engaged in trade. | | | | |
| | | (B) Documented cargo or tank vessels issued a permit to carry 16 or fewer persons in addition to the crew. | | | | |
| | | (C) Fishing vessels not engaged in ocean or coastwise service. Such vessels may carry persons on the legitimate business of the vessel[8] in addition to the crew, as restricted by the definition of passenger.[7] | | | | |

**Key to symbols used in this table:** ≤means less than or equal to; >means greater than; <means less than; and ≥means greater than or equal to.

Footnotes:

[1] Where length is used in this table, it means the length measured from end to end over the deck, excluding sheer. This expression means a straight line measurement of the overall length from the foremost part of the vessel to the aftermost part of the vessel, measured parallel to the centerline.

[2] Subchapters E (Load Lines), F (Marine Engineering), J (Electrical Engineering), N (Dangerous Cargoes), S (Subdivision and Stability), and W (Lifesaving Appliances and Arrangements) of this chapter may also be applicable under certain conditions. The provisions of 49 CFR parts 171 through 179 apply whenever packaged hazardous materials are on board vessels (including motorboats), except when specifically exempted by law.

[3] Public nautical schoolships, other than vessels of the Navy and Coast Guard, must meet the requirements of part 167 of subchapter R (Nautical Schools) of this chapter. Civilian nautical schoolships, as defined by 46 U.S.C. 1331, must meet the requirements of subchapter H (Passenger Vessels) and part 168 of subchapter R (Nautical Schools) of this chapter.

[4] Subchapter H (Passenger Vessels) of this chapter covers only those vessels of 100 gross tons or more, subchapter T (Small Passenger Vessels) of this chapter covers only those vessels of less than 100 gross tons, and subchapter K (Small Passenger Vessels) of this chapter covers only those vessels less than 100 gross tons carrying more than 150 passengers or overnight accommodations for more than 49 passengers.

[5] Vessels covered by subchapter H (Passenger Vessels) or I (Cargo and Miscellaneous Vessels) of this chapter, where the principal purpose or use of the vessel is not for the carriage of liquid cargo, may be granted a permit to carry a limited amount of flammable or combustible liquid cargo in bulk. The portion of the vessel used for the carriage of the flammable or combustible liquid cargo must meet the requirements of subchapter D (Tank Vessels) in addition to the requirements of subchapter H (Passenger Vessels) or I (Cargo and Miscellaneous Vessels) of this chapter.

[6] Any vessel on an international voyage is subject to the requirements of the International Convention for Safety of Life at Sea, 1974 (SOLAS).

[7] The terms "passenger(s)" and "passenger(s)-for-hire" are as defined in 46 U.S.C. 2101(21)(21a). On oceanographic vessels, scientific personnel onboard shall not be deemed to be passengers nor seamen, but for calculations of lifesaving equipment, etc., must be counted as persons.

[8] Boilers and machinery are subject to examination on vessels over 40 feet in length.

[9] Under 46 U.S.C. 441 an oceanographic research vessel ". . . being employed exclusively in instruction in oceanography or limnology, or both, or exclusively in oceanographic research, . . ." Under 46 U.S.C. 443, "an oceanographic research vessel shall not be deemed to be engaged in trade or commerce." If or when an oceanographic vessel engages in trade or commerce, such vessel cannot operate under its certificate of inspection as an oceanographic vessel, but shall be inspected and certified for the service in which engaged, and the scientific personnel aboard then become persons employed in the business of the vessel.

[10] Bulk dangerous cargoes are cargoes specified in table 151.01–10(b); in table 1 of part 153, and in table 4 of part 154 of this chapter.

[11] For manned tankbarges, see § 151.01–10(c) of this chapter.

[12] See § 151.01–15, 153.900(d), or 154.30 of this chapter as appropriate.

[13] Sail vessel means a vessel with no auxiliary machinery on board. If the vessel has auxiliary machinery, refer to motor vessels.

(b)(1) A U.S.-flag towing vessel is subject to inspection and certifying regulations in subchapter M of this chapter except:

(i) A vessel less than 26 feet (7.92 meters) in length measured from end to end over the deck (excluding the sheer), unless that vessel is pushing, pulling, or hauling a barge that is carrying oil or hazardous material in bulk;

(ii) A vessel engaged in one or more of the following:

(A) Assistance towing as defined in §136.110 of this chapter;

(B) Towing recreational vessels for salvage; or

(C) Transporting or assisting the navigation of recreational vessels within and between marinas and marina facilities, within a limited geographic area, as determined by the local Captain of the Port;

(iii) A workboat operating exclusively within a worksite and performing intermittent towing within the worksite;

(iv) A seagoing towing vessel of 300 gross tons or more subject to the provisions of subchapter I of this chapter;

(v) A vessel inspected under other subchapters of this chapter that may perform occasional towing;

(vi) A public vessel as defined in 46 U.S.C. 2101;

(vii) A vessel which has surrendered its Certificate of Inspection and is laid up, dismantled, or otherwise out of service; and

(viii) A propulsion unit used for the purpose of propelling or controlling the direction of a barge where the unit is controlled from the barge, is not normally manned, and is not utilized as an independent vessel.

(2) A towing vessel not subject to subchapter M of this chapter should refer to table 2.01–7 of this section.

(c) The specific application of regulations concerning inspecting and certifying vessels is set forth in the specific subchapter governing a particular class of vessels.

(1) For passenger vessels see part 70 of subchapter H (Passenger Vessels) of this chapter.

(2) For cargo and miscellaneous vessels see part 90 of subchapter I (Cargo and Miscellaneous Vessels) of this chapter.

(3) For tank vessels see part 30 of subchapter D (Tank Vessels) of this chapter.

(4) For small passenger vessels see part 114 of subchapter K (Small Passenger Vessels Carrying More Than 150 Passengers or with Overnight Accommodations for More Than 49 Passengers) and part 175 of subchapter T (Small Passenger Vessels) of this chapter.

(5) For uninspected vessels see part 24 of subchapter C (Uninspected Vessels) of this chapter.

(6) For vessels carrying certain bulk dangerous cargoes see subchapter O of this chapter.

(7) For towing vessels, see part 136 of subchapter M of this chapter.

[CGFR 65–50, 30 FR 16604, Dec. 30, 1965]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting §2.01–7, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.govinfo.gov.*

§2.01–8 Application of regulations to vessels or tankships on an international voyage.

(a) Where, in various places or portions in this chapter, requirements are stipulated specifically for *vessels on an international voyage* or *tankships on an international voyage,* it is intended that these requirements apply only to vessels or tankships, as applicable, which are subject to the International Convention for Safety of Life at Sea, 1974.

(b) For details regarding application of Convention requirements to tankships, see §30.01–6 of this chapter; to passenger vessels, see §70.05–10 of this chapter; to cargo ships other than tankships, see §90.05–10 of this chapter; and to small passenger vessels, see §§115.900 and 176.900 of this chapter. (E.O. 11239, 30 FR 9671, 3 CFR, 1965 Supp.).

[CGFR 65–50, 30 FR 16604, Dec. 30, 1965, as amended by CGD 90–008, 55 FR 30659, July 26, 1990; USCG–1999–4976, 65 FR 6499, Feb. 9, 2000]

§2.01–10 Inspection requirements—domestic vessels.

(a) If during the inspection of a vessel made at the request of the master, owner, or agent, the vessel or her

equipment is found not to conform to the requirements of law or regulations in this chapter, the requirements which must be met will be listed on Form CG–835, Notice of Merchant Marine Inspection Requirements, and given to the master of the vessel.

(b) The Coast Guard, on its own initiative, may examine or inspect or reinspect at any time any vessel subject to inspection under subtitle II, title 46 of the U.S. Code, title 46 and title 33 U.S. Code. If during such examination, inspection, or reinspection, any failure to comply with any applicable requirement of law and/or applicable regulations in this chapter, or any defects or imperfections become apparent tending to render the navigation of the vessel unsafe, or that repairs have become necessary, the Coast Guard will so notify the master and state what is required.

[CGFR 65–50, 30 FR 16604, Dec. 30, 1965, as amended by CGD 95–028, 62 FR 51194, Sept. 30, 1997; USCG–2004–18884, 69 FR 58341, Sept. 30, 2004]

### § 2.01–13 Inspection requirements—foreign vessels.

(a) Foreign vessels registered in countries which are parties to the effective International Convention for Safety of Life at Sea are normally subject to the examination provided for in chapter I of that Convention. However, in the case of any vessel involving novel features of design or construction, upon which that Convention is silent or which involve potential unusual operating risks, a more extensive inspection may be required when considered necessary to safeguard the life or property in United States ports where such vessel may enter. In such a case, pertinent plans and/or calculations may be required to be submitted sufficiently in advance to permit evaluation before inspection.

(b) Foreign vessels registered in countries which are not parties to the effective International Convention for Safety of Life at Sea, or foreign vessels registered in countries which are parties to the effective Convention but which vessels are exempted from part or all of the Convention, may under conditions specified in applicable inspection laws be subject to inspection

and certification as specified in regulations governing specific categories of vessels.

(c) For details concerning application of regulations to foreign vessels, see part 30 (Tank Vessels), part 70 (Passenger Vessels), part 90 (Cargo and Miscellaneous Vessels), § 147.1 (Dangerous Cargoes), part 148 (Bulk Solid Hazardous Materials), parts 153 and 154 (Certain Bulk Dangerous Cargoes), and part 175 (Small Passenger Vessels) of this chapter.

[CGFR 65–50, 30 FR 16604, Dec. 30, 1965, as amended by CGD 73–96, 42 FR 49022, Sept. 26, 1977; CGD 97–057, 62 FR 51041, Sept. 30, 1997]

### § 2.01–15 Vessel repairs.

(a) No repairs or alterations affecting the safety of the vessel or its machinery shall be made unless applicable requirements in this chapter are met. The procedures to be followed in notifying the Coast Guard about vessel repairs vary according to the type of vessel and service in which engaged. The requirements are set forth in the subchapter governing a particular class of vessels or in a subchapter governing a particular subject as follows:

(1) For passenger vessels that are 100 gross tons or more, see §§ 71.55–1 and 71.60–1 of subchapter H (Passenger Vessels) of this chapter.

(2) For small passenger vessels under 100 gross tons, see either § 176.700 of subchapter T (Small Passenger Vessels) or § 115.700 of subchapter K (Small Passenger Vessels Carrying More than 150 Passengers or with Overnight Accommodations for more than 49 Passengers) of this chapter.

(3) For cargo and miscellaneous vessels, see §§ 91.45–1 and 91.50–1 of subchapter I (Cargo and Miscellaneous Vessels) of this chapter.

(4) For tank vessels, see §§ 31.10–25 and 35.01–1 of subchapter D (Tank Vessels) of this chapter.

(5) For public nautical schoolships, see §§ 167.30–1 and 167.30–10 of subchapter R (Nautical Schools) of this chapter.

(6) For oceanographic vessels, see §§ 189.45–1 and 189.50–1 of subchapter U (Oceanographic Vessels) of this chapter.

(7) For repairs to a vessel after it has been surveyed, see § 42.09–50 of subchapter E (Load Lines) of this chapter.

(8) For repairs to boilers, pressure vessels, and appurtenances, see part 59 of subchapter F (Marine Engineering) of this chapter.

(9) For repairs to electrical installations or equipment, see §§ 111.05–5(e), 111.05–10(e), and 111.90–5 of subchapter J (Electrical Engineering) of this chapter.

(10) For vessels carrying compressed gases regulated by subchapter O (Certain Bulk Dangerous Cargoes), see § 151.50 30(c) of this chapter.

(11) For repairs to a vessel that affects its subdivision or stability, see § 170.005 of this chapter.

(b) If repairs to a vessel are necessary, such a vessel may be permitted to proceed to another port for repairs, if, in the opinion of the marine inspector, it can be done with safety. The permit is granted by the Officer in Charge, Marine Inspection, upon request in writing by the master or owner of the vessel and is issued on Coast Guard Form CG–948, Permit to Proceed to Another Port for Repairs. The requirements for such permits are set forth in the subchapter governing a particular class of vessels as follows:

(1) For passenger vessels that are 100 gross tons or more, see subpart 71.05 of subchapter H (Passenger Vessels) of this chapter.

(2) For small passenger vessels under 100 gross tons, see subpart B of subchapter T (Small Passenger Vessels) of this chapter.

(3) For cargo and miscellaneous vessels, see subpart 91.05 of subchapter I (Cargo and Miscellaneous Vessels) of this chapter.

(4) For tank vessels, see § 31.10–35 of subchapter D (Tank Vessels) of this chapter.

(5) For public nautical schoolships, see § 167.30–5 of subchapter R (Nautical Schools) of this chapter.

(6) For oceanographic vessels, see subpart 189.05 of subchapter U (Oceanographic Vessels) of this chapter.

[CGFR 68–126, 34 FR 9010, June 5, 1969, as amended by CGD 73–96, 42 FR 49023, Sept. 26, 1977; CGD 79–023, 48 FR 51006, Nov. 4, 1983; CGD 97–057, 62 FR 51041, Sept. 30, 1997; USCG–2004–18884, 69 FR 58341, Sept. 30, 2004]

### § 2.01–20 Suspension or revocation of certificates of inspection.

Under the authority if 46 U.S.C. 3313 and 46 U.S.C. 3710, a certificate of inspection issued to a vessel may be suspended or revoked if a vessel is found not to comply with the terms of its certificate or fails to meet a standard required by this chapter.

[CGD 95–028, 62 FR 51195, Sept. 30, 1997, as amended by USCG–1998–4442, 63 FR 52188, Sept. 30, 1998; USCG–2004–18884, 69 FR 58341, Sept. 30, 2004]

### § 2.01–25 International Convention for Safety of Life at Sea, 1974.

(a) *Certificates required.* (1) The International Convention for Safety of Life at Sea, 1974, requires one or more of the following certificates to be carried on board certain passenger, cargo or tankships engaged in international voyages:

(i) Passenger Ship Safety Certificate.

(ii) Cargo Ship Safety Construction Certificate.

(iii) Cargo Ship Safety Equipment Certificate.

(iv) Cargo Ship Safety Radio Certificate.

(v) Nuclear Passenger Ship Safety Certificate.

(vi) Nuclear Cargo Ship Safety Certificate.

(vii) Safety Management Certificate.

(viii) International Ship Security Certificate.

(ix) High-Speed Craft Safety Certificate.

(x) Polar Ship Certificate.

(2) The U.S. Coast Guard will issue through the Officer In Charge, Marine Inspection, the following certificates after performing an inspection or safety management audit of the vessel's systems and determining the vessel meets the applicable requirements:

(i) Passenger Ship Safety Certificate.

(ii) Cargo Ship Safety Construction Certificate, except when issued to cargo ships by a Coast Guard recognized classification society at the option of the owner or agent.

(iii) Cargo Ships Safety Equipment Certificate.

(iv) Exemption Certificate.

(v) Nuclear Passenger Ship Safety Certificate.

Add. 114

(vi) Nuclear Cargo Ship Safety Certificate.

(vii) Safety Management Certificate, except when issued by a recognized organization authorized by the Coast Guard.

(viii) International Ship Security Certificate (ISSC).

(ix) High-Speed Craft Safety Certificate.

(x) Polar Ship Certificate.

(3) When authorized by the Commandant, U.S. Coast Guard, an authorized classification society may issue international convention certificates as permitted under part 8, subpart C, of this title.

(4) The Federal Communications Commission will issue the following certificates:

(i) Cargo Ship Safety Radio Certificate.

(ii) Exemption Certificate.

(b) *Applications.* (1) The application for inspection and issuance of a certificate or certificates is made on the appropriate form listed in § 2.01–1, or by letter, to the Officer in Charge, Marine Inspection, in or nearest the port at which the inspection is to be made and shall be signed by the master or agent of the vessel. The certificates previously issued are surrendered at the time the inspection is performed. Further details are set forth in subchapter D (Tank Vessels), subchapter H (Passenger Vessels), subchapter I (Cargo and Miscellaneous Vessels), subchapter K (Small Passenger Vessels Carrying more than 150 Passengers or with overnight accommodations for more than 49 Passengers), subchapter L (Offshore Supply Vessels), subchapter O (Certain Bulk Dangerous Cargoes), subchapter T (Small Passenger Vessels), and subchapter U (Oceanographic Research Vessels), of this chapter.

(2) For vessels other than passenger vessels, you must contact the local office of the Federal Communications Commission to apply for the inspection concerning the issuance of a Cargo Ship Safety Radio Certificate.

(c) *Certificates issued.* (1) If a vessel meets the applicable requirements of the Convention, it shall be issued appropriate certificates listed in paragraph (a) of this section. These certificates describe the vessel and state the vessel is in compliance with the applicable requirements of the Convention.

(2) A Convention certificate may be withdrawn, revoked or suspended at any time when it is determined the vessel is no longer in compliance with applicable requirements. (See § 2.01–70 for appeal procedures.)

(d) *CG–969—Notice of Receipt of Application for Passenger Ship Safety Certificate.* (1) The Passenger Ship Safety Certificate is issued by the Commandant after determining all applicable requirements of the Convention have been met. In the event the completion of the certification of any passenger vessel cannot be effected prior to the sailing of the passenger ship on a foreign voyage, or in any case where the Passenger Ship Safety Certificate is not received from the Commandant before the ship sails on a foreign voyage, the Officer in Charge, Marine Inspection, will issue a completed Form CG–969, describing the passenger ship and certifying that an application for a Passenger Ship Safety Certificate is being processed, and that in his opinion the vessel meets applicable requirements of the Convention administered by the Coast Guard.

(2) The completed Form CG–969 may be exhibited in explanation of the failure of the passenger ship to have on board a current Passenger Ship Safety Certificate. This completed form CG–969 may be accepted as prima facie evidence that the passenger ship described therein is in compliance with the applicable requirements of the Convention.

(e) *Exempted vessel.* (1) A vessel may be exempted by the Commandant from complying with certain requirements of the Convention under his administration upon request made in writing to him and transmitted via the Officer in Charge, Marine Inspection. In such case the exemptions are stated in the Exemption Certificate, which is issued by the Commandant through the appropriate Officer in Charge, Marine Inspection.

(2) The Federal Communications Commission issues the Exemption Certificate, which modifies the Cargo Ship Safety Radio Certificate.

(f) *Availability of Certificates.* The Convention certificates must be on board

28

Add. 115

the vessel and readily available for examination at all times.

(g) *Foreign flag vessels.* At the request of the government of a country in which is registered a vessel engaged in an international voyage, such a vessel may be issued the applicable certificate or certificates listed in paragraph (a) of this section. The certificate will be issued only after inspection has been made by the issuing agency, providing the vessel is found to comply with the requirements of the Convention.

[CGFR 65–50, 30 FR 16604, Dec. 30, 1965]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting §2.01–25, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.govinfo.gov.*

§2.01–30 **Delegation of OCMI signature authority.**

The Officer in Charge, Marine Inspection, may redelegate signature authority for documents issued under this subpart to: one individual on his or her staff; and each Marine Safety Unit Commanding Officer within his or her Sector.

[USCG–2009–0702, 74 FR 49223, Sept. 25, 2009]

§2.01–40 **Passengers or persons in addition to crew on cargo or tank vessels.**

(a) Under the authority of 46 U.S.C. 3304, a documented vessel transporting cargo may be allowed by its certificate of inspection to carry not more than 12 individuals in addition to the crew on international voyages and not more than 16 individuals in addition to the crew on other voyages.

(b) The application for permission to carry persons in addition to the crew may be included in the application described in §2.01–1. If granted it is endorsed on the certificate of inspection.

[CGFR 65–50, 30 FR 16604, Dec. 30, 1965, as amended by CGD 95–028, 62 FR 51195, Sept. 30, 1997]

§2.01–45 **Excursion permit.**

(a) Under 46 U.S.C. 2113, the Coast Guard may issue a permit to the owner, operator, or agent of a passenger vessel, allowing the vessel to engage in excursions that carry additional numbers of passengers, extend an existing route, or both. Details concerning the application process for excursion permits for inspected passenger vessels are contained in §§71.10, 115.204, or 176.204 of this chapter. Details concerning the application process for special permits for uninspected passenger vessels are contained in §26.03–6 of this chapter.

(b) For Marine Events of National Significance, as determined by the Commandant, U.S. Coast Guard, a vessel may be permitted to engage in these events while carrying passengers-for-hire for the duration of the event. Event sponsors must request this determination in writing from the Commandant (CG–54) at least 1 year prior to the event. Details concerning the application process for special permits for Marine Events of National Significance are contained in §26.03–8 of this chapter.

(c) The application for an excursion permit is made by the master, owner, or agent of the vessel to the Officer in Charge, Marine Inspection, on Coast Guard Form CG–950, Application for Excursion Permit. If, after inspection, permission is granted, it is given on Coast Guard form CG–949, Permission to Carry Excursion Party. The permit describes the vessel, the route over which and the period during which the excursions may be made, and the safety equipment required for the additional persons indicated.

[USCG–1999–5040, 67 FR 34767, May 15, 2002]

§2.01–50 **Persons other than crew on towing, oyster, or fishing steam vessels.**

(a) A steam vessel engaged in towing, oyster dredging and planting, and fishing may be permitted to carry persons in addition to its crew.

(b) The application for a permit to carry such persons may be included in the application described in §2.01–1. If granted it is endorsed on the certificate of inspection.

[CGFR 65–50, 30 FR 16604, Dec. 30, 1965, as amended by CGD 95–028, 62 FR 51195, Sept. 30, 1997]

§2.01–60 **Overtime compensation.**

(a) *General.* Extra compensations for overtime services performed by inspectors of vessels and their assistants who

Add. 116

may be required to remain on duty between the hours of 5:00 p.m. and 8:00 a.m. or on Sundays or holidays to perform services in connection with the inspection of vessels or their equipment, supplying or signing on or discharging crews of vessels is authorized by 46 U.S.C. 2111 and regulations in part 9 of this chapter, together with the method of computing such extra compensation.

(b) *Application and certification of time.* Application for the performance of such overtime services and certification of services performed is made by the master, owner, or agent of a vessel to the Officer in Charge, Marine Inspection, on Form CG–830, Application for and Certificate of Overtime Service.

(c) *Collection.* The bill for the collection of the overtime compensation is submitted by the Officer in Charge, Marine Inspection to the master, owner, or agent on whose vessel overtime services are performed on Form CG–832, Bill for Collection Overtime Services. Payment is made to the Collector of Customs of the port designated.

[CGFR 65–50, 30 FR 16604, Dec. 30, 1965, as amended by CGD 97–057, 62 FR 51041, Sept. 30, 1997; USCG–2000–7790, 65 FR 58458, Sept. 29, 2000]

§ 2.01–70   **Right of appeal.**

Any person directly affected by a decision or action taken under this part, by or on behalf of the Coast Guard, may appeal therefrom in accordance with subpart 1.03 of this chapter.

[CGD 88–033, 54 FR 50379, Dec. 6, 1989]

§ 2.01–80   **Vessel inspections in Alaska.**

(a) The waters of southeastern Alaska inside of the general trend of the shore from Cape Spencer, southeasterly to Cape Muzon, and thence easterly to Sitklan Island, shall be considered as bays, sounds, and lakes other than the Great Lakes, for the purpose of administering the vessel inspection laws and applicable regulations in this chapter.

## Subpart 2.10—Fees

Source: CGD 91–030, 60 FR 13563, Mar. 13, 1995, unless otherwise noted.

§ 2.10–1   **Applicability.**

(a) This subpart establishes inspection and examination fees for all owners or operators requesting certification, including those for vessels that are required to have a Certificate of Inspection and those required to have a Certificate of Compliance.

(b) The fees in this subpart do not apply to:

(1) Vessels being inspected for the initial issuance of a Certificate of Inspection;

(2) Foreign passenger vessels;

(3) Training vessels operated by State maritime academies;

(4) Public vessels of the United States except for Maritime Administration vessels; and

(5) Publicly owned ferries.

[CGD 91–030, 60 FR 13563, Mar. 13, 1995, as amended by CGD 96–067, 62 FR 19232, Apr. 21, 1997; USCG–2010–0759, 75 FR 60001, Sept. 29, 2010; USCG–2013–0671, 78 FR 60144, Sept. 30, 2013]

§ 2.10–5   **Exemptions.**

(a) Vessels owned or operated by a non-profit organization may be exempted from payment of the fees required by this subpart, only if the vessel is used exclusively for one or more of the following:

(1) Training youth in boating, seamanship, or navigation skills;

(2) Educating youth in a course of marine environmental studies;

(3) Providing excursions for persons with disabilities as defined under the Americans with Disabilities Act (ADA) [42 U.S.C. 12102(2)]; or

(4) Providing medical services.

(b) Vessels owned or operated by the Federal government or the government of any State or political subdivision thereunder may be exempted from the fees required by this subpart provided the vessel is used exclusively for one or more of the purposes listed in paragraph (a) of this section.

(c) The term *used exclusively* in paragraphs (a) and (b) of this section does not preclude:

(1) The carriage of adult volunteers or crew, or

(2) The vessel's use for fundraising activities without regard to the age of

the participants aboard the vessel, provided revenues raised are for the operation and maintenance of the vessel and that such fundraising activities do not exceed one day of fundraising for each month of the vessel's operating season.

(d) Vessel owners or operators may submit a written request for exemption to the Officer in Charge, Marine Inspection, of the Marine Inspection Zone in which the vessel normally operates. The exemption request must provide the vessel name, the vessel identification number, and evidence that the organization and the vessel meet the criteria set forth in this section. The Officer in Charge, Marine Inspection will endorse and forward the request to Commandant (CG–DCO–83) for decision.

[CGD 96–067, 62 FR 19232, Apr. 21, 1997, as amended by CGD 96–067, 63 FR 59474, Nov. 4, 1998; USCG–2010–0759, 75 FR 60001, Sept. 29, 2010]

**§2.10–10   Waivers.**

The Commandant (CG–DCO–83) will waive collection of vessel inspection fees in this subpart for a Federally-owned or operated vessel if the fee would be directly paid by an agency acting as the vessel owner using Federal appropriated funds. By October 1 of each year, Federal agencies shall provide Commandant (CG–DCO–83) with a list of the names and vessel identification numbers of vessels for which a fee waiver is requested.

[CGD 91–030, 60 FR 13563, Mar. 13, 1995, as amended by CGD 95–072, 60 FR 50459, Sept. 29, 1995; CGD 96–041, 61 FR 50725, Sept. 27, 1996; USCG–2010–0759, 75 FR 60001, Sept. 29, 2010]

**§2.10–20   General requirements.**

(a) Unless otherwise specified, vessel owners must pay the fees required by this subpart before inspection or examination services are provided.

(b) Fees required by this subpart must be paid in U.S. currency by check or money order, drawn on a U.S. bank, and made payable to the U.S. Treasury. Payment may also be made by credit card or wire transfer.

(c) All payments must be accompanied by the vessel name and its vessel identification number.

(d) Unless otherwise specified or if payment is made through *www.pay.gov*,

fees required by this subpart must be submitted using one of the following methods:

(1) For COI and COC Inspections:

(i) For payment by credit card, online through *www.pay.gov*, or U.S. Coast Guard Finance Center (OGR), 1430A Kristina Way, Chesapeake, VA 23326.

(ii) For payment by check, made payable to U.S. Treasury, with delivery by postal service, USCG Vessel Inspections Fees, P.O. Box 979118, St. Louis, MO 63197–9000.

(iii) For payment by check, made payable to U.S. Treasury, with delivery by overnight courier, USCG Vessel Inspection Fees, Lockbox No. 979118, U.S. Bank Government Lockbox, 1005 Convention Plaza, ATTN: GOVERNMENT LOCKBOX, SL–MOC1 GL, St. Louis, MO 63101.

(2) For Overseas Inspection Fees:

(i) For payment by credit card, U.S. Coast Guard Finance Center (OGR), 1430A Kristina Way, Chesapeake, VA 23326.

(ii) For payment by check, made payable to U.S. Treasury, with delivery by postal service, USCG User Fees, P.O. Box 979125, St. Louis, MO 63197–9000.

(iii) For payment by check, made payable to U.S. Treasury, with delivery by overnight courier, USCG User Fees, Lockbox No. 979125, U.S. Bank Government Lockbox, 1005 Convention Plaza, ATTN: GOVERNMENT LOCKBOX, SL–MOC1 GL, St. Louis, MO 63101.

(e) For purposes of this subpart, the address for Commandant (CG–DCO–83), Attn: Office of Budget Execution, U.S. Coast Guard Stop 7318, 2703 Martin Luther King Jr. Avenue SE., Washington, DC 20593–7318.

(f) Information concerning a vessel's user fee anniversary date may be obtained from any Coast Guard Coast Guard Sector, Officer in Charge, Marine Inspection, or Marine Safety Detachment.

[CGD 91–030, 60 FR 13563, Mar. 13, 1995, as amended by CGD 95–072, 60 FR 50459, Sept. 29, 1995; CGD 96–041, 61 FR 50725, Sept. 27, 1996; USCG–2010–0759, 75 FR 60001, Sept. 29, 2010; USCG–2011–0618, 76 FR 60753, Sept. 30, 2011; USCG–2012–0832, 77 FR 59773, Oct. 1, 2012; USCG–2018–0874, 84 FR 30881, June 28, 2019]

**§ 2.10–25  Definitions.**

The following definitions apply to this subpart:

*Drill ship MODU* means a mobile offshore drilling unit with a ship shape displacement hull intended for operation in the floating condition.

*Ferry* means a vessel that is used on a regular schedule—

(1) To provide transportation only between places that are not more than 300 miles apart; and

(2) To transport only—

(i) Passengers; or

(ii) Vehicles, or railroad cars, that are being used, or have been used, in transporting passengers or goods.

*Freight barge* means a non-self-propelled vessel carrying freight for hire.

*Freight ship* means a self-propelled freight vessel.

*Freight vessel* means a motor vessel of more than 15 gross tons that carries freight for hire, except an oceanographic research vessel or an offshore supply vessel.

*Industrial vessel* means a vessel which, by reason of its special outfit, purpose, design, or function engages in certain industrial ventures. For the purposes of this subpart, this classification includes such vessels as dredges, cable layers, derrick barges, and construction and wrecking barges, but does not include vessels which carry passengers or freight for hire, OSVs, oceanographic research vessels, or vessels engaged in the fisheries.

*Liquefied gas tankship* means a self-propelled vessel equipped with cargo tanks primarily designed to carry liquefied or compressed gases in bulk.

*Mobile offshore drilling unit (MODU)* means a vessel capable of engaging in drilling operations for the exploration or exploitation of subsea resources that is: seagoing and 300 or more gross tons and self-propelled by machinery; Seagoing and 100 or more gross tons and non-self-propelled; or more than 65 feet in length and propelled by steam.

*Nautical school vessel* means a vessel operated by or in connection with a nautical school or an educational institution under section 13 of the Coast Guard Authorization Act of 1986, Public Law 99–640.

*Non-profit organization* means an organization under Internal Revenue Code (I.R.C.) section 501(c) which is exempt for the purposes of federal income taxation.

*Oceanographic research vessel* means a vessel that is being employed only in instruction in oceanography or limnology, or both, or only in oceanographic or limnological research, including those studies about the sea such as seismic, gravity meter, and magnetic exploration and other marine geophysical or geological surveys, atmospheric research, and biological research.

*Offshore supply vessel* or *OSV* means a vessel that—

(1) Is propelled by machinery other than steam;

(2) Does not meet the definition of a passenger-carrying vessel in 46 U.S.C. 2101(22) or 46 U.S.C. 2101(35);

(3) Is more than 15 gross tons; and

(4) Regularly carries goods, supplies, individuals in addition to the crew, or equipment in support of exploration, exploitation, or production of offshore mineral or energy resources.

*Passenger barge* means a non-self-propelled passenger vessel, including a prison barge or a barge which carries occupied recreational vehicles.

*Passenger ship* means a self-propelled passenger vessel.

*Passenger vessel* means a vessel of at least 100 gross tons:

(1) Carrying more than 12 passengers, including at least one passenger for hire;

(2) That is chartered and carrying more than 12 passengers;

(3) That is a submersible vessel carrying at least one passenger for hire; or

(4) That is a ferry carrying a passenger.

*Political subdivision* means a county, district, parish, township, city or similar governmental entity established within a State.

*Publicly owned* means, owned by (1) the federal government, or (2) the government of any State or political subdivision thereunder.

*Sailing school vessel* means a vessel of less than 500 gross tons, carrying more than 6 individuals who are sailing school instructors or sailing school students, principally equipped for propulsion by sail even if the vessel has an auxiliary means of propulsion, and

owned or demise chartered and operated by a qualified organization during such times as the vessel is operated exclusively for the purposes of sailing instruction.

*Sea-going towing vessel* means a seagoing commercial vessel engaged in or intending to engage in the service of pulling, pushing or hauling alongside, or any combination of pulling, pushing or hauling alongside, that has been issued a Certificate of Inspection under the provisions of subchapter I of this chapter.

*Self-elevating MODU* means a mobile offshore drilling unit with movable legs capable of raising its hull above the surface of the sea.

*Semi-submersible MODU* means a mobile offshore drilling unit with the main deck connected to an underwater hull by columns or caissons, that is intended for drilling operations in the floating condition.

*Small passenger vessel* means a vessel of less than 100 gross tons:

(1) Carrying more than 6 passengers, including at least 1 passenger for hire;

(2) That is chartered with the crew provided or specified by the owner or the owner's representative and carrying more than 6 passengers;

(3) That is chartered with no crew provided or specified by the owner or the owner's representative and carrying more than 12 passengers;

(4) That is a submersible vessel carrying at least one passenger for hire; or

(5) That is a ferry carrying more than 6 passengers.

*State* means a State of the United States, Guam, Puerto Rico, the Virgin Islands, American Samoa, the District of Columbia, the Northern Mariana Islands and any other territory or possession of the United States.

*Submersible MODU* means a mobile offshore drilling unit intended for drilling operations in the bottom-bearing condition, having the main deck connected to an underwater hull or pontoons by way of columns or caissons.

*Submersible vessel* means a vessel that is capable of operating below the surface of the water.

*Tank barge* means any tank vessel not equipped with means of propulsion.

*Tank vessel* means a vessel that is constructed or adapted to carry, or that carries, oil or hazardous material in bulk as cargo or cargo residue.

*Tankship* means any tank vessel propelled by power or sail, including an integrated tug and barge designed to operate together only in the pushing mode.

*User fee anniversary date* means the date on which a vessel's annual inspection fee is due each year. Once established by the Coast Guard, a vessel's user fee anniversary date remains fixed for as long as the vessel remains in service.

*Vessel identification number* (VIN) means a U.S. official number, a number assigned by a State, a number assigned by the Coast Guard, or a Lloyd's Register of Shipping identification number issued to a U.S. or foreign commercial vessel for purposes of vessel identification. For U.S. vessels, VIN means the number listed on the Certificate of Inspection. For foreign vessels, VIN means either the Lloyd's Register of Shipping identification number or the number assigned by the Coast Guard.

*Youth* means an individual 21 years of age or younger.

[CGD 91–030, 60 FR 13563, Mar. 13, 1995, as amended by CGD 96–067, 62 FR 19232, Apr. 21, 1997; CGD 97–057, 62 FR 51041, Sept. 30, 1997; CGD 96–067, 63 FR 59474, Nov. 4, 1998; USCG 2008–1107; 74 FR 63628, Dec. 4, 2009; USCG–2012–0208, 79 FR 48924, Aug. 18, 2014; USCG–2006–24412, 81 FR 40100, June 20, 2016]

**§2.10–101 Annual vessel inspection fee.**

(a)(1) Unless otherwise provided by this subpart, each vessel required to have a Certificate of Inspection is subject to the annual vessel inspection fee listed in table 2.10–101 for its vessel category.

(2) A vessel certificated for more than one service must pay only the higher of the two applicable fees in table 2.10–101 of this section.

(b) The vessel owner or operator must pay the annual vessel inspection fee each year on or before the vessel's user fee anniversary date, unless the fee has been prepaid under §2.10–105 of this subpart.

(c) Payment of the annual vessel inspection fee entitles a vessel to all inspection services related to compliance

33

with its Certificate of Inspection, including but not limited to the inspection for renewal of the Certificate of Inspection, reinspections (annual and periodic inspections), hull (drydock) inspections, deficiency inspections, damage surveys, repair and modification inspections, change in vessel service inspections, permit to proceed inspections, drydock extension inspections, and all inspections required for the issuance of international certificates.

(d) Entitlement to inspection services for the current year remains with the vessel if it is sold. The entitlement to inspection services may not be transferred to any other vessel.

TABLE 2.10–101—ANNUAL VESSEL INSPECTION FEES FOR U.S. AND FOREIGN VESSELS REQUIRING A CERTIFICATE OF INSPECTION

| | |
|---|---|
| Any inspected vessel not listed in this table ............ | $1,030 |
| Freight Barges: | |
|    Length not greater than 150 feet ........................ | 495 |
|    More than 150 feet but not more than 300 feet ... | 610 |
|    More than 300 feet ............................................... | 955 |
| Freight Ships: | |
|    Length not greater than 100 feet ........................ | 1,425 |
|    More than 100 feet but no more than 300 feet ... | 1,870 |
|    More than 300 feet ............................................... | 5,410 |
| Industrial Vessels: | |
|    Length not greater than 200 feet ........................ | 1,435 |
|    More than 200 feet ............................................... | 2,550 |
| Mobile Offshore Drilling Units (MODUs): | |
|    Drill ship MODUs ................................................. | 6,710 |
|    Submersible MODUs ............................................ | 4,695 |
|    Self-elevating MODUs .......................................... | 4,695 |
|    Semi-submersible MODUs .................................... | 8,050 |
| Nautical School Vessels: | |
|    Length not greater than 100 feet ........................ | 835 |
|    More than 100 feet but not more than 200 feet ... | 1,450 |
|    More than 200 feet ............................................... | 7,205 |
| Oceanographic Research Vessels: | |
|    Length not greater than 170 feet ........................ | 840 |
|    More than 170 feet but not more than 240 feet ... | 1,980 |
|    More than 240 feet ............................................... | 3,610 |
| Offshore Supply Vessels: | |
|    Length not greater than 140 feet ........................ | 1,135 |
|    More than 140 feet ............................................... | 1,470 |
| Offshore Supply Vessels: Alternate Reinspection Program *: | |
|    Length not greater than 140 feet ........................ | 940 |
|    More than 140 feet ............................................... | 1,260 |
| Passenger Barges: | |
|    Less than 100 gross tons and: | |
|      Less than 65 feet in length .............................. | 300 |
|      65 feet or more in length ................................. | 600 |
|    100 gross tons or more and: | |
|      Certified for fewer than 150 passengers ... | 2,215 |
|      Certified for 150 or more passengers ........ | 2,525 |
| Passenger Ships: | |
|    Length not greater than 250 feet: | |
|      Certified for fewer than 150 passengers .... | 3,600 |
|      Certified for 150 or more passengers ........ | 4,050 |
|    More than 250 feet but not more than 350 feet ... | 5,330 |
|    More than 350 feet but not more than 450 feet ... | 6,835 |
|    More than 450 feet ............................................... | 14,650 |
| Sailing School Vessels: | |
|    Length not greater than 30 feet ......................... | 530 |

TABLE 2.10–101—ANNUAL VESSEL INSPECTION FEES FOR U.S. AND FOREIGN VESSELS REQUIRING A CERTIFICATE OF INSPECTION—Continued

| | |
|---|---|
|    More than 30 feet but not more than 65 feet .... | 560 |
|    More than 65 feet ............................................... | 980 |
| Sea-going Towing Vessels .......................................... | 2,915 |
| Small Passenger Vessels: | |
|    Less than 65 feet in length ................................ | 300 |
|    65 feet or more in length ................................... | 600 |
| Tank Barges .............................................................. | 500 |
| Tankships: | |
|    Length not greater than 100 feet ........................ | 1,295 |
|    More than 100 feet but not more than 300 feet ... | 2,310 |
|    More than 300 feet ............................................... | 5,805 |
| Liquefied Gas Tankships ............................................ | 12,120 |

*Note: Eligibility for the reduced annual vessel inspection fee for Offshore Supply Vessels is contingent upon the vessel's continued acceptance in the alternative reinspection program by the cognizant Officer in Charge, Marine Inspection.

[CGD 91–030, 60 FR 13563, Mar. 13, 1995, as amended by CGD 96–067, 62 FR 19232, Apr. 21, 1997; USCG–2004–18884, 69 FR 58341, Sept. 30, 2004; USCG–2010–0759, 75 FR 60001, Sept. 29, 2010]

§ 2.10–105  Prepayment of annual vessel inspection fees.

(a) Vessel owners may prepay the annual vessel inspection fee for any period of not less than three years, and not more than the design life or remaining expected service life of the vessel.

(b) To prepay the annual vessel inspection fee for a period of three or more years, the owner must submit a written request to Commandant (CG–DCO–83) specifying the vessel identification number and the period for which prepayment is to be made.

(c) The total of the annual fees for the requested prepayment period will be discounted to its net present value using the following formula:

$$PV = \sum_{t=0}^{n} \frac{R_0(1+\pi)^t}{(1+i)^t}$$

Where:

PV is the Present Value of the series of annual user fees to be prepaid (the net amount to be prepaid)

$R_O$ is the published user fee of the vessel

i is the interest rate for 10-year Treasury notes at the time of prepayment calculation

$\pi$ is the rate of inflation (based on projected military personnel costs at the time of prepayment calculation)

n is the total number of years to be prepaid

t is the number of years after prepayment of the fee, for each annual increment (t = 0, 1, 2, 3 ... n)

(d) When the annual vessel inspection fee has been prepaid, the entitlement to inspection services for the prepayment period attaches to the vessel and remains with the vessel if it is sold. The entitlement to inspection services may not be transferred to any other vessel.

(e) If a vessel is removed from Coast Guard certification and the vessel owner surrenders the vessel's Certificate of Inspection, the owner may request a refund of the remaining prepayment amount. The annual vessel inspection fee will not be refunded for the year in which the Certificate of Inspection is surrendered. The request for refund must be submitted to the Officer in Charge, Marine Inspection to whom the Certificate of Inspection is surrendered. The Officer in Charge, Marine Inspection will endorse and forward the request to Commandant (CG–DCO–83) for decision.

[CGD 91–030, 60 FR 13563, Mar. 13, 1995, as amended by CGD 95–072, 60 FR 50459, Sept. 29, 1995; CGD 96–041, 61 FR 50725, Sept. 27, 1996; USCG–1999–6216, 64 FR 53223, Oct. 1, 1999; USCG–2010–0759, 75 FR 60001, Sept. 29, 2010]

### § 2.10–115 Changes in vessel service.

(a) If a vessel certificated for a single service, changes service, the annual vessel inspection fee is not adjusted during the year in which a change in service occurs. The annual vessel inspection fee for the new vessel category is payable on the vessel's user fee anniversary date immediately following the date of the change in service.

(b) If a change in service occurs and the annual vessel inspection fee has been prepaid, Commandant (CG–DCO–83) will recalculate the prepayment amount based on the new vessel category and advise the owner of available prepayment options.

[CGD 91–030, 60 FR 13563, Mar. 13, 1995, as amended by CGD 95–072, 60 FR 50459, Sept. 29, 1995; CGD 96–041, 61 FR 50725, Sept. 27, 1996; USCG–2004–18884, 69 FR 58341, Sept. 30, 2004 ; USCG–2010–0759, 75 FR 60000, Sept. 29, 2010]

### § 2.10–120 Overseas inspection and examination fees.

(a) In addition to any other fee required by this subpart, an overseas inspection and examination fee of $4,585 must be paid for each vessel inspection and examination conducted outside the United States and its territories. This fee does not apply to vessel inspections and examinations conducted in Canada, Mexico, or the British Virgin Islands.

(b) The overseas inspection and examination fee for each vessel must be received before an overseas inspection or examination is conducted.

[CGD 91–030, 60 FR 13563, Mar. 13, 1995, as amended by USCG–2013–0671, 78 FR 60144, Sept. 30, 2013]

### § 2.10–125 Fees for examination of foreign tankships.

Each foreign tankship of a country party to the International Convention for the Safety of Life at Sea, 1974 as amended, must pay:

(a) For examination for the issuance of a Certificate of Compliance under § 2.01–6(a)(2)(i) of this part, or examination for the annual endorsement to a Certificate of Compliance, a fee of $1,100.

(b) For examination for the issuance of a Tank Vessel Examination Letter under § 2.01–6(a)(3) of this part, a fee of $1,100.

[CGD 91–030, 60 FR 13563, Mar. 13, 1995, as amended by USCG–2010–0759, 75 FR 60001, Sept. 29, 2010]

### § 2.10–130 Fees for examination of foreign mobile offshore drilling units.

Each foreign mobile offshore drilling unit must pay:

(a) For examination for the issuance of a Certificate of Compliance indicating compliance with the design and equipment standards of either the documenting nation or the International Maritime Organization Code for Construction and Equipment of Mobile Offshore Drilling Units, a fee of $1,830.

(b) For examination for the issuance of a Certificate of Compliance indicating compliance with the design and equipment standards of 46 CFR part 108, the inspection fee listed in table

Add. 122

2.10–101 of this subpart for the same type of mobile offshore drilling unit.

[CGD 91–030, 60 FR 13563, Mar. 13, 1995, as amended by USCG–2010–0759, 75 FR 60001, Sept. 29, 2010]

### § 2.10–135 Penalties.

(a) A vessel owner or operator who fails to pay a fee or charge established under this subpart is liable to the United States Government for a civil penalty.

(b) In addition to the fees established in this subpart, the Coast Guard may recover collection and enforcement costs associated with delinquent payments of, or failure to pay, a fee. Coast Guard inspection and examination services may also be withheld pending payment of outstanding fees owed to the Coast Guard for inspection and examination services provided.

(c) Each District Commander or Officer in Charge Marine Inspection may request the Secretary of the Treasury, or the authorized representative thereof, to withhold or revoke the clearance required by 46 U.S.C. app. 91 of a vessel for which a fee or charge established under this part has not been paid or until a bond is posted for the payment.

[CGD 91–030, 60 FR 13563, Mar. 13, 1995, as amended by CGD 96–052, 62 FR 16703, Apr. 8, 1997]

## Subpart 2.20—Reports and Forms

### § 2.20–40 Chief engineer's reports.

(a) Repairs to boilers and pressure vessels. The chief engineer is required to report any repairs to boilers or unfired pressure vessels in accordance with §§ 33.25–5, 78.33–1, and 97.30–1 of this chapter.

(b) The chief engineer of any vessel is required to report any accident to a boiler, unfired pressure vessel, or machinery tending to render the further use of the item unsafe until repairs are made by §§ 35.25–5, 78.33–5, and 97.30–5 of this chapter.

(c) When fusible plugs in boilers are renewed at a time other than the inspection for certification and there is no marine inspector in attendance at the renewal, the chief engineer must report the renewal of the fusible plugs by letter to the OCMI who issued the certificate of inspection. This letter report must contain the following information:

(1) Name and official number of vessel.

(2) Date of renewal of fusible plugs.

(3) Number and location of fusible plugs renewed in each boiler.

(4) Manufacturer and heat number of each plug.

(5) Reason for renewal.

[CGFR 65–50, 30 FR 16604, Dec. 30, 1965, as amended by CGFR 68–82, 33 FR 18804, Dec. 18, 1968; USCG–2004–18884, 69 FR 58341, Sept. 30, 2004]

### § 2.20–50 Repairs or alterations in life-saving or fire prevention equipment.

No repairs or alterations shall be made to any lifesaving or fire-detecting or fire-extinguishing equipment, except in an emergency, without advance notice to the Officer in Charge, Marine Inspection. See §§ 78.33–10 and 97.30–10 of this chapter.

[CGFR 65–50, 30 FR 16604, Dec. 30, 1965, as amended by CGD 97–057, 62 FR 51041, Sept. 30, 1997; USCG–2004–18884, 69 FR 58341, Sept. 30, 2004]

## Subpart 2.45—Classification Society Activities

SOURCE: 77 FR 47551, Aug. 9, 2012, unless otherwise noted.

### § 2.45–1 Definitions.

The following definitions apply to this subpart:

*Administration* means the Government of the State whose flag the ship is entitled to fly.

*Classification society* means an organization that, at a minimum, verifies that a vessel meets requirements embodying the technical rules, regulations, standards, guidelines and associated surveys, and inspections covering the design, construction, and/or through life compliance of a ship's structure and essential engineering and electrical systems.

*Recognized Organization (RO)* means an organization authorized to act on behalf of an Administration.

*Regional port state control secretariat* means an organization established to collect and maintain port state control

inspection data in addition to other functions under a regional agreement among countries.

### §2.45–5 Incorporation by reference.

(a) Certain material is incorporated by reference into this part with the approval of the Director of the Federal Register under 5 U.S.C. 552(a) and 1 CFR part 51. To enforce any edition other than that specified in this section, the Coast Guard must publish notice of change in the FEDERAL REGISTER and the material must be available to the public. All approved material is available for inspection at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030 or go to *http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.* Also, it is available for inspection at the Coast Guard Headquarters. Contact Commandant (CG–ENG), Attn: Office of Design and Engineering Systems, U.S. Coast Guard Stop 7509, 2703 Martin Luther King Jr. Avenue SE., Washington, DC 20593–7509, and is available from the sources indicated in this section.

(b) International Maritime Organization, 4 Albert Embankment, London SE1 7SR, U.K. + 44 (0)20 7735 7611, *http://www.imo.org/.*

(1) IMO Resolution A.739(18), Guidelines for the Authorization of Organizations Acting on Behalf of the Administration, adopted 4 November 1993, incorporation by reference approved for §2.45–15.

(2) [Reserved]

### §2.45–10 General.

(a) A classification society (including an employee or agent of that society) must not review, examine, survey, or certify the construction, repair, or alteration of a vessel in the United States unless it is approved under the provisions of this subpart.

(b) This subpart applies to a recognized organization that meets the definition of a classification society provided in §2.45–1 of this subpart.

### §2.45–15 Approval requirements.

(a) A classification society may be approved for purpose of §2.45–10 if the following conditions are met:

(1) Vessels surveyed by the classification society must have a worldwide port state control detention rate of less than 2 percent based on the number of Recognized Organization (RO)-related detentions divided by the number of vessel inspections for at least 40 port state control inspections for the past 3 years;

(2) The classification society must not be identified in the most recent publication of ''Port State Control in the United States'' as a Priority I and as having more than one RO-related detention for the past 3 years;

(3) The classification society must comply with the minimum standards for an RO recommended in IMO Resolution A.739(18), Appendix 1 (incorporated by reference, see §2.45–5.);

(4) The classification society must be an RO for at least one country under a formal written agreement that includes all of the elements described in IMO Resolution A.739(18), Appendix 2 (incorporated by reference, see §2.45–5.);

(5) The referenced country that is cited for satisfaction of the requirement of paragraph (a)(4) of this section for which the classification society is an RO—

(i) Must be signatory to each of the following: The International Safety of Life at Sea Convention (SOLAS), the International Convention on the Prevention of Pollution from Ships (MARPOL 73/78), the International Convention on Load Lines (ICLL), 1966, and the Protocol of 1988 relating to the ICLL, 1966; and

(ii) Must not be identified as a flag state targeted for additional port state control action by the Coast Guard or any regional port state control secretariat.

(6) The classification society must use a system to—

(i) Make its safety records and those of persons acting on behalf of the classification society available to the Coast Guard in electronic format;

(ii) Provide its safety records and those of persons acting on behalf of the

37

Add. 124

classification society to another classification society that requests those records for the purpose of conducting surveys of vessels; and

(iii) Request the safety records of a vessel to be surveyed from any other classification society that previously surveyed that vessel.

(b) Where sufficient performance records are not available from a regional port state control secretariat, the Coast Guard may consider an equivalent safety performance indicator proposed by the classification society seeking approval.

### § 2.45–20 Probation, suspension, and revocation.

(a) A classification society approved for the purpose of this subpart must maintain the minimum requirements for approval set forth in § 2.45–15.

(b) If an approved classification society fails to maintain compliance with paragraph (a) of this section, the Coast Guard may place the classification society approval on probation, or suspend or revoke the classification society's approval, as appropriate.

(c) *Probation.* A classification society on probation is approved for the purpose of this subpart. The probation continues until the next review of the classification society's compliance with paragraph (a) of this section.

(1) If the review shows that compliance with paragraph (a) of this section is achieved, the probation may end.

(2) If the review shows significant improvement but compliance with paragraph (a) of this section is not achieved, the probation may be extended.

(3) If the review does not show significant improvement, and compliance with paragraph (a) of this section is not achieved, the approval may be suspended.

(d) *Suspension.* A classification society whose approval is suspended is not approved for the purpose of this subpart. Suspension will continue until the next review of the classification society's compliance with paragraph (a) of this section.

(1) If the review shows compliance with paragraph (a) of this section, the classification society's approval may be restored.

(2) If the review shows significant improvement toward compliance with paragraph (a) of this section, the suspension may be extended.

(3) If the review does not show significant improvement and compliance with paragraph (a) of this section, the classification society's approval may be revoked.

(e) *Revocation.* A classification society whose approval is revoked is not approved for the purpose of this subpart. The classification society may reapply for approval when the requirements of § 2.45–15 are met.

(f) The Coast Guard's Office of Design and Engineering Standards (CG–ENG) administers probations, suspensions, and revocations and makes all related notifications to affected classification societies.

### § 2.45–25 Application for approval.

(a) An application for approval must be made in writing and in the English language to Commandant (CG–ENG), Attn: Office of Design and Engineering Systems, U.S. Coast Guard Stop 7509, 2703 Martin Luther King Jr. Avenue SE., Washington, DC 20593–7509.

(b) The application must—

(1) Indicate the type of work the classification society intends to perform on vessels in the United States;

(2) Include documentation demonstrating that the classification society complies with § 2.45–15;

(3) Contain a list of the vessels surveyed by the classification society over the previous 3 calendar years. The list must include vessel names, flags, and IMO numbers, as well as initial vessel inspections and detentions; and

(4) Provide a summary of the safety records of vessels the classification society surveys for each of the previous 3 calendar years, including initial vessel inspections and detentions for all data contained in regional port state control Memoranda of Understanding (MOU) and other port state control data sources, including the U.S. Coast Guard.

(c) An application submitted in accordance with 46 CFR part 8, subpart B satisfies the application requirements of paragraph (a) of this section, provided the applicant:

(1) Has been notified in writing by the Commandant that it met the criteria to be a recognized classification society, and its recognized status has not been revoked, under 46 CFR part 8, subpart B;

(2) Submits in writing and in the English language to the address in paragraph (a) of this section a statement that the applicant is applying for approval under this subpart; and

(3) Certifies in the submission under paragraph (c)(2) of this section that the information in the application submitted under 46 CFR part 8, subpart B remains valid.

§ 2.45–30 **Penalties.**

The owner, charterer, managing operator, agent, master, or individual in charge of a vessel that employs a classification society to review, examine, survey, or certify the construction, repair, or alteration of a vessel in the United States is subject to civil penalties in accordance with Title 46 U.S.C. 3318 if the classification society is not approved by the Coast Guard under this subpart.

## Subpart 2.50—Penalties

§ 2.50–1 **Penalty procedures.**

Civil and criminal penalty procedures appear in 33 CFR part 1. Civil monetary penalty amounts are set forth in 33 CFR part 27.

[CGD 96–052, 62 FR 16703, Apr. 8, 1997]

## Subpart 2.75—Approvals of Safety Equipment, Materials and Installations, and Qualifications for Construction Personnel

§ 2.75–1 **Approvals.**

(a) Certain navigation and vessel inspection laws, or regulations in this chapter or in 33 CFR chapter I, require the Commandant's approval before specific types of safety equipment, materials, or installations may be installed or used on vessels subject to Coast Guard inspection, or on other described vessels, motorboats, artificial islands, and fixed structures.

(b) The Commandant's approvals are issued to persons, partnerships, companies, or corporations who offer for sale

specific items of safety equipment, materials, or installations, or intend them for their own or others' use. These approvals are intended to provide a control over the quality of such approved items. The Commandant's approvals apply only to those items constructed or installed in accordance with applicable requirements, and the details as described in the documents granting specific approval. If a specific item when manufactured does not comply with these details, then it is not considered to be approved and the approval issued does not apply to such modified item. For example, if an item is manufactured with changes in design or material not previously approved, the approval does not apply to such modified item. The failure to comply with applicable requirements and details specified in the approval subjects the holder to immediate suspension of approval as described in § 2.75–40, and if necessary, to a public hearing seeking withdrawal of approval and removal of all such items from use or installation as provided in § 2.75–50.

(c) The Commandant's approvals are issued to qualified holders in the form of certificates of approval (Form CGHQ–10030), by appropriate description and identification in documents filed with the Office of the Federal Register and published in the FEDERAL REGISTER, or by letters, or by appropriate markings on drawings, plans, etc. Under the direction of the Commandant, the Deputy for Operations Policy and Capabilities (CG–DCO–D) is delegated the authority to exercise the necessary actions relating to the granting, suspension, cancellation or revocation of approvals for special items of safety equipment, materials or installations required by law in regulation in this chapter or in 33 CFR chapter I to have the Commandant's approval. The authority delegated to the Deputy for Operations Policy and Capabilities (CG–DCO–D) may be further delegated by him.

(d) The approvals granted to holders qualifying under the regulations in this chapter or in specifications, copies of which may be obtained from the Commandant (CG–ENG), and to which official Coast Guard numbers are assigned,

will be in the form of certificates of approval. Unless specifically provided otherwise, the approval shall be valid for a period of five years from the date on the certificate of approval, but subject to suspension and/or cancellation if it is found the item offered, sold, or used as Coast Guard approved differs in any detail from the item as described in the certificate of approval and referenced material.

(e) A specific Commandant's approval granted to anyone, which is described in a certificate of approval, or a letter, or marked plans, etc., cannot be transferred to another without a specific prior authorization from the Commandant. Such a transfer without the Commandant's authorization normally terminates such approval.

(f) A listing of current and formerly approved equipment and materials may be found on the internet at: *http://cgmix.uscg.mil/equipment*. Each OCMI may be contacted for information concerning approved equipment.

[CGFR 65–50, 30 FR 16604, Dec. 30, 1965, as amended by CGD 82–063b, 48 FR 4781, Feb. 3, 1983; CGD 88–070, 53 FR 34533, Sept. 7, 1988; CGD 95–072, 60 FR 50459, Sept. 29, 1995; CGD 93–055, 61 FR 13927, Mar. 28, 1996; CGD 96–041, 61 FR 50725, Sept. 27, 1996; CGD 97–057, 62 FR 51041, Sept. 30, 1997; USCG–2004–18884, 69 FR 58341, Sept. 30, 2004; USCG–2010–0759, 75 FR 60001, Sept. 29, 2010]

§ 2.75–5 Certificates of approval.

(a) The Deputy for Operations Policy and Capabilities (CG–DCO–D) or his delegate, will issue a certificate of approval to the manufacturer or party named therein and certify that such manufacturer or party has submitted satisfactory evidence that the item described therein complies with the applicable laws and regulations, which are outlined on the reverse side of the certificate.

(b) The approval shall be in effect for a period of 5 years from the date on the certificate of approval unless canceled or suspended by proper authority, or otherwise specifically stated in the certificate.

[CGFR 65–50, 30 FR 16604, Dec. 30, 1965, as amended by CGD 82–063b, 48 FR 4781, Feb. 3, 1983; CGD 88–070, 53 FR 34533, Sept. 7, 1988; CGD 96–041, 61 FR 50725, Sept. 27, 1996; CGD 97–057, 62 FR 51041, Sept. 30, 1997; USCG–2004–18884, 69 FR 58341, Sept. 30, 2004]

§ 2.75–10 Procedures for obtaining approvals.

(a) The requirements for obtaining approvals of items covered by specifications and bearing official Coast Guard approval numbers are set forth in parts 159 through 164 of this chapter. For other items, the requirements are described in the regulations governing such items.

(b) Unless otherwise specified, correspondence concerning approvals should be addressed to the Commandant (CG–ENG), Attn: Office of Design and Engineering Systems, U.S. Coast Guard Stop 7509, 2703 Martin Luther King Jr. Avenue SE., Washington, DC 20593–7509. When plans, drawings, test data, etc., are required to be submitted by the manufacturer, the material being transmitted with the application should be clearly identified.

[CGD 76–048, 44 FR 73043, Dec. 17, 1979, as amended by CGD 82–063b, 48 FR 4781, Feb. 3, 1983; CGD 88–070, 53 FR 34533, Sept. 7, 1988; CGD 95–072, 60 FR 50459, Sept. 29, 1995; CGD 96–041, 61 FR 50725, Sept. 27, 1996]

§ 2.75–15 Requirements and tests.

(a) Approved items described in certificates of approval are usually required to meet specific requirements and/or tests, prior to obtaining the approval. Additional factory tests to determine that proper uniformity and quality controls are followed during the manufacture of the specific items may be required. These requirements governing the manufacturer in particular are set forth in the regulations in this chapter or in specifications, copies of which may be obtained from the Commandant (CG–ENG). If the requirements are met, a certificate of approval will be issued.

(b) When the specific item described in an application, together with accompanying drawings, plans, etc., does not meet applicable requirements or fails to meet specified tests, the applicant will be notified accordingly. The Coast Guard may suggest changes in order for the item to qualify and permit the issuance of an approval.

(c) For items not covered by specification requirements in parts 160 to 164, inclusive (subchapter Q—Specifications) of this chapter, the requirements in the navigation and vessel inspection

laws, and applicable regulations in this chapter or in 33 CFR chapter I apply and shall be met before approvals may be issued.

[CGFR 65–50, 30 FR 16604, Dec. 30, 1965, as amended by CGD 82–063b, 48 FR 4781, Feb. 3, 1983; CGD 88–070, 53 FR 34533, Sept. 7, 1988; CGD 95–072, 60 FR 50459, Sept. 29, 1995; CGD 96–041, 61 FR 50725, Sept. 27, 1996]

### §2.75–25 Portable fire extinguishers.

(a) The portable fire extinguishers listed and labeled as *marine type* by a recognized laboratory, as provided in subpart 162.028 of part 162 of subchapter Q (Specifications) of this chapter, will be accepted as approved for use on merchant vessels, motorboats, etc., whenever required by the regulations in this chapter, and for use on artificial islands and fixed structures on the Outer Continental Shelf whenever required by the regulations in 33 CFR parts 140 to 146, inclusive.

(b) The procedures for manufacturers to follow and the requirements governing portable fire extinguishers to qualify being listed and labeled as *marine type* by a recognized laboratory are set forth in subpart 162.028 of part 162 of subchapter Q (Specifications) of this chapter.

(c) The procedures for a laboratory to qualify as a *recognized laboratory* and to be listed in §162.028–5 of subchapter Q (Specifications) of this chapter are as follows:

(1) The laboratory shall submit an informal application in writing on its usual letterhead paper to the Commandant (CG–5PS), Attn: Director of Commercial Regulations, U.S. Coast Guard Stop 7509, 2703 Martin Luther King Jr. Avenue SE., Washington, DC 20593–7509, requesting recognition and listing, as a recognized laboratory.

(2) Accompanying the informal application, as identified enclosures, shall be:

(i) A certification that it is a laboratory which has been and is regularly engaged in the examination, testing, and evaluation of portable fire extinguishers.

(ii) A certification that it has an established factory inspection, listing, and labeling program, together with a complete description of it and how it works.

(iii) A description of its facilities used in the examination, testing, and evaluation of portable fire extinguishers, together with its name (if different from that of submitter), and location (city, street, and state).

(iv) A list of the names and home and office addresses of its principal officers and its managing directors (if any).

(v) A description of its special standards for listing and labeling portable fire extinguishers as *marine type*, as contemplated by the specification in subpart 162.028 of part 162 of subchapter Q (Specifications) of this chapter.

(3) If the Commandant finds that a laboratory qualifies as a *recognized laboratory*, and it is subject to Coast Guard jurisdiction, the approval and listing will be published on the Coast Guard's Maritime Information eXchange Web site at *http://cgmix.uscg.mil/equipment* and will be in effect until suspended, canceled or terminated by proper authority. The failure of a recognized laboratory to maintain its established factory inspection, listing and labeling program as approved by the Commandant shall be cause for terminating a listing as a *recognized laboratory*.

[CGFR 65–50, 30 FR 16604, Dec. 30, 1965, as amended by CGD 82–063b, 48 FR 4781, Feb. 3, 1983; USCG–2015–0867, 80 FR 62469, Oct. 16, 2015]

### §2.75–40 Suspension of approval.

(a) Whenever it is determined that a specific item is not in compliance with the applicable laws, rules, and regulations, and the requirements specified in the approval issued by the Coast Guard, the District Commander or the Officer in Charge, Marine Inspection, will immediately notify the holder of the approval wherein the specific item fails to meet applicable requirements. If the defects, deficiencies or variations in the item are deemed important, such officer is authorized and may immediately suspend the approval, may require the holder to surrender the certificate of approval (if any), and may direct the holder to cease claiming the defective items are Coast Guard approved, pending a final decision from the Commandant in the matter.

Add. 128

(b) The procedures for appealing the temporary suspension shall be those described in § 2.01–70.

### § 2.75–50  Withdrawals or terminations of approvals and appeals.

(a) The Commandant may withdraw approval for any item which is found not to be in compliance with the conditions of approval, found to be unsuitable for its intended purpose, or does not meet the requirements of applicable regulations.

(b) Approvals of equipment are terminated when the manufacturer is no longer in business, or when the item is no longer being manufactured, or when the approval expires.

(c) Any person directly affected by a decision to deny, withdraw, or terminate an approval may appeal the decision to Director of Commercial Regulations & Standards (CG–5PS) as provided in § 1.03–15 of this chapter.

[CGFR 65–50, 30 FR 16604, Dec. 30, 1965, as amended by CGD 93–055, 61 FR 13927, Mar. 28, 1996; CGD 96–041, 61 FR 50725, Sept. 27, 1996; CGD 97–057, 62 FR 51041, Sept. 30, 1997; USCG–2004–18884, 69 FR 58341, Sept. 30, 2004]

### § 2.75–60  Hazardous ships' stores.

Hazardous ships' stores, as defined in § 147.3 of this chapter, must not be brought on board or used on any vessel unless they meet the requirements of part 147 of this chapter.

[CGD 84–044, 53 FR 7748, Mar. 10, 1988]

### § 2.75–70  Welding procedure and performance qualifications.

(a) Welding procedures and welder performance utilized in the fabrication of vessels and their various systems and components subject to Coast Guard inspection shall be qualified as required by the applicable subchapter. For applicable requirements see §§ 32.60–1(a) of subchapter D (Tank Vessels), § 72.01–15 of subchapter H (Passenger Vessels), § 92.01–10 of subchapter I (Cargo and Miscellaneous Vessels), or § 190.01–10 of subchapter U (Oceanographic Vessels) of this chapter. See part 57 of subchapter F (Marine Engineering) for requirements for the welding of pressure piping, boilers, pressure vessels, and nonpressure vessel type tanks, and associated secondary barriers as defined in § 38.05–4 of sub-

chapter D (Tank Vessels) of this chapter.

[CGFR 68–82, 33 FR 18804, Dec. 18, 1968]

## Subpart 2.85—Load Lines

### § 2.85–1  Assignment of load lines.

Most U.S. vessels, and foreign vessels in U.S. waters are required to have load line assignments in accordance with 46 U.S.C. Chapter 51. The load lines marks, when placed on a vessel, indicate the maximum draft to which such vessel can be lawfully submerged, in the various circumstances and seasons applicable to such vessel. See subchapter E (Load Lines) of this chapter for applicable details governing assignment and marking of load lines.

[CGD 95–028, 62 FR 51195, Sept. 30, 1997, as amended by USCG–1998–4442, 63 FR 52188, Sept. 30, 1998; USCG–2004–18884, 69 FR 58341, Sept. 30, 2004]

## Subpart 2.90—Plans, Drawings or Blueprints

### § 2.90–1  General requirements.

(a) Drawings, blueprints or plans showing the details of construction of vessels subject to inspection or installations thereon are required to be submitted for approval in accordance with applicable regulations in this chapter, information as to which may be obtained at any local Marine Inspection Office.

(b) The requirements for passenger vessel construction are in parts 43–46, 70–78, of this chapter.

(c) The requirements for tank vessel construction are in parts 30–39, 43–45, of this chapter.

(d) The requirements for cargo and miscellaneous vessel construction are in parts 43–45, 90–97, of this chapter.

(e) The requirements for marine engineering installations or equipment are in parts 50–69 of this chapter.

(f) The requirements for electrical engineering installations or equipment are in parts 110–113 of this chapter.

(g) The requirements for items to be manufactured under specific approval by the Commandant are in parts 160–164 of this chapter.

(h) The requirements for vessels carrying certain bulk dangerous cargoes

are in parts 148, 151, 153, and 154 of this chapter.

(i) The requirements for subdivision and stability plans and calculations are in part 170 of this chapter.

[CGFR 65–50, 30 FR 16604, Dec. 30, 1965, as amended by CGD 73–96, 42 FR 49203, Sept. 26, 1977; CGD 79–023, 48 FR 51006, Nov. 4, 1983]

## Subpart 2.95—Retention of Records by the Public

### § 2.95–1 Certificates or documents issued by Coast Guard.

(a) Certificates or documents issued to the public, as required by laws, rules, or regulations, shall be retained for the applicable period of time, as follows:

(1) If the certificate or document specifies a definite period of time for which it is valid, it shall be retained for so long as it is valid unless it is required to be surrendered; or,

(2) If the certificate or document does not specify a definite period of time for which it is valid, it shall be retained for that period of time such certificate or document is required for operation of the vessel; or,

(3) If the certificate or document is evidence of a person's qualifications, it shall be retained for so long as it is valid unless it is required to be surrendered.

(b) Nothing in this section shall be construed as preventing the Coast Guard from canceling, suspending, or withdrawing any certificate or document issued at any time.

### § 2.95–5 Certificates or documents issued by others.

(a) Certificates or documents issued by other public agencies or private organizations, which are accepted as prima facie evidence of compliance with requirements administered by the Coast Guard, shall be retained for the applicable period of time as follows:

(1) If the certificate or document specifies a definite period of time for which it is valid, it shall be retained for so long as it is valid unless it is required to be surrendered; or

(2) If the certificate or document does not specify a definite period of time for which it is valid, it shall be retained for the period of time such cer-

tificate or document is required for operation of the vessel; or,

(3) If the certificate or documents is evidence of a person's qualifications, it shall be retained for so long as it is valid unless it is required to be surrendered.

### § 2.95–10 Equipment or material required to be approved.

(a) The manufacturer of any equipment or material, which must also be approved by or found satisfactory for use by the Commandant, shall keep the required drawings, plans, blueprints, specifications, production models (if any), qualification tests, and related correspondence containing evidence that the Coast Guard has found such equipment or material satisfactory, during the period of time the approval or listing is valid. Most of the specifications containing detailed descriptions of records required to be retained by the public are in parts 160 to 164, inclusive in subchapter Q (Specifications) of this chapter.

## PART 3—DESIGNATION OF OCEANOGRAPHIC RESEARCH VESSELS

### Subpart 3.01—Authority and Purpose

Sec.
3.01–1  Purpose of regulations.

### Subpart 3.03—Application

3.03–1  Vessels subject to the requirements of this part.

### Subpart 3.05—Definition of Terms Used in This Part

3.05–1  Letter of designation.
3.05–3  Oceanographic research vessel.

### Subpart 3.10—Designation

3.10–1  Procedures for designating oceanographic research vessels.
3.10–5  Renewal of letter of designation.
3.10–10  Right of appeal.

AUTHORITY: 46 U.S.C. 2113, 3306; Department of Homeland Security Delegation No. 0170.1.

SOURCE: CGD 77–081, 46 FR 56202, Nov. 16, 1981, unless otherwise noted.

43

# SUBCHAPTER H—PASSENGER VESSELS

## PART 70—GENERAL PROVISIONS

### Subpart 70.01—Authority and Purpose

Sec.
70.01–1  Purpose of regulations.
70.01–7  Right of appeal.
70.01–15  OMB control numbers assigned pursuant to the Paperwork Reduction Act.

#### Subpart 70.05—Application

70.05–1  United States flag vessels subject to the requirements of this subchapter.
70.05–3  Foreign vessels subject to the requirements of this subchapter.
70.05–5  Specific application noted in text.
70.05–7  Ocean or unlimited coastwise vessels on inland and Great Lakes Routes.
70.05–10  Application to vessels on an international voyage.
70.05–18  Applicability to vessels operating under an exemption afforded in the Passenger Vessel Safety Act of 1993 (PSVA).
70.05–20  Gross tonnage as a criterion for requirements.
70.05–30  Combustible and flammable liquid cargo in bulk.

#### Subpart 70.10—Definition of Terms Used in This Subchapter

70.10–1  Definitions.

#### Subpart 70.15—Equivalents

70.15–1  Conditions under which equivalents may be used.

#### Subpart 70.20—General Marine Engineering Requirements

70.20–1  Marine engineering details.

#### Subpart 70.25—General Electrical Engineering Requirements

70.25–1  Electrical engineering details.

#### Subpart 70.28—Lifesaving Appliances and Arrangements

70.28–1  Lifesaving appliances and arrangements.

#### Subpart 70.35—American Bureau of Shipping's Standards

70.35–1  Standards to be used.
70.35–5  Where obtainable.

AUTHORITY: 46 U.S.C. 2103, 3306, 3703; E.O. 12234, 45 FR 58801, 3 CFR, 1980 Comp., p. 277, sec. 1–105; Department of Homeland Security Delegation No. 0170.1(II)(92)(a), (92)(b).

SOURCE: CGFR 65–50, 30 FR 16890, Dec. 30, 1965, unless otherwise noted.

## Subpart 70.01—Authority and Purpose

### § 70.01–1  Purpose of regulations.

The purpose of the regulations in this subchapter is to set forth uniform minimum requirements for passenger vessels. The regulations are necessary to carry out the provisions of law affecting passenger vessels and such regulations have the force of law. The regulations in this subchapter (parts 70, 71, 72, 76, 77, 78, and 80) have preemptive effect over State or local regulations in the same field.

[CGFR 65–50, 30 FR 16890, Dec. 30, 1965, as amended by CGD 95–028, 62 FR 51203, Sept. 30, 1997, USCG–2012–0196; 81 FR 48251, July 22, 2016]

### § 70.01–7  Right of appeal.

Any person directly affected by a decision or action taken under this subchapter, by or on behalf of the Coast Guard, may appeal therefrom in accordance with subpart 1.03 of this chapter.

[54 FR 50380, Dec. 6, 1989]

### § 70.01–15  OMB control numbers assigned pursuant to the Paperwork Reduction Act.

(a) *Purpose.* This section collects and displays the control numbers assigned to information collection and recordkeeping requirements in this subchapter by the Office of Management and Budget (OMB) pursuant to the Paperwork Reduction Act of 1980 (44 U.S.C. 3501 *et seq.*). The Coast Guard intends that this section comply with the requirements of 44 U.S.C. 3507(f) which requires that agencies display a current control number assigned by the Director of the OMB for each approved agency information collection requirement.

(b) *Display.*

5

| 46 CFR part or section where identified or described | Current OMB control No. |
|---|---|
| § 71.10 | 1625–0032 |
| § 71.50–5 | 1625–0032 |
| § 78.17–22 | 1625–0064 |
| § 78.17–33 | 1625–0064 |

[49 FR 38120, Sept. 27, 1984, as amended by CGD 88–072, 53 FR 34297, Sept. 6, 1988; CGD 89–037, 57 FR 41822, Sept. 11, 1992; USCG–2004–18884, 69 FR 58347, Sept. 30, 2004]

## Subpart 70.05—Application

### § 70.05–1 United States flag vessels subject to the requirements of this subchapter.

(a) This subchapter is applicable to all U.S.-flag vessels indicated in Column 3 of table 2.01–7(A) that are 100 gross tons or more, except as follows:

(1) Any vessel operating exclusively on inland waters which are not navigable waters of the United States; or,

(2) Any vessel while laid up and dismantled and out of commission; or,

(3) With the exception of vessels of the U.S. Maritime Administration, any vessel with title vested in the United States and which is used for public purposes.

(b) The requirements for notification of safety standards and for safety information and country of registry in promotional literature or advertising of a domestic passenger vessel of 100 gross tons or over having berth or stateroom accommodations for 50 or more passengers are contained in part 80 of this chapter.

[CGFR 65–50, 30 FR 16890, Dec. 30, 1965]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting § 70.05–1, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at www.govinfo.gov.

### § 70.05–3 Foreign vessels subject to the requirements of this subchapter.

(a) Except as specifically noted in paragraphs (b) and (e), and (f) of this section, parts 70 to 78, inclusive, of this subchapter, shall be applicable to the extent prescribed by law to all foreign vessels of the following classifications indicated in column 4 of table 70.05–1(a) that are 100 gross tons or over:

(1) Foreign vessels which carry more than 12 passengers from any port in the United States; or,

(2) Foreign vessels, other than those mentioned in paragraph (a)(1) of this section, which carry more than 6 passengers from any port in the United States, and which are:

(i) Sailing vessels of 100 gross tons or over and not more than 700 gross tons; or,

(ii) Non-self-propelled vessels of 100 gross tons.

(b) The provisions of parts 70 to 78, inclusive, of this subchapter shall not be applicable to those foreign vessels covered by paragraph (a) of this section which are:

(1) Any vessel of a foreign nation signatory to the International Convention for Safety of Life at Sea, 1974, and which has on board a current valid safety certificate; or,

(2) Any vessel of a foreign nation having inspection laws approximating those of the United States together with reciprocal inspection arrangements with the United States, and which has on board a current valid certificate of inspection issued by its government under such arrangements.

(c) Notwithstanding the exceptions previously noted in paragraph (b) of this section, foreign vessels of novel design or construction, or whose operation involves potential unusual risks shall be subject to inspection to the extent necessary to safeguard life and property in United States' ports, as further provided by § 2.01–13 of subchapter A (Procedures Applicable to the Public) of this chapter.

(d) The requirements for notification of safety standards and for safety information and country of registry in promotional literature or advertising of a foreign passenger vessel of 100 gross tons or over having berth or stateroom accommodations for 50 or more passengers are contained in part 80 of this chapter.

(e) Notwithstanding the other provisions of this section, foreign passenger vessels of over 100 gross tons having berth or stateroom accommodations for more than 50 persons and departing a United States port with passengers who are United States nationals and

Add. 132

who embarked at that port shall comply with the provisions of the International Convention for Safety of Life at Sea, 1974.

(f) Notwithstanding the exceptions noted in paragraph (b) of this section, each foreign vessel must report marine casualties occurring while the vessel is in the navigable waters of the United States as required by subpart 78.07.

[CGFR 65–50, 30 FR 16890, Dec. 30, 1965, as amended by CGFR 66–33, 31 FR 15280, Dec. 6, 1966; CGFR 68–65, 33 FR 19985, Dec. 28, 1968; CGFR 69–106a, 35 FR 16834, Oct. 31, 1970; CGD 72–187R, 38 FR 9081, Apr. 10, 1973; CGD 77–042, 42 FR 63643, Dec. 19, 1977; CGD 90–008, 55 FR 30660, July 26, 1990; USCG–2014–0688, 79 FR 58281, Sept. 29, 2014]

## §70.05–5  Specific application noted in text.

(a) At the beginning of the various parts, subparts, and sections, a more specific application is generally given for the particular portion of the text involved. This application sets forth the types, sizes, or services or vessels to which the text pertains, and in many cases limits the application of the text to vessels contracted for before or after a specific date. As used in this subchapter, the term *vessels contracted for* includes not only the contracting for the construction of a vessel, but also the contracting for a material alteration to a vessel, the contracting for the conversion of a vessel to a passenger vessel, and the changing of service or route of a vessel if such change increases or modifies the general requirements for the vessel or increases the hazards to which it might be subjected.

(b) [Reserved]

## §70.05–7  Ocean or unlimited coastwise vessels on inland and Great Lakes Routes.

(a) Vessels inspected and certificated for ocean or unlimited coastwise routes shall be considered suitable for navigation insofar as the provisions of this subchapter are concerned on any inland route, including the Great Lakes.

(b) [Reserved]

## §70.05–10  Application to vessels on an international voyage.

(a) Except as provided in paragraphs (b), (c), and (d) of this section, the reg-

ulations in this subchapter that apply to a vessel on an "international voyage" apply to a vessel that—

(1) Is mechanically propelled and carries more than 12 passengers; and

(2) Is engaged on a voyage—

(i) From a country to which the International Convention for Safety of Life at Sea, 1974, (SOLAS 74) applies, to a port outside that country or the reverse;

(ii) From any territory, including the Commonwealth of Puerto Rico, all possessions of the United States and all lands held by the United States under a protectorate or mandate, whose international relations are the responsibility of a contracting SOLAS 74 government, or which is administered by the United Nations, to a port outside that territory or the reverse; or

(iii) Between the contiguous states of the United States and the states of Hawaii or Alaska or between the states of Hawaii and Alaska.

(b) The regulations that apply to a vessel on an "international voyage" in this subchapter do not apply to ships engaged on a voyage solely on the Great Lakes and the St. Lawrence River as far east as a straight line drawn from Cap des Rosiers to West Point, Anticosti Island and, on the north side of Anticosti Island, the 63rd Meridian;

(c) The Commandant or his authorized representative may exempt any vessel on an international voyage from the requirements of this subchapter if the vessel—

(1) Makes a single international voyage in exceptional circumstances; and

(2) Meets safety requirements prescribed for the voyage by the Commandant.

(d) The Commandant or his authorized representative may exempt any vessel from the construction requirements of this subchapter if the vessel does not proceed more than 20 nautical miles from the nearest land in the course of its voyage.

[CGD 72–131R, 38 FR 29320, Oct. 24, 1973, as amended by CGD 90–008, 55 FR 30661, July 26, 1990; CGD 84–069, 61 FR 25287, May 20, 1996]

Add. 133

**§ 70.05–18 Applicability to vessels operating under an exemption afforded in the Passenger Vessel Safety Act of 1993 (PVSA).**

(a) The Passenger Vessel Safety Act of 1993 (PVSA) contained an allowance for the exemption of certain passenger vessels that are—

(1) At least 100 gross tons but less than 300 gross tons; or

(2) Former public vessels of at least 100 gross tons but less than 500 gross tons.

(b) The owner or operator of a vessel must have applied for an exemption under the PVSA by June 21, 1994, and then brought the vessel into compliance with the interim guidance in Navigation and Inspection Circular (NVIC) 7–94 not later than December 21, 1996. The PVSA exemption is valid for the service life of the vessel, as long as the vessel remains certified for passenger service. If the Certificate of Inspection (COI) is surrendered or otherwise becomes invalid (not including a term while the vessel is out of service but undergoing an inspection for recertification), the owner or operator must meet the appropriate inspection regulations to obtain a new COI without the PVSA exemption. See 46 CFR 175.118 for information about applicable regulations for vessels that operate under the PVSA exemption.

[USCG–1999–5040, 67 FR 34791, May 15, 2002]

**§ 70.05–20 Gross tonnage as a criterion for requirements.**

(a) The regulations in this subchapter, as well as referenced requirements in other subchapters in this chapter, take into account the passenger vessel's size, construction, and equipment, as well as its intended service on the routes or waters on which it is desired to be operated or navigated, which are indications of the hazards to which such vessel may be subjected. The Commandant's determinations in this respect for a particular passenger vessel are stipulated in a certificate of inspection, which states certain terms and conditions governing such vessel when in operation.

(b) In applying the laws and regulations to passenger vessels, one criterion for invocation of safety standards is the description of passenger vessels by relative size in gross tons. When it is determined by the Commandant that the gross register tonnage for a particular passenger vessel, which is attained by exemptions, reductions, or other devices in the basic gross tonnage formulation, will circumvent or be incompatible with the application of specific safety requirements in the passenger vessel regulations for a vessel of such physical size, the Commandant shall prescribe the regulations to be made applicable to such vessel.

(c) When the Commandant determines that the gross register tonnage is not a valid criterion for the invocation of safety requirements based on relative size, the parties involved will be informed of the determination and of the regulations applicable to such passenger vessel, and before being permitted to operate such vessel, compliance therewith shall be required. Endorsements or notations on the passenger vessel's certificate of inspection may be made as appropriate.

**§ 70.05–30 Combustible and flammable liquid cargo in bulk.**

NOTE: Requirements for double hull construction for vessels carrying oil, as defined in 33 CFR 157.03, in bulk as cargo are found in 33 CFR 157.10d.

Vessels inspected and certificated under this subchapter may carry limited quantities of combustible liquid cargo in bulk in the grades indicated, provided the certificate of inspection is endorsed to permit such carriage:

(a) Grade E in an integral tank; and

(b) Grade E in a portable tank, including a marine portable tank, in accordance with subpart 98.30 or 98.33 of this chapter.

[CGD 84–043, 55 FR 37410, Sept. 11, 1990, as amended by CGD 90–051, 57 FR 36246, Aug. 12, 1992]

# Subpart 70.10—Definition of Terms Used in This Subchapter

**§ 70.10–1 Definitions.**

*Approved* means approved by the Commandant, unless otherwise stated.

*Barge* means any non-self-propelled vessel.

Add. 134

*Carrying freight for hire* means the carriage of any goods, wares, or merchandise, or any other freight for a consideration, whether directly or indirectly flowing to the owner, charterer, operator, agent, or any other person interested in the vessel.

*Classed vessel* means any vessel classed by the American Bureau of Shipping or other recognized classification society.

*Coast Guard District Commander* means an officer of the Coast Guard designated as such by the Commandant to command all Coast Guard activities within his or her district, which include the inspection, enforcement, and administration of Subtitle II, Title 46 U.S. Code; Title 33 U.S. Code; and regulations issued under these statutes.

*Coastwise* is a designation of service that includes all vessels normally navigating the waters of any ocean or the Gulf of Mexico 20 nautical miles or less offshore.

*Commandant* means the Commandant of the United States Coast Guard.

*Consideration* means an economic benefit, inducement, right, or profit including pecuniary payment accruing to an individual, person, or entity but not including a voluntary sharing of the actual expenses of the voyage by monetary contribution or donation of fuel, food, beverage, or other supplies.

*Ferry* means a vessel that is used on a regular schedule—

(1) To provide transportation only between places that are not more than 300 miles apart; and

(2) To transport only—

(i) Passengers; or

(ii) Vehicles, or railroad cars, that are being used, or have been used, in transporting passengers or goods.

*Great Lakes* is a designation of service that includes all vessels navigating the Great Lakes.

*Headquarters* means the Commandant (CG–ENG), Attn: Office of Design and Engineering Systems, U.S. Coast Guard Stop 7509, 2703 Martin Luther King Jr. Avenue SE., Washington, DC 20593–7509.

*Lakes, bays, and sounds* is a designation of service that includes all vessels navigating the waters of the lakes, bays, or sounds other than the waters of the Great Lakes.

*Marine inspector* or *inspector* means any person from the civilian or military branch of the Coast Guard assigned under the direction of an Officer in Charge, Marine Inspection, or any other person designated to perform duties related to the inspection, enforcement, and administration of Subtitle II, Title 46 U.S. Code; Title 33 U.S. Code; and regulations issued under these statutes.

*Motor vessel* means any vessel more than 65 feet in length, which is propelled by machinery other than steam.

*Ocean* is a designation of service that includes all vessels navigating the waters of any ocean or the Gulf of Mexico more than 20-nautical miles offshore.

*Officer in Charge, Marine Inspection* means any person from the civilian or military branch of the Coast Guard designated as such by the Commandant and who, under the direction of the Coast Guard District Commander, is in charge of an inspection zone for the performance of duties related to the inspection, enforcement, and administration of Subtitle II, Title 46 U.S. Code; Title 33 U.S. Code; and regulations issued under these statutes.

*Passenger* means—

(1) On an international voyage, every person other than—

(i) The master and the members of the crew or other persons employed or engaged in any capacity onboard a vessel on the business of that vessel; and

(ii) A child under the age of one.

(2) On other than an international voyage, an individual carried on the vessel, except—

(i) The owner or an individual representative of the owner or, in the case of a vessel under charter, an individual charterer or individual representative of the charterer;

(ii) The master; or

(iii) A member of the crew engaged in the business of the vessel, who has not contributed consideration for carriage, and who is paid for onboard services.

*Passenger-for-hire* means a passenger for whom consideration is contributed as a condition of carriage on the vessel, whether directly or indirectly flowing to the owner, charterer, operator, agent, or any other person having an interest in the vessel.

Add. 135

*Passenger vessel* means a vessel of at least 100 gross tons:

(1) Carrying more than 12 passengers, including at least one passenger for hire;

(2) That is chartered and carrying more than 12 passengers;

(3) That is a submersible vessel carrying at least one passenger for hire; or

(4) That is a ferry carrying a passenger.

*Pilot boarding equipment* means a pilot ladder, accommodation ladder, pilot hoist, or combination of them, as required by this subchapter.

*Point of access* means the place on the deck of a vessel where a person steps onto or off pilot boarding equipment.

*Recognized classification society* means the American Bureau of Shipping or other classification society as recognized by the Commandant.

*Rivers* is a designation of service that includes all vessels whose navigation is restricted to rivers and/or canals, and to such other waters as may be designated by the Coast Guard District Commander.

*Sailing vessel* means a vessel with no mechanical means of propulsion, all propulsive power being provided by sails.

*Short international voyage* means an international voyage in the course of which a vessel is not more than 200 miles from a port or place in which the passengers and crew could be placed in safety. Neither the distance between the last port of call in the country in which the voyage begins and the final port of destination, nor the return voyage, may exceed 600 miles. The final port of destination is the last port of call in the scheduled voyage at which the vessel commences its return voyage to the country in which the voyage began.

*Specially suitable for vehicles* is a designation used for a space that is designed for the carriage of automobiles or other self-propelled vehicles with batteries connected and fuel tanks containing gasoline on vessels on ocean or unlimited coastwise voyages. Requirements for the design and protection of spaces specially suitable for vehicles appear in subparts 72.15, 76.15, 77.05, 78.45, 78.47, and 78.83 of parts 72, 76, 77, and 78 of this subchapter. In addition, preparation of automobiles prior to carriage, with the exception of disconnecting battery cables, must be in accordance with the applicable provision of 49 CFR 176.905.

*Submersible vessel* means a vessel that is capable of operating below the surface of the water.

*Vessel,* unless otherwise noted in this subpart, includes all vessels indicated in column three of table 70.05–1(a) in §70.05–1 that exceed 65 feet in length (measured from end-to-end over the deck, excluding sheer) and that carry more than six passengers-for-hire.

[USCG–1999–5040, 67 FR 34792, May 15, 2002, as amended by USCG–2008–1107, Dec. 4, 2009; USCG–2012–0832, 77 FR 59778, Oct. 1, 2012; USCG–2013–0671, 78 FR 60149, Sept. 30, 2013]

## Subpart 70.15—Equivalents

### § 70.15–1  Conditions under which equivalents may be used.

(a) Where in this subchapter it is provided that a particular fitting, material, appliance, apparatus, or equipment, or type thereof, shall be fitted or carried in a vessel, or that any particular provision shall be made or arrangement shall be adopted, the Commandant may accept in substitution therefor any other fitting, material, apparatus, or equipment, or type thereof, or any other provision or arrangement: *Provided,* That he shall have been satisfied by suitable trials that the fitting, material, appliance, apparatus, or equipment, or type thereof, or the provision or arrangement shall be at least as effective as that specified in this subchapter.

(b) In any case where it is shown to the satisfaction of the Commandant that the use of any particular equipment, apparatus, or arrangement not specifically required by law is unreasonable or impracticable, the Commandant may permit the use of alternate equipment, apparatus, or arrangement to such an extent and upon such conditions as will insure, to his satisfaction, a degree of safety consistent with the minimum standards set forth in this subchapter.

Add. 136

## Subpart 70.20—General Marine Engineering Requirements

§ 70.20–1   Marine engineering details.

All marine engineering details such as piping, valves, fittings, boilers, pressure vessels, etc., and their appurtenances installed on the vessel, shall be designed, constructed, and installed in accordance with the provisions of subchapter F (Marine Engineering) of this chapter.

## Subpart 70.25—General Electrical Engineering Requirements

§ 70.25–1   Electrical engineering details.

All electrical engineering details and installations shall be designed and installed in accordance with subchapter J (Electrical Engineering) of this chapter.

## Subpart 70.28—Lifesaving Appliances and Arrangements

§ 70.28–1   Lifesaving appliances and arrangements.

All lifesaving appliances and arrangements on passenger vessels must be in accordance with subchapter W (Lifesaving Appliances and Arrangements) of this chapter.

[CGD 84–069, 61 FR 25287, May 20, 1996]

## Subpart 70.35—American Bureau of Shipping's Standards

§ 70.35–1   Standards to be used.

(a) Where in this subchapter an item, or method of construction, or testing is required to meet the standards established by the American Bureau of Shipping, the current standards in effect at the time of construction of the vessel, or otherwise as applicable, shall be used. The current standards of other recognized classification societies may also be accepted upon approval by the Commandant.

(b) [Reserved]

§ 70.35–5   Where obtainable.

(a) The standards established by the American Bureau of Shipping are usually published annually and may be purchased from the American Bureau of Shipping, ABS Plaza, 16855 Northchase Drive, Houston, TX 77060. These standards may also be examined at Coast Guard Headquarters. Contact Commandant (CG–5PS), Attn: Director of Commercial Regulations, U.S. Coast Guard Stop 7509, 2703 Martin Luther King Jr. Avenue, SE., Washington, DC 20593-7509, or contact the office of any Coast Guard District Commander or Officer in Charge, Marine Inspection.

(b) [Reserved]

[CGFR 65–50, 30 FR 16890, Dec. 30, 1965]

Editorial Note: For Federal Register citations affecting § 70–35–5, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.govinfo.gov*.

# PART 71—INSPECTION AND CERTIFICATION

### Subpart 71.01—General Provisions; Certificate of Inspection

Sec.
71.01–1   Preemptive effect.
71.01–2   When required.
71.01–5   Posting.
71.01–10   Period of validity.
71.01–15   Temporary certificate.
71.01–20   Expired certificate.

### Subpart 71.05—Permit To Proceed to Another Port for Repair

71.05–1   When issued.
71.05–5   To whom issued.
71.05–10   Conditions of permit.
71.05–15   Posting.

### Subpart 71.10—Permit To Engage in Excursions

71.10–1   When issued.
71.10–5   To whom issued.
71.10–10   Conditions of permit.
71.10–15   Posting.

### Subpart 71.15—Inspection of Vessels

71.15–1   Standards in inspection of hulls, boilers, and machinery.
71.15–5   Alternate compliance.

### Subpart 71.20—Initial Inspection

71.20–1   Prerequisite of certificate of inspection.
71.20–5   When made.
71.20–10   Plans.
71.20–15   Scope of inspections.

Add. 137

71.20–20 Fire detecting and extinguishing equipment.

**Subpart 71.25—Annual Inspection**

71.25–1 Prerequisite of reissuance of certificate of inspection.
71.25–3 Incorporation by reference.
71.25–5 When made.
71.25–10 Scope of inspections.
71.25–15 Lifesaving equipment.
71.25–20 Fire detection and extinguishing equipment.
71.25–25 Hull equipment.
71.25–30 [Reserved]
71.25–35 Marine engineering equipment.
71.25–37 Pollution prevention.
71.25–40 Sanitary inspection.
71.25–45 Fire hazards.
71.25–50 Inspector not limited.

**Subpart 71.30—Reinspection**

71.30–1 When made.
71.30–5 Scope.
71.30–10 Inspector not limited.

**Subpart 71.40—Inspection After Accident**

71.40–1 General or partial survey.

**Subpart 71.45—Sanitary Inspections**

71.45–1 When made.

**Subpart 71.50—Drydocking**

71.50–1 Definitions relating to hull examinations.
71.50–3 Drydock examination, internal structural examination, underwater survey, and alternate hull exam intervals.
71.50–5 Underwater Survey in Lieu of Drydocking (UWILD).
71.50–15 Description of the Alternate Hull Examination (AHE) Program for certain passenger vessels.
71.50–17 Eligibility requirements for the Alternative Hull Examination (AHE) Program for certain passenger vessels.
71.50–19 The Alternative Hull Examination (AHE) Program application.
71.50–21 Preliminary examination requirements.
71.50–23 Pre-survey meeting.
71.50–25 Alternative Hull Examination (AHE) procedure.
71.50–27 Alternative Hull Examination (AHE) Program options: Divers or underwater remotely operated vehicle (ROV).
71.50–29 Hull examination reports.
71.50–31 Continued participation in the Alternative Hull Examination (AHE) Program.
71.50–35 Notice and plans required.

**Subpart 71.53—Integral Fuel Oil Tank Examinations**

71.53–1 When required.

**Subpart 71.55—Repairs and Alterations**

71.55–1 Permission required.
71.55–5 Inspection required.

**Subpart 71.60—Special Operating Requirements**

71.60–1 Inspection and testing required when making alterations, repairs, or other such operations involving riveting, welding, burning or like fire-producing actions.

**Subpart 71.65—Plan Approval**

71.65–1 General.
71.65–5 Plans and specifications required for new construction.
71.65–10 Plans required for alterations of existing vessels.
71.65–15 Procedure for submittal of plans.
71.65–20 Number of plans required.

**Subpart 71.75—Certificates Under the International Convention for Safety of Life at Sea, 1974**

71.75–1 Application.
71.75–5 Passenger Ship Safety Certificate.
71.75–10 Exemption Certificate.
71.75–13 Safety Management Certificate.
71.75–15 Posting of Convention certificates.
71.75–20 Duration of certificates.

AUTHORITY: 46 U.S.C. 2113, 3205, 3306, 3307, 70034; E.O. 12234, 45 FR 58801, 3 CFR, 1980 Comp., p. 277; E.O. 12777, 56 FR 54757, 3 CFR, 1991 Comp., p. 351; DHS Delegation 00170.1, Revision No. 01.2.

SOURCE: CGFR 65–50, 30 FR 16895, Dec. 30, 1965, unless otherwise noted.

## Subpart 71.01—General Provisions; Certificate of Inspection

### § 71.01–1 Preemptive effect.

The regulations in this part have preemptive effect over State or local regulations in the same field.

[USCG–2006–24797, 77 FR 33874, June 7, 2012]

### § 71.01–2 When required.

(a) Except as noted in this subpart or subpart 71.05, no vessel subject to inspection and certification shall be operated without a valid certificate of inspection.

Add. 138

(b) [Reserved]

[CGFR 65–50, 30 FR 16895, Dec. 30, 1965. Redesignated at USCG–2006–24797, 77 FR 33874, June 7, 2012]

**§71.01–5  Posting.**

The certificate of inspection shall be displayed under glass in a conspicuous place where observation by the passengers is likely.

[CGD 72–104R, 37 FR 14233, July 18, 1972]

**§71.01–10  Period of validity.**

(a) Certificates of inspection will be issued for a period of 1 year. Application may be made by the master, owner, or agent for inspection and issuance of a new certificate of inspection at any time within the period of validity of the current certificate.

(b) Certificates of inspection may be revoked or suspended by the Coast Guard where such process is authorized by law. This may occur if the vessel does not meet the requirements of law or regulations in this chapter or if there is a failure to maintain the safety requirements requisite to the issuance of a certificate of inspection.

[CGFR 68–82, 33 FR 18899, Dec. 18, 1968, as amended by CGD 95–012, 60 FR 48051, Sept. 18, 1995; CGD 95–028, 62 FR 51203, Sept. 30, 1997]

**§71.01–15  Temporary certificate.**

(a) If necessary to prevent delay of the vessel, a temporary certificate of inspection, Form CG–854, shall be issued pending the issuance and delivery of the regular certificate of inspection. Such temporary certificate shall be carried in the same manner as the regular certificate and shall in all ways be considered the same as the regular certificate of inspection which it represents.

(b) [Reserved]

**§71.01–20  Expired certificate.**

(a) Nothing in this subpart shall prevent a vessel upon a regularly established line from a port in the United States to a port of a foreign country not contiguous to the United States whose certificate of inspection expires at sea or while said vessel is in a foreign port or a port of Hawaii from lawfully completing her voyage without the valid certificate of inspection or temporary certificate required by this subpart: *Provided,* That the voyage shall be completed within 30 days after the expiration of the certificate of inspection. No such vessel shall depart if its certificate of inspection will expire within 15 days of the date of sailing.

(b) [Reserved]

## Subpart 71.05—Permit To Proceed to Another Port for Repair

**§71.05–1  When issued.**

(a) The Officer in Charge, Marine Inspection, may issue a permit to proceed to another port for repair, Form CG–948, to a vessel, if in his judgment it can be done with safety, even if the certificate of inspection of the vessel has expired or is about to expire.

(b) [Reserved]

**§71.05–5  To whom issued.**

(a) Such permit will only be issued upon the written application of the master, owner, or agent of the vessel.

(b) [Reserved]

**§71.05–10  Conditions of permit.**

(a) The permit will state upon its face the conditions under which it is issued and whether or not the vessel is permitted to carry freight or passengers. Passengers may not be carried if the certificate of inspection has expired, except as provided under §71.01–20.

(b) [Reserved]

**§71.05–15  Posting.**

(a) The permit shall be carried in a manner similar to that described in §71.01–5 for a certificate of inspection.

(b) [Reserved]

## Subpart 71.10—Permit To Engage in Excursions

**§71.10–1  When issued.**

(a) The Officer in Charge, Marine Inspection, may issue a permit to carry additional passengers on an excursion, Form CG–949, if after personally inspecting the vessel, it can, in his judgment, be done with safety.

(b) [Reserved]

Add. 139

**§71.10–5  To whom issued.**

(a) Such permit will only be issued upon the written application of the master, owner, or agent of the vessel.

(b) [Reserved]

**§71.10–10  Conditions of permit.**

(a) The permit will state upon its face the conditions under which it is issued, the number of extra passengers the vessel may carry, any additional lifesaving or safety equipment which will be required, the route for which the permit is granted, and the dates on which the permit will be valid.

(b) [Reserved]

**§71.10–15  Posting.**

(a) The permit when used, shall be carried in addition to the certificate of inspection and shall be carried in a manner similar to that described in §71.01–5 for a certificate of inspection.

(b) [Reserved]

## Subpart 71.15—Inspection of Vessels

**§71.15–1  Standards in inspection of hulls, boilers, and machinery.**

In the inspection of hulls, boilers, and machinery of vessels, the standards established by the American Bureau of Shipping, see part 70, subpart 70.35 of this chapter respecting material and inspection of hulls, boilers, and machinery, and the certificate of classification referring thereto, except where otherwise provided for by the rules and regulations in this subchapter, subchapter E (Load Lines), subchapter F (Marine Engineering), subchapter J (Electrical Engineering), and subchapter W (Lifesaving Appliances and Arrangements) of this chapter, shall be accepted as standard by the inspectors.

[CGD 84–069, 61 FR 25287, May 20, 1996]

**§71.15–5  Alternate compliance.**

(a) In place of compliance with other applicable provisions of this subchapter, the owner or operator of a vessel subject to plan review and inspection under this subchapter for initial issuance or renewal of a Certificate of Inspection may comply with the Alternate Compliance Program provisions of part 8 of this chapter.

(b) For purposes of this section, a list of authorized classification societies, including information for ordering copies of approved classification society rules and supplements, is available at Coast Guard Headquarters. Contact Commandant (CG–ENG), Attn: Office of Design and Engineering Systems, U.S. Coast Guard Stop 7509, 2703 Martin Luther King Jr. Avenue SE., Washington, DC 20593–7509; telephone 202–372–1372 or fax 202–372–1925. Approved classification society rules and supplements are incorporated by reference into 46 CFR 8.110(b).

[CGD 95–010, 62 FR 67536, Dec. 24, 1997, as amended by USCG–1999–5004, 64 FR 30439, June 8, 1999; USCG–2004–18884, 69 FR 58347, Sept. 30, 2004; USCG–2006–25697, 71 FR 55746, Sept. 25, 2006; USCG–2009–0702, 74 FR 49231, Sept. 25, 2009;USCG–2012–0832, 77 FR 59779, Oct. 1, 2012; USCG–2013–0671, 78 FR 60150, Sept. 30, 2013]

## Subpart 71.20—Initial Inspection

**§71.20–1  Prerequisite of certificate of inspection.**

(a) The initial inspection is a prerequisite of the issuance of the original certificate of inspection.

(b) [Reserved]

**§71.20–5  When made.**

(a) The original inspection will only be made upon the written application of the owner or builder of the vessel to the Officer in Charge, Marine Inspection, on Form CG–3752, application for inspection of U.S. vessel, at or nearest the port where the vessel is located.

(b) [Reserved]

**§71.20–10  Plans.**

(a) Before application for inspection is made and before construction is started, the owner or builder shall have plans indicating the proposed arrangement and construction of the vessel approved by the Commandant. The procedure for submitting plans and the list of plans to be supplied is set forth in subpart 71.65.

(b) [Reserved]

**§71.20–15 Scope of inspections.**

The initial inspection, which may consist of a series of inspections during the construction of a vessel, shall include a complete inspection of the structure, including the outside of the vessel's bottom, the machinery, unfired pressure vessels, equipment and the inside and outside of the boilers. The inspection shall be such as to insure that the arrangements, material, and scantlings of the structure, boilers and other pressure vessels and their appurtenances, piping, main and auxiliary machinery, electrical installations, lifesaving appliances, fire-detecting and extinguishing equipment, pilot boarding equipment, pollution prevention equipment and other equipment fully comply with the applicable regulations for such vessel and are in accordance with approved plans, and determine that the vessel is in possession of a valid certificate issued by the Federal Communications Commission, if any. The inspection shall be such as to ensure that the workmanship of all parts of the vessel and its equipment is in all respects satisfactory and that the vessel is provided with lights, means of making sound signals, and distress signals as required by applicable statutes and regulations.

[CGFR 68–32, 33 FR 5715, Apr. 12, 1968, as amended by CGD 82–036, 48 FR 654, Jan. 6, 1983; CGD 79–032, 49 FR 25455, June 21, 1984; CGD 95–012, 60 FR 48051, Sept. 18, 1995]

**§71.20–20 Specific tests and inspections.**

The applicable tests and inspections relating to annual inspection as set forth in subpart 71.25 shall be made at this time. In addition, the following specific tests and inspections shall be made by the inspector:

(a) For inspection procedures of lifesaving appliances and arrangements, see subchapter W (Lifesaving Appliances and Arrangements) of this chapter.

(b) Installation of carbon dioxide or clean agent extinguishing piping in accordance with 46 CFR 76.15–15 and 46 CFR subpart 95.16.

(c) For inspection procedures of marine engineering equipment and systems, see subchapter F (Marine Engineering) of this chapter.

(d) For inspection procedures of electrical engineering equipment and systems, see subchapter J (Electrical Engineering) of this chapter.

(e) For inspection and testing standards of structural subdivision integrity, see §72.01–25 of this subchapter.

(f) For inspection and testing of watertight doors, see §170.270 of this chapter.

[CGFR 65–50, 30 FR 16895, Dec. 30, 1965, as amended by CGD 79–023, 48 FR 51007, Nov. 4, 1983; CGD 84–069, 61 FR 25287, May 20, 1996; USCG–2006–24797, 77 FR 33874, June 7, 2012]

## Subpart 71.25—Annual Inspection

**§71.25–1 Prerequisite of reissuance of certificate of inspection.**

(a) The annual inspection is a prerequisite of the reissuance of a certificate of inspection.

(b) [Reserved]

**§71.25–3 Incorporation by reference.**

(a) Certain material is incorporated by reference into this subpart with the approval of the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. All approved material is available for inspection at the U.S. Coast Guard, Office of Design and Engineering Standards (CG–ENG), 2703 Martin Luther King Jr. Avenue SE., Stop 7509, Washington, DC 20593–7509, and is available from the sources listed below. It is also available for inspection at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030 or go to *http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.*

(b) National Fire Protection Association (NFPA), 1 Batterymarch Park, Quincy, MA 02169, 617–770–3000, *http://www.nfpa.org.*

(1) NFPA 10, Standard for Portable Fire Extinguishers, 2010 Edition, effective December 5, 2009, IBR approved for §71.25–20(a).

(2) [Reserved]

[USCG–2012–0196, 81 FR 48251, July 22, 2016]

§ 71.25–5   When made.

(a) The annual inspection will be made only upon the written application of the master, owner, or agent of the vessel on Form CG–3752, Application for Inspection of U.S. Vessel, to the Officer in Charge, Marine Inspection, at or nearest the port where the vessel is to be inspected.

(b) You must submit your application for the annual inspection at least 30 days before your current certificate of inspection expires.

[CGFR 65–50, 30 FR 16895, Dec. 30, 1965, as amended by USCG–1999–4976, 65 FR 6501, Feb. 9, 2000]

§ 71.25–10   Scope of inspections.

The annual inspection shall include an inspection of the structure, boilers, and other pressure vessels, machinery and equipment. The inspection shall be such as to insure that the vessel, as regards the structure, boilers and other pressure vessels, and their appurtenances, piping, main and auxiliary machinery, electrical installations, life-saving appliances, fire-detecting and extinguishing equipment, pilot boarding equipment, and other equipment is in satisfactory condition and fit for the service for which it is intended, and that it complies with the applicable regulations for such vessels, and determine that the vessel is in possession of a valid certificate issued by the Federal Communications Commission, if required. The lights, means of making sound signals, and distress signals carried by the vessel shall also be subject to the above-mentioned inspection for the purpose of ensuring that they comply with the requirements of the applicable statutes and regulations.

[CGFR 68–32, 33 FR 5715, Apr. 12, 1968, as amended by CGD 82–036, 48 FR 655, Jan. 6, 1983; CGD 79–032, 49 FR 25455, June 21, 1984; CGD 95–012, 60 FR 48051, Sept. 18, 1995]

§ 71.25–15   Lifesaving equipment.

For inspection procedures of lifesaving appliances and arrangements, see subchapter W (Lifesaving Appliances and Arrangements) of this chapter.

[CGD 84–069, 61 FR 25287, May 20, 1996]

§ 71.25–20   Fire detection and extinguishing equipment.

(a) At each annual inspection, the inspector must ensure that the following tests and inspections of fire detection and extinguishing equipment have been conducted:

(1) All portable fire extinguishers and semi-portable fire extinguishing systems must be maintained in accordance with NFPA 10, chapter 7 (incorporated by reference, see § 71.25–3). Chapter 7 requires persons performing annual and periodic maintenance, and recharging to be certified. The Coast Guard requires that the servicing persons be properly licensed to perform fire extinguisher maintenance as required by local authorities having jurisdiction. Monthly inspections required by NFPA 10 may be conducted by the owner, operator, person-in-charge, or a designated member of the crew.

TABLE 71.25–20(a)(1)

| Type unit | Test |
|---|---|
| Soda acid | Discharge. Clean hose and inside of extinguisher thoroughly. Recharge. |
| Foam | Discharge. Clean hose and inside of extinguisher thoroughly. Recharge. |
| Pump tank (water or antifreeze) | Discharge. Clean hose and inside of extinguisher thoroughly. Recharge with clean water or antifreeze. |
| Cartridge operated (water, antifreeze or loaded stream) | Examine pressure cartridge and replace if end is punctured or if cartridge is otherwise determined to have leaked or to be in unsuitable condition. Remove liquid. Clean hose and inside of extinguisher thoroughly. Recharge with clean water, solution or antifreeze. Insert charged cartridge. |
| Carbon Dioxide | Weigh cylinders. Recharge if weight loss exceed 10 percent of weight of charge. Inspect hose and nozzle to be sure they are clear.[1] |
| Dry chemical (cartridge-operated type) | Examine pressure cartridge and replace if end is punctured or if cartridge is otherwise determined to have leaked or to be in unsuitable condition. Inspect hose and nozzle to see they are clear. Insert charged cartridge. Be sure dry chemical is free-flowing (not caked) and chamber contains full charge. |

TABLE 71.25–20(a)(1)—Continued

| Type unit | Test |
|-----------|------|
| Dry chemical (stored pressure type). | See that pressure gage is in operating range. If not, or if seal is broken, weigh or otherwise determine that full charge of dry chemical is in extinguisher. Recharge if pressure is low or if dry chemical is needed. |
| Vaporizing liquid[2] (pump type). | Pump a few strokes into clean pail and replace liquid. Keep water out of extinguisher or liquid. Keep extinguisher completely full of liquid. |

TABLE 71.25–20(a)(1)—Continued

| Type unit | Test |
|-----------|------|
| Vaporizing liquid (stored pressure type). | See that pressure gage is in operating range. Weigh or check liquid level to determine that full charge of liquid is in extinguisher. Recharge if pressure is low or if liquid is needed. |

[1] Cylinders must be tested and marked, and all flexible connections and discharge hoses of semi-portable carbon dioxide and halon extinguishers must be tested or renewed, as required by §§ 147.60 and 147.65 of this chapter.

[2] Vaporizing-liquid type fire extinguishers containing carbon tetrachloride or chlorobromomethane or other toxic vaporizing liquids must be removed from all vessels. (See § 76.50–5(e) of this subchapter.)

(2) Fixed fire extinguishing systems must be checked as noted in table 71.25–20(a)(2). In addition all parts of the fixed fire extinguishing systems must be examined for excessive corrosion and general conditions.

TABLE 71.25–20(a)(2)

| Type system | Test |
|-------------|------|
| Foam | Systems utilizing a soda solution must have that solution replaced. In all cases, ascertain that powder is not caked. |
| Carbon dioxide | Weigh cylinders. Recharge cylinder if weight loss exceeds 10 percent of the weight of the charge. Test time delays, alarms, and ventilation shutdowns with carbon dioxide, nitrogen, or other nonflammable gas as stated in the system manufacturer's instruction manual. Inspect hoses for damage or decay. Ensure that nozzles are unobstructed. Cylinders must be tested and marked, and all flexible connections on fixed carbon dioxide systems must be tested or renewed, as required by 46 CFR 147.60 and 147.65. |
| Halon 1301 and halocarbon. | Recharge or replace if weight loss exceeds 5 percent of the weight of the charge or if cylinder has a pressure gauge, recharge cylinder if pressure loss exceeds 10 percent, adjusted for temperature. Test time delays, alarms, and ventilation shutdowns with carbon dioxide, nitrogen, or other nonflammable gas as stated in the system manufacturer's instruction manual. Inspect hoses for damage or decay. Ensure that nozzles are unobstructed. Cylinders must be tested and marked, and all flexible connections to Halon 1301 and halocarbon cylinders must be tested or renewed, as required by 46 CFR 147.60 and 147.65 or 147.67.<br>NOTE: Halon 1301 system approvals have expired, but existing systems may be retained if they are in good and serviceable condition to the satisfaction of the Coast Guard inspector. |
| Inert gas | Recharge or replace cylinder if cylinder pressure loss exceeds 5 percent of the specified gauge pressure, adjusted for temperature. Test time delays, alarms, and ventilation shutdowns with carbon dioxide, nitrogen, or other nonflammable gas as stated in the system manufacturer's instruction manual. Ensure that nozzles are unobstructed. Cylinders must be tested and marked, and all flexible connections on fixed inert extinguishers must be tested or renewed, as required by 46 CFR 147.60 and 147.66. |
| Water mist | Maintain system in accordance with the maintenance instructions in the system manufacturer's design, installation, operation, and maintenance manual. |

(3) All fire detection and extinguishing systems, all piping controls, valves, and alarms must be checked to ascertain that the system is in operating condition. In this respect, automatic sprinkling systems must be checked by means of test stations or opening heads, smoke detection systems must be checked by introducing smoke into the accumulators, fire detection and manual alarm systems must be checked by test stations or actuating detectors or pull boxes, and steam smothering lines must be checked with at least a 50 p.s.i. air pressure with the ends capped or by blowing steam through the lines at the designed pressure.

(4) The fire main system must be operated and the pressure checked at the most remote and highest outlets. All firehose must be subjected to a test pressure equivalent to the maximum pressure to which they may be subjected in service, but not less than 100 p.s.i.

17

(b) [Reserved]

[CGFR 65–50, 30 FR 16895, Dec. 30, 1965, as amended by CGFR 68–32, 33 FR 5716, Apr. 12, 1968; CGD 84–044, 53 FR 7748, Mar. 10, 1988; USCG–2006–24797, 77 FR 33874, June 7, 2012; USCG–2014–0688, 79 FR 58281, Sept. 29, 2014; USCG–2012–0196; 81 FR 48252, July 22, 2016]

### § 71.25–25 Hull equipment.

(a) At each annual inspection, the inspector shall conduct the following tests and inspections of hull equipment:

(1) All subdivision bulkheads shall be examined to determine that their watertight integrity has not been impaired.

(2) All watertight doors shall be operated locally by manual power and also by hydraulic or electric power if so fitted. Where remote control is fitted, the doors shall also be operated by the remote control apparatus.

(3) All magnetically controlled fire doors shall be operated locally and by the remote control, and all automatic fire dampers shall be checked to determine that they are in an operable condition.

(4) The remote controls of all valves shall be operated.

(5) The owner, operator or master shall provide the Officer in Charge, Marine Inspection with all current valid certificates and registers of cargo gear issued by an organization recognized by the Commandant under § 31.10–16.

(b) Every acceptable cargo gear certificate and/or register shall be properly executed by a person authorized to do so and shall:

(1) Certify as to the tests and examinations conducted;

(2) Show the dates on which the tests and examinations were conducted; and,

(3) Indicate that the cargo gear described in the certificate or register complies with the standards of the organization or association authorized to issue the certificate or register.

(c) Competent persons for the purposes of this section are defined as—

(1) Surveyors of a classification society recognized by the Commandant under 46 U.S.C. 3316.

(2) Surveyors of a cargo gear organization recognized by the Commandant under § 31.10–16.

(3) Responsible officials or employees of the testing laboratories, companies, or organizations who conduct tests of pieces of loose cargo gear, wire rope, or the annealing of gear as may be required by the standards of the organization or association authorized to issue the certificate or register.

(d) The registers issued in connection with cargo gear certification must have all required entries fully completed as of the dates indicated, shall be kept current, and shall include the following:

(1) A register of the cargo handling machinery and the gear accessory thereto carried on the vessel named therein;

(2) Certification of the testing and examination of winches, derricks, and their accessory gear;

(3) Certification of the testing and examination of cranes, hoists, and their accessory gear;

(4) Certification of the testing and examination of chains, rings, hooks, shackles, swivels, and blocks;

(5) Certification of the testing and examination of wire rope;

(6) Certification of the heat treatment of chains, rings, hooks, shackles, and swivels which require such treatment; and,

(7) Certification of the annual thorough examinations of gear not required to be periodically heat treated.

[CGFR 65–50, 30 FR 16895, Dec. 30, 1965, as amended by CGD 95–028, 62 FR 51203, Sept. 30, 1997]

### § 71.25–30 [Reserved]

### § 71.25–35 Marine engineering equipment.

(a) For inspection procedures of marine engineering equipment and systems, see subchapter F. (Marine Engineering) of this chapter.

(b) [Reserved]

### § 71.25–37 Pollution prevention.

At each inspection for certification, the inspector shall examine the vessel to determine that it meets the vessel design and equipment requirements for pollution prevention in 33 CFR part 155, subpart B.

[CGD 71–161R, 37 FR 28262, Dec. 21, 1972]

Add. 144

§ 71.25–40 **Sanitary inspection.**

(a) At each annual inspection the passenger and crew quarters, toilet and washing spaces, galleys, serving pantries, lockers, etc., shall be examined by the inspector to be assured that they are in a sanitary condition.

(b) [Reserved]

§ 71.25–45 **Fire hazards.**

(a) At each annual inspection, the inspector shall examine the tank tons and bilges in the machinery spaces to see that there is no accumulation of oil which might create a fire hazard.

(b) [Reserved]

§ 71.25–50 **Inspector not limited.**

(a) Nothing in this subpart shall be construed as limiting the inspector from making such tests or inspections as he deems necessary to be assured of the safety and seaworthiness of the vessel.

(b) [Reserved]

## Subpart 71.30—Reinspection

§ 71.30–1 **When made.**

In general, at least three reinspections shall be made on each vessel within one year. These reinspections will be made at approximately equal intervals between annual inspections. In the case of vessels with a seasonal schedule, reinspections will be made during the operating season if practicable.

[CGFR 65–50, 30 FR 16895, Dec. 30, 1965, as amended by CGD 95–028, 62 FR 51203, Sept. 30, 1997]

§ 71.30–5 **Scope.**

(a) The inspector shall examine all accessible parts of the vessel's hull, machinery, and equipment to be assured that it is in a satisfactory condition.

(b) In general, the scope of the reinspection shall be the same as for the annual inspection, but will be in less detail unless it is determined that major change has occurred since the last annual inspection.

§ 71.30–10 **Inspector not limited.**

(a) Nothing in this subpart shall be construed as limiting the inspector from making such tests or inspections as he or she deems necessary to be assured of the safety and seaworthiness of the vessel.

(b) [Reserved]

[CGFR 65–50, 30 FR 16895, Dec. 30, 1965, as amended by, USCG–2021–0348, 87 FR 3224, Jan. 21, 2022]

## Subpart 71.40—Inspection After Accident

§ 71.40–1 **General or partial survey.**

(a) A survey, either general or partial, according to the circumstances, shall be made every time an accident occurs or a defect is discovered which affects the safety of the vessel or the efficacy or completeness of its life-saving appliances, fire-fighting or other equipment, or whenever any important repairs or renewals are made. The survey shall be such as to insure that the necessary repairs or renewals have been effectively made, that the material and the workmanship of such repairs or renewals are in all respects satisfactory, and that the vessel complies in all respects with the regulations in this subchapter.

(b) [Reserved]

## Subpart 71.45—Sanitary Inspections

§ 71.45–1 **When made.**

(a) An inspection of passenger and crew quarters, toilet and washing spaces, serving pantries, galleys, etc., shall be made, in general, at least once in every month. If the route of the vessel is such that it is away from a United States port for more than one month, an inspection shall be conducted at least once every trip.

(b) [Reserved]

## Subpart 71.50—Drydocking

§ 71.50–1 **Definitions relating to hull examinations.**

As used in this part—

*Adequate hull protection system* means a method of protecting the vessel's hull

from corrosion. It includes, as a minimum, either hull coatings and a cathodic protection (CP) system consisting of sacrificial anodes, or an impressed current CP system.

*Alternative Hull Examination (AHE) Program* means a program in which an eligible vessel may receive an initial and subsequent credit hull examination through a combination of underwater surveys, internal examinations, and annual hull condition assessment.

*Drydock examination* means hauling out a vessel or placing a vessel in a drydock or slipway for an examination of all accessible parts of the vessel's underwater body and all through-hull fittings and appurtenances, including verification of the accuracy of draft marks if not already verified at a previous drydock examination.

*Internal structural examination* means an examination of the vessel while afloat or in drydock and consists of a complete examination of the vessel's main strength members, including the major internal framing, the hull plating, voids, and ballast tanks, but not including cargo, sewage, or fuel oil tanks.

*Remotely operated vehicle (ROV) team*, at a minimum, consist of an ROV operator, a non-destructive testing inspector, an ROV tender or mechanic, and a team supervisor who is considered by the Officer in Charge, Marine Inspection (OCMI), to have the appropriate training and experience to perform the survey and to safely operate the ROV in an effective manner. The team must also have a hull-positioning technician present. This position may be assigned to a team member already responsible for another team duty.

*Shallow water* is an ascertained water depth at which the uppermost deck(s) of a sunken vessel remain above the water's surface. The determination of the water's depth is made by the Officer in Charge, Marine Inspection (OCMI) who considers the vessel's stability (passenger heeling moment), the contour of the hull, the composition of the river bottom, and any other factors that would tend to prevent a vessel from resting an even keel.

*Third party examiner* means an entity:

(1) With a thorough knowledge of diving operations, including diving limitations as related to diver safety and diver supervision;

(2) Having a familiarity with, but not limited to, the following—

(i) The camera used during the AHE; and

(ii) The NDT equipment used during the AHE, including the effect of water clarity, and marine growth in relation to the quality of the readings obtained;

(3) Having a familiarity with the communications equipment used during the AHE;

(4) Possessing the knowledge of vessel structures, design features, nomenclature, and the applicable AHE regulations; and

(5) Able to present the Officer in Charge, Marine Inspection, with evidence of formal training, demonstrated ability, past acceptance, or a combination of these.

*Underwater Survey in Lieu of Drydocking (UWILD)* means a program in which an eligible vessel may alternate between an underwater survey and the required drydock examinations.

[USCG–2000–6858, 67 FR 21076, Apr. 29, 2002, as amended by USCG–2000–6858, 69 FR 47382, Aug. 5, 2004; USCG–2007–0030, 75 FR 78081, Dec. 14, 2010; USCG–2014–0688, 79 FR 58281, Sept. 29, 2014]

**§ 71.50–3 Drydock examination, internal structural examination, underwater survey, and alternate hull exam intervals.**

(a) If your vessel is operated on international voyages, it must undergo a drydock and internal structural examination once every 12 months unless it has been approved to undergo an underwater survey per §71.50–5 of this part.

(b) If your vessel is operated on other than international voyages and does not meet the conditions in paragraphs (c) through (f) of this section, it must undergo a drydock and internal structural examination as follows unless it has been approved to undergo an underwater survey per §71.50–5 of this part:

(1) Except as provided in paragraph (b)(2) of this section, vessels that operate in salt water must undergo two drydock and two internal structural examinations within any five year period. No more than three years may elapse between any two examinations.

Add. 146

(2) Vessels 20 years of age or older that operate in salt water and accommodate overnight passengers must undergo drydock and internal structural examinations at intervals not to exceed 18 months.

(3) Vessels that operate in fresh water at least six months in every 12 month period since the last drydock examination must undergo drydock and internal structural examinations at intervals not to exceed five years.

(c) Vessels with wooden hulls must undergo two drydock and two internal structural examinations within any five year period regardless of the type of water in which they operate. No more than three years may elapse between any two examinations.

(d) If, during an internal structural examination, damage or deterioration to the hull plating or structural members is discovered, the Officer in Charge, Marine Inspection, may require the vessel to be drydocked or otherwise taken out of service to further assess the extent of the damage and to effect permanent repairs.

(e) Each vessel which has not met the applicable examination schedules in paragraphs (a) through (d) of this section because it is on a voyage, must undergo the required examinations upon completion of the voyage.

(f) For a vessel that is eligible per § 71.50–17 and the owner opts for an alternate hull examination with the underwater survey portion conducted exclusively by divers, the vessel must undergo two alternate hull exams and two internal structural exams within any five-year period. If a vessel completes a satisfactory alternate hull exam, with the underwater survey portion conducted predominantly by an approved underwater ROV, the vessel must undergo one alternate hull and one internal structural exam, within any five-year period. The vessel may undergo a drydock exam to satisfy any of the required alternate hull exams.

(g) The Commandant (CG-CVC) may authorize extensions to the examina-

tion intervals specified in paragraph (a) through (c) of this section.

[CGD 84–024, 52 FR 39652, Oct. 23, 1987, as amended by CGD 84–024, 53 FR 32231, Aug. 24, 1988; CGD 95–072, 60 FR 50463, Sept. 29, 1995; CGD 96–041, 61 FR 50729, Sept. 27, 1996; USCG–2000–6858, 67 FR 21076, Apr. 29, 2002; USCG–2009–0702, 74 FR 49231, Sept. 25, 2009; USCG–2012–0632, 77 FR 59779, Oct. 1, 2012]

## § 71.50–5 Underwater Survey in Lieu of Drydocking (UWILD).

(a) The Officer in Charge, Marine Inspection (OCMI), may approve an underwater survey instead of a drydock examination at alternating intervals if your vessel is—

(1) Less than 15 years of age;

(2) A steel or aluminum hulled vessel;

(3) Fitted with an effective hull protection system; and

(4) Described in § 71.50–3(a) or (b).

(b) For vessels less than 15 years of age, you must submit an application for an underwater survey to the OCMI at least 90 days before your vessel's next required drydock examination. The application must include—

(1) The procedure for carrying out the underwater survey;

(2) The time and place of the underwater survey;

(3) The method used to accurately determine the diver's or remotely operated vehicle's (ROV) location relative to the hull;

(4) The means for examining all through-hull fittings and appurtenances;

(5) The means for taking shaft bearing clearances;

(6) The condition of the vessel, including the anticipated draft of the vessel at the time of survey;

(7) A description of the hull protection system; and

(8) The name and qualifications of any third party examiner.

(c) If your vessel is 15 years old or older, the cognizant District Commander for the area in which the exam is being completed, may approve an underwater survey instead of a drydock examination at alternating intervals. You must submit an application for an underwater survey to the OCMI at least 90 days before your vessel's next required drydock examination. You may be allowed this option if—

(1) The vessel is qualified under paragraphs (a)(2) through (4) of this section;

(2) Your application includes the information in paragraphs (b)(1) through (b)(8) of this section; and

(3) During the vessel's drydock examination that precedes the underwater survey, a complete set of hull gaugings was taken and they indicated that the vessel was free from appreciable hull deterioration.

(d) After this drydock examination required in paragraph (c)(3) of this section, the OCMI submits a recommendation for future underwater surveys, the results of the hull gauging, and the results of the Coast Guards' drydock examination results to the cognizant District Commander for review.

[USCG–2000–6858, 67 FR 21077, Apr. 29, 2002]

### § 71.50–15 Description of the Alternative Hull Examination (AHE) Program for certain passenger vessels.

The Alternative Hull Examination (AHE) Program provides you with an alternative to a drydock examination by allowing your vessel's hull to be examined while it remains afloat. If completed using only divers, this program has four steps: the application process, the preliminary examination, the pre-survey meeting, and the hull examination. If the vessel is already participating in the program or if a remotely operated vehicle (ROV) is used during the program, the preliminary exam step may be omitted. Once you complete these steps, the Officer in Charge, Marine Inspection (OCMI), will evaluate the results and accept the examination as a credit hull exam if the vessel is in satisfactory condition. If only divers are used for the underwater survey portion of the examination process, you may receive credit for a period of time such that subsequent AHEs would be conducted at intervals of twice in every five years, with no more than three years between any two AHEs. The OCMI may waive an underwater survey in accordance with § 71.50–29(a) provided that the interval does not exceed five years between any two underwater surveys. If an underwater ROV is used as the predominate method to examine the vessel's underwater hull plating, you may receive credit up to five years. At the end of this period,

you may apply for further participation under the AHE Program.

NOTE TO § 71.50–15: The expected hull coverage when using an ROV must be at least 80 percent.

[USCG–2000–6858, 69 FR 47382, Aug. 5, 2004]

### § 71.50–17 Eligibility requirements for the Alternative Hull Examination (AHE) Program for certain passenger vessels.

(a) Your vessel may be eligible for the AHE Program if—

(1) It is constructed of steel or aluminum;

(2) It has an effective hull protection system;

(3) It has operated exclusively in fresh water since its last drydock examination;

(4) It operates in a reduced risk environment such as a river or the protected waters of a lake; and

(5) It operates exclusively in shallow water or within 0.5 nautical miles from shore.

(b) In addition to the requirements in paragraph (a), the Officer in Charge, Marine Inspection (OCMI), will evaluate the following information when determining your vessel's eligibility for the AHE Program:

(1) The overall condition of the vessel, based on its inspection history;

(2) The vessel's history of hull casualties and hull-related deficiencies; and

(3) The AHE Program application, as described in § 71.50–19 of this part.

(c) When reviewing a vessel's eligibility for the AHE program, the OCMI may modify the standards given by paragraph (a)(5) of this section where it is considered safe and reasonable to do so. In making this determination, the OCMI will consider the vessel's overall condition, its history of safe operation, and any other factors that serve to mitigate overall safety risks.

[USCG–2000–6858, 67 FR 21077, Apr. 29, 2002]

### § 71.50–19 The Alternative Hull Examination (AHE) Program application.

If your vessel meets the eligibility criteria in § 71.50–17 of this part, you may apply to the AHE Program. You must submit an application at least 90 days before the requested hull examination date to the Officer in Charge, Marine Inspection (OCMI), who will

Add. 148

oversee the hull examination. The application must include—

(a) The proposed time and place for conducting the hull examination;

(b) The name of the participating diving contractor and underwater remotely operated vehicle (ROV) company accepted by the OCMI under §71.50–27 of this part;

(c) The name and qualifications of the third party examiner. This person must be familiar with the inspection procedures and his or her responsibilities under this program. The OCMI has the discretionary authority to accept or deny use of any third party examiner using the criteria established in §71.50–1 of this part;

(d) A signed statement from your vessel's master, chief engineer, or the person in charge stating the vessel meets the eligibility criteria of §71.50–17 of this part and a description of the vessel's overall condition, level of maintenance, known or suspected damage, underwater body cleanliness (if known), and the anticipated draft of the vessel at the time of the examination;

(e) Plans or drawings that illustrate the external details of the hull below the sheer strake;

(f) A detailed plan for conducting the hull examination in accordance with §§71.50–25 and 71.50–27 of this part, which must address all safety concerns related to the removal of sea valves during the inspection; and

(g) A preventative maintenance plan for your vessel's hull, its related systems and equipment.

[USCG–2000–6858, 67 FR 21077, Apr. 29, 2002, as amended by USCG–2000–6858, 69 FR 47382, Aug. 5, 2004]

### § 71.50–21 Preliminary examination requirements.

(a) If you exclusively use divers to examine the underwater hull plating, you must arrange to have a preliminary examination conducted by a third party examiner, with the assistance of qualified divers. The purpose of the preliminary examination is to assess the overall condition of the vessel's hull and identify any specific concerns to be addressed during the underwater hull examination.

(b) The preliminary examination is required only upon the vessel's entry or reentry into the AHE program.

(c) If you use an underwater ROV as the predominant means to examine your vessel's hull plating, a preliminary examination and the participation of a third party examiner will not be necessary.

[USCG–2000–6858, 67 FR 21078, Apr. 29, 2002]

### § 71.50–23 Pre-survey meeting.

(a) In advance of each AHE, you must conduct a pre-survey meeting to discuss the details of the AHE procedure with the Officer in Charge, Marine Inspection (OCMI). If you exclusively use divers to examine the underwater hull plating, the third party examiner must attend the meeting and you must present the results of the preliminary examination. If you use an underwater remotely operated vehicle (ROV) as the predominant means to examine the vessel's hull plating, then the pre-survey meeting must be attended by a representative of the ROV operating company who is qualified to discuss the ROV's capabilities and limitations of your vessel's hull design and configuration.

(b) A vessel owner, operator, or designated agent must request this meeting in writing at least 30 days in advance of the examination date.

(c) The pre-survey meeting may be conducted by teleconference, if agreed to in advance by the OCMI.

[USCG–2000–6858, 67 FR 21078, Apr. 29, 2002, as amended by USCG–2000–6858, 69 FR 47382, Aug. 5, 2004]

### § 71.50–25 Alternative Hull Examination (AHE) procedure.

(a) To complete the underwater survey you must—

(1) Perform a general examination of the underwater hull plating and a detailed examination of all hull welds, propellers, tailshafts, rudders, and other hull appurtenances;

(2) Examine all sea chests;

(3) Remove and inspect all sea valves in the presence of a marine inspector once every five years;

(4) Remove all passengers from the vessel when the sea valves are being examined, if required by the Officer in Charge, Marine Inspection (OCMI);

(5) Allow access to all internal areas of the hull for examination, except internal tanks that carry fuel, sewage, or potable water. Internal tanks that carry fuel must be examined in accordance with § 71.53–1 of this part. Internal sewage and potable water tanks may be examined visually or by non-destructive testing to the satisfaction of the attending marine inspector; and

(6) Meet the requirements in § 71.50–27 of this part.

(b) A marine inspector may examine any other areas deemed necessary by the OCMI.

(c) If the AHE reveals significant deterioration or damage to the vessel's hull plating or structural members, the OCMI must be immediately notified. The OCMI may require the vessel be drydocked or otherwise taken out of service to further assess the extent of damage or to effect permanent repairs if the assessment or repairs cannot be completed to the satisfaction of the OCMI while the vessel is waterborne.

[USCG–2000–6858, 67 FR 21078, Apr. 29, 2002, as amended by USCG–2000–6858, 69 FR 47382, Aug. 5, 2004]

### § 71.50–27 Alternative Hull Examination (AHE) program options: Divers or underwater remotely operated vehicle (ROV).

To conduct the underwater survey portion of the AHE, you may use divers or an underwater ROV.

(a) If you use divers to conduct the underwater survey, you must:

(1) Locate the vessel so the divers can work safely under the vessel's keel and around both sides. The water velocity must be safe for dive operations;

(2) Provide permanent hull markings, a temporary grid system of wires or cables spaced not more than 10 feet apart and tagged at one-foot intervals, or any other acoustic or electronic positioning system approved by the OCMI to identify the diver's location with respect to the hull, within one foot of accuracy;

(3) Take ultrasonic thickness gaugings at a minimum of 5 points on each plate, evenly spaced;

(4) Take hull plating thickness gaugings along transverse belts at the bow, stern, and midships, as a minimum. Plating thickness gaugings must also be taken along a longitudinal belt at the wind and water strake. Individual gaugings along the transverse and longitudinal belts must be spaced no more than 3 feet apart;

(5) Ensure the third party examiner observes the entire underwater examination process;

(6) Record the entire underwater survey with audio and video recording equipment and ensure that communications between divers and the third party examiner are recorded; and

(7) Use appropriate equipment, such as a clear box, if underwater visibility is poor, to provide the camera with a clear view of the hull.

(b) You may use an underwater ROV to conduct the underwater survey. The underwater ROV operating team, survey process and equipment, quality assurance methods, and the content and format of the survey report must be accepted by the Officer in Charge, Marine Inspection (OCMI) prior to the survey. If you choose this option, you must—

(1) Locate the vessel to ensure that the underwater ROV can operate effectively under the vessel's keel and around all sides;

(2) Employ divers to examine any sections of the hull and appurtenances that the underwater ROV cannot access or is otherwise unable to evaluate; and

(3) If the OCMI determines that the data obtained by the ROV, including non-destructive testing results, readability of the results, and positioning standards, will not integrate into the data obtained by the divers, then a third party examiner must be present during the diver's portion of the examination.

[USCG–2000–6858, 67 FR 21078, Apr. 29, 2002, as amended by USCG–2000–6858, 69 FR 47382, Aug. 5, 2004; USCG–2014–0688, 79 FR 58281, Sept. 29, 2014]

### § 71.50–29 Hull examination reports.

(a) If you use only divers for the underwater survey portion of the Alternative Hull Examination (AHE), you must provide the Officer in Charge, Marine Inspection (OCMI), with a written

Add. 150

hull examination report. This report must include thickness gauging results, bearing clearances, a copy of the audio and video recordings, and any other information that will help the OCMI evaluate your vessel for a credit hull exam. The third party examiner must sign the report and confirm the validity of its contents.

(b) If you use an underwater ROV as the predominant means to examine the vessel's underwater hull plating, you must provide the OCMI with a report in the format that is accepted by the OCMI, per §71.50–27(b) of this part.

(c) The OCMI will evaluate the hull examination report and grant a credit hull exam if satisfied with the condition of the vessel. If approved and you exclusively use divers to examine the hull plating, you may receive a credit hull exam up to 36 months. (Underwater examinations are required twice every 5 years). If approved and you use an underwater ROV as the predominant means to examine the underwater hull plating, you may receive a credit hull exam up to 60 months (5 years).

(d) At least 60 days prior to each scheduled underwater exam, the owner may request a waiver from the OCMI if:

(1) A satisfactory exam has been completed within the last three years;

(2) The conditions during the last exam allowed at least 80 percent of the bottom surface to be viewed and recorded; and

(3) The results of the last exam indicated that an extended interval is safe and reasonable.

[USCG–2000–6858, 67 FR 21078, Apr. 29, 2002, as amended by USCG–2000–6858, 69 FR 47382, Aug. 5, 2004]

§ 71.50–31 Continued participation in the Alternative Hull Examination (AHE) program.

(a) To continue to participate in the AHE Program, vessel operators must conduct an annual hull condition assessment. At a minimum, vessel operators must conduct an internal examination and take random hull gaugings internally during the hull condition assessment, unless waived by the Officer in Charge, Marine Inspection (OCMI). If the annual hull assessment reveals significant damage or corrosion, where temporary repairs have been made, or where other critical areas of concern have been identified, the OCMI may require an expanded examination to include an underwater hull examination using divers. If an underwater examination is required, the examination must focus on areas at higher risk of damage or corrosion and must include a representative sampling of hull gaugings.

(b) If an underwater survey is required for the annual hull condition assessment, the OCMI may require the presence of a third party examiner and a written hull examination report must be submitted to the OCMI. This report must include thickness gauging results, a copy of the audio and video recordings and any other information that will help the OCMI evaluate your vessel for continued participation in the AHE program. The third party examiner must sign the report and confirm the validity of its contents.

(c) You must submit your preventive maintenance reports or checklists on an annual basis to the OCMI. These reports or checklists must conform to the plans you submitted in your application under §71.50–19 of this part, which the OCMI approved.

(d) Prior to each scheduled annual hull condition assessment—

(1) The owner may submit to the OCMI a plan for conducting the assessment, or a request for a waiver of this requirement, no fewer than 30 days before the scheduled assessment; and

(2) The OCMI may reduce the scope or extend the interval of the assessment if the operational, casualty, and deficiency history of the vessel, along with a recommendation of the vessel's master, indicates that it is warranted.

[USCG–2000–6858, 67 FR 21078, Apr. 29, 2002, as amended by USCG–2000–6858, 69 FR 47382, Aug. 5, 2004]

§ 71.50–35 Notice and plans required.

(a) The master, owner, operator, or agent of the vessel shall notify the Officer in Charge, Marine Inspection, whenever the vessel is to be drydocked, regardless of the reason for drydocking.

(b) Each vessel, except barges, that holds a Load Line Certificate must have on board a plan showing the vessel's scantlings. This plan must be

made available to the Coast Guard marine inspector whenever the vessel undergoes a drydock examination, internal structural examination or underwater survey or whenever repairs are made to the vessel's hull.

(c) Each barge that holds a Load Line Certificate must have a plan showing the barge's scantlings. The plan need not be maintained on board the barge but must be made available to the Coast Guard marine inspector whenever the barge undergoes a drydock examination, internal structural examination, or underwater survey or whenever repairs are made to the barge's hull.

[CGD 84–024, 52 FR 39652, Oct. 23, 1987. Redesignated and amended by USCG–2000–6858, 67 FR 21076, Apr. 29, 2002; USCG–2014–0688, 79 FR 58281, Sept. 29, 2014]

## Subpart 71.53—Integral Fuel Oil Tank Examinations

### § 71.53–1  When required.

(a) Each fuel oil tank with at least one side integral to the vessel's hull and located within the hull ("integral fuel oil tank") is subject to inspection as provided in this section. Each integral fuel oil tank is subject to inspection as provided in this section. The owner or operator of the vessel shall have the tanks cleaned out and gas freed as necessary to permit internal examination of the tank or tanks designated by the marine inspector. The owner or operator shall arrange for an examination of the fuel tanks of each vessel during an internal structural examination at intervals not to exceed five years.

(b) Integral non-double-bottom fuel oil tanks need not be cleaned out and internally examined if the marine inspector is able to determine by external examination that the general condition of the tanks is satisfactory.

(c) Double-bottom fuel oil tanks on vessels less than 10 years of age need not be cleaned out and internally examined if the marine inspector is able to determine by external examination that the general condition of the tanks is satisfactory.

(d) All double-bottom fuel oil tanks on vessels 10 years of age or older but less than 15 years of age need not be cleaned out and internally examined if the marine inspector is able to determine by internal examination of at least one forward double-bottom fuel oil tank, and by external examination of all other double-bottom fuel oil tanks on the vessel, that the general condition of the tanks is satisfactory.

(e) All double-bottom fuel oil tanks on vessels 15 years of age or older need not be cleaned out and internally examined if the marine inspector is able to determine by internal examination of at least one forward, one amidships, and one aft double-bottom fuel oil tank, and by external examination of all other double-bottom fuel oil tanks on the vessel, the general condition of the tanks is satisfactory.

[CGD 84–024, 52 FR 39652, Oct. 23, 1987, as amended by CGD 84–024, 53 FR 32231, Aug. 24, 1988]

## Subpart 71.55—Repairs and Alterations

### § 71.55–1  Permission required.

(a) No repairs or alterations affecting the safety of the vessel with regard to the hull, machinery, or equipment, shall be made without the knowledge of the Officer in Charge, Marine Inspection.

(b) Drawings of alterations shall be approved before work is started, unless deemed unnecessary by the Officer in Charge, Marine Inspection.

(c) Drawings will not be required for repairs in kind.

### § 71.55–5  Inspection required.

(a) An inspection, either general or partial depending upon the circumstances, shall be made whenever any important repairs or alterations are undertaken.

(b) [Reserved]

## Subpart 71.60—Special Operating Requirements

### § 71.60–1  Inspection and testing required when making alterations, repairs, or other such operations involving riveting, welding, burning or like fire-producing actions.

(a) The provisions of "Standard for the Control of Gas Hazards on Vessels

to be Repaired,'' NFPA No. 306, published by National Fire Protection Association, 1 Batterymarch Park, Quincy, MA 02269, shall be used as a guide in conducting the inspections and issuance of certificates required by this section.

(b) Until an inspection has been made to determine that such operation can be undertaken with safety, no alterations, repairs, or other such operations involving riveting, welding, burning, or like fire-producing actions shall be made:

(1) Within or on the boundaries of cargo tanks which have been used to carry combustible liquid or chemicals in bulk; or,

(2) Within or on the boundaries of fuel tanks; or,

(3) To pipe lines, heating coils, pumps, fittings, or other appurtenances connected to such cargo or fuel tanks.

(c) Such inspections shall be made and evidenced as follows:

(1) In ports or places in the United States or its territories and possessions the inspection shall be made by a marine chemist certificated by the National Fire Protection Association; however, if the services of such certified marine chemist are not reasonably available, the Officer in Charge, Marine Inspection, upon the recommendation of the vessel owner and his contractor or their representative, shall select a person who, in the case of an individual vessel, shall be authorized to make such inspection. If the inspection indicated that such operations can be undertaken with safety, a certificate setting forth the fact in writing and qualified as may be required, shall be issued by the certified marine chemist or the authorized person before the work is started. Such qualifications shall include any requirements as may be deemed necessary to maintain, insofar as can reasonably be done, the safe conditions in the spaces certified throughout the operation and shall include such additional tests and certifications as considered required. Such qualifications and requirements shall include precautions necessary to eliminate or minimize hazards that may be present from protective coatings or residues from cargoes.

(2) When not in such a port or place, and a marine chemist or such person authorized by the Officer in Charge, Marine Inspection, is not reasonably available, the inspection shall be made by the senior officer present and a proper entry shall be made in the vessel's logbook.

(d) It shall be the responsibility of the senior officer present to secure copies of certificates issued by the certified marine chemist or such person authorized by the Officer in Charge, Marine Inspection. It shall be the responsibility of the senior officer present, insofar as the persons under his control are concerned, to maintain a safe condition on the vessel by full observance of all qualifications and requirements listed by the marine chemist in the certificate.

[CGD 84–024, 52 FR 39652, Oct. 23, 1987, as amended by CGD 95–072, 60 FR 50463, Sept. 29, 1995]

## Subpart 71.65—Plan Approval

**§71.65–1 General.**

(a) The list of required plans is general in character, but includes all plans in §71.65–5 which normally show construction and safety features coming under the cognizance of the Coast Guard. In the case of a particular vessel, all of the plans enumerated may not be applicable, and it is intended that only those plans and specifications submitted as will clearly show the vessel's arrangement, construction and required equipment.

(b) In the list of required plans in §71.65–5 the items which must be approved by the American Bureau of Shipping for vessels classed by that organization are indicated by an asterisk. When prints bearing record of such approval by the American Bureau of Shipping are forwarded to the Coast Guard they will in general be accepted as satisfactory except insofar as the law or the Coast Guard regulations contain requirements which are not covered by the American Bureau of Shipping.

(c) Plans and specifications for cargo gear shall be approved by either a recognized classification society or the International Cargo Gear Bureau, Inc., whose home office is located at 481

27

Eighth Avenue, New York, NY 10001 on the Internet at *http://www.icgb.com.*

[CGFR 65–50, 30 FR 16895, Dec. 30, 1965, as amended by CGD 95–028, 62 FR 51204, Sept. 30, 1997; USCG–2008–0906, 73 FR 56510, Sept. 29, 2008; USCG–2021–0348, 87 FR 3224, Jan. 21, 2022]

### § 71.65–5 Plans and specifications required for new construction.

(a) *General.* (1) Specifications.

(2) General Arrangement Plan of decks, holds, inner bottoms, etc., and including inboard and outboard profile.

(b) *Hull structure.*[1]

(1) *Inner Bottom Plating and Framing.

(2) *Midship Section.

(3) *Shell Plating and Framing.

(4) *Stem, Stern Frame, and Rudder.

(5) *Structural Deck Plans for Strength Decks.

(6) *Pillars and Girders.

(7) *Watertight and Oiltight Bulkheads.

(8) *Foundations for Main Machinery and Boilers.

(9) *Arrangement of Ports, Doors, and Airports in Shell Plating.

(10) *Hatch Coamings and Covers in Weather and Watertight Decks.

(11) *Details of Hinged Subdivision Watertight Doors and Operating Gear.

(12) *Scuppers and Drains Penetrating Shell Plating.

(13) *Arrangement of the cargo gear including a stress diagram. The principal details of the gear and the safe working load for each component part shall be shown.

(c) *Subdivision and stability.* Plans and calculations required by subchapter S of this chapter.

(d) *Fire control.* (1) Fire control diagram showing location and type of all required fire-screen insulation, including main fire zone and subdivisions, stairway and elevator enclosures, control space enclosures, etc., and type of all doors in such subdivisions and enclosures.

(2) Comprehensive typical details of fire-screen insulation of both vertical and horizontal surfaces, including deck coverings where used, keyed by reference numbers to the "fire control diagram".

(3) Ventilation diagram including dampers and other fire control features.

(4) Alarm systems.

(5) Detecting systems.

(6) Extinguishing systems, including fire main, carbon dioxide, clean agent, foam, and sprinkling systems.

(7) Supervised Patrol Route.

(e) *Marine engineering.* (1) For plans required for marine engineering equipment and systems, see subchapter F (Marine Engineering) of this chapter.

(2) [Reserved]

(f) *Electrical engineering.* (1) For plans required for electrical engineering equipment and systems, see subchapter J (Electrical Engineering) of this chapter.

(2) [Reserved]

(g) *Lifesaving equipment.* (1) These plans are to show the location and arrangement of embarkation decks, all overboard discharges and projections in way of launching lifeboats, weights of lifeboats fully equipped and loaded, working loads of davits and winches, types and sizes of falls, the manufacturer's name and identification for all equipment, and all other relevant and necessary information.

(i) Arrangement of lifeboats.

(ii) Arrangement of davits.

(iii) Location and stowage of liferafts and buoyant apparatus.

(2) [Reserved]

(h) *Crew's accommodations.* (1) Arrangement plans showing accommodations, ventilation, escapes, hospital, and sanitary facilities for all crewmembers.

(2) [Reserved]

(i) *Navigation bridge visibility.* For vessels of 100 meters (328 feet) or more in length contracted for on or after September 7, 1990, a plan must be included which shows how visibility from the

---

[1] The Asterisk (*) indicates items that are approved by the American Bureau of Shipping for vessels classed by it. Items approved the American Bureau of Shipping are generally accepted as satisfactory unless the law or Coast Guard regulations contain requirements that are not covered by the American Bureau of Shipping.

Add. 154

navigation bridge will meet the standards contained in §72.04–1 of this subchapter.

[CGFR 65–50, 30 FR 16895, Dec. 30, 1965, as amended by CGD 79–023, 48 FR 51007, Nov. 4, 1983; CGD 85–099, 55 FR 32247, Aug. 8, 1990; CGD 88–032, 56 FR 35824, July 29, 1991; USCG–2006–24797, 77 FR 33875, June 7, 2012]

### §71.65–10 Plans required for alterations of existing vessels.

(a) In the event of alterations involving the safety of the vessel, the applicable plans shall be submitted for approval covering the proposed work, except as modified by §71.55–1(b). The general scope of the plans shall be as noted in §71.65–5.

(b) [Reserved]

### §71.65–15 Procedure for submittal of plans.

(a) As the relative location of shipyards, design offices, and Coast Guard offices vary throughout the country, no specific routing will be required in the submittal of plans. In general, one of the following procedures would apply, but in a particular case, if a more expeditious procedure can be used, there will be no objection to its adoption:

(1) The plans may be submitted to the Officer in Charge, Marine Inspection, in the district in which the vessel is to be built. This procedure will be most expeditious in the case of those offices where personnel and facilities are available for examination and approval of the plans locally.

(2) The plans may be submitted by visitors directly to the Commanding Officer, Marine Safety Center, U.S. Coast Guard, 2703 Martin Luther King Jr. Avenue SE., Washington, DC 20593, or transmitted by mail to: Commanding Officer (MSC), Attn: Marine Safety Center, U.S. Coast Guard Stop 7430, 2703 Martin Luther King Jr. Avenue SE., Washington, DC 20593–7430, in a written or electronic format. Information for submitting the VSP electronically can be found at *http://www.uscg.mil/HQ/MSC*. In this case, the plans will be returned directly to the submitter, with a copy of the action being forwarded to the interested Officer in Charge, Marine Inspection.

(3) In the case of classed vessels, upon specific request by the submitter, the American Bureau of Shipping will arrange to forward the necessary plans to the Coast Guard indicating its action thereon. In this case, the plans will be returned as noted in paragraph (a)(2) of this section.

(b) [Reserved]

[CGFR 65–50, 30 FR 16895, Dec. 30, 1965, as amended by 60 FR 50463, Sept. 29, 1995; CGD 95–072, 60 FR 54106, Oct. 19, 1995; USCG–2007–29018, 72 FR 53965, Sept. 21, 2007; USCG–2009–0702, 74 FR 49231, Sept. 25, 2009; USCG–2013–0671, 78 FR 60150, Sept. 30, 2013; USCG–2016–0498, 82 FR 35091, July 28, 2017]

### §71.65–20 Number of plans required.

(a) Three copies of each plan are normally required so that one can be returned to the submitter. If the submitter desires additional approved plans, a suitable number should be submitted to permit the desired distribution.

(b) [Reserved]

[CGFR 65–50, 30 FR 16895, Dec. 30, 1965, as amended by CGFR 69–116, 35 FR 6861, Apr. 30, 1970]

## Subpart 71.75—Certificates Under the International Convention for Safety of Life at Sea, 1974

### §71.75–1 Application.

(a) The provisions of this subpart shall apply to all vessels on or certificated for an international voyage.

(b) [Reserved]

[CGFR 65–50, 30 FR 16895, Dec. 30, 1965, as amended by USCG–2007–0030, 75 FR 78081, Dec. 14, 2010]

### §71.75–5 Passenger Ship Safety Certificate.

(a) All vessels on or certificated for an international voyage are required to have a " SOLAS Passenger Ship Safety Certificate."

(b) All such vessels shall meet the requirements of this chapter for vessels on or certificated for an international

Add. 155

voyage in addition to the applicable requirements of SOLAS.

[CGFR 65–50, 30 FR 16895, Dec. 30, 1965, as amended by CGD 95–012, 60 FR 48051, Sept. 18, 1995; USCG–2007–0030, 75 FR 78081, Dec. 14, 2010]

### § 71.75–10 Exemption Certificate.

(a) A vessel may be exempted by the Commandant from complying with certain requirements of the Convention under his administration upon request made in writing to him and transmitted via the Officer in Charge, Marine Inspection.

(b) When an exemption is granted to a vessel by the Commandant under and in accordance with the Convention, an Exemption Certificate describing such exemption shall be issued through the appropriate Officer in Charge, Marine Inspection, in addition to the Passenger Ship Safety Certificate.

[CGFR 65–50, 30 FR 16895, Dec. 30, 1965, as amended by CGD 95–012, 60 FR 48051, Sept. 18, 1995]

### § 71.75–13 Safety Management Certificate.

All vessels to which 33 CFR part 96 applies on an international voyage must have a valid Safety Management Certificate and a copy of their company's valid Document of Compliance certificate on board.

[CGD 95–073, 62 FR 67514, Dec. 24, 1997]

### § 71.75–15 Posting of Convention certificates.

(a) The certificates described in this subpart, or certified copies thereof, when issued to a vessel shall be posted in a prominent and accessible place on the vessel.

(b) The certificate shall be carried in a manner similar to that described in § 71.01–5 for a certificate of inspection.

### § 71.75–20 Duration of certificates.

(a) The certificates are issued for a period of not more than 12 months, with exception to a Safety Management Certificate which is issued for a period of not more than 60 months.

(b) An Exemption Certificate shall not be valid for longer than the period of the Passenger Ship Safety Certificate to which it refers.

(c) The Passenger Ship Safety Certificate may be withdrawn, revoked, or suspended at any time when it is determined the vessel is no longer in compliance with applicable requirements. (See § 2.01–70 of this chapter for procedures governing appeals.)

[CGFR 65–50, 30 FR 16895, Dec. 30, 1965, as amended by CGD 95–012, 60 FR 48051, Sept. 18, 1995; CGD 95–073, 62 FR 67514, Dec. 24, 1997]

## PART 72—CONSTRUCTION AND ARRANGEMENT

### Subpart 72.01—Hull Structure

Sec.
72.01–1 Application.
72.01–2 Incorporation by reference.
72.01–5 Vessels subject to load line.
72.01–10 Vessels using fuel having a flashpoint of 110 degrees F. or lower.
72.01–15 Structural standards.
72.01–20 Special consideration.
72.01–25 Additional structural requirements.
72.01–90 Vessels contracted for prior to November 19, 1952.

### Subpart 72.03—General Fire Protection

72.03–1 Application.
72.03–5 Fire hazards to be minimized.
72.03–10 Woodwork insulated from heated surfaces.
72.03–15 Lamp room construction.

### Subpart 72.04—Navigation Bridge Visibility

72.04–1 Navigation bridge visibility.

### Subpart 72.05—Structural Fire Protection

72.05–1 Application.
72.05–5 Definitions.
72.05–10 Type, location, and construction of fire control bulkheads and decks.
72.05–15 Ceilings, linings, trim, and decorations in accommodation spaces and safety areas.
72.05–20 Stairways, ladders, and elevators.
72.05–25 Doors, other than watertight.
72.05–30 Windows and airports.
72.05–35 Hatch covers and shifting boards.
72.05–40 Insulation, other than for structural fire protection.
72.05–45 Paint.
72.05–50 Ventilation.
72.05–55 Furniture and furnishings.
72.05–90 Vessels contracted for prior to May 26, 1965.

### Subpart 72.10—Means of Escape

72.10–1 Application.
72.10–5 Two means required.
72.10–10 Location.

# ARTICLE VII
**Permits**

## § 125-77.  Permit required for certain activities. [Amended 5-7-1991 ; 11-2-1999 ]

After the effective date of this chapter, a written permit from the Code Enforcement Officer shall be required for the following activities, regardless of whether such activities have received site plan or subdivision approval or whether they also require review by the Design Review Board pursuant to Article XIII, Design Review:

A.  Flood hazard areas. All construction or earthmoving activities or other improvements within the one-hundred-year floodplain designated on the Flood Insurance Rate Maps published by the Federal Emergency Management Agency.

B.  New construction. New construction of buildings and structures.

C.  Alteration. Alteration of a building, structure, or land, or parts thereof, including but not limited to: [Amended 5-3-2004 ]

    (1)  Change in size of windows or doors;

    (2)  Repair of foundations, whether concrete, cinder block, granite and posts, or piles;

    (3)  Interior renovations for change in use;

    (4)  Remodeling interior walls to create new rooms;

    (5)  Enclosing open frame porch;

    (6)  Installing skylights;

    (7)  Erection of fences;

    (8)  Construction of new steps;

    (9)  Creation of roads or driveways;

    (10) Erection of panels for winter closure or the erection of winter storm vestibules in the Downtown Village or Waterfront Development Districts; provided, however, that a permit need only be obtained in the first year of the useful life of the structure to be erected. [Amended 6-8-2010 ]

D.  Placement of signs. Placement of signs except temporary signs. [Amended 5-3-2004 ]

E.  Moving or demolition. All buildings or structures which are removed from or moved onto, or moved around within, a lot or demolished.

F.  Change of use. The change of any premises from one category of land use to any other land use.

G.  Activities. Any other activities described in Article III as requiring a permit from the Code Enforcement Officer.

Downloaded from https://ecode360.com/BA1953 on 2024-07-26

**Add. 157**

H. Disembarking persons from cruise ships on, over, or across any property located within the Town of Bar Harbor. **[Added 11-8-2022 ]**

   (1) For the purposes of this section, "cruise ship" has the same meaning as set forth in § 153-22B of the Town of Bar Harbor Code.

   (2) As determined by the Harbor Master, no more than 1,000 persons, in the aggregate, may disembark on a single calendar day from any cruise ship(s) and come to shore on, over, or across any property located within the Town of Bar Harbor; provided, however, that this subsection shall not apply with regard to any cruise ship reservations that have been accepted by the Harbor Master prior to March 17, 2022.

   (3) The Harbor Master shall develop rules and regulations in order to establish (a) a reservation system for cruise ships that transport persons by watercraft for disembarkation in the Town of Bar Harbor; (b) a mechanism for counting and tracking the number of persons disembarking each day; (c) a mandatory procedure for reporting violations to the Code Enforcement Officer; and (d) any other provisions that the Harbor Master deems necessary under this subsection. Any property owner issued a permit under this § 125-77H shall comply with all rules and regulations promulgated by the Harbor Master under this subsection.

   (4) This subsection shall be enforced by the Code Enforcement Officer in accordance with § 125-100 of this chapter, based on information as to violations provided by the Harbor Master, and property owners in violation of this subsection shall be subject to such fines, penalties, actions and orders as are authorized by 30-A M.R.S. § 4452, as the same may be amended, provided that each disembarking person exceeding the permitted daily limit in § 125-77H(2) is a specific violation under 30-A M.R.S. § 4452(3)(B), resulting in a minimum $100 penalty per excess unauthorized person.

   (5) Notwithstanding 1 M.R.S. § 302, and regardless of the date on which it is approved by the voters, this subsection will be applicable as of March 17, 2022, and shall govern any and all applications for permits or approvals required under this subsection that were or have been pending before any officer, board, or agency of the Town of Bar Harbor on or at any time after March 17, 2022; provided, however, that the Town will not take any enforcement action under this subsection with regard to any cruise ship visits occurring prior to the date of adoption by voters at Town Meeting.

## § 125-78. Prohibitions. [Amended 6-13-2006 [1] ]

A. No activity or use requiring a permit under this article shall be commenced unless and until the property owner has received any required permits for the Code Enforcement Officer.

B. No building permit shall be approved for a particular property if the property owner is in violation of this chapter or of any other previously approved subdivision or site plan on said property.

---

1. **Editor's Note: This ordinance also provided that it shall apply retroactively to all proceedings, applications and/or petitions pending on or commenced after 9-6-2005, notwithstanding the provisions of 1 M.R.S.A. § 302.**

Downloaded from https://ecode360.com/BA1953 on 2024-07-26

## § 125-79.  Procedure.

A.  Application. All applications for permits shall be submitted in writing in duplicate to the Code Enforcement Officer on forms provided for the purpose, together with such fees as shall, from time to time, be set by the Town Council.

B.  Submissions. All applications for a permit shall be accompanied by a plan accurately drawn to scale or showing actual dimensions or distances and showing:

(1)  The actual shape and dimensions of the lot for which a permit is sought.

(2)  The location and size of all buildings, structures, water bodies, and other significant features currently existing on the lot.

(3)  The location and building plans of new buildings, structures or portions thereof to be constructed.

(4)  The existing and intended use of each building or structure.

(5)  Where applicable, the location of soils test pits, subsurface sewage disposal system, parking lots and driveways, signs, buffer strips and private wells.

(6)  Such other information as may be reasonably required by the Code Enforcement Officer to provide for the administration and enforcement of this chapter.

C.  To whom issued. No permit shall be issued except to the owner of record or his authorized agent. Written proof of authorization shall be required.

D.  Compliance with this chapter. All activities undertaken pursuant to a permit issued under this article shall comply with all applicable standards set forth in Article V. Each application and each permit shall bear the following conspicuous notations which, on the application, shall be acknowledged in writing by the applicant: "The undersigned applicant acknowledges that the applicant and the person on whose behalf a permit is sought are responsible to ensure that the proposed activity complies with all applicable standards of the Bar Harbor Land Use Ordinance."

E.  Deadline for decision. The Code Enforcement Officer shall, within 30 days of receipt of an application, issue the permit, if all proposed construction and uses meet the provisions of this chapter, refer the applicant to the Planning Board for site plan review under Article V, or deny the application. All decisions of the Code Enforcement Officer shall be in writing. Failure of the Code Enforcement Officer to act within 30 days shall constitute denial of the application.

F.  Copies. One copy of the application, with the permit or other written decision of the Code Enforcement Officer, shall be returned to the applicant and one copy, with a copy of the permit or written decision, shall be retained by the Code Enforcement Officer as a permanent public record. The applicant shall cause any permit issued to be conspicuously posted on the lot where the activity will occur at a location clearly visible from the street.

G.  Other permits required. No permit shall be issued for any structure or use until all other necessary federal, state and local permits and approvals have been obtained. The issuance of

Downloaded from https://ecode360.com/BA1953 on 2024-07-26

**Add. 159**

a permit under this article shall not be deemed a permit under any federal or state statutes or other ordinance of the Town of Bar Harbor. It is the responsibility of the landowner or applicant to comply with all other laws and regulations.

### § 125-80. Certificate of occupancy.

A certificate of occupancy, certifying that all applicable provisions of this chapter have been satisfied, shall be obtained from the Code Enforcement Officer:

A.   After a building, structure or part thereof has been erected, altered, enlarged or moved pursuant to a permit, site plan approval or subdivision approval, for the proposed use before the building or structure or part thereof may be used or occupied;

B.   After a site has been modified or otherwise developed pursuant to a permit, site plan approval, or subdivision approval to ensure all terms, conditions and the plan approved by the Planning Board, the Design Review Board, the Board of Appeals, the Planning Department or the Code Enforcement Officer, as applicable, have been met; **[Added 6-8-2010 [2]]**

C.   After a building has been modified to accommodate additional dwelling units, before such units may be used or occupied;

D.   After a building or structure has been modified to accommodate a home occupation, before said home or structure may be used or occupied for a home occupation;

E.   Before a change in use of a nonconforming structure or lot;

F.   Before the occupancy and use, or change in use, of vacant land, except for the raising of crops.

---

2.   **Editor's Note: This amendment also redesignated former Subsections B through E as Subsections C through F, respectively.**

Downloaded from https://ecode360.com/BA1953 on 2024-07-26

Maine Revised Statutes Annotated
    Constitution of the State of Maine (Refs & Annos)
        Article VIII. [Education; Municipal Home Rule] (Refs & Annos)
        Part Second. Municipal Home Rule (Refs & Annos)

M.R.S.A. Const. Art. 8, Pt. 2, § 1

§ 1. Power of municipalities to amend their charters

Currentness

Section 1. The inhabitants of any municipality shall have the power to alter and amend their charters on all matters, not prohibited by Constitution or general law, which are local and municipal in character. The Legislature shall prescribe the procedure by which the municipality may so act.

M. R. S. A. Const. Art. 8, Pt. 2, § 1, ME CONST Art. 8, Pt. 2, § 1
Current with emergency legislation through Chapter 646 of the 2023 Second Regular Session of the 131st Legislature. The Second Regular Session convened January 3, 2024. Statutory adjournment is April 17, 2024.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. **Add. 161** 1

Maine Revised Statutes Annotated
    Title 30-a. Municipalities and Counties (Refs & Annos)
        Part 2. Municipalities
            Subpart 4. Ordinance Authority and Limitations
                Chapter 141. Ordinances

30-A M.R.S.A. § 3001

§ 3001. Ordinance power

Currentness

Any municipality, by the adoption, amendment or repeal of ordinances or bylaws, may exercise any power or function which the Legislature has power to confer upon it, which is not denied either expressly or by clear implication, and exercise any power or function granted to the municipality by the Constitution of Maine, general law or charter.

**1. Liberal construction.** This section, being necessary for the welfare of the municipalities and their inhabitants, shall be liberally construed to effect its purposes.

**2. Presumption of authority.** There is a rebuttable presumption that any ordinance enacted under this section is a valid exercise of a municipality's home rule authority.

**3. Standard of preemption.** The Legislature shall not be held to have implicitly denied any power granted to municipalities under this section unless the municipal ordinance in question would frustrate the purpose of any state law.

**4. Penalties accrue to municipality.** All penalties established by ordinance shall be recovered on complaint to the use of the municipality.

**Credits**
1987, c. 737, § A, 2.

30-A M. R. S. A. § 3001, ME ST T. 30-A § 3001

Current with emergency legislation through Chapter 646 of the 2023 Second Regular Session of the 131st Legislature. The Second Regular Session convened January 3, 2024. Statutory adjournment is April 17, 2024.

---

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Maine Revised Statutes Annotated
    Title 30-a. Municipalities and Counties (Refs & Annos)
        Part 2. Municipalities
            Subpart 4. Ordinance Authority and Limitations
                Chapter 141. Ordinances

30-A M.R.S.A. § 3009

§ 3009. Authority of municipal officers to enact ordinances

Effective: June 29, 2023
Currentness

**1. Exclusive authority.** The municipal officers have the exclusive authority to enact all traffic ordinances in the municipality, subject to the following provisions.

**A.** The municipal officers may regulate pedestrian traffic in the public ways, including, but not limited to, setting off portions of a municipality's public ways for sidewalks and regulating their use; providing for the removal of snow and ice from the sidewalks by the owner, occupant or agent having charge of the abutting property; and establishing crosswalks or safety zones for pedestrians.

**(1)** The violation of any ordinance authorized by this paragraph is a civil violation.

**(2)** The municipal officers may establish a method by which persons charged with the violation of ordinances governing pedestrian traffic on the public ways may waive all court action by payment of specified fees within stated periods of time.

**B.** The municipal officers may regulate the operation of all vehicles in the public ways and on publicly owned property.

**(1)** The violation of any ordinance authorized by this paragraph is a civil violation.

**(2)** A municipality may not adopt or enforce an ordinance authorized by this paragraph that is the same as or conflicts with any speed or other traffic control limits imposed by the Department of Transportation pursuant to Title 23 or 29-A.

**C.** The municipal officers may regulate the parking of motor vehicles on any public way or public parking area, including, but not limited to, providing for the installation of parking meters, providing the fact that any vehicle is illegally parked or is in a metered space when the time signal on the parking meter for that space indicates no parking permitted without the deposit of a coin or coins is prima facie evidence that the vehicle has been parked illegally by the person in whose name the vehicle is registered, and establishing reasonable charges for metered parking.

**(1)** Illegal parking of a vehicle in violation of any ordinance authorized by this paragraph is a civil violation.

**(2)** The municipal officers may establish a method by which persons charged with the violation of parking regulations may waive all court action by payment of specified fees within stated periods of time.

**(3)** The revenue collected from parking meters must be used:

**(a)** To purchase, maintain and police the meters;

**(b)** To construct and maintain public ways;

**(c)** To acquire, construct, maintain and operate public parking areas;

**(c-1)** To provide for property tax relief;

**(c-2)** To acquire, construct, maintain and operate capital infrastructure projects; and

**(d)** For no other purpose.

**(4)** A vehicle that exhibits a permanent placard, a temporary placard or a disability registration plate issued under Title 29-A, section 521 may park in accordance with Title 29-A, section 521, subsection 12.

**D.** The following provisions apply to the establishment and policing of parking spaces and access aisles for disabled persons.

**(1)** Municipal public parking areas are subject to any applicable requirements of the Maine Human Rights Act, Title 5, chapter 337, subchapter 5. [1] The municipality shall post a sign adjacent to and visible from each disability parking space established by the municipality. The sign must display the international symbol for accessibility.

**(2) Deleted.** Laws 1997, c. 673, § 3.

**(2-A)** Enforcement of disability parking restrictions must be in accordance with Title 29-A, section 521, subsection 9-A.

**(3)** Any vehicle or motorcycle parked in a parking space clearly marked as a disability parking space and that does not bear a special registration plate or placard issued under Title 29-A, section 521 or 523, or a similar plate issued by another state, must be cited for a fine of not less than $200 and not more than $ 500. "Clearly marked" includes painted signs on pavement and vertical standing signs that are visible in existing weather conditions.

**(4)** The municipal officers may establish and enforce the time limit for use of a parking space reserved as a disability parking space on a public way or public parking area.

**E.** The municipal officers may provide for the regulation of motor vehicles as defined in Title 29-A, section 101, subsection 42 on icebound inland lakes during the hours from sunset to sunrise of the following day. The Maine Land Use Planning Commission shall regulate motor vehicles on icebound inland lakes that are completely encompassed by unorganized territories. Motor vehicles on icebound inland lakes that are abutted by an unorganized territory and either one or more municipalities, village corporations or plantations, in any

combination, are regulated by those municipalities, village corporations or plantations, as provided in subparagraphs (1) and (2).

No ordinance authorized by this paragraph is valid unless:

> **(1)** Each municipality abutting a lake has enacted an identical local ordinance, in which case the ordinance of any municipality is in effect on the entire lake and any law enforcement officer from any of those municipalities may enforce the ordinance on any portion of the lake; or

> **(2)** In cases where a lake is divided by an easily identifiable boundary into 2 or more nearly separate bodies, each municipality abutting one of the distinguishable portions of the lake has enacted an identical local ordinance. The ordinance of any municipality is in effect only on that distinguishable portion of the lake and any law enforcement officer from any of those municipalities may enforce the ordinance anywhere on that portion of the lake.

> **F.** The municipal officers may regulate or establish a licensing authority which may regulate rates of fare, routes and standing places of vehicles for hire, except where jurisdiction rests with the Public Utilities Commission and may require an owner or operator of a vehicle for hire to carry a liability insurance policy in amount and form satisfactory to the licensing authority as a condition precedent to the granting of a license to operate.

**1-A. Transfer of mobile home or modular construction home.** To ensure the fair and efficient administration of property taxation, municipal officers may enact an ordinance requiring the owner of a mobile home or modular construction home to notify the municipal assessor, according to such reasonable terms as the ordinance may establish, upon the transfer of a mobile home or modular construction home when that mobile home or modular construction home is situated on land that is not owned by the mobile home or modular home owner.

**2. Powers of village corporation.** The officers of a village corporation have the same powers and duties as municipal officers under this section.

**3. Method of enactment; effective date.** When enacting ordinances under this section, the municipal officers shall give 7 days' notice of the meeting at which the ordinances are to be

proposed in the manner provided for town meetings. Unless otherwise provided, these ordinances take effect immediately.

**4. Repealed.** Laws 2005, c. 53, § 2.

**Credits**

1987, c. 737, § A, 2; 1989, c. 104, § A, 28; 1989, c. 394, § 2; 1989, c. 878, § A-130, eff. April 20, 1990; 1991, c. 549, § 16, eff. Jan. 1, 1992; R.R.1991, c. 2, § 158; 1995, c. 65, § A-127 to A-129, eff. May 11, 1995; 1997, c. 60, § 1; 1997, c. 392, § 1, eff. June 2, 1997; 1997, c. 673, § 3; 1997, c. 750, § A-4; 1999, c. 127, § A-45, eff. May 6, 1999; 1999, c. 427, § 1; 1999, c. 753, § 8; 2001, c. 151, § 2; 2003, c. 80, § 1; 2003, c. 117, § 1; 2005, c. 53, § 2; 2005, c. 528, § 3, eff. April 4, 2006; 2019, c. 648, § 2, eff. June 16, 2020; 2023, c. 14, §§ 1 to 3, eff. June 29, 2023.

**Footnotes**

1     5 M.R.S.A. § 4591 et seq.

30-A M. R. S. A. § 3009, ME ST T. 30-A § 3009
Current with emergency legislation through Chapter 646 of the 2023 Second Regular Session of the 131st Legislature. The Second Regular Session convened January 3, 2024. Statutory adjournment is April 17, 2024.

End of Document
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. **Add. 168**

Maine Revised Statutes Annotated
  Title 38. Waters and Navigation
    Chapter 1. Operation of Vessels
      Subchapter 3. Pilots (Refs & Annos)

38 M.R.S.A. § 85

§ 85. Declaration of policy

Currentness

It is declared to be the policy and intent of the Legislature and the purpose of this subchapter to provide for a system of state pilotage in order to provide maximum safety from the dangers of navigation for vessels entering or leaving the waters described in this subchapter, to maintain a state pilotage system devoted to the preservation and protection of lives, property, the environment and vessels entering or leaving these waters at the highest standard of efficiency and to insure the availability of pilots well qualified for the discharge of their duties in aid of commerce and navigation.

**Credits**

1969, c. 410, § 1; 1985, c. 389, § 32; 1999, c. 355, § 2, eff. May 28, 1999.

38 M. R. S. A. § 85, ME ST T. 38 § 85
Current with emergency legislation through Chapter 646 of the 2023 Second Regular Session of the 131st Legislature. The Second Regular Session convened January 3, 2024. Statutory adjournment is April 17, 2024.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Maine Revised Statutes Annotated
  Title 38. Waters and Navigation
    Chapter 1. Operation of Vessels
      Subchapter 3. Pilots (Refs & Annos)

38 M.R.S.A. § 86

§ 86. Vessels required to take pilot

Currentness

Every foreign vessel and every American vessel under register, with a draft of 9 feet or more, entering or departing from any port or harbor within the waters described in section 86-A must take a pilot licensed under this chapter. Any master, owner, agent or consignee that fails to take a pilot licensed under this subchapter is subject to a civil penalty not to exceed $15,000 per day, payable to the State. This penalty is recoverable in a civil action.

**Credits**

1969, c. 410, § 1; 1985, c. 389, § 32; 1991, c. 698, § 2; 1999, c. 355, § 5, eff. May 28, 1999.

38 M. R. S. A. § 86, ME ST T. 38 § 86
Current with emergency legislation through Chapter 646 of the 2023 Second Regular Session of the 131st Legislature. The Second Regular Session convened January 3, 2024. Statutory adjournment is April 17, 2024.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. **Add. 170** 1

Maine Revised Statutes Annotated
  Title 38. Waters and Navigation
    Chapter 1. Operation of Vessels
      Subchapter 3. Pilots (Refs & Annos)

38 M.R.S.A. § 86-A

§ 86-A. Jurisdiction over coastal waters and rivers

Currentness

This subchapter applies to all Maine coastal waters and navigable waters with the exception of:

**1. Piscataqua River.** The Piscataqua River;

**2. Exempt waters.** Those waters specifically exempted by the Maine Pilotage Commission; or

**3. Portland harbor.** Those waters specifically governed by the Board of Harbor Commissioners for the Harbor of Portland.

**4, 5. Repealed.** Laws 1987, c. 689, § 1.

**Credits**
1985, c. 389, § 33; 1987, c. 689, § 1; 1999, c. 355, § 6, eff. May 28, 1999.

38 M. R. S. A. § 86-A, ME ST T. 38 § 86-A
Current with emergency legislation through Chapter 646 of the 2023 Second Regular Session of the 131st Legislature. The Second Regular Session convened January 3, 2024. Statutory adjournment is April 17, 2024.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

> Maine Revised Statutes Annotated
>   Title 38. Waters and Navigation
>     Chapter 1. Operation of Vessels
>       Subchapter 3. Pilots (Refs & Annos)

38 M.R.S.A. § 97

### § 97. Authority of pilots

Currentness

A pilot licensed under this subchapter may pilot any vessel required to take a state pilot anywhere upon the pilotage area for which the pilot is licensed.

**Credits**

1969, c. 410, § 1; 1999, c. 355, § 18, eff. May 28, 1999.

38 M. R. S. A. § 97, ME ST T. 38 § 97
Current with emergency legislation through Chapter 646 of the 2023 Second Regular Session of the 131st Legislature. The Second Regular Session convened January 3, 2024. Statutory adjournment is April 17, 2024.

---

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.
**Add. 172**

Received: 24 June 2020 | Revised: 23 February 2021 | Accepted: 30 April 2021

DOI: 10.1111/grow.12499

**ORIGINAL ARTICLE**

growth and change WILEY

# Measurement and analysis of neighborhood congestion: Evidence from sidewalk pedestrian traffic and walking speeds

EXHIBIT

Gabe 7

### Todd Gabe 

School of Economics, University of Maine, Orono, ME, USA

**Correspondence**
Todd Gabe, School of Economics, University of Maine, 5782 Winslow Hall Orono, ME 04469-5782. USA
Email: todd.gabe@maine.edu

**Funding information**
USDA National Institute of Food & Agriculture, Grant/Award Number: Hatch Multistate Grant # ME 031808 (NE 1749)

### Abstract

Regional scientists and planners are interested in congestion, both vehicular and pedestrian. This paper examines pedestrian congestion on sidewalks in the tourism district of Bar Harbor, Maine, with a focus on the effects of cruise passengers. The analysis considers pedestrian counts and the effects of passengers on walking speeds. Cruise passengers increase sidewalk pedestrian traffic overall, but the effects on walking speeds are mixed. For both indicators of sidewalk congestion, cruise passenger impacts decrease at greater distances from the passenger point-of-entry into Bar Harbor. The methods presented in the paper can be applied to sidewalk congestion related to a wide range of facilities and events (e.g., transportation hubs, museums and concert halls, sporting events, large pilgrimage events).

## 1 | INTRODUCTION

Congestion can take on a lot of different forms. At the scale of a large city or metropolitan area, congestion can be represented by commuting times and the number of vehicles on a region's roadways (Broersma & van Dijk, 2008; Sweet, 2014). Past studies have examined the connection between congestion and the structure of urban areas (Gordon et al., 1989; Smeed, 1968; Tsekeris & Geroliminis, 2013). Likewise, researchers have analyzed the efficacy of using tolls to combat urban disamenities such as traffic congestion and sprawl (Anas & Rhee, 2006; Arnott, 1998; Leape, 2006; Small, 1983). At a much smaller scale of a neighborhood, congestion can be represented by the number of vehicles and pedestrians that cross a busy intersection or even the number of people walking along a particular stretch of sidewalk. Cities such as New York, San Francisco, Seattle, and Las Vegas experience crowded sidewalks, particularly in places around transportation hubs and major attractions

DX319.001

Add. 173

such as Fisherman's Wharf in San Francisco and New York's Fifth Avenue between 54th and 55th Streets (Blumenberg & Ehrenfeucht, 2008; Hu, 2016).

The everyday lives of local residents, people who walk to work, and the presence of cyclists and skateboarders contribute to sidewalk congestion. In places that attract tourists, the activities of visitors can further increase levels of pedestrian traffic. The combination of local residents and tourists using sidewalks, along with street performers and outdoor seating in sidewalk cafés (Kim et al., 2006), can create hotspots of sidewalk congestion. And just as the number of tourists in a region often varies by month of the year and time of day, these factors and a place's proximity to attractions and transportation hubs are expected to influence the number of people walking along the sidewalk.

This study examines congestion at the neighborhood level, with a focus on sidewalk pedestrian traffic and walking speeds. The specific application is an analysis of the effects of cruise passengers on congestion in Bar Harbor, Maine's tourism district. The research questions addressed by the study are:

1. What are the impacts of cruise passengers on sidewalk pedestrian traffic and walking speeds?
2. To what extent are the impacts of cruise passengers on sidewalk pedestrian traffic and walking speeds moderated by a stretch of sidewalk's distance from where they enter and depart from port?

These questions are motivated, in part, by a local ordinance that sets a limit of no more than 3,500 passengers allowed per day in July and August, which is Bar Harbor's peak season for non-cruise ship tourism. The paper looks at a local policy experiment that involved a one-day lift of the summertime passenger cap. Namely, the town allowed the *Anthem of the Seas*, with a capacity of 4,180 passengers, to visit the port on August 27, 2018. Results of the analysis are used to estimate the impacts on sidewalk congestion in Bar Harbor's tourism district due to the additional 680 passengers permitted on that day.

## 2 | RELATED LITERATURE

Sidewalk congestion is often analyzed in terms of pedestrian level-of-service (LOS) (Dixon, 1996; Polus et al., 1983; Zacharias, 2001). Pedestrian LOS is defined as an indicator of operational conditions within a pedestrian traffic stream (Transportation Research Board, 2000). It is influenced by the sidewalk's capacity, quality of the walking environment (e.g., architectural interest, pedestrian signals), and the pedestrian's perception of comfort, safety, and security (Landis et al., 2001; Raad & Burke, 2018). Along with its impact on pedestrian LOS, sidewalk congestion influences the walkability of neighborhoods, which is related to the health of residents and the local environment (Creatore et al., 2016; Frank et al., 2006).

Fruin's (1971) seminal study of pedestrian LOS examined the relationships between the volume of pedestrians on sidewalks, the amount of sidewalk space between pedestrians, and walking speed. The research used time-lapse photography at specific points on the sidewalk, which allowed for precise measurement and modification of sidewalk characteristics. Study findings show that higher pedestrian volumes are associated with less space between pedestrians, and a reduction in space is associated with slower walking speeds. Mōri and Tsukaguchi (1987), who also found that an increase in pedestrian density is associated with a reduction in walking speed, suggest that a focus on sidewalk capacity and related measures such as walking speed are "suitable" for the analysis of congested sidewalks due to heavy pedestrian traffic. In our analysis of sidewalks in Bar Harbor, we use a similar approach that

DX319.002

examines the effects of cruise ships on the number of people observed while walking on the sidewalk, as well as impacts on walking speed.

This study builds from a rich literature in regional science about congestion in cities and metropolitan areas (Anas & Rhee, 2006; Arnott, 1998; Gordon et al., 1989; Small, 1983; Tsekeris & Geroliminis, 2013), but its focus on congestion in neighborhoods is novel. Our analysis at this scale of geography responds to a call by Ellen and O'Regan (2010) for more research by regional scientists on neighborhoods.[1] To date, regional scientists have studied a variety of issues related to neighborhoods, such as crime, gentrification, residential sorting, school quality, and housing (Aaronson, 2001; Bell & Machin, 2013; Boehm & Ihlanfeldt, 1986; Brueckner & Rosenthal, 2009; Clark & Herrin, 2000; Helms, 2003; Ioannides, 2004; McMillen, 2008; Rosenthal, 2008). For many research questions, knowing the amount of activity on sidewalks and how it varies by time of day and proximity to key landmarks are important considerations in the study of neighborhoods.

This paper is also one of the first econometric-based studies to analyze the determinants of sidewalk pedestrian traffic, and how congestion translates into slower walking speeds. Much of the existing research on sidewalk congestion focuses on how to measure it, and many previous studies use various types of descriptive analyses to characterize pedestrian traffic (Dixon, 1996; Fruin, 1971; Landis et al., 2001; Raad & Burke, 2018). The econometric approach outlined in the paper allows us to isolate the effects of cruise passengers on sidewalk congestion. A similar approach could be used in other places to examine the impacts on neighborhood congestion associated with a wide range of local attractions and events.

In addition, this paper contributes to the literature on the behavior of cruise passengers while in port (Andriotis & Agiomirgianakis, 2010; De Cantis et al., 2016; Ferrante et al., 2018). Most closely related to this study, Jaakson (2004) examined the idea of a "tourist bubble" by analyzing the parts of town that cruise passengers explore. Jaakson (2004) employed an observational method of counting pedestrian flows, similar to the data collection approach used in our analysis, in a study of cruise passengers in Zihuatanejo, Mexico. Descriptive analysis of the data shows that 7 of the 16 areas considered experience more than 50 percent higher pedestrian traffic flows when ships are in port, whereas the impacts of cruise ships are much smaller in other parts of town. The areas with the largest percentage increases in pedestrian traffic tend to be located close to where passengers get off the ship, which suggests that impacts decrease at greater distances from the point of entry.

# 3 | BAR HARBOR AND CRUISE PASSENGERS

Bar Harbor, which is similar to many coastal towns and national park gateway communities, provides an excellent setting for the study of sidewalk congestion. The town has a compact and walkable tourism district that is characterized by streets lined with restaurants, bars and shops, several parks, and residential housing.[2] Figure 1 is a map of Bar Harbor's tourism district with a few streets and landmarks identified. The distances listed in the figure are measured between the landmarks and Harbor Place (marked with a star).[3] The Town Pier and Harborside are also noted on the map. Most cruise passengers take a tender from the ship to Harbor Place and some take one to a pier near Harborside. Some small ships dock at the Town Pier and passengers walk on and off ships directly without tendering. The two most distant landmarks shown (Havana restaurant and Hannaford supermarket) are located near the outskirts of Bar Harbor's tourism district, which are about 2,700 and 2,200 feet, respectively, from Harbor Place.

The region's main visitor attraction is Acadia National Park, which brings substantial numbers of tourists to Bar Harbor during the summer months. These visitors to Acadia National Park, along

DX319.003



**FIGURE 1** Map of Bar Harbor's tourism district

with cruise passengers in the fall and a small year-round resident population, account for most of the pedestrian traffic in Bar Harbor's tourism district. The high seasonality of tourism in the area (e.g., 43 percent of Acadia National Park use happens in July and August) contributes to a wide variation in the number of pedestrians observed in Bar Harbor's tourism district at different times of the year.[4] These seasonal trends aid in establishing a baseline level of sidewalk pedestrian traffic related to a particular day, which helps to isolate the additional pedestrians associated with cruise ships.

Most of the land-based visitors to Bar Harbor use automobiles as the mode of transportation, as the entire state of Maine is characterized as a "drive" tourism market. After arriving in town, visitors can explore the tourism district by foot and, to access Acadia National Park, people can drive their own vehicles or use a free seasonal bus service. Most of the streets in the tourism district have parallel parking spots, either on one or both sides of the street. To address local concerns about parking, which are more apparent during the summer, Bar Harbor installed seasonal parking meters after the time period covered by this study. The traffic patterns in the tourism district vary widely from a steady stream of vehicles in the peak summer season to very light traffic in the offseason.

Cruise passengers are an ideal segment of visitors to examine the effects of tourists on sidewalk congestion. Unlike land-based tourists that arrive and depart at all times of the day, cruise passengers follow a set schedule that allows us to know the approximate number that could be in town. Likewise, given that cruise passengers enter and depart from port at a specific location (De Cantis et al., 2016), we know the distance that passengers have to cover to reach all parts of Bar Harbor's tourism district. This type of information is not typically known for land-based tourists. Finally, since cruise passengers arrive by ship and very few rent automobiles, the majority of these visitors explore Bar Harbor's tourism district by foot. This means that cruise passengers directly contribute to pedestrian traffic in an area.

Bar Harbor had a scheduled 180 cruise ships visit in 2018, with a combined capacity of about 250,000 passengers. Most cruise ships came to Bar Harbor during the months of September (one-third

DX319.004

of passengers in 2018) and October (30 percent of passengers), as part of autumn New England and Atlantic Canada itineraries. Unlike cruise passengers that mostly visit in September and October, a large percentage of land-based tourists come to Bar Harbor in August and July.[5] Bar Harbor's popularity as a summertime tourism destination is presumably a motivating factor behind the town's cruise passenger cap in July and August.

Most of the cruise passengers access the tourism district and the area's sidewalks by crossing West Street from Harbor Place (or the Town Pier or Harborside) to the corner of West Street and Main Street. From there, a large percentage of the passengers explore the tourism district by walking on the sidewalks along Main Street in the direction of Cottage Street and the Village Green Park. Land-based tourists and local residents access the sidewalks in a variety of ways. The tourism district has several lodging establishments, which provide direct access to overnight visitors who wish to explore the area on foot. Day visitors and local residents primarily access the area and its sidewalks from a parking spot along one of the streets or a parking lot.

## 4 | EMPIRICAL ANALYSIS AND RESULTS

A two-part empirical method examines the relationship between walking speed and the number of people encountered while walking on a stretch of sidewalk, and then the effects of cruise passengers on sidewalk pedestrian traffic. Both parts of the analysis use data collected from 2,031 sidewalk pedestrian counts observed in Bar Harbor's tourism district between July 2017 and December 2018. Jaakson (2004) used a similar approach of counting people while walking on a sidewalk, which is a method referred to by Burton and Cherry (1970) as the "principle of the moving observer," to examine the idea that cruise passengers stay in a "tourist bubble" while in port. More generally, past research examining pedestrian level-of-service has used indicators related to the attributes of sidewalks, pedestrian flow such as walking speed and space between people, and the subjective walkability ratings of pedestrians (Fruin, 1971; Landis et al., 2001; Maghelal & Capp, 2011; Petritsch et al., 2006; Raad & Burke, 2018).

The specific data collection approach used in this study involved a researcher walking between two arbitrary points and counting the number of pedestrians who are walking in the opposite direction and the number of people walking in the same direction that the researcher walks past. From this count, we subtract the number of people that "overtook" the researcher by walking at a faster pace. This method is then repeated by walking between the same two points in the opposite direction.[6] Having observations collected by walking in both directions allows for a calculation of an average amount of pedestrian traffic on the sidewalk covered between the two points.

Since the two points used to count pedestrians can be spaced at different distances apart, it is necessary to measure the distance between the two points and use this value to scale the count of pedestrians.[7] This is because, other things being equal, the number of pedestrians observed increases with the distance over which the counts are measured.[8] Along with counting the number of people observed, the researcher also logged the amount of time it took to walk between the two points. This information is used, combined with the distance between the two points, to measure walking speed. Although the observations on pedestrian traffic and walking speeds provide a novel way to examine sidewalk congestion, the data collection method has several disadvantages such as being "labor intensive and time consuming," and inherent limits "to the accuracy of counts of people… and subjectivity in the interpretation of data" (Jaakson, 2004). Jaakson (2004, p. 50) notes, and this caveat applies to this study as well, that "there is a fine line in the analysis" of this type of research "between rigid factual reporting and exploratory interpretation of observations."

Figure 2 shows the distribution of pedestrians encountered per 100 feet while walking along sidewalks in Bar Harbor's tourism district. The 2,031 observations were collected between 7 a.m. and 10 p.m. over 66 different days, and across the entire tourism district shown in Figure 1. The pedestrian counts were observed in all types of weather conditions (e.g., a low temperature of 1-degree Fahrenheit on January 1, 2018) and at times when the sidewalks were treacherous due to accumulations of ice and snow. The observations shown in Figure 2 and used in the regression analysis are weighted by day of the week (i.e., weekend versus weekday), season of the year, time of day, and location in Bar Harbor's tourism district.

The figure shows sidewalk pedestrian counts of fewer than one person per 100 feet in about one-half of the observations. These data points were mostly collected at times early in the morning, during months outside the peak tourism season and in inclement weather, or at places located on the outskirts of the tourism district. At the other end of the spectrum, about 20 percent of the observations had pedestrian counts of five or more people per 100 feet, with many of these observations collected on Main Street during the summer months. Overall, the distribution is skewed to the right with a weighted average sidewalk congestion of 3.09 people observed per 100 feet (standard deviation of 5.19 people per 100 feet).

Table 1 shows OLS regression results on the effects of sidewalk congestion on walking speeds, as measured by a 50-year-old male researcher while conducting the pedestrian counts. Across all 2,031 observations, the researcher had an average walking speed of 4.88 feet per second with a standard deviation of 0.76 feet per second. This is faster than the 50th percentile walking speed (4.75 feet per second) of a person between 31 and 60 years old when crossing an intersection and slower than the average speed (4.96 feet per second) of a male between 14 and 64 years old (Fitzpatrick et al., 2006).



**FIGURE 2** Pedestrians counted per 100 feet of Bar Harbor sidewalks

DX319.006

**TABLE 1**   OLS results: Effects of sidewalk congestion on walking speeds ($n = 2,031$)

| Variable | Estimated coefficient | Standard error |
|---|---|---|
| Constant | 5.145*** | 0.038 |
| People per 100 Feet | −0.076*** | 0.004 |
| Treacherous Sidewalks | −0.610*** | 0.143 |
| Raining | −0.122 | 0.082 |
| Snowing | 0.104 | 0.253 |
| $R^2$ | 0.280 | |

*Notes:* The dependent variable is walking speed measured in feet per second. The superscript *** indicates statistical significance at a 1-percent level. The second column of results shows robust standard errors.

The average walking speed of 4.88 feet per second translates to about 3.33 miles per hour or 148.7 centimeters per second, which is within a 95-percent confidence interval (112.2 to 149.1 centimeters per second) of the walking speed of males aged 50 to 59 years old (Bohannon & Andrews, 2011).

Along with a measure of the number of people observed per 100 feet, the regression model also has variables indicating the weather condition (i.e., rain or snow) when the observation was collected and a separate variable indicating whether the sidewalk had treacherous walking conditions due to ice or snow from current or past precipitation.[9] Similar to the results of Fitzpatrick et al. (2006), Fruin (1971), and Mōri and Tsukaguchi (1987), the regression results show that an increase in the number of people encountered on the sidewalk is associated with a reduction in walking speed. Other results suggest that current weather conditions do not affect walking speeds, whereas pedestrians tend to walk slower on snow- and ice-covered sidewalks.

Figure 3 shows the estimated effect of sidewalk congestion on walking speeds, with the other variables in the model set at values, indicating that it is not raining or snowing and that the sidewalk is not treacherous from current or past precipitation. The regression results imply an estimated walking speed of 4.91 feet per second at the average congestion level of 3.09 people encountered per 100 feet and that it would require a more than 400 percent higher congestion level to reduce walking speeds by 20 percent. This suggests that, at an average level of pedestrian traffic, Bar Harbor's sidewalks can accommodate considerably more people without substantially lowering walking speeds. These results, summarized in Figure 3, are used later in the paper to measure the extent to which cruise passengers reduce pedestrian walking speeds.

The second part of the empirical analysis examines the effects of cruise passengers on sidewalk congestion, where the dependent variable is the number of people encountered on sidewalks per 100 feet walked. In this analysis, the dependent variable is adjusted to a uniform walking speed of 4.88 feet per second, which is the average pace across all observations, to account for the interrelationship between congestion and walking speeds.[10] This adjustment allows for an evaluation of the effects of cruise passengers on congestion that is not influenced by the fact that, other things being equal, a slower pace provides more time to encounter pedestrians while walking on the sidewalk.

The explanatory variable of main interest is the capacity of the ship(s) in port, which is scaled to 100s of passengers in the regression model. Of the 2,031 observations, 841 were logged when one or more ships were in port. Across the entire sample, the average number of cruise passengers in Bar Harbor is 800, with a standard deviation of 1,485. To isolate the effect of cruise passengers on sidewalk pedestrian traffic, the regression models have variables that control for the time of day (five dummy variables, with between 1 p.m. and 4 p.m. as the omitted category that is excluded in the regression model).[11] The models also include dummy variables indicating the street where the observation was

DX319.007



**FIGURE 3** Effect of sidewalk congestion on walking speeds

recorded (four dummy variables, with places in the tourism district other than Cottage, Main, and West Streets as the omitted category to which the other dummy variables are compared).[12]

In addition, the regression models have a variable measuring the distance between Harbor Place and where the observation was logged, as well as a variable that measures the interaction between the number of passengers in port and distance from Harbor Place. The distance from Harbor Place (mean of 1,145 feet, with a standard deviation of 579 feet) is measured relative to the midpoint of the stretch of sidewalk covered when counting the number of pedestrians. The estimated coefficient corresponding to the interaction term shows the extent to which passenger impacts peter out at greater distances from where they enter Bar Harbor. Finally, the regression models include dummy variables indicating the day when the observation was collected. As noted earlier in the paper, the 2,031 observations were logged over 66 different days, and the day-specific dummy variables account for all of the non-cruise ship factors that might affect sidewalk pedestrian traffic on a particular day.

In the regression models with the day-specific dummy variables, the impact of cruise passengers on sidewalk pedestrian traffic is identified by differences, within a given day, in the number of passengers. For example, a day with a cruise ship in port could have observations from before its arrival and after its departure. In addition, the data set includes observations from days when Bar Harbor hosted multiple ships with staggered arrival and departure times. A day with multiple cruise ships in town could have observations with zero passengers in port before or after the visits and differences in the numbers of passengers throughout the day.[13] Comparing observations with and without ships from a single day, with variables in the model that controls for time-of-day and location impacts identified from the entire sample of observations, provides a very "tight" set of controls for isolating the impacts of cruise passengers.

**TABLE 2** OLS results: Effects of cruise passengers on sidewalk pedestrian traffic ($n = 2{,}031$)

| | Estimated coefficients | | | |
| --- | --- | --- | --- | --- |
| Variable | Model 1 | Model 2 | Model 3 | Model 4 |
| Constant | 4.675*** (0.383) | 3.896*** (0.396) | 0.938 (0.658) | 0.020 (0.618) |
| Cruise passengers, 100s | 0.087*** (0.006) | 0.178*** (0.015) | 0.079** (0.033) | 0.165*** (0.035) |
| Distance from harbor place | −0.002*** (0.0001) | −0.002*** (0.0002) | −0.002*** (0.0001) | −0.001*** (0.0001) |
| Passengers is × Distance | NA | −0.00008*** (0.00001) | NA | −0.00008*** (0.00001 |
| 7 a.m. to 10 a.m. | −2.690*** (0.303) | −2.723*** (0.303) | −2.167*** (0.368) | −2.406*** (0.365) |
| 10 a.m. to 1 p.m. | −1.533*** (0.310) | −1.539*** (0.307) | −0.784*** (0.313) | −0.846*** (0.311) |
| 4 p.m. to 7 p.m. | 1.193* (0.662) | 1.315** (0.666) | 0.469 (0.430) | 0.520 (0.442) |
| 7 p.m. to 10 p.m. | 3.171*** (0.727) | 3.233*** (0.718) | 1.567** (0.725) | 1.397* (0.735) |
| Main street | 2.400*** (0.218) | 2.334*** (0.213) | 2.160*** (0.181) | 2.091*** (0.173) |
| Cottage street | 0.953*** (0.298) | 1.017*** (0.298) | 1.111*** (0.234) | 1.160*** (0.233) |
| West street | −0.353 (0.353) | −0.246 (0.334) | −0.291 (0.303) | −0.185 (0.291) |
| Day-specific dummy variables | No | No | Yes | Yes |
| $R^2$ | 0.466 | 0.494 | 0.662 | 0.694 |

*Notes:* The dependent variable is the number of people encountered per 100 feet. The superscripts ***, **, and * indicates statistical significance at a 1-percent, 5-percent, and 10-percent level. Robust standard errors are shown in parentheses.

DX319.009

Add. 181

**TABLE 3** OLS results: Effects of cruise passengers on walking speeds ($n = 2{,}031$)

| Variable | Estimated coefficients | | | |
| --- | --- | --- | --- | --- |
| | Model 1a | Model 2a | Model 3a | Model 4a |
| Constant | 4.772*** (0.110) | 4.863*** (0.111) | 5.471*** (0.293) | 5.571*** (0.289) |
| Cruise passengers, 100s | −0.004 (0.002) | −0.014*** (0.003) | −0.003 (0.006) | −0.013** (0.006) |
| Distance from harbor place | 0.0002*** (0.00004) | 0.0001* (0.00004) | 0.0001*** (0.00004) | 0.00005 (0.00004) |
| Passengers × Distance | NA | 0.00001*** (0.000002) | NA | 0.00001*** (0.000002) |
| 7 a.m. to 10 a.m. | 0.318*** (0.083) | 0.322*** (0.083) | 0.080 (0.106) | 0.106 (0.107) |
| 10 a.m. to 1 p.m. | 0.217*** (0.080) | 0.217*** (0.080) | 0.036 (0.101) | 0.042 (0.099) |
| 4 p.m. to 7 p.m. | 0.024 (0.113) | 0.010 (0.114) | −0.123 (0.100) | −0.128 (0.100) |
| 7 p.m. to 10 p.m. | −0.258** (0.112) | −0.265** (0.112) | −0.192 (0.121) | −0.173 (0.121) |
| Main street | −0.388*** (0.082) | −0.380 (0.082) | −0.353*** (0.079) | −0.346*** (0.079) |
| Cottage street | −0.173* (0.095) | −0.180* (0.094) | −0.240*** (0.092) | −0.245*** (0.092) |
| West street | −0.267** (0.110) | −0.279** (0.110) | −0.207** (0.095) | −0.219** (0.095) |
| Day-specific dummy variables | No | No | Yes | Yes |
| $R^2$ | 0.123 | 0.133 | 0.280 | 0.290 |

*Notes*: The dependent variable is walking speed measured in feet per second. The superscripts ***, **, and * indicates statistical significance at a 1-percent, 5-percent, and 10-percent level. Robust standard errors are shown in parentheses.

DX319.010

Table 2 shows regression results on the effects of cruise passengers on sidewalk pedestrian traffic. The first model, which does not include the set of dummy variables indicating the day the observation was collected, has variables that control for the number of passengers in port, time of day, street where the observation was recorded, and the distance between where the observation was recorded and Harbor Place. The second model includes these same explanatory variables and a variable that measures the interaction between the cruise passenger and distance variables. The third and fourth models add the day-specific dummy variables.

The regression results from all four models show a positive and statistically significant relationship between sidewalk pedestrian traffic and the number of cruise passengers in Bar Harbor. The results from model 3 show that a 100-passenger increase in the capacity of ships in port is associated with a 0.08 increase in the number of pedestrians encountered per 100 feet walked at a speed of 4.88 feet per second.[14] This impact can be thought of as an "overall" effect of cruise passengers on sidewalk congestion across the entire tourism district.[15] The results from model 4 show that the effects of cruise passengers on sidewalk pedestrian traffic decrease at greater distances from Harbor Place. This is similar to the findings of Jaakson (2004), who also found lower impacts of cruise ships at greater distances from the point of entry. At 250, 500, 1,000, and 1,500 feet away, the estimated impacts per 100 cruise passengers are 0.14, 0.12, 0.08, and 0.04 increases, respectively, in the number of pedestrians observed per 100 feet. The effect of cruise passengers on sidewalk congestion is "zero" at about 2,000 feet from Harbor Place. When walking on Main Street, this distance is about the halfway point between the Village Green Park and Havana restaurant (see Figure 1).

The estimated coefficients from model 4 show that other things being equal, sidewalk pedestrian traffic is higher during the hours of 4 to 7 p.m., and 7 to 10 p.m., as compared with the hours of 1 to 4 p.m. Other results show that Main and Cottage Streets experience more sidewalk congestion as compared with areas in the tourism district that are not located on Cottage, Main, and West Streets. The day-specific dummy variables indicate substantial variation in sidewalk pedestrian traffic over the course of the year, with higher amounts of people walking the sidewalks on summer days than during the rest of the year. For example, the dummy variable indicating observations collected on August 4, 2017, has an estimated coefficient of 10.2 (t-statistic of 7.25), compared to an omitted category of observations logged on December 30, 2017, when the temperature was 10-degrees Fahrenheit. Likewise, a dummy variable indicating observations from July 3, 2017, has an estimated coefficient of 7.6 (t-statistic of 6.10). These results are consistent with the strong seasonal patterns of tourism and economic activity in Bar Harbor.

Results from the two-part analysis can be used to estimate the effect of cruise passengers on sidewalk walking speeds. The estimates from model 3 show that an additional 100 passengers in port increase sidewalk congestion by 0.08 people per 100 feet. A 0.08-increase in the number of people observed per 100 feet, using the results presented in Table 1, lowers walking speeds by 0.006 feet per second. This effect of cruise passengers on walking speeds, interpreted as an "overall" impact across the entire tourism district, is very small. Estimates from model 4 show that an additional 100 passengers in town lead to 0.14, 0.12, 0.08, and 0.04 higher levels of pedestrian traffic at 250, 500, 1,000, and 1,500 feet from Harbor Place. Increases in sidewalk congestion of 0.14 (at 250 feet) and 0.08 (at 1,000 feet) additional people observed lower walking speeds by 0.011 and 0.006 feet per second. This shows that the impacts of cruise passengers on walking speeds decrease at greater distances from Harbor Place.

As a robustness check to these findings from the two-part analysis, Table 3 shows results from regressions that have walking speeds as the dependent variable and the same sets of explanatory variables used in the analysis of sidewalk pedestrian traffic. The estimates from model 3a, which do not account for the interaction between the number of passengers and distance from Harbor Place, do not

show a statistically significant relationship between walking speeds and the number of passengers in Bar Harbor. This result is similar to the very small impact from the two-part analysis and suggests that the presence of cruise passengers does not affect walking speeds when considered across the entire tourism district.

The results from model 4a, however, show that cruise passengers lower walking speeds in Bar Harbor, but these effects peter out at greater distances from Harbor Place. For example, the regression results suggest that an additional 100 passengers in town decrease walking speeds by 0.010 and 0.004 feet per second at 250 and 1,000 feet from Harbor Place. This pattern of a reduction in impacts at greater distances from where passengers enter port is qualitatively similar to the estimates (0.011 and 0.006, respectively, at 250 and 1,000 feet) from the two-part analysis. The estimated coefficients from model 4a suggest that the effect of cruise passengers on walking speeds is "zero" at about 1,400 feet from Harbor Place, which is 30 percent closer than the estimated distance of about 2,000 feet at which the impact of cruise passengers on the sidewalk pedestrian traffic is "zero."

# 5 | EFFECTS OF LIFTING THE PASSENGER CAP ON AUGUST 27, 2018

As discussed in the introduction, Bar Harbor limits the size of cruise ships allowed in July and August to vessels with combined capacities of no more than 3,500 passengers per day. The reasoning behind this cruise passenger cap is, presumably, the already high levels of congestion in and around Bar Harbor's tourism district associated with non-cruise ship tourists and visitors to Acadia National Park. Bar Harbor lifted the passenger cap on August 27, 2018, as an experiment to study its effects.[16] On this date, Bar Harbor hosted the *Anthem of the Seas*, which has a capacity of 4,180 passengers.

The results of the regression analysis can be used to estimate the impact of this one-time exception to the cruise passenger cap. Although the demonstration project exceeded the cap by 680 people, this general approach could be used to estimate the impact of any-sized ship visiting Bar Harbor on any particular day. The results from model 3 in Table 2 suggest that an additional 680 cruise passengers in Bar Harbor are associated with a 0.53 increase in the number of pedestrians encountered while walking 100 feet. This is interpreted as an "overall" impact across the entire tourism district. Using the results from model 4 in Table 2, we estimate that an additional 680 passengers would increase sidewalk pedestrian traffic from 11.1 to 12.1 pedestrians per 100 feet walked at 250 feet from Harbor Place, 10.1 to 11.0 people at 500 feet from Harbor Place, and 8.1 to 8.7 people at 1,000 feet from Harbor Place.[17] These effects translate into 8.8, 8.3, and 7.0 percent higher levels of sidewalk congestion with the larger ship, compared with a baseline of a vessel holding exactly 3,500 passengers.

We can also examine the effects of an additional 680 cruise passengers on pedestrian walking speeds, which vary at different distances from Harbor Place. Figure 4 shows that, at a distance of 250 feet from Harbor Place, having 4,180 passengers in port allows for a walking speed of 4.23 feet per second.[18] This is 1.7 percent slower than the walking speed of 4.30 feet per second estimated at the cap of 3,500 cruise passengers. The estimated walking speed with 4,180 cruise passengers is 9.8 percent slower than the estimated walking speed with no ship in port, and 14.0 percent slower than the walking speed under the sample average of 3.09 pedestrians encountered. The slower walking speed of 4.23 feet per second with a ship holding 4,180 passengers is influenced by the presence of the ship and the fact that sidewalks are more crowded during the summer months. Of the entire reduction in walking speed from 4.91 to 4.23 feet per second, about 77 percent of the slowdown is due to the presence of the ship and the remaining 23 percent is attributed to the time of year when the ship visited Bar Harbor.[19]

DX319.012



**FIGURE 4**    Walking speeds at 250 feet from Harbor Place on August 27, 2018



**FIGURE 5**    Effects of cruise ships on walking speeds: August 27, 2018

DX319.013

Figure 5 summarizes results on the effects of exceeding the cruise passenger cap on August 27, 2018, at various distances from Harbor Place. For example, at a distance of 1,000 feet, the estimated walking speed with 4,180 cruise passengers in port is 0.9 percent slower than the walking speed at the passenger cap of 3,500 passengers, and 5.5 percent slower than the walking speed with no ship in port. Likewise, at 500 feet from Harbor Place, there is a 1.5 percent reduction in walking speed associated with a 680-person increase (i.e., from 3,500 to 4,180) in the number of cruise passengers.

## 6 | CONCLUSIONS

Regional scientists and planners are interested in the causes and consequences of congestion. Considerable research has examined congestion at the scale of a large city or metropolitan area, using indicators such as commuting times and the number of vehicles on a region's roadways (Anas & Rhee, 2006; Arnott, 1998; Gordon et al., 1989; Small, 1983; Sweet, 2014). This paper analyzed congestion at a much smaller scale of a neighborhood, with a focus on sidewalk pedestrian traffic and walking speeds. Specifically, this study examined the effects of cruise passengers on congestion in Bar Harbor, Maine's tourism district, along with an analysis of a local policy experiment that lifted a summertime cruise passenger cap on a single day in August of 2018.

To revisit the research questions posed at the beginning of the paper, the results show that cruise passengers increase sidewalk pedestrian traffic overall, but the effects of passengers on walking speeds are mixed. For both indicators of congestion, cruise passenger impacts decrease at greater distances from the passenger point of entry into Bar Harbor. Pertaining to the town's "demonstration project" that allowed a one-day exception to the summertime cruise passenger cap, our analysis shows that the *Anthem of the Seas* contributed to almost twice as much sidewalk pedestrian traffic, compared with a no-ship baseline on August 27, 2018, at 250 feet from where passengers enter the port. This increase in sidewalk congestion resulted in 9.8-percent slower walking speeds at 250 feet from the passenger point of entry. The ship's impact on pedestrian level-of-service decreases to a 5.5-percent reduction in walking speeds at 1,000 feet from the point of entry, and the ship's impact on walking speeds is "zero" at about 1,400 feet from where passengers enter the port.

In addition to these results specific to Bar Harbor's one-day policy experiment of exceeding the summertime cruise passenger cap, the analysis revealed several general findings that are important to the study of sidewalk congestion. First, our assessment of congestion differed depending on the indicator used. Specifically, we found that the number of people observed on sidewalks is more sensitive than pedestrian walking speeds at detecting differences in congestion. Second, the analysis showed large impacts on congestion associated with the street of observation and distance from where the passengers entered the town. These results are not surprising, however, given the importance of location and distance to the study of regions and the idea that "neighborhoods are ultimately microregions, so the theories and tools used to study" regions apply to neighborhoods as well (Ellen & O'Regan, 2010, p. 376).

Third, our analysis revealed impacts on sidewalk congestion that are associated with the time of day and the exact day when observations were measured. This demonstrates the utility of our approach at capturing the "ebb and flow" of economic activity at a very micro level, but also suggests that relative impacts on sidewalk congestion depend on exactly when they occur. For example, in our study of cruise passengers, a ship carrying 4,180 passengers would have a larger relative impact, compared with a "no-cruise ship" baseline, in October than in July, because the amount of sidewalk congestion without a ship is generally lower in October than in July.

DX319.014

The methods used in this paper can be applied to the study of congestion elsewhere and inform research on other topics related to neighborhood change and regional planning. Although this study used observations covering 18 months, this type of information could be collected over a longer time horizon to examine more gradual patterns of neighborhood change.[20] In a large city or metropolitan area, sidewalk pedestrian traffic and walking speed data could be collected in multiple neighborhoods at a single point in time to examine differences across places. Finally, although our analysis focused on cruise passengers, the methods could be applied to the impacts of a wide range of facilities and events (e.g., transportation hubs, museums and concert halls, sporting events, large pilgrimage events) that attract people to an area.[21]

Ideas for future research include examining preferences for sidewalk pedestrian traffic, analyzing the impacts of sidewalk congestion and walking speeds on individual behavior, and examining the impacts of sidewalk congestion on people with different levels of mobility. Pertaining to preferences, laboratory experiments could use videos and pictures of different levels of congestion to determine optimal levels of pedestrian traffic. Preferences might vary with individual characteristics such as age and are likely to differ between tourists, local residents, and business owners.

Pertaining to the impacts of sidewalk congestion and walking speeds on behavior, some local residents may avoid parts of the tourism district during the summer months and times when ships are in port. The slower walking speeds experienced during the summer, however, could encourage more "window shopping," which might affect the probability that a pedestrian enters a shop or restaurant. Finally, an extension to the analysis could look at the relationship between sidewalk pedestrian traffic and walking speed for a senior adult, or someone in a wheelchair. The current project used data collected by a single researcher, which eliminates some sources of variation related to differences in walking speeds across people, but it also limits our ability to say how sidewalk pedestrian traffic might impact others.

## ACKNOWLEDGEMENT

The author thanks Dan Rickman and the anonymous reviewers for excellent comments provided on an earlier draft of the paper. Gabe's research program is supported, in part, by Hatch Multistate Grant # ME 031808 (NE 1749) from the USDA National Institute of Food & Agriculture. The dataset used in this project is available at the Maine Dataverse Network website: http://dataverse.acg.maine.edu/dvn/faces/study/StudyPage.xhtml?globalId=hdl:TEST/10282&versionNumber=1

## ORCID

*Todd Gabe*  https://orcid.org/0000-0002-9455-2070

## ENDNOTES

[1] Mulligan (2014) includes "neighborhood change" as a promising "new direction" for research in regional science.

[2] Bar Harbor's tourism district meets Lewis and Adhikari's (2017, p. 501) definition of a neighborhood, which is "the housing and nearby land uses that serve them, primarily local businesses meeting routine needs, elementary schools, and small parks.".

[3] The street address of Harbor Place is One West Street.

[4] Acadia National Park visitor use statistics are from the National Park Service, U.S. Department of the Interior.

[5] Taxable lodging sales data from Maine Revenue Services show that 25 percent of Bar Harbor's 2018 lodging sales took place in August, and July accounted for 23 percent of annual lodging sales.

[6] This method of counting pedestrians and taking an average after walking in "both directions" is similar to the approach used by Jaakson (2004).

[7] This method of scaling the number of pedestrians by the distance between the two points is different than the approach used by Jaakson (2004), who scaled the number of pedestrians by the amount of time spent walking. Our study accounts for the time spent walking between the two points, but uses walking speed (i.e., distance divided by time) as a second indicator of sidewalk congestion.

[8] Sidewalk width could also affect the number of pedestrians encountered in places with very dense congestion. The sidewalks in the area of study, however, were rarely at congestion levels where the sidewalk width would affect walking speeds or the number of people encountered. Fruin's (1971) seminal research on pedestrian LOS considered sidewalk width, but it used time-lapse photographs of very short and fixed sidewalk segments over which width and other characteristics could be readily measured and even adjusted. The approach used by Jaakson (2004) and in this study covered large areas of sidewalks (e.g., entire neighborhoods), where it would be impractical to measure sidewalk characteristics such as width, which can vary due to the placement of utility poles, vegetation, and accumulated snow.

[9] The percentage of observations collected on treacherous sidewalks and in the rain and snow is 4.8 percent, 1.9 percent, and 0.3 percent, respectively.

[10] This adjustment, which did not affect the results very much (see note 15), involved multiplying the count of pedestrians per 100 feet by the ratio of the actual walking speed when collecting the observation divided by 4.88 feet per second.

[11] The percentage of observations from each time period of the day are: 7 a.m. to 10 a.m. (33.6 percent), 10 a.m. to 1 p.m. (32.3 percent), 1 p.m. to 4 p.m. (16.1 percent), 4 p.m. to 7pm. (10.1 percent), and 7 p.m. to 10 p.m. (7.9 percent).

[12] The percentage of observations from each street are: Main Street (31.6 percent), Cottage Street (27.0 percent), West Street (11.3 percent), and other places in the tourism district (30.1 percent).

[13] For example, on a given day, one ship might depart at 3 p.m., a second ship might depart at 5 p.m. and a third ship might depart at 7 p.m.

[14] As a robustness check to the OLS results, we re-estimated model 3 using Poisson, negative binomial, and zero-inflated Poisson estimators. The dependent variable used in this analysis is the count of pedestrians encountered per 100 feet (adjusted to a walking speed of 4.88 feet per second), rounded to the nearest whole number. The results pertaining to the impacts of cruise passengers on sidewalk pedestrian traffic are qualitatively similar—that is, the three additional regression models show positive and statistically significant effects—although the magnitudes of passenger impacts are smaller using the Poisson, negative binomial, and zero-inflated Poisson estimators. For example, the marginal effect associated with 100 additional passengers using a zero-inflated Poisson model (with day-specific dummy variables and the other control variables used in model 3) is 0.047, which is smaller than the comparable OLS coefficient of 0.079 in model 3. The OLS results are the main findings used in the paper because rounding the dependent variable to the nearest whole number, a necessary step when using the other estimators, removes useful information about the number of pedestrians observed on the sidewalk. For example, 13 percent of the observations have counts of between zero and 0.49 pedestrians per 100 feet (see Figure 2) and these observations, when pedestrians were observed, are treated as zeroes in the Poisson, negative binomial, and zero-inflated Poisson regression models.

[15] As a second robustness check, we re-estimated the four models shown in Table 2 using a dependent variable (i.e., count of pedestrians per 100 feet) that is not adjusted to a uniform walking speed of 4.88 feet per second. The results from these additional regressions are very similar to those presented in Table 2. For example, the effect of cruise passengers on sidewalk congestion in model 3 (using the unadjusted dependent variable) is 0.085, compared to an estimated coefficient of 0.079 shown in Table 2.

[16] The town referred to this experiment as a "demonstration project.".

[17] These estimates are for an observation logged on Main Street between 1 and 4 in the afternoon of August 27, 2018.

[18] These results are based on the two-part method of estimating the relationship between walking speeds and congestion (shown as the bold downward-sloping line) and the effects of cruise passengers on sidewalk pedestrian traffic (shown as the dashed vertical lines).

[19] The percentage of the slowdown attributed to the ship would be lower on dates in early August or July (i.e., other times when the summertime cruise passenger cap is in effect) because, in general, these days tend to have higher

DX319.016

levels of baseline congestion than those observed in late August. The overall level of congestion, however, would be higher on dates in early August or July.

[20] For example, Papachristos et al., (2011) examined patterns of neighborhood change over 15 years.

[21] For example, similar methods could examine the effects of sporting events on pedestrian traffic at different distances from the venue. In a related analysis, Stitzel and Rogers (2019) looked at the effects of the Oklahoma Thunder NBA franchise on establishment-level sales at different distances from the team's arena.

## REFERENCES

Aaronson, D. (2001). Neighborhood dynamics. *Journal of Urban Economics*, *49*(1), 1–31. https://doi.org/10.1006/juec.2000.2181

Anas, A., & Rhee, H. J. (2006). Curbing excess sprawl with congestion tolls and urban boundaries. *Regional Science and Urban Economics*, *36*(4), 510–541. https://doi.org/10.1016/j.regsciurbeco.2006.03.003

Andriotis, K., & Agiomirgianakis, G. (2010). Cruise visitors' experience in a Mediterranean port of call. *International Journal of Tourism Research*, *12*(4), 390–404. https://doi.org/10.1002/jtr.770

Arnott, R. (1998). Congestion tolling and urban spatial structure. *Journal of Regional Science*, *38*(3), 495–504. https://doi.org/10.1111/0022-4146.00105

Bell, B., & Machin, S. (2013). Immigrant enclaves and crime. *Journal of Regional Science*, *53*(1), 118–141. https://doi.org/10.1111/jors.12003

Blumenberg, E., & Ehrenfeucht, R. (2008). Civil liberties and the regulation of public space: The case of sidewalks in Las Vegas. *Environment and Planning A*, *40*(2), 303–322. https://doi.org/10.1068/a37429

Boehm, T. P., & Ihlanfeldt, K. R. (1986). Residential mobility and neighborhood quality. *Journal of Regional Science*, *26*(2), 411–424. https://doi.org/10.1111/j.1467-9787.1986.tb00828.x

Bohannon, R. W., & Andrews, A. W. (2011). Normal walking speed: A descriptive meta-analysis. *Physiotherapy*, *97*(3), 182–189. https://doi.org/10.1016/j.physio.2010.12.004

Broersma, L., & van Dijk, L. (2008). The effect of congestion and agglomeration on multifactor productivity growth in Dutch regions. *Journal of Economic Geography*, *8*(2008), 181–209.

Brueckner, J. K., & Rosenthal, S. S. (2009). Gentrification and neighborhood housing cycles: Will America's future downtowns be rich? *Review of Economics and Statistics*, *91*(4), 725–743. https://doi.org/10.1162/rest.91.4.725

Burton, T. L., & Cherry, G. E. (1970). *Social research techniques for planners*. Routledge.

Clark, D. E., & Herrin, W. E. (2000). The impact of public school attributes on home sale prices in California. *Growth and Change*, *31*(3), 385–407. https://doi.org/10.1111/0017-4815.00134

Creatore, M. I., Glazier, R. H., Moineddin, R., Fazli, G. S., Johns, A., Gozdyra, P., Matheson, F. I., Kaufman-Shriqui, V., Rosella, L. C., Manuel, D. G., & Booth, G. L. (2016). Association of neighborhood walkability with change in overweight, obesity, and diabetes. *JAMA*, *315*(20), 2211–2220. https://doi.org/10.1001/jama.2016.5898

De Cantis, S., Ferrante, M., Kahani, A., & Shoval, N. (2016). Cruise passengers' behavior at the destination: Investigation using GPS technology. *Tourism Management*, *52*, 133–150. https://doi.org/10.1016/j.tourman.2015.06.018

Dixon, L. B. (1996). Bicycle and pedestrian level-of-service performance measures and standards for congestion management systems. *Transportation Research Record*, *1538*(1), 1–9. https://doi.org/10.1177/0361198196153800101

Ellen, I. G., & O'Regan, K. (2010). Welcome to the neighborhood: How can regional science contribute to the study of neighborhoods? *Journal of Regional Science*, *50*(1), 363–379. https://doi.org/10.1111/j.1467-9787.2009.00643.x

Ferrante, M., De Cantis, S., & Shoval, N. (2018). A general framework for collecting and analysing the tracking data of cruise passengers at the destination. *Current Issues in Tourism*, *21*(12), 1426–1451. https://doi.org/10.1080/13683500.2016.1194813

Fitzpatrick, K., Brewer, M. A., & Turner, S. (2006). Another look at pedestrian walking speed. *Transportation Research Record*, *1982*(1), 21–29. https://doi.org/10.1177/0361198106198200104

Frank, L. D., Sallis, J. F., Conway, T. L., Chapman, J. E., Saelens, B. E., & Bachman, W. (2006). Many pathways from land use to health: Associations between neighborhood walkability and active transportation, body mass index, and air quality. *Journal of the American Planning Association*, *72*(1), 75–87. https://doi.org/10.1080/01944360608976725

Fruin, J. J. (1971). *Designing for pedestrians: A level-of-service concept* (No. HS-011 999).Washington, DC: Highway Research Board.

DX319.017

Gordon, P., Kumar, A., & Richardson, H. W. (1989). Congestion, changing metropolitan structure, and city size in the United States. *International Regional Science Review*, *12*(1), 45–56. https://doi.org/10.1177/016001768901200103

Helms, A. C. (2003). Understanding gentrification: An empirical analysis of the determinants of urban housing renovation. *Journal of Urban Economics*, *54*(3), 474–498. https://doi.org/10.1016/S0094-1190(03)00081-0

Hu, W. (2016, July 1). Taking it to the street to dodge sidewalk mobs. *New York Times*, p. A1. Retrieved from https://www.nytimes.com/2016/07/01/nyregion/new-york-city-overcrowded-sidewalks.html

Ioannides, Y. M. (2004). Neighborhood income distributions. *Journal of Urban Economics*, *56*(3), 435–457. https://doi.org/10.1016/j.jue.2004.04.006

Jaakson, R. (2004). Beyond the tourist bubble? Cruiseship passengers in port. *Annals of Tourism Research*, *31*(1), 44–60. https://doi.org/10.1016/j.annals.2003.08.003

Kim, K., Hallonquist, L., Settachai, N., & Yamashita, E. (2006). Walking in Waikiki, Hawaii: Measuring pedestrian level of service in an urban resort district. *Transportation Research Record*, *1982*(1), 104–112. https://doi.org/10.1177/0361198106198200114

Landis, B. W., Vattikuti, V. R., Ottenberg, R. M., McLeod, D. S., & Guttenplan, M. (2001). Modeling the roadside walking environment: Pedestrian level of service. *Transportation Research Record*, *1773*(1), 82–88. https://doi.org/10.3141/1773-10

Leape, J. (2006). The London congestion charge. *Journal of Economic Perspectives*, *20*(4), 157–176. https://doi.org/10.1257/jep.20.4.157

Lewis, S. L., & Adhikari, K. (2017). Walkable neighborhood systems. *Growth and Change*, *48*(4), 500–511. https://doi.org/10.1111/grow.12185

Maghelal, P. K., & Capp, C. J. (2011). Walkability: A review of existing pedestrian indices. *Journal of the Urban & Regional Information Systems Association*, *23*(2), 5–19.

McMillen, D. P. (2008). Changes in the distribution of house prices over time: Structural characteristics, neighborhood, or coefficients? *Journal of Urban Economics*, *64*(3), 573–589. https://doi.org/10.1016/j.jue.2008.06.002

Mōri, M., & Tsukaguchi, H. (1987). A new method for evaluation of level of service in pedestrian facilities. *Transportation Research Part A: General*, *21*(3), 223–234. https://doi.org/10.1016/0191-2607(87)90016-1

Mulligan, G. (2014). Regional science at sixty: Traditional topics and new directions. *Australian Journal of Regional Studies*, *20*(1), 4–67.

Papachristos, A. V., Smith, C. M., Scherer, M. L., & Fugiero, M. A. (2011). More coffee, less crime? The relationship between gentrification and neighborhood crime rates in Chicago, 1991 to 2005. *City & Community*, *10*(3), 215–240. https://doi.org/10.1111/j.1540-6040.2011.01371.x

Petritsch, T. A., Landis, B. W., McLeod, P. S., Huang, H. F., Challa, S., Skaggs, C. L., Guttenplan, M., & Vattikuti, V. (2006). Pedestrian level-of-service model for urban arterial facilities with sidewalks. *Transportation Research Record*, *1982*(1), 84–89. https://doi.org/10.1177/0361198106198200111

Polus, A., Schofer, J. L., & Ushpiz, A. (1983). Pedestrian flow and level of service. *Journal of Transportation Engineering*, *109*(1), 46–56. https://doi.org/10.1061/(ASCE)0733-947X(1983)109:1(46)

Raad, N., & Burke, M. (2018). What are the most important factors for pedestrian level-of-service estimation? A systematic review of the literature. *Transportation Research Record*, *2672*(15), 101–117. https://doi.org/10.1177/0361198118790623

Rosenthal, S. S. (2008). Old homes, externalities, and poor neighborhoods: A model of urban decline and renewal. *Journal of Urban Economics*, *63*(3), 816–840. https://doi.org/10.1016/j.jue.2007.06.003

Small, K. A. (1983). The incidence of congestion tolls on urban highways. *Journal of Urban Economics*, *13*(1), 90–111. https://doi.org/10.1016/0094-1190(83)90047-5

Smeed, R. J. (1968). Traffic studies and urban congestion. *Journal of Transport Economics and Policy*, *2*(1), 33–70.

Stitzel, B., & Rogers, C. L. (2019). NBA sweet spots: Distance-based impacts on establishment-level sales. *Growth and Change*, *50*(1), 335–351. https://doi.org/10.1111/grow.12262

Sweet, M. (2014). Traffic congestion's economic impacts: Evidence from US metropolitan regions. *Urban Studies*, *51*(10), 2088–2110. https://doi.org/10.1177/0042098013505883

Transportation Research Board. (2000). *Highway capacity manual*, Chapter 2—Capacity and Level-of-Service Concepts. Washington, DC: National Research Council.

Tsekeris, T., & Geroliminis, N. (2013). City size, network structure and traffic congestion. *Journal of Urban Economics*, *76*, 1–14. https://doi.org/10.1016/j.jue.2013.01.002

Zacharias, J. (2001). Pedestrian behavior and perception in urban walking environments. *Journal of Planning Literature*, *16*(1), 3–18.

**How to cite this article:** Gabe T. Measurement and analysis of neighborhood congestion: Evidence from sidewalk pedestrian traffic and walking speeds. *Growth and Change*. 2021;52:1633–1651. https://doi.org/10.1111/grow.12499

DX319.019

Add. 191

Copyright of Growth & Change is the property of Wiley-Blackwell and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

DX319.020