# In the United States Court of Appeals
## for the First Circuit

ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS; B.H. PIERS, L.L.C.; GOLDEN ANCHOR, L.C., d/b/a Harborside Hotel; B.H.W.W., L.L.C.; DELRAY EXPLORER HULL 495 LLC; DELRAY EXPLORER HULL 493 LLC; ACADIA EXPLORER 492, LLC,

*Plaintiffs – Appellants/Cross-Appellees,*

and

PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION,

*Plaintiff-Intervenor – Appellant/Cross-Appellee,*

v.

CHARLES SIDMAN,

*Defendant-Appellee/Cross-Appellant,*

TOWN OF BAR HARBOR, a Municipal Corporation of the State of Maine,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Maine, No. 1:22-CV-00416-LEW
Hon. Judge Lance E. Walker

## APPENDIX

| | |
|---|---|
| Timothy C. Woodcock | C. Jonathan Benner |
| P. Andrew Hamilton | Kathleen E. Kraft |
| EATON PEABODY | THOMPSON COBURN LLP |
| 80 Exchange Street (04401) | 1909 K Street N.W., Suite 600 |
| Bangor, Maine 04402-1210 | Washington, D.C. 20006 |
| (207) 992-0111 | (202) 585-6900 (main) |
| *Counsel for Plaintiffs –* | *Counsel for Plaintiff-Intervenor –* |
| *Appellants/Cross-Appellees* | *Appellant/Cross-Appellee* |

*(Additional Counsel Listed on Inside Cover)*

Patrick W. Lyons
EATON PEABODY
80 Exchange Street (04401)
Bangor, Maine 04402-1210
(207) 992-0111

John S. Kingston
THOMPSON COBURN LLP
One U.S. Bank Plaza
St. Louis, Missouri 63101
(314) 552-6000 (main)

# Table of Contents

District Court Docket Report ........................................ App. 001

Complaint, ECF No. 1 ................................................ App. 026

Plaintiff-Intervenor's Complaint, ECF No. 43 ................ App. 080

Defendant's Answer and Defenses to Complaint,
    ECF No. 53 ...................................................... App. 118

Defendant's Answer and Defenses to Plaintiff-Intervenor's
    Complaint, ECF No. 61 ...................................... App. 137

Order on Motion to Intervene, ECF No. 63 ................. App. 160

Order Denying Motion to Dismiss, ECF No. 87 ........... App. 168

Defendant-Intervenor's Answer to Plaintiffs' Complaint,
    ECF No. 88 ...................................................... App. 170

Defendant-Intervenor's Answer to Plaintiff-Intervenor's
    Complaint, ECF No. 89 ...................................... App. 190

Court Witness List, ECF No. 179 .............................. App. 214

Court Exhibit List, ECF No. 180 .............................. App. 215

Plaintiffs' and Plaintiff-Intervenor's Proposed
    Findings of Fact, ECF No. 192 ........................... App. 227

Notice of Appeal (Plaintiffs), ECF No. 209 ............... App. 281

Notice of Appeal (Plaintiff-Intervenor), ECF No. 210 ... App. 283

Cross-Notice of Appeal (Defendant-Intervenor),
    ECF No. 219 .................................................... App. 285

Order on Motion for Injunction Pending Appeal,
    ECF No. 236 .................................................... App. 287

Initiative (March 17, 2022), PX 209 .......................... App. 295

Initiative (March 16, 2022), PX 243A ........................ App. 297

Warrant Article, PX 243B ........................................................ App. 301

Quantitative Research Regarding Cruise Ship Tourism,
    DX 323 ............................................................................. App. 305

# U.S. District Court
## District of Maine (Bangor)
## CIVIL DOCKET FOR CASE #: 1:22−cv−00416−LEW

ASSOCIATION TO PRESERVE AND PROTECT LOCAL
LIVELIHOODS et al v. TOWN OF BAR HARBOR
Assigned to: JUDGE LANCE E. WALKER
Referred to: MAGISTRATE JUDGE KAREN FRINK WOLF
Case in other court: First Circuit Court of Appeals, 24−01317
       First Circuit Court of Appeals, 24−01318
       First Circuit Court of Appeals, 24−01385
Cause: 28:2201 Constitutionality of State Statute(s)

Date Filed: 12/29/2022
Date Terminated: 03/01/2024
Jury Demand: None
Nature of Suit: 950 Constitutional − State
Statute
Jurisdiction: Federal Question

**Plaintiff**

| | | |
|---|---|---|
| **ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS** | represented by | **TIMOTHY C. WOODCOCK**<br>EATON PEABODY<br>P.O. BOX 1210<br>BANGOR, ME 04402<br>207−947−0111<br>Email: twoodcock@eatonpeabody.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **JANNA L. GAU**<br>EATON PEABODY<br>P.O. BOX 1210<br>BANGOR, ME 04402<br>207−947−0111<br>Email: jgau@eatonpeabody.com<br>*ATTORNEY TO BE NOTICED* |
| | | **P. ANDREW HAMILTON**<br>EATON PEABODY<br>P.O. BOX 1210<br>BANGOR, ME 04402<br>947−0111<br>Email: ahamilton@eatonpeabody.com<br>*ATTORNEY TO BE NOTICED* |
| | | **PATRICK W. LYONS**<br>EATON PEABODY<br>204 MAIN STREET<br>ELLSWORTH, ME 04605<br>207−664−2900<br>Fax: 207−667−3550<br>Email: plyons@eatonpeabody.com<br>*ATTORNEY TO BE NOTICED* |
| | | **SETH W. BREWSTER**<br>EATON PEABODY<br>100 MIDDLE STREET, WEST TOWER<br>SECOND FLOOR<br>PO BOX 15235<br>PORTLAND, ME 04112−5235<br>(207) 274−5266<br>Fax: 207−274−5286<br>Email: sbrewster@eatonpeabody.com<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

**BH PIERS LLC**        represented by

App. 001

**TIMOTHY C. WOODCOCK**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JANNA L. GAU**
(See above for address)
*ATTORNEY TO BE NOTICED*

**P. ANDREW HAMILTON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**PATRICK W. LYONS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SETH W. BREWSTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GOLDEN ANCHOR LC**              represented by    **TIMOTHY C. WOODCOCK**
*doing business as*                                 (See above for address)
HARBORSIDE HOTEL                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                   **JANNA L. GAU**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

                                                   **P. ANDREW HAMILTON**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

                                                   **PATRICK W. LYONS**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

                                                   **SETH W. BREWSTER**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

**Plaintiff**

**BHWW LLC**                      represented by    **TIMOTHY C. WOODCOCK**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **JANNA L. GAU**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

                                                   **P. ANDREW HAMILTON**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

                                                   **PATRICK W. LYONS**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

                                                   **SETH W. BREWSTER**
                                                   (See above for address)
                                                   *ATTORNEY TO BE NOTICED*

App. 002

**Plaintiff**

**DELRAY EXPLORER HULL 495 LLC**            represented by    **TIMOTHY C. WOODCOCK**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JANNA L. GAU**
(See above for address)
*ATTORNEY TO BE NOTICED*

**P. ANDREW HAMILTON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**PATRICK W. LYONS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SETH W. BREWSTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DELRAY EXPLORER HULL 493 LLC**            represented by    **TIMOTHY C. WOODCOCK**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JANNA L. GAU**
(See above for address)
*ATTORNEY TO BE NOTICED*

**P. ANDREW HAMILTON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**PATRICK W. LYONS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SETH W. BREWSTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ACADIA EXPLORER 492 LLC**            represented by    **TIMOTHY C. WOODCOCK**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JANNA L. GAU**
(See above for address)
*ATTORNEY TO BE NOTICED*

**P. ANDREW HAMILTON**
(See above for address)
*ATTORNEY TO BE NOTICED*

**PATRICK W. LYONS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SETH W. BREWSTER**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Plaintiff**

**PENOBSCOT BAY & RIVER**    represented by  **CHARLES JONATHAN BENNER**
**PILOTS ASSOCIATION**

THOMPSON COBURN LLP
1909 K STREET N.W.
SUITE 600
WASHINGTON, DC 20006−1167
202−585−6985
Email: jbenner@thompsoncoburn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JOHN SCOTT KINGSTON**
THOMPSON COBURN LLP
ONE US BANK PLAZA
ST LOUIS, MO 63101
314−552−6464
Email: jkingston@thompsoncoburn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**KATHLEEN E. KRAFT**
THOMPSON COBURN LLP
1909 K STREET N.W.
SUITE 600
WASHINGTON, DC 20006−1167
202−585−6966
Fax: 202−585−6969
Email: kkraft@thompsoncoburn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**TWAIN BRADEN**
ARCHIPELAGO LAW, LLP
ONE DANA STREET
PORTLAND, ME 04101
207−558−0102
Email: tbraden@archipelagona.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**TOWN OF BAR HARBOR**    represented by  **ALLISON A. ECONOMY**
*A Municipal Corporation of the State of*
*Maine*

RUDMAN WINCHELL
84 HARLOW STREET
P.O. BOX 1401
BANGOR, ME 04401
207−947−4501
Email: aeconomy@rudmanwinchell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JONATHAN P. HUNTER**
RUDMAN & WINCHELL
84 HARLOW STREET
BANGOR, ME

207−992−2562
Email: jhunter@rudmanwinchell.com
*ATTORNEY TO BE NOTICED*

**STEPHEN W. WAGNER**
RUDMAN WINCHELL
84 HARLOW STREET
P.O. BOX 1401
BANGOR, ME 04401
207−947−4501
Fax: 207−941−9715
Email: swagner@rudmanwinchell.com
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Defendant**

**CHARLES SIDMAN**                    represented by    **DAVID P. SILK**

CURTIS THAXTER, LLC
ONE CANAL PLAZA
SUITE 1000
P.O. BOX 7320
PORTLAND, ME 04112−7320
774−9000
Fax: 775−0612
Email: dsilk@curtisthaxter.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JASON J. THEOBALD**
CURTIS THAXTER, LLC
ONE CANAL PLAZA
SUITE 1000
P.O. BOX 7320
PORTLAND, ME 04112−7320
207−774−9000
Email: jtheobald@curtisthaxter.com
*ATTORNEY TO BE NOTICED*

**RICHARD P. OLSON**
CURTIS THAXTER, LLC
ONE CANAL PLAZA
SUITE 1000
P.O. BOX 7320
PORTLAND, ME 04112−7320
207−774−9000
Fax: 207−775−0612
Email: rolson@curtisthaxter.com
*ATTORNEY TO BE NOTICED*

**ROBERT J. PAPAZIAN**
BRACH EICHLER LLC
101 EISENHOWER PARKWAY
ROSELAND, NJ 07068
973−228−5700
Email: rpapazian@curtisthaxter.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/29/2022 | 1 | COMPLAINT against TOWN OF BAR HARBOR **PAYMENT OF FILING FEE DUE WITHIN 48 HOURS. IF FILING FEE IS BEING PAID WITH A CREDIT CARD COUNSEL ARE INSTRUCTED TO LOGIN TO CMECF AND DOCKET** *Case Opening Filing Fee Paid* |

App. 005

| | | |
|---|---|---|
| | | **FOUND IN THE** *Complaints and Other Initiating Documents* **CATEGORY. CHECK PAYMENTS DUE WITHIN 48 HOURS.**, filed by BH PIERS LLC, DELRAY EXPLORER HULL 493 LLC, ACADIA EXPLORER 492 LLC, BHWW LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. (Service of Process Deadline 3/29/2023) Fee due by 1/3/2023. (Attachments: # 1 Verifications, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D)(mmy) (Entered: 12/30/2022) |
| 12/29/2022 | 2 | CIVIL COVER SHEET. (mmy) (Entered: 12/30/2022) |
| 12/30/2022 | 3 | Summons Issued as to TOWN OF BAR HARBOR. **Counsel shall print the embossed summons and effect service in the manner in accordance with Fed.R.Civ.P.4.** **Note−If you are using Version 6 of Adobe Acrobat, be sure the PRINT WHAT field is set to DOCUMENTS AND COMMENTS (Click File, then Print to check this setting).** (mmy) (Entered: 12/30/2022) |
| 12/30/2022 | | Set Deadlines: Per Local Rule 7.1 Notice of Interested Parties or Corporate Disclosure Statement due by 1/6/2023. (mmy) (Entered: 12/30/2022) |
| 12/30/2022 | 4 | CORPORATE DISCLOSURE STATEMENT by ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS. (WOODCOCK, TIMOTHY) (Entered: 12/30/2022) |
| 12/30/2022 | 5 | CORPORATE DISCLOSURE STATEMENT by BH PIERS LLC. (WOODCOCK, TIMOTHY) (Entered: 12/30/2022) |
| 12/30/2022 | 6 | CORPORATE DISCLOSURE STATEMENT by GOLDEN ANCHOR LC. (WOODCOCK, TIMOTHY) (Entered: 12/30/2022) |
| 12/30/2022 | 7 | CORPORATE DISCLOSURE STATEMENT by BHWW LLC. (WOODCOCK, TIMOTHY) (Entered: 12/30/2022) |
| 12/30/2022 | 8 | CORPORATE DISCLOSURE STATEMENT by DELRAY EXPLORER HULL 495 LLC. (WOODCOCK, TIMOTHY) (Entered: 12/30/2022) |
| 12/30/2022 | 9 | CORPORATE DISCLOSURE STATEMENT by DELRAY EXPLORER HULL 493 LLC. (WOODCOCK, TIMOTHY) (Entered: 12/30/2022) |
| 12/30/2022 | 10 | CORPORATE DISCLOSURE STATEMENT by ACADIA EXPLORER 492 LLC. (WOODCOCK, TIMOTHY) (Entered: 12/30/2022) |
| 12/30/2022 | 11 | Consented MOTION for Leave to File Excess Pages to Plaintiff's Motion for Preliminary Injunction and Any Response Thereto from Defendant by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC Responses due by 1/20/2023. (WOODCOCK, TIMOTHY) Modified on 1/3/2023 to correct motion type to Motion for Leave (mmy). (Entered: 12/30/2022) |
| 12/30/2022 | 12 | MOTION for Preliminary Injunction by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC Responses due by 1/20/2023. (Attachments: # 1 Memorandum of Law in Support of Motion, # 2 Text of Proposed Order Proposed Order, # 3 Certificate of Service)(WOODCOCK, TIMOTHY) (Entered: 12/30/2022) |
| 12/30/2022 | 13 | AFFIDAVIT of Kevin DesVeaux filed by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. (WOODCOCK, TIMOTHY) (Entered: 12/30/2022) |

| 12/30/2022 | 14 | AFFIDAVIT of Loren Hubbard filed by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. (WOODCOCK, TIMOTHY) (Entered: 12/30/2022) |
|---|---|---|
| 12/30/2022 | 15 | AFFIDAVIT of Glenn Tucker filed by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. (WOODCOCK, TIMOTHY) (Entered: 12/30/2022) |
| 12/30/2022 | 16 | AFFIDAVIT of Shawn Moody filed by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. (WOODCOCK, TIMOTHY) (Entered: 12/30/2022) |
| 12/30/2022 | 17 | AFFIDAVIT of Chris Mastrippolito filed by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. (WOODCOCK, TIMOTHY) (Entered: 12/30/2022) |
| 12/30/2022 | 18 | AFFIDAVIT of B.H. Piers, LLC filed by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. (Attachments: # 1 Exhibit 1)(WOODCOCK, TIMOTHY) (Entered: 12/30/2022) |
| 12/30/2022 | 19 | AFFIDAVIT of Golden Anchor, L.C. filed by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. (Attachments: # 1 Exhibit 1)(WOODCOCK, TIMOTHY) (Entered: 12/30/2022) |
| 12/30/2022 | 20 | AFFIDAVIT of B.H.W.W., LLC filed by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. (WOODCOCK, TIMOTHY) (Entered: 12/30/2022) |
| 12/30/2022 | 21 | AFFIDAVIT of Delray Explorer Hull 495, LLC,Delray Explorer Hull 493, LLC, and Acadia Explorer 492, LLC ("Tender Owners") filed by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. (WOODCOCK, TIMOTHY) (Entered: 12/30/2022) |
| 12/30/2022 | 22 | AFFIDAVIT of Eben Salvatore filed by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(WOODCOCK, TIMOTHY) (Entered: 12/30/2022) |
| 01/03/2023 | 23 | ORDER granting 11 Motion for Leave to File Excess of Page Limit By JUDGE LANCE E. WALKER. (mmy) (Entered: 01/03/2023) |
| 01/03/2023 | 24 | ADDITIONAL ATTACHMENTS filed by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC re 12 Motion for Preliminary Injunction, *Notice of Filing*.. (Attachments: # 1 Exhibit A to Memorandum of Law, # 2 Exhibit B to Memorandum of Law)(WOODCOCK, TIMOTHY) (Entered: 01/03/2023) |

| 01/03/2023 | 25 | NOTICE of Appearance by ALLISON A. ECONOMY on behalf of TOWN OF BAR HARBOR (ECONOMY, ALLISON) (Entered: 01/03/2023) |
|---|---|---|
| 01/03/2023 | 26 | WAIVER OF SERVICE Returned Executed TOWN OF BAR HARBOR waiver sent on 12/30/2022. (ECONOMY, ALLISON) (Entered: 01/03/2023) |
| 01/03/2023 | 27 | NOTICE of Appearance by JONATHAN P. HUNTER on behalf of TOWN OF BAR HARBOR (HUNTER, JONATHAN) (Entered: 01/03/2023) |
| 01/04/2023 | | Set Answer Deadline Regarding Waiver of Service Executed for TOWN OF BAR HARBOR: Answer due by 3/6/2023. (mmy) (Entered: 01/04/2023) |
| 01/04/2023 | | Filing Fee Received from ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC: Amount Paid: $402.00. Receipt Number: AMEDC−2743924. Method of Payment: Credit Card. Purpose of Payment: Filing Fee. Date Paid: 12/31/2022 (mmy) (Entered: 01/04/2023) |
| 01/09/2023 | 28 | NOTICE of Hearing: Telephone Conference set for 1/12/2023 12:00 PM before MAGISTRATE JUDGE JOHN C. NIVISON. Counsel have been provided the call−in information. (jwr) (Entered: 01/09/2023) |
| 01/09/2023 | 29 | NOTICE of Appearance by STEPHEN W. WAGNER on behalf of TOWN OF BAR HARBOR (WAGNER, STEPHEN) (Entered: 01/09/2023) |
| 01/12/2023 | 30 | Minute Entry for proceedings held before MAGISTRATE JUDGE JOHN C. NIVISON: Telephone Conference held. (Court Reporter: No court reporter present) (mtm) (Entered: 01/13/2023) |
| 01/13/2023 | 31 | NOTICE of Hearing: Telephone Conference set for 1/19/2023 08:00 AM before MAGISTRATE JUDGE JOHN C. NIVISON. The parties have been provided with the call−in information.(mtm) (Entered: 01/13/2023) |
| 01/14/2023 | 32 | MOTION to Intervene by Penobscot Bay & River Pilots Association Responses due by 2/6/2023. (Attachments: # 1 Exhibit Proposed Complaint in Intervention, # 2 Exhibit Initiative to the Town of Bar Harbor, # 3 Exhibit Order Placing Initiative on Warrant, # 4 Exhibit Special Town Meeting Warrant, # 5 Affidavit Application for Admission Pro Hac Atty K. Kraft, # 6 Affidavit Application for Admission Pro Hac C. Benner)(BRADEN, TWAIN) (Entered: 01/14/2023) |
| 01/17/2023 | 33 | CERTIFICATION for Admission Pro Hac Vice of C. Jonathan Benner filed by TWAIN BRADEN on behalf of PENOBSCOT BAY & RIVER PILOTS ASSOCIATION (Total admission fee $ 100 receipt number AMEDC−2749636.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (BRADEN, TWAIN) (Entered: 01/17/2023) |
| 01/17/2023 | 34 | CERTIFICATION for Admission Pro Hac Vice of Kathleen E. Kraft filed by TWAIN BRADEN on behalf of PENOBSCOT BAY & RIVER PILOTS ASSOCIATION (Total admission fee $ 100 receipt number AMEDC−2749738.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (BRADEN, TWAIN) (Entered: 01/17/2023) |
| 01/17/2023 | 35 | ADDITIONAL ATTACHMENTS filed by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION re 32 Motion to Intervene, *Proposed Complaint in Intervention*. Main Document: Exhibit A−1 Initiative dated March 17 2022. (BRADEN, TWAIN) (Entered: 01/17/2023) |
| 01/17/2023 | 36 | CORPORATE DISCLOSURE STATEMENT by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION. (BRADEN, TWAIN) (Entered: 01/17/2023) |
| 01/17/2023 | | Set Deadlines: Maine has transitioned to the NextGen ECF filing system; therefore, to complete the admissions process, Attorney C. JONATHAN BENNER and KATHLEEN E. KRAFT must register for a PACER account and/or request the appropriate e−filing rights in the District of Maine via PACER at |

| | | www.pacer.uscourts.gov by 1/24/2023. NOTE: Counsel appearing Pro Hac Vice MUST click on the PRO HAC VICE link when requesting e−filing rights via PACER. For more details on NextGen/PACER go to our website at www.med.uscourts.gov. (mmy) (Entered: 01/17/2023) |
|---|---|---|
| 01/18/2023 | 37 | RESPONSE (no objection) to Motion re 32 MOTION to Intervene filed by TOWN OF BAR HARBOR. Reply due by 2/1/2023. (ECONOMY, ALLISON) (Entered: 01/18/2023) |
| 01/18/2023 | 38 | Consent MOTION to Extend Time Extend Time to Respond to Motion for Preliminary Injunction by TOWN OF BAR HARBOR Responses due by 2/8/2023. (ECONOMY, ALLISON) (Entered: 01/18/2023) |
| 01/19/2023 | 39 | ORDER granting 38 Motion to Extend Time to File Response to Motion for Preliminary Injunction. Time is extended to February 7, 2023. By MAGISTRATE JUDGE JOHN C. NIVISON. (NIVISON, JOHN) (Entered: 01/19/2023) |
| 01/19/2023 | | Reset Deadlines as to 12 MOTION for Preliminary Injunction per Order #39: Responses due by 2/7/2023. (mmy) (Entered: 01/19/2023) |
| 01/19/2023 | 40 | RESPONSE to Motion re 32 MOTION to Intervene filed by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. Reply due by 2/2/2023. (WOODCOCK, TIMOTHY) (Entered: 01/19/2023) |
| 01/19/2023 | 41 | ORDER granting 32 Motion to Intervene. The Clerk is instructed to enter the intervenor complaint [32−1] on the docket. By JUDGE LANCE E. WALKER. (jwr) (Entered: 01/19/2023) |
| 01/19/2023 | 42 | Intervenor COMPLAINT against TOWN OF BAR HARBOR, filed by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION. (Service of Process Deadline 4/19/2023)(jwr) (Entered: 01/19/2023) |
| 01/19/2023 | 43 | Intervenor COMPLAINT *SIGNED COPY* against TOWN OF BAR HARBOR, filed by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION. (Service of Process Deadline 4/19/2023)(BRADEN, TWAIN) (Entered: 01/19/2023) |
| 01/19/2023 | 44 | Minute Entry for proceedings held before MAGISTRATE JUDGE JOHN C. NIVISON: Telephone Conference held. (Court Reporter: No court reporter present) (jwr) (Entered: 01/19/2023) |
| 01/19/2023 | 45 | MOTION to Intervene, or in the alternative MOTION to Participate as Amicus Curiae and MOTION to Extend Time to Respond to the Motion for Preliminary Injunction by CHARLES SIDMAN Responses due by 2/9/2023. (Attachments: # 1 Appendix Verification (Charles Sidman), # 2 Exhibit A − Partial Transcript, # 3 Exhibit B − Press Release)(SILK, DAVID). Added MOTION to Participate as Amicus Curiae, MOTION to Extend Time to Respond to the Motion for Preliminary Injunction on 1/20/2023 (mmy). (Entered: 01/19/2023) |
| 01/19/2023 | 46 | ORDER Setting Settlement Conference for 1/26/2023 09:00 AM in Magistrate Judge Nivison's Chambers before MAGISTRATE JUDGE JOHN C. NIVISON, In Camera Settlement Papers due by 1/25/2023. By MAGISTRATE JUDGE JOHN C. NIVISON. (jwr) (Entered: 01/19/2023) |
| 01/20/2023 | 47 | NOTICE of Appearance by PATRICK W. LYONS on behalf of ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC (LYONS, PATRICK) (Entered: 01/20/2023) |
| 01/24/2023 | 48 | NOTICE of Appearance by ROBERT PAPAZIAN on behalf of CHARLES SIDMAN (PAPAZIAN, ROBERT) (Entered: 01/24/2023) |
| 01/24/2023 | 49 | NOTICE of Appearance by P. ANDREW HAMILTON on behalf of ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC |

| | | (HAMILTON, P.) (Entered: 01/24/2023) |
|---|---|---|
| 01/26/2023 | 50 | Minute Entry for proceedings held before MAGISTRATE JUDGE JOHN C. NIVISON: Settlement Conference held; discussions to continue. (Court Reporter: No court reporter present) (MFS) (Entered: 01/26/2023) |
| 01/27/2023 | 51 | NOTICE of Hearing: Telephone Conference set for 1/30/2023 at 11:00 AM before MAGISTRATE JUDGE JOHN C. NIVISON. The parties have been provided with the Court's call−in information. (MFS) (Entered: 01/27/2023) |
| 01/30/2023 | 52 | Minute Entry for proceedings held before MAGISTRATE JUDGE JOHN C. NIVISON: Telephone Conference held; settlement discussions to continue. (Court Reporter: No court reporter present) (MFS) (Entered: 01/30/2023) |
| 02/06/2023 | 53 | ANSWER to 1 Complaint,, *Verified Complaint of Plaintiffs Association to Preserve and Protect Local Livelihoods et al.* by TOWN OF BAR HARBOR.(HUNTER, JONATHAN) (Entered: 02/06/2023) |
| 02/06/2023 | 54 | Consent MOTION to Extend Time to Respond to Motion for Preliminary Injunction by TOWN OF BAR HARBOR Responses due by 2/27/2023. (HUNTER, JONATHAN) (Entered: 02/06/2023) |
| 02/06/2023 | 55 | RESPONSE in Opposition re 45 MOTION to Intervene MOTION to Participate as Amicus Curiae MOTION to Extend Time to Respond to the Motion for Preliminary Injunction filed by TOWN OF BAR HARBOR. Reply due by 2/21/2023. (Attachments: # 1 Affidavit Verification of Valerie Peacock, # 2 Exhibit A − Memo from Sidman to Council 1/17/23, # 3 Exhibit B − Op−ed by Sidman 1/30/23)(HUNTER, JONATHAN) (Entered: 02/06/2023) |
| 02/06/2023 | 56 | ORDER granting 54 Motion to Extend Time to Respond to Motion for Preliminary Injunction By MAGISTRATE JUDGE KAREN FRINK WOLF. (mlm) (Entered: 02/06/2023) |
| 02/06/2023 | | Reset Deadlines as to 12 MOTION for Preliminary Injunction : Responses due by 3/20/2023. (mlm) (Entered: 02/06/2023) |
| 02/06/2023 | 57 | MOTION to Exceed Page Limit (with consent) by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC Responses due by 2/27/2023. (WOODCOCK, TIMOTHY) (Entered: 02/06/2023) |
| 02/06/2023 | 58 | RESPONSE in Opposition re 45 MOTION to Intervene MOTION to Participate as Amicus Curiae MOTION to Extend Time to Respond to the Motion for Preliminary Injunction filed by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. Reply due by 2/21/2023. (WOODCOCK, TIMOTHY) (Entered: 02/06/2023) |
| 02/06/2023 | 59 | RESPONSE in Opposition re 45 MOTION to Intervene MOTION to Participate as Amicus Curiae MOTION to Extend Time to Respond to the Motion for Preliminary Injunction filed by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION. Reply due by 2/21/2023. (Attachments: # 1 Exhibit A − Argosy Gallery Website Screenshot)(KRAFT, KATHLEEN) (Entered: 02/06/2023) |
| 02/07/2023 | 60 | ORDER granting 57 Motion to Exceed Page Limit By MAGISTRATE JUDGE KAREN FRINK WOLF. (mmy) (Entered: 02/07/2023) |
| 02/10/2023 | 61 | ANSWER *and Defenses* to 43 Intervenor Complaint by TOWN OF BAR HARBOR.(ECONOMY, ALLISON) Modified on 2/10/2023 to clean up docket text (mmy). (Entered: 02/10/2023) |
| 02/21/2023 | 62 | REPLY to Response to Motion re 45 MOTION to Intervene MOTION to Participate as Amicus Curiae MOTION to Extend Time to Respond to the Motion for Preliminary Injunction filed by CHARLES SIDMAN. (Attachments: # 1 Exhibit A (excerpt Town Council Packet (10−3−22): 9−20−22 Council Minutes), # 2 Exhibit B (Town Code Ch. 125, Art. I § 125−9))(SILK, DAVID) (Entered: 02/21/2023) |

| | | |
|---|---|---|
| 02/28/2023 | 63 | ORDER granting 45 Motion to Intervene; mooting 45 Motion to Participate as Amicus Curiae; mooting 45 Motion to Extend Time to Respond to the Motion for Preliminary Injunction. By JUDGE LANCE E. WALKER. (mmy) (Entered: 02/28/2023) |
| 03/02/2023 | 64 | NOTICE of Hearing: Telephone Conference set for 3/3/2023 at 10:00 AM before MAGISTRATE JUDGE JOHN C. NIVISON. The parties have been provided with the Court's call−in information. (MFS) (Entered: 03/02/2023) |
| 03/03/2023 | 65 | Minute Entry for proceedings held before MAGISTRATE JUDGE JOHN C. NIVISON: Telephone Conference held. (Court Reporter: No court reporter present) (MFS) (Entered: 03/03/2023) |
| 03/03/2023 | 66 | NOTICE of Hearing: Continued Settlement Conference by video set for 3/6/2023 at 1:00 PM before MAGISTRATE JUDGE JOHN C. NIVISON. (MFS) (Entered: 03/03/2023) |
| 03/06/2023 | 67 | Minute Entry for proceedings held before MAGISTRATE JUDGE JOHN C. NIVISON: Continued Settlement Conference held; discussions to continue. (Court Reporter: No court reporter present) (MFS) (Entered: 03/07/2023) |
| 03/07/2023 | 68 | NOTICE of Hearing: Telephone Conference set for 3/8/2023 at 2:00 PM before MAGISTRATE JUDGE JOHN C. NIVISON. The parties have been provided with the Court's call−in information. (MFS) (Entered: 03/07/2023) |
| 03/08/2023 | 69 | NOTICE of Appearance by SETH W. BREWSTER on behalf of All Plaintiffs (BREWSTER, SETH) (Entered: 03/08/2023) |
| 03/08/2023 | 70 | Minute Entry for proceedings held before MAGISTRATE JUDGE JOHN C. NIVISON: Telephone Conference held; further settlement discussions to continue. (Court Reporter: No court reporter present) (MFS) (Entered: 03/08/2023) |
| 03/09/2023 | 71 | NOTICE of Video Hearing: Conference of Counsel set for 3/10/2023 at 11:00 AM before MAGISTRATE JUDGE JOHN C. NIVISON. Counsel have been provided with the hearing instructions. (MFS) (Entered: 03/09/2023) |
| 03/10/2023 | 72 | Minute Entry for proceedings held before MAGISTRATE JUDGE JOHN C. NIVISON: Conference of Counsel held. Scheduling conference to be scheduled. (Court Reporter: No court reporter present) (MFS) (Entered: 03/10/2023) |
| 03/13/2023 | 73 | NOTICE of Conference of Counsel set for 3/16/2023 01:00 PM in VIDEO HEARING before JUDGE LANCE E. WALKER. The parties are to file their proposed scheduling orders by the end of the business day on March 15, 2023.(CJD) (Entered: 03/13/2023) |
| 03/13/2023 | | Set Deadlines Proposed Scheduling Orders (1) due by 3/15/2023. (CJD) (Entered: 03/13/2023) |
| 03/14/2023 | 74 | MOTION to Dismiss for Failure to State a Claim by CHARLES SIDMAN Responses due by 4/4/2023. (SILK, DAVID) (Entered: 03/14/2023) |
| 03/15/2023 | 75 | NOTICE/CORRESPONDENCE Re: Proposed Scheduling Order Dates by CHARLES SIDMAN (Attachments: # 1 Text of Proposed Order Proposed Scheduling Order)(SILK, DAVID) (Entered: 03/15/2023) |
| 03/15/2023 | 76 | NOTICE/CORRESPONDENCE Re: proposed scheduling order by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION (BRADEN, TWAIN) (Entered: 03/15/2023) |
| 03/15/2023 | 77 | NOTICE/CORRESPONDENCE Re: PROPOSED SCHEDULING ORDER by TOWN OF BAR HARBOR (ECONOMY, ALLISON) (Entered: 03/15/2023) |
| 03/15/2023 | 78 | NOTICE/CORRESPONDENCE Re: Proposed Scheduling Order by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC (WOODCOCK, TIMOTHY) (Entered: 03/15/2023) |
| 03/16/2023 | 79 | Minute Entry for proceedings held before JUDGE LANCE E. WALKER: Video Conference of Counsel held. (Court Reporter: Cathy Ford) (mmy) (Entered: 03/16/2023) |

| | | |
|---|---|---|
| 03/16/2023 | 80 | Consent MOTION to Extend Time to File Response in Opposition to Motion for Preliminary Injunction (Doc. No. 12) by CHARLES SIDMAN Responses due by 4/6/2023. (PAPAZIAN, ROBERT) (Entered: 03/16/2023) |
| 03/16/2023 | 81 | ORDER granting 80 Motion to Extend Time to File Response to Preliminary Injunction By JUDGE LANCE E. WALKER. (mlm) (Entered: 03/16/2023) |
| 03/16/2023 | | Set Deadlines as to 12 MOTION for Preliminary Injunction : Responses due by 3/27/2023. (mlm) (Entered: 03/16/2023) |
| 03/17/2023 | 82 | EXPEDITED SCHEDULING ORDER: Discovery due by 5/31/2023. Motions due by 6/2/2023. Ready for Trial on 7/5/2023. By JUDGE LANCE E. WALKER. (mmy) (Entered: 03/17/2023) |
| 03/24/2023 | 83 | WITHDRAWAL of : 12 MOTION for Preliminary Injunction by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC . (WOODCOCK, TIMOTHY) (Entered: 03/24/2023) |
| 04/04/2023 | 84 | Motion(s) joined by TOWN OF BAR HARBOR : 74 MOTION to Dismiss for Failure to State a Claim filed by CHARLES SIDMAN . (ECONOMY, ALLISON) (Entered: 04/04/2023) |
| 04/04/2023 | 85 | RESPONSE in Opposition re 74 MOTION to Dismiss for Failure to State a Claim filed by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. Reply due by 4/18/2023. (WOODCOCK, TIMOTHY) (Entered: 04/04/2023) |
| 04/04/2023 | 86 | RESPONSE in Opposition re 74 MOTION to Dismiss for Failure to State a Claim filed by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION. Reply due by 4/18/2023. (BENNER, CHARLES) (Entered: 04/04/2023) |
| 04/12/2023 | 87 | ORDER denying 74 Motion to Dismiss for Failure to State a Claim By JUDGE LANCE E. WALKER. (mmy) (Entered: 04/12/2023) |
| 04/12/2023 | | Reset Answer Deadline for CHARLES SIDMAN: Answer due by 4/26/2023. (mmy) (Entered: 04/12/2023) |
| 04/26/2023 | 88 | ANSWER to 1 Complaint,, by CHARLES SIDMAN.(SILK, DAVID) (Entered: 04/26/2023) |
| 04/26/2023 | 89 | ANSWER to 43 Intervenor Complaint ntervenor Complaint by CHARLES SIDMAN.(SILK, DAVID) (Entered: 04/26/2023) |
| 05/03/2023 | 90 | CERTIFICATION for Admission Pro Hac Vice of John S. Kingston filed by TWAIN BRADEN on behalf of PENOBSCOT BAY & RIVER PILOTS ASSOCIATION (Total admission fee $ 100 receipt number AMEDC−2794289.) The District of Maine is a CM/ECF NextGen Court. If PHV counsel has not previously been granted electronic filing rights with the District of Maine, PHV counsel will now need to submit a PRO HAC VICE request in this District via PACER at www.pacer.uscourts.gov (BRADEN, TWAIN) (Entered: 05/03/2023) |
| 05/10/2023 | 91 | TRIAL LIST:. On Trial List for 7/5/2023. Video Final Pretrial Conference set for 6/7/2023 at 09:00 AM before MAGISTRATE JUDGE KAREN FRINK WOLF. Final Pretrial Memo due by 5/31/2023.(jad) (Entered: 05/10/2023) |
| 05/11/2023 | 92 | NOTICE of RESCHEDULED Hearing: Video Final Pretrial Conference set for 6/28/2023 09:00 AM before MAGISTRATE JUDGE KAREN FRINK WOLF. Final Pretrial Memo due by 6/21/2023. Counsel have been provided Zoom login information. (mmy) (Entered: 05/11/2023) |
| 05/17/2023 | 93 | MOTION for Confidentiality Order by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC Responses due by 6/7/2023. (Attachments: # 1 Attachment A − Proposed Confidentiality Order, # 2 Attachment B |

| | | |
|---|---|---|
| | | − NECEC Confidentiality Order)(WOODCOCK, TIMOTHY) (Entered: 05/17/2023) |
| 05/18/2023 | 94 | RESPONSE in Opposition re 93 MOTION for Confidentiality Order filed by CHARLES SIDMAN. Reply due by 6/1/2023. (Attachments: # 1 Exhibit A − Sidman Confidentiality Order (clean), # 2 Exhibit B − Sidman Confidentiality Order (Redline))(SILK, DAVID) (Entered: 05/18/2023) |
| 05/22/2023 | 95 | NOTICE of VIDEO Hearing on Motion 93 MOTION for Confidentiality Order: Motion Hearing set for 5/25/2023 02:00 PM before MAGISTRATE JUDGE KAREN FRINK WOLF. Counsel have been provided with Zoom login information. (mmy) (Entered: 05/22/2023) |
| 05/22/2023 | 96 | REPLY to Response to Motion re 93 MOTION for Confidentiality Order filed by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. (Attachments: # 1 Attachment A − Plaintiffs Initial Disclosures, # 2 Attachment B − Defendants Request for Production of Documents, # 3 Attachment C − Viewpoint: Reflections on recent cruise ship initiative vote)(WOODCOCK, TIMOTHY) (Entered: 05/22/2023) |
| 05/24/2023 | 97 | NOTICE of Appearance by JANNA L. GAU on behalf of ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC (GAU, JANNA) (Entered: 05/24/2023) |
| 05/25/2023 | 98 | Minute Entry for proceedings held before MAGISTRATE JUDGE KAREN FRINK WOLF: Motion Hearing held re 93 MOTION for Confidentiality Order filed by ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, BH PIERS LLC, ACADIA EXPLORER 492 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. (Court Reporter: Cathy Ford) (mmy) (Entered: 05/26/2023) |
| 05/25/2023 | 99 | REPORT OF CONFERENCE AND ORDER ON DISPUTES OVER PROPOSED CONFIDENTIALITY ORDER. Set Deadlines: Revised Proposed Order due by 5/30/2023. By MAGISTRATE JUDGE KAREN FRINK WOLF. (mmy) Modified on 5/26/2023 to correct filed date (mmy). (Entered: 05/26/2023) |
| 05/26/2023 | 100 | Witness List by CHARLES SIDMAN . (PAPAZIAN, ROBERT) (Entered: 05/26/2023) |
| 05/26/2023 | 101 | Witness List by TOWN OF BAR HARBOR . (ECONOMY, ALLISON) (Entered: 05/26/2023) |
| 05/26/2023 | 102 | Witness List by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION . (KRAFT, KATHLEEN) (Entered: 05/26/2023) |
| 05/26/2023 | 103 | Witness List by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC . (GAU, JANNA) (Entered: 05/26/2023) |
| 05/30/2023 | 104 | **FILED IN ERROR** MOTION for Confidentiality Order by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC Responses due by 6/20/2023. (Attachments: # 1 Supplement Letter to Court)(LYONS, PATRICK) Modified on 5/31/2023 to indicate filed in error (mmy). (Entered: 05/30/2023) |
| 05/31/2023 | 105 | NOTICE of Docket Entry Modification regarding 104 MOTION for Confidentiality Order: This docket entry has modified to indicate it is filed in error. Counsel have been advised how to properly submit proposed order. (mmy) (Entered: 05/31/2023) |
| 05/31/2023 | 106 | **STRICKEN − PER ORDER #117** (Access to document is restricted to case participants only) REQUEST FOR A HEARING REGARDING A DISCOVERY DISPUTE filed by CHARLES SIDMAN (Attachments: # 1 Exh 1−Motion to Compel |

| | | |
|---|---|---|
| | | (Sidman), # 2 Exh A−2023 05 12(h) APPL Obj & Responses RFPD, # 3 Exh B−2023 05 19 APPLL Responses−Town 1st, # 4 Exh C− 2023 05 16 APPLL Final Answers−Sidman Interrogatories)(PAPAZIAN, ROBERT) Modified on 6/1/2023 to remove duplicative exhibit text (mmy). Modified on 6/6/2023 to indicate stricken (mmy). (Entered: 05/31/2023) |
| 05/31/2023 | 107 | Consent MOTION to Extend Time Certain Deadlines by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC Responses due by 6/21/2023. (GAU, JANNA) (Entered: 05/31/2023) |
| 06/01/2023 | 108 | ORDER granting in part and denying in part 93 Motion for Confidentiality Order for the reasons noted in my Report of Conference and Order 99 resolving disputes over that proposed order. The parties have submitted a revised proposed order that I adopt as consistent with my rulings and will separately docket. By MAGISTRATE JUDGE KAREN FRINK WOLF. (SD) (Entered: 06/01/2023) |
| 06/01/2023 | 109 | ORDER granting 107 Motion to Extend Time. Discovery deadline enlarged to June 6, 2023 for limited and specific purposes of the production of documents and continuation of deposition of rebuttal expert Charles Sidman. Discovery deadline is enlarged to allow the continuation of the depositions of Plaintiff's Rule 30(b)(6) witnesses but only to the extent that such enlargement shall not delay trial as scheduled. Daubert and Kumho motion deadline enlarged to June 9, 2023, response deadline enlarged to June 16, 2023, and reply deadline enlarged to June 23, 2023. By MAGISTRATE JUDGE KAREN FRINK WOLF. (WOLF, KAREN) (Entered: 06/01/2023) |
| 06/01/2023 | 110 | CONFIDENTIALITY ORDER By MAGISTRATE JUDGE KAREN FRINK WOLF. (mmy) (Entered: 06/02/2023) |
| 06/01/2023 | | Reset Scheduling Order Deadlines − per Order #109: Discovery due by 6/6/2023. Motions due by 6/9/2023. (mmy) (Entered: 06/02/2023) |
| 06/02/2023 | 111 | Consent MOTION to Extend Time To File Proposed Stipulations by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC Responses due by 6/23/2023. (GAU, JANNA) (Entered: 06/02/2023) |
| 06/02/2023 | 112 | NOTICE of Hearing: Discovery Hearing set for 6/8/2023 01:00 PM in VIDEO HEARING before MAGISTRATE JUDGE KAREN FRINK WOLF. (nrg) (Entered: 06/02/2023) |
| 06/02/2023 | 113 | ORDER granting 111 Motion to Extend Time. Proposed Stipulations due 06/12/2023. By MAGISTRATE JUDGE KAREN FRINK WOLF. (WOLF, KAREN) (Entered: 06/02/2023) |
| 06/02/2023 | 114 | OBJECTION to Witness List by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION. (KRAFT, KATHLEEN) Modified on 6/5/2023 to correct event used to objection (mmy). (Entered: 06/02/2023) |
| 06/02/2023 | 115 | OBJECTION to Witness List by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. (GAU, JANNA) Modified on 6/5/2023 to correct event used to objection (mmy). (Entered: 06/02/2023) |
| 06/05/2023 | | Set Deadlines as to 114 OBJECTION to Witness List, 115 OBJECTION to Witness List per Judge Walker: Responses due by 6/15/2023. No reply permitted. (mmy) (Entered: 06/05/2023) |
| 06/05/2023 | 116 | **STRICKEN − PER ORDER #117** OBJECTION to 106 Request for a Hearing Regarding a Discovery Dispute, filed by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. Responses due by 6/20/2023. (WOODCOCK, TIMOTHY) Modified on 6/6/2023 to indicate objection is stricken |

| | | |
|---|---|---|
| | | (mmy). (Entered: 06/05/2023) |
| 06/06/2023 | 117 | ORDER striking 106 Request for a Hearing Regarding a Discovery Dispute, 116 OBJECTION to 106 Request for a Hearing Regarding a Discovery Dispute. Local Rule 26(b) provides that "[n]o written discovery motions shall be filed without the prior approval of a judicial officer." In an apparent attempt to circumvent this prohibition, Intervenor Defendant Charles Sidman attached a full−fledged motion to compel to his most recent request for a discovery hearing, which, in turn, prompted the Plaintiffs to file a fifteen−page objection to that motion. Because the motion and response were filed without permission, they are both hereby STRICKEN. The parties are ORDERED to meet and confer in a good faith effort to resolve or at least narrow this dispute. If the Court's assistance is still required, the parties should promptly file a request for a discovery hearing that complies with Local Rule 26(b). In the meantime, the discovery hearing currently scheduled for June 8, 2023, is CANCELLED. By MAGISTRATE JUDGE KAREN FRINK WOLF. (MGW) (Entered: 06/06/2023) |
| 06/06/2023 | 118 | NOTICE OF CANCELED HEARING: Per Order #117 the Video Discovery Hearing set for 6/8/2023 01:00 PM MAGISTRATE JUDGE KAREN FRINK WOLF is hereby canceled. (mmy) (Entered: 06/06/2023) |
| 06/07/2023 | 119 | NOTICE of Appearance by RICHARD P. OLSON on behalf of CHARLES SIDMAN (OLSON, RICHARD) (Entered: 06/07/2023) |
| 06/08/2023 | 120 | (Access to document is restricted to case participants only) REQUEST FOR A HEARING REGARDING A DISCOVERY DISPUTE filed by CHARLES SIDMAN (Attachments: # 1 Exhibit A − Plaintiffs Objection−Response to Request for Production of Documents, # 2 Exhibit B − APPLL Answers to Interrogatories)(PAPAZIAN, ROBERT) (Entered: 06/08/2023) |
| 06/08/2023 | 121 | (Access to document is restricted to case participants only) SEALED ADDITIONAL ATTACHMENTS re 120 Request for a Hearing Regarding a Discovery Dispute, C − Attorney Eyes Only Documents APPL008−062 — by CHARLES SIDMAN. (PAPAZIAN, ROBERT) Modified restriction level from sealed to case participants as part of discovery issue on 6/8/2023 (mlm). (Entered: 06/08/2023) |
| 06/08/2023 | 122 | (Access to document is restricted to case participants only) SEALED ADDITIONAL ATTACHMENTS re 120 Request for a Hearing Regarding a Discovery Dispute, — First Attached Document: Exhibit D − Attorney Eyes Only Pier Owners PIER1379−1446 by CHARLES SIDMAN. (PAPAZIAN, ROBERT) Modified restriction level from sealed to case participants as part of discovery issue on 6/8/2023 (mlm). (Entered: 06/08/2023) |
| 06/09/2023 | 123 | NOTICE of Hearing: Discovery Hearing set for 6/12/2023 01:45 PM in VIDEO HEARING before MAGISTRATE JUDGE KAREN FRINK WOLF. (nrg) (Entered: 06/09/2023) |
| 06/09/2023 | 124 | NOTICE of Hearing: Bench Trial set for 7/11/2023 through 7/13/2023 at 08:30 AM in Bangor Courtroom 2 before JUDGE LANCE E. WALKER. Hearing days will to begin at 8:30 a.m. and conclude at 4:00 p.m. with (2) 15 minute breaks and (1) 30 minute lunch recess.(cjd) (Entered: 06/09/2023) |
| 06/09/2023 | 125 | MOTION to Exclude Testimony of Expert Witness Charles Sidman by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC Responses due by 6/30/2023. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(WOODCOCK, TIMOTHY) (Entered: 06/09/2023) |
| 06/09/2023 | 126 | Motion(s) joined by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION : 125 MOTION to Exclude Testimony of Expert Witness Charles Sidman filed by ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, BH PIERS LLC, ACADIA EXPLORER 492 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC . (KRAFT, KATHLEEN) (Entered: 06/09/2023) |
| 06/12/2023 | 127 | (Access to document is restricted to case participants only) NOTICE/CORRESPONDENCE Re: Discovery Hearing by ACADIA EXPLORER |

| | | |
|---|---|---|
| | | 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC (Attachments: # 1 Exhibit 11.14.2022 Opinion, # 2 Exhibit 1.12.2023 Commentary, # 3 Exhibit 6.5.2023 The Bar Harbor Story)(WOODCOCK, TIMOTHY) Modified on 6/12/2023 to add case participants only restriction level as part of discovery issue (mmy). (Entered: 06/12/2023) |
| 06/12/2023 | | Reset Deadlines as to 125 MOTION to Exclude Testimony of Expert Witness Charles Sidman per Judge Walker: Responses due by 6/16/2023. Reply due by 6/20/2023. (mmy) (Entered: 06/12/2023) |
| 06/12/2023 | 128 | Minute Entry for proceedings held before MAGISTRATE JUDGE KAREN FRINK WOLF: Discovery Hearing held. (Court Reporter: FTR) (MGW) (Entered: 06/12/2023) |
| 06/12/2023 | 129 | Consent MOTION to Amend Scheduling Order *to Extend Time to File Proposed Stipulations* by TOWN OF BAR HARBOR Responses due by 7/3/2023. (ECONOMY, ALLISON) (Entered: 06/12/2023) |
| 06/13/2023 | 130 | ORDER granting 129 Motion to Extend Time to File Proposed Stipulations. Defendant and Intervenor Defendant shall respond to Plaintiffs' and Plaintiff Intervenor's proposed stipulations by June 14, 2023. Joint proposed stipulations due by June 20, 2023. By MAGISTRATE JUDGE KAREN FRINK WOLF. (WOLF, KAREN) (Entered: 06/13/2023) |
| 06/13/2023 | 131 | ORDER RE: DISCOVERY DISPUTE. By MAGISTRATE JUDGE KAREN FRINK WOLF. (MGW) (Entered: 06/13/2023) |
| 06/15/2023 | 132 | RESPONSE to 114 OBJECTION *to Witness List* filed by TOWN OF BAR HARBOR. (ECONOMY, ALLISON) (Entered: 06/15/2023) |
| 06/15/2023 | 133 | RESPONSE to 115 OBJECTION *to Witness List* filed by TOWN OF BAR HARBOR. (ECONOMY, ALLISON) (Entered: 06/15/2023) |
| 06/15/2023 | 134 | RESPONSE to 115 OBJECTION */Plaintiffs' Objection to Sidman's Witness List (ECF 100)* filed by CHARLES SIDMAN. (Attachments: # 1 Exhibit A (Charles Sidman's Initial Disclosures (Mar. 31, 2023)))(PAPAZIAN, ROBERT) (Entered: 06/15/2023) |
| 06/15/2023 | 135 | RESPONSE to 114 OBJECTION */Pilots Association's Objection to Sidman's Witness List (ECF 100)* filed by CHARLES SIDMAN. (Attachments: # 1 Exhibit A (Charles Sidman's Initial Disclosures (Mar. 31, 2023))(PAPAZIAN, ROBERT) (Entered: 06/15/2023) |
| 06/16/2023 | 136 | RESPONSE in Opposition re 125 MOTION to Exclude Testimony of Expert Witness Charles Sidman filed by CHARLES SIDMAN. Reply due by 6/30/2023. (Attachments: # 1 Exhibit A − Sidman Expert Designation, # 2 Exhibit B − Todd Gabe Deposition Excerpts, # 3 Exhibit C − Plaintiffs Expert Witness Designation (exhibits omitted), # 4 Exhibit D − Charles Sidman 5−30−23 Expert Rebuttal Deposition Excerpts, # 5 Exhibit E − Charles Sidman 6−6−23 Expert Rebuttal Deposition Excerpts, # 6 Exhibit F − Charles Sidman CV, # 7 Exhibit G − Todd Gabe Deposition Exhibit 7 (Pedestrian Study), # 8 Exhibit H − Expert Rebuttal Deposition by CS)(PAPAZIAN, ROBERT) (Entered: 06/16/2023) |
| 06/20/2023 | | Reset Deadlines as to 125 MOTION to Exclude Testimony of Expert Witness Charles Sidman per Judge Walker: Reply due by 6/20/2023. (mmy) (Entered: 06/20/2023) |
| 06/20/2023 | | Reset Deadlines per Order #109 as to 125 MOTION to Exclude Testimony of Expert Witness Charles Sidman: Reply due by 6/23/2023. Counsel are to disregard previously reset reply deadline. (mmy) (Entered: 06/20/2023) |
| 06/20/2023 | 137 | STIPULATION *Joint Stipulations* by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. (GAU, JANNA) (Entered: 06/20/2023) |

| 06/21/2023 | 138 | FINAL PRETRIAL MEMORANDUM by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. (GAU, JANNA) (Entered: 06/21/2023) |
|---|---|---|
| 06/21/2023 | 139 | FINAL PRETRIAL MEMORANDUM by CHARLES SIDMAN. (Attachments: # 1 Exhibit A: Witness List, # 2 Exhibit B: Exhibit List)(PAPAZIAN, ROBERT) (Entered: 06/21/2023) |
| 06/21/2023 | 140 | FINAL PRETRIAL MEMORANDUM by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION. (KRAFT, KATHLEEN) (Entered: 06/21/2023) |
| 06/21/2023 | 141 | FINAL PRETRIAL MEMORANDUM by TOWN OF BAR HARBOR. (ECONOMY, ALLISON) (Entered: 06/21/2023) |
| 06/23/2023 | 142 | OBJECTION to 131 Order filed by CHARLES SIDMAN. Responses due by 7/7/2023. (Attachments: # 1 Exhibit A: 2023 05 12(h) Pl. Obj & Responses RFPD, # 2 Exhibit B: 2023 05 16 APPLL Final Answers−Sidman Interrogatories, # 3 Exhibit E: 2023 03 31 Plaintiffs 1st Request for Production of Documents to Charles Sidman)(PAPAZIAN, ROBERT) (Entered: 06/23/2023) |
| 06/23/2023 | 143 | (Document sealed from public view) MOTION to Seal Exhibits to Objection to Magistrate Judge's Discovery Order *dated June 1, 2023,* by CHARLES SIDMAN Responses due by 7/14/2023. (Attachments: # 1 Exhibit C: APPL ProductionAPPL008−APPL0062 − Confidential Attorneys' Eyes Only, # 2 Exhibit D: PIER PRODUCTION−AEO Confidential − PIER_001379 − PIER_001446, # 3 Exhibit F: AEO CONFIDENTIAL APPL PRODUCTION − APPL_00063−000114, # 4 Exhibit G: AEO CONFIDENTIAL APPL PRODUCTION − APPL_000115, # 5 Exhibit H: AEO CONFIDENTIAL APPL PRODUCTION − APPL_000116−000374, # 6 Exhibit I: AEO CONFIDENTIAL APPL PRODUCTION − APPL_000432, # 7 Exhibit J: AEO CONFIDENTIAL APPL PRODUCTION − APPL−000375−000431)(PAPAZIAN, ROBERT) (Entered: 06/23/2023) |
| 06/23/2023 | 144 | REPLY to Response to Motion re 125 MOTION to Exclude Testimony of Expert Witness Charles Sidman filed by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(WOODCOCK, TIMOTHY) Modified on 6/26/2023 to remove duplicative exhibit text (mmy). (Entered: 06/23/2023) |
| 06/26/2023 | | Reset Deadlines as to 142 OBJECTION to 131 Order per Judge Wolf: Responses due by 6/30/2023. (mmy) (Entered: 06/26/2023) |
| 06/27/2023 | 145 | ORDER granting 143 Motion to Seal Exhibits to Objection to Magistrate Judge's Discovery Order dated June 1, 2023 By MAGISTRATE JUDGE KAREN FRINK WOLF. (mmy) (Entered: 06/27/2023) |
| 06/28/2023 | 146 | Minute Entry for proceedings held before MAGISTRATE JUDGE KAREN FRINK WOLF: Final Pretrial Conference held. Report and order to follow. (Court Reporter: Lori Dunbar) (MGW) (Entered: 06/28/2023) |
| 06/28/2023 | 147 | REPORT OF FINAL PRETRIAL CONFERENCE AND ORDER. Bench trial set. Trial Brief due by 7/5/2023. By MAGISTRATE JUDGE KAREN FRINK WOLF. (MGW) (Entered: 06/28/2023) |
| 06/30/2023 | 148 | RESPONSE to 142 OBJECTION to 131 Order *of Magistrate Judge on Discovery* filed by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit B−1, # 4 Exhibit Exhibit C, # 5 Exhibit Exhibit D)(WOODCOCK, TIMOTHY) (Entered: 06/30/2023) |
| 07/05/2023 | 149 | DEPOSITION of James Willis taken on 05−09−2023 filed by CHARLES SIDMAN. (PAPAZIAN, ROBERT) (Entered: 07/05/2023) |

| | | |
|---|---|---|
| 07/05/2023 | <u>150</u> | DEPOSITION of Valerie Peacock taken on 05−09−2023 filed by CHARLES SIDMAN. (PAPAZIAN, ROBERT) (Entered: 07/05/2023) |
| 07/05/2023 | <u>151</u> | DEPOSITION of Charles Sidman taken on 05−15−2023 filed by CHARLES SIDMAN. (PAPAZIAN, ROBERT) (Entered: 07/05/2023) |
| 07/05/2023 | <u>152</u> | DEPOSITION of Todd Gabe taken on 05−23−2023 filed by CHARLES SIDMAN. (PAPAZIAN, ROBERT) (Entered: 07/05/2023) |
| 07/05/2023 | <u>153</u> | DEPOSITION of Charles Sidman taken on 05−30−2023 filed by CHARLES SIDMAN. (PAPAZIAN, ROBERT) (Entered: 07/05/2023) |
| 07/05/2023 | <u>154</u> | DEPOSITION of Sarah Flink taken on 06−29−2023 filed by CHARLES SIDMAN. (PAPAZIAN, ROBERT) (Entered: 07/05/2023) |
| 07/05/2023 | <u>155</u> | DEPOSITION of Chris Martin taken on 05−30−2023 filed by CHARLES SIDMAN. (PAPAZIAN, ROBERT) (Entered: 07/05/2023) |
| 07/05/2023 | <u>156</u> | DEPOSITION of Charles Sidman taken on 06−06−2023 filed by CHARLES SIDMAN. (PAPAZIAN, ROBERT) (Entered: 07/05/2023) |
| 07/05/2023 | <u>157</u> | DEPOSITION of Angela Chamberlain taken on May 9, 2023 filed by TOWN OF BAR HARBOR. (ECONOMY, ALLISON) (Entered: 07/05/2023) |
| 07/05/2023 | <u>158</u> | TRIAL BRIEF by TOWN OF BAR HARBOR. (ECONOMY, ALLISON) (Entered: 07/05/2023) |
| 07/05/2023 | <u>159</u> | TRIAL BRIEF by CHARLES SIDMAN. (PAPAZIAN, ROBERT) (Entered: 07/05/2023) |
| 07/05/2023 | <u>160</u> | TRIAL BRIEF by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. (WOODCOCK, TIMOTHY) (Entered: 07/05/2023) |
| 07/05/2023 | <u>161</u> | DEPOSITION of Paul Grigsby taken on May 30, 2023 filed by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION. (KRAFT, KATHLEEN) (Entered: 07/05/2023) |
| 07/05/2023 | <u>162</u> | DEPOSITION of Juan Kuryla taken on May 31, 2023 filed by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION. (KRAFT, KATHLEEN) (Entered: 07/05/2023) |
| 07/05/2023 | <u>163</u> | DEPOSITION of Rob Van Den Hof taken on May 31, 2023 filed by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION. (KRAFT, KATHLEEN) (Entered: 07/05/2023) |
| 07/05/2023 | <u>164</u> | TRIAL BRIEF by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION. (KRAFT, KATHLEEN) (Entered: 07/05/2023) |
| 07/06/2023 | <u>165</u> | ORDER ON OBJECTION Overruling <u>142</u> Objection to Order <u>131</u> By JUDGE LANCE E. WALKER. (mmy) (Entered: 07/06/2023) |
| 07/06/2023 | <u>166</u> | ORDER ON PLAINTIFFS' MOTION TO EXCLUDE reserving ruling <u>125</u> Motion to Exclude Testimony of Expert Witness Charles Sidman By JUDGE LANCE E. WALKER. (mmy) (Entered: 07/06/2023) |
| 07/07/2023 | <u>167</u> | MOTION in Limine *to Exclude Defendant Intervenor's Witnesses* by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC Responses due by 7/28/2023. (WOODCOCK, TIMOTHY) (Entered: 07/07/2023) |
| 07/08/2023 | <u>168</u> | Motion(s) joined by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION : <u>167</u> MOTION in Limine *to Exclude Defendant Intervenor's Witnesses* filed by ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, BH PIERS LLC, ACADIA EXPLORER 492 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC . (KRAFT, KATHLEEN) (Entered: 07/08/2023) |
| 07/10/2023 | <u>169</u> | DEPOSITION of Richard Ade taken on May 25, 2023 filed by TOWN OF BAR HARBOR. (ECONOMY, ALLISON) Modified on 7/10/2023 to seal. Motion to Seal |

| | | |
|---|---|---|
| | | to be filed by counsel (mmy). (Entered: 07/10/2023) |
| 07/10/2023 | 170 | (Document sealed from public view) First MOTION to Seal by TOWN OF BAR HARBOR Responses due by 7/31/2023. (Attachments: # 1 DEPOSITION TRANSCRIPT)(ECONOMY, ALLISON) Modified on 7/14/2023 to correct event used from Sealed Motion to Motion to Seal and to correct attachment text to remove the word "Exhibit" (mmy). (Entered: 07/10/2023) |
| 07/10/2023 | 171 | Exhibit List *Joint Trial Exhibit List* by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC.. (GAU, JANNA) (Entered: 07/10/2023) |
| 07/11/2023 | 172 | Minute Entry for proceedings held before JUDGE LANCE E. WALKER: Bench Trial Begun. (Court Reporter: Cathy Ford) (mmy) (Entered: 07/11/2023) |
| 07/12/2023 | 173 | Minute Entry for proceedings held before JUDGE LANCE E. WALKER: Bench Trial Continues. (Court Reporter: Cathy Ford) (mmy) (Entered: 07/12/2023) |
| 07/13/2023 | 174 | Minute Entry for proceedings held before JUDGE LANCE E. WALKER: Bench Trial completed. (Court Reporter: Cathy Ford) (mmy) (Entered: 07/14/2023) |
| 07/13/2023 | 175 | ORAL MOTION for Judgment as a Matter of Law by CHARLES SIDMAN (mmy) (Entered: 07/14/2023) |
| 07/13/2023 | 176 | ORAL ORDER granting 167 Motion in Limine to to Exclude Defendant Intervenor's Witnesses By JUDGE LANCE E. WALKER. (mmy) (Entered: 07/14/2023) |
| 07/13/2023 | 177 | ORAL ORDER granting in part 125 Motion to Exclude Testimony of Expert Witness Charles Sidman for the reasons stated on the record. By JUDGE LANCE E. WALKER. (mmy) (Entered: 07/14/2023) |
| 07/14/2023 | 178 | ORDER denying 175 Motion for Judgment as a Matter of Law for the reasons stated on the record. By JUDGE LANCE E. WALKER. (mmy) (Entered: 07/14/2023) |
| 07/14/2023 | 179 | Court Witness List from Bench Trial held on 7/11/23 − 7/13/23. (mmy) (Entered: 07/14/2023) |
| 07/14/2023 | 180 | Court Exhibit List from Bench Trial held on 7/11/23 − 7/13/23 (Exhibits listed on the Court Exhibit List are not remotely electronically available). (mmy) (Entered: 07/14/2023) |
| 07/14/2023 | 181 | NOTICE of Docket Entry Modification regarding 170 (Document sealed from public view) MOTION to Seal: This docket entry was modified to correct motion type from "Sealed Motion" to "Motion to Seal", and to remove "Exhibit" attachment text. (mmy) (Entered: 07/14/2023) |
| 07/14/2023 | 182 | ORDER granting 170 Motion to Seal By JUDGE LANCE E. WALKER. (mmy) (Entered: 07/14/2023) |
| 07/26/2023 | 183 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings Bench Trial held on July 11, 2023 before Judge Lance E. Walker. Court Reporter/Transcriber: Cathy J. Ford, Telephone Number: (609) 367−2777. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.med.uscourts.gov.** Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 10/24/2023. (FORD, CATHERINE) (Entered: 07/26/2023) |
| 07/26/2023 | 184 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings Bench Trial held on July 12, 2023 before Judge Lance E. Walker. Court Reporter/Transcriber: Cathy J. Ford, Telephone Number: (609) 367−2777. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed,** |

| | | |
|---|---|---|
| | | **the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.med.uscourts.gov.** Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 10/24/2023. (FORD, CATHERINE) (Entered: 07/26/2023) |
| 07/26/2023 | 185 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings Bench Trial held on July 13, 2023 before Judge Lance E. Walker. Court Reporter/Transcriber: Cathy J. Ford, Telephone Number: (609) 367−2777. **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.med.uscourts.gov.** Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 10/24/2023. (FORD, CATHERINE) (Entered: 07/26/2023) |
| 07/31/2023 | 186 | Consent MOTION for Post−Trial Briefing Schedule and Page Limitations by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC Responses due by 8/21/2023. (Attachments: # 1 Text of Proposed Order)(GAU, JANNA) Modified on 8/1/2023 to remove duplicate text (mlm). (Entered: 07/31/2023) |
| 08/02/2023 | 187 | ORDER granting 186 Motion for Post−Trial Briefing Schedule and Page Limitations. By JUDGE LANCE E. WALKER. (mmy) (Entered: 08/02/2023) |
| 08/02/2023 | | Set Deadlines Regarding Order on Motion for Post−Trial Briefing Schedule and Page Limitations: Plaintiff/Intervenor−Plaintiff Brief Deadline (1) due by 9/1/2023. Defendant/Intervenor−Defendant Brief Deadline (2) due by 10/6/2023. Plaintiff/Intervenor−Plaintiff Reply Brief Deadline (3) due by 10/27/2023. (mmy) (Entered: 08/02/2023) |
| 08/02/2023 | 188 | *Plaintiffs'* NOTICE of Intent to Request Redaction by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC re 185 Transcript,,, 184 Transcript,,, 183 Transcript,,, *Plaintiffs'* (GAU, JANNA) (Entered: 08/02/2023) |
| 08/04/2023 | 189 | Transcript Errata Sheet Re: 183 Transcript,,, Release of Transcript Restriction set for 10/24/2023. (FORD, CATHERINE) Modified on 10/26/2023 to correct date of release transcript restriction deadline (mmy). (Entered: 08/04/2023) |
| 09/01/2023 | 190 | TRIAL BRIEF *(Post−Trial Brief)* by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION. (KRAFT, KATHLEEN) (Entered: 09/01/2023) |
| 09/02/2023 | 191 | TRIAL BRIEF *Plaintiffs' Post Trial Brief* by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. (GAU, JANNA) (Entered: 09/02/2023) |
| 09/02/2023 | 192 | Proposed Findings of Fact *Plaintiffs and Plaintiff−Intervenor's Joint Proposed Findings of Fact* by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC, PENOBSCOT BAY & RIVER PILOTS ASSOCIATION. (GAU, JANNA) (Entered: 09/02/2023) |
| 09/03/2023 | 193 | MOTION for Leave to File *Plaintiffs' Late Post Trial Brief* by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC Responses |

| | | |
|---|---|---|
| | | due by 9/25/2023. (WOODCOCK, TIMOTHY) (Entered: 09/03/2023) |
| 09/05/2023 | 194 | Joint MOTION for Leave to File *Plaintiffs' and Plaintiff−Intervenor's Late Filing of Joint Proposed Findings of Fact* by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC, PENOBSCOT BAY & RIVER PILOTS ASSOCIATION Responses due by 9/26/2023. (KRAFT, KATHLEEN) (Entered: 09/05/2023) |
| 09/06/2023 | 195 | ORDER granting 193 and 194 Motions for Leave to File Late Post Trial Brief/Proposed Findings of Fact By JUDGE LANCE E. WALKER. (mlm) (Entered: 09/06/2023) |
| 10/06/2023 | 196 | TRIAL BRIEF by TOWN OF BAR HARBOR. (HUNTER, JONATHAN) (Entered: 10/06/2023) |
| 10/06/2023 | 197 | BRIEF */POST−TRIAL MEMORANDUM* by CHARLES SIDMAN. (PAPAZIAN, ROBERT) (Entered: 10/06/2023) |
| 10/27/2023 | 198 | TRIAL BRIEF *Plaintiffs' Reply to Defendants' Post Trial Briefs* by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. (WOODCOCK, TIMOTHY) (Entered: 10/27/2023) |
| 10/27/2023 | 199 | TRIAL BRIEF *Pilots' Reply to Defendants' Post−Trial Briefs* by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION. (Attachments: # 1 **STRICKEN PER ORDER #204** Exhibit 1 − BH Oct 17 Agenda, # 2 **STRICKEN PER ORDER #204** Exhibit 2 − HAL 2025, # 3 **STRICKEN PER ORDER #204** Exhibit 3 − NCL 2025)(KRAFT, KATHLEEN) Modified on 12/1/2023 to indicate exhibits are stricken (mmy). (Entered: 10/27/2023) |
| 11/01/2023 | 200 | MOTION to Strike 199 Trial Brief *AND JOINT OBJECTION TO TRIAL BRIEF* by CHARLES SIDMAN, TOWN OF BAR HARBOR Responses due by 11/22/2023. (ECONOMY, ALLISON) (Entered: 11/01/2023) |
| 11/02/2023 | | Reset Deadlines as to 200 MOTION to Strike 199 Trial Brief *AND JOINT OBJECTION TO TRIAL BRIEF* per Judge Walker: Responses due by 11/9/2023. Reply due by 11/13/2023. (mmy) (Entered: 11/02/2023) |
| 11/09/2023 | 201 | RESPONSE in Opposition re 200 MOTION to Strike 199 Trial Brief *AND JOINT OBJECTION TO TRIAL BRIEF* filed by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION. Reply due by 11/24/2023. (KRAFT, KATHLEEN) (Entered: 11/09/2023) |
| 11/09/2023 | 202 | RESPONSE in Opposition re 200 MOTION to Strike 199 Trial Brief *AND JOINT OBJECTION TO TRIAL BRIEF Plaintiffs' Notice of Joinder in 201 Pilots' Response to Motion to Strike* filed by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. Reply due by 11/24/2023. (WOODCOCK, TIMOTHY) (Entered: 11/09/2023) |
| 11/13/2023 | 203 | REPLY to Response to Motion re 200 MOTION to Strike 199 Trial Brief *AND JOINT OBJECTION TO TRIAL BRIEF* filed by CHARLES SIDMAN. (PAPAZIAN, ROBERT) (Entered: 11/13/2023) |
| 12/01/2023 | 204 | ORDER granting 200 Motion to Strike 200 MOTION to Strike 199 Trial Brief By JUDGE LANCE E. WALKER. (mmy) (Entered: 12/01/2023) |
| 02/29/2024 | 205 | DECISION AND ORDER re 174 Bench Trial By JUDGE LANCE E. WALKER. (mmy) (Entered: 02/29/2024) |
| 03/01/2024 | 206 | AMENDED DECISION AND ORDER re 174 Bench Trial By JUDGE LANCE E. WALKER. (mmy) (Entered: 03/01/2024) |

| 03/01/2024 | 207 | JUDGMENT By DEPUTY CLERK: M. York (mmy) (Entered: 03/01/2024) |
|---|---|---|
| 03/14/2024 | 208 | BILL OF COSTS *and Declaration of Robert J. Papazian in Support of Bill of Costs* by CHARLES SIDMAN Responses due by 4/4/2024. (Attachments: # 1 Declaration of Robert Papazian ISO Bill of Costs, # 2 Exhibit A − Declaration of Robert Papazian)(PAPAZIAN, ROBERT) Modified on 3/14/2024 to remove duplicative exhibit text (mmy). (Entered: 03/14/2024) |
| 03/29/2024 | 209 | NOTICE OF APPEAL as to 206 Order on Bench Trial by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC . ( Filing fee $ 605 receipt number AMEDC−2933865.)<br><br>**NOTICE TO FILER:** A transcript Report/Order form <u>MUST</u> be completed and submitted to the First Circuit Court of Appeals. The form can be found under the Forms & Fees section on their website at https://www.ca1.uscourts.gov.<br><br>**NOTICE TO COUNSEL:** Counsel should register for a First Circuit CM/ECF Appellate Filer Account at https://pacer.psc.uscourts.gov. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at https://www.ca1.uscourts.gov/cmecf (Attachments: # 1 Appeal Cover Sheet)(WOODCOCK, TIMOTHY) (Entered: 03/29/2024) |
| 03/29/2024 | 210 | NOTICE OF APPEAL as to 206 Order on Bench Trial by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION *Filing Fee $605 receipt number AMEDC−2933889.*<br><br>**NOTICE TO FILER:** A transcript Report/Order form <u>MUST</u> be completed and submitted to the First Circuit Court of Appeals. The form can be found under the Forms & Fees section on their website at https://www.ca1.uscourts.gov.<br><br>**NOTICE TO COUNSEL:** Counsel should register for a First Circuit CM/ECF Appellate Filer Account at https://pacer.psc.uscourts.gov. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at https://www.ca1.uscourts.gov/cmecf (Attachments: # 1 Appellate Cover Sheet)(KRAFT, KATHLEEN) (Entered: 03/29/2024) |
| 04/02/2024 | | COPIES of Notice of Appeal Sent to Counsel Re: 209 Notice of Appeal filed by ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, BH PIERS LLC, ACADIA EXPLORER 492 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC; 210 Notice of Appeal filed by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION. (mmy) (Entered: 04/02/2024) |
| 04/02/2024 | 211 | APPEAL COVER SHEET Re: 209 Notice of Appeal (mmy) (Entered: 04/02/2024) |
| 04/02/2024 | 212 | APPEAL COVER SHEET Re: 210 Notice of Appeal (mmy) (Entered: 04/02/2024) |
| 04/02/2024 | 213 | CLERK'S CERTIFICATE Re: 209 Notice of Appeal. Documents sent to the U.S. Court of Appeals. (mmy) (Entered: 04/02/2024) |
| 04/02/2024 | 214 | CLERK'S CERTIFICATE Re: 210 Notice of Appeal. Documents sent to the U.S. Court of Appeals. (mmy) (Entered: 04/02/2024) |
| 04/02/2024 | | Abbreviated Appeal Records Transmitted Electronically to U.S. Court of Appeals re 209 Notice of Appeal; 210 Notice of Appeal (mmy) (Entered: 04/02/2024) |
| 04/02/2024 | 217 | USCA Case Number 24−1317 for 209 Notice of Appeal filed by ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, BH PIERS LLC, ACADIA EXPLORER 492 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. (mmy) (Entered: 04/10/2024) |
| 04/02/2024 | 218 | USCA Case Number 24−1318 for 210 Notice of Appeal filed by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION. (mmy) (Entered: 04/10/2024) |
| 04/04/2024 | 215 | RESPONSE to 208 BILL OF COSTS *and Declaration of Robert J. Papazian in Support of Bill of Costs − Plaintiffs' Opposition* filed by ACADIA EXPLORER 492 |

| | | |
|---|---|---|
| | | LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC. (WOODCOCK, TIMOTHY) (Entered: 04/04/2024) |
| 04/04/2024 | 216 | RESPONSE to 208 BILL OF COSTS *and Declaration of Robert J. Papazian in Support of Bill of Costs* filed by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION. (KRAFT, KATHLEEN) (Entered: 04/04/2024) |
| 04/12/2024 | 219 | Cross NOTICE OF APPEAL as to 206 Order on Bench Trial by CHARLES SIDMAN . ( Filing fee $ 605 receipt number AMEDC−2939699.)<br><br>**NOTICE TO FILER:** A transcript Report/Order form MUST be completed and submitted to the First Circuit Court of Appeals. The form can be found under the Forms & Fees section on their website at https://www.ca1.uscourts.gov.<br><br>**NOTICE TO COUNSEL:** Counsel should register for a First Circuit CM/ECF Appellate Filer Account at https://pacer.psc.uscourts.gov. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at https://www.ca1.uscourts.gov/cmecf (Attachments: # 1 Appeal Cover Sheet)(PAPAZIAN, ROBERT) (Entered: 04/12/2024) |
| 04/18/2024 | | COPIES of Notice of Appeal Sent to Counsel Re: 219 Notice of Appeal filed by CHARLES SIDMAN. (mmy) (Entered: 04/18/2024) |
| 04/18/2024 | 220 | APPEAL COVER SHEET Re: 219 Notice of Appeal (mmy) (Entered: 04/18/2024) |
| 04/18/2024 | 221 | CLERK'S CERTIFICATE Re: 219 Notice of Appeal. Documents sent to the U.S. Court of Appeals. (mmy) (Entered: 04/18/2024) |
| 04/18/2024 | | Abbreviated Appeal Record Transmitted Electronically to U.S. Court of Appeals re 219 Notice of Appeal (mmy) (Entered: 04/18/2024) |
| 04/18/2024 | 222 | USCA Case Number 24−1385 for 219 Notice of Appeal filed by CHARLES SIDMAN. (mmy) (Entered: 04/18/2024) |
| 05/24/2024 | 223 | ORDER of USCA as to 210 Notice of Appeal filed by PENOBSCOT BAY & RIVER PILOTS ASSOCIATION, 209 Notice of Appeal filed by ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, BH PIERS LLC, ACADIA EXPLORER 492 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC (clp) (Entered: 05/24/2024) |
| 05/30/2024 | 224 | Joint MOTION for Preliminary Injunction *Pending Appeal with Incorporated Memorandum of Law* by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC, PENOBSCOT BAY & RIVER PILOTS ASSOCIATION Responses due by 6/20/2024. (Attachments: # 1 Exhibit B − Bar Harbor Code Sec.125−77, # 2 Exhibit C − Town Council Statement 3.6.2024, # 3 Exhibit D − Sidman Complaint Excerpts, # 4 Exhibit E − Affidavit of Sarah Flink, # 5 Exhibit H − Trial Transcript Excerpts 7.11.2023, # 6 Exhibit I − DX 442, # 7 Exhibit J − Trial Transcript Excerpts 7.13.2023, # 8 Exhibit K − Town Motion to Dismiss Excerpts, # 9 Exhibit L − PX 192, # 10 Exhibit M − PX 191, # 11 Exhibit N − Bar Harbor Code, Ch. 125−109, # 12 Exhibit P − Affidavit of W. Walsh for B.H.W.W., LLC, # 13 Exhibit Q − Declaration of Captain David Gelinas, # 14 Exhibit R − Affidavit of W. Walsh for Golden Anchor, LC and BH Piers, LLC)(WOODCOCK, TIMOTHY) (Entered: 05/30/2024) |
| 05/30/2024 | 225 | Joint MOTION for Expedited Briefing Schedule by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC, PENOBSCOT BAY & RIVER PILOTS ASSOCIATION Responses due by 6/20/2024. (WOODCOCK, TIMOTHY) (Entered: 05/30/2024) |

| 05/31/2024 | 226 | ORDER granting 225 Motion for Expedited Briefing Schedule By JUDGE LANCE E. WALKER. (clp) (Entered: 05/31/2024) |
|---|---|---|
| 05/31/2024 | | Reset Deadlines as to 224 Joint MOTION for Preliminary Injunction *Pending Appeal* per order no. 226: Responses due by 6/6/2024. Reply due by 6/11/2024. (clp) (Entered: 05/31/2024) |
| 05/31/2024 | 227 | NOTICE of Appearance by JASON J. THEOBALD on behalf of CHARLES SIDMAN (THEOBALD, JASON) (Entered: 05/31/2024) |
| 05/31/2024 | 228 | Amended MOTION for Preliminary Injunction *Pending Appeal* by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC, PENOBSCOT BAY & RIVER PILOTS ASSOCIATION Responses due by 6/21/2024. (Attachments: # 1 Exhibit B − Bar Harbor Code Section 125−77, # 2 Exhibit C − Town Council Statement 3.6.2024, # 3 Exhibit D − Sidman Complaint Excerpts, # 4 Exhibit E − Affidavit of Sarah Flink, # 5 Exhibit H − Trial Transcript Excerpts 7.11.2023, # 6 Exhibit I − DX 442, # 7 Exhibit J − Trial Transcript Excerpts 7.13.2023, # 8 Exhibit K − Town Motion to Dismiss Excerpts, # 9 Exhibit L − PX 192, # 10 Exhibit M − PX 191, # 11 Exhibit N − Bar Harbor Code, Ch. 125−109, # 12 Exhibit P − Affidavit of W. Walsh for B.H.W.W., LLC, # 13 Exhibit Q − Declaration of Captain David Gelinas, # 14 Exhibit R − Affidavit of W. Walsh for Golden Anchor, LC and BH Piers, LLC)(WOODCOCK, TIMOTHY) (Entered: 05/31/2024) |
| 05/31/2024 | 229 | Joint MOTION to Amend Briefing Schedule by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC, PENOBSCOT BAY & RIVER PILOTS ASSOCIATION Responses due by 6/21/2024. (WOODCOCK, TIMOTHY) (Entered: 05/31/2024) |
| 05/31/2024 | 230 | ORDER granting 229 Joint Motion to Amend Briefing Schedule By JUDGE LANCE E. WALKER. (jwr) (Entered: 05/31/2024) |
| 05/31/2024 | | Reset Deadlines as to 228 Amended MOTION for Preliminary Injunction *Pending Appeal* per Order on Motion to Amend Briefing Schedule: Responses due by 6/7/2024. Reply due by 6/12/2024. (jwr) (Entered: 05/31/2024) |
| 05/31/2024 | 231 | ADDITIONAL ATTACHMENTS filed by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC, PENOBSCOT BAY & RIVER PILOTS ASSOCIATION re 228 Motion for Preliminary Injunction,,,, *Corrected Exhibit G − Declaration of Captain David Gelinas.*. (WOODCOCK, TIMOTHY) (Entered: 05/31/2024) |
| 05/31/2024 | 232 | ADDITIONAL ATTACHMENTS filed by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC, PENOBSCOT BAY & RIVER PILOTS ASSOCIATION re 228 Motion for Preliminary Injunction,,,, 231 Additional Attachments, *Correction to Previous Filing − Exhibit Q − Declaration of Captain David Gelinas.*. (WOODCOCK, TIMOTHY) (Entered: 05/31/2024) |
| 06/07/2024 | 233 | RESPONSE in Opposition re 228 Amended MOTION for Preliminary Injunction *Pending Appeal* filed by TOWN OF BAR HARBOR. Reply due by 6/21/2024. (Attachments: # 1 Exhibit EXHIBIT 1 AFFIDAVIT OF JAMES L. SMITH, # 2 Exhibit EXHIBIT 1−A PROPOSED RULES, # 3 Exhibit EXHIBIT 2− DECLARATION OF CHRISTOPHER WHARFF)(HUNTER, JONATHAN) (Entered: 06/07/2024) |
| 06/07/2024 | 234 | RESPONSE in Opposition re 228 Amended MOTION for Preliminary Injunction *Pending Appeal /DEFENDANT−INTERVENOR'S OPPOSITION TO PLAINTIFFS' AND PLAINTIFF−INTERVENOR'S AMENDED JOINT MOTION FOR INJUNCTION PENDING APPEAL* filed by CHARLES SIDMAN. Reply due by 6/21/2024. (Attachments: # 1 Exhibit 1 (1st Cir. 5−24−24 Order of Court))(THEOBALD, JASON) (Entered: 06/07/2024) |

| | | |
|---|---|---|
| 06/10/2024 | | Reset Deadlines as to <u>228</u> Amended MOTION for Preliminary Injunction *Pending Appeal* : Reply due by 6/12/2024. (clp) (Entered: 06/10/2024) |
| 06/12/2024 | <u>235</u> | REPLY to Response to Motion re <u>228</u> Amended MOTION for Preliminary Injunction *Pending Appeal* filed by ACADIA EXPLORER 492 LLC, ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, BH PIERS LLC, BHWW LLC, DELRAY EXPLORER HULL 493 LLC, DELRAY EXPLORER HULL 495 LLC, GOLDEN ANCHOR LC, PENOBSCOT BAY & RIVER PILOTS ASSOCIATION. (KRAFT, KATHLEEN) (Entered: 06/12/2024) |
| 06/21/2024 | <u>236</u> | ORDER ON MOTION FOR INJUNCTION PENDING APPEAL denying <u>228</u> Motion for Preliminary Injunction By JUDGE LANCE E. WALKER. (clp) (Entered: 06/21/2024) |
| 06/21/2024 | <u>237</u> | CLERK'S FIRST SUPPLEMENTAL CERTIFICATE Re: <u>210</u> Notice of Appeal, <u>219</u> Notice of Appeal, <u>209</u> Notice of Appeal. Documents Sent to U.S. Court of Appeals (clp) (Entered: 06/21/2024) |
| 06/21/2024 | | Supplemental Record on Appeal transmitted to US Court of Appeals re <u>209</u> Notice of Appeal, <u>210</u> Notice of Appeal, <u>219</u> Notice of Appeal (clp) (Entered: 06/21/2024) |

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, B.H. PIERS, L.L.C., GOLDEN ANCHOR L.C., B.H.W.W., L.L.C., DELRAY EXPLORER HULL 495 LLC, DELRAY EXPLORER HULL 493 LLC, and ACADIA EXPLORER 492, LLC, | ) ) ) ) ) ) ) ) | Civil Action No. |
| *Plaintiffs,* | ) ) ) | |
| v. | ) ) | |
| TOWN OF BAR HARBOR, a municipal corporation of the State of Maine, | ) ) ) | |
| *Defendant.* | ) ) ) | |

## VERIFIED COMPLAINT

Plaintiffs, the Association to Preserve and Protect Local Livelihoods ("APPLL"), B.H. Piers, L.L.C. ("BH Piers"), Golden Anchor, L.C., doing business as Harborside Hotel ("Harborside"), B.H.W.W., L.L.C. ("BHWW"), Delray Explorer Hull 495 LLC ("495"), Delray Explorer Hull 493 LLC ("493"), and Acadia Explorer 492, LLC ("492") (and together with APPLL, BH Piers, Harborside, BHWW, 495, and 493, "Plaintiffs"), through their attorneys, complain against Defendant the Town of Bar Harbor, ("Defendant" or "the Town"), as follows:

## SUMMARY

1.     This Complaint challenges, under the Constitution and the laws of the United States, the legality of efforts to all but close the port of Bar Harbor to cruise ships engaged in the interstate and foreign commerce of the United States through that certain Citizen Petition for Land Use Ordinance Amendment passed by the Town on November 8, 2022, as Article 3 of the Special Town Meeting Warrant and became an ordinance (the "Initiated Ordinance") of the Town,

1

pursuant to the Town Charter, effective as of December 8, 2022, which, by its terms, prohibits the disembarkation of more than one thousand (1,000) persons, including passengers and crew, cumulatively from cruise ships per day into the Town of Bar Harbor. Plaintiffs seek a declaration that the Initiated Ordinance is unconstitutional and otherwise unlawful and a permanent injunction against the implementation and enforcement of the Initiated Ordinance. Plaintiffs seek no monetary damages.

2.      The 1,000-person disembarkation limit, which covers passengers and crew, is antithetical to the Supremacy and Commerce clauses of the US Constitution and the resultant comprehensive federal regulatory scheme that governs the operations of cruise ships and maritime facilities. Federal regulations prescribe the operating standards and conditions of cruise ships, their crews, and maritime facilities with preemptive effect and provide implicit, if not explicit, authority for these ships and facilities to engage in the operations for which they have been federally approved. By imposing a draconian and arbitrary limitation on passenger and crew disembarkations from cruise ships, the Initiated Ordinance impermissibly bars cruise ships and maritime facilities from engaging in their federally approved operations in the port of Bar Harbor that passenger and cruise ships have safely engaged in at that port for decades.

3.      The Initiated Ordinance will exclude cruise ship visitors, but not visitors arriving by any other conveyance, from the Town, purportedly to conserve Town resources and enhance the lives and safeguard the health, safety, and welfare of the Town's residents. The Initiated Ordinance discriminates against interstate and foreign commerce, and its application of the 1,000-person limit only to cruise ships and cruise ship visitors is not the least discriminatory means available to achieve the purported purpose of the Town Council of Bar Harbor (the "Initiative"). The Initiated Ordinance will also have impacts outside of the Town and the State of Maine. It will

2

App. 027

also cause disruption of cruise ship commerce up and down the Eastern Seaboard that greatly outweighs any asserted conservation of Town resources that is purported to result from the unlawful exclusion of less than ten percent of all visitors to the Town.

4.      The Initiated Ordinance is not rationally related to its purpose and objectives in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

5.      Plaintiffs allege that the Initiated Ordinance is invalid under United States Constitution and federal statutory protections. Plaintiffs seek declaratory and injunctive relief barring the enforcement of the Initiated Ordinance.

**PARTIES**

6.      Plaintiff APPLL is a not-for-profit 501(c)(6) organization, duly organized under the laws of the State of Maine, with a principal place of business in the Town of Bar Harbor, County of Hancock, State of Maine. Plaintiff APPLL is comprised of members ("APPLL Members") that own and/or operate businesses in Bar Harbor and have combined their resources to advocate for the preservation and protection of local businesses and livelihoods. APPLL Members include owners and employees of restaurants, retail stores and tour-related businesses, among others. Consistent with its articles of incorporation, APPLL's purposes include, but are not limited to, empowering and supporting local business owners and employees and protecting their way of life, advocating for businesses in and around the Mount Desert region, and resisting measures that would impinge on business conditions or the local economy. APPLL exists so that its members can work together to protect tourism from inequitable treatment and legislation that discriminates against maritime tourism. APPLL Members are bringing this case because they recognize the

App. 028

economic benefits that result from maritime visitor spending. The Board of APPLL has specifically authorized its president to review and verify the allegations of this Complaint.

7.      Plaintiff BH Piers is a limited liability company, duly organized under the laws of the State of Maine, with a principal place of business in the Town.

8.      Plaintiff BH Piers operates a pier located at 1 West Street, commonly known as Harbor Place in Bar Harbor, Maine. One of the pier's uses is landing passengers and crew from cruise ships anchored in Frenchman Bay. BH Piers' operation is in full compliance with United States Coast Guard rules and regulations, pursuant to 33 C.F.R. § 105.200. A true and accurate copy of BH Piers' Federal Overlay Plan ("Approval") is attached hereto as Exhibit A.

9.      Plaintiff Golden Anchor (herein "Golden Anchor" and "Harborside") is a limited liability company, duly organized under the laws of the State of Florida, with a principal place of business in Delray Beach, County of Palm Beach, State of Florida, authorized to transact business in the State of Maine.

10.     Harborside operates a pier at 55 West Street in the Town. One of the uses of the pier is landing passengers and crew from cruise ships anchored in Frenchman Bay. Harborside's operation is in full compliance with United States Coast Guard rules and regulations, pursuant to 33 C.F.R. § 105.200. A true and accurate copy of Harborside's Approval, is attached hereto as Exhibit A.

11.     Plaintiff BHWW is a limited liability company, duly organized under the laws of the State of Maine, with a principal place of business in the Town, doing business as Bar Harbor Whale Watch Company.

12.     Plaintiff 495 is a Florida limited liability company. 495 owns and operates a 149-passenger custom built cruise ship tender vessel that is used to ferry cruise ship passengers and

App. 029

crew to and from the landings of BH Piers and Harborside for their disembarkations and visits to the Town.

13.     Plaintiff 493 is a Florida limited liability company. 493 owns and operates a 149-passenger custom built cruise ship tender vessel that is used to ferry cruise ship passengers and crew to and from the landings of BH Piers and Harborside for their disembarkations and visits to the Town.

14.     Plaintiff 492 is a Florida limited liability company. 492 owns and operates a 149-passenger custom built cruise ship tender vessel that is used to ferry cruise ship passengers and crew to and from the landings of BH Piers and Harborside for their disembarkations and visits to the Town.

15.     BHWW, Golden Anchor, BH Piers, 495, 493 and 492 are affiliated entities. 495, 493 and 492 are sometimes referred to, collectively, in this Complaint as the "Tender Owners."

16.     Defendant Town is a municipal corporation, duly organized under the laws of the State of Maine, and its principal place of business is in the County of Hancock, State of Maine.

## JURISDICTION AND VENUE

17.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts over actions arising under the Constitution or laws of the United States. This case arises under the Commerce Clause of the Constitution, Article I, Section 8, the Treaty Clause of the United States Constitution, Article II, Clause 2, the federal authority over maritime and navigable waters, certain statutes and regulations of the United States, and the Due Process Clause of the Fourteenth Amendment to the United States Constitution, all of which, pursuant to the Supremacy Clause, Article VI of the United States Constitution, are the supreme law of the land and this case is brought pursuant to 42 U.S.C. § 1983.

App. 030

18.     This suit is brought pursuant to 42 U.S.C. § 1983, which provides, in part, as follows: "Every person who under color of any statute, ordinance, regulation, custom, usage of any state or territory subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to a deprivation of any rights, privileges, immunity secured by the Constitution shall be liable to the party injured in an action at law or in equity or other proper proceedings for redress."

19.     Venue is proper in the District of Maine pursuant to 28 U.S.C. § 1391 because Defendant is located in this District. In addition, a substantial part of the events or omissions giving rise to the claims, specifically, the passage of the Initiated Ordinance, occurred in this District.

20.     The Court has authority to enjoin enforcement of the Initiated Ordinance under 42 U.S.C. § 1983 and to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## **FACTUAL BACKGROUND**

### *The Cruise Industry in Bar Harbor*

21.     Bar Harbor serves as a popular access point for both Acadia National Park, which experienced approximately four million visitors in 2021, and cruises to the Canadian Maritimes. Both overnight and daytime visitors are drawn to Bar Harbor because of its proximity to the Maine coast and Acadia National Park. The Town has also been a sought after tourist destination since the 1880's with its cottages, hotels and shops set in a pastoral and waterfront setting.

22.     In 1998, Bar Harbor developed and adopted a plan called the "Bar Harbor Waterfront Master Plan." The plan (the "Master Plan") identified several infrastructure improvements the Town should consider to facilitate the increase in cruise ship visitation and the Town went ahead actively developing a plan to attract cruise ship visitation with the goal of

developing, growing, and supporting the cruise ship economy in coordination with Maine Department of Transportation and the Maine Port Authority.

23.     The Master Plan was embraced by the Town, the State of Maine, the cruise industry, and the owners of privately-owned key waterfront parcels, all of which worked together for years to develop Bar Harbor as the arrival gateway for visitors. In furtherance of that objective, millions of dollars were spent on the infrastructure required to enable Bar Harbor to welcome large cruise ship and to safely tender their passengers and crew aboard custom-made cruise ship tender vessels.

24.     In furtherance of the Master Plan and in reliance on the Town and the State of Maine's commitment to cruise ship tourism in Bar Harbor, the Tender Owners collectively expended $17,800,000 on their tender boats. BH Piers and Harborside each went through a lengthy and expensive process to acquire and renovate their respective piers to accommodate cruise passenger tourism. As explained in more detail below, these funds were expended by BH Piers, Harborside, BHWW, and the Tender Owners in reliance on the Town and the State of Maine's commitment to cruise ship tourism in Bar Harbor. At all relevant times hereto, the anticipated volume of this cruise ship tourism involved disembarkation of anticipated 2,000 to 4,500 cruise ship tourists (average daily) on cruise ships that call on the port of Bar Harbor.

25.      Bar Harbor has the distinction of being one of the most convenient and practical customs point of entry capable of accommodating the large number of cruise ships that re-enter the United States from foreign waters each season. Those cruise ships anchor outside the town's municipal jurisdiction at the two separate federally-designated anchorages in Frenchman Bay up to two miles away from the passenger landing areas in Bar Harbor.

26.     Once anchored, BHWW custom barges are ferried to the cruise ship where the barges are safely secured to the ship so the tender boats can have a stable docking area to accept

App. 032

passengers. The tender boats owned by the Tender Owners (and at times boats owned by entities related to the Tender Owners) ferry passengers and crew between the custom barges secured to the cruise ships and the two Coast Guard approved private piers in Bar Harbor at Harbor Place and Harborside Docks, owned and operated by BH Piers and Harborside.  These two private piers are the only cruise ship tender landing facilities in the Town.

27.     The private piers are specifically designed and designated as secure facilities for the purpose of receiving cruise ship passengers and crew. These operations are duly and properly approved by the United States Coast Guard. *See* ¶¶ 8, 10 *supra*. BH Piers and Harborside each went through an exacting, rigorous, and costly process in order to gain their U.S. Coast Guard Approvals. BH Piers and Harborside incurred the expense of acquiring the property and underwent the federal process for obtaining their Coast Guard Approvals for the express purpose of engaging in the business of disembarking cruise ship passengers and crew at their respective piers.

28.     On a daily basis, when cruise ships call at Bar Harbor, they typically arrive in the morning and depart later the same day. Once on land, typically for no more than six (6) hours, passengers and crew cross a private landing site and proceed into Bar Harbor, patronizing shops, museums, restaurants, tour services, and other hospitality-related services in the Town or in the surrounding areas, including Acadia National Park.

29.     Prior to the COVID-19 pandemic, approximately 158 cruise ships, carrying a potential 249,080 passengers, were scheduled to call at Bar Harbor in 2019.

30.     Cruise ship visitation has a positive, outsized economic impact in Bar Harbor. A peer-reviewed twenty-year study of monthly taxable Bar Harbor restaurant sales, including data from January of 2000 to December of 2019, using a time-series regression model, reveals much about the beneficial economic impact of cruise ship visitations during that time period. This

lengthy study of the cruise industry in Bar Harbor encompasses a sufficient time frame for determining how restaurant sales are related to the presence of overnight visitations, the impact of Acadia National Park visitors, the number of cruise ship passengers that disembark, and the general variation in restaurant sales nationally.

31.     In 2019, each cruise ship passenger spent an average of $21.83 on food and drink while in port. Based on the estimated number of cruise ship passengers that disembarked each month in 2019 and the estimated restaurant spending of $21.83 per passenger, cruise ship passengers had their greatest relative impacts in September (10% of restaurant sales) and October (12% of restaurant sales). These figures are not surprising because, the Town, by its own design, has the highest number of cruise ship passengers in September and October, while overnight tourism slows down in the fall. In 2019, the overall economic impact of cruise ship passengers, which included spending at restaurants and other purchases prior to COVID-19, was $23.5 to $31.5 million.

32.     This economic activity is essential to many businesses that have grown to support the cruise industry in Bar Harbor, including restaurants, retail, and tour-based businesses.  When the COVID-19 pandemic forced the shutdown of cruise travel in 2020, and no cruise ships came to Bar Harbor, Bar Harbor businesses immediately felt the impact.  For example, Bar Harbor restaurant sales in October 2020 decreased by 47 percent as compared to that same month in 2019. *Id*.

33.     For many years, the Town (fully considering any impact on the Town and its facilities and services) has managed cruise ship visitation. Since 2008, the Town has established voluntary and variable cruise ship "daily caps" of 5,500 passengers per day for the months of May, June, September and October, and 3,500 passengers per day for the months of July and August.

34.     For more than 15 years, the Town and its Cruise Ship Committee and Town Staff have negotiated voluntary caps and have again entered into voluntary caps with the cruise industry for a modified cruise schedule for 2023 and beyond.

35.     On February 15, 2022, the Town Council approved the formation and membership of a working group to negotiate with the cruise industry for a voluntarily-modified cruise schedule for 2023 and beyond.

36.     On August 16, 2022, as a result of the efforts of the Town's working group, the Town Council adopted the cruise ship scheduling plan, which included a shortened cruise ship season and passenger caps that, in some cases, would voluntarily reduce the number of daily cruise visitors disembarking at Bar Harbor.

37.     In September and October 2022, the Town entered into Memoranda of Agreement ("MOA") with each of various cruise lines,[1] whereby the cruise lines voluntarily agreed that, in the months of May, June, September and October, they would limit aggregate daily passenger disembarkations to 3,800 passengers, and in the months of July and August would limit daily passenger disembarkations to 3,500 passengers.

### The Citizens' Initiative

38.     On March 16, 2022, a citizens' group submitted a petition to the Town Council of Bar Harbor (the "Initiative").

---

[1] The cruise lines signing the MOA include American Cruise Lines, Disney Cruise Lines, Holland America Line, Hurtigruten Expeditions, Norwegian Cruise Line, Pearl Seas Cruises, Princess Cruises, Royal Caribbean Cruises, Ltd., Seabourn Cruise Line, Viking Cruises, and Windstar Cruises Marshall Islands.

App. 035

39.     The Initiative amends the Bar Harbor Code ("Town Code"), Chapter 125, Article VII, by adding Section 125-177(H). A true and accurate copy of the Initiative is attached hereto as Exhibit B.

40.     Substantively, as to the daily limit for persons disembarking from a cruise ship, the Initiative proposed an amendment to the land use ordinance of the Town Code prohibiting the disembarkation of more than 1,000 "passengers" from cruise ships per day on, over, or across any property located within the Town.

41.     The Initiative provided that, "no more than 1,000 *passengers*, in the aggregate, may disembark on a single calendar day from any cruise ship(s) and come to shore on, over, or across any property located within the Town of Bar Harbor." *Id.* at § 125-77(H)(2) (emphasis added).

42.     The Initiative also charged the Town's Harbormaster with duties that include but are not limited to "determin[ing]" whether and when the 1,000-passenger limit has been exceeded in each calendar day. *Id.* It also charged the Harbormaster with devising "a reservation system for cruise ships that transport persons by watercraft for disembarkation in the Town of Bar Harbor"; a "mechanism for counting and tracking the number of persons disembarking each day"; a "mandatory procedure for reporting violations to the Code Enforcement Officer." *Id.*

43.     The Initiative provided further that "[a]ny property owner issued a permit under this § 125-77(H) shall comply with all rules and regulations promulgated by the Harbormaster [pursuant to the Initiative]." *Id.*

44.     The Initiative empowered the Code Enforcement Officer to impose "fines, penalties, actions" with the specific provision that "each disembarking person exceeding the permitted daily limit" could result in a $100 fine "per excess unauthorized person" to be imposed on property owners to whom permits have been issued. *Id.* at § 125-77(H)(4). The only property

11

owners susceptible to fines under the Initiative are BH Piers and Harborside, because these entities are the only owners of property on which cruise ship disembarkations occur.

45.     The Initiative was to be expressly retroactive to March 16, 2022, but included a provision that it will not apply to "any cruise ship reservations that have been accepted by the Harbormaster prior to March 16, 2022" and provided further that "the Town will not take any enforcement action . . . with regard to any cruise ship visits occurring prior to the date of adoption at Town Meeting, [November 8, 2022]." *Id.* § 125-77(H)(5).

46.     The Initiative is accompanied by a "Purpose" section, which was not enacted into law. The Purpose section broadly asserts that "large numbers of [cruise ship] passengers" entering into the limits of the Town of Bar Harbor "have overwhelmed the downtown area, resulting in excessive congestion and traffic on public streets and sidewalks, frequent overcrowding of parks and other spaces, and inundating local amenities and attractions, all of which results in a diminished quality of life for Town residents." *Id.* Purpose, ¶ 1.

47.     The Purpose section of the Initiative asserted further that:

the presence of disembarking cruise ship passengers in the downtown area jeopardizes the Town's ability to deliver municipal services to Town residents and visitors (for example, cruise ship passengers), including the provision of public safety services (police and fire), emergency medical services (EMS), in-patient and out-patient services at local hospitals, pandemic control measures, and public sanitation services, and also impacts the ability of local shops, restaurants, and other businesses to attract and serve customers.

*Id*.

48.     The Purpose section identified only passengers arriving by cruise ship as the cause of the alleged burdens on the Town's public services, businesses, and healthcare providers.

49.     The stated Purpose of the Initiative is mere pretense and was unsupported by relevant facts or data. Although not expressly stated, the Initiative's purpose—and actual

12

App. 037

effect—is to bar virtually all cruise ships that have safely visited Bar Harbor for decades and to bar the passengers who patronize those cruise ships from entering the Town.

50.     On August 2, 2022, the Town Council voted to place the Initiative on the warrant articles calling the November town meeting warrant. A true and accurate copy of the Order placing the Initiative on the warrant articles is attached hereto as Exhibit C.

51.     The Initiative was listed as Article 3 on the Warrant for the November 8, 2022, Special Town Meeting. A true and accurate copy of the Special Town Meeting Warrant, which includes Article 3, is attached hereto as Exhibit D.   On August 2, 2022, when the Council adopted Warrant Article 3 to advance the form of the initiative ordinance to the voters at Town Meeting on November 8, 2022, the approved text in the Council's Warrant used a form of Ordinance that used the term "persons" throughout the Initiated Ordinance. As a result, the 1000 *passenger* per day cap on disembarkations is now a 1000-*person* cap, clearly encompassing all types of travelers on cruise ships (passengers and crew).  In all staff memoranda to the Council subsequent to November 8, 2022, Town officials acknowledge that the term "persons" in the Initiated Ordinance includes both passengers and crew.

52.     On November 8, 2022, the Initiative was passed by the Bar Harbor Town Meeting as Article 3 of the Special Town Meeting Warrant and became an ordinance (the "Initiated Ordinance") of the Town, pursuant to the Town Charter, effective as of December 8, 2022.

53.     By its terms, the Initiated Ordinance applies to "persons" (both crew and passengers) and it also exclusively applies to "cruise ships" as defined in Section 153-22(B) in the Town Code. Under the Town Code, "[C]ruise ship" means a watercraft carrying passengers for hire which is capable of providing overnight accommodations for 49 or more passengers." It does not apply to any other vessel of any type or size.

App. 038

54.     The State of Maine, the Town and private businesses have for decades solicited the cruise lines to include Bar Harbor as a port-of-call on cruise itineraries, and cruise lines have done so because it is popular with cruise passengers. Cruise passengers want to visit Bar Harbor and Acadia National Park. They want to get off the ship, visit the Town, and tour the surrounding area. A cruise itinerary with a stop at Bar Harbor loses its appeal if passengers cannot get off the ship. Cruise vessels simply will not call at Bar Harbor if, by law or by the happenstance of timing, all passengers cannot choose to disembark and enjoy shore-side activities.

55.     The terms of the Initiated Ordinance effectively prohibit most cruise ships from otherwise being able to book calls at the port of Bar Harbor as cruise lines do not book ports where the local town does not allow all persons on the ship the option to disembark.

56.     Most cruise lines schedule vessels in excess of 1,000-passenger lower berth capacity for calls at Bar Harbor. The Initiated Ordinance prohibits these vessels from disembarking their full complement of potential passengers.

57.     The terms of the Initiated Ordinance would prohibit even a vessel with a lower berth capacity of fewer than 1,000 passengers from disembarking its full complement of potential passengers (or crew) if one or more other cruise vessels already has disembarked passengers (or crew) that day.

58.     The Initiated Ordinance immediately renders the Town an unviable destination port-of-call. This is because cruise line itineraries are planned years in advance, and if forced to now meet the 1,000-person requirement, it effectively makes the port not viable for the cruise lines which have historically used the port of Bar Harbor to disembark all of their passengers. And, once cruise lines schedule their vessels to visit other ports, it could take years to reestablish cruise line confidence in calling at the port of Bar Harbor.

59.     The reduction in the number of disembarking persons caused by the Initiated Ordinance impacts the economic viability of Tender Owners having and maintaining infrastructure and staff to the point that Tender Owners will be forced to close.

60.     Without historical cruise ship passenger traffic, the tendering operations of the Tender Owners and the private pier facility operations of BH Piers and Harborside are effectively obsolete.

61.     The Initiated Ordinance eliminates the good will that the Tender Owners have developed over decades with its customers, as well as the customer contacts and referral sources of the cruise lines that frequent the Town.

62.     The Initiated Ordinance will have these further impacts: (a) it will render the property interests of BH Piers and Harborside in their U.S. Coast Guard Approvals essentially valueless, (b) it will substantially reduce the value of the disembarkation points owned by Golden Anchor (Harborside Docks) and BH Piers (Harborplace) that are the subject of the U.S. Coast Guard Approvals, (c) it will cause the loss of the vast majority of the tendering business of BHWW and its affiliates, (d) it will render the tender vessels obsolete for their designed purpose and will cause the Tender Owners to lose the revenue necessary to sustain their respective businesses and be forced to close, and (e) it will dramatically reduce the revenue previously generated along the Bar Harbor waterfront through the operation of whale watch boats, lighthouse tours and nature cruises as well as revenue previously generated by the operators of the shops and restaurants that rely on the business provided by cruise ship passengers, some of whom may be forced out of business.

63.     The custom-built barges owned by BHWW utilized to assist in safely disembarking and embarking cruise ship passengers from the ships to and from tender vessels, will be obsolete and they will be unable to generate enough revenue to sustain their use for their intended purpose.

64.     APPLL Members' businesses and the other Plaintiffs' businesses, which include barge work, tendering, restaurants, tour businesses, retail businesses, and Coast Guard-approved related facilities, will be severely damaged by the Initiated Ordinance and its implementation will harm the ability of their employees to earn a living.

65.     Plaintiffs have been damaged and continue to be damaged by the unconstitutional Initiated Ordinance.

66.     All conditions precedent to the relief requested in this Complaint have been performed or have occurred.

## CLAIMS FOR RELIEF

### COUNT I
*(Violation of the Supremacy Clause, Article VI, Clause 2, of the U.S. Constitution)*

67.     Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 6 through 66 as if fully set forth herein.

68.     The Supremacy Clause ensures that the "[U.S.] Constitution, and the Laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." U.S. Const., art. VI, cl. 2.

69.     Pursuant to this mandate, state law yields to federal law in three instances: when Congress states its intention to displace state law in a federal statute (express preemption), where the federal interest is so dominant that the federal system will preclude enforcement of state laws on the same subject (field preemption), and where the state or local law "stands as an obstacle to

16

App. 041

the accomplishment and execution of the full purpose and objectives of Congress" or compliance

with both state and federal law is impossible (conflict preemption). *Young v. Coloma-Agaran*, No.

00-00774, 2001 WL 1677259 (D. Hawaii Dec. 27, 2001), *aff'd*, 340 F.3d 1053 (9th Cir. 2003).

70.    The Constitution and a wide array of federal statutes recognize the primacy and

virtual exclusivity of federal authority over maritime activities. *See United States v. Locke*, 529

U.S. 89, 108 (2000) ("Congress has legislated in the field from the earliest days of the Republic,

creating an extensive federal statutory and regulatory scheme."). Because only confusion and

difficulty would result if "vessels were compelled to comply with the local statutes at every port[,]"

local interests "yield" to the Constitution in the field of maritime commerce. *State of Washington*

*v. W.C. Dawson & Co.,* 264 U.S. 219 (1924); *see Foremost Ins. Co. v. Richardson,* 457 U.S. 668,

674-75 (1982) (federal interest in maritime commerce can only "be fully vindicated if all operators

of vessels on navigable waters are subject to uniform rules of conduct.").

71.    Establishing and maintaining ports of call is essential to the health and stability of

the cruise line industry.  The Eleventh Circuit Court of Appeals observed that:

> Ports-of-call not only add to the enjoyment of a cruise but form an
> essential function of the cruise experience…[p]lainly, individuals
> choose cruise ship vacations because they want to visit unfamiliar
> places ashore. Cruises . . . offer fundamentally different experiences,
> not generally because of any material difference between ships, but
> often because of where the ships elect to *stop. See Isham v. Pacific*
> *Far East Line, Inc.,* 476 F.2d 835, 837 (9th Cir.1973) ("Where a
> passenger or cruise vessel puts into numerous ports in the course of
> a cruise, these stopovers are the sine qua non of the cruise."). When
> a passenger selects a particular cruise, ports-of-call or stopovers
> provide those passengers with the "cruise experience" for which
> they are paying. Simply put, the destinations or ports-of-call are
> frequently the main attraction.

*Doe v. Celebrity Cruises, Inc*., 394 F.3d 891, 901 (11th Cir. 2004) (emphasis in original).

**App. 042**

72.     A substantial body of federal law controls and regulates the operations of cruise vessels serving the interstate and foreign maritime commerce of the United States. Cruise vessels are subject to federal inspection and supervision in a variety of areas, including construction standards, environmental protection requirements, operational procedures, customs and immigration compliance, security measures, and health and safety requirements.

73.     The United States Coast Guard and other federal agencies, such as the Centers for Disease Control and Prevention ("CDC"), Environmental Protection Agency ("EPA"), and Federal Maritime Commission ("FMC"), routinely prescribe practices, procedures, and standards for vessel operations and, in the interests of safety, environmental protection, and maritime and national security, direct where vessels may (and may not) operate or anchor. *See*, *e.g.*, 46 C.F.R. Subchapter H; 33 U.S.C. §1322. The Coast Guard's Title 46 regulations "have the force of law" and "preemptive effect over State or local regulations in the same field." 46 C.F.R. § 70.01-1.

74.     Under this comprehensive federal statutory and regulatory regime, it is clear that granting (or revoking) permission for a carrier to enter a U.S. port, disembark, and begin operation, lies solely with the federal government.[2] State or local laws that ban federally licensed vessels from calling at a port violate the Supremacy Clause. *See Young v. Coloma-Agaran*, 340 F.3d 1053, 1057 (9th Cir. 2003).

---

[2] For example, the CDC made clear in its directives to the maritime industry responding to the global COVID-19 pandemic that the federal government alone grants (or denies) permission for a carrier to enter a U.S. port, disembark, and begin operation in international, interstate, or intrastate waterways subject to the jurisdiction of the United States. CDC, *Second Modification and Extension of No Sail Order and Other Measures Related to Operations* (July 16, 2020); *see also* 42 C.F.R. § 71.1(b) (defining "controlled free pratique" as "permission for a carrier to enter a U.S. port, disembark, and begin operation under certain stipulated conditions.").

75.     Cruise ships calling at the port of Bar Harbor and their operations, including accepting disembarking cruise ship passengers, are regulated by the federal government and such cruise ships operate under valid Coast Guard Certificates of Inspection issued pursuant to regulations at Title 46, Chapter 1, Subchapter H.[3]  Having satisfied all federal requirements for their operations, these cruise ships are authorized to engage in the activities for which they have been certified.

76.     The Town cannot exclude federally regulated and federally certified cruise ships from its port through the Initiated Ordinance. *See Young v. Coloma-Agaran*, 340 F.3d 1053, 1057 (9th Cir. 2003) (state or local laws that ban federally licensed vessels from calling at a port violate the Supremacy Clause).

77.     The proposed 1,000-person daily disembarkation limit will effectively prohibit the cruise fleet that has for decades been solicited by the State of Maine and the Town from calling at Bar Harbor, despite these vessels being physically able to operate safely in the navigable waters surrounding the Town and despite these vessels meeting all applicable federal (and international) standards. The 1,000-person limit in the Initiated Ordinance on all persons on cruise ships disembarking each day will effectively prohibit most every cruise line from booking calls at the Port of Bar Harbor. That impact will result in a consequent reduction of more than ninety percent (90%) of cruise ship visitors into the Port of Bar Harbor.

78.     The federal government, through the United States Coast Guard, also regulates maritime facilities that receive vessels certified to carry more than 150 passengers. *See* 33 C.F.R. § 105.105(a)(2).

---

[3] As noted above, these regulations "have preemptive effect over State or local regulations in the same field." 46 C.F.R. § 70.01-1.

App. 044

79.     Like the Title 46 regulations, the regulations at Title 33, Chapter 1, Subchapter H, Part 105 "have preemptive effect over State or local regulations insofar as a State or local law or regulation applicable to the [federally regulated] facilities … would conflict with the regulations in part 105, either by actually conflicting or by frustrating an overriding Federal need for uniformity." 33 C.F.R. § 101.112(b).

80.     Among other things, the Part 105 regulations require that the owner or operator of a covered maritime facility ensure shore access to individuals who work on the vessels ("seafarers", *i.e.*, the crew) and those who provide services to seafarers. 33 C.F.R. § 105.237. A maritime facility operating pursuant to Part 105 cannot provide timely access to some seafarers and not others.

81.     BH Piers and Harborside administer maritime facilities regulated by the federal government, specifically the United States Coast Guard. Each has approvals pursuant to 33 C.F.R. Part 105 from the Coast Guard to operate their facilities. *See* <u>Exhibit</u> <u>A</u>.

82.     The Initiated Ordinance applies to all persons (passengers and crew) seeking to disembark from cruise vessels.  In addition to unlawfully limiting passengers' disembarkations, the 1,000-*person* daily cap directly conflicts with, and is expressly preempted by, federal law and regulations requiring that maritime facilities, like those operated by Plaintiffs BH Piers and Harborside, provide timely access to all seafarers (*i.e.*, crew) seeking to disembark at the facility.

83.     Under federal law, Plaintiffs BH Piers and Harborside cannot provide access to some seafarers and not others. Yet access for some, not all, seafarers is exactly the effect of the Initiated Ordinance.  Plaintiffs BH Piers and Harborside cannot comply with both federal law and the Initiated Ordinance. The Initiated Ordinance's draconian and arbitrary limitations on the number of persons allowed to disembark at and through BH Piers' and Harborside's maritime

facilities hinder and frustrate BH Piers' and Harborside's ability to conduct their operations in accordance with federal requirements.

84.     A disparate state law also "must yield when it is inconsistent with, or impairs the policy or provisions of, a treaty or of an international compact or agreement." *United States v. Pink*, 315 U.S. 203, 231 (1942).

85.     The cruise industry is inherently international. A "significant and intricate complex of international treaties and maritime agreements[,]" in addition to the above-mentioned federal regulations, "bear[ ] upon the licensing and operation of vessels." *Locke*, 529 U.S. at 102. The United States is a party to, among other treaties and agreements, the *International Convention for the Safety of Life at Sea*, 1974, 32 U.S.T. 47, T.I.A.S, No. 9700, the *International Convention for Prevention of Pollution from Ships*, 1973, S. Exec. Doc. C, 93-1, 12 I.L.M. 1319, as amended by 1978 Protocol, S. Exec. Doc. C., 96-1, 17 I.L.M. 546, and the *International Convention of Standards of Training, Certification and Watchkeeping for Seafarers*, With Annex, 978 (STCW), S. Exec. Doc. EE-96-1, C.T.I.A. No. 7624. *See id.*

86.     These conventions, established under the auspices of the International Maritime Organization (IMO) and, by extension, the United Nations, bind signatory maritime nations to minimum standards for vessels flying their own flag and establish mutual cooperation among Port States to ensure uniformity of enforceable standards that each party imposes on vessels of other nations and impose the sole enforceable standards that each party may impose on the vessels of other signatory nations' flags.

87.     A key structural component of the network of maritime treaties and conventions to which the United States is a party is the notion of reciprocity—signatory nations, including the United States, accept compliance by another nation as satisfying conditions for port entry. When

App. 046

the national government has exercised its indisputable foreign affairs powers to commit the Nation to vessel standards agreed to by various maritime countries, it is clear that a municipality cannot restrict the operation of a vessel that the federal government has pledged to accept in U.S. ports.

88.     The Initiated Ordinance through its 1,000-person limit (a) violates the Supremacy Clause because it impermissibly circumvents federal maritime laws and regulations and imposes local regulation upon navigable waters of the United States, (b) violates the explicit language of, and conflicts with, multiple federal laws, including regulations that expressly preempt state and local laws, (c) violates the comprehensive federal regulatory scheme by purporting to control ship design, construction, the ability to make a port of call, the operations and the overall passenger capacity, and the general operation of cruise ship vessels, and (d) moreover, it impermissibly frustrates the overriding need for federal supremacy and uniformity in the field of maritime commerce.

89.     As a result of the Initiated Ordinance, Plaintiffs are suffering and will suffer actual, immediate, and irreparable injury. Cruise vessels otherwise certified to conduct their operations will be excluded from the port of Bar Harbor, and the cruise industry will lose confidence in the availability and viability of the port of Bar Harbor as a valuable and marketable destination port-of-call and will now remove the Town from the future itineraries of the cruise lines which will eliminate the good will built up as a result of decades of work with the cruise lines. Plaintiffs BH Piers and Harborside will be prevented from conducting their federally approved operations and will be penalized for doing so and such operations will cease. The Tender Owners will have to close their businesses. The exclusion of cruise vessels from the port of Bar Harbor will also cause immediate, substantial, and deleterious economic disruption to the businesses of APPLL's members. Similar to the losses sustained during the cruise industry shutdown in 2020, as a result

App. 047

of the COVID-19 pandemic, Plaintiffs will experience a substantial loss of restaurant sales, retail sales, and tour-related income from the application of the Initiated Ordinance during the pendency of this lawsuit and some may be forced to close.

90.    An actual justiciable controversy exists among the parties regarding whether the Initiated Ordinance is preempted by federal law and thus is unconstitutional and in violation of the Supremacy Clause.

## COUNT II
### *(Violation of the Commerce Clause of the United States Constitution)*

91.    Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 6 through 66 as if fully set forth herein.

92.    The Commerce Clause of the U.S. Constitution, Art. I, § 8, Clause 3, confers upon Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States." The Commerce Clause's express grant of power carries with it "a further, negative command, known as the dormant Commerce Clause," *Okla. Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. 175, 179 (1995), which limits the power of local governments to enact laws affecting interstate commerce, *Hughes v. Oklahoma,* 441 U.S. 322, 326 (1979); *see South-Central Timber Development, Inc. v. Wunnicke,* 467 U.S. 82, 87 (1984). Even in the absence of congressional legislation, the Commerce Clause restricts "the powers of the States to interfere with or impose burdens on interstate commerce." *Arkansas Electric Cooperative Corporation v. Arkansas Public Service Commission*, 461 U.S. 375, 390 (1983).

93.    With regard to foreign commerce, the federal government's power is "exclusive and absolute[,]" *Buttfield v. Stranahan*, 192 U.S. 470, 493 (1904), and "may not be limited, qualified, or impeded to any extent by state action[,]" *Bd. of Trustees,* 289 U.S. at 56-57.

App. 048

94.     Local measures violate the Commerce Clause if they: A) attempt to regulate beyond the boundaries of the enacting state; B) if they discriminate against interstate commerce on their face, in purpose, or in effect; C) if they are an excessive burden on interstate commerce in relation to the putative local benefits; or D) if they interfere with the federal government's ability to speak with one voice when regulating commerce with foreign nations.

**The Initiated Ordinance Discriminates Against Interstate Commerce**

95.     Local laws that discriminate against interstate commerce are *per se* invalid under the Commerce Clause, subject only to a government's defensive demonstration that the law has a non-protectionist purpose and employs the least discriminatory means for achieving that purpose. It is not enough that a law's *stated* purpose is non-protectionist because the "evils of protectionism can reside in legislative means as well as legislative ends." *Fort Gratiot Sanitary Landfill v. Michigan Department of Natural Resources*, 504 U.S. 353, 360 (1992). A legitimate state goal may not be "achieved by the illegitimate means of isolating the State from the national economy." *Id*.

96.     The Initiated Ordinance discriminates against interstate commerce.  The Initiated Ordinance seeks to regulate the transport of persons by water. The transport of persons by water is part of interstate and foreign commerce. *Chy Lung v. Freeman*, 92 U.S. 278 (1879)*; Gibbons v. Ogden*, 22 U.S. 1, 9 (1824).

97.     The transport of persons by water to Bar Harbor is an inherently "out-of-state" activity.  Almost exclusively, cruise ships call at the port of Bar Harbor following one or more calls at ports in other states and often ports in other countries (i.e., Canada, Bermuda).

98.     Transport by water, however, is not the only (or even the primary) way that persons enter Bar Harbor.  Less than 10 percent of visitors come to Bar Harbor by cruise ship. The

remaining visitors reach Bar Harbor by land-based means of transportation (e.g., automobile, bus, or bicycle).

99.     The Initiated Ordinance seeks only to restrict the number of persons who enter Bar Harbor by cruise ship.  Persons gaining access to Bar Harbor by any other means of conveyance (such as land-based conveyance) are unaffected.

100.    The Initiated Ordinance asserts, though does not demonstrate, that the "large numbers" of persons coming to the Town via cruise ships jeopardize the Town's ability to deliver municipal services to Town residents and visitors (including those visitors that the Initiative seeks to exclude) and "diminish[es]" the "quality of life for Town residents." *Initiative,* § 125-77(H), *Purpose* ¶ 1.

101.    The Initiated Ordinance asserts that the disembarkation limit is necessary to "protect, preserve and promote the general health, safety, welfare and peace of the community." *Initiative,* § 125-77(H), *Purpose* ¶ 1.

102.    While the stated "Purpose" for the Initiative is mere pretense and lacked any factual basis, the Initiated Ordinance does not and could not assert that the alleged impacts on the Town and its residents caused by persons coming via cruise ship, either individually or collectively, is any different from those impacts caused by persons arriving in Bar Harbor by other means of conveyance. Indeed, the Initiative does not even refer to the impact of non-cruise visitors in Bar Harbor.

103.    Cruise ship passengers make up *less than 10 percent* of the visitors to Bar Harbor each year. Their impact on congestion of local sidewalks or ability to walk through the Town is marginal at best.  According to a 2021 study, cruise ship passengers marginally impact congestion beyond 100 feet from the point of disembarkation and have zero effect on congestion at 2,000 feet

beyond the point of disembarkation. Further, minimizing any impact, most cruise visitors come in September and October, when the volume of land-based travelers and overnight guests is at its lowest and is roughly equivalent or less than the tourists on Town streets in June and July.

104.    The Initiated Ordinance erects a wall around the port of Bar Harbor—halting commerce from a large percentage of cruise ships active in interstate and foreign commerce. This is exactly the kind of local obstruction of commerce that the Commerce Clause is designed to avoid. *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 92 (1984) ("The Commerce Clause was designed 'to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.") Eliminating or reducing the presence of out-of-state cruise tourists is not a proper reason for a ban and contradicts the very purpose of the Commerce Clause.

105.    Even if the Initiated Ordinance had a non-protectionist purpose, which it does not, a disembarkation limit applied only to persons arriving by one type of conveyance is not the least discriminatory means for achieving that purpose.

**The Initiated Ordinance Is an Excessive Burden on Interstate Commerce**

106.    A non-discriminatory local law violates the Commerce Clause if it burdens interstate commerce in a way that is clearly excessive in relation to the law's putative local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

107.    The Initiated Ordinance imposes burdens on interstate commerce that are clearly excessive in relation to any of the Initiated Ordinance's putative local benefits.

108.    The Initiated Ordinance does not advance any public health or safety purpose and erects substantial barriers to the free flow of commerce.  It will force cruise lines to "route around" the disembarkation limits by calling at other ports, use only the smallest of vessels to call at Bar

App. 051

Harbor (an irrational notion given that vessels with lower berth capacity in excess of 1,000 account for nearly all of the cruise industry capacity), or remove Bar Harbor completely from cruise itineraries.

109.    In this way, the Initiated Ordinance more than burdens interstate commerce. It essentially prohibits cruise lines from bringing cruise tourists to Bar Harbor via the port of Bar Harbor and in so doing renders substantially all cruise ship industry operations in the Town, including the private tendering and support service businesses required for cruise ship operations, obsolete and the operations are not sustainable given the limited business the Initiated Ordinance allows.

110.    The Initiated Ordinance was not supported by any formal findings about the asserted putative benefits of restricting the number of individuals visiting Bar Harbor via cruise ship.

111.    Far from conferring local benefits, the Initiated Ordinance withholds from Bar Harbor and its citizens, substantial economic benefits that the cruise ship industry would otherwise provide.

**The Initiated Ordinance Unduly Restricts Foreign Commerce**

112.    In matters pertaining to foreign commerce, the federal government's power is "exclusive and absolute." *Buttfield v. Stranahan*, 192 U.S. 470, 493 (1904). Discordant state and local restrictions must give way before the imperative that the national government "speak[] with one voice." *Japan Line Ltd. v. County of Los Angeles*, 441 U.S. 434, 452 (1979).

113.    Federal supremacy over maritime commerce and the nation's relationships with foreign countries leaves little room for state or local action. *See e.g.*, *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000); *Locke*, 529 U.S. at 108 (recognizing a need for "uniformity

of regulation for maritime commerce"); *Kraft Gen. Foods, Inc. v. Iowa Dept. of Revenue and Fin.*, 505 U.S. 71, 79 (1992) ("the Foreign Commerce Clause recognizes that discriminatory treatment of foreign commerce may create problems, such as the potential for international retaliation, that concern the Nation as a whole.").

114.    The Initiated Ordinance discriminates against foreign commerce. The majority of cruise ships that call at Bar Harbor operate itineraries that include foreign ports of call. These cruise ships facilitate the international transportation of passengers.

115.    The Initiated Ordinance disrupts the free flow of interstate commerce as most cruise ship itineraries, for ships calling on Bar Harbor, involve ports in other states and many itineraries include ports in Canada. The Initiated Ordinance adversely impacts foreign commerce by imposing draconian and arbitrary disembarkation limitations that render the Town an unsuitable destination port-of-call.

116.    The Initiated Ordinance will disrupt the operations of domestic and foreign corporations doing business in Bar Harbor, prevent foreign (and out-of-state) travelers on international vessels from disembarking at Bar Harbor, and severely diminish the ability of Plaintiffs in Bar Harbor to provide valuable services to instrumentalities of interstate and foreign commerce. *See, e.g., Henderson v. Mayor of City of New York*, 92 U.S. 259 (1875) (held invalid state law that impinged on the U.S. and foreign flagged vessels from transporting passengers, foreign commerce that was committed to Congress). The Initiated Ordinance is without authority to make such impositions on foreign commerce.

117.    The Initiated Ordinance is not based on any condition "arising from the peculiarities of local waters that call for special precautionary measures." *Ray v. Atlantic Richfield,* 435 U.S 151, 171 (1978); *Cooley*, 53 U.S. at 19. Nothing in the Initiated Ordinance suggests that the 1,000-

App. 053

person limitation on the number of passengers and crew is based on any peculiar conditions of the local waters. Rather, it is based solely on the claimed effect of cruise ship passengers and crew once they "come to shore on, over, or across any property located within the Town of Bar Harbor." *Initiative,* at § 125-77(H)(2). Thus, the local waters exception to preemptive federal regulatory authority cannot apply to the Initiated Ordinance.

118.    The Initiated Ordinance impermissibly regulates in an area where national uniformity is essential. Every cruise ship journey involves advanced planning for complex vessel itineraries, the interstate and foreign travel of passengers not only aboard the vessel but, upon reaching a particular port of call, may also, as in true for Bar Harbor, involve providing water-borne conveyances on which the cruise ship passengers and crew can travel to and from the ship. Such advanced planning also includes long-term coordination for the availability of Coast Guard-approved cruise ship terminal facilities and barge services, procuring and tendering provisions and supplies, all of which move in the interstate and foreign commerce of the United States. This advanced planning for both international and interstate commerce requires uniformity in regulation.

119.    The Initiated Ordinance would impose a regime for landing passengers and crew in Bar Harbor that is different than those in other ports in the United States, in violation of the Foreign Commerce Clause. *Henderson*, 92 U.S. at 273 ("The laws which govern the right to land passengers in the United States from other countries ought to be the same in New York, Boston, New Orleans, and San Francisco.").

120.    The Initiated Ordinance threatens the nation's ability to maintain an integrated maritime transportation system, and its aims cannot be validated by resorting to the "apologetics

App. 054

of the police power." *See Southern Pac. Co. v. State of Ariz. ex rel Sullivan*, 325 U.S. 761, 779-80 (1945).

121.    The Initiated Ordinance deprives Plaintiffs of rights secured by the United States Constitution, as set forth above, under color of state law, thereby violating 42 U.S.C. § 1983.

122.    An actual justiciable controversy exists among the parties regarding whether the Initiated Ordinance violates the Commerce Clause.

123.    Plaintiffs are suffering and will suffer irreparable harm as a result of being deprived of their constitutional rights.

124.    Plaintiffs are entitled to declaratory and injunctive relief against the Town.

**COUNT III**
*(Initiated Ordinance Inconsistent with Substantive Due Process)*

125.    Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 6 through 66 as if fully set forth herein.

126.    The Initiated Ordinance confiscates Plaintiffs property interests in their U.S. Coast Guard approvals without due process of law because it constitutes economic regulation, which is arbitrary, discriminatory, and/or demonstrably irrelevant to the intentions and policy goals of the Initiated Ordinance, *supra* paragraph 89, by making such property interests worthless.

127.    Said Initiated Ordinance is arbitrary, discriminatory and irrelevant to any legitimate legislative goal. The Purpose section of the Initiative, *supra* paragraph 47, identified only passengers arriving by cruise ship as the cause of the alleged burdens on the Town's public services, businesses, and healthcare providers. Yet, cruise ship passengers only constitute a small percentage of visitors to Bar Harbor. Mandatory disembarkation caps unreasonably deprive Plaintiffs of their property interests.

App. 055

128.    The Initiated Ordinance is unreasonable, arbitrary, inadequate, discriminatory and wholly disconnected from any valid legislative goal. The Initiated Ordinance fails to meet the requirements of the Due Process Clause, and Plaintiffs ask this Court so declare.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment against Defendant as follows:

1. A declaration, pursuant to 28 U.S.C. § 2201, that the Initiated Ordinance violates federal laws and regulations that govern and subordinate the authority of the Town under the Supremacy Clause of the Constitution.

2. A declaration, pursuant to 28 U.S.C. § 2201, that the Initiated Ordinance violates the Commerce Clause of the U.S. Constitution.

3. A declaration, pursuant to 28 U.S.C. § 2201, that the Initiated Ordinance violates the Due Process Clause of Fourteenth Amendment to the U.S. Constitution.

4. A preliminary and permanent injunction against implementation and enforcement of the Initiated Ordinance.

5. An award to Plaintiffs of all costs, attorneys' fees, and expenses, pursuant to 42 U.S.C. § 1988.

6. Such other and further relief as this Court deems just and proper.

ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, B.H. PIERS, L.L.C., GOLDEN ANCHOR L.C., B.H.W.W., L.L.C., DELRAY EXPLORER HULL 495 LLC, DELRAY EXPLORER HULL 493 LLC, and ACADIA EXPLORER 492, LLC

By their attorneys,

DATED: December 29, 2022        /s/ *Timothy C. Woodcock*
                                Timothy C. Woodcock, Bar #1663
                                P. Andrew Hamilton, Bar #2933
                                Patrick W. Lyons, Bar #5600
                                *Counsel for Plaintiffs*

EATON PEABODY
80 Exchange Street
Bangor, Maine 04401
(207) 992-0111
twoodcock@eatonpeabody.com
ahamilton@eatonpeabody.com
plyons@eatonpeabody.com

App. 057

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 29, 2022, the foregoing Verified Complaint was electronically filed with the Clerk of this Court using the CM/ECF system.


Dated: December 29, 2022                    /s/ *Timothy C. Woodcock*

39

App. 058

# VERIFICATIONS

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | | |
|---|---|---|
| ASSOCIATION TO PRESERVE | ) | |
| AND PROTECT LOCAL LIVELIHOODS, | ) | |
| BH PIERS, L.L.C., GOLDEN ANCHOR, L.C., | ) | |
| B.H.W.W., L.L.C., DELRAY EXPLORER HULL | ) | |
| 495 LLC, DELRAY EXPLORER HULL | ) | |
| 493 LLC, and ACADIA EXPLORER 492, LLC, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| TOWN OF BAR HARBOR, a municipal | ) | |
| corporation of the State of Maine, | ) | |
| | ) | |
| *Defendant.* | ) | |

**VERIFICATION**

KRISTI L. BOND, being duly sworn, deposes and says that I am the President of the Association to Preserve and Protect Local Livelihoods ("APPLL") in the case captioned above and have authorized the filing of this complaint. I have reviewed the allegations made in the complaint, and as to those allegations of which I have personal knowledge, I believe them to be true. As to those allegations of which I do not have personal knowledge, I rely on information from the records of the regularly conducted activities of APPLL, by or from information transmitted by persons with knowledge, kept in the regular course of such activities, and which is the regular practice of APPLL to make and keep such records, and each and all of the Affidavits incorporated with the Motion for Preliminary Injunction that is filed with this Complaint and as to all of such records, I believe them to be true.

Kristi L. Bond

STATE OF MAINE
HANCOCK, ss

Personally appeared before me the above-named Kristi L. Bond and swore or affirmed that the statements made and verified by her herein are true.

Before me,

Dated: December __, 2022

Notary Public
My Commission expires:

JENNIFER COUGH
NOTARY PUBLIC MAINE
My Commission Expires 04/03/2025

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, B.H. PIERS, L.L.C., GOLDEN ANCHOR L.C., B.H.W.W., L.L.C., DELRAY EXPLORER HULL 495 LLC, DELRAY EXPLORER HULL 493 LLC, and ACADIA EXPLORER 492, LLC, | ) ) ) ) ) ) ) ) |
| *Plaintiffs,* | ) ) |
| v. | ) ) |
| TOWN OF BAR HARBOR, a municipal corporation of the State of Maine, | ) ) ) |
| *Defendant.* | ) ) ) |

Civil Action No.

### VERIFICATION

I, WILLIAM JOSEPH WALSH, being duly sworn, deposes and says that I am a member of the Walsh family that holds the membership interests in B.H. Piers, L.L.C. in the case captioned above and have authorized the filing of this Complaint. I have reviewed the allegations made in the complaint, and as to those allegations of which I have personal knowledge, I believe them to be true. As to those allegations of which I do not have personal knowledge, I rely on information from the records of the regularly conducted activities of B.H. Piers, L.L.C., by or from information transmitted by persons with knowledge, kept in the regular course of such activities, and of which is the regular practice of B.H. Piers, L.L.C. to make and keep such records and each and all of the Affidavits incorporated with the Motion for Preliminary Injunction that is filed with this Complaint and as to all of such records, I believe them to be true.

William Joseph Walsh

STATE OF FLORIDA
PALM BEACH, ss

Personally appeared before me the above-named William Joseph Walsh and swore or affirmed that the statements made and verified by him herein are true.

Dated: December 29, 2022

Before me,

Notary Public
My Commission expires: 7-31-25

*[Notary seal: DEBORAH HOWARD, MY COMMISSION EXPIRES JULY 31, 2025, #HH 122906, Bonded thru Notary Public Underwriters, NOTARY PUBLIC, STATE OF FLORIDA]*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, B.H. PIERS, L.L.C., GOLDEN ANCHOR L.C., B.H.W.W., L.L.C., DELRAY EXPLORER HULL 495 LLC, DELRAY EXPLORER HULL 493 LLC, and ACADIA EXPLORER 492, LLC, | ) ) ) ) ) ) ) | |
| | ) | |
| *Plaintiffs,* | ) | Civil Action No. |
| v. | ) ) | |
| TOWN OF BAR HARBOR, a municipal corporation of the State of Maine, | ) ) ) | |
| *Defendant.* | ) ) ) | |

### VERIFICATION

I, WILLIAM JOSEPH WALSH, being duly sworn, deposes and says that I am a member of the Walsh family that holds the membership interests in Golden Anchor, L.C., in the case captioned above and have authorized the filing of this complaint. I have reviewed the allegations made in the complaint, and as to those allegations of which I have personal knowledge, I believe them to be true. As to those allegations of which I do not have personal knowledge, I rely on information from the records of the regularly conducted activities of Golden Anchor, L.C., by or from information transmitted by persons with knowledge, kept in the regular course of such activities, and of which is the regular practice of Golden Anchor, L.C. to make and keep such records, and each and all of the Affidavits incorporated with the Motion for Preliminary Injunction that is filed with this complaint and as to all of such records, I believe them to be true.

William Joseph Walsh

STATE OF FLORIDA
PALM BEACH, ss

Personally appeared before me the above-named William Joseph Walsh and swore or affirmed that the statements made and verified by him herein are true.

Before me,

Dated: December 29, 2022

Deborah Howard
Notary Public
My Commission expires: 7-31-25

App. 062

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, B.H. PIERS, L.L.C., GOLDEN ANCHOR L.C., B.H.W.W., L.L.C., DELRAY EXPLORER HULL 495 LLC, DELRAY EXPLORER HULL 493 LLC, and ACADIA EXPLORER 492, LLC, | ) ) ) ) ) ) ) ) | Civil Action No. |
| *Plaintiffs,* | ) ) ) | |
| v. | ) ) | |
| TOWN OF BAR HARBOR, a municipal corporation of the State of Maine, | ) ) ) | |
| *Defendant.* | ) ) ) | |

## VERIFICATION

I, WILLIAM JOSEPH WALSH, being duly sworn, deposes and says that I am a member of the Walsh family that holds the membership interests in B.H.W.W., LLC, in the case captioned above, and have authorized the filing of this complaint. I have reviewed the allegations made in the complaint, and as to those allegations of which I have personal knowledge, I believe them to be true. As to those allegations of which I do not have personal knowledge, I rely on information from the records of the regularly conducted activities of B.H.W.W., LLC, by or from information transmitted by persons with knowledge, kept in the regular course of such activities, and of which is the regular practice of B.H.W.W., LLC to make and keep such records, and each and all of the Affidavits incorporated with the Motion for Preliminary Injunction that is filed with this complaint and as to all of such records, I believe them to be true.

_____
William Joseph Walsh

STATE OF FLORIDA
PALM BEACH, ss

Personally appeared before me the above-named William Joseph Walsh and swore or affirmed that the statements made and verified by him herein are true.

Before me,

Dated: December 29, 2022

_____
Notary Public
My Commission expires: 7-31-2025

App. 063

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, B.H. PIERS, L.L.C., GOLDEN ANCHOR L.C., B.H.W.W., L.L.C., DELRAY EXPLORER HULL 495 LLC, DELRAY EXPLORER HULL 493 LLC, and ACADIA EXPLORER 492, LLC, | ) ) ) ) ) ) ) ) | Civil Action No. |
| *Plaintiffs,* | ) ) ) | |
| v. | ) ) | |
| TOWN OF BAR HARBOR, a municipal corporation of the State of Maine, | ) ) ) ) | |
| *Defendant.* | ) ) ) | |

## VERIFICATION

I, WILLIAM JOSEPH WALSH, being duly sworn, depose and say that I am a member of the Walsh family that holds the membership interests in Delray Explorer Hull 495 LLC, Delray Explorer Hull 493 LLC and Acadia Explorer 492, LLC in the case captioned above, and have authorized the filing of this complaint. I have reviewed the allegations made in the complaint, and as to those allegations of which I have personal knowledge, I believe them to be true. As to those allegations of which I do not have personal knowledge, I rely on information from the records of the regularly conducted activities of Delray Explorer Hull 495 LLC, Delray Explorer Hull 493 LLC and Acadia Explorer 492, LLC, by or from information transmitted by persons with knowledge, kept in the regular course of such activities, and of which is the regular practice of Delray Explorer Hull 495 LLC, Delray Explorer Hull 493 LLC, and Acadia Explorer 492, LLC, to make and keep such records, and each and all of the Affidavits incorporated with the Motion for Preliminary Injunction that is filed with this complaint and as to all of such records, I believe them to be true.

William Joseph Walsh

36

App. 064

STATE OF FLORIDA

PALM BEACH, ss

Personally appeared before me the above-named William Joseph Walsh and swore or affirmed that the statements made and verified by him herein are true.

Dated: December 29, 2022

Before me,

Notary Public

My Commission expires: 7-31-2025

37

App. 065

# EXHIBIT A

**U.S. Department of Homeland Security**

**United States Coast Guard**

Commander
United States Coast Guard
Sector Northern New England

259 High Street
South Portland, ME, 04106
Staff Symbol: s
Phone: (207) 338-8395

16611

MISLE Activity #: 6673184
FIN #: BLFSTSEC04

BH Piers, LLC
Harbor Place
Attn: Mike Siemion
1 West Street
Bar Harbor, ME  04609

MAY 0 6 2019

Dear Mr. Siemion,

The Facility Security Plan (FSP) for the Harbor Place facility in Bar Harbor, Maine dated March 29, 2019 meets the requirements of Title 33 Code of Federal Regulations (CFR) Part 105, and is hereby **approved**. Effective immediately, the subject facility and all personnel with responsibilities under the FSP must operate in accordance with the approved FSP and all relevant 33 CFR Subchapter H requirements. Failure to adhere to the requirements of 33 CFR Subchapter H requirements or your approved FSP may result in the suspension or revocation of this approval.

Your FSP constitutes sensitive security information and must be protected at all times in accordance with 49 CFR Part 1520.

This approval will remain valid until five years from the date of this letter, unless rescinded in writing by this office. In accordance with 33 CFR Part 105.415(b), your FSP must be audited no later than one year from the date of this letter and annually thereafter. A letter signed by the Facility Security Officer attesting to the date and results of each annual audit must be maintained with the FSP. All proposed amendments to your FSP must be submitted to this office for approval in accordance with 33 CFR 105.415(a).

The subject facility will be inspected by Coast Guard personnel to verify compliance with all relevant regulations, the approved FSP, and any approved amendments. A copy of your FSP and all effective amendments must be made available to Coast Guard personnel immediately upon request.

Should you have any questions concerning this matter, please contact the Marine Safety Detachment Belfast at (207) 338-8395, or via e-mail at USCGMSDBelfast@uscg.mil.

Sincerely,

B.J. LeFEBVRE
Captain, U. S. Coast Guard
Captain of the Port
Sector Northern New England

Copy: Marine Safety Detachment Belfast

App. 067

# Proprietary Confidential - Do Not Photocopy

# United States Coast Guard

# Harbor Place

**Including the Harborside Docks and Regency Docks**

# USCG Facility Security Plan

**Version 2019**

## BH Piers, LLC
## 1 West Street
## Bar Harbor, ME  04609

**For Purposes of this USCG Facility Security Plan, any references herein to Bar Harbor Whale Watch Co. can also be identified as BH Piers, LLC**

*WARNING: This record contains Sensitive Security Information that is controlled under the provisions of 49 CFR 15 and 1520. No part of this record may be disclosed to persons without a "need to know," as defined in 49 CFR 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. Government agencies, public disclosure is governed by U.S.C. 552 and CFR 15 and 1520.1*

# EXHIBIT B

To the Members of the Bar Harbor Town Council:

*We, the undersigned voters of the Town of Bar Harbor, petition the Members of the Bar Harbor Town Council to place the following article before the voters of the Town for their consideration:*

AN AMENDMENT TO THE TOWN OF BAR HARBOR CODE TO IMPOSE DAILY LIMITS ON DISEMBARKING CRUISE SHIP PASSENGERS

The Town of Bar Harbor hereby ordains that Bar Harbor Code Chapter 125, Article VII, Section 125-77 shall be amended as follows (additions are <u>underlined</u>, and deletions are ~~struck-through~~):

§ 125-77  **Permit required for certain activities.**

. . .

<u>H.      Disembarking of cruise ship passengers on, over, or across any property located within the Town of Bar Harbor.</u>

<u>(1)      For the purposes of this section, "cruise ship" has the same meaning as set forth in § 153-22(B) of the Town of Bar Harbor Code.</u>

<u>(2)      As determined by the Harbor Master, no more than 1,000 passengers, in the aggregate, may disembark on a single calendar day from any cruise ship(s) and come to shore on, over, or across any property located within the Town of Bar Harbor; provided, however, that this subsection shall not apply with regard to any cruise ship reservations that have been accepted by the Harbor Master prior to March 16, 2022.</u>

<u>(3)      The Harbor Master shall develop rules and regulations in order to establish (i) a reservation system for cruise ships that transport passengers by watercraft for disembarkation in the Town of Bar Harbor; (ii) a mechanism for counting and tracking the number of passengers disembarking each day; (iii) a mandatory procedure for reporting violations to the Code Enforcement Officer; and (iv) any other provisions that the Harbor Master deems necessary under this subsection.  Any property owner issued a permit under this § 125-77(H) shall comply with all rules and regulations promulgated by the Harbor Master under this subsection.</u>

<u>(4)      This subsection shall be enforced by the Code Enforcement Officer in accordance with § 125-100 of this chapter, based on information as to violations provided by the Harbor Master, and property owners in violation of this subsection shall be subject to such fines, penalties, actions and orders as are authorized by 30-A M.R.S. § 4452, as the same may be amended, provided that each disembarking passenger exceeding the daily passenger limit in § 125-77(H)(2) is a specific violation under 30-A M.R.S. § 4452(3)(B), resulting in a minimum $100 penalty per passenger.</u>

<u>(5)      Notwithstanding 1 M.R.S. § 302, and regardless of the date on which it is approved by the voters, this subsection will be applicable as of March 16, 2022, and shall govern any and all applications for permits or approvals required under this subsection that were or have been pending before any officer, board, or agency of the Town of Bar Harbor on or at any</u>

App. 070

<u>time after March 16, 2022; provided, however, that the Town will not take any enforcement action under this subsection with regard to any cruise ship visits occurring prior to the date of adoption by voters at Town Meeting.</u>

PURPOSE:

The purpose of this amendment to the Code is to require a permit to be issued to any property owner wishing to allow for the discharge of cruise ship passengers in the Town of Bar Harbor from their property, and to establish a codified limit on the number of passengers who may disembark from cruise ships and be transported to the Town of Bar Harbor per day.  Underlying this proposed amendment is the fact that, in recent years, the Town has been a popular port of call for cruise ships of varying sizes, from which passengers disembark via tender boats that offload passengers directly into the downtown area.  The large numbers of passengers have overwhelmed the downtown area, resulting in excessive congestion and traffic on public streets and sidewalks, frequent overcrowding of parks and other public spaces, and inundating local amenities and attractions, all of which result in a diminished quality of life for Town residents.  The unchecked and continued influx of disembarking cruise ship passengers in the downtown area jeopardizes the Town's ability to deliver municipal services to Town residents and visitors (for example, cruise ship passengers), including the provision of public safety services (police and fire), emergency medical services (EMS), in-patient and out-patient services at local hospitals, pandemic control measures, and public sanitation services, and also impacts the ability of local shops, restaurants, and other businesses to attract and serve customers.  A town-wide survey was conducted in 2021, showing that a majority of respondents believe that the volume of disembarking cruise ship passengers is too high and has a negative impact on the Town and the health, safety and welfare of its residents.

The Town's existing, uncodified limits of 5,500 passengers per day (for May, June, September and October) and 3,500 passengers per day (for July and August) have proven to be insufficient to mitigate the impacts described above, and furthermore, are currently subject to adjustment at the discretion of the Harbor Master without further input from the voters of the Town.  This discretion is removed, and the limits herewith are made absolute.  In order to protect, preserve and promote the general health, safety, welfare and peace of the community, it is determined to be in the best interest of the Town to amend the daily disembarkation limits by lowering the cap to 1,000 and requiring that all property owners receive a permit from the Code Enforcement Officer that formally imposes such a limit.  By statute, 38 M.R.S. § 439-A, the Town is expressly authorized to regulate activities that occur within its own shoreland areas.  Further, in accordance with the Town's home rule authority under the Maine Constitution (Article VIII, Part Second, Section 1) and by statute (30-A M.R.S. § 3001) the Town may adopt ordinances to protect the health, safety and welfare of its residents, including Chapter 125 of the Town of Bar Harbor Code, which regulates the use of land and permitted structures in Bar Harbor.

As drafted, the provision is applicable as of March 16, 2022, and the purpose of the retroactive application of the amendment is to provide adequate notice of the daily passenger cap to all interested parties prior to the time when reservations are made for the 2023 cruise ship season.  As stated in the amendment, the daily passenger cap will not apply to any cruise ship reservation or "booking" that has already been accepted by the Town's Harbor Master prior to March 16, 2022, and the Town will not take any enforcement action with regard to any cruise ship visits occurring prior to the date of adoption of this subsection by voters at Town Meeting.

Petitioning Committee:

Charles Sidman (for all communications), 395 Main St., PO Box 200, Bar Harbor, ME 04609.
Phone: 207-288-0428.  Email: csidman@acadia.net.

Amy Sidman, 395 Main St., PO Box 200, Bar Harbor, ME 04609.

Barbara Fenderson, 243 Oak Hill Road., Bar Harbor, ME 04609.

Art Greif, 8 Devon Road, Bar Harbor, ME 04609.

Donna Karlson, 8 Devon Road, Bar Harbor, ME 04609.

Pat Murphy, 13 Arata Drive, Bar Harbor, ME 04609.

Jim O'Connell, 5 Higgins Terrace, Bar Harbor, ME 04609.

For the Committee:

Charles Sidman

3/16/22

**EXHIBIT C**

**Order**
**of the Bar Harbor Town Council**
**for the November 8, 2022 Town Meeting**

It is hereby ordered that the following article be placed on the town meeting warrant with voting thereon to be held by Australian ballot.

## WARRANT ARTICLE

Article XX CITIZEN PETITION FOR LAND USE ORDINANCE AMENDMENT — Daily Limits on Cruise Ship Disembarkations Ordinance — Shall an ordinance dated July 19, 2022 and entitled "An amendment to the Town of Bar Harbor Code to Impose Daily Limits on Cruise Ship Disembarkations," be enacted?

## SUMMARY

The amendment, with a retroactive date of March 17, 2022, will limit the number of persons allowed to disembark in Bar Harbor from cruise ships to a maximum of 1,000 per day.

## EXPLANATION

The amendment for daily limits on cruise ship disembarkations has a retroactive date of March 17, 2022.

The amendment will limit the number of persons from cruise ships allowed to disembark in Bar Harbor to a maximum, in the aggregate, of 1,000 per day. Exempt from this limit are persons disembarking from cruise ships that have made reservations prior to March 17, 2022. A cruise ship is defined as a watercraft carrying passengers for hire which is capable of providing overnight accommodations for 49 or more passengers.

The Harbor Master will develop rules and regulations to include, but not limited to, a cruise ship disembarkation reservation system, a daily counting and tracking system for persons disembarking, and a violation reporting system.

The Code Enforcement Officer will be responsible for enforcement of the disembarkation daily limit. Pursuant to the rules and regulations developed by the Harbor Master, property owners will be required to secure a written permit from the Code Enforcement Officer for any person disembarking from a cruise ship on, over, or across their land. The Harbor Master will report violations to the Code Enforcement Officer.

Each disembarking person exceeding the daily limit will constitute a specific violation resulting in a minimum civil penalty of $100 per person.

## AN AMENDMENT TO THE TOWN OF BAR HARBOR CODE TO IMPOSE DAILY LIMITS ON CRUISE SHIP DISEMBARKATIONS

The Town of Bar Harbor hereby ordains that Bar Harbor Code Chapter 125, Article VII, Section 125-77 shall be amended as follows (additions are <u>underlined</u>, and deletions are ~~struck-through~~):

§ 125-77 Permit required for certain activities.

***

H.     <u>Disembarking persons from cruise ships on, over, or across any property located within the Town of Bar Harbor.</u>

    (1)     <u>For the purposes of this section, "cruise ship" has the same meaning as set forth in § 153-22 B. of the Town of Bar Harbor Code.</u>

    (2)     <u>As determined by the Harbor Master, no more than 1,000 persons, in the aggregate, may disembark on a single calendar day from any cruise ship(s) and come to shore on, over, or across any property located within the Town of Bar Harbor; provided, however, that this subsection shall not apply with regard to any cruise ship reservations that have been accepted by the Harbor Master prior to March 17, 2022.</u>

    (3)     <u>The Harbor Master shall develop rules and regulations in order to establish (a) a reservation system for cruise ships that transport persons by watercraft for disembarkation in the Town of Bar Harbor; (b) a mechanism for counting and tracking the number of persons disembarking each day; (c) a mandatory procedure for reporting violations to the Code Enforcement Officer; and (d) any other provisions that the Harbor Master deems necessary under this subsection. Any property owner issued a permit under this § 125-77 H. shall comply with all rules and regulations promulgated by the Harbor Master under this subsection.</u>

    (4)     <u>This subsection shall be enforced by the Code Enforcement Officer in accordance with § 125-100 of this chapter, based on information as to violations provided by the Harbor Master, and property owners in violation of this subsection shall be subject to such fines, penalties, actions and orders as are authorized by 30-A M.R.S. § 4452, as the same may be amended, provided that each disembarking person exceeding the permitted daily limit in § 125-77 H. (2) is a specific violation under 30-A M.R.S. § 4452(3)(B), resulting in a minimum $100 penalty per excess unauthorized person.</u>

    (5)     <u>Notwithstanding 1 M.R.S. § 302, and regardless of the date on which it is approved by the voters, this subsection will be applicable as of March 17, 2022,</u>

and shall govern any and all applications for permits or approvals required under this subsection that were or have been pending before any officer, board, or agency of the Town of Bar Harbor on or at any time after March 17, 2022; provided, however, that the Town will not take any enforcement action under this subsection with regard to any cruise ship visits occurring prior to the date of adoption by voters at Town Meeting.

\*\*\*

Given under our hands and seal at Bar Harbor this ___2nd___ day of ~~July~~ AUG, 2022:

## Municipal Officers of the Town of Bar Harbor

_____   _____
Valerie Peacock, Chair        Matthew A. Hochman, Vice Chair

_____   _____
Gary Friedmann              Joseph Minutolo

_____   _____
Jefferson G. Dobbs          Erin E. Cough

_____
Jill Goldthwait

# EXHIBIT D

*The following article was passed by Bar Harbor voters on November 8, 2022 by a vote of 1780 to 1273. The amendment takes effect December 8, 2022. A copy has been filed with the Town Clerk.*

**Article 3 – CITIZEN PETITION FOR LAND USE ORDINANCE AMENDMENT — Daily Limits on Cruise Ship Disembarkations Ordinance — Shall an ordinance dated July 19, 2022 and entitled "An amendment to the Town of Bar Harbor Code to Impose Daily Limits on Cruise Ship Disembarkations," be enacted?**

**Summary**: *The amendment, with a retroactive date of March 17, 2022, will limit the number of persons allowed to disembark in Bar Harbor from cruise ships to a maximum of 1,000 per day.*

**Explanation**: *The amendment for daily limits on cruise ship disembarkations has a retroactive date of March 17, 2022.*

*The amendment will limit the number of persons from cruise ships allowed to disembark in Bar Harbor to a maximum, in the aggregate, of 1,000 per day. Exempt from this limit are persons disembarking from cruise ships that have made reservations prior to March 17, 2022. A cruise ship is defined as a watercraft carrying passengers for hire which is capable of providing overnight accommodations for 49 or more passengers.*

*The Harbor Master will develop rules and regulations to include, but not limited to, a cruise ship disembarkation reservation system, a daily counting and tracking system for persons disembarking, and a violation reporting system.*

*The Code Enforcement Officer will be responsible for enforcement of the disembarkation daily limit. Pursuant to the rules and regulations developed by the Harbor Master, property owners will be required to secure a written permit from the Code Enforcement Officer for any person disembarking from a cruise ship on, over, or across their land. The Harbor Master will report violations to the Code Enforcement Officer.*

*Each disembarking person exceeding the daily limit will constitute a specific violation resulting in a minimum civil penalty of $100 per person.*

**Recommendations:**
*The seven-member Planning Board recommends rejection by a vote of 6 to 0 with one abstention. The 15-member Warrant Committee recommends rejection by a vote of 9 to 6.*

**An Amendment to the Town of Bar Harbor Code to Impose Daily Limits on Cruise Ship Disembarkations**
*The Town of Bar Harbor hereby ordains that Chapter 125 of the Town Code is amended as follows:*
[Please Note: Old language is ~~stricken~~.  New language is <u>underlined</u>.]

App. 078

§ 125-77 Permit required for certain activities.

\*\*\*

H.     Disembarking persons from cruise ships on, over, or across any property located within the Town of Bar Harbor.

    (1)     For the purposes of this section, "cruise ship" has the same meaning as set forth in § 153-22 B. of the Town of Bar Harbor Code.

    (2)     As determined by the Harbor Master, no more than 1,000 persons, in the aggregate, may disembark on a single calendar day from any cruise ship(s) and come to shore on, over, or across any property located within the Town of Bar Harbor; provided, however, that this subsection shall not apply with regard to any cruise ship reservations that have been accepted by the Harbor Master prior to March 17, 2022.

    (3)     The Harbor Master shall develop rules and regulations in order to establish (a) a reservation system for cruise ships that transport persons by watercraft for disembarkation in the Town of Bar Harbor; (b) a mechanism for counting and tracking the number of persons disembarking each day; (c) a mandatory procedure for reporting violations to the Code Enforcement Officer; and (d) any other provisions that the Harbor Master deems necessary under this subsection. Any property owner issued a permit under this § 125-77 H. shall comply with all rules and regulations promulgated by the Harbor Master under this subsection.

    (4)     This subsection shall be enforced by the Code Enforcement Officer in accordance with § 125-100 of this chapter, based on information as to violations provided by the Harbor Master, and property owners in violation of this subsection shall be subject to such fines, penalties, actions and orders as are authorized by 30-A M.R.S. § 4452, as the same may be amended, provided that each disembarking person exceeding the permitted daily limit in § 125-77 H. (2) is a specific violation under 30-A M.R.S. § 4452(3)(B), resulting in a minimum $100 penalty per excess unauthorized person.

    (5)     Notwithstanding 1 M.R.S. § 302, and regardless of the date on which it is approved by the voters, this subsection will be applicable as of March 17, 2022, and shall govern any and all applications for permits or approvals required under this subsection that were or have been pending before any officer, board, or agency of the Town of Bar Harbor on or at any time after March 17, 2022; provided, however, that the Town will not take any enforcement action under this subsection with regard to any cruise ship visits occurring prior to the date of adoption by voters at Town Meeting.

\*\*\*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, et al., | ) ) ) |
| *Plaintiffs*, | ) ) ) |
| PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION, a Maine corporation, | ) ) ) |
| *Plaintiff-Intervenor*, | )   Case No. 1:22-cv-416 ) |
| v. | )   **INJUNCTIVE RELIEF SOUGHT** ) |
| TOWN OF BAR HARBOR, a municipal corporation of the State of Maine, | ) ) ) |
| *Defendant*. | ) ) |

<u>**COMPLAINT IN INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF**</u>

   Plaintiff-Intervenor Penobscot Bay and River Pilots Association (the "Penobscot Pilots Association"), through its attorneys, complains against Defendant Town of Bar Harbor (the "Town") as follows:

**INTRODUCTION**

   1.  This complaint in intervention seeks declaratory and injunctive relief against recent municipal activity in the Town of Bar Harbor that severely and arbitrarily restricts the operations of cruise vessels into the Town of Bar Harbor in violation of the United States Constitution and the Maine Constitution. This protectionist municipal action – specifically, a citizens' group petition (the "Initiative") amending the Bar Harbor Code, Chapter 125, Article VII, by adding Section 125-177(H), which became an ordinance of the Town effective December

71641/224806 -

**App. 080**

8, 2022 (the "Challenged Ordinance")[1] – purports to control cruise vessels that anchor in federally designated anchorages outside the municipal jurisdiction of the Town and private property owners who operate piers used for landing passengers from cruise ships anchored in Frenchman Bay. The Challenged Ordinance directly and immediately harms local businesses of all types, including the business of the Penobscot Pilots Association. Because of its damaging impacts on the provision of pilotage services, it threatens the safety and security of Maine's coastal waters.

2.      The Challenged Ordinance unlawfully interferes with the comprehensive federal system regulating the operation of cruise ships and maritime commerce. Cruise vessels are federally certified and authorized to engage in the operations for which they have been certified. The Challenged Ordinance imposes an unreasonable and arbitrary limitation on the number of persons that can disembark from federally certified cruise vessels anchored at federally designated anchorages, effectively barring the cruise vessels from engaging in their federally certified operations in navigable waters of the United States.

3.      Federal law and federal regulations govern the system of commerce within the U.S. and between the U.S. and foreign countries. In this arena of federal primacy, the need for uniformity far outweighs any benefits that the Town, or citizen supporters of the Challenged Ordinance, may claim in defense of this attempt to erect a barrier to maritime commerce at its shoreline.

4.      The Challenged Ordinance imposes impermissible burdens on the interstate and foreign commerce of the United States. It penalizes the disembarkation of more than one

---

[1] Plaintiff-Intervenor Penobscot Pilots Association will refer to the municipal action as the Challenged Ordinance throughout this Complaint, except where it is necessary to distinguish the citizen's petition from the resulting ordinance.

**App. 081**

thousand (1,000) persons from cruise ships per day into the Town for the purported purpose of conserving municipal resources and enhancing the lives and safeguarding the health, safety, and welfare of municipal residents. The Challenged Ordinance discriminates against interstate and maritime commerce by limiting disembarkations from cruise ships only and not restricting visitors arriving by any other form of transportation. The Challenged Ordinance discriminates against foreign commerce by favoring domestic vessels and disadvantaging foreign vessels. Draconian restrictions on admission to the Town from persons using one method of transportation (ships) or from ships engaged in international itineraries, but not domestic itineraries, is not the least discriminatory means available to achieve the Challenged Ordinance's purported purpose. Disruption of maritime commerce on the Eastern Seaboard greatly outweighs any asserted need of the Town to conserve municipal resources by excluding a relatively small component of tourists and visitors to Bar Harbor.

5.      While the Challenged Ordinance does not directly speak to pilotage, its effect is to eliminate the vast majority of vessels requiring pilotage in Frenchman Bay, and through its collateral impacts on other Maine ports, elsewhere in Maine. In so doing, the Challenged Ordinance upsets the balance of pilotage resources in the State and frustrates the purposes of Maine's pilotage system – to provide maximum safety for vessels entering and leaving Maine's coastal waters, to support the operations of pilotage groups with the highest standard of efficiency, and to ensure that well-qualified pilots are available for the discharge of their duties in aid of commerce and navigation.

6.      The Challenged Ordinance prevents the efficient accomplishment of the purposes of state pilotage laws and frustrates the very purposes of Maine's pilotage system – to provide maximum safety for vessels entering and leaving Maine's coastal waters, to support the

App. 082

operations of pilotage groups with the highest standard of efficiency, and to ensure that well-qualifies pilots are available for the discharge of their duties in aid of commerce and navigation. The Town's severe restrictions on cruise ship disembarkations effectively close the port of Bar Harbor to maritime cruise commerce, thereby disrupting the careful balance of pilotage resources in the State.

7.      The Challenged Ordinance specifically threatens the ability of the Penobscot Pilots Association to provide for the safe passage of vessels entering or leaving its designated pilotage area; undermines the Penobscot Pilots Association's ability to maintain the system of pilotage in its designated area for the public purposes of preserving and protecting lives, property, the environment, and transient vessels; and places in doubt the availability of qualified pilots to discharge pilotage duties in Penobscot and Frenchman Bays.

8.      The Challenged Ordinance frustrates Maine's ability to support and grow tourism and tourism-based revenues in the State and ensure consistency of municipal and regional tourism efforts with the State's economic development strategy. The Challenged Ordinance harms the State's ability to promote the cruise tourism industry in Maine and rely on the cruise tourism industry as a segment of the State's overall tourism economy, which is essential to the State's economic stability and growth.

9.      The Challenged Ordinance harms the Penobscot Pilots Association. The Challenged Ordinance is designed to suppress the overwhelming majority of cruise vessel traffic in Bar Harbor and Frenchman Bay, traffic which currently accounts for nearly 50 percent of the Penobscot Pilots Association's annual revenues. Without these revenues, the Penobscot Pilots Association will be unable to support the human and capital resources necessary to maintain efficient and high-quality pilotage services in the Penobscot Pilots Association's designated

App. 083

pilotage area and to recruit and train pilots for the future, as is necessary for the safe navigation of vessels in Frenchman Bay.

10.     The Challenged Ordinance violates the United States Constitution and the Maine Constitution. The Penobscot Pilots Association requests that this Court (1) enjoin the Challenged Ordinance from going into effect; (2) declare that the Challenged Ordinance is invalid under the Supremacy and Commerce Clauses of the U.S. Constitution; and (3) declare that the Challenged Ordinance is invalid under the Maine Constitution.

## PARTIES

11.     Plaintiff-Intervenor Penobscot Pilots Association is a corporation duly organized under the laws of the State of Maine, with a principal place of business in Searsport, Maine.

12.     The Penobscot Pilots Association is the single designated pilotage association providing pilotage services on seven of the ten regulated pilotage routes in Maine, covering Penobscot and Frenchman Bay and the Penobscot River. The Penobscot Pilots Association's owners are four of only nine active licensed pilots in Maine serving the waters under the jurisdiction of the Maine Pilotage Commission. The Penobscot Pilots Association's pilotage operations are regulated by the Maine Pilotage Commission.

13.     Defendant Town of Bar Harbor is a municipal corporation, duly organized under the laws of the State of Maine, and its principal place of business is in the County of Hancock, State of Maine.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts over actions arising under the Constitution or laws of the United States. The Penobscot Pilots Association brings claims arising under the

App. 084

Supremacy Clause, Article VI of the United States Constitution, the Commerce Clause, Article I, Section 8 of the United States Constitution, and for vindication of rights pursuant to 42 U.S.C. § 1983.[2]

15.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1367, which confers supplemental jurisdiction on federal district courts over all other claims that are so related to claims in the action within the court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. The Penobscot Pilots Association brings claims arising under the Maine Constitution, which arise out of a common nucleus of operative facts with the Penobscot Pilots Association's substantive federal claims.

16.     Venue is proper in the District of Maine pursuant to 28 U.S.C. § 1391. The Defendant resides in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

17.     The Court has authority to issue the requested relief under 42 U.S.C. § 1983 and to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

18.     The Penobscot Pilots Association satisfies the standard for intervention as a matter of right under Rule 24(a) of the Federal Rules of Civil Procedure. The Penobscot Pilots Association claims a significant protectable interest relating to the property or transaction which is the subject of the action and is so situated that disposition of the action may as a practical matter impair or impede the Penobscot Pilots Association's ability to protect its interest. The

---

[2] Section 1983 provides: "Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress[.]"

App. 085

Penobscot Pilots Association's interests are not adequately represented by the parties to the action.

19.     Alternatively, the Penobscot Pilots Association satisfies the standard for permissive intervention under Rule 24(b) of the Federal Rules of Civil Procedure.

20.     In either case, the Penobscot Pilots Association's request for intervention is timely.

## BACKGROUND

### *Maine State Pilotage System*

21.     Maritime pilotage in the United States is subject to an accumulation of regulatory requirements that, depending on the location of the pilot and the nationality or citizenship of the vessel, include both federal and state regulation of rates and qualifications. The First Congress of the United States, confronting a welter of pilotage practices from the former colonies, determined that pilotage ". . . in the bays, inlets, rivers, harbors and ports of the United States [should] continue to be regulated in conformity with the existing laws of the States, respectively . . . until further legislative provision shall be made by Congress."[3] Act of August 7, 1789, ch. 9, 1 Stat. 53 (1789) (the "Lighthouse Act"). Despite its power to regulate commerce and navigation, Congress elected to forego assertion of exclusive federal authority over pilotage in favor of permitting states to devise varying regulatory structures focusing on state regulation that permitted consideration of the peculiarities of particular ports and localities.

22.     Thus, since the earliest days of our Nation, and with certain exceptions not relevant here, pilotage of foreign vessels in United States waters has been governed by the twenty-four coastal states, including Maine, through comprehensive pilotage systems designed to

---

[3] The relevant Lighthouse Act provisions are now codified at 46 U.S.C. § 8501(a) and now reads, in relevant part, "Except as otherwise provided in this subtitle, pilots in the bays, rivers, harbors, and ports of the United States shall be regulated only in conformity with the laws of the States."

App. 086

meet the particular needs and circumstances of the state's waters and ensure that "well-trained independent pilots are always available, without discrimination, to any vessel required to use a state pilot." Paul G. Kirchner & Clayton L. Diamond, *Unique Institutions, Indispensable Cogs, and Hoary Figures: Understanding Pilotage Regulations in the United States*, 23 U.S.F. Mar. L.J. 168, 170 (2011) [hereinafter *Understanding Pilotage Regulations*]; *see* 46 U.S.C. § 8501.

23.     Every state pilotage statute compels pilotage, meaning that the state "requires . . . vessels to take [on] a state-licensed pilot[,]" "identifies the vessels to which the requirement applies[,]" and in so doing, "assumes the responsibility to ensure that the vessel receives good service and fair treatment." *Understanding Pilotage Regulations*, 23 U.S.F. Mar. L.J. at 189-90. Thus, the states regulate pilotage comprehensively, typically through state-recognized commissions, in order to "implement and support the pilotage requirement." *See id*.

24.     For safety and efficiency reasons, there is no competition among state pilots. States set and regulate the rates that pilots may charge for their services. *Id*. at 191. They also limit the number of pilot licenses issued to a number required to maintain a safe and efficient pilotage service. *Id*. These economic regulations have laudable goals. Under such a structure, states can ensure that pilots have the "right" amount of work – enough to "earn sufficient revenues to pay the substantial infrastructure costs of a modern pilotage operation and [remain] current in [their] experience over a broad range of vessel types and geographic locations" but not so much work as to cause fatigue. *Id*.

25.     Maritime pilots offer an essential and unique service to the maritime commerce industry. They provide critical independent local knowledge and navigational information to vessels and bring the highest level of ship-handling skills to maneuver vessels within their

App. 087

pilotage area. Safety is the primary objective of pilotage. State-licensed pilots are among the most highly trained mariners in the world.

26.     Pilotage is an "indispensable [element] in the transportation system of every maritime economy. [The pilots'] work prevents traffic congestion and accidents which would impair navigation in and to the ports. It affects the safety of lives and cargo, the cost and time expended in port calls, and in some measure, the competitive attractiveness of particular ports." *Kotch v. Bd. of River Port Pilot Comm'rs for Port of New Orleans*, 330 U.S. 552, 558 (1947).

27.     A modern, dependable piloting operation is an extensive system that requires great effort and resources to maintain. Pilotage associations or other groups of pilots must make large capital investments in pilot boats, office facilities and equipment, dispatch systems, communication equipment and other facilities, and equipment and support services. They also must invest in training and retaining capable crew for pilot boat operations and maintenance.

28.     Maine's system of state pilotage, established by state law at 38 M.R.S. §§ 85, *et seq.,* follows this time-tested design. The system is intended to "provide maximum safety from the dangers of navigation for vessels entering or leaving [Maine coastal and navigable waters], to maintain a state pilotage system devoted to the preservation and protection of lives, property, the environment and vessels entering or leaving these waters at the highest standard of efficiency and to insure the availability of pilots well qualified for the discharge of their duties in aid of commerce and navigation." 38 M.R.S. § 85. Pilotage is compulsory for "[e]very foreign vessel and every American vessel under register, with a draft of 9 feet or more, entering or departing from any port or harbor[.]" 38 M.R.S. § 86.

29.     The Maine Pilotage Commission oversees and administers the state-mandated system of pilotage covering ten pilotage routes in the three coastal zones of Maine's coastal

App. 088

waters. *See* 38 M.R.S. § 86-A. The Commission controls the assignment of pilotage areas, the licensing of pilots, and the rates that may be charged for pilotage service within its jurisdiction. 38 M.R.S. § 90.

30.     Under the jurisdiction and oversight of the Maine Pilotage Commission, the Penobscot Pilots Association maintains the state-mandated system of pilotage for the Penobscot and Frenchman Bays and the Penobscot River, which includes the ports of Searsport, Bucksport, Bangor/Brewer, Bar Harbor, and Rockland. The Penobscot Pilots Association's pilotage region extends 75 miles across from Boothbay Harbor to Frenchman Bay and 75 miles from the west pilot station on Penobscot Bay to the Penobscot River Port of Brewer.

31.     The Penobscot Pilots Association's pilots are responsible for guiding any vessel required to take a pilot within the Penobscot Pilots Association's designated area in accordance with state law. The pilots board vessels at offshore pilot stations 24 hours a day, 365 days a year (weather permitting) and navigate them safely to their destination. Once a vessel's port visit is complete, the pilots reverse the process and direct the navigation of the vessels until they are safely clear of state waters.

32.     The Penobscot Pilots Association facilitates year-round commercial traffic in Penobscot Bay and River ports of Searsport and Bucksport. These ports receive commercial traffic supporting trade in petroleum products and other liquid bulk cargos. In addition, Searsport regularly receives bulk, breakbulk, and specialty cargo and has carved out a niche serving the wind energy industry with the import of blades, towers, and nacelles for land-based wind turbine installation. Further up the Penobscot River, the port of Brewer receives sporadic vessel traffic in the form of tugs and barges calling on the Cianbro modular fabrication facility.

App. 089

33.     The Penobscot Pilots Association navigates large yachts (over 275') into Boothbay Harbor, Blue Hill Bay, and Somes Sound, as well as on the major waterways of Penobscot Bay and Frenchman Bay. Since 2016, the fastest growing segment of its pilotage operations has been the increase in cruise ship traffic visiting the port of Bar Harbor. In a six-month tourist season, the Penobscot Pilots Association will move more ships in Bar Harbor than in the entire year in Penobscot Bay and River. The region covered by the Pilots extends 75 miles across from Boothbay Harbor to Frenchman Bay, and 75 miles from the west pilot station on Penobscot Bay to the Penobscot River Port of Brewer.

34.     The Penobscot Pilots Association covers its region with four individual state-licensed pilots, two pilot boats, and a host of support staff in the form of contract pilots, pilot boat captains, deckhands, boat maintenance staff, and drivers for shoreside transportation. In addition to piloting vessels, the pilots are responsible for coordinating shoreside and pilot boat transportation arrangements for their respective jobs, planning transit times for deep-draft vessels based on the local 10-13' tides and daylight restrictions, and communicating these transit "windows" to attending ship agents and local terminal operators. The pilots also provide their own "back office" support, including dispatching, billing, accounting of invoices, and correspondence with agents and interested shippers regarding potential ship movements.

### Maine's Tourism Industry

35.     Tourism is a vital economic driver for Maine. The State invests considerable energy and money to support and expand the tourism industry in Maine and promote the state as a tourist destination. The day-to-day work is coordinated through the Maine Office of Tourism ("MOT"), which is charged with developing and implementing a "marketing and development strategy for state tourism growth that maximizes the effectiveness of state and private sector

App. 090

contributions in attracting visitors to the State and increasing tourism-based revenues." 5 M.S.A. § 13090-E; *see* 5 M.S.A. § 13090-C (legislative purpose of MOT).

36.     One of the focuses of the MOT is cruise tourism in Maine. To that end, MOT works with CruiseMaine to encourage and oversee cruise ship tourism in the state. State funding supports CruiseMaine for the purpose of promoting Maine as a cruise ship destination.

### Cruise Tourism in Bar Harbor

37.     Bar Harbor is a marquee cruise destination and popular port-of-call on a wide variety of cruise ship itineraries. Among other things, it serves as a popular access point for both Acadia National Park and cruises to Canadian ports along the Atlantic Coast and the St. Lawrence River.

38.     Bar Harbor is a destination port (not a turnaround port) for the cruise industry. Cruise itineraries do not begin or end at Bar Harbor.

39.     Bar Harbor also has the distinction of being one of the most convenient and practical customs ports of entry capable of accommodating the large number of cruise ships that re-enter the United States from foreign waters each season. Bar Harbor is one of only three such ports (termed Class A ports) in Maine.

40.     Bar Harbor is a tender port, meaning that cruise ships do not dock at the waters' edge. Cruise ships calling at Bar Harbor typically arrive in the morning and anchor offshore in federally designated anchorages outside the Town's municipal jurisdiction. The Penobscot Pilots Association's licensed pilots provide pilotage to the anchorages for all foreign-flagged vessels, as required by law, and for any U.S.-flagged vessels required to take a pilot.

App. 091

41.     Once anchored, smaller launches or tenders ferry passengers between the cruise vessels and two private piers in Bar Harbor. The pilots sometimes ride these tenders to and from the private piers.

42.     Passengers typically head back to the ships in the early afternoon, again via tenders. Once the ship is ready to depart, the pilots provide pilotage for the outbound transit of the cruise vessel to open water.

43.     For nearly 20 years, Bar Harbor has worked cooperatively with stakeholders, residents, cruise industry partners, and state agencies to develop cruise tourism in a manner beneficial to the Town and the cruise industry. As part of these efforts, in 2008, the Town accepted a recommendation from the Town's Cruise Ship Study Task Force (now the Cruise Ship Committee), which consists of representatives from the Town, businesses, tender operations, and the cruise industry, to adopt daily cruise passenger caps (based on a ship's lower berth capacity[4]) of 5,500 passengers per day for the months of May, June, September and October, and 3,500 passengers per day for the months of July and August.

44.     In early 2022, the Town formed a working group to explore with the cruise industry a modified cruise schedule for 2023 and beyond.

45.     Thereafter, the Town and various cruise lines entered into a Memorandum of Agreement ("MOA"), whereby the cruise lines voluntarily agreed that, in the months of May, June, September, and October, they would limit aggregate daily passenger disembarkations to 3,800 passengers, and in the months of July and August would limit daily passenger disembarkations to 3,500 passengers.

---

[4] "Lower berth capacity" generally refers to the capacity of the vessel and is calculated based on the number of "lower berths" or beds on the vessel. The term does not account for other persons on the vessel who may disembark at a port, such as crew.

**App. 092**

### *The Initiative*

46.     On March 16, 2022, a citizens' group submitted the Initiative to the Town Council of Bar Harbor. A true and accurate copy of the Initiative dated March 16, 2022 is attached hereto as <u>Exhibit A</u>.[5]

47.     Substantively, the Initiative proposed an amendment to the land use ordinance of the Town Code prohibiting the disembarkation of "more than 1,000 *passengers*, in the aggregate, … on a single calendar day from any cruise ship(s) [to] come to shore on, over, or across any property located within the Town of Bar Harbor[.]" Ex. A (emphasis added).

48.     The Initiative contained no plan for implementation. Instead, it required the Harbormaster to devise "a reservation system for cruise ships that transport passengers by watercraft for disembarkation in the Town of Bar Harbor"; a "mechanism for counting and tracking the number of passengers disembarking each day"; and a "mandatory procedure for reporting violations to the Code Enforcement Officer[.]" *Id.*

49.     The Initiative required compliance by "[a]ny property owner issued a permit under this § 125-77(H) … with all rules and regulations promulgated by the Harbor Master [pursuant to the Initiative]." *Id.*

50.     The Initiative empowered the Town's Code Enforcement Officer to impose fines and/or penalties of at least $100 for each "disembarking passenger exceeding the daily passenger limit" upon permit-holding property owners. *Id.*

51.     The Initiative was expressly retroactive to March 16, 2022, but proposed to exempt from its application "any cruise ship reservations that have been accepted by the Harbor

---

[5] A substantially similar version of the Initiative dated March 17, 2022 discusses "persons," not "passengers" and is expressly retroactive to March 17, 2022.  A true and accurate copy of the March 17, 2022 Initiative is attached hereto as <u>Exhibit A-1</u>.

**App. 093**

Master prior to March 16, 2022" and protect from enforcement action "any cruise ship visits occurring prior to the date of adoption by voters at [the] Town Meeting." *Id*.

52.     The Initiative's "purpose" section contains the purported rationale for the restrictive disembarkation limits of the Initiative's proponents. It complains that the "large numbers of [cruise ship] passengers" entering into the limits of the Town of Bar Harbor "have overwhelmed the downtown area, resulting in excessive congestion and traffic on public streets and sidewalks, frequent overcrowding of parks and other public spaces, and inundating local amenities and attractions, all of which result in a diminished quality of life for Town residents." *Id.*

53.     The Initiative's purpose section asserts further that the presence of "disembarking cruise ship passengers in the downtown area jeopardizes the Town's ability to deliver municipal services to Town residents and visitors (for example, cruise ship passengers), including the provision of public safety services (police and fire), emergency medical services (EMS), in-patient and out-patient services at local hospitals, pandemic control measures, and public sanitation services, and also impacts the ability of local shops, restaurants, and other businesses to attract and serve customers." *Id.*

54.     The Initiative blames only passengers arriving by cruise ship for the alleged burdens on the Town's public services, businesses, and healthcare providers. It makes no reference to visitors or tourists arriving by other means of transport.

55.     The Initiative's broad claims of harm allegedly caused by disembarking cruise passengers are not supported by studies or other evidence. For example, the Initiative does not cite traffic studies or accident statistics that show any deleterious effects of cruise passenger crowding of downtown areas. Nor does the Initiative reference statements or other evidence from

App. 094

Town officials indicating that the presence of more than 1,000 cruise passengers per day jeopardizes the Town's ability to offer police, fire, EMS, and hospital services.

56.     Although not expressly stated, the Initiative's purpose—and actual effect—is to bar almost all cruise ships from visiting Bar Harbor and for the ships that do call on Bar Harbor, bar their passengers from entering the Town.

57.     On August 2, 2022, the Town Council voted to place the Initiative on the warrant articles calling the November town meeting warrant. A true and accurate copy of the Order placing the Initiative on the warrant articles is attached hereto as <u>Exhibit B</u>.

58.     The Initiative was listed as Article 3 on the Warrant for the November 8, 2022, Special Town Meeting. A true and accurate copy of the Special Town Meeting Warrant, which includes Article 3, is attached hereto as <u>Exhibit C</u>.

59.     On November 8, 2022, the Bar Harbor Town Meeting passed Article 3. Pursuant to the Town Charter, Article 3 became the Challenged Ordinance, effective December 8, 2022.

60.     As presented and passed, the Challenged Ordinance uses the term "persons" rather than "passengers." Ex. B; Ex. C. As a result, the Challenged Ordinance imposes a 1,000-*person* cap that encompasses all forms of travelers (not just passengers) seeking to disembark from cruise ships.

### *Impacts of the Challenged Ordinance*

61.     The Challenged Ordinance, if implemented and enforced, will have swift and immediate impacts.

62.     The Challenged Ordinance will drastically reduce, and very likely eliminate the overwhelming majority of, cruise ship calls at the port of Bar Harbor. It will effectively prohibit cruise vessels with a certain lower berth capacity (those with a lower berth capacity in excess

**App. 095**

1,000, which account for approximately 95 percent of the cruise industry operating fleet capacity) from calling at Bar Harbor for the purpose of disembarking passengers and crew.

63.     Under the Challenged Ordinance, at a minimum, vessels with a lower berth capacity in excess of 1,000 passengers will be prohibited from disembarking their potential full complement of passengers (not to mention any crew). Even vessels with a lower berth capacity under 1,000 passengers will be discouraged from calling at Bar Harbor and, if they do call, will face the real possibility that, through the happenstance of timing, they will be prohibited from disembarking their potential full complement of passengers (or any combination of passengers and crew).

64.     Cruise lines include Bar Harbor as a port-of-call on cruise itineraries because it is popular with cruise passengers. Cruise passengers want to visit Bar Harbor and Acadia National Park. They want to get off the ship, visit the Town, and tour the surrounding area. A cruise itinerary with a stop at Bar Harbor loses its appeal if passengers cannot get off the ship. Cruise vessels simply will not call at Bar Harbor if, by law or the happenstance of timing, all passengers cannot choose to disembark and enjoy shoreside activities.

65.     The Challenged Initiative offers cruise lines a Hobson's choice – anchor at Bar Harbor as planned and somehow decide who can (and cannot) get off the ship, replace the Bar Harbor call with a call at Portland or Eastport (Maine's two remaining Class A ports), if capacity to accommodate the vessel even exists, or scrap the stop (or stops) in Maine altogether. The Challenged Ordinance renders Bar Harbor an unreliable destination port-of-call.

66.     The Challenged Ordinance will impact the 2023 and 2024 cruise seasons. The Challenged Ordinance, by its terms, makes the 1,000-person limit applicable to any cruise vessel booking confirmed on or after March 17, 2022.

App. 096

67.     The Challenged Ordinance will impact the 2025 cruise season. Cruise itineraries are planned years in advance, and many cruise lines are planning their itineraries and booking ports of call for 2025. Cruise lines are deciding now whether to include Bar Harbor on future itineraries. The Challenged Ordinance's disembarkation limits make it extremely difficult for any cruise line to project with certainty the availability of Bar Harbor as a port of call. And once cruise lines schedule their vessels to visit other ports, it could take years to reestablish cruise line confidence in calling at the port of Bar Harbor.

68.     The Challenged Ordinance will place unwarranted stress on the operations and capacity of other Maine ports. The Challenged Ordinance effectively eliminates Bar Harbor's capacity to process through U.S. Customs cruise vessels re-entering the United States. Instead, re-entering cruise vessels will need to call at one of Maine's two remaining Class A ports (Portland and Eastport). It is unlikely that Portland and Eastport will be able to fully absorb Bar Harbor's capacity, and ships that are excluded from Bar Harbor may have nowhere else to go, in Maine at least.[6]

69.     Maritime commerce requires and benefits from a robust and resilient system of pilotage. Pilotage is a time-proven service that provides great benefits to the State, residents, and visitors (human, vessel, and cargo). A strong system of pilotage preserves and protects lives, property, the environment, and vessels in Maine's coastal waters.

70.     Pilotage is an extensive system that requires great effort and resources to maintain. Pilotage groups face high fixed operating costs. They must acquire, maintain, and insure purpose-built pilot boats that are specifically designed to operate under challenging

---

[6] In this regard, the Challenged Ordinance likely will have impacts outside Maine as well.  If ships re-entering the United States cannot clear customs in Bar Harbor, Eastport, or Portland, they will need to clear customs at a port outside Maine, such as MassPort.

App. 097

conditions. They must employ and retain qualified mariners in sufficient numbers to operate reliable, efficient service 24 hours a day, 7 days a week, 365 days a year.

71.     Pilotage is a regulated industry. Its various aspects (participants, rates, territories) are carefully balanced to provide sufficient revenues to each pilotage group so that each group can cover its fixed costs, maintain the skills of the group's pilots, and attract future pilots to the profession. This regulation helps ensure that essential pilotage services are available to all vessels required to take on a pilot without discrimination. It also ensures that pilots who provide these necessary services are well-qualified, skilled and experienced in the waters of their designated area, and adequately compensated to support the human and capital costs of their endeavors.

72.     Pilotage is an essential public service in aid of interstate and foreign commerce. It is designed to weather fluctuations in vessel traffic resulting from customary market forces, economic and business changes, and the ebb and flow of supply and demand. But it cannot be maintained in an environment where commerce is allowed or denied by local fiat.

73.     The Challenged Ordinance arbitrarily excludes a whole category of commerce from Frenchman Bay by local fiat. In so doing, the Challenged Ordinance threatens the efficiency and viability of the Penobscot Pilots Association. Approximately 50 percent of the Penobscot Pilots Association's annual revenues come from pilotage services provided to cruise vessels anchoring in Frenchman Bay. The Challenged Ordinance aims to reduce that cruise traffic drastically, thereby cutting the Penobscot Pilots Association's revenues nearly in half. These revenues cannot be replaced.

74.     The large and immediate loss of revenue for the Penobscot Pilots Association as a result of the Challenged Ordinance will negatively impact the Penobscot Pilots Association's

App. 098

ability to cover its fixed costs, attract and retain well-qualified mariners to the profession and in service of the Penobscot Pilots Association's designated area, and otherwise maintain the system of pilotage in its designated area.

75.     The immediate disruption of the Penobscot Pilots Association's resources, and the consequent inability of the Penobscot Pilots Association to perform its vital role, will compromise the safety, environmental resources, and security of traffic in the Penobscot Pilot Association's pilotage area to the detriment of all persons, property, and vessels that rely on its pilotage services for safe navigation.

76.     The Challenged Ordinance, by local fiat, categorizes a whole segment of commerce as locally undesirable, and therefore excludable. In so doing, the Challenged Ordinance upsets the natural balance of maritime commerce and threatens the efficiency and viability of the Maine pilotage system as an essential element of maritime commerce. Its protectionist effects will impact maritime commerce up and down the coast of Maine.

## FIRST CAUSE OF ACTION
### *Violation of the Supremacy Clause*

77.     The Penobscot Pilots Association repeats and incorporates by reference the allegations contained in paragraphs 1 through 76 as if fully set forth herein.

78.     The Supremacy Clause provides that the United States "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2.

79.     State and local law is superseded by federal law in three instances: (1) when Congress states its intention to displace state law in a federal statute (express or explicit preemption), (2) where the federal interest is so dominant that the federal system will prevent

App. 099

enforcement of state laws on the same subject (field or implicit preemption), and (3) where the state or local law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" or compliance with both state and federal law is impossible (conflict preemption). *Young v. Coloma-Agaran*, No. 00-00774, 2001 WL 1677259 (D. Haw. Dec. 27, 2001) (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67 (1941)), *aff'd*, 340 F.3d 1053 (9th Cir. 2003).

80.     The Constitution and numerous federal statutes recognize the primacy and virtual exclusivity of federal authority over maritime activities. *See United States v. Locke*, 529 U.S. 89, 108 (2000). The "manifest purpose" of committing maritime law to the federal government was to avoid the "confusion and difficulty" that would come if "vessels were compelled to comply with the local statutes at every port[.]" *State of Washington v. W.C. Dawson & Co.,* 264 U.S. 219 (1924). Therefore, local interests must "yield" to the Constitution in the field of maritime commerce. *Id.*; *see Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 674-75 (1982).

81.     The federal interest in uniformity in the maritime arena is reflected in the substantial body of federal law that governs and regulates the operations of cruise vessels serving the interstate and foreign maritime commerce of the United States. For instance, cruise vessels are subject to federal inspection and supervision in a variety of areas, including construction standards, environmental protection requirements, operational procedures, customs and immigration compliance, security measures, and health and safety requirements.

82.     The federal government routinely prescribes practices, procedures, and standards for maritime vessel operations and, in the interests of safety, environmental protection, and maritime and national security, directs where vessels may (and may not) operate or anchor. *See,*

App. 100

*e.g.*, 46 C.F.R. Subchapter H. The Coast Guard's Title 46 regulations "have the force of law" and "preemptive effect over State or local regulations in the same field." 46 C.F.R. § 70.01-1.

83.     Under this comprehensive federal statutory and regulatory regime, granting (or revoking) permission for a ship to enter a U.S. port, disembark, and begin operation, lies solely with the federal government.[7] Therefore, state or local laws that ban federally-licensed vessels from calling at a port violate the Supremacy Clause. *See Young v. Coloma-Agaran*, 340 F.3d 1053, 1057 (9th Cir. 2003).

84.     Cruise ships calling at the port of Bar Harbor are regulated by the federal government and operate under valid Coast Guard Certificates of Inspection issued pursuant to regulations at Title 46, Chapter 1, Subchapter H.[8]  Having satisfied all federal requirements for their operations, these cruise ships are authorized to engage in the activities for which they have been certified.

85.     The Town cannot exclude federally regulated and federally certified cruise ships from the port. *See Young*, 340 F.3d at 1057 (state or local laws that ban federally-licensed vessels from calling at a port violate the Supremacy Clause).

86.     Yet, near-complete exclusion of federally certified cruise ships from the port of Bar Harbor is exactly the result of the Challenged Ordinance. The 1,000-person daily disembarkation limit will effectively prohibit the cruise fleet that has historically visited the Town (*i.e.*, cruise ships carrying 1,000 or more passengers) from calling at Bar Harbor, despite

---

[7] *See, e.g.*, CTRS. FOR DISEASE CONTROL AND PREVENTION, SECOND MODIFICATION AND EXTENSION OF NO SAIL ORDER AND OTHER MEASURES RELATED TO OPERATIONS (July 16, 2020) (making clear that the federal government alone grants (or denies) permission for a carrier to enter a U.S. port, disembark, and begin operation in "international, interstate, or intrastate waterways subject to the jurisdiction of the United States"); *see also* 42 C.F.R. § 71.1(b) (defining "controlled free pratique).
[8] As noted above, these regulations "have preemptive effect over State or local regulations in the same field." 46 C.F.R. § 70.01-1.

App. 101

these vessels being physically able to operate safely in the navigable waters surrounding Bar Harbor and despite these vessels meeting all applicable federal (and international) standards. No cruise vessel will call at a port where all passengers and crew, whether by law or by the happenstance of timing, cannot disembark.

87.    The federal government, through the United States Coast Guard, also regulates the maritime facilities that embark or disembark persons traveling on vessels certified to carry more than 150 passengers. *See* 33 C.F.R. § 105.105(a)(2).

88.    Like the Title 46 regulations, the regulations at Title 33, Chapter 1, Subchapter H, Part 105 "have preemptive effect over State or local regulations insofar as a State or local law or regulation applicable to the [federally-regulated] facilities … would conflict with the regulations in part 105, either by actually conflicting or by frustrating an overriding Federal need for uniformity." 33 C.F.R. § 101.112(b).

89.    Among other things, the Part 105 regulations require that the owner or operator of a covered maritime facility ensure shore access to seafarers, which include vessel crew and pilots. 33 C.F.R. § 105.237. A maritime facility operating pursuant to Part 105 cannot provide timely access to some seafarers and not others.

90.    The Challenged Ordinance applies to all persons seeking to disembark from cruise vessels. Its 1,000-person daily cap directly conflicts with, and is expressly preempted by, federal law and regulations requiring that maritime facilities provide timely access to all seafarers (including pilots) seeking to disembark at the facility.

91.    The Challenged Ordinance interferes with the right of the Penobscot Pilots Association's pilots to disembark from a cruise vessel at the Part 105 maritime facilities operated by Plaintiffs BH Piers, L.L.C. and Golden Anchor, L.C.

App. 102

92.     A disparate state law also "must yield when it is inconsistent with or impairs the policy or provisions of a treaty or of an international compact or agreement." *United States v. Pink*, 315 U.S. 203, 231 (1942).

93.     The cruise industry is inherently international. A "significant and intricate complex of international treaties and maritime agreements[,]" in addition to the above-mentioned federal regulations, "bear[ ] upon the licensing and operation of vessels." *Locke*, 529 U.S. at 102. The United States is a party to, among other treaties and agreements, the *International Convention for the Safety of Life at Sea*, 1974, 32 U.S.T. 47, T.I.A.S, No. 9700, the *International Convention for Prevention of Pollution from Ships*, 1973, S. Exec. Doc. C, 93-1, 12 I.L.M. 1319, as amended by 1978 Protocol, S. Exec. Doc. C., 96-1, 17 I.L.M. 546, and the *International Convention of Standards of Training, Certification and Watchkeeping for Seafarers*, With Annex, 978 (STCW), S. Exec. Doc. EE 96-1, C.T.I.A. No. 7624. *See id.* at 102-03.

94.     These conventions, established under the auspices of the International Maritime Organization (IMO) and, by extension, the United Nations, bind signatory maritime nations to minimum standards for vessels flying their own flag, establish mutual cooperation among Port States to ensure uniformity of enforceable standards that each party imposes on vessels of other nations, and impose the sole enforceable standards that each party may impose on the vessels of other signatory nations' flags.

95.     A key structural component of the network of maritime treaties and conventions to which the United States is a party is the notion of reciprocity—signatory nations, including the United States, accept compliance by another nation as satisfying conditions for port entry. When the national government has exercised its indisputable foreign affairs powers to commit the United States to vessel standards agreed to by various maritime countries, it is clear that a

App. 103

municipality cannot restrict the operation of a vessel that the federal government has pledged to accept in U.S. ports.

96.     The Challenged Ordinance violates the Supremacy Clause. It impermissibly aims to circumvent federal maritime laws and regulations and impose local regulation upon navigable waters of the United States. It violates the explicit language of, and conflicts with, multiple federal laws, including regulations that expressly preempt state and local laws. It violates the comprehensive federal regulatory scheme by purporting to control ship design, construction, ability to call at a U.S. port, operations and passengers, and operation of vessels through its 1,000-person limit. Moreover, it impermissibly frustrates the overriding need for federal supremacy and uniformity in the field of maritime commerce.

97.     The Challenged Ordinance harms the Penobscot Pilots Association.

98.     An actual justiciable controversy exists among the parties regarding whether the Challenged Ordinance is preempted by federal law and thus unconstitutional and in violation of the Supremacy Clause.

## SECOND CAUSE OF ACTION
### *Violation of the Commerce Clause*

99.     The Penobscot Pilots Association repeats and incorporates by reference the allegations contained in paragraphs 1 through 76 and 78 through 97 as if fully set forth herein.

100.     The Commerce Clause of the U.S. Constitution, Art. I, § 8, Clause 3, provides Congress with the power "[t]o regulate Commerce with foreign Nations, and among the several States." The Commerce Clause's express grant of power carries with it "a further, negative command, known as the dormant Commerce Clause," *Okla. Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. 175, 179 (1995), which limits the power of local governments to enact laws affecting interstate commerce. *Hughes v. Oklahoma,* 441 U.S. 322, 326 (1979); *see S.-Cent.*

*Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984). Even in the absence of congressional legislation, the Commerce Clause restricts "the power of the States to interfere with or impose burdens on interstate commerce." *Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 389 (1983) (quoting *Western & Southern Life Insurance Co. v. Board of Equalization,* 451 U.S. 648, 652 (1981)).

101.    For matters affecting foreign commerce, the federal government's power is "exclusive and absolute," *Buttfield v. Stranahan*, 192 U.S. 470, 493 (1904), and "may not be limited, qualified, or impeded to any extent by state action[,]" *Bd. of Trustees of Univ. of Illinois v. United States,* 289 U.S. 48, 56-57 (1933)..

102.    Local measures violate the Commerce Clause if they: (1) attempt to regulate beyond the boundaries of the enacting state; (2) discriminate against interstate commerce on their face, in purpose, or in effect; (3) create an excessive burden on interstate commerce in relation to any putative local benefits; or (4) interfere with the federal government's ability to speak with one voice when regulating commerce with foreign nations.

103.    Local laws that discriminate against interstate commerce are *per se* invalid under the Commerce Clause, subject only to a government's defensive demonstration that the law has a non-protectionist purpose and employs the least discriminatory means for achieving that purpose. A law must have more than a non-protectionist *stated* purpose because the "evil of protectionism can reside in legislative means as well as legislative ends." *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Nat. Res.*, 504 U.S. 353, 360 (1992) (quoting *City of Philadelphia v. New Jersey*, 437 U.S. 617, 626-27 (1978)). A legitimate state goal may not be "achieved by the illegitimate means of isolating the State from the national economy." *Id*.

App. 105

104.     The Challenged Ordinance is a regulation of commerce. It regulates the transport of persons by water and prescribes the terms and conditions for the discharge of passengers. When applied to vessels and passengers arriving from foreign ports, it regulates foreign commerce as well. *See Henderson v. Mayor of City of New York*, 92 U.S. 259, 271 (1875) (describing conditions placed on the discharge of passengers as regulation of interstate and foreign commerce); *see also Chy v. Freeman*, 92 U.S. 275 (1875)*; Gibbons v. Ogden*, 22 U.S. 1, 9 (1824).

105.     The Challenged Ordinance discriminates against interstate commerce. The transport of persons by water to Bar Harbor is an inherently "out-of-state" activity. Almost exclusively, cruise vessels call at the port of Bar Harbor on itineraries that include one or more calls at ports in other states.

106.     Transport by water, however, is not the only (or even the primary) way that persons enter Bar Harbor.

107.     The Challenged Ordinance seeks only to restrict the number of persons who visit Bar Harbor by cruise ship. Persons gaining access to Bar Harbor by any other means of conveyance (such as land-based conveyance) are unaffected.

108.     The Initiative (on which the Challenged Ordinance is based) asserts, though does not demonstrate, that the "large numbers" of persons coming to the Town via cruise ships jeopardizes the Town's ability to deliver municipal services to Town residents and visitors (including those visitors that the Initiative seeks to exclude) and "diminish[es]" the "quality of life for Town residents." Ex. A; Ex. A-1.

109.     The Initiative (on which the Challenged Ordinance is based) asserts that the disembarkation limit is necessary to "protect, preserve and promote the general health, safety,

App. 106

welfare and peace of the community." *Id.* But the Initiative does not provide evidence to support its claims that the presence of more than 1,000 cruise passengers per day impedes the Town's ability to maintain the health, safety, or welfare of the community.

110.    The Initiative (on which the Challenged Ordinance is based) does not assert that the alleged impacts on the Town and its residents caused by persons coming via cruise ship, either individually or collectively, are any different from impacts caused by persons arriving in Bar Harbor by other means of conveyance. Indeed, the Initiative does not even refer to the impact of non-cruise visitors in Bar Harbor.

111.    The Challenged Ordinance essentially erects a wall around the port of Bar Harbor—halting commerce from a large percentage of cruise ships active in interstate and foreign commerce. This is exactly the kind of local obstruction of commerce that the Commerce Clause is designed to avoid. *See S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 92 (1984). Eliminating or reducing the presence of out-of-state cruise tourists is not a proper reason for a ban and contradicts the very purpose of the Commerce Clause.

112.    Even if the Challenged Ordinance had a non-protectionist purpose, which it does not, a disembarkation limit applied only to persons arriving by one type of conveyance is not the least discriminatory means for achieving that purpose.

113.    A local law also violates the Commerce Clause if the burdens it creates on interstate commerce clearly exceed the law's putative local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

114.    The Challenged Ordinance imposes burdens on interstate commerce that are clearly excessive in relation to any of the Challenged Ordinance's putative local benefits.

App. 107

115.     The Challenged Ordinance does little, if anything, to further any putative public health or safety purpose. Rather, its narrow, protectionist focus on cruise ship visitors purposefully ignores the reality that the "evils" allegedly suffered by the Town's residents will not be solved by imposing draconian limits on one small segment of visitors only.

116.     The Challenged Ordinance creates substantial barriers to the free flow of commerce. It forces cruise lines to "route around" the disembarkation limits by calling at other ports, use only the smallest of vessels to call at Bar Harbor, or remove Bar Harbor (and possibly other ports in Maine) completely from cruise itineraries.

117.     The Challenged Ordinance disrupts the free flow of interstate commerce by imposing a burdensome and almost impossible condition on cruise vessels that seek to call and disembark passengers at Bar Harbor. *See Henderson*, 92 U.S. at 271. In this way, the Challenged Ordinance more than burdens interstate commerce. It essentially halts interstate (and foreign) cruise commerce at the port of Bar Harbor.

118.     In matters pertaining to foreign commerce, the federal government's power is "exclusive and absolute." *Buttfield*, 192 U.S. at 493. Discordant state and local restrictions must give way before the imperative that the national government "speak[] with one voice." *Japan Line Ltd. v. Los Angeles County*, 441 U.S. 434, 452 (1979).

119.     Federal supremacy over maritime commerce and the Nation's relationships with foreign countries leaves little room for state or local action. *See, e.g., Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000); *Locke*, 529 U.S. at 108 (recognizing a need for "uniformity of regulation for maritime commerce"); *Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue & Fin.*, 505 U.S. 71, 79 (1992) ("the Foreign Commerce Clause recognizes that discriminatory treatment

App. 108

of foreign commerce may create problems, such as the potential for international retaliation, that concern the Nation as a whole.").

120.     The Challenged Ordinance discriminates against foreign commerce. Foreign-flagged cruise vessels make up the overwhelming majority of cruise vessels that call at the port of Bar Harbor. All of these vessels are engaged in itineraries that include one or more calls at ports in other countries (*i.e.*, Canada, Bermuda),[9] and the majority of these vessels have lower berth capacities in excess of 1,000 passengers. These vessels facilitate the international transportation of passengers, and they will bear the burden of the Challenged Ordinance's limitations. The Challenged Ordinance thus favors domestic vessels over foreign competitors and ships engaged in domestic itineraries over ships engaged in international itineraries. The Town is without authority to make such impositions on foreign commerce.

121.     The Challenged Ordinance impermissibly regulates in an area where national uniformity is essential. Every cruise ship journey involves advanced planning for complex vessel itineraries, the interstate and foreign travel of passengers not only aboard the vessel but, upon reaching a particular port of call, may also, as in true for Bar Harbor, involve providing for pilotage to ensure the safe and efficient navigation of vessels from and to open water and to assist in the maneuvering of vessels while anchoring. This advanced planning for both international and interstate commerce requires uniformity in regulation.

122.     The Challenged Ordinance imposes rules for landing persons in Bar Harbor that are different than the rules of other U.S. ports, in violation of the Commerce Clause. *Henderson*, 92 U.S. at 273 ("The laws which govern the right to land passengers in the United States from other countries ought to be the same in New York, Boston, New Orleans, and San Francisco.").

---

[9] Foreign-flagged cruise ships must call at a foreign port in order not to run afoul of U.S. cabotage laws. *See* 46 U.S.C. § 55103.

App. 109

In so doing, the Challenged Ordinance threatens the Nation's ability to maintain an integrated maritime transportation system.

123.    The Challenged Ordinance harms the Penobscot Pilots Association. Among other things, it will severely diminish the Penobscot Pilots Association's ability to provide valuable services to instrumentalities of interstate and foreign commerce.

124.    The Challenged Ordinance deprives the Penobscot Pilots Association of rights secured by the U.S. Constitution, under color of state law, thereby violating 42 U.S.C. § 1983.

125.    An actual justiciable controversy exists among the parties regarding whether the Challenged Ordinance violates the Commerce Clause.

126.    The Penobscot Pilots Association is entitled to declaratory and injunctive relief against the Town.

**COUNT III**
***Violation of the Maine Constitution***
***Preemption by 38 M.R.S. §§ 85, et seq.***

127.    The Penobscot Pilots Association repeat and incorporate by reference the allegations contained in paragraphs 1 through 76, 78 through 97, and 100 through 123 as if fully set forth herein.

128.    Home rule is granted to municipalities by the Maine Constitution and Maine's home rule statute. Me. Const. art. VIII, Pt. 2, § 1; 30-A M.R.S. § 3001.[10]

129.    Home rule, while broad, does not authorize all municipal action. To be sure, municipal action is invalid "when the Legislature has expressly prohibited local regulation, or

---

[10] The Maine Constitution provides municipalities the "power to alter and amend their charters on all matters, not prohibited by Constitution or general law, which are local and municipal in nature." Me. Const. art. VIII, pt. 2, § 1. Section 3001 provides municipalities the authority to "exercise any power or function . . . which is not denied either expressly or by clear implication." 30-A M.R.S. § 3001 (municipal action can be preempted expressly or by implication); *see State v. Brown*, 95 A.3d 82, 90–91 (Me. 2014) (citing cases).

**App. 110**

when the Legislature has intended to occupy the field and the municipal legislation would frustrate the purpose of state law." *State v. Brown,* 95 A.3d 82, 90-91 (Me. 2014) (quoting *Perkins v. Town of Ogunquit*, 709 A.2d 106 (Me. 1998)).

130.    In the absence of an express prohibition, a local ordinance is preempted where state law creates "a comprehensive and exclusive regulatory scheme inconsistent with the local action" or the local ordinance "prevents the efficient accomplishment of a defined state purpose[.]" *E. Perry Iron & Metal Co. v. City of Portland*, 941 A.2d 457, 462 (Me. 2008).

131.    The pertinent inquiry is "whether the local action would frustrate the purpose of any state law[,]" *Sawyer Env't Recovery Facilities, Inc. v. Town of Hampden,* 760 A.2d 257, 263-64 (Me. 2000), or ""prevent[ ] [its] efficient accomplishment[,]" *Smith v. Town of Pittston,* 820 A.2d 1200 (Me. 2003).

132.    Maine has enacted a comprehensive system to regulate pilotage. The statute's broad legislative purpose includes "provid[ing] maximum safety from the dangers of navigation for vessels entering or leaving the waters[,]" "maintain[ing] a state pilotage system devoted to the preservation and protection of lives, property, the environment and vessels entering or leaving these waters at the highest standard of efficiency[,]" and "insur[ing] the availability of pilots well qualified for the discharge of their duties in aid of commerce and navigation." 38 M.R.S. § 85.

133.    The Challenged Ordinance is inconsistent with Maine's comprehensive scheme for the provision and regulation of pilotage services along Maine's coastal waters.

134.    The Challenged Ordinance, by local fiat, categorizes a whole segment of commerce as locally undesirable, and therefore excludable. Its effect is to eliminate a whole

App. 111

category of vessels from Frenchman Bay, and through its collateral impacts on other Maine

ports, elsewhere in Maine.

135.    The Challenged Ordinance destroys the natural balance of maritime commerce.

Its protectionist effects will impact maritime commerce up and down the coast of Maine.

136.    The Challenged Ordinance threatens the efficiency and viability of the Maine

pilotage system as an essential element of maritime commerce and, in so doing, frustrates the

public interest purposes of Maine's pilotage system – to provide maximum safety for vessels

entering and leaving Maine's coastal waters, to support the operations of pilotage groups with

the highest standard of efficiency, and to ensure that well-qualified pilots are available for the

discharge of their duties in aid of commerce and navigation.

137.    The Challenged Ordinance prevents the efficient accomplishment of the public

interest purposes of the State's pilotage law. In particular, it frustrates the ability of the

Penobscot Pilots Association and the State to "insure the availability of pilots" for its designated

pilotage area, as the current pilotage system does. Efficient, reliable, and available pilotage

operations cannot be maintained in an environment where municipalities are permitted to close

their shores to whole segments of commerce.

138.    The Challenged Ordinance will cut off an entire segment of vessel traffic into

Frenchman Bay instantaneously. The immediate loss of this traffic and its corresponding revenue

will frustrate the ability of the Penobscot Pilots Association to maintain the system of state

pilotage in its designated area. The Penobscot Pilots Association likely will need to reduce the

number of pilots it employs while still covering its entire pilotage area, from Boothbay Harbor to

Frenchman Bay. Other vessels will bear the consequences (*i.e.*, traffic delays) of the Penobscot

Pilots Association's reduced capacity to provide pilotage. Over time, the loss of revenue will

App. 112

discourage experienced mariners from undertaking the years of training required to become a

state pilot, thereby preventing the Penobscot Pilots Association from being able to fulfill its

mandate to the State to insure the availability of pilots well qualified for the discharge of their

duties in aid of commerce and navigation.

139.    The Challenged Ordinance harms the Penobscot Pilots Association.

140.    An actual justiciable controversy exists among the parties regarding whether the

Challenged Ordinance frustrates or otherwise prevents the efficient accomplishment of the

purposes of the Maine state pilotage laws.

141.    The Penobscot Pilots Association is entitled to declaratory and injunctive relief

against the Town.

**COUNT IV**
*Violation of the Maine Constitution*
*Preemption by 5 M.R.S. §§ 13052, et seq.*

142.    The Penobscot Pilots Association repeat and incorporate by reference the

allegations contained in paragraphs 1 through 76, 78 through 97, 100 through 123, and 128

through 139 as if fully set forth herein.

143.    Local action is preempted when it "would frustrate the purpose of any state

law[,]" *Sawyer Env't Recovery Facilities, Inc. v. Town of Hampden,* 760 A.2d 257, 263-64 (Me.

2000), or "prevent[ ] [its] efficient accomplishment[,]" *Smith v. Town of Pittston,* 820 A.2d 1200

(Me. 2003) (quoting *School Comm. of Town of York v. Town of York,* 626 A.2d 935, 938 n.8

(Me. 1993)).

144.    Tourism is a vital economic driver for Maine, and the State relies heavily on

tourism for economic stability and growth. Maine statutes establish the importance of state-level

coordination of economic development policies and programs and consistency of municipal and

App. 113

regional economic efforts with the economic development strategy for the State. 5 M.R.S. §
13052. Maine statutes further direct the MOT, as an organization within the Maine Department
of Economic and Community Development, to fulfill the State's economic growth and
development purposes and mission consistent with the State's economic development strategy. 5
M.R.S. § 13055.

145.    The State invests considerable energy and money to support and grow the tourism
industry in Maine, promote the state as a tourist destination, maximize the effectiveness of state
and private sector contributions in attracting visitors to the State, and increase tourism-based
revenues. 5 M.S.A. § 13090-E; *see* 5 M.S.A. § 13090-C (legislative purpose of MOT).

146.    The Challenged Ordinance is inconsistent with Maine's goals of tourism and
tourism-based revenue growth. It is inconsistent with Maine's efforts to promote the cruise
industry in Maine. The Challenged Ordinance frustrates the purposes of Maine's efforts to
maintain state-level coordination of economic development policies and programs, which
support growth of the cruise tourism industry in Maine.

147.    The Challenged Ordinance, again by local fiat, egoistically seeks to reduce,
almost to a trickle, cruise tourism in Bar Harbor.

148.    The Challenged Ordinance will have outsized, negative impacts on cruise tourism
throughout Maine. Ships that previously would have visited two or even three ports in Maine
will stop at fewer ports (because Bar Harbor is not an option) or will skip Maine ports altogether.
The State's tourism industry and other municipalities who benefit economically from the tourism
industry will bear the consequences of the Town's protectionist attempt to ban cruise tourism.

149.    The Challenged Ordinance harms the Penobscot Pilots Association.

App. 114

150.    An actual justiciable controversy exists among the parties regarding whether the Challenged Ordinance frustrates or otherwise prevents the efficient accomplishment of the purposes of the Maine economic development and tourism laws.

151.    The Penobscot Pilots Association is entitled to declaratory and injunctive relief against the Town.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Intervenor Penobscot Bay and River Pilots Association respectfully prays for judgment against Defendant Town of Bar Harbor as follows:

1.  A judgment, pursuant to 28 U.S.C. § 2201, against Defendant Town of Bar Harbor and in favor of Plaintiff-Intervenor Penobscot Bay and River Pilots Association, declaring that the Challenged Ordinance is preempted by federal law and violates the Supremacy Clause of the United States Constitution.

2.  A judgment, pursuant to 28 U.S.C. § 2201, against Defendant Town of Bar Harbor and in favor of Plaintiff-Intervenor Penobscot Bay and River Pilots Association, declaring that the Challenged Ordinance violates the Commerce Clause of the United States Constitution.

3.  A judgment, pursuant to 28 U.S.C. § 2201, against Defendant Town of Bar Harbor and in favor of Plaintiff-Intervenor Penobscot Bay and River Pilots Association, declaring that the Challenged Ordinance frustrates the purpose of Maine state laws establishing and regulating a statewide system of pilotage and therefore is preempted under the Maine Constitution and 30-A M.R.S. § 3001.

4.  A judgment, pursuant to 28 U.S.C. § 2201, against Defendant Town of Bar Harbor and in favor of Plaintiff-Intervenor Penobscot Bay and River Pilots Association,

App. 115

declaring that the Challenged Ordinance frustrates or otherwise prevents the efficient accomplishment of the purposes of the Maine economic development and tourism laws and therefore is preempted under the Maine Constitution and 30-A M.R.S. § 3001.

5. A judgment, pursuant to 28 U.S.C. § 2201, against Defendant Town of Bar Harbor and in favor of Plaintiff-Intervenor Penobscot Bay and River Pilots Association, declaring that any local, involuntary imposition of limitation(s) on the disembarkation of passengers, crew, and other persons from federally certified vessels violates the Supremacy Clause of the United States Constitution.

6. A judgment, pursuant to 28 U.S.C. § 2201, against Defendant Town of Bar Harbor and in favor of Plaintiff-Intervenor Penobscot Bay and River Pilots Association, declaring that any local, involuntary imposition of limitation(s) on the disembarkation of passengers, crew, and other persons from vessels operating in the interstate and foreign commerce of the United States violates the Commerce Clause of the United States Constitution.

7. A judgment, pursuant to 28 U.S.C. § 2201, against Defendant Town of Bar Harbor and in favor of Plaintiff-Intervenor Penobscot Bay and River Pilots Association, declaring that any local, involuntary imposition of limitation(s) on the disembarkation of passengers, crew, and other persons from maritime vessels frustrates the purpose of Maine state laws establishing and regulating a statewide system of pilotage and therefore is preempted under the Maine Constitution and 30-A M.R.S. § 3001.

8. A judgment, pursuant to 28 U.S.C. § 2201, against Defendant Town of Bar Harbor and in favor of Plaintiff-Intervenor Penobscot Bay and River Pilots Association,

App. 116

declaring that any local, involuntary imposition of limitation(s) on the disembarkation of passengers, crew, and other persons from maritime vessels frustrates or otherwise prevents the efficient accomplishment of the purposes of the Maine economic development and tourism laws and therefore is preempted under the Maine Constitution and 30-A M.R.S. § 3001.

9.  A permanent injunction against Defendant Town of Bar Harbor, and such other preliminary injunctive or other relief as may be appropriate to prevent injury pending review (as requested in Plaintiffs' pending motion for preliminary injunction, ECF No. 12), prohibiting Defendant Town of Bar Harbor from (i) implementing and/or enforcing the Challenged Ordinance and (ii) failing to accept, enter, take, and honor cruise vessel reservations for calls at the port of Bar Harbor on the basis of the Challenged Ordinance.

10. An award to Plaintiff-Intervenor Penobscot Bay and River Pilots Association of all costs, attorneys' fees, and expenses, pursuant to 42 U.S.C. § 1988.

11. Such other and further relief as this Court deems just and proper.

Respectfully submitted,

C. Jonathan Benner (*pro hac vice* pending)
Kathleen E. Kraft (*pro hac vice* pending)
Thompson Coburn LLP
1909 K Street N.W., Suite 600
Washington, D.C. 20006
(202) 585-6900 (main)
(202) 585-6969 (fax)

*Attorneys for Plaintiff-Intervenor Penobscot Bay and River Pilots Association*

*/s/ Twain Braden*
Twain Braden, Esq.
Thompson Bowie & Hatch LLC
415 Congress Street
P.O. Box 4630
Portland, ME 04112-4630
(207) 774-2500
tbraden@thompsonbowie.com

Date: January 19, 2023

App. 117

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, *et al.*,<br><br>    *Plaintiffs*,<br><br>PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION, a Maine corporation,<br><br>    *Plaintiff-Intervenor*,<br><br>v.<br><br>TOWN OF BAR HARBOR, a municipal corporation of the State of Maine,<br><br>    *Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     **Civil Action No. 1:22-cv-416** |

## ANSWER AND DEFENSES

Defendant Town of Bar Harbor ("Defendant"), by and through its attorneys, Rudman Winchell, hereby answers the Verified Complaint (the "Complaint") filed by Plaintiffs, the Association to Preserve and Protect Local Livelihoods ("APPLL"), B.H. Piers, L.L.C. ("BH Piers"), Golden Anchor, L.C., doing business as Harborside Hotel ("Harborside"), B.H.W.W., L.L.C. ("BHWW"), Delray Explorer Hull 495 LLC ("495"), Delray Explorer Hull 493 LLC ("493"), and Acadia Explorer 492, LLC ("492") (and together with APPLL, BH Piers, Harborside, BHWW, 495, and 493, "Plaintiffs"), as follows:

## DEFENSES

1.    Plaintiffs have failed to state a claim upon which relief may be granted.

App. 118

2. Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations.

3. Plaintiffs lack standing to bring this action.

4. This action is not ripe for adjudication.

5. Plaintiffs have failed to present a justiciable controversy among or between the parties.

6. Plaintiffs have failed to demonstrate that they are entitled to injunctive relief.

7. Defendant has acted in good faith at all times relevant to this action.

8. Plaintiffs' claims are barred, in whole or in part, by the doctrines of waiver, estoppel, and/or unclean hands.

9. Defendant's home rule authority to enact the Initiated Ordinance is expressly recognized and affirmed by Maine's Coastal Conveyance Act, 38 M.R.S. § 7.

10. The Initiated Ordinance does not discriminate against interstate commerce or attempt to regulate beyond the boundaries of the Town of Bar Harbor.

11. To the extent there exists any discrimination against interstate commerce, the Initiated Ordinance advances a non-protectionist purpose.

12. To the extent there exists any discrimination against interstate commerce, the Initiated Ordinance sets forth the least discriminatory means for achieving that purpose.

13. Any burdens imposed on interstate commerce by the Initiated Ordinance are reasonable in relation to the Initiated Ordinance's putative local benefits.

14. The Initiated Ordinance advances general health, safety, welfare, and peace of the community.

4872-1234-6446, v. 1

App. 119

15.     The Initiated Ordinance does not interfere with the federal government's ability to speak with one voice when regulating commerce with foreign nations.

16.     Plaintiffs have failed to mitigate their damages, if any.

17.     Defendant has no duty, fiduciary or otherwise, to operate the Town of Bar Harbor in a manner that benefits Plaintiffs' business operations to the detriment of its residents.

18.     Facts and law demonstrate that the Initiated Ordinance is not preempted, and the enforcement of the Initiated Ordinance would not violate any provision of the U.S. Constitution or laws of the United States, or violate any right of any Plaintiff under the U.S. Constitution or any of the laws of the United States.

## SUMMARY

1.      Paragraph 1 of the Complaint is introductory in nature. To the extent a response is required, the Initiated Ordinance is a written document that speaks for itself. Defendant denies the allegations in Paragraph 1 to the extent they are inconsistent with the Initiated Ordinance. Defendant lacks sufficient information to admit or deny the remaining allegations in Paragraph 1 and therefore denies the same.

2.      Paragraph 2 of the Complaint is introductory in nature. To the extent a response is required, Defendant denies the allegations contained in Paragraph 2.

3.      Paragraph 3 of the Complaint is introductory in nature. To the extent a response is required, Defendant denies the allegations contained in Paragraph 3.

4.      Paragraph 4 of the Complaint is introductory in nature. To the extent a response is required, Defendant denies the allegations contained in Paragraph 4.

App. 120

5.      Paragraph 5 of the Complaint is introductory in nature and purports to describe what is contained elsewhere in the Complaint. The Complaint speaks for itself.  To the extent a response is required, Defendant denies the allegations contained in Paragraph 5.

## PARTIES

6.      Defendant lacks sufficient information to admit or deny the allegations in Paragraph 6 of the Complaint and therefore denies the same.

7.      Upon information and belief, Defendant admits the allegations in Paragraph 7 of the Complaint.

8.      The Approval is a written document that speaks for itself. Defendant denies the allegations in Paragraph 8 to the extent they are inconsistent with the Approval. Defendant lacks sufficient information to admit or deny the remaining allegations in Paragraph 8 of the Complaint and therefore denies the same.

9.      Upon information and belief, Defendant admits the allegations in Paragraph 9 of the Complaint.

10.     The Approval is a written document that speaks for itself. Defendant denies the allegations in Paragraph 10 to the extent they are inconsistent with the Approval. Defendant lacks sufficient information to admit or deny the remaining allegations in Paragraph 10 of the Complaint and therefore denies the same.

11.     Upon information and belief, Defendant admits the allegations in Paragraph 11 of the Complaint.

12.     Upon information and belief, Defendant admits the allegations in Paragraph 12 of the Complaint.

4872-1234-6446, v. 1

App. 121

13.     Upon information and belief, Defendant admits the allegations in Paragraph 13 of the Complaint.

14.     Upon information and belief, Defendant admits the allegations in Paragraph 14 of the Complaint.

15.     Upon information and belief, Defendant admits the allegations in Paragraph 15 of the Complaint.

16.     Admitted.

## JURISDICTION AND VENUE

17.     Paragraph 17 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 17.

18.     Paragraph 18 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 18.

19.     Paragraph 19 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant admits that venue is proper in the District of Maine.

20.     Paragraph 20 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 20.

4872-1234-6446, v. 1

App. 122

**FACTUAL BACKGROUND**

***The Cruise Industry in Bar Harbor***

21.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 21 of the Complaint and therefore denies the same.

22.     The Master Plan is a written document that speaks for itself. Defendant denies the allegations in Paragraph 22 to the extent they are inconsistent with the Initiated Ordinance. Defendant lacks sufficient information to admit or deny the remaining allegations in Paragraph 22 and therefore denies the same.

23.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 23 of the Complaint and therefore denies the same.

24.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 24 of the Complaint and therefore denies the same.

25.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 25 of the Complaint and therefore denies the same.

26.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 26 of the Complaint and therefore denies the same.

27.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 27 of the Complaint and therefore denies the same.

28.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 28 of the Complaint and therefore denies the same.

29.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 29of the Complaint and therefore denies the same.

App. 123

30.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 30 of the Complaint and therefore denies the same.

31.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 31 of the Complaint and therefore denies the same.

32.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 32 of the Complaint and therefore denies the same.

33.     Defendant admits that it has managed cruise ship visitation by establishing seasonal limitations on cruise ship passengers. Defendant lacks sufficient information to admit or deny the remaining allegations in Paragraph 33 of the Complaint and therefore denies the same.

34.     Defendant admits that it has managed cruise ship visitation by establishing seasonal limitations on cruise ship passengers. Defendant lacks sufficient information to admit or deny the remaining allegations in Paragraph 34 of the Complaint and therefore denies the same.

35.     Admitted.

36.     Defendant admits that on or about August 16, 2022, it adopted a Cruise Management Plan which established seasonal limitations on cruise ship passengers. Defendant denies the allegations in Paragraph 36 of the Complaint to the extent that they are inconsistent with the Cruise Management Plan.

37.     The MOA are written documents that speak for themselves. Defendant denies the allegations in Paragraph 37 to the extent they are inconsistent with the MOA.

*The Citizens' Initiative*

38.     Admitted.

App. 124

39.     The Town Code and the Initiative are written documents that speak for themselves. Defendant denies the allegations in Paragraph 39 to the extent they are inconsistent with the written documents.

40.     The Town Code and the Initiative are written documents that speak for themselves. Defendant denies the allegations in Paragraph 40 to the extent they are inconsistent with the written documents.

41.     The Town Code and the Initiative are written documents that speak for themselves. Defendant denies the allegations in Paragraph 41 to the extent they are inconsistent with the written documents.

42.     The Town Code and the Initiative are written documents that speak for themselves. Defendant denies the allegations in Paragraph 42 to the extent they are inconsistent with the written documents.

43.     The Town Code and the Initiative are written documents that speak for themselves. Defendant denies the allegations in Paragraph 43 to the extent they are inconsistent with the written documents.

44.     The Town Code and the Initiative are written documents that speak for themselves. Defendant denies the allegations in Paragraph 44 to the extent they are inconsistent with the written documents.

45.     The Town Code and the Initiative are written documents that speak for themselves. Defendant denies the allegations in Paragraph 45 to the extent they are inconsistent with the written documents.

4872-1234-6446, v. 1

App. 125

46.     The Town Code and the Initiative are written documents that speak for themselves. Defendant denies the allegations in Paragraph 46 to the extent they are inconsistent with the written documents.

47.     The Town Code and the Initiative are written documents that speak for themselves. Defendant denies the allegations in Paragraph 47 to the extent they are inconsistent with the written documents.

48.     The Town Code and the Initiative are written documents that speak for themselves. Defendant denies the allegations in Paragraph 48 to the extent they are inconsistent with the written documents.

49.     Denied.

50.     Defendant admits the Town Council voted to place the Initiative on the warrant for the November Special Town Meeting. The Order is a written document that speaks for itself. Defendant denies the allegations in Paragraph 50 to the extent they are inconsistent with the Order.

51.     Defendant denies that the document attached as Exhibit D to the Complaint is a true and accurate copy of the Special Town Meeting Warrant. Exhibit D is a written document that speaks for itself and appears to be the Ordinance Amendment Notice prepared by the Town Clerk for eCode360.com, the online vendor that hosts the Town's Code. Defendant lacks sufficient information to admit or deny the contents of all staff memoranda to the Council submitted prior to November 8, 2022, which are not attached to the Complaint. Defendant denies any allegations in Paragraph 51 to the extent they are inconsistent with the written document attached as Exhibit D or all staff memoranda to the Council issued prior to November 8, 2022.

52.     Defendant admits the Initiative passed by the Bar Harbor Special Town Meeting on November 8, 2022. The remaining allegation in Paragraph 52 of the Complaint states a legal

App. 126

conclusion to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 52. The Initiated Ordinance, Special Town Meeting Warrant, and the Town Charter are written documents that speak for themselves. Defendant denies the allegations in Paragraph 52 to the extent they are inconsistent with the written documents.

53.     The Initiated Ordinance and Town Code are written documents that speak for themselves. Defendant denies the allegations in Paragraph 53 to the extent they are inconsistent with the written documents.

54.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 54 of the Complaint and therefore denies the same.

55.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 55 of the Complaint and therefore denies the same.

56.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 56 of the Complaint and therefore denies the same.

57.     The Initiated Ordinance is a written document that speaks for itself. Defendant denies the allegations in Paragraph 57 to the extent they are inconsistent with the Initiated Ordinance.

58.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 58 of the Complaint and therefore denies the same.

59.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 59 of the Complaint and therefore denies the same.

60.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 60 of the Complaint and therefore denies the same.

4872-1234-6446, v. 1

App. 127

61.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 61 of the Complaint and therefore denies the same.

62.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 62 of the Complaint and therefore denies the same.

63.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 63 of the Complaint and therefore denies the same.

64.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 64 of the Complaint and therefore denies the same.

65.     Denied.

66.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 66 of the Complaint and therefore denies the same.

**CLAIMS FOR RELIEF**
**COUNT I**
*(Violation of the Supremacy Clause, Article VI, Clause 2, of the U.S. Constitution)*

67.     Defendant repeats and incorporates by reference the responses contained above as if fully set forth herein.

68.     Paragraph 68 of the Complaint contains a statement of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 68.

69.     Paragraph 69 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 69.

4872-1234-6446, v. 1

App. 128

70.     Paragraph 70 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 70.

71.     Paragraph 71 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 71.

72.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 72 of the Complaint and therefore denies the same.

73.     Paragraph 73 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 73.

74.     Paragraph 74 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 74.

75.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 75 of the Complaint and therefore denies the same.

76.     Denied.

77.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 77 of the Complaint and therefore denies the same.

78.     Paragraph 78 of the Complaint contains a statement of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 78.

4872-1234-6446, v. 1

App. 129

79.     Paragraph 79 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 79.

80.     Paragraph 80 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 80.

81.     The Approvals are written documents that speak for themselves. Defendant denies the allegations in Paragraph 81 to the extent they are inconsistent with the Approval. Defendant lacks sufficient information to admit or deny the remaining allegations in Paragraph 81 of the Complaint and therefore denies the same.

82.     The Initiated Ordinance is a written document that speaks for itself. Defendant denies any allegations in Paragraph 82 to the extent they are inconsistent with the Initiated Ordinance. Defendant denies re remaining allegations contained in Paragraph 82.

83.     Denied.

84.     Paragraph 84 of the Complaint contains a statement of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 84.

85.     Paragraph 85 of the Complaint contains a statement of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 85.

86.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 86 of the Complaint and therefore denies the same.

App. 130

87.     Defendant denies that it lacks the right to establish and enforce limitations on the number of cruise ship passengers entering on a daily basis. Defendant lacks sufficient information to admit or deny the remaining allegations in Paragraph 87 of the Complaint and therefore denies the same.

88.     Denied.

89.     Denied.

90.     Denied.

**COUNT II**
*(Violation of the Commerce Clause of the United States Constitution)*

91.     Defendant repeats and incorporates by reference the responses contained above as if fully set forth herein.

92.     Paragraph 92 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 92.

93.     Paragraph 93 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 93.

94.     Paragraph 94 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 94.

**The Initiated Ordinance Discriminates Against Interstate Commerce**

95.     Paragraph 95 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 95.

App. 131

96.     Defendant denies that the Initiated Ordinance discriminates against interstate commerce. The remaining allegations of Paragraph 96 of the Complaint contain statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 96.

97.     Defendant denies that transport of persons by water to Bar Harbor is an inherently "out-of-state" activity. Defendant lacks sufficient information to admit or deny the remaining allegations in Paragraph 97 of the Complaint and therefore denies the same.

98.     Defendant lacks sufficient information to admit or deny the allegations in Paragraph 98 of the Complaint and therefore denies the same.

99.     The Initiated Ordinance is a written document that speaks for itself. Defendant denies any allegations in Paragraph 99 to the extent they are inconsistent with the Initiated Ordinance.

100.    The Initiated Ordinance is a written document that speaks for itself. Defendant denies any allegations in Paragraph 100 to the extent they are inconsistent with the Initiated Ordinance.

101.    The Initiated Ordinance is a written document that speaks for itself. Defendant denies any allegations in Paragraph 101 to the extent they are inconsistent with the Initiated Ordinance.

102.    Defendant denies that the stated "Purpose" for the Initiative is mere pretense and lacks any factual basis. The Initiated Ordinance and the Initiative are written documents that speak for themselves. Defendant denies any allegations in Paragraph 102 to the extent they are inconsistent with the written documents.

4872-1234-6446, v. 1

App. 132

103.    Defendant lacks sufficient information to admit or deny the allegations in Paragraph 103 of the Complaint and therefore denies the same.

104.    Defendant denies that the Initiated Ordinance erects a wall around the port of Bar Harbor, halts commerce from a large percentage of cruise ships active in interstate and foreign commerce, and/or obstructs commerce. The remaining allegation of Paragraph 104 of the Complaint contains a statement of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 104.

105.    Denied.

**The Initiated Ordinance is an Excessive Burden on Interstate Commerce**

106.    Paragraph 106 of the Complaint contains a statement of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 106.

107.    Denied.

108.    Denied.

109.    Denied.

110.    Defendant lacks sufficient information to admit or deny the allegations in Paragraph 110 of the Complaint and therefore denies the same.

111.    Denied.

**The Initiated Ordinance Unduly Restricts Foreign Commerce**

112.    Paragraph 112 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 112.

App. 133

113.    Paragraph 113 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 113.

114.    Defendant denies that the Initiated Ordinance discriminates against foreign commerce. Defendant lacks sufficient information to admit or deny the remaining allegations in Paragraph 114 of the Complaint and therefore denies the same.

115.    Denied.

116.    Denied.

117.    The Initiated Ordinance is a written document that speaks for itself. Defendant denies any allegations in Paragraph 117 to the extent they are inconsistent with the Initiated Ordinance. Paragraph 117 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 117.

118.    Defendant denies that the Initiated Ordinance impermissibly regulates in an area where national uniformity is essential. Defendant lacks sufficient information to admit or deny the allegations in Paragraph 118 of the Complaint and therefore denies the same.

119.    Defendant denies that the Initiated Ordinance would impose a regime for landing passengers and crew in Bar Harbor that is different than those in other ports in the United States, in violation of the Foreign Commerce Clause. Paragraph 119 of the Complaint contains a statement of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 119.

120.    Defendant denies that the Initiated Ordinance threatens the nation's ability to maintain an integrated maritime transportation system. Paragraph 120 of the Complaint contains a

4872-1234-6446, v. 1

App. 134

statement of law to which no response is required. To the extent a response is required, Defendant

denies every allegation and legal conclusion in Paragraph 120.

121.    Denied.

122.    Denied.

123.    Denied.

124.    Denied.

## COUNT III
*(Initiated Ordinance Inconsistent with Substantive Due Process)*

125.    Defendant repeats and incorporates by reference the responses contained above as

if fully set forth herein.

126.    Denied.

127.    Defendant denies that the Initiated Ordinance is arbitrary, discriminatory and

irrelevant to any legitimate legislative goal and that mandatory disembarkation caps unreasonably

deprive Plaintiffs of their property interests. The Initiated Ordinance is a written document that

speaks for itself. Defendant denies any allegations in Paragraph 127 to the extent they are

inconsistent with the Initiated Ordinance. Defendant lacks sufficient information to admit or deny

the remaining allegations in Paragraph 127 of the Complaint and therefore denies the same.

128.    Denied.

WHEREFORE, Defendant respectfully requests that this Honorable Court dismiss

Plaintiffs' Complaint in its entirety, enter judgment in favor of Defendant, award Defendant its

costs, attorneys' fees, and expenses, and grant such other and further relief as this Court deems

just and proper.


Dated at Bangor, Maine, this 6th day of February, 2023.

4872-1234-6446, v. 1

App. 135

/s/ Allison A. Economy, Esq.
Allison A. Economy, Bar No. 5336
aeconomy@rudmanwinchell.com

/s/ Jonathan P. Hunter, Esq.
Jonathan P. Hunter, Bar No. 4912
jhunter@rudmanwinchell.com

/s/ Stephen W. Wagner, Esq.
Stephen W. Wagner, Bar No. 5621
swagner@rudmanwinchell.com

Attorneys for Defendant Town of Bar Harbor
RUDMAN WINCHELL
84 Harlow Street
P.O. Box 1401
Bangor, ME  04402
207.947.4501

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2023, I electronically filed the foregoing *Answer and Defenses* using the CM/ECF system, which will provide notice to all counsel of record in this case.

Dated:  February 6, 2023

/s/ Jonathan P. Hunter
Jonathan P. Hunter, Bar No. 4912
Attorney for Defendant
RUDMAN WINCHELL
84 Harlow Street
P.O. Box 1401
Bangor, ME  04402
207.992.2413
jhunter@rudmanwinchell.com

19

App. 136

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, B.H. PIERS, L.L.C., GOLDEN ANCHOR L.C., B.H.W.W., L.L.C., DELRAY EXPLORER HULL 495 LLC, DELRAY EXPLORER HULL 493 LLC, and ACADIA EXPLORER 492, LLC,<br><br>    *Plaintiffs*,<br><br>PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION,<br><br>    *Plaintiff-Intervenor*,<br><br>v.<br><br>TOWN OF BAR HARBOR, a municipal corporation of the State of Maine,<br><br>    *Defendant*. | Civil Action No. 1:22-cv-416 |

## ANSWER AND DEFENSES

Defendant Town of Bar Harbor ("Defendant"), by and through its attorneys, Rudman Winchell, hereby answers the Complaint in Intervention for Declaratory and Injunctive Relief (ECF No. 43) (the "Complaint") filed by Plaintiff-Intervenor Penobscot Bay River Pilots Association ("Penobscot Pilots Association"), as follows:

## DEFENSES

1.      Penobscot Pilots Association has failed to state a claim upon which relief may be granted.

2.      Penobscot Pilots Association's claims are barred, in whole or in part, by the applicable statutes of limitations.

App. 137

3.      Penobscot Pilots Association lacks standing to bring this action.

4.      This action is not ripe for adjudication.

5.      Penobscot Pilots Association has failed to present a justiciable controversy among or between the parties.

6.      Penobscot Pilots Association has failed to demonstrate that it is entitled to injunctive relief.

7.      Defendant has acted in good faith at all times relevant to this action.

8.      Penobscot Pilots Association's claims are barred, in whole or in part, by the doctrines of waiver, estoppel, and/or unclean hands.

9.      Defendant's home rule authority to enact the Initiated Ordinance is expressly recognized and affirmed by Maine's Coastal Conveyance Act, 38 M.R.S. § 556.

10.     The Challenged Ordinance does not discriminate against interstate commerce or attempt to regulate beyond the boundaries of the Town of Bar Harbor.

11.     To the extent there exists any discrimination against interstate commerce, the Challenged Ordinance advances a non-protectionist purpose.

12.     To the extent there exists any discrimination against interstate commerce, the Challenged Ordinance sets forth the least discriminatory means for achieving that purpose.

13.     Any burdens imposed on interstate commerce by the Challenged Ordinance are reasonable in relation to the Challenged Ordinance's putative local benefits.

14.     The Challenged Ordinance advances general health, safety, welfare, and peace of the community.

15.     The Challenged Ordinance does not interfere with the federal government's ability to speak with one voice when regulating commerce with foreign nations.

App. 138

16.     Penobscot Pilots Association has failed to mitigate its damages, if any.

17.     Defendant has no duty, fiduciary or otherwise, to operate the Town of Bar Harbor in a manner that capitalizes Penobscot Pilots Association's pilotage operations to the detriment of its residents.

18.     Facts and law demonstrate that the Challenged Ordinance is not preempted, and the enforcement of the Challenged Ordinance would not violate any provision of the U.S. Constitution or laws of the United States, or violate any right of the Penobscot Pilots Association under the U.S. Constitution or any of the laws of the United States.

19.     Facts and law demonstrate that the Challenged Ordinance is not preempted, and the enforcement of the Challenged Ordinance would not violate any provision of the Maine Constitution or laws of the State of Maine, or violate any right of the Penobscot Pilots Association under the Maine Constitution or any of the laws of the State of Maine.

## ANSWER

### INTRODUCTION

1.     Paragraph 1 of the Complaint is introductory in nature. To the extent a response is required, the Initiative and Challenged Ordinance are written documents that speak for themselves. Defendant denies the allegations in Paragraph 1 to the extent they are inconsistent with the written documents. Defendant denies the remaining allegations contained in Paragraph 1.

2.     Paragraph 2 of the Complaint is introductory in nature. To the extent a response is required, Defendant denies the allegations contained in Paragraph 2.

3.     Paragraph 3 of the Complaint is introductory in nature and contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 3.

App. 139

4.      Paragraph 4 of the Complaint is introductory in nature. To the extent a response is required, Defendant denies the allegations contained in Paragraph 4.

5.      Paragraph 5 of the Complaint is introductory in nature. To the extent a response is required, Defendant denies the allegations contained in Paragraph 5.

6.      Paragraph 6 of the Complaint is introductory in nature. To the extent a response is required, Defendant denies the allegations contained in Paragraph 6.

7.      Paragraph 7 of the Complaint is introductory in nature. To the extent a response is required, Defendant denies the allegations contained in Paragraph 7.

8.      Paragraph 8 of the Complaint is introductory in nature. To the extent a response is required, Defendant denies the allegations contained in Paragraph 8.

9.      Paragraph 9 of the Complaint is introductory in nature. To the extent a response is required, Defendant denies the allegations contained in Paragraph 9.

10.      Paragraph 10 of the Complaint is introductory in nature. To the extent a response is required, Defendant denies the allegations contained in Paragraph 10.

**PARTIES**

11.      Upon information and belief, Defendant admits the allegations contained in Paragraph 11 of the Complaint.

12.      Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 12 of the Complaint and therefore denies the same.

13.      Admitted.

App. 140

**JURISDICTION AND VENUE**

14.     Paragraph 14 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 14.

15.     Paragraph 15 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 15.

16.     Paragraph 16 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant admits that venue is proper in the District of Maine.

17.     Paragraph 17 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 17.

18.     Paragraph 18 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant does not object to the Penobscot Pilots Association's intervention. Defendant lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 18 of the Complaint and therefore denies the same.

19.     Paragraph 19 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant does not object to the Penobscot Pilots Association's intervention.

20.     Paragraph 20 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant does not object to the Penobscot Pilots Association's intervention.

App. 141

## BACKGROUND
### *Maine State Pilotage System*

21.     Paragraph 21 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 21.

22.     Paragraph 22 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 22.

23.     Paragraph 23 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 23. Defendant lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 23 of the Complaint and therefore denies the same.

24.     Paragraph 24 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every legal conclusion in Paragraph 24. Defendant lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 24 of the Complaint and therefore denies the same.

25.     Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 25 of the Complaint and therefore denies the same.

26.     Paragraph 26 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 26.

27.     Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 27 of the Complaint and therefore denies the same.

App. 142

28.     Paragraph 28 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 28.

29.     Paragraph 29 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 29.

30.     Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 30 of the Complaint and therefore denies the same.

31.     Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 31 of the Complaint and therefore denies the same.

32.     Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 32 of the Complaint and therefore denies the same.

33.     Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 33 of the Complaint and therefore denies the same.

34.     Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 34 of the Complaint and therefore denies the same.

*Maine's Tourism Industry*

35.     Paragraph 35 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every legal conclusion in Paragraph 35. Defendant lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 35 of the Complaint and therefore denies the same.

36.     Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 36 of the Complaint and therefore denies the same.

App. 143

*Cruise Tourism in Bar Harbor*

37.     Defendant admits that Bar Harbor is included on a variety of cruise ship itineraries and that it is an access point for permitting cruise ship passengers to visit Acadia National Park. Defendant lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 37 of the Complaint and therefore denies the same.

38.     Upon information and belief, Defendant admits the allegations contained in Paragraph 38 of the Complaint.

39.     Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 39 of the Complaint and therefore denies the same.

40.     Defendant admits that cruise ships anchor offshore and passengers and crew tender into Bar Harbor. Defendant lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 40 of the Complaint and therefore denies the same.

41.     Defendant admits that cruise ships anchor offshore and passengers and crew tender into Bar Harbor. Defendant lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 41 of the Complaint and therefore denies the same.

42.     Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 42 of the Complaint and therefore denies the same.

43.     Defendant admits that it has managed cruise ship visitation by establishing seasonal limitations on cruise ship passengers. Defendant lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 43 of the Complaint and therefore denies the same.

44.     Upon information and belief, Defendant admits the allegations contained in Paragraph 44 of the Complaint.

App. 144

45.     The MOA are written documents that speak for themselves. Defendant denies the allegations in Paragraph 45 to the extent they are inconsistent with the written documents.

### The Initiative

46.     Upon information and belief, Defendant admits that a citizens group submitted the Initiative to the Bar Harbor Town Council on or about March 16, 2022. The Initiative is a written document that speaks for itself. Defendant denies the allegations in Paragraph 46 to the extent they are inconsistent with the Initiative.

47.     The Initiative is a written document that speaks for itself. Defendant denies the allegations in Paragraph 47 to the extent they are inconsistent with the Initiative.

48.     The Initiative is a written document that speaks for itself. Defendant denies the allegations in Paragraph 48 to the extent they are inconsistent with the Initiative.

49.     The Initiative is a written document that speaks for itself. Defendant denies the allegations in Paragraph 49 to the extent they are inconsistent with the Initiative.

50.     The Initiative is a written document that speaks for itself. Defendant denies the allegations in Paragraph 50 to the extent they are inconsistent with the Initiative.

51.     The Initiative is a written document that speaks for itself. Defendant denies the allegations in Paragraph 51 to the extent they are inconsistent with the Initiative.

52.     The Initiative is a written document that speaks for itself. Defendant denies the allegations in Paragraph 52 to the extent they are inconsistent with the Initiative.

53.     The Initiative is a written document that speaks for itself. Defendant denies the allegations in Paragraph 53 to the extent they are inconsistent with the Initiative.

54.     The Initiative is a written document that speaks for itself. Defendant denies the allegations in Paragraph 54 to the extent they are inconsistent with the Initiative.

App. 145

55.     Defendant denies that the Initiative is not supported by studies or other evidence. The Initiative is a written document which speaks for itself. Defendant denies the allegations in Paragraph 55 to the extent they are inconsistent with the Initiative.

56.     Denied.

57.     Defendant admits that on or about August 2, 2022, the Town Council voted to place the Initiative on the warrant articles calling the November town meeting warrant. The Order is a written document that speaks for itself. Defendant denies the allegations in Paragraph 57 to the extent they are inconsistent with the Order.

58.     Defendant admits that the Initiative was listed as Article 3 on the Warrant for the November 8, 2022, Special Town Meeting. Defendant denies that the document attached as Exhibit C to the Complaint is a true and accurate copy of the Special Town Meeting Warrant. Exhibit C is a written document that speaks for itself and appears to be the Ordinance Amendment Notice prepared by the Town Clerk for eCode360.com, the online vendor that hosts the Town's Code. Defendant denies any allegations in Paragraph 58 to the extent they are inconsistent with the written document attached as Exhibit C.

59.     Admitted.

60.     The Challenged Ordinance is a written document that speaks for itself. Defendant denies the allegations in Paragraph 60 to the extent they are inconsistent with the Challenged Ordinance.

*Impacts of the Challenged Ordinance*

61.     Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 61 of the Complaint and therefore denies the same.

App. 146

62. The Challenged Ordinance is a written document that speaks for itself. Defendant denies the allegations in Paragraph 62 to the extent they are inconsistent with the Challenged Ordinance.

63. The Challenged Ordinance is a written document that speaks for itself. Defendant denies the allegations in Paragraph 63 to the extent they are inconsistent with the Challenged Ordinance.

64. Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 64 of the Complaint and therefore denies the same.

65. Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 65 of the Complaint and therefore denies the same.

66. Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 66 of the Complaint and therefore denies the same.

67. Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 67 of the Complaint and therefore denies the same.

68. Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 68 of the Complaint and therefore denies the same.

69. Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 69 of the Complaint and therefore denies the same.

70. Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 70 of the Complaint and therefore denies the same.

71. Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 71 of the Complaint and therefore denies the same.

App. 147

72.     Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 72 of the Complaint and therefore denies the same.

73.     Defendant denies the characterization of the Challenged Ordinance as arbitrary. Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 73 of the Complaint and therefore denies the same.

74.     Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 74 of the Complaint and therefore denies the same.

75.     Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 75 of the Complaint and therefore denies the same.

76.     Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 76 of the Complaint and therefore denies the same.

## FIRST CAUSE OF ACTION
### *Violation of the Supremacy Clause*

77.     Defendant repeats and incorporates by reference the responses contained in paragraphs 1 through 76 as if fully set forth herein.

78.     Paragraph 78 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 78.

79.     Paragraph 79 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 79.

80.     Paragraph 80 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 80.

App. 148

81.     Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 81 of the Complaint and therefore denies the same.

82.     Paragraph 82 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every legal conclusion in Paragraph 82. Defendant lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 82 of the Complaint and therefore denies the same.

83.     Paragraph 83 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every legal conclusion in Paragraph 83. Defendant lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 83 of the Complaint and therefore denies the same.

84.     Paragraph 84 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every legal conclusion in Paragraph 84. Defendant lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 84 of the Complaint and therefore denies the same.

85.     Defendant denies that lacks the right to establish and enforce limitations on the number of cruise ship passengers entering on a daily basis. Paragraph 85 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 85.

86.     Defendant denies that lacks the right to establish and enforce limitations on the number of cruise ship passengers entering on a daily basis. The Challenged Ordinance is a written document that speaks for itself. Defendant denies the allegations in Paragraph 86 to the extent they are inconsistent with the Challenged Ordinance. Defendant lacks sufficient information to admit

App. 149

or deny the remaining allegations contained in Paragraph 86 of the Complaint and therefore denies the same.

87.    Paragraph 87 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 87.

88.    Paragraph 88 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 88.

89.    Paragraph 89 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every legal conclusion in Paragraph 89. Defendant lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 89 of the Complaint and therefore denies the same.

90.    Defendant denies that the Challenged Ordinance is preempted by federal law and regulations. The Challenged Ordinance is a written document that speaks for itself. Defendant denies the allegations in Paragraph 90 to the extent they are inconsistent with the Challenged Ordinance.

91.    Denied.

92.    Paragraph 92 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 92.

93.    Paragraph 93 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every legal conclusion in

14

**App. 150**

Paragraph 93. Defendant lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 93 of the Complaint and therefore denies the same.

94.     Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 94 of the Complaint and therefore denies the same.

95.     Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 95 of the Complaint and therefore denies the same.

96.     Denied.

97.     Denied.

98.     Paragraph 98 of the Complaint contains a request for relief to which no response is required. To the extent a response is required, Defendant denies every allegation conclusion in Paragraph 98.

## SECOND CAUSE OF ACTION
### *Violation of the Commerce Clause*

99.     Defendant repeats and incorporates by reference the responses contained in paragraphs 1 through 76 and 78 through 97 as if fully set forth herein.

100.    Paragraph 100 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 100.

101.    Paragraph 101 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 101.

102.    Paragraph 102 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 102.

App. 151

103.    Paragraph 103 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 103.

104.    The Challenged Ordinance is a written document that speaks for itself. Defendant denies the allegations in Paragraph 104 to the extent they are inconsistent with the Challenged Ordinance. Paragraph 104 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 104.

105.    Defendant denies that the Challenged Ordinance discriminates against interstate commerce. Paragraph 105 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every legal conclusion in Paragraph 105. Defendant lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 105 of the Complaint and therefore denies the same.

106.    Defendant admits that persons enter Bar Harbor by various means. Defendant lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 106 of the Complaint and therefore denies the same.

107.    The Challenged Ordinance is a written document that speaks for itself. Defendant denies the allegations in Paragraph 107 to the extent they are inconsistent with the Challenged Ordinance.

108.    The Initiative is a written document that speaks for itself. Defendant denies the allegations in Paragraph 108 to the extent they are inconsistent with the Initiative.

109.    The Initiative is a written document that speaks for itself. Defendant denies the allegations in Paragraph 109 to the extent they are inconsistent with the Initiative.

App. 152

110.    The Initiative is a written document that speaks for itself. Defendant denies the allegations in Paragraph 110 to the extent they are inconsistent with the Initiative.

111.    Defendant denies that the Challenged Ordinance erects a wall around the port of Bar Harbor, halts commerce from a large percentage of cruise ships active in interstate and foreign commerce, and/or obstructs commerce. The remaining allegation of Paragraph 111of the Complaint contains a statement of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 111.

112.    Paragraph 112 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 112.

113.    Paragraph 113 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 113.

114.    Denied.

115.    Denied.

116.    Denied.

117.    Denied.

118.    Paragraph 118 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 118.

119.    Paragraph 119 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 119.

App. 153

120.    Defendant denies that the Challenged Ordinance discriminates against foreign commerce, that it favors domestic vessels over foreign competitors and ships engaged in domestic itineraries over ships engaged in international itineraries. Defendant further denies that it is without authority to establish and enforce limitations on the number of cruise ship passengers entering on a daily basis. Defendant lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 120 of the Complaint and therefore denies the same.

121.    Defendant denies that the Challenged Ordinance impermissibly regulates in an area where national uniformity is essential. Defendant lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 121 of the Complaint and therefore denies the same.

122.    Defendant denies that the Challenged Ordinance imposes rules for landing persons in Bar Harbor that are different from the rules of other U.S. ports, in violation of the Commerce Clause. Paragraph 122 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 122.

123.    Defendant denies that the Challenged Ordinance harms the Penobscot Pilots Association. Defendant lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 123 of the Complaint and therefore denies the same.

124.    Paragraph 124 of the Complaint contains a request for relief to which no response is required. To the extent a response is required, Defendant denies every allegation conclusion in Paragraph 124.

125.    Paragraph 125 of the Complaint contains a request for relief to which no response is required. To the extent a response is required, Defendant denies every allegation conclusion in Paragraph 125.

App. 154

126.     Paragraph 126 of the Complaint contains a request for relief to which no response is required. To the extent a response is required, Defendant denies every allegation conclusion in Paragraph 126.

## COUNT III
### *Violation of the Maine Constitution*
### *Preemption by 38 M.R.S. §§ 85, et seq.*

127.     Defendant repeats and incorporates by reference the responses contained in paragraphs 1 through 76, 78 through 97, and 100 through 123 as if fully set forth herein.

128.     Paragraph 128 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 128.

129.     Paragraph 129 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 129.

130.     Paragraph 130 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 130.

131.     Paragraph 131 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 131.

132.     Paragraph 132 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 132.

133.     Denied.

App. 155

134.    Denied.

135.    Denied.

136.    Denied.

137.    Denied.

138.    Defendant denies that the Challenged Ordinance will cut off an entire segment of vessel traffic into Frenchman Bay instantaneously. Defendant lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 138 of the Complaint and therefore denies the same.

139.    Denied.

140.    Paragraph 140 of the Complaint contains a request for relief to which no response is required. To the extent a response is required, Defendant denies every allegation conclusion in Paragraph 140.

141.    Paragraph 141 of the Complaint contains a request for relief to which no response is required. To the extent a response is required, Defendant denies every allegation conclusion in Paragraph 141.

**COUNT IV**
***Violation of the Maine Constitution***
***Preemption by 5 M.R.S. §§ 13052, et seq.***

142.    Defendant repeats and incorporates by reference the responses contained in paragraphs 1 through 76, 78 through 97, 100 through 123, and 128 through 139 as if fully set forth herein.

143.    Paragraph 143 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every allegation and legal conclusion in Paragraph 143.

App. 156

144.    Paragraph 144 of the Complaint contains statements of law to which no response is required. To the extent a response is required, Defendant denies every legal conclusion in Paragraph 144. Defendant lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 144 of the Complaint and therefore denies the same.

145.    Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 145 of the Complaint and therefore denies the same.

146.    Denied.

147.    Denied.

148.    Defendant denies that the Challenged Ordinance will have outsized, negative impacts on cruise tourism throughout Maine. Defendant lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 148 of the Complaint and therefore denies the same.

149.    Denied.

150.    Paragraph 150 of the Complaint contains a request for relief to which no response is required. To the extent a response is required, Defendant denies every allegation conclusion in Paragraph 150.

151.    Paragraph 151 of the Complaint contains a request for relief to which no response is required. To the extent a response is required, Defendant denies every allegation conclusion in Paragraph 151.

WHEREFORE, Defendant respectfully requests that this Honorable Court dismiss Penobscot Pilots Association's Complaint in its entirety, enter judgment in favor of Defendant, award Defendant its costs, attorneys' fees, and expenses, and grant such other and further relief as this Court deems just and proper.

App. 157

*/s/ Allison A. Economy, Esq.*
Allison A. Economy, Bar No. 5336
aeconomy@rudmanwinchell.com

*/s/ Jonathan P. Hunter, Esq.*
Jonathan P. Hunter, Bar No. 4912
jhunter@rudmanwinchell.com

*/s/ Stephen W. Wagner, Esq.*
Stephen W. Wagner, Bar No. 5621
swagner@rudmanwinchell.com

Attorneys for Defendant Town of Bar Harbor
RUDMAN WINCHELL
84 Harlow Street
P.O. Box 1401
Bangor, ME 04402
207.947.4501

App. 158

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 10, 2023, I electronically filed the foregoing Answer and Defenses using the CM/ECF system, which will provide notice to all counsel of record in this case.

Dated: February 10, 2023

*/s/ Allison A. Economy*
Allison A. Economy, Bar No. 5336
Attorney for Defendant
RUDMAN WINCHELL
84 Harlow Street
P.O. Box 1401
Bangor, ME 04402
207.992.2413
aeconomy@rudmanwinchell.com

23

App. 159

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:22-cv-00416-LEW |
| TOWN OF BAR HARBOR, | ) ) | |
| Defendant. | ) | |

## <u>ORDER ON MOTION TO INTERVENE</u>

In this action, Plaintiffs, a group of family-owned limited liability companies, a local business league and the Penobscot Bay and River Pilots Association seek declaratory and injunctive relief to prevent implementation of Bar Harbor's recently initiated land use ordinance that caps the daily total of passengers who may be disembarked from cruise ships on, over, or across property in the Town. The matter is before the Court on a motion to intervene filed by Charles Sidman, a Bar Harbor resident and business owner who seeks leave to intervene as a party defendant. Verified Mot. to Intervene and Alt. Mot. to Participate as Amicus Curiae (ECF No. 45). The motion is opposed by both the Plaintiffs and the Defendant.

### Background

The matter is presently in the briefing cycle of a motion for preliminary injunction. The deadline for the Town to oppose the motion has been continued by agreement of the

1

parties to facilitate settlement negotiations that will implement a preliminary injunction by stipulation, which voluntary injunction would postpone implementation of the ordinance during the pendency of this action and potentially beyond (throughout both the 2023 and 2024 extended seasons).[1]  Town's Obj. at 2 n.2 & 9 (ECF No. 55).

Through his motion, Mr. Sidman verifies that he has been "adversely affected by the influx of cruise ship passengers," who cause, in his experience, "excessive congestion, overcrowding, and inundat[ed] local services, amenities, and attractions."  *Id.*  at 1.  Mr. Sidman also asserts that the Town is not likely to be a vigorous opponent in this litigation over the constitutionality of the Town's new cruise ship ordinance, which ordinance arose from a popular initiative that the Town Council actively opposed.

Based on my review of the available record, the history of this controversy reflects a decidedly pro cruise ship sentiment on the part of the Bar Harbor Town Council.  The Town's Cruise Ship Committee has been chaired by an agent of a principal plaintiff and does not appear (at first blush) to have done anything other than foster the growth of cruise ship passenger traffic.  Over time, visitations have increased in volume, rather dramatically in more recent years.  In 2016, itself a year of significant growth, 117 cruise ships visited with a passenger complement of 163,000.  Most (roughly 68%) visited in September and October.  As cruise ship visitations steadily swelled (stalling out only during a COVID-19-induced hiatus), the tide of local sentiment was turning against the cruise ship industry.  The record contains evidence that the Town and the Plaintiffs were aware of this shifting

---

[1] In exchange, the Town explains that it is reducing its exposure to claims for money damages.  Bar Harbor's Verified Obj. at 2 n.2 & 9.

2

tide.  Nevertheless, before the 2022 season, through a "voluntary" system of reserving cruise ship visits, the Town authorized cruise ship visits totaling as many as 180,000 passengers for September and October alone (i.e., more passengers in two months of 2022 than in the entirety of 2016).

In March 2022, an initiative seeking to curtail the passenger influx was set in motion and readily garnered sufficient support to go on the municipal ballot.  In the months leading up to the election, the Town actively encouraged the electorate to vote down the initiative. By all appearances and representations, the initiative movement and the new ordinance have proved quite divisive at the local level.  Despite the Town's efforts, the initiative passed.

At present, the Plaintiffs and the Town are attempting to settle the matter of the Plaintiffs' motion for preliminary injunction.  The record strongly suggests to me that the effort must be focused on protecting the 2024 season because the initiative already specified that the ordinance's cap on passenger visits would not be imposed for cruise ship reservations accepted by the Harbor Master before March 16, 2022.  Plaintiffs have offered sworn testimony that "[c]ruise lines generally create the itineraries for their ships approximately eighteen to twenty-four months in advance."  Moody Aff. ¶ 7.  In other words, the 2023 season should already be secure.  And while the parties' effort to stipulate a resolution for the 2024 season is timely for purposes of the cruise ship industry's itinerary planning, they have not provided any indication in their filings that their voluntary approach to settling the matter of the preliminary injunction involves any serious compromise in terms of passenger volumes that would be responsive to the expressed will

3

App. 162

of the Town of Bar Harbor's electorate, even as they insist in briefs opposed to Mr. Sidman's intervention that the Town will vigorously litigate to uphold the ordinance.

## Discussion

"On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction" if the person "is so situated that disposing of the action may as a practical matter impair or impede [his] ability to protect [his] interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2).  Known as "intervention as of right," this avenue for intervention in a lawsuit requires that the moving party satisfy every requirement (timeliness, interest, threat of impairment, and inadequate representation by existing parties).  *Victim Rights Law Ctr. v. Rosenfelt*, 988 F.3d 556, 560 (1st Cir. 2021); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 807 F.3d 472, 474 (1st Cir. 2015).  If the moving party cannot meet every requirement, then a second avenue for intervention, labeled "permissive intervention," is available if he "has a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1)(B).  It is generally understood that intervention as of right "is somewhat more circumscribed" than its permissive cousin, and that there is enough distance between them in terms of the rigor of the relative standards for a district court to call shots that balance out "idiosyncratic factual settings," *Ungar v. Arafat*, 634 F.3d 46, 51 (1st Cir. 2011), based on a "commonsense view of the overall litigation," *Pub. Serv. Co. of New Hampshire v. Patch*, 136 F.3d 197, 204 (1st Cir. 1998).

4

Turning to the instant motion, no one suggests that Mr. Sidman's motion is not timely. Instead, they focus their challenge on Mr. Sidman's interest in the litigation and the Town's ability to adequately represent municipal residents who favor the ordinance.

Concerning his individualized interest, those opposed to Mr. Sidman's intervention argue that he cannot demonstrate a real or concrete interest beyond the interest of the general populace. I am not convinced by this argument. To the contrary, Mr. Sidman has a concrete personal stake in the alleged harms the ordinance was meant to redress. Quite unlike a party with no skin in the game who seeks to intervene solely to advocate on behalf of or against an enactment that is dividing popular opinion across a wide region, state, or nation,[2] Mr. Sidman is connected to this very localized controversy based on a personal investment in the Town of Bar Harbor, including an investment in its commercial downtown. Given this basic reality, it is reasonable to infer that he has a concrete, personal stake in the local commons that is impacted by the influx of cruise ship passengers throughout an extended season. This is more than a mere "undifferentiated, generalized interest." *Patch*, 136 F.3d at 205. In this regard, Mr. Sidman's interest in the litigation and that of the members of the Plaintiff Association appear to occupy opposite sides of the very same coin.[3]

---

[2] That is, quite unlike the circumstances at play in most of the cases cited by Mr. Sidman's opponents.

[3] Separately, the Town of Bar Harbor insists that Mr. Sidman must also meet the demands of Article III's standing requirements, noting that the First Circuit has not resolved the issue and the existence of a circuit split. Bar Harbor's Verified Obj. at 6 (citing *Mangual v. Rotger-Sabat*, 317 F.3d 45, 61 & n.5 (1st Cir. 2003)). Having found a plausible basis to infer more than an undifferentiated, generalized interest, and having based that interest on something other than Mr. Sidman's mere status as a principal proponent of the ordinance, standing does not appear to be an obstacle to Mr. Sidman's participation. *Cf. United States v. AVX Corp.*, 962 F.2d 108, 118 (1st Cir. 1992) (analogous standing concern in the context of

App. 164

Those opposed to Mr. Sidman's intervention also contend that his motion should fail because the interest he seeks to represent has an adequate champion: the Town of Bar Harbor. On this issue, Mr. Sidman's request for intervention as of right is somewhat equivocal due to the presumption of adequate representation that arises when the defendant is a governmental body. *See Victims Rights Law Ctr.*, 988 F.3d at 561. The First Circuit holds that a "strong affirmative showing" is needed to successfully rebut the presumption, *id.*, and it has demonstrated that it will affirm an exercise of discretion that denies intervention on this basis, even with respect to permissive intervention, *id.* at 564. However, in this case I find that the request for intervention is appropriate given the Town's history of boosterism for the cruise ship industry. Indeed, there is a strong showing in the record so far adduced that the Town has long given over to one or more agents of the Walsh family enterprises (i.e., most of the nominal plaintiffs) what appears (upon first impression) to be carte blanche in matters of Bar Harbor's informal and voluntary cruise ship policy. When added to the fact of the Town's opposition to the ordinance there arises an idiosyncratic factual setting that supports a commonsense finding in favor of intervention.

The remaining challenge worthy of comment is the contention that permitting intervention will only result in delay because Mr. Sidman's participation might monkey

---

environmental litigation); *see also Nergaard v. Town of Westport Island*, 2009 ME 56, ¶ 18, 973 A.2d 735, 741 ("standing has been liberally granted to people who own property in the same neighborhood as the property that is subject to a permit or variance"). Given the plausible scope of the impact of the land use in issue, even under Maine law Mr. Sidman appears to have viable standing given his regular actual use of the downtown area, his ownership of a business in the vicinity of the use, and the fact that he is among the persons whom the ordinance is designed to protect. *See id.* ¶¶ 19, 21. For these reasons, and solely to appease the Town's demand for a finding, I find that Mr. Sidman clears the Town's standing obstacle, even though I am not fully persuaded that such a finding is necessary.

6

wrench an otherwise amicable settlement of the matter of the Plaintiffs' motion for preliminary injunction. This challenge is particular to the permissive intervention analysis. Rule 24 states: "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). Cases of this kind—constitutional challenges to popular enactments—typically move along at a much faster clip than standard civil litigation. Based on their briefs, the parties already appear to appreciate that this case is no exception. I fail to apprehend cause why Mr. Sidman would frustrate that objective, as he makes representations to the contrary in his reply brief. Reply at 4 (ECF No. 62).

In any event, those opposed to Mr. Sidman's intervention contend that the interest they share in an early and voluntary settlement of the preliminary injunction motion will be undermined by Mr. Sidman's participation, and that but for his intervention their agreement as to how best to proceed would dramatically expedite the final resolution of proceedings before this Court. Even if accurate, these exhortations are ultimately unpersuasive because they fail to demonstrate that any resulting delay will be excessive or disproportionate to the needs of the case or that the existing parties will be prejudiced in their ability to secure a timely and complete adjudication of their rights.

## Conclusion

Mr. Sidman's Motion to Intervene (ECF No. 45) is GRANTED. Mr. Sidman will hereafter be recognized as an intervenor-defendant.

**SO ORDERED.**

App. 166

Dated this 28th day of February, 2023.

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE

App. 167

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:22-cv-00416-LEW |
| TOWN OF BAR HARBOR, | ) ) | |
| Defendant, | ) ) | |
| CHARLES SIDMAN, | ) ) | |
| Defendant-Intervenor. | ) | |

## <u>ORDER ON MOTION TO DISMISS</u>

The matter is before the Court on the motion to dismiss filed by Defendant-Intervenor Charles Sidman and joined by the Defendant Town of Bar Harbor.  Motion to Dismiss (ECF No. 74); Joinder (ECF No. 84).  In this action, Plaintiffs seek to enshrine in federal and state constitutional law a rather astounding new maxim: "Build it and they *must* come."  Mr. Sidman argues the proposed maxim is not actionable on the facts and theories alleged.  The Plaintiffs argue it is and that their claims will only be enhanced by a factual record.

Although there may be claims in this matter deserving of the brevis tridentis, others appear to anticipate a factual record and are worthy of a hearing.  Given the already

accelerated schedule, I am not inclined to address the claims in a piecemeal fashion.

Accordingly, the Motion to Dismiss is DENIED.

      SO ORDERED.

Dated this 12th day of April, 2023.

                 /s/ Lance E. Walker
                UNITED STATES DISTRICT JUDGE

App. 169

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, et al., | ) ) ) |
| *Plaintiffs*, | ) ) |
| PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION, a Maine corporation, | ) ) ) ) |
| *Plaintiff-Intervenor*, | ) )     Case No. 1:22-cv-416 |
| v. | ) ) |
| TOWN OF BAR HARBOR, a municipal corporation of the State of Maine, | ) ) ) ) |
| *Defendant*, | ) ) |
| CHARLES SIDMAN, | ) ) |
| *Defendant-Intervenor*. | ) |

**DEFENDANT-INTERVENOR CHARLES SIDMAN'S ANSWER**
**TO PLAINTIFFS' VERIFIED COMPLAINT**

Defendant-Intervenor Charles Sidman, by and through his attorneys, hereby answers the

Verified Complaint filed by Plaintiffs (Doc. No. 1), the Association to Preserve and Protect

Local Livelihoods ("APPLL"), B.H. Piers, L.L.C. ("BH Piers"), Golden Anchor, L.C., doing

business as Harborside Hotel ("Harborside"), B.H.W.W., L.L.C. ("BHWW"), Delray Explorer

Hull 495 LLC ("495"), Delray Explorer Hull 493 LLC ("493"), and Acadia Explorer 492, LLC

("492") (collectively  "Plaintiffs"), as follows:

1.     Paragraph 1 of the Complaint is introductory in nature.  To the extent a response

is required, the Initiated Ordinance is a written document that speaks for itself; Mr. Sidman

denies any attempt to characterize or paraphrase the contents or meaning of said document which

is inconsistent therewith and, to the extent they are inconsistent with the Initiated Ordinance, Paragraph 1 is denied.  Mr. Sidman lacks sufficient information to admit or deny the remaining allegations in Paragraph 1 and therefore denies the same.

2.      Paragraph 2 of the Complaint is introductory in nature and contains conclusions of law to which no response is required. To the extent a response is required, Mr. Sidman denies the allegations contained in Paragraph 2.

3.      Paragraph 3 of the Complaint is introductory in nature and contains conclusions of law to which no response is required. To the extent a response is required, Mr. Sidman denies the allegations contained in Paragraph 3.

4.      Paragraph 4 of the Complaint is introductory in nature and contains conclusions of law to which no response is required. To the extent a response is required, Mr. Sidman denies the allegations contained in Paragraph 4.

5.      Paragraph 5 of the Complaint is introductory in nature and contains conclusions of law to which no response is required. To the extent a response is required, Mr. Sidman denies the allegations contained in Paragraph 5.

6.      Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 6 of the Complaint and therefore denies the same.

7.      Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 7 of the Complaint and therefore denies the same.

8.      Answering Paragraph 8 of the Complaint, the Approval is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said document which is inconsistent therewith and, to the extent they are inconsistent with the Approval, Paragraph 8 is denied. Answering further, Mr. Sidman lacks sufficient

App. 171

information to admit or deny the remaining allegations in Paragraph 8 of the Complaint and therefore denies the same.

9.      Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 9 of the Complaint and therefore denies the same.

10.     Answering Paragraph 10 of the Complaint, the Approval is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said document which is inconsistent therewith and, to the extent they are inconsistent with the Approval, Paragraph 10 is denied.  Answering further, Mr. Sidman lacks sufficient information to admit or deny the remaining allegations in Paragraph 10 of the Complaint and therefore denies the same.

11.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 11 of the Complaint and therefore denies the same.

12.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 12 of the Complaint and therefore denies the same.

13.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 13 of the Complaint and therefore denies the same.

14.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 14 of the Complaint and therefore denies the same.

15.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 15 of the Complaint and therefore denies the same.

16.     Mr. Sidman admits the allegations in Paragraph 16 of the Complaint.

17.     Paragraph 17 of the Complaint states conclusions of law to which no response is required. To the extent a response is required, Mr. Sidman denies every allegation and legal

App. 172

conclusion in Paragraph 17.

18.     Paragraph 18 of the Complaint states conclusions of law to which no response is required. To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 18.

19.     Paragraph 19 of the Complaint states conclusions of law to which no response is required. To the extent a response is required, Mr. Sidman admits that venue is proper in the District of Maine.

20.     Paragraph 20 of the Complaint states conclusions of law to which no response is required. To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 20.

21.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 21 of the Complaint and therefore denies the same.

22.     Answering Paragraph 22 of the Complaint, the Master Plan is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said document which is inconsistent therewith and, to the extent they are inconsistent with the Master Plan, Paragraph 22 is denied. Answering further, Mr. Sidman lacks sufficient information to admit or deny the remaining allegations in Paragraph 22 and therefore denies the same.

23.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 23 and therefore denies the same.

24.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 24 and therefore denies the same.

25.     Mr. Sidman lacks sufficient information to admit or deny the allegations in

App. 173

Paragraph 25 and therefore denies the same.

26.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 26 and therefore denies the same.

27.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 27 and therefore denies the same.

28.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 28 and therefore denies the same.

29.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 29 and therefore denies the same.

30.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 30 and therefore denies the same.

31.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 31 and therefore denies the same

32.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 32 and therefore denies the same.

33.     Answering Paragraph 33 of the Complaint, Mr. Sidman admits that the Town has established daily caps since at least 2008.  Mr. Sidman lacks sufficient information to admit or deny the remaining allegations in Paragraph 33 and therefore denies the same.

34.     Answering Paragraph 34 of the Complaint, Mr. Sidman admits that the Town has established daily caps since at least 2008.  Mr. Sidman lacks sufficient information to admit or deny the remaining allegations in Paragraph 34 and therefore denies the same.

35.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 35 and therefore denies the same.

App. 174

36.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 36 and therefore denies the same.

37.     Answering Paragraph 37 of the Complaint, the MOA is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said document which is inconsistent therewith and, to the extent they are inconsistent with the MOA, Paragraph 37 is denied.[1]

38.     Answering Paragraph 38 of the Complaint, the Initiative is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said document which is inconsistent therewith and, to the extent they are inconsistent with the Initiative, Paragraph 38 is denied.

39.     Answering Paragraph 39 of the Complaint, the Town Code and the Initiative are written documents that speak for themselves; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said documents which is inconsistent therewith and, to the extent they are inconsistent with the referenced written documents, Paragraph 39 is denied.

40.     Answering Paragraph 40 of the Complaint, the Town Code and the Initiative are written documents that speak for themselves; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said documents which is inconsistent therewith and, to the extent they are inconsistent with the referenced written documents, Paragraph 40 is denied.

41.     Answering Paragraph 41 of the Complaint, the Town Code and the Initiative are written documents that speak for themselves; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said documents which is inconsistent therewith and, to the

---

[1] Footnotes within the Complaint do not constitute allegations and do not require a response.  To the extent footnotes do require a response, Mr. Sidman denies all allegations and legal conclusions contained in all footnotes within the Complaint.

App. 175

extent they are inconsistent with the referenced written documents, Paragraph 41 is denied.

42.     Answering Paragraph 42 of the Complaint, the Town Code and the Initiative are written documents that speak for themselves; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said documents which is inconsistent therewith and, to the extent they are inconsistent with the referenced written documents, Paragraph 42 is denied.

43.     Answering Paragraph 43 of the Complaint, the Town Code and the Initiative are written documents that speak for themselves; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said documents which is inconsistent therewith and, to the extent they are inconsistent with the referenced written documents, Paragraph 43 is denied.

44.     Answering Paragraph 44 of the Complaint, the Town Code and the Initiative are written documents that speak for themselves; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said documents which is inconsistent therewith and, to the extent they are inconsistent with the referenced written documents, Paragraph 44 is denied.

45.     Answering Paragraph 45 of the Complaint, the Town Code and the Initiative are written documents that speak for themselves; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said documents which is inconsistent therewith and, to the extent they are inconsistent with the referenced written documents, Paragraph 45 is denied.

46.     Answering Paragraph 46 of the Complaint, the Town Code and the Initiative are written documents that speak for themselves; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said documents which is inconsistent therewith and, to the extent they are inconsistent with the referenced written documents, Paragraph 46 is denied.

47.     Answering Paragraph 47 of the Complaint, the Town Code and the Initiative are written documents that speak for themselves; Mr. Sidman denies any attempt to characterize or

App. 176

paraphrase the contents or meaning of said documents which is inconsistent therewith and, to the extent they are inconsistent with the referenced written documents, Paragraph 47 is denied.

48.     Answering Paragraph 48 of the Complaint, the Town Code and the Initiative are written documents that speak for themselves; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said documents which is inconsistent therewith and, to the extent they are inconsistent with the referenced written documents, Paragraph 48 is denied.

49.     Mr. Sidman denies the allegations in Paragraph 49 of the Complaint.

50.     Answering Paragraph 50 of the Complaint, Mr. Sidman admits the Town Council voted to place the Initiative on the warrant for the November Special Town Meeting.  The Order is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said document which is inconsistent therewith and, to the extent it is inconsistent with the Order, Paragraph 50 is denied.

51.     Answering Paragraph 51 of the Complaint, Mr. Sidman denies that the document attached as Exhibit D to the Complaint is a true and accurate copy of the Special Town Meeting Warrant.  Mr. Sidman alleges Exhibit D is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said document which is inconsistent therewith and, to the extent they are inconsistent with Exhibit D or all staff memoranda to the Council issued prior to November 8, 2022, Paragraph 51 is denied. Mr. Sidman further alleges said document is the Ordinance Amendment Notice prepared by the Town Clerk for eCode360.com, the online vendor that hosts the Town's Code.  Answering Paragraph 51 further, Mr. Sidman lacks sufficient information to admit or deny the contents of all staff memoranda to the Council submitted prior to November 8, 2022, which are not attached to the Complaint.

App. 177

52.      Mr. Sidman admits the allegations in Paragraph 52 of the Complaint.

53.      Answering Paragraph 53 of the Complaint, the Initiated Ordinance and Town Code are written documents that speak for themselves; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said documents which is inconsistent therewith and, to the extent they are inconsistent with the referenced written documents, Paragraph 53 is denied.

54.      Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 54 of the Complaint and therefore denies the same.

55.      Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 55 of the Complaint and therefore denies the same.

56.      Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 56 of the Complaint and therefore denies the same.

57.      Answering Paragraph 57 of the Complaint, the Initiated Ordinance is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said documents which is inconsistent therewith and, to the extent they are inconsistent with the Initiated Ordinance, Paragraph 57 is denied.

58.      Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 58 of the Complaint and therefore denies the same.

59.      Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 59 of the Complaint and therefore denies the same.

60.      Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 60 of the Complaint and therefore denies the same.

61.      Mr. Sidman lacks sufficient information to admit or deny the allegations in

App. 178

Paragraph 61 of the Complaint and therefore denies the same.

62.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 62 of the Complaint and therefore denies the same.

63.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 63 of the Complaint and therefore denies the same.

64.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 64 of the Complaint and therefore denies the same.

65.     Mr. Sidman denies the allegations in Paragraph 65 of the Complaint.

66.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 66 of the Complaint and therefore denies the same.

CLAIMS FOR RELIEF

COUNT 1<br>
<em>(Violation of the Supremacy Clause, Article VI, Clause 2, of the U.S. Constitution)</em>

67.     Answering Paragraph 67 of the Complaint, Mr. Sidman reasserts his answers and denials to Paragraphs 1 through 66 of the Complaint and incorporates by reference his responses above as if fully set forth herein.

68.     Paragraph 68 of the Complaint states a conclusion of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 68.

69.     Paragraph 69 of the Complaint states a conclusion of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 69.

70.     Paragraph 70 of the Complaint states a conclusion of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal

App. 179

conclusion in Paragraph 70.

71.     Paragraph 71 of the Complaint states a conclusion of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 71.

72.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 72 of the Complaint and therefore denies the same.

73.     Paragraph 73 of the Complaint states a conclusion of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 73.

74.     Paragraph 74 of the Complaint states a conclusion of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 74.[2]

75.     Paragraph 75 of the Complaint states a conclusion of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every legal conclusion in Paragraph 75.  Answering further, Mr. Sidman lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 75 of the Complaint and therefore denies the same.[3]

76.     Mr. Sidman denies the allegations in Paragraph 76 of the Complaint.

77.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 77 of the Complaint and therefore denies the same.

---

[2] Footnotes within the Complaint do not constitute allegations and do not require a response.  To the extent footnotes do require a response, Mr. Sidman denies all allegations and legal conclusions contained in all footnotes within the Complaint.

[3] Footnotes within the Complaint do not constitute allegations and do not require a response.  To the extent footnotes do require a response, Mr. Sidman denies all allegations and legal conclusions contained in all footnotes within the Complaint.

78.     Paragraph 78 of the Complaint states a conclusion of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 78.

79.     Paragraph 79 of the Complaint states a conclusion of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 79.

80.     Paragraph 80 of the Complaint states a conclusion of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 80.

81.     Answering Paragraph 81 of the Complaint, the Approvals are written documents that speak for themselves; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said documents which is inconsistent therewith and, to the extent they are inconsistent with the Approvals, Paragraph 81 is denied.  Answering further, Mr. Sidman lacks sufficient information to admit or deny the remaining allegations in Paragraph 81 of the Complaint and therefore denies the same.

82.     Answering Paragraph 82 the Complaint, the Initiated Ordinance is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said document which is inconsistent therewith and, to the extent they are inconsistent with the Initiated Ordinance, Paragraph 82 is denied. Mr. Sidman denies any allegations in Paragraph 82 to the extent they are inconsistent with the Initiated Ordinance.  Mr. Sidman denies the remaining allegations contained in Paragraph 82.

83.     Mr. Sidman denies the allegations in Paragraph 83 of the Complaint.

84.     Paragraph 84 of the Complaint states a conclusion of law to which no response is

App. 181

required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 84.

85.     Paragraph 85 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every legal conclusion in Paragraph 85.  Answering further, Mr. Sidman lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 85 of the Complaint and therefore denies the same.

86.     Paragraph 86 of the Complaint states a conclusion of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 86.

87.     Answering Paragraph 87 of the Complaint, Mr. Sidman denies that the Town lacks the right to establish and enforce limitations on the number of cruise ship passengers entering on a daily basis.  The remaining allegations of Paragraph 87 of the Complaint state conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 87.

88.     Mr. Sidman denies the allegation in Paragraph 88 of the Complaint.

89.     Mr. Sidman denies the allegation in Paragraph 89 of the Complaint.

90.     Mr. Sidman denies the allegation in Paragraph 90 of the Complaint.

COUNT II
*(Violation of the Commerce Clause of the United States Constitution)*

91.     Answering Paragraph 91 of the Complaint, Mr. Sidman reasserts his answers and denials to Paragraphs 1 through 90 of the Complaint and incorporates by reference his responses above as if fully set forth herein.

92.     Paragraph 92 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal

conclusion in Paragraph 92.

93.     Paragraph 93 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 93.

94.     Paragraph 94 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 94.

95.     Paragraph 95 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 95.

96.     Answering Paragraph 96 of the Complaint, Mr. Sidman denies that the Initiated Ordinance discriminates against interstate commerce and that the Initiated Ordinances seeks to regulate the transport of persons by water.  The remaining allegations of Paragraph 96 of the Complaint state conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 96.

97.     Answering Paragraph 97 of the Complaint, Mr. Sidman denies that transport of persons by water to Bar Harbor is an inherently "out-of-state" activity.  Mr. Sidman lacks sufficient information to admit or deny the remaining allegations in Paragraph 97 of the Complaint and therefore denies the same.

98.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 98 of the Complaint and therefore denies the same.

99.     Answering Paragraph 99 of the Complaint, the Initiated Ordinance is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the

App. 183

contents or meaning of said document which is inconsistent therewith and, to the extent they are inconsistent with the Initiated Ordinance, Paragraph 99 is denied.

100.     Answering Paragraph 100 of the Complaint, the Initiated Ordinance is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said document which is inconsistent therewith and, to the extent they are inconsistent with the Initiated Ordinance, Paragraph 100 is denied.

101.     Answering Paragraph 101 of the Complaint, the Initiated Ordinance is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said document which is inconsistent therewith and, to the extent they are inconsistent with the Initiated Ordinance, Paragraph 101 is denied.

102.     Answering Paragraph 102 of the Complaint, Mr. Sidman denies that the stated "Purpose" for the Initiative is mere pretense and lacks any factual basis.  The Initiated Ordinance and the Initiative are written documents that speaks for themselves; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said documents which is inconsistent therewith and, to the extent they are inconsistent with the written documents, Paragraph 102 is denied.

103.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 103 of the Complaint and therefore denies the same.

104.     Answering Paragraph 104 of the Complaint, Mr. Sidman denies that the Initiated Ordinance erects a wall around the port of Bar Harbor, halts commerce from a large percentage of cruise ships active in interstate and foreign commerce, and/or obstructs commerce.  The remaining allegations in Paragraph 104 of the Complaint state conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation

App. 184

and legal conclusion in Paragraph 104.

105.     Mr. Sidman denies the allegations in Paragraph 105 of the Complaint.

106.     Paragraph 106 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 106.

107.     Mr. Sidman denies the allegations in Paragraph 107 of the Complaint.

108.     Mr. Sidman denies the allegations in Paragraph 108 of the Complaint.

109.     Mr. Sidman denies the allegations in Paragraph 109 of the Complaint.

110.     Mr. Sidman lacks sufficient information to admit or deny the allegations in Paragraph 110 of the Complaint and therefore denies the same.

111.     Mr. Sidman denies the allegations in Paragraph 111 of the Complaint.

112.     Paragraph 112 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 112.

113.     Paragraph 113 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 113.

114.     Answering Paragraph 114 of the Complaint, Mr. Sidman denies that the Initiated Ordinance discriminates against foreign commerce.  Mr. Sidman lacks sufficient information to admit or deny the remaining allegations in Paragraph 114 of the Complaint and therefore denies the same.

115.     Mr. Sidman denies the allegations in Paragraph 115 of the Complaint.

116.     Mr. Sidman denies the allegations in Paragraph 116 of the Complaint.

App. 185

117.    Answering Paragraph 117 of the Complaint, the Initiated Ordinance is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said document which is inconsistent therewith and, to the extent they are inconsistent with the Initiated Ordinance, Paragraph 117 is denied.    Paragraph 117 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 117.

118.    Answering Paragraph 118 of the Complaint, Mr. Sidman denies that the Initiated Ordinance impermissibly regulates in an area where national uniformity is essential.  Mr. Sidman lacks sufficient information to admit or deny the remaining allegations in Paragraph 118 of the Complaint and therefore denies the same.

119.    Mr. Sidman denies the allegations in Paragraph 119 of the Complaint.

120.    Answering Paragraph 120 of the Complaint, Mr. Sidman denies that the Initiated Ordinance threatens the nation's ability to maintain an integrated maritime transportation system. Paragraph 120 of the Complaint states conclusions of law to which no response is required. To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 120.

121.    Mr. Sidman denies the allegations in Paragraph 121 of the Complaint.

122.    Mr. Sidman denies the allegations in Paragraph 122 of the Complaint.

123.    Mr. Sidman denies the allegations in Paragraph 123 of the Complaint.

124.    Mr. Sidman denies the allegations in Paragraph 124 of the Complaint.

COUNT III
*(Initiated Ordinance Inconsistent with Substantive Due Process)*

125.    Answering Paragraph 125 of the Complaint, Mr. Sidman reasserts his answers and denials to Paragraphs 1 through 124 of the Complaint and incorporates by reference his

App. 186

responses above as if fully set forth herein.

126.   Mr. Sidman denies the allegations in Paragraph 126 of the Complaint.

127.   Answering Paragraph 127 of the Complaint, Mr. Sidman denies that the Initiated Ordinance is arbitrary, discriminatory and irrelevant to any legitimate legislative goal and that mandatory disembarkation caps unreasonably deprive Plaintiffs of their property interests. Further answering Paragraph 127, the Initiated Ordinance is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said document which is inconsistent therewith and, to the extent they are inconsistent with the Initiated Ordinance, Paragraph 127 is denied.  Mr. Sidman lacks sufficient information to admit or deny the remaining allegations in Paragraph 127 of the Complaint and therefore denies the same.

128.   Mr. Sidman denies the allegations in Paragraph 128 of the Complaint.

## **Affirmative Defenses**

1.   Plaintiffs have failed to state a claim in whole or in part upon which relief may be granted.

2.   Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations.

3.   Plaintiffs lack standing to bring this action.

4.   This action is not ripe for adjudication.

5.   Plaintiffs have failed to present a justiciable controversy among or between the parties.

6.   Plaintiffs have failed to demonstrate that they are entitled to injunctive relief.

7.   Mr. Sidman has acted in good faith at all times relevant to this action.

App. 187

8.      Plaintiffs' claims are barred, in whole or in part, by the doctrines of waiver, estoppel, and/or unclean hands.

9.      Defendant Town's home rule authority to enact the Initiated Ordinance is expressly recognized and affirmed by Maine's Coastal Conveyance Act, 38 M.R.S. § 556, the Harbor Masters Act, 38 M.R.S. § 1, et seq., 30-A M.R.S. § 3001, and the Maine Constitution Article VIII, Part Second.

10.     The Initiated Ordinance does not discriminate against interstate commerce or attempt to regulate beyond the boundaries of the Town of Bar Harbor.

11.     The Initiated Ordinance does not impose a burden on out-of-state interests or confer advantages upon in-state interests.

12.     To the extent there exists any discrimination against interstate commerce, the Initiated Ordinance advances a non-protectionist purpose.

13.     To the extent there exists any discrimination against interstate commerce, the Initiated Ordinance sets forth the least discriminatory means for achieving that purpose.

14.     Any burdens imposed on interstate commerce by the Initiated Ordinance are reasonable in relation to the Initiated Ordinance's putative local benefits.

15.     The Initiated Ordinance advances general health, safety, welfare, and peace of the community.

16.     The Initiated Ordinance does not interfere with the federal government's ability to speak with one voice when regulating commerce with foreign nations.

17.     The Initiated Ordinance does not interfere with any of Plaintiffs' rights or property interests.

18.     Plaintiffs have failed to mitigate their damages, if any.

App. 188

19.     Defendants have no duty, fiduciary or otherwise, to operate the Town of Bar Harbor in a manner that benefits Plaintiffs' business operations to the detriment of its residents.

20.     Facts and law demonstrate that the Initiated Ordinance is not preempted, and the enforcement of the Initiated Ordinance would not violate any provision of the U.S. Constitution or laws of the United States, or violate any right of any Plaintiff under the U.S. Constitution or any of the laws of the United States.

WHEREFORE, Defendant-Intervenor Charles Sidman respectfully requests that this Court dismiss Plaintiffs' Complaint, enter judgment in Mr. Sidman's favor, award him costs, award him reasonable attorney's fees to the extent available by law, and all other and further relief as this Court may deem just and appropriate.

Respectfully submitted,

Dated: April 26, 2023

/s/ *David P. Silk*
David P. Silk, Esq., Bar No. 3136
Robert Papazian, Esq., Bar No. 6491
CURTIS THAXTER LLC
One Canal Plaza, Suite 1000/P.O. Box 7320
Portland, Maine 04112-7320
(207) 774-9000
dsilk@curtisthaxter.com
rpapazian@curtisthaxter.com

*Attorneys for Defendant-Intervenor*
*Charles Sidman*

App. 189

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, et al., <br><br> *Plaintiffs*, <br><br> PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION, a Maine corporation, <br><br> *Plaintiff-Intervenor*, <br><br> v. <br><br> TOWN OF BAR HARBOR, a municipal corporation of the State of Maine, <br><br> *Defendant*, <br><br> CHARLES SIDMAN, <br><br> *Defendant-Intervenor*. | Case No. 1:22-cv-416 |

## DEFENDANT-INTERVENOR CHARLES SIDMAN'S ANSWER TO PLAINTIFF-INTERVENOR PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION'S COMPLAINT IN INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF

Defendant-Intervenor Charles Sidman, through his attorneys, answers Intervenor Penobscot Bay and River Pilots Association's Complaint in Intervention for Declaratory and Injunctive Relief (Doc. No. 43) as follows:

1. Paragraph 1 of the Complaint is introductory in nature. To the extent a response is required, the Initiative and Challenged Ordinance are written documents that speak for themselves. Mr. Sidman denies the allegations in Paragraph 1 to the extent they are inconsistent with the public record documents admissible under Rule 44 of the Federal Rules of Civil

App. 190

Procedure.  Mr. Sidman denies the remaining allegations contained in Paragraph 1.[1]

2.      Paragraph 2 of the Complaint is introductory in nature.  To the extent a response is required, Mr. Sidman denies the allegations contained in Paragraph 2.

3.      Paragraph 3 of the Complaint is introductory in nature and states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 3.

4.      Paragraph 4 of the Complaint is introductory in nature and states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies the allegations contained in Paragraph 4.

5.      Paragraph 5 of the Complaint is introductory in nature.  To the extent a response is required, Mr. Sidman denies the allegations contained in Paragraph 5.

6.      Paragraph 6 of the Complaint is introductory in nature and states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies the allegations contained in Paragraph 6.

7.      Paragraph 7 of the Complaint is introductory in nature.  To the extent a response is required, Mr. Sidman denies the allegations contained in Paragraph 7.

8.      Paragraph 8 of the Complaint is introductory in nature.  To the extent a response is required, Mr. Sidman denies the allegations contained in Paragraph 8.

9.      Paragraph 9 of the Complaint is introductory in nature.  To the extent a response is required, Mr. Sidman denies the allegations contained in Paragraph 9.

10.     Mr. Sideman denies the allegations contained Paragraph 10 of the Complaint.

---

[1] Footnotes within the Complaint do not constitute allegations and do not require a response.  To the extent footnotes do require a response, Mr. Sidman denies all allegations and legal conclusions contained in all footnotes within the Complaint.

App. 191

PARTIES

11.     Upon information and belief, Mr. Sidman admits the allegations contained in Paragraph 11 of the Complaint.

12.     Mr. Sidman lacks sufficient information to admit or deny the allegations contained in Paragraph 12 of the Complaint and therefore denies the same.

13.     Mr. Sidman admits the allegations contained Paragraph 13 of the Complaint.

JURISDICTION AND VENUE

14.     Paragraph 14 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 14.[2]

15.     Paragraph 15 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 15.

16.      Paragraph 16 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 16.

17.     Answer:  Paragraph 17 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 17.

18.     Paragraph 18 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal

_____

[2] Footnotes within the Complaint do not constitute allegations and do not require a response.  To the extent footnotes do require a response, Mr. Sidman denies all allegations and legal conclusions contained in all footnotes within the Complaint.

App. 192

conclusion in Paragraph 18.

19.     Paragraph 19 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 19.

BACKGROUND

*Maine State Pilotage System*

20.     Paragraph 20 of the Complaint states a conclusion of law to which no response is required.  To the extent a response is required, Mr. Sidman denies Paragraph 20.

21.     Paragraph 21 of the Complaint of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 21.[3]

22.     Paragraph 22 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 22.

23.     Paragraph 23 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 23.

24.     Paragraph 24 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 24.  Answering further, Mr. Sidman lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 24 of the Complaint and

---

[3] Footnotes within the Complaint do not constitute allegations and do not require a response.  To the extent footnotes do require a response, Mr. Sidman denies all allegations and legal conclusions contained in all footnotes within the Complaint.

App. 193

therefore denies the same.

25.     Mr. Sidman lacks sufficient information to admit or deny the allegations contained in Paragraph 25 of the Complaint and therefore denies the same.

26.     Paragraph 26 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 26.

27.     Mr. Sidman lacks sufficient information to admit or deny the allegations contained in Paragraph 27 of the Complaint and therefore denies the same.

28.     Paragraph 28 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 28.

29.     Paragraph 29 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 29.

30.     Mr. Sidman lacks sufficient information to admit or deny the allegations contained in Paragraph 30 of the Complaint and therefore denies the same.

31.      Mr. Sidman lacks sufficient information to admit or deny the allegations contained in Paragraph 31 of the Complaint and therefore denies the same.

32.     Mr. Sidman lacks sufficient information to admit or deny the allegations contained in Paragraph 32 of the Complaint and therefore denies the same.

33.     Mr. Sidman lacks sufficient information to admit or deny the allegations contained in Paragraph 33 of the Complaint and therefore denies the same.

34.     Mr. Sidman lacks sufficient information to admit or deny the allegations

App. 194

contained in Paragraph 34 of the Complaint and therefore denies the same.

*Maine's Tourism Industry*

35.     Paragraph 35 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every legal conclusion in Paragraph 35.  Answering further, Mr. Sidman lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 35 of the Complaint and therefore denies the same.

36.     Mr. Sidman lacks sufficient information to admit or deny the allegations contained in Paragraph 36 of the Complaint and therefore denies the same.

*Cruise Tourism in Bar Harbor*

37.     Answering Paragraph 37 of the Complaint, Mr. Sidman admits that Bar Harbor serves as a popular access point for Acadia National Park.  Answering further, Mr. Sidman lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 37 of the Complaint and therefore denies the same.

38.     Mr. Sidman lacks sufficient information to admit or deny the allegations contained in Paragraph 38 of the Complaint and therefore denies the same.

39.     Mr. Sidman lacks sufficient information to admit or deny the allegations contained in Paragraph 39 of the Complaint and therefore denies the same.

40.     Answering Paragraph 40 of the Complaint, Mr. Sidman admits that cruise ships anchor offshore and passengers tender into Bar Harbor.  Answering further, Mr. Sidman lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 40 of the Complaint and therefore denies the same.

41.     Answering Paragraph 41 of the Complaint, Mr. Sidman admits that cruise ships anchor offshore and passengers tender into Bar Harbor.  Answering further, Mr. Sidman lacks

App. 195

sufficient information to admit or deny the remaining allegations contained in Paragraph 41 of the Complaint and therefore denies the same.

42.     Mr. Sidman lacks sufficient information to admit or deny the allegations contained in Paragraph 42 of the Complaint and therefore denies the same.

43.     Answering Paragraph 43 of the Complaint, Mr. Sidman admits that the Town has established daily caps since at least 2008.  Answering further, Mr. Sidman lacks sufficient information to admit or deny the remaining allegations in Paragraph 43 and therefore denies the same.[4]

44.     Answering Paragraph 44 of the Complaint, Mr. Sidman admits that the Town has established daily caps since at least 2008.  Answering further, Mr. Sidman lacks sufficient information to admit or deny the remaining allegations in Paragraph 44 and therefore denies the same.

45.     To the extent a response is required to Paragraph 45 of the Complaint, Mr. Sidman states the referenced MOA is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said document which is inconsistent therewith and, to the extent they are inconsistent with the MOA, Paragraph 45 is hereby denied.

*The Initiative*

46.     Answering Paragraph 46 of the Complaint, the Initiative is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said document which is inconsistent therewith and, to the extent they are

---

[4] Footnotes within the Complaint do not constitute allegations and do not require a response.  To the extent footnotes do require a response, Mr. Sidman denies all allegations and legal conclusions contained in all footnotes within the Complaint.

App. 196

inconsistent with the Initiative, Paragraph 46 is hereby denied.[5]

47.     Answering Paragraph 47 of the Complaint, the Initiative is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said document which is inconsistent therewith and, to the extent they are inconsistent with the Initiative, Paragraph 47 is hereby denied.

48.     Answering Paragraph 48 of the Complaint, the Initiative is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said document which is inconsistent therewith and, to the extent they are inconsistent with the Initiative, Paragraph 48 is hereby denied.

49.     Answering Paragraph 49 of the Complaint, the Initiative is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said document which is inconsistent therewith and, to the extent they are inconsistent with the Initiative, Paragraph 49 is hereby denied.

50.     Answering Paragraph 50 of the Complaint, the Initiative is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said document which is inconsistent therewith and, to the extent they are inconsistent with the Initiative, Paragraph 50 is hereby denied.

51.     Answering Paragraph 51 of the Complaint, the Initiative is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said document which is inconsistent therewith and, to the extent they are inconsistent with the Initiative, Paragraph 51 is hereby denied.

---

[5] Footnotes within the Complaint do not constitute allegations and do not require a response.  To the extent footnotes do require a response, Mr. Sidman denies all allegations and legal conclusions contained in all footnotes within the Complaint.

App. 197

52.     Answering Paragraph 52 of the Complaint, the Initiative is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said document which is inconsistent therewith and, to the extent they are inconsistent with the Initiative, Paragraph 52 is hereby denied.

53.     Answering Paragraph 53 of the Complaint, the Initiative is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said document which is inconsistent therewith and, to the extent they are inconsistent with the Initiative, Paragraph 53 is hereby denied.

54.     Answering Paragraph 54 of the Complaint, the Initiative is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said document which is inconsistent therewith and, to the extent they are inconsistent with the Initiative, Paragraph 54 is hereby denied.

55.     Answering Paragraph 55 of the Complaint, Mr. Sidman denies that the Initiative is not supported by studies or other evidence.  Further answering Paragraph 55 of the Complaint, the Initiative is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said document which is inconsistent therewith and, to the extent they are inconsistent with the Initiative, Paragraph 55 is hereby denied.

56.     Mr. Sidman denies the allegations contained in Paragraph 56 of the Complaint.

57.     Answering Paragraph 57 of the Complaint, Mr. Sidman admits the Town Council voted to place the Initiative on the warrant for the November Special Town Meeting.  Further answering Paragraph 57 of the Complaint, the Order is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said

App. 198

document which is inconsistent therewith and, to the extent they are inconsistent with the Order, Paragraph 57 is hereby denied.

58.     Answering Paragraph 58 of the Complaint, Mr. Sidman admits that the Initiative was listed as Article 3 on the Warrant for the November 8, 2022, Special Town Meeting.  Mr. Sidman denies that the document attached as Exhibit C to the Complaint is a true and accurate copy of the Special Town Meeting Warrant.  Exhibit C is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said written document which is inconsistent therewith and, to the extent they are inconsistent with the document, Paragraph 58 is hereby denied.  Mr. Sidman alleges that the written document appears to be the Ordinance Amendment Notice prepared by the Town Clerk for eCode360.com, the online vendor that hosts the Town's Code.

59.     Mr. Sidman admits the allegations contained in Paragraph 59 of the Complaint.

60.     Answering Paragraph 60 of the Complaint, the Challenged Ordinance is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said written document which is inconsistent therewith and, to the extent they are inconsistent with the Challenged Ordinance, Paragraph 60 is hereby denied.

*Impacts of the Challenged Ordinance*

61.     Mr. Sidman lacks sufficient information to admit or deny the allegations contained in Paragraph 61 of the Complaint and therefore denies the same.

62.     Answering Paragraph 62 of the Complaint, the Challenged Ordinance is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said written document which is inconsistent therewith and, to the extent they are inconsistent with the Challenged Ordinance, Paragraph 62 is hereby denied.

App. 199

63.     Answering Paragraph 63 of the Complaint, the Challenged Ordinance is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said written document which is inconsistent therewith and, to the extent they are inconsistent with the Challenged Ordinance, Paragraph 63 is hereby denied.

64.     Mr. Sidman lacks sufficient information to admit or deny the allegations contained in Paragraph 64 of the Complaint and therefore denies the same.

65.     Mr. Sidman lacks sufficient information to admit or deny the allegations contained in Paragraph 65 of the Complaint and therefore denies the same.

66.     Mr. Sidman lacks sufficient information to admit or deny the allegations contained in Paragraph 66 of the Complaint and therefore denies the same.  The Challenged Ordinance is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said written document which is inconsistent therewith and, to the extent they are inconsistent with the Challenged Ordinance, Paragraph 66 is hereby denied.

67.     Mr. Sidman lacks sufficient information to admit or deny the allegations contained in Paragraph 67 of the Complaint and therefore denies the same.

68.     Mr. Sidman lacks sufficient information to admit or deny the allegations contained in Paragraph 68 of the Complaint and therefore denies the same.[6]

69.     Mr. Sidman lacks sufficient information to admit or deny the allegations contained in Paragraph 69 of the Complaint and therefore denies the same.

70.     Mr. Sidman lacks sufficient information to admit or deny the allegations

---

[6] Footnotes within the Complaint do not constitute allegations and do not require a response.  To the extent footnotes do require a response, Mr. Sidman denies all allegations and legal conclusions contained in all footnotes within the Complaint.

**App. 200**

contained in Paragraph 70 of the Complaint and therefore denies the same.

71.     Mr. Sidman lacks sufficient information to admit or deny the allegations
contained in Paragraph 71 of the Complaint and therefore denies the same.

72.     Mr. Sidman lacks sufficient information to admit or deny the allegations
contained in Paragraph 72 of the Complaint and therefore denies the same.

73.     Answering Paragraph 73 of the Complaint, Mr. Sidman denies that the
Challenged Ordinance arbitrarily excludes a whole category of commerce from Frenchman Bay.
Mr. Sidman lacks sufficient information to admit or deny the remaining allegations contained in
Paragraph 73 of the Complaint and therefore denies the same.

74.     Mr. Sidman lacks sufficient information to admit or deny the allegations
contained in Paragraph 74 of the Complaint and therefore denies the same.

75.     Mr. Sidman lacks sufficient information to admit or deny the allegations
contained in Paragraph 75 of the Complaint and therefore denies the same.

76.     Mr. Sidman denies the allegation contained in Paragraph 76 of the Complaint.

FIRST CAUSE OF ACTION
*Violation of the Supremacy Clause*

77.     Answering Paragraph 77 of the Complaint, Mr. Sidman reasserts his answers and
denials to Paragraphs 1 through 76 of the Complaint and incorporates by reference his responses
above as if fully set forth herein.

78.      Paragraph 78 of the Complaint states conclusions of law to which no response is
required.  To the extent a response is required, Mr. Sidman denies every allegation and legal
conclusion in Paragraph 78.

79.     Paragraph 79 of the Complaint states conclusions of law to which no response is
required.  To the extent a response is required, Mr. Sidman denies every allegation and legal

App. 201

conclusion in Paragraph 79.

80.     Paragraph 80 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 80.

81.     Mr. Sidman lacks sufficient information to admit or deny the allegations contained in Paragraph 81 of the Complaint and therefore denies the same.

82.     Paragraph 82 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every legal conclusion in Paragraph 82.  Mr. Sidman lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 82 of the Complaint and therefore denies the same.

83.     Paragraph 83 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 83.[7]

84.     Paragraph 84 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every legal conclusion in Paragraph 84.  Mr. Sidman lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 84 of the Complaint and therefore denies the same.[8]

85.     Mr. Sidman denies the allegations contained in Paragraph 85 of the Complaint.

86.     Answering Paragraph 86 of the Complaint, the Challenged Ordinance is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the

---

[7]Footnotes within the Complaint do not constitute allegations and do not require a response.  To the extent footnotes do require a response, Mr. Sidman denies all allegations and legal conclusions contained in all footnotes within the Complaint.

[8] Footnotes within the Complaint do not constitute allegations and do not require a response.  To the extent footnotes do require a response, Mr. Sidman denies all allegations and legal conclusions contained in all footnotes within the Complaint.

**App. 202**

contents or meaning of said written document which is inconsistent therewith and, to the extent they are inconsistent with the Challenged Ordinance, Paragraph 86 is hereby denied. Answering further, Mr. Sidman lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 86 of the Complaint and therefore denies the same.

87.     Paragraph 87 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 87.

88.     Paragraph 88 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 88.

89.     Paragraph 89 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 89.

90.     Answering Paragraph 90 of the Complaint, Mr. Sidman denies that the Challenged Ordinance is preempted by federal law and regulations.  The Challenged Ordinance is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said written document which is inconsistent therewith and, to the extent they are inconsistent with the Challenged Ordinance, Paragraph 90 is hereby denied.

91.     Mr. Sidman lacks sufficient information to admit or deny the allegations contained in Paragraph 91 of the Complaint and therefore denies the same.

92.     Paragraph 92 of the Complaint states conclusions of law to which no response is required. To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 92.

App. 203

93.     Paragraph 93 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every legal conclusion in Paragraph 93.  Answering further, Mr. Sidman lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 93 of the Complaint and therefore denies the same.

94.     Paragraph 94 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 94.

95.     Answering Paragraph 95 of the Complaint, Mr. Sidman denies that the Town lacks the right to establish and enforce limitations on the number of cruise ship passengers entering on a daily basis.  The remaining allegations of Paragraph 95 of the Complaint state conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 95.

96.     Mr. Sidman denies the allegations contained in Paragraph 96 of the Complaint.

97.     Mr. Sidman denies the allegations contained in Paragraph 97 of the Complaint.

98.     Mr. Sidman denies the allegations contained in Paragraph 98 of the Complaint.

SECOND CAUSE OF ACTION
*Violation of the Commerce Clause*

99.     Answering Paragraph 99 of the Complaint, Mr. Sidman reasserts his answers and denials to Paragraphs 1 through 98 of the Complaint  and incorporates by reference his responses above as if fully set forth herein.

100.    Paragraph 100 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 100.

101.    Paragraph 101 of the Complaint states conclusions of law to which no response is

- 15 -

required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 101.

102.     Paragraph 102 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 102.

103.     Paragraph 103 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 103.

104.     Answering Paragraph 104 of the Complaint, the Challenged Ordinance is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said written document which is inconsistent therewith and, to the extent they are inconsistent with the Challenged Ordinance, Paragraph 104 is hereby denied.  Answering further, Paragraph 104 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 104.

105.     Mr. Sidman denies that the Challenged Ordinance discriminates against interstate commerce and that the transport of persons by water to Bar Harbor is an inherently "out-of-state" activity.  Mr. Sidman lacks sufficient information to admit or deny the remaining allegations in Paragraph 105 of the Complaint and therefore denies the same.

106.     Answering Paragraph 106 of the Complaint, Mr. Sidman admits that persons enter Bar Harbor by various means.  Mr. Sidman lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 106 of the Complaint and therefore denies the same.

107.     Answering Paragraph 107 of the Complaint, the Challenged Ordinance is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said written document which is inconsistent therewith and, to the extent they are inconsistent with the Challenged Ordinance, Paragraph 107 is hereby denied.

108.     Answering Paragraph 108 of the Complaint, the Initiative is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said written document which is inconsistent therewith and, to the extent they are inconsistent with the Initiative, Paragraph 108 is hereby denied.

109.     Answering Paragraph 109 of the Complaint, the Initiative is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said written document which is inconsistent therewith and, to the extent they are inconsistent with the Initiative, Paragraph 109 is hereby denied.

110.     Answering Paragraph 110 of the Complaint, the Initiative is a written document that speaks for itself; Mr. Sidman denies any attempt to characterize or paraphrase the contents or meaning of said written document which is inconsistent therewith and, to the extent they are inconsistent with the Initiative, Paragraph 110 is hereby denied.

111.     Answering Paragraph 111 of the Complaint, Mr. Sidman denies that the Challenged Ordinance erects a wall around the port of Bar Harbor, halts commerce from a large percentage of cruise ships active in interstate and foreign commerce, and/or obstructs commerce. The remaining allegations in Paragraph 111 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 111.

App. 206

112.     Mr. Sidman denies the allegations contained in Paragraph 112 of the Complaint.

113.     Paragraph 113 of the Complaint contains statements of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 113.

114.     Mr. Sidman denies the allegations contained in Paragraph 114 of the Complaint.

115.     Mr. Sidman denies the allegations contained in Paragraph 115 of the Complaint.

116.     Mr. Sidman denies the allegations contained in Paragraph 116 of the Complaint.

117.     Mr. Sidman denies the allegations contained in Paragraph 117 of the Complaint.

118.     Paragraph 118 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 118.

119.     Paragraph 119 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 119.

120.     Answering Paragraph 120 of the Complaint, Mr. Sidman denies that the Challenged Ordinance discriminates against foreign commerce or favors domestic vessels over foreign competitors and ships engaged in domestic itineraries over ships engaged in international itineraries.  Mr. Sidman further denies that the Town is without authority to establish and enforce limitations on the number of cruise ship passengers entering on a daily basis.  Mr. Sidman lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 120 of the Complaint and therefore denies the same.[9]

---

[9] Footnotes within the Complaint do not constitute allegations and do not require a response.  To the extent footnotes do require a response, Mr. Sidman denies all allegations and legal conclusions contained in all footnotes within the Complaint.

121.    Answering Paragraph 121 of the Complaint, Mr. Sidman denies that the Challenged Ordinance impermissibly regulates in an area where national uniformity is essential. Mr. Sidman lacks sufficient information to admit or deny the remaining allegations in Paragraph 121 of the Complaint and therefore denies the same.

122.    Mr. Sidman denies the allegations contained in Paragraph 122 of the Complaint.

123.    Answering Paragraph 123 of the Complaint, Mr. Sidman denies that the Challenged Ordinance harms the Penobscot Pilots Association. Mr. Sidman lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 123 of the Complaint and therefore denies the same.

124.    Mr. Sidman denies the allegations contained in Paragraph 124 of the Complaint.

125.    Mr. Sidman denies the allegations contained in Paragraph 125 of the Complaint.

126.    Mr. Sidman denies the allegations contained in Paragraph 126 of the Complaint.

COUNT III
*Violation of the Maine Constitution*
*Preemption by 38 M.R.S. §§ 85, et seq.*

127.    Answering Paragraph 127 of the Complaint, Mr. Sidman reasserts his answers and denials to Paragraphs 1 through 126 of the Complaint and incorporates by reference his responses above as if fully set forth herein.

128.    Paragraph 128 of the Complaint states conclusions of law to which no response is required. To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 128.[10]

129.    Paragraph 129 of the Complaint states conclusions of law to which no response is

---

[10] Footnotes within the Complaint do not constitute allegations and do not require a response. To the extent footnotes do require a response, Mr. Sidman denies all allegations and legal conclusions contained in all footnotes within the Complaint.

required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 129.

130.    Paragraph 130 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 130.

131.    Paragraph 131 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 131.

132.    Paragraph 132 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 132.

133.    Mr. Sidman denies the allegations contained in Paragraph 133 of the Complaint.

134.    Mr. Sidman denies the allegations contained in Paragraph 134 of the Complaint.

135.    Mr. Sidman denies the allegations contained in Paragraph 135 of the Complaint.

136.    Mr. Sidman denies the allegations contained in Paragraph 136 of the Complaint.

137.    Mr. Sidman denies the allegations contained in Paragraph 137 of the Complaint.

138.    Answering Paragraph 138 of the Complaint, Mr. Sidman denies that the Challenged Ordinance will cut off an entire segment of vessel traffic into Frenchman Bay instantaneously.  Mr. Sidman lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 138 of the Complaint and therefore denies the same.

139.    Mr. Sidman denies the allegations contained in Paragraph 139 of the Complaint.

140.    Mr. Sidman denies the allegations contained in Paragraph 140 of the Complaint.

141.    Mr. Sidman denies the allegations contained in Paragraph 141 of the Complaint.

COUNT IV
*Violation of Maine Constitution*
*Preemption by 5 M.R.S. § 13052, et seq.*

142.    Answering Paragraph 142 of the Complaint, Mr. Sidman reasserts his answers and denials to Paragraphs 1 through 141 of the Complaint and incorporates by reference his responses above as if fully set forth herein.

143.    Paragraph 143 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every allegation and legal conclusion in Paragraph 143.

144.    Paragraph 144 of the Complaint states conclusions of law to which no response is required.  To the extent a response is required, Mr. Sidman denies every legal conclusion in Paragraph 144.  Answering further, Mr. Sidman lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 144 of the Complaint and therefore denies the same.

145.    Mr. Sidman lacks sufficient information to admit or deny the allegations contained in Paragraph 145 of the Complaint and therefore denies the same.

146.    Mr. Sidman denies the allegations contained in Paragraph 146 of the Complaint.

147.    Mr. Sidman denies the allegations contained in Paragraph 147 of the Complaint.

148.    Answering Paragraph 148 of the Complaint, Mr. Sidman denies that the Challenged Ordinance will have outsized, negative impacts on cruise tourism throughout Maine. Mr. Sidman lacks sufficient information to admit or deny the remaining allegations contained in Paragraph 148 of the Complaint and therefore denies the same.

149.    Mr. Sidman denies the allegations contained in Paragraph 149 of the Complaint.

150.    Mr. Sidman denies the allegations contained in Paragraph 150 of the Complaint.

App. 210

151.    Mr. Sidman denies the allegations contained in Paragraph 151 of the Complaint.

## **Affirmative Defenses**

1.    Penobscot Bay and River Pilots Association has failed to state a claim in whole or in part upon which relief may be granted.

2.    Penobscot Bay and River Pilots Association's claims are barred, in whole or in part, by the applicable statutes of limitations.

3.    Penobscot Bay and River Pilots Association lacks standing to bring this action.

4.    This action is not ripe for adjudication.

5.    Penobscot Bay and River Pilots Association has failed to present a justiciable controversy among or between the parties.

6.    Penobscot Bay and River Pilots Association has failed to demonstrate that it is entitled to injunctive relief.

7.    Mr. Sidman has acted in good faith at all times relevant to this action.

8.    Penobscot Bay and River Pilots Association's claims are barred, in whole or in part, by the doctrines of waiver, estoppel, and/or unclean hands.

9.    Defendant's home rule authority to enact the Challenged Ordinance is expressly recognized and affirmed by Maine's Coastal Conveyance Act, 38 M.R.S. § 556, the Harbor Masters Act, 38 M.R.S. § 1, et seq., 30-A M.R.S. § 3001, and the Maine Constitution Article VIII, Part Second.

10.    The Challenged Ordinance does not discriminate against interstate commerce or attempt to regulate beyond the boundaries of the Town of Bar Harbor.

11.    The Challenged Ordinance does not impose a burden on out-of-state interests or confer advantages upon in-state interests.

App. 211

12.     To the extent there exists any discrimination against interstate commerce, the Challenged Ordinance advances a non-protectionist purpose.

13.     To the extent there exists any discrimination against interstate commerce, the Challenged Ordinance sets forth the least discriminatory means for achieving that purpose.

14.     Any burdens imposed on interstate commerce by the Challenged Ordinance are reasonable in relation to the Challenged Ordinance's putative local benefits.

15.     The Challenged Ordinance advances general health, safety, welfare, and peace of the community.

16.     The Challenged Ordinance does not interfere with the federal government's ability to speak with one voice when regulating commerce with foreign nations.

17.     The Challenged Ordinance does not interfere with any of Penobscot Bay and River Pilot Association's rights or property interests.

18.     Penobscot Bay and River Pilots Association has failed to mitigate its damages, if any.

19.     Defendants have no duty, fiduciary or otherwise, to operate the Town of Bar Harbor in a manner that capitalizes Penobscot Bay and River Pilots Association's pilotage operations to the detriment of its residents.

20.     Facts and law demonstrate that the Challenged Ordinance is not preempted, and the enforcement of the Challenged Ordinance would not violate any provision of the U.S. Constitution or laws of the United States, or violate any right of the Penobscot Bay and River Pilots Association under the U.S. Constitution or any of the laws of the United States.

21.     Facts and law demonstrate that the Challenged Ordinance is not preempted, and the enforcement of the Challenged Ordinance would not violate any provision of the Maine

App. 212

Constitution or laws of the State of Maine, or violate any right of the Penobscot Bay and River Pilots Association under the Maine Constitution or any of the laws of the State of Maine.

WHEREFORE, Defendant-Intervenor Charles Sidman respectfully requests that this Court dismiss Plaintiff-Intervenor's Complaint, enter judgment in Mr. Sidman's favor, award him costs, award him reasonable attorney's fees to the extent available by law, and all other and further relief as this Court may deem just and appropriate.

Respectfully submitted,

Dated: April 26, 2023

/s/ *David P. Silk*
David P. Silk, Esq., Bar No. 3136
Robert Papazian, Esq., Bar No. 6491
Curtis Thaxter LLC
One Canal Plaza, Suite 1000
P.O. Box 7320
Portland, Maine 04112-7320
(207) 774-9000
dsilk@curtisthaxter.com
rpapazian@curtisthaxter.com

*Attorneys for Defendant-Intervenor*
*Charles Sidman*

- 24 -

App. 213

# UNITED STATES DISTRICT COURT
## District of Maine

### Witness List

| Case Name:  ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, et al v. TOWN OF BAR HARBOR, et al  Case No.: | Proceeding Type:  Bench Trial |
|---|---|

| Presiding Judge:  Hon. Lance E. Walker | Plaintiff's Attorney: | Defendant's Attorney: |
|---|---|---|
| Courtroom Deputy:  Meghan York | **Plaintiff:** Timothy C. Woodcock, Esq. Janna L. Gau, Esq. P. Andrew Hamilton, Esq. Patrick W. Lyons, Esq. Seth W. Brewster, Esq. Interv. Pltf: Charles Jonathan Benner, Esq. John Scott Kingston, Esq. Kathleen E. Kraft, Esq. Twain Braden, Esq. | **Defendant:** Allison A. Economy, Esq. Jonathan P. Hunter, Esq. Stephen W. Wagner, Esq. Interv. Def: David P. Silk, Esq. Richard P. Olsen, Esq. Robert Papazian, Esq. |
| Court Reporter:  Cathy Ford | | |

| Pla | Dft | Date | WITNESS |
|---|---|---|---|
| 1 | | 7/11/23 | Sarah Flink, Video Deposition |
| 2 | | 7/11/23 | Captain David Gelinas |
| 3 | | 7/11-12/23 | Paul Paradis |
| 4 | | 7/12/23 | Eben Salvatore |
| 5 | | 7/12/23 | Adam Goldstein |
| 6 | | 7/12/23 | Todd Michael Gabe |
| 7 | | 7/12/23 | David Fuller |
| 8 | | 7/12/23 | Kristi Bond |
| 9 | | 7/12/23 | Kevin Desveaux |
| | 10 | 7/13/23 | Christopher Wharff |
| | 11 | 7/13/23 | Sarah Gilbert |
| | 12 | 7/13/23 | Valerie Peacock |
| | 13 | 7/13/23 | Gary Friedmann |
| | 14 | 7/13/23 | William Horner |
| | 15 | 7/13/23 | Nathan Young |
| | 16 | 7/13/23 | Seth Libby |
| | 17 | 7/13/23 | Charles Sidman |

**App. 214**

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

CASE NAME:  ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS et al v. TOWN OF BAR HARBOR et al

DOCKET NO:  1:22-cv-00416-LEW

PROCEEDING TYPE: 7/11/23 – 7/13/23 BENCH TRIAL

## Exhibit List

| Pltfs' Ex. No. | Defts' Ex. No. | Ct. Ex. | Description | Date Ment. | Date Off'd | Obj. | Date Adm. |
|---|---|---|---|---|---|---|---|
| 1 | | | Prof. Todd Gabe Curriculum Vitae | 7/12/23 | 7/12/23 | | 7/12/23 |
| 3 | | | Proposed New Cruise Ship Caps (0036-0037) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 6 | | | PortCall Excerpt (PILOTS002242) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 7 | | | PortCall Excerpt (PILOTS003163) | 7/11/23 | 7/11/23 | | 7/11/23 |
| 8 | | | PortCall Excerpt (BARHARBCTRL0000005150) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 12a | | | 9/20/2019 Memo from Mount Desert and Bar Harbor Police Departments re Cruise Ship Post Orders, Responsibilities and Policies (0353-0361) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 14 | | | 4/21/2023 Email from M. Gagnon to S. Gilbert re Cruise Ship litigation (0367) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 19 | | | 3/15/2023 Memo from Lt. Wharff to Chief Willis re Cruise Ship Land Use Ordinance Legal Scenarios | 7/12/23 | 7/12/23 | | 7/12/23 |
| 22 | | | 12/5/2022 NOAA Coast Survey 13302 (PILOTS004387) | 7/11/23 | 7/11/23 | | 7/11/23 |
| 23 | | | 3/27/2023 NOAA Coast Survey 13312 (PILOTS004388) | 7/11/23 | 7/11/23 | | 7/11/23 |
| 25 | | | 4/3/2020 NOAA Coast Survey 13323 (PILOTS004385) | 7/11/23 | 7/11/23 | | 7/11/23 |

App. 215

| Pltfs' Ex. No. | Defts' Ex. No. | Ct. Ex. | Description | Date Ment. | Date Off'd | Obj. | Date Adm. |
|---|---|---|---|---|---|---|---|
| 26 | | | 2022 Carnival Form 10-K (PILOTS004770-PILOTS004859) | 7/12/23 | 7/12/23 | x | |
| 27 | | | 2022 Norwegian Form 10-K (PILOTS004860-PILOTS005094) | 7/12/23 | 7/12/23 | x | |
| 28 | | | 2022 Royal Caribbean Form 10-K (PILOTS005095-PILOTS005311) | 7/12/23 | 7/12/23 | x | |
| 29a | | | Color Version of 29 | 7/13/23 | 7/13/23 | | 7/13/23 |
| 32 | | | 7/15/2019 Cruise Tourism & Traffic Congestion in Bar Harbor: Improving the Visitor & Resident Experience (0578-0623) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 35 | | | T. Gabe Congestion Study Data Set | 7/12/23 | 7/12/23 | | 7/12/23 |
| 37 | | | Cruise Management Plan / Warrant Article 3 Comparison | 7/13/23 | | | |
| 39 | | | 1/1/2023 Maine Pilotage Commission Endorsed Rates (PILOTS001520-PILOTS001528) | 7/11/23 | 7/11/23 | | 7/11/23 |
| 47 | | | 12/2/2011 Feasibility Study for the Acquisition of the Bar Harbor Ferry Terminal (1200-1211) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 48 | | | Photo - East down Mt. Desert St. from Village Green 3:08 pm (PILOTS005324) | 7/11/23 | 7/11/23 | | 7/11/23 |
| 50 | | | Photo - Harbor Place tendering location 2:56 pm (PILOTS005326) | 7/11/23 | 7/11/23 | | 7/11/23 |
| 55 | | | Photo - Main & Cottage looking west 10:58 am (PILOTS005331) | 7/11/23 | 7/11/23 | | 7/11/23 |
| 65 | | | 2019 CruiseMaine Annual Report (PILOTS004323-PILOTS004334) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 66 | | | 12/15/2022 Memo from Mount Desert and Bar Harbor Police Departments re Land Use Ordinance change governing Cruise Ship Passenger | 7/13/23 | 7/13/23 | | 7/13/23 |
| 72 | | | 2/19/2022 Email chain re Cruise Ship Initiative (SIDMAN04420-SIDMAN04422) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 83 | | | Aerial video of Bar Harbor, Main St. looking west 1:30 pm (6:45 min) (PILOTS005369) | 7/12/23 | 7/12/23 | | 7/12/23 |

App. 216

| Pltfs' Ex. No. | Defts' Ex. No. | Ct. Ex. | Description | Date Ment. | Date Off'd | Obj. | Date Adm. |
|---|---|---|---|---|---|---|---|
| 84 | | | Aerial video of Bar Harbor, Main St. looking west 1:51 pm (6:45 min) (PILOTS005370) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 85 | | | Aerial video of Bar Harbor, Main St. looking west 6:56 pm (6:45 min) (PILOTS005371) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 86 | | | Aerial video of tender run (5:19 min) (PILOTS005372) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 86g | | | Condensed video of 86 | 7/12/23 | 7/12/23 | | 7/12/23 |
| 86e | | | Still Photo from 86g Video | 7/12/23 | 7/12/23 | | 7/12/23 |
| 94 | | | 2005 Annual Summary by Month report from imra.nps.gov (PILOTS004295-PILOTS004296) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 95 | | | 2006 Annual Summary by Month report from imra.nps.gov (PILOTS004297-PILOTS004298) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 96 | | | 2007 Annual Summary by Month report from imra.nps.gov (PILOTS004299-PILOTS004300) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 97 | | | 2008 Annual Summary by Month report from imra.nps.gov (PILOTS004301-PILOTS004302) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 98 | | | 2009 Annual Summary by Month report from imra.nps.gov (PILOTS004303-PILOTS004304) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 99 | | | 2010 Annual Summary by Month report from imra.nps.gov (PILOTS004305-PILOTS004306) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 100 | | | 2011 Annual Summary by Month report from imra.nps.gov (PILOTS004307-PILOTS004308) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 101 | | | 2012 Annual Summary by Month report from imra.nps.gov (PILOTS004309-PILOTS004310) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 102 | | | 2013 Annual Summary by Month report from imra.nps.gov (PILOTS004311-PILOTS004312) | 7/12/23 | 7/12/23 | | 7/12/23 |

App. 217

| Pltfs' Ex. No. | Defts' Ex. No. | Ct. Ex. | Description | Date Ment. | Date Off'd | Obj. | Date Adm. |
|---|---|---|---|---|---|---|---|
| 103 | | | 2014 Annual Summary by Month report from imra.nps.gov (PILOTS004313-PILOTS004314) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 104 | | | 2015 Annual Summary by Month report from imra.nps.gov (PILOTS004315-PILTOS004316) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 105 | | | 2016 Annual Summary by Month report from imra.nps.gov (PILOTS004317-PILOTS004318) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 106 | | | 2017 Annual Summary by Month report from imra.nps.gov (PILOTS004319-PILOTS004320) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 107 | | | 2018 Annual Summary by Month report from imra.nps.gov (PILOTS004321-PILOTS004322) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 108 | | | 2019 Annual Summary by Month report from imra.nps.gov (PILOTS004389-PILOTS004390) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 109 | | | 2020 Annual Summary by Month report from imra.nps.gov (PILOTS004391-PILOTS004392) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 110 | | | 2021 Annual Summary by Month report from imra.nps.gov (PILOTS004393-PILOTS004394) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 111 | | | 2022 Annual Summary by Month report from imra.nps.gov (PILOTS004395-PILOTS004396) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 112 | | | 2023 Annual Summary by Month report from imra.nps.gov (PILOTS004397-PILOTS004398) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 135 | | | Video from Penbay Pilots website - Waiting for a lee (PILOTS005368) | 7/11/23 | | | |
| 141 | | | Ship Movement Spreadsheet for 2021 (PILOTS000007) | 7/11/23 | 7/11/23 | | 7/11/23 |
| 143 | | | U.S.C.G. Maritime Information Exchange Exemplars (PILOTS005390-PILOTS005415) | 7/12/23 | 7/12/23 | | 7/12/23 |

App. 218

| Pltfs' Ex. No. | Defts' Ex. No. | Ct. Ex. | Description | Date Ment. | Date Off'd | Obj. | Date Adm. |
|---|---|---|---|---|---|---|---|
| 145 | | | U.S. Department of State, Treaties in Force, List of Treaties and Other International Agreements of the United States in Force (PILOTS005416-PILOTS005889) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 146 | | | Photos from Penobscot Bay & River Pilots Association website (PILOTS005890-PILOTS005997) | 7/11/23 | | | |
| 146.2 | | | Photo PILOTS005891 | 7/11/23 | 7/11/23 | | 7/11/23 |
| 146.10 | | | Photo PILOTS005899 | 7/11/23 | 7/11/23 | | 7/11/23 |
| 146.92 | | | Photo PILOTS005981 | 7/11/23 | 7/11/23 | | 7/11/23 |
| 146.40 | | | Photo PILOTS005929 | 7/11/23 | 7/11/23 | | 7/11/23 |
| 146.87 | | | Photo PILOTS005976 | 7/11/23 | 7/11/23 | | 7/11/23 |
| 149 | | | 6/22/2023 Misc. Photos (PILOTS005998-PILOTS006001) | 7/11/23 | | | |
| 150 | | | Bar Harbor Map with Town Lines (PILOTS006002) | 7/11/23 | 7/11/23 | | 7/11/23 |
| 151 | | | Bar Harbor Map with Town Lines overlayed on maritime chart (PILOTS006003) | 7/11/23 | 7/11/23 | | 7/11/23 |
| 159 | | | Website capture - The Global Industry Classification Standard (GICS) (PILOTS006040-PILOTS006043) | 7/12/23 | 7/12/23 | x | |
| 161 | | | Flink Exhibit 161 | 7/11/23 | 7/11/23 | | 7/11/23 |
| 162 | | | Flink Exhibit 162 | 7/11/23 | 7/11/23 | | 7/11/23 |
| 163 | | | Flink Exhibit 163 | 7/11/23 | 7/11/23 | | 7/11/23 |
| 164 | | | Flink Exhibit 164 | 7/11/23 | 7/11/23 | | 7/11/23 |
| 165 | | | Flink Exhibit 165 | 7/11/23 | 7/11/23 | | 7/11/23 |
| 166 | | | Flink Exhibit 166 | 7/11/23 | 7/11/23 | | 7/11/23 |
| 167 | | | Flink Exhibit 167 | 7/11/23 | 7/11/23 | | 7/11/23 |

App. 219

| Pltfs' Ex. No. | Defts' Ex. No. | Ct. Ex. | Description | Date Ment. | Date Off'd | Obj. | Date Adm. |
|---|---|---|---|---|---|---|---|
| 186 | | | S&P 500 Hotels, Resorts & Cruise Lines | 7/12/23 | 7/12/23 | x | |
| 191 | | | Paul Grigsby (Holland) Designation List Report | 7/13/23 | 7/13/23 | | 7/13/23 |
| 192 | | | Juan Kuryla (Norwegian) Designation List Report | 7/13/23 | 7/13/23 | | 7/13/23 |
| 193 | | | Chris Martin (Holland) Designation List Report | 7/13/23 | 7/13/23 | | 7/13/23 |
| 194 | | | Rob Van Den Hof (Holland) Designation List Report | 7/13/23 | 7/13/23 | | 7/13/23 |
| 195 | | | Sarah Flink Designation List Report | 7/11/23 | 7/11/23 | | 7/11/23 |
| 197 | | | Deposition Designations (Bartlett, Chamberlain, Gilbert, Peacock, Wharff, and Willis) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 200 | | | Acadia Explorer Captain's Logs (Date TBD) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 201 | | | Coastal Explorer Captain's Logs (Date TBD) | 7/12/23 | 7/12/23 | | 7/12/23 |
| 202 | | | Pier Permit Golden Anchor | 7/13/23 | 7/13/23 | | 7/13/23 |
| 203 | | | Pier Permit B.H.H. Piers | 7/13/23 | 7/13/23 | | 7/13/23 |
| 204 | | | 5/31/2023 Letter from S. Gilbert Town of Bar Harbor | 7/13/23 | 7/13/23 | | 7/13/23 |
| 206 | | | 2/2008  Bar Harbor Town Council Meeting Minutes reflecting first cap on cruise ships based upon B&A Study | 7/12/23 | 7/12/23 | | 7/12/23 |
| 207 | | | 8/2/2022 Bar Harbor Town Council Meeting Minutes (0014) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 208 | | | 7/19/2022 Amendment to the Town of Bar Harbor Code to Impose Daily Limits on Cruise Ship Disembarkations (0015-0016) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 209 | | | 3/18/2022 Amendment to the Town of Bar Harbor Code to Impose Daily Limits on Cruise Ship Disembarkations (0017-0018) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 210 | | | 11/8/2022 Order of the Bar Harbor Town Council for Town Meeting - Amendment imposing Limit to Number of Persons Allowed to Disembark (0019-0020) | 7/13/23 | 7/13/23 | | 7/13/23 |

App. 220

| Pltfs' Ex. No. | Defts' Ex. No. | Ct. Ex. | Description | Date Ment. | Date Off'd | Obj. | Date Adm. |
|---|---|---|---|---|---|---|---|
| 211 | | | 7/30/2021 Letter from Cruise Lines International Assoc. (CLIA) to Bar Harbor Town Council re changes to cruise ships in Bar Harbor | 7/11/23 | 7/11/23 | | 7/11/23 |
| 212 | | | 11/12/2021 Letter from CLIA to Bar Harbor Town Council re visitors to Bar Harbor | 7/11/23 | 7/11/23 | | 7/11/23 |
| 213 | | | 12/15/2021 Letter from CLIA to Bar Harbor Town Council re December 7 Town Council meeting | 7/11/23 | 7/11/23 | | 7/11/23 |
| 214 | | | 2/2/2022 Letter from CLIA to E. Salvatore re comments to recommendations to Town Council | 7/11/23 | 7/11/23 | | 7/11/23 |
| 215 | | | Winter 2022 Memo of Agreement Between the Town of Bar Harbor, Maine and cruise lines anchoring in Bar Harbor | 7/11/23 | 7/11/23 | | 7/11/23 |
| 216 | | | 2/16/2017 Memo to Bar Harbor Town Council from E. Salvatore re 2016 Annual Report (0240-0272) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 217 | | | 11/5/2018 CLIA Proposal for Study (0273-0325) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 218 | | | 10/17/2022 Email chain re Viewpoint submission (0423-0424) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 220 | | | Bar Harbor Fire Department presentation re FY 2024 Budget (0425-0442) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 221 | | | Town of Bar Harbor, Maine, Marine Mass Casualty Incident Response Guidelines (0443-0461) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 222 | | | 6/28/2019 Bar Harbor Fire Department Cruise Ship Emergency guidelines (0462) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 223 | | | 10/18/2022 2022 Emergency Operations Plan (0463-0488) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 224 | | | 2/12/2008 Bar Harbor Town Council minutes re Cruise Ship Study Task Force | 7/13/23 | 7/13/23 | | 7/13/23 |
| 224A | | | 1/23/08 Passenger Cap Recommendations – Cruise Ship Task Force | 7/11/23 | 7/12/23 | | 7/12/23 |
| 224B | | | Cruise Ship Committee Ordinance, as amended 2011 | 7/12/23 | 7/12/23 | | 7/12/23 |

App. 221

| Pltfs' Ex. No. | Defts' Ex. No. | Ct. Ex. | Description | Date Ment. | Date Off'd | Obj. | Date Adm. |
|---|---|---|---|---|---|---|---|
| 225 | | | 12/15/2021 Memo to Town Council from E. Salvatore re Motion to limit passengers' arrivals to 70% (1212-1214) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 226 | | | 1/5/2022 Article "Citizen petition to regulate cruise ships likely" (SIDMAN00483-SIDMAN00486) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 227 | | | 12/20/2021 Email from *The Quietside Journal* to C. Sidman re article "Anti-cruise ship activists up the stakes for 2022 ahead of Bar Harbor council meeting tomorrow" (SIDMAN01993-SIDMAN01997) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 228 | | | 5/3/2022 Email from *The Quietside Journal* to C. Sidman re article "Citizen group gain enough signatures for petition to cap cruise ships" (SIDMAN02005) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 229 | | | 1/3/2023 Email from *Bar Harbor Story* to C. Sidman re article "Businesses Take the New Cruise Ship Disembarkation Plan to Court" (SIDMAN02016-SIDMAN02019) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 230 | | | 3/22/2022 Email chain re crew numbers (SIDMAN02028-SIDMAN02031) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 231 | | | 3/7/2022 Email chain from C. Sidman to C. Sidman re Final(?) DRAFT of 2022 BH Cruise Ship Initiative (SIDMAN02052-SIDMAN02057) | 7/13/23 | 7/13/13 | | 7/13/23 |
| 232 | | | 1/17/2023 Email to Bar Harbor Town Council from C. Sidman re Cruise Ship Suit and Town Manager (SIDMAN00643-SIDMAN00644) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 233 | | | 10/30/2022 Email from C. Sidman to Council and Maine State Dept of Transportation re Anti-initiative in Bar Harbor (SIDMAN00661-SIDMAN00662) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 235 | | | 1/19/2023 Proposed Defendant-Intervenor C. Sidman's Verified Motion to Intervene and Alternative Verified Motion to Participate as Amicus Curiae and Memorandum in Support of Motions | 7/13/23 | 7/13/23 | | 7/13/23 |

App. 222

| Pltfs' Ex. No. | Defts' Ex. No. | Ct. Ex. | Description | Date Ment. | Date Off'd | Obj. | Date Adm. |
|---|---|---|---|---|---|---|---|
| 236 | | | 2/6/2023 Plaintiff-Intervenor Penobscot Bay and River Pilots Association's Opposition to Charles Sidman's Motion to Intervene | 7/13/23 | 7/13/23 | | 7/13/23 |
| 237 | | | 12/29/2022 Memo from C. Sidman to Town Council re Amendment to Code to Impose Daily Limits on Disembarking Cruise Ship Passengers | 7/13/23 | 7/13/23 | | 7/1323 |
| 240 | | | 4/13/2022 Email chain re April visits for 2023 (0041 – 0046) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 241 | | | 10/27/2022 Website Article, "Something is rotten in the state of Denmark" by C. Sidman (0047 – 0048) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 242 | | | 10/30/2022 Email re Anti-Initiative in Bar Harbor from C. Sidman (0049 – 0050) | 7/13/23 | 7/13/23 | | 7/13/23 |
| 243 | | | Ordinance, Purpose Section and Warrant Articles | 7/13/23 | 7/13/23 | | 7/13/23 |
| 244 | | | Amended Articles of Incorporation for APPLL | 7/12/23 | 7/12/23 | | 7/12/23 |
| 245 | | | 2022 Lunch, Ship vs. No Ship Days (APPL000431) - **CONFIDENTIAL** | 7/12/23 | | | |
| | 250A | | 2007 Comprehensive Plan Update (Complete Copy) | 7/13/23 | 7/13/23 | | 7/13/23 |
| | 252 | | 2016 Email to Cornell Knight Re 2016 Park Loop Closures Congestion (1198) | 7/13/23 | 7/13/23 | | 7/13/23 |
| | 256 | | 2035 Comprehensive Plan Bar Harbor Existing Conditions Analysis Report (TOWN031399) | 7/13/23 | 7/13/23 | x | 7/13/23 |
| | 259 | | A. Powers to D Gelinas 8 23 21 Eastport Alternative Email (PILOTS003603) | 7/13/23 | 7/13/23 | | 7/13/23 |
| | 260 | | B & A 2007 Town of Bar Harbor Cruise Tourism Destination Management Plan (Ex. 34) | 7/11/23 | 7/12/23 | | 7/12/23 |
| | 316 | | Gabe Economic Impact of Cruise Ship Passengers Visiting Bar Harbor (Maine) in 2016 UMaine 2017 (Ex. Gabe 2) | 7/12/23 | | | |

App. 223

| Pltfs' Ex. No. | Defts' Ex. No. | Ct. Ex. | Description | Date Ment. | Date Off'd | Obj. | Date Adm. |
|---|---|---|---|---|---|---|---|
| | 319 | | Gabe Measurement and analysis of neighborhood congestion Evidence from sidewalk pedestrian traffic and walking speeds GC Wiley 2020 (Ex. Gabe 7) | 7/12/23 | 7/12/23 | | 7/12/23 |
| | 323 | | June 2021 Pan Atlantic Quantitative Research Regarding Cruise Ship Tourism (TOWN05781) | 7/13/23 | 7/13/23 | | Limited 7/13/23 |
| | 324 | | **CONFIDENTIAL** Maine Cruise Industry Contingency Plan (PILOTS001977) | 7/11/23 | | | |
| | 327 | | Memorandum of Understanding Between Town and Cruise Lines (TOWN26054) | 7/13/23 | 7/13/23 | | 7/13/23 |
| | 337 | | Town Council Minutes July 20 2021 (TOWN004028) | 7/13/23 | 7/13/23 | | 7/13/23 |
| | 345 | | Town of Bar Harbor Parking Revenue (TOWN031949) | 7/13/23 | 7/13/23 | | 7/13/23 |
| | 348 | | Cruise Ship Fund Details Town Budget FY22 | 7/13/23 | 7/13/23 | | 7/13/23 |
| | 349 | | Cruise Ship Fund Details Town Budget FY23 | 7/13/23 | 7/13/23 | | 7/13/23 |
| | 357 | | Email 03-17-2022 - Re: Slightly revised BH Cruise Ship Petition resubmitted today (3/17/22) (SIDMAN04232-SIDMAN04233) | 7/11/23 | 7/11/23 | | 7/11/23 |
| | 364 | | Re: BHBBA cruise ship position paper- review final (SIDMAN01921-SIDMAN01922) | 7/12/23 | | | |
| | 386 | | Re: 1-18-2022 Email Re Draft Workability Feedback 1-18 (PILOTS003828) | 7/12/23 | 7/12/23 | | 7/12/23 |
| | 390 | | re: Cruise Ships Bar Harbor (SIDMAN00725) | 7/12/23 | | | |
| | 402 | | re: Effects of Cruise Ships on Sidewalk Pedestrian Traffic in Bar Harbor (PILOTS001856-PILOTS001875) | 7/12/23 | 7/12/23 | | 7/12/23 |
| | 411 | | re: Growth and Change/Measurement and analysis of neighborhood congestion: Evidence from sidewalk pedestrian traffic and walking speeds (SIDMAN01792-SIDMAN01810) | 7/12/23 | | | |

App. 224

| Pltfs' Ex. No. | Defts' Ex. No. | Ct. Ex. | Description | Date Ment. | Date Off'd | Obj. | Date Adm. |
|---|---|---|---|---|---|---|---|
| | 412 | | re: BH Cruise Ship Initiative (SIDMAN03903-SIDMAN03904) | 7/13/23 | 7/13/23 | | 7/13/23 |
| | 414 | | re: Slightly revised BH Cruise Ship Petition resubmitted today (3/17/22) (SIDMAN04231) | 7/13/23 | 7/13/23 | | 7/13/23 |
| | 415 | | re: BREAKING NEWS: citizens group seeks to limit cruise ship visitors to 1,000/day (SIDMAN03970) | 7/13/23 | 7/13/23 | | 7/13/23 |
| | 426 | | Re: 8-31-2022 Re: Port Development worksheet (PILOTS002354-PILOTS00255) | 7/11/23 | 7/11/23 | | 7/11/23 |
| | 438 | | **CONFIDENTIAL** Re: 7-22-2020 Economic Injury Disaster Loan Request (PILOTS001974-PILOTS001975) | 7/11/23 | | | |
| | 442 | | Re: 2-12-2021 Survey vessels; letter to Governor (PILOTS003060) | 7/11/23 | 7/11/23 | | 7/11/23 |
| | 443 | | Re: 10-4-21 Re: BH Town Council proposal and effect (PILOTS003630-PILOTS003631) | 7/11/23 | 7/11/23 | | 7/11/23 |
| | 447 | | **CONFIDENTIAL** Re: 12-5-2022 Company Financials (PILOTS004028) | 7/11/23 | | | |
| | 471 | | re Cruise Management Plan v Article 3 (TOWN25979-TOWN25980) | 7/11/23 | 7/11/23 | | 7/11/23 |
| | 479 | | re: Agenda Bar Harbor Cruise Ship Committee By Video Conference 3/4/21 (PILOTS003072-PILOTS003082) | 7/12/23 | 7/12/23 | X | |
| | 485 | | re: To The Members of the Bar Harbor Town Council/An Amendment to the Town of Bar Harbor Code to Impose Daily Limits on Cruise Ship Disembarkations (SIDMAN01859-SIDMAN01863) | 7/13/23 | | | |
| | 487 | | re: 05-31-2023 Rulemaking Memo - Update on Land Use Ordinance (TOWN031977-TOWN031978) | 7/13/23 | | | |
| | 502 | | Re: CV – Charles Lawrence Sidman (NO BATES STAMP NO.) | 7/13/23 | 7/13/23 | | 7/13/23 |
| | 503 | | Re: Photo 9229 | 7/13/23 | 7/13/23 | | 7/13/23 |
| | 504 | | Re: Photo 9230 | 7/13/23 | 7/13/23 | | 7/13/23 |

App. 225

| Pltfs' Ex. No. | Defts' Ex. No. | Ct. Ex. | Description | Date Ment. | Date Off'd | Obj. | Date Adm. |
|---|---|---|---|---|---|---|---|
| | 505 | | Re: Photo 9233 | 7/13/23 | 7/13/23 | | 7/13/23 |
| | 506 | | Re: Photo 9243 | 7/13/23 | 7/13/23 | | 7/13/23 |
| | 507 | | Re: Photo 9244 | 7/13/23 | | | |

App. 226

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, et al., <br><br> *Plaintiffs*, <br><br> PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION, <br><br> *Plaintiff-Intervenor*, <br><br> v. <br><br> TOWN OF BAR HARBOR, <br><br> *Defendant*, <br><br> CHARLES SIDMAN, <br><br> *Defendant-Intervenor* | Case No. 1:22-cv-416-LEW |

## <u>JOINT PROPOSED FINDINGS OF FACT</u>

Plaintiffs Association to Preserve and Protect Local Livelihoods ("APPLL"), B.H. Piers, L.L.C. ("BH Piers"), Golden Anchor, L.C., doing business as Harborside Hotel ("Harborside"), B.H.W.W., L.L.C. ("BHWW"), Delray Explorer Hull 495 LLC ("495"), Delray Explorer Hull 493 LLC ("493"), and Acadia Explorer 492, LLC ("492") (and together with APPLL, BH Piers, Harborside, BHWW, 495, and 493, "Plaintiffs") and Plaintiff-Intervenor Penobscot Bay and River Pilots Association ("Pilots" or the "Pilots Association") submit the following Joint Proposed Findings of Fact.

App. 227

# TABLE OF CONTENTS

I.  PARTIES .................................................................................................................... 1

II.  BACKGROUND ....................................................................................................... 4

    A.  Maine's Tourism Industry ................................................................................. 4

    B.  The Cruise Industry in Bar Harbor ................................................................... 8

    C.  Bar Harbor as a Tender Port ............................................................................ 11

    D.  Bar Harbor as a Class A Port .......................................................................... 16

    E.  Bar Harbor Visitation ...................................................................................... 18

    F.  Bar Harbor's Paid Parking Program ............................................................... 19

    G.  Competition in the Vacation Market ............................................................... 20

    H.  Town's Efforts to Manage Cruise Ship Visitation .......................................... 22

III.  THE INITIATIVE AND THE ORDINANCE ........................................................ 27

    A.  The Initiative ................................................................................................... 27

    B.  Town Council Actions on Initiative ................................................................ 32

    C.  The Ordinance ................................................................................................. 33

    D.  Effect of the Ordinance ................................................................................... 35

    E.  Pedestrian Traffic in Bar Harbor .................................................................... 40

    F.  Less Restrictive Means .................................................................................... 40

IV.  FEDERAL GOVERNMENT REGULATION ........................................................ 40

V.  STATE PILOTAGE ................................................................................................. 42

    A.  The System of Pilotage ................................................................................... 42

    B.  The Pilots Association's Pilotage System ....................................................... 44

VI.  STANDING ............................................................................................................ 48

    A.  Injury to the Tender Vessel Owners and the Pier Owners .............................. 48

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

30825574.2

App. 228

B.  Injury to APPLL Members ............................................................................................49

C.  Injury to the Pilots Association ...................................................................................50

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

30825574.2

**App. 229**

## I.  PARTIES

1.      Plaintiff Association to Preserve and Protect Local Livelihoods ("APPLL") is a not-for-profit 501(c)(6) organization, duly organized under the laws of the State of Maine, with a principal place of business in the Town of Bar Harbor, County of Hancock, State of Maine. *See* Compl. at ¶ 6 (ECF No. 1); Plaintiffs' Trial Exhibit ("PX") 244 (Amended Articles of Incorporation).

2.      APPLL is comprised of members ("APPLL Members") that own and/or operate businesses in Bar Harbor and have combined their resources to advocate for the preservation and protection of local businesses and livelihoods. *See* Compl. at ¶ 6 (ECF No. 1); Trial Transcript, July 12, 2023 ("Tr. 12-Jul.") at 271:3-10, 310:3-16.

3.      APPLL Members include owners and employees of restaurants, retail stores and tour-related businesses, among others.  *See* Tr. 12-Jul. at 271:6-10, 310:3-16.

4.      Consistent with its amended articles of incorporation, APPLL's purposes include, but are not limited to, empowering and supporting local business owners and employees and protecting their way of life, advocating for businesses in and around the Mount Desert region, and resisting measures that would impinge on business conditions or the local economy. *See* Compl. at ¶ 6 (ECF No. 1); Tr. 12-Jul. at 271:6-10, 308:13-14, 310:3-5; PX 244.

5.      APPLL exists so that its members can work together to protect tourism from inequitable treatment and legislation that discriminates against maritime tourism. *See* Compl. at ¶ 6 (ECF No. 1); Tr. 12-Jul. at 271:6-10, 310:3-16.

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 1 -

30825574.2

App. 230

6.     Plaintiff BH Piers is a limited liability company, duly organized under the laws of the State of Maine, with a principal place of business in the Town. *See* Compl. at ¶ 7 (ECF No. 1); Compl. Verification at pp. 42-43 (ECF No. 1).

7.     Plaintiff BH Piers operates a pier located at 1 West Street, commonly known as Harbor Place in Bar Harbor, Maine. *See* Compl. at ¶ 8 (ECF No. 1); Compl. at p. 36 (ECF No. 1); Tr. 12-Jul. at 270:3-4 (mentioning the address).

8.     Passengers and crew from cruise ships anchored in Frenchman Bay land at Harbor Place.  *See* Trial Transcript, July 11, 2023 ("Tr. 11-Jul.") at 80:3-5; Trial Transcript, July 13, 2023 ("Tr. 13-Jul.") at 15:11-12.

9.     Plaintiff Golden Anchor (with BH Piers, collectively referred to as the "Pier Owners") is a limited liability company, duly organized under the laws of the State of Florida, with a principal place of business in Delray Beach, County of Palm Beach, State of Florida, authorized to transact business in the State of Maine. *See* Compl. at ¶ 9 (ECF No. 1); Compl. Verification at p. 37 (ECF No. 1); Tr. 12-Jul. at 66:4-12 (describing acquisition and formation).

10.     Golden Anchor operates a pier at 55 West Street in the Town, commonly known as Harborside Docks.[1]  *See* Compl. at ¶ 10 (ECF No. 1).

11.     Plaintiff BHWW is a limited liability company, duly organized under the laws of the State of Maine, with a principal place of business in the Town, doing business as Bar Harbor Whale Watch Company. *See* Compl. at ¶ 11 (ECF No. 1); Compl. Verification at p. 38 (ECF No. 1); Tr. 12-Jul. at 78:23-25, 79:1-3 (describing ownership).

---

[1] Collectively, the owners of the Harbor Place and Harborside tender piers are sometimes identified herein as the "Pier Owners."

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 2 -

12.     Plaintiff 495 is a Florida limited liability company. 495 owns and operates a 149-passenger custom built jet propulsion cruise ship tender vessel (the "Coastal Explorer") that is used to ferry cruise ship passengers and crew to and from the cruise ships to the landings of BH Piers and Harborside for their disembarkations and visits to the Town. *See* Compl. at ¶ 12 (ECF No. 1); Tr. 12-Jul. at 125:22-126:3, 145:9-16 (Delray Explorer 495 owns the Coastal Explorer); PX 201.

13.     Plaintiff 493 is a Florida limited liability company. 493 owns and operates a 149-passenger custom built jet propulsion cruise ship tender vessel (the "Schoodic Explorer") that is used to ferry cruise ship passengers and crew to and from the cruise ships to the landings of BH Piers and Harborside for their disembarkations and visits to the Town. *See* Compl. at ¶ 13 (ECF No. 1); Tr. 12-Jul. at 145:17-19 (Delray Explorer 493 owns the Schoodic Explorer); Tr. 12-Jul. at 126:10-15 (discussion in which Schoodic Explorer is mentioned as one of the tender vessels).

14.     Plaintiff 492 is a Florida limited liability company. 492 owns and operates a 149-passenger custom built jet propulsion cruise ship tender vessel (the "Acadia Explorer") that is used to ferry cruise ship passengers and crew to and from the cruise ships to the landings of BH Piers and Harborside for their disembarkations and visits to the Town.[2] *See* Tr. 12-Jul. at 145:20-22 (Acadia Explorer owns the Acadia Explorer); Tr. 12-Jul. at 87:13-22.

15.     Plaintiff-Intervenor Penobscot Bay and River Pilots Association ("Pilots Association") is a corporation duly organized under the laws of the State of Maine, with a principal place of business in Searsport, Maine. *See* Intervenor Compl. at ¶ 11 (ECF No. 43).

---

[2] Collectively, the owners of the three tender vessels are alternatively identified as the "Tender Vessel Owners" or "Tender Owners" herein.

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 3 -

16.     Defendant Town of Bar Harbor (the "Town") is a municipal corporation, duly organized under the laws of the State of Maine, and its principal place of business is in the County of Hancock, State of Maine. *See* Answer of Defendant Town of Bar Harbor at ¶ 16 (ECF No. 53).

17.     Defendant-Intervenor Charles Sidman ("Sidman") is a resident of Bar Harbor, Maine and was the lead petitioner in the Initiated Ordinance. *See* Verified Motion to File Complaint in Intervention (ECF No. 45 at 1); Tr. 13-Jul. at 249:8-9; PX 235.

18.     Sidman is co-author of the language of the Initiated Ordinance. Tr. 13-Jul. at 97:23-25; 97:1; Tr. 13-Jul. at 311:19-25; 312:1-3.

19.     Sidman also drafted, with counsel, the "Purpose" section of the Initiative. *See* Tr. 13-Jul. at 266:5-13.

## II. BACKGROUND

### A. Maine's Tourism Industry

20.     Tourism is one of the state's largest industries. *See* Tr. 12-Jul. at 198:8-14 (Gabe: "Maine is thought of as being a drive tourism market.").

21.     The State relies heavily on tourism for economic stability and growth. *See id.*

22.     Cruise tourism inspires return visits to Maine. *See* PX 195 at 13 (Flink).

23.     The Maine Office of Tourism is, by statute, a marketing agency for the State. *See* PX 195 at 3 (Flink). CruiseMaine is an initiative of the Maine Office of Tourism. *See* PX 195 at 3 (Flink).

24.     The mission of CruiseMaine is to support, educate, and promote all the cruise communities in Maine seeking sustainable cruise ship tourism. *See* PX 195 at 3 (Flink).

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

30825574.2

25.     CruiseMaine engages in business-to-business marketing with the cruise industry on behalf of the State of Maine. *See* PX 195 at 4 (Flink). CruiseMaine engages with cruise line operators and the cruise industry trade association, Cruise Lines International Association ("CLIA"). PX 195 at 6 (Flink).

26.     Carnival Corporation, Royal Caribbean Group, and Norwegian Cruise Line Holdings and lines that are subsidiaries or affiliates of these companies are active in the New England/Canada cruise trade. *See* PX 195 at 6 (Flink). These cruise lines do not operate domestic-flag vessels in the New England/Canada region. PX 195 at 7 (Flink).

27.     Ports of call are vital to the cruise industry. Tr. 12-Jul. at 168: 24-25.

28.     Decades of consumer research confirm that the ports of call on an itinerary are what is important to the customer. Where the cruise ship is going is the first thing the customer wants to know. Tr. 12-Jul. at 168:24-25.

29.     Cruise passengers get off the ship to visit the ports of call on the cruise itinerary. Tr. 12-Jul. at 169:1-5.

30.     Marquee ports are essential destinations for cruises in a region due to their close proximity to exceptional tourist attractions. PX 195 at 11 (Flink) (Acadia and Bar Harbor's brand recognition are attributes that make it a marquee port).

31.     A marquee port is a port that sell cruise tickets according to marketing research. PX 195 at 11 (Flink).

32.     A marquee port is a port that is optimal for customer preference. Tr. 12-Jul. at 174:8.

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

33.     Cruise companies are motivated to fit marquee ports into their itineraries. Tr. 12-Jul. at 174:5-6.

34.     A cruise itinerary does not work if it does not have multiple destinations. PX 195 at 8 (Flink).

35.     Seven to fourteen day cruises are the most common cruise lengths in Canada and New England. PX 195 at 8 (Flink).

36.     The vast majority of Maine's cruise traffic is part of the Canada/New England region, which spans from New York City and New Jersey to Montreal and the St. Lawrence Seaway.  It includes New England, the eastern Canadian provinces, the Maritimes, as well as the province of Quebec. PX 195 at 8-9 (Flink).

37.     One of the focuses of the Maine Office of Tourism is cruise tourism in Maine. PX 195 at 12 (Flink); *see also* Joint Stipulation ("J. Stip.") ¶ 5 (ECF No. 137).

38.     Bringing first-time visitors to Maine is a high priority of the Maine Office of Tourism. PX 195 at 12 (Flink).

39.     Research conducted by the Office of Tourism and CruiseMaine shows that over half of cruisers are coming to Maine for the first time. PX 195 at 12 (Flink).

40.     Introducing new visitors to Maine is a priority of the Maine Office of Tourism because once visitors come to Maine, they tend to come back. Visitation methods that bring first-time visitors are a way for the State to expand into new markets. PX 195 at 12 (Flink).

41.     Cruises bring first-time visitors to Maine from a broader geographical region than Maine's typical land-based visitation. PX 195 at 12 (Flink); *see also* Tr. 12-Jul. at 198:11-19.

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 6 -

30825574.2

**App. 235**

42.     Over 80 percent of Maine's land-based visitors originate in the mid-Atlantic, New England, or eastern Canada. PX 195 at 12 (Flink).

43.     Twelve percent of cruise visitors are international, with half of those visitors coming from Canada. PX 195 at 12-13 (Flink).

44.     The most common states of origin for cruise visitors are California and Texas. PX 195 at 13 (Flink).

45.     A 2018 CruiseMaine survey found that 30 percent of cruise visitors intended to return on a land-based vacation and 29 percent planned to return on another cruise. PX 195 at 13 (Flink).

46.     Peak visitation season for the Maine Office of Tourism is the summer months, particularly July and August. PX 195 at 13 (Flink).

47.     The peak season for cruising to Maine is September and October. These months see two-thirds of all cruise passengers in a season. PX 195 at 13 (Flink).

48.     The Maine Office of Tourism works with CruiseMaine to encourage and oversee cruise ship tourism in the state. PX 195 at 12 (Flink).

49.     State funding supports CruiseMaine. J. Stip. ¶ 5 (ECF No. 137).

50.     "PortCall" is a maritime software platform that provides users real-time data related to vessel movements and port operations—obtained from port authorities, terminal operators, or other entities responsible for overseeing port operations and/or vessel movement. J. Stip. ¶ 3 (ECF No. 137).

51.     CruiseMaine, a part of the Maine Office of Tourism, maintains the PortCall system for Maine ports, which posts some information for the general public at the following uniform

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 7 -

30825574.2

App. 236

resource locator (URL) address: https://maine.portcall.com. J. Stip. ¶ 4 (ECF No. 137).

## B.  The Cruise Industry in Bar Harbor

52.   Bar Harbor is a tourist town. Tr. 13-Jul. at 177:22-23.

53.   Bar Harbor is an access point for Acadia National Park. Tr. 12-Jul. at 15:22-16:1; PX 195 at 11 (Flink); PX 191 at 6 (Grigsby).

54.   Acadia National Park experienced approximately four million visits in 2021. PX 110 (ANP Annual Summary 2021).

55.   Bar Harbor experiences high tourist visitation, particularly during the summer season.  Visitors are drawn by, among other things, Acadia National Park, but many are drawn by Bar Harbor itself. These visitors come by cruise ship or they come by land. Tr. 13-Jul. at 82:19-83:9.

56.   Both overnight and daytime visitors are drawn to Bar Harbor because of its proximity to the Maine coast and Acadia National Park. J. Stip. ¶ 2 (ECF No. 137).

57.   Bar Harbor is a marquee cruise destination. Tr. 12-Jul. at 173:21-22 ("[I]n the Canada/New England context, Bar Harbor is the Marquee Port."); PX 195 at 11 (Flink); PX 191 at 6 (Grigsby). It is a popular port-of-call on a wide variety of cruise ship itineraries. J. Stip. ¶ 1 (ECF No. 137). Bar Harbor is the only marquee port in Maine. Tr. 12-Jul. at 174:9-10.

58.   Bar Harbor is an access point for cruises to the Canadian Maritimes. PX 195 at 8-9 (Flink); *see* PX 191 at 7 (Grigsby) (Holland America has been in the Canada/New England market for over 23 years).

59.   For many years, Bar Harbor's tourist economy was limited to the period between Memorial Day and Labor Day. Tr. 11-Jul. at 133:21-25;134: 1-7; Tr. 12-Jul. at 64:3-19.

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 8 -

30825574.2

App. 237

60.     At various times, business leaders made efforts to expand the tourist season, such as efforts to "bring people in via boat," including Navy vessels and cruise ships. Tr. 12-Jul. at 13:16-24.

61.     In the late 1990s and early 2000s, several groups came together to grow the economic potential of the "shoulder seasons"—the months on either side of the Memorial Day-Labor Day period (April and May and September and October). Tr. 11-Jul. at 135:20-25, 136:1-17; *see also* PX 195 at 13-14 (Flink) (describing ripple effect of shoulder season on local economy).

62.     In 2008, the Bar Harbor Town Council, at the request of the Cruise Ship Task Force, adopted several recommendations of the Plan, including establishing voluntary, daily passenger caps to manage cruise ship visitation and forming a permanent committee—the Cruise Ship Committee—to review cruise ship activity, which would report annually to the Town Council. PX 206 (2/12/2008 Meeting Minutes).

63.     In addition to promising growth for the shoulder seasons, it was recognized that cruise ship visits had some unique and positive attributes which set them apart from land-based visitors, including: cruise ship visitors did not come by automobile; the Town could schedule and therefore prepare for each cruise ship visit; and the Town could impose a fee on each cruise ship visiting Bar Harbor, thereby, supporting the municipal services the visits would require. Tr. 12-Jul. at 16:2-25, 17:1-22.

64.     Working in conjunction with the Maine Department of Transportation and the Maine Port Authority, the Town commissioned a broad-based review which covered increasing cruise visits and increased activity such visits would bring. In 2007, the consulting firm of Bernello

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

30825574.2

& Ajamil issued the Cruise Tourism Destination Management Plan (the "B&A Report").  DX 260 (B&A Report).

65.     The Town of Bar Harbor formed a Cruise Ship Task Force to further review the B&A Report's findings and recommendations. Tr. 11-Jul. at 140:17-25, 141:1-3, 141:16-25, 142:1; PX 206 (2/12/2008 Meeting Minutes); PX 224A (Passenger Cap Recommendation).

66.     In accordance with the B&A Report recommendations, the Town Council established a Cruise Ship Committee. PX 224A (Passenger Cap Recommendation). The Cruise Ship Committee had no legislative power; it was "strictly advisory." Tr. 11-Jul. at 142:5-9; Tr. 12-Jul. at 72:3-8.

67.     The Cruise Ship Committee also included a place for a representative of "an entity receiving ship tenders," in other words, the Pier Owners. PX 224A (Passenger Cap Recommendation).

68.     A representative of the Pier Owners was included on the Cruise Ship Committee "to bring their operational issues and suggestions to the table." Tr. 11-Jul. at 142:13-15; Tr. 12-Jul. at 70:13-16.

69.     The Town Council also provided a seat on the Cruise Ship Committee for a representative of CruiseMaine. PX 224A (Passenger Cap Recommendation); Tr. 11-Jul. at 142:13-21.

70.     The Cruise Ship Committee usually met eight to ten times a year and the Harbormaster, the Chief of Police, and "other Town officials" were "almost always in attendance." Tr. 12-Jul. at 5:20. At these meetings, the committee members would "update[e] each other of how the operation was going." Tr. 12-Jul. at 73:15-16.

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 10 -

30825574.2

**App. 239**

71.     The B&A Report recommended that the Town set fees for cruise ship visits. DX 260 at 105-11); Tr. 11-Jul. at 17:5-22. The Town Council accepted this recommendation and structured the fees so that they were allocated to municipal services where cruise ship visits had "a direct impact," including salary support for the Town Planner, the Police Department, and the Harbormaster. Tr. 12-Jul. at 17:20-25, 18:1-4; Tr. 13-Jul. at 76:20-78:6, 81:3-8, 84:12-18.

72.     Cruise ship fees are estimated to be approximately 10% of the Town budget. Tr. 12-Jul. at 19:5-12; *see also* DX 471 at 1 (Cruise Management Plan v. Article 3).

73.     The B&A study prepared a map showing the walking patterns of disembarking cruise ship passengers in Bar Harbor. DX 260 at 34 (B&A Report).

74.     The walking patterns of disembarking cruise ship passengers observed by residents are consistent with the B & A study which indicates the highest intensity of pedestrians is near the waterfront. Tr. 11-Jul. at 152:6-25, 153:1.

75.     In response to complaints, and the Cruise Ship Committee's recommendation, the Town Council directed tour buses returning from Acadia National Park to offload at the Village Green where, from there, they could "filter through the town." Tr. 11-Jul. at 155:16-25, 156:1-6.

## C.  Bar Harbor as a Tender Port

76.     Cruise itineraries do not begin or end at Bar Harbor. PX 195 at 9 (Flink).

77.     Bar Harbor is not a turn-around port for the cruise industry. A turn-around port is a port where passengers begin or end their cruises. PX 195 at 9 (Flink).

78.     Bar Harbor is a tender port, meaning that cruise ships do not dock at the water's edge. Tr. 12-Jul. at 67:21-68:1, 201:20-202:3. PX 195 at 14 (Flink).

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 11 -

30825574.2

App. 240

79.     Cruise vessels cannot come all the way into port in Bar Harbor. Tr. 12-Jul. at 67:21-68:1, 201:20-202:3. PX 195 at 14 (Flink).

80.     Tender vessels, owned by the Tender Owners, ferry passengers and crew between the custom barges secured to the cruise ships and the two Coast Guard approved private piers in Bar Harbor at Harbor Place and Harborside Docks, owned and operated by the Pier Owners.  These two private piers are the only cruise ship tender landing facilities in the Town. Tr. 12-Jul. at 84:10-16, 86:16-87:5. PX 195 at 15 (Flink).

81.     The two private piers of the Pier Owners receive disembarking passengers via tenders from cruise vessels in Bar Harbor. J. Stip. ¶ 7 (ECF No. 137).

82.     Those private tender piers are specifically designed and designated as secure facilities for the purpose of receiving cruise ship passengers and crew. PX 202 (Golden Anchor Pier Permit); PX 203 (BHH Pier Permit); Tr. 12-Jul. at 88:11-21.

83.     The Pier Owners underwent the federal process for obtaining Coast Guard Approvals for the express purpose of engaging in the disembarking of cruise ship passengers and crew at their respective tender piers. PX 202 (Golden Anchor Pier Permit); PX 203 (BHH Pier Permit); Tr. 12-Jul. at 88:11-21.

84.     Cruise ships calling at Bar Harbor typically arrive in the morning. *See* PX 6 (PortCall excerpt); PX 7 (PortCall excerpt); PX 163 (PortCall excerpt); PX 164 (PortCall excerpt); PX 165 (PortCall.com schedule); Tr. 12-Jul. at 68:19-20, 107:23-108:2.

85.     Cruise ships that call at Bar Harbor typically depart on the same day they arrive. *See* PX 6 (PortCall excerpt); PX 7 (PortCall excerpt); PX 163 (PortCall excerpt); PX 164 (PortCall excerpt); PX 165 (PortCall.com schedule); Tr. 12-Jul. at 107:23-108:2. However, American Cruise

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 12 -

30825574.2

App. 241

Lines cruise ships calling at Bar Harbor depart the day following the day of arrival. *See* PX 6 (PortCall excerpt).

86.     Cruise ships anchor offshore at one of two federal anchorage grounds in Frenchman Bay, known as Anchorage A and Anchorage B. *See* Tr. 11-Jul. at 45:16-18; 46:7-14; PX 25 (Map of Federal Anchorages).

87.     Anchorages A and B are anchorage grounds designated by the United States Coast Guard to facilitate maritime commerce. *See* Tr. at 46:11-16.

88.     The anchorage grounds are up to two miles away from the passenger landing areas of the Pier Owners in Bar Harbor. *See* PX 25 (Map of Federal Anchorages).

89.     All cruise vessels are required to use Anchorage A or B. Tr. 13-Jul. at 18:24-19:2; PX 195 at 15 (Flink).

90.     The majority of cruise ships anchor at Anchorage B. *See* PX 197 at 114-115 (Wharff).

91.     When a pilot directs a vessel in Frenchman Bay, the pilot does his best to honor the Town's reservation system with regard to anchorage designations. Ultimately, however, the pilot in consultation with the vessel master decides where each individual vessel should be anchored. Tr. 11-Jul. at 47:3-11.

92.     The pilot directs the navigation of vessels into their positions within the anchorages and determines the point at which anchors are deployed. Tr. 11-Jul. at 47:25-48:10, 64:23-65:7, 108:1-23.

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 13 -

30825574.2

**App. 242**

93.     No one other than a United States Coast Guard Captain of the Port ("COTP") can overrule a state-licensed pilot's decision on a vessel's use of an anchorage. Tr. 11-Jul. at 47:25-48:10, 64:23-65:7, 108:1-23.

94.     Ships anchored at Anchorage B are not visible from downtown Bar Harbor. Tr. 12-Jul. at 115:5-16 (Salvatore: "At high tide, on some ships you can get a glimpse of the tippy top…"); PX 86G (Video of Anchorage B).

95.     Rarely does it happen that vessels are in all three spots in Anchorages A and B on a single day. Tr. 13-Jul. at 48:1-8.

96.     The Harbor Master takes reservations on a first-come, first-served basis for cruise ships for Anchorage A and Anchorage B. Tr. 11-Jul. at 46:17-47:5; Tr. 13-Jul. at 18:6.

97.     The Town does not have a priority list for which ship or ships get the anchorages if there is some competition for their use. *See id.*

98.     The Town does not have, and has not had, an internal policy of giving preference to large cruise ships over smaller cruise ships for use of the anchorages. PX 29 (2022 BH Cruise Ship SOP – Port Call Reservations and Procedures).

99.     The Pilots Association's licensed pilots provide pilotage to the anchorages for all foreign-flagged vessels. Tr. 11-Jul. at 85:17-21 (pilot system is compulsory for foreign and certain domestic vessels); Tr. 11-Jul. at 93:13-18 (same).

100.    The Pilots Association's licensed pilots provide pilotage to the anchorages for any U.S.-flagged vessels required to take a pilot. Tr. 11-Jul. at 85:17-21 (pilot system is compulsory for foreign and certain domestic vessels); Tr. 11-Jul. at  93:13-18 (same).

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 14 -

30825574.2

App. 243

101.    All foreign-flagged vessels are required to take a pilot under Maine law. Tr. 11-Jul. at 85:17-21 (pilot system is compulsory for foreign and certain domestic vessels); Tr. 11-Jul. at 93:13-18 (same).

102.    Not all U.S.-flagged vessels are required to take a pilot under Maine law. Tr. 11-Jul. at 85:17-21 (pilot system is compulsory for foreign and certain domestic vessels); Tr. 11-Jul. at 93:13-18 (same).

103.    During the 2023 cruise season, foreign-flagged cruise vessels are scheduled to spend, on average, approximately nine hours in their federally-designated anchorage, based on scheduled arrival time and departure time. J. Stip. ¶ 6 (ECF No. 137).

104.    Once anchored, smaller launches or tenders (including those owned by the Tender Vessel Owners) ferry passengers between the cruise vessels and two private piers in Bar Harbor operated by the Pier Owners. PX 195 at 15 (Flink).

105.    The Pilots Association's pilots sometimes ride these tenders to and from the private piers. Tr. 11-Jul. at 94:13-16.

106.    The private piers are the only cruise ship tender landing facilities in the Town. Tr. 13-Jul. at 90:13-22.

107.    The Town does not have control over the secure facilities that accept passengers. PX 197 at 128 (Willis).

108.    The secure facilities that accept passengers are regulated by the Coast Guard. PX 197 at 128 (Willis).

109.    The Harbor Master does not have rulemaking authority over the private piers where cruise ship passengers disembark. Tr. 13-Jul. at 39:18-24.

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 15 -

30825574.2

App. 244

110.     The Harbor Master, in his capacity as lieutenant of special services, manages traffic only at the points of disembarkation for cruise ship passengers, Harborside and Harbor Place. Tr. 13-Jul. at 15:9-12.

111.     Typically, cruise passengers are on land in Bar Harbor for no more than six to seven hours. Tr. 12-Jul. at 201:6-8; PX 6 (PortCall excerpt); PX 7 (PortCall excerpt); PX 163 (PortCall excerpt); PX 164 (PortCall excerpt); PX 165 (PortCall.com schedule); see also PX 200 (Acadia Explorer Captains Logs); PX 201(Coastal Explorer Captain's Logs).

112.     Once on land, passengers and crew visit Bar Harbor or the surrounding area, including Acadia National Park. Tr. 12-Jul. at 15:22-16:1; PX 195 at 11 (Flink).

113.     Passengers disembarking from cruise ships at the private piers may become pedestrians or board tour buses or taxis to go on tours. PX 197 at 109 (Wharff).

114.     With respect to passengers boarding tour buses to go on tours, their presence in Bar Harbor is relatively minimal and short term. PX 85 (Aerial Video); PX 197 at 109 (Wharff).

115.     The Town does not have a system in place to track disembarking passengers and determine where such passengers end up. PX 197 at 108, 110-111 (Wharff).

116.     Passengers typically head back to the ships in the early afternoon by tenders, including those owned by Tender Vessel Owners. PX 200 (Acadia Explorer Captains Logs); PX 201 (Coastal Explorer Captains Logs); Tr. 12-Jul. at 107:15-108:2.

**D.  Bar Harbor as a Class A Port**

117.     Bar Harbor serves as a United States Customs and Border Protection ("CBP") Class A port of entry for foreign-flagged cruise vessels re-entering the United States. J. Stip. ¶ 24 (ECF No. 137).

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 16 -

30825574.2

App. 245

118.    A Class A port is a designated port of entry for all travelers. *Id.*

119.    Bar Harbor is one of only three Class A ports in Maine. *See, e.g.*, J. Stip. ¶¶ 24, 26, 28 (ECF No. 137).

120.    Many cruise ships that call at the port of Bar Harbor do so following one or more calls at ports in other states and often ports in other countries (*i.e.*, Canada, Bermuda). See PX 6 (PortCall excerpt); PX 7 (PortCall excerpt); PX 163 (PortCall excerpt); PX 164 (PortCall excerpt); PX 165 (PortCall.com schedule); PX 191 at 6 (Grigsby).

121.    Bar Harbor often serves as a port of entry for foreign-flagged cruise vessel re-entering the United States. *See* PX 193 at 5-6 (Martin); PX 8 (PortCall excerpt).

122.    Bar Harbor is one of the most convenient and practical customs ports of entry capable of accommodating the large number of cruise ships that re-enter the United States from foreign waters each season. *See generally* PX 193 at 3 (Martin) (Bar Harbor is by far the preferred port of call).

123.    When Bar Harbor is the vessel's first port of call on a southbound voyage from Canada, passengers and crew disembarking in Bar Harbor, whether U.S. citizens or foreign nationals, are presented at Bar Harbor for federal immigration and customs inspection onboard the vessel at the federal anchorages and are cleared entry into the United States before they ever step foot on Bar Harbor soil. *See* Tr. 11-Jul. at 107:14-24; PX 192 at 8-9 (Kuryla).

124.    The majority of cruise itineraries that include a call at Bar Harbor also include one or more foreign ports of call. PX 6 (PortCall excerpt); PX 7 (PortCall excerpt); PX 163 (PortCall excerpt); PX 164 (PortCall excerpt); PX 165 (PortCall.com schedule).

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 17 -

30825574.2

**App. 246**

125.    Bar Harbor is geographically well-located to permit customs processing of cruise vessel passengers on itineraries that include ports of call in Canada and other foreign locations. *See generally* PX 192 at 8-9 (Kuryla); PX 193 at 3 (Martin) (Bar Harbor is by far the preferred port of call).

126.    Bar Harbor is geographically well-located between Boston and Halifax. PX 191 at 5 (Grigsby).

**E.  Bar Harbor Visitation**

127.    Persons enter Bar Harbor by various means of conveyance. See PX 85 (Aerial Video); Defendants' Trial Exhibit ("DX") 319 at 4 (Gabe article discussing land-based tourism in the context of cruise passenger congestion).

128.    Transport by water is not the only (or even the primary) way that visitors enter Bar Harbor. *See* PX 83 (Aerial Video); PX 84 (Aerial Video); PX 85(Aerial Video); Tr. 12-Jul. at 198:8-19 (Maine is primarily driving tourism).

129.    Less than 10 percent of visitors come to Bar Harbor by cruise ship. PX 211 (CLIA Letter: "cruising accounts for 7 percent of Bar Harbor's tourism business").

130.    The remaining visitors reach Bar Harbor by land-based means of transportation (e.g., automobile, bus, or bicycle).  Tr. 12-Jul. at 198:8-19 (Maine is primarily driving tourism).

131.    The Town does not have a way of counting the number of tourists that come into Bar Harbor. *See generally* J. Stip. ¶ 8 (ECF No. 137).

132.    The Town does not have a definitive number for the number of tourists that come into Bar Harbor. J. Stip. ¶ 8 (ECF No. 137).

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW
- 18 -

30825574.2

App. 247

133.    The Town does not have its own figure as to what proportion of visitors to Bar Harbor come by cruise ship. *See generally* J. Stip. ¶ 8 (ECF No. 137).

134.    The Town has not, at any time, had a system in place to track people disembarking from or embarking on cruise ships in Bar Harbor. PX 197 at 108 (Wharff).

135.    Most cruise visitors come to Bar Harbor in September and October. PX 195 at 13 (Flink); DX 402 at 4 (Gabe PPT) (over 60% of cruise passengers visit in September and October); DX 319 at 4-5 (Gabe, Growth and Change); *see, e.g.,* PX 106 (ANP Annual Summary).

136.    In September and October, the volume of land-based travelers and overnight guests is at its lowest. DX 319 at 5 (Gabe, Growth and Change).

137.    In September and October, the number of cruise visitors entering Bar Harbor is roughly equivalent or less than the tourists on Town streets in June and July. PX 195 at 13 (Flink).

138.    The COVID-19 pandemic forced the shutdown of cruise travel in 2020. Tr. 13-Jul. at 137:5-12.

139.    In 2020, no cruise ships came to Bar Harbor because of the COVID-19 pandemic. Tr. 13-Jul. at 261:6-7.

140.    In 2021, no foreign-flagged cruise ships came to Bar Harbor because of the COVID-19 pandemic. Tr. 13-Jul. at 137:17-22, 261:8-11.

**F.  Bar Harbor's Paid Parking Program**

141.    In 2019, the Town instituted a paid parking program in downtown Bar Harbor. Tr. 13-Jul. at 67:15-25.

142.    The Town has generated revenue as a result of the paid parking program. Tr. 13-Jul. at 69:6-7.

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 19 -

30825574.2

App. 248

143.    The Town generates more parking revenue on days when cruise ships are not in Bar Harbor versus on days when cruise ships are in Bar Harbor. Tr. 13-Jul. at 69:17-70:6.

144.    The Town generates more parking revenue on days when cruise vessels are not in Bar Harbor because parking spaces blocked off for tour buses on cruise days are available for paid public parking. Tr. 13-Jul. at 70:7-71:13.

## G.  Competition in the Vacation Market

145.    The primary operational purpose of cruise vessels is the embarkation, disembarkation, and transport of passengers from port-to-port for leisure and recreation. Tr. 12-Jul. at 168:15-169:13.

146.    Cruise lines operate in the vacation market. Tr. 12-Jul. at 163:19-21, 166:21-167:7; PX 191 at 11 (Grigsby); PX 192 at 10-12 (Kuryla).

147.    Cruise lines compete with other vacation alternatives, like hotels, for travelers' leisure dollars. Tr. 12-Jul. at 163:19-21, 166:21-167:7; PX 191 at 11 (Grigsby); PX 192 at 10-12 (Kuryla).

148.    Cruising is an alternative available to individuals planning a visit to Bar Harbor. *See* Tr. 12-Jul. at 163:19-21, 166:21-167:7; PX 191 at 11 (Grigsby); PX 192 at 10-12 (Kuryla).

149.    Overnight visitors to Bar Harbor and Acadia National Park can stay at hotels in or around Bar Harbor. *See* Tr. 12-Jul. at 162:17-163:5.

150.    Visitors coming by cruise vessel to Bar Harbor and Acadia National Park stay on the cruise vessel. *See* Tr. 12-Jul. at 162:17-163:5.

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 20 -

30825574.2

App. 249

151.    Cruise lines compete with land-based hotels and other businesses that cater to tourists for business from visitors to Acadia National Park and/or Bar Harbor. Tr. 12-Jul. at 162:17-163:10; see PX 191 at 11 (Grigsby); PX 192 at 11-12 (Kuryla).

152.    Approximately 60 percent of cruise passengers will travel on a cruise vessel that is scheduled to call at Bar Harbor during the 2023 season. PX 195 at 10-11 (Flink).

153.    Cruise lines include Bar Harbor as a port-of-call on cruise itineraries because it is popular with cruise passengers. Tr. 12-Jul. at 168:15-169:13; PX 193 at 3 (Martin).

154.    Bar Harbor ranks high on cruise line customer surveys. PX 195 at 63 (Flink) (explaining that Bar Harbor is a marquee port based on customer surveys by cruise brands).

155.    Cruise passengers want to visit Bar Harbor and Acadia National Park. PX 195 at 11 (Flink).

156.    A cruise itinerary with a stop at Bar Harbor is not practical and loses its appeal if passengers cannot get off the ship. Tr. 12-Jul. at 15:22-16:1, 293:12-14.

157.    Generally, cruise itineraries are planned years in advance and are published 24 to 30 months from the first sailing in a given season. J. Stip. ¶ 23; PX 191 at 5 (Grigsby).

158.    Many cruise lines are planning their itineraries and booking ports of call for 2025-2028. *See* PX 7 (PortCall excerpt).

159.    Itinerary planning involves considerations of time, speed, and distance, to assemble the best possible itineraries. Vessel speed puts limitations on what ships can do in the course of several days or a week or two. Cruise lines often try to build an itinerary around at least one port that has particular cachet, keeping in mind time, speed, and distance considerations. *See* Tr. 12-Jul. at 172:22-173:18.

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 21 -

30825574.2

App. 250

160.    A disembarkation limitation set at less than the capacity of the vessel creates an "untenable" situation for itinerary planning. Disembarkation limits like the one in the Ordinance would create issues for marketing, logistics, guest satisfaction, and fairness issues, among others. It would force a line to pick "winners and losers." PX 192 at 12-14 (Kuryla).

## H.  Town's Efforts to Manage Cruise Ship Visitation

161.    For nearly 20 years, Bar Harbor has worked cooperatively with stakeholders, residents, cruise industry partners, and state agencies to develop cruise tourism in a manner beneficial to the Town and the cruise industry. *See* Tr. 11-Jul. at 136:18-137:8 (Paradis describing Council's efforts before he was elected); Tr. 12-Jul. at 29:7-12 (Council wanted to expand cruise ship visits in shoulder season).  The industry has done the same. Tr. 12-Jul. at 179:4-180:13; PX 192 at 12 (Kuryla).

162.    In 1998, Bar Harbor adopted a plan called the "Bar Harbor Waterfront Master Plan" (the "Master Plan").  See Tr. 11-Jul. at 133:21-25; 134:24-25; 135:1-4 (discussing Bar Harbor was in the middle of a comprehensive planning time).

163.    The Tender Vessel Owners have historically and collectively expended of more than $17.8 million on the three customized tender vessels based, in part, on the development and adoption of the Master Plan and the efforts of the Town and the State of Maine in support of the Plan.  Tr. 12-Jul. at 83-84; *see* Tr. 12-Jul. at 87:6-25 (Tender Vessel Owners designed and built new tender vessels between 2017 and 2018 exclusively to serve cruise ships calling on Bar Harbor).  Initially, tender services were provided by boats that were designed for whale watch tours. Tr. 12-Jul. at 80-81.

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 22 -

30825574.2

**App. 251**

164.    Likewise, the two Pier Owners each went through a process to acquire, improve and renovate their respective piers to accommodate cruise passenger tourism and expended more than $4,137,000 on the two tender piers based, in part, on the development and adoption of the Master Plan and the efforts of the Town and the State of Maine in support of the Plan. Tr. 12-Jul. at 82-83; *see* Tr. 12-Jul. at 82:1-24 (Any improvements made to the piers by the Pier Owners were to facilitate growth in cruise ship visits*).*

165.    The tender vessels owned by the Tender Vessel Owners (and at times boats owned by entities related to the Tender Owners) ferry passengers and crew between the custom barges secured to the cruise ships and the two Coast Guard approved private piers in Bar Harbor at Harbor Place and Harborside Docks, owned and operated by BH Piers and Harborside. *See* Tr. 12-Jul. at 89:1-90:25.

166.    The custom-built barges owned by BHWW are utilized to assist in safely disembarking and embarking cruise ship passengers from the ships to and from tender vessels.  Tr. 12-Jul. at 84:13-87:12.

167.    The tenders ferry passengers and crew between the cruise ships and the two Coast Guard approved private piers in Bar Harbor at Harbor Place and Harborside Docks, owned and operated by the Pier Owners. These two private piers are the only cruise ship tender landing facilities in the Town. *See* Tr. 12-Jul. at 89:1-90:25; PX 200 (Acadia Explorer Captains' Logs); PX  201 (Coastal Explorer Captain's Logs).

168.    In 2008, the Town accepted a recommendation from the Town's Cruise Ship Study Task Force (now the Cruise Ship Committee) to adopt daily cruise passenger caps of 5,500

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 23 -

30825574.2

App. 252

passengers per day for the months of May, June, September and October, and 3,500 passengers per day for the months of July and August. J. Stip. ¶ 9 (ECF No. 137).

169.    The daily passenger caps were based on the lower berth capacity of the cruise vessels. J. Stip. ¶ 10 (ECF No. 137).

170.    Lower berth capacity generally refers to the passenger capacity of the vessel and is calculated based on the number of "lower berths" or beds on the vessel. DX 260 at 89 (B&A Report).

171.    Lower berth capacity is based on double occupancy (two lower beds per cabin). *See* DX 260 at 89 (B&A Report).

172.    Lower berth capacity does not account for other persons on the vessel who may disembark at a port, such as crew. PX 191 at 6 (Grigsby); DX 260 at 89 (B&A Report).

173.    Lower berth capacity does not account for a possible third, fourth, or fifth passenger in a cabin. PX 191 at 6 (Grigsby).

174.    The daily passenger limits were voluntary. Tr. 11-Jul. at 144:21-23.

175.    The daily passenger limits were variable. Tr. 11-Jul. at 145:4-9 (5,500 for May and June, 3,500 for July and August).

176.    For more than 15 years, the Town and its Cruise Ship Committee and Town Staff negotiated voluntary caps with the cruise industry. Tr. 11-Jul. at 146:23-147:8 (explaining that the Cruise Ship Committee made recommendations annually); Tr. 12-Jul. at 54:19-55:6 (same); PX 197 at 28-29 (Gilbert); *see also* J. Stip. ¶ 11 (ECF No. 137); J. Stip. ¶ 14 (ECF No. 137).

177.    The Town Council had the authority to accept or reject the Cruise Ship Committee's annual recommendations for cruise ship passenger caps. J. Stip. ¶ 12 (ECF No. 137).

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 24 -

30825574.2

App. 253

178.    The Town Council has acted on the Cruise Ship Committee recommendations annually. J. Stip. ¶ 13 (ECF No. 137).

179.    From 2008 through 2021, the Town Council approved the Cruise Ship Committee's recommendations for passenger caps. J. Stip. ¶ 14 (ECF No. 137).

180.    On February 15, 2022, the Town Council approved the formation and membership of a working group to negotiate with the cruise industry for a voluntarily-modified cruise schedule for 2023 and beyond. J. Stip. ¶ 15 (ECF No. 137). Previously, on July 21, 2021, the Town Council instructed the Harbormaster not to confirm cruise line applications to visit Bar Harbor. PX 197 at 72 (Peacock). The suspension order remained in effect for more than a year until August of 2022 and, while it was in effect, no cruise ship applications could be confirmed. PX 195 at 47 (Flink); s*ee also* PX 195 at 39-41 (Flink) (discussion of July 30 through December 15, 2021 CLIA letters to Town Council).

181.    On August 16, 2022, the Town Council adopted the cruise ship management plan. *see* J. Stip. ¶ 16 (ECF No. 137).

182.    On August 16, 2022, the Town Council initially approved a Memorandum of Agreement ("MOA") plan by a 5-2 vote. J. Stip. ¶ 16 (ECF No. 137).

183.    After several months of discussions and revisions, the MOA was finalized on September 28, 2022. J. Stip. ¶ 17 (ECF No. 137).

184.    In September and October 2022, the Town entered into Memoranda of Agreement ("MOA") with cruise lines. J. Stip. ¶ 20 (ECF No. 137).

185.    The MOAs contain voluntary caps consistent with the cruise ship management plan. DX 327 at 2 (Memorandum of Understanding).

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 25 -

30825574.2

App. 254

186.    Under the MOAs, aggregate daily passenger disembarkations are limited to 3,800 passengers in May, June, September and October. *See* PX 195 at 25-26 (Flink).

187.    Under the MOAs, aggregate daily passenger disembarkations are limited to 3,500 passengers in July and August. DX 327 at 2 (Memorandum of Understanding).

188.    The MOA included a shortened cruise ship season, by eliminating the months of April and November, and lower passenger caps that, in almost all cases, would reduce the number of daily cruise visitors disembarking at Bar Harbor. J. Stip. ¶ 18 (ECF No. 137).

189.    The Town entered into MOAs with American Cruise Lines, Disney Cruise Lines, Holland America Line, Hurtigruten Expeditions, Norwegian Cruise Line, Pearl Seas Cruises, Princess Cruises, Royal Caribbean Cruises, Ltd., Seabourn Cruise Line, Viking Cruises, and Windstar Cruises Marshall Islands. DX 327 (Memorandum of Understanding).

190.    The Town's efforts to revise the passenger caps were a response to increased land-based visitation and the lengthening of the cruise ship season. PX 197 at 57 (Peacock).

191.    The Town's efforts were also a response to "angst and feeling of too much cruise ship tourism in town." Tr. 13-Jul. at 113:1-7; PX 197 at 116 (Peacock).

192.    The Town approved the passenger caps in the MOAs with the individual cruise lines. J. Stip. ¶ 19 (ECF No. 137).

193.    The passenger caps in the MOAs with the individual cruise lines were compatible with the ability of the Town to accommodate those numbers of cruise ship visitors. PX 197 at 62 (Peacock).

194.    The Town managed cruise visitation in other ways, in addition to the voluntary passenger caps. PX 12A (9/20/19 Cruise Ship Post Orders, Responsibilities and Policy).

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 26 -

30825574.2

App. 255

195.    Over the years, the Town made changes to the way the Town managed the disembarkation of cruise ship passengers and the tour buses, specifically developing processes to make the process more efficient and safer for the passengers and the general public. PX 197 at 126-27 (Willis).

## III.  THE INITIATIVE AND THE ORDINANCE

### A.  The Initiative

196.    On March 16, 2022, a citizens' group submitted a petition to the Town Council of Bar Harbor (the "Initiative"). PX 243A (3/16/22 Initiative).

197.    The same citizens' group submitted a substantially similar version of the Initiative dated March 17, 2022. PX 209 (3/18/2022 Proposed Amendment); *see* DX 357 at 2 (Email).

198.    The March 17 version of the Initiative references "persons," not "passengers" and is expressly retroactive to March 17, 2022. PX 209 (3/18/2022 Proposed Amendment); *see* DX 357 at 2 (Email).

199.    Mr. Sidman led the citizen's group that submitted the Initiative. Tr. 13-Jul. at 262:17-21; 311:19-312:16; PX 209 (3/18/2022 Proposed Amendment); *see* PX 72 (Sidman Email),

200.    The Initiative proposed an amendment to the Bar Harbor land use code. *See* Tr. 13-Jul. at 267:17-20PX 209 (3/18/2022 Proposed Amendment).

201.    The Initiative proposed to prohibit the disembarkation of more than 1,000 persons, in the aggregate, on a single calendar day from any cruise ships. *See* Tr. 13-Jul. at 272:8-20; PX 209 (3/18/2022 Proposed Amendment); DX 485.

202.    The Initiative's proposed 1,000 person per day limit was an experiment. *See* Tr. 13-Jul. at 312:20-22 (not a rigorously defensible finding or study or calculation).

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 27 -

30825574.2

App. 256

203.    The Initiative's proposed 1,000 person per day limit resulted from seat-of-the-pants calculations. *See* Tr. 13-Jul. at 312:20-22 (not a rigorously defensible finding or study or calculation).

204.    The Initiative proposed to require the Harbor Master to devise a reservation system for cruise ships. PX 209 (3/18/2022 Proposed Amendment).

205.    The Initiative proposed to require the Harbor Master to devise a mechanism for counting and tracking the number of passengers disembarking each day from cruise ships. PX 209 (3/18/2022 Proposed Amendment).

206.    The Initiative proposed to require the Harbor Master to devise a mandatory procedure for reporting violations to the Code Enforcement Officer. PX 209 (3/18/2022 Proposed Amendment).

207.    The Initiative proposed to require compliance with all Harbor Master rules and regulations by property owners issued a permit. PX 209 (3/18/2022 Proposed Amendment).

208.    The Initiative proposed to empower the Code Enforcement Officer to impose fines, penalties, and actions. PX 209 (3/18/2022 Proposed Amendment).

209.    The Initiative proposed a minimum penalty of $100 per excess unauthorized person. PX 209 (3/18/2022 Proposed Amendment).

210.    The Initiative proposed to impose the penalty on property owners holding permits. PX 209 (3/18/2022 Proposed Amendment); *see* PFF 211.

211.    The only piers that currently accommodate the landing of cruise ship passengers into Bar Harbor are two privately-owned piers, Harborside and Harbor Place. Tr. 12-Jul. at 84:10-16, 86:16-87:5; 90:13-22; Tr. 13-Jul. 11-12;. PX 195 at 15 (Flink); *see* J. Stip. ¶ 7 (ECF No. 137).

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW
- 28 -

30825574.2

App. 257

212.    The only property owners susceptible to fines under the Initiative are the Pier Owners because these entities are the only owners of property on which cruise ship disembarkations occur. Tr. 12-Jul. at 109:15-25; 110:1; Tr. 13-Jul. at 61:12-18; PX 197 at 112 (Wharff); PX 197 at 12 (Chamberlain); PX 209 (3/18/2022 Proposed Amendment).

213.    The Initiative was expressly retroactive to March 17, 2022.  PX 209 (3/18/2022 Proposed Amendment).

214.    The Initiative proposed to protect from enforcement action, any cruise ship visits occurring prior to the date of adoption of the Initiative at the Town Meeting on November 8, 2022. PX 209 (3/18/2022 Proposed Amendment).

215.    The Initiative was accompanied by a "Purpose" section.  PX 243 (Ordinance, Purpose Section & Warrant Articles); Tr. 13-Jul. at 266:5-7, 267:1-20; 311:19-312:16.

216.    The Purpose section of the Initiative was not enacted into law. PX 243 (Ordinance, Purpose Section & Warrant Articles).

217.    The Purpose section of the Initiative identifies two reasons for the Initiative's cruise ship disembarkation restrictions. PX 243 (Ordinance, Purpose Section & Warrant Articles); Tr. 13-Jul. at 268:6-272:12.

218.    The Purpose section's first reason for the disembarkation restrictions recites that large numbers of cruise ship passengers in Bar Harbor have resulted in excessive congestion and traffic on public streets and sidewalks, frequent overcrowding of parks and other public spaces, and inundating local amenities and attractions, which results in a diminished quality of life for Town residents. PX 243 (Ordinance, Purpose Section & Warrant Articles); Tr. 13-Jul. at 268:6-11.

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 29 -

30825574.2

App. 258

219.    The Town does not have any empirical data or study that support the assertion that there is excessive congestion and traffic on public streets and sidewalks caused by persons disembarking from cruise ships. *See* PX 197 at 81 (Peacock).

220.    The Town does not have empirical data that indicate that the presence of disembarking persons from cruise ships has an impact on the Town outside of the immediate landing area (the private piers). PX 197 at 53 (Peacock).

221.    The statement in the Purpose section is based on Mr. Sidman's personal observations of congestion in the downtown district. *See* Tr. 13-Jul. at 272:8-20 (Sidman proposed the number without empirical support).

222.    The second reason in the Purpose section is that disembarking cruise ship passengers in the downtown area jeopardize the Town's ability to deliver municipal services, namely public safety services (police and fire), emergency medical services (EMS), inpatient and out-patient services at local hospitals, pandemic control measures, and public sanitation services, and impacts the ability of local shops, restaurants and other businesses to attract and serve customers. PX 243 (Ordinance, Purpose Section & Warrant Articles).

223.    The Town has no information that cruise ship passengers are jeopardizing the ability of the fire department to provide fire or EMS services. PX 197 at 6 (Bartlett).

224.    The Town responded to approximately 35 calls to cruise ship disembarkation locations in 2022. PX 197 at 4 (Bartlett).

225.    In comparison, the Town responds to approximately 1,500-1,600 emergency calls every year. PX 197 at 11 (Bartlett).

226.    Cruise ships do not strain the Town's fire department. PX 197 at 6 (Bartlett).

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 30 -

30825574.2

App. 259

227. Crowds have never interfered with the fire department's ability to perform fire or EMS services. PX 197 at 10 (Bartlett).

228. The Town does not have any information that identifies whatever impact persons who disembark cruise ships and enter the Town on foot may have on municipal infrastructure as opposed to any other persons. PX 197 at 111 (Wharff).

229. Cruise ship passengers do not impose any identifiable risk to public safety in the Town as opposed to persons coming in via other means of conveyance. PX 197 at 113 (Wharff).

230. The Town cannot differentiate any draw on municipal services between passengers who disembark cruise ships and all other persons who come to Bar Harbor by all other means of conveyance. *See* PX 197 at 145-46 (Willis); *see also* PX 197 at 49-53 (Peacock).

231. Historically, passengers who have disembarked and walked into town have not had uniquely burdened municipal services as compared to persons who arrive in Bar Harbor by other means of conveyance. PX 197 at 133 (Willis).

232. The Purpose section identified only passengers arriving by cruise ship as the cause of the alleged burdens on the Town's streets, amenities, public services, and businesses. PX 243 (Ordinance, Purpose Section & Warrant Articles).

233. The Purpose section makes no reference to visitors or tourists arriving by other means of transport. PX 243 (Ordinance, Purpose Section & Warrant Articles).

234. The Initiative does not assert that the impacts on the Town and its residents caused by persons coming via cruise ship, either individually or collectively, are any different from impacts caused by persons arriving in Bar Harbor by other means of conveyance. PX 243 (Ordinance, Purpose Section & Warrant Articles).

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW
- 31 -

30825574.2

App. 260

235.    The Initiative does not refer to the impact of non-cruise visitors in Bar Harbor. PX 243 (Ordinance, Purpose Section & Warrant Articles).

236.    The Town has no information that cruise ship passengers place particular or special demands on fire or EMS services as compared to visitors to the Town coming by all other means of conveyance. *See* PX 197 at 145-46 (Willis); *see also* PX 197 at 49-53 (Peacock); Tr. 13-Jul. at 318:6-23 (actual experience of police, fire and EMS not pertinent to Sidman).

237.    The Town does not have any information that differentiates between effects or impacts of persons disembarking from cruise ships and persons entering the Town by any other means of conveyance. PX 197 at 17-18 (Chamberlain).

238.    [Reserved]

239.    The Town's public works may feel the impacts of overall tourism but those impacts cannot be distinguished between land-based and cruise tourism. PX 197 at 53 (Peacock).

240.    According to Mr. Sidman, the Initiative will "get rid of the biggies (and 930 pax is still a honking large boat!), with the much proposed alternative being to welcome the smaller, generally wealthier-passengered, 'boutique' ships that might contribute to rather than destroying life for BH taxpayers …" DX 357 (Email).

## B.  Town Council Actions on Initiative

241.    On August 2, 2022, the Town Council voted to place the Initiative on the warrant articles calling the November town meeting. PX 243 (Ordinance, Purpose Section & Warrant Articles); J. Stip. ¶ 21. The Town's Planning Board and Warrant Committee recommended rejection of the Initiative. PX 243 (Ordinance, Purpose Section & Warrant Articles).

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 32 -

30825574.2

App. 261

242.    The Initiative was listed as Article 3 on the Warrant for the November 8, 2022, Special Town Meeting.  PX 243 (Ordinance, Purpose Section & Warrant Articles).

243.    On November 8, 2022, the Bar Harbor Town Meeting passed Article 3. PX 210 (Ordinance); Tr. 13-Jul. at 132:14.

244.    Pursuant to the Town Charter, Article 3 became the Ordinance, effective December 8, 2022. J. Stip. ¶ 22 (ECF No. 137).

## C.  The Ordinance

245.    The Ordinance applies to "persons" (both crew and passengers). PX 204 (5/13/2023 Gilbert Memo); DX 357 (Email).

246.    The Town's intention is to count all disembarking persons from cruise ships, not just passengers, including crew members and pilots. PX 197 at 11(Chamberlain).

247.    The Ordinance applies to "cruise ships" as defined in Section 153-22(B) in the Town Code.  PX 210 (Ordinance).

248.    The Ordinance does not apply to any other vessel of any type or size. PX 210 (Ordinance).

249.    The Ordinance only restricts the number of persons who visit Bar Harbor by cruise ship. PX 210 (Ordinance).

250.    Persons gaining access to Bar Harbor by any other means of conveyance (such as land-based conveyance) are unaffected. *See* PX 210 (Ordinance).

251.    The Ordinance sets an absolute limit of 1,000 disembarking persons per day *(for every day of the year)* before violations can be assessed, regardless of whether any person counted in the first 1,000 persons returns to the ship. PX 197 at 29 (Wharff).

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 33 -

30825574.2

App. 262

252.    The Ordinance was not supported by any formal findings about the asserted putative benefits of restricting the number of individuals visiting Bar Harbor via cruise ship. PX 210 (Ordinance).

253.    The Town does not have any empirical data or any study that supports the 1,000-person limit in the Ordinance. PX 197 at 82-84 (Peacock).

254.    The Town does not have any empirical data or study that support the 1,000-person limit *for persons visiting Bar Harbor from cruise ships for every day of the year* as appropriate or necessary to protect, preserve, and promote general welfare, safety, and peace of the community. PX 197 at 97 (Peacock).

255.    The Town does not have information or data that a dramatic decline in persons visiting by cruise ship coupled with a commensurate increase in persons coming by all other means of transportation would not present a risk to the general health, safety, welfare, and peace of the community. PX 197 at 85 (Peacock).

256.    Pier owners with permits are the only entities capable of being sanctioned for violations of the Ordinance. PX 197 at 20-21 (Chamberlain).

257.    Because the only tender piers in Bar Harbor where cruise ship passengers disembark are Harbor Place and Harborside Docks owned by the Pier Owners, the Pier Owners are the only persons subject to asserted violations and fines under the Ordinance.  *See* PX 197 at 20-21 (Chamberlain); Tr. 12-Jul. at 84:10-16, 86:16-87:5. PX 195 at 15 (Flink); *see* J. Stip. ¶ 7 (ECF No. 137).

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 34 -

30825574.2

App. 263

### D.  Effect of the Ordinance

258.    Foreign-flagged cruise vessels re-entering the United States that cannot call at Bar Harbor will need to call at another Class A port. J. Stip. ¶ 25 (ECF No. 137).

259.    Maine has three Class A ports: Bar Harbor, Portland, and Eastport. J. Stip. ¶ 21 (ECF No. 137); J. Stip. ¶ 26 (ECF No. 137); J. Stip. ¶ 28 (ECF No. 137); PX 195 at 64 (Flink).

260.    The port of entry at Portland is more than a 170-mile drive from Acadia National Park. J. Stip. ¶ 27 (ECF No. 137).

261.    The port of entry at Eastport is more than a 110-mile drive from Acadia national Park. J. Stip. ¶ 29 (ECF No. 137).

262.    The port of entry at Bar Harbor is less than a 2-mile drive from Acadia National Park. J. Stip. ¶ 29 (ECF No. 137).

263.    If cruise ships re-entering the United States cannot clear customs in Bar Harbor, Eastport, or Portland, they will need to clear customs at a port outside Maine, such as MassPort. *See* PX 195 at 64 (Flink).

264.    The majority of cruise lines schedule vessels in excess of 1,000-passenger lower berth capacity for calls at Bar Harbor.  *See* PX 6 (PortCall excerpt); DX 471 (Cruise Management Plan v. Article 3); PX 195 at 42 (Flink).

265.    In 2019, prior to the COVID-19 pandemic, approximately 158 cruise ships (counted per call or visit), carrying a potential 249,080 passengers, were scheduled to call at Bar Harbor. J. Stip. ¶ 32 (ECF No. 137).

266.    As of December 2022, 134 cruise vessels (counted per call or visit) were booked to call at Bar Harbor for the 2023 cruise season. *See* PX 8 (PortCall excerpt).

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 35 -

30825574.2

App. 264

267.    As of December 2022, the 134 cruise vessel calls for the 2023 cruise season were distributed between cruise lines as follows:

|  | Total Calls |
|---|---|
| American Cruise Lines | 18 |
| Carnival Plc | 1 |
| Celebrity | 3 |
| Holland America Line | 25 |
| Norwegian Cruise Lines | 36 |
| Oceania | 4 |
| Pearl Seas | 5 |
| Ponant | 1 |
| Princess | 15 |
| Regent | 6 |
| Royal Caribbean | 11 |
| Seaborn | 5 |
| Silversea | 3 |
| TUI | 1 |

*See* PX 8 (PortCall excerpt).

268.    As of December 2022, 107 of the 134 cruise vessel calls for the 2023 cruise season were scheduled for vessels that have a lower berth capacity in excess of 1,000:

|  | Total Calls | Vessel Size |
|---|---|---|
| Carnival Plc | 1 | Above 1K |
| Celebrity | 3 | Above 1K |
| Holland America Line | 25 | Above 1K |
| Norwegian Cruise Lines | 36 | Above 1K |
| Princess | 15 | Above 1K |
| Royal Caribbean | 11 | Above 1K |

*See* PX 8 (PortCall excerpt).

269.    As of December 2022, 48 of the 134 cruise vessel calls for the 2023 cruise season were scheduled to arrive from a foreign port. *See* PX 8 (PortCall excerpt).

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 36 -

**App. 265**

270.    In the cruise industry, the trend in vessel size is toward larger ships. The average size of a cruise ship in terms of the number of berths has expanded over the years steadily and consistently. Tr. 12-Jul. at 168:2-6.

271.    Larger ships enable the cruise lines to offer more amenities to their passengers and entertain their passengers in a larger variety of ways. *See* Tr. 12-Jul. at 168:8-14.

272.    The ability to offer a wider variety of experiences is a competitive element for cruise lines in the vacation market. *See* Tr. 12-Jul. at 168:8-14.

273.    From a volume and density standpoint, larger ships can accommodate more guests onboard and generate more revenue. They also lead to greater efficiencies and economies of scale. *See* Tr. 12-Jul. at 168:8-14; PX 192 at 3-4 (Kuryla).

274.    Many cruise lines that call at Bar Harbor exclusively deploy cruise vessels with lower berth capacities above 1,000 for these itineraries. In addition to passengers, each vessel carries hundreds of crew. For example, a vessel with 4,000 lower berth capacity would also carry 1,500 to 1,600 crew. Some of these cruise lines do not have cruise vessels with lower berth capacities below 1,000 in their vessel fleets. *See* PX 192 at 2-3 (Kuryla); PX 191 at 2 (Grigsby).

275.    If cruise lines are limited to disembarking a thousand passengers a day, cruise lines with fleets of vessels in excess of 1,000 passengers would not be able to call at Bar Harbor with those vessels. *See* PX 193 at 4 (Martin); *see also* Tr. 12-Jul. at 181:23-182:10. All of these vessels are foreign-flag. *See* PX 6 (PortCall excerpt); PX 7 (PortCall excerpt).

276.    American Cruise Lines (ACL) vessels that call at Bar Harbor sail under the flag of the United States. *See* PX 7 (PortCall excerpt); J. Stip. ¶ 31 (ECF No. 137). American Cruise Lines generally deploys vessels with lower berth capacities of 100 for its itineraries that include a call at

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

30825574.2

Bar Harbor. *See* PX 7 (PortCall excerpt). American Cruise Lines operates two vessels in Maine. See PX 195 at 10 (Flink).

277.    The Ordinance restricts disembarkation of passengers at Bar Harbor. *See* PX 210 (Ordinance and Purpose Section); *see also* Tr. 13-Jul. at 264:10-22 (Sidman testimony re committee's goals in passing Ordinance).

278.    Any vessel with a lower berth capacity in excess of 1,000 will not be able to disembark its full complement of potential passengers. *See* Tr. 12-Jul. at 109:10-14.

279.    Any vessel with a lower berth capacity of fewer than 1,000 passengers will not be able to disembark its full complement of potential passengers (or crew) if one or more other cruise vessels already has disembarked passengers (or crew) that day. *See* Tr. 12-Jul. at 109:10-14 (Salvatore agreeing that "the ordinance at issue here would limit the number of persons who could disembark from a cruise ship onto a pier without penalty to 1,000 per day every day of the year[.]").

280.    The cruise ship industry cannot bring people to port and only allow a certain number of people to disembark. *See* Tr. 12-Jul. at 181:23-182:10 (Goldstein testifying that it would be unprecedented for a cruise line to call at a port without being able to guarantee every passenger would be able to disembark).

281.    No cruise vessel will call at a port where all passengers and crew, whether by law or by the happenstance of timing, cannot disembark. *See* Tr. 12-Jul. at 181:23-182:10 (Goldstein testifying that it would be unprecedented for a cruise line to call at a port without being able to guarantee every passenger would be able to disembark); PX 191 at 13 (Grigsby).

282.    Large cruise vessels will not include Bar Harbor in their itineraries if they cannot permit any passenger wishing to visit the Town to go ashore. PX 191 at 7-9, 12 (Grigsby); PX 192

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 38 -

30825574.2

App. 267

at 13-14 (Kuryla); PX 193 at 4 (Martin); PX 211 (CLIA Letter); PX 212 (CLIA Letter); PX 213 (CLIA Letter).

283.    The Town concluded that the Initiative would result in a 95 percent reduction in passenger visits. *See* PX 197 at 92 (Peacock); DX 471 (Cruise Management Plan v. Article 3).

284.    The Town based its 95 percent reduction figure on the assumption that cruise ships would not call at Bar Harbor if they could not disembark all their passengers. *See* PX 197 at 92 (Peacock); PX 195 at 30 (Flink) (removed all ships larger than 1,000 passengers because "it would not be any kind of normal cruise line practice to bring passengers to a port of call and not allow them to disembark if they wanted to").

285.    The Ordinance will cause cruise lines to make and alter decisions about how they manage their New England/Canada cruise itineraries. *See* PX 192 at 13 (Kuryla).

286.    The Ordinance will affect vessel routing decisions. *See* PX 192 at 13 (Kuryla); PX 193 at 4 (Martin).

287.    The Ordinance will force changes in embarkation and disembarkation operations at the vessel while lying in federal anchorage grounds in waters near Bar Harbor. *See* PX 191 at 8 (Grigsby); PX 193 at 4 (Martin).

288.    The Ordinance will require cruise vessels to "work around" the unavailability of Bar Harbor, including the unavailability of Bar Harbor as a first port of entry. The other two Class A ports of entry in Maine are limited in their ability to absorb the amount of business that Bar Harbor is able to provide as a Class A port of entry in Maine. PX 195 at 64-65, 68-69 (Flink).

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 39 -

30825574.2

**App. 268**

289.    The Ordinance will cause adverse collateral impacts for Maine's maritime commerce as a result of degradation of the system of pilotage in the region. Tr. 11-Jul. at 118:23-119:15; DX 442 (Email).

290.    Cruise ships will not come to Bar Harbor if the Ordinance is enforced. *See* Tr. 12-Jul. at 181:23-182:10 (Goldstein testifying that it would be unprecedented for a cruise line to call at a port without being able to guarantee every passenger would be able to disembark); PX 191 at 13 (Grigsby); PX 195 at 48 (Flink); PX 192 at 12-14 (Kuryla).

**E.  Pedestrian Traffic in Bar Harbor**

291.    The Town does not have a definitive number for the number of tourists that come into Bar Harbor. J. Stip. ¶ 8 (ECF No. 137).

292.    The only way to determine if a pedestrian on the sidewalks of Bar Harbor is a cruise ship passenger is a sticker or lanyard. Tr. 13-Jul. at 309:25-310:4.

293.    The number of persons on the sidewalks in Bar Harbor increases after 6 p.m., after most of the cruise ship passengers have returned to their ships. *See* Tr. 12-Jul. at 233:18-237:8; PX 85 (Video of evening pedestrian activity).

**F.  Less Restrictive Means**

294.    Removal of obstructions, such as benches, on the sidewalks of Bar Harbor may allow for better flow of pedestrian traffic. *See* Tr. 13-Jul. 240:6-25; 328:19-21.

**IV.  FEDERAL GOVERNMENT REGULATION**

295.    Cruise vessels are subject to federal inspection and supervision in a variety of areas, including construction standards, environmental protection requirements, operational procedures,

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 40 -

30825574.2

App. 269

customs and immigration compliance, security measures, and health and safety requirements. PX 192 at 4 (Kuryla); PX 194 at 3-7 (Van Den Hof); Tr. 12-Jul. at 174:11-175:25, 176:23-177:14.

296.    Cruise ships calling at the port of Bar Harbor operate under valid Coast Guard Certificates of Inspection issued pursuant to regulations at Title 46, Chapter 1, Subchapter H. *See, e.g.*, PX 192 at 5 (vessels are subject to federal regulation and inspection).

297.    Among other things, the Part 105 regulations require that the owner or operator of a covered maritime facility ensure shore access to individuals who work on the vessels ("seafarers", *i.e.*, the crew) and those who provide services to seafarers. 33 C.F.R. § 105.237. A maritime facility operating pursuant to Part 105 must provide timely access to all seafarers.  *See* 33 C.F.R. § 105.237.

298.    BH Piers and Harborside administer maritime facilities regulated by the federal government, including the United States Coast Guard. Each has approvals pursuant to 33 C.F.R. Part 105 from the Coast Guard to operate their facilities. Tr. 12-Jul. at 88:11-21.

299.    Every cruise ship journey involves advanced planning for complex vessel itineraries, the interstate and foreign travel of passengers not only aboard the vessel but, upon reaching a particular port of call, may also, as in true for Bar Harbor, involve providing waterborne conveyances on which the cruise ship passengers and crew can travel to and from the ship.  Tr. 12-Jul. at 171:10-18 (planning is "an extremely complicated process that goes on endlessly into the future").

300.    This advanced planning includes developing itineraries that comply with U.S. cabotage laws. DX 250A at 219 (explaining that Bar Harbor is well positioned because U.S.

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 41 -

30825574.2

App. 270

cabotage rules require foreign vessels to visit one international port while carrying U.S. passengers).

301.    This advanced planning also includes long-term coordination for the availability of Coast Guard-approved cruise ship terminal facilities and barge services, procuring and tendering provisions and supplies, all of which move in the interstate and foreign commerce of the United States. *See generally* PX 211 (CLIA Letter); Tr. 12-Jul. at 89:8-25.

302.    The Ordinance prevents the Pier Owners from being able to provide timely access to all seafarers (i.e., crew) seeking to disembark at their facilities. *See* Tr. 12-Jul. at 89:8-25.

303.    [Rserved]

## V.  STATE PILOTAGE

## A.  The System of Pilotage

304.    Maritime pilots provide critical independent local knowledge and navigational information to vessels and bring the highest level of ship-handling skills to maneuver vessels within their pilotage area. Tr. 11-Jul. at 14:13-15:17.

305.    Safety is the primary objective of pilotage. *See* Tr. 11-Jul. at 32:4-9, 44:9-14; 90:18-24.

306.    Pilots make large capital investments in pilot boats, office facilities and equipment, dispatch systems, communication equipment and other facilities, and equipment and support services. *See generally* Tr. 11-Jul. at 50:14-24.

307.    Pilots also must invest in training and retaining capable crew for pilot boat operations and maintenance. *See* Tr. 11-Jul. at 51:16-18.

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 42 -

30825574.2

App. 271

308.     Pilotage is a time-proven service that provides great benefits to the State, residents, and visitors (human, vessel, and cargo).  *See* Tr. 11-Jul. at 33:2-15.

309.     Reserved.

310.     Pilotage groups face high fixed operating costs. *See generally* Tr. 11-Jul. at 50:12-24.

311.     Pilots must acquire, maintain, and insure purpose-built pilot boats that are specifically designed to operate under challenging conditions. Tr. 11-Jul. at 38:24-44:14.

312.     They must employ and retain qualified mariners in sufficient numbers to operate reliable, efficient service 24 hours a day, 7 days a week, 365 days a year. *See* Tr. 11-Jul. at 51:16-18.

313.     Pilotage is a regulated industry. J. Stip. ¶ 33 (ECF No. 137).

314.     A pilotage system's various aspects (participants, rates, territories) are carefully balanced to provide sufficient revenues to each pilotage group so that each group can cover its fixed costs, maintain the skills of the group's pilots, and attract future pilots to the profession. *See* Tr. 11-Jul. at 56:12-60:10, 100:14-19 (when circumstances could not support pilotage).

315.     Reserved.

316.     Reserved.

317.     Reserved.

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 43 -

30825574.2

**App. 272**

## B. The Pilots Association's Pilotage System

318.     The Pilots Association maintains the state-mandated system of pilotage for the Penobscot and Frenchman Bays and the Penobscot River. *See* Tr. 11-Jul. at 29:21-30:15; *see also* PX 22 (Map of Pilotage Area).

319.     The Pilots' area includes the ports of Searsport, Bucksport, Bangor/Brewer, Bar Harbor, and Rockland. *See* Tr. 11-Jul. at 29:21-30:15; *see also* PX 22 (Map of Pilotage Area).

320.     The Pilots Association's pilotage operations are regulated by the Maine Pilotage Commission. J. Stip. ¶ 34 (ECF No. 137).

321.     The Pilots Association's pilotage region extends 75 miles across from Boothbay Harbor to Frenchman Bay and 75 miles from the west pilot station on Penobscot Bay to the Penobscot River Port of Brewer. J. Stip. ¶ 35 (ECF No. 137).

322.     The Pilots Association's pilots are responsible for guiding any vessel required to take a pilot within the Pilots Association's designated area in accordance with state law. *See* Tr. 11-Jul. at 14:13-25.

323.     The Pilots are harbor pilots and docking pilots. Tr. 11-Jul. at 14:12.

324.     The Pilots board vessels 8 to 12 miles offshore as they approach state waters coming into ports like Penobscot Bay and Frenchman Bay. Tr. 11-Jul. at 14:14-17.

325.     The Pilots physically land alongside the side of the vessel and once onboard are responsible for directing the navigation of the vessel on the way to its final destination in port. Tr. 11-Jul. at 14:18-25.

326.     The pilots board vessels at offshore pilot stations 24 hours a day, 365 days a year (weather permitting) and navigate them safely to their destination. *See* Tr. 11-Jul. at 33:8-10.

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 44 -

30825574.2

App. 273

327.    Once a vessel's port visit is complete, the pilots reverse the process and direct the navigation of the vessels until they are safely clear of state waters. *See* Tr. 11-Jul. at 14:17 (Gelinas describing the Pilots' jurisdiction as "anything from 8 to 20 miles offshore").

328.    The Pilots Association facilitates year-round commercial traffic in Penobscot Bay and River ports of Searsport and Bucksport. Tr. 11-Jul. at 16:5-14.

329.    Searsport and Bucksport receive commercial traffic supporting trade in petroleum products and other liquid bulk cargos. PX 141 (Ship Movement Spreadsheet); Tr. 11-Jul. at 16:5-14.

330.    Searsport receives liquid cargos such as petroleum products, gasoline, diesel, heating oil, as well as liquid clay slurry and caustic soda. Tr. 11-Jul. at 20:20-23. *See* PX 146.2 (Photo); PX 146.10 (Photo); PX 146.92 (Photo); PX 146.40 (Photo); PX 146.87 (Photo).

331.    The liquid products coming into Searsport are shipped primarily on foreign-flagged vessels. Tr. 11-Jul. at 20:24-21.

332.    Some of the products coming into Searsport are sourced domestically, outside Maine, and arrive on domestic-flagged vessels. Tr. 11-Jul. at 21:1-13.

333.    Most of the refined product delivered into Searsport comes from Canadian ports. Tr. 11-Jul. at 21:12-17.

334.    Dry products are also shipped through Searsport, including road salt and petroleum coke. Components for wind turbines are also shipped through Searsport. Tr. 11-Jul. at 21:19-24.

335.    The Pilots bring oil tankers and petroleum products to the port of Bucksport. Tr. 11-Jul. at 23:14-20.

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW
- 45 -

30825574.2

App. 274

336.    The port of Brewer exports construction modules from the Cianbro modular fabrication facility in Brewer that are used to construct refineries and mineral-processing facilities in the United States and Canada. *See* Tr. 11-Jul. at 23:14-20.

337.    Reserved.

338.    The Pilots occasionally guide yacht traffic in the port of Bar Harbor. Tr. 11-Jul. at 16:16:5-9, 86:23-87:3.

339.    Reserved.

340.    The Pilots also guide the international fast ferry, the CAT. Tr. 11-Jul. at 16:8-9.

341.    The Pilots facilitate the movement of vessels carrying two big classes of commodities: products and people. Tr. 11-Jul. at 27:10-13.

342.    The Pilots facilitate hundreds of ship movements every year. Tr. 11-Jul. at 31:15-17.

343.    All of the vessels guided by the Pilots are moving commodities in interstate commerce. Tr. 11-Jul. at 21:16-18, 27:2-29:14.

344.    The Pilots Association covers its region with four individual state-licensed pilots, two pilot boats, and a host of support staff in the form of contract pilots, pilot boat captains, deckhands, boat maintenance staff, and drivers for shoreside transportation. *See* Tr. 11-Jul. at 29:15-31:19. They are supported by an extensive system that enables the Pilots to safely get out to sea and back and travel up and down the coast. Tr. 11-Jul. at 32: 13-23.

345.    The Pilots maintain two different pilot boats in two different regions. Each pilot boat has its own dedicated crew. The most dangerous part of a pilot's job is embarking and disembarking vessels, especially when the vessels are moving. The Pilots' dedicated, purpose-built

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 46 -

30825574.2

App. 275

pilot boats contribute to the safety of the Pilots when embarking and disembarking vessels. Tr. 11-Jul. at 37:20-39:11.

346. Reserved.

347. The pilots also provide their own "back office" support, including dispatching, billing, accounting, invoicing, and correspondence with agents and interested shippers regarding potential ship movements. *See generally* Tr. 11-Jul. at 32:13-20 (discussing logistics), 37:16-19 (dispatching).

348. An efficient pilotage system keeps Maine's ports efficient and keep commerce flowing. The Pilots' system of pilotage is designed to provide pilots on an "as needed" basis, meaning that pilots are available 24 hours a day, 7 days a week, every day of the year. Tr. 11-Jul. at 33:8-10.

349. The Pilots' system of pilotage enables the Pilots to work around and within Maine's sometimes-challenging weather conditions and avoid vessel delays occasioned by the unavailability of a pilot at the day and time the vessel can move into or out of a port. Tr. 11-Jul. at 33:4-8.

350. The Pilots' system of pilotage helps the flow of goods back and forth and avoids the shortage of commodities that may result if pilots were not available to move the vessels. Tr. 11-Jul. at 33:8-10.

351. The Pilots' system of pilotage enables the pilots to work within weather and timing constraints at certain ports. For example, in Bucksport, vessels can be brought in only during daylight hours and only during high or low tide, depending on the vessel draft. Tr. 11-Jul. at 33:16-34:18.

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 47 -

30825574.2

App. 276

352.    Sometimes, vessels moving products and vessels moving people arrive at the same time and need pilots at the same time. *See* Tr. 11-Jul. at 37:2-24.

353.    The Pilots' system of pilotage enables the Pilots to serve both vessels. Tr. at 37:2-24.

354.    The Pilots' system of pilotage is contrasted by an "as available" system of pilotage under which vessels would wait for an available pilot. Tr. 11-Jul. at 36:17-18.

355.    Pilotage rates are set by the Maine Pilotage Commission. Tr. 11-Jul. at 56:15-18.

356.    Pilots must charge the rates set by the Maine Pilotage Commission for their regions. Pilots cannot give discounts, kickbacks, or rebates. Pilots also cannot charge more than the published rates. Tr. 11-Jul. at 56:19-22.

357.    The Pilots Association last sought a rate increase from the Maine Pilotage Commission in 2022, effective for the 2023 calendar year. Tr. 11-Jul. at 58:9-59:3. As a result, the Pilots' rates increased substantially for 2023. The substantial increase was necessary to account for the loss of cruise traffic during the height of COVID and rising inflation, as well as to bring the Pilots' rates in parity with rates for similar vessels in other New England ports. Tr. 11-Jul. at 58:9-59:3.

## VI. STANDING

## A. Injury to the Tender Vessel Owners and the Pier Owners

358.    If the Ordinance caused large cruise ship to stop calling at Bar Harbor, the tender vessels could no longer be used to tender passengers, which is the only reason they were built. Tr. 12-Jul. at 111:24-112:13.

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 48 -

30825574.2

App. 277

359.     The reduction in the number of disembarking persons as a result of the Ordinance would cause a reduction in revenue to the Pier Owners from the use of their piers for disembarkation and re-embarkation of cruise ship passengers. Tr. 12-Jul. at 11:19-23.

360.     The reduction in the number of disembarking persons as a result of the Ordinance will cause the loss of the vast majority of the tendering business of the Tender Owners and BHWW.

361.     The reduction in the number of disembarking persons as a result of the Ordinance renders the tendering operations of the Tender Owners effectively obsolete. Tr. 12-Jul. at 111:24-112:13.

362.     The reduction in the number of disembarking persons as a result of the Ordinance will render the property interests of the Pier Owners in their U.S. Coast Guard approvals essentially valueless. Tr. 12-Jul. at 88:9-21.

363.     The reduction in the number of disembarking persons as a result of the Ordinance will substantially reduce the value of the disembarkation points owned by the Pier Owners.  Tr. 12 Jul. at 111:19-23.

## B.  Injury to APPLL Members

364.     The reduction in or virtual elimination of the number of disembarking persons caused by the Initiated Ordinance impacts the economic viability of a substantial number of APPLL members and will result in the loss of the tens of millions of dollars of annual economic benefit to the Bar Harbor economy. Tr. 12-Jul. at 271:5-10 (Bond describing APPLL's purpose); Tr. 12-Jul. at 271:14-18 (175 members); Tr. 12-Jul. at 284:1-12; Tr. 12-Jul. at 208:20-25 (Gabe estimating multiplier effect of cruise ship passenger spending in Bar Harbor).

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 49 -

30825574.2

App. 278

365.     APPLL Members' businesses, which include restaurants, tour businesses, and retail businesses, will be severely damaged by the Initiated Ordinance and its implementation will harm the ability of many of their employees to earn a living. *See* Tr. 12-Jul. at 271:6-7 ("like-minded business owners and residents"); Tr. 12-Jul. at 273:24-25; 274:1-2; 274:14-21; Tr. 12-Jul. 277:14-19; Tr. 12-Jul. at 311:16-22.

366.     APPLL Members relied on the cruise ship visits to staff their businesses. Tr. 12-Jul. at 274:25; 275: 1-12; Tr. 12-Jul. at 314:5-19.

367.     APPLL Members schedule their seasonal staffing around the cruise ship itineraries published on Port of Call. Tr. 12-Jul. at 281:7-17; Tr. 12-Jul. at 314:5-19.

368.     APPLL Members have expanded, renovated and updated their businesses as a result of the historical cruise ship visitation in Bar Harbor. *See* Tr. 12-Jul. at 312:10-23; 319:5-25; 320:1-18.

369.     APPLL Members have financed their expansion, renovation and updates to their businesses through local Bar Harbor financial institutions. Tr. 12-Jul. at 282:12-15; 21-25; Tr. 12-Jul. at 312:10-23; 319:5-25; 320:1-18.

370.     Some APPLL Members may not be able to pay their outstanding loan payments to their local Bar Harbor financial institution if the Ordinance is enforced. Tr. 12-Jul. at 312:10-23; 319:5-25; 320:1-18.

371.     Some local businesses, who are not members of APPLL, but supply goods and services to APPLL members, will suffer economically if the Ordinance is enforced. Tr. 12-Jul. at 284:6-11.

## C. Injury to the Pilots Association

---

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

372.    Approximately 50 percent of the Penobscot Pilots Association's annual revenues come from pilotage services provided to cruise vessels anchoring in Frenchman Bay. Tr. 11-Jul. at 54:8-19; DX 442 (Gelinas email stating that cancelling a cruise ship season would mean a 50% reduction in the Pilots' revenue).

373.    These revenues cannot be replaced. DX 442 (Gelinas email stating that cancelling a cruise ship season would mean a 50% reduction in the Pilots' revenue).

374.    The loss of revenue will negatively impact the Pilots Association's ability to cover its fixed costs. Tr. 11-Jul. at 35:12-36:19, 69:7-72:15.

375.    The loss of revenue will negatively impact the Pilots Association's ability to attract and retain well-qualified mariners to the profession and in service of the Pilots Association's designated area. Tr. 11-Jul. at 35:12-36:19.

376.    The disruption of the Pilots Association's resources, and the consequent inability of the Pilots Association to perform its vital role, will compromise the safety, environmental resources, and security of traffic in the Pilot Association's pilotage area to the detriment of all persons, property, and vessels that rely on its pilotage services for safe navigation. Tr. 11-Jul. at 32:8-9, 39:7-11, 44:9-14 (safety obligations under the Pilotage Act).

**JOINT PROPOSED FINDINGS OF FACT – PLAINTIFFS AND PLAINTIFF-INTERVENOR**
*Association to Preserve and Protect Local Livelihoods, et al. v. Town of Bar Harbor*, Case No. 1:22-cv-416-LEW

- 51 -

30825574.2

App. 280

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | | |
|---|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, *et al.* | ) ) ) | |
| *Plaintiffs,* | ) ) | Civil Action No. 1:22-cv-416-LEW |
| PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION, | ) ) ) ) | |
| *Plaintiff-Intervenor,* | ) ) | |
| v. | ) ) | |
| TOWN OF BAR HARBOR, a municipal corporation of the State of Maine, | ) ) ) | |
| *Defendant.* | ) ) | |
| CHARLES SIDMAN, | ) ) | |
| *Defendant-Intervenor.* | ) ) ) | |

**<u>NOTICE OF APPEAL</u>**

Pursuant to Fed. R. App. P. 3 and 28 U.S.C. § 1292(a)(1), Plaintiffs, Association to Preserve and Protect Local Livelihoods ("APPLL"), B.H. Piers, L.L.C. ("BH Piers") and Golden Anchor, L.C., doing business as Harborside Hotel ("Harborside") (together, "Pier Owners"), B.H.W.W., L.L.C. ("BHWW"), Delray Explorer Hull 495 LLC ("495"), Delray Explorer Hull 493 LLC ("493"), and Acadia Explorer 492, LLC ("492" and (together, "Tender Owners") (herein, APPLL, the Pier Owners, and the Tender Owners are referred to collectively as "Plaintiffs"), hereby appeal to the United States Court of Appeals for the First Circuit from this Court's final Decision and Order, as Amended (ECF No. 206) entered on March 1, 2024.

App. 281

Dated at Bangor, Maine this 29th day of March, 2024.

/s/*Timothy C. Woodcock*
Timothy C. Woodcock, Bar No. 1663
P. Andrew Hamilton, Bar No. 2933
Patrick W. Lyons, Bar No. 5600

EATON PEABODY
80 Exchange Street (04401)
Post Office Box 1210
Bangor, Maine 04402-1210
(207) 992-0111

twoodcock@eatonpeabody.com
ahamilton@eatonpeabody.com
plyons@eatonpeabody.com
jgau@eatonpeabody.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2024, the foregoing was electronically filed with the Clerk of this Court using the CM/ECF system, which will send notification of such filing to all counsel of record as follows:

/s/*Timothy C. Woodcock*

App. 282

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, *et al.* | ) ) |
| | ) |
|     *Plaintiffs,* | ) |
| | ) |
| PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION, | ) ) |
| | ) |
|     *Plaintiff-Intervenor,* | ) |
| | ) |
| v. | )   Civil Action No. 1:22-cv-416-LEW |
| | ) |
| TOWN OF BAR HARBOR, a municipal corporation of the State of Maine, | ) ) |
| | ) |
|     *Defendant,* | ) |
| | ) |
| CHARLES SIDMAN, | ) |
| | ) |
|     *Defendant-Intervenor.* | ) |
| | ) |

## <u>NOTICE OF APPEAL</u>

Pursuant to Fed. R. App. P. 3 and 28 U.S.C. § 1292(a)(1), Plaintiff-Intervenor Penobscot Bay and River Pilots Association hereby appeals to the United States Court of Appeals for the First Circuit from this Court's final Decision and Order, as Amended (ECF No. 206) entered on March 1, 2024.

App. 283

Dated: March 29, 2024

/s/ Kathleen Kraft

Twain Braden
Archipelago LLC
One Dana Street, 4th Floor
Portland, ME 04101
(207) 558-0102
tbraden@archipelagona.com

C. Jonathan Benner (*pro hac vice*)
Kathleen E. Kraft (*pro hac vice*)
Thompson Coburn LLP
1909 K Street N.W., Suite 600
Washington, D.C. 20006
(202) 585-6900 (main)
(202) 585-6969 (fax)
kkraft@thompsoncoburn.com
jbenner@thompsoncoburn.com

John Kingston (*pro hac vice*)
Thompson Coburn LLP
One U.S. Bank Plaza
St. Louis, Missouri 63101
(314) 552-6000 (main)
(314) 552-7000 (fax)
jkingston@thompsoncoburn.com

*Attorneys for Plaintiff-Intervenor Penobscot
Bay and River Pilots Association*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of March, 2024, I caused the foregoing document to be served upon all counsel of record via the Court's CM/ECF system.

*/s/ Kathleen E. Kraft*

- 2 -

App. 284

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, *et al.* | ) ) ) |
| *Plaintiffs,* | ) ) |
| PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION, | ) ) ) |
| *Plaintiff-Intervenor,* | ) Case No. 1:22-cv-416 |
| v. | ) ) |
| TOWN OF BAR HARBOR, a municipal corporation of the State of Maine, | ) ) ) |
| *Defendant,* | ) ) |
| CHARLES SIDMAN, | ) ) |
| *Defendant-Intervenor.* | ) |

## NOTICE OF CROSS-APPEAL

Pursuant to Rules 3 and 4(a)(3) of the Federal Rules of Appellate Procedure and 28

U.S.C. § 1291, Defendant-Intervenor appeals to the United States Court of Appeals for the First

Circuit from this Court's Decision and Order, as Amended, (ECF No. 206) entered March 1,

2024.

Dated: April 12, 2024

/s/Robert J. Papazian
David P. Silk, Bar No. 3136 (CCA 13651)
Robert Papazian, Bar No. 6491
Richard P. Olson, Bar No. 7275 (CCA 1033912)
CURTIS THAXTER LLC
One Canal Plaza, Suite 1000/P.O. Box 7320
Portland, Maine 04112-7320
(207) 774-9000
dsilk@curtisthaxter.com
rpapazian@curtisthaxter.com
rolson@curtisthaxter.com
*Attorneys for Defendant-Intervenor*
*Charles Sidman*

1

App. 285

<u>CERTIFICATE OF SERVICE</u>

      I certify that on April 12, 2024, the foregoing Notice of Cross-Appeal was electronically filed with the Clerk of this Court using the CM/ECF system which will send notification of such filing to all registered counsel of record and that there are no *pro se* parties.

Dated:  April 12, 2024

                                            */s/Robert J. Papazian*
                                            Robert Papazian, Bar No. 6491
                                            CURTIS THAXTER LLC

App. 286

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, B.H. PIERS, L.L.C., GOLDEN ANCHOR L.C., B.H.W.W., L.L.C., DELRAY EXPLORER HULL 495 LLC, DELRAY EXPLORER HULL 493 LLC, and ACADIA EXPLORER 492 LLC, <br><br> Plaintiffs, <br><br><br> PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION, <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> TOWN OF BAR HARBOR, <br><br> Defendant, <br><br> CHARLES SIDMAN, <br><br> Defendant-Intervenor. | No. 1:22-cv-00416-LEW |

## ORDER ON MOTION FOR INJUNCTION PENDING APPEAL

Plaintiff and Plaintiff-Intervenor ("Plaintiffs") move for an injunction pending appeal.  Am. Joint Mot. for Inj. Pending Appeal ("Motion," ECF No. 228).  *See* Fed. R. App. P. 8(a)(1)(C).  Plaintiffs appeal this Court's Final Judgment following a bench trial of the merits.  (ECF No. 206.)  The Amended Decision and Order on which the Judgment

App. 287

rests resolved their legal claims unfavorably by declining to invalidate in its entirety a municipal ordinance barring daily disembarkations from vessels of more than 1,000 persons per day over piers (or other property) situated in the Town of Bar Harbor ("the Ordinance").  *See* Judgment (ECF No. 207); Amended Decision and Order (ECF No. 206). Through their Motion, Plaintiffs seek to secure cruise line reservations for the 2025 season, at a significantly higher visitation rate than what is permitted under the Ordinance.

The following discussion presumes the reader's familiarity with the underlying Amended Decision and Order.  Plaintiffs contend that they are likely to succeed on appeal by demonstrating that this Court (1) erroneously limited the preemptive impact of a federal regulation on the Ordinance's use of the all-encompassing word "persons" and/or (2) misapprehended the teachings of certain commerce clause precedent concerned for the free flow of commerce.  *See* Mot. at 5 n.5.  For the reasons that follow, I deny the request for injunctive relief.

To secure from a district court injunctive relief pending appeal, "the moving party need not persuade the court that it is likely to be reversed on appeal."  *Canterbury Liquors & Pantry v. Sullivan*, 999 F. Supp. 144, 150 (D. Mass. 1998).  However, "more than a mere possibility of relief is required."  *Nken v. Holder*, 556 U.S. 418, 434 (2009) (internal quotation marks omitted).  The provision of a stay pending appeal is a discretionary matter attuned to the circumstance of the case at hand.  *Id.* at 433.  The exercise of that discretion is guided by the moving party's ability to convincingly demonstrate the following: (1) likelihood of success on appeal; (2) irreparable harm absent injunctive relief; (3) a lack of substantial injury to others having an interest in the decision under appeal; and (4) service

of the public interest.  *Id.* at 434; *Arborjet*, *Inc. v. Rainbow Treecare Sci. Advancements*, *Inc.*, 794 F.3d 168, 171 (1st Cir. 2015).  Of these elements, the "first two factors are the most critical," *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st 2010), but failure to "show a strong likelihood of success" on appeal is an independent basis for denial of an injunction pending appeal, *id.*; *Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13, 16 (1st Cir. 2002) (per curiam); *In re Elias*, 182 Fed. App'x 3 (1st Cir. 2006) (per curiam).

As for likelihood of success, Plaintiffs argue that I missed the mark when I concluded that the scope of the preemptive impact of 33 C.F.R. § 105.237, which assures shore access for seafarers, is limited to prohibiting Bar Harbor from applying the term "persons" in a way that prevents seafarer shore access.  They contend that the ordinary result of federal preemption is total abnegation of any state law or regulation when preemption carves out part of an expansive term like "persons."  Mot. at 8–11.[1]  But, as Plaintiffs concede, the use of an expansive term like "persons" conveys a meaning that encompasses a long list of entities including both passengers and crew.  Mot. at 7 ("'Persons' certainly does not mean anything less than passengers, seafarers, and all other humans disembarking from cruise ships into Bar Harbor.").  The Federal Seafarer Shore Access Regulation effectively draws a line through only one of the words on the list implied by the term "persons," not the others.  Thus, the term "persons" still includes a list of readily ascertainable entities who remain subject to the Ordinance.

---

[1] Plaintiffs also suggest that Bar Harbor will be incapable of crafting workable rules to honor the preemptive impact of the Seafarer Shore Access Regulation.  I have considered this argument and find this contention to be less than persuasive.  Developing a limitation to honor seafarer shore access seems a rather abecedarian affair.

App. 289

Plaintiffs otherwise acknowledge that the severability analysis considers whether the electorate "would have preferred what is left of the [Ordinance] to no [Ordinance] at all," *see Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006), and whether the preemptive impact is so "integral" to the purpose or function of the Ordinance that the enacting body would not have enacted the Ordinance if it had foresight of the preemption that would result from litigation, *Bayside Enterprises*, *Inc. v. Maine Agricultural Bargaining Bd.*, 513 A.2d 1355, 1360 (Me. 1986).  In this case, when the reach of the term "persons" is curtailed to "persons other than seafarers" (in practical effect, limited to passengers), it remains the case that the Ordinance is almost entirely capable of achieving the end for which it was drawn, *i.e.*, stemming the tide of daily cruise ship visitation to vessels with lower berth capacities of 1,000 or less.  Given this reality, it would be illogical to conclude that the majority of the voters of Bar Harbor would prefer outright invalidation to a slightly more limited application of the term "persons" that might, perhaps, permit a visit by a few additional vessels.  Likewise, it is wishful thinking to conclude that the electorate would have rejected the Ordinance had it understood that the term persons would be applied only to passengers.

That leaves the "free flow of commerce" challenge.  Plaintiffs argue that the Amended Decision and Order is reductive and improperly reduces free-flow jurisprudence into only two categories before moving on to the *Pike v. Bruce Church* analysis.  Mot. at 11–12.  They assert that I failed to consider that the Ordinance "violates a well-established Commerce Clause restriction by interfering with 'transportation into or through' Bar Harbor (and Maine) 'beyond [what] is absolutely necessary for [Bar Harbor's] self-

App. 290

protection.'"  *Id.* at 13 (first quoting *Hannibal & St. J.R. Co. v. Husen*, 95 U.S. 465, 472 (1877); and then quoting *Bayley's Campground v. Mills*, 985 F.3d 153, 159–60 (1st Cir. 2021)).

The "absolutely necessary for its self-protection" standard briefly emerged in cases in which states enacted laws that had as their very object "to obstruct inter-state commerce, and to discriminate between the property of citizens of one State and that of citizens of other States." *Hannibal*, 95 U.S. at 470.  The Bar Harbor Ordinance under review in this case does not have as its object the obstruction of commerce or discrimination in favor of local market participants.  Instead, its object is to protect a small harbor community against the localized negative impacts of outsized cruise tourism.  It is as though the State of Maine concluded (albeit through the Town of Bar Harbor exercising its home rule authority) that cruise tourism generally should continue unabated throughout the State, but that limitations on the volume of daily traffic are appropriate in the small port of Bar Harbor most heavily burdened with such traffic, where the burden is the product of an economy of scale practiced by a narrow group of market participants to the detriment of local conditions. This was a primary point observed in the Amended Decision and Order, that "the Commerce Clause does not protect the cruise line industry's 'particular structure [and] methods of operation.'"  Am. Dec. and Order at 58 (alteration in original) (quoting *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127 (1978)).  Yet Plaintiffs' request for an injunction pending appeal is silent on this point.

The most recent reference to the "absolutely necessary for its self-protection" standard in a majority Supreme Court decision appears in *Hennington v. State of Georgia*,

163 U.S. 299 (1896), which upheld a state law barring the running of all trains, including interstate trains, on Sunday.[2]  The Supreme Court rejected a Commerce Clause challenge, observing that police power regulations having a "real relation to the domestic peace, order, health, and safety of their people, but which by their necessary operation, affect to some extent . . . the conduct of commerce among the states, are yet not invalid by force alone of the grant of power to congress to regulate such commerce."  *Id.* at 317.  Such regulations ordinarily "are to be respected in the courts of the Union until they are superseded and displaced by some act of [C]ongress passed in execution of the power granted to it by the constitution."  *Id.*  After all, such local laws "have their source in the powers which the states reserved, and never surrendered to congress, of providing for the public health, the public morals, and the public safety, and are not, within the meaning of the constitution, and considered in their own nature, regulations of interstate commerce, simply because, . . to a limited extent, they cover the field occupied by those engaged in such commerce."  *Id.* at 317–18.

As explained in the Amended Decision and Order, it is proper that local legislatures should regulate "in matters admitting of diversity of treatment, according to the special requirements of local conditions, . . . until Congress sees fit to act."  Am. Dec. and Order at 52 (quoting *Sproles v. Binford*, 286 U.S. 374, 390 (1932)); *see also id.* at 52. n.32 (quoting *National Pork Producers Council v. Ross*, 598 U.S. at 375 (recognizing "the usual

---

[2] *See Lake Shore & M. S. R. Co. v. State of Ohio*, 173 U.S. 285, 292-98 (1899) (upholding over Commerce Clause challenge Ohio law that required passenger trains to stop at a designated minimum number of Ohio municipalities as a condition of running trains in the state, observing that states are free to legislate in matters of the public convenience or general good unless or until Congress legislates otherwise (collecting cases)).

App. 292

legislative power of a State to act upon persons and property within the limits of its own territory, a feature of our constitutional order that allows different communities to live with different local standards" (internal quotation marks and citation omitted)), and *Maine v. Taylor*, 477 U.S. 131, 151 (1986) ("The Commerce Clause significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce, but it does not elevate free trade above all other values.  As long as a State does not needlessly obstruct interstate trade or attempt to place itself in a position of economic isolation, it retains broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources." (internal quotation marks omitted))).

Congress simply is not in the exclusive position to regulate the standards by which small port communities interface with cruise line tourism.  Plaintiffs acknowledge but do not actually engage with this principle.  Instead, Plaintiffs attempt to sidestep it altogether by relying on precedent involving, for example, a state's effort to control pricing in the context of interstate rail freight, *Wabash v. Illinois*, 118 U.S. 557 (1886), and puzzling Prohibition Era jurisprudence, *Leisy v. Hardin*, 135 U.S. 100 (1890).  The price regulation effort in *Wabash* involved a local undertaking that the Supreme Court described as producing an "obvious injustice" that "show[ed] the value of the constitutional provision which confides the power of regulating interstate commerce to the congress of the United States."  118 U.S. at 576–77.  Price regulation and the danger of follow-on legislation by other states involves a "species of regulation" that "must be, if established at all, of a general and national character, and cannot be safely and wisely remitted to local rules and local regulations."  *Id.* at 577.  Not so here.  As for *Leisy*, the Supreme Court's Prohibition

Era precedent has its own unfortunate history and is unhelpful in the current context.  In *Leisy*, the Supreme Court stated that transportation between states should be "free," *id.* at 113, then advanced a legal doctrine that had the effect of giving out of state purveyors of alcohol a market to sell alcohol in states that prohibited the sale of alcohol altogether, an odd state of affairs that Congress abrogated through legislation.  *See Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 523–24 (2019).

That leaves the Commerce Clause standard articulated in *National Pork Producers Council*, 598 U.S. 356, which expounds on the standard found in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).  When I review Plaintiff's Motion, it appears to me that Plaintiffs seek to sidestep this line of inquiry altogether based on the precedent discussed above, rather than engage with the *Pike* standard directly.  For the reasons set forth above, I find that their approach is not likely to succeed.  Because the likelihood of success is the weightiest factor, an injunction pending appeal is not appropriate in this case.

The Amended Motion for Preliminary Injunction Pending Appeal is **DENIED** (ECF No. 228).

SO ORDERED.

Dated this 21st day of June, 2024.

/s/ Lance E. Walker
Chief U.S. District Judge

App. 294

# AN AMENDMENT TO THE TOWN OF BAR HARBOR CODE TO IMPOSE DAILY LIMITS ON CRUISE SHIP DISEMBARKATIONS

The Town of Bar Harbor hereby ordains that Bar Harbor Code Chapter 125, Article VII, Section 125-77 shall be amended as follows (additions are underlined, and deletions are struck-through):

§ 125-77 **Permit required for certain activities.**

\*\*\*

H.      Disembarking persons from cruise ships on, over, or across any property located within the Town of Bar Harbor.

(1)      For the purposes of this section, "cruise ship" has the same meaning as set forth in § 153-22(B) of the Town of Bar Harbor Code.

(2)      As determined by the Harbor Master, no more than 1,000 persons, in the aggregate, may disembark on a single calendar day from any cruise ship(s) and come to shore on, over, or across any property located within the Town of Bar Harbor; provided, however, that this subsection shall not apply with regard to any cruise ship reservations that have been accepted by the Harbor Master prior to March 17, 2022.

(3)      The Harbor Master shall develop rules and regulations in order to establish (i) a reservation system for cruise ships that transport persons by watercraft for disembarkation in the Town of Bar Harbor; (ii) a mechanism for counting and tracking the number of persons disembarking each day; (iii) a mandatory procedure for reporting violations to the Code Enforcement Officer; and (iv) any other provisions that the Harbor Master deems necessary under this subsection.  Any property owner issued a permit under this § 125-77(H) shall comply with all rules and regulations promulgated by the Harbor Master under this subsection.

(4)      This subsection shall be enforced by the Code Enforcement Officer in accordance with § 125-100 of this chapter, based on information as to violations provided by the Harbor Master, and property owners in violation of this subsection shall be subject to such fines, penalties, actions and orders as are authorized by 30-A M.R.S. § 4452, as the same may be amended, provided that each disembarking person exceeding the permitted daily limit in § 125-77(H)(2) is a specific violation under 30-A M.R.S. § 4452(3)(B), resulting in a minimum $100 penalty per excess unauthorized person.

(5)      Notwithstanding 1 M.R.S. § 302, and regardless of the date on which it is approved by the voters, this subsection will be applicable as of March 17, 2022, and shall govern any and all applications for permits or approvals required under this subsection that were or have been pending before any officer, board, or agency of the Town of Bar Harbor on or at any time after March 17, 2022; provided, however, that the Town will not take any enforcement action under this subsection with regard to any cruise ship visits occurring prior to the date of adoption by voters at Town Meeting.

# AFFIDAVIT

I, _CHARLES SIDMAN_____, being first duly sworn, deposes and states as follows:

1. My name is _CHARLES SIDMAN_____. I reside at _395 MAIN ST_____, Bar Harbor. I am of legal age and competent to give testimony in this affidavit. I make the following statements based upon my own personal knowledge, information and belief, and to the extent based upon information and believe, I believe them to be true.

    _SEVEN (7)_

2. The following ~~five (5)~~ qualified voters of the Town of Bar Harbor will constitute the petitioners committee and be responsible for circulating the attached petition and filing it in proper form:

    > Name
    > Address
    > Bar Harbor, ME 04609

    > Name
    > Address
    > Bar Harbor, ME 04609

    > Name                    _SEE ATTACHED_
    > Address                      _LIST_
    > Bar Harbor, ME 04609

    > Name
    > Address
    > Bar Harbor, ME 04609

    > Name
    > Address
    > Bar Harbor, ME 04609

3. The mailing address to which all notices to the committee are to be sent is as follows:

    > Name    _CHARLES SIDMAN_
    > Address  _PO BOX 200_
    > Bar Harbor, ME 04609

4. The proposed petition setting forth the proposed amendments to the ordinance is attached hereto as Exhibit A.

Date: _3/18/22_                          _[signature]_

STATE OF MAINE
HANCOCK, ss.                             Date: _____

Appeared before me the above-named _CHARLES SIDMAN_, and made oath that the foregoing statements by him made are true and are based upon his own personal knowledge, information and belief, and to the extent based upon information and belief, he believes them to be true.

Before me _[signature]_____
Notary Public of Maine
My commission expires:
_12/03/2027_

SEAL

_ELIZABETH N. GRAVES_
Print or Type Name as signed

PX 209.002

Exhibit A

PX 243A.001

To the Members of the Bar Harbor Town Council:

*We, the undersigned voters of the Town of Bar Harbor, petition the Members of the Bar Harbor Town Council to place the following article before the voters of the Town for their consideration:*

AN AMENDMENT TO THE TOWN OF BAR HARBOR CODE TO IMPOSE DAILY LIMITS ON DISEMBARKING CRUISE SHIP PASSENGERS

The Town of Bar Harbor hereby ordains that Bar Harbor Code Chapter 125, Article VII, Section 125-77 shall be amended as follows (additions are underlined, and deletions are struck-through):

§ 125-77 **Permit required for certain activities.**

. . .

H.     Disembarking of cruise ship passengers on, over, or across any property located within the Town of Bar Harbor.

(1)     For the purposes of this section, "cruise ship" has the same meaning as set forth in § 153-22(B) of the Town of Bar Harbor Code.

(2)     As determined by the Harbor Master, no more than 1,000 passengers, in the aggregate, may disembark on a single calendar day from any cruise ship(s) and come to shore on, over, or across any property located within the Town of Bar Harbor; provided, however, that this subsection shall not apply with regard to any cruise ship reservations that have been accepted by the Harbor Master prior to March 16, 2022.

(3)     The Harbor Master shall develop rules and regulations in order to establish (i) a reservation system for cruise ships that transport passengers by watercraft for disembarkation in the Town of Bar Harbor; (ii) a mechanism for counting and tracking the number of passengers disembarking each day; (iii) a mandatory procedure for reporting violations to the Code Enforcement Officer; and (iv) any other provisions that the Harbor Master deems necessary under this subsection. Any property owner issued a permit under this § 125-77(H) shall comply with all rules and regulations promulgated by the Harbor Master under this subsection.

(4)     This subsection shall be enforced by the Code Enforcement Officer in accordance with § 125-100 of this chapter, based on information as to violations provided by the Harbor Master, and property owners in violation of this subsection shall be subject to such fines, penalties, actions and orders as are authorized by 30-A M.R.S. § 4452, as the same may be amended, provided that each disembarking passenger exceeding the daily passenger limit in § 125-77(H)(2) is a specific violation under 30-A M.R.S. § 4452(3)(B), resulting in a minimum $100 penalty per passenger.

(5)     Notwithstanding 1 M.R.S. § 302, and regardless of the date on which it is approved by the voters, this subsection will be applicable as of March 16, 2022, and shall govern any and all applications for permits or approvals required under this subsection that were or have been pending before any officer, board, or agency of the Town of Bar Harbor on or at any

PX 243A.002

**App. 298**

time after March 16, 2022; provided, however, that the Town will not take any enforcement action under this subsection with regard to any cruise ship visits occurring prior to the date of adoption by voters at Town Meeting.

PURPOSE:

The purpose of this amendment to the Code is to require a permit to be issued to any property owner wishing to allow for the discharge of cruise ship passengers in the Town of Bar Harbor from their property, and to establish a codified limit on the number of passengers who may disembark from cruise ships and be transported to the Town of Bar Harbor per day. Underlying this proposed amendment is the fact that, in recent years, the Town has been a popular port of call for cruise ships of varying sizes, from which passengers disembark via tender boats that offload passengers directly into the downtown area. The large numbers of passengers have overwhelmed the downtown area, resulting in excessive congestion and traffic on public streets and sidewalks, frequent overcrowding of parks and other public spaces, and inundating local amenities and attractions, all of which result in a diminished quality of life for Town residents. The unchecked and continued influx of disembarking cruise ship passengers in the downtown area jeopardizes the Town's ability to deliver municipal services to Town residents and visitors (for example, cruise ship passengers), including the provision of public safety services (police and fire), emergency medical services (EMS), in-patient and out-patient services at local hospitals, pandemic control measures, and public sanitation services, and also impacts the ability of local shops, restaurants, and other businesses to attract and serve customers. A town-wide survey was conducted in 2021, showing that a majority of respondents believe that the volume of disembarking cruise ship passengers is too high and has a negative impact on the Town and the health, safety and welfare of its residents.

The Town's existing, uncodified limits of 5,500 passengers per day (for May, June, September and October) and 3,500 passengers per day (for July and August) have proven to be insufficient to mitigate the impacts described above, and furthermore, are currently subject to adjustment at the discretion of the Harbor Master without further input from the voters of the Town. This discretion is removed, and the limits herewith are made absolute. In order to protect, preserve and promote the general health, safety, welfare and peace of the community, it is determined to be in the best interest of the Town to amend the daily disembarkation limits by lowering the cap to 1,000 and requiring that all property owners receive a permit from the Code Enforcement Officer that formally imposes such a limit. By statute, 38 M.R.S. § 439-A, the Town is expressly authorized to regulate activities that occur within its own shoreland areas. Further, in accordance with the Town's home rule authority under the Maine Constitution (Article VIII, Part Second, Section 1) and by statute (30-A M.R.S. § 3001) the Town may adopt ordinances to protect the health, safety and welfare of its residents, including Chapter 125 of the Town of Bar Harbor Code, which regulates the use of land and permitted structures in Bar Harbor.

As drafted, the provision is applicable as of March 16, 2022, and the purpose of the retroactive application of the amendment is to provide adequate notice of the daily passenger cap to all interested parties prior to the time when reservations are made for the 2023 cruise ship season. As stated in the amendment, the daily passenger cap will not apply to any cruise ship reservation or "booking" that has already been accepted by the Town's Harbor Master prior to March 16, 2022, and the Town will not take any enforcement action with regard to any cruise ship visits occurring prior to the date of adoption of this subsection by voters at Town Meeting.

**App. 299**

Petitioning Committee:

Charles Sidman (for all communications), 395 Main St., PO Box 200, Bar Harbor, ME 04609.
Phone: 207-288-0428.  Email: csidman@acadia.net.

Amy Sidman, 395 Main St., PO Box 200, Bar Harbor, ME 04609.

Barbara Fenderson, 243 Oak Hill Road., Bar Harbor, ME 04609.

Art Greif, 8 Devon Road, Bar Harbor, ME 04609.

Donna Karlson, 8 Devon Road, Bar Harbor, ME 04609.

Pat Murphy, 13 Arata Drive, Bar Harbor, ME 04609.

Jim O'Connell, 5 Higgins Terrace, Bar Harbor, ME 04609.

For the Committee:

*Charles Sidman*

Charles Sidman

3/16/22

App. 300

# Exhibit B

PX 243B.001

**Order**
**of the Bar Harbor Town Council**
**for the November 8, 2022 Town Meeting**

It is hereby ordered that the following article be placed on the town meeting warrant with voting thereon to be held by Australian ballot.

## WARRANT ARTICLE

**Article XX CITIZEN PETITION FOR LAND USE ORDINANCE AMENDMENT — Daily Limits on Cruise Ship Disembarkations Ordinance — Shall an ordinance dated July 19, 2022 and entitled "An amendment to the Town of Bar Harbor Code to Impose Daily Limits on Cruise Ship Disembarkations," be enacted?**

## SUMMARY

The amendment, with a retroactive date of March 17, 2022, will limit the number of persons allowed to disembark in Bar Harbor from cruise ships to a maximum of 1,000 per day.

## EXPLANATION

The amendment for daily limits on cruise ship disembarkations has a retroactive date of March 17, 2022.

The amendment will limit the number of persons from cruise ships allowed to disembark in Bar Harbor to a maximum, in the aggregate, of 1,000 per day. Exempt from this limit are persons disembarking from cruise ships that have made reservations prior to March 17, 2022. A cruise ship is defined as a watercraft carrying passengers for hire which is capable of providing overnight accommodations for 49 or more passengers.

The Harbor Master will develop rules and regulations to include, but not limited to, a cruise ship disembarkation reservation system, a daily counting and tracking system for persons disembarking, and a violation reporting system.

The Code Enforcement Officer will be responsible for enforcement of the disembarkation daily limit. Pursuant to the rules and regulations developed by the Harbor Master, property owners will be required to secure a written permit from the Code Enforcement Officer for any person disembarking from a cruise ship on, over, or across their land. The Harbor Master will report violations to the Code Enforcement Officer.

Each disembarking person exceeding the daily limit will constitute a specific violation resulting in a minimum civil penalty of $100 per person.

PX 243B.002

App. 302

## AN AMENDMENT TO THE TOWN OF BAR HARBOR CODE TO IMPOSE DAILY LIMITS ON CRUISE SHIP DISEMBARKATIONS

The Town of Bar Harbor hereby ordains that Bar Harbor Code Chapter 125, Article VII, Section 125-77 shall be amended as follows (additions are <u>underlined</u>, and deletions are ~~struck through~~):

§ 125-77 Permit required for certain activities.

***

<u>H.</u> <u>Disembarking persons from cruise ships on, over, or across any property located within the Town of Bar Harbor.</u>

    <u>(1)</u> <u>For the purposes of this section, "cruise ship" has the same meaning as set forth in § 153-22 B. of the Town of Bar Harbor Code.</u>

    <u>(2)</u> <u>As determined by the Harbor Master, no more than 1,000 persons, in the aggregate, may disembark on a single calendar day from any cruise ship(s) and come to shore on, over, or across any property located within the Town of Bar Harbor; provided, however, that this subsection shall not apply with regard to any cruise ship reservations that have been accepted by the Harbor Master prior to March 17, 2022.</u>

    <u>(3)</u> <u>The Harbor Master shall develop rules and regulations in order to establish (a) a reservation system for cruise ships that transport persons by watercraft for disembarkation in the Town of Bar Harbor; (b) a mechanism for counting and tracking the number of persons disembarking each day; (c) a mandatory procedure for reporting violations to the Code Enforcement Officer; and (d) any other provisions that the Harbor Master deems necessary under this subsection. Any property owner issued a permit under this § 125-77 H. shall comply with all rules and regulations promulgated by the Harbor Master under this subsection.</u>

    <u>(4)</u> <u>This subsection shall be enforced by the Code Enforcement Officer in accordance with § 125-100 of this chapter, based on information as to violations provided by the Harbor Master, and property owners in violation of this subsection shall be subject to such fines, penalties, actions and orders as are authorized by 30-A M.R.S. § 4452, as the same may be amended, provided that each disembarking person exceeding the permitted daily limit in § 125-77 H. (2) is a specific violation under 30-A M.R.S. § 4452(3)(B), resulting in a minimum $100 penalty per excess unauthorized person.</u>

    <u>(5)</u> <u>Notwithstanding 1 M.R.S. § 302, and regardless of the date on which it is approved by the voters, this subsection will be applicable as of March 17, 2022,</u>

PX 243B.003

**App. 303**

and shall govern any and all applications for permits or approvals required under this subsection that were or have been pending before any officer, board, or agency of the Town of Bar Harbor on or at any time after March 17, 2022; provided, however, that the Town will not take any enforcement action under this subsection with regard to any cruise ship visits occurring prior to the date of adoption by voters at Town Meeting.

\*\*\*

Given under our hands and seal at Bar Harbor this ___2nd___ day of ~~July~~ AUG, 2022:

## Municipal Officers of the Town of Bar Harbor

_____          _____
Valerie Peacock, Chair                 Matthew A. Hochman, Vice Chair

_____          _____
Gary Friedmann                         Joseph Minutolo

_____          _____
Jefferson G. Dobbs                     Erin E. Cough

_____
Jill Goldthwait

PX 243B.004

App. 304

# Pan Atlantic Research Report To



# Quantitative Research Regarding Cruise Ship Tourism

*June, 2021*



217 Commercial Street • Portland, Maine • 04101
• www.panatlanticresearch.com •
207.221.8877

DX323.001

# Table of Contents

| | |
|---|---|
| Project Background, Objectives, and Methodology | **3** |
| Executive Summary | **11** |
| Research Findings | |
| *Aspects of Life in Bar Harbor* | **19** |
| *Overall Attitudes Towards Cruise Ships and the Cruise Ship Industry* | **21** |
| *Impacts and Key Challenges of Cruise Ship and Land-Based Tourism on Bar Harbor* | **26** |
| *Perceived Economic Impact of the Cruise Ship Industry on Bar Harbor* | **40** |
| *Specific Suggestions Regarding Cruise Ships in Bar Harbor* | **46** |
| *Perceptions of 2019 and 2020 Tourist Seasons in Bar Harbor* | **49** |
| Demographics of the Sample | **58** |
| Appendix A: Survey Instrument | |
| Appendix B: Verbatim Responses to Open-Ended Questions | |
| Appendix C: Statistical Cross-Tabulations | |
| Appendix D: Details of Mailing List Generation, Data Collection, and Data Cleansing Procedures | |



TOWN05782

# Project Background, Objectives, and Methodology

DX323.003

Report to Town of Bar Harbor
June, 2021

3

App. 307

PAN TOWN05783 C
RESEARCH

# Project Background

- Bar Harbor, with a population of 5,611 (2020), is located on Mount Desert Island, home to Acadia National Park, and is a major tourist destination. Over the past 20 years, Bar Harbor and Acadia have seen increases in the level of both sea-based and land-based tourism. This increase has brought additional revenues to businesses and to the town. At the same time, the number of tourists has had some impact on the quality of life of town residents.

- In January, 2021, Pan Atlantic Research, a full-service marketing research and consulting firm based in Portland, ME was commissioned by the Town of Bar Harbor to conduct research with residents (year-round and seasonal), property owners, and businesses of the town to gauge citizen opinion about sea-based tourism. The key objective of this research is "to provide data to guide the Town Council in setting limits on cruise ship visitation over the next seven years."[1]

[1] Source: Bar Harbor RFP, *Cruise Ship Visitation Community Survey*

App. 308

TOWN05784

# Project Objectives

- Specific objectives of the current research include:

  - Evaluate perceived impacts of cruise ship tourism on Bar Harbor's quality of life, both on its own and also relative to the impact of land-based tourism

  - Evaluate key challenges related to cruise ship tourism, both on its own and relative to the challenges of land-based tourism

  - Evaluate perceived impacts of cruise ship tourism on Bar Harbor's economy

  - Solicit community input on suggestions for future management (and/or limitation) of cruise ship tourism

  - Collect community feedback regarding both the 2019 cruise ship season and the 2020 season in which Bar Harbor received no cruise ships due to Covid-19.

# Project Methodology

- The survey instrument used in this research project was developed over the course of four strategic planning sessions with the Town Council and Town Manager between January and March of 2021. Eight drafts were submitted for Council feedback before approval was given for a final survey instrument.

- During these strategic planning sessions, the Council also determined that the target population for this survey would be Bar Harbor residents (full-time and seasonal), property owners, and business owners.

- The primary methodology for survey distribution was mail, as outlined in the RFP and based on the available databases from the Town (property tax and voter registration lists). However, it should be noted that approximately one-third of survey participants responded online.

DX323.006
Report to Town of Bar Harbor
June, 2021
6
App. 310
PAN TOWN05786
RESEARCH

# Project Methodology

- In order to reach the maximum number of town residents (full-time and seasonal), businesses, and property owners, Pan Atlantic merged the town's voter registration and property tax lists to create the distribution list for the mail survey.

- In order to maximize the overall response level, to allow adult members of a household to submit separate responses, and to reach those who did not receive a survey instrument in the mail due to circumstances such as incorrect addresses, not being included in either of the two town lists, etc., Pan Atlantic also programmed and hosted an online version of the survey.

- The final postmarked date for the return of completed surveys was originally April 26th; however, in order to give more time to publicize the survey, and due to delays in mail delivery, surveys were accepted through May 14th.

PA TOWN05787 RESEARCH

# Project Methodology

- Pan Atlantic had targeted 400-500 completed responses to allow for a sufficient sample size to reflect the opinions of the Bar Harbor community with a strong degree of statistical significance. Instead, Pan Atlantic received 1,533 surveys before the cutoff date (1,028 by mail and 505 online).

- **The procedures for generating the mailing list, collecting online responses, and cleansing the data received to produce the final dataset of 1378 responses are described in detail in Appendix D of this report.**

- Given this sample size of 1378, the margin of sampling error for this research is ±2.0% at the 95% confidence level. This is a very high response level to a survey of this nature given the size of the overall target population.

DX323.008
Report to Town of Bar Harbor
June, 2021

8

App. 312   TOWN05788

PAN ATLANTIC
RESEARCH

# Project Methodology

- The 1378 responses include 985 responses from year-round resident non-business owners (71.5%), 207 responses from seasonal resident non-business owners (15.0%), 93 responses from resident business owners, and 65 responses from non-resident business owners (total 11.4% business owners). 28 respondents (2.0%) did not answer the question regarding their relationship to the town. Further demographics of the sample are shown beginning on page 58 of the report.

- Results for many survey questions are shown broken out by "relationship to the town." The specific categories used, based on responses to Q2 of the survey, are:

    - "Year-round resident non-business owners" (referred to as "Year-round residents" in the report)

    - "Seasonal resident non-business owners" (referred to as "Seasonal residents" in the report)

    - "Business owners, both resident and non-resident" (referred to as "Business owners" in the report).

DX323.009
Report to Town of Bar Harbor
June, 2021
9
App. 313
PAN TOWN05789 C
RESEARCH

# Project Methodology

- A copy of the survey instrument can be found in Appendix A to this report. Verbatim responses to the five open ended questions in the survey can be found in Appendix B, and the statistical cross-tabulations can be found in Appendix C.

- In the report which follows, results are organized by topic area rather than following the precise order of questions in the survey instrument.

- Due to rounding of numbers, figures in this report may not always add up to precisely 100.0%.

DX323.010
Report to Town of Bar Harbor
June, 2021

App. 314

TOWN05790

# Executive Summary

# Executive Summary

- **Bar Harbor rates well on a series of quality-of-life questions posed to survey participants.**

- **Across all three questions that asked about the overall impact of cruise ship tourism in Bar Harbor, somewhat more than half of respondents indicated that the impact was negative, overall:**
  - 55% of respondents indicated that they perceive cruise ship tourism as more negative than positive for Bar Harbor, while 35% indicated that they perceive it as more positive than negative.
  - 53% of respondents rated the impact of cruise-ship tourism on the quality of life for Bar Harbor residents as negative overall, while 26% rated the impact as more positive, overall.
  - 55% of respondents feel that cruise ship tourism detracts, overall, from the image and attraction of Bar Harbor, while 27% feel that cruise ship tourism enhances the image and attraction, overall.

- **Participants rated the overall impact of cruise ship tourism on the overall quality of life for Bar Harbor residents lower (mean score of 2.52) than that for land-based tourism (mean score of 3.14).**

DX323.012
Report to Town of Bar Harbor
June, 2021
12
App. 316
TOWN05792
PAN RESEARCH

# Executive Summary

- **The three greatest challenges related to cruise ship tourism based on unaided survey participant responses, are "Foot traffic / Overcrowding / Street congestion," "Too many ships / Too many tourists," and "Environmental concerns / Pollution."**

- **With regard to the greatest challenges presented by land-based tourism, the negative impacts of "Limited parking availability" "Car traffic congestion," and "Foot traffic congestion" were cited as the top-three challenges.**

- Environmental / Pollution challenges were mentioned much less frequently in relation to land-based tourism (3%) vs. cruise ship tourism (15%).

TOWN05793
PARXXXXXC
RESEARCH

# Executive Summary

- **Levels of concern regarding the key negative impacts of both cruise ship and land-based tourism vary. While "Lack of adequate parking" and "Car traffic congestion" are rated as the most concerning negative potential impacts for land-based tourism, "Overcrowding in Bar Harbor," "Pedestrian congestion," and "Bus traffic congestion" are the key concerns regarding sea-based tourism.**

- **Almost half of respondents rated the economic impacts of cruise ship tourism (46%) and Passenger Service and Port Development Fees (45%) to the town as important, overall.**
  - However, less than a quarter of respondents rated the economic impact of cruise ship tourism as important to themselves (19%), their friends, families, and neighbors (24%), or their business or place of employment (18%).
  - Business owners were much more likely to rate these impacts as important to themselves (37%), their friends, families and neighbors (38%), and their businesses (37%).

DX323.014
Report to Town of Bar Harbor
June, 2021

App. 318   TOWN05794

# Executive Summary

- **63% of respondents feel that the 2019 cruise ship season included too many days with cruise ships, while 66% feel that the average number of cruise ship passengers was "too many" in 2019.**

- **Half of respondents (49%) indicated that the summer spent without cruise ships in 2020 had a purely positive impact on them. Furthermore, 25% indicated that the impact was mixed or neutral, while 13% indicated that it was purely negative (13% did not respond).**
  - Key positive impacts cited include less foot and traffic congestion; better access to downtown shops, facilities, etc.; better overall quality of life; cleaner environment; and better harbor vistas.

# Executive Summary

- **There was broad agreement from respondents across the year-round resident, seasonal resident, and business owner communities on the top suggestions for improving the management of cruise ship tourism:**

    (1) **Reduce the overall number of ships** (29% among year round residents, 23% among seasonal residents, 26% among business owners)

    (2) **Reduce size of ships** (18% year-round, 16% seasonal, 15% business)

    (3) **Limit number of ships per day** (11% year-round, 7% seasonal, 8% business)

    (4) **Move tendering or disembarking to another location** (10% year-round, 10% seasonal, 10% business)

    (5) **Ban cruise ships entirely** (10% year-round, 7% seasonal, 8% business)

# Executive Summary

- **While survey respondents focused strongly on the big-picture issues of the number of visiting ships and cruise ship passengers, they also offered a wide variety of suggestions relating to specific challenges presented in future management of sea-based tourism in Bar Harbor. These include suggestions related to parking, foot traffic congestion, car and bus congestion, traffic control, an alternative cruise ship berthing location to that presently used, alleviation of negative environmental and pollution impacts, etc. There was significant overlap in the suggestions made by some respondents to the set of recommendations to alleviate these challenges previously made in the report conducted by Operations and Management, LLC, at the request of the Bar Harbor Town Council in 2019.**

- **As the Town continues to develop policies with regard to cruise ship tourism, the public should continue to be engaged in the discussion on solutions to these varied specific challenges.**

TOWN05797
PAN RESEARCH

# Executive Summary

- **Data gathered indicates that business owners (resident and non-resident) and seasonal residents are more inclined to be positive than year-round residents on issues relating to Bar Harbor's cruise ship business.**
  - Examples include their responses to questions relating to the impact of cruise ship tourism on Bar Harbor's image, lower levels of concern relating to potential negative impacts of cruise ship tourism in general, and higher ratings of this tourism sector's importance in relation to positive economic impacts.

- **Finally, in terms of the future management of cruise ship tourism in Bar Harbor, some survey respondents pointed out that in making future policy decisions, the Town of Bar Harbor needs to ensure balance between the viewpoints and the interests of various groups, including year-round and seasonal residents, businesses, the fishing and marine sector, environmental organizations, etc.**

# Research Findings

*Aspects of Life in Bar Harbor*

*Q3a-Q3g*

DX323.019
Report to Town of Bar Harbor
June, 2021

App. 323

TOWN05799

- **Respondents rated Bar Harbor at or above 4.0 on a 5-point scale (1 lowest, 5 highest) "As a place to raise children," (4.36), "As a place to live," (4.26), for the Town's "Overall quality of life" (4.25), "As a place to retire" (4.00), and for the "Opportunities to participate in community matters" (4.00).**

- Respondents rate the Town somewhat less highly (although still above average) in terms of the "Quality of Town governance" (3.41) and "As a good place to make a living" (3.38).

## Ratings of the Town of Bar Harbor *(1-5 scale)*

|  | Mean Rating |
|---|---|
| As a place to raise children | **4.36** |
| As a place to live | **4.26** |
| Overall quality of life | **4.25** |
| As a place to retire | **4.00** |
| Opportunities to participate in community matters | **4.00** |
| Quality of Town governance | **3.41** |
| As a good place to make a living | **3.38** |

*Q3: As a member of the Bar Harbor community, how would you rate the Town of Bar Harbor on each of the following factors?*

App. 324



TOWN0580

# Research Findings

*Overall Attitudes Towards Cruise Ships and the Cruise Ship Industry*

*Q4, Q13, Q17*

- **27.6% of respondents indicated that their attitude towards the cruise ship industry apart from its impact on Bar Harbor is positive overall with a rating of a 4 (13.9%) or a 5 (13.7%) on a 5-point scale.**

- **45.0% of respondents indicated that their attitude towards the cruise ship industry apart from its impact on Bar Harbor is negative overall with a rating of a 1 (24.8%) or a 2 (20.2%) on a 5-point scale.**

- 25.5% rated their feeling as neutral, while 1.9% do not know or did not offer a response.

DX323.022
Report to Town of Bar Harbor
June, 2021

22



# Attitude Towards the Cruise Ship Industry as a Whole *(1-5 Scale)*

*Q4: How do you feel about the cruise ship industry as a whole, apart from its impact on Bar Harbor?*

App. 326



- **27.1% of respondents indicated that they feel that Bar Harbor's status as a cruise ship destination <u>enhances</u> the town's image and attraction.**

- **54.7% indicated that they feel that Bar Harbor's status as a cruise ship destination <u>detracts</u> from the town's image and attraction.**

- 11.8% feel that Bar Harbor's status as a cruise ship destination makes no difference in terms of the town's image and attraction.

- 39.9% of business owners and 34.8% of seasonal residents indicated that Bar Harbor's status as a cruise ship destination enhances the town's image and attraction compared to 23.7% of year-round residents.

DX323.023
Report to Town of Bar Harbor
23      June, 2021



# Impact of Cruise Ship Tourism on Bar Harbor's Image and Attraction

*Q13: In your opinion, does Bar Harbor's status as a cruise ship destination enhance or detract from the town's image and attraction?*

App. 327    TOWN0583

- **34.8% of respondents indicated that they perceive cruise ship tourism as <u>more positive than negative</u> for Bar Harbor, rating their attitude as "4 – Somewhat positive" (16.0%) or "5 – Very positive" (18.8%) on a 5-point scale.**

- **55.3% of respondents indicated that they perceive cruise ship tourism as <u>more negative than positive</u> for Bar Harbor, rating their attitude as "1 – Very negative" (33.5%) or "2 – Somewhat negative" (21.8%) on a 5-point scale.**

- 7.4% rated their perception as "3 – Neutral," while 2.4% do not know or did not offer a response.

DX323.024
Report to Town of Bar Harbor
June, 2021

24



Q17: Overall, do you feel that cruise ship tourism is more positive or more negative for Bar Harbor?



App. 328    TOWN0580J

# Summary of Overall Attitudes Towards the Cruise Ship Industry and Cruise Ship Tourism as it Relates to Bar Harbor

| | | |
|---|---|---|
| Attitude towards the Cruise Ship Industry as a Whole *(Q4)* | **27.6%** "Positive, overall" | **45.0%** "Negative, overall" |
| Impact of Cruise Ship Tourism on Bar Harbor's Image and Attraction *(Q13)* | **27.1%** "Enhances" | **54.7%** "Detracts" |
| Overall Perception of Cruise Ship Tourism for the Town of Bar Harbor *(Q17)* | **34.8%** "Positive, Overall" | **55.3%** "Negative, Overall" |

*Q4: How do you feel about the cruise ship industry as a whole, apart from its impact on Bar Harbor?*

*Q13: In your opinion, does Bar Harbor's status as a cruise ship destination enhance or detract from the town's image and attraction?*

*Q17: Overall, do you feel that cruise ship tourism is more positive or more negative for Bar Harbor?*



TOWN05805

# Research Findings

*Impacts and Key Challenges of Cruise Ship and Land-Based Tourism*

*Q5, Q6, Q7, Q8, Q11, Q12*

DX323.026
Report to Town of Bar Harbor
June, 2021

App. 330

- **25.6% of respondents rated the impact of cruise-ship tourism on the quality of life for Bar Harbor residents as positive overall (4 or 5 on a 5-point scale), while 38.2% rated the impact of land-based tourism as positive overall.**

- **53.2% of respondents rated the impact of cruise-ship tourism on the quality of life for Bar Harbor residents as negative overall (1 or 2 on a 5-point scale), while 28.7% rated the impact of land-based tourism as negative overall.**

- For both land-based and cruise ship tourism, business owners rated the impact as more positive than seasonal residents or year-round residents, as shown on the chart on the following page.



# Impact of Land-Based and Cruise Ship Tourism on Quality of Life *(5-Point Scale)*

*Q5: How would you rate the impact of land-based tourism (cars, bus tours, etc.) on the overall quality of life for Bar Harbor residents?*

*Q7: How would you rate the impact of cruise ship tourism on the overall quality of life for Bar Harbor residents?*

App. 331



# Mean Rating of Impact of Land-Based and Cruise Ship Tourism on Quality of Life
*(5-Point Scale) - By Relationship to Town of Bar Harbor*

- **Across all three demographic groups, the mean rating of the impact of cruise ship tourism on the quality of life of Bar Harbor residents was between .58 and .66 lower (more negative) compared to the impact of land-based tourism.**



*Q5: How would you rate the impact of land-based tourism (cars, bus tours, etc.) on the overall quality of life for Bar Harbor residents?*

*Q7: How would you rate the impact of cruise ship tourism on the overall quality of life for Bar Harbor residents?*





## Principal Challenges Which Bar Harbor Faces Related to Management of <u>Cruise Ship Tourism</u>
### *(Open-Ended Question)*

*Up to 3 Responses Accepted*

- **The challenge related to cruise ship tourism that respondents cited most frequently was "Foot traffic / Overcrowding / Street congestion" (32.7%).**

- Other frequently cited challenges include "Too many ships/tourists" (17.0%) and "Environmental concerns/Pollution" (14.6%).

- Year-round residents, seasonal residents, and business owners each expressed the same top 3 challenges, as shown on the chart on the following page.

| | |
|---|---|
| Foot traffic / Overcrowding / Street Congestion | **32.7%** |
| Too many ships/tourists | **17.0%** |
| Environmental concerns / Pollution | **14.6%** |
| Impact of tour buses | **8.4%** |
| Impact on harbor views | **3.6%** |
| Poor quality of tourist | **3.2%** |
| Town is too touristy | **2.9%** |
| Traffic congestion | **2.6%** |
| Other | **21.4%** |
| N/A – No negatives | **2.3%** |
| No response / Don't know | **14.5%** |

*Q8: In your opinion what are the key challenges Bar Harbor faces with regard to its management of cruise ship tourism?*

App. 333

DX323.029
Report to Town of Bar Harbor
June, 2021

29

TOWN0589



PAN ATLANTIC SMS INC
RESEARCH



# Principal Challenges Which Bar Harbor Faces Related to Management of <u>Cruise Ship Tourism</u>
*(Open-Ended Question) - By Relationship to Town of Bar Harbor*

**Legend:** ■ Year-round residents ■ Seasonal residents ■ Business owners

**Foot traffic / Overcrowding**
- Year-round residents: 33.9%
- Seasonal residents: 32.8%
- Business owners: 27.9%

**Too many ships / tourists**
- Year-round residents: 16.1%
- Seasonal residents: 16.0%
- Business owners: 22.1%

**Environmental concerns / Pollution**
- Year-round residents: 14.6%
- Seasonal residents: 14.5%
- Business owners: 10.8%

DX323.030
Report to Town of Bar Harbor
June, 2021

*Q8: In your opinion what are the key challenges Bar Harbor faces with regard to its management of cruise ship tourism?*

App. 334

TOWN0581O

PAN... RESEARCH

# Principal Challenges Which Bar Harbor Faces Related to Management of <u>Cruise Ship Tourism</u> *(Open-ended Question)*
## *Sample of Responses\**

"***Too many visitors, all of which make traffic and parking and shopping on cruise ship days too frustrating for year-round residents***." – Year-round resident

"***Too many people in a small place, ruins charm of the town, scares away overnight visitors***." – Seasonal resident

"***Effects on Frenchman Bay (pollution, air and water), effect on retail businesses that end up catering to these types of customers***." – Year-round resident

"***Town gets too congested, to the detriment of the land-based tourists***." – Resident business owner

"***They give us nothing. Except a bathroom. Pollution. Rude, cheap, crass people.***" – Year-round resident

"***Too many people - Visitors that pay to stay, eat, and shop don't enjoy it anymore. The park and town get too overcrowded***." – Non-resident business owner

*\*A complete list of verbatim responses to this question is attached in Appendix B*

App. 335

TOWN0581
PAN RESEARCH

- **The principal challenge related to land-based tourism that respondents cited most frequently was "Impact on parking availability" (32.5%).**

- Other frequently cited reasons include "Car traffic / Congestion" (27.7%) and "Foot traffic / Overcrowding" (19.4%).

- As was also the case for cruise ship tourism, year-round residents, seasonal residents, and business owners each expressed the same top 3 challenges related to land-based tourism, as shown on the chart on the following page.

DX323.032
Report to Town of Bar Harbor
June, 2021

32

## Principal Challenges Which Bar Harbor Faces Related to Management of <u>Land-Based Tourism</u>
### *(Open-Ended Question)*

*Up to 3 Responses Accepted*

| | |
|---|---|
| Impact on parking availability | **32.5%** |
| Car traffic / Congestion | **27.7%** |
| Foot traffic / Overcrowding | **19.4%** |
| Housing market challenges | **6.4%** |
| Impact of tour buses | **4.9%** |
| Environmental concerns / Pollution | **3.2%** |
| Too much tourism / Too many tourists | **3.0%** |
| Town is too touristy | **1.7%** |
| Other | **13.9%** |
| N/A – No negatives | **0.5%** |
| No response / Don't know | **17.5%** |

*Q6: In your opinion what are the key challenges Bar Harbor faces with regard to its management of land-based tourism?*

App. 336

TOWN0512



# Principal Challenges Which Bar Harbor Faces Related to Management of <u>Land-Based Tourism</u>
## *(Open-Ended Question) - By Relationship to Town of Bar Harbor*



*Q6: In your opinion what are the key challenges Bar Harbor faces with regard to its management of land-based tourism?*



# Principal Challenges Which Bar Harbor Faces Related to Management of <u>Land-Based Tourism</u> *(Open-Ended Question)*
## *Sample of Responses\**

"***Traffic, pedestrian congestion in Town, unsafe walking downtown, parking spaces too close to intersections, sight at intersections are unsafe, street not bicycle friendly, new national park access plans are not considerate of working residents***." – Year-round resident

"***Parking availability and costs. Access to restaurants and businesses difficult***." – Seasonal resident

"***Hosting beyond the Island's carrying capacity. A summer Bar Harbor that forces year round residents to alter their daily usage due to overcrowding***." – Year-round resident

"***Vehicle traffic congestion, pedestrian foot traffic congestion, and crowds detract from the positive experience of both locals and visitors.***" – Resident business owner

"***Town has reached the tipping point for cars, traffic, parking, sidewalks, etc., due to proliferation of Airbnbs, Ubers, etc..***" – Year-round resident

"***Space-RV parking spots, regular parking, road safety for pedestrians and bikers.***" – Non-resident business owner

DX323.034
Report to Town of Bar Harbor
June, 2021

*\*A complete list of verbatim responses to this question is attached in Appendix B*

App. 338

TOWN05814

PAN RESEARCH

- **Of all eight potential negative impacts of cruise ship tourism tested, respondents expressed the highest level of concern regarding "Overcrowding excluding local residents, which prevents residents from accessing the town pier, parks, and local businesses at certain times" (mean of 3.95 on a 5-point scale).**

- Other potential negative impacts with relatively high levels of concern include "Pedestrian congestion (3.88), "Negative impacts on air and water quality" (3.86), "Negative impacts on marine activities" (3.84), and "Bus traffic congestion" (3.83).

- Business owners rated their level of concern for each of the top five factors lower than other respondents as shown on the charts on the following page.

## Level of Concern Regarding Negative Potential Impacts of Cruise Ship Tourism *(1-5 Scale)*

| | |
|---|---|
| #1: Overcrowding which prevents local residents from accessing the town pier, parks, and local businesses, etc. | **3.95** |
| #2: Pedestrian congestion | **3.88** |
| #3: Negative impacts on air and water quality | **3.86** |
| #4: Negative impacts on marine activities | **3.84** |
| #5: Bus traffic congestion | **3.83** |
| #6: Impact on harbor views due to cruise ships | **3.31** |
| #7: Lack of adequate parking | **2.93** |
| #8: Car traffic congestion | **2.92** |

*Q11: The following are what some people have described as negative impacts of cruise ship tourism. How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor?*

DX323.035
Report to Town of Bar Harbor
June, 2021

35

App. 339



# Level of Concern Regarding Negative Potential Impacts of Cruise Ship Tourism
## % Saying "5 – Very Concerned" - *By Relationship to Town*



Overcrowding Excluding Local Residents



Pedestrian Congestion



Negative Impact on Air and Water Quality



Negative Impacts on Marine Activities



Bus Traffic Congestion

*Q11: The following are what some people have described as negative impacts of cruise ship tourism. How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor?*

DX323.036

Report to Town of Bar Harbor
June, 2021

36

TOWN0516

PAN ATLANTIC RESEARCH

- **Of the five potential negative impacts of land-based tourism tested, respondents expressed the highest level of concern regarding "Car traffic congestion" and "Lack of adequate parking," (each with a mean of 4.03 on a 5-point scale).**

- Other potential negative impacts with relatively high levels of concern include and "Overcrowding which is excluding local residents." (3.64) and "Bus traffic congestion" (3.58).

- As was also the case for cruise ship tourism, business owners rated their level of concern for each of the five factors lower than other respondents as shown on the charts on the following page.

## Level of Concern Regarding Negative Potential Impacts of Land-Based Tourism *(1-5 Scale)*

| | |
|---|---|
| #1: Car traffic congestion | **4.03** |
| #2: Lack of adequate parking | **4.03** |
| #3: Overcrowding which prevents local residents from accessing the town pier, parks, and local businesses, etc. | **3.64** |
| #4: Bus traffic congestion | **3.58** |
| #5: Pedestrian congestion | **3.23** |

*Q12: The following are what some people have described as negative impacts of land-based tourism. How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor?*

App. 341

TOWN0587



PAN ATLANTIC
RESEARCH

# Level of Concern Regarding Potential Negative Impacts of Land-Based Tourism
## % Saying "5 – Very Concerned" - *By Relationship to Town*



Car Traffic Congestion

- Year-Round: 53.2%
- Seasonal: 40.1%
- Business: 27.2%



Lack of Adequate Parking

- Year-Round: 51.6%
- Seasonal: 47.3%
- Business: 41.8%



Overcrowding Excluding Local Residents

- Year-Round: 43.1%
- Seasonal: 29.5%
- Business: 21.5%



Bus Traffic Congestion

- Year-Round: 37.3%
- Seasonal: 23.7%
- Business: 19.6%



Pedestrian Congestion

- Year-Round: 26.2%
- Seasonal: 16.4%
- Business: 14.6%

*Q12: The following are what some people have described as negative impacts of <u>land-based tourism</u>. How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor?*

38

DX323.038
Report to Town of Bar Harbor
June, 2021

App. 342

TOWN0518

PAN ATLANTIC RESEARCH

- Comparing the five potential negative impacts that were tested in the context of both land-based and cruise ship tourism, it is apparent that "lack of adequate parking" and "car traffic congestion" are perceived as much more concerning impacts of land-based tourism relative to cruise ship tourism.

- Conversely, pedestrian congestion is perceived as a much more concerning impact of cruise ship tourism.

- "Overcrowding which prevents local residents from town access" and "Bus traffic congestion" are perceived with a high degree of concern in both the land-based and cruise ship tourism contexts.

DX323.039
Report to Town of Bar Harbor
June, 2021



# Degree of Concern Regarding Potential Negative Impacts of Cruise Ship and Land-Based Tourism *(1-5 Scale)*

App. 343   TOWN0581/9

# Research Findings

*Perceived Economic Impact of the Cruise Ship Industry*

*Q9, Q10*

DX323.040
Report to Town of Bar Harbor
June, 2021
40

App. 344
TOWN 05820
PAN AMERICA
RESEARCH

# Background: Economic Impact of Cruise Ship Tourism

**Respondents were provided the following background text before answering questions about their perceptions of the importance of the economic impact of cruise ship tourism to Bar Harbor:**

A report issued in 2017 by the School of Economics at the University of Maine led by Professor Todd Gabe on the economic benefits to Bar Harbor of cruise ship visitation estimated that spending by cruise ship passengers contributes approximately $20 million of annual revenue to local businesses, approximately 380 jobs (full-time, part-time, and seasonal), and approximately $5.4 million in labor income annually.

DX323.041
Report to Town of Bar Harbor
June, 2021
41
App. 345
TOWN05821
PAN RESEARCH

- **46.4% of respondents rated the importance of the economic impact of the cruise ship industry to "The Town of Bar Harbor as a whole" at a 4 ("somewhat important") or 5 ("very important") on a 5-point scale.**

- 24.4% rated the importance to "friends, families and neighbors" at a 4 or a 5.

- 19.4% rated the importance to "you [the respondent]" at a 4 or 5, and 17.6% rated the importance to "your business or place of employment" at a 4 or 5.

DX323.042
Report to Town of Bar Harbor
June, 2021

42

# Perceived Importance of the Overall Economic Impact of the Cruise Ship Industry to Bar Harbor *(1-5 Scale)*



% Rating Economic Impact at 4 or 5 on a 5-Point Scale

- **46.4%** — The Town of Bar Harbor as a whole: 17.2% (4 - Somewhat important), 29.2% (5 - Very important)
- **24.4%** — Your friends, families, and neighbors: 11.4%, 13.0%
- **19.4%** — You [the respondent]: 7.4%, 12.0%
- **17.6%** — Your business or place of employment, as applicable: 5.6%, 12.0%

*Q9: In your opinion, how important is this overall economic impact to:*

App. 346



- **Business owners and seasonal residents rated the importance of the economic impact of the cruise ship industry to the Town of Bar Harbor somewhat more highly (54.4% and 56.0%) relative to year-round residents (43.5%)**

- For the other three economic impacts tested ("Your friends, families and neighbors," "You [the respondent]," and "Your business or place of employment"), business owners rated the importance of the economic impact of the cruise ship industry significantly higher than either seasonal or year-round residents.



# Perceived Importance of the Overall Economic Impact of the Cruise Ship Industry to Bar Harbor *(1-5 Scale)* *By Relationship to Town of Bar Harbor*

% Rating Economic Impact at 4 or 5 on a 5-Point Scale

*Q9: In your opinion, how important is this overall economic impact to:*



TOWN05823

# Background: Passenger Service and Port Development Fees

**Respondents were provided the following additional background text before answering a question about Passenger Service and Development Fees:**

In 2019, The Town of Bar Harbor collected about $1 million in Passenger Service and Port Development fees. About half of this money was spent on direct or indirect costs associated with cruise ships, while about half was spent on capital improvements or added to the town fund balance, offsetting some property taxes.

DX323.044

Report to Town of Bar Harbor
June, 2021

App. 348

TOWN05824

PAN RESEARCH

44

- **44.5% of respondents rated the importance of Passenger Service and Port Development Fees to the Town of Bar Harbor at a 4 (13.6%) or 5 (30.9%) on a 5-point scale.**

- 33.3% rated the importance at a 1 (14.9%) or a 2 (18.4%) on a 5-point scale, and 16.5% rated the importance at a 3.

- Business owners (mean rating 3.69) and seasonal residents (3.60) assigned a higher importance to these fees relative to year-round residents (3.16).



## Perceived Economic Impact of Passenger Service and Port Development Fees Paid to the Town *(1-5 Scale)*

5 - Very important
30.9%

4
13.6%

3
16.5%

2
18.4%

1 - Not at all important
14.9%

Don't know/No Response
5.6%

Mean: 3.29

*Q10: When considering future management of cruise ships, how important is this economic benefit to the Town?*

App. 349



# Research Findings

*Specific Suggestions Regarding Cruise Ships in Bar Harbor*

*Q14*

- **The suggestion made most frequently to improve management of cruise ship tourism was "Reduce the overall number of ships," cited by 28.0% of respondents.**

- Other frequent suggestions include "Reduce the size of ships" (17.3%), "Limit the number of ships per day" (10.0%), "Move the tendering or disembarking location" (9.9%), and "Ban cruise ships entirely (9.5%).

- The frequency of each of the top five suggestions made was fairly similar across year-round residents, seasonal residents, and business owners, as shown on the charts on the following page.

# Suggested Changes To Improve Management of Cruise Ship Tourism *(Open-Ended Question)*

*Up to 3 Responses Accepted*

| | |
|---|---|
| Reduce the overall number of ships | **28.0%** |
| Reduce the size of ships | **17.3%** |
| Limit the number of ships per day | **10.0%** |
| Move tendering or disembarking to another location | **9.9%** |
| Ban cruise ships entirely | **9.5%** |
| Reduce passengers per day or per season | **8.3%** |
| Raise ship or passenger fees | **3.2%** |
| More days without cruise ships | **3.1%** |
| Other | **19.1%** |
| Positive comments about cruise ships and/or management of cruise ships in Bar Harbor | **3.1%** |
| No response / Don't know | **19.5%** |

*Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?*

App. 351



## Most Frequently Suggested Changes To Improve Management of Cruise Ship Tourism
*(Open-Ended Question) - By Relationship to Town of Bar Harbor*



*Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?*

App. 352



# Research Findings

*Perceptions of 2019 and 2020 Tourist Seasons in Bar Harbor*

*Q15, Q16*

TOWN05829

PAN ATLANTIC
RESEARCH

- **63.1% of respondents feel that the 2019 cruise ship season included too many days with visiting cruise ships.**

- 18.3% feel that there were "about the right number" of days, while 8.3% feel that the season included "too few days."

- 67.1% of year-round residents, 53.6% of seasonal residents, and 49.4% of business owners indicated feeling that there were too many cruise ship days in 2019.



# Perceptions Regarding Number of <u>Days</u> with Cruise Ships in 2019

*Q15a: Thinking back to 2019, which of the following best captures your opinion about the amount of cruise ship tourism in that year, as a member of the Bar Harbor community? Number of <u>days</u> with cruise ships*

App. 354



TOWN0580

- **66.4% of respondents feel that the average number of cruise ship passengers was "too many" in 2019.**

- 14.9% feel that there were "about the right number" of passengers, while 7.1% feel that the season included "too few passengers."

- 70.3% of year-round residents, 57.5% of seasonal residents, and 51.9% of business owners indicated feeling that there were too many passengers in 2019.

DX323.051
Report to Town of Bar Harbor
June, 2021

51



## Perceptions Regarding Number of <u>Cruise Ship Passengers</u> in 2019

*Q15b: Thinking back to 2019, which of the following best captures your opinion about the amount of cruise ship tourism in that year, as a member of the Bar Harbor community? Number of cruise ship <u>passengers</u>, on average*

App. 355

TOWN0581

PAN ATLANTIC
RESEARCH

# Personal Experience of 2020 Season Without Cruise Ships *(Open-Ended Question)*

- **Among all respondents, 48.6% indicated that the summer of 2020 with no cruise ships in Bar Harbor had a purely positive impact on them.**

- 25.3% indicated that the impact was mixed or neutral, while 13.2% indicated that the impact was purely negative.

- 12.8% did not respond, were not sure, or indicated that they were not present in Bar Harbor 2020.



*Up to 3 Responses Accepted*

| | | | |
|---|---|---|---|
| Positive Impact | Mixed/Neutral Impact | Negative Impact | No response / Not sure / NA |
| 48.6% | 25.3% | 13.2% | 12.8% |

*Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?*



- **53.0% of year-round residents said that the summer of 2020 without cruise ships had a purely positive impact on them compared to 39.6% of seasonal residents and 35.4% of business owners.**

- 30.0% of seasonal residents, 24.0% of year-round residents, and 25.9% of business owners indicated that the impact was mixed or neutral.

- 29.7% of business owners, 11.1% of year-round residents, and 10.1% of seasonal residents indicated the impact was purely negative.



# Personal Experience of 2020 Season Without Cruise Ships
## *(Open-Ended Question)*
### *By Relationship to Town of Bar Harbor*

*Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?*



- **21.1% of respondents specifically cited a positive impact which fell into the category of "less crowded, less traffic; ability to move around town" due to the summer without cruise ships in 2020.**

- 4.5% of respondents cited the "positive impact on views," while 2.9% cited the positive "environmental impact."

- 27.5% cited a different positive impact or said the impact was positive in general.

- A sample of verbatim positive responses follows on the next page.

# Personal Experience of 2020 Season Without Cruise Ships *(Open-Ended Question) – Positive Responses*



*Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?*



# Personal Experience of 2020 Season Without Cruise Ships *(Open-Ended Question)*
## *Sample of Positive Responses\**

"*Oh my…it reminded me of Bar Harbor when I first moved here in 1986. It felt like my home, my community. I loved it, the small town feeling. I could walk downtown in summer and enjoy it. I could shop more easily. I could get an ice cream without waiting in a mile long line. Simple things that add up to high quality.*" – Year-round resident

"*The town was friendly and livable. The beauty of Frenchman's Bay was restored.*" – Seasonal resident

"*Seeing unobstructed views of Frenchman Bay from shore path was amazing. I had forgotten how beautiful it could be.*" – Year-round resident

"*A huge positive impact. I own a shop and my sales were the same without them! My shop wasn't so congested. People could see my things and buy.*" – Resident business owner

"*The shop I manage did the same amount of business, and town wasn't as crazy. It was a positive impact*" – Year-round resident

"*Bar Harbor was still very busy. More tourists spending more $'s. Views gorgeous without the ships filling the harbor.*" – Non-resident business owner

DX323.055
Report to Town of Bar Harbor
June, 2021

*\*A complete list of verbatim responses to this question is attached in Appendix B*

App. 359

TOWN05835

PAN RESEARCH

- **6.9% of respondents specifically cited the negative impact of "loss of job, income, revenue, and/or customers" due to the summer without cruise ships in 2020.**

- 5.8% cited the negative impact on the business environment in Bar Harbor in general.

- 2.8% cited a different negative impact or said the impact was negative in general.

- A sample of verbatim negative responses follows on the next page.



## Personal Experience of 2020 Season Without Cruise Ships *(Open-Ended Question) – Negative responses*

*Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?*

App. 360     TOWN05836

# Personal Experience of 2020 Season Without Cruise Ships *(Open-Ended Question)*
## *Sample of Negative Responses\**

"*It hurt restaurants and retail, which detracted from the general vitality of town.*" – Year-round resident

"[It] *Cut my business to less than half the revenue. Thankfully my landlord was able to help out on rent reduction, but that will only happen once*." – Resident business owner

"*I'm sure it was devastating to my friends who had shops and restaurants*." – Seasonal resident

"*I lost one business (forced to close because of dependence on cruise ships and bus tours). A second business did okay.*" – Resident business owner

"*The streets seemed just as busy but so many people I know didn't have a good season. And my taxes went up again.*" – Year-round resident

"*The place I have worked for over a decade cut hours and staffing, and I did not have a job.* " – Year-round resident

DX323.057
Report to Town of Bar Harbor
June, 2021

*A complete list of verbatim responses to this question is attached in Appendix B

App. 361

PATOWN05837C
RESEARCH

# Demographics of the Sample

*Q1, Q2, Q19-Q22*

# Demographics

**Respondent Age**

| Age | % |
|---|---|
| 18-34 | 5.5% |
| 35-44 | 9.3% |
| 45-54 | 15.5% |
| 55-64 | 24.4% |
| 65+ | 37.6% |
| No response / Prefer not to answer | 7.7% |

**Respondent Household Income Level**

| Income | % |
|---|---|
| Less than $25k | 4.4% |
| $25k to under $50k | 11.5% |
| $50k to under $75k | 14.9% |
| $75k to under $100k | 14.7% |
| $100k or more | 30.8% |
| No response / Prefer not to answer | 23.6% |

DX323.059
Report to Town of Bar Harbor
June, 2021

App. 363

TOWN05839

PAN... RESEARCH

# Demographics

**Respondent Gender**

| Gender | % |
|---|---|
| Male | 36.1% |
| Female | 45.7% |
| Non-binary | 0.4% |
| No response / Prefer not to answer | 17.9% |

**Respondent Level of Education**

| Education | % |
|---|---|
| Less than HS | 0.3% |
| High school | 5.7% |
| Vocational / Trade school | 1.4% |
| Some college / Two-year degree | 14.3% |
| Four-year college degree | 30.6% |
| Post-graduate work | 38.7% |
| No response / Prefer not to answer | 9.1% |



TOWN05840

# Demographics

**Own / Rent Home in Bar Harbor**

| Home Ownership | % |
|---|---|
| Own | 79.2% |
| Rent | 12.8% |
| Other | 1.7% |
| N/A – Nonresident business owner | 4.7% |
| No response / Prefer not to answer | 1.5% |

**Relationship with Town of Bar Harbor**

| Relationship | % |
|---|---|
| Year-round resident | 71.5% |
| Seasonal resident | 15.0% |
| Resident business owner | 6.7% |
| Non-resident business owner | 4.7% |
| No response / Prefer not to answer | 2.0% |

DX323.061
Report to Town of Bar Harbor
June, 2021

App. 365   TOWN0581

PAN... RESEARCH

# Appendix A

*Survey Instrument*

TOWN05842

# Cruise Ship Community Survey – TOWN OF BAR HARBOR

- This survey of the community is being conducted on behalf of the Town of Bar Harbor. Your opinions, preferences and experiences related to cruise ship and land-based tourism, will be used to create a plan for management of cruise ship tourism. The Town Council would very much appreciate your completing this short survey and returning it in the enclosed postage paid envelope to our market research contractor, Pan Atlantic Research, a Maine-based market research and consulting firm, by Monday, April 26.

- This survey is exclusively intended for residents, taxpayers, and non-resident business owners of Bar Harbor, Maine. If you would prefer to submit the survey online, the web-based version of the survey can be found at: https://www.research.net/r/BHSurvey2021. If submitting online, please enter the following code when prompted: [CODE]

- All responses are confidential, and data will be reported in aggregate form only. If you have any questions about this survey, please contact Mr. Cornell Knight, Town Manager at manager@barharbormaine.gov, or contact Mr. Jason Edes, Director of Research at Pan Atlantic Research at jedes@panatlanticresearch.com.

**1.** Do you own or rent your home in Bar Harbor?
❑ Own      ❑ Rent      ❑ Other / Specify: _____
❑ N/A – Non-resident business owner

**2.** Which of the following best describes your relationship with the Town of Bar Harbor?
❑ Year-round resident      ❑ Seasonal resident      ❑ Resident business owner
❑ Non-resident business owner

**3.** As a member of the Bar Harbor community, how would you rate the Town of Bar Harbor on each of the following? Please use a scale from 1 to 5, with 1 being "very poor" and 5 being "excellent."

|  | 1 - Very poor | 2 | 3 | 4 | 5 - Excellent | Don't know |
|---|:---:|:---:|:---:|:---:|:---:|:---:|
| **A.** Overall quality of life | ❑ | ❑ | ❑ | ❑ | ❑ | ❑ |
| **B.** As a place to raise children | ❑ | ❑ | ❑ | ❑ | ❑ | ❑ |
| **C.** As a place to live | ❑ | ❑ | ❑ | ❑ | ❑ | ❑ |
| **D.** As a place to retire | ❑ | ❑ | ❑ | ❑ | ❑ | ❑ |
| **E.** As a good place to make a living | ❑ | ❑ | ❑ | ❑ | ❑ | ❑ |
| **F.** Opportunities to participate in community matters | ❑ | ❑ | ❑ | ❑ | ❑ | ❑ |
| **G.** Quality of Town governance | ❑ | ❑ | ❑ | ❑ | ❑ | ❑ |

**4.** How do you feel about the **cruise ship industry** as a whole, apart from its impact on Bar Harbor? Please use a scale from 1 to 5, with 1 being "very negative" and 5 being "very positive."

| 1 - Very Negative | 2 | 3 | 4 | 5 – Very Positive | Don't know |
|:---:|:---:|:---:|:---:|:---:|:---:|
| ❑ | ❑ | ❑ | ❑ | ❑ | ❑ |

DX323.063

App. 367      TOWN05843

5. How would you rate the impact of **land-based tourism** (cars, bus tours, etc.) on the overall quality of life for Bar Harbor residents? Please use a scale from 1 to 5, with 1 being "very negative impact" and 5 being "very positive impact.

| 1 - Very negative | 2 | 3 | 4 | 5 – Very positive | Don't know |
|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

6. In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of **land-based tourism**?

_____

7. How would you rate the impact of **cruise ship tourism** on the overall quality of life for Bar Harbor residents? Please use a scale from 1 to 5, with 1 being "very negative impact" and 5 being "very positive impact.

| 1 - Very negative | 2 | 3 | 4 | 5 – Very Positive | Don't know |
|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

8. In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of **cruise ship tourism**?

_____

9. A report issued in 2017 by the School of Economics at the University of Maine led by Professor Todd Gabe on the economic benefits to Bar Harbor of cruise ship visitation estimated that spending by cruise ship passengers contributes approximately $20 million of annual revenue to local businesses, approximately 380 jobs (full-time, part-time, and seasonal), and approximately $5.4 million in labor income annually.

In your opinion, how important is this overall economic impact to:

| | 1 – Not at all important | 2 | 3 | 4 | 5 – Very important | Don't know |
|---|---|---|---|---|---|---|
| **A.** The Town of Bar Harbor as a whole | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **B.** You | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **C.** Your friends, family, and neighbors | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **D.** Your business or place of employment, as applicable | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

10. In 2019, The Town of Bar Harbor collected about $1 million in Passenger Service and Port Development fees. About half of this money was spent on direct or indirect costs associated with cruise ships, while about half was spent on capital improvements or added to the town fund balance, offsetting some property taxes.

When considering future management of cruise ships, how important is this economic benefit to the Town?

| 1 – Not at all important | 2 | 3 | 4 | 5 – Very important | Don't know |
|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

DX323.064

App. 368

TOWN05844

**11.** The following are what some people have described as negative impacts of cruise ship tourism. How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? Please use a scale from 1 to 5, with 1 being "not at all concerned about this" and 5 being "very concerned about this."

| | 1<br>Not at all concerned | 2 | 3 | 4 | 5<br>Very concerned | Don't know |
|---|---|---|---|---|---|---|
| **A. Car traffic congestion** from cruise ship passengers | O | O | O | O | O | O |
| **B. Bus traffic congestion** from cruise ship passengers | O | O | O | O | O | O |
| **C. Pedestrian congestion** from cruise ship passengers | O | O | O | O | O | O |
| **D. Lack of adequate parking** due to cruise ship passengers | O | O | O | O | O | O |
| **E. Overcrowding** due to cruise ship passengers which prevents residents from accessing the town pier, parks, and local businesses at certain times | O | O | O | O | O | O |
| **F.** Negative impacts on local **air and water quality** due to cruise ships | O | O | O | O | O | O |
| **G.** Impact on **harbor views** due to cruise ships | O | O | O | O | O | O |
| **H. Negative impacts on marine activities,** including fishing and other harbor traffic | O | O | O | O | O | O |

**12.** The following are what some people have described as negative impacts of land-based tourism. How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? Please use a scale from 1 to 5, with 1 being "not at all concerned about this" and 5 being "very concerned about this."

| | 1<br>Not at all concerned | 2 | 3 | 4 | 5<br>Very concerned | Don't know |
|---|---|---|---|---|---|---|
| **A. Car traffic congestion** from land-based tourists | O | O | O | O | O | O |
| **B. Bus traffic congestion** from land-based tourists | O | O | O | O | O | O |
| **C. Pedestrian congestion** from land-based tourists | O | O | O | O | O | O |
| **D. Lack of adequate parking** due to land-based tourists | O | O | O | O | O | O |
| **E. Overcrowding** due to land-based tourists which prevents residents from accessing the town pier, parks, and local businesses at certain times | O | O | O | O | O | O |

**13.** In your opinion, does Bar Harbor's status as a cruise ship destination enhance or detract from the town's image and attraction? ❑ Enhance ❑ Detract ❑ Makes no difference ❑ Don't know

DX323.065

App. 369      TOWN05845

**14.** What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

_____

_____

**15.** Thinking back to 2019, which of the following best captures your opinion about the amount of cruise ship tourism in that year, as a member of the Bar Harbor community?

Number of **days** with cruise ships: ❑ Too many days     ❑ Too few days
     ❑ About the right number of days     ❑ Not sure

Number of cruise ship **passengers**, on average: ❑ Too many passengers     ❑ Too few passengers
     ❑ About the right number of passengers     ❑ Not sure

**16.** Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

_____

**17.** Overall, do you feel that cruise ship tourism is more positive or more negative for Bar Harbor?

| 1 - Very Negative | 2 – Somewhat negative | 3 – Neutral | 4 – Somewhat positive | 5 – Very Positive | Don't know |
|---|---|---|---|---|---|
| ❑ | ❑ | ❑ | ❑ | ❑ | ❑ |

**18.** Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

_____

**19.** What is your age?
❑ 18-34   ❑ 35-44   ❑ 45-54   ❑ 55-64   ❑ 65+   ❑ Prefer not to answer

**20.** For tabulation purposes, which of the following income ranges best approximates your annual household income for 2020 from all sources?    ❑ Under $25,000   ❑ $25,000-$49,999   ❑ $50,000-$74,999
     ❑ $75,000-$99,999   ❑ $100,000 or more   ❑ Prefer not to answer

**21.** What is the highest level of education that you have completed?
❑ Less than high school   ❑ High school   ❑ Vocational/Trade school   ❑ Some college/Two-year college degree
❑ Four-year college degree   ❑ Post-graduate work   ❑ Prefer not to answer

**22.** What is your gender?
❑ Female   ❑ Male   ❑ Non-binary   ❑ Prefer not to answer

| **Thank you for your participation!** |
|---|

DX323.066

App. 370    TOWN05846

# Appendix B

*Verbatim Responses to Open Ended Questions*

TOWN05847

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| -- Traffic congestion, especially the impact of tour buses.  -- Parking.  -- Habitat impact, and impact of increased visitation on Acadia National Park. |
| (1) Managing traffic and transportation to reduce congestion on roads.  (2 ) Providing enough green space beyond park boundaries to keep an environment of high quality. |
| (1) Season needs to be extended. (2) Landscaped parking lots needed. (3) Shuttles needed. |
| 1) Inadequate parking! 2) Overwhelmed roads |
| 1) Numbers of tourists and traffic. We have finite roads and finite parking but we keep providing an ever-increasing number of beds in every shape and form. 1) (Because this is equally important.) The joint problem of housing pricing out the working class and too many second/vacation/rental homes. You know there is a problem when there are more of these than year-round residences. |
| 1) Traffic and parking 2) Control of access to Acadia National Park |
| 1. Creating appropriate ( subjective I know) access to the town, park and surrounding areas as the number of visitors increases  2. Having funds to support facilities for the visitors  3. Having appropriate housing available for employees that are needed to support the businesses that support these visitors  4. Housing for these visitors |
| 1. Housing lost to vacation rentals negatively impacting year-round housing supply & prices  2. Parking pressure |
| 1. managing crowds and traffic;   2. preserving opportunity for local people to benefit from a truly sustainable tourist industry. Short-term thinking about attracting a notoriously toxic industry (like cruise ships) is long-term disastrous for everybody here. |
| 1. Traffic flow  2. Medical infrastructure in case of emergencies |
| a balance of quality of life for locals |
| A belief that tourism is essential to the economy of the town at the scale it currently exists.  A narrowness of vision of what the economy of the town could be if tourism was not so heavily prioritized. Tourism and the businesses that exist to cater to tourism are given outsized sway over the machinations of this town. The biggest challenge the town of Bar Harbor faces with managing tourism is managing it as one aspect of this community and not a stand alone idea to be catered to at all costs. |
| A complete deterioration to our simple, natural beauty |
| A few loud people don't like cruise ships. |
| A little crowded |
| Acadia has become even more popular and how to manage more cars. |
| Access to the park  Enough summer employees to meet the demands of the insurgence of tourists |
| Accommodating and reducing automobile traffic |
| Adopt park transportation plan when finished, reducing bus size |
| Affordable housing |
| affordable housing for seasonal help |
| Affordable year-round housing, unchecked versus sustainable tourism. |
| Affordable year-round rentals, summer congestion |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| aging tourist population need to personal vehicles, parking, pedestrian congestion |
| air bnb |
| Air BnB and weekly rentals destroyed affordable housing |
| Air quality in the downtown. Would love to see electric circulator buses that loop the downtown and restrict non-commercial traffic from Main Street and adjacent zones. |
| Allowing too many hotels, out of state/not full-time residents renting their home. Sonogee should not have been sold to a hotelier. |
| Already have too many hotels! Don't allow any more built. |
| although bar harbor has long been a tourist town, in the past few decades I have seen catering to transients drive out serving the best interests of bar harbor as a place where people live |
| Amount of vehicular traffic--more mass transit into park--improved delivery services. |
| anti-business agendas |
| As a Tax payer. I am not allowed to use or move around freely. Not allowed to use the town dock. Must pay taxes for services then have to pay for parking, park pass. If you are a resident you should have some rights. There are too many people here. Too Congested. Grocery Shopping is a nightmare. No parking and sometimes no food. You can't even use West Street. My Taxes must go to that. Why am I restricted? These people who come here to visit increase trash, wear a tear, speeding at the residents expense. The natives need space too |
| As a vacation destination, car and pedestrian traffic should be expected during the tourist season. It would have been helpful to separate the land based traffic to not be all inclusive to cars, pedestrians, and busses. My opinion is that the large busses are almost as much of an issue as the cruise ships. Both busses and ships deposit large amounts of people all at once and the large buses seriously impact traffic navigation through town and the surrounding areas negatively. Maybe there should be a bus length limit size to something similar to the Island Explorer. |
| As affordable, year round housing opportunities are minimal for locals, at some point the only people that will live here are retirees from away. |
| As always, how to treat visitors without overwhelming native year-rounders. |
| As has been observed in recent years, Bar Harbor is facing greater influxes of tourists. At times in the previous summer, tourists inundated Cadillac Mountain for the sunrise to the point that no parking was available at the summit. Acadia is mitigating this deluge with permits to come, but Bar Harbor must find a way to curb land tourism to protect the purity of its natural environment. Over-tourism will only bear ruin to the precious sanctuary of Frenchman's Bay and Acadia National Park. |
| auto traffic (flow, parking) |
| auto traffic control |
| Auto traffic volume exceeds capacity to deal with it |
| Auto traffic, noise |
| Auto traffic, seasonal housing and hospitality demand, maintaining affordable housing for residents, waste management |
| Availability of public parking |

DX323.069

TOWN05849

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| Available on street parking and/or parking lots for handicapped visitors. |
| Available Parking |
| Avoid being overrun by tourists; need off-island parking. |
| Avoid overcrowding some areas which can affect safety. |
| Balance between tourism and quality of life |
| Balance of maximizing business while minimizing impact--balance. |
| Balance tourism with the year/round community |
| Balancing community versus tourism. Obviously many people here make their living from tourism so putting up huge roadblocks is not the answer. Balance is. For example, the tourist don't mind paying for parking. Make it easier for the island community to park instead of forcing them to pay for spots. Allow all island residents to get a free permit. Start functioning more as a cooperative island town instead of individual towns. |
| balancing economic vs quality of life |
| balancing growth against quality of life |
| Balancing perceived business owner needs with residents who are trying to maintain a high quality of life. We seem to err on the side of protecting businesses in our town, which it is important to note, are largely owned by a handful of people. We've handed over our waterfront to tour boats and cruise ships. I do not go into town in the summer. That's a loss on so many levels. In short, as a non business owning resident and non tourist, I feel second rate in my own town. |
| Balancing the economics of housing/profitability of seasonal rentals displacing access to affordable worker housing. |
| Balancing tourism with business and residential needs |
| Balence. Hotels vs public housing that is affordable to own |
| Ban large tour buses. |
| Bar Harbor is accessible to many urban dwellers, but too many tourists will diminish the quality of the tourist experience as well as reduce the quality of life for residents, both human and natural. |
| Bar Harbor is challenged by overcrowding. Bar Harbor residents face day to day challenges including parking, commuting, going to the grocery store and enjoying our local amenities (movies, restaurants), all of which are stressed by the number of people who are trying to share these spaces at the same time. Overcrowding stresses other resources in obvious ways - air quality is reduced by vehicle emissions, trails, paths, and waterfronts are gradually worn at a pace that outcompetes maintenance. General public safety is undermined by casual parking and pedestrian crowds. |
| Bar Harbor is increasingly catering to seasonal visitors and summer residents. There are fewer year-round business and people to support them, largely because of unaffordable housing. Air BNBs are a serious threat to the year-round viability and vitality of this town. |
| Bar Harbor is not at risk of loosing tourism, it is only at risk of being over run. We have the privilege of shaping and choosing what industry we want for our children, we can and should choose economic industries that are ecologically sound and that are appropriate scale for a small island community. They boon and bust of summer and winter is a huge negative to our community and cruise ships |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| farther that boon and bust into daily events, again negative to building the caring, inclusive, and sustainable life and economy that the majority of residents want. |
| Bar Harbor needs to find solutions for its parking shortage. |
| Bar Harbor needs to prioritize land-based tourism and it need to implement the plan that was drawn up several years ago which included less intown tourist parking and more use of buses for tourist commuting. |
| Bar Harbor residents having to pay parking and Cadillac fees. |
| Because of the number and seasonality of tourists, our downtown businesses tend to cater to tourists and not locals. Local spots are overrun in the summer and closed in the winter. There is a lot of pressure to maximize profits. It makes it harder to define the community. And we have big players like Walsh with the buying power to significantly impact the face of BH. |
| Being able to access town to complete simple chores like grocery shopping, going to the bank etc; |
| Being absolutely overrun in the summer |
| Better bikeways and pedestrian ways to encourage people to leave their cars at the hotel to move about by alternatives. Vacation Rental and Air BnB limits to restore year round livability. Overcrowding and being loved to death. |
| better focus on bicycle tourist more friendly |
| Better parking/new garage (for pay) needed |
| Better transportation plans |
| BH doesn't limit to accommodate what the town can handle. |
| BH never planned enough parking |
| BH, native resident for 58 years. It is a bit crowded. More tourists-longer season. |
| bus tours |
| Bus tours unloading in our downtown creates a very sad and negative impact on our downtown. |
| Buses are enormously congesting, blocking bicyclists, idling and emitting fumes.  Cars are everywhere, darting and blocking and endangering bicyclists. |
| Buses hogging Agamont park, crowded |
| Buses too big for small streets, congestion of cars. |
| business interest exploits recreational hot spot , town profits at expense  of quality of life. peak period congestion . |
| Capacity; size of town and streets and parking insufficient to support visitation. |
| Car and bus traffic cause jams and are not considerate of pedestrians.  (not Ollies Trolly/Island Explorer/Acadia Bus) |
| Car parking is a concern, but minor |
| Car traffic impact |
| Car use - it would be great to get Trenton Explorer Bus Depot fully functional. |
| Carbon neutral/efficient transportation |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| Carrying capacity of ANP is being stressed. Summer housing and labor market displacing residents. Large companies displacing local entrepreneurs and they abuse their power through lawyers and treating fines as a cost of doing business to ignore the concerns and decisions of the community. |
| Cars |
| Cars and busses on the roads are the greatest challenge. We need tourism to maintain our vibrant downtown, and hold done responsibility to make Acadia NO accessible and welcoming to the public. Large busses on small roads are a real hazard. The rush hour traffic is a nuisance. |
| cars and huge buses |
| cars, crowding |
| cars, traffic congestion, should only charge for parking on main arteries |
| Cars. Parking. Too many people in the summer. |
| Cars/parking, local housing being used as nightly rentals |
| Charging for parking instead of providing more parking. |
| Chasing demand at the expense of a quality visitor experience and residential quality of life. Overcrowding of the town. Overuse of town infrastructure, and services. Loss of use of the town pier to passenger tendering and bus staging. Locals avoiding town due to crowding and congestion. |
| Concerning Cruise Ship Traffic, there should be more open public restrooms. |
| congested roadways and sidewalks. Too many people in a small area. |
| Congested streets and roads (bus traffic) |
| Congestion |
| congestion |
| congestion |
| Congestion |
| congestion |
| Congestion |
| congestion |
| Congestion |
| Congestion (both traffic and crowded public areas), Lack of affordable seasonal and year-round housing, Overabundance of vacation rentals |
| Congestion (traffic) |
| Congestion and development |
| congestion and large buses strain natural resources and infrastructure capacity |
| congestion and parking, need for expanded transit/Island Explorer |
| congestion at the town pier |
| Congestion downtown with buses and parking |
| Congestion downtown, increase in type of tourists less committed to respecting island environment |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| Congestion management |
| Congestion of traffic (buses) |
| congestion on roads |
| congestion on roads and sidewalks, including way too many busses; loss of year-round residences due to housing used for short-term rental |
| Congestion on sidewalks, parking, National Park reservations, lack of staff at local businesses. |
| Congestion with traffic |
| Congestion, Co2 emissions from tourism, hypertourism, lack of affordable housing due to high taxes and real estate prices due to overtourism |
| congestion, over use, parking |
| Congestion, parking |
| congestion, parking, hard to bike, lack of year-round rentals |
| congestion, the balance between tourism, and the quality of life. |
| Congestion. Everyone's in cars instead of public transit. |
| Congestion: traffic and parking |
| Congestion; small village for so many at once so challenge in spreading out visits/people; Road traffic downtown, more transportation options than individual cars (more buses) |
| Congestion--vehicles and pedestrians, parking |
| Conjestion , parking |
| Continue to support Island Explorer |
| control of size of visitors, air b&b problem, housing for locals |
| controlling congestion and damage to environment |
| controlling growth |
| controlling overcrowding |
| Controlling the amount of vehicle traffic in the area. |
| controlling the number of visitors |
| -Controlling the number of visitors on a daily basis  -PARKING! |
| Cost and wear on infrastructure |
| Covid |
| Covid 19 |
| covid 19: cruise ships/tourists will spread virus |
| covid pandemic |
| Create downtown parking and high-density housing. |
| creating a balance between very pro tourist businesses and residents more focused on having less environmental impacts on MDI |
| Creating a shuttle system to get people through the park and avoid so many cars |

## Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| crime - limited space! |
| Critical mass, hard to park at times. |
| Crowd control |
| Crowd control and parking |
| crowd limit |
| Crowd management and parking |
| Crowd/traffic controls |
| crowded sidewalks and people crossing streets anywhere/between cars |
| Crowded streets with no parking places. |
| crowding |
| Crowding in Acadia National Park |
| Crowding the park, insufficient parking, summer traffic |
| Crowding, grocery stores too small, eatery prices too high |
| Crowding, parking |
| crowding.  Buses. lack of housing. extreme seasonality of many businesses |
| Crowding; Not enough parking downtown |
| crowding; pollution |
| crowds |
| crowds |
| Crowds |
| crowds, parking. Year round residents can barely do chores, bank, post office, pharmacy, store with influx of summer people |
| Crowds, restaurants/shops made for tourists, not resdients, decisions made to increase dollars, not for quality of life, health, or environment |
| crowds, traffic, and litter |
| Crowds, traffic, bay pollution |
| Crowds; access; parking for locals |
| crowds--overuse of the park--parking |
| cruise industry overwhelms the system |
| Cruise ship congestion/people and buses |
| Cruise ships are the biggest challenge. They turn what could be a wonderful variety of galleries, shops, and restaurants, into T-shirt shops. This discourages land based tourism And the reputation of the town. The town would be much more prosperous without the cruise ships. |
| Cruise ships are the largest issue with overcrowded streets. |
| cruise ships use land based tourism |
| Cut ships way back--meters out |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| Dealing with lowering tourism-currently exceed economic carrying capacity |
| Deciding how to limit the nubmers to prevent overcrowding in Town and the Park |
| decreasing # of businesses for locals to frequent |
| Density issues, overcrowding on trails, roads, town center, waste and consumption |
| develop reasonable public parking options, i.e. central parking garage |
| Disregard of "plans sold to the town." I.e., [illegible] station at Agamont Park, buses taking over lower Main St. parking |
| Doing a good job |
| Don't know |
| don't punish the residents because there are way too many tourists - eg parking, overcrowding in downtown, overuse of resources |
| Double edged sword--community needs tourism |
| Downtown area control of traffic flow. Parking in the town. Ability to connect tourists efficiently with Acadia National Park. |
| downtown congestion |
| downtown gridlock and loss of access to residents. |
| Downtown parking and traffic |
| downtown traffic and parking, year round rentals vs seasonal/weekly |
| downtown traffic, housing crisis, difficulty finding year-round jobs |
| downtown traffic--trying to combine both cars and crosswalk crossers simultaneously |
| economic interests vs ecological interests |
| Effect on the environment |
| Eliminate parking meters, look into a parking garage, complete ferry terminal parking for visitors |
| emissions |
| Employee housing, year-round housing challenges |
| encourage, create downtown pedestrian mal |
| Encouraging people to come to BH who are not on a cruise ship.  It would bring in more people to the town who don't like the cruise ship crowds and would buy more than t-shirts |
| Ensuring that locals can access restaurants, outdoor spaces, and other opportunities |
| Environmental degradation and parking and social services |
| equity in areas like town hill and local neighborhoods. Ex. LL Bean bus is not fit for locals |
| Excessive car traffic; Lack of in-town parking; Too many houses used as summer rentals; Not enough year-round housing |
| Excessive number of vehicles |
| Exhaust fumes from buses.  Buses should be required to be electric. (And pedestrian safety - allow careful drivers only.) |

TOWN05855

# Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| Explorer bus system needs to expand and be more timely. |
| family residents verus rentals and employee housing |
| figure # of cars/buses per day to keep businesses happy but not overcrowd |
| find balance for residents and visitors |
| Finding ways to encourage bus use and not driving into town unless absolutely needed. Buses, Shuttles, bikes, etc should be encouraged as a way to reduce extra cars downtown. |
| Flow of traffic and parking |
| foot traffic |
| foot traffic, very congested in town. Sidewalks in bad shape |
| for such an "ecology & green" town, bar harbor has lost all control of the huge impact that care & bus traffic jams have on all aspects of "clean life" there should be strict enforcement of buses not adhering to town rules!! Traffic from JAX labs should be diverted thru alternate routes instead of clogging up downtown. |
| for the very high property taxes we pay, we should not have to wait in long lines to eat out or get a coffee. We can't shop at the local grocer because tourists buy everything out. Cruise passengers and car visitors should pay more, via hotel and port taxes because they are using/ruining our infrastructure (roads, restrooms, they litter, they are overwhelming our emergency services...) that we pay for via our property taxes. our taxes continue to increase, to maintain the infrastructure, pushing locals out that are needed to support year round businesses |
| From research I've seen, land based tourism brings more money into BH than the garbage economy of cruise ship tourism, as people stay longer, eat out more, buy more things and rent houses or stay in hotels. However, the rise of land-based tourists also puts massive stress on the town of BH and is making access to Acadia very difficult. I rarely come to BH in the summer as there are too many tourists in general. And I NEVER come to BH when a cruise ship is docked. Nightmare!!! |
| geography, multiple & sometimes competing interests, resistance to restrictions on vehicle traffic & alternative transportation, lack of creative shared vision. |
| Get rid of big charter bus coaches too big for our roads and Town. Bike, walker-safe trails and parks. Handicapped accessible walks, parking access. Reduce all speeding--our roads are unsafe. |
| Get rid of the parking meters and make Walsh provide the parking garage as promised. |
| Get them off the town pier |
| Getting folks out of their cars |
| Getting locals out of the mindset that tourism isn't a benefit to their town |
| Getting people out over all the island / seasonal employees |
| getting visitors out of their cars to decrease congestion |
| hard to balance |
| health and safety, traffic and crowding, housing - especially affordable, trash recycling infrastructure in general |
| Hectic atmosphere trying to get around |

## Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| high car and foot traffic, especially downtown |
| High cost of infrastructure, overcrowding, access to groceries nad medical care. Property values |
| Hosting beyond the Island's carrying capacity. A summer Bar Harbor that forces year round residents to alter their daily usage due to overcrowding. |
| house prices overcrowding |
| housing |
| housing (lack thereof due to weekly rentals), parking, road safety/pedestrian safety, cyclists safety |
| Housing and parking |
| Housing for seasonal employees and traffic around Town |
| Housing for support personnel (seasonal workers) |
| housing for workers, affordable housing for bar harbor residents in the village. We are owned by out of state money. We need more families living in bar harbor village. Off season needs to stop being a ghost town. Quiet, yes. Empty, no. housing for teachers, hospital employees. |
| housing, land apportionment for tourist based industry, sticking to zoning in the face of outside money pressure, putting residents in equation, equality |
| Housing, parking, poor drivers |
| How to balance the financial impact of the tourists with the needs of the community. How to ensure that the residents are prioritized without losing tourism $. Crowd management during the peaks. |
| How to be more inviting to attract more tourism dollars here |
| How to encourage tourist to use human power visitation of Acadia (bicycles, walking, hiking) |
| how to get tourists disbursed around the island |
| how to manage over-crowding |
| How to prevent overcrowding in general, both in-town and in Acadia, and working with other towns and the park to prevent that. |
| Huge crowds, not enough parking, season rentals taking away residential homes |
| huge RVs, long buses and BIG mirrors stuck out, POOR parking (too far from curb) |
| I am all for showing what we have, but currently not being managed well. Too many people to be absorbed in a very small community. Needs to be ??? Kind of ceiling. We are being "loved to death". |
| I feel like we lose our island to the tourists during the nicest time of the year--then everything closes. |
| I feel overrun by visitors from June to October |
| I feel that we are a "tourist" town/destination, and we need to understand and live with the reality of this. This also isn't a land-based versus cruise-ship issue. We need a balance between them as the people who live here need both in terms of their businesses, the town's income, and to provide a way of life in BH. |
| I feel the town tries to manage tourism too much. Too many rules and regulations. |
| I find bus tour congestion and parking to be the largest problem. |
| I own my home and pay taxes, but I have to pay to park on the street in front of my house? Seriously. This is a good idea??? The impact of parking meters on residents and property owners. |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| I see tourism as great for our economy, no challenges |
| I think bar harbor does a good job w land based tourism |
| I think Bar Harbor has tried too hard to succeed with parks, etc. I worry a lot about the pressure on ANPL. |
| I think due to National Park Bar Harbor [illegible] |
| I think more people should be made aware that there are transfer busses that can bring tourists on the island without having to come here with their own cars. |
| I think the principal challenges are to manage the foot traffic, cars, and Island Explorers in the congested areas of the village. In my opinion the parking permits and meters are a big help. It is the crowds that flow over to the streets, especially Main, Cottage, and Rodick, that concern me. |
| I think the town took a positive direction with the implementation of paid parking.  A major complaint in the past from tourists was they couldn't find parking places. There were plenty of places after paid parking was implemented. That being said parking for residents and downtown employees needs to be better addressed.  I also think pedestrian crossing lights should be installed along Main Street. The congestion is unbearable in the summer. |
| I think you doing a very good job. |
| I would like to see less bus tours |
| If Bar Harbor has a vision of what it would like to become, that vision is not shared often enough.  It is not shared as the reason for design review's, CEO's or other authority's decisions.  The vision is not well enough defined to be followed.  Places where it seem there was a consistent, communicated and well defined vision are  examples Helena, GA, Lihue, HI, and Santa Barbara, CA. |
| if you build it they will come. Wider roads, rentals such as air bnb, more hotels equals more people. When will it stop? Think less is more and implement that concept. |
| Impact of bus traffic on parking and street traffic in town. |
| Impact of traffic during peak season |
| Impact on the local housing market, and the ability for families to find home to buy or rent |
| Impact on year round residents ability to enjoy Bar Harbor/Acadia in the summer months |
| Impact on year-round housing/affordability and availability |
| impact to our natural environment - so many people, everywhere and traffic/circulation |
| in summer, the number of cars greatly exceeds the number of parking spaces; currently, available public transportation must in general be accessed by driving onto MDI and into Bar Harbor (for tourists) |
| In town traffic is terrible. Even sidewalks are difficult to navigate especially for the elderly. It is just too crowded.   Residential streets carry the overflow for lack of in- town parking from town which adversely affects the neighborhood feeling and is dangerous for young children who live in these neighborhoods and use these these streets on their bicycles, etc.. |
| inadequate staging areas, congested streets |
| Increase bus services and park and ride |
| Increased summer traffic |

DX323.078

TOWN05858

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| Increasing availability of Island Explorer and encouraging visitors to drive less and walk more. |
| Infrastructure |
| initiate parking (visitors) off island. Puttin glimits on the number of cruise ships at any time |
| Interfacing with the National Park Service and stabilizing visitor entry by sea. |
| In-town parking availability, parking and housing for employees |
| in-town parking; overcrowding |
| It causes the increase of vacation rentals & airb&bs which results in loss of year round homes. Too many people at natural assets. |
| It doesn't seem Bar Harbor's space and infrastructure can accommodate the growing amount of tourism. |
| It has attempted to keep most traffic out of the center of town by establishing a good busing system. However, numbers are increasing to the detriment of quality of life in Bar Harbor. |
| It is a challenge to bring tourists here during a pandemic and keep residents safe. |
| It is a challenge to weigh the effects of the huge influx of summer visitors.  This is obviously good for many businesses.  But can be overwhelming for others.  Traffic can be a problem, noise, just getting groceries, etc.  Parking used to be problematic, but the new parking meter/resident permit system has been working well, at least for me.    But it is and will be a continuing challenge to manage the number of people in the peak season.  The NPS has made changes in response.     I should note I am a part-time summer resident, but also stay through fall and often winter. |
| it is the management of tourism as a whole that is difficult. ANP has recognized that the carrying capacity has been exceeded and has taken action by developing and implementing a transportation plan to preserve the integrity of the resource and the enjoyment of the user. as a town, it is difficult to manage land based tourism but feasible to manage sea-based tourism. Tourism as a whole is exceeding the carrying capacity if the downtown and something should be done. Coupled with this is the need to also develop a plan to develop a year-economy. |
| It is time for a moratorium on creating any more new lodging establishments. What we have is enough. Greed has taken over common sense. |
| It seems like parking is the main issue in Bar Harbor. I have been late a couple of times due to being unable to find parking, including in permit parking, and once paid for expensive parking just to be able to open the store. There is not enough permit parking and I have had to park in metered parking and pay. As a visitor, I know there is not enough metered parking for them either but I know the town is limited in options when it comes to this. |
| it should be a tourist friendly town |
| it would be extremely beneficial if the construciton of a parking garage could miraculously come to fruition |
| It's not just Bar Harbor, it's the whole island. |
| Just too many people come here |
| keep buses on time and frequent - minimize cars. Island explorer is great...expand it. Have 1 run later at night from town to keep drinkers off road. |

TOWN05859

# Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| Keeping a managable busy season that does not overtax the town…keep it in scale all growth is not the answer |
| keeping it at a level where numbers of people don't ruin the experience |
| Keeping it attractive for visitors and year round residents |
| keeping our community alive and providing more year-round residence and controlling tourism by limiting rental properties and air bnb |
| Keeping the tourists experience positive and the local residents supported. Keeping the park and MDI from being overwhelmed and damaged. |
| Keeping the town from being too congested. |
| Keeping volume reasonable, parking availability |
| labor shortage, meddlesome town council |
| Labor supply |
| lack of a downtown parking garage so that people can walk more |
| Lack of adequate parking outside of downtown. |
| Lack of community based design process |
| Lack of long-term housing |
| Lack of parking |
| lack of parking |
| Lack of parking garage/High volume parking. Park and ride options. |
| Lack of parking spaces. |
| Lack of parking, congestion for car-based tourism/visitors |
| Lack of parking, lack of bike lanes, allowing vehicles larger than passengers and trucks, i.e. buses and motor homes downtown |
| Lack of parking, too many cars on streets |
| Lack of parking. Lack of year-round services & opportunities. Overcrowding of certain areas (Cottage St from Rodick to Main, Main St from the Village Green to the Pier) with lack of visitation spread to other areas of town.  Public Transportation.  Accessibility/safety for bike transportation (bike lanes, places to lock up bikes). |
| Lack of policing on speeding, parking infractions, littering. Zero police presence. Transportation both on and off and around the island to prevent car congestion for tourists and locals alike. |
| Lack of signage directing tourists specially to the restrooms, not enough trash cans |
| Lack of space - lab and park dominate land usage. |
| lack of where the tour buses should park |
| Lack of workers |
| Lack of year round amenities |
| land based tourism cannot be controlled |
| land based tourism has caused the decline of affordable housing for local/native people |

# Appendix B – Verbatim Responses to Open-Ended Questions

### Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| Land based tourism is a great way to explore our island and town. The problem occurs when there is way too much of it across too small an area, which results in turning our small peaceful town into a loud, congested, city vibe. Trying to get to work during a busy time really impacts locals, and we are left with a sour taste regarding tourism in general.   The parks and beaches have become so overcrowded and uninviting that locals don't even use them during the season to avoid the disruptions of an otherwise natural beauty. This is the result of so many bus tours, personal cars, RVs, etc.   The bike tourism is especially frustrating when trying to navigate around town. Many you see are inexperienced and cause a real danger to themselves and motorists as they flounder up West Street Extension and along busy higher speed roads. The town did offer an alternate bike route into the park, and it now proceeds directly down a quiet, residential neighborhood, which we happen to live on.     Overall, tourism is good, we benefit from it, and love meeting people from other places and walks of life, but when your town starts feeling more like Disneyland than a small Maine community there have to be changes made and issues addressed.  Thank you. |
| Land-based tourism does not pose major challenges |
| Land-based tourism pretty much takes care of itself. |
| land-based tourism problems are being blamed on cruise ships |
| large abundance of tourist housing replacing access to year round housing - and all that goes with this... parking, lack of 'everyday resources' as stores cater to tourism |
| LARGE Buses |
| Large crowds,  Hard to park |
| large tour buses create dangerous congestion on streets in village, particularly on Cottage and West streets |
| Large tour buses/Overcrowding in the village/Traffic |
| larger seasons |
| Leads to excessive governance |
| Less tourism in Spring and Fall would be welcome--it's too busy |
| Like any tourist town, natives don't go out. |
| Limit development of lodging as roads/parking/ANP at capacity or exceeding now |
| limit hotels and vacation rental |
| Limit number of tourists |
| Limit numbers of tourists |
| Limited access |
| limited parking |
| Limited space |
| Limiting (visitor) numbers, limiting number of cars/vehicles. |
| limiting car traffic which detracts from overall quality of life on the island and stresses the park |
| Limiting negative impacts on the park's ecosystem. Parking at popular ANP attractions (Sand Beach, Cadillac Mt., etc.) |

TOWN05861

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| Limiting numbers. The tourist levels of 30 years ago or more were fine, now it's out of control and miserable for residents and tourists alike. There are just waaaaay too many visitors at a time. |
| Limiting the number of motels, hotels, cottages, B&Bs, places to stay. Already too many people in Bar Harbor, not enough homes, rentals for year-round residents. |
| limiting tour buses; quality of life for MDI residents versus visitors |
| Loading and of-loading of guests into buses and places for these buses to park. |
| Local government |
| locals pay for tourist needs, so a few downtown business owners can profit. Bar Harbor is more than downtown. |
| Locals that don't understand how their favorite restaurants really pay the bills. |
| Losing its sense of community due to promoting its brand |
| Loss of working waterfront/waterfront access and affordable housing  Loss of culture  Overexploitation of resources and of locals' patience |
| lots of cars |
| lots of people |
| Lots of people in a small town |
| Lots of rentals- no worker housing |
| lots of vacation rentals |
| Maintaining parking for residents during summer, encourages seasonal work rather than full-time employment. |
| Maintaining small town character |
| Make management decisions based on facts, not emotions and bias. |
| making downtown pedestrian friendly providing ways that move people around island without cars |
| Making it possible for tourists to make use of local buses [illegible] without ruining quality of life for non-business residents |
| Making sure there is still available town for the people who live here, not just Tshirt shops and summer restaurants. |
| Making the experience enjoyable by not feeling crowded. Especially during a 2 year pandemic. |
| Management of tourist movement, parking, and tourist density. |
| management of traffic flow, during peak season months and lack of employee housing. |
| managing a positive tourist experience without negatively effecting the local population |
| Managing an overwhelming amount of vehicles in the summertime, and what comes with them - pollution, extra traffic, and disregard for preserved nature areas due to a desire for a fun vacation. |
| Managing congestion and lack of parking |
| Managing crowding. Our island is small and can only handle so many visitors at a time. Finding a "sweet spot" assures business owners can enjoy a reasonable livelihood from their businesses while property owners can enjoy the scenic character of their settings. Doing so also protects the quality of experience for both year round residents and for tourists. Bar Harbor's opportunity to find |

DX323.082

TOWN05862

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| appropriate levels of congestion also represents major steps towards mending the rift between property owners and business owners. Durable good will within the community is a high quality of life that we all deserve to enjoy. |
| Managing growth with quality of life in down town Bar Harbor |
| Managing heavy traffic and parking in downtown area during peak season |
| Managing oversized vehicles in downtown, and providing sufficient parking for tourists without compromising parking availability for residents. |
| managing parking in acadia national park |
| Managing summer traffic, adequate parking, including some free parking. Personally, I think the way tour buses and cruise ship visits are currently managed is good. Our island economy depends in large part on tourism and we need to make tourists feel as welcome and comfortable as we can. Sadly 2020 has changed all things immeasurably, so we'll need to evaluate new measures as they arise. |
| managing surge issues - road traffic biggest issue for me |
| Managing the amount of tourist industry business |
| Managing the crowds and the parking |
| Managing the large commercial tour buses is too difficult in a town and Nat'l. Park the size of Bar Harbor and Acadia. |
| managing the parking to accommodate visitors |
| managing the sheer number of tourists |
| Managing traffic, parking and congestion |
| Managing vehicle traffic and shortage of overnight accommodations. |
| Many of the parallel parking spaces are too small for the majority of large SUVs and trucks that visit Bar Harbor. The large coach buses are simply too big to navigate the narrow local roads. For whatever reason, RVs don't seem to know where their designated parking is, and they are often parking in spaces that are not appropriate or too small. There is no signage to discourage car camping, which is not permitted, but many, many, many people do it. (Presumedly because they didn't study the local ordinances prior to their visit.) Finally, the town should be working with state lawmakers to change how paid parking funds may be utilized. Dedicating parking funds to help make cycling and pedestrian foot traffic safer within the town (both in the downtown area and the more rural outskirts) would help tremendously with in town congestion in town. |
| Many opportunities for tourists |
| Many use multiple parking spaces with parking on both side of the road, sometimes hard getting through. |
| Maximum Capacity |
| Minimal options for public transportation to keep cars off island. Lack of public and business encouragement to use existing public transportation or off island parking. |
| more buses, more frequent stops |
| More eco-friendly public transportation, |
| More forward thinking... less about the government, more about hospitality... |

DX323.083

App. 387

TOWN05863

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| more modes of transportations of tourists so they don't need to drive their cars into town |
| more parking needed |
| More people need to utilize the bus system. Zion is a perfect example. |
| More visitors wish to come here, Mount Desert Island, than we have accommodation for at this time, i.e., parking in the town center, parking in and around the park, and forcing reservations to drive through Acadia. |
| Move to ferry terminal. |
| moving people around safely and equitably |
| Moving through town with extra care |
| My customers complain about visiting BH when cruise ships are in port and generally avoid the town that whole day. |
| n/a |
| Narrow roads, little parking |
| Narrow streets, pick up/drop off locations |
| Need a cap on total visitors per month |
| Need a parking garage |
| Need for additional parking |
| Need for more parking |
| Need more parking, need more buses or alternative transportation around the Island and Park. |
| need remote parking w/ shuttle bus service to town. Our small 19th century town can't handle to heavy summer traffic. Give permits to residents - exclude all others. |
| Negative impact on cyclists--need bike lanes |
| neighborhoods are disappearing with increase in weekly rentals. Too much traffic, overcrowded - too many cars and people due to private rentals. We are beyond carrying capacity for our roads, restaurants, and trails |
| No caps on vacation rentals |
| No control of vacation rentals |
| No control of vacation rentals |
| No homes that locals can afford |
| No housing |
| No large tour buses |
| No limits, new lodging continuing to be built/converted for short stays |
| No opinion |
| No parking |
| no parking for us disabled seniors |
| no town can really manage 10s of thousands of tourists |

DX323.084

TOWN05864

# Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| no walking streets in downtown; insufficient use of public transportation |
| no workers |
| no workers. and if there were there isn't anywhere for them to live |
| none |
| non-resident business owners who cater their summer income toward these transient visitors and drive up costs of commercial rents & take from extremely limited housing stock; it's a finite amount of area available to all visitors (and residents!) and we may no longer be able to accommodate everyone who wants to be here without impacting the experience for all. |
| Non-resident traffic control, drug/alcohol abuse |
| not enough bus service to park |
| Not enough family friendly places, you want this to be a destination for the youth. Let them feel welcome . Finish the skate Park, more places to park , a in town dog friendly park. |
| not enough parking |
| Not enough parking, tourists spilling into residential areas, traffic, tons of litter |
| not enough space for all the visitors. Crowds in general |
| not neglecting the needs of residents who are not associated with tourism |
| Not sure |
| not sure |
| Not to overpopularize, limit numbers |
| Nowhere for working class to live--too many weekly rentals. Loss of community, locals being priced out for wealthy out-of-staters. |
| Number and concentration of visitors for such a small (island) town and limited facilities to accommodate the visitors. Parking for residents. Prospect for continued development and increasing visitation. |
| Number of cars during summer months. Need a park and ride system based out of town (Ferry Terminal) to bring visitors into town/park. |
| Number of cars in town, buses for cruise ships clogging downtown |
| Number of peole, strain on services, transportation congestion |
| Number of tourists--possible count of visitors daily (set limit) |
| Number of visitors |
| off-street parking, single road access to island, rural infrastructure, power, cable, internet needs hardening |
| ollie's trolley driving in downtown Bar Harbor = awful |
| optics, crowds are seen as a deterrent |
| Our infrastructure and roads can't handle the volume of cars in the summer. Something more needs to be done to control the traffic. |
| Our town council--not tourism business friendly. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| Over crowding |
| Over crowding |
| OVER CROWDING |
| Over crowding |
| over crowding and vehicle congestion |
| Over crowding; lack of parking; limited mooring coming from Sorrento by whaler |
| over population in summer, no year round affordable housing, too much air bnb |
| over reliance on cruise ship tourism |
| over saturation of lodging incl Air B and B,home away from home, inns,motels , dinning facilities |
| Overall number of people July-Oct. |
| Overcoming the short-sighted view that prosperity hinges on vehicles and parking instead of mobility and quality. |
| Overconcentration of motor vehicles in the downtown area. |
| overcrowded |
| Overcrowded |
| Overcrowded, hard to park |
| Overcrowded, not benefits for locals, we even have to pay to park. |
| Overcrowded. |
| overcrowded. Expensive park passes mean poorer family can't access park |
| Overcrowding |
| overcrowding |
| overcrowding |
| overcrowding |
| overcrowding |
| overcrowding |
| overcrowding |
| Overcrowding |
| Overcrowding |
| Overcrowding |
| overcrowding - as more and more weekly rentals have become available there are more land-based tourists. This has also contributed to less housing being available, this has also contributed to less of a year round community. |
| Overcrowding - killing the goose that laid the golden egg |
| Overcrowding - streets, sidewalks, shops, restaurants |
| Overcrowding , traffic, Covid-19 (currently) |

19

DX323.086

# Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| overcrowding and congestion on sidewalks, roads, businesses, and recreational areas; lack of year-round housing and employment (non-tourism based); diminished quality of life for residents; increased disrespect for residents and town regulations, increased crime and decreased safety |
| Overcrowding and congestion, increased disrespect for residents, town regulations and increased crime affecting residents quality of life and contributing to a lack of year-round affordable housing and employment. |
| overcrowding and traffic congestion with its subsequent negative effect on our natural resources and quality of life |
| Overcrowding and weekly rentals (loss of year-rounding housing) |
| Overcrowding by too many ships reduces the quality of the experience for land-based tourists |
| overcrowding downtown |
| Overcrowding in high season, not enough parking space |
| Overcrowding in July and August |
| Overcrowding in park |
| Overcrowding in peak summer months and some other holiday weekends and impact of tourism on housing prices and availability. |
| Over-crowding in the park caused by personal vehicles. |
| Overcrowding in the park, traffic congestion, housing prices. |
| overcrowding in the park/speeding on schooner heall??? |
| Overcrowding is the biggest. Impossible to walk or drive downtown in July-August. Restaurants are crowded. Acadia is overcrowded - need reservations to drive in parts of the park now. |
| overcrowding of Acadia National Park in the summer and early fall. |
| Overcrowding of natural places, as well as overcrowding of towns (restaurants etc) and insufficient parking. Also, too many properties for summer/weekly rentals and not enough affordable housing for year round families. |
| Overcrowding of Public places, traffic, |
| Overcrowding of rental and hotel markets. |
| Overcrowding of roads and establishments |
| overcrowding of roads, lack of parking in town, overcrowding of national park and other sites |
| Overcrowding, climate change, ocean pollution |
| Overcrowding, deforestation to build rentals. |
| Over-crowding, environmental pollution, damage, and conservation, habitat deterioration, seasonality |
| Overcrowding, housing for seasonal employees, parking. |
| Overcrowding, negative effects on pedestrians, parking management |
| Overcrowding, noise, poor impact on scenery, pollution |
| overcrowding, only having tourist based shops in town |

DX323.087

TOWN05867

## Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| overcrowding, overuse of resources, pollution - sound and air |
| Overcrowding, parking |
| overcrowding, parking, environmental issues |
| overcrowding, pollution, giving weight to residents' quality of life over tourism dollars. |
| Overcrowding, pollution, trash |
| overcrowding, too many cons and poor transif infrastructure |
| Overcrowding/traffic/parking/lack of affordable housing |
| overcrowding; roads/parking not built for 21st century |
| Overcrowding; traffic congestion, weekly rentals |
| Overcrowding-narrow streets with parkign on both sides (West St.) |
| Overload of traffic and tourists |
| Overpromoted, chasing carrying capacity, quantity over quality, expecting the park to absorb whatever the town brings. |
| Overstressing muncipal capabilities with growth is key concern. Changes that try to regulate; reduce numbers and impacts (while sometime are awkward and lumpy) are probably essential. |
| Overuse of space/wear and tear. |
| Ownership by big corporations has changed quality of living. Too many people have made this island feel like a foreign country that caters to tourists more than year-round residents |
| Paid parking a hindrance, not needed |
| Parking |
| Parking |
| Parking |
| Parking |
| parking |
| Parking |
| parking |
| parking |
| parking |
| Parking |
| parking |
| parking |
| parking |
| Parking |
| Parking |
| Parking |

DX323.088

App. 392          TOWN05868

# Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| parking |
| parking |
| Parking |
| Parking |
| Parking |
| Parking |
| parking |
| parking |
| parking |
| Parking |
| Parking |
| parking |
| parking |
| parking |
| parking |
| Parking |
| parking |
| parking |
| parking |
| parking |
| Parking |
| Parking |
| parking |
| parking |
| parking |
| parking |
| Parking |
| Parking |
| Parking |
| Parking |
| Parking |
| parking |
| Parking |
| Parking |
| Parking |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| Parking |
| Parking |
| Parking |
| Parking |
| Parking |
| Parking |
| Parking |
| Parking |
| parking |
| parking - different for shops and restaurants. * we need a system of ubers up and down cadillac - we could then get rid of the reservation system - I DON'T THINK RESERVATIONS WILL WORK WELL. |
| parking - lake large parking lots outside town and run shuttle buses into town. |
| Parking - need free resident parking/parking garage paid |
| Parking - not enough. Perhaps a parking garage or two would help. |
| parking & in-town traffic |
| parking (lack of); congestion downtown; tourism oriented businesses vs focused on year round residents; high prices of restaurants; lack of affordable housing because of expansion of short term rentals for tourists |
| parking (not enough); overall too many cars in season |
| parking ??? Town and overall congestion. Overall it is an economic benefit to our town though |
| Parking and arrangements for large buses are not adequate. Not enough taxis available. |
| Parking and congestion |
| Parking and congestion (car and foot). |
| Parking and cruise ship impact |
| Parking and growing opportunities for engagement |
| Parking and higher taxes for residents who live here year-round. How to help residents be able to park for free like they used to, so we don't feel like we're living in a large city. |
| Parking and infrastructure does not support the hoardes of people. |
| Parking and limited pedestrian walkways - terrible congestion! Tourists crossing the street where ever/whenever they want -- we've had close calls while driving downtown because of tourists doing dangerous things. |
| parking and mass transportation |
| parking and noise |
| parking and number of cars |
| Parking and overcroding, especially popular trails/trailheads |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| Parking and pedestrian disregard for motorists as well as bikers weaving in and out of traffic. RVs downtown. |
| Parking and quality shops |
| Parking and seasonal employment |
| Parking and traffic |
| parking and traffic |
| parking and traffic |
| Parking and traffic |
| parking and traffic |
| parking and traffic |
| Parking and traffic at times seems to be a bigger issue |
| parking and traffic downtown |
| Parking and traffic management |
| Parking and traffic. Too Much traffic island wide and in bar harbor in summer. It's ridiculous. |
| parking and traffic. Establish bulk parking outside of the village |
| Parking availability |
| Parking availability and costs. Access to restaurants and businesses difficult. |
| parking availability; loss of year round housing to vacation rentals |
| Parking but that is being dealt with |
| Parking congestion, cars on the island |
| Parking during the high season is near impossible for residents and employees in town. Also, the large amount of weekly rentals for the land based tourists makes it very hard for local residents to find affordable and year round living. |
| Parking facilities |
| parking for all residents of MD not just BH. For us ??????? It's a hike from ????? To town center |
| parking for employees, available seating when not eating |
| Parking for everyone |
| parking for residents and employees |
| Parking for the big RVs and traffic downtown. |
| Parking for workers, available housing for year-round residents (Air B&B), a lot of housing is bought up for seasonal workers |
| Parking garage |
| Parking garage needs |
| parking housing |
| Parking in Acadia and in-town. |
| Parking in downtown |

## Appendix B – Verbatim Responses to Open-Ended Questions

### Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| Parking in downtown and traffic flow throughout the town and park |
| Parking in general. Whether its in-town, Acadia parking lots (Sand Beach), hike pull-over parking (Cadillac south ridge). Infrastructure in general (the bridge). We would expect these land-based tourists too visit the rest of the Island, not just compete for parking in front of Geddy's. It's difficult to offer a solution that wouldn't completely redesign the town as we know it. Plus, what would that look like on the off season? |
| Parking in the downtown of Bar Harbor |
| Parking in town |
| parking in town |
| parking in town and by trailheads to ANP |
| Parking in town, should have [illegible] parking for bus pickup |
| Parking is largest problem and foot traffic flow |
| Parking is the biggest issue. The town voted yet did not approve a start to that resolution by building a parking desk.   Congestion is an issue, but an issue in all resort communities. It's all about how we handle the situation!   Cruise ships are an added benefit and bonus to the town. It allows taxes to be lower and the congestion is temporary. I feel most residents understand this |
| Parking is too limited. Need more island explorer buses, satellite parking, and shuttles. |
| Parking issues, crowding of restaurants and public spaces |
| Parking issues...sidewalk space and repairs...restrooms..air quality from ships emissions |
| Parking meters ar a challenge |
| parking meters are an eyesore. A parking facility would be a better solution |
| Parking presents a challenge-very difficult to find parking for local year-round residents.  Seems that lots of parking spaces are blocked off, saved, congested with buses/saved for buses.  And neighborhood areas/side streets (where we can park with a permit) are already used.  It's confusing and challenging.  It's difficult to do business in town, library, bank, food shopping, shore path for a walk, shopping at local businesses, etc. |
| parking problems. Too much traffic on the 3-4 main streets |
| parking remove meters |
| parking solutions |
| Parking space, failure to use designated crossing of streets. |
| Parking spaces for visitors from away and from other towns on MDI.  Otherwise, land based tourist eat in our restaurants, book local tours, and buy items from our merchants.  I feel they are worth some inconveniences. |
| Parking still seems to be an issue, though better with current plan.    Preserving a desirable town for generations to enjoy while preserving a small town feel some desire.   Uniting a town divided on the perception of tourism.  Tourism enabled me to moved to this area and allowed the opportunity for me and my family to enjoy all it has to offer. |
| parking traffic |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| parking traffic congestion |
| parking very narrow roads in and out of town |
| Parking which can be solved with a parking lot |
| Parking without meters |
| Parking! And overcrowed restaurants July, Aug, Sept. |
| Parking! Parking garage! |
| parking, access to the park for residents |
| Parking, air pollution, switching to electric vehicles, providing charging stations. |
| Parking, buses, vacation rentals |
| Parking, but its [illegible] |
| Parking, congestion for autos |
| parking, congestion in stores, on streets; residents should be prioritized |
| Parking, congestion on the Loop Road |
| Parking, congestion, pollution |
| parking, congestion, traffic |
| Parking, congestion, trash |
| Parking, congestion/overcrowding |
| Parking, crowd control |
| Parking, crowded in summer |
| Parking, crowded trails, and streets in town. |
| parking, crowding |
| parking, crowding, driving residents off island for shopping |
| Parking, crowds |
| Parking, downtown traffic congestion and resulting pollution. |
| Parking, drinking, proliferation of tourist shops selling tee shirts and nothing else |
| Parking, general infrastructure to accommodate the number of people |
| Parking, heavy foot traffic, location of ships drop off point, public transportation |
| Parking, high rents can be difficult for long term local based small businesses |
| parking, housing for seasonal employees |
| Parking, infrastructure |
| Parking, large buses |
| parking, lodging |
| Parking, maintaining covid precautions. |
| Parking, noise, pedestrian/cyclist safety |
| Parking, out of state investors buying properties to rent. |

DX323.093

TOWN05873

## Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| parking, overall crowding, tour buses blocking roads |
| parking, overcrowded |
| Parking, over-crowded roads |
| Parking, overcrowded streets |
| parking, overcrowding |
| Parking, overcrowding |
| parking, overcrowding downtown |
| Parking, overcrowding downtown, lack of affordable housing as a result |
| parking, parking meters, tourist misconduct |
| Parking, parking, parking. Locals should not pay to park anywhere. |
| Parking, pedestrian, bicycles, stroller, dogs |
| parking, providing year round tourism support and opportunities |
| Parking, public (lack of) transportation, popularity |
| Parking, public transportation |
| Parking, road conditions, traffic, long waits at stores and restaurants, crowded attractions |
| Parking, road congestion |
| parking, road congestion and carbon emissions |
| Parking, size of bus for tours, speed, scooters, segways |
| parking, small sidewalks |
| Parking, the impact of airbnb and short term rentals on our housing crisis, not having locals-based businesses for things we need |
| Parking, too many cars in town, grocery store overwhelmed |
| Parking, too many people, can't use town services. |
| Parking, too many trinket and tee shirt shops, crowds |
| Parking, too many vehicles |
| parking, tourists in streets, congestion |
| parking, traffic congestion |
| Parking, traffic congestion |
| parking, traffic control and sidewalks need repair |
| Parking, traffic control, pollution, over-crowding, consumption of the natural environment. |
| parking, traffic control, use of sidewalks and crosswalks by everyone.    Masks and social distancing |
| Parking, traffic flow, small police force and overall dated infrastructure being heavily taxed. |
| Parking, traffic in town |
| Parking, traffic, and congestion downtown. |
| parking, traffic, congestion, noise |

DX323.094

App. 398

TOWN05874

# Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| Parking, traffic, overcrowding common areas (grocery stores, etc.) |
| parking, traffic, pollution |
| Parking, traffic, speeding on Rt 3 from Hulls Cove into town |
| parking, t-shirt shops |
| parking, variety of businesses, few year round businesses and services, impacts on housing availability, congestion, housing costs, safety |
| Parking. |
| Parking. |
| Parking. |
| Parking. |
| Parking.  Need more parking out of town with bussing into town and parts of park.  Need to make it easy to get into town and spend time here. |
| Parking. Cars. Damaged trail resources. Bias towards business development and revenue generation to the exclusion of quality of life and resource protection issues. |
| Parking. Lack of affordable housing due to vacation rental stock increasing. |
| Parking. Lack of convenient public transportation. |
| parking. Overcrowded streets |
| Parking. Pressure of weekly rental on availability of year-round, affordable housing. |
| parking. Road. Traffic. |
| Parking. Set up a multi floor covered parking |
| Parking. Zoning laws that promote year round communities are lacking. All of BH is available to rent by the week inflating house prices. |
| Parking/overcrowding of ANP/out-of-state driving |
| parking/pandemic |
| Parking/Pedestrian traffic |
| Parking/traffic |
| Parking/traffic related issues; people buying properties to rent seasonally, which prices out the non wealthy from buying homes |
| Parking; Air pollution; Road damage |
| parking; housing availablility |
| Parking; Restroom facilities; Parking |
| parking; traffic and overcrowding; putting cap on # of hotel rooms |
| parking; traffic management |
| Parking-lack of workers to service demand of tourism due to lack of workers' housing. |
| Parking--need shuttles/bus from remote lots |
| Parking--pedestrian-only streets/districts |

28

## Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| Parking--will be better with more Island Explorer trips |
| parochial orientation in the presence of a national treasure |
| pay actual living wages to the service providers, which would trickle up and make housing more accessible to those of us who live and work in hancock cty. Charge the actual cost of visitors to compensate for their impact |
| Pedestrian and vehicular traffic |
| Pedestrian congestion of downtown shopping area, and bus congestion at the town pier. |
| People forget how important it is to be busy |
| People live here or move here for the quality of life! Land-based and cruise ship tourism needs to be lowered. |
| People moving, parking |
| People moving. Smaller "jitney" type vans that range the whole island--even in winter--would solve a lot of parking issues (post-Covid). |
| People that move here and want to close the bridge behind them |
| Personal agendas |
| Physical capacity of streets, sidewalks |
| Place taxpayers first - not the almighty dollars and friend |
| pollution |
| Pollution |
| Pollution and deterioration due to overcrowding |
| Pollution don't need any more tourists |
| pollution due to excessive cars |
| Pollution traffic, overcrowding |
| Pollution, GHG emissions, congestion |
| pollution, overcrowded sidewalks |
| Pollution, parking |
| Pollution, strain on resources, rise in cost |
| pollution, traffic |
| Poor. They worry more about the cruise ship passengers while the majority of our visitors are land based travelers |
| Preserving the natural beauty and quiet of the island while managing the crowds and traffic. Also balancing the amount of business that is allowed - example is t shirt shops and trinket stores. At what point can we say Stop, no more while also keeping the tax base enough for public programs and preservation policies. |
| Private rentals are now blanketing the entire town which negatively impacts the year round community and puts home prices out of range for year round families. |
| Proliferation of Airbnb is a big problem |

29

## Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| Promote locally operated tours and eliminate coach bus tours and cruise ships |
| Promote more ship visitations |
| Protecting deer and other wildlife from becoming roadkill |
| Protecting the integrity of lifestyle for those who call BH home. It's great to earn from tourism, but no one needs the resentment it seems to foster toward those who are visiting. |
| Provide more free and easily accessible shuttle bus service for people to get around the island |
| Providing affordable housing for year-round residents |
| providing more remote parking w/ shuttles to downtown |
| Public Parking |
| public transport, lack of |
| Public transportation |
| Public transportation & parking. |
| Public transportation is a very obvious issue, as is parking. |
| quality of ???? Options - access to park. Parking/roads < dining options - workers to support the system and thereby housing for the same |
| QUALITY OF LIFE. The Town of Bar Harbor has been taken from its residents with the influx of land based tourism. |
| Quality v quantity |
| Quantity and quality of the tourists & their mode of arrival |
| Quantity of people and vehicles. |
| Quantity of people visiting. I grew up here used to tourism, but the number of people has steadily increased. |
| Raising living cost |
| Read congestion; lack of parking (no garage) |
| Realizing the island has a finite capacity that cannot support more and more (in fact, it is already over capacity) |
| Really? One line? Traffic: roads cannot handle the volume structure and also geographic parameters. Parking: where do you park all of these vehicles, including RVs? Wait times for restaurants are way too long. Employees--not enough of them to work much less fill the season--where do they live? Park? |
| Recognizing that Bar Harbor is physically a very small town with a very large reputation globally as a great destination with limited resources to manage large numbers of people at a time. |
| Reduce autos of non-residents in town in high season, perhaps use of shuttle buses into Bar Harbor. |
| Reducing car and bus congestion downtown |
| Reducing number of automobiles, increasing public and shared transportation |
| Reducing the amount of tourism. |
| reducing vehicles and parking issues |
| reduction of car/bus traffic at peak times. Making downtown friendly for residents |

DX323.097

App. 401

TOWN05877

# Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| Regulate how many ships can come in one day.   Regulate the days they can visit...Monday/Tuesday/Weds   Those are what one would imagine are slow sales days for restaurants/gifts |
| remove parking meters |
| restrict cars/people, limit new hotels |
| return of the shuttle buses to reduce vehicle traffic |
| Road congestion, no parking except paid for residents, off areas for local permits especially elderly |
| Roads, sidewalks, safe bicycle riding |
| Safe and adequate traffic coordination on "cruise ship days" |
| Safely managing all the automobile traffic on narrow roads filled with pedestrians and bicyclists. I believe part of in-town should be pedestrian only. |
| Safety driving through Main St. with bus 45' and fire engine on Main St. |
| saturation too many in summer |
| Scarcity of affordable year-round housing; parking and traffic |
| Seasonal influx of cars and people. Crowding. |
| seems like it is hard for people to find a place to live |
| Severe overcrowding in the streets pollution to waterways. |
| Sheer number of people |
| sheer number of recreational vehicles (campers, SUVs)-noise, pollution, lack of parking for ordinary vehicles |
| Short season-very little impact 9-10 months of the year. It is busy only in July-August. |
| short term parking and overcrowding of restaurants |
| Short term vacation rentals ruining residential neighborhoods, creating winter ghost towns, decreasing property affordability due to property values based on rental income, using too much parking (e.g. 5 bedroom vacation rental parking 5 vehicles on the street), no year round housing available for employees to live locally leading to employers purchasing more property to then "import" seasonal foreign labor and leave the housing empty in the winter...etc. |
| Side Walk Maintenance - Run Down/ Limit number of people at port daily with cruise ships - They take over the town and don't pay to stay |
| size (small) of downtown accommodating visitors |
| slow it down. |
| So many cars and not enough places for them to park. |
| So many vehicles in town; affects parking here and in the park |
| Space |
| Space!  Key factors: parking, transportation (getting around parked tourists), schedule of public tranportation/its limits -- though routes seem abundant they have to be much more-so to be generically convenient, |

DX323.098

App. 402

TOWN05878

## Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| Space, management of people and vehicles, |
| space-RV parking spots, regular parking, road safety for pedestrians and bikers. |
| spreading of virus and tourists take over town negatively |
| Staging area for busses and other transport. |
| Stopping the needs of vehicles overwhelming the needs of pedestrians. |
| Street overcrowding |
| street parking / parking lots |
| substain ability |
| Sufficient cruise ship parking in BH; housing for summer workers in hotels, restaurants, etc.; impact on year-round rental property |
| sufficient facilities for promoted year-round tourism; congestion; increased cost of living |
| Summer overcrowding |
| summer overcrowding |
| Sustain affordable infrastructure |
| Taking over year-round rental industry |
| tax payers paying for all infrastructure |
| That there is too much focus and weight on the cruise ship industry even though their financial impact in minimal. |
| The absence of any parking structures or mass surface lots poorly supports the substantial volume of traffic generated by land-based tourism |
| The attitude of residents who want to look a gift horse in the mouth. |
| The biggest challenge is to curb greed. |
| The biggest problem for the Town regarding land-based tourism is the disconnect between the Park Service and the Town. ANP acts unilaterally on major policy decision and disregards the impacts of those decisions on the Town. The latest transportation "plan" is a good example. They have made wholesale changes to the way access will be allowed within the park with no meaningful consideration of how it would affect the town or local businesses. ANP needs to understand that their success depends upon a cooperative existence with local communities. As it is now, ANP only seeks "input" from local communities when they want to rope those communities into shouldiering a specific burden for which they do not have funding, or as much funding as they want. The Trenton "Welcome Center" has been nothing short of a disaster. A huge waste of funds, tax revenue and real estate. This, in spite of the fact that Bar Harbor as a community opposed the project and worked hard to find a solution on the island. Part of the problem is the monolithic nature of a Federal entity and part of it is the sheer arrogance of key players who work for ANP. John Kelly is at the top of that list. |
| The bus and taxi service transportation are very lacking during the high season and during pandemic times for obvious reasons |
| The buses completely take over the pier and corner of Main and West for months, which make it feel almost inaccessible to taxpayers. |

DX323.099

TOWN05879

# Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| The buses plugging up West St. |
| The buses that clog the streets and take up the town. |
| The challenges are monumental. At what point do you draw the line between the impact of tourism dollars and the detrimental impact on the community and the environment both on land and sea. I have witnessed in other ports where the desire to increase Business for the almighty dollar has destroyed the community. |
| The challenges are too many people and vehicles on a small-ish island. The cruise ships bring people and too a certain extent, they also bring more buses however, with them gone, I'm not sure that solves the problem as a whole (Too many vehicles and people.) |
| The city council bowing to a few loud voices of "not in my back yard" The fact the opinions of the townies is actually from relocators. |
| The constant focus on growing the tourism-based economy is eroding the quality of the year-round experience. |
| The destruction of the natural resources in and around the town as well as the loss of year round ability to make a living on the Island. |
| the ease of vacation rentals/increase of large hotels |
| The environmental degradation and overuse caused by cruise ships in the bay will destroy what people come to see. The economic value of tourism needs to be kept in balance with the need to protect this unique, amazing, one of a kind natural habitat/ landscape. |
| The huge influx of people, cars, buses. |
| the huge number of people |
| The inability of most councilors to understand the value of quality high net profits that end up multiplying through the town from weekly rentals. Quality over quantity |
| The increase in traffic is changing causing a loss of charm and relaxation that I used to enjoy on our trips to the harbor area. The harbor has become too crowded for docking small boats |
| The Island is only so big |
| The large hotel owners should be required to house their employees on the site of their lodging facilities. They have bought up too many homes in the downtown area- taking away housing from year-round residents. |
| The locals can't afford to live here soon. |
| The management of the total number of people. This is an island with a finite capacity. The businesses seem to drive government into thinking it is a infinite capacity. This has caused a decrease in quality of life, destroying a natural resource and making it impossible to sustain a year round living. |
| The negative feelings of a number of residents. |
| The number of tourists is increasing beyond the capacity of the town's infrastructure (parking, sewage, getting on and off the island.) It's hard for businesses to get staff, especially since the shoulder seasons are getting busier and college students aren't available. Weekends in October have been about as busy as August the last few years. |
| The numbers of tourists. |

# Appendix B – Verbatim Responses to Open-Ended Questions

**Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?**

| |
|---|
| The park should limit attendance due to overuse overcrowding ecological impact. The town just wants tourism dollars. |
| The people that do not count on its income. |
| The people that want to close the bridge now that they moved here and "discovered" our town. |
| The principal challenge is that increasing tourist traffic in town detracts from the qualities that make Bar Harbor attractive in the first place.  For example, crowding of streets and establishments diminishes the small town appeal that has drawn tourists here for generations. |
| The principal challenge is the lack of housing to operate enough businesses to accommodate the summer seasonal traffic. Take a walk along Main Street and you'll see an extraordinary amount of help wanted signs. Take a walk through the neighborhoods and all houses are empty during the week, but light up as soon as the weekend approaches. There is a disproportionate amount of lodging, in the form of weekly rentals, compared to housing. How can land based tourism or any tourism in this area really take off and grow if there is a shortage of employees, and a shortage of housing available to new businesses? It's undeniable that land based tourism, presents a huge challenge to Bar Harbor, and it's tittering on having a huge negative impact if it isn't addressed. |
| The principal challenges relate to inadequate/insufficient parking and some overcrowding. The town deserves credit for its new signage and its participation in the re-do of Rte. 3. Congestion at the town pier and Agamont Park will be addressed in comments regarding cruise ships. |
| The principle challenge is to put some meaningful limits on the number of tourists visiting the island. Overcrowding in ANP has reached the point of ridiculousness. Many of my clients complain about overcrowding in the park and of the difficulty in enjoying the many things the park has to offer due to too many visitors! I've had people tell me they arrive at a trailhead or other visitor spot only to find no place to park. Many then drive until they find parking only to discover overcrowding on the trail or at the observation point totally ruins their experience. Others complain that the much touted Explorer Bus system is of limited usefulness as bus after bus passes them by due to being full. One lady last summer told me that she waited more than an hour before a bus finall picked her up! |
| The property value has risen to high for working class to live here, and there is a serious help shortage looming. |
| The roads and sidewalks are the challenges. |
| The roads are narrow. There is limited parking |
| The scale of the Island and environmental impact should come first. Overcrowding of Bar Harbor and Acadia National Park causes the detriment of all one values and makes this place unique |
| The seasonal economy |
| The shear number of visitors every year overly taxes our natural resources. |
| The sidewalks are too narrow! Encourage people to park on side streets! |
| The Town has mistakenly operated off the assumption that more tourists should be the goal, creating a notable impact on the quality of life of residents over the last two decades. |
| The Town seems to blame everything on Cruise Ships and Vacation Rentals |
| The town, in the summer of a normal season, is so jammed with cars & buses, it is a victim of its success as a go-to spot for tourism.  It is ironic that virtually none of the souvenirs purchased are |

34

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| made locally or even in Maine.  Parking is a huge problem so I mostly visit by boat in summer, docking space is often unavailable.  It is also ironic that the wonderful experience of seeing the mountains laying on the edge of the sea can really only be appreciated from the water. |
| The Town's failure to limit vacation rentals and air B&Bs is causing an irretrievable loss of homes for year round residents. Hotels, motels, inns and traditional Bed and Breakfast are good. Vacation rentals for families who quality for homestead exemption were also good for the community. |
| the traffic from cars and people |
| The transpanted elitists--too little land for traffic |
| The volume has to be managed professionally |
| There appears to be a lack of planning infrastructure to manage the volume of land-based tourism. We live on an island with limited space. |
| There are to many large charter buses doing tours and clogging the streets and impacting traffic. It would much better and a far better experiance to encourage smaller tour operators  to give more personalized tours , which would enhance the local economy as well as relieve the congestion on the streets, which visitors both by land and by cruise ship find so frustrating during the season. |
| There are too many cruise ships. They are loud and they don't fit in here. People come to Bar Harbor and Acadia because of the natural beauty. Cruise ships are giant floating hotels- and they don't belong here. |
| There are too many people coming, they aren't making any more land. |
| There are too many people for a small place |
| There are too many vehicles. Limit the number that can cross the bridge to MDI/Bar Harbor. Congestion is negative for year-round residents. |
| There are too many weekly rentals and lodging establishments as compared to year round residents |
| There are way too many people coming here. It's a small island and no where for them to go. |
| There is no management that I can see. |
| There is no regulation to how many vehicles enter the island.  The needs of tourism are placed above the needs of residents |
| there is nothing they can do |
| There need to be limits!  Limit the size and number of cruise ships that can come in to town.  And, the number of tour buses. |
| There needs to be a better transit system. |
| There no reason to draw more visitors when the town is breaking at the seams. |
| There's not enough space for locals! |
| they are the goose who lays the golden egg |
| They do not think about the people that live here. |
| They keep blaming Cruise Ships for the people problem |
| This is a very 'high class problem' we are glad to see. We were both raised in towns that struggled because of real lack of tourism. We love seeing the town thrive and sharing it! |

DX323.102

TOWN05882

## Appendix B − Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| this year health safety because of the pandemic |
| Too any buses and cars in town |
| Too crowded |
| too crowded |
| Too crowded |
| Too crowded June through Sept. |
| Too crowded. People that are living here have no space. |
| too dependent on more is better (it's not) |
| too many ???? |
| too many at once in a small space |
| Too many beds/parking |
| too many bus tours, dangerous and overcrowded |
| Too many buses parked around pier to load cruise ship passengers. |
| Too many cars |
| too many cars , not enough housing for locals |
| Too many cars and not enough parking. Not enough public transportation. No parking garage to help get cars off the streets. |
| Too many cars around town and on the Island. |
| Too many cars for the small amount of parking.  Bicycling on streets is difficult. |
| Too many cars in the National Park. Too many people downtown. Cruises only add to the congestion. |
| too many cars in town leading to poor traffic flow |
| Too many cars in town--NEED close out of town parking |
| Too many cars on the island in the summer months |
| Too many cars, greenhouse gas emissions |
| Too many cars, lack of parking for residents in summer. |
| Too many cars, moving and parked |
| Too many cars, not enough off street parking. We need parking garages. |
| Too many cars, not enough space. Property taxes too high with no benefits to out of town resdients. Can't enjoy my own town in the summer. Traffic issues. |
| Too many cars, people, no place to park for locals at work. |
| too many cars, too many tourists |
| Too many cars. |
| Too many cars. Bring back the cog railroad up Cadillac Mt. and close it to cars and buses. People could use electric bikes if they're feeble. |
| Too many cars. Parking program helped. |

DX323.103

App. 407

TOWN05883

# Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| Too many cars. People should be making reservations not just for Cadillac and Ocean Drive, but for entrance on to MDI as a whole. |
| too many cars. The bussing is excellent but underpromoted/utilized. |
| Too many hotels (at both of our former nursing homes) B&B's and especially Air Bnb and weekly housing rentals. Loss of year round housing for rentals and seasonal employees. |
| Too many in too short of a time |
| Too many parking meters |
| Too many pedestrians! Too many cars and buses! |
| Too many people |
| Too many people |
| Too many people |
| Too many people and cans |
| Too many people and locals can't get around. |
| Too many people and traffic for such a small town.  Over-use of the facilities in summer.  Few opportunities for year-round work and health insurance. |
| too many people at certain times--want to spread them out |
| Too many people clogging up the roads (traffic), making access to places in Acadia NP more difficult, and littering. |
| too many people come here and we don't have a road infrastructure to deal with them |
| Too many people for the services available; especially the grocery store inability to walk in summer, prioritizing tourists over residents' needs. |
| Too many people for the town to handle in the volume we have grown to, parking is still an issue, affordable housing for shops/businesses to have help to serve those tourists. |
| Too many people in a place with not enough space |
| Too many people in a small town.  You invite them and pack them in like sardines.  Not enjoyable for anyone.  It is ridiculous!!!  Covid is a concern and there will be other diseases.  I don't think I should have to pay taxes for 3-4-5 months out of the year as I can't utilize the town at all. |
| too many people in cars, too much tourist development, not enough housing for people who live and work here |
| Too many people in town at once. |
| Too many people leave [illegible] overcrowded. |
| Too many people makes a bad time for everyone |
| Too many people visit during the warmer months. |
| Too many people! We can't even get anywhere near Bar Harbor in the summer. |
| too many people, cars, no manners |
| Too many people, no parking, loss of howmetown feel in tourist season. |
| too many people, over-marketed, overdoing it |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| too many people, too many cars, no reward for taxpayers |
| too many people, too many lodging establishments taking over neighborhoods, too much traffic, too many buses. |
| too many people. |
| too many people. seasonal rentals take away housing |
| Too many people/vehicles/tourists during a very short time period/months |
| Too many people; too many accommodations |
| Too many short term rentals |
| Too many short term tourists arriving on buses or driving just for a day. |
| Too many special interests at play and LUZO is non-resident friendly |
| Too many to list |
| Too many tour buses |
| Too many tour buses allowed in downtown area |
| too many touris and too much catering to the tourist |
| Too many tourists |
| Too many tourists and cars |
| Too many tourists for size of park, capacity needs to be regulated |
| Too many tourists for this small area |
| Too many tourists on one little island. |
| Too many tourists, and parking |
| too many vacation rentals |
| too many vehicles |
| too many vehicles |
| Too many vehicles and people, impossible to commute, purchase essentials during tourist season. |
| Too many vehicles on the road making it hard to function in the summer months.  Poorly maintained recreational areas such as the tennis courts and Glen Mary pool for ice skating in the winter months. |
| Too many vehicles, conversion of housing to short-term rentals. |
| Too many vehicles, too little parking, negative impact for year round residents who are forced to pay parking, etc. |
| Too many vehicles, too many people |
| Too many vehicles. Too much traffic. Too much noise. This area has finite resources and is a finite resource. Restricting the number of island visitors to a sustainable level is very important. Just go downtown during vacation season and the roads are jam packed with pollution traffic and noise. |
| Too many visitors and vehicles and not enough space or parking. |
| too many visitors for a town of this size. |

38

TOWN05885

# Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| Too many visitors so that traffic and parking issues reduce quality of life, there should be no more hotels or other [illegible] approved for occupancy. |
| Too many visitors, too many places for them to stay. Not enough places for workers to live. Stop the weekly rentals. No new lodging establishments. |
| Too many weekly rentals/not enough employee housing |
| Too many, stop advertising. |
| Too many. We are a town, not a business that exists for tourists. The usual complaints like traffic and weekly rentals, but just oo many people. |
| Too much automobile and pedestrian traffic |
| too much congestion for a small town  too many large motor coaches (Cyr buses and other tour buses)  traffic |
| too much emphasis on tourism and not enough on year-round businesses. Limited year-round housing; congestion of vehicles. Difficult to run errands; stores crowded. Expensive to live here. |
| Too much in traffic in summer in town |
| Too much priority given to tourism, decline in quality of life to year-rounders when season begins. |
| Too much relance on cars; need more bike/walk/transit |
| Too much sometimes. I have stopped going to town for shopping. Too much traffic on roads into town. New routes are helping ease congestion. |
| too much traffic |
| Too much traffic |
| too much traffic |
| Too much traffic |
| Too much traffic and not enough parking |
| Too much traffic in summer |
| Too much traffic in town/people crossing everywhere |
| Too much traffic on residential roads and smaller roads which access ANP. Poor quality of roads. Inappropriate parking to access the park when it is closed. |
| too much traffic, lack of parking at Hannafords & library |
| too much traffic, too little parking |
| Too much, too many idling buses, cars, etc. Town too small and is usually overwhelmed. |
| total number of visitors overwhelming |
| Tough to enforce all aspects effectively |
| Tour bus location and parking |
| Tour buses dominating the downtown area near the pier and Agamont Park where there is very little room to maneuver. |
| Tour buses should not be permitted downtown;  Access to water by locals or day visitors, as in loading/unloading kayaks, canoes |

## Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| Tourists exceeding capacity of town space. Humans--too many. Hotels--not enough. Access--limited everywhere. |
| Town congestion (sidewalks, restaurants), traffic, crowded hiking in Acadia |
| Town congestion, traffic management, noises at night |
| Town government trying to over-regulate. |
| Town has reached the tipping point for cars, traffic, parking, sidewalks, etc., due to proliferation of Airbnbs, Ubers, etc. |
| Town is crowded in the summer. Many stores are seasonal and don't server the year round community. Cost and availability of housing are high and limited respectively. |
| Town is too politically dominated by interests of hoteliers and to a lesser extent business owners in general to come up with & execute actual innovative, comprehensive strategies for managing existing tourist numbers, including solutions on transportation and pedestrian management (e.g. closing streets) or issues like the steady decrease in business diversification downtown.  Due both to fundamental layout and lack of infrastructure improvements, town is unprepared for handling existing tourist numbers much less annual increases, especially given huge proportion of tourists it receives vs. the rest of the island |
| Town is way too congested, traffic and people |
| Town needs to protect its image against overpopulation during tourist season. |
| Town was not built for big buses or to accommodate thousands of people from cruise ships. Makes it unpleasant for residents to come into town. |
| traffic |
| Traffic |
| traffic |
| Traffic |
| traffic |
| traffic |
| traffic |
| Traffic |
| traffic |
| traffic |
| traffic |
| Traffic |
| traffic |
| traffic |
| traffic |
| Traffic |
| traffic |

DX323.107

TOWN05887

## Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| traffic |
| Traffic |
| Traffic |
| traffic |
| Traffic |
| Traffic |
| Traffic |
| Traffic |
| Traffic |
| Traffic |
| traffic - lack of off-island parking and mass transportation - bus traffic downtown / harbor |
| Traffic - need more island explorer buses |
| Traffic - parking |
| traffic - parking - environment |
| traffic (congestion on roads and limited parking) |
| Traffic (duh), parking, balancing life quality with revenue |
| Traffic and affordable housing |
| traffic and congestion |
| traffic and hooliganism |
| Traffic and number of people |
| Traffic and overcrowding threaten to overshadow the beauty of the park and the island. |
| traffic and parking |
| traffic and parking |
| traffic and parking |
| traffic and parking |
| traffic and parking |
| Traffic and parking |
| traffic and parking |
| Traffic and parking |
| Traffic and parking |
| Traffic and parking |
| Traffic and parking are a major issue during the tourism season. All the cars make it difficult for locals to get to and from work and all the cars detract from the beauty of the town and park |
| Traffic and parking are the biggest issues. Downtown renters who don't have parking with their housing really get short-changed. |

DX323.108

App. 412                TOWN05888

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| Traffic and parking are the overwhelming problems. |
| traffic and parking car congestion, overcrowding |
| Traffic and parking during summer months. Air pollution due to excessive vehicular traffic i including landing crafts from cruise boats in harbor area. |
| Traffic and parking during tourist season. |
| Traffic and parking in town. |
| Traffic and parking issuse |
| Traffic and parking management |
| traffic and parking problems |
| traffic and parking, obeying traffic laws |
| Traffic and parking, retail businesses catering to items desired by tourists like t-shirts. |
| Traffic and parking. |
| Traffic and parking. I stay out of downtown during tourist season. |
| Traffic and pedestrian issues |
| traffic congestion |
| Traffic congestion |
| traffic congestion |
| Traffic congestion   Many of the hotels/motels  are overpriced   Park traffic   the town lacks certain types of stores, thus adding to traffic to and from Ellsworth -- for example, the technology store (was it Arnold's) where you could purchase items for your computer, audio-visual, etc. /  There is also a need for access on the weekends to services needed to operate a business -- for example, First Express closes early on Saturdays, and is not open on Sundays.    Getting back to the traffic issue in town -- I'm wondering if the town could build an UNDERGROUND parking lot (I have no idea if that is technically even possible) --- or ... even a parking lot on Main Street (in the direction of the hospital -- inset from the street), and architecturally creative |
| Traffic congestion #1 |
| Traffic congestion and parking; seasonal employee housing |
| Traffic congestion downtown, parking rates for property owners is high, parking difficult overall |
| Traffic congestion on Main St |
| Traffic congestion on the major roads throughout the island and the concentration of people on the sidewalks in the Village of Bar Harbor. |
| traffic congestion, both vehicle and foot |
| Traffic congestion, not enough parking, housing for summer workers, housing for all year-round residents |
| traffic congestion, overcrowding |
| Traffic congestion, parking |
| traffic congestion, parking |

42

## Appendix B – Verbatim Responses to Open-Ended Questions

### Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| Traffic congestion, parking, as Bar Harbor builds "up" and without providing parking spaces in and around buildings, this will become a problem. One possible future work-around is a smart vehicle garage/charging center where an autonomous vehicle could go while the owner/renter sleeps, hikes or shops. |
| Traffic congestion, parking, impact on seasonal and year round rental opportunities for workforce due to rental properties solely being used for weekly rentals. |
| Traffic congestion, roadways, and parking |
| traffic congestion, sidewalks aren't big enough, need more bike lanes/wide road shoulders |
| Traffic congestion, unsafe walking with so many buses and vehicles. We invite toursits to come and don't give them a place to park! We lose our small-town feeling when we become overrun with cars and buses. Dangerous for bikes. |
| traffic congestion, year-round prices increase in the summer |
| traffic congestion/parking |
| traffic congestion/pollution/ people congestion in towns and potential deterioration of trails in area |
| traffic congestion; parking |
| Traffic control and parking, shopping access when inundated by millions |
| traffic control, congestion, safety, accessibility to pier and center of town |
| traffic control, parking |
| Traffic control.   Provide convenient free parking for seasonal and year round residents. |
| Traffic flow |
| traffic flow |
| Traffic flow and management (spreading people out)  Seasonality (high density in summer v. low density in winter) |
| Traffic flow and parking |
| traffic flow and parking (adequate amount) |
| Traffic flow management |
| Traffic flow. |
| Traffic flow.  Ability to attract enough work force to service visitors and residents. |
| traffic from cars. Parking both in town & in the park. |
| Traffic in ANP |
| Traffic in Bar Harbor and the park.  And related, all those cars lead to parking issues. |
| traffic in town and in the park |
| Traffic in town should be one way. |
| traffic is the major problem |
| Traffic issues |
| Traffic issues during peak season. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| traffic issues, parking, having to make [illegible] for Cadillac Mt. |
| Traffic management |
| Traffic management |
| traffic management, parking |
| Traffic Management.  Congestion in downtown area. |
| Traffic management. Need public transport that works and off-island parking. |
| traffic management: build parking garage on town land in the back yard (behind blgs on main and west). A little pkg ferry terminal site with water taxi to downtown. |
| Traffic mostly |
| Traffic on island |
| Traffic patterns parking in Bar Harbor during the summer is difficult. |
| Traffic pollution and congestion and noise. |
| traffic problems |
| traffic vehicle |
| traffic volume |
| traffic! |
| Traffic!! |
| traffic, |
| traffic, congestion car and bus |
| traffic, congestion in town and the park |
| Traffic, congestion, environmental impact - outweighed by positives |
| Traffic, congestion, pollution |
| traffic, crowding of streets, grocery store and park |
| Traffic, crowds, housing |
| Traffic, disregard for environment |
| traffic, emissions, crowded, parking |
| Traffic, environment, infrastructure |
| Traffic, intensity of use of the surrounding natural resources, impacts from spike in population during high season |
| Traffic, lack of parking |
| Traffic, overcrowding |
| Traffic, overcrowding, lack of year round housing |
| Traffic, parking |
| Traffic, parking |
| Traffic, parking |

44

# Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| traffic, parking |
| Traffic, parking |
| traffic, parking |
| traffic, parking |
| Traffic, parking |
| traffic, parking |
| traffic, parking |
| Traffic, parking |
| traffic, parking |
| traffic, parking downtown, crowds downtown and in park |
| Traffic, parking issues |
| Traffic, parking, and seasonality of business |
| Traffic, parking, both in and out of Acadia; access, environmental impact |
| traffic, parking, congestion downtown |
| traffic, parking, control of number of visitors at a time |
| Traffic, Parking, just too many people all at the same time who want to see Acadia, etc... |
| traffic, parking, overcrowded! |
| traffic, parking, pedestrian traffic |
| Traffic, parking, pollution |
| traffic, parking, population |
| traffic, parking, too many people, too busy, pollution, trash |
| Traffic, parking, travelers being cognizant that there are people who live here FT so noise level after 10pm, garbage on roads and front lawns |
| Traffic, Parking. The constantly blinking parking meters are an eye sore |
| Traffic, parking-I avoid coming into BH during the summer. |
| Traffic, pedestrian congestion in Town, unsafe walking downtown, parking spaces too close to intersections, sight at intersections are unsafe, street not bicycle friendly, new national park access plans are not considerate of working residents |
| Traffic, pedestrians hwo don't know how to stop; look both ways before crossing street |
| traffic, town too commercial (Seasonal), cheap imports |
| Traffic. Crowding. |
| Traffic. Lack of ease in both shopping and eating when I visit Bar Harbor |
| traffic. We had a traffic light in the 1950s |
| Traffic/car congestion and large bus tours instead need for robust public transportation around MDI, preferably non-polluting electric vehicles, but far superior for town than cruise ships. |
| Traffic/parking |

DX323.112

TOWN05892

# Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| traffic/parking |
| Traffic/parking |
| traffic/pedestrian control |
| traffic; parking; litter; lack of affordable year-round housing |
| traffic--both vehicles and pedestrians/large vehicles (busses, trollies on narrow streets/too few traffic lights which makes for dangerous intersections and difficulty turning |
| traffic--too many vehicles in the summer |
| traffic-walking and driving-crowds, parking, rowdy parties |
| Transportation - need to get more cars off the road |
| Transportation, overcrowded |
| Understanding of the economics, including the taxes charged to local residents. |
| Vacation rentals |
| vacation rentals |
| Vacation rentals are pushing year round residents out of the town, there seems to be no authority enforcing any vacation rental regulations.    The infrastructure in this town is designed for what appears to be 1/5th of the actual number of vacationers. May as well make walking only areas instead of feeling like we are driving through a mine field every day going to work, people walking in the middle of the road suddenly and taking photos from the middle of the street. |
| Vacation rentals used to accommodate land-based tourists are eroding our affordable housing and workforce, while also contributing to a higher number of tourists each year. You can't build a lodging business in a residential neighborhood but you allow hundreds of houses to be run as transient accommodations. You also take a blind to all of the illegal rentals that rent for less than required minimum number of nights. |
| vacation rentals versus year-round affordable housing and vehicular traffic |
| Vacation Rentals were not regulated from the start.  Now there is to much pressure on to little supply |
| Vehicle and crowd management; housing costs |
| Vehicle congestion on the island |
| Vehicle congestion, parking, impacts on available housing (i.e., houses being used as seasonal hotels) |
| Vehicle traffic congestion, pedestrian foot traffic congestion, and crowds detract from the positive experience of both locals and visitors. |
| Vehicle traffic in-town is crazy! Accessing basic needs-medical, pharmacy, grocery, banking, etc. is deeply stressful due to over-inundation. Environmental impacts are very concerning. |
| Vehicle traffic on Mt. Desert St., Main St., Cottage St. |
| Vehicles - parking/traffic, etc. |
| Vehicles. It would be good to have more public transportation. |
| Very crowded during tourist season |
| Volume |

DX323.113

TOWN05893

# Appendix B – Verbatim Responses to Open-Ended Questions

Q6: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism?

| |
|---|
| volume of tourism, traffic, inconvenience for locals |
| Volume of visitors continuing to increase places stress on the island. |
| VRBO, air BNB policies and housing |
| Way too many people driving on island--rental of private homes. |
| way too many tourists at once |
| We don't go to town 6/1 to 10/31; overcrowded, no parking, traffic jams. 3/4 of island is an Airbnb |
| we don't have enough parking or adequate roads for the volume of traffic. The town is overwhelmed |
| we don't provide adequate parking or alternative transportation to move them from place to place |
| We have created a monster by allowing unregulated growth on our small piece of paradise and in doing so we have sacrificed the viability of our  year round community.  Big hotels, a run-away and largely unchecked rental market, inadequate parking , a far too zealous Chamber of Commerce ... all have contributed to the overcrowding and commercialization that has so negatively impacted our area in the last decades. We met, but did not acknowledge that we met our tipping point years ago; bigger is not always better, more is often less.   The largest challenge this community faces is to confront and answer this question: Does Bar Harbor want to work to ensure that it survives as a year round community of residents who provide essential services to the town, who can afford to live here, bring up their children here, retire here? And if so, what are we going to do about it?  We need to work to make this happen. |
| We have exceeded the carrying capcity of MDI. |
| We have no housing for our workers. Tourists are overpopulating our small space. |
| we keep blaming Cruise ships |
| We lack infrastrucutre (parking/roads/lodging) |
| We manage people and traffic very poorly,   Our streets and sidewalks were designed for horse and buggies and the traffic we got in the 1800's,  The issue of congestion has less to do with the amount of people, than the fact that we have poor infrastructure to handle the people,   Redoing Cottage Street and Main Street per the Cottage/Main St Streetscape designs from LA-RK studios would go a long way towards solving the problem of land based tourist congestion as well as sea based. |
| we need a better transportation model - too many cars here but there is really no other way for families to reasonably visit |
| We need more public transportation and less cars, buses etc. |
| We need the streetscapes completely overhauled. |
| We need to be aware that this little island can only fit a certain number of people at one time. At this time, land based tourism is not being "managed," it is being encouraged to grow by the various regional chambers of commerce. This is a problem, we can't keep offering more and more space and resources we don't have. |
| Weekly rentals, overcrowding and traffic congestion |
| weekly rentals, parking |

DX323.114

App. 418          TOWN05894

| |
|---|
| We're too accommodating. Island explorers should move to and ANP instead of village green and we need a pier for cruise ships and a peroper place for the tour buses to pickup cruise ship passengers and it shoul dnot be at the expense of the town. |
| When cruise ships are in port, particularly in September and October, there are too many people in town. There is a flood of people and we avoid going to Bar Harbor "in season". |
| where to land boats - bar harbor should collect funds/person |
| Without land-based tourism, there is no Bar Harbor |
| Workforce/housing/congestion |
| year round residents resenting it |
| yes |
| you have ruined a nice town with too many tourists. Attracts too many people, as no local housing. So no year round community |
| You need to make day tourists use the bus terminal. |
| you simply can't control it, you can't close the bridge, you can't prevent a hotel from building, you can try to regulate vacation rentals but you'll get sued again and probably lose |
| zero parking in zone for year round residents; overcrowding - too many available beds |

DX323.115

TOWN05895

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| -- Tourism is the mainstay of MDI's economy, but cruise ships bring in the wrong type of tourists -- too transient (i.e., short term in and out) to have significant enough commercial impact to mitigate the many downsides to the community.    -- The vast increase in the size of the ships (and # of passengers) and the number of ships per season has led to throngs of passengers packing the town leads many residents and seasonal not to want to come to town at all.  The average $ amount spent per passenger is not enough to compensate for the great decrease in the quality of community life.    -- Environmental/Ecological Impact -- Inability to effectively monitor and limit ship discharges and fuel residue, which have a large impact of the marine ecosystem including aquatic animals.  -- |
| #s of cruise ships, # of passengers |
| (1) Control of number and size of ships per day (2) Number and size of tour buses used for cruise passengers |
| * not enough ubers waiting to take tourists around for various hikes, sight-seeing, etc. we need them at the docks. |
| *Traffic congestion at pier and on West Street, as well as other areas of town.  The buses take up lots parking spaces that could be available for regular parking.  *Parking issues-not enough parking spaces available  *Access to pier, local parks, local businesses  are challenging  *Village character  *Neighborhoods  *Viewing over the harbor and to the islands   *Noise pollution |
| ????? To cut back |
| [illegible] to high volume, crowding |
| 1 or 2 a week, the novelty of these has worn off. A smaller number of them. |
| 1) Better control of main harbor area 2) need for another "docing" place w/shuttle to town |
| 1. Air pollution - the smell of the ships' exhaust pollutes Shore Path walks. 2. They are an eyesore, spoiling the viewscape of the Shore.  The ships' announcements and music are loud and spoil the natural sounds of the environment we cherish.  In spite of the "reports" on water pollution, the shoreline water was the clearest ever seen.  For the first time, swimming was possible. |
| 1. amount of people clogging the streets in relation to amount of money spent a local merchants. Most residents avoid town when cruise ships are in.  2. Increase traffic due to tours Particularly Cadillac Mountain 3. the  visual view of the monstrous ships that anchor in the Bay  4. is it good environmentally for those big ships to anchor in the bay? is it harming the bay floor and what about discharges from fuel. is that doing damage? there were once a lot of mussels off the shore and they have all disappeared along Eden street. I wondered what happened. could this be the cause? be a summer resident. Now I avoid town when the cruise ships                 are in. they also cause a lot of road traffic with tours.  BH was            a more pleasant place before the cruise ships. Do we have to          have more than one each day????? |
| 1. Risks of overwhelming medical emergencies   2. Excessive crowding of streets and park  3. Huge quality of life impact on residents and businesses but little benefit to most retailers, other businesses, and taxpayers.  4. High risk but low reward except to a few tourist shops |
| 1. When the cruise ships are running they create a large pulse of very short term visitors who in turn put a large demand and impact on the town ....while creating two very different opinions on whether or not this influx of visitors is worth the negative impact they create as crowds flooding the streets, waterfont and harbor.  1. Determining how many cruise ship visitors are too many...both in a day and |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| in a season  2.where to anchor the boats....keep them out of the Bay please because no one in the Bay wants them and ever did.  3.balancing the believe that businesses need the cruise ship visitors to thrive vs getting along without the cruise ship visitors. It's not true to say that some of the businesses have a right to make their money off of the cruise ships, not if the greater good (imho) is to preserve a higher quality of life that will exist without the cruise ships |
| 3 large ships in one day is too many. Otherwise okay with them. |
| A belief that cruise ship tourism is essential to the economy of the town at the scale it currently exists. A narrowness of vision of what the economy of the town could be if cruise ship tourism was not so heavily prioritized. Cruise ship tourism and the businesses that exist to cater to cruise ship tourism are given outsized sway over the machinations of this town. The biggest challenge the town of Bar Harbor faces with managing cruise ship tourism is managing it as one aspect of this community, with all its implications throughout that community and not a stand alone idea to be catered to at all costs. |
| A constant influx of people who crowd the streets, parks, and restaurants |
| a lot fo congestion at the harbor i.e. people |
| A single bus versus many cars driving on park loop and creating more roadkill |
| A small, highly vocal set of business owners promote the cruise ship industry to the detriment of the rest of the community; also, they're huge polluters. |
| A town council that takes the business community for granted and treats the local merchants with hostility and disdain. |
| A very large number of people flooding the streets but not spending much because their room and board is already paid for on the ship! |
| A very loud group of people that don't like cruise ships.  Some of us are afraid to stand up to them. They can be very nasty |
| A) the crowds of people from the cruise ships... if three ships carrying 6,000 people come in at once that adds 18,000 people to the population of the town.  The sewage problems that must arise as well as the air pollution caused by the exhaust of the running engines, generators etc. can be clearly seen from Sorrento. |
| Ability of local business to attract enough workforce to service cruise ship visitors.  Additionally, the traffic flow of buses on West Street makes that area very congested. |
| Ability to limit the amount of cruise ships with the needs of local businesses |
| acknowledge the addiction to cruise ships by downtown merchants wqho deny impact, ignore sustainable land based tourism and are blind to the slavery below decks |
| Adds to already overcrowded town/island/park. |
| Adds to traffic pollution, congestion, and noise while balancing against income opportunities for residents. |
| affects pier traffic, sidewalks overly congested - too many tour buses or cabs used by cruise ship visitors - parking barricades |
| affects the character of the town |
| again - traffic - getting large groups to sights |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| again as my response to #6, all decisions by town officials negate what resident want they think only of money instead of trying to lower taxes, etc. residents are NOT here to subsidize tourists. |
| Again just too many people, buses don't work well for people moving because of size. Foot traffic in Bar Harbor, unmanageable, sidewalks can't absorb all the people. |
| Again, balance.  We don't need to eliminate cruise ships.  However, we can't allow visitation in this one area to grow unchecked.  Keeping passenger caps will help this balance.  Also, traffic control. West Street becomes a bottleneck when ships are in town.  Eliminating a row of parking spots or moving the transportation hub out to the ferry terminal may relieve some of this - it's not only cruise buses - it's also Oli's Trolley and other tour operators that congest West Street. |
| again, I believe sidewalk size is an issue, lack of pedestrian-only space |
| Again, space and management of crowds and vehicles |
| Again, too many of them. |
| Again, too many tourists in Town for this area |
| Again, we need and want people in town to support our local businesses. Cruise ships create less motor vehicle traffic but the large your busses are dangerous on small roads, especially park roads, and should be banned. |
| Again--one line…Greed. Too many bodies in town or the park leads to congestion which is very unpleasant. Most folks go into the park--bus congestion ruins it…especially for passenger vehicles. They don't shop in town nor do they eat at the restaurants in town. |
| aggressive opponents |
| air and water pollution, traffic congestion, wear and tear of infrastructure |
| air pollution and water disposal |
| air pollution from ships  overcrowding of the town |
| air pollution from the ships dwarfs all of the avoided vehicle emissions ... |
| Air pollution, damage to the marine ecosystem, water pollution/illegal sewage & trash dumping, in-town congestion,  infectious disease transmission  (i.e. norovirus, coronavirus), plastic litter |
| Air pollution, illegal dumping of sewage and garbage in waterways, pedestrian congestion, infectious disease transmission. |
| Air pollution, noise pollution, water pollution, overcrowded streets. |
| Air pollution, traffic congestion, pier access |
| air pollution, visual impact, town dock congestion |
| Air, water, noise pollution/lodging and unloading passengers at congested pier area |
| All of the ecological and social problems of tourism are pushed to the extreme with the extreme transience of these visitors. |
| Allow too many ships at sometime so very crowded --no benefit to hotels. Encourages junk business like t-shirts. |
| Allowing out-of-town tour buses take up all of our parking and allowing the industry dictate where their fees are spent. |
| Allowing ships exceeding the very scale of the Island to visit. And too many! |

DX323.118

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| Allowing some ships in without making it impossible for residents to access the local end of town with buses lined up and some [illegible] closed |
| allowing too many at one time / failure to give local taxpayer residents a larger share of the revenue |
| allowing too many LARGE cruise ships |
| allowing too many passengers off the boats at once which leads to overcrowding of downtown especially the pier area.   The water, noise and light pollution from the boats ruins the feel of this wonderful place and can be a navigational hazard for other boaters. |
| Allowing too many ships per day and the crowd moving up Main St. |
| Amenities for passengers in town during the day. |
| An abundance of people coming into town filling the streets and not caring about the town - some days there are two or three HUGE ships in and it gets dangerous to walk in town |
| An over run of the town when cruise ships are in and nobody wants to go to town when they are in. Buying up excursions from land base tourist who are spending more money in our town then the cruise ship tourist |
| anti-business agendas |
| as above and pollution! And ecological damage |
| As I stated prior. Loss of the town pier to tendering and bus staging. Overcrowding, an ever increasing schedule of cruise ships from year to year. Sacrificing a quality visitor experience to accommodate additional demand. Too many mixed uses, pedestrians, vehicles, buses with little evidence of active management. |
| As stated above,  our infrastructure was not designed for as many people as we serve yearly, Implementing the Cottage Street and Main St Streetscapes would alleviate many of the challenges of CS management. |
| At least land based tourists spend their money in this town, cruise ship folks clog up an already crowded town, and the majority don't come here to eat or stay or buy much coffee anything except cheap trinkets. environmental impacts are huge from cruise ships.    In my mind these are low quality tourists with a low cap on the amount of dollars they will spend compared to families coming here for a couple of nights, and they decrease the experience everyone else has by walking in zombie hordes down the street with no regards to anything around them. |
| awful for the ocean, over population in summer |
| Bad sidewalks, crowding on narrow sidewalks |
| Balance - find the right amount of ship tourism. |
| Balance between tourism and quality of life |
| Balance with regular population, few benefits for most. |
| balancing economic activity with traffic |
| Balancing negative environmental impact with financial gain by residents. |
| balancing quality of life for year round residents and seasonal workers with concerns about economic growth/stability |

TOWN05899

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| balancing the few small businesses that want cruise ships vs the impact cruise ship bring to a small town |
| Balancing the negative views of some residents with the financial and public relation benefits to the community. |
| Balancing the number of cruise ship passeners with summer season tourist cars that clog roads so shopping in downtown is almost impossible. |
| Balancing the quality of the ecology of the bay and the view shed of the area with the economic benefit of cruise ship visits. |
| ban large ships |
| Ban large tour buses. |
| Banning cruise ships from Frenchman Bay |
| Bar Harbor has not managed cruise ships at all, and they need to start. No more giant cruise ships, no more than 1 ship per day, and no more than 100 passengers. And only 3-4 days per week. |
| bar harbor is losing its identity in a negative way |
| Bar Harbor is very fortunate to have them, manage with great care. |
| Bar Harbor manages the cruise tourists way better than land based tourists. I think that having "cruise ship free" days one to two designated days (per week) would go a long way. |
| Bar Harbor needs to limit entrance of one cruise ship at a time and allow only small cruise ships. Managing the people on cruise ships and preserving the water and wild life of Frenchman Bay and Acadia are the most severe challenges. |
| Bar Harbor needs to reduce the negative impact of having too many cruise sihps and manage the behavior of debarked passengers in town. There are simply too many cruise ships. Instead of allowing any chip to port and dump passengers in Town, Bar Harbor should be a "premium" destination where only certain lines or ships are allowed to visit. |
| Because Bar Harbor is ranked so high for places to visit for cruise ships we are responsible for the pollution generated by these ships. If we are going to work to save the planet this must be considered and acted on. |
| being less reliant on cruise industry, health of Frenchman's Bay |
| better foot traffic |
| BH needs fewer visits, fewer cruise passengers, and higher-end cruises. |
| Big buses |
| big buses in village and previous answer. |
| Big cruise ships sometimes 3 of them at the same time. It gets a lot of people in town, plus the ones coming by car, plane etc. It gets to busy, which is great for the economy but a bit a hassle for the residents. |
| Bigger is not better, A balance between tourism and quality-of-life are essential. Don't let outside big business destroy Bar Harbor and Acadia National Park. Cruise ships are floating hotels that pollute air and sea. They're not oceanliners that transport. |
| Biggest challenge is anti cruise ship rhetoric |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| block pier access, large buses exceed capacity of west street, are dangerous to bicyclists and to pedestrians in crosswalks crows main street and downtown |
| Block view of harbor, blast horn at all hours, expel hordes of trinket-seekers who mob stores. |
| Blocking of pier area and Large Buses that demand right-of-way on West Street forcing other drivers to back up and yield, too aggressive and dangerous toward bicyclists and pedestrians |
| Boarding and deboarding traffic.  Too many busses and blocked off areas near the town pier. |
| Bottleneck at town pier, tour buses when biking |
| brings visitors to park, but not to shops. Pollution |
| Bus congestion, town pier access, harbor pollution |
| Bus congestion. I don't like that the way visitors see the park is by huge buses. I know there is a plan to make smaller buses, but I wish they could enjoy the park In a more active way. |
| Bus parking, people flows access to small businesses, and pier access |
| Bus tours invade/overrun park. Street congestion |
| bus traffic |
| Bus traffic - use of ferry terminal would help |
| bus traffic is a pain particularly in town due to narrow streets and both pedestrian and traffic congestion; there is also a disconnect between the cruise ships and buses full of cruise ship passengers, neither of which are perceived as environmentally friendly, and the natural beauty of the place they are visiting. (This is also a problem in the Park, where so many visitors end up in traffic jams at popular places.) |
| bus traffic, congestion by dock |
| Bus traffic, congestion downtown, pollution from ships   Just too many people dumped in town at one time |
| Buses and tourism vans on the roads and in the park.  Loading spaces for buses which disrupt the town parking dynamic. |
| buses and town pier congestion |
| Buses at the pier |
| Buses, negative effects on environment, including water |
| Buses/Environmental issues |
| Buses/transport needs to be out of town, ferry terminal? |
| business interest drives people in. it exceeds carrying capicity  business interest drives people in, exceeding carrying capacity. |
| Businesses have seized control of the process and make decisions in their own interests, ignoring the interests of residents, taxpayers, and other normal human beings.  There are too many ships on a given day making it impossible to access the downtown area by car or foot.      The Cruise Ship Committee should consider the interests of the residents in scheduling.  No more than one ship per day with some days with no ships in town.  The limit of passengers in town should be lower than currently allowed - maybe a max of 2,000 on a given day and a max of one ship per day. |

DX323.121

App. 425

TOWN05901

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| cancel culture |
| Capping daily ship arrivals |
| Cars and foot traffic are not a good combination.  Perhaps downtown areas need to be one way or pedestrian only when lots of cruise ship passengers in town. |
| Catering to the Cruise Ship demographic will kill the unique and charming character of this Bar Harbor.  Don't let it turn into another Nassau Bahamas or Charlotte Amelie in St. Thomas.   Also, Acadia NP is already at capacity with visitors and doesn't need the extra 4000 a day that show up on a cruise ship.   Acadia is beautiful but fragile.   If you let if be over run you will ruin it. |
| Certainly volume in town, but I feel that's outweighed by the positives |
| Chance of Covid |
| Changing the personality of the town in a negative way. Congestion at the pier. Character of shops in town going "down market." |
| cheapens the ambiance and charm of bar harbor/ANP |
| Cheapens tourist experience, e.g. tshirt sales. Too many people. |
| Clogging harbor waters, clogging streets by town pier, allowing too many ships in a day and all season long. |
| Clogs the streets and waterways |
| Closing town pier for cruise ship tours. |
| complete ban, concentrate on land based tourism. |
| Complexities abound, I realize. Am most concerned with the exploitative nature of the cruise industry and whether engaging/continuing with it at all is in Town's best long-range interest |
| Compromise! Have ships come every day but know what the daily capacity is! |
| Concerned with pollution to the Bay |
| Congested, too many cruise ships, too many people at one time. |
| congestion |
| congestion |
| congestion |
| Congestion |
| Congestion |
| congestion and monopolization of the pier. Pollution. |
| Congestion and traffic with buses that must be brought in to move pasengers. |
| Congestion at pier |
| congestion at the town dock, too many boats per day |
| congestion at town pier |
| congestion at town pier and Agamont Park |
| congestion at town pier and main street due to tourists and buses |

DX323.122

TOWN05902

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| congestion downtown, pedestrian traffic, influx of cruise ship toruists driving away longer term or returning visitors who would spend more money |
| congestion downtown; tacky tourism shops; shopping mentality of cruise passengers, too many buses |
| Congestion from tour buses, environmental pollution from burning heavy crude oil, disturbance of the sea floor from bow and stern thrusters used to maneuver or hold position, and legal challenges to town government from the cruise ship industry. More recent challenges include pandemic spreading of coronavirus, and we may continue to see this behavior though the industry may mandate "vaccine passports" or PCR testing to take a cruise. Also, some land based tourists have been upset at the congestion, and the industry has been suing to prevent any limits to passenger landings. |
| Congestion in downtown |
| congestion in sidewalks, businesses etc. buses congestion, narrow variety of businesses, obstruction of west street |
| congestion in town |
| Congestion in town and in the park seriously compromising  land-based tourism and the quality of life for residents |
| Congestion near tonw pier, crowded streets in town. Ships totally out of scale with harbor. |
| Congestion of streets/sidewalks with the amount of passengers |
| Congestion of the harbor is a concern, I am sure that could be mitigated |
| congestion of the town pier and impact to fisherman |
| congestion on sidewalks; too many stores that primarily cater to these visitors rather than being part of a varied small-town shopping life; concern re harbor/water management, esp. re impact on fishing and other marine uses |
| congestion on the pier |
| congestion with pedestrians and bus traffic at the town pier |
| Congestion!  Congestion of boats in the harbor, congestion of buses and people downtown and in the park! Fishermen and boaters unable to access fuel when tenders are running (because of crowding?) Residents are no longer able to enjoy town pier and views the harbor, we're often not able to go up Cadillac mountain, go on carriage rides, etc. The number of passengers from cruise ships on a single day severely stress all our resources. |
| congestion, pedestrians |
| congestion, pollution |
| congestion, the type of shops it brings to our town |
| Congestion, transportation/mobility |
| Consumes waterfront resources |
| control |
| Control of COVID-19 |
| control of increasing numbers of ships, people, tours, buses. Losing access to downtown and pier area. Not enough room for all the tourists at one time downtown |

DX323.123

TOWN05903

### Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| Control of number of people in a day |
| Control over number of allowable ships per day. |
| Control the number of cruise ships that visit daily in the fall. |
| Controlling the number and size of the cruise ships. |
| Controlling the number of cruise ships |
| Controlling the overall numbers / not allowing too many |
| controlling too many buses in downtown |
| Controlling waste dumping into Frenchman's Bay |
| convincing the town retirees that cruise passengers have just as much right to enjoy bar harbor as they do. This is not their private island. |
| Cost-benefit does not work in Bar Harbor's favor. The negative impacts (crowding downtown, negative visual impact of ship) is borne by everyone, but the benefits are narrow and only support a few businesses. Mostly, supports the cruise ship industry. I worry also about climate impacts, and the in-and-out feeling of this type of tourism. |
| costs/impact of added infrastructure needs to manage cruise ship tourist deluge on arrival    noise and emissions from ship at anchor    influx of bus traffic and conveyance vehicles dedicated to ship tourist needs |
| Covid 19 |
| covid 19: will rapidly spread virus 2021 season |
| Covid--too many people from far awayhealth care needed for too many |
| Covid--too many people from far awayhealth care needed for too many |
| Creative mapmaking for cruise ship tourists? A map of where the Village Green is. The various destinations they could manage in time allotted. Tourists never get to see the rest of the island. An Islander bus, if time permits. |
| crowd control |
| Crowd control |
| crowd control, use of island explorer, can't walk in town |
| Crowd control. West Street and the entire pier area are essentially impassable with the crowds off the ships, the lines of tour busses, and general everyday town traffic. The frustration is real. |
| crowd management and safety excursion bus congestion and management |
| Crowd management, organization of transportation to/from cruise ships and tourist sites |
| Crowd/traffic controls |
| crowded sidewalks, water and air pollution |
| Crowded sidewalks. |
| Crowded streets |
| crowded, benefits a few stores, park is overrun by buses |
| Crowding |

DX323.124

TOWN05904

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| Crowding |
| crowding |
| crowding |
| Crowding at the town pier |
| Crowding downtown, noise and air/water pollution |
| crowding in town with multiple shops and traffic congestion with pickups |
| crowding out locals and land based tourists |
| Crowding out locals and land-based tourism. |
| Crowding, degrades environment, and view. Ship noise. |
| Crowding, disregard |
| crowding, pollution from ships |
| crowds |
| crowds |
| Crowds and pollution |
| Crowds from ships are less of a problem than tourists who drive, but add to the overall negative impact. |
| Crowds in town that displace land-based tourists |
| crowds in town/buses on narrow streets |
| Crowds make the down town effectively unusable to residents, and that might be OK if the town decides it needs to cater to tourists only.  Note, though, things could be better managed from a tourist-only perspective, eg as a warning oversubscribing the town by bringing in more tourists than seatings at all the restaurants make visiting downtown a problem even for tourists.   There are solutions to this, too. |
| Crowds of people for a day in town looking for things to do. |
| Crowds on streets; too many trinket/t-shirt shops |
| Crowds outsized to available space |
| Crowds, bay pollution |
| crowds, but with less benefit. Pollution of bay |
| Crowds, pollution |
| crowds, pollution, uncertain econoimc benefit |
| Crowds. Pollution. Abundance of stores that sell tourist crap. |
| Cruise folks seem to buy ice cream then leave trash in public places. Negative ecological Impact on Frenchman Bay. Over crowded streets and roads. |
| Cruise passenger displace traditional land-based visitors, who are of greater economic benefit |
| cruise ship days are very invasive adding to crowding so I don't shop or drive |
| cruise ship industry influence on local gv't marine pollution and water access for residents |

58

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

Cruise ship people are low quality tourists. There are too many people, all at once. They ruin everyone's experience in town. They seem drugged when they get off the ship. The ships are ugly. The ships are huge. There is no access to the pier area when they are in. The tour busses that pick them up are vultures. I don't know why they bother stopping since they obviously have no clue why they are here, they could just look at Bar Harbor while floating by. They dump waste in the water NUMEROUS TIMES without meaningful consequences. The cruise ship industry is awful. There are so many better ways to make money from our waterfront, if that's the argument. Prof Todd Gabe was paid off. Those numbers seem inflated, especially the jobs (full-time jobs, especially). I can't believe the town only gets $500,000 from all those abhorrent ships, that's almost nothing. Please find a better way to use the waterfront that profits the town.

cruise ship pier

Cruise ship revenue doesn't account for 20 million/year (free and clear) to the town. There are costs associated with cruise ships. Only a few businesses make any substantial income from cruise ships and most residents gain nothing. Overcrowding and congestion on sidewalks, businesses and recreational areas; diminished quality of life for residents; increased disrespect for residents and town regulations and decreased safety; air and noise pollution from the cruise ships, tenders and tour buses. In pandemic possible spread of COVID from passengers and crew into Bar Harbor/MDI.

Cruise ship tourism does not pay its fair share to the town for infrastructure and quality of life (i.e.schools) improvements other than those that directly benefit cruise industry. Exceedingly self-serving.

Cruise ship tourism encourages seasonal business versus year round

Cruise ship tourism is excellent for our shop and we are unsure how long we could stay open if it dropped off drastically more than temporarily. I know the town becomes even more congested when large ships are here, which is the con that I see, but its needed for businesses closer to the water that down see the same Main St foot traffic.

Cruise ship tourism is good for businesses, but causes crowding on the street. Used to consider it a fun day, now concerned about health.

Cruise ship tourism is necessary but only in small quantities

Cruise ship tourism is the best managed by far of our tourism.

cruise ship tourism worked well when cruise ships were limited to 2 or 3 days a week. Then we knew which days to spend time downtown and which days to stay away. Also, they are virus incubators. People should have to get tested before allowing them to come here.

Cruise ship visits only negative impact on BH is this congestion caused when disembarking. This can be alleviated by unloading at the town's recently purchased ferry termanal. Tour bus can then depart for tours of ANP wihtout impacting traffic congestion downtown.

Cruise ship waste and impact on local environmental effect of products to manage the capacities and to power the ships

Cruise ships are horrible for the environment. They are destroying marine life and should be banned from Bar Harbor!

Cruise ships are known to take over the tourist destinations and dictate policy. Example: Key West and others.

DX323.126

App. 430

TOWN05906

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| cruise ships bring people (no cars) great for our economy, no challenges |
| Cruise ships create a huge environmental impact on the area without driving significant economic benefit |
| Cruise ships have been made out to be a disproportional scapegoat for every perceived inconvenience--stop it! Be grateful! |
| cruise ships have negative affects on all town because there are simply too many of them |
| Cruise ships negatively impact the experience for local environment, residents and overnight tourists. Limiting the number of ships to a manageable volume is essential.  We should have some good anecdotal date available after two years of no cruise ship visits to determine what that number is and how businesses fared without cruise ships. |
| cruise ships pollute our water and kill whales in our waters |
| Cruise ships tourism has limited residents' access to the waterfront. Aesthetically, cruise ships obscure a gorgeous view of Frenchman Bay. One of my greatest fears has been that the old ferry terminal would be used for cruise ships. They are an eye sore.  But most importantly, when cruise ships are in town, the shear number of people puts us over capacity, pushing residents out of town. |
| Cut back on number per day, make two tender landing points, town and ferry. |
| cut the number |
| daily visitor limit far too high. Pulse of visit????? Town; overwhelms small bus system and ????? Park |
| Damage to Frenchman Bay waters/biome. Number and size of ships allowed. |
| Days w ships- let's have weekends without ships and say yes to them m-f |
| Daytime congestion in downtown. |
| Defining and acceptable amount of cruise ship visits. The town Council reviews this information annually and does nothing but except the recommendations from the cruise ship committee. The survey would have been unnecessary if the council had fulfilled its duties and recognized the impact of the growth that has happened over the past ten years |
| Deriving much value from it. |
| Despite BH denials, passengers purchase only $10-$15 of items and/or food.  Everything is free on boat.  Passengers are rudely unaware; boats pollute in egregious amounts; large smoke screwing beast do little for view.  Block view from across bay.  Challenge the peace of small town life whereas car passengers come to escape into the environment. |
| Destruction of the local ecosystem. Overwhelming the town with too many visitors. |
| Destruction of the natural beauty of Frenchman Bay |
| Developing a policy that is fair given the negative comments. |
| Difficult but must achieve a balance. Economic boost, but slightly diminishes the experience. Unsure of long term environmental impacts. |
| Directing traffic--from buses |
| Disband cruise committee |
| Discharge wash, noise and light polution. Ships are too big, too many passengers, ruin the views. |

DX323.127

App. 431

TOWN05907

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| dishonest radicals that hate cruise ships |
| Disruption and enjoyment of downtown Bar Harbor. Pollution from all the buses, tenders and cruise ships themselves. Negative effects cruise ships have on marine life. |
| disruption of town life |
| Disrupts scenery. Crowds of people. Bus traffic. |
| Do no good in off months. |
| Do not allow dredging of bay to allow ocean liners to gain shore access |
| Dockage that heads to congestion downtown |
| Docking or mooring obstructs views for all mass influx of people--floods streets here for short stay so not invested in our town at all--trash everywhere, disrespect |
| Does not need to be eliminated but certainly controlled.  There are too many at one time and so many a year has hurt the regular tourists that eat in restaurants and stay in lodging |
| Doesn't bother me. |
| doesn't cover enough surface area in town |
| Don't know |
| don't know |
| Don't know, moved here in June 2020. |
| downtown congestion while ship is in town |
| Downtown congestion, water contamination/quality |
| Downtown gets flooded with people. With all the busses rimming the Agamont park the park lose a lot of luster.  3 ship days are a mad house. Our store seldom had ship passengers buy much, the crew did buy a reasonable amount. It seems silly but I'd rather have the passengers stay on the ship and just the crew come off. |
| Downtown is stupid during season |
| Downtown is too small for that many people |
| Downtown movement |
| Downtown overcrowding, bus congestion, business focus on cruise trinkets |
| Downtown pedestrian and traffic congestion, noise from cruise ships early in the morning wakes us up, diminishes scenes views |
| Downtown traffic |
| Dumping sewage and polluting water; crowded sidewalks/buses/stores while only limited revenue for local businesses. Reputation among locals and Mainers from across the state to avoid Bar Harbor during cruise ship season. |
| During cruise ship season, being in town is complete chaos. The pier and all streets/sidewalks are too congested. The amount of people getting off the ships is too overwhelming. I've heard locals and those visiting through land based tourism say that on cruise ship days, they avoid Bar Harbor and even Acadia at all costs. With last years pandemic and the cancelation of all cruise ships, I must say that I saw no negative impact on business. In fact, I think it was a better season without them. People were |

61

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| more likely to stay for several days instead of just coming into town for a few hours and then leaving. They had to get hotel rooms or stay at camp grounds, they went to more restaurants and shopped in town, giving more money to Bar Harbor. Without cruise ships, we saw more Mainers willing to make long weekend trips. I've never been a fan of the cruise ship industry and honestly, I think we are better off with them. |
| Ecology |
| economic loss without cruise tourism --revised property taxes ugh |
| economic versus view, pollution and overcrowding |
| Educating the public as to the income it produces for the town. |
| Effects on Frenchman Bay (pollution, air and water), effect on retail businesses that end up catering to these types of customers. |
| Eliminate cruise ships - there isn't any community anymore |
| eliminate then all together or omit the number of ships and passengers |
| Emissions and other discharges from cruise ships. |
| Ending Ocean Properties' monopoly on collecting landing fees, limiting anchorages to anchorage B, reducing the number of passengers and the size of ships which visit. |
| environmental |
| environmental |
| Environmental (air, water, fishing), overcrowding town all at once, harbor views, harbor traffic. Concerned unique shops with character will all get replaced over time by jewlery and knickknack stores that cater to cruise passengers like hwat has happened in many of the Alaska cruise ports. |
| environmental (pollution) |
| Environmental (water pollution) |
| environmental , aesthetic congestion |
| Environmental concerns |
| Environmental concerns from ship waste |
| Environmental damage to marine and land, excessive harborfront traffic and pedestrian congestion |
| Environmental damage to the harbor, too many large ships make the downtown areas unapproachable. Only a few downtown vendors profit yet everyone else pays |
| Environmental hazards of cruise ships. Quality of visitor experience to BH--too many people. |
| Environmental impact |
| environmental impact - both on the natural environment and on community. If bar harbor is branded a cruise ship destination it may even drive away cruise ship tourists. The short term gains to t-shirt tourist shops may threaten the long-term viability of the town |
| Environmental impact (negative), short-term visitors, limited economical impact (Trinket shops only, snacks only), they monopolize pier use |
| Environmental impact of cruise ships, especially gigantic ones |
| Environmental impact of ships and tourists. Annoying passengers walking around town. |

DX323.129

App. 433

TOWN05909

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| Environmental impact on bay |
| Environmental impact, changing the feel of the town, visual impact on harbor |
| Environmental impact, impact on public services, strain on the hospital |
| Environmental impact, infectious disease monitoring and control. |
| Environmental impact, poor return per visitor |
| Environmental impact, visual impairment of Frenchman Bay (they are huge and unsightly) |
| Environmental impact; maximum capacity |
| Environmental impacts of huge cruise ships much greater than being recognized. Not worth it just to be able to sell more T-shirts, magnets, and other consumer trash. |
| environmental impacts on the bay, fisheries, etc. |
| environmental inmpact, crowding management, transportation to park and points of interest. Safety of visitors and locals re:pandemic |
| environmental, aesthetic, crowds, impact on water/sewer infrastructure |
| Environmental, noise and visual pollution, air quality |
| Environmental, overcrowding |
| every day some days as many as 3 ships crowd the town. Not enjoyable |
| Except for the auto traffic, it exacerbated the problems with population spike, major issues are environmental: air pollution from the ships, water pollution from gray water discharge, etc. Some cruise ships are fine, too many and too large create problems. |
| Excessive crowd levels relative to revenue |
| Excessive crowding of pier area; congestion; large ships in harbor |
| Excessive crowds, concern r.e. pollution of bay. |
| Exclude or severely limit |
| Extreme congestion in downtown areas |
| Extremely difficult to move around and conduct business when cruise ships are in town and their customers are thronging the streets of Bar Harbor and other parts of the Island |
| facilities in BH unsuited - Harbor, land transpo, harbor views blocked - disruptive for fishermen/traps. Air polluting buses |
| false information from anti-ship activists |
| false narrative from activists |
| Far too crowded when ship(s) are in, and after they leave it looks like a tornado swooped through. |
| Far too many passenger disembarkments, downtown too crowded |
| far too many people walking the streets--2-3 ships a disaster |
| fewer ships, over a longer period |
| figure number of ships/day to keep businesses happy but not overcrowded |
| filthy, rude, tour buses clog up everything, rarely drop any money other than west st., spoil views |

DX323.130

TOWN05910

## Appendix B – Verbatim Responses to Open-Ended Questions

### Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| find a balance between those who advocate and residents quality of life. Stop following the money |
| finding a balance. Removing ships is not the answer. The anti-biz voices in this town are relentless. Pro-biz ppl are too busy working to engage in the fight |
| Finding the "sweet spot" of congestion as describes previously. |
| Finding the compromise between those fishing and the cruise ships.  And the compromise between the small town feel and the economic benefits brought by passengers. |
| Fishing gear loss; crowds |
| Flooded with more people than the town can handle who are ashore for a relatively short period of time. Fewer visitors might actually be more profitable. |
| foot and car traffic flow, reduction in diversity of businesses |
| foot traffic |
| Foot traffic congestion, harbor aesthetics, finding a balance |
| foot traffic downtown |
| foot traffic flow in town; environmental concerns |
| foot traffic in downtown BH |
| Foot traffic ins mall area / Bus traffic in park. |
| Foot traffic is ridiculous when 2-3 ships dump their passengers into town. |
| foot traffic. Logistics of navigating the village. 2020-21 spread of covid (any disease) |
| For cruise ship passengers, Bar Harbor is one stop of many, not a destination.  In my eight years operating an art gallery, I had very few 'good' days when two or more cruise ship were in. |
| Frenchman's Bay, marine life and water quality |
| frequency of ship visits causing crowd surges in town and damaging water quality in the bay. |
| Get out and look at the current water and air clarity! Allowing only clean ships--dumping sewage 3+ miles out is not acceptable; this washes up eventually. Buses with engines running waiting for passengers is noisy and pollutes the air. |
| Get them off West Street |
| Get tour bus traffic out of town. |
| Gets really crowded when the big ones come. Town feels different, like a stupid circus. |
| Getting a cross-section of opinion about ships from all residents. |
| Getting cruise ship passengers into town and the park in a timely manner |
| Getting hire port levies and more money overall from cruise ships |
| Getting more people on and off the cruise ships easily so they can spend their money in Bar Harbor |
| Getting rid of it when town gov't wants to keep it. |
| Getting the correct information to citizens and business owners |
| Getting the proponents of the cruise ship industry in Bar Harbor to recognize that the number of cruise ships allowed to visit Bar harbor is way out of scale in proportion to the size of the town and that land tourism generates enough business to the town merchants. Find a better location for cruise |

64

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| ship passengers to disembark.The town pier should not be used as a place of disembarkment for cruise ship passengers thereby closing it off to locals and land tourists. |
| Getting tourists from ship deep into commercial areas easily |
| Give up the cruise ships entirely |
| good for a small segment of downtown economy. Does not positively affect residents. No benefit for most. |
| Good for Bar Harbor |
| Greed. Too many people and too large ships. Small ships in stay over packages would be more useful financially for town. |
| Handle loading and busing better |
| harbor access, pedestrian management, access for resident |
| Harbor issues and marine health. |
| Harbor safety and aesthetics and too many people. |
| Harbor traffic |
| harm to harbor. Cruise ship tourists walk in swarms. |
| Have bus tours leave from Ferry Terminal to reduce bus congestion in town |
| have not seen a net benefit of increased ship traffic. Taxes have increased with the increased ship traffic. Costs being recovered? |
| Having cruise ship operations based downtown |
| health concerns |
| Health of coastal waters, impact on local water-based economy. |
| Health of the bay - water pollution and air pollution. Also, spread of covid. |
| high denisty congestion downtown |
| Hoarders of folks who don't stay overnight or use many restaurants or other facilities. |
| Hoards of people who don't contribute other than to tshirt shops |
| Holding back the negativity on the industry when so many benefit from the cruise ship tourism. |
| Hordes arrive at one time - often from two or three ships!  They provide little income to merchants other than T-shirts and refrigerator magnets.  Rarely spend on meals (all included with cruise ticket).  Costly clean-ups of public spaces and public bathrooms.  Highly notorious for air and water pollution.  Does Bar Harbor need the cruise ship fee that badly?  Will it regret its greed?  Or will it blame some other entity - but not itself? |
| Horrible excess of extremely short term tourists who've degraded the quality of life on essentially every dimension. |
| How do we ban them until they stop polluting our air and water |
| How eroded the types of businesses that can survive in Bar Harbor. Too many tee shirt shops and few clothing stores. |
| how it drives business downtown. In the 10 years I've lived here, I've watched a unique town turn into t-shirt shops |

65

DX323.132

TOWN05912

## Appendix B – Verbatim Responses to Open-Ended Questions

### Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| how many and when |
| How to accommodate thousands of people pouring off the boats. |
| How to convice business owners we don't need cruise ships. |
| How to fit a 3 pound salami in a 1 pound bag |
| How to lower cruise ship visitations |
| How to mitigate negative impact of insane uptick of numbers |
| how to prevent them from entering our harbors and bays |
| Huge crowds are turning away other visitors, even longtime ones |
| Huge Numbers of people let lose in town at one time and devastating impact on the bay. |
| huge ships bring huge crowds into tiny downtown. Limit cruise ships to small capacity. Limit number of ships per week - one or two per week is plenty. |
| huge waves of tourists descending on the town. |
| I am a lover of cruising and see the need to limit the number of ships that come to port on a given day so that it's a great experience for both the cruisers and land based tourists. |
| I believe it needs to go. Focus on weekly rentlas, hotels and better shops. Bar Harbor has become cheap and tacky! |
| I believe the inordinate volume of cruise ship tourism has diminished the quality of retail shopping by largely catering to cheap souvenir merchandise |
| I do not suggest more and more boats as well as bigger boats.  Worried about water pollution, crowding of even more tourists in Bar harbor.  Please do not build a large pier for bigger boats!!! Huge eyesore and too many people. |
| I don't know many who want it here--except some business people. By the way, I am a business owner. |
| I don't live here when they are here |
| I don't think we need cruise ships and they degrade life here for both residents & land-based tourists. |
| I don't think we need so man cruise hsips. One a day! |
| I don't want to go into town any more (20 year seasonal resident). Too many people running into each other in town. |
| I feel it is the wrong crowd for Bar Harbor. As a business owner, I find the cruise ship passengers do not spend the money and car-based tourist. They overwhelm the streets, keeping other shoppers away. I hear repeatedly, the streets were too busy, we do not come to town on days with ships! |
| I feel like the location of which they come in to town let's them overwhelm the entire downtown area and they shut the whole waterfront down to reasonable access when they come into the harbor |
| I have to admit, I am not a fan of the cruise ships. They are an eyesore in the harbor (especially the really huge ones) and the feel of town on a cruise ship day is akin to the cheesy port stops on a Caribbean cruise, where the ports have sacrificed their character and authenticity and become caricatures of themselves. I am honestly curious how much meaningful business cruise ship visitors bring to local businesses. I know there was a lot of worry about this during the hiatus of 2020 and I wonder whether or not those businesses had a successful season without cruise ship visitors. |

DX323.133

TOWN05913

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| I realize that it (cruise ship) is very important for merchants--even if a majority of $ is taken away after closing. As an artist doing craft fairs, I was always mad. That we could not have a fair on a day a cruise ship was in. |
| I see dark plumes of emissions from these ships from Hancock Point and I know the town could make these ships use low-sulphuric fuels, but do NOT force them to. Those generators keep the engines running to produce power for thousands of people and often one can hear these generators that disturb the peace of a quiet night. Thousands of passengers and hundreds of crew members shower, use toilets, use water in several kitchens and it is treated and "gray water" is dumped into the Bay. BAR HARBOR DOES NOT OWN FRENCHMAN BAY! |
| I see virtually no benefit for most residents and massive detriment to benefit a very few downtown businesses. Overcrowding. Environmental damage to bay. Town is unuseable for residents |
| I think BH does a great job managing the tour/cruise ships. Brings revenue for downtown business without need for parking |
| I think cruise ships are a wonderful financial blessing for our town and budget and welcome them if managed. However, I strongly feel that the pier is not the palce to park buses/etc because locals are told to shop local but then boxed out of town by congestion. There should be a size and capacity limit for our small space. |
| I think it is fine the way it is now. |
| I think it's unfortunate that the cruise ships have come to be a target. They bring in so many people, who are enjoying a vacation, shopping in our town and allow for such a diverse mix of small businesses to thrive. I find the ships to be far less a problem than the folks who live here that are so outwardly negative. |
| I think our land based tourist cause more problems. I think West Street should have parking on only one side of the street. |
| I think the cruise ships lower the quality of everything. The town feels honkytonk and very trashy--just look at Belfast Maine to compare. |
| I think the needs of the t-shirt shops have been put before the needs of the residents. If I were king, I would triple cruise ship fees and see what happens. I would get rid of the self serving cruise ship committee and focus on getting fair compensation from all outside businesses including cruise ships and bus tours for what they sell, our town. |
| I think the present management is good and appropriate |
| I think the town is doing a good job.  I think they should try and bring more cruise ships in through out the summer months |
| I think visually Cruise ships destroy the beautiful views, especially on multiple ship days. I also have concerns about the floor of the bay with the gigantic anchors scraping the bottom and changing the ecosystem. We allow too many ships on given days, which creates a lot of problems on the streets of town as well as issues in the park. The number of tour busses needed to move the ship passengers around take up much needed parking spaces for those that drove to Bar Harbor. I don't think more is better in the case of Cruise ships; I think we need fewer altogether, one at a time (not everyday). |
| I would like to see all but the smallest cruise ships eliminated entirely. |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| I've watched cruise ships release thousands of passengers into central Bar Harbor over the years. I see them overwhelm the downtown without venturing out into the park or other natural attractions, and when they see them return to the ship very few (maybe one in ten) is carrying a bag from a local business. They stop, they get ice cream, maybe a quick meal (if we're lucky, lobster) and they head back to the cruise ship. I've watched it many times. They take more (disruption, resource use, degradation of quality of life) than they give back in dollars to local businesses. |
| If any, only one at a time in port. |
| if limited to 1-2 ships a day, its impact would be more positive, but it currently overwhelmed all other town expenses |
| If the majority of tendering to bus tours occurred outside of downtown it would relieve congestion and make a better experience for everyone. |
| If the town decides we either want reduced cruise ship visitation or no cruise ships, the biggest challenge will be standing up for ourselves against the cruise ship industry, and to the local business owners who are afraid the change will hurt them. Prove things will be better! |
| Ignoring xenophobes who don't like to look at boats |
| I'm happy with how the town is handling the ships |
| impact of so many people disembarking at the same time. Town infrastructure does not support this volume. Also noise and environmental impact in the bay. |
| Impact on air quality, sea life, massive influx of people in small place over short period of time. |
| Impact on environment. |
| Impact on environment. Residents (we) avoid downtown when ships are in. It feels like a zoo. |
| Impact on year round residents ability to enjoy Bar Harbor/Acadia in the summer months |
| impossible to manage they come in droves |
| In addition to land based more congestion in town. |
| In my opinion, it was always managed well. |
| In my opinion, the large vessels (anything over 100 passengers) should not be allowed. They are unsightly, negatively impact the environment, block the harbor views, and negatively impact the use of the harbor. West Avenue and lower Main Street become a gridlock mess with large busses and masses of passengers. |
| Inappropriate in this jewel of a global treasure |
| Income from ships isolated to a few businesses, not distributed across the island like land-based. Significant health concerns for the town. |
| Increase town revenue from the activity and continue to use it to improve town, Parks and Rec., etc. |
| Influx of a very large number of people all at once. Long term damage to Frenchman Bay by cruise ship pollution. |
| influx of pedestrians, overwhelming the systems - water, envitonment, sewage |
| Infrastructure inadequate to take care of the thousands of cruise ship tourists. |
| infrastructure to match market needs |

DX323.135

TOWN05915

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| Instant volume of people makes town impractible for residents. |
| intermittent congestion that is hard to plan for and results in less revenue than the traditional tourists |
| In-town congestion, long-term impacts on small businesses who do not get cruise ship patronage |
| Inundation with too many people in bursts, traffic, parking, overuse of facilities, insufficient reimbursement, pollution (air, noise, light, water), quality of life for residents (year round and seasonal) and for neighbors from surrounding communities |
| It doesn't seem Bar Harbor's space and infrastructure can accommodate the growing amount of tourism. |
| it fuels businesses and lowers our taxes but I stay out of town in summer. It's so crowded |
| It is hard for some people to see the overall benefit they bring. |
| It is has destroyed the quality of the town. Every other shop sells T-shirts'. The town gets Flooded with people that just buy T-shirts' and leave. Contributing nothing to the town. Also The huge shops are causing irreparable harm to the harbor and Marine life. |
| It is terrible for the environment, especially the beautiful Maine coast/wildlife |
| It just needs to be more organized. For instance there should be a dedicated and consistant pickup point to alleviate or minimize the congestion and confusion when the ships passengers are coming in and departing.  If hotels can have a dedicated pickup and drop off point and a traffic flow pattern i would think the town could easily setup the same thing. Thus making it easier and consistate for the operators and the vistors |
| It seemed well managed in 2019 |
| It took over pier, they don't spend much money on trinkets |
| it will destroy the harbor, put polution into frenchmans bay and impact surrounding communities due to this |
| It's cheap exploitative tourism--exploits the town/park resources without enough payback--unsustainable |
| It's good for retail business downtown but the potential danger to the waters of Frenchman Bay are concerning. Fuel leaks, exhaust pollution, and ship waste dumping could ruin Frenchman Bay for everyone and are potentially serious dangers. Ship traffic is a hazard to the fishing industry in the Bay. |
| It's the smallest part of our people that visit but gets the most attention |
| Just more people in town |
| Just stop it--too many people |
| Keep locals informed of schedule. Best leave town by 6pm |
| Keeping businesses profitable while keeping our Bay healthy and the crowds down. |
| Keeping pedestrians safe. The new sidewalks and bolards are great. |
| Keeping shore property owners happy. |
| Keeping the number of visits to a manageable number. |
| keeping the numbers at a level where they don't completely take over downtown |
| Lack of a deep water pier. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| Lack of accurate information |
| Lack of community process |
| lack of control over size and amount of ships, complete change of character of surrounding area |
| lack of diversity of businesses and business owners due to focus on catering to cruise ships; pollution from ships and charter buses |
| lack of docking facilities |
| lack of shorefront to accommodate residents and cruise ship passengers and the vehicles necessary to transport them |
| lack of spending by cruise ship passengers - they've put all vacation money into the cruise |
| land and disembark at terminal--develop transportation modems to town |
| Large amount of people coming to shore and impact the town but the people who benefit are the stores that sell trinkets and the large out of town bus fleets that cater to them... often taking up MORE parking spaces and polluting the area as they idle for hours. Cruise ships passengers don't tend to eat in the restaurants and the amount of people make it impossible to walk down the sidewalks. The density is just dangerous. Cruise ship passengers don't spend the same amount of money as land based tourisms. They also cheapen the lovely view. How many times have I looked down West street to the harbor only to see a wall of cruise ship. |
| Large crowd swells for tourist areas and restaurants, not a spread-out increase in visitors as with land-based |
| large influx of folks less inclined to spend $ at year round businesses |
| Large ships bring too many people at one time |
| Large ships.   Too many large ships. |
| large tour buses are disruptive and polluting. |
| less ships |
| Less ships |
| Less ships in the future. Town too small to have 3000-5000 dropped into. |
| let them come and enjoy the town, then the local business can expand. |
| Let's face BH is largely supported by tourism. Cruise ship visitors help downtown businesses and create little impact on the rest of the island. |
| light pollution, tour buses (especially due to size, ??) |
| limit # of passengers coming to town in one day, offer more "shuttle" options to get passengers to more areas in town "spread them out" help the pedestrian congestion on lower main St |
| Limit cruise ships to 100 passengers. |
| Limit cruise ships TO ONE PER DAY - and limit the size of the ships to under 2,000 passengers.  The crowds are insane - and the wear and tear on Acadia is shameful. |
| limit number of ships and increase the fees |
| limit number of ships and increase the fees |
| Limit the amount of cruise ships. |

## Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| Limit the number of ships to around 100/120 per season. |
| limited space at current waterfront. Negative opinions from residents, too many surveys not enough action |
| Limiting cruise ship visits |
| Limiting number and type/smaller ships are better |
| Limiting number of passengers |
| Limiting number of people that can come ashore to 5,000 a day. Also, keeping the harbor, ocian, safe for all that use it. |
| Limiting number of ships |
| Limiting number of ships and size of ships |
| Limiting number of ships per day. |
| Limiting numbers and controlling invisible environmental impact from emissions and waste |
| Limiting numbers and impact on local residents. I worked 4 seasons at the Village Green working for ANP cruise ships always a problem. |
| Limiting the number of cruise ship visitors. Limiting cruise ships to upscale ships. We don't need more retail catering to tee shirts and refrig magnets. |
| limiting the number of pedestrians with or without masks. ?????? ?? The downtown traffic |
| limiting the number of ships per day |
| Limiting toursim to avoid excessive overcrowding in Town to preserve quality of life for residents and enjoyment for tourists. |
| Logistics of moving such a concentrated influx of people off boats and out and around the town/park/MDI |
| loss of land-based tourists due to cruise ship visitors |
| Loss of town pier, mega buses, overcrowded sidewalks |
| lost of income to the town |
| lots of pedestrian crowding in a concentrated area |
| Lots of street traffic; do not believe they are big spenders supporting our businesses; opt for smaller ships |
| Maintaining a level of cruise ship visits that was experienced in 2019 |
| Maintaining an "acceptable" level of visitations. |
| Make it way smaller. Better yet, stop it entirely. |
| Make them spend money |
| Makes it too crwoded to even try to go into town when ships are in. Environmental and visual eyesore. |
| making decisions based on business-related model |
| Making everyone happy. |
| Making sure the town continues to receive fees from cruise ships |

DX323.138

App. 442          TOWN05918

## Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| Making sure they don't get tired of our canstant antagonism and leave. |
| Management of cruise ships is excellent, please don't be influenced by narrow minded residents who want to be selfish with the town.  Bar Harbor has been a tourist attraction for over a hundred years. People move here, love the town and area, and think they have the right to keep others away.  The town is unique in the country and it's beauty needs to be shared. |
| Management of extreme volume |
| Management of passengers to/from ships. Make use of ferry terminal to unload town pier area. |
| Management of the retail district to meet the demand |
| Management of the tour bus traffic and how cruise ships created a point of instability and debate |
| Managing , reducing the need for huge influx of tour buses. |
| managing greedy business owners. Folks have gotten in bed with the money cruiseships bring |
| Managing large buses |
| Managing large groups of incoming people at once. Glad the terminal is no longer directly in front of harbor |
| Managing number of people allowed per day. |
| Managing or limiting the number of ships/days that cruise ship tourism is permitted in Bar Harbor |
| managing the drop off location on West St. |
| Managing the impact of large cruise ship clients on the town/crowds without much spending |
| Managing the passengers and buses . I feel that large ships should tender to the ferry terminal . Shuttle folks into town and have the tour buses pick up passengers for excursions right at the ferry terminal . |
| managing the shear number of passengers that are on each ship. should work on a better disembarking location rather than all on west street which leads to a very clustered pier and agamont park. should also make a better attempt to spread passengers out by taking them to different locations (different streets in BH,, acadia, other sites. this will lessen the negative impact of introducing many passengers at once. |
| Managing the type of shops in town to attract land base tourist who come and stay for days, not just a few hours |
| man-made and natural infrastructure is... often  already... and will be much more... overtaxed and overcome by the arrival of more and lager cruise ships... # of tourists.... demand for clean water and fuel... even the unsightly view of huge ships that are wildly out of scale with the landscape. From Sorrento we sometimes see cruise ships that are taller than the habor's islands, thus dwarfing the islands. It's ugly. More of these kinds of ships will only make it worse. The sizes and numbers of ships, the numbers of tourists, the amounts of polluted discharge... need to be in balance with the natural world around us.... not distrust it. |
| Many the use of buses going through town and blocking the use of the pier. |
| Many townspeople vocal about dislike of cruise ships (these are the folks on committees) |
| Marring of the natural ocean landscape and horizon  Cruise ship co2 emissions and overall carbon footprint times 200 visits   Illegal Gray water discharge   Thousands more people coming ashore into |

DX323.139

App. 443

TOWN05919

## Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| an already supersaturated with tourist town  Not enough revenue and benefits to year round community to offset quality of life and environment loss |
| mass of people overwhelm the small space |
| mass transportation, moving people through out town and the island |
| Massive overcrowding when ships are docked. Also, the air and water pollution from cruise ships is unforgivable in a place that is a national treasure. I can see the cruise ship air pollution streaming over Cadillac Mountain from 5 miles away. The scientific record on the negative environmental impacts of the cruise ship industry is well documented. Please pay attention to it. Do not sacrifice the environmental well being of MDI residents and those who live all around Frenchman Bay for the short term economic gain, which is minimal compared to land based tourism. |
| Massive problems caused  for lobster fishermen on the water. Cruise ship tourists are cheap and don't tip servers or spend enough money to make their negative impact worth the space they take up. |
| max number of passengers per day |
| Maybe lower numbers but "dumps" them all in at once. Too crowded streets, buses on side roads. I avoid town because of people in the street. We lost our working pier to cruise ships. Are we a resort or a town? |
| meddlesome town council/losing revenue to bucksport |
| Merchants may want the business of cruise ship tourists, but too many tourists reduce the quality of the experience for everyone. |
| Merchants want more, residents want way less ships. |
| Misconceptions of the impact cruise passengers have on Bar Harbor  Traffic management in downtown (especially at the Town Pier)  Visual impact on Frenchman Bay  Environmental concerns |
| Misinformation about financial benefits of cruise ships; overcrowding in the town; visual pollution of landscape |
| Misinformation--lots of people on sidewalks get blamed on cruise ships |
| Moderation of impact on infrastructure, including internet demands, sewage system demands. |
| Money talks and local people suffer / TOO MANY SHIPS |
| More even scheduling of ships |
| more than 1 cruise ship daily. |
| Move to ferry terminal. |
| Moving people |
| Mt. Desert Island should be cruise ship free |
| Multiple ships per day on top of already saturated town amenities gives cruise ships bad reputation. Single ship per day max. |
| My only problem is the foghorns blasting early in the morning |
| n/a |
| narrow sidewalks |
| narrowly conceived self-interests among different parties |

DX323.140

App. 444

TOWN05920

| |
|---|
| Need for balance of the numbers of people visiting. In town, especially crowded. |
| need less days, less cruise ships |
| Need lower daily limits. Too many cruise ship passengers at one time. |
| Need more staggered arrival times. Cruise lines need to be greater participants on waterfront renewal and repair. |
| Need to decrease number of ships daily and season total. |
| Need to keep them out of here! |
| Need to limit the number of boats - and pole businesses to find out which are the best in terms of supporting businesses through sales etc. |
| Needs to be limited |
| Needs to reduce size of ships and limit number of days that they can visit. Need to utilize Ferry Terminal for cruise ship tour buses |
| negative financial impact on lobster fishery. Pollution. Bad return on infrastructure; commercialization and trivialization of our culture |
| Negative image, overcrowding, pollution |
| Negative voices from residents who refuse to see the financial benefits to the town, its businesses, and their own pocketbooks. |
| no access to town pier for anyone except cruise ship passengers and the bus tours. We are kicked off the pier |
| No benefit if not in business/No access to pier. |
| no challenges |
| No challenges  It was managing it very well |
| No large bus to bring cruise passengers around. |
| no large cruise ships |
| No matter what profession you are in on this Island, it is affected by tourism one way or another.  The lack of knowledge of the anti-everything people really challenges ever aspect. |
| no more than one a day |
| No more than two very large ships and one or two small shps |
| No place to put people, congestion, parking, no consideration for locals or local workers. |
| No real challenges. |
| No town this size can handle thousands of people a day |
| noise and physical polution;  inability to handle all the tourists;  limiting number and size of cruise ships allowed to dock |
| Noise and pollution from the ships threatens fragile ecosystem already being stressed by human and car traffic. |
| Noise from ships [illegible] close to shore, blockage of views from ships close to shore |
| noise pollution if you live near the shore, overcrowding in town |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| noise, congestion downtown, water and air pollution |
| None |
| None |
| none noticed |
| None really. Leave it alone. |
| none that I am aware of |
| None. I believe cruise ships are good for our economy |
| None. In the most recent cruise ship season (2019) very successful changes were made to improve foot traffic in town. |
| Not beneficial for the bulk of residents of Bar Harbor, creates many issues (pollution, crowding, etc.) |
| not enough room to walk around |
| Not having more than 2 boats ships per day in harbor. |
| Not opposed to cruise ships. It needs tight regulations and firm caps in place lower than what the town has been dealing with is a must. Managed properly it can work for everyone. The current model is not functional for town residents and land based tourism. It's a major turn off for both and is starting to show negative consequences for all but a few. |
| not paying attention, overcrowded. |
| Not structured to properly accommodate such a large volume. |
| Not sure |
| Not sure -- except for the fact that they are ugly. People come to Bar Harbor to be in NATURE, and this is completely antithetical to nature -- nothing more than a horizontal high rise apartment building. |
| Not sure how it helps the tax payers? Ones that don't own a business. |
| Not to overtake local buisnesses; it's the native sonly to keep their homes and pay high tax. |
| not understanding the need for additional revenue on the island |
| Not using town pier - use ferry terminal - to alive congestion. |
| Number allowed on land. Impact on land-based tourism |
| number and size of ships, overcrowding of streets during the day |
| number limits |
| Number of cruise ships allowed in the harbor. |
| Number of cruise ships need to be reduced overall. No more than 1 per day. Cruise ships deter land tourists. Land tourism brings in more money. Cruise ship tourists spend less at restaurants and retail shops than land tourists. |
| Number of passengers and ships. |
| number of people |
| Number of people |
| Number of people at a time, pollution, visual impact |

75

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| Number of people in town, pollution, ships too large for area. |
| number of people on the island - particularly bar harbor down town - main st |
| Number of ships per day |
| number of ships too high |
| Number of ships, passengers and crew to accommodate in such a small area. |
| number of tourists |
| Number of tourists, group land tours, and size of ships. |
| Numbers of people allowed into town for a day. |
| Numbers of people, motor coaches to drive them |
| obstruction of view?????, environmental impacts of tender constantly running and waste discharged off our shore |
| ocean and frenchman bay environmental impact and overcrowding in town |
| On land transportation |
| Only benefits a very small percentage of businesses in a small location. |
| Onslaught of huge numbers of people for a short time. |
| Opposition from people who want to reduce or eliminate cruise ship visits. |
| Oppositional older town residents that don't like change and hate the tourism business |
| Organization. Leadership. The town should hire someone who's principle job is to be on the pier organizing and directing. Right now no one appears to be in charge and it creates confusion |
| Other areas (Juneau Alaska for instance) have a group that comprises business owners, community, and other stakeholders that work together to create cruise ship regulations. Living by the whim of whoever is elected to the town council is not helpful. |
| Other dream destinations (Venice, Key West, etc.) have seen what happens when cruise ships are allowed in: unsustainably high volumes of people, with economic benefits to local people routinely outweighed by loss of quality of life and one environmental headache after another. |
| Other than the ugly ships, none. |
| our waters and air quality |
| Out of state people who have moved here that want things to be different than they are...such as no cruise ships, no visitors in general. |
| Out of town resdients don't benefit from cruise ship tourism. We pay for the infrastructure. There should be an in-town tax rate and and out-of-town tax rate. |
| Over crowded streets, impossible to walk the streets or enjoy the park, traffic gets jammed every time there is a cruise ship in town. Cruise Ship Tourists do not spend as much money as regular tourists. |
| Over crowding |
| OVER CROWDING |
| Over crowding |

DX323.143

TOWN05923

## Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| Over crowding. Ocean pollution |
| Over the 12 years we've been in business in Bar Harbor, the cruise ship visitations have gone from 86 per season, late April - Columbus Day, to close to 200 in 2019. The challenge to the Town Council is to better manage this volume by reducing the number of visits to something that will more evenly spread out the number of cruise ship visitors in a season. Suggestion: 120 visits. |
| Overall it appears to be handled well |
| Overall, cruise ship business has served BH very well. The congestion situation at the town pier can be greatly mitigated with re-direction of some tendering vessels to the ferry terminal location. Probably a reduction in the daily cruise passenger number ought to be considered. |
| Overcrowded and too consumerist |
| overcrowded downtown |
| Overcrowded in bursts; Congested waterways |
| Overcrowded sidewalks, disruptive tour buses/traffics |
| Overcrowded streets, bus traffic, visual impact |
| Over-crowded walkways |
| Overcrowded, buses parked on Maine, circus-like |
| overcrowded, sidewalk too small/narrow. From 6/1-10/31, we do all shopping in Ellsworth, we avoid town of BH. |
| overcrowding |
| overcrowding |
| overcrowding |
| overcrowding |
| Overcrowding |
| overcrowding |
| overcrowding |
| Overcrowding |
| overcrowding |
| Overcrowding |
| Overcrowding and congestion downtown, limited access to the wharf area due to too many passengers and tour bus loading, cruise ship pollution. |
| Overcrowding and congestion, diminished quality of life for residents who can't even enjoy their own town. Air and noise pollution from cruise ships, tenders and buses. Loss of parking revenue from tour buses. And in the pandemic possible spread of COVID into BH/MDI from passengers and crew. |
| overcrowding and impact on fishing industry |
| overcrowding downtown |
| overcrowding in town |

DX323.144

App. 448    TOWN05924

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| Overcrowding of certain areas (Cottage St from Rodick to Main, Main St from the Village Green to the Pier). The heinous debacle that is the Pier, both in bus traffic and parking, and in people. Environmental impact of cruise ship industry. Failure to ensure local people and businesses profit first from cruise passengers - allowing off-island tour companies and buses to "steal" passengers while locals don't see these profits. Restrictions on the use of cruise ship funds which only benefit cruise industry and fail to address the needs of locals. Balancing the need for cruise business to support local businesses in the slower shoulder seasons with poor management of numbers and traffic contributing to the opposition to the cruise ship industry in Bar Harbor. |
| Overcrowding of downtown and the Park. |
| Overcrowding of downtown areas |
| Overcrowding of downtown, proliferation of low-end ("t-shirt") shops. |
| overcrowding of people in the downtown |
| Overcrowding of restaurants, shops |
| overcrowding of sidewalks and streets. Added issues with bus tours, etc. |
| overcrowding of streets and national park sites, water and air pollution |
| Overcrowding of town on cruise ship days |
| Overcrowding of town, traffic, parking available buses take up |
| Overcrowding on Cruise Ship days, with large buses clogging our streets. Being overtaken by the strong lobby they put on our local government, and Chamber of Commerce, that's just about their interests, and not the communities. The image as a large scale Cruise Ship destination can turn both land based tourists, and people that want to live in Bar Harbor off. Too much intensity, movement of people keeping on a schedule, damage to our historic and natural view sheds. Too much is just too much ! |
| overcrowding the downtown |
| overcrowding, access to pier and harbor |
| overcrowding, air pollution |
| Overcrowding, air pollution, noise levels from loudspeakers etc, negative visual impact on scenic views. |
| Overcrowding, congestion, decreased access |
| Overcrowding, Covid-19, visually unappealing, disrupting fishing industry, harbor pollution |
| Overcrowding, cruise ships only benefit a few in the community |
| Overcrowding, especially pedestrian traffic |
| Overcrowding, excessive noise, pollution, and more visitors who do not respect the beauty of Acadia |
| Overcrowding, for example, passengers reserve all space in carriage rides, fill up Cadillac Mtn. & other ANP features, etc. |
| Overcrowding, managing bus traffic, crappy junk shops catering to ship tourists. |
| Overcrowding, noise, poor impact on scenery, pollution |

DX323.145

App. 449          TOWN05925

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| Over-crowding, over-use, environmental pollution, damage, and degradation, disrespectful personalities, smog, visually disrupts landscape |
| overcrowding, pollution |
| Overcrowding, pollution, trash, ocean polution |
| Overcrowding, too many seasonal gift shops. I also wonder where all the substantial income the town receives from cruise ships actually goes. Why are our sidewalks and roads in such awful condition? |
| overcrowding, unsightly boats day after day |
| Overcrowding. |
| overcrowding/pollution |
| Overcrowding/poor quality consumer |
| Overcrowding; busing and moving people from point A to point B |
| Overhead of infrastructure. … management of residents vs. tourists |
| Overload of people, water pollution, visual pollution |
| Overly accommodating them compared to locals and land tourists when we know they don't spend as much in town other than t-shirt shops |
| Overpopulation, trash, cleanliness of water |
| overran town and espeically Acadia Park |
| Overreliance on cruise industry/environmental disaster/too much sway do the cruise ships have |
| Overtaxed police & public safety to help control crowds, the sheer volume of people that come in if there is 1 very large ships in or a few large ships in a single day.  Waste generated by this number of people, natural resources being over taxed and the overall carbon footprint created by this form of tourism. |
| overtourism / our streets are too filled / it feels like Disney World. Makes it a terrible place for locals. Enviornmental on our air quality and the globe that we are part of. |
| Overwhelming amount of people in the town. |
| Overwhelming impact on ocean views, light pollution, low ROI for impact of short-term visitors. Potential harm to water quality. |
| overwhelming the infrastructure |
| overwhelming. Too many. BHB is a dumping ground for cruise ship industry |
| Paid, unregulated lobbyists (Eben Salvatore) in town government. |
| parking |
| Parking |
| Parking |
| parking |
| Parking because there are so many large buses that take over the regular parking spaces. |
| Parking, traffic, buses, tour vehcles, too many people in town, residents have difficulty supporting local buinesses because of the crowds |

DX323.146

TOWN05926

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| Parking, traffic, too many buses--negative impact on Acadia National Park. |
| Parking; Restroom facilities; Parking |
| pedestrian and bus traffic |
| Pedestrian congestion |
| pedestrian congestion |
| Pedestrian congestion and overall crowds in the ANP and in town. |
| Pedestrian congestion downtown, crowding out of taxpaying residents from public spaces such as the Town Pier from residents in the name of commerce, air and water pollution from cruise ships, degradation of our town's reputation as a good destination. |
| pedestrian congestion pier area, west st, and main st. |
| Pedestrian congestion, tour bus congestion downtown |
| Pedestrian downtown; Bus traffic, especially in ANP |
| Pedestrian traffic |
| pedestrian traffic jaywalkers |
| pedestrian traffic, impact on harbor views |
| People do not fully understand cruise ships and how important they are to our economy |
| People do not like to share space with people coming off the ships. Even though ships bring in big money for local business the "nonbusiness locals" do not care, they want their island. |
| People forget what it was like to see the town close up after Labor Day.  It used to be a REALLY long winter |
| People getting on buses to head to the Park and not spend time or money downtown. The number of cruise-related buses can be overwhelming, too. |
| People who are rude, entitled, too many of them. I HATE going into Bar Harbor in the summer. |
| Perception from false statements |
| Personal agendas |
| pin headed townies |
| planning. Not enough was done initially. Growth is way beyond what most residents ever envisioned. We need to cut back. |
| Please don't allow so many cruise ships |
| political controversy / pier congestion |
| Pollution |
| Pollution |
| pollution |
| pollution |
| Pollution |
| pollution |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| pollution - air and water. Days of severe overcrowding. People of bar harbor losing control of our destiny and too much overt capitalism. |
| Pollution  Huge influx of tourists that the town and park just can't handle well.   Strained use of the dock |
| Pollution  Poor quality of tourists  Eyesores |
| Pollution / pedestrian crowding / bus traffic / spoil the view |
| pollution and congestion |
| Pollution and environmental risks for the harbor and bay. |
| Pollution and ivercrowding |
| Pollution both land and water. Too much seasonal t-shirt shops and bad food. Congested streets. Lack of knowledge and respect for MDI. |
| Pollution for the diesel fuel and aesthetics. There needs to be a balance on volume as well. |
| Pollution from ships and buses |
| Pollution from ships, crowding |
| pollution from ships/more traffic/overcrowding |
| Pollution in bay, garbage, over-crowdedness |
| Pollution in Bay; Too many buses and pedestrians; Congestion at pier |
| Pollution in Frenchman's Bay, pedestrian traffic |
| pollution in our waters, causing hardships for the local fishermen. Too many people |
| Pollution in the bay, interference with fishing. |
| Pollution of air and possibly water - locals stay away from town in summer |
| Pollution of air and water.  Overcrowding downtown such that it causes safety issues and reduces overall enjoyment by all. |
| Pollution of Frenchman Bay as well as air, light and noise pollution |
| Pollution of ocean, does not realistically support businesses |
| Pollution of our harbor |
| pollution of our waters |
| pollution of our waters/crowding/proliferation of cheap shops and goods |
| Pollution of the harbor, floods of people coming/going |
| Pollution of the waters offshore and pulses of congestion that tie up road resources (and the huge buses are a nuisance) |
| Pollution of water and air; perceived [illegible] for t-shirts and mementos (kitsch!) |
| pollution of water, crowded sidewalks, noise (???) |
| pollution overcrowding money Only goes to cruise company and partners |
| Pollution!  Cruise ships are problematic because of the environmental issues. This has been studied and documented and ranges from the heavy use of fossil fuels, disposal of sewage, trash, and fuel |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| directly into the ocean, etc.   They also destroy the beauty of the harbor.   The problems mount with the increase in the number of cruise ships visiting, as well as the increased size of many. |
| Pollution! Water quality in jeopardy. |
| Pollution, Congestion on pier |
| pollution, congestion, reputation |
| pollution, crowds |
| pollution, crowds who don't support local business |
| Pollution, GHG emissions, congestion |
| Pollution, landscape/views impact |
| Pollution, large buses |
| Pollution, overcrowding |
| pollution, overcrowding diesel buses |
| pollution, overcrowding of town |
| Pollution, pollution, over-crowding, crowd control, congestion in main town area, transient environment feel, pressure on the local resources. |
| Pollution, pollution, pollution. |
| Pollution, too much crowding, add little to the town |
| pollution, unsightly view of huge ships, crowding when large numbers come to town. |
| Pollution--air/sea. Too many tourists for a small area. |
| Pollutiopn  Congestion at Town Pier  Congestion in town  Quality of businesses in town is low for local needs (it's mostly souvenir shops) |
| Port and trash that come with the crude ship passengers- we must do better with this.   The congestion is temporary! We must be more cruise ship friendly! |
| positives for anyone beyond special shops/co. unknown! Limited appeal beyond trinket shops - tours - etc. we have a lot of ships - yet still people get so mad if you say we have enough |
| PR-Bar Harbor has a well-known widely-regarded opinion with locals, land-based tourists (specifically Maine-based tourists) as being a "cruise ship town" and people love talking about how they avoid Bar Harbor like it's the "smart" thing to do. Especially how "it's gotten worse over the years." |
| Presenting a fact-based plan/recommendation to the citizens. |
| Preservation of local businesses and local ownership |
| Preserving the mild and scenic beauty of the harbor |
| Prevent pollution at bay and waters, limiting number of ships per week and passenger capacity limiting |
| Preventing congestion, pollution, and commotion caused by presence of big ships in harbor and swarms of ship's passengers coming into town. |
| prevention against inundation by people  environmental pollution  risks of cataclysm (protective vehicular access extremely limited) |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| Prevention of covid |
| Prices. Lack of jobs and ability to own homes for people who wish to have jobs out side of seasonal industries |
| privileging small # of businesses over residents |
| protecting environment and quality of life |
| protecting our waters/overcrowding |
| public bathrooms - sidewalk space - cleanliness |
| Public opinion and false information |
| Public perception that downtown is overcrowded on cruise ship days. Public perception that cruise ships are environmentally damaging. I'd like to see a study comparing the environmental impact of a tourist coming here on a 5,000 passenger ship vs. the impact of a tourist arriving by car from NYC. Sure, ships have emissions, but are they greater than the emissions of 2,500 cars? Data would help. |
| Pushes all local residents out of town, should have access to buses out of main town area |
| putting a cap on number of ships per year that is sustainable to quality of life |
| Putting limits on the number of cruise ships each year. |
| putting strain on sewer/water system; too many ships which seem to increase every year - overcrowding town |
| putting the needs of full time residents ahead of the economic interests of a few shop keepers |
| Quality of life goes from bad to worse with the influx of ships. |
| Quantity control |
| Re Covid: must wear masks. Walk on crosswalks. Pay attention. |
| Receiving sufficient revenue/visitors to justify the daily adverse impact. |
| Reduce congestion of streets and roadways. Overtourism is not a pleasant experience. Too many pedestrians. |
| Reducing congestion of tourists and pollution by ships |
| reducing it to manageable size |
| regret to pollution |
| Regulate what days they can visit.   Three days seems sufficient for a trial period. |
| Reigning it in and fazing it out. |
| Remember that Bar Harbor/MDI exists because of the park, nto the cruise ship influx. |
| Remove them from the town pier |
| resident resistance |
| Residents get no return on investment. It all goes to business owners or back into perpetuating the monster. Residents only get their lives disrupted. |
| Restrooms |
| Retired rich people who think they have a clue about what working class people go through to live here |

DX323.150

App. 454

TOWN05930

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| revenues are great. Think of other ways to raise revenues |
| ruining it for everyone else - locals and vacationers |
| ruins the quaintness of a small village/overcrowded streets and parks |
| Ruins the view. Crowds the town with people there for a few hours only...they overwhelm the sights. We should cater to people who stay at our motels and homes and spend money day after day...we want them to come back. Many complain about the cruise ship hordes overwhelming everything...we are trading off stop by visitors and tshirt buyers and alienating the people who really make the general economy (restaurants, bars, motels, B&B etc) really work. |
| ruins view, no diversity in tourists, upsetting to sea life, too much pollution |
| same as #6 x10 |
| same as 6 |
| Same as above. Unload cruise ships at ferry terminal and have buses waiting there for them. We spend a lot of money managing and accommodating them. |
| Same as above; Large vessels especially. Boutique ships preferred. |
| same as above-balancing business needs with needs of residents who want to feel like they can still go places on the island, without being over run by tourists |
| Same as for land management however cruise ships are much worse!!!!!!!!!!!  They have completely destroyed Bar Harbor!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!! |
| Same. Excessive densitive in town. Number of ships needs to be strictly limited. |
| Same. I understand our economy depends on tourists, but the crowds are awful. |
| scapegoated for other problems |
| Scheduling and most efficient spreading of people to town areas. |
| see #6 |
| see #6 above |
| see previous answer |
| Seeing two or three large ships in the harbor is daunting, not to mention the crowds of people and now large tour buses. If allowing ships, why not one at a time with a small number of passengers? Please, no more Queen Mary's or Queen Elizabeth's (can't recall which it was) dwarfing the whole town. |
| Sheer crush of passengers disembarked at the same time when multiple large ships are anchored at once |
| sheer number of people and ugly ships in the harbor |
| Ship environmental impact, congestion, massive size and number of ships |
| ship mooring location and passenger landings and transfer |
| ships - too many. Pollutes the air, stirs up the ocean, noisy. Too many people - crowded |
| ships ruin the view, noise, traffic, homogenization of Bar Harbor retail offerings, ships much too big, cruise ship passengers dominate pier and downtown, and prevent others, especially fishermen from using the area.  Ships are helping to destroy seasonal and year-round communities. |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| Ships should reduce off-load at ferry terminal not town pier, that would reduce congestion. |
| Short term greed over quality of life. |
| shouldn't be multiple ships in one day/restrict size of vessels |
| sidewalk congestion, pier congestion, bus traffic, pulses of visitors |
| sidewalk traffic, spending on low-end food and souvenirs |
| Similar to land based tourism.  We have to manage over-all numbers and congestion. |
| Size of cruise ships should be reduced.   If size was addressed, the ships could dock at the ferry terminal and reduce congestion in town.  Too many large buses crowding the narrow streets downtown and on Cadillac. |
| Size of the ships, volume of people in town when large cruise ships are in port. |
| Size of the town, impact on the character, traffic in the harbor |
| So far they have been good. people survive off of the income they bring in the off season. |
| some are good, greed is not good |
| Some businesses profit from cruise ships. They may be comparatively few in number, but they are vocal and will fight for their turf. It will be hard to find an equitable compromise with them. |
| Some cruise ship activity is a plus, but it can also be too much.  I am worried about air pollution in an area which already has the worst air quality in the state.  We avoid Bar Harbor in the crush of the tourist season and mainly visit in off seasons. |
| Some very vocal residents and businesses see any regulation of business as personal threats. We need to tread the line between bringing those aggressively in favor of cruise ships (and lack of thoughtful regulation) and also knowing when those perspectives have been heard and it is time to move on without them. |
| Spikes in crowds and tour buses. |
| spread em out, but I realize the ships don't want to come in November and April--it's also a chicken and egg thing, open businesses versus visitors. |
| Spreading dates and number of cruise ships at any one time. |
| spreading of virus and tourists very rude and negative |
| Spreading out the ship visits so as not to have too many ships/visitors coming in all at once. |
| Spreading the wealth to businesses and local needs outside of walking distance from port. |
| stop it |
| Streets clogged with people, tourists stanidng in clumps ignoring townspeople |
| sudden flood of people, then nothing. Repeat for six long months. |
| sudden massive influxes of tourists swamping the down-town area & demanding bus service to other parts of the island.  Air pollution from idling ship diesels. Visual pollution (many of these "ships" are little more than gigantic Winnebagoes with a pointed end. They have no couth or majesty. |
| sudden surge in traffic; overcrowding; trash; pollution |
| Surge of visitors into compact time frames |

DX323.152

TOWN05932

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| surges of people, buses, contamination of frenchmand bay |
| swarming streets/sidewalk |
| Taking fees from ships to enrich the town |
| Taking the pressure off that tiny corner of town near the pier, spreading out the retail benefits of those visitors, and minimizign the trampled feeling the town has when there's a ship. |
| tendering difficulty |
| That cohort spends little or no money for hospitality, restaurants, or recreation, just ice cream, T-shirts and  nicknacks. They make it less attractive to residents, shore-based visitors, and people from around the bay. With some of the best outdoor vacation options, why does BH seem more interested in managing for quantity instead of quality when the former destroys what we've valued as a community for generations, and while the latter would maintain those cultural values without nuking them? The question isn't whether the cruise ship business is good money, it's whether the other hospitality/restaurant/recreation business has a better return that improves the livelihoods of more residents, more sustainably which, I believe they are. Why would we choose to be the Coney Island Boardwalk or Atlantic City of Maine? What's next? Casinos on shore? |
| that it exists |
| That there is no management of the cruise ship tourism beyond the day to day logistics of on and off the boats.  The town has allowed the growth of passenger counts on ships to grow 6-10% year after year since 2016.  That isn't a good thing. |
| The ability to move and distribute crowds. |
| the air pollution from the ships is poisoning you and your children- you can't see it but we can from across the bay. No industry is worth harming your air. The numbers of, and size of ships are completely out of proportion to our ecosystem and to your town. The industry will never be satisfied. Climate change is real, and these ships significantly contribute. Whale strike deaths are real and these Mega ships contribute. Those who benefit are few, and those who are harmed are many. Why would Bar Harbor want to keep doing business with a highly polluting industry which gets around US labor laws by flagging off shore? It seems right now like the cruise industry wants to manage Bar Harbor instead of the other way around. |
| The amount of people coming off the ships added to the other land based traffic. sometimes from more than one ship. |
| the amount of people downtown makes it hard to do anything in town |
| The amount of ships that come is excessive. Land based tourists and residents have stated that they avoid going into Bar Harbor in the summer due to the congestion of passengers from the ships. Some land based tourists no longer visit due to the swarms that take up the sidewalks. Too many ships, too many passengers a day. |
| The balance has shifted to max out the cruise ship traffic. |
| The balance is tricky- some businesses rely on cruise ship passengers while others don't benefit at all and see the cruise ship passengers as just taking up space that could be used by land based visitors. |

DX323.153

App. 457

TOWN05933

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| The biggest challenge is overcrowding.  The needs of the industry seem to weigh heavier and take priority over the needs of the year round residents.  Also there is a challenge in the environmental impact. |
| The biggest challenge is to get these tourists to spend more money in town. |
| The blocked views of the porcupine islands,  ships are unsightly!  The reduction or elimination of cruise ships. the ships are too large  environmental impact (black smoke from ships smoke stacks - pollution)  overcrowded sidewalks on cruise ship days- there are times I have to walk in the street making walking in town unsafe.  loss of the pier, congestion of people and buses on west street,   Cyr tour buses are oversized for our streets |
| The bus situation has gotten a lot better |
| The buses coming into town. West Street should only have parking on one side. |
| The buses for tours and closing piers off |
| The buses taking up parking the amount of tourists clogging everything.  It makes the town unbearable. |
| The buses they use can be disrespectful to walkers and bikers, especially in Town and on Cadillac Mt./Park Loop Road. |
| The challenge is that the Town leadership is not actively managing the cruise industry.  The cruise industry mostly has its way because the Town leaders are blinded by the revenues. |
| The challenge is to create a better quality of experience for all visitors. Cruise style of tourism is the wrong direction for Bar Harbor. |
| The challenge that I see is when there are 3 ships in one day. The town gets too crowded and that it is tough to enjoy a walk through town |
| The challenges are too many people in a small-ish area of streets/land.  I work in BH so have to be there but on my day off...I'm not going there.  Locals who don't have to go to BH won't.  It's a fine line of tourists and locals. |
| the cruise industry has prevented the establishment of a No Discharge Area in Frenchman Bay from Great Harbor N. to Sullivan.  Without this you are jeopardizing water quality big time.  Petition the DEP to establish a No Discharge Area.  Ocean Properties' grip on tendering and the cruise ship committee are big challenges.  The Bar Harbor budget should not be so heavily weighted on cruise ship revenues |
| The cruise ship industry brings in revenue...but at what cost? The local  economy may be benefitting, though, we must be cognizant of the various forms of pollution this industry imports. From litter to greenhouse gas emissions, Bar Harbor must choose the environment over money. |
| The cruise ship industry is a disgusting cancer. |
| The cruise ship industry is managing Bar Harbor, not the other way around. Cruise ships are environmentally unsustainable and the Town of Bar Harbor needs to stop accepting visits from cruise ships. |
| The cruise ship industry will bring a lot of air, water and overall  waste pollution to a very small and fragile ecosystem.  As a boat owner when the big ships are in town it is impossible to  find a place to moor our boat. When these big ships are in town they tower over the islands spewing smoke and are a complete eye sore.  We come to Maine to get away from this kind of thing.  The people who come |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| on these ships do very little for the economy. They may buy a tee shirt or two but all their food and drinks are pre-paid for on the ship so they don't spend a whole lot. |
| The cruise ship presence has to be greatly scaled back to small ships (100-200 passengers) or slighly larger hsips on a limited visit schdule and have Town of Bar Harbor collect landing fees, not Ocean Properties. |
| the current cancel culture |
| The current town council |
| The destruction of the natural resource of the national park. The loss of "community" which has started. The challenges of keeping year round residents, do to increasing taxes caused by the cost of infrastructure to support this industry with little to no return or benefit for the year round resident. |
| The downtonw has become more focused on the selling of tourist trinkets as opposed to meeting the needs of residents. |
| The effect of the ships on the beauty of the entire area puts long term quality tourism at risk. Bad reputation for Bar Harbor is apparent on internet searches. |
| The environmental impact of the waters and the immense swelling of crowds who don't often contribute that much to the economy |
| The environmental impacts on the bay is the first concern. The overcrowding of the park and downtown area are the second concern. If we can make arrangements for land based travel that keeps cars at bay but provides visitors with an opportunity to enjoy the park that is where I'd prefer our efforts. |
| The idiots down town didn't approve improving the pier north of the Village |
| the increase in number of passengers in Bar harbor at one time. Not enough public bathrooms, causing to many passengers attempting to access small businesses' bathrooms. that are not |
| The influx of traffic on the sidewalks, etc. |
| the infrastructure can't handle the influx of people |
| The land based tourism already fills capacity. Cruise ship is simply too much in an already filled small town through the entire month of October. |
| The large amount of pollution that is caused by cruise ships. The influx of folks who don't actually care about the town or Acadia, and how we are just another t-shirt and ice cream shop. Their litter. |
| The large ships have been out of control for a long while. I propose that if there are to be ships, they be capped in size. |
| The largest challenge is pedestrian traffic. I feel that cruise ship guests are better at reducing vehicle traffic and spend a good deal of money in the shops but they also cause traffic issues with Jay walking and being on roadways |
| The logistics of huge influxes of people coming into town throughout the season. |
| The management of the number of people allowed into the town along with the number of ships and type. |
| The mega pier idea was the elephant in the room for too long |
| The mis-information efforts from the ant ship group distracts from productive dialogue. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| the money is great for the businesses. No cars clogging island. Eye sore. Mostly concerned with impact on environment. |
| The money is spent on the boat, not in town.  When I worked at Cadillac Mountain Sports, we might get some of the cruise ship workers (typically the J1 or H2V visa workers) looking for clothing or shoes for their families to bring back home, but not the cruising customers.    Now with the pandemic, Hancock County does not have the capacity to handle a major healthcare crisis if a boat came in with a large number of sick passengers. |
| The negative impact of cruise ships on the Bar Harbor community cannot be underestimated or overstated. The environmental impact is #1. Then the mass crowds descending on the town, using resources and NOT spending a commensurate amount of money - sure they go to the tourist shops and might get some ice cream, chocolate, and a t-shirt. But they aren't making a bigger investment in the community - staying in hotels, eating in restaurants, etc. and they utilize a disproportionate amount of resources when they descend on the town and surrounding areas. Cruise ship passengers behave in an entitled way, and this contributes to a negative atmosphere in Bar Harbor when they're in town. Small ships are not too bad, but these mega ships are an eyesore, create large crowds and scare away land-based visitors. They may add $20 million in revenue, but what do they cost? What is the resource, infrastructure and environmental cost of these cruise ships? And to only collect $1 million in 2019 from the cruise fees? That's ridiculous - the fees should be 10x that to mitigate their impact |
| The negative opinions of people. |
| The negative people that want to stop cruise ships.  We need tourism to live here.  We need a happy medium but NO cruise ships is not an option just like no land tourism is not an option. |
| The number of cruise ships allowed in port. Too many tourists at a time! |
| The number of ships allowed |
| The numbers of cruise ships have been progressively increased with multiples that swamp town resources and make the town unusable for residents that may need to do business. As a result many skip town and do business elsewhere. There's only so much capacity for a small town and 180 ships planned in essentially 6 months is too much to properly handle well. |
| The numbers of passengers on the streets downtown, and the terrible fumes from the ships and the impact on fishermen and recreational boating. |
| the numbers restriction seem about right… raise price |
| The obvious cancel culture |
| The opinions of those who don't need to make a living here. |
| The over run of town with pedestrians makes it difficult to move around. |
| The people on the cruise ship committee should not be mostly comprised of the entities that benefit from them the most, therefore bringing a biased approach to the management of ships, and should be considered a conflict of interest.  Cruise ship visitation should be on the voting ballot and decided by the residents of Bar Harbor,  not the entities that benefit from them. |
| the perception that has been fabricated by anti business people. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| The principal challenge is in getting the cruise ship tourists to spend money and contribute to the economy, beyond bus tours and tshirt shops. |
| The principal challenge is the lack of cohesion between those who want cruise ships and those who don't. Cruise ships bring in dollars without taxing housing but can overwhelm a town with a shortage of employees. The goal should be focused on bringing high end, higher priced cruise ships, with passengers who are equipped to spend large amounts of money on food, experiences, and gifts. Bringing in lower priced cruise ships, increases the amount of visitors, but decreases the dollar value spent per visitor. The increase of volume is what Bar Harbor residents complain the most about, since they feel their weekend guests are overwhelmed by the amount of tourist on a given day. It's also evident that the lack of housing, which cause a shortage of employees presents a challenge when large volume low priced cruise ships come to port. Cruising is a great ally, but if managed correctly, as in only bringing higher priced cruises in or limiting the lower priced cruise ships to only once a week, these issues should lessen. |
| The principal challenges are 1) vehicular overcrowding from tour buses, 2) pedestrian overcrowding in certain areas of the village, 3) environmental degradation of our marine environments and air quality from idling and discharging boats, tour buses, and tenders. |
| The real challenge is to answer the question, Why do we need cruise ship tourism? |
| The relentless mis-information campaign |
| The reliance on the money from cruise ships makes us compromise the integrity and beauty of our town.  There are too many ships coming that pollute our air and water, scrape the ocean floor (ruining seagrass and marine life habitat), crowd our sidewalks with people without spending as much money as land-based tourists. |
| The reliance, we NEED the tourism. Bar Harbor is just as big as Acadia National Park these days! Cruise ship tourists visit "Bar Harbor, home of Acadia", they rarely see the rest of the island. Personally I worry most about the eggs in one basket approach on such a large scale, we need to diversify how people visit our town. Not to mention environmental factors (Carnival/Princess). I love my local business, but I think besides for crew and passengers, most people do not care for cruise ships. |
| The scale of ships and numbers of passengers per day does not match our town. We do not have adequate facilities for managing passengers without impacting/sacrificing a mixed use waterfront. There is a sense that it doesn't matter if Bar Harbor wants cruise ships, they are coming anyway. Cruise ship companies are the biggest winners- BH has to deal with congestion and conflict. |
| The ships are an eye-sore in our harbor. All-too-often, their tender drivers are not experienced enough to run those awkward-to-maneuver boats. A limited number of businesses benefit from the cruise-ships. You hear their announcements and bells on the mountaintops (this is true). On a day with multiple big ships, there are just too many people on the streets. |
| The ships are obnoxiously loud (I can hear their announcements and horns at my house- approximately a half mile from the harbor), they ruin the beauty of the area and they are polluting the air we all breathe. They ruin the quality of the life for the residents and they are a huge turn off to the valuable land-based tourists- day trippers and out of staters. I hear from land-based tourists all the time that they don't like the ships- they are a huge turn off. Please get rid of the large cruise ships! Ocean Properties should not be the driving force of major decisions in our town. I would be happy to |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| pay a little more in taxes if we could get rid of the cruise ships. We- the residents would like to have our pier and harbor back. |
| The ships are too big visually and carry too many passengers for a small town and a small island. |
| The ships dwarf the beauty of our islands and do nothing for the sea life and quality of our water. |
| The ships pollute the air and the sea. The tourists clog the street. |
| The spread of Covid-19, there is no taxi service because they are all doing tours. Parking! Locals enjoying amenities. |
| the sudden overpopulation of our small town when ships unload their passengers - we can't go to the post office, drug store, or grocery store |
| The temporary influx of people |
| The tourists don't spend much but they do spend |
| The town and ANP cannot handle the numer of people and buses. The town survived prior to any cruise ship activity 30 years ago. It's all greed! |
| The town being overly influenced by the cruise ship industry's money and not working for local peoples. |
| The town can only accommodate a certain amount of tourism yet there seems to be no limit to what shop owners/businesses and town officials want.  Quality tourism means not increasing the cruise ships out of pure greed for more revenue.  Protecting the environment and natural resources is what makes this area so beautiful and a desirable tourist destination.  Don't ruin it by overwhelming the area with more cruise ships and infrastructure to handle more cruise ships! |
| the town does not need huge ships. It ruins the national park feel. |
| The Town has let it get way out of control |
| The town has to consider non-economic negative impacts from cruise tourism to be more important than economic impact or the town is lost |
| The town is doing a good job managing the ships |
| The town is shaping itself to accommodate the cruise boat industry, which really doesn't care about the town. I equate it to drug dealers—the cruise boat industry promises to make towns and businesses rich quick but once the town is eroded of its character, the industry will just go elsewhere to find new dealers. |
| the town needs to do a better job balancing the need for revenue (tourist $$$'s) with residents that want to occasionally go downtown. As it currently stands, we typically avoid downtown during the silly season. This is a shame sine many businesses are only open during the tourist season. |
| The town pier and downtown areas become very unpleasant for Bar Harbor resdients hwen cruise ships are in--way too many people, and the view of the harbor is ruined |
| The town pier is congested in the summer with buses and ship tourists. Those buses drive by my house all summer long. Up to three ships running 24/7 in the bay has an impact on air quality. Ship annoucements can be heard in town. The visual impact of the ships is not in line with the MDI and Acadia area. |
| The town seems to listen to only people who do not like the cruise ship industry |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| The town should allow only small cruise ships into our harbor, and only one small (no more than 1000 passengers) ship each day several times per week. |
| The town should not be blocking access to the wharf simply for the cruise ship passengers.  Disembark them at the ferry terminal and keep the big buses out of downtown.  In town, sidewalk congestion is overwhelming on days the ships are in, especially now that there are parking meters taking up sidewalk space.    Overall, they are an eye-sore ruining our lovely Shore Path. |
| The town was never made to accommodate so many people. |
| the transfer of people from ships to and from tours on the municipal wharf |
| The transplanted elitists |
| The two issues that concern me the most are the impacts on the wildlife in the water and the dense concentration of cruise ship passengers who never leave the concentrated areas of Main, West, Cottage, and Rodick. For many cruise ship passengers, we are just another stop along the route. They are not interested in BH and ANP as a destination. Also, I believe they "hang out" even more than land-based tourists because it is either the town or back on the ship. (I used to work on West Street in an art gallery. We had too many people who just wanted to talk to someone to pass the time until they got back on the ship.) |
| The very negative feelings of residents, many reactions have no basis in reality |
| The volume of passengers all in the downtown area at one time is often overwhelming and detracts from the quality of village life. |
| the volume of people |
| There appears to be little control in the number of cruise ships permitted to stop in Bar Harbor annually, and the number of people that can safely navigate the town at the same time. The economics of the cruise ship tourism business did not take into consideration the natrual and cultural impacts caused by excessive visitation. |
| There are 3,000,000 visitors independent of the Cruise Ships, For the benefit of a small number of businesses, the entire downtown district is basically ceded to floating cities that descend on West, Main, Cottage Streets. |
| there are simply way too many - scale is off |
| There are too many cruise ships. The passengers are concentrated in only a few locations. Land based tourists can spread out more and make less of an impact. |
| There are too many ships coming into the harbor. I overlook the Bay and hate seeing these massive things all day one after the other. They block our water view from every vantage point. Too many buses in town clogging our streets and taking up parking spaces for our use.People walking on our sidewalks block use of same by crowding in-groups.. |
| There are too many tourists coming ashore with the mega-ships and too many ships in the harbor at the same time. |
| There are way too many cruise ships with way too many passengers & crew on board visiting Bar Harbor. It is not uncommon for our small town to more than double in size when the very largest ships visit. The large coach buses further clog up the already congested downtown roads. Many of the passengers disembark for the sole purpose of visiting Acadia by coach bus, which is what they paid for when booking the cruise; aside from the shop owners right near the pier, the passengers don't spend |

DX323.159

TOWN05939

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| a lot of time or money shopping in town, and they certainly don't spend money on lodging or dining out when they have already paid for all the food anyone could ever eat on board the ship. The 2020 summer & fall seasons yielded record days for many of the local businesses without a single cruise ship. |
| There are way too many cruise ships, polluting our oceans. |
| There are way too many ships visiting, it's compounding the overwhelming number of people here and is detrimental to residents and tourists visiting. |
| There aren't any challenges, Bar Harbor manages cruise ships well |
| There is more of a need for structure! The land based people need to know what they are doing, challenges to the guests getting off the ships and what their needs are. |
| There needs to be a cap on the number of passengers disembarking. |
| There should be no cruise ships allowed into Bar Harbor. |
| They are a popular target for activists |
| They are blamed for everything |
| They are purely transient, do not contribute economically (T-shirts and mementos purchased while briefly ashore do not move the dial, and swell the town while the ships disturb the environment (high speed approaches, sound , fuel and waste discharges disturb wildlife and the delicate ecology of the area) |
| They cheapen the experience of Bar Harbor |
| They come, they shop, they eat, the increase taxes which is very negative. |
| They destroy lobster ships. |
| They don't 'manage.' Just let them come to collect landing fees. Have zero idea what is done with those funds--squandered, most likely. |
| They don't spend dollars/pollute/eyesore/should be very limited to smaller ships |
| They give us nothing. Except a bathroom. Pollution. Rude, cheap, crass people. |
| they need to go away |
| They need to reduce the large negative impacts before they lose the the charm and tranquility of the entire town. Crews ship passengers do not shop more than a block up the hill. They might grab an ice cream cone. Typically , in all ports the cruise ships do not raise the sales at any locally owned shops. |
| This is not 'our town.' It is far from the town I grew up in. The mobs on our sidewalks. NO respec.t Junk shopping. No year-round quality. No quality stores like 5 and 10, Wards, Adlers, Sachsmans. |
| this started out with a few ships and now it has ruined BH in the summer |
| Those that brought this industry here. Powerful voices.  We were not asked if we wanted or needed cruise ships.    Look around; understand the world wide disdain for the impact these unregulated big businesses have had on other communities. |
| Thousands of people are dropped off in town, clogging streets and side walks.  Too many buses lined up and when they reach their destinations and the tourists embark, the crowds deter from the sites...and because of the crowds the park has to shut down areas. The cruise ships anchored in the bay, spewing dirty exhaust to keep the air conditioning going, ruins the historic sites.  Tat exhaust |

DX323.160

App. 464

TOWN05940

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| blows directly toward those of us residing in Sorrento because of the predominant winds from the Southwest. Overall the cruise ships represent a unsustainable carbon footprint, the economic contribution to the town are minimal given the crowding and overuse of facilities. |
| To extend time of visitation over a longer season. |
| To many people. Limits the Lobster men and there traps. Limits the residents to what and when they can use town services. Plus the money isn't going to the town or it doesn't seem too. My Taxes keep going up and my Services going down. |
| To reduce the number of them; we are too small landwise to handle the large numbers |
| To stand up to the powerful industry |
| Too big, too many |
| Too busy in downtown area and peer area, buses |
| too congested for a town the size of bar harbor |
| Too crowded when they are in port. Emissions from ships bad for the environment. |
| Too crowded, can't service that many people, makes tourist season way too long |
| too many |
| too many |
| too many - need to strike the right balance |
| too many / day and per season |
| Too many 8-hour visitors are driving away multi-day visitors. |
| Too many are too large ships. |
| too many arrive on same day |
| Too many ashore at once. |
| Too many at once as tour buses exceed venue capacity. |
| Too many at once-the buses, people walking in the streets. |
| Too many boats |
| Too many boats, size of boats impacting downtown congestion, detracting from natural beauty of the harbor |
| Too many buses |
| too many cruise ships |
| too many cruise ships |
| Too many cruise ships |
| Too many cruise ships allowed per season. Too many passengers alllowed ashore at the same time. |
| too many cruise ships and increase in passengers. Loading passengers |
| Too many cruise ships and too many people. The pollution of Frenchman's Bay and the crowds of people bussed to beautiful spots in the island can do no good for the environment. It is not sustainable. |

DX323.161

App. 465

TOWN05941

## Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| Too many cruise ships at once causing both land-based tourism and local quality of life to be negatively impacted. |
| Too many cruise ships parked in the harbor ruining the view. |
| Too many cruise ships, and tranportation of those people |
| Too many cruise ships, pollution, harbor/tender congestion |
| Too many cruise ships, water pollution, pedestrian congestion--impossible to walk on sidewalks and shore path. Noise from ships, bus congestion. Buses too large for the small streets of Bar Harbor. |
| Too many huge ships are allowed to come at a single time; Streets are clogged with pedestrians who buy little; Cruise ship companies buy stores and turn town into "cruise ship junk" land; land-based tourists who spend more are forced away from Bar Harbor. |
| Too many ill or uninformed special interest groups at work dictating policy. |
| Too many in at once, buses taking up the pier, overcrwoded streets diminishing quality |
| Too many in the harbor at one time. |
| Too many in town at short intervals/time |
| too many large boats are allowed access to town, it is overwhelming at times....optics |
| too many large cruise ships |
| Too many large cruise ships |
| too many large cruise ships single day (up to 3 at 1 time) in the fall |
| Too many of them deprive everyone else of enjoying places like Agamont Park and the Town Pier |
| TOO MANY of them, resulting in crowded streets and sidewalks. It also has diminished the quality of Bar Harbor's offerings (mostly retail) to cater to this caliber of tourist. |
| Too many of them. Traffic congestion of buses and too many people crowding the streets. |
| Too many on certain days |
| too many overall, and too many large ships |
| Too many passengers at once from the big ships. Too much foot traffic. |
| Too many passengers for a 2 square block business area |
| Too many passengers per day, harbor too crowded with tenders---all should go to ferry terminal. |
| Too many pedestrians on sidewalks and in the streets |
| Too many pedestrians! Too many buses! |
| Too many people |
| Too many people |
| Too many people |
| too many people |
| Too many people |

95

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| Too many people - Visitors that pay to stay, eat, and shop don't enjoy it anymore. The park and town get too overcrowded. I would say put a cap on the larger cruise ships and just allow the smaller ones. Maybe one per day - cap of 1,500 people |
| Too many people "in town" at once |
| too many people all at once |
| Too many people all at once in a concentrated area. Buses. |
| Too many people all at once wandering about not sure what to do. |
| Too many people all at once. Crowded without many sales. People eat and drink on ship. Short stay. |
| Too many people and pollution and too many cruise ship days |
| Too many people arriving per unit time. The sidewalks are so crowded that people are forced to walk in the streets, and that interferes with vehicular traffic flow. |
| too many people at once |
| Too many people at once, straining infrastructure |
| Too many people at one time |
| Too many people at one time |
| Too many people at one time in one place. |
| Too many people at one time who spend very little money locally |
| Too many people at one time. Our infrastructure (sidewalks, parking areas for buses, restrooms) cannot handle the number of cruise ship passengers who unload. The parking of buses around Agamont park ruins the experience of all the land travelers. Plus the negative environmental impact of the ships and buses. |
| too many people at one time--can't even walk on sidewalk |
| too many people droped into the town - too long. It impacts residents life (I avoid town when cruise ships are in) and definitely an impact on land based tourists who contribute more to the town |
| too many people dropped off. Goodness sake, the ANP limits people on Sand Beach and Cadillac because of the toll on natural resources. Does have the town have unlimited resources to care for all these people. let alone the toll on our town resources? We have a small hospital, with limited resources also! Limited police! |
| Too many people dumped at once, they and tour buses dominate. |
| Too many people dumped into an already congested area. |
| Too many people flooding the streets bringing an already very crowded place to overload. |
| Too many people from boats not contributing to the community |
| Too many people from the cruise ships dominate the sidewalks and shops and surrounding areas to which they are bused.   The pollution from the ships--air, water, and light--affects all species (people, fish, animals, trees, etc.  The cruise ships are a blight on the beautiful natural views from the trails, mountain, and surrounding communities. |
| Too many people in a small place, ruins charm of the town, scares away overnight visitors. |
| too many people in one place at one time--very disruptive |

DX323.163

TOWN05943

## Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| Too many people in too short of a time. |
| too many people in town and on buses, dwarfing the Bay and polluting it. Cruise ships do NOT help local businesses more than they hurt. |
| too many people in town during a visit- can't even drive/walk through town. Visual pollution - cruise ships are massively out of scale with our beautiful environment. Environmental pollution from discharge. Animal welfare- creatures that live in the bay are disturbed, potentially injured.  We should be protecting, not exploiting our remarkable environment. Also, it's pretty clear they are sailing petri dishes- the close living quarters spread infections easily. |
| Too many people in town on a lot of ship days |
| Too many people in town! |
| Too many people in town, adding to air pollution and too many buses |
| Too many people landing in town all at once. |
| Too many people on one day. In the fall it can be a mob scene. Makes other visitors (who spend more in town)avoid town until the ships are gone as I have been told by many they don't want to come back to BH because of the mess of cruise ships. |
| too many people on ship / not the type of person who appreciates nature / rude and demanding, poor tippers |
| too many people per day |
| Too many people putting way too much stress on all the town infrastructure not to mention the stress on the park |
| Too many people spending almost no money |
| too many people when ship/tourists are here at same time / the town is too small for both |
| too many people who don't watch for cars |
| Too many people!! Businesses do not benefit and the park and attractions are overcrowded. |
| too many people!! Too crowded!! |
| Too many people, environmental issues |
| Too many people, large buses crowding park and town |
| too many people, more pollution |
| too many people, oversized ships |
| Too many people, ships too big, buses idling at the wharf discourages access, visually unappealing, causes noise and air pollution. |
| Too many people, too many boat visits, too little revenue when compared to land-based tourism |
| Too many residents (and land-based tourists) experience primarily adverse effects from cruise ships in Bar Harbor.  With relatively short shore excursions that offer little, if any, direct benefit to the majority of our local businesses, cruise ships and the culture they bring into Bar Harbor are in conflict with the quiet remoteness and natural beauty of the town and its surroundings. |
| too many ships |
| Too many ships |

DX323.164

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| too many ships / too many passengers debarking per day |
| too many ships allowed - good to have a better balance. Two boats a week - max. |
| too many ships allowed in / town pier and downtown congestion |
| Too many ships and passengers adding to the congestion downtown   I think police officers during the summer at several intersections would help the congestion. |
| Too many ships and too large. Season goes too long. Don't believe the money spent in town is worth the negative impact on land based tourism, the bay, and quality of life for locals during cruise ship season |
| Too many ships at once |
| Too many ships at one time. Way too many people in Town |
| Too many ships at one time/too many large ships |
| Too many ships coming - at times, 3 ships dock at once |
| too many ships during late aug-oct - streets are overrun with people. I hate having to do business downtown |
| too many ships in a season, some ships too large, need to be tendered somewhere other than the town pier |
| too many ships in a season, too many in a day |
| too many ships in port on the same day and buses in town |
| Too many ships per day, too many people overall |
| Too many ships per day--sometimes there's been 3 per day. |
| Too many ships per year, more than one per day |
| too many ships! |
| Too many ships, blocked pier with tour buses, too many people per ship |
| too many ships, buses & people especially on multiple ship days. Accurate counting of off-loaded passengers. Town infrastructure |
| Too many ships, people dumped at once. Ruins view off shore, pollution |
| Too many ships, ships too large, the cruise ship people are not here for dinner, and they eat so much on the ship that at best they buy an ice cream when they are here. |
| Too many ships, too large, I hate BH when they are in Port! |
| Too many ships, too many people in a short period of time.  The sidewalks are so overrun that citizens cannot even use the town.  The one grocery store is overcrowded. |
| Too many ships, too many people, effect on park |
| Too many ships, too often, too many pedestrians |
| too many ships. The streets are not walkable when there are 2 or 3 ships in port. |
| Too many ships/passengers allowed have negative impact on quality of life. Need to strike a balance between toursim and quality of life for residents. |
| Too many ships; many ships too large |

DX323.165

TOWN05945

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| Too many ships--limit size ships |
| Too many ships--need for annual quota! Hard on natural resources. |
| too many tourist all at once. town becomes packed one day, light traffic the next. |
| Too many visitors at one time/Massive impact on tiny community. |
| too many visitors, all of which make traffic and parkign and shopping on cruise ship days too frustrating for year-round residents |
| too many visits |
| Too many visits by huge ships. |
| too many!! Too many cruise ships; too many tourists; pressure on water with waste disposal |
| too many, and I don't think we get enough money for their impact |
| Too many, no supervision by town |
| Too many. One at a time on days. |
| Too many. They dump too many people in town all at once. |
| Too many; too much |
| Too many; town cannot handle influx of people. |
| Too manypoeple all at once. Cap ship passenger numbers at 1500. All business goes to a .25 mile radius around pier-improve public transportation. |
| Too mnay people on streets at one time, too many buses to ferry passengers, too many ships. Usually, ships are ugly against the [illegible] islands, etc. Cruise ships make our beautiful harbor ugly. Most of the ships look way too big relative to the space. |
| Too mnay ships in one day floods the town, we don't enjoy it. |
| Too much congestion at the pier--way too many people in the town |
| Too much congestion in downtown area, is not worth economic impact. |
| Too much foot traffic, too many buses. |
| Too much of everything! |
| Too much reliance on cruise ship-based income for town budget items; too many people in a narrow window of time who want to see the same things & be in the same small area of downtown; Disney-ification of Bar Harbor |
| total number of visitors per day |
| Totally noncontributing to all except a few non-resident business owners |
| tour bus and vehicle management |
| Tour bus location |
| tour buses |
| tour buses producing congestion in park |
| Tours , businesses, getting people from the places they need to go buses . Mini buses , when the streets are clear thing go better |

99

| |
|---|
| town becomes too crowded when all passengers disembark from multiple cruise ships |
| Town buses |
| Town changes when ships come in and business cater to ships not people around all the time. |
| Town congestion (sidewalks, parks, restaurants) |
| town crowding, but that's positive energy and income |
| Town gets too congested, to the detriment of the land-based tourists |
| Town government not working with business community/stakeholders for their input. |
| Town government trying to over-regulate |
| Town has reached a point of diminishing returns; Town is hurt by exceeding this level of cruise ships |
| Town image of being overrun by cruise ship people |
| Town is again too dominated politically by hoteliers and business owners to take any more than half-steps to solving congestion issues with cruise ships, and has for many years abdicated responsibility for analyzing the impact of the passenger cap in favor of turning the dial up every year. |
| Town is too small to accommodate the cruise ship passengers and land tourists too. |
| Town is too small to have big ships in the harbor. |
| town pier congestion and loss of access |
| Town too busy. Have to avoid going downtown when cruise ships are in. |
| town too small for both land and sea together |
| Town too small for sudden influx of people from cruise ship. They also do not use the stores/restuarants that locals need. |
| traffic |
| Traffic |
| traffic |
| traffic |
| Traffic and body count--however, I am all for the dollars it brings in. |
| Traffic and health risks |
| Traffic and parking. Pollution. |
| traffic and stores needing cruise tourists. Although we have survived well without the cruise industry for two summers due to covid. |
| traffic congestion |
| traffic congestion, diesel pollution, crowds |
| traffic congestion, push away weekend guests for daytime sightseeing |
| traffic control, congestion, safety, accessibility to pier and center of town |
| traffic controls |
| traffic flow |
| Traffic flow |

DX323.167

TOWN05947

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| Traffic flow and parking and disbursement of occupents |
| Traffic flow at the pier.  Mismanagement of cruise ship funds overall.  Parking.  Poor overall planning at the pier with passenger flow overall.  Lack of any true management via the Town. |
| Traffic flow of arriving and departing guests. Prevention of crowding by limiting ships in harbor. |
| Traffic in town, croud management, quality of tourist (from perspective of dollars per tourist. Also impact on reputation of town as place to visit in summer |
| traffic issues and cruise ships take up space and prevent land tourists from visiting popular areas |
| traffic management |
| Traffic management of both bus/taxi tours and foot traffic.  Too much congestion downtown. |
| traffic management, access to pier |
| Traffic management, foot traffic |
| Traffic problems on cruise ship days, health of the bay waters |
| traffic,   crowded streets,  locals have a hard time enjoying the island |
| Traffic, crowds of pedestrians, idling buses, proliferation of souvenir shops |
| Traffic, environment, infrastructure |
| Traffic, pollution, no access to town dock area, spoiling "natural" environment/views for land-based tourists, turning off land-based tourists (who spend much more in town) from cruise-ship tourist overcrowding |
| Traffic, the negative perception  "summer people" have about cruise ship visitors, environmental issues |
| Traffic, the terminal is ugly |
| Traffic/buses at the pier. |
| transportation from new terminal to points of interest, big waves of tourists in town at once |
| Transporting visitors |
| trying to balance opposition from naysayers |
| Tying up traffic loading passengers for bus tours. |
| Ugly ships in the harbor; polluted water; overcrowded streets. |
| Understanding of the economics including the impact of taxes charged to local residents. |
| unrelenting crush of cruise people, ugly crowded harbor and pier area; too many, too big ship rude cruise people |
| Unsightly ships. Huge crowds |
| Vehicle and pedestrian safety? |
| Vehicle traffic  Sound restrictions on cruise ship traffic |
| Very few "benefit" from this outdated industry with the extreme environmental impact on our oceans. Also, the possible COVID cases brought to our community is not worth ANY amount of financial gain for a handful of businesses. |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| Very large crowds entering bar harbor and crowding of bar harbor town as well as the national park making it very difficult for local resident of seasonal residents to enjoy the surroundings when they want to. It also enables a lot of ship traffic in the bay which could harm aquaculture and residents pristine view of the bay. |
| Very little economic gain for its strain on town resources and quality of experience for land tourists. Burden on locals and environment. |
| Viewshed blight from massive ships; air and water pollution; excessive numbers of passengers contributing little to the Bar Harbor economy |
| Visual impact (some ships block whole island), CO2 emissions and pollution, congestion, T-shirt shops |
| -visual impact of large ships dwarfing the islands  -pollution from these ships, both air and water  -clogging downtown with hundreds of extra people   -adequate rest room facilities for all of these people |
| Visual pollution in the bay, sheer onslaught of people in town |
| volume |
| volume of people, disregard for waterfront - fisheries and lobstermen |
| Volume, environmental impact |
| warning the town from the love affair with the cruise ship industry money |
| Waste disposed in ocean, buses |
| Wastewater spillage, tearing up bay bottom |
| Water pollution, congestion |
| Water pollution; Disrupt fishing; Too many people; No admittance to town pier |
| Water quality (contamination); hoardes of people who are inconsiderate or less invested in the place; unnaturally large boats=eyesore |
| water quality, air quality, traffic congestion, poor working conditions for workers, impacts on traffic and fishing |
| Water quality, pier usage, harbor usage and appearance, congestion |
| water, noise, air pollution |
| Way too many people at one time |
| way too many people in a town people work and live in. very hard to get around |
| Way too many people roaming and clogging up the streets. The cheesy stores that cater to the cruise ship passengers. The boats in the harbor are unsightly and they are bad for the environment and pollute the waters. |
| Way too many people! Just standing in the middle of the streets… |
| Way too much congestion. Mostly supporting uninteresting souvenir shops. |
| We are a relatively small island, but with much to offer. I think limiting the number of cruise ship visits per day is helpful, but size of ship and number of passengers could be a criteria for determining cruise ship limit per day. |
| We are being overrun! Pollution, congestion, contagion |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| we are in [illegible] and support cruise ships. Done well before Covid 19. |
| we are too small to handle cruise ship buses with land-based tourism, we should find a better way to hanlde cruise ships or not have them. |
| We avoid Bar Harbor when we are on the island. The huge number of cruise ship visitors have degraded the local tourist businesses. These visitors are looking for inexpensive items. |
| We have enough people coming by bus and car! |
| We lose our use of our Town pier. The cruise ships need to land somewhere else. |
| We need balance with quality of life in our town and commerece. There are far too many ships and too many large ships coming into part. We should cap the number and size of ships coming to BH. 100 ships per season. Aside from the money that they bring, the challenges in staffing employees and managing the congestion in town are real issues that need to be dealt with. |
| We need more in the Spring - June is the perfect month for growth |
| we need ships |
| We need to find a way to get the cruise ship tourists farther into the downtown area. |
| We need to get rid of the large cruise ships. |
| We need to offboard people not at the town pier. |
| we need to supervise congestion of traffic and people downtown. Police need to be present |
| We should be offloading cruise passengers at the CAT pier |
| When cruise ships are in, downtown is completely congested. I dread having to come into Town when cruise ships come in. |
| when Large buses are in town very unsafe and over crowed |
| When the cruise ships come, they dominate the scene from the mountains to the shops. I don't go to town when they are in Bar Harbor. I have been on cruise ships that were good, but they were small enough to fit into the places they were cruising. I think Bar Harbor and all of Maine are in danger of overdosing on these businesses and might lose the wonders that attract tours and year round residents and others involved with Maine. |
| Where to start. We do not need any more tourists than are already arriving by land. I can not believe a number like $20 million dollars in local impact. And 380 jobs? Not many likely local and year round. |
| While cruise ship passengers do benefit a some businesses, and have provided for a revenue stream to the town, the needs of the few should not outweigh the needs of the many when it comes to making decisions that impact all the residents of the town. |
| While I understand the positive impact cruise ships bring to local businesses, the crowds they create mean I avoid downtown for months at a time.  I won't even grocery shop in BH during the summer and fall. |
| Who is making the decisions? The cruise ship industry or locals? |
| Why can't the citizens decide whether we even want cruise ships. Our quaint town and harbor look like Atlantic City with cruise ships. Pollution of oceans. Crowds of people all at once. |
| Wide enough roads to accommodate large buses and dump truck and trucks unloading on Main St. |
| With Covid issues, we don't need 1,000 extra people should not let anyone unvaccinated. |

103

# Appendix B – Verbatim Responses to Open-Ended Questions

Q8: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism?

| |
|---|
| with the overcrowding of land-based tourism having too many ships in the summer can lead to overcrowding in downtown and access to the pier almost impossible. |
| You are hooked on the money, and ignoring the negative impact that results from overcrowding, day-tripping visitors.  Land-based tourists spend more money on food/nightlife. |
| you can't please everybody, you simply need to lead and make some tough decisions to control the numbers in Sep and Oct |
| you have too many people at once. Horrible. ????? Town ???? |
| You need to find a balance between limiting the number of passengers allowed and the economic impact they have. You're obviously letting too many in if you are taking the time conduct this survey and have on going conversations about the problems cruise ships create. Just start reducing the cap until a balance can be found. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

-- Limit the size, # of cruise ships at the same time, and # of ships per season.  -- Substantially increase both the fees paid by ship companies and the environmental regulations and monitoring of their practices.  -- Focus on eco-tourism oriented cruise lines (e.g., National Geographic) and other, smaller cruise ships/lines rather than   on cruise ships as mega carriers.  -- Consider examining the environmental and social responsibility ratings and practices of cruise lines and their owner companies when prioritizing booking and issuing permits.

"A report issued in 2017 by the School of Economics at the University of Maine led by Professor Todd Gabe on the economic benefits to Bar Harbor of cruise ship visitation estimated that spending by cruise ship passengers contributes approximately $20 million of annual revenue to local businesses, approximately 380 jobs (full-time, part-time, and seasonal), and approximately $5.4 million in labor income annually."  I think this is largely useless without seeing this information broken down into how many of those jobs are FT, PT, and seasonal. How many of those local businesses that benefit actually serve the community, rather than simply cashing in on cruise ship tourism?     I think we need to take a hard look at how we spend cruise ship money and think about what we really *need* versus what would be nice to have. Then we need to prepare to put off some projects if it means having a smaller number of cruise ship visits and improve the quality of life for residents & visitation experience for land-based tourists.

(1) Only small 20-25 passenger buses should be used. (2) A village shuttle should circulate to assist handicapped cruise ship passengers to shops. (3) Fewer passengers should be allowed shore visits each day between May 1 and Oct 15.

(1) Permit smaller ships (2) Offer lower port fees to smaler ships (3) Anchor farther away, like behind Bar Island (4) Require strict trash disposal (5) Require ship-board music and announcments to be at lower volume

*Limit number of cruise ship visits and number of passengers

*see notes

?

1 reduce significantly the number of cruise ships 2 choose ships that are economically significant to retail, also food service for lunch, coffee shops, etc 3 build the parking garage

1 ship limit in the harbor

1) Limit the number of cruise ships per day and per season  2) Don't allow large ships with thousands of passengers

1) only one cruise ship here at a time 2) ban the gigantic ones

1) Reduce size, number, scale, number of visits greatly to small and medium sihps. 2) Have town of Bar Harbor collect landing fees instead of Ocean Properties. 3) Split tendering operations between Town Pier and Ferry Terminal. 4) Move ships out of Anchorage A.

1) Reduce the number of cruise ship days 2) Reduce size of allowed ships/reduced number of passengers 3) Consider eliminating cruise ships altogether

1.  require use of cleanest possible fuels for all onboard energy generation  2.  build facilities and require cold ironing for ships that visit repeatedly.

1. Because of limited medical infrastructure immediately limit the number of passengers from all cruise ships that can arrive in Bar Harbor on any given day;  2. Ban any cruise ship company from use

DX323.172

App. 476

TOWN05952

# Appendix B – Verbatim Responses to Open-Ended Questions

Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| that has a violation regarding discharge of gray water or black water with 12 mile limit of land; and  3. During CoVid crisis or future contagions require proof that all passengers have been double vaccinated and received all necessary booster shots as they become available and recommended by USA government |
| 1. charge more. 2. limit ships to one a day |
| 1. Cruise ships should only be allowed to dock if they have 500 or fewer passengers and crew.  2. There should be a limit to one ship per day.  3. We should remember that this is not a cruise ship town. People live here, work here, die here, and love it here, but it becomes hard to stay when the only peaceful time you can experience as a local is in the dead of winter.  4. Limits on crowds  5. Addressing the garbage issue from cruise passengers adding to the already big problem   The town did an excellent job in supporting local businesses and individuals during the pandemic, and it was very eye opening to see how well our community and economy could do without cruise ships. |
| 1. Do NOT move the primary anchorage into the bay as is recently being discussed.  2. Seriously reduce the current number of cruise ship passengers allowed to visit the port. Even if this results in driving away some existing businesses, sorry tough I know but important  3. Do NOT tender the passengers into the old blue nose terminal...bight the bullet and keep them in barhabor proper if they don't get reduced  4. Never in the future allow the ships to dock like in St Thomas and other ports. |
| 1. limit # of cruise ships per week. 2. limit size of cruise ships. 3. dis-allow loud speaker announcements on the ships. Contributes to noise pollution |
| 1. move cruise ships off of anchorage A. Don't block views of the bay.  2. reduce or eliminate cruise ships  3. don't park Cyr buses in town or drive buses on Main, Cottage or Mt Desert streets  4. if cruise ships are reduced- don't allow large ships  5. have cruise ship free days  6. management of number of people from cruise ships to reduce congestion in town. |
| 1. Prohibit "mega" ships i.e. passenger capacity above 2000  2.Disembark cruise passengers at new terminal and load any buses, vans, taxies at that location (out of town) |
| 2 large ships per day limit. Also limit # of passengers per day |
| 2020 has shown that the town does not economically need the cruise ship industry. Its burden far outweighs the minimal economic gain the town gets. |
| 50 passengers or less allowed to enter Frenchman's Bay |
| A better understanding of information providing it's accurate |
| A few safety officers directing both people and traffic both down by the pier and throughout town during the busy season - the "people dump" into down from the cruise ships is a bit much some days. I'm not saying that there shouldn't be cruise ships but on days when there are multiple large ships, town is rough for everyone |
| A lot less cruise ships |
| A lot of the people who make money off the cruise ships and tourism do not even live here year-round. Too much strain on town services. |
| Accept tendering boats at a refurbished ferry terminal pier, with part of landing fees used to subsidize the Island Explorer.  Limit size of ships that visit and number of visitors per day.  Close anchorage A to end the view shed blight and the air pollution so close to downtown. |
| Accept that they are a small part of our visitation and move on. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Acknowledge that the fall season is not a "shoulder season" and hasn't been for over a decade. There are far too many land based people here already to add thousands of people every day. Return back to the levels of ships seen prior to 2016 when it was a moderate impact. Everything from 2017 to 2019 is overwhelming and unhelpful to everyone but a few retail shops. The town budget survived without those passenger fees, it'll survive again. |
| Acknowledging we have a car problem which is not caused by cruise passengers. |
| Actively manage cruise ships to maintain the character of the town rather than to maximize revenues to the town. Town leaders should make decisions about managing cruise ships without thinking the town cannot survive without them. |
| Add pedestrian management signs or police officer downtown to alleviate constant crossing and holding up traffic. RVs downtown during busy times, hold bikers to the same traffic rules as drivers. |
| Address overcrowding, parking and bus traffic at the Pier location. Spread visitors around town more to prevent overcrowding and benefit businesses outside of the few block radius where most visitors congregate. Promote local businesses and tour companies and limit off-island businesses from profiting from Bar Harbor's cruise ship passengers. Restrict the number of passengers/ships in Bar Harbor's busiest times (July-August and weekends). |
| Address the number of passengers added to the town and the Town's abilities to handle those numbers. |
| Again, some cruise ship activity is a plus, but too much is a minus. Can we find a happy medium? |
| all cruise ship passengers come and go thru the cat ferry terminal, alleviating parking/bus congestion at the town pier. |
| all measures should be taken to protect the environment |
| All of the suggestions above |
| Allow cruise ships - businesses are struggling and closing...we need the revenue source back |
| Allow cruise ships but aim to get the best quality. Consider environmental protection and limiting the number of ships |
| allow fewer and smaller cruise ships |
| Allow fewer cruise ships in a shorter season. |
| allow fewer ships |
| allow fewer ships and smaller ships |
| Allow less ships into port at a time. Perhaps limiting the number of ships and passengers daily. |
| allow less, charge more |
| Allow more ships in June and Sept-October and limit/restrict volume in July and August. |
| allow one ship a day. Require bus vendors be local. Stop using parking for cruise ships to allow local use. Ban discharge. Increase fees manifold. |
| Allow only carbon neutral cruise ships to visit the town. Not load passengers onto buses on the town pier and lower main street. Lower limit of passengers per day Have cruise ships invest in shore power infrastructure so they do not run generators throughout their stay in local waters. |

DX323.174

TOWN05954

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Allow only 'green ships' that do not dump waste anywhere, do not have the dirty smoke pouring from their stacks, quiet communications--not heard onshore, no smelly noisy buses polluting air with engines running. |
| Allow only one ship at a time. Improve parking so the tour buses don't slow things down. |
| allow only small cruise ships as we are a small town. |
| Allow only small cruise ships. |
| Allow only small ships: 100 or fewer passengers |
| allow only smaller cruise ships |
| Allow only smaller ships, under 1000 people, and not so many. |
| allow only three ships/week |
| allow residents to have free parking permits |
| Allow smaller ships and get rid of the giant ones. |
| Allowing the visitation of smaller ships and prohibiting the largest ships could be in keeping with the size and scale of Bar Harbor. Studies have proven the above referenced economic impacts as incorrect. Limiting the largest cruise ships would address congestion while improving the quality of land-based tourism which provides higher revenue per visitor. |
| allwo only small (less than 100 passengers) ships with a maximum of 15 ships/year |
| An official town pier is needed for pleasure craft, shuttles, and fishermen. Town companies and larger yachts also need piers. The Kat needs its own space. An accessible osurce for fuel should always be available for all. |
| anchor them out of view - regulate and enforce waste (air and water) disposal and number/freq |
| Answered already. Small ships, no more than 100 passengers, one per day, 3-4 days per week. |
| Any way to have pedestrian only sections? Like Bayside Landing but a grander scale? |
| appreciate the income to the residents and calm down |
| Are these more enviornmentally-minded/smaller/higher fee paying cruise ships we can attract? Toursim is slowly turning MDI into a Disney town with no personality filled with non-year round rich white players. Eventually, the few authentic communities and places in Bar Harbor will be killed off by the rich and then what will we market? Lobsters from Florida and moose that don't exist here. It's time to prioritize year-round middle class and below residents. Get these old white men out of positions of power. |
| Arrive after 7:30am and leave by 6:00pm. Also, no ships July 1 to Sept 1 |
| As I indicated before the best thing they could do is restrict or curtail the volume of large charter buses that directly impact traffic flow and all vistor experiances both land and by sea.  All vistors positive experiances can do is enhance Bar Harbors appeal  to prospective new vistors, which may in fact spend time in Bar Harbor as well as utilizing the CAT for a truely memorable experiance. |
| As I said above, I think large cruise ships should be abolished. Bar Harbor attracts people from all over the world for its natural beauty and small town quality. I would focus on the people who come time and again for those reasons. |
| As stated above, start reducing the number of passengers and visits until a balance can be struck. |

DX323.175

App. 479

TOWN05955

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| assure cruise ships fees are adequate to cover all costs to the town and capital improvements to accommodate additional demands. If not possible, limit or exclude ship docking. |
| At least reduce the number of ships and passengers, but that said, I'm in favor of banning them. I believe saying we are free of cruise ships will bring in more people who love the park and the area, as well as locals from around MDI and surrounding towns. |
| At the very least, reduce the number of cruise ships allowed to anchor. Keep them offshore as once they can dock, trucks will begin arriving to restock and resupply, thus adding to traffic and emissions. Perhaps limit access to shoulder season when there are fewer other tourists around. |
| Ban |
| Ban all cruise ship like Town of Mount Desert. |
| Ban all cruise ships from our port. If not, charge fees that actually reflect the impact and cost to the town citizens and return that money to the taxpayers, rather than spending it on amenities for the cruise industry. |
| Ban all cruise ships permanently. |
| ban all cruise ships, all the time |
| ban all large ships |
| Ban Cruise Ships |
| Ban cruise ships |
| Ban cruise ships |
| Ban cruise ships above 50 passengers. |
| Ban cruise ships altogether. |
| Ban cruise ships and promote MDI as a human-powered (walk, hike, bike, XC-ski, kayak, sail) outdoor recreation destination offering hospitality, entertainment, seafood, and fine-dining for people interested in and willing to take care of and preserve the landscape that everyone wants to experience. |
| Ban cruise ships. |
| Ban cruise ships. |
| Ban cruise ships. Become an eco tourism destination with ANP. |
| Ban cruise ships. Bring Bar Harbor back to a town that provides goods and services to all. |
| Ban cruise visitations like other Great Harbor towns have done. Request a No Discharge Area for the non covered areas of Frenchman Bay. |
| ban large capacity ships and favor small capacity ships |
| Ban large cruise ships entirely and limit small cruise ships |
| Ban large cruise ships entirely. They detract from our quality of life and pollute our air. |
| Ban large cruise ships from Bar Harbor/MDI waters. Charge a carbon offset fee. Strict monitoring of cruise ship waste discharge into the water. More garbage cans and curbside recycling bins. |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Ban large cruise ships with passengers greater than 1500.  Limit the number of cruise ships visits per season to 100 and increase passenger fee rates.  Prohibit cruise ship companies from buying up local shops. |
| Ban large cruise ships. |
| Ban large cruise ships. Reduce number of cruise ship days. |
| Ban large cruse ships, the small regional pier docking vessels have negligible impact to the concerns but bring the diversity of visitation types that help a thriving tourist economy. Lets focus economic growth on industries that are environmentally sensitive and protect the natural area of Bar Harbor. Having been born in Bar Harbor and raising my own children here I hope they will have the community and natural area that I love rather than one taken advantage of in an extractive disrespectful manner. |
| ban large ships |
| Ban large ships, ban tour buses, severely limit cruise passengers per day |
| Ban large ships.   Limit the number of ships. |
| ban the cruise ships like venice italy has done. Recover from the foul addition to this highly destructive unsustainable industry who relies on enslaving workers on ships who do not comply with US labor laws. Atrocious violations to human rights  and environment |
| Ban the large buses. |
| Ban the larger buses from downtown. Close the ferry terminal for cruise ship docking and bus parking. |
| Ban the practice altogether. The cruise ship industry must be stymied in order to keep Acadia as pure as possible. |
| ban them |
| Bar Harbor and Acadia will always be gems and sought after. Permit less people and charge more. But do NOT charge people who live here. Charging the people who live and die here to park in town is disgusting. If you can use a sticker to dump trash you can use that same sticker to exempt locals from paying meter fees. |
| Bar Harbor should GREATLY limit the number and size of cruise ships that come to BH to ships of less than 100 passengers |
| Bar Harbor was a quaint coastal town before cruise ship tourism arrived. It now resembles the NJ boardwalk. Make Bar Harbor great again--ban cruise ships and large tour buses. The roads and town infrastructure was not built to accommodate excessive visitation and large vehicles. For the safety of the visitors and others, limit tourism scooter to in-town and/or 25 mph zones. |
| Base policy on quantifiable concerns and issues, not personal or unsubstantiated rumors |
| Based on information provided in the previous question - that the cruise tourism accounts for only $500,000 in net revenues to the town - I would gladly pay a modest increase in local taxes   to offset any loses to Bar Harbor revenues for a significant decrease or elimination of cruise ship tourism. |
| Be careful what you wish for - we haven't had a community, only decisions made for personal gains, including council and planning board members |
| be cautious on how many per season |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Because Bar Harbor is a top cruise ship destination, I would like the town to market to smaller ships with higehr income passengers. Perhaps limit ship size. Another criteria should be ships that have good environmental records or "greener ships." Maybe smaller ships would even stay longer so that passengers could get a better view of the town and surrounding area instead of a short time in Bar Harbor, buying a t-shirt, and leaving. |
| Beside not allowing cruise ships, we don't need the extra people, ships should have a smaller passenger cap, only one shop per day and overall less cruise lines. I found that the passengers on the smaller ships, such as the Independance, spend the night and spend a lot more money in my shop. It would be nice if this was the trend. |
| Better balanced cruise ship, smaller boat with less people, less visits, cruise ship free day. |
| Better bus process; Have more ships in the Spring |
| Better communication to the taxpayers and citizens overall on this subject.  Cruiseships have become the scape goat it seems for overall poor communication and poor government planning.  Make it known to taxpayers how much this industry brings in via non-tax revenue (perhaps explain fiscally what that means in laymens terms).  Maybe people would feel better seeing and working around some traffic and congestion if they are informed properly of the financial benefits to the Town and therefore them as tax payers.   Overall better traffic flow at the pier.  Overall more support for our police department and perhaps officers on foot doing more patrolling and traffic regulation during busy times (ie: JAX travel times and classic peak travel hours).   Mainly better communication, signage, and direction.  Perhaps reconsidering how the cruise ship funds are distributed to taxpayers? The old adage, What's In It For ME? |
| Better control of passengers at site other than town pier--other than ferry terminal---shuttle buses to town, etc. |
| Better manage the flow of pedestrians and vehicles. Close the core to private non-commercial vehicles and require emission free buses in the downtown. Make the downtown a pedestrian zone. Open streets for freer circulation of guests, more street arts/entertainment, and outdoor dining. |
| better management of buses and passengers for bus excursions |
| Better management of seasons, fully utilizing non-peak times. Better distribution of passenger and possibly a cap on number of boats/passengers. |
| Better management of transportation options |
| Better monitoring air/water impacts. Limit number of passengers. Limit number of ships per day/per season. Limit number of buses. |
| Better pedestrian amenities for all of us |
| Better public restrooms, run island explorer and buses, less cars |
| better scheduling of ships - 1 at a time. Collecting a 5.00 dock fee per each tourist. |
| bring in more |
| Build a cruise ship pier at the Ferry Terminal with water and land transportation.  Many other ports of call already do this! |
| Build a cruise ship pier. |
| build a dock to move congestion out of party pier |

DX323.178

TOWN05958

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| build a parking garage downtown |
| build a parking garage to cars and buses; buses at pier, one big ship at at a time, or two medium ships at a time max. Maybe by fixing land-based car and people issues the cruise ship impacts will be limited. I think it's the synergy of the two and the cruise ship's passengers are getting the most blame. |
| Build a pier somewhere else and bus passengers in. Stop using existing pier, land, harbor, and allow the loclas (taxpayers) some space to enjoy their own town during peak season. |
| build and organize systems to accommodate them rather than villify the activity |
| Build more housing to accommodate the economic growth. |
| Build the damn pier on the northside of the village. |
| Burn, sink, and destroy |
| Bus from a port out of town. Limit total numbers of ships at any one time. |
| bus passengers to downtown away from waterfront. Limit number of cruise ships/day - give greater sahre of profits to homeowners |
| Bus tour management should be improved.  Passengers who are taking tours should be tendered to the ferry terminal where there is more room for buses/taxis/private cars to pick up their passengers there.  Cruise ship passengers who want to walk around town to shop and eat should be dropped off at the in town wharf.  We need 2 stops for the tenders.  This will distribute the number of passengers on a given day more equitably around the town. |
| Bus traffic on West St. too tight. Take a look at Oli's Trolley and NPTours having a "hub" for loading and unloading tours. |
| Cancel the cruise ships or limit their numbers |
| cap number and/or size of cruise ships measures to limit cruise ship industry influence on town policy |
| Cap number of cruise ships at 30 - 50/year  During summer months prioritize Sundays as cruise ship days to minimize conflicts with fishermen |
| Cap ship/passenger limits at maximum 2 ships per day carrying a total of 3,--- passengers to limit strain and congestion. |
| Cap the annual # of cruise ships allowed. |
| cap the number and/or frequency of passenger ships. However, it would be a great service to have accurate information/data about the environmental impact on land and sea - instead of third party environmental or commerce focused groups spreading statistics |
| Cap the number of passengers at any one time on shore |
| Cap the number of ships! |
| Cap the ships coming in to port to 100 per season and spread them out more. Cap the size of ships coming into port. Smaller ships can use smaller busses to transport them into the park. In my opinion, the large 55 passenger busses do not belong on our roads. They were clearly not designed for them. |
| Care more about actual residents. |
| Careful attention to scheduling |
| Carry on as usual. Make changes as needed. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Cease cruise ship visitation. |
| Cease or greatly reduce cruise ship visitations |
| Change more, improve quality of goods sold. |
| change of attitude. An attitude of gratitude for them spending money in BH. |
| Change the infrastructure at the pier or more tendering to ferry terminal. Limit the # of visits by # of boats and passenger caps. |
| change the land use ordinance to allow a cruise ship pier at the ferry terminal. Having a cruise ship pier, would remove the congestion created on West St., when passengers disembark |
| Change the location to where passengers unload to out of downtown or eliminate cruise ships completely due to environmental impacts |
| Charge higher port fees to offset infrastructure; use fees to build parking garages and housing/cafeteria for seasonal help |
| charge more money for fees. Money should stretch across ???. Admit enough is enough. Put the energy into year round businesses and people. Can we have non biz owners be heard. And real estate prices / commercial rents are crazy! |
| close roads to automobiles at times |
| Collect more fees to offset the additional services provided. Move loading/unloading of passengers to a new location. Move tour buses to a new location. |
| communicate with cruise ships before passengers come to "land" both COVID-19 concerns and sharing the space - just like the bikes. Limit number of ships on one day |
| Completely eliminate cruise ship tourism and promote year round non-tourism industry. |
| Compromise! Have ships come every day but know how many passengers our sidewalks and streets can handle. Don't listen to the selfish people who don't enjoy beneficial visitors. |
| Concentrate on many fewer and smaller cruise ships |
| Consider berthing at the ferry terminal instead of tendering in the harbor. |
| Consider carefully the size amount ships allowed to dock within Bar Harbor. |
| Consider expanding and create logistics for expanding pedestrian use of downtown, strengthen alternate ways for tourists to arrive to MDI. |
| Consider limiting number and size of cruise ships. |
| Consider limiting number of passengers on cruise ships. |
| Consider limiting number of ships and/or passengers per day. |
| Consider offloading passengers outside of town pier; Can they be routed to bay ferries landing pier? Rent bicycles for passengers to access downtown--improve cycling access/routes; small buses for inclement weather |
| -Consider that sea-tourists spend considerably less money than land-tourists  -Congestion management during high-travel times for land-tourists (ie perhaps limit cruise ships even more over longer holidays when land-tourists are driving in to town) |
| consider the number of allowed cruise ships, mainly during the high season. |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Considering environmental impact first! While allowing small-scale cruise ships in reasonable numbers on a seasonal schedule that protects the health and preservation of life and welfare of Frenchman's Bay. |
| Continue doing things the way you're doing. It's good for town and business. Island Explorer is more of a pain than tour buses that spend most of the day in the park. |
| Continue or reduce daily passenger/ship limits |
| Continue to monitor the situation but am happy with current status |
| Continue with reasonable limits to passenger caps |
| control how many are allowed at a time and when - not HOLIDAY |
| Controlling number of ships and size per day to limit bus/town congestion. |
| Creat anchorage areas so the cruise ships can't be seen, allow only small cruise ships in port, i.e. 150 passengers, block cruise ships from arriving when we know there is a high tourist visitation already |
| Create more parking |
| cross walk signals. Fewer ships and passengers. Different place to load and unload passengers. Too congested in pier ???? And dangerous |
| Cruise ship disembarking at ferry terminals. Shuttle passengers wishing to shop to village green. |
| Cruise ship scheduling needs reform; less than 100 cruise ships per year; max one cruise ship per day; promote Bar Harbor as an exclusive (not every day) destination |
| cruise ship terminal |
| Cruise ship tourism "crowds out" more desirable forms of tourism, including longer term tourism from people driving to MDI and tourism from nearby residents who now mostly avoid Bar Harbor during the cruise ship season. Let's refuse the siren call from cruise ship owners, as other premium destinations around the world are. As a premium destination, Bar Harbor and the MDI region should be seeking the best tourists - those who stay longer, spend more on higher quality local artisan products, and disrupt the natural environment the least. |
| Cruise ship tourism enhances the image of Bar Harbor as a destination location and contributes to the economy, but we've seen some rather nefarious actions taken by the cruise ship industry to influence the direction of the town. The industry needs to be regulated to balance the needs of cruise ship tourism with the needs of the town's residents and other stakeholders. |
| Cruise ship tourism is important to the community, but a double-edged sword. I don't know how to improve it. |
| Cruise ships should be part of the town. I would strongly support limiting the number of ships and imposing lower daily passenger counts. The fact that cruise ships visits have more than doubled over the last 10 years is troubling and unsustainable going forward. |
| cruise ships should dock at ferry terminal, or moor in that vicinity and tender to the terminal if cannot dock. Cruise ships and their queueing should be removed from downtown |
| Cruise ships should use ferry terminal site rather than town pier. |
| Cruises should be limited or eliminated in July and August. It could help in May or Cotober/November. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Curtail the number of cruise ships allowed to visit and the numbers of people allowed to be brought ashore at any one time.  This may include limiting the months or weeks of the season in which cruise ships may come.  For example, no cruise ships at all on holiday weeks. |
| cut back numbe rof ships, one given time. |
| Cut back on the # of ships (moderation). Keep large buses out of downtown (2 points of landing town pier and ferry term). |
| Cut back on the # of ships allowed and perhaps smaller vessels |
| cut back on the number of ships/passengers/days that ships are allowed. No multiple ship days |
| Cut cruise ship numbers and passenger cap by at least half. |
| cut cruise ship schedule in half. Limit number of ships per day. Police officer at 3 intersections to direct pedestrians and cars. Downtown needs to be supervised |
| cut cruise ships to 25% of current capacity |
| Cut down on multi ship anchorages - too many days with 2 or more large ships; limit number of large ship visits; deal with West Street somehow |
| cut down on number of ships allowed. |
| Cut the number of arrivals by at least one half |
| Daily Passenger limits |
| Decide how much tourist business we want and focus on those segments which have the greatest economic benefit to local business. This is not cruise ships here or anywhere. |
| Decrease amt of ships. |
| decrease frequency of visits |
| Decrease number of cruie ships |
| Decrease number of cruise ship passengers(size and number of ships) allowed on a single day. Remove staging area from downtown and restrict buses using downtown parking |
| decrease number of cruise ships & passengers drastically! Especially the BIG ships. Probably too late because of new ferry terminal which will? Accommodate those big ships. Sometimes I would see 3 cruise ships here at a time - even just a few years ago, unable to drive downtown because of congestion of PEOPLE in road - same for walking on sidewalk to get to PO or a pizza/sandwich. |
| decrease number of ships per season and per day |
| decrease number of ships slightly |
| decrease number of ships/season one ship/day |
| Decrease number per day, smaller ships (like Key West did). Apply environmental standards. |
| decrease ship traffic and visitation |
| Decrease the amount of tourism |
| Decrease the frequency of cruise ships and/or only accept smaller ships |
| Decrease the number of cruise ships allowed during the season |
| Decrease the number of cruise ships allowed to visit and also decrease the number of large cruise ships from visiting |

115

# Appendix B – Verbatim Responses to Open-Ended Questions

Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Decrease the regularity of cruise ship landings. Somehow lessen waste of cruise ship tourists. Increase public transport. |
| decrease the total number of passengers and cruise ship that gets to come |
| Deep water dock |
| Demand a pledge of sustainable practices by any company who may come here. |
| Deny ships from visiting just like Northeast Harbor, Eliminate coach bus excursions in total |
| Despite the obvious positive economic impact, the overcrowding created by added tourism from both cruise and loud visitors has a negative impact on our quality of life. Somehow the total number allowed on MDI needs to be controlled. |
| Direct tenders to Ferry Terminal to access buses and other tours. Direct Tenders to Town pier for pedestrian only access. |
| Direct voter control of ship size, number of passengers landing/day, ships/day, ships/season, & length of season. |
| Disallow all cruise ships. As a young person who grew up in Bar Harbor, cruise ships actually make me less likely to move back and join the local community and job force because of the negative impact on quality of life in the summer from their passengers |
| Disband the self serving Cruise Ship Committee. Reduce budget to $0.00 for promotion of the Town as a cruise ship destination. Increase all fees related to cruise ships by 3 times. Charge tour busses directly. Put all these fees into the general fund. Substantially limit the number of ships and people allowed by half or more. |
| Discontinue allowing cruise ships! Unless you own a business, they have no value. What percentage of the jobs created provide a livable wage, particularly given the draconian price of housing on the island? |
| Discontinue cruise ship tourism / only a certain few benefit from the income it generates / pollutes the air and land and sea--no benefits |
| disembark outside of downtown |
| Disembark outside of town, reduce caps, limit the number of ships on any given day (3 massive ships are too many for one day) |
| Do a better job of correcting the false claims. |
| Do more to combat false claims |
| Do not accept ships. Town needs to be 5x larger to accommodate 1 ship a day. |
| Do not add a big pier to get bigger ships!!! There are plenty of ships already and we don't need more. |
| Do not allow cruise ships |
| Do not allow cruise ships. |
| Do not allow huge cruise ships in Bar Harbor or on MDI. |
| Do not allow large cruise ships to dock in town. Only allow smaller and higher-end ships to come here. |
| Do not allow non-Bar Harbor residents input into any decisions (i.e., Eben Salvatore). |
| Do not allow ships with over 200 passengers to visit or disembark. |

DX323.183

TOWN05963

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Do not increase the number of cruise ships. Do not allow cruise ships that are larger that the island to anchor. |
| Do not shut down town pier when cruise ships in. I had a mooring permit for Bar Harbor but I could not get near the pier to use it when it was closed due to cruise ships. |
| Doesn't matter what I think; they do what they want |
| Don't allow cruise ships at all. |
| Don't allow cruise ships during July and August. Allow only a single ship to have passengers ashore at any given time. |
| Don't allow cruise ships here--port too small. |
| Don't allow large cruise ships to port or at least significantly reduce the number and never more than 1/week |
| Don't allow them anymore |
| Don't alow cruise ships in Bar Harbor |
| Don't have more than one ship at a time. Move buses someplace other than terminal. |
| don't know |
| Don't let cruise ship industry lobby in town matters |
| Don't let more big ships in. |
| Don't park large cruise ships off shore path. Limit # of large cruise ships per season. |
| Double the fee per passenger, cut amount of ships, bring to ferry terminal |
| Downscale to small ships that fit into environment....harbor, Bays, and restaurants and all. Whatever BarHarbor gains from a temporary entry fee is overdone by too many people coming...and they come when Bar Harbor is in the news....then they go to Madrid, Spain when that is in the news. |
| Dramatically reduce the number if not eliminate cruise ships altogether.  The return is negative to the year round resident, as the cost of infrastructure in the town specific to the industry is costing the year round resident more then it brings in to the operating cost of Town. |
| drastically limit the number and size of ships which would be allowed to visit Bar Harbor  Consider tenders going to Marina/Bluenose pier area  Increase fees charged to cruise ships who are allowed to visit  value smaller high end ships over Mega ships |
| Drastically reduce daily passenger count! |
| Drastically reduce or eliminate the number that come |
| Drastically reduce the number of cruise ships and work towards eliminating them. |
| Dropping the number per day of passengers |
| dumping waste, limit cruise ships to fewer per month |
| Educate locals with correct information. |
| Efficient scheduling |
| Either ban it or only allow small ships to visit in limited numbers. |
| Either no ships, or have them dock in Trenton or Loraine. Bus people to BH. |

DX323.184

TOWN05964

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Either not encourage it by capital improvements such as pier extension, or only allow in smaller cruise ships. |
| eliminate |
| Eliminate all cruise ships except small ones that can tie up at the pier. Under 500 passengers. |
| eliminate all large capacity cruise ships, limit number of small capacity (river cruise lines) docking ships |
| Eliminate all large Cruise Ship Visits Completely. Allow only small, pier-docked, small-number of passenger, cruise ships to visit. This will enhance the experience for the passengers, businesses, and residents; and facilitate land-based tourism experience and economic growth for the town as a whole in general.  Cruise ship visits currently deter possibility of other economic growth potentials. |
| eliminate all large cruise ship; strictly limit smaller cruise ships |
| ELIMINATE AUTO TRAFFIC NEAR THE WATERFRONT |
| Eliminate big ships. Allow only ships with under 200 passengers. |
| Eliminate cruise boats from Bar Harbor entirely. |
| Eliminate cruise ship |
| Eliminate cruise ship tourism. It would be a powerful statement for the well being of our town as well as the environment. |
| Eliminate cruise ship tourist. |
| Eliminate Cruise Shipe. |
| Eliminate cruise ships altogether. Only focus on land tourism and resources. |
| Eliminate cruise ships.  Allow environmentally-friendly small tour boats.  Looking at the income and expenses of the budget, the town gains about $300,000.  Assuming the population of year-round and summer residents at about 18,000, get everyone to chip in $17!  I would certainly pay that to get rid of cruise ships.  Many businesses that are not T-shirt shops, report doing fine without cruise-ship passengers. |
| Eliminate it or decrease it to a minimum. |
| Eliminate it. At best, limit to ships <70 passengers. Do not allow cruise ship tourism until 2023 or later due to COVID. |
| Eliminate large cruise ships or severely restrict number of large cruise ships (over 500 passengers) |
| Eliminate megacruise ships; Consider landing only at ferry terminal, smaller ships only; Reduce number of days ships dock; If feasible, vary landings, some at ferry terminal, perhaps Southwest Harbor |
| Eliminate or further limit cruise ship access |
| Eliminate or greatly reduce. |
| Eliminate or only allow ships with minimal passengers |
| Eliminate ships with more than 250 passengers.  Require all ships to have up to date environmental accountability, especially with waste water and air pollution. |
| EMBRACE CRUISESHIPS and their value to the area... |

118

# Appendix B – Verbatim Responses to Open-Ended Questions

Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Encourage bussing out passengers to further businesses and attractions. Spread the wealth = non-downtown businesses and locals year-round feel like cruises only benefit a 1/4 mile radius. |
| Encourage more land based tourism and find housing solutions for more year round houses |
| Encourage ships to stay for multiple days--reduce emissions due to cruises. Better traffic management for passengers. |
| Encourage small ships. Discourage large ships. Limit summer visits. Encourage overnight stays. |
| Encourage with better messaging the satellite parking with clean restrooms and food trucks as a stopping place and free bus riding better to cut down on cars. Make biking paths more safe as well as provide bike sharing at lower cost at this same location the way that cities do. |
| End it. |
| End or severely limit cruise ships. Considerations for covid as it is not going away soon. Travel is not recommended so why is Bar Harbor promoting it risking residents health. |
| Ensure cruise ships are limited # per week and that cruise passengers are back on ship before dinner time. |
| Environmental impact assessments including water quality and air pollution near ships and bus idle spots. Ban idling. |
| environmental tax that considers damage to trails and ecosystem from foot traffic and littering and marine polution. Close Main and Cottage Street to be pedestrian only. No cars on Park Loop Road 1x/week. |
| Envision a future for the town that does not rely on cruise ships. Develop more resilient, diverse pathways to economic benefit for residents. Encourage tourism that involves developing a relationship with this important place, rather than dropping in for 3 hours. Recommit to town values (fishing, beauty of Acadia, quiet). |
| Establish or increase landing tax each person coming ashore should pay at least $20. Keep increasing till number of people ashore is reasonable. |
| Even with 2020 being a rough year, not having a cruise ship was nice. With land base tourist they are going to shops, eating out and spending more money in our town and our biggest question is what to do when a cruise ship is in and the town is over run |
| Every other day? Require smaller ships? One per day? |
| Exclude them |
| Expand explorer system. Keep dockings limited. Expand business zone to spread out the people. |
| Expand use of cruise ship monies; Charge more for ships to visit |
| Explore ways to better move people from the pier to other parts of town. Consider blackout days, lower passenger caps. |
| Facilitate dialogue directly between cruise ship management and residents |
| Ferry all passengers to former Ferry Terminal have a common drop off and pick up point on a regular basis and the bus [illegible] back to terminal. |
| Ferry Terminal development |
| fewer - dock farther, only allow socially conscious cruiselines. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| fewer and smaller cruise ships and use ferry terminal for all passengers going on tours |
| Fewer and smaller ships/more monitoring of adverse environmentla effects/bus pickup and drop off in less congested part of town, it.e. lower Main St., western West St., Ferry Terminal. |
| Fewer cruise ship visits. Limit to 1 cruise ship a day, not 3 or 4. |
| fewer cruise ships and limit number in a week! NEVER 2 on a single day |
| Fewer cruise ships and smaller ships |
| Fewer cruise ships per season |
| Fewer cruise ships with smaller passenger capacities. |
| Fewer cruises per year. Consider implementing a no-discharge policy for small passenger vessels in the harbor. |
| Fewer in August. |
| fewer ship visits |
| fewer ships |
| Fewer ships |
| fewer ships - smaller ships - no traffic from boats to buses down at wharf - no large buses - use ferry for ship to land transportation - no buses downtown |
| Fewer ships (no more than 50-60 per year). No more than 1 ship per day. |
| Fewer ships and exclude the really large ones carrying over 1500 passengers. |
| Fewer ships and fewer passengers per day.  One ship max, 2,000 passengers max.  Have one or two days each week with no ships.  Reduce the number of buses.    Make Main Street and Cottage Street in the town center pedestrian only.  Allow restaurants to have outdoor seating in the street. |
| fewer ships and more parking! I do not ????? Town in the summer any longer as you can't park! Or get around the town. I grew up in BH and the town has done a poor job managing this |
| fewer ships or a much larger fee. $1M for a full season is way too low. |
| fewer ships, docked further from the harbor |
| Fewer ships, smaller ships, only use small vans and buses to take them on tours. |
| Fewer ships, smaller ships--if at all. |
| Fewer ships. None of the huge ships, no more than one or two on any given day--none in July or August |
| fewer ships; no use of town pier; to open residential access fewer large ships; fewer passengers; no multiple ships same day |
| Fewer, smaller cruise ships. |
| Fewer, smaller ships |
| Fewer, smaller ships. |
| Fewer, smaller ships; higher fees |
| fewer/smaller ships, fewer passengers; |

| |
|---|
| Find a sustainable number of ships and cap that number as a happy medium. Study moving offloading to ferry terminal. |
| Find another area to offlowad passengers other than the town pier. |
| find the balance. Move the ships to pier style. One ship at a time |
| Find ways to encourage cruisers to spend time and money downtown, such as more local paid walking tours, barbecues for them sponsored by local groups, etc. |
| First choice, no ships. Second choice, only small ships. Third choice, stop using the anchorage near the shore path. |
| First, docking the ships at the Pier is a good idea. Second, keep the cruise ship "season" short, as it currently is. I think the town is doing a good job of managing concerns. |
| flow of people/motor vehicles. Moving residential needs just outside of bar harbor proper: ie towards KEBO |
| Focusing on our wild places and less on tourism. |
| forget the cruise ships and tourism and be concerned about us locals year-round living here!! |
| Free parking for city property owners. Utilize the old ferry area for cruise liners to dock. Use parking there, buses should shuttle people to town and sights. |
| free parking for MDI residents anywhere |
| Free up public town pier when ships are in. |
| From what I can tell, the most conflicts occur around the pier and West Street. Using the Bluenose terminal would probably help with that, but all those people will need to get into town and dropped somewhere. I have no idea where that spot could be. The ballfields are too far for oldsters to walk towntown adn back. |
| Further limit the number of visits/year; furthher cap the number of tourists landing per day; allow only ships with the highest ecologic compliance ratings; inspect ships and test air and water for compliance. |
| Further regulate the volume of ships allowed into the town, ie 75 for the season of Memorial day through Indigenous Peoples day.  So that the tourism is there, but less taxing to resources. |
| Get correct information to tax payers, with out cruise ship funds how much will taxes increase. |
| Get rid of cruise ships |
| Get rid of cruise ships faster. |
| Get rid of cruise ships in BH |
| Get rid of cruise ships. Charge cruise ships huge sums of money. Keep the cruise ships under ~30 people. Also get rid of cruise ships. Invite other businesses like whale watches, tours, kayaks, lobstermen, and other LOCAL business to use the pier, and charge them. And then get rid of cruise ships. |
| Get rid of it. |
| Get rid of parking meters or give locals a free pass. |
| Get rid of the cruise ships or severely limit their number and size. |
| Get rid of the large cruise ships. The very small cruise ships are fine. |

121

# Appendix B – Verbatim Responses to Open-Ended Questions

Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Get rid of them all. They decimate lobster gear, bring massive pollution into our air, are a major eyesore, and the traffic pushes longer-term vacationers away. |
| Get rid of them. |
| Get rid of them--all of them--as fast as possible. Failing that, as fast as possible raise all fees on them as high as possilbe as fast as possible, which will reduce the number and give more [illegible] for each one we have to endure. |
| Get the ships off the pier and take the buses off from the parking spots. |
| Given the number of ships and the number of passengers I feel strongly that management of cruise ship tourism is impossible |
| Go away |
| Greatly reduce cruise ship visits, maybe even eliminate them. |
| greatly reduce number of ships permitted |
| Grow the town....encourage new businesses....the reason there may be some congestion is that the people only walk the few blocks on main st. We don't nessesarily need to have less people come we need to  grow and spread them around. |
| Hard to say. I've lived here 50 years and seen many changes in town, most not positive. Old story. Merchants and CC want more visitors, locals trying to live a normal life beside the 7th most visited US-NP have to see their quality of life deteriorate. Businesses seem to get their way! |
| have a fleet of ubers / tour guides to take people around WITHOUT prior resertations - like every other port. It will keep the people moving and less on the streets wandering. |
| Have all cruise ships go to the ferry terminal. |
| Have cruise ships disembark at the old Ferry Lanidng, use small tour buses |
| Have less cruise ships per year. |
| have less ships - the shops have all turned into junk shops to serve the cruise passengers |
| Have more buses available to more locations. |
| Have more visits in the spring. |
| Have mostly one cruise ship at a time. Maybe 2 during cir season. We don't want to be Venice or like some ports in Mexico where 6 ships arrive a day. Only accept American flagged ships, then you wouldn't have a bunch of numbies inspecting the ships for dubious criteria. The passengers would have liability traveling on these ships. Ship owners should pay income taxes for the per cent of American Ports they visit. |
| Have no more than 2 big ships and 2 small at once. |
| Have only smaller cruise ships and limit them to one visit at a time. |
| Have tenders disembark at the marine terminal instead of downtown and bus to ANP from these; create more bike/walk infrastructure downtown. Perhaps limit size of ships and/or number of ships. |
| Have the cruise ships use the ferry terminal; buses come and go from there |
| Have the tenders go to the old Ferry Terminal and the excursion buses pick cruisers up there. |
| have them find another destination |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Have them park nearer the cat pier and taxi in and out of a non centralized location in town, instead of clogging up the center of town with a massive influx of pedestrians and busses. |
| Higher air and water quality standards, limit bus use and thereby improve air quality or use electric. Require excursions out of town center to be smaller (fewer people). |
| Higher fines and docking fees to help protect and ameliorate ecological impacts of cruise industry. |
| Honesty as to true financial impact, I.e. actually dollars spent by passengers.  Car filled families spend more at grocery, restaurant, outfitting, and ATTITUDE |
| How about allowing only small ones? After all, Bar Harbor is a small town and it already has a lot of tourists. |
| How many people had to look up ameliorate? |
| I can think of nothing negative. Just a constructive criticism is to have a bussing system that works quicker and not block off parking spots for tourists that are already here. There has to be a better way. |
| I do not think cruise ships should be allowed in Bar Harbor |
| I do not think it is healthy for our water quality. This town and harbor are too small to accommodate these ships. I've lived here since 1973 and I remember when we had no cruise ships OR just the Q2 arrive for a short stay - and even that was an impact on the quality of the town |
| I don't know |
| I don't know what can be done other than maybe limit the size of the ships and the number on any given day.   If we eliminated cruise ships all together, can we add parking spaces near the town pier to off set the loss of revenue? I heard this discussed some where.  In my view, the loss to the harbor view, the environmental impact along with street crowding cannot be made up for by the town revenue that the ships bring. |
| I don't know enough about what the town actually does so I can't provide suggestions |
| I don't know. |
| I don't want cruise ships at all. Limit the size, preferably less than 100 passengers and never have more than one at a time several days a week. 2-3 every day in 2019 was totally obnoxious, makes Bar Harbor seem like Disney World. Some businesses are hurt by the cruise ships. People hate coming here when a cruise ship is in. Years ago, when QEII came, it was a novelty. Now it's a nuisance. |
| I doubt that a ban will likely take place because of the economic advantages. But significantly fewer and smaller ships are a must.  And the number of people who can come ashore should also be limited. |
| I have no opinion |
| I have not experienced negative impact of the cruise ship industry, therefore cannot say. Without tourism, what economic drivers does the town of Bar Harbor have? It needs to be welcoming to all forms of tourism. |
| I know that what I think or how I feel doesn't matter to the town of BH. This town sold its soul years ago to the cruise ship industry, their money is what makes decisions now. |
| I know there is a cup on cruise ships at a time, but it still seems too high (passengers disembarking at same time) |

DX323.190

TOWN05970

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| I like the idea of cruise ships using the ferry terminal for loading/unloading as it would decrease density in town. |
| I like the idea of having cruise ship passengers downtown at the pier by COA |
| I live in Town Hill and am not affected by cruise ship tourism. At some point, the number of passengers coming ashore will have to be limited. |
| I think Bar Harbor should do away with cruise ship tourism completely. I don't think there is any significant improvements that can be made to tip the scale in favor of cruise ship tourism. I would rather focus on land based tourism. |
| I think cruise ships should not come here. Period. |
| I think it does a relatively good job currently. However further assuring not too many ships are in at the same time might be helpful. Also pushing out information regarding the positive financial impacts to all townspeople may help the overall perception (and acceptance of some level of inconvenience during the busiest months of a relatively short tourist season). |
| I think it should discontinue allowing cruise ship tourism. |
| I think it should not be part of our economy. Maybe very small ships/cruises. Cruise ships are nasty vectors of respiratory disease. I didn't need Covid to tell me that. |
| I think messaging and transparency to the positive fiscal and community impacts that the seasonal tourism has on Bar Harbor would go a long way. Yes, there are challenges but these are the challenges to have. |
| I think that the number of cruise ships coming into the harbor has grown completely out of control in the last decade. It would be nice if it could be significantly more limited. |
| I think that the town should set a much more restrictive cap on both ship and passenger numbers than currently. I would not be sad to see them banned. |
| I think the number of cruise ships should be limited. The number is quite high. Also, the giant ships that hold 3000+ passengers should NOT be allowed because of the volume of people |
| I think the town should consider any and all suggestions from the community with a clear and open mind and consider the longevity of our culture here in Bar Harbor. |
| I think the town should limit the number tours |
| I think the town should utilize the pre-covid ship visitation cap. After that, any other "management" is impeding local business owners' right to make a living. |
| I think there should be WAY less cruise ships visiting. And maybe only smaller ones. |
| I think they do a good job given the space limitations of the town pier area. |
| I think we should stop cruise ships--stores will be fine without the chaos… |
| I wish I had an answer to this. Perhaps allow only small ships, and lower the number the visitors per season. Personally I would like to see cruise ships disappear altogether. I believe the town and people will be better off and the economic impact will level off as people make changes and come up with creative ideas to supplement seasonal businesses. We can make this money some other way. Hosting cruise ships feels a bit like having too many T-shirt shops. We have a vibrant and creative community in an extraordinary landscape. We know it's special because so many people want to visit. We should |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| be protecting this wonderful jewel, rather than overrunning. it. I know change is hard, and some people will be more impacted than others. But at some point, change is necessary. |
| I wish I had the answers. I understand from the above studies that they bring in a lot of money. At the very least, limiting the size and capacity of the ships in port would be an improvement. |
| I would like to see the amount of ships decreased and a cap placed on how big the ship can be (which needs to be smaller than what has been allowed in the past) |
| I would think the residents would have access to cruise ship schedule to help them in planning their visits to busier sites.  Widely publicize for best communication.  Continue to explain the benefits and tax offsets for the residents. |
| If Bar Harbor is going to allow cruise ships (which it should not in my opinion), the amount of cruise ships that are allowed to come should be severely restricted.  Also, the size of the cruise ships should be limited. |
| If cruise ships are to come to Bar Harbor, the ferry terminal should be used for passenger offload and tour buses. |
| if not an outright ban then a limiting of # of ships/passengers in town at one time |
| If people are going to be "shipped" into town, a much more economical priority could be bus travel. Making BH less of an "elite" destination. Closing the rich/poor destination more. |
| If ships are to be allowed at all ABSOLUTELY no more than one at a time. All tourists should be required to pay full park entrance fees if visiting Acadia National Park |
| If the industry must continue, bus folks up the hill, so they can spend money at locally-owned businesses and not at an out-of-state owned corporation. I also would like to see cruise ship fees available for non-cruise ship related projects. Why can't we use the fees for example parks and rec, library? We don't really benefit from nice bathrooms. |
| If the town insists on keeping the whale killing, sewage dumping, cesspools of humanity afloat visiting as is apparent, then we should be offsetting 1/3 to 1/2 property taxes. |
| If we are going to allow cruseis (hopefully many fewer than 2019), is there a way of ensuring that the town character and shops don't chagne? WE do not want to become like Ketchikam, [illegible], etc. in Alaska where the towns lost all their local character and the cruise lines get kickbacks from the stores that took over to cater to cruise passengers. |
| If we cannot eliminate altogether, limit number and size of ships, as well as days per week ships can visit. |
| if we have to have them (which I don't agree with) then they should be smaller and not several a day |
| I'm more concerned about land-based tourism. Not sure how you address environmental concerns of cruise lines…be selective of type of ships allowed and cut down on idling? |
| I'm not a consultant - needs more thought than I'm prepared to give it |
| Improve Rodick St. and create new traffic patterns, but do not move passengers to ferry terminal. |
| In medical terms the cruise ship industry amounts to a deadly, non treatable illness. Avoidance is really the only line of effective defense. The mere fact that Bar Harbor is a cruise ship port as drawn the "fast buck" out of state business crowd like metal to magnet. This has resulted in not only the overcrowding and other issues addressed in this survey it has also driven the Air B&B conversion of year round homes into out of state owned business ops. |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Increase fees from cruise ships--limit cruise ships to one per week. |
| Increase restrictions on # of vessels and # of passengers allowed at a time. |
| Increase the harbor fees by a factor fo 5--reduce the number of ships by 80% |
| Increase the number and ways to get people off the cruise ships so they can spend their money here |
| Increased fees for the cruise ships. The 2019 study suggested that half of the fees currently does not go to the town. Negative impacts from cruise ships should be accounted for within these fees. |
| is there another place where bus pickup could happen? Shuttle bus town passengers to a different area and have buses not right downtown? Close off streets for walking? |
| It is my understanding that the 1000' cruse ships proposed for Bar Harbor would be detrimental for the town, for Frenchman Bay and the environment.   WHY should the all the surrounding communities have to absorb the negative aspect of this huge increase in tourism for Bar Harbor. This is happening all over the world. I hope BH has the guts to control this tourism. |
| It is working OK as is. |
| It makes sense to put some limits on cruise ships. |
| It seems like there is one or 2 here everyday. All summer do we need that many? The shops and restuarants make a lot of money from them. They should be required to pay the Town extra as they are using Town services to there gain. The residents need to know where this money is going. Example Extra people means Extra Police. Who is paying for that? Extra Trash. Who is paying for that? ...ect |
| It tough because once you allow something, it's hard to take it back. We have provided millions of tourists with a wonderful experience, businesses with predictable, healthy income, and a town that has really earned a name for itself. We will always ride the fine line of "a quaint town with resources allocated phenomenally" and "just another place to get ice-cream and a lobster roll". |
| It would seem that every time someone complains about something the complaint is addressed, far and beyond what may be necessary. |
| It's a filthy industry from top to bottom. Don't we get enough tourists and their money, without the ships? |
| It's a question of degree: 1 or occasional 2 ships per day. Never 3 or more. Limit number of paxs on bus tours; provide outlets for musicians, performers, and artists, storytellers to incorporate more Maine culture. |
| It's adequately managed as is. |
| It's doing well. |
| it's like new orleans at mardi gras! Not fun in BH! Limit by a lot the number of cruise ships allowed at any one time - bring back an orderly seaside town. I can't drive down main street without worrying about hitting a pedestrian. |
| it's not broken |
| Just us locals can't support all the businesses in town. Let things be. I think for the amount of time cruise ships are in town for a day is fine. I think it brings people back to the island later on to spend time here. Brings money to local businesses, etc. It's a long winter. |

DX323.193

TOWN05973

## Appendix B – Verbatim Responses to Open-Ended Questions

Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Keep a strict limit on the size and number of ships that can visit. Insist on a high standard of cleanliness and low disruption to locals. |
| Keep bringing in the cash and use it to improve all roads in Bar Harbor and parking |
| Keep cruise ships small and limit numbers, enforce pollution controls |
| Keep experimenting to see what works and what doesn't. Movement of people--try it all! |
| Keep managing the maximum passengers allowed per day |
| keep measurable data and monitor any negative impacts. I personally believe tourism on land or water is critical to MDI's success |
| Keep number of cruise ships in harbor limited to low number on days they are in harbor. |
| keep people downtown |
| Keep staying cruise ship friendly |
| Keep the largest cruise ships out.  Building larger piers to accommodate more of these monsters is a terrible idea. |
| Keep the ships small |
| Keep the timing of cruise ships consistent with slower periods of land based tourism. |
| Keep them moving |
| Keep them out and away |
| Keep them out! |
| Keep them out!!! |
| Keep working on improvements around the pier. |
| Keep working on the people moving by the Pier.  Don't forget we made a deal with Witham years ago to use Newport Drive for busses |
| Knowing the cruise ship industry is only going to make larger and larger ships limit the size and number of passengers to a manageable level, perhaps 1000 people a day. |
| Land passengers at ferry terminal |
| Larger boats in shoulder seasons, single ships June-August. Short-term vacation rentals are a much bigger issue. |
| larger sidewalks that are ADA compliant |
| Learn when to take up issues from the squeaky wheel and when not to. |
| Less |
| Less bus tours, more walking, the bus takes all the people away! |
| Less cruise ship days, less ships. |
| less cruise ships |
| less cruise ships |
| Less cruise ships and buses to accommodate. |
| Less cruise ships and less number of days. Move dockign location from town pier. |

127

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Less cruise ships and tour buses! Move the Island Explorer out of center of town. |
| Less cruise ships and/or smaller cruise ships |
| Less cruise ships during the season; relocate the tender landings outside of downtown. |
| Less cruise ships per season. |
| Less cruise ships! Maybe 1 a week. |
| less cruise ships, less days, chareg more for ships coming |
| Less cruise ships, limit number of passengers per day, and cruise ships per day. |
| Less cruise ships, more housing for year-round families. |
| Less cruise ships/year |
| Less high days but balanced with fewer low days (numbers of passengers) |
| Less is more beneficial |
| Less numbers |
| Less of them, less people, more spread out. |
| Less ships and smaller ships. Tendering to ferry terminal instead of pier. |
| less ships or smaller ships |
| Less ships per day, or allow only smaller vessels, not these huge ships. |
| less ships per day. Maybe only one ship per day. and maybe not 7 days a week. |
| Less ships per year |
| less ships, fewer passengers, making changes to manage pedestrians. Signage about not walking in the road |
| Less ships, less often, smaller size. |
| Less ships, lower passenger caps, higher fees to dock and disembark, less focus on visits/revenue and more on quality of visitation |
| less ships, no ships in july and august |
| Less ships. No more than 1 ship per day. Reduce passenger capacity. Smaller ships. |
| less ships. Smaller ships/less people |
| less total of cruise ships, still if we get a fair and awesome net |
| Lessen the number of ships allowed and how many per day as well as the SIZE of passengers on each.. |
| lessen the number of ships allowed. Require tour buses taking ship passengers to/fro to reimburse town for loss of parking meter income. Less cars downtown - less families able to enjoy town in a more relaxed manner |
| Let the Cruise Ship Committee do it's job.  That has worked for years. |
| Let the cruise ship committee get back to work on improving the operation |
| let the free market solve the problems. Overregulation will stifle BH's future growth and role as a tourist attraction. Not smart to kill the Golden Goose. |

DX323.195

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Let the residents vote on it!!! Drastically reduce the number of ships per season. Never allow more than one boat in the harbor at a time. |
| Lighten up the schedule. Fewer boats stopping would be better |
| Limit it or get rid of it |
| limit - none |
| Limit # allowed; more the landing area to the ferry terminal to relieve congestion in town; use the $ to improve year-round residents not beautification projects and increase benefits to include those who can't afford to buy property here |
| Limit # of days where ships are visible in Frenchman Bay so there are clear days too. |
| limit # of passengers/day. ?????? To the ferry terminal. Shuttle cruise ship passengers into town in smaller buses |
| Limit # of ships per day and total # of passengers per day. A reduction from 2019 is necessary. |
| limit # of ships; solve congestion issues on waterfront |
| limit (the number and size) of cruise ships to start with and also to use more park bus service to land based tourist. |
| limit activity during peak tourist season |
| Limit amount of ships and market promote town as not overrun with cruise ships |
| Limit cruise ship berths and the total size of cruise ships. In other words, max amount of total cruise ships each season and max amount of passengers i.e. no ships that hold more that 500 total people including crew or something similar. No large ships. |
| Limit cruise ship tourism to the same days of the week throughout the entire season. So residents can plan around and visit Bar Harbor on the "off" days. |
| Limit cruise ship traffic to 3,000 or to some other set number per day. |
| Limit cruise ship triffic during peak season (july/aug). |
| Limit cruise ships in number and in passenger capacity size. Encourage small cruise ships. Strict regulations about engine idling, exhaust pollution, and waste dumping. Limit number of tender landings. |
| Limit cruise ships to 100 passengers. |
| Limit cruise ships to 2 week days a week. Limit the size to much smaller ships. Significantly cut cruise ship businesses by 70%. |
| Limit cruise ships to 60. Only in shoulder season. Banned July thru September. |
| Limit cruise ships to 75 per year |
| Limit cruise ships to maximum 500 passengers |
| Limit cruise ships to no more than one per day. |
| Limit cruise ships to one large ship per day and one small per day; Don't hold up pier traffic as the passengers come up by Harbor Place |
| Limit Cruise Ships to September to November only, not more than 1 ship per day |

DX323.196

TOWN05976

| |
|---|
| Limit cruise ships to very small ships that dock at the town pier and stay overnight. Raise the fees for all cruise ships -- if Bar Harbor is in demand, the fees need to reflect that. |
| Limit cruise ships; Move from downtown area (ferry terminal); Cruise ships always came before everyone else when one is in town |
| limit cruise vessels |
| Limit how many giant ships are in at the same time. |
| limit how many ships are allowed. ?? Limit how long they can stay. Increase their fees. |
| Limit it to very small ships and charge them more. |
| Limit large ships 1000 or more passengers to 2 per week, on different days; increase number of smaller ships-25 to 50 passengers |
| Limit length of season: late September to early November |
| Limit number |
| Limit number - relocate |
| Limit number allowed at a time and total annually both by number of ships and number of visitors. |
| limit number allowed, don't alllow big ones (2000 passenger size) |
| Limit number and size of ships, number of days with ships |
| limit number and size of ships. Dock them at the ferry terminal. |
| limit number of cruise ship visits, no more than one per day, and ideally, fewer |
| Limit number of cruise ship visits. Limit number of days for ship arrivals. Address noise from PA systems. |
| Limit number of cruise ships that can come. Hold them accountable. If polluting the environment, don't let that company come here. |
| Limit number of cruise ships to one per day. It is frustrating to have the pier closed for buses. Moving those to a different location would help. |
| Limit number of people that can come ashore each day. Think it's 5,000 now. Limit the number of boats, ships that can come each year and each day. |
| Limit number of ships |
| Limit number of ships and freeze proeprty purchases by cruise lines. |
| limit number of ships and number of passengers per ship |
| Limit number of ships and passengers per day. Limit total number of ships  person. |
| Limit number of ships and passengers. |
| Limit number of ships and size of ships. Waste discharge in Frenchman's Bay has a detrimental effect on burgeoning aquaculture industry. |
| Limit number of ships at a time |
| limit number of ships per day |
| limit number of ships per day, hefty fees for ships over a certain tonnage. Prioritize health of the bay ecology and BH residents over cruise industry. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Limit number of ships per day; Limit size of ships to less than 100; Do not bring passengers ashore at pier; Accept ships with excellent eco records regarding pollution to sea/air. |
| limit number of ships, limit size of ships |
| Limit number of ships, prevent ships until Covid is under control |
| Limit number of ships, tighten regulations affecting water quality, air quality and marine life and fishing industry |
| Limit number of ships; Limit large capacity ships. |
| limit number to 1 ship per day - no more than 2,000 passengers |
| limit numbers and require cruise companies to employ green technologies, ban big polluters |
| Limit numbers of people getting off per day |
| Limit numbers of ships and passengers. Look at ways to more evenly distribute benefits and costs. Shift toward smaller/high-end ships. |
| Limit numbers of ships per day and have cruise ship-free days for locals and land-based tourists who then could plan ahead to visit.  For example, never on a Tuesday...or something like that. |
| Limit numer of passengers from all ships at any one time in town, not just number of ships. |
| limit of one cruise ship daily (if any) - limit vehicles transporting cruise ships. Small cruise ships only |
| Limit passenger and ship size and visit frequency |
| Limit passenger boats to 200 persons or less, allow less per year |
| Limit passenger disembarkations to a reasonable number. Only one cruise ship in port at a time. Replace the big tour busses with smaller ones that are safer on our roads. Enforce clean harbor environmental policy. Ensure local marine traffic is not negatively impacted by cruise ship traffic. |
| Limit passengers to 1500 a day. Charge higher fees. |
| limit ship numbers and size |
| Limit ship numbers, limit people numbers, ships need ot limit time spent idling with pollution entering air--set time limits, must be parked a certain distance away when not actively loading/unloading. |
| Limit ship size to ~1500 passengers, which encourages high-spending clientel (the passengers on Princess small ship) were way more extravagent than Anthem (huge, cheap ship). Also reduces the severity of the mass influx of people. Utilize/improve the former state ferry terminal to reduce competition between local marine traffic and cruise ships. Designate parking locations for public shuttles to/on upper Main St, lwoer cottage Village Green, etc. to better disperse crowds and enhance business for those on the outskirts of tonw. Also, reboot Island Explorer to max capacity. STrengthen adn enforce environmental regulations. |
| Limit ship sizes, increase costs to cruise ships to offset water quality and infrastructure impacts. |
| limit ship visits and size of vessels. Number of passengers. |
| limit ships |
| limit ships |
| Limit ships or not allow |
| limit ships to one a week increase ship fees to lower taxes and improve all sidewalks and roads |

131

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Limit significantly. No multi-ship days. No days/ships over 2000 people or less. |
| Limit size (especially) and number of cruise ships |
| Limit size and frequency, limit number of ships in one day; [illegible] emissions cut, no dumping grey water |
| Limit size and number of ships |
| Limit size and number of ships visiting and limit number of passengers per ship allowed to disembark |
| limit size and passengers |
| Limit size and quantity of size/passengers. Eliminate blocked parking for tour buses. Keep large tour buses out of ANP completely. |
| Limit size of cruise ships and season. |
| Limit size of cruise ships to 200/300 passengers |
| limit size of cruise ships; plan 'cruise ship-free days,' 1-2x each week |
| limit size of ship, limit # of cruise ships/day/monnt |
| Limit size of ships and number allowed access. |
| Limit size of ships and number of ships visiting |
| Limit size of ships and number of ships/per week. Control loudspeakers on ships--Very disturbing to residents closer to water. |
| limit size of ships and only one at a time |
| Limit size of ships that can come. Also limit the number. Encourage Bar Harbor as an exclusive destination. |
| Limit size of ships, have a designated pier with transportation into town, limit large bus touring companies. |
| limit size of ships, II of ships per season. Make towntown main st and cottage pedestrian only, bids from cruise ships for docking ????? Stop |
| Limit size to small, eco-friendly cruise ships and limit the number of small cruise ships allowed in the harbor at one time.  Be sure the waste is being properly cared for and not dumped at sea.  Better yet, zero waste ships would be good.  Limit the season of the small ships.  Sailing cruise ships/solar-powered small ships could be a niche market. |
| Limit the # of ships for the season - no more than one a week |
| Limit the amount of cruise ship passengers per day. More of a balance daily, not 10,000 one day and 50 the next. |
| limit the amount of cruise ships each season |
| limit the amount of ships and passengers in town. Future use of ferry terminal to help eliminate downtown congestion. |
| Limit the amount of ships or the amount of large ships with many passengers |
| Limit the amount of ships per year |
| Limit the days in which cruise ships are allowed in port (e.g., Mon Wed only), and further decrease the number of cruise ships allowed in port at any one time. |

132

# Appendix B – Verbatim Responses to Open-Ended Questions

Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Limit the frequency of cruises allowed to dock in Bar Harbor. |
| Limit the number allowed per day |
| limit the number and frequency of landings |
| limit the number and size of cruise ships allowed per day.  look into ways to lessen noise and water pollution. |
| Limit the number and size of the cruise ships!  Like 1 or 2 ships per Week, and only on certain days so residents know what's coming and can plan their time downtown as needed.. |
| Limit the number and size of the ships coming into Bar Harbor |
| Limit the number of boats to what can be accommodated and only companies with good environmental needs |
| limit the number of cruise ship passengers landing |
| Limit the number of cruise ship visits to 100.  Don't allow cruise ships with greater than 1500 passengers |
| Limit the number of cruise ships allowed per season and consider just having one ship per day rather than 2 or 3 |
| Limit the number of cruise ships and cruise ship tourists to a manageable level; be sure the cruise ship fees offset the full negative impact on the town and natural environment. |
| Limit the number of cruise ships arriving at Bar Harbor and/or the number of passengers they carry |
| Limit the number of cruise ships daily. |
| Limit the number of cruise ships in the harbor to one at a time. Limit the number of passengers who can come into town at any one time. |
| Limit the number of cruise ships so there are no days with multiple ships.  Or cut the number of ships-- let them barter to get the opportunity to come. |
| Limit the number of cruise ships visiting at any one time. |
| Limit the number of cruise ships visiting Bar Harbor to one ship daily during the season |
| limit the number of large boats allowed |
| Limit the number of large ships on a single day. Perhaps no more than 2,000 cruise-based visitors on any given day. |
| Limit the number of large ships that anchor in the harbor from July to early October and limit the number of days when ships can come. |
| limit the number of large ships with thousands of passengers |
| limit the number of passengers entering the town each day |
| Limit the number of people allowed to come to shore. |
| Limit the number of ships at once |
| Limit the number of ships in port at any given time to 1 |
| limit the number of ships in the harbor at any one time. Limit the numbers of ships passengerse ashore |
| Limit the number of ships in the harbor at one time. Strict regulations on pollution. |

133

# Appendix B – Verbatim Responses to Open-Ended Questions

Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Limit the number of ships per day to one. |
| Limit the number of ships per season to about 130 |
| limit the number of ships per season, limit the size of ships |
| Limit the number of ships per week to 2-3/week |
| limit the number of ships to 50 or less a year. |
| Limit the number of ships to a few a year. |
| Limit the number of ships, reduce the frequency. |
| Limit the number of ships. Like 70-90. |
| Limit the number of ships/size of the tourist population. Offloaded from the large ships at one time. |
| Limit the number of them coming each year |
| Limit the number of visits and ships per day |
| Limit the numbers coming, more moorings out of downtown. Use blue nose as point of entry/exit. Stagger buses of visitors off ships into town. |
| Limit the numbers of large ships. |
| Limit the overall number, starting with not allowing more than one ship per day. |
| limit the passenger count to 12-1400/day |
| Limit the size and number of cruise ships allowed to visit Bar Harbor in proportion to the square area of the downtown and the number of projected land visitors. |
| Limit the size and number of cruise ships within Bar Harbor. Summer months are too crowded with visitors. Visitors to make reservations to enter MDI. |
| Limit the size and number of cruise ships. Strict enforcement of environmental regulations. |
| limit the size and number of ships |
| Limit the size and/or number of ships in port at the same time. |
| Limit the size of cruise ships and the number permitted to visit each week. |
| Limit the size of ships ('moderate' not 'huge') and limit the nubmer allowed at one time (if possible, 1-2 at a time) |
| Limit the size of ships allowed into Bar Harbor's anchorage. |
| Limit the size of ships and the frequency, if not restricting altogether |
| Limit the size of the cruise ships and the number of people in town at once. |
| Limit the size of the cruise ships you let in.  The mega ships are too big.   Bar Harbor is getting ripped off by only getting  $1 million from the Cruise ships each year.    Bar harbor needs to get more.  Limit the number of cruise ships that are allowed into BH each year.  How about have an auction for only 12 cruise ships a year.  Your auction will make way more than $1 million as Cruise companies bid for those slots.   So you make more money while having less cruise ships. |
| Limit the size of the ships to small and midsized only. Those monstrosities are awful and have a major negative environmental impact. Allow 2 days a week. No more! |

TOWN05981

# Appendix B – Verbatim Responses to Open-Ended Questions

Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Limit the total number of ships that can be in harbor (lower total number of people). Close downtown streets to cars/buses-pedestrian traffic only in summer |
| limit to 1 ship per day, construct adequate cruise ship terminal |
| Limit to 1 ship/day max |
| Limit to 2 cruise ships per season |
| Limit to 2 large ships a day. They leave at night so their impact in town is limited. |
| Limit to 50 per year |
| Limit to one cruise ship per day and 2500 passengers, reduce to only 1 anchorage, fines placed on ships for ignoring the cruise ship track into Bar Harbor. Profits paid to fishermen for lost gear |
| limit to one ship a week |
| Limit to small 100 passenger ships |
| Limit to small cruise lines. Limit number of summer days. |
| limit total number of cruise ship visit >500 to approx 100/year, eliminate july and august visits (cruise ships > 500) |
| Limit visits per season; Limit visits per day. |
| limit visits to <100 ships per season. Limit daily passenger numbers to <3000. no more than 2 ships in port per day. |
| Limitation of sizes of ships; Parking; Amount of tourists (overcrowded in town) |
| Limited number of ships and passenger capacity. |
| Limiting number of cruise ships at one time, enticing cruise lines to visit slightly off peak season, communication to the public of ship arrivals so residents/land-based tourists can plan accordingly |
| Limiting severely the size of cruise ships (perhaps less than 500 passengers)   Close monitoring of potential pollution issues. |
| Limiting size and number of ships drastically, changing from town pier to ferry terminal for disembarkation |
| limiting the number of cruise ships or total passengers each day |
| Limiting the number of cruise ships that are allowed to enter the harbor |
| Limiting total daily number of passengers. |
| Limits on ships and caps on passengers. Drawbridge perhaps :) |
| Limits on size of ships and frequency of visits. |
| limits on the number per day of ships or passengers |
| limits or a ban. it is fabulous without them this year |
| Look at the long-range goals. Cruise ships are short money for a few select businesses at the cost of long-range, higher valued land-based tourism. Cruise ships are not needed in the fall or at all. The toursim is so great that no other means is needed. |
| Look to use the terminal property for tendering and parking for the buses and tour guide. |
| low the amount of people who come to shore when ship is here. |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Lower caps on the number of passengers and amount of ships per day. One ship at a time is more than enough |
| lower caps. Don't allow the cruise ships to take over the waterfront/pier area |
| lower daily limit of ships and passengers |
| lower number of ships allowed per season--limit of two max per day; launch on/off ferry terminal only |
| Lower the # allowed and potentially work towards ending cruise ships in BH. |
| Lower the number of people a little. |
| lower the number of ships allowed in port at one time |
| Maintain as much as possible the old world charm of the village. Please stop tearing down harborfront small buildings and shops for fancy multi-floor hotels and shops with expensive things you can purchase in a lot of places. We need to support local crafts and arts in our shops. And we don't need to look like every other yuppified tourist town. |
| Maintain limits on ship traffic (in total and number of ships at same time), more police traffic management (including foot traffic) |
| Maintain or lower the cap on # of ships and passengers. Use mini vans or smaller buses |
| Maintain the cap on the number of cruise ship passengers allowed, perhaps reduce the total passengers per day at peak season. It would be nice if we could bring some passengers in at a different dock (ferry terminal) to reduce bus traffic in town, but perhaps that option is already off the table. |
| Make a traffic schedule so people know when to avoid typically cruise ship related traffic |
| Make a walking district |
| Make Bar Harbor not a destination for cruise ships |
| make buses pickup/dropoff on private property. |
| Make it so they don't disembark all from the same pier on one West St. |
| Make the ferry terminal the primary destination for tendering and let people walk or take a shuttle to downtown.  The cruise ships aren't the ones blocking the park with cars, that's all land-based. |
| Make weekends "cruise ship free" then the weekend warriors and those getting married wont have cruise ships in their pictures |
| manage days and ship traffic limits better |
| Manage it so the flow of cruise ships is limited. |
| manage the cruise ship schedule to avoid multiple ships on the same day |
| Manage the number of ships visiting better. We avoid downtown like the plague on days there are several ships in port at the same time |
| Managment of passengers disembarking and embarking |
| Many ecologically sensitive areas limit the number of visitors. We could also restrict through-traffic on streets and make a vertical parking structure to handle parking. There are too many people and cars here. We either need to tell people they can't come or start building up. Clearing more land for more |

DX323.203

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| stuff should be prohibited. Undeveloped land is our most precious resource and it's being destroyed at a frightening pace. |
| Many less cruise ships - limit numbers and size |
| Max 2 ships per day |
| may need to restrict cruise ships. |
| Maybe a cap on how many cruise ships can come on a singe day. |
| Maybe consider fewer visits of ships per year and limiting the sizes of those that come. |
| Maybe traffic pattern change? One way down Cottage toward Main, then one way back on West? Put cruise ship terminal at old ferry port? |
| Maybe, if these awful people are going to pollute our bay and ruin our roads and scare off tourists who actually contribute to our economy, we should see some benefit in property tax relief. |
| measure pollution/regulate, raise fees |
| MINIMIZE size of and numbers of ships using BHB as port. |
| Minimize their access to Bar Harbor |
| Minimize, if possible, the view of the ugly cruise ships from Bar Harbor. |
| Moderation. Fewer, smaller seats. Keep buses on side roads. Not try ot cater every single day Aug-Oct. |
| Monitor and work closely with cruise lines regarding arrival/departure times. |
| More bus parking away from the pier which is important for fishermen and women, parking, access, view from Agamont. Limit capacity daily. |
| More businesses that support locals needs like every day necessities instead of 4 Acadia shops and more |
| More consideration for locals to not lose benefits of living here. |
| more cruise ship docking to ferry terminal, institute shuttles into town, have buses for passengers pick up at ferry terminal. |
| More data would help answer this question - you've given the economic impact of cruise ships, but what percentage is that of the total tourist economy? Again, how do cruise ship emissions compare with land-based tourism impact (vehicle emissions, power consumption, water use)? Allowing only smaller ships would help with congestion, harbor views, impact on harbor traffic, and public perception of the problems. Maybe don't allow ships that are longer than Bar Island? |
| More efficiently move people around town. |
| More parking town wide and some type of Island Explorer stop on or near pier. |
| More smaller ships and limit significantly number of large ships |
| More transparency about how funds are raised and spent |
| More transportation to keep the folks from taking over the sidewalks. They wander looking confused as to where to go. More guides to move them along. |
| move anchorages to behind bar island, less tour busses, eliminate anchorage in front of bar harbor inn. |

137

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Move as many disembarking cruise ship passengers, especially those visiting Acadia National Park, to the Blue…terminal |
| move buses and tenders to ferry terminal on rt 3. |
| Move buses out of town to ferry terminal land |
| move cruise ship landings to the ferry pier |
| Move cruise ship offloading from town pier |
| Move cruise ship operations to bay ferries terminal? |
| Move cruise ships and explorer bus to the ferry terminal--use the Village Green to drop off passengers. Stop taking away parking for those who visit by car and live here. |
| Move docking to ferry terminal location. |
| Move docking to route 3; Not have 3-4 ships a day; Limit to one ship and limit size of ship |
| Move docking to the old ferry terminal and bus / shuttle from there. |
| Move em to the ferry terminal |
| move fishing boats out of town and designate areas of town for walking (no car traffic). Minimize overlap of local vs. tourist activities. |
| Move landing site of tenders tour bus hub away from town pier, perhaps to ferry site, shuttle pedestrians to village green and explorer. |
| Move loading/unloading passengers away from town pier |
| move passenger landing to ferry terminal, getting buses for cruiseships out of downtown area. Limit the size and amount of ships/passengers |
| move passenger landings and bus traffic to the ferry terminal; establish a shuttle or trolley system around downtown and immediate perimeter (Eden St hotels, ferry terminal, ballfield) |
| Move pier to outside of town landing for cruise ships. |
| move port to the ferry terminal or other location w/parking, bus terminal, people management |
| Move ships where they aren't visible; demand more money for each ship passenger; move docks away from town; limit number of ships. |
| move tenders of tour passengers to ferry terminal so buses are off the town pier, use shuttle to bring the to town if desired. |
| Move the access to the ferry terminals |
| move the cruise ship to the route 3 facility finally |
| Move the hub out of downtown Bar Harbor, make/increase shuttles of cruise ship pedestrians to downtown from other places. |
| Move the landing to 121 Eden. It's too congested at Town Pier. |
| Move the loading and unloading of ship passengers away from the town pier location. |
| Move the tenders out of the pier area. Move the buses out of the pier area. |
| Move to Ferry Terminal |
| Move to Ferry Terminal |

DX323.205

App. 509

TOWN05985

## Appendix B – Verbatim Responses to Open-Ended Questions

Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| move to ferry terminal for more room |
| Move to the ferry terminal - limit amount of cruise ships at once - no buses in town. |
| Move tour bus parking out of center of town; limit # of passengers and limit length of season and # of ships |
| Move where cruise ships tender their passengers |
| Much more limited visitation |
| much more restrictive measures on total number of ships, total number passengers, and ship size - focus on smaller ships |
| N/A |
| n/a |
| Need a nicer spot for the tenders to come in. This is a great town and should be very welcoming to visitors, no matter how they get here. |
| Need fewer visits. |
| Need to place quotas on number of cruise ships/year |
| Need to use the money collected to better impact the community |
| Negative impacts are somewhat made up. Tender traffic could be a problem. This town absorbs far more day trippers in August than 3 cruise ships in October. |
| Negative impacts disappear if ships disallowed; Revenue to business can't be a reason to destroy nature. |
| Negotiate for more cruise ships |
| Never allow more than one ship in port. Spread out cruise ships, perhaps avoiding weekends to reduce the overall impact on residents. |
| New passenger landing site - eg old ferry site |
| no big ones |
| no changes |
| No changes should be made to the management of cruise ships |
| No changes. |
| no concerns |
| no cruise ship tourism |
| No cruise ship visits during the months of July and August. Still allow the small ships to tie up at our town pier. Use only Anchorage be and tender passengers into our ferry terminal |
| No cruise ships |
| No cruise ships ! |
| No cruise ships in July and August; Max of one cruise ships per day in shoulder season; Manage number of passengers/day |
| No cruise ships! |
| No easy fix |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| no large cruise ships |
| No large cruise ships, few ships overall |
| No large cruise ships. |
| No large tour buses. |
| no longer allow cruise ships. If ships have to be allowed, cap size of ships allowed here. |
| No mega pier. Limit the number and size of ships able to come to bar hard |
| no mega ships. Enforce water and pollution (air) quality standards. |
| No more ships, plenty of tourists from land entry. |
| No more than 1 ship a day, max 2000 passengers a day. |
| No more than 1 ship per day, 100 ships per year. No ships in August |
| No more than one ship a day and do something with the f***ing buses!!!! |
| No more than one ship per day, look to the potential of tendering passengers to the Ferry Terminal for busing in order to ease congestion on the town pier. |
| No need to ban them altogether, but we could be more foot forward about regulating and limiting size, scale, and frequency of cruise ships. If we take charge of the quality of life here in the summer, we will gain a more sustainable and respectful tourist base and create a better quality of life for residents. |
| no opinion |
| no or significantly less ships/ less passengers per day/ less ships during peak tourism/ no buses at town pier/ |
| No prebooking events so land based tourists miss out. Stop the greed and limit number of cruise ships. |
| No ships |
| NO ships July, Aug. |
| No ships on weekends |
| No ships or smaller ships, eliminate visits in July, August, and September, fewer ships at same time or deisgnate and advertise cruise ship-free days of the week. |
| no ships over 500 passengers |
| no shisp during july, aug, and sept and use the ferry terminal to unload them, that's why we voted to acquire it - get those folks off the main pier |
| none |
| none |
| None |
| None |
| None |
| none |
| None there is no difference from them or land base |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| none, other than improve on what we have now when possible |
| None. |
| None. |
| None. |
| none. Cruise passengers do not have cars & are gone by about 5pm each night. |
| None. Excepting development of ferry terminal to accommodate ships, etc. |
| none. Keep it the same |
| None-Bar Harbor does it well. |
| Not accept cruise ships or limit to 1, 3 days a week. |
| Not accept cruise ships. |
| Not allow any cruises.  or no mega ships  if we keep small cruises only one per day |
| Not allow cruise ships |
| Not allow cruise ships, or only allow small ones. The crush of people and vehicles when the ships are in is horrible. |
| Not allow cruise ships. At the very least, ensure days without them. Limit them and passenger size limits. |
| Not allowing Bar Harbor to be a port |
| Not close enough to advise but it's relevant to you that for thirty years now I avoid MDI completely if I at all can from May 15 to Indigenous People's Day |
| Not enough experience to suggest |
| Not have too many ships visit all on one day |
| Not more than one cruise ship a day ever. |
| Not much that can be done. |
| Not personally clear on pier renovations for CAT--can that pier be used? |
| Not receive passengers at the bar harbor town pier. I feel land based tourist that come and stay and spend more money then cruise ship passengers based on the longevity of there stay and the fact that the economic impact is more beneficial from being spread out to more businesses don't visit bar harbor to deal with the congestion and to see cruise ships in the the harbor and deal with a town over run with people crowded into the Main Street cottage street area which makes them look for alternative places to visit such as northeast southwest and bass harbor or anywhere they can not be overwhelmed by the amount of people that are in town |
| Not sure |
| Not sure ... |
| Not sure, but reading the local paper, people would rather start staying on the other side of the island so they don't have to deal with all the people. |
| Not sure. |

DX323.208

App. 512

TOWN059988

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Number of cruise ships during one day; As a member of the working waterfront, it's nearly impossible to maneuver during a high volume ship day. |
| Number of ships allowed and when. |
| obviously, less frequent visitation of ships. Raise taxes/fees per passenger - charged to each passenger - not the cruise line |
| Offer cruise ships but less than previous years. |
| offload passengers going on a bus tour to use the ferry terminal - that will keep buses from downtown |
| one cruise ship per day maximum |
| one cruise ship per week (on same day each week) |
| One ship a day MAX |
| One ship at a time |
| One ship at a time |
| One ship at a time, not consecutive days , much smaller total number allowed in a season. |
| One ship in port at at time. |
| One ship only per day. |
| One thing would be to offload passengers someplace other than our small town dock. |
| One way traffic on parts of Main and Cottage to allow wider sidewalks and more, parklets. |
| One way vehicle traffic with wider sidewalks |
| only 1 cruise ship a day |
| Only accept if any small cruise ships--no more mega ships with more occupants than town population! |
| Only allow 2x per week |
| Only allow cruise ships on certain days, offer discounts to certain businesses so the majority of cruise ship passengers are only in a few locations, find ways to offset environmental impacts with profits |
| Only allow one large ship to dock per day. |
| Only allow small capacity ships, 100-200 passengers max |
| Only allow small vessels or none at all and eliminate the busses in town. Both land and cruise based busses.  The town is bringing in millions with the new pay parking. Make the town pier pay parking to help offset the lost revenue. With the continuing popularity of Bar Harbor and the number of tourist visiting every year there are plenty of dollars out there for businesses. At what point dose profit become greed? |
| Only allow smaller ships. Limit the number of ships. |
| only allow so many ships to visit per season.  never allow them in July or August, only allow a certain # of passengers to disembark from the ships at once.  set up a better system to get the ship passengers onto buses away from the town pier. |
| Only allow the smaller 100-150 passenger ships.   Only use anchorage B and shuttle to the ferry dock since the Bluenose only needs it mid-day (noon-3PM).  Cap the number of passengers at 500 per day. Have the big buses load at the ferry terminal and not drive any cruise passengers directly into town. Cruise Ship passengers can walk to town on the new pathway on Rt 3 or hire taxis. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Only allow the smallest cruise ships to come to Bar Harbor. |
| Only allowing smaller ships more efficient running ships into Frenchman's Bay |
| Only cruise ships under a certain size and with good environmental track records should be permitted. The gigantic cruise ships are a detriment, visually and environmentally,  and bring few extra dollars to local businesses. |
| Only one large ship per day. |
| Only small boats allowed and only one at a time. Also parking the boats outside the porcupines. Shorten the season. |
| only small number of people at a time and make sure they obey all rules and respect all town residents |
| Only very small boats, <100 passengers and crew combined, and limited #2 ships max allowed at any one times at our piers. No tenders! |
| only very small cruise ships should be allowed. They actually spend more and there should never be more than one in port. |
| Operate a free tram system downtown, between the pier, village green/Island Explorer bus.  Make Main St. a car and bus free zone, except for the free trams. |
| Our Town needs to drastically reduce the size of cruise ships and greatly reduce the number of passengers per day, down to a much smaller scale compatible with a very small town on a very small island. The "small ship cruising," as promoted by American Cruise Lines (e.g., ships with 100 passengers or "no more than 185 passengers"per ship) could have a positive impact on our community. Limiting the number of smaller ships or total passengers per day of course would also still be needed. |
| out daily visitor limit in half. Limit size of ships; limit # of days w/ cruise ships in port |
| Overall the number of ships and days that ships are visiting should be reduced. In 2019 there were ~180 ships visiting Bar Harbor, with multiple ships on some days. This is out of control  and should be reduced. |
| Park ships so they don't block the view so much.  Consider making part of town car-free part of the year (like part of Cottage St); similar to Burlington, VT or Boulder, Co. |
| Parking |
| Parking |
| Parking can be built off island and people can pay and ride a bus to be be brought on island , as it is there is no room for locals . And if they want to park on island they can by a parking pass |
| parking garage |
| Perhaps a limit on the amount of cruise ships that can come into town on one day |
| Perhaps consider catering to smaller more expensive ships--not the princess discount cruise crowd |
| perhaps cruises on non-peak times when land tourism is down a bit (like not july aug) |
| Perhaps limit cruise ships to 1 per day. When 3 ships are all there it is too crowded in town. |
| perhaps limit the # of ships by a bit. |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Perhaps not to dwell on the dollars brought into the merchants and consider a more reasonable equation between their desire for good business and more and more cruise ship opportunities. |
| Perhaps set limits on the size of ships and the number that come through in any given time period.   I understand the financial impact to businesses....I KNOW it's their livelihood....but some kind of balance might make it more palatable for those of us who live here all year and would like to also enjoy the beauty during good weather! |
| perhaps small cruise ships - NO large ships |
| Perhaps use new ferry terminal to spread out buses |
| Perhaps we could cut back a little on the number of ships |
| permanent ban on cruise ships |
| Permanently ban ships over 100 passengers. bad reputation causes traditional land based tourists to not visit the area. |
| permit only the smaller cruise ships and no more than 2/day |
| Personally I would rather not see cruise ships but understand the economic impact. Therefore I think cruise activity should be restricted to 2 or 3 a week at the most. |
| pier for cruise ships |
| Place limits on passenger capacity each ship; limit cruise ship visits to one or two per week |
| Plan ahead for what it will be like without the big busses.  Lots of smaller shuttles.  Things will get even better. |
| Please ban cruise ships and work toward a year round sustainable economy |
| Please stop having them. It absolutely detracts from the beauty of Bar Harbor. |
| Police their pollution and give big fines. Have a cruise ship limit, i.e. 100 max per year and no more than two per day, or some kind of limits. |
| Pollution standards that are above and beyond. Very forward-thinking. |
| precisely timed schedule of excursion buses so the buses are not sitting at Agamont park. |
| Prejudicial question, implies there are negative impacts. |
| Probably limit the daily amount of passengers/ships. As a business owner...the ships have been critical to keeping us in business through the month of October. It's difficult making a years living in 6 months. |
| Prohibit cruise ships with the exception of those small enough to moor at the pier. |
| Prohibit cruise ships. |
| prohibit large ships. Permit only small ships. Limit ships to one or two per week. |
| prohibit vehicles in parts of downtown; make it pedestrian only. Redulate strictly to reduce availability of short term housing rentals; totally eliminate cruise ships. Provide more revenue to island explorer to increase service |
| provide better support for the cruise ship committee |
| Pursue examples above. No pier landings. Limited offshore anchorage. Small ships only. |
| Push for the streetscape changes; Have more ships in the month of June |

144

| |
|---|
| put in a currency exchange so they spend more money. Offer more guided tours |
| Put limits of no more than 1200 passengers per day. Do not allow the large ships at all. Limit to 1 ship at a time. Cruise Ship free days. Move passengers disembarking to the ferry terminal, and charge a more substantial passenger fee. |
| Quality over quantity; limit per day; days when there are none; buses should not queue up around Agamont Park |
| Queue busses off public ways |
| raise awareness; communicate expected peak periods for cruise ship passage visits |
| Raise fees to a level high enough to discourage nose ships from coming here with no more than one per day |
| raise per person price… they'll pay! Encourage the use of out stretch portion of town. Shuttles |
| raise port taxes and fees to pay for their use of our infrastructure (see #6) |
| Raise price for ships 2x |
| raise the fees to a much higher level and let the industry decide if bar harbor stays on their list of desinations |
| Raise user fees by 3 times all to general fund. Eliminate self serving cruise ship committee. |
| Redirect all cruise ships to General Anchorage B area and/or develop the ferry terminal to receive cruise ship tenders; decrease the number of cruise ship visits per year; negative impacts on spending at local businesses that may result from decreased cruise ship traffic would be largely offset by an increase in foot traffic from land-based tourists (I'm confident about this based on the maximum capacity consistently reached during peak season at restaurants, shops, and grocery stores). Certain local businesses that derive a substantial portion (approaching majority) of their income from cruise ship tourist traffic provide minimal benefit to the local community and serve to increase rent and decrease available retail space. |
| reduce and eliminate cruise ship tourism |
| reduce capacity or size of ships that are allowed to come, |
| Reduce car traffic downtown and open pedestrian walkways; Introduce open air one-way loop trolley system at low ticket cost to move people up/down Main St., Cottage, and Mt. Desert St. |
| reduce cruise ship tourism by at least half |
| Reduce cruise ship tourism, please. |
| Reduce cruise ship toursim and refocus on more sustainable/long-term tourism: land tourism. Also, develop long-term plans to increase year-round jobs and affordable housing for year-round residents. |
| Reduce cruise ship visits to 10-20 per year, and allow only small ships (100-200 passengers) |
| Reduce cruise ships to 1 per day depending on size. Maximum number of passengers to 3000 per day |
| Reduce daily passenger cap to 1500. Anchor ships at anchorage B. Tender passengers to and load tour buses at the ferry terminal. Monitor and regulate air pollution when ships are anchored. |
| Reduce discharge of waste from cruise ships. Reduce daily limit of passengers and crew. |
| Reduce how many cruise ships can visit. Often I see 3 and 4 cruise ships per day. Should limit to 1 per day if that. |

## Appendix B – Verbatim Responses to Open-Ended Questions

Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Reduce it. The dollars you quoted were gernated by the industry, including revenue and expenses, when reduced they will be reduced also. |
| reduce number |
| Reduce number and size of ships allowed to dock! |
| Reduce number and size of ships for visits. |
| Reduce number and/or size of cruise ships |
| Reduce number of cruise ship visits, offload at ferry terminal |
| reduce number of cruise ships |
| Reduce number of cruise ships allowed each day; move cruise ship passenger bus tours to ferry dock, do not allow large…to top of Cadillac Mt. and limit # of … on Park Loop Rd. at any given time. |
| Reduce number of cruise ships coming to Bar Harbor. |
| Reduce number of ships |
| Reduce number of ships allowed each day |
| reduce number of ships and number of passengers per day, don't have ships scheduled every day. Leave days open for land tourists. Stricter rules regarding air, water pollution |
| reduce number of ships, and don't allow ships every day. |
| Reduce number of ships/passengers. Double or triple cruiseship fees - will both decrease ships and increase income. |
| reduce number of visiting ships and limit number of megaships |
| Reduce number of visits and number of disembarkments |
| reduce numbers / year in peak months. Have 1-3 days/week with no cruise ships |
| reduce numbers of both ships and size/people. Tender them away from downtown and prevent any buses etc. from downtown area - roads too small/tight. |
| reduce or do away with cruise lines, they have a negative impact on the quality of life here. |
| reduce or eliminate cruise ship tourism |
| reduce or eliminate cruise ships. Bar Harbor should focus on attracting land visitors who stay in motels, hotels, B&Bs, and eat in the restaurants. |
| Reduce or eliminate, if possible, cruise ships. At least reduce the number of passengers per ship. |
| Reduce ship numbers |
| reduce size and number of ships. Decide whether to welcome ships at all. |
| Reduce size of ships accessing the harbor. Space out access times to reduce concentration. |
| Reduce the cap on cruise ship passengers allowed in port at one time. |
| Reduce the nubmer of passengers and/or ships per day. |
| Reduce the number and size of cruise ships from Bar Harbor |
| Reduce the number and size of the cruise ships |
| reduce the number of cruise ships |

DX323.213

App. 517    TOWN05993

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Reduce the number of cruise ships allowed each summer and early fall. |
| Reduce the number of cruise ships allowed in town both per day and per year. |
| reduce the number of cruise ships and number of days with cruise ships |
| Reduce the number of cruise ships and the number of passengers per day. |
| reduce the number of cruise ships coming into the area and the harbor, do not build a large scale dock |
| Reduce the number of cruise ships considerably or eliminate entirely. Move cruise ship tendering and buses to former ferry terminal. |
| reduce the number of cruise ships to 50 per season and charge the ships more to visit |
| Reduce the number of cruise ships, Reduce size of allowed ships |
| Reduce the number of cruise ships. Develop a management plan similar to cruise ship destinations that have successfully addressed the problem. Increase fees. |
| Reduce the number of passengers allowed onshore at any given time. Prohibit buses from using the downtown sections of Main St., Mt Desert St., and Cottage St. |
| Reduce the number of visitations to something in the 100-120 range. This follows from the levels of complaints which have increased since the visitations have exceeded 120+. |
| reduce the number of visits per year, per day, per month - one huge ship a day is enough and there is no need to jam everyday with a ship. I found the town refreshingly welcoming last summer. Did not miss the ships at all! |
| Reduce the numbers of cruise ships allowed to visit per year and the capacity of each ship. |
| Reduce the numbers of cruise ships. |
| Reduce the passenger caps--cut in half. Don't allow ships with more than 2k passengers. Make the maximum number of ships in port two/day. |
| Reduce the quantity of super ships and focus more on the boutique ships of smaller size and who carry a more discerning customer. |
| Reduce to number of cruise ships by 75% compared to 2019 level |
| Reduce total cruise ship days by 30% |
| Reduce visitation, especially the amount of ships and one time--3 large ships is too many. |
| Reduced visits, smaller ships |
| Reduced weekly access of number of passengers disembarking |
| Reducing the number and size of cruise ships would help improve the negative impact. |
| Reduction of ships and/or passengers. |
| Reduction over three year period to zero cruise ships per year. |
| refer to comment above |
| regulate amount # of ship and passengers in july and august |
| regulate not just how many ships/passengers but the days they visit.   More people come by car on Thurs/Fri/Sat/Sun   on those days no ships.   EVERYONES money tricles down...not just the shop keepers.   When I find it easier to shop in Ellsworth then that becomes habit...that carries on in the off |

DX323.214

App. 518          TOWN05994

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| season.   Offer products that year round people want also...not a Bar Harbor Shirt.  Those business owners need to rethink their business plan. |
| Regulate the number amd size  of cruise ships allowed to visit bar harbor |
| Regulate the size of the ships. Smaller than presently allowed. |
| Rein in spending and live within your means. BH thinks more tourism makes it easy to keep spending. $ per student spent on schools is among highest--results are a bit above average at best. |
| Relocate the landing of the transport boats. Have an open air transportation maybe a vehicle (to look like a Lobster Boat) to pull some train like carts. |
| Remember the big busses are going to be banned from the Park.  That will help a lot. |
| Remove from town pier, no big ships. |
| remove the tour bus pick-up from the street and acknowledge cruise ship tourist are less than 10% of total visitors. Stop making it such a big deal of "negatives" |
| Replace cruise ship tourism completely with higher-quality land-based options that bring greater and more sustained revenue potential. |
| Require carbon neutral ships or charge $50 per passenger who steps on land. Use this money to offset the carbon and pollution by building/investing in clean renewable energy for all of MDI |
| Restrict number and frequency of visits, restrict size (passenger capacity) of ships, strictly regulate environmental impact. This is a sensitive ecological environment that many members of local industries rely upon for their livelihood. Their concerns should not be pushed aside. What is the good of gaining dollars in one aspect of your economy if by doing so you eliminate them elsewhere? |
| restrict number of visits |
| restrict numbers of ships and passengers restrict season |
| Restrict ships to one per day |
| Restrict size of ships, require sollutions to pollution |
| Restrict the number and size dramatically |
| restrict the ships...we don't need them. Economic growth will happen organically. |
| Restricting the number of cruise ships allowed |
| Review the limit to number of ships/capacity permitted to visit |
| Schedule fewer cruise ships, shorten cruise season, limit to one a day, limit overall # per season. |
| Schedule only 2 ships at a time to be in port. Never more than 2. Only schedule the newer eco friendly ships. Hire a town employee whose job is to lead and organize all aspects of the pier when ships are in port |
| Schedule only one ship per day; Cap amount should be lowered and enforced; Perhaps unloading at a different location other than the town pier. |
| Schedule ship visits to take advantage of all days of the week and avoid the potential overcrowding caused by multiple ships in one day when other days have no ships. |
| Schedule ships to come not all at once but even throughout the season. Passengers are allowed to come not all at once. |

## Appendix B – Verbatim Responses to Open-Ended Questions

**Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?**

| |
|---|
| See #18 below. |
| see 18 |
| See if more ships will come in the spring |
| Seems okay as it is |
| send bus tours to ferry terminal, visitors to town dock, setup so town gets money. |
| Serious consideration to the ferry terminal as a cruise ship "port", limiting ship numbers and size |
| Set a cap on the number of passengers that can be in port on a day. I may be wrong but I believe it's currently 3 ships which can vary in size and the volume of passengers can vary greatly. I believe the town should build the on boarding and off boarding of passengers into the new town harbor at the ferry terminal. The town should collect all fees associated with the industry rather than the private dock currently used. By staging the land transfer at the ferry terminal most of the buses could be moved out of down town. |
| set a limit on the amout of cruise ship. For spring, summer, fall, the same for all three seasons. |
| Set a seasonal limit on cruise ship landings. Would suggest 180 per season. |
| Set firm cap on the number of cruise ships allowed in a given year. Increase the per passenger fee. |
| Set some limits. Business will always want more and more. Residents need services too and the cruise ships and tourism dominant town interests. Services are lacking in comparison to less tourist obsessed towns on MDI |
| Setting a limit per year and limiting size of ships. |
| Severely limit cruise ship access |
| Severely limit size of ships and numbers of ships per season |
| Severely limit the number of cruise ship visitations to less than 10 per season. |
| Severely limit the number of large ships--no more than one at a time. |
| Severely limit/eliminate. If this is unrealistic, then set serious limits. |
| severely restrict access by mega-cruise ships. Encourage small cruise ships catering to 'nature tours' - cyclists, hikers, birders |
| Severely restrict the number of cruise ships visiting Bar Harbor |
| Severley limit. Do not rely on CS revenue for town budget. |
| severly curtail # of cruise ships allowed. Lessen the length of cruise ship season |
| Shift larger ships to anchorage B  Enact existing plans to better manage traffic flow at Town Pier  Work with cruise industry to stagger arrival schedules to reduce volume of passengers arriving at the Town Pier at any one time  More/better wayfinding tools at 1 West Street to aid arriving passengers |
| Short of disallowing cruise ships, I don't think you can avoid air and water pollution associated with them. Reducing the number of cruise ships would help with the overall congestion throughout the year. We avoid downtown during the summer and take our business elsewhere (e.g., Hannaford in Ellsworth as opposed to Bar Harbor; dining in Southwest, which is less crowded). |
| Shorten the cruise ship season and limit the number of cruise ships to one per week |

DX323.216

TOWN05996

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Should use the Ferry Terminal and also bus people in from there, open it up to parking and bus people into town. |
| Shuttles to different ports of town will help disperse foot traffic, not sure what else… |
| Significant reduction in number, size, and frequency of ships, more aggressive protection of marine and air environment |
| significantly limit number of cruise ships/day and maximum size of ships allowed to tender |
| Significantly limit the number of ships per day/season. Focus time and energy on sustainable year-round employment/industries/development. |
| Since it seems quite likely that ANP-bound passengers can be separately queued while on board, it makes good sense to direct those tendering vessels to the ferry terminal location where the buses would then board them for their ANP tour. This alone would greatly ease the town pier congestion on cruise ship days. It ought also to increase the town's cruise ship revenue. |
| since many businesses (not our familys) rely on the massive numbers of 'customers' brought by cruise ships, we cannot imagine shutting it down. The current management is probably as good as it can be. The impact of the spending (positive) of cruise ship passengers is proportional to the fact that many residents just have to stay away from downtown most of the summer. |
| Since there are only negatives, they should ban cruise ships and use the harbor for local business. |
| Size of ship, amount of cruises limited, amount of visitors land/sea limited |
| Size of ships; amount of passengers; # of ships in one day. |
| skip the cruise ship law suits and move on to the vacation rental law suites. |
| slap some sense into pinheaded townies |
| Slight reduction in number of passengers, use Ferry Terminal for tenders. |
| Small cruise ships only allowed(no more than 1000 passengers), |
| small ship unity |
| Small ships only - no mega cruise ships. Vastly increase the Passenger Service and Port Development fees. Better manage the timing of cruise ships - have one ship/week and one week on/one week off to decrease consistency of impact. Tighten up the hours that cruise ships allow passengers to be in town. |
| Small to medium size ships. |
| Smaller and fewer ships; encourage local boat taxi industry to ferry passengers from the ships to the town |
| Smaller and less cruise ships. |
| smaller boats that make less impact or a shorter cruise ship season |
| Smaller buses |
| Smaller capacity and less of them or total elimination |
| Smaller cruise ships (number of passengers) and lower number of passengers allowed in port on any given day. |
| smaller cruise ships oriented to nature appreciation and education. Fewer ships. Zero tolerance on pollution of waters. |

DX323.217

TOWN05997

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| smaller ship size, no huge buses to transport passengers |
| Smaller ships - Limit one per day. Maximum number of occupants not to exceed a large amount - roughly 500-1,500 people per day |
| Smaller ships and less of them. Shorter season as well |
| Smaller ships with less frequency, None would be perfect. |
| Smaller ships, less of them. No weekend visits, occasional large ships--October. |
| Smaller ships, less port calls |
| Smaller ships. |
| smaller ships. Maybe upgrade infrastructure elsewhere close to distribute demand for travel to acadia |
| smaller ships; max 1 per day; tender to ferry terminal; no ships on holidays, sundays & Monday, no buses stacked up at pier |
| Some days with no ships during the summer so that locals could enjoy going out to eat and walking around town and shopping. |
| Some of your studies and the following questions are loaded!  I think cruise ship tourism is good for the area but needs to be managed to balance the financial benefits and the environmental costs.  Too often the people making decisions are more interested in the financial aspects.  Short sighted in my opinion.  Instead of more more more, how about enough is enough! |
| sorry - don't know |
| Space…the reason we all love MDI--air, nature, and making a good living. |
| Spread out visits over days (not have several ships on one day). Work with tour operators to develop a plan that works for everyone. |
| Spread ships out as much as possible in the fall. |
| Spread them out--limit on passenger counts per day 3000 or less; No cruise ships on holiday weekends (July 4th, Labor Day, Indigenous Peoples Day), market to higher end ships and smaller ships |
| Stagger the days/times the ships can dock/stay |
| Start a community-based design process. Get the fox out of the henhouse. |
| Stay away from downtown in the summer due to too many tourists. |
| Stay open minded to both sides |
| Stop all cruise ships from entering Frenchman Bay |
| Stop all cruise ships! |
| Stop allowing cruise ships into the harbor. |
| stop allowing cruise ships. Land based traffic is congestion enough. |
| stop being greedy. Just stop the mass crowding. It sucks for everyone |
| stop blowing the horn, stop the onboard announcements and music that we all have to listen to - noise pollution |
| stop cruise ships!!! |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| stop having cruise ships. Force the cruise ships to run 100% on renewable energy. Charge the cruise ships the actual impact fee |
| Stop having the ships come in. |
| Stop it. At the very least--minimize it to very small "localized or domestic ships with very few visitations. |
| Stop LARGE buses |
| Stop letting cruise ships stop here. The negative impacts outweigh the minor financial positives the town receives. Our infrastructure is not suited for an influx of thousands of people coming and going in the course of a few hours. It makes daily life in town difficult on cruise ship days. |
| Stop off loading them at the town pier. Should be at the ferry terminal and have the Island Explorer bring them into town. |
| Stop or greatly reduce ships coming into the harbor. Definitely do not build a pier |
| stop pretending the town has the best of intentions while pandering to the loud minority that do not understand economics. |
| Stop the cruise ships!   Terrible to our oceans and air, and bring the worst kind of tourist with them. It's 2021, there's no need to continue to support an industry that contributes to the death of our planet. Yeah, I understand that it impacts incomes across town (though most of those businesses are owned by seasonal folks who don't actually care about BH, just the money). The cruise ships are contributing to turning Bar Harbor into another tourist town/disney world. Where's the heart? It's slowly fading, and before you know it, it will all be t-shirt shops and overpriced sysco foods because the cruise ship tourists love it. |
| stop them |
| stop them |
| Stop them from coming, when it has gotten to the point of needing a reservation to go up Cadillac, that should be an inclination we don't any more. |
| Stop them from docking there |
| Stop them or limit number and length of season. |
| Strict and enforceable local environmental regulations. Limits of the number and size of cruise ships and efforts to ensure that the harbor does not become a parking lot for cruise ships. |
| Strict limit of one ship per day that has no more then 2,000 passengers.  No mega ships. |
| Strict limits on number and size of ships. Limits on passengers per day. Move passenger tendering away from downtown and the wharf. |
| Strict water quality enforcement. Careful/thoughtful movement of cruise visitors in-town although already seem to practice this. |
| Stricter control of big buses |
| Stricter limits on total number of passengers allowed per day...especially during peak summer season. |
| Stricter limits/Passenger caps |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Strictly limit size of ships (only allow small ships), drastically limit number of ships at a time, promote multiple "no cruise ship days" per season, move tender landings to ferry terminal site, do not allow use of loudspeakers when in bay. |
| Strike a balance by limiting cruise ship passengers, anchoring ships, and tendering passengers. Do not build a cruise ship dock which will negatively tip the balance. |
| strike the balance; get cruise ships to ferry to ferry terminal, not town dock; use smaller buses to move people in town |
| Strong limits to visits |
| substantially reduce the size of ships and the number that can visit at one time |
| support the cruise ship committee |
| Support the Cruise Ship Committee- They seem to do a lot of good for the Town |
| Support the Cruise Ship Committee. They have made a lot of positive things happen in Bar Harbor. |
| Take seriously how it may never be a good idea for cruise ship tourism to come here at all. Actually, the negative reputation that Bar Harbor has during the cruise ship season hurts businesses that could otherwise benefit from Mainers and others who deliberately choose to avoid it for the overcrowding reasons. |
| Tax the ships and related activity more! Build sidewalks, bike lanes, minimize cars. |
| Tax the teeth out of their mouths. Take their gold fillings. Use the revenue to fund climate adaptation and free energy for Bar Harbor citizens. |
| Tender cruise ship passengers to Ferry Terminal. |
| Tendering more by the ferry terminal. Limit number of ships which you already do. If you move the tendering out of downtown you solve the traffic problem at the town pier and the whining of locals:) |
| The cruise industry has huge negative impact on the quality of life and the year round resident. The financial benefit will go away due to the destruction of the image, the natural resource, and overall quality of life. |
| The Cruise Ship Committee has done a lot of great improvements- support them |
| the cruise ships are most beneficial and provide the least congestion in the shoulder seasons - I would decrease port visits and number of ships at one time during peak months |
| The crusie industry and the cruise ship committee have constantly addressed issues above and beyond the attention given to other far more pressing problems within the Town. |
| The Island draws enough land based tourists, there will never be not enough. There is no need for cruise ships, period. Their benefit will never outweigh their costs to the community and the environment. |
| The loss of the Cruise Ship Business would not have an overall adverse impact. The congestion deters other visitors from visiting the region. |
| The more money the town can get the better. I would just like to see it get done in an efficient way. I have lost many friends to the economic deficiencies of bar harbor. |
| The only suggestion is for busses to not block parking spaces. That is the biggest gripe I hear. I remember when they were parked at the ball fields and only brought down when it was time for their tours. I highly suggest that! |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| The town needs to consider whether "service businesses" can support the increase e.g. dining.  I don't know why there are questions about cars with respect to cruise ship passengers on this questionnaire, BUT there should be more opportunities , but helping cruise ship tourists get into the park would be a win e.g. by frequent buses/routes, especially if the park can be considered for more dining opportunity (besides Jordan Pond House).  Tourists are still going to buy souvenirs, but more can come if they can not overcrowd the town. |
| The town needs to limit the number of cruise ships that stop in Bar Harbor. The revenue generated is helpful but too many ships becomes detrimental to the environment and the residents of our town. |
| The Town of Bar Harbor needs to stop accepting cruise ship passenger landings to our town. There are businesses that are being affected by the lack of cruise ship passengers due to Covid-19 at this time. The Town, the Small Business Association, the Chamber of Commerce, etc. all need to actively help these businesses "rebrand" themselves. How can the local tour operators access the land based tourists? What items could the local shops carry that would appeal to land bases tourists? Let these 2 years without cruise ships be the beginning of a new way of doing tourist business in Bar Harbor. |
| The town should allow more cruise ships to ameliorate the negative impacts of businesses closing. |
| the town should ban cruise ships |
| The town should consider making Downtown a walking only area |
| The town should focus more on businesses that are directly impacted by cruise ships and less to the wealthy 1% who's multi-million dollar homes are slightly inconvenienced. |
| The town should suspend all cruise ship tourism. It is not a stable economy, as we have seen proven with the pandemic, and the port fees that are collected are heavily regulated how they may be used, that it seems like all Bar Harbor has done is allow more and more, bigger and bigger ships to come in, with no concern for the residents that have to live with the consequences of having our town overrun. The cruise industry is also horrible for the environment and marine wildlife; we have seen invasive species here that could only have arrived in the bilge of a foreign ship. Cruise ships often hit whales. It is estimated that a passenger's carbon footprint grows by 3x when traveling by cruise ship, versus land. Cruise ships annually dump over 1 billion gallons in raw sewage into the ocean--it doesn't matter how far offshore they dump it, it is very much causing harm and pollution. They also dump trash and toxic fuel. Most of the cruise ships operate under foreign flags to avoid US taxes, which is gross and disgusting in a whole different way. Bar Harbor is an environmentally aware town, and it's time that we act more like it and show more respect for the planet and the environment. |
| the town should use the ferry terminal for all cruise ship activities |
| The town would benefit from listening intently to the residents and to not have industry representatives in the Harbor Committee. We really need some kind of environmental impact study done. |
| The true economic impact as compared to land-based. This includes environmental impact, strain on town infrastructure and impacts on marine activities. |
| The visits in 2019 seemed about right. Perhaps use the data from that year as a base number for future visit controls. |
| There are certain ships that bring little to our economy as the  AIDA line. Certain Holland American ships are not valuable to us. Let the business owners who are affected by them cut the list down. |

DX323.221

TOWN06001

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| There should be in-town tax rates and out-of-town tax rates. Rural residents do not benefit from cruise ship tourism. |
| There will always be those who do not want cruise ships whatsoever because they feel as if they "Own" ANP, and Bar Harbor! No one owns this area and all should be welcomed provided safety is the top priority followed by all other guests needs. Cruise ships are a lifeline to so many people on this Island! It would close 2 of my businesses without them. |
| There's just too many people for the amount of resources Bar Harbor can equitably provide, please consider limiting cruise ship visitation |
| These people will always see the glass half empty. We need the cruise ships. |
| they are too big. You don't need 3 ships on 1 day. ??????? Parking by water, residents can't even get around. I want to live my life without accommodating 6,000 extra people a day |
| They need to pay more in taxes per head coming off the ship to the city for the use and visitation of our city |
| They should manage it and not make it a free for all, looking for members of the council to increase revenue for their personal businesses. |
| think about possibility of limiting the number of ships allowed on any given days |
| Think of all the townspeople--not everybody benefits from cruise ships. |
| This is far above my knoweldge base, not having lived in a summer yet. Tell you next summer. |
| This is simply not a good place for large scale tourism-not the foundation this area was created for. |
| This survey is great. Do not increase number of cruise ships (that was the main thing). |
| This survey is great. Do not increase number of cruise ships (that was the main thing). |
| This was a thriving place economically before these polluting behemoths got here. There is no upside to regular folks having them here (most profits are extracted to outside areas). Please limit passenger max and number of overall visits.  Thank you. |
| To limit the cruise ships allowed in Bar Harbor to have a 500-person limit and only 1 or 2 per week. |
| To try to get people with business experience on council--there are several absolute morons on the council. Bar Harbor is a very unfriendly town in general. |
| Too many boats |
| Too many people on the streets. We cannot have ships come in with 3000 people per ship. We cannot bring in three ships with 4000 people in one day. |
| Too many places ot stay now. Kind of too late to do anything. It's uncomfortable to go into town for about 6 months of the year due to the traffic and pedestrians. I'm used to a busy summer, but it starts sooner and ends much later. I don't have the answe.r |
| Tough question--less ships would help--as for cars, buses, not much can be done. |
| tourists wanting to visit coastal maine would be willing to pay a premium if the ships were limited. These same passengers would expect better restaurants and shopping bar harbor has too many t-shirt and mugs shops as it is. |
| Town needs to place more emphasis on values of privacy, general welfare; liveability of their residents. While understanding town's need for an economy, we will always have a decent one, I |

155

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| believe. Yet emphasis on exponentially growing, expanding this "business" economy is too often stressed ind ecision making at the expnese of every day living qualities. |
| town officials should try to lower taxes and use monies from tourism to improve all aspects of life for residents (that's what is done all around the world) |
| Town should only allow 1 ship a day in harbor; town should only allow a small cruise ship in harbor. |
| Traffic flow, cruise ship caps.  Again, eliminating parking from one side of West Street would ease the congestion.  Of course, this reduces available parking - maybe just for September and October when the ships come every day. |
| Traffic patterns should be changed--ie West St one way. Less ships--not having 3 ships at one time. |
| Transportation after PAX arrive on land.  It is the buses and congestion that makes the negative impact. Only allow smaller buses, a few at a time on the pier. Other than that its just like a peak season day |
| try to establish a reasonable limit for cruise ship passengers which allows the industry to continue visits without completely overrunning downtown |
| Try to limit cruise ship access. Do not make it convenient for the boat companies to take over Bar Harbor |
| Try to limit the number of passenger landings. I know this will be challenging as the industry makes money from landing passengers. But Acadia National Park is limiting large tour buses, so where are all these people going to go? |
| turn off the damn lights! Smaller tour buses with no idling. Electric buses that fit in lanes for cadillac and downtown |
| Unload passengers at the ferry terminal so that people can be more evenly distributed |
| until BH can get away from bringing all passengers into west street BH should have passenger caps (not caps on cruise ships since  many ships are small, 200 passengers or less). The caps perhaps should only be 2500-3000 per day which would alleviate congestion during peak tourist times. perhaps have also amnesty day where certaing days of week there would be  no visiting ships |
| Use Ferry Terminal for unloading; Continue to work with Acadia National Park to help with their overcrowding |
| Use funds raised solely to lower taxes; Ensure schedule/management is top notch and reviewed by BH community for most efficient/smooth operations; Coordinate and mitigate congestion and overcrowding risks. |
| Use the control measures (numbers) from 2019 as a base  for future visit controls. |
| use the ferry terminal. Build parking garages |
| use the old bluenose to dock ships and bus them to town/acadia. Not moor and dock at downtown pier. |
| Use the terminal pier instead of the downtown pier.  Take all the bus traffic out of downtown. |
| Using Ferry Terminal site to tender cruise ship tour passengers taking buses. Leave the town pier for small local tours. Develop Rodick St. as alternative route in to downtown for passengers to reduce congestion |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Using the "CAT" pier for cruise ships would help--reducing bus traffic on West St. The tenders could easily sort out the people interested in bus tours. |
| using the ferry terminal alongside the Cat or finding a place outside the harbor to have a cruiseship terminal |
| Using the old Ferry Terminal as the primary place for cruise ship embarking, disembarking, bus transfers; Maximize environmental regulation/enforcement of air and water quality impact which may result in minimizing/reducing cruise ship visits; Make Main St a pedestrian and biking walkway; No cars. |
| Utilize ferry terminal for cruise ships. Limit days ships can come and passenger caps. |
| Utilize the Cat ferry terminal for cruise ships and buses. Continue to monitor air and water pollution and redirect as needed. |
| utilize the ferry terminal property to load and unload cruise passengers going into Acadia |
| Very small ships only, if at all. |
| Visits kept to low numbers per week, 3 or less. Size of ship kept smaller, 200-300 passengers maximum. |
| Visual impact analyses are required for solar arrays standing 10' high, why are cruise ships large enough to block whole isalnds allowed in the Bay? How much CO2 and other pollutants and toxins do these ships emit while idling? What are the impacts to marine life with all these large ships comign and going? Limits on ship size. |
| wait another year for further covid vaccinations worldwide. |
| Wake up to the reality of your loss of tranquility, gorgeous views, and local merchants working hard to make ends meet.   The harbor is so congested that boaters from surrounding islands can't dock safely. There is too much traffic and it is unsafe and hectic. |
| Water and air pollution control   Limit number of cruise ships at any one time |
| We are not against cruise ships, but very much against "mega cruise ships". Limit the number of passengers by using smaller ships. We run a bed and breakfast in Hancock and our guests that visit Bar Harbor complain about what a hassle it is there and how it has been spoiled by allowing so many people from cruise ships to take over. Many say they will be sure to avoid Bar Harbor after their initial visit. |
| we don't need it. It has a negative impact on our town and keeps people away. If we don't keep those things under control, no one would want to come here. |
| We feel 2-3 cruise ships a day is fine. We think Bar Harbor has to date handled it well. |
| We feel it brings revenues to our business owners, which provides tax dollars for our town. |
| We need to get a handle on how many we can have visit daily and then manage up from that number. As to the second issue, debarked passengers cannot be allowed to act like the downtown is Disneyland and just walk in the streets or cross wherever they feel is most convenient for them. Jaywalking should not be allowed and there should be meaningful penalties for doing so. I am sure it will not be an easy task, but it is a matter of time before someone iskilled or seriously injured, so it needs to be dealt with sooner than later. On days when there are big ships with lots of passengers or multiple ships, the downtown simply cannot function as a tourist destination. Restaurants are |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| overwhelmed and traffic through the downtown is throttled. Until we get the numbers managed, there should be traffic cops on foot at the major intersections (West/Main, Cottage/Main, and Mt Desert/Main) that manage pedestrians and cars. Yes, it will cost money, but it is an impact fee the cruise ships should shoulder. Finally, if passengers are debarking simply to get on a bus or other land-based tour they should be handled at the ferry terminal and not in the downtown. |
| We need to lessen the number of people that come here in a single day on ships. We need to maintain access to the pier for residents and workers. We need less days with ships. |
| We need to reduce the number of cruise-ship passengers allowed in the port on any given day by at least half. Cruise-ships need to turn off external speakers and chimes when at anchor. We need to move processing of cruise-ship passengers away from the Town Pier area, most likely to the old ferry terminal. |
| We often visit from across the bay by boat and the dock spaces seem to be tighter in recent years with the increase in cruise ships as their ferry boats occupy significant space.  And since the land based traffic has also increased, we try to come over by boat to avoid the bottleneck traffic and limited parking |
| we only have 1 place (town pier) to bring them on land so I don't know what other option there could be other than reduce the numbers and/or size of ships |
| We should ban cruise ships |
| We should limit the overall number and we really need to land these folks at the ferry terminal and not downtown. |
| We should resource other means of income to the town that wouldn't have such a big detrimental footprint |
| We were happy to have 23 cruise ships over the season. Now we have 200 (potentially) and what happened to the limit of 2 per day. |
| Weigh benefits now vs problems later.  Allow 1/4 the number of cruise ships, and keep the total number disembarking to a reasonable, acceptable number.  Hordes are not attractive.  Bar Harbor is becoming a place to check-off on a score card, not the special destination it used to be.  Just go downtown and look around on a day when two or three ships are in. |
| West Street is a nightmare! Rude people at crosswalks. Ships--deport passengers out of town. |
| While I agree that some of these impacts are negative, I think the benefits outweigh them. Without these tourists, many businesses may need to close, so I am ok with the congestion because that means businesses are being supported and can thrive. I think the town has already done a nice job managing these issues to the best of their ability. |
| While I am supportive of the continued visitation by Cruise Ships,  It is time to start looking at an overall cap,  as well as designating "Sanctuary" days when there will be no ships on a regular schedule,  If people knew there would be two regularly scheduled days a week where they could enjoy town CS free,  they may feel less negatively towards them |
| wider sidewalks / pedestrian car free zones, fix traffic flow around trig landing |
| Wider sidewalks and have more in June |
| with no cruise ships or buses here for 2020 the town was just as busy as ever. The streets were just as crowded. Hotels, inns, restaurants wer busy. Cute. This way had a record breaking year |

158

## Q14: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?

| |
|---|
| Work cooperatively with all of the players to offset the negative impacts and accentuate the positive. With the economic hardship of so much of Maine, we need to overcome the temptation to ban everything i.e. NIMBY |
| work on a strategic plan with all voices heard and considered, limit number of cruises and follow the limits, take large commercial interests out of the picture, stop putting cruises first |
| Work on correcting the negative images of ships created with false information |
| Work productively with the industry to leverage more improvements for all of us. |
| Work together as a community and with businesses that deal directly with cruise ship tourism on this issue. By not including the businesses that directly engaged with the cruise ship industry, the inherent bias of town decision makers is shown. |
| Work with cruise industry and cruise ship committee to find solutions |
| Work with local concerned residents and experts for environmental congestion and other concerning areas. Could be a task force created for this purpose: to create a balance between tourism and the quality of life for residents. |
| Work with them instead of antagonizing them. Consider how to spread visitors throughout towns. |
| would not increase number of ships accepted over what we've had in the past |
| You could limit cruise ships to a one month period, say September. And limit the number of ships during this month to two a day maximum. This would mitigate all the negatives of constant cruise ships, while affording cruiseship passengers a chance to book bar harbor Though  in a limited time period. |
| you have to limit the numbers, especially in Sep and Oct |
| You have to take the good with the bad. More cruise tourism could be a good opportunity to expand |
| You should stay out of it |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| It was a welcomed change. We constantly listen to our guests complain of the congestion cruise ship passengers create. They are often run out of town during cruise ship days. We've been told by several guests who had visited other coastal towns in Maine that they were told not to bother with visiting Bar Harbor because it's far too congested with cruise ships and it's really difficult to enjoy the area. |
| Beautiful! But I understand the economic implications. |
| I could feel free to take advantage of the stores, etc. |
| improved quality of town |
| ????? Spent almost no time in town in 2020 |
| 0 impact. |
| 1 no impact on my thriving business 2 great improvement in my personal life; improvement in air and water quality, improvement in accessibility of waterfront, fewer ???? Buses |
| 2020 as one of the quietest and most serene summers I have had on the island. The amount of people in town, on the roads, and on the trails felt just right. |
| 40-70% revenue loss overall. Cruise ships would have helped that # |
| 50% down on income |
| 50% loss of business |
| A better Bar Harbor, thriving even better from land tourists without the burden of tour buses, large eyesores in the harbor, over-capacity pedistrian traffic |
| A bit less crowding, but it's still a busy and crowded spot, people found a way to visit anyway! |
| A breath of relief for one of my favorite places. |
| a calmer downtown. Concern for businesses and their losses |
| A huge break |
| A huge positive impact. I own a shop and my sales were the same without them! My shop wasn't so congested. People could see my things and buy. |
| A huge relief to wake up in the morning.and not see polluting smoke rising from the ships |
| a little less pedestrian congestion |
| A loss of about 25% revenue |
| A more quiet town with less crowding |
| A much better impact with not as many. |
| a much more peaceful summer; but COVID brought extra ground travelers to the park. |
| A much more pleasant downtown |
| A pleasant effect personally--felt bad for business owners. |
| a positive impact = bar harbor felt more like a ???? "village". |
| A positive impact in empty harbor, happy hotel guest without ships in their view. |
| a positive impact, easier to get around town |
| A relief |

## Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| A relief |
| A relief and proof that downtown businesses do fine without cruisers. |
| A relief not to have cruise ships in Bare Harbor. |
| A relief! |
| a sense of relief |
| a sigh of relief |
| Able to enjoy Acadia National Park daily, able to shop and drive through town. |
| Able to walk and drive through town, nice not to see buses or ships. |
| Absolutely no negative impact, along with a large positive impact. |
| actually, it was rather nice! |
| added to the business downturn of 2020 |
| Ahhhh, I enjoyed the Harbor views and going into town when ever I wanted too.   Priceless!!!!!! |
| All the people that were blaming the Cruise Ships for how busy we were should have noticed its not really the ships fault |
| All towns in Maine and US suffered, cruise ships or no cruis ships |
| Allowed me to live, shop and enjoy the natural resources of the island for a change, it had a positive impact. |
| Almost filed for bankruptcy |
| Almost lost my business, but barely survived. Now trying to sell last years inventory in order to purchase new. Luckily, it is already busy! |
| Along with reduce car traffic, it was wonderful! I actually chose to come into BH the summer of 2020. I don't expect to do so this year. |
| Although a strange summer as it was, I personally did not miss the cruise ships or the large numbers of people. |
| An amazing impact — without cruise ships, Bar Harbor felt much more comfortable, welcoming. The community felt more tight-knit. |
| An enjoyable one (no financial impact) |
| Appreciated getting to required services: Walgreens, bank, post office, grocery, hardware store |
| As a Bed and Breakfast owner, the lack of cruise ships did not affect my business financially. However, the early closure of activities and restaurants due to lack of cruise ship passengers had a slight impact - not enough to affect me personally.  My guests enjoyed the lack of cruise ships downtown however, I'm not sure it necessarily impacted their ability to enjoy the Town. |
| as a business owner there was a decline in some business but certainly understandable given the circumstances |
| As a kayaker, I noticed significant improvement throughout the region in water quality in Frenchman's Bay. Downtown felt more accessible although most of the shops and restaurants were closed for a good portion of the summer. Once they did open and people started coming from other states, I stayed away from downtown as much as possible. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| As a local fisherman, it made things in the harbor and on the pier way less hectic. |
| As a resident of Town Hill, I shopped in Bar Harbor instead of Ellsworth. |
| As a small business owner, it had a huge impact on our sales. |
| as I said in #14 the town was just as busy. I don't think we need to depend on cruise ships. There were just as many tourist without them and many luxury yachts for the 1st time. |
| As in the old Rolaids commercial, "Oh what a relief it was!" |
| As much noise as the anti ship people make you would have expected deserted streets.  Not so much |
| Bar Harbor became more accessible, but since the pandemic closed restaurants and theaters, there was little to access. |
| Bar Harbor seemed a bit empty. Which is why I'd adovocate keeping car traffic (which limits influx to one family at a time, a healthy stream of visitors/income) and limiting cruise ship traffic (an unhealthy stream of casual visitors who take much, exact a large toll on the bay, and contribute little.) |
| Bar Harbor was a much more pleasant place to live. |
| Bar harbor was more like a Maine Coastal Community--very important for Maine. |
| Bar harbor was so much better without the ships!! I don't own a business, but Acadia was better off! |
| Bar Harbor was still very busy.  More tourists spending more $.  Views gorgeous without the ships filling the harbor. |
| Beautiful views of the bay!  I was more likely to shop at favorite stores in town than I would have in the past. |
| Beautiful views. Congestion free. |
| Became obvious how important they are to our entire community |
| because of COVID, I did not go into town |
| Benefits due to improved scenic views and less bus crowding in the park (my business does not depend on cruise ships) |
| Best season ever. I am in the wine business and sales were up |
| Best summer ever--could walk to local shops whenever I wanted. |
| best summer for years and years |
| Best summer I've had in years. I was able to enjoy my town as a local and comfortably use the Town Pier as a commercial fisherman |
| Best summer of 7 summers in BH. Quiet and peaceful without ships. |
| Best summer to be in Bar Harbor! |
| best summer to visit BH |
| Best thing to come out of Covid-19. How lovely to see the view. |
| Better |
| better access to pier and Agamont park |
| Better quality of in-town life. Cleaner environment (Air, water, trash litter) |
| Better quality of life in Bar Harbor |

162

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| better sleep |
| Better views. No traffic jams on lower main street. A year without feeling that Bar Harbor is just a cog in the wheel of the crushing cruise ship industry. The thought that there might be a chance that Bar Harbor could do something about the place it has gotten itself into on that wheel. |
| Better visitor experience, more people visiting out of town restaurant |
| Big negative impact |
| Blessed relief. |
| bliss. No noise fewer tourists on the sidewalk. No huge boats marring the view |
| Breath of fresh air! Visitor numbers to Acadia still high in fall. |
| bringing more risks |
| Business was better--much less crowded. |
| Business where I work suffered some initially, but then ended up making up for it with land traffic. Missed seeing the smaller cruise ships in the harbor, but LOVED that the monster ones that dwarf the town weren't here. |
| Business: none--my businesses were very busy. Personal--it was nice to not see the ships and fight the buses. |
| Businesses depend on this income to get them thru to the following year. This ensures that building and storefronts will be stocked and open for business. |
| businesses seem to suffer |
| Business-terrible, down 50% at least. |
| Came over on ferry from Winter Harbor for lunch and or for early supper. Sat and enjoyed all aspects of Bar Harbor and COA since less congested. |
| Certainly gave a new perspective on their absence but hard to know full impact since land based tourism was also impacted at least before August |
| Cleaner air and water and overall environment. |
| Cleaner air, possible to walk downtown, less congested sidewalks. |
| Cleaner and less crowded town, better quality of life |
| cleaner bay and noise from cruise ships. Still same amount of tourist only oct less tourists |
| Cleaner clear waters.    I actually went downtown with visiting family x5 days, when usually it's once or twice in Summer/Fall.  Drove my boat there, knowing the big ships wouldn't be an issue. |
| Closed business due to Covid-19 and town was packed because no enformecemnt of governor's regulations. The town was as packed, just without ships. |
| Closed one aspect of our business completely down. |
| community, enjoy our own space |
| Completely changed my job. No tours. |
| Cost me my job for the season. |
| Cost me my job. So I was in bar Harbor for only 2 months  instead of6. |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| Could access the pier and enjoy downtown more. |
| Could enjoy the downtown for once. |
| Could not notice any difference. |
| could not see any difference in town |
| Covid aside, last summer was FANTASTIC without cruise ships.  For the first time in years, we experienced a sense of ease in town.  We experienced a greatly improved quality of life in town, better safety in all boating activities, and unimpeded enjoyment of the iconic views and waters that Acadia National Park is known for.  We were also able to observe more abundant marine life, and marine ecosystem seemed, in general, to be more healthy. |
| covid impacted us so much that the loss of ships wasn't |
| Covid restrictions make this question not relevant |
| COVID was the bigger story. |
| cruise ships didnt, restrictions did |
| Cruise ships do not affect my business.  Also, my programs at COA had to be cancelled due to COVID in 2019. |
| Cut my business to less than half the revenue. Thankfully my landlord was able to help out on rent reduction, but that will only happen once. |
| Daytime/lunchtime congestion greatly reduced in months of Sept. and Oct. |
| Decrease in income--sustained. |
| definitely spent more time downtown enjoying it during summer months. |
| Delightful not having the sight, sound and noise pollution and the congestion. |
| Delightful town again! |
| Despite all the sad and awful things that go along with the ongoing pandemic, Bar Harbor 2020 (sans cruise ships) was pretty great. I was able to drive through town--even the intersection of West Street & Main--I was able to drive narrow West Street without fear of meeting a coach bus approaching from the opposite direction. I have yet to hear of anyone who missed the cruise ships in 2020. |
| DEVASTATING, our sales were down by 80% |
| Did not have impact. |
| Did not impact me but did impact my friends and neighbors that own shops and restaurants. |
| Did not miss cruise ship |
| Did not miss the ships, business was good. |
| Did not vacation in Bar Harbor in 2020. |
| Didn't go to BH in 2020 |
| didn't go to town much |
| Didn't hang around like usual, because of crowds.  However, we enjoyed the peaceful and quiet experience of driving to the pier and parking without the congestion of traffic and buses lined up.  It was beautiful. |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| Didn't have to see them and the smoke from their stacks. |
| Didn't miss them |
| didn't miss them |
| Didn't miss them at all--what a relief! |
| Do not like the tables in the parking spaces, too much traffic. |
| Don't know--we did not travel to our home in Bar Harbor in 2020. |
| Downtown is much more pleasant place to be. |
| Downtown was less congested. I went to the town pier and shore path. Less buses. |
| Downtown was less crowded, which was nice. But many restaurants and shops were closed, which was not nice. It was OK, but not ideal. |
| dramatically enhanced life |
| Due to Covid, hard to tell, but the crowds seemed more managable |
| Due to limited capacity allowance, we couldn't keep up with feeding the land-based tourists, so never could have served cruise ship people last year. |
| Due to selling right before Covid (downtown business), nothing, but if I was still there--everything--bad for shops and restaurants. |
| earned less and paid more taxes |
| Easier access to downtown |
| Easier access to the pier and parking. The harbor was so much more beautiful without the large ships. |
| Easier access to town businesses/services; Enjoyed visiting Town again. |
| easier and safer to walk. Positive impact. Visitors who were actually customers visited stores |
| easier getting around town and into businesses |
| Easier to drive, park, shop, dine, enjoy ocean. |
| Easier to get to and around Bar Harbor |
| Easier to go to the grocery store and dock. |
| easier to walk around |
| easier to walk downtown |
| Easier to walk in town. |
| easier travel within the town |
| Economics bad, life good |
| Economy suffered, workers had less money. |
| Enjoyed Bar Harbor a bit more than a usual cruise ship summer. |
| Enjoyed Bar Harbor more |
| enjoyed it |
| enjoyed it! LOL |

TOWN06012

## Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| Enjoyed my town. Parking okay except dollars. Room in stores and restaurants. |
| enjoyed not seeing ships in harbor/less pedestrian traffic, more access to town pier area |
| Enjoyed some leisurely visits to Bar Harbor |
| Enjoyed the quiet and felt safer without the extra people. Our activities were very restricted in 2020 due to Covid-19, so really had little impact. |
| Enjoyed views of harbor and enjoyed far less crowding |
| Enjoyment of the area without crowds. |
| Ensure to go to and shop in downtown BH |
| Even though we had to deal with masks and distancing, I felt like I had room to move in the village areas. I enjoyed drives without busses. The wildlife seemed more relaxed and active. |
| Even with Covid, I found ways to support local, shop, and enjoy way too frequent takeout due to accessibility. |
| Even with the Covid-19 pandemic, this was the most peaceful two years I've had in Bar Harbor for a long time. |
| Everythign was horrible--cruise ships were not relevant. |
| Excellent impact. |
| excellent! Such a relief |
| excellent. We were able to enjoy shops, restaurants (take away) and parks, especially village |
| Experienced relief of having the Town back. |
| Extreme loss of income |
| Extreme negative impact on businesses (retail, dining, activities) in downtown  Loss of revenue to the town meant the removal of their contribution to the Chamber so we could not provide the same level of visitor services in downtown |
| Fall was great! Lots of people happy with no ships. |
| Family could get around easily to hike, etc. I stayed home a lot....looking at the Eastern Bay and Frenchmans Bay  as they will be destroyed by commercial aquaculture which is proposed...and by gigantic cruise ships to come. |
| fantastic - you could actually walk down the road |
| Felt free to come over to Bar Harbor by boat or car to shop and enjoy spending time there with extended family for the first time in many years. |
| felt like we had our town to ourselves. |
| felt more relaxed |
| Felt safer |
| Felt safer without tourists (germs), less congestion downtown in parks, sidewalks, etc. |
| Fewer buses. I could walk down the street and sometimes I could even go to the pier. Loved it! |
| Fewer shoppers was bad for business. Less people eating lobster. |
| Fewer tourists! Less congestion! |

TOWN06013

| |
|---|
| financial impact on overall town revenue |
| Fine--loved the fact that we had most of the town back. |
| foot traffic plenty in july and august |
| Frankly it was nice to be able to access businesses without fear of mowing down wandering cruisers that do not understand a crosswalk. |
| Frankly, it was positive for me but, I was greatly concerned for the town business owners.  I think cruise ships should be part of the town plan..I just don't think we should ignore the balance needed to protect the environment and quality of life in Bar Harbor and surrounding areas. |
| Friends were impacted fonancially |
| fun to wander streets, but fall was as crowded with day trippers. Terrible for business |
| Gave peace of mind. |
| Given other limitations due to Covid, this is difficult to answer. |
| Given the threat from COVID limited our desire to visit the downtown area, it was great to walk around and not feel the crush of people |
| Glad there were non polluting the air and harbor. |
| Going through town felt busy from land based tourist, but more manageable without adding cruise ship passengers. |
| going to town was less hectic |
| Good |
| Good impact. Land tourists flocked here and rented houses, rooms etc. Shopped, hiked and biked. They were happy to hear no cruise ships would be in Bar Harbor. |
| Good. I don't like cruise ships |
| Great enjoyment and appreciation of peace and quiet and return of birds and sea creatures--back and able to live undestured. |
| Great improvement! |
| Great peace of mind in the reduction of carbon emissions and fewer people potentially spreading Covid-19. |
| Great without cruise ships and all the problems.  Tourism has caused a tremendous amount of stress for residents regarding covid. |
| Great year for business. |
| Great. We loved having no ships. |
| greatly enhanced access and enjoyment of town, businesses, park, and island |
| Greatly enhanced access and enjoyment of town, park, and island in general. |
| greatly improved experience in bar harbor. Much fewer cars, buses, people. It was the nicest summer in decades - I normally avoid coming into downtown during the tourist season |
| Greatly improved experience. |
| Greatly reduced congestion on West street which is not wide enough to accommodate a bus and a car meeting each other without one of them pulling over |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| Greatly relieved as it proved that Bar Harbor can do very well for tourists without cruise ships even in a COVID restricted season |
| had no impact |
| half of things was open |
| happy |
| Happy to not see so many cruise ships. It will be interesting to see how this summer goes. |
| Harbor environment beauty enhanced, there was still a problem with congestion due to increased land-based tourism but the addition of cruise ships would have made it significantly worse |
| Hard to determine / seemed like plenty of land-based patrons, maybe more |
| Hard to determine since land-based tourists stayed away until September. |
| Hard to say , wasn't out and about now. Glad there wasn't any. |
| Hard to say because we tended not to go out due ot Covid, but I know we would be more likely to venture downtown this summer if there are none again. In past recent summers, we avoid downtown whenever possible. I don't like walking aroundnow, but enjoyed the summer influx in the past up until about 2015/2016. |
| Hard to see so many businesses suffer |
| hard to separate out impact of no cruise ships and the covid quarantine |
| hard to separate out the fact that not only were there no ships but no tourists with lodging and restaurants closed for first part, but the land based came in droves when things opened and it was nuts for covid world |
| Hard to tell because other tourism was down and so many other things were changed that it's hard to parse out the cruise ship effect. |
| Hard to tell! The pandemic affected us in so many ways having nothing to do with tourism |
| Having low visitation in the spring of 2020 brought the community together like I've never seen before I hope we can carry that forward. One of the few silver linings of 2020 was having no cruise ships. |
| helps reclaim the town for Mainers |
| Higher taxes |
| Hired fewer staff, less sales, and shorter work agreements for staff.   The day time pedestrian traffic was less moving around Main street and West Street was easier |
| honestly, none. I work for an oyster farm that serves cruise ship passengers, and last year demand increased with zero cruise ships. |
| Huge financial loss and negative impact to my business.  Not sustainable going forward. |
| Huge impact -- all negative |
| HUGE impact!! It was wonderful! So nice to be able to go down to the water without being swamped. So nice not to drive through crowds to the grocery store. So nice to see tourists actively engaged in their vacations and spending money at businesses. It felt like such a treat to look out and not see a swarm of cruise ships in the harbor like flies at a piece of dung. |

168

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| huge improvement! So much easier to love where I live. |
| Huge! Revenues down 40-60% |
| hurt town economy |
| I actually used the town I live in instead of taking my money to Ellsworth |
| I actually went into downtown bar harbor; in past I avoided it during cruise ship season |
| I am a waitress. I made more money last year than I have any summer before. It was refreshing to not have the pier totally off limits for most of the fall and to be able to walk through town without obscene congestion. Improved quality of life all around. |
| I am glad! Don't want them to spread disease to us!! |
| I am retired and found it peaceful, but fully understand the economical impact of not having cruise ships. |
| I am thrilled.  I get to enjoy my town and the park without hoards of tourists. |
| I and my family were very happy with the change and -- though the pandemic was hard -- the absence of cruise ships was great consolation. |
| I came to BH more often to visit family |
| I can breathe in town (I'm allergic to diesel) and I enjoyed less crowded town. |
| I can't overstate how positive the change was.  Quality of life, business at my/my wife's workplace, and access to the harbor and its facilities, all improved or held steady. |
| I closed my business to comply with social distancing. It was a terrible year for our family financially. But it was less congested in town without all the cruise ships. |
| I could actually walk and drive about town with much less effort. |
| I could breathe! |
| I could go downtown to shop and bank. |
| I could some what use the Town I live in. Lobster men could place there traps not worry about them being cut off. |
| I could visit Bar Harbor as it was 40 years ago! Wonderful! |
| I could walk down the sidewalk in my hometown and still have a space to move.  It was quieter, more like it used to be years ago, when we had fewer tourists. |
| I couldn't come. |
| I deliver fresh seafood to downtown Bar Harbor. Delivery was easier without cruise ships, but restaurants were still moving lots of product. |
| I did not come to Bar Harbor last year except one visit within the park. We drove from Winter Harbor and did not enter Bar Harbor.   In previous years we have taken the passenger ferry over. |
| I did not come to my house on MDI until late September and then only to check on it. I did not rent it or loan the house to anyone for vacation. It helped me make the transition to using the house more for myself and my husband. |
| I did not miss the ships at all. |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| I did not notice an economic impact in 2020 and prefer to explore extending our town's land based tourist season. I liked having businesses stay open longer and think there is opportunity in the shoulder seasons as well at the winter. |
| I didn't go to into town much because we weren't leaving our house except for work, because of the pandemic. |
| I didn't have to avoid town because no ships came in |
| I didn't have to check the cruise ship calendar to see if I needed to avoid coming into town |
| I didn't have to see smoke pouring out of their stacks all day long and obscuring the view from our house and from the Shore Path. Our water was cleaner, too, and marine life got a break. |
| I didn't live here then. |
| I didn't spend much time in town, so not much. But I hear town was still packed with tourists and restaurants did very well in summer (less number of people in fall) |
| I don't know, too soon to see. |
| I don't like the anti-business efforts. |
| I enjoy watching the cruise ships, and my business and my personal finances were negatively impacted. |
| I enjoyed having our streets less crowded. |
| I enjoyed it and thought that the land based tourism would eventually increase to make up the difference to most viable businesses  The cruise ship tourist I feel don't have enough time to do much besides get on out of town bus tours and buy a few shirts the day bar harbor and maybe eat a meal at restaurants that would be already busy without them |
| I enjoyed less crowding downtown |
| I enjoyed that there was less overcrowding. It helped with less congestions of pedestrians and cars. |
| I enjoyed the downtown feeling more than I have in years. |
| I enjoyed the space. |
| I enjoyed the town (sidewalks, especially) being less crowded |
| I enjoyed the town again, like when I was younger. It was nice to walk the streets again and not feel like I was at Disney World. |
| I enjoyed there being less congestion and was able to more easily conduct my contracting work. |
| I enjoyed town much more, walked downtown in summer, visited businesses. I never do this in a normal year. |
| I felt as though I could almost breathe in town again. |
| I felt I could enjoy the downtown again and always view a beautiful harbor |
| I felt that town was much easier to navigate and my family spent time in town |
| I forgot how nice it was before cruise ships. Virus aside, it was a lovely summer in BH |
| I found the reduced traffic and people to be refreshing and it encouraged locals to use the facilities more |
| I found the town and the harbor much more pleasant |

DX323.237

TOWN06017

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| I found the town much more enjoyable and maybe some of the shitty tourist shops will rebrand themselves to be more appealing for land-based tourism and local residents. |
| I got to cruise the town freely. |
| I liked it. |
| I liked it. It had a positive impact.. |
| I liked it. We get plenty of land-based tourists. |
| I live in-town Bar Harbor and the summer of 2020 was a blessed relief from the negative impacts of cruise ships. I did not breathe diesel fumes whenever the wind blew into town from the bay. I could physically access the town dock without long lines of busses and police telling me to go somewhere else. When at the dock, I did not need to breath the diesel fumes from cruise tenders. I no longer heard on board cruise ship announcements, music and noise. There was room to walk on the town sidewalks in the middle of the day. I knew an unanticipated, major pollution spill into Frenchman Bay could not happen - our coastal fishermen depend upon clean waters to make a living. Cruise ship's mechanical systems endanger our waters. Smoke stack scrubbers transform air pollution into water pollution. The list goes on and on. The environmental dangers of cruise ships far outweigh the positive monetary impacts to the town. |
| I lobster; glad not to have to deal with ships at sea |
| I lost a lot of money |
| I lost my corporate job, but found an overall better way of life. I found a new position working for a local couple who just want to see the community thrive. Community is the heartbeat of our town. |
| I lost my job as aguide and had to work longer hours at a more difficult, less gainful profession. Friends of mine located on lower Main St. went out of business. It was nice not to have to look at ships in the harbor. |
| I lost my job. |
| I lost one business (forced to close because of dependence on cruise ships and bus tours). A second business did okay. |
| I loved having my town back! Get more varied tourism from near and far! It allowed for more Mainers to get to experience Bar Harbor/Acadia. |
| I loved how relaxed the town was / not crowded. |
| I loved it! |
| I loved it.  The quiet peaceful atmosphere was like the old Bar Harbor.  Everything was less crowded. |
| I loved not have cruise ships |
| I made more money! Without cruise ship, a lot of yachts came to the harbor and gave me tons of business, just my kind of customer. They stay in town for a few days and spend at all the shops, grocery stores and more. |
| I miss seeing the visitors, no joke. |
| I miss the excitement of a different ship each day and all the visitors that are so excited to visit our town |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| I missed meeting interesting people, practicing my foreign languages. I stopped going for walks downtown and shore because of the people not wearing masks. I saved much money by not having lunch out daily. |
| I missed seeing the ships in the harbor |
| I noticed more land based visitors, especially those from Maine, and especially on weekends. Congestion was improved, especially in Bar Harbor's high traffic areas and around the pier.  In the fall especially, some businesses were greatly affected, not just in the amount of foot traffic, but also in changes to what is typically purchased by our regular cruise ship visitors during that time of year.  I experienced this both in the restaurant and the retail industry. |
| I operate a tour boat, passengers like to see the large ships. |
| I own 4 restaurants and it deeply affected our bottom line. Our waterfront location was down 72% in sales, our other three locations were down between 53-79% over 2019. I hope in 2021 we can recoup and not go out of business. We need all the help we can get. We need all the customers we can get, no matter how they get here |
| I owned a brick and mortar shop and my sales actually increased from 2019-2020.  (Granted, it was a new business starting June of 2019) |
| I patronized downtown businesses more frequently because of the lighter pedestrian traffic and not having to encounter busses. |
| I personally loved it. I do not like seeing them in the harbor, polluting our water and unloading thousands of people. It is a cynical perception at best because I love our town and local businesses, but despise the cruise ships. |
| I really liked it. |
| I retired midseason! |
| I run a motel. Customers were positively impacted. |
| I saw better fall buisness in a younger demographic that my biz tends to cater to. |
| I saw streets that were just as busy with people staying in hotels and vacation rentals.  This proved to me just how false the "crowding" claims are with regards to cruise ship passengers.  The sidewalks were just as busy in 2019. |
| I spent many more days in town than I usually do in the summer season, walking the shore path and doing my errands. This was partly because of the lack of congestion and partly to give extra support to our local business trying to keep themselves open. I have a business on the outskirts of town; I rarely see cruise ship passengers, but I do see people who work to serve the passengers in some capacity. I don't feel the ships have a direct effect on my business, but I am aware of, and appreciate, the indirect business that comes through my door. |
| I spent time at the pier, town was easier to navigate. My work was more pleasant (our visitors didn't have to "run off" when buses pulled in. Plenty of people still came. The restrooms at work didn't break down. |
| I think Bar Harbor was a safer place. I think it's healthier here with less visitors. |
| I thought august was pretty crowded in town and with decreased capacity in stores and restaurants I can't imagine |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| I thought it was great, there were no cruise ship tourists in town. |
| I thought it was wonderful! I work at a restaurant on Cottage St. and our business was not impacted |
| I thought it was wonderful. |
| I was able to actually go downtown - if businesses could have been "totally" open, I would have been able to ??? And give them my business as in days before cruise ships. |
| I was able to enjoy town |
| I was able to get around the island and sights better than when ship are in port. However, the amount of land travel was increased so there was still a lack of parking. |
| I was able to go into town much more easily. |
| I was able to park and visit my favorite stores and restaurants. |
| I was able to spend more time in town.   I got to know my little home town again.  Not once did I go to Ellsworth.  I had the time, space and parking to purchase gifts for special occasions.  Balance is possible now that we have seen both sides of the coin again. |
| I was able to walk in town without fighting for space on the sidewalks |
| I was able to walk the streets of Bar Harbor, much easier and eat out easier. |
| I was able to walk through town on errands and drive through town without frequent stops due to people standing in the street. The town regained its charm |
| I was closed for several mouths |
| I was more apt to drive into town for various reasons. |
| I was not able to open one of my stores, could not employee an additional 3-5 people, could not run my other store with employees so it was just me and the other owner running the store everyday. We ended up 91% down from the previous year. |
| I was not in Bar Harbor myself due to the pandemic |
| I was pleased to not have the ships/tourists present. |
| I was shocked at how much cleaner, clearer the ocean is. So nice and quiet with good air quality. I highly recommend the Town Council, take a look at the ocean. |
| I was shocked to hear an elected official say that things were "fine" |
| I was so pleased NOT to see the black diesel smoke streaming over your town from across the bay. I was very pleased to see dramatically fewer whale strike deaths and so pleased to see higher reproduction rates 2020 and 2021 spring. I enjoyed visiting the town and spending local money without the throngs of cruise ship passengers (as did my local friends). In the 5 years I don't usually visit Bar Harbor due to cruise ship crowding. |
| I was unable to come to Bar Harbor because of the pandemic |
| I wasn't there because of Covid but would have loved it and would have spent time in BH during July through September for the first time in many years. |
| I wasn't here to see the impact but wish I was, better views |
| I wasn't there in 2020 |
| I wasn't working in town, but less congestion for sure. |

173

Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| I went to Sherman's in a month wihtout an "r" in it. |
| I went to town more often |
| I wish I knew--wasn't able to visit. |
| I work for a financial institution and business was much slower |
| I, for one, enjoyed knowing I could go about my business in town without the hoards of passengers forcing me off sidewalks. Didn't miss the endless stream of tour buses either. |
| I'm sure it was devastating to my friends who had shops and restaurants. |
| Impact, none. Was it nice to not have the overcrwoding and extra exposure, absolutely. |
| Impossible to tell since covid impacted all public places, hotels, and restaurants world-wide. The thinner crowds were appreciated. |
| Improve dview, better access |
| Improved |
| Improved ease of access to downtown--not really comparable. |
| Improved enjoyment of the area. |
| improved fredom of movement, less congestion |
| Improved it. Showed how busy we would be without it. Showed how quality of tourism improved. Not just shotglass purchases |
| Improved my access to downtown amenities, including Agamont Park, Shore Path, and Village Green. |
| Improved our access to downtown |
| Improved quality of life, despite Covid. |
| Improved views, less concern over impact. |
| In a word - Wonderful. |
| In my world, Bar Harbor was more enjoyable. |
| In reference to the question above, I do believe we could spread the ships out better.  Having a ship every day is a lot.  That being said, my business was down significantly and I had to lay off 15 employees |
| Income declined |
| Increase access to resources, including pier and necessary businesses. |
| increased enjoyment of downtown spaces |
| Incredibly detrimental to my business. 1/3 of our revenue comes from cruise ship business. |
| Initially, large impact due to scarce crowds. By July-Aug, felt almost the same from a traffic perspective. |
| It actually had a negative impression on me,  While it was nice to not have the throngs downtown,  it gave people a false impression that businesses could survive just fine without cruise ships, and while a few businesses, who's owners are vociferously anti cruise ship did claim to do well last year,  If you talk to the overall business community, you will find that NOT to be the case, and that most |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| businesses had an extremely poor year, and if not for the assistance of the Federal government through the PPP program, would no longer be in business. |
| it brought me back 30 years. So nice |
| It brought so many better customers to town who commented that they came because of the absence of cruise ships. |
| It certainly negatively affected our business. I realize the perception was that it was just as busy without cruise ships however the bottom line of most businesses for 2020 does not support this conclusion. It felt busy due to reduced capacity of restaurants and activities in the area. |
| It did affect my [illegible] and my employer. But ona personal level--I thought it was nice. |
| It didn't have an impact on me. I am sure the town finances missed the income generated. Sounds to me like the shops didn't find it as much of a negative as they thought it would be. |
| It drastically affected my business which meant I had less to give locally |
| It enhanced the natural beauty of Frenchman Bay immeasurably. |
| It felt more calm --fewer people in hoards. |
| It felt so much better |
| It had a calming effect on year-round residents who felt more like it was our place. |
| It had a positive impact. The town was much nicer and I believe land based tourism benefited as did locals use of Acadia, restaurants, parks ,etc. |
| It had a positive impact. People who would normally avoid the village were more likely to visit and buy. Unfortunately, COVID-19 had an obvious negative impact. |
| It had a tremendous negative impact on our business. Our 12 years experience is that cruise ship passengers visit our store and purchase while here then they order throughout the rest of the year and beyond through our website. So the negative impact if 2020 will be felt by us for years to come unfortunately. |
| It had very positive impact. We got to enjoy the magnificent views of Frenchmen's Bay from Agamont and Grant park again! It was meant as it was meant to be viewed (unobstructed) The sidewalks were less crowded! Another positive was not having the large coach buses in town. West street was accessible! |
| It has affected many businesses which have had to close. |
| It has affected my customers greatly |
| It hurt restaurants and retail, which detracted from the general vitality of town. |
| it improved my quality of life |
| it is hard to sort out. Overall there are too many variables. It was nice to be "emptier'. |
| It is impossible to tell the impact of cruise ships specifically on bar harbor versus covid |
| It made Bar Harbor more intimate and pleasurable. |
| It made for a more pleasant summer with it being less crowded in town. |
| It made he town much more enjoyable and able to walk around without being shoulder to shoulder and people in the streets |

DX323.242

App. 546

TOWN06022

| |
|---|
| it made life somewhat easier, but I do not reside in the middle of town |
| It made me happy, less people |
| It made me happy. Looking forward to a 2021 without cruise ships. |
| it made my travels and recreational experiences more pleasant due to less crowding. But the impact on local businesses may have been more negative |
| It made us realize how much we didn't miss the cruise ships. The nosie was gone, the congestion of people. The town felt right! |
| It meant fewer cruise ship tourists which was good - altho the parks were still crowded from land based tourists. it also meant that the bay view was unobstructed for residents which was great and less impact on air quality and aquaculture. |
| It negatively affected our business |
| It proved to me we still have plenty of people around in downtown Bar Harbor |
| It put a huge damper on visitation and sales for the Bar Harbor Historical Society. |
| It reminded me of the world-class destination Bar Harbor was before the introduction of significant cruise ship volume. |
| It seemed just as busy-  If the ships really were a problem it should have been more obvious |
| It was a better experience for residents. |
| it was a breath of fresh air! we were able to access the park much more easily and even walk down our own street without excessive traffic |
| It was a complete relief and a joy not to have to look at them when hiking in park. |
| It was a disturbingly quiet (and often pleasant) summer. |
| It was a good reminder how important they are to so many people |
| It was a great improvement. |
| It was a great summer without any cruise ships. |
| it was a great summer! |
| It was a little better without the cruise congestion but more land based tourists came |
| It was a lovely year, in this respect to Covid 2020. |
| it was a markedly more peaceful summer in town |
| it was a nice change. |
| It was a nice relief! |
| It was a pleasure not to have the cruise ships |
| It was a pleasure to see the land and water free of the ships. |
| it was a pleasure, still plenty of tourist pressure and business, without the added chaos |
| It was a positive. Folks said they came to enjoy the park without cruise ships. |
| It was a relief and made it easier to run my business (landscaping). |
| it was a relief to have fewer people here. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| It was a relief to have fewer tourists unfortunately offset by the number of people arriving by car. |
| It was a reminder of the quality of life before… |
| It was a very positive summer! |
| It was a wonderful feeling! |
| It was a wonderful, cruise ship free summer. My experience of life in Bar Harbor, aside from other Covid related inconveniences, was greatly enhanced by the ban on Cruise Ships. |
| It was absolutely fantastic. I bicycle in Town and the Park and reduced number of big coach buses and vehicles was great. And, the views from the top of Cadillac were goregious wihtout the big chlorox bottles polluting the beautiful views. Our harbor was lovely again. |
| It was absolutely wonderful - no blight in the harbor, no crowded streets, no lines at the post-office! |
| It was actually nice to walk down the street again. Fewer masses of people clogging the streets. |
| It was amazing! Bar harbor the way it should be and used to be!! |
| It was amazing! Did not affect my local job/business. It still felt like a community last summer. |
| It was amazing! I could use Bar Harbor and enjoy it as much as COVID allowed (parking, walking, grocery shopping, supporting local businesses, park use, and viewing of our beautiful coastline). |
| It was amazing. Huge benefit to all. Please keep it this way. |
| It was an incentive to visit, knowing I would be able, as a pedestrian, walk the sidewalks at noon, assuming there will be sufficient land-based tourism parking |
| it was appreciated |
| it was awesome. I felt angry at several biz. Owners who were angry at saying so. They think its all about them. |
| It was better (town was still too crowded!) |
| It was better and town was amazingly busy for a pandemic. |
| It was bliss!! |
| It was blissful as a downtown pedestrian and shopper. |
| It was blissful. No worrying about crowds in Bar Harbor, the view was unmarred, people were nicer. It was wonderful |
| It was boring without them. |
| It was delightful to see so many fellow Maine residents enjoying the area. (Many of them had not been to Bar Harbor for many years because of the cruise ships they reported.) |
| It was easier and more enjoyable to access park and downtown businesses. |
| It was easier for me to shop in the village and easier for me to navigate near Agamont park. |
| It was easier to park and get around town. |
| it was fabulous |
| It was fabulous! |
| It was fantastic! I was able to access the town pier and see the porcupine island without obstruction from cruise ships. |

DX323.244

App. 548    TOWN06024

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| It was fantastic! Lack of crowding, beautiful views of bay, able to enjoy the Shore Path (impossible to enjoy when filled with ship passengers). |
| it was glorious for me but, I imagine, devastating to business owners |
| It was glorious. The town felt more like a town. |
| It was good to have less congestion and to know the environment was having a chance to recover from the pollution these ships bring. It would be great if some happy medium could be found where Bar Harbor gets the economic benefits of the tourism cruise ships bring without jeopardizing the environment and the quality of life the town has long been accustomed to. You can have too much of a good thing (tourism), and that can spoil the attractiveness that made the destination desirable in the first place. Cruise industry CEO's care about their shareholders and their bottom line, they don't care much about the impact of uncontrolled growth in their industry on quality of life and environment in the destinations their ships visit. |
| It was great |
| It was great not having to breathe the fumes that drift across the bay!!!! |
| It was great not to hear them |
| It was great! |
| It was great! |
| It was great! |
| It was great! |
| IT WAS GREAT!  My experiences in Bar Harbor in 2020 were the best ever since 1970. |
| It was great! Not breathing diesel fumes or seeing those clouds over National Park. It was nice not seeing those ships in the bay! Dorr and Rockefeller would have been ashamed with their unsightlyness ruining many views from within Acadia. |
| It was great!!!! |
| it was great, and business did ok. Land based tourist increased |
| It was great, we could go downtown and move freely. We did not have to walk around groups walking four-wide on the sidewalk, or wandering aimlessly through the streets. |
| It was great. I had more people say they could go to Bar Harbor and shops and enjoy our town. |
| It was great--less people |
| It was heaven to use my town again! And be able to grocery shop at Hannafords! |
| It was heaven. |
| It was heavenly. |
| It was just as busy on the streets |
| it was less hectic |
| it was lovely |
| It was lovely downtown! |
| It was lovely not to see them or have  the crowded streets. I was more comfortable in Bar Harbor. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| It was lovely not to see those huge ships in Frenchman Bay and to know that they were not paisoning local water and air with their engine fumes and their bilge and their wastewater releases. |
| it was lovely to have the harbor free of cruise ships and tenders I think it may have had a negative impact on businesses |
| It was miraculous! Huge difference! So much more relaxed! |
| it was more quiet, less traffic, no impact on air and water quality. |
| It was much better without cruise ships!!! I am sorry for some of the businesses that suffered but we MUST take care of the island first and 2020 made it obvious that cruise ships have no place here. |
| It was much better, but tourists drove here, regardless. |
| It was much easier to get around town to shop |
| It was much more pleasant downtown. There were still many land based tourists supporting the economy |
| It was much nicer to be be in town and not see exhaust pouring out of cruise ship funnels. |
| it was nice |
| it was nice around town and more land based visitors seem to like the lack of cruiseships as well as myself |
| it was nice not to feel so overcrowded |
| it was nice not to hear them or see them and only the local fishing/boating traffic. seeing the islands not being blocked buy the huge ships or deal with the traffic from them even on the water and dock from the taxi service. |
| It was nice not to see the hulking cruise ships in the viewshed. |
| It was nice to experience the town with less people |
| It was nice to have the town back. |
| It was nice to have the town feel like it used to, but I realize that 0 ships is not good financially. |
| It was nice to see less tourists, It seems Bar Harbor still had a great year! |
| It was nice. But I get that we need the revenue |
| It was nicer |
| It was nicer going into town and I did it more frequently |
| it was not good |
| It was pleasant to go to town. |
| it was pleasurable to go downtown |
| It was quiet but sad |
| It was quite pleasant and the town has proven that the cruise industry isn't required for successful business opportunities and much better standard of living for residents. |
| It was really nice in town, Bar Harbor was like itself. |
| It was really nice to have our shorefront back. Seeing the Porcupine Islands, and enjoying our parks without being blocked out by the massive size of these ships. Regional Tourists returning to Bar |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| Harbor and having a great experience, noting the reason for returning being, NO CRUISE SHIPS ! Locals enjoying the place they live without having to compete with Cruise Ship Buses, and Passengers. Realizing that we really don't need to be so invested in this industry, land based tourism filled the gap just fine. |
| It was really pleasant. Felt more like "real" Bar Harbor. |
| It was really wonderful - Visitors and locals really got to enjoy the park and downtown without overcrowding |
| It was refreshing to have the town somewhat less crowded. Of course, we did not walk or bike downtown much either due to COVID. |
| It was sad to see so many businesses under or not performing. |
| It was so much better. My job, which benefits heavily from cruise ships, did fine without them because land-based tourism was still strong |
| It was so much nicer without them! |
| it was so nice not to have any cruise ships |
| It was so nice. You could park in town, you could walk on the streets. Views from my cottage were far better. |
| it was the best part of a tough year |
| It was the best summer in years. Able to go to the grocery store after 8am, get to the bank during the day and enjoy the Park. |
| it was the best summer since I was a child |
| It was the most wonderful summer ever. Cleanest air on Shore Path, harbor water clear enough to swim in and a joy to paddle in, a natural, unspoiled view from Shore, quietness - no noise pollution. |
| It was the only good thing to come out of the pandemic. |
| it was tremendously positive |
| It was very nice |
| It was very pleasant. |
| It was wonderful |
| It was wonderful |
| it was wonderful - like going back in time |
| It was wonderful and no air and water pollution |
| it was wonderful and the town was busy busy busy! |
| It was wonderful for quality of life but hard on the economy--we can figure a solution for this. |
| It was wonderful having a cruise ship free harbor. |
| It was wonderful having the pier back so that the residents could use it. We also could walk on the sidewalks and it was a lovely experience. I heard from many other residents that this was such a treat! |
| it was wonderful not having to deal with ignorant people taking over the town and residents |
| It was wonderful to be able to drive down West Ave. and to the town pier. Also going hiking in Acadia and along the shore path in town and not seeing ships in the harbor as big as the town. The noise |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| level was down due to not having the large ships running with black smoke billowing out of them. Additionally, being at any destination location in the national park and not having busses pull up with masses of visitors on them was great!! |
| It was wonderful to be able to walk around the town! And the view from across the bay to Bar Harbor was pristine! |
| It was wonderful to be on the water as well as the views we have from Hancock Point to NOT see cruise ships...and when we did visit Bar Harbor and the park, they were crowded with land based tourists BUT NOT overcrowded with cruise ship tourists. |
| it was wonderful! |
| It was wonderful! |
| It was wonderful!  Fewer tourists, cruise ships didn't block beautiful views, Bar Harbor wasn't as crowded. |
| It was wonderful!  It made a huge difference.  It was like the Bar Harbor of years past! |
| It was wonderful!  So many were talking about it. |
| it was wonderful! it took me back to the 1960s! Even though it hurt businesses, it was amazing to walk in town without being jostled by crowds! |
| It was wonderful! We could turn left! |
| it was wonderful! We had recaptured our town |
| It was wonderful. |
| It was wonderful. |
| It was wonderful. Bar Harbor felt like a real town, not a (sorry) tourist trap. I feel guilty saying that knowing that the absence of cruise ships may have caused hardship for others. |
| It was wonderful. Finally, after many years, I could as a year-round resident, enjoy much of MDI and Bar Harbor. |
| it was wonderful. I could walk without being pushed off sidewalk. Land tourists had more room to enjoy town. |
| It was wonderful. Lots of other filled streets. |
| it was wonderful. No buses at pier and [illegible]. No view of ships, no packed sidewalks with all the passengers. |
| It was wonderful. No downsides at all. A return to sanity |
| It was wonderful. What a relief. |
| It was WONDERFUL.....Could move about with ease and LOOK AT THE VIEW without a MASSIVE ship or two or three blocking it....Sidewalks were less crowded...air quality was much better |
| It was wonderful-an extremely positive impact of no cruise ships |
| It was wonderful--the water seemed cleaner. |
| It's been much better. |
| It's hard to say, as visitation to my buisness was down. I do believe my business can survive without the larger vessels at the high frequency. |

| |
|---|
| It's hard to sort from overall lower numbers of tourists, but it was nice to have clear ocean views. |
| It's sad to see anti ship people using COVID to launch this attack |
| I've seen friends lose their businesses |
| Lack of business and employment |
| lack of businesses open and closed earlier than normal |
| Lack of business--no raise in pax |
| Less air pollution while boating on the water |
| less bus and pedestrian activity. Improvement of the environment |
| Less busy in town and easier to get around |
| Less congested in all senses. Cleaner ocean |
| Less congestion |
| less congestion |
| Less congestion although land based tourism was high and had similar impact |
| Less congestion at town pier |
| less congestion in downtown - still no parking available to residents downtown. Parking taken up with employees and out of state visitors |
| less congestion in fall. Easier to access downtown shops |
| Less crowded |
| Less crowding |
| Less crowding near the waterfront, no obstructed scenic views |
| less pedestrian congestion, tour buses around the island |
| Less pedestrian congestion. Could actually go for runs around town. Less vehicle traffic. |
| less people enjoyed town more |
| Less people in town, easier to get around as a local |
| less people to deal with |
| Less people, less dollars spent, less insurance sold to our clients |
| Less pollution, less discharge into the Bay, less noise |
| Less sales in the fall at our gallery |
| Less stress when going downtown |
| Less stressful! |
| Less traffic, lost revenue, nice without buses in town |
| Less trouble with parking, easy access to entire park. |
| Less work ours |
| LIFE W/O CRUISE SHIPS HAS BEEN A DELITEFUL REPRIVE FROM THE MASSES OF HUMANITY AND TRAFFIC CONFUSION SET UPON US IN PAST 5-10 YEARS. |

DX323.249

TOWN06029

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| Life was better. |
| Life was good |
| life was more serene |
| Like a breath of fresh air. We were reminded how BH looked 20 years ago and loved it. |
| liked it personally - covid benefit |
| Liked it! Many business owners did as well or better without the cruise ships. Easier to get in a store to spend money versus crusie people 'window shopping.' |
| Liked the feel of the town and park better. Fewer buses in park. |
| little--better traffic conditions |
| Living across the Bay and looking at Bar Harbor everyday, it was great Not to see any Enormous ships blocking the islands, and spewing air and water pollution.  The night skies were darker too. |
| Local businesses was hurt |
| Loss in revenue for businesses in town who rely on the visitors of which I am employed |
| loss of about 50% of salary |
| loss of boat fees to the town, loss of businesses in twon add unemployment |
| Loss of income |
| Loss of income |
| Loss of income for my business and many others. |
| Loss of income, all tourists are welcome, no matter how they arrive here. |
| Loss of income. |
| Loss of income.  I am a professional guide. |
| Loss of money |
| Loss of seasonal income which I was able to scrape by with out |
| Loss of upwards to $25,000. And we are not right downtown |
| Loss sales. |
| Lost income to family and friends |
| Lost money |
| Lost my job, but gained a different one in the same field. |
| Lost revenue |
| Lots more visitors who lingered, explored the island. |
| Lots of tourists in town, so I avoided going downtown. But fewer buses going down my street which was nice. |
| loved it |
| Loved it! |
| loved it! |

183

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| Loved it! Clear views, restaurants did well. |
| Loved it! Town was still very busy by July 4th, but much more in balance and scale of what our small town can handle. |
| loved it!! So much less congestion and enjoyment in town and park |
| Loved it. |
| Loved it. Spent more time in town at restaurants and buying things for our home. |
| Loved not seeing the ship or hoards of passengers. |
| Loved the bay view unimpeded by huge ships. |
| Lovely |
| Lovely to go to BH |
| Low, I sheltered in place at home and did not go downtown. |
| lower business |
| lower income |
| Lower revenue. |
| Made Bar Harbor a more enjoyable place to be. |
| Made coming into downtown more pleasant and able to frequent restaurants. |
| Made going downtown much more pleasant (except for running into tourists who refused to wear masks) |
| Made life downtown somewhat better. |
| Made me very happy! People were enjoying the pier and the shore path. View not blocked by behemoth ships. Main Street sidewalks not totally congested. Less buses. The air and water weren't being polluted. The waterfront became ours again. |
| Made public areas more accessible |
| Made summer life easier. |
| Made the town enjoyable again; friendlier; locals came to town |
| Made the town seem extra empty. |
| Made town and the park ore accessible, aside from Covid closures and precautions |
| Major impact |
| Major impact on B2B business with businesses serving food and retail |
| Major impact to business. |
| Many businesses did better--land-based visitors loved having no ships. |
| Many local businesses severely impacted creating hardship and closures. |
| Marginally improved downtown atmosphere. |
| Me, none. But I felt bad for my friends who lost that business. |
| Minimal if at all, land tourism made up for the lack of sea travelers by far |
| minimal impact - less traffic; less income |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| missed seeing the cruise ships |
| Missed seeing the cruise ships and their passengers. |
| missed the view of cruise ships in harbor, missed interacting with cruise ship visitors |
| missed them, and their busiensses and presence |
| More access to the harbor as a local, more access to the park and to stores, more support for year-round businesses, not as much street congestion. |
| More access to town! Able to be in town from 9am to 5pm |
| more accessibility to going into town without feeling overwhelmed. |
| More enjoyable atmosphere |
| More enjoyable. |
| More land-based traffic. |
| More lost fishing gear from private yachts |
| More peace |
| More people from other parts of Maine spent money and more time here. |
| more pleasant in town |
| more pleasant to visit town |
| More relaxed, able to access sidewalks. |
| More room--felt like it used to before. |
| more space to breath! No buses on PK Loop Rd, less people in condensed time slot and area |
| More walkable streets.  We need to make a walking mall downtown. Europe has them all over and their streets are fewer and smaller than ours.  Make better use the Trenton bus/parking area.  Buy Macquinns pit or part of it for shuttle parking.  Let's start using part of the ferry terminal for parking, etc. |
| Much better all over town. |
| Much better feel to the town without all the congestion of buses and boatloads of people emptying onto the sidewalks at one time. Due to COVID, many pedestrians were staying on the sidewalk rather than entering shops -- if there had been cruise ship passengers on top of that, the sidewalks would have been impassable. I think 2020 proved that the Bar Harbor experience is better without cruise ships. |
| much better quality of life |
| Much better tourism wise |
| MUCH better waterfront access and in frenchman bay small vessel access |
| MUCH BETTER WITHOUT THE HORRIBLE CRUISE SHIPS AND THEIR MULTITUDES OF LOW QUALITY TOURISTS. |
| Much better! |
| Much better! |
| Much easier to navigate town and to patronize local establishments. Less stress! |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| much improved congestion and appreciated being able to access the town pier |
| Much improved experiences downtown and in Acadia National Park. |
| Much improved quality of life; better experience in Bar Harbor with reduced crowding at shops, restaurants and on street |
| Much less congestion in town. |
| Much more enjoyable season without cruise ships; less congestion on sidewalks, shore path and in stores in town and on pier; better view of harbor and islands; less air and noise pollution from cruise ships, tenders and tour buses; more revenue from parking meters without the cruise ship tour buses and vans taking up parking spaces; less fear of a COVID outbreak in Bar Harbor/MDI from cruise ship passengers/crew during the pandemic. |
| -much more enjoyable sidewalk experiences (ie not over crowded with sea-tourists that spend exponentially less money)  -higher-caliber of tourists (ie majority of sea-tourists are not respectful of the towns in which they stop, vs land-tourists being more respectful as they specifically opted to travel to BH)  -many friends and family members in the hospitality industry noted some of their best summers ever in terms of business levels (all without sea-tourists) |
| Much more peaceful, better views and air quality |
| Much more pleasant downtown. |
| Much more pleasant to walk/eat/shop in town; Easier to park |
| much more pleasant without the influx of cruise ship passengers |
| Much more pleasant. |
| Much nicer atmosphere overall |
| much nicer without them |
| Much preferable in that Bar Harbor felt like a normal town (under abnormal, sad circumstances). More peaceful. Air was cleaner. Water was visibly cleaner. Quieter, less crazy. LOVE NO CRUISE SHIPS! |
| much quieter on park trails and roads, much less traffic in and out of town |
| much quieter, pleasanter, no eyesores in the harbor |
| Much, much nicer town.  Nicer views on shore path and while eating at ocean view restaurants.  Less crowding on the streets.  The town felt calmer and nicer somehow.  I liked it. |
| My business depends on land-based tourism, so the impact was nil. |
| My business did not suffer. Most cruise ship passengers do not spend a lot of money on locally owned, year-round businesses. We still saw a big tourist bump but without the congestion of the cruise ship passengers. |
| my business did very well in 2020 and i experienced a sense of relief not having to navigate the cruise ship traffic in down down |
| My business saw a reduction of about 50% in business. |
| My business was down about 40 percent |
| My customers did not complain about the cruise ship noise. I had several customers who came to visit Bar Harbor specifically because there weren't any cruise ships. I heard from many residents as well |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| that it was a very pleasant experience to be free of cruise ships. I'm looking forward to another summer without cruise ships. |
| my daily shore paths walks did not have me agape at their monstrous size. |
| My families business suffered severely. |
| My friends that own businesses suffered and taxes went up |
| my guests loved it! |
| My husband and I worked ourselves to exhaustion; all the freeloaders on unemployment could have worked. |
| My income down--$7000 not all cruise ship but some |
| My in-town business saw the return of land-based visitors who spent more on average, and I found town in general a more pleasant place to move around. |
| My job went away in 2020, so minimal impact. |
| My property tax went up because of the loss of cruise ship revenue. |
| My sales were down 50 % |
| My seasonal job was no longer available |
| My taxes went up |
| My taxes went up and local businesses suffered |
| N/a |
| N/A |
| N/A |
| N/A |
| N/a |
| n/a |
| n/a we were not in bh. |
| NA |
| negative financial impact |
| negative impact due to loss of reverence caused an increase in RE taxes |
| negative impact on downtown businesses, which contributes to my income |
| Negative. Income suffered. |
| Negatively impacted my business and bottom line. |
| negligible due to covid-19 |
| nice and quiet summer |
| Nice not to have the harbor plugged up and the town super congested. |
| Nice! Loved it! |
| Nice! Reduced traffic, easier travel, less crowded trails |

## Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| nicer summer |
| Nicer views and less pollution! It was heavenly! Bit easier to walk and drive. |
| Nicer, less overcrowding. |
| no added income |
| No business on waterfront |
| No Carcinogenic sea breeze and a beautiful pristine view of Frenchman Bay |
| No congestion was great. I could go into downtown BH to shop and visit ANP. |
| No craft fairs for my personal business. |
| No cruise ships means they purchased no lobsters from local lobstermen. That did not effect my immediate family but it did negatively impact other members of my family as well as some friends. |
| No economic impact--less crowded on island. |
| No effect--am retired |
| No financial impact but liked town better. |
| No financial impact. Enhanced outdoor experience and views |
| No freakishly large ships that dwarf the majestic beauty of the harbor. |
| no impact |
| No impact |
| no impact |
| no impact |
| No impact |
| no impact |
| No impact |
| No impact at all |
| No impact at all. In fact many downtown businesses seemed happy without the amount of business they had despite the lack of cruise ships. I heard some of the restaurants were impacted more from Covid restrictions on capacities than the lack of cruise ship customers. |
| No impact business-wise. It made getting around Town much easier too. |
| No impact but an overall sense of happiness that there were no ships with the type of tourists they carry. |
| No impact due to everyone limiting their activities. |
| No impact financially but higher in quality of Bar Harbor. |
| no impact from the cruise ships |
| no impact on me but businesses suffered |
| No impact on me that I know of. |
| No impact on me, happy about no cruise ships! |
| no impact on me. Town was quieter but that was also due to pandemic |

188

DX323.255

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| no impact on myself - town was quite peaceful - this did have an impact on many businesses however |
| No impact on myself personally, but I know businesses were and are continuing to struggle. |
| No impact personally, other than it being less crowded. |
| No impact really--streets less crowded is about all. |
| No impact to me personally. |
| No impact, personally. I did not leave my house much during the pandemic. |
| No impact. |
| No impact. |
| No impact. |
| No impact. But I liked it. With Covid-19, no cruises should be operating. |
| No impact. We were not living in Bar Harbor in 2020. |
| no income for self/spouse as tour guides |
| No lobster gear lost. Used to lose 80-100 traps a year to them. |
| No negative impact, easier to maneuver in town (but was also a pandemic) |
| No Negative impact, out of town lodging.  BUT it was nice to have less congestion in town for our guests |
| No negative impact. Made spending time in Bar Harbor and Acadia more enjoyable. |
| No personal impact |
| No personal impact |
| No real impact because I don't think the Covid summer could be compared to anything. |
| no real impact. |
| no seasonal work on tours (whale watch co) |
| No supplemental income from serving as a tour guide.  Missed seeing the big ships in the harbor, though the private yachts made up for it a bit.  Fall shopping was dramatically reduced.  Stores closed much earlier than usual.  Bar Harbor became a ghost town after Columbus Day. |
| No, it did not.  And this is also a loaded question given some have already claimed that because of no ships the town did poorly in 2020.  That is malarkey. The town did poorly as a whole because we lost MONTHS of business due to the pandemic.  The real test is 2021 when the land based travel is going to be at historic levels and without any cruise ships we'll see quite clearly just how unnecessary they are economically to this town.  And just how full we are without adding thousands of ship passengers on top of our high volume. |
| None |
| none |
| none |
| none |
| None |

Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| None |
|------|
| None |
| None |
| None |
| none |
| none |
| none |
| None |
| None |
| None |
| None |
| none |
| None |
| None |
| None |
| none |
| none |
| None |
| none |
| None |
| none |
| none |
| none |
| None |
| none |
| None |
| none |
| None |
| none |
| none |
| None |
| None |
| none |
| none |
| none |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| None |
| None |
| None |
| None |
| none |
| None |
| none |
| None |
| none |
| none |
| none |
| none |
| None |
| none |
| None |
| None |
| None |
| None |
| None |
| none |
| None |
| NONE |
| None |
| None |
| None |
| None |
| None |
| None |
| none |
| None |
| None |
| None |
| none |
| None |
| None |

DX323.258

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| none |
| None |
| None |
| None |
| none |
| None |
| None |
| none |
| none |
| None |
| none |
| None |
| None |
| None |
| none |
| None |
| none |
| None |
| none |
| None |
| None |
| None |
| none |
| None |
| none |
| None |
| None |
| none |
| none |
| None |
| None |
| none |
| None |
| None |
| none |

DX323.259

TOWN06039

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| None |
| None |
| None |
| None |
| none |
| none |
| none |
| None |
| none |
| None |
| None |
| None |
| None |
| none |
| None |
| None |
| none |
| None |
| None |
| None |
| None |
| None |
| none |
| none |
| None |
| none |
| none |
| none |
| None |
| None |
| None |
| None |
| none |
| None |
| None |

DX323.260

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| none |
| none |
| None |
| None |
| None |
| None - actually was totally pleasant! |
| none - I think it was perfect |
| none - my business is land based tourists |
| None - no immediate impact to us personally |
| none - we avoid town during summery. Only way |
| None - we don't have a business that would be affected. |
| None . Once things started opening up it seemed normal crazy busy to me . |
| None as a rural citizen. |
| None at all. |
| None business-wise, but my customers were happy there were none. |
| none but I felt relieved being able to go to BH instead of Ellsworth |
| None economically, but the harbor, etc. was nicer. |
| none financially |
| None financially. But being able to walk around town was very nice. |
| None for me. I don't own a business. |
| None from a business standpoint. From a personal standpoint, it was much nicer to visit downtown and the park. |
| None from a negative perspective, joy in not having any come that year. |
| None- great summer. |
| none I spent the summer at home - no driving - no shopping - no banking |
| None- it was blissful |
| none on me |
| None on me personally, but I saw a huge impact on businesses of friends. |
| None on me personally. Friends and neighbors suffered economically. |
| None on me, but friends who own businesses reported distress. |
| None on me. In talking with shop owners I was sad to hear how their businesses were impacted. |
| None on me--quieter in town |
| none personally |
| none personally |
| none personally |

194

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| None personally except I felt very positive having my town back |
| None personally. However, I work at a Bank and many businesses had to defer loan payments in the fall due to the lack of the expected sales to cruise ship passengers. |
| none really! |
| None really. In general, I stay away from downtown in summer and that is okay with me! |
| none really. My income doesn't depend on their businesses |
| none- town was busy enough - no cruise ships, somewhat more relaxed |
| None was great |
| None what so ever, It was a busy fall. In fact many of our customers told us that they came because the ships did not. Our average sales were way up. Many of our cruise ship passengers purchase small items. In fact, our product mix has changed due to the #'s of ships coming in. |
| none whatsoever |
| None yet. But if they don't return, there will be significant tax issues (loss of revenues). |
| None! |
| None, as due to pandemic, I could not return to Bar Harbor. |
| None, as I did not come to Bar Harbor then. However, I bet it was a lot less crowded. |
| None, because I have been virtually completely quarantined except for twice a month food shopping and medical appointments requiring my physical presence and one trip to MDI to pick up a custom bird carving |
| None, because I rarely spent time in the village because of COVID |
| None, because of the pandemic we stayed home anyway. |
| None, because we weren't gong out to eat, etc. or using downtown area. |
| None, but I worried about those who lost business last year. Hopeful they can recover and prosper. |
| None, except didn't see big ships from my great view apartment. |
| None, except it was far easier to go around the island. |
| none, except loss of money to the town |
| none, except that the town was more pleasant to be in |
| none, got to enjoy the town more |
| None, I couldn't visit |
| none, I live out of town and my business is out of town |
| None, I loved it! |
| None, I'm retired and live outside of town |
| None, I'm retired. |
| None, it made me very happy |
| None, just more time on shore path throughout daytime summer |
| none, land base was way up |

DX323.262

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| None, my employment is reliant on land-based tourism. |
| None, other than feeling less crowded. |
| None, personaly. |
| None, really .Sad to streets of Bar Harbor pretty empty in the fall. |
| None, since I was not in town except for groceries. |
| None, since we were quarantining. |
| None, there was a pandemic so we didn't go out. |
| None. |
| None. |
| None. |
| None. |
| none. |
| None.  I think most businesses did fine without cruise ship customers. |
| None.  We were quarantining at home most of the summer. |
| none. But establish a precedent for not being so dependant on cruise money. |
| None. But hope it won't increase property taxes due to lost revenue. |
| None. did not go down town to establishments anyways due to COVID concerns. |
| none. Did not go to BH because of the pandemic |
| None. I didn't go either. |
| none. I was busy no matter what. I'm in the landscaping industry |
| None. It was nice |
| none. Land-based tourism filled the gap. Sidewalks were packed |
| none. Liked the quiet |
| None. Locked down at home, unlike tourists. |
| None. We were pleased BH cancelled the cruise ships due to Covid 19. Car traffic was at a high. |
| None. Well, it was great they weren't here, so it was good. |
| none; enjoyed the space and quietness |
| None…it was a very positive change and a major relief. |
| None-business was better except for capacity limits hurting restaurants and shops. |
| None-except parking on the pier was available. |
| Not a clean experiement, people were restricted from downtown, but nice to not have ships. |
| not being able to do much it had little impact |
| Not having them was a positive impact |
| not me, personally, but my local friends and neighbors - devastating. Praise god for community spirit through food pantry donations and volunteers. |

196

| |
|---|
| Not much |
| Not much because of increased visitation by automobiles causing more congestion. |
| Not much beyond the pandemic because I wasn't going to restaurants, and not many tourists hit Hannaford. That said, the park was nicer being more empty, but it could certainly accommodate more visitors. |
| Not much due to the pandemic. |
| Not much other than pier access. Work was busy as usual. |
| Not Much, my business was closed. |
| Not much, really. |
| Not much. |
| Not much. I avoid downtown in the summer, anyway. But the absence of them in the views from town and ANP were nice. |
| not much. I liked it |
| Not much. Still a lot of people. |
| not sure - no cruise ships would have allowed us to visit bar harbor more - except for COVID. |
| Not sure yet. |
| not too bad/summer flow started later/my family didn't get covid! |
| not very impacted at all. Heard many visitors state that they used to visit Bar Harbor during Sept. & Oct. years ago, but stopped once cruise ships began coming. They were so happy to return to town in 2020 and enjoyed their stay vey much! |
| Nothing |
| Nothing and we have a restaurant--best year yet. |
| Nothing because my business isn't dependent on cruise ships |
| Nothing negative |
| nothing to me - but to local business a lot |
| noticeably less crowded & hectic & relieved some concerns about COVID infection |
| Noticeably less land and Harbor congestion |
| Oh my gosh! it was GREAT. I could walk to the banks, I could find parking on my street. I could shop at local stores... something I had stopped doing in other years. I live in town and never go to the center of town from April to mid-September. I was able to support local business in 2020 instead of getting stuff from Amazon. It was great. |
| oh my! Best town ever. I loved it. So much better--mask and all |
| Oh my.....it reminded me of Bar Harbor when I first moved here in 1986. It felt like my home, my community.....I loved it, the small town feeling. I could walk downtown in summer and enjoy it. I could shop more easily. I could get an ice cream without waiting in a mile long line. Simple things that add up to high quality. I don't mind sharing our beautiful world, but please we need a better balance. |
| One of my jobs suffered due to lack of customers. The business is largely supported by cruise ship shoppers |

197

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| Only positives - no ships to see, no pollution; some lack of sales revenue |
| opened up dock space, eased park visitation, reduced pollution |
| Our 2020 business was about half of our 2019 numbers, I believe in large part due to cruise ship passengers. We are holding onto hope that cruise ships return, but if they never do or they return in extremely decreased numbers, we may be forced to close. Our location is very dependent on those customers. |
| Our busiest season. |
| Our business lost revenue. |
| Our business suffered greatly from the loss of cruise ship business. |
| Our business was much better. Customers felt they could enjoy Bar Harbor |
| Our customers spend more money and have a better experience. |
| Our guests at Eden Village motel and octtages and Heathwood Inn liked less people and parking everywhere was better. Wait lines restaurants were short |
| Our town was overcrowded without cruise ships. It's too much on this small community. |
| Overall important. |
| overall more enjoyable. Didn't have to avoid town because cruise ships were in. Didn't negatively impact my serving job, heard from a lot of customers enjoying town w/no cruise ships. |
| Overall, much more peaceful, less stressful.    (An initial influx of people refusing to wear masks or social distance was addressed later, and we still had access into the park.) |
| Parking was easier in town. The streets weren't as congested. Docking was more readily available. |
| peace and quiet--lack of congestion |
| peace, lower levels of air pollution.  no visual pollution |
| peace, tranquility, access to pier, access to town parking |
| Peaceful |
| Peaceful--return of the town I love and tourists had a better visit. Money was still made in shops and restaurants. |
| people bitched about other things instead |
| Perfect |
| Personally did not miss them |
| Personally, none. I did feel the absence of the cruise revenue in my tax bill. |
| pleasant impact |
| Pleasant quiet. |
| Pleasantly quiet/ no loudspeakers |
| Plenty, still too crowded, parking was still difficult, hated sidewalk seating--streets should have been made pedestrian areas. At least cruise ship visitors don't have cars and leave by 5pm |
| positive |
| Positive |

DX323.265

App. 569

TOWN06045

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| positive |
| Positive |
| Positive |
| Positive |
| Positive |
| positive - more trips to the village and walking the streets. |
| positive impact |
| Positive impact - daily strolls, biking to pier, unobstructive views of harbor, less crowding of Main/West St. No buses in ANP. |
| Positive impact "nice not having to deal with ships." |
| Positive impact such that I enjoyed downtown and the park. |
| Positive impact. I could walk through town without bumping into people.I could see the porcupine islands without a cruise ship blocking the view from the Shore Path. I did not hear cruise ship loudspeakers from the morning till the night. |
| Positive impact; it was a much more relaxed in-town experience. |
| Positive impact--tourist crowds were more manageable, and I did not see any negative financial impacts at either of my jobs. |
| Positive in every way |
| positive less congestion |
| positive! Less congestion. Covid related - simply safer |
| Positive, more outdoor oriented tourists |
| Positive.  Easier to access the harbor, not as crowded in the town |
| Positive. It kept us healthy. |
| positive. Life in bar harbor was less frenetic |
| Positive. Town of BH always quiet. Parking available. Sidewalks empty. |
| Positive--better access to town pier and downtown. |
| positive--one benefit of Covid |
| Positive-quieter, easier to get around, cleaner air and water |
| pure Joy |
| Quality of life improved dramatically!! |
| Quality of life increased: more areas of town were accessible for car and foot traffic and places like Bar Harbor weren't overrun to the point of repugnance. |
| quality of life really increased - less noise, less litter, less crowding, cleaner water in harbor, safer personal boating (esp sailing, kayaking, paddling) |
| Quite lovely, it was wonderful |
| Really got to experience the town |

DX323.266

TOWN06046

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| reduced business reducing my compensation |
| Reduced business, closed businesses that never opened, a loss of Bar Harbor Character. |
| Reduced congestion in downtown to speek access to work. |
| reduced crowds |
| reduced traffic and increased ease of access to town facilities - all improvements |
| Reduction in business |
| Reduction in income. |
| Refreshing lack of crowds. Many businesses that service those crowds, but those important to me (grocery, hardware, health foods) stayed open |
| Reinforced my opinion that the town had taken the wrong 'path' in regard to cruise ship traffic |
| Relief |
| relief |
| Relief from congestion |
| relief! Absence of ships returned bar harbor to the appropriate scale and proportion of a small maine town. |
| Relief.  Enjoyment. Town was more pleasant. |
| Relief. This improved air quality and water quality, reduced infection risk, improved the view shed, and made the Village and the shore path more accessible.  It also saved the Town the extra costs of managing cruise ship visitors. |
| Relief. We were able to enjoy our own community for a change. |
| Relieved congestion in my neighborhood, fewer buses, pier and downtown more accessible. |
| relieved to not have cruise ships |
| Relieved, more relaxed. |
| remember back when cruise ships were a novelty not a nuisance. A bit more quiet, beautiful views, cleaner air and water, a little calmer. |
| Restaurant numbers way down, taxes way up |
| Retail and restaurants suffered. |
| Sad for small businesses |
| Sad for the businesses that depend on them. |
| Sad to see how some people really feel. |
| Sad to see so much economic loss, really depressing |
| Second homeowners, sometimes 20 or 30 eyars, came to BH for the first time because it was less crowded. This had a positive effect on my business. |
| seeing unobstructred views of frenchmans bay from shore path was amazing. I had forgotten how beautiful it could be |
| Severe economic impact on my business |
| Severe financial loss |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| Sigh. Relief. I loved not hearing them, seeing them, dealing with swarms of people intown and on the Shore Path, busses idling, congestion downtown. I especially loved the bucolic views of our waterfront, both from intown and from the mountains; this is why folks come here, and want to live here. |
| Significant improvement in areas mentioned above. |
| significant improvement on the ambiance of bar harbor |
| Significant increase in income |
| significantly less stress at my place of work and less noise pollution impacting my sleep (ship hours/music) |
| Slow sometimes in a retail store |
| So much better without cruise ships. Finding parking. Not overrun with tourists |
| SO MUCH BETTER! No noise, smell, light or other pollution from ships. nothing ruining the amazing view from Hancock. made going to BH via boat so much easier. |
| So much better! With zero cruise ships! |
| So much easier to enjoy the town I've paid into for 15 years. So nice to see familiar faces (behind masks) more often than not Better driving without buses. |
| So much nicer! Town seemed plenty crowded as it was, so I couldn't imagine what it would have been like with the cruise ships. Its impact on me was that I could stand to be in town and took my guests there. |
| Some businesses who say they rely on cruise ship revenue had better (even best ever) years, we had an extended fall and even winter season. It was nice not to see/hear the ships in the harbor and to not have to worry about COVID transmission from/on ships. It showed me that while some businesses may have seen losses, we can survive without ships. It was also nice to see more recreational boats in the harbor and bay. |
| Sorry, we stayed away out of habit. We did our usual thing of visiting in the spring and fall. |
| spending time in Bar Harbor was much more pleasant and it would be better if it were like it was in the 80's cruisers are NOT spenders. |
| still a lot of people but restaurants closed. Movie theaters closed so we avoided town |
| Still no parking |
| Still resources concern and rise of cost |
| Still tons of people here the whole summer, overcrowded |
| Streets and sidewalks less crowded. View of Fr. Bay much improved and noise from ships gone. |
| Streets felt more peaceful but not really sure I can discern from negative feelings about Covid. |
| Streets had less tourists, restaurants, still full though. I felt like the park was less crowded and thus more enjoyable. |
| Streets were more quiet in general. I prefer that… |
| Summer still plenty crowded! But at least you could walk down the streets. |
| Superb. Family and friends' enjoyment increased. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| Taxes |
| --- |
| taxes and commerce |
| Taxes went up |
| Taxes went up. |
| The "abatement" was welcome. As a resident, the hectic aspects of last summer was relieved…and it was easier to access; visit downtown (independent of Covid effects) |
| The 2020 summer without cruise ships was a relief and a realization of how I missed the way it used to be when we first moved here 26 years ago.  Reminded me of what a special place Bar Harbor is to live. |
| The air was clearer, and the water seemed cleaner too--I am an ocean swimmer so noticed.  There was no sound or light pollution. |
| The air was noticeably cleaner as was the sea. |
| The coastal views weren't negatively impacted - what a huge relief! |
| The current parking plan, with meters downtown and having property owners only in residence in the summer have to pay for street parking by their houses [illegible] up a whole lot of good will toward the town |
| The dollars that did not come into the town impacts all those who live here. It did make an impact on downtown businesses. |
| The downtown district was more friendly ot parking, less traffic. |
| The early part of the season seemed pleasantly uncrowded, while the later months seemed quite crowded. I cannot imagine what it would have been like with cruise ships. |
| the fear fueled attitude of bar harbor closed several businesses and made "hoop jumping" normal. I almost closed for good as well |
| the few times I did go to town were wonderful! |
| the harbor was beautiful to look at again and our oceans were less polluted |
| The immediate tax increase made it crystal clear that cruise ships benefit every Bar Harbor resident. It was also sad to see the anti-ship crowd use the pandemic to push their agenda |
| The impact on us is irrelevant. My understanding of the impact on the town and surrounding environment is that it was a positive year without cruise ship tourism. |
| The impact was positive in that I experienced much less congestion from tour buses and less passenger congestion in areas where I like to walk. |
| The impact was positive, enjoyed the views, ability to walk in town and there was less stress on the overall infrastructure of the town. |
| The impact was positive. Although there were issues with people not wearing masks and/or not socially distancing, it would have been much worse if we had many cruise passengers at the same time downtown. |
| the lack of crowding around pier and that part of town was good. |
| The number of land-based visitors was huge. There is just not enough appropriate parking for that number of cars. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| The only impact it had on us was that we didn't have as many people walk on our lawn and try to take short cuts through our property in town |
| The pandemic-induced cancellation of the cruise-ship season had virtually no impact on my income. The positive impact was not having those eye-sores in the harbor, not having to listen to their voluble noise of all sorts, not seeing their stacks leaking smoke into the air, and not having to give them wide birth when on the water. |
| The place I have worked for over a decade cut hours and staffing, and I did not have a job. |
| the shop I manage did the same amount of business, and town wasn't as crazy. It was a positive impact |
| The spring of 2019 was heavenly. Trails were clear, roads were clear. When no one is here, it's a pretty nice place. |
| The streets seemed just as busy but so many people I know didn't have a good season. And my taxes went up again. |
| the summer crowds were much better in 2020, but we're not sure if it was a lack of cruise ships or lower number of visitors overall |
| The summer was fantastic. There was significantly less traffic on trails. There island looked amazing. There was no noise pollution and light pollution or air pollution from the ships. It was as the Island should be - how it used to be. |
| The summer/season of 2020 without cruise ships was way busier than expected and went longer into the usual season than expected. The start was slow and scary for most, but tourists still came to support our economy and we heard countless stories from locals on how much better they did than imagined, and did not miss having the added stress of cruise crowds. I walked down West Street for the first time in years at the peak of summer and was able to enjoy it. The crowds were still there, but it was not the hectic vibes of past seasons, and people seemed less stressed out. When you work at a local restaurant, the cruise crowds descend on your establishment like hungry locusts with only a few hours to devour what they can before moving onto the next docking point. It's extremely stressful to suddenly have dozens of impatient, hungry groups of people trying to cram into often small restaurants, which in turn reduces the number of other patrons able to enjoy the same space. In general, the influx of crowds that happen all at once really disrupts the town as a whole, |
| The town felt less congested, though many tourists arrived by car. |
| The Town felt more like a community rather than a tourist stop. |
| The town was an enjoyable place for our kids to run around and it was enjoyable not to be in mobs of people walking around town. |
| The town was crippled... people were surviving off of unemployment and selling drugs more than actually going to work.... that hurts my soul |
| The town was friendly and livable. The beauty of Frenchman's Bay was restored. |
| The town was more peaceful, but tenants had harder time coming up with rent. |
| The town was much more pleasant. |
| the town was very busy with land based tourists - more than enough even with the pandemic |
| The town wasn't congested from cruise ship pedestrians and bus tours. Better air quality. Less noise. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| The town will survive with or without ships. Let's get back our quality of life. |
| The view out over our home harbor was restored. Out waters were cleaner. Less buffet fed tourists blocked the sidewalks while not buying anything more than a t-shirt or trinket. |
| The water is much cleaner this Spring! |
| The water looked cleaner, fewer people on shore path and in park which was nice. |
| There was a negative economic impact on my business due to lack of cruise ship passengers |
| There was a positive impact from not having cruise ships last year. We had more land based tourists which kept us going through out the fall. The streets were not as crowded and locals could enjoy the park and coming into downtown. |
| There was less vehicular traffic, less congestion, and it was easier to access and shop locally. |
| There were less services available due to less passenger fees, such as fewer restrooms and less police presence. |
| There were so many dogs that it was miserable to walk on sidewalks or eat outside on the streets. I love dogs, but not the way it has become in town. |
| This allowed the community to have a needed break from the congestion |
| This had no impact on me. |
| This improved quality of life in Bar Harbor because of less congestion, pollution, and commotion. |
| This is a ridiculous question because COVID-19 changed everything about tourism in the town. 2020 should not be presented as a typical year with cruise ships out of the equation. To really know what that would be like, I suggest you pick a year in the future and prohibit cruise ships when the whole economy has normalized. |
| This was a wonderful change and a reminder that we do NOT need the cruise ships as much as some might think. The waterfront was more scenic, less crowded and great. The town streets were not mobbed at the usual cruise hours and we're more enjoyable. Yes, it was very tough on many businesses and we took a financial hit but I would like to see us adjust to that rather than go back to cruise ship business as it was. I look out onto the bay and really enjoyed not seeing our boating around any cruise ships I did not have to see any monster sized ships suddenly arrive and creat significant eye sores to the landscape inside the bay and outside the bay. I on the water most days June thru sept and don't like this big ship impact to my marine travels |
| This was an incredible year. Even at the height of tourist season, I could walk around town to do errands without the chaos of cruise ship passengers. I could go anywhere in the Park and have a beautiful view of all of Frenchman Bay without a ship. I heard from so many people, year-round residents and returning visitors alike, how much better last summer was specifically because of the lack of cruise ships and passengers |
| thought it was great/none |
| Too many cars in town and too many non-compliant visitors |
| too many land based travelers |
| Too many other elements to know how cruise ships affected me. Downtown was avoided more than ever. |

## Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| Too many yachts not following recommended track. |
| totally positive, proved to me we do not need any cruise ships here. |
| Town did great! So happy to use the pier again. |
| Town felt more accessible, calm |
| Town is pleasant without crowds |
| Town seemed just as crowded, not much difference. |
| Town still felt bustling, even without cruise ship passengers. The business I work for (breakfast, lunch restaurant) had a stream of customers. Honestly I did not notice a negative impact from the lack of cruise ships. I liked having the harbor free from the visual impact of cruise ships. |
| Town was a bit quieter. Retail businesses maybe questioned whether their inventory should cater to cruise ships. |
| Town was better |
| Town was less busy due to less car visitations. |
| Town was more enjoyable |
| town was more enjoyable, less obnoxious customers, more space on sidewalks |
| Town was more pleasurable |
| Town was much more accessible--parking available, no overcrowding, less pollution, Harbor views were ummarred. |
| Town was quieter and business was down. |
| Town/harbor was less congested. |
| tranquility! Less foot traffic in town |
| Traveling into/shopping etc. in town was a lot easier. Except for the xxx parking meters! |
| Tremendous negative impact on our retail store.  Especially Sept/Oct. |
| Trickle-down financial shorts. Not difficulties, per se-- but definitely enough to make a noticeable effort to make ends meet during the winter months. |
| unable to return to Bar Harbor I was unable to to experience the town that i love without the cruise ships. Oh how lovely it must have been!! But i did get to enjoy the pictures! |
| Unable to say. Covid-19 provided its own challenges. It cannot accurately be noted as a cruise ship-free "real" summer season. |
| Unable to visit due to Covid. |
| Unemployed due to no cruise ship business |
| Unfortunately, the land-based tourism was plenty frustrating. |
| Unlike all other summers, I did not get to BH. |
| Unlimited clear days.  Clear views.  Easy access throughout bay.  Availability to many restaurants - take out.  Walking, strolling, book shopping, life.  Small town New England life with nature.  Isn't this why we moved here? |
| Vast improvement in quality of life. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| Vast improvement on quality of life in town |
| vastly improved environment and quality of life |
| Very concerned with financial impact on our neighbors and their businesses. |
| very good experience for me |
| Very good. Nothing bad from ban. |
| Very happy |
| very little because I was not going to restaurants due to COVID |
| Very little due to multiple closures of businesses. |
| Very little, lost revenues due to COVID was the greater concern. |
| Very little, since we didn't leave home ot venture downtown |
| Very little. |
| Very little. |
| Very little. We stayed home and went ot restaurants away from BH. |
| very minimal seasonal home-based hobby |
| very nice summer! |
| Very nice to to not have cruise ships. |
| Very pleased |
| Very positive |
| very positive impact |
| Very positive! It was a relief! |
| Very positive! Very little congestion. |
| Very positive, mainly because of less hassle downtown and better quality of life due to less overcrowding, congestion, and pollution. |
| Very positive. |
| very positive. It felt like our town again |
| Very saddened because we lost large amount of revenue. |
| virtually no impact because everything was closed |
| visit and surpassing improvement and unexpected but decent tourism by land. People stayed, came by land and spend more money. Encourage THIS. |
| Visited Bar Harbor from Sorrento by car far more often to shop and dine as parking was available and non tourist retailers are attractive places to do Christmas and other gift shopping as well as other need shopping. Brought all visitors to Bar Harbor for meals as well as seeing MDI. |
| Visually, it was pleasant not to see cruise ships. But these seemed to be more auto passengers and traffic. |
| Visually, the harbor was more appealing, but not really a fair assessment otherwise due to the pandemic |

## Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| Walking and parking was easier. Shops were not overcrowded. |
| Walking in Bar Harbor was pleasant like the "old" days, parking was available. |
| Walking in town in the daytime was a more pleasant experience. |
| Walking through town was much more pleasant. Businesses still made money without cruise ships. |
| Was a pretty great experience, minus the whole deadly pandemic thing |
| Was able to enjoy our town docks |
| Was great |
| Was less crowded and overall more pleasant. |
| was nice not too have the persistent influx |
| was not able to return to work |
| was not here |
| was not there in 2020 due to Covid |
| Was wonderful. No people riding bikes in flipflops on the carriage roads (bikes supplied from ship). |
| Wasn't here in summer 2020 |
| We actually visited town and businesses because it wasn't crowded |
| We could actually access the fuel dock! |
| We could park the boat more easily at the docks.  The view was beautiful without those monsterous ships, from across the bay, some appear to be almost as tall as Huganot Head next to Champlain. We still had difficulty parking a few times when we tried to visit Jordan Pond just to walk the loop though, so the park still felt crowded at times. |
| We could see the harbor, fish off the wharf, and walk around town! |
| We didn't have any impact. |
| We didn't have to think about when we went to town. |
| We enjoyed reduced traffic, congestion, and noise. |
| We enjoyed the park and town more. |
| We found the impact to be devastating to our small business. |
| We had a wonderful, peaceful break |
| We had more room to navigate downtown. |
| We heard continually especially in the fall from folks, residents and visitors alike who had not come into downtown Bar Harbor during what they called "cruise ship season" in a long time. They were once again enjoying the town.  The impact was positive for us resulting in several sales. It seemed to us folks were more relaxed from the not so hectic pedestrian pace on the sidewalks.  We felt the same, it felt like we had out town back again. |
| we liked fewer/less congestion, although we weren't out and about much |
| We lost 40 percent of our business Sept and Oct. This plus loss of cruise ships other months and Covid put us in a negative profit for the year. |

## Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| We lost a substantial amount of business |
| We lost hundreds of thousands of dollars in revenue, as did our staff, vendors, and charities we donate to. |
| We loved it. |
| we loved not having cruise ships |
| We saw a loss of revenue. |
| We saw businesses struggling |
| we stayed out of bar harbor town was clogged with cars not enough parking & residents should not be charged for parking! |
| We went into Bar Harbor often. We never go to Bar Harbor when a cruise ship is in. |
| We were able to walk the streets. |
| We were in lockdown. We weren't able to experience the summer without cruise ships. |
| We were not able to visit Maine in 2020. |
| We were not living here then. |
| We were not there last summer, so I don't know. |
| We worry about tax increase and/or lessening of town services |
| Well considering most taxpayers are uneducated on the financial impacts of the non-tax revenue via the cruise industry on our Town due to poor communication and lack of fiscal discussion, I would think many will answer this question incorrectly.  Lack of cruiseships and the overall revenue had a massive impact on every taxpayer in this Town whether they know that or not.  So, where it may have been "nice" to navigate the streets freely without bus and tours blocking the way, it was not nice to still have massive congestion, poor infrastructe to handle land based tourism, and then still zero revenue from cruiseships.  Perhaps all the anti cruise folks would be open to donating an additional 10% toward their property taxes this year to offset these losses?  Same folks will say it is unaffordable to live here.  But let's kill a revenue boosting industry that infuses money into the Town?!  I agree there needs to be a balance.  Educating the taxpayers in the fiscal role this industry plays is key. |
| well COVID-19 sucks a lot more than cruise ships do, but I appreciated the lack of ships |
| went downtown more often |
| Were finally able to enjoy the old Bar Harbor without no traffic congestion, sidewalk congestion, noise and able to shop downtown |
| When I drove my Father to town, we could drive on the pier. |
| When I ventured out, Bar Harbor was enjoyable again. |
| When we boated over from Hancock Point, there were actually places available to tie up at the public dock. We ate dinner at The Terrace at BH Inn. |
| where to begin |
| Wonderful |
| wonderful |
| wonderful not to have as much congestion / air/water pollution |

208

# Appendix B – Verbatim Responses to Open-Ended Questions

Q16: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you?

| |
|---|
| Wonderful not to have bursts of people and large ships in waterways. |
| Wonderful to see the bay without big ships. Bar Harbor a little less crowded. |
| wonderful view, less congestion, a better town |
| wonderful views and less stress on environment |
| Wonderful! |
| Wonderful! No cruise ships! |
| Wonderful, relaxing, visited shops and cinema. |
| Wonderful, stupendous, views, less crowding, people came in the fall who hadn't visited in years! |
| Wonderful. I could drive, walk, and enjoy town for once. |
| Wonderful--almost like it used to be! |
| Worry my real estate taxes will increase in future (town drawing down fund balance) |
| Worst year ever |
| wow - our waters look better! The fishermen can work again - the buses from the cruise ships were gone and it was great to go down to the wharf - and park and see our beautiful scenery to which we pay taxes to live here! |
| Wow, Bar Harbor is lovely when it's not mobbed. |
| Zero |
| zero |
| Zero negative impact, Positive impact, were able to visit downtown |

DX323.276

App. 580

TOWN06056

## Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| "Release" them into different parts of town at different times.  More BATHROOMS and improve Police Station bathrooms (embarrassing) |
| (1) Follow the Canadian lead of no cruise ships in 2021 until vaccine results are more definite. (3) Maybe limit ships to small 'local' ships like the American Cruise Lines (3) strict Covid testing of crews, passengers before, during cruises (4) Town should have persons to advise cruise directors and passengers about US and our habits. |
| 1) Have town council select only year-round residents to any task force on cruise ships 2) Overall strategy should be to lower cruise ship visits |
| 1. CHECK THE FIGURES GIVEN BY THIS SURVEY IN RESPECT TO $$ BROUGHT INTO THE COMMUNITY AS WEIGHED AGAINST TAX RELIEF, INFRASTRUCTURE BUILD-UP AND DESTRUCTION AND IN GENERAL "BENEFICIAL QUALITY OF LIFE" BROUGHT TO US BY CRUISE INDUSTRY. I WOULD LIKE TO SEE A FACT SHEET WITH REFERENCES FOR THE DERIVED FIGURES USED IN YOUR VERBAGE IN THE FORGOING ITEMS.  I TOTALLY DISTRUST THE  $$ FIGURES GIVEN WITHIN  THIS SURVEY FOR THE  YEAR 2017 |
| 1. move the tender port to the ferry terminal   2. make downtown walkable. seasonal closure of upper Main St. and Cottage st from Rodick to Main st.   3. Internet improvement. To extend our tourist season the town should re-explore high speed internet. I believe many people will continue to work remotely and will want to spend time here. many house do not have adequate internet speed for these people to work remotely.   4. If cost to manage the cruise ships is $500,000 after all cost are accounted for I believe the town could find ways to close this gap in other ways. |
| 1. Not making enough profit to justify hundreds of ill-effects  2. Pre-empts/displaces desirable businesses at pier  3. Ruins everyone's experience in town and looking out on the water  4. Cruise ship people suck |
| 50 passengers or less allowed to enter Frenchman's Bay |
| a balance between environmental concerns, economics and the fishing industry needs to be cultivated. Ask the fishermen to join the problem solving |
| a lot less, only 1 per day, only 3 days per week or less. Do people really like the looks of those mostrous ships blocking the islands and the view. They are bigger and bigger every year |
| A quality experience is not a product of parking or how close I can drive to my destinaton. Limit private vehicles from the tourism core. Get busses off Main Street. |
| A reminder that many businesses increased their debt to expand in response to the increase in tourists over the years - to no fault of their own.  If Bar Harbor attempts to reduce either land or sea based visitors and generally sales decrease for businesses, they still owe payments on the increased debt.  That does not go away. |
| A smaller pier at the ferry terminal with a town run marina would have less negative impact and still provide economic support for the town |
| Absolutely no docking facilities which could serve as a location to load and resupply ships that would result in an unacceptable increase in truck traffic and exacerbate an already bad air pollution problem. |
| Accept the reality that Bar Harbor is a tourist destination spot and control the influx with creativity and a smile--90% of us wouldn't be here if Bar Harbor wasn't such a popular spot |
| Advertise and encourage tourism by land or air. |

210

# Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| Again, honesty.  The citizens of BH voted.  The town council ignored.  Appalling.  Look in the mirror. Few business truly gain.  Ex: the business that sells bras ranted that cruise ships helped her survive.  HUh?  Ever seen a woman off a cruise ship buy a new bra?  On side street in BH?  Really? |
| Again, it does not need to exist in Bar Harbor, 2020 demonstrated that we don't need it. |
| Again, manage it. |
| Again, maybe limiting the size and capacity of ships. Or maybe putting caps on the number of cruise ship days and the number of people who come ashore? There are no easy answers. |
| Again, move docking onboarding/deboarding to the old ferry terminal and bus/shuttle from there. Otherwise, please stop blocking so many parking spots near the town pier. |
| Again, we need to strike a balance. |
| Again: none or one a day, 3 days a week |
| Allow craft fairs to be held on days when a ship is in port. It is only a few times a season and it does not take away from merchants. |
| Allow cruise ships but smaller ships with fewer passengers and fewer days. |
| Allow cruise ships only in the winter! Haha! |
| allow fewer ships overall  allow only one ship per day |
| Allow only one cruise ship at a at a time in the Harbor |
| allow them for 2021 season. Hoping canada will do the same. |
| Already commented upon |
| Although it is difficult to ignore the financial benefit, Council should not only be looking at $ signs when considering the impacts of Cruise ships. |
| as a former business owner (year round) and 22-year year round resident, I believe cruise ships and land-based tourism are what keeps the town in business. Don't over-regulate |
| As a resident of town, I have accepted that Bar Harbor is basically off-limits to me over the summer tourist season. I do my grocery shopping in Ellsworth and spend little of my money in town. |
| As a top destination, we should be more deliberate about the type of tourists WE WANT as a community and build a business plan around that. |
| As above. |
| as above--limit # of ships |
| As it is, it is somewhat negative, but can be managed and compromised with a reduction of ships allowed per week. |
| As I've said above, if ships have to come into the harbor, I suggest they be smaller and less frequent. Making money and commerce is not the only priority here. |
| As mentioned above, a low cost one-way loop trolley system would benefit all toursits and businesses if we can omove people deeper into the business district and reduce pedestrian traffic on the sidewalks. Open up a walk lane on the streets mentioned and a one-way trolly lane. Eliminate cars on loop. |
| as noted above |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| As stated above, I know that what I think or how I feel doesn't matter to the town of BH. So, take the biggest kickback. |
| As stated above, less ships, less days, smaller ships, and dismbark and terminal instead of pier. |
| Assuming the population of year-round and summer residents at about 18,000, get everyone to chip in $17 to eliminate cruise ships. Promote businesses that flourish with land-based tourists and local residents. Require buses to be electric. Set up auxiliary parking lots and shuttle buses with reasonably priced fares. |
| At least reduce number of ships, number of days ships are allowed and reduce passenger capacity. Individuals that represent private interests that directly profit from increased cruise ship visitation should not be seated on cruise ship committees or involved in town government. They represent interests that do not reflect the best interest of the community. Conflict of interest. |
| Balance is the key; nos hips woul dhurt; more ships would hurt. Finding the balance and moving buses to another location. |
| Balance. I don't see how we could eliminate ships' visits, and I would hate to see the town increase the number of visits. We are a very small town without the infrastructure that can handle (long term) the tourism numbers (however they get here) that we have seen prior to COVID. We must be considerate of the environmental impacts these ships have. We cannot undo the damage they do in a short time. We rely on tourism, period. If we fuck up what people come here to see eventually the tourists will stop coming. We need to manage the crowds, protect this beautiful island and the waters around it while we enjoy the success of our businesses. I think we should raise our fees to the ships substantially; I don't think 1 million dollars a year is enough to offset all the impacts we deal with. Also, It cant be just about money, we can always find ways to make money....but there ain't no way to make more of what Mother Earth has to offer us. This is an opportunity for this town to really shine in our approach to sustainable tourism, for the human experience and the nature experience. |
| Balancing the desires of some to have more and more cruise ships while others want fewer or none. |
| Ban all but the smallest (100 or fewer passengers) cruise ships. |
| Ban all cruise ships! |
| ban big polluters, limit numbers |
| BAN CRUISE SHIPS To make one souvenir sale cost 400 gallons of diesel to get that customer here from Boston on a ship. |
| Ban cruise ships and bring back coastal ferries. |
| Ban Cruise Ships completely. Bar Harbor will become the Jewel it once was. It will loose its reputation as T-Shirt Town. Tourist with higher financial possibilities will come back and stay not just for a few hours and a T-Shirt |
| Ban cruise ships from Bar Harbor |
| Ban cruise ships. |
| Ban cruise ships. |
| Ban cruise ships. If the goal here is for people to enjoy their experience in Bar Harbor and ANP then not allowing cruise ships would be an excellent start. |
| Ban it, please. |

DX323.279

TOWN06059

## Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| Ban it. |
| Ban large cruise ships altogether |
| Ban or further limit cruise ship access. |
| ban the cruise ships. The passengers arrive stuffed to the gills and consume cheap crap. They are rude and gross. Our national park is enough |
| Bar Harbor has a reputation of caring about ht eocean and environmental issues. The National Park can't handle all these people. What effects do cruise ships have on whales, fishermen, water quality, air quality, small boats? We must look at issues beyond our town. |
| Bar Harbor is a special place, much more diversity than many small Maine towns due to Jackson Lab and COA. It would remain special with less reliance on cruise ships to help fund capital improvements and property taxes. Preserving the water quality (for marine life and fishing industry) air quality (for land life and all of us) is more important. I'm retiring to Bar Harbor May 2021, and this is what is important to me for the future there! |
| Bar Harbor is a tourist town, run int like one and stop trying to find ways to kill it. |
| Bar Harbor is at risk of New Jersey-fication. Cruise ship passengers come here to buy t-shirts and coffee, not because of the unique natural beauty of our area. Limiting that kind of tourism can only be good for the area. |
| Bar Harbor needs more sustainable, broad-based economic growth, moving toward more year-round as possible. Large cruise ships are singularly focused for economics of a few businesses and detrimental to residents and the town in general. Eliminating large cruise ship visits will facilitate opportunity for other more broad-based potentials that will increase a more sustainable and equitable future for all instead of benefiting only the few at the expense of the many by using common shared property (streets, pier area) primarily for the economic benefit of the few. |
| Bar Harbor was built and sustained with an ever growing tax base because of land and sea tourism for 150 years. This is what goes on here. If all of this boethers you, maybe Bar Harbor is not the right place for you. |
| Bar large ships; limit cruise ships to those that are more harmoneaous with the delicate ecosystem and cruise lines aligned with presentation of natural resources (e.g., National Geographic).  Increase fees (possibly to help fund a trust fund to address spillage and other ecological disasters.  In short, do not let cruise lines "externalize" their costs of business by shifting the costs on Bar Harbor, Frenchman's Bay and is surrounding communities. |
| Based on 2020, I would guess the positive economic impact of cruise ships is over-estimated. Maybe revisit! |
| Be a bit more positive about cruise ships visits. They are part of the lifeblood of the town. |
| Be aware of Key West, who just banned cruise ships. |
| Be careful limiting cruise ships or making it more difficult for them to make a stop in BH. Stores and restaurants rely on ships -especially in the fall to help overall sales.  Commercial rents are extremely high in BH, so I especially need to have the tourist season last as long as possible and cruise ships help that a lot. |
| Be careful what you do, it impacts many people who work very hard to pay the town taxes and provide jobs. |

213

# Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| be creative and willing to compromise |
| Be less greedy and think more of the community. |
| Be more positive. |
| Be smart, prepare for vac passport even |
| Be sure to not just honor the opinions the merchants and Chamber of Commerce but also those of residents of the area |
| Be very careful what you do. A large number of businesses, your tax payers, rely on cruise ships. |
| Became residents in 2020, so we have limited experience, although we've been ocmign here on a weekly basis for 15 years to Acadia National Park. |
| because it's such a big money maker, I don't see it ending any time soon, nor should it. In the beginning it was charming; now, having 1,000 plus people running all over town and to the "hot spots" in the Park has drastically impacted negatively the summer community who liked summer on the Island to escpe the crowds looking for unspoiled nature. Not any more! |
| bids for spots (????? Goes to community) fewer cruise ships, ban on mega ships |
| Bigger and more is not always better. |
| Bring it to ferry terminal; Raise fee for ships |
| Bring small ships only. NO more than one ship on a given day. Only 4 max ships a week. |
| Bring them in. |
| Build a few condos, tax the weekly rentals a head tax if it's not done already, if so increase the rate, and  scout high end higher priced cruise ships. |
| build a second town center for locals |
| Build the damned pier north of the village.  Vote Friedman out of office. |
| Build the new pier at the ferry that can accommodate smaller boats or just tenders and take some of the pressure off the downtown. Less boats with less days. Doesn't matter if we lose some revenue it will improve quality of life for residents and the experience of visitors. |
| Can the Town Council consider whether to bring in a limited number of smaller ships that would bring in income, but without the many disadvantages of very large cruise ships and cruise ship population. |
| Can they go electric or only use clean(?) Diesel?  Be nice if they could plug in when they are in port, (their cost).  It would be better to have a walking mall, Main from Mt. Desert to Cottage. Cottage from Main to Rodick. Rodick from Cottage to Fire Fly lane.   Have West St. Be the auto/bus travel road and allow parking only on one side of the street to give enough maneuvering space.  I'd rather have boat tenders go to the ferry terminal their coxswains aren't very well trained and they never put their boats out of gear. In Belize no ship comes into port , there are many ferries that bring people in.  Keep a Coast Guard boat by the anchorage, the ships are a perfect terrorist target. |
| Cancel all cruise ships-none in 2020 or 2021-focus on ferry terminal and CAT |
| Cap number of annual visits; Passengers and ships (large and small); Cap number of ships that can anchor on daily basis; More docking to former Ferry Terminal! |
| Care less about money and more about people who actually live here. |
| careful and thoughtful consideration of any changes |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| charge enough so people feel they can't live without them because of the tax relief |
| Charge in-town businesses a tax rate that reflects the benefit they receive from cruise ships. Out of town buisnesses do not benefit from cruise ship tourism. |
| Charge more money if you want to reduce ship traffic. The town sold out to tourism a long time ago. |
| Charge more money if you want to reduce ship traffic. The town sold out to tourism a long time ago. |
| charge the actual impact fee |
| Charge them more. |
| Community Design Process |
| Completely eliminate cruise ship tourism. Cruise ship revenue doesn't account for $20 million/year (free and clear)      to the town. There are costs associated with bringing cruise ships to BH. Only a few businesses make any substantial income from cruise ships and more income can be made from land-based tourists who stay longer. Revenue from the cruise ships can only be used for specific passenger related projects and not to decrease property taxes or upgrade sewer, water and infrastructure or fund school costs. |
| Consider a couple of things: 1) make Main street one-way traffic flow. 2) Expand the width of the sidewalks to better accommodate the increased number of people during the summer. 3) Build a parking garage. These changes would make the downtown area more pedestrian friendly. |
| Consider all of the uses of this area in ways to save the special parts of Maine....The Industrial Revolution keeps coming everywhere and often the results destroy what we love about Maine.. I have researched the history of Bar Harbor and Salsbury Cove for many years. I recommend "MAINE, THE WILDER HALF OF New England" BY William David Barry for perspective on the historic overdoses. I started this book to get more idea of what the lives were like for the people who built 21 Watch Hill and barn in 1810 (?) ...now I am grateful that we saved the shore area where the Native Americans were fishing...and appreciate how hard it was to do agriculture on our meadow. |
| Consider all sources for input, including out of town. |
| Consider amending the Land Use Ordinance to limit the number of zoning districts where cruise ship docking and/or tender landings are permitted (e.g., limit to only Shoreland General Development I downtown and the Shoreland Maritime Activities District where the ferry terminal is located) in order to mitigate future potential congestion and negative impact. |
| Consider eliminating or limiting it |
| Consider frequent busses running between town green and Park Loop Road, e.g. every 15 minutes on the one-way Park Loop Road means about 4 busses.  See my comments about another restaurant, eg at Sand beach on this route to alleviate in-town dining.  Consider ways to alleviate cars downtown. E.g. FREE parking at the Ferry terminal with our friendly LLBean busses running every 10 minutes (8am-10pm) to Town Green (two stops only). |
| Consider how much business is lost because people don't visit Bar Harbor when cruise ships are in |
| Consider increasing port fees. |
| Consider quality of life over the money brought into the town.  Watch over the pollution issues more carefully. |

DX323.282

App. 586

TOWN06062

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| Consider quality over quantity in tourist experiences. I have friends who loved MDI decades ago and now won't visit due to overcrowding. |
| Consider revenues to the town and economic impact to uor local businesses before making decisions |
| consider that cruise ships are "selling" bar harbor and mdi to every passenger that visits. This turns in to buyers driving out locals |
| Consider that it's not all about making more money and welcoming more and more visitors. Over 40 years ago, when I looked forward to having more time to enjoy my home region in retirement, I did not envision the crowds of today. |
| Consider the environmental and ecological detriments cruise industry brings and does nothing to offset. Majority consensus > financial incentive. |
| consider the environmental impacts to frenchmen's bay and the quality of life in bar harbor over money |
| consider the outsized impacts on non-downtown/bus businesses and residents in proportion to their number ??? Those that benefit |
| Consider the overall cost to the community beyond the short-term economic gain derived from the presence of the cruise ship industry. Consdier the "concordia" incident and what our town would do when it happens here. |
| consider what a cruise ship tourist brings to the town and how they spend their money. Many year round businesses are seeing little of this money |
| Consider what our future could be - a national park on the ocean with no cruise ships obstructing the view and no passengers clogging town.  How much better that would be for land-based tourists!  We, the residents of Bar Harbor, do not owe the cruise ship industry our time and energy when all they do is send thousands of people who come into town solely for lobster nicknacks made in China.  This is not the kind of income we want or need in our community.  The passengers don't even eat at our restaurants because they have free gourmet meals onboard!  With only land-based tourism, we could easily make as much as we make from the Passenger Service and Port Development fees. |
| consider what the big picture is - visitors feeling Bar Harbor no longer fun to visit due to overcrowding downtown and in the park |
| Considered the quality of life of residents strongly when making cruise ship decisions |
| Consult other small coastal cities which are major cruise ship destinations: Venice, Italy; Key West, Florida. |
| Consult with local businesses about their experiences with land based tourists last year as apposed to years when there were crowds of cruise ship people discouraging land based tourist |
| Continue due diligence |
| Continue to  Listen, but:  Don't be bullied by the cruise industry or the State.   Don't be bullied by Frenchman Bay seasonal residents not in Bar Harbor. |
| Continue to encourage growth in cruise ship visits. |
| Continue to have cruise ships to benefit our economy |
| Continue to manage landings as previous 10+ years. |

TOWN06063

| |
|---|
| Continue to regulate the encroachment of cruise ship owned businesses in town and consider increase docking fees as you improve facilities. |
| Continue to share the economic impact to the town and make it widely known what benefits the cruise/tourism industry makes to the town. |
| Continue to wisely manage passenger caps. The current level is a good compromise. |
| Continue to work for the balance--as much as possible, keep it from a 'we/them' issue. |
| continue to work w/the fishing community and write to them - they were here 1st and should not take a back seat to the cruise ships |
| control buses downtown (except Explorer) |
| Control the number of visits, the number of passengers, the pollution compliance and increase the fees. I believe the economic impact statement quoted above is a serious overestimate. If BH is going to suffer the negative impacts of cruise tourism, it should keep control and charge commensurate fees for its reputation as the prime natural tourist destination on the East coast...remembering that it loses land tourists for every cruise tourist that comes...with a big difference between money and jobs gained for land vs cruise tourists. |
| could use a monorail to go to cadillac mtn off of door Mt. LARGE PARKING LOT possibly filling in the TARN. Controlling mountain runoff so it doesn't flood the springs every year. |
| council has failed to consider the preferences and feelings of year-round residents. By accepting so many ships - particularly th ehuge ones - council has turned Bar Harbor into a carnival for 6 months of the year, with severe damage to the atmosphere and charm of the town. |
| Council needs to reduce the number of cruise ships to an acceptable number. |
| Create an unbiased cruise ship committee made up of residents. Reopen pier and Agamont Park to all. Reduce substantially or eliminate cruise ships entirely. Move tendering and buses to ferry terminal. |
| Create balance wit the boats. Have aa cruise ship free day in September or October. |
| crowding is a problem and it exhausts the resources of this environment. I think fewer passengers would help. But reliable and non biased data regarding environmental, economic and health would be valuable to know and share publicly |
| Cruise ship and passengers  limits |
| Cruise ship Impact on marine life is also very concerning for me |
| Cruise ship passengers come back as land-based tourists. Bar Harbor is a tourist town and we need to admit it. You should have asked ow long have you been a resident of BH. |
| cruise ship revenue is like an addictive drug, the town needs to imagine and create revenue streams that are year-round and sustainable. One idea: attract tech, finance and other work-from-home professionals by offering relocation bonuses fo rmoving themselves and their jobs to bar harbor. |
| Cruise ship tourism encourages people who 'sample' our location to return for longer vacations. Tendering, however, is dangerous in a working harbor and could be remedied by allowing boats to tie up. |
| Cruise ship tourism is an important economic factor for Bar Harbor, but it is poorly managed. This mismanagement creates an environment that negatively impacts the experience of land based |

DX323.284

TOWN06064

# Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| tourists, Maine resident visitors, and residents of other MDI towns, most likely causing avoidance among some members of those groups and giving Bar Harbor a bad reputation as a whole. |
| Cruise ship tourism is part of the mix of our tourist-based economy, but it needs appropriate limits that focus on quality of life for residents and other visitors (not just economic return). |
| Cruise ship visitors don't impact overall quality, it's cars that do. Folks shoul dbe required to park somewhere out of town and either walk or take a shuttle into town. Also, AirBNB and weekly rentals (owned by folks from away) are destroying our town and quality of life. |
| Cruise ships are easy short-term money that will destroy the brand of the region. Do do the hard work to build business that's sustainable for the long haul that benefits the region, not just a few blocks by the docks. Think about the natural beauty, the climate, and the abundant resources that underwrite why all of us are attracted to the region. Figure out how to amplify the experiences of appreciating and championing those things. The cruise ship business denigrates all those things. If it continues, all of us will want to go somewhere else. |
| Cruise ships are not a negative per se, but the number of ships/passengers has grown much too large. |
| cruise ships are not the enemy. But they do need to be regulated as does land based tourism. Both have major impacts |
| Cruise ships are vital to the economy of Bar Harbor. |
| Cruise ships aren't as bad as people make them out to be. They are an easy scapegoat. The key is balance. |
| Cruise ships bring people back to the Island for longer stay once they're listed for one day. |
| Cruise ships bring some economic benefit to some people, but Bar Harbor is getting so congested that it will start to keep people away. I suspect it already has. The town benefits more from visitors who stay for a few days and are able to explore the whole island. |
| Cruise ships cause pollution everywhere--try to keep Northeast cleaner. |
| Cruise ships have ruined the town / There is already too much land based tourism. That should be enough. |
| Cruise ships should use ferry terminal site to load and unload cruise ship passengers |
| Cruise tourism seems to lead to low quality goods and services being offered by businesses. The number of stores and restaurants that interest me as a year round resident goes down every year. |
| Cruises and land tourism is our lifeblood.  It is also a double edged sword.  I do think there can be a happy medium. |
| Crusie ships are an important part of the business formula. |
| Crusie ships are just one way for visitors to discover Bar Harbor and Acadia National Park. Many cruise ship visitors return to visit Bar Harbor/Acadia again. I don't believe we should discriminate against cruise ship visitors any more than any other group of visitors arriving in Bar Harbor by any mode of transportation. |
| Cut down the number of ships and passengers. |
| cut down the traffic of ships, raise the port fees. Make it more special for fewer guests. |
| Cut the largest ships, make it a special destination for one ship at a time.   Have one cruise ship free day a week, and run specials to bring land-based folk into town those days in the fall. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| Cut the number of ships down by at least half. Only allow smaller. Cruise ships in our harbor/port. In our opinion, the quality of life in Bar Harbor both for visitors and year-round residents would be improved by eliminating the cruise ships. |
| cutback |
| Decide what you want to be.  Bar Harbor with the crowded, dirty, rushed, jostling streets, with mobs getting off the ships, staying ashore half a day to a day, buying trinkets, T-shirts, souvenirs; or Bar Harbor a special destination for those who  appreciate a quiet, friendly, beautiful place, fresh air, ample spaces, serene, lovely.  It may cost more, but people would be happy to pay more. |
| Decrease amount of cruise ships and passengers |
| decrease cruise ships |
| Decrease involvement with cruise ship tourism, increase management/support of more sustainable, year-round industries and community programs. |
| Design and build 2 parking garages in town that resemble New England homes, buy a motel and refurbish it to accommodate seasonal employees, buy or put out a contract for a town cafeteria, hire a merchandising consultant to work with town stores to improve merchandise selection and display, remove ubiquity of retail in Bar Harbor |
| Designated and limited month range with limited number of ships are a predictable docking day. |
| Dial it back, way back. |
| Direct passener arrivals to new pier at old ferry terminal on [illegible] |
| do everything you can to protect the environment |
| Do not allow any false information pro or con to go unchallenged |
| Do not allow large cruise ships to dock in town. Only allow smaller and higher-end ships to come here. |
| Do not be bullied. |
| Do not destroy the town for short term financial gain. What will be lost if more, larger cruise ships are allowed to dock is far more valuable. |
| Do not encourage cruise ship tourism, but concentrate instead on uniqueness of Acadia National Park's visitors who populate B and Bs, motels, and campgrounds and come out to eat and use movie theater (Reel's Pizza), etc. Family-friendly vacation spot I'm sure overall is preferable. |
| do not increase |
| Do not kill the golden goose. Countless towns would love to have our problems. |
| Do not listen to the loudest. They are only the loudest. |
| Do we want to be a seasonal cruise ship town? It's parasitica nd the benefits for year-round residents are grossly overestimated. |
| Do what you think is right. |
| Do your best as this is a huge challenge. No way to please everyone. |
| Does overcrowding of the downtown and ANP align with what attracts visitors to Bar Harbor? |
| Don't focus only on the money cruise ships bring to Bar Harbor and the MDI community. Think about the crowding out that these cruise ships do, driving away the higher value tourists who would never |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| want to be spending time in a mega cruise ship destination. Bar harbor is a premium destination. Cruise ships are the lowest form of mass tourism. There should be no intersection. |
| Don't make decisions based solely on financial gain.  Be a good steward of this beautiful area.  I question if Bar Harbor businesses could benefit from encouraging winter tourism as well.  I have a vacation rental that people like to rent in the winter months but Bar Harbor is a ghost town. |
| Don't screw up a good thing   Many people depend on cruise ships for their livelihood |
| Don't' try to to sell the town. Place an emphasis on quality of life and resource protection and the town will sell itself. |
| Don't advertise to attract cruise ships. |
| Don't allow any more motels! Really limit the cruise ships! |
| Don't allow so many large ships in. It's too much for the Town. |
| Don't allow the very large ships here. Aim for smaller, boutique ships. |
| Don't allow them anymore |
| Don't allow them. |
| Don't allow tour buses to park by town pier as long with engines running. Bring passengers to Village Green so they can start walking through town up the hill of Main Street. Develop Ferry Terminal as berthing site for some cruise ships to reduce parking congestion of tour buses |
| Don't assume we need cruise ships, we have enough problems with climate change. Don't need to add more pollutants to our air and water, the apssengers don't come there to eat (they have food 24/7 on board). They change the whole nature of the town, the destruction of place. They did the same thing in Venice. |
| Don't be afraid to limit cruise ships. The business community will still thrive as long as the environmental quality of the area remains pristine. A bad environmental leak or spill will ruin everything for everyone. |
| don't be afraid to negotiate with the industry, because what other ports have acadia? |
| Don't be so greedy |
| don't let big money dictate town council decisions |
| Don't let so many wander around town |
| Don't let the strong opinion of some residents wag the dog. |
| Don't let the tail wag (and destroy) the dog! |
| Don't let them call the shots or influence town matters |
| Don't raise taxes in lieu of allowing cruise ships to continue to come to Bar Harbor. |
| Drastically cut numbers. Consider the big picture. Our pristine beauty is what people drive all the way up the coast to get here. Losing that will affect the entire coast. Pollution in Bay will get worse and worse. |
| During high season, we (and others) avoid coming to Bar Harbor due to overcrowding. The Council should try to level the load of toursits across a wider time frame by eliminating ships during the high season. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| easy access to local tours without reservations at dock. Fleet of ubers to take visitors and locals to various places on MDI, individual revolving service up and down cadillac mountain. 4 |
| Ecological impact too harmful |
| Elbow room, please |
| eliminate all large cruise ships; strictly limit smaller cruise ships |
| ELIMINATE AUTO TRAFFIC NEAR THE WATERFRONT |
| Eliminate big ships entirely |
| Eliminate completely or limit to cruise ships with 100 passengers or less. |
| Eliminate cruise ship visitations. |
| Eliminate highs (less fluxuation) and lows of passenger discharge, would give town better handle on management. |
| Eliminate it. Enough tourists come by car. |
| eliminate large cruise ship visits (reduce to zero); consider the lost economic opportunity from family-oriented, land-based tourism that is created by the current cruise ship visitation schedule. |
| Eliminate or drastically reduce big cruise ship visitation in BH. No more mega ships. Encourage smaller ships to come. |
| Eliminate ships and more land-based tourists will come. |
| Eliminate the cruise ships, if possible. Drastically reduce the number of passengers so that each arrival does not overcrowd the town. |
| eliminate them |
| Eliminating or drastically reducing the number of ships. The industry is destroying the quality of life and ability to live year round in Bar Harbor. This industry will use up this resource destroy it then move on with no regard for the people or towns it has destroyed.  Then the business will look to the Town to repair the damage on the backs of the year round resident. |
| Embrace it and tourism in general. Without it, Bar Harbor will decline. |
| Embrace the cruise ship industry with excitement... |
| Encourage more ships |
| Encourage smaller cruise ships. A marina at the ferry terminal would encourage private yachts or power boats. |
| Encourage smaller ships to visit (100-150 passengers) (American Cruise Line) and stay for 2 nights. More affluent people spend more in restaurants. Limit large ships to one per day. |
| End it. |
| End it. They kill the lovely views, the harbor, etc. Don't need them. Don't need the money. Can make it up better with other tourism related activities. |
| Environmental impact far too high to bring in cruise ships. |
| Establish a nightly/daily maximum town capacity/limit of visitors that balances keeping the feel of town appealing and enjoyable (not overcrwoded, adequate parking, less congestion) with income needs. Then put caps on lodging (including cruise ships) to help keep numbers wihtin established |

221

# Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| maximum capacity. It's part of a bigger picutre--more people want to visit than our infrastructure and natural beauty can handle. |
| Every Councilor should realize that the Todd Gabe study is flawed.  It is not peer-reviewed, depends on individuals willing to respond, not a random sample, assumes that a respondent who says he spent $100 is a single person not the head of a household (which inflates the impact by a factor of at least two since that respondent  is likely answering for his traveling companion or family), uses an incorrect multiplier, does not factor out money that flows directly out of town to wholesalers and non-local tour operators, and makes no attempt to cross-check its data with sales tax revenue differences between cruise and non-cruise days.  Port fees paid to the Town are strictly limited to services directly benefitting the ships under federal law and some of the money the Town has spent exceeds those limits per the federal court decision in CLIA v. Juneau.  Questions 9 and 10 are push poll questions as phrased.  The premise of each question is flawed. |
| everything about cruise ships seems to focus on the businesses and how much they can make and not every??? On the residents who utilize the town. I switched banks because it was difficult to access the downtown banks. I used to utilize the town's businesses and parks, walk the shore path, etc. Just getting to the library has become difficult (this also because of no close parking) I take compass harbor road just to bypass the town. |
| Extrapolate any data available from all residents and businesses to help determine a management plan going forward.  At least with cruise ships we know exactly when where and how many unlike Air BNB who come in under the radar and each bring their own car and burden our infrastructure even more. |
| Few. Less ships. |
| Fewer and smaller ships! |
| Fewer cruise ship visits  I have already noticed a tremendous increase in Maine residents visiting in town this season  So many people I have spoken with have said that they have starting coming to town again since the Pandemic prevented cruise ship visits last year. |
| fewer cruise ships and higher tariffs |
| Fewer cruise ships, smaller cruise ships. Ideally, tender passengers to newly developed ferry terminal if they are taking bus excursions. Perhaps buses could later drop them off downtown for shopping. |
| Fewer cruise ships. |
| fewer mega ships or none = only smaller ships. Clear limits on foot traffic, overcrowding. |
| fewer ships |
| Fewer ships (1 per week), fewer passengers (<30), charge them a ton more to make it worthwhile. |
| fewer ships , fewer days |
| fewer ships / no multiple ship days |
| Fewer ships!!!! |
| Fewer ships, limit size and season, limit number of bus tours |
| Fewer ships, smaller ships, longer stays by ships, not the half frantic adventures |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| find a balance. Acknowledge if we need cruise ships for people to run a shop…. Then rents/shops are worth too much money. Selling T-shirts out of a 1.5 million $ property is dumb! |
| find a way to ferry passengers from old Bluenose dock instead of downtown pier |
| Find a way to make being on council more accessible and create a more diverse council. As a former downtown business owner, I can tell you that cruise ship days are the worst and we hated them. Also, the worst customers treating us like animals in a zoo. |
| Find Innovative ways to allow more people to get onto land to spend their money here in Bar Harbor |
| Find other sources of revenue. If there are cruise ships, make them filter all sewage and pay for sewage treatment lke in FL. It all goes into the ocean in Maine. |
| find the balance cruise ships shoul dcome. My business has many returning cruisers who want more time on average spending 800-1000 ???? Alone |
| fix housing crisis |
| Focus more on community experience than just collecting cruise ship revenue. We'd pay more in taxes for quality of life. |
| Focus on cars and pedestrian traffic. Limit parking in town. The cruise passengers send money and are here for a LIMITED time. |
| Focus on enhancing quality of life for year-round residents |
| Focus on enhancing the wonderful experience of visiting MDI. |
| Focus on managing land-based tourism and what possibilities would open up if there were no cruise ships. |
| Focus on small ships. Severely limit visits by large ships. |
| focus on supporting and maintaining year round community support schools and other community organizations, ????? Keep ????? |
| Focus on sustainability based on park capacity, preservation of environment, smaller and fewer buses spread out better. |
| Follow example of Key West FL. Don't rely on the economic study used here. |
| Follow the example of Key West! The industry has been allowed to overrun our town. Take back control. Look at other studies documenting economic impacts of cruise ships besides the one quoted in this survey. |
| For the sake of our community work on economic development. Plan that is not dependent on cruise ships. |
| For the value that Bar Harbor provides to the cruise ship operators as a destination stop that so many want to visit, a fee of $1,000,000 from the cruise ship industry is an embarrassing pittance to ask, especially given the burdens placed on the town by being so frequented by so many ships, and especially since half of that the town has to spend to accommodate the ships themselves. To us, that fee is laughably and embarrassingly low. We strongly suggest the town consider charging something much more meaningful to the industry, perhaps ten-fold or more. If they want access to MDI and Acadia, which of course they do, and if we are supposed to tolerate their mass-intrusions into our town and the daily chaos we understand it can bring, then help them pay something more in line with |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| the value that Bar Harbor provides as the only port of call on MDI presently willing to cooperate and tolerate them. |
| Forego cruise ship access through Ferry Terminal. |
| Free parking. |
| get back to in-person meeting |
| Get bus traffic out of town--build the cruise ship terminal discussed a few years back! |
| Get guarantees that ships and owners regulating pollution |
| Get involved with the community, businesses and residents. From this interaction you can manage the flow of tourism via cruise ship frequency. For 12 years, through our interaction with over 85% of the cruise ship visits via on board advertising, we have gained business that we can track directly from cruise ships during their time in port and then through our website when they went back home. This business has allowed us to be a year round open business for all 12 years of our existence in BH. This has afforded us the opportunity to be a contributing member of the community year round employing local staff and collaborating with local organizations and individuals in the community. |
| Get more input form non-cruise ship related people |
| Get off your ass and use the Ferry Terminal to best advantage. |
| Get out of the pocket of the cruise ship industry |
| get rid of all cruise ship activities on the pier and move all ships, buses and pedestrians from cruise ships to the ferry terminal |
| Get rid of the large cruise ships. I find the UMaine Gabe study to be quite odd, because my personal experiences with cruise ship passengers does not show them spending large amounts of money in our community. I have noticed that the passengers from the smaller ships tend to spend more money in our community- benefiting local businesses. The larger ships- like Royal Caribbean- have shopping on board, and they do everything possible to keep the passengers spending their money on the ship. The fact that CLIA (Cruise Lines International Association) paid for the UMaine Gabe study just shows that you can't take it seriously. It's a complete joke. |
| get rid of the parking meters |
| Get rid of them |
| Get rid of them for good. |
| Get rid of them. |
| Get ships out of town |
| get them off the pier. Fewer ships |
| Getting land based tourism under control because the cruise ship tourism just exacerbates the overcrowdedness and congestion. |
| Give residents and seniors a break on parking and accessing the park, etc. |
| go for quality over quantity |
| Good job so far |
| Good luck finding the right balance. Don't allow the salmon farm though. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| Great for businesses that benefit. Not so good for locals as it's an inconvenience |
| Grow some balls and get the VRBO industry under control. Adopt land use policy that makes it possible for folks to afford to live here. |
| Hard limits/spread out the season to encourage more stable cruise ship landings with lower daily passenger counts. |
| Have no more than one ship scheduled per day. Build incentives for smaller-medium sized vessels. |
| have not seen the cost/benefit advantage to the town with the increased ship traffic. Taxes and village congestion are both increasing. |
| Have park sticker for Cadillac for all Bar Harbor taxpayers. |
| have property tax payers able to buy ???? Fee parking passes for MDI - that way there will be less neighborhood congestion from locals asking for parking. To town from ???? |
| have the cruise taxis to take passengers who are taking a bus town to the ferry terminal and stage all buses there to load-unload |
| Have you consulted with any of the Wabanaki Tribes about their thoughts on water or land-based tourism in Bar Harbor? |
| Having lived in BH all my life, there have always been issues with parking and overcongestion, and that hasn't been taken care of. Start there, that would be helpful. |
| heavier fines if laws broken, permissions for year round residents. |
| Help us articulate the values of Bar Harbor, and find ways to commit to them. I think we can have a bright future that is independent of cruise ships. |
| higher head count tax, higher tax on waterfront businesses that benefit most |
| hotel room tax, let people rent their houses if they want to unload passengers on town dock so town would get the income from passengeres |
| How did you decide this was the best time to come after cruise ships? |
| I am not anti-cruise ships, just concerned abou their increasing numbers and size. |
| I am not sure the Town Council is interested in advice from mere residents |
| I appreciate the challenging position you are in concerning cruise-ships. No matter what you do, or don't do, you will anger constituents. I know most of you and respect you. That will not change. But I urge the Town Council to look at the improved quality of life for most of us by not having cruise-ships. This is about more than money. |
| I combine cruise and land tourism into one management issue. Both are positive and both need logistical management. Some more police direction in town will help. |
| I do not believe cruise ship business supports people who live here. It supports ugly souvenir shops that are owned by out-of-town folks and they are killing this town. Crowded, loud, just awful. |
| I do not have to balance the financial responsibilities that you all do so well. If cruise ships help you do this, maybe restrict the ship size? Thank you for all your work! |
| I don't know |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| I don't believe the study by Prof. Todd Gabe. I think we need more accurate numbers. And why have we done business with Carnival Lines with their bad record? We need standards for who we do business with. |
| I don't have any suggestions, specifically, though it would be good if there were a way to tip the balance of the income (the cited $1 million) so that more went to Town improvements that equated to less taxes. Our taxes are too high when one considers we live on a private road, with well water and septic. Unless we ever need police or fire, we get very little for our taxes while providing a nice vacation experience to our wonderful town for others. |
| I don't think the economic benefits are worth the degradation in quality of life. I'd rather pay more property taxes than have the money from cruise ships |
| I feel it's needed revenue for the town of Bar Harbor to lower costs passed on to residents. |
| I have a rental home in BH and on cruise ship days my guests go to the other side of the Island. Numerous guests have said they had no idea BH would be like this "and we won't be back." Too many people-maybe close the streets to traffic between 9 and 4. |
| I have no knowledge of any negative impact. |
| I hope the town Council considers that an increase to the cruse ship industry  will do more harm to the community then good. I have seen it in other ports. The industry is more concerned about there own interest than the communities that they pray on. Juno Alaska is the perfect example. The cruse ship industry owns the town!!! The shops are junky tourist shops that have nothing to do with the community or the region.   Please Town Council, control the cruse ship industry in such a way that benefits the town of Bar Harbor. If you don't control them they will control you and  you will loose your town! |
| I know cruise ships won't go away, but they can be spread to other ports in Maine. I would like to see smaller ships allowed and the giant ones pointed towards larger ports. I have been following the issues in Key West which has similar problems. |
| I know for a fact that many land based tourists do not come or plan to come back because of how bad the cruise tourist congestion is. |
| I know property and retns will go up in town regardless, but I'd rather not see stores like Dalis [illegible] take over to serve cruise customers. I don't like how the nature of town has adapted to serve that clientele. |
| I know that the funding has benefitted the infrastructure of the Town, but part of the need for that infrastructure has been the heavy use by cruise ship passengers.  The biggest problem to me is that it makes us feel like a pretend town, structured around appealing to these very short-term visitors rather than those who live here or who visit for longer than six hours at a time.  I know that some people who visit by ship then do come back for a longer stay, but the tradeoff seems too much to ask of our community members.  When the ships are in that is what people talk about, not "how are you" types of conversation. |
| I perfer a total ban. Lacking that, severely reduce: the number and size of ships, length of season, number of passengers/day. Have many more cruise ship-free days. |
| I reviewed the Univ of Maine School of Economics survey cited in question 9 and it does not appear to account for or address the likelihood that locals and land-based tourists would be able to sustain |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| many, if not most, of the jobs and revenue streams purportedly contributed by cruise ship tourism. For example, anecdotally, I am regularly turned away from local restaurants on my lunch breaks due to their facilities' capacities being reached during cruise ship season.  Further, I and my family members generally avoid purchasing boat fuel in Bar Harbor due to the presence of cruise ship tenders at the fuel float; instead, we purchase fuel almost exclusively in Winter Harbor and Northeast Harbor. |
| I strongly feel we could better to manage the pier and tendering.  Having all pre-booked tours go to the ferry terminal and the busses leave from there.  But, the steps taken over the past 5 years have been very good in improving overall pedestrian flow.  I really think people are complaining about land based crowding caused by CARS in the park.  That is not cruise ships. |
| I suggest cruise ships not be allowed in Bar Harbor.  There are other beneficial, environmentally conscious ways to bring revenue to Bar Harbor.  The cruise ship industry is ruining the charm, beauty and tranquility of MDI. |
| I think Bar Harbor has the possibility of reclaiming its roots. But not with large cruise ships. |
| I think in the past, things have been handled okay. Just take it as it comes for the summer months and fall. Be grateful that people want to see the area and possibly return. |
| I think I've said it all |
| I think only allowing smaller boats would still allow that income but impact locals in a better way |
| I think that the council needs to focus on creating employment and revenue opportunities for BH residents and business owners rather than overregulating vacation/weekly rentals and the cruise ship industry/visits |
| I think the cruise ships keep town a-buzz with activity, all of which is great for the local economy and tax base. |
| I think the ships themselves have an environmental negative impact, but the number of passengers improve the financial success of many people. |
| I think Town Council needs to really weight the impacts of the cruise ships for our long term viability for the tourism industry this island has relied on for over a century. This would be a different conversation if we were struggling for additional business and needed to extend the season. The original intent for cruise ships was a valid one and it served its purpose for those years in extending past Labor Day the overall season.  But we are years and years past that time and the volume already coming is so large we no longer need 150+ ships of varying capacity.  Its a detriment to the overall experience of all locals, and land based visitors.  The town budget and passenger fees "lost" should not be a driving force for why we keep them.  We never should have started taking in that much in passenger fees if we had maintained a moderate level we had prior to 2016. |
| I think we need the money, keep the ships. But: No dock! And limit the number of people docking to fewer…perhaps close streets to cars--just end of cottage and Main and waterfront |
| I think we should prioritize our year-round residence and choose quality over quantity when it comes to tourism. |
| I think year-round housing is a bigger issue than cruise ships. |
| I understand the financial benefits, but feel it is a detriment to the environment and community. |

DX323.294

App. 598

TOWN06074

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| I want our town to be year-round focused, inviting to folks from away but focused on land-based tourism. More authentic, less like Disney World. |
| I wish I did! |
| I wish the Town Council a strong dose of wisdom in their planning. They can never return to the past when Bar Harbor was an undiscovered destination! |
| I wonder how inviting cruise ships squares with the town's climate emergency and action plan as well as the state of Maine's climate plan. Also, I would like the town to not be so focused on the revenue from ships. Much of the money is used for direct cruise ship expenses. And other expenses offest by cruise ship revenue should be looked at carefully. |
| I would check into what impact it has on marine life. there use to be tons of mussels on the beach along part of Eden st but they have virtually disappeared. |
| I would focus on providing out-of-town parking, facilities for land visitors, providing free shuttle services into town |
| I would like the cruise ship tourism industry removed from completely from Bar Harbor, or very small vessels allowed. I fear our town is at maximum capacity and even though the total number of people the ships bring in might only be a few hundred thousand, the infrastructure to move them is huge. Busses, boats, and ships. All affect our environment negatively causing congestion, pollution, eyesores, and stress on the local population. |
| I would not want to figure this one out, myself. Good luck to the Town Council. If we could get those dollars without cruise ships, it would be FAB! |
| I would think the tourists (land and ship) are what keeps the shops and restaurants alive! |
| I'd rather pay higher taxes than continue to host cruise boats in Bar Harbor. |
| If Bar Harbor is going to continued allow a large number of cruise ships, raise the fees paid significantly to reduce the cost to the town and to lower resident taxes. |
| If cruise ships are still coming, the locals need an incentive: free parking on the Main Streets and money needs to go to paying teachers more or for a new school! |
| If cruise ships are to be continued then property taxes must be reduced in a noticeable way |
| If cruise ships continue, move the terminal out of town so the pier area is not so congested. |
| If cruise ships need improvements to town to service passengers, then they should pay 100% for those improvements so 100% of revenue comes to town to help those of us who live here year round. |
| if possible, spread the visitation of ships out more, perhaps more in spring-early summer, and don't double up 2000-3000 ships same day |
| If ships are to continue, realistic, lower caps need to be in place to make the town more viable for all and provide success well into the future. Land based tourism built it, over abundance of cruise ships will ruin it. Mismanagement will be catastrophic. Most importantly, the infrastructure surrounding ships (docking, water taxi etc..)needs to facilitated by the town and revenues gained from those functions need to go into town coffers not a certain big hotelier's pockets and furthermore, agents of said hotelier should not be seated on cruise ship committees or involved in town government. Major conflict of interest. I can't emphasize just how repulsive and wrong that concept truly is... |

DX323.295

TOWN06075

# Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| If the masses don't come on ships, they'll come in cars, which is way worse! I believe Prof Gabe's study under-estimates the number of people who depend on the cruise ship industry financially. Only permitting small ships will substantially reduce the strain on the Town's resources, while retaining much of the financial benefits. |
| if the town council puts as much effort into results of this survey as a hospital puts into patients concerns and experiences and is willing to address the problems that the survey identifies this survey could be very useful |
| If there's community support for extending Bar Harbor as a port, focus on small cruise ships of 200/500 passengers and crew, as has Eastport with some growing success. |
| If they have to come, which I hope they don't, limit it to 1x a week. |
| If they must come, limit size, number of people and environmental impact |
| If this gets ugly, don't forget why. |
| If this is a priority for the town, fix the infrastructure to be more pedestrian friendly and accommodating, have a dedicated area not in the middle of town for the busses and loading/unloading of passengers. If it is a priority treat it like a business investment and do something that benefits the people of the towns experience living in this town as well as visitors experiences in this town while here instead of building parks and features. |
| If we must have cruise ships, allow only small "boutique" ships and only on specified days of the week, i.e. Sun-Wed-Fri, same days each week |
| If we must have cruise ships, let them continue to disembark downtown so as to benefit local merchants and the community. |
| If you can find a way to spread the cruise ship money (both in Town passenger fees, and in cruise ship business spending) around to benefit more locals you will see more general support of this industry. If you fail to address the congestion and mismanagement issues while only a few select areas and businesses benefit, you will continue to see opposition to the cruise ship industry locally. |
| If you cannot ban all cruise ship for some legal reson, charge much higher fees and limit ships to the smallest possible size. Cruise ships are ruin ing our town. |
| If you haven't gotten my point yet: the tourism is fine, the ships are not! Improve the quality of the cruise ships so they dump nothing into the water and air! |
| If you really wanted to compare the economic benefits of land-based tourism to cruise ship tourism, you should have presented the revenues, jobs, and income the town receives from land-based tourism, as you did for cruise ships in question #9. |
| If you remove cruise ships they will only go elsewhere in maine.  Keep 2019 level cruise ships, if not it will be devastating to bar harbor |
| Ignore revenue. Increasing land-based tourism will make up for the loss of cruise ship revenue in the two years we've been closed to ships. |
| I'm a lifelong, 3rd generation Bar Harbor resident and I've been forced out of the town because of the Chamber of Commerce decisions. I am one of the last graduates of MDIHS Class of '03 to live here. The Town should focus and prioritize its residents, not cruise ship visitors. Referring back to question #9, I have read the report and studied the methods used. The figures reported are a gross overestimation of the actual economic impact of cruise ships in town, since most spending by cruise |

## Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| ship passengers actually goes to cruise ship-sponsored activities and/or partners. Referring to question #10, as a commercial fisherman, I don't see much of this money supporting our industry. |
| I'm hoping for a balance, not an all-or-nothing solution |
| In considering the number of visits, be realistic about our size and ability to manage the problems that come with the visits |
| In my observation, the local dialogue on cruise ships has become polarized by the large number of vocal and visible retirees (some on the Council) who don't seem to care that the rest of the community still needs to have an income and that cruise ships are a great way to reduce local taxes. My sense is that many that have retired here are financially well-off and simply do not appreciate the value of the cruise ships to the rest of the Town. Bar Harbor needs to remain a place where people can make a living and afford to live, not just become a quaint retirement community drifting from one whiny compalint to the next by folks who have retired here and want to create a non-sustainable "community" that suits them. |
| In my opinion, we don't need them. |
| increase feeds to offset impact. |
| Increase fees for cruise ships and decrease number of cruise ships |
| Increase fees for cruise ships. If they increase the load on services, they should pay more. |
| increase housing stock for year round residents work force |
| Increasing numbers each year and not putting a cap on it isn't always better |
| Independent of Cruise Ships the number of tourists in the region has grown dramatically over the last two decades. How much is enough? The capacity of the current infrastructure cannot support more. |
| Input from all.   BALANCE!!  Business plans for shop owners needs to be fine tuned by them. EVERYONES money trickles down, not just shop owners.  Shop owners have to offer products for everyone.   Locals need to be able to get into shop   We only have two days out of the week to do so, as well as our other "two day only" chores.   We need to relax alos |
| Invest in a state of the art yacht marina. This will provide greater revenue with decreased impact. |
| Involve people who come to the table without preconceived opinions or ideas. |
| Is this question predicated on the assumption that cruise ship tourism is a given at its highest number of visits/ships? Therefuroe unmanageable! |
| Is this really tops on the list coming out of a pandemic?  If you haven't noticed there isn't anywhere to live in this town. |
| It ain't broke. |
| It has become increasingly apparent that local businesses make more money off of land-tourists than they do sea-tourists, and also the land-tourists are a higher-caliber of clientele which makes them more respectful tourists in the town. When you also consider the environmental impacts on the town from the sea-tourists (ie ships themselves in the water), it just doesn't make sense. |
| It is a very short-sighted and short-term gain. Look past the quick money and diversify the town's income with a more balanced mix of year-round income plans, land travel, etc. |
| It is not all about the money. It is about quality of life. Other wonderful destinations are facing the same issues. |

TOWN06077

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

It is simply not worth the headaches, the management, the committees, or the money. Eliminate the cruise ship industry in Bar Harbor.

It is the council's duity to listen to the full-time Bar Harbor resdient and not the part-time T-Shirt store owner and not make decisions of the like on their own.

It is very hard to be a resident here and function. Day to Day tasks are very hard to accomplish. Plus it is getting very expensive to live here with less services. More and More people are moving away.

it seems that the cruise ship industry only funnels $ towards a few businesses/people, wheras land-based tourism spreads economic impact more evenly.

It turns the lovely town of BH into something else.

It was wonderful. The Island was not mobbed.

It would be a ideal if we could manage the boats and keep them out of the bay.  If we can have the cruise ships provide more funds towards the protection of the park and the natural environment. If the ships could drive more business and funds to local businesses that would help offset the impact

It would be great if there were more days with no ships so locals could enjoy the area more without mobs of tourists. We avoid going around Bar Harbor and Acadia during the summer.

It would be so much better to have the cruise ships tender into the "ferry terminal" where all of the tour buses could be staged to eliminate the downtown congestion issues.  Shuttles for cruise ship passengers into town could be scheduled easily.

It's important to take a broad view when comparing cruise ship benefits with cruise ship costs: environmental, quality of life, income for local businesses, etc. Does Bar Harbor need to add further to its luster as a tourist destination by remaining a cruise ship destination in the future? Likely the answer is no.

It's not always about money. Bar Harbor does not need to be promoted any more.

It's time to act on the environmental impacts and stop participating in furthering it. Whether it is noise,  air pollution, water pollution from cruise ship tourism or anything else.

Just communication (social media, email, text alert sign-up) for times of potential 'crowd swell' in the park or downtown with notice of a week if possible. If poelpe have greater flexibility to visit these areas on non-crowd swell days/times, it would even things out. Cruise passengers cannot be flexible given their schedule.

just control the number

Just less is more. The coming generation will dismiss us eventually, even with the park, if we don't strive for authenticity in retail sales and less crowding with ships.

Just limit how many come each day.

just say no. it benefits a small few business owners, but hurts 99% of people

Just that when making decisions or changes, that they look at things from the vistors perspective. In that will they see it as hampering, making things complicated or difficult therefore diminishing the enjoyment of there visit and there overal experiance and the likelyhood of them recommending Bar Harbor as a premier destination to friends, colleuges, businesses doing retreats and conferences.

Just wondering how much the cruise ships cost the town? Was there an impact survey for 2020 economically? I know we need tourism but there's a happy medium to everything.

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| keep a broad perspective, not just short-term economic benefits, rather longer-term pollution aspects, adding congestion to already overused park facilities, quality of life for residents and nearby residents |
| Keep decision making local, consider sources of those pushing for more cruise ships , who benefits most. Which businesses are contributing to year-round quality of life for BH citizens. Which companies stand to lose most. |
| Keep it as is, do not increase |
| Keep property taxes low--do we need cruise ships to keep taxes low? |
| Keep the cruise ships out! |
| Keep the levels the same and allow the 2019 proposal from committee to work. |
| Keep the numbers down (one large or two small, not three large boats). There is a tipping point where crowds/buses detract from everyone's enjoyment. |
| keep the ships coming. Great added income for ???????? People trying to ???  It financially |
| Keep the town livable in summer, especially for year-round residents |
| Keep them off the pier |
| Keep this in perspective relative to land-based. Look at how cruise passengers use services (vs. land). |
| Killing the  cruise industry would be shortsighted.  It helps all businesses survive the fall shoulder season. |
| Know that not all business owners benefit from cruise ships, and the loud ones who do not speak for all of us. |
| Land people out of town--if not the terminal, how about at the airport? |
| land tourism |
| Larger docking fees - $1,000,000 is really not enough |
| learn from 2020 and bar harbor past history - we don't need cruise ships to be a viable town year-round |
| leave pier and surrounding area open and available to fishermen, locals and tourist (pedestrians) - use ferry terminal for disembarking ships - if any! |
| leave well enough alone |
| Less congestion is they could unload at the ferry terminal! |
| less congestion would be more enjoyable  for me but might not be practical . |
| Less cruise ships with a longer stay for each ship |
| Less cruise ships. |
| Less cruise ships/year |
| Less dates less boats |
| less days and not so many passengers on one day |
| less giant cruise ships would be nice |
| less is more |

TOWN06079

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| Less is more |
| Less is more. One at a time. |
| Less rules. You really should adapt a more laissez-faire governing style. |
| Less ships with a smaller passenger count, 200 or less. |
| Less ships! |
| Less ships. Lots less. |
| Less tourism. Change our mindset to let Nature prevail. |
| Less, smaller cruise ships. |
| Let Bar Harbor be Bar Harbor - not a town at the sway of the cruise ship industry |
| Let local operators like whale watcher take passengers to around islands to NE and SW [illegible] for those who don't want to shop in BH. |
| Let's find a way to get along without them. |
| Let's just get rid of cruise ships so we don't have to talk about it anymore, then let's work on building up ecologically sensitive year round industries and getting rid of those that extractive and environmentally degrading. |
| Limit # of ships. |
| limit ??? One ship per day. Having 2 or more in with 5,000 plus passengers presents too much congestion with our small town and population plus out of town tourists adding ??? More congestion |
| Limit cruise ships to 100 passengers. |
| Limit cruise ships to one per day, Monday-Friday only, before Memorial Day and after Labor Day. No cruise ships during June-August. That would allow about 59 per year. |
| Limit days and number of cruise ships per day. |
| limit frequency! 2 ships/day - tops. Perhaps have 1 week/month w/o cruise ships |
| Limit it as much as possible. Cruise ships cheapen the image of Bar Harbor. Many active cruise ports do not have good economies. They are cheap feeling. |
| Limit it please! Don't be greedy for the dollars. We survived and thrived before cruise ships and can again. Focus on bringing more year-round housing and year-round residents. |
| Limit it severely. No more than one ship per day, no more than 2-3 days per week. |
| Limit it to very small (under 300 passengers) and charge a premium port fee. If they really want to visit they'll pay top dollar. |
| limit it! |
| limit number and size by large amount. Charge more and put towards infrastructure |
| Limit number and size; move away from town harbor |
| limit number of cruise ships |
| Limit number of cruise ships in harbor on one day. |
| limit number of cruise ships per day and number of people don't want 4 sum ship in harbor either |

DX323.300

TOWN06080

# Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| Limit number of passengers per day.  Load touring vehicles at new terminal, away from downtown/pier. |
| Limit number of ship visits with one limit for May to August, second limit for Sept-October/November |
| Limit number of ships . Stagger times for visitation. Disperse shuttle passengers to drop-off points. |
| Limit number of ships and number of passengers. |
| Limit number of ships per day to 1. Spread out days ships come. |
| limit number of ships to 3/week. Give priority to ships with best environmental record. Do not allow ships with >1500 passengers. |
| limit numbers |
| Limit numbers of people allowed ashore at any one time |
| Limit numbers, raise fees to ships, charge a carbon surcharge, continue ot solicit feedback from residentes regularly to track trends. |
| Limit passengers and ships to a reasonable number.  Use the terminal outside of downtown. |
| Limit qty of cruise ships to met air  and water quality. Be sure to find a way to bring passengers to town(s) for small businesses. |
| Limit ship size, passengers and frequency. |
| Limit Ship tourism |
| Limit size of ships; Limit number of ships |
| Limit size of ships--no more than 1000 passengers; Limit number of landings--50/year |
| limit size, limit ships, reduce days, reduce passengers |
| Limit the # per day, move all to ferry terminal bus in passengers to Town |
| limit the large boats that come to Bar Harbor, thus manage the amount of people coming to town at one time |
| Limit the number and shorten the cruise ship season. |
| Limit the number and size of the cruise ships. |
| Limit the number of cruise ship viists a year--especially the extremely large ships with thousands of passengers. |
| Limit the number of cruise ship visits and the size of the cruise ships allowed to visit. |
| Limit the number of cruise ships daily in the fall |
| limit the number of passengers on any given day, there are too many |
| Limit the number of ships per day. |
| Limit the number of ships while modestly increasing local fees charged to cruise providers. Limit the number of land-based excursions by limiting the number of buses that can operate within the town. Increased monitoring of air and water quality, while passing those expenses on to the cruise industry in the form of increased fees. |
| Limit the number of ships. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| Limit the number of ships. Seasonal restaurants are OK with me. I'd be happy to see the seasonal stores loose business and either change to serve the local community or go away. |
| Limit the number per day to one large and one small. |
| Limit the number. Dock or tie up away from town. Further out to sea. |
| limit the number; too many visits ruin the image of BH as a coastal community abutting a national park |
| limit the ships to no more than 2 and not on holidays |
| Limit the size and number of ships and the volume and number of announcements made from ship while in port. Monitor environmental impact closely. |
| Limit the size of cruise ships to very small ships that dock at the pier, if any at all. Raise the fees charged to cruise ship companies. |
| Limit the size of ships allowed to enter the Bay to something more appropriately scaled to the town (no larger than the CAT) and place limits on how many ships and what times of year these ships can anchor. |
| Limit the size of the cruise ships you let in.  The mega ships are too big.   Bar Harbor is getting ripped off by only getting  $1 million from the Cruise ships each year.    Bar harbor needs to get more.  Limit the number of cruise ships that are allowed into BH each year.  How about have an auction for only 12 cruise ships a year.  Your auction will make way more than $1 million as Cruise companies bid for those slots.   So you make more money while having less cruise ships. |
| Limit the size of the ship with less passengers. |
| Limit the size of the ships. Only have one large ship a day. Limit the number of total visits each year. |
| limit the size of tour buses - 20-25 people per bus. In town small shuttle. ONE-WAY TRAFFIC ON west and cottage street. Seasonal. |
| limit the volume of ships and passengers, move landing location, stop folding to the few commercial businesses related to cruise ships |
| Limit them! Think more about making this a vibrant year-round community rather than cramming everything into the summer months and having most businesses shuttered six months of the year. |
| Limit to 1500 crew and passengers |
| Limit to one per day (or one large and one small); Reduce parking fee system to Jun/Jul/Aug/Sep; Don't [illegible] parking fees May or Oct |
| limit total passengers in fall months to 3000 max (now 5000 I believe) |
| limit visits and size of ships |
| Limit, limit, limit ! |
| limit, limit, limit. Do not shut down town pier for cruise ship tourism. |
| Limitations--increased parking for year round residents who are senior and cannot walk far. |
| Limiting size of ships and weeding out those with poor environmental records makes sense. Lots of businesses depend on the money that cruise ships bring in, but we'd strike a nice balance with only smaller size ships. |
| limiting the # of passengers coming into town on a given day is going to have the biggest effect. |

DX323.302

App. 606

TOWN006082

# Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| listen to business owners |
| Listen to business owners not out people from out of state |
| Listen to business owners who directly deal with cruise ship tourism. |
| Listen to residents! |
| Listen to the business community and other stakeholders that deal directly with cruise ship tourism. Not base decisions on personal opinion. |
| Listen to the business community, not out-of-staters who have moved here. |
| Listen to the locals |
| Listen to the people most impacted, those who live in the downtown area. |
| Listen to the year-round residents |
| Look at an overall CS cap, somewhere in the 120-150 ship per year range (As this is the actual number of ships we usually get anyway) Consider Amnesty/Sanctuary days when there are no ships allowed (Except under emergency situations) and immediately begin steps to implement the Cottage Street/Main St streetscape plans from LA-RK Studios. |
| Look at examples of other tourist destinations. Ruined by cruise ships and don't let that happen here. I think some ships are okay, but we need sanity too! |
| Look at this a business person, not just as some one being  inconvenienced |
| Look at this as part of the whole, it's a mistake to abstract it out of context with the millions of other visitors. |
| Look to other coastal towns who do not depend on cruise ships for income. I find their shops and services far more interesting and inviting. |
| Looking toward the future, TC should consider other ways of raising revenue. Cruise ships wn't last forever--Bar Harbor needs to be ahead of the curve, not behind it. |
| lower the amount of people who come ashore |
| Mak ecruise ship tourism more eco-friendly. |
| Make certain there are no cruise ships on at least one day every week. Maybe advertise those dates so locals can plan their schedules accordingly. |
| Make Cottage and Main St one-way and remove the street parking from the park up to the Post Office. Widen the sidewalk and allow more outside dining and retail displays. |
| Make it more of an exclusive harbor, less is more. |
| Make Maine street a pedestrian only street which gives more room for people to walk and the possibilities of more revenue for the town by renting out small kiosks or such on that street. |
| Make plans to talk with our year-round town residents and seasonal summer residents and local business owenrs who lived in Bar Harbor about how to manage reduction of big cruise ships and leave out the big outside corporate entitities. Have landing fees collected to benefit town, not Ocean Propreites. Continue tendering and develop landing to [illegible] some of cruise ship passengers at Ferry Terminal |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| Make sure we're hearing equally from representatives of the cruise industry/those who benefit directly and those with less enthusiasm towards the cruise industry - this includes who serves on relevant committees. |
| Make the ferry terminal safe for cruise ship tenders to dock and use that area as the staging area for tour buses. |
| Make them anchor further out to sea, outside Frenchman's Bay. |
| make use of the ferry pier with free bus service into town |
| manage as we had it in 2019. Stop driving uncertainty and fear. |
| manage cruise ship visitation to a moderate level |
| manage high season land tourism versus cruise. Highlight cruise offseason not peak season |
| Manage what we have better and stop with the anti cruise ship agenda |
| Management of traffic and partnership with Acadia. |
| Many tour guides are residents of bar Harbor. Chamber of Commerce or town officials should interact with them. |
| Market the town as a non-cruise ship destination and do more to partner with the NPS |
| May want to remind each other that busy sidewalks are a good thing. |
| maybe if there were several points of entry for passengers to unload so they're not all dumped in the same couple spots. |
| Maybe limit the number of passengers. |
| Maybe you should stop raising our property taxes while you rake in millions from parking fees and docking fees. Seriously, if you can't help normal year-round residents with this BS, just ban them altogether. |
| Mega cruise ships are floating playgrounds that are great fun for many people of all ages. My family has had fun on them. But they should not come to small harbors like Bar Harbor and Mount Desert Island where fishing is an important industry and land-based activities like hiking in ANP are the best tourist dollar draws. |
| Minimize cruise ship activity if it is a benefit to economy but I prefer no traffic at all |
| Minimize number allowed per month. Limit size of ships |
| Minimizing environmental impact seems important. |
| Moderation is key. Let's not ruin the small town feel of Bar Harbor by allowing the cruise ship cash cow to overwhelm this island. |
| Money isn't the only thing that matters |
| monitor impact of revenue from BOTH auto and ship traffic--review findings annually |
| More $$$$ does not equal a better life. More respect for Earth does. |
| More accessible parking. New traffic plan for Main St and Cottage St. More pedestrian areas. |
| More and more is not always a benefit for a town that must manage masses in a moment. In light of the global pandemic that will not resolve soon, is this small town prepared for the potential EMS and |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| medical impact as well??? Not a ship run aground, but a town run aground? Hold the line, limit the numbers to a dull manageable roar. |
| More cruise ships up to a point will only have a positive impact on bar harbor. You will see return tourism with more spending in our town. More business will have a positive effect on the overall welfare of the town and its people. |
| More hospitality workers greeting tourists! |
| More landing of passengers out of town. |
| more parking |
| More parking will do far more for the local economy than people who arrive and quickly leave by sea |
| more realistic evaluation of economic impact. Most passengers just buy teeshirts, lobster rolls, and ice cream, not major gift items. |
| more stores downtown that cater to locals and not businesses who make money off bar harbor memorabilia |
| move all ships and buses out of downtown bar harbor |
| Move forward on the Ferry Terminal and remove all bus traffic from the town pier, reduce visits to one ship per day. |
| Move it all to the ferry terminal and stop interfering with it and spending time discussing it. BH is a tourist town. That is how the majority of people live here year round. Embrace what we have rather than constantly fighting against it. |
| Move on to important topics |
| Move the cruise ship activity to the ferry terminal. |
| Move the cruise ship loading/unloading place to outside of the immediate downtown area and then utilize busses. |
| Move the ships for ferry terminal. |
| move the ships into the bay to park. Let tourists off at the old blue nose dock |
| move them out of the center of town |
| Move them out of town. |
| move them out to ferry terminal |
| Must limit the number of cruise ship passengers in the town/island at any time. |
| My suggestion is to consider all that the community has to say. A year round economy is possible if we can move away from the commercial 'cookie-cutter' perception. |
| My wife and I have cruised all over the world--it has enhanced our lives. It would be selfsih to inhibit cruise passengers visiting our island. |
| N/A |
| N/a |
| Need for limits on number of cruise ships per year |
| Need to consider the qulaity of life for year-round residents. We like to be able to go to our local restuarants and be able to park too, or the gorcry store, etc. There needs to be a focus on the |

238

# Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| enviornment (Air quality), taxes for resdients and in creating more of a balance. IN the last 3 years, it has gotten out of hand. |
| Need to manage the number of cruise ship guests on Main Street. We experienced extreem overcrowding leading to negative impact on land-based tourism. |
| Negotiations to reduce number of ships/passengers. Encourage the tours so cruisers get on bus and go into park. Access to Cadillac Mountain would help, too. |
| never 2 big ships on a day. Buses should not be a hazard |
| NIMBY is not an attractive sentiment |
| no |
| No |
| no |
| no |
| No |
| No |
| no |
| No |
| No |
| no |
| No |
| no |
| No |
| No |
| no |
| no |
| No |
| No |
| No |
| No |
| No |
| No |
| no |
| no |
| No |
| No |
| no |

DX323.306

# Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| no |
| No |
| No |
| No - multiple cruise ships on any given day. Designate 1-2 days a week to not allow any cruise ships in the harbor. |
| NO BIG DOCK for mega ships. Insist on small ships and make all the rules and create all the fees you want. They will still come and just charge more to their customers. |
| no big ones |
| No big ships, limit number of ships at the same time, work with merchants to determine best type of ships for economy |
| No cruise ships during summer months. |
| No cruise ships would encourage tourists who stay longer. |
| No cruise till after Covid |
| No docking at town pier, destroys the harbor ambiance. |
| No large or super-large ships. Only allow cruise ships in harbor 2 days per week. Charge higher port fees to make up for it. |
| no more than 1 ship per day |
| No more than one cruise ship at a time; Keep large 55 seat buses off and out of the wharf area |
| No more than one of the large ships in port on given day--any time of the year. |
| No more than two ships in port on a given day. |
| no need for boats, truly. |
| no need to get overly involved. Cruise ships may not come and business owners will suffer |
| No other suggestions at this time, but I appreciate the value of this survey and that you may consider my responses even though I'm not currently operating a business. |
| No suggestions other than don't be afraid to try it without cruise ships. I think other businesses will thrive and new land-based tourists and Downeast residents will make up for the lost revenue. We can replace the "we're bored with Bar Harbor," and "what is our stop tomorrow" with people who want BH and ANP to be their destination, especially in the fall. |
| No. |
| No. |
| No. |
| no.  I appreciate this survey and I appreciate the TC taking action on this issue.  I didn't receive a survey in the mail, even though I live in Bar Harbor, pay taxes, and work here. (maybe it got accidentally recycled with junk mail) |
| no. the land-based tourists are much more of a problem. |
| None |
| None |

DX323.307

TOWN06087

# Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| None |
| None period! |
| Nope |
| nope |
| Not at this time. |
| Not at this time.  You all have a lot on your plates. |
| not directly related to cruise ships, but some centralized parking - connors and emerson? Consider pedestrian areas for the summer? |
| Not havea s many tour buses blocking carsa nd people from coming down Main Street hill to park at the town pier. |
| Not really, reduce allowed visits, and limit daily numbers, or weekly numbers to balance things out for everyone |
| Not yet - maybe next year. |
| Nothing more. Thank you. |
| Nt |
| One cruise at a time. Reduce # of cruises by 50%. No discharge by any size commercial passenger vessels in ME harbor. |
| One cruise ship per day with no more than 1700 passengers with landings and 121 Eden. Keeping the motor coaches away from the town pier. |
| one of the reasons my family moved to BH was the cleaner environment--less air, water and litter pollution. We also relish the smaller population. Over the years, we've seen increasing pollution, development and population and are contemplating moving out of the state since the negative impact of increasing tourism if very painful to experience |
| only allow "small" cruise ships or none at all |
| Only allow one cruise ship at a time. |
| Only allow the small cruise ships that dock at the pier. Consider the qulaity of life for the residents of the town of this town and island. |
| Only one large ship per day. |
| Only one ship a time. |
| only one ship permitted on any one day |
| Only that just because the passenger numbers have proven to be too high on some days, is no reason to banish cruise ships altogether. We ought to be able to determine a reasonable, workable number of allowable passengers. |
| Only the vocal minority is worried about this! Don't ruin a good thing! Don't over-regulate or mess too much with it. It works and it is a huge benefit to our town. |
| Open up to cruise ships ASAP! |
| Other than harbor fees, cruise ships don't contribute to town |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| other towns don't allow it - ask them for help! The cruise ships and bus tourism has ruined this island and particularly Bar Harbor. Let's get back to what we used to do |
| Our Chuch lost a very important source of donations without any cruise passangers last summer. Please consider that. |
| Our town needs to find a way to balance quality of life with commere within a busy resort town. Perhaps without all the push to bring more ships in to town we would see a different retail climate. Possibly fewer tshirt, trinket shops and fewer monopolies taking over the town selling the same product under a different storefront name. We can be a charming coastal community serving locals, summer residents and visitors. |
| our views and our ecological health is what drives ALL tourism here; WE have the power to tell the industry what we want… not the other way around. |
| Overall a reduction in the number of ships and days that ships are in harbor. |
| Overall number of people need to decrease. We are reaching a tipping point. |
| Overall, I think Bar Harbor/MDI has become "trendy." Too many places to stay for other visitors added to too many cruise visitors. I understand what happened over the years, but I think it's too late for land visitation. Maybe cruise ships can be managed. |
| Parking |
| Parking meters provide significnatly more income. There isn't any traditional port in the world hwere cruise ships aren't a problem and will only get worse. |
| Passengers that get off for a short time may come back on their own. |
| Patience: before enacting any sweeping policy changes, please wait to see how effective the management plans drafted by the Cruise Ship Committee and public safety in 2019 will be on traffic and congestion at the Pier.   Compromise: cruise visitation is very important to our business community and has extended our season well beyond Labor Day (ever closer to year-round business opportunities). A drastic reduction in visits will threaten the livelihood of many local residents and business owners. Let's work on a plan that balances the needs of the whole community (including residential and business interests). |
| Pay attention to all sides of the issue, not just the shrill anti cruise ship faction |
| Pay attention to businesss as well as retirees |
| People are going to come to Bar Harbor no matter what you decide. We had a frickin' global pandemic and were still packed in August. And September, October, November - and now in April again. We are packed in April! Go ahead and say 'no mega-cruise ships,' then you won't have to build infrastructure to handle them, maybe the haters will stop ranting, and we'll still have more tourists than we can handle. Also, I personally do not see the point of going to sea in a floating mall and would be fine if mega-ships didn't exist at all, but that's me. I'd also be just fine if the WalMart and Home Depot lots were still woods, and we didn't have a four-story hotel that looks like a Virginia Beach condo on steroids looming over West Street. I don't have major data-based objections to cruise ships, but it wouldn't bother me at all if they vanished from the earth. |
| People love visiting Bar Harbor. It is our home, but we know what that involves and tourism is something we all depend on either directly or indirectly. |

| |
|---|
| People need to make a living. Overall, cruise ships are not a big deal. |
| People outside the town are well aware of when the cruise ships are there and avoid the town like a plague when they are there. So I suppose it's good for the other towns because that's where others go. |
| Perhaps an overview of the basic fiscal impact (review Todd Gabe's study for one) would be prudent for all of the Councilors or better yet more open communication on all aspects of this topic between the taxpayers and the town government. Consider letting the committee designated to take on these issues do their job and focus on the overall communication wall between citizens, taxpayers and town government (not an unusual problem to have when polling several other town leaders throughout the state). Bar Harbor is very, very lucky to have the resources we have regarding the tourism industry and this is something that needs to be carefully looked at. The ripple effect of banning or creating moratoriums on revenue producing industries is something to be further studied very, very carefully. |
| Perhaps limiting ships with massive numbers of people or having only certain days of the week for arrivals/departures (so locals can plan around congestion). |
| perhaps move cruise ship passenger docking to the ferry terminal to eliminate the congestion on the town pier and west st / main st |
| perhaps not have any cruise ships as it seems the passengers only buy souvenirs |
| Perhaps the town could consider having the cruise ships lay anchor near the old Cat Ferry to avoid them ruining the harbor view seen from the town pier(s), park, etc. |
| Please accept that ships have the right to be here and they are an important part of our economy |
| Please accept that they provide a lot of positive things for our town and move on. If they were bad for us, people would stop coming. |
| Please balance |
| Please cancel all cruise ship tourism. |
| please consider a better balance between cruise ship visits and the effect they have on residents. I doubt tey will be eliminated but a reduction by at least half would make a positive change in the feel of the town. I have had visitors (land based) say they won't return due to the overcrowding on ship days. |
| Please consider all the aspects of cruise ship tourism before making any chnages |
| Please consider harbor expansion to include mooring, passenger/visitor onload/offload at the Ferry Terminal. |
| Please consider the environmental impact that cruise ships have on our beautiful natural wonder and despite the financial impact, ban cruise ships from MDI. I believe the island can survive quite well without them. |
| Please consider the local environment and the people who call it home. |
| Please consider the long-term natural and cultural impacts caused by excessive visitation. The excessive volume of cruise ships, vehicles and people are destroying the very natural and cultural resources that attract tourism/visitation. In addition, many stores/businesses/sidewalksa re not easily accessible, ADA compliant. |
| Please do not raise my taxes by eliminating cruise ships. |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| please do something! Cruise ship visitation is out of control. Observe how the retail mix has changed in the last 25 years. Talk to former/current small lodging owners (such as myself). Facilitate creation of year-round workforce housing and town-wide high-speed broadband |
| Please do the right thing for the environment and the character and beauty of the town and don't give in to the temptation of money. Thank you. |
| Please don't ignore the opinions of non resident property owners like myself. I have a 65 year annual personal history of bar harbor and care for it more than many new residents. My family had a 140 year history with the town and we all care for it deeply. |
| Please don't let one more cruise ship in. Ever. |
| Please don't make a rash decision to eliminate cruise ships. The effects of such a decision could have far reaching consequences. Balance is the solution. |
| Please help us. The overcrowding in the streets is miserable. It is a terrible place to live as a local. |
| Please just get rid of them altogether. They don't bring in a large enough percentage of the town's income to be worth the problems they cause. |
| Please keep the health of residents as a top priority as Covid-19 keeps spreading. The fewer the outside chances of contamination, the better. "Wear and tear" impact with too many people. |
| Please limit cruise ship tourism to a reasonable amount! Otherwise, we accept the financial benefits to the Town and business. |
| PLEASE limit the size and number of cruise ships allowed into the harbor on any given day. We are the worse for any increase beyond what already taxes our system to its limits. We just can't sustain more traffic. |
| Please listen to the scientists and help them by making wise decisions that will keep this wonderfully unique small-scale and historical place healthy and in keeping with its long-term future. |
| Please look at this issue holistically and from a long term perspective. Bar Harbor has been a popular place to visit for a long time, long before the cruise ships came to town. Uncontrolled, I fear the cruise industry will jeopardize that which is so desirable about visiting. Please regulate it, restrict it to a level that the town and the region can handle. We all share Frenchman Bay, we share Acadia and the beauty of its wild surroundings. Let's not let our pursuit of the almighty dollar spoil that. Thank you for your consideration. |
| Please regulate the size and number of cruise ships allowed To visit. It is ruining the beauty amd essence of our amazing town. |
| Please remember that you are not the only stake-holders in Frenchman Bay. The cruise ships affect us all, not to mention our environment and the creatures that depend on it. |
| Please stop accepting them. |
| please think of bar harbor as a whole, we need to get back to being a "year round" town, like lots of towns down the coast have done, don't sell out to the large corporations that don't care about us! |
| Please understand that this industry is turning people off from coming to Bar Harbor |
| Please, whatever monetary gains the cruise ships provide I feel that this is a clear case of diminishing returns. If we have to have cruise ships, please let' follow the model of Key Wet where the number of ships and the passengers is a fraction of what it was. How many surveys do we need to responsibly address what is obvious and oppose voted commercial interest. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| Plenty but feel it's a unwinable proffit over people argument |
| police at corner of main and cottage all day. Police at corner of main and mt desert all day. People cluster here |
| Post arrivals and departures of cruise ships so locals can plan when to go into Bar Harbor. |
| Preserve and enhance the quality of visiting Bar Harbor and MDI for the long term. Don't be fooled by money generated by measures that will degrade Bar Harbor in the long term. |
| Prioritize residents in some ways. We've established out lives here, and we get the shaft for 6-8 months out of the year. |
| Promote businesses other htan trinket/t-shirt shops--need more 'high end shops.' Charge cruise ship companies more for passengers departing ships. Place restrictions to mitigate on environmental impact of cruise ships. Impose fines. |
| Provide their full support for the cruise ships. |
| publicly let us know what you are doing especially with the crowds at the intersection of cottage and main |
| Publish and analysis of net revenue for the town, quantifying the costs in resources to the community. |
| Put quality of the overall toursit experience and image of Bar Harbor over $ |
| Put year round residents first.  Provide opportunities for them instead of focusing on tourism which on a limited basis may be helpful to the town however at this point it is a disgrace.  The year round residents deserve better than just being servants for people from away wanting to make a buck off of Bar Harbor.  Bar Harbor used to be a nice small town however no long because tourism is so out of control.  Actually thinking of leaving...  And there is cruise ship covid...  How can you really protect the residents of Bar Harbor? |
| Quality of life for people (locals and visitors) will boost business, so less cruise ships (and THOSE type of tourists) will benefit us! |
| Quality of life for the planet and all species is important.  Covid reminded us. |
| Questionable timing to attack struggling businesses. |
| raise port fees & taxes to reduce burden on local residents and allow our taxes to be reduced |
| Raise the fees and drastically limit the number of visits and passengers. We have a large hospitality industry and working in this we have heard many people say they would not return because of the ships. |
| Re visit study cited in question 9 as I've read that it's unreliable. |
| Realize that the scale of cruise ships is the antithesis of Acadia National Park and they should leverage all tourism activities that take place in the park. |
| reduce |
| Reduce # and size of ships coming to BH |
| Reduce impact by reducing number of passengers and cruise ship visits |
| reduce it lightly, build a parking garage w/ metering for land-based tourism |
| Reduce number of cruise ship passengers allowed each day. |

## Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| Reduce number of passengers and move focus (Tenders) away from town pier |
| Reduce number of ships, number of passengers per day, number of days per season/reduce downtown hypercongestion. |
| Reduce ship visits/passengers per day. |
| Reduce the number of cruise ships. Increase fees. Develop a plan |
| Reduce the number of passengers and visits. Free parking for locals anywhere they want |
| Reduce the number to one cruise ship per weekday. None on weekends, since get so many car/bus visitors. |
| Reduce the volume, size and frequency of cruise ships into the harbor and town |
| Rehab the sidewalks all the way to Woodbury (along Eagle Lake Rd) to connect Kebo Golf Club, etc. We need sidewalks to avoid having to drive in congested conditions and to be safe. |
| reiterating #14, we didn't have them before and managed financially. Serious limits for resident quality of life and land based guest experience |
| Reject it |
| Remember and communicate the benefits of returning visitors that may have had their first visit to Bar Harbor on a cruise ship.  Many wind up coming back by car year after year, which positively improves the financial benefits to the Town. |
| Remember cruise ships are only a small part of our visitation.  They mathematically can not inflict the negative effects people claim. |
| Remember how hard the Town worked to establish a Fall cruising season and take a closer look at all the additional benefits that came with a longer season. |
| remember our good life 20 years ago without a flood of cruise ships. If we can survive in 2020, why not every year without cruise ships? |
| Remember that this started out as a good thing for the town economy. Stop listening to the "group of 40" who rose up to go against the idea of using the ferry terminal for cruise ships. |
| remember that you have a year round population that would like to have a year round town and not have to leave for the summer due to crowding |
| Remembering that they work for the residents and stop bringing their personal/business agendas to the table before the residents. |
| Remove councilors who have a personal regardless of facts. |
| remove their GD noses from wrecking that revenue source |
| Remove them from town pier. Do something with the ferry terminal. |
| REPEAT REPEAT.  LIMIT CRUISE SHIPS TO NO MORE THAN 1 A DAY. |
| resign |
| Revise cruise ship committee would be a start. Please consider our town was never designed to become a port for cruise ships. |
| Roll back cruise ship visitation to 2005 level. |
| Same as above-cut back on numbers and size. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| save the lawyers for vacation rentals |
| Schedule ships by number of passengers, 1 large, 1 small |
| schedule them like a day or two per week. |
| seasonal business interests should not dicatate quality of life for residents of BH. More more more is not the answer |
| see #14 |
| see #14 |
| See #14 above. Still need more bathroom facilities and open them late April or first of May. Ridiculous that Ball Field Baths closed while ballgames, etc. happening. |
| See #14. Make all ships dock at former CAT terminal |
| see above |
| see all answers up to now |
| See how it is handled in other ports on the East Coast. |
| See item 14 - less cruise ships and tender landing site |
| see question #14 |
| See question #14. At the very least more voter input. |
| seems that the income from parking fees should offset the income described in this survey from the cruise ships |
| send them all (buses) to Ellsworth, come into Ferry Terminal, keep them out of downtown |
| send them to bucksport |
| Seriously, if parking moved out of the center of town and would have been moved as discussed to the ferry terminal, I would be so supportive of limited capacity (reasonable, not small) cruise ships |
| Set passenger caps at 4000. Eliminate ships with LBC of greater than 5000 ie The Anthem, the Escape, Meraviglia etc... |
| Severely restrict cruise ship visits. |
| Sharing/communicating the budget positive effect cruise ships have on our town better with our general population--signs etc. should say it is provided by cruise ship fees for those who do not study our annual budget. |
| Ship size. Number of ships allowed per week, path taken for ships to get into the harbor. |
| shorten season - summer only |
| Should see how this year 2021 goes without cruise ships, because land base tourism should be closer to normal and think the town will be better off with out the cruise ships |
| Shut down Main St from the Village Green to the pier and Cottage St from Main St to Rodick St on days with multiple large ships in the Fall from 10am-2pm. Ask people who work in stores(not the owners, they are not necessarily in the stores) how many cruise ship passengers and crew members visit/make purchases, I've worked in retail in BH for nearly two decades at different businesses, and as far as I know, this has never happened. |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| Simply to be extremely cautious and deliberate in our studies of issues and any decisions that are made. Remain as inclusive of opinion as possible. Move and change conservatively. |
| Skip Bar Harbor as a cruise ship port |
| small ship only |
| small ships only if any |
| Small ships, only one per day or less. |
| Smaller and fewer |
| Smaller number of ships and size; Regulate amount per day and passengers; Park boat behind islands in the bay |
| Smaller ship tourism, in keeping with the size and scale of Bar Harbor, enhances the image of Bar Harbor, the quality experience for both residents and tourists, and provides important revenues for Bar Harbor businesses. The largest ships should be the focus re-visioning cruise ship tourism policy. |
| Smaller ships and higher fees |
| Smaller ships only! Taxes/fees that help support the infrastructure impacts. |
| Smaller ships! Fewer in 1 day--let passengers know somehow not to wander into street as this is a REAL town? |
| Smaller ships, way fewer cruise days, better crowd management, more public restrooms. |
| Smaller ships. Like Dubrovnick, too many visitors make the location less desirable. |
| Smaller tour ships might have value and not negatively impact the character of the town. |
| Smaller, high-end ships. |
| Small-medium sized cruise ships are preferable to large ones. |
| some restrictions (free parking for senior residents) |
| Some year-round residents would like ot see less cruise ship days in general to have a better quality of life. |
| Sorry, it's a tough one--do away with it so residents can actually enjoy the summer here. |
| Spend more effort on helping fishing industry, docking and parking for them. Lessen cruise ship traffic |
| stagger the ship traffic, especially at peak times |
| Start paying attention to the community. This is not a theme park |
| Stay calm, well, and bless you for being involved. |
| Stay cruise ship friendly! |
| Stick to known economic concerns and reject concerns that have no place in the Council's docket. |
| Stick with small boats. Remember Acadia National Park is all about nature and those mega ships don't fit. |
| Stop all cruise ship activity |
| Stop all cruise ships! Period! |
| stop attempting to find a way to stop the industry and start looking for ways to embrace it and benefit from it. |

DX323.315

App. 619

TOWN06095

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| stop being blinded by the money.  The long term damage is not worth it. |
| Stop blaming everything on cruise ships and have real conversations about real issues. |
| stop having 3 ships in the harbor at once - discuss if they are really needed in July and August - if kept decrease numbers of ships in those months |
| stop it |
| stop letting a small group of anti cruise ship people dictate how our town is run.  It is evident by the actions of some counsel members whether they are anti cruise ship supporters.  Council members should not have an agenda  but should be there to balance the support of both our residents and business owners. |
| stop listening to a couple business owners only. They sell the same stuff as every port in the Atlantic. I have friends who no longer visit because of the ships. They are spenders. |
| Stop listening to vocal minority. |
| Stop making cruise ships as the problem! With some tweaking to what is provided now, things can become a lot easier for all! The benefits out-way the small annoyances we see when cruise ship are in port! |
| Stop meddling in things you don't understand. |
| Stop pandering to the cruise ship industry!  Build land-based tourism.  The folks who visit our island by land are respectful of our environment and stay/spend money in the community for days at a time. Enough of the 'grab-n-go' two hour cruise ship passengers. |
| Stop pretending like cruise ships are vital to our economy. 2020 proved that to be incorrect. |
| Stop the constant debating |
| Stop the reliance on cruise ship fees to run our town.   The character of our town is at stake.  Allow for local artists to setup shop near where cruise ship passengers arrive on MDI, so they can benefit. |
| Stop them permanently!! No more!! |
| Stop them!!! |
| Stop them, town is too small |
| Stop thinking more like bankers than [illegible]. We are a Town, not a business. Start by reforming the number of visits (25-30 might be okay), then revamp the cruise ship committees to stack it with concerned residents to [illegible] against cruise ships, not to slavishly promote them. |
| stop trying to divide the people on this issue. |
| stop! Don't pad the pockets while average people like me - a nurse in town - can't find a home to live in an apartment to rent. You have ruined this town |
| strike a balance with land tourism. There are too many rooms to rent and too many cars. It (Bar Harbor) is not set up for the number of people that come to vacation |
| Studies on how to increase supply of affordable year-round housing, which hopefully would keep town open during the winter and keep revenue flowing in the "off" season. |
| Study the (primarily negative) impact this industry has had on other communities around the world and the difficulty many  areas are encountering as they try to preserve and restore their communities to pre-cruise ship livability standards.  We reached a tipping point years ago in that delicate balance |

Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| between commercial and residential interests.   We don't need to 'manage' cruise ship visitation, we need to end it. It is a bad idea promoted by a few to the detriment of many. The essential question for our Town Council is: do you care about the future of this town as a vital, year round community and if so, what are you willing to do to ensure that this will happen? That our schools are full, our hospital staffed, our housing affordable and not seasonal, that there are opportunities for a basic workforce to live here, raise their children here, retire here. I believe we need to reorder our priorities if we are going to survive as anything more than an overcrowded tourist town ..just like every other one. |
| Study the effects on the environment and make this public. |
| Stuff the cruise ships. |
| Suspend all cruise ship tourism. There is SO MUCH harm being done on so many levels, that would little good (port fees) the town sees are just not worth it. |
| Take a more in depth look at the negative impacts on the harbor and surrounding islands. People flock to the island for it's natural beauty.. not for its congestion, noise, and trinkets |
| Take more consideration of the permanent residents and the long term environmental health of the town rather than short term economic income (if it is even net positive income). |
| Take some of the money and build a dorm and parking garage, then we could get staff to work. |
| Tax this form of tourism. |
| Thank you for asking, and for putting out this survey. I spent 12 intense years as a server, bartender, and restaurant manager in Bar Harbor from 2006-18. Cruise ship traffic did nonly positively affect restaurant businesses in the fall shoulder season for about 1.5 hours at lunchtime. Servers (many) resent ships because staffing demands someone show up for critical mass at lunch and be cut from service soon after the lunch rush. This cruise ship traffic timing is not conducive to healthy staffing welfare. In the fall only, a day-long and night schedule of passengers visiting shore would actually benefit restaurants and hopefully encourage folks to explore beyond the immediate dock areas, where lots of the the money they spend is not going in local pockets! |
| Thank you for taking the time and all the effort to navigate this. |
| Thank you! |
| Thankful for the town council and the work they do. I hope they will find that cruise ships are truly beneficial for our businesses. |
| Thanks for asking! |
| the $250 yearly fee for weekly rentals units should also be applied to all (motel, hotel, B&B etc) businesses - wy just weekly rentals - think of the yearly income!!. Random thought. |
| The average land tourist spends far more than by sea in our town. All parties benefit from no cruise ship industry. |
| The balance between keeping our important working waterfont and cruise ship and yacht vacationland. |
| The benefits of cruise ship tourism do not necessarily benefit locally-owned businesses, whose owners are not local. And some land-based tourists are turned off by the volume of people flooding the downtown area. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| the council is in favor of downtown merchants and only sees money from cruise ship addiction. The failure to entertain sustainable land-based tourist improvements (pedestrian mall) is tragic and myopic. |
| The council needs to deal with our overcrowding issues and parkign issues both from car traffic and cruise ships. |
| The council should consider eliminating cruise ship tourism.  The town's reputation as a quality fall destination will return. |
| The cruise ship industry has already started the transformation of the town. The town is no longer a place with unique specialty shops with local craft etc.. The town is turning into another Old Orchard beach, a T-Shirt town. |
| The cruise ship tourism impacts our public lands. For that reason, Bar Harbor should capture all of the revenue it can from cruise ship visits, including tendering facilities that benefit of the town, not a private business that is making over $1 million of revenue. |
| The cruise ships do not just impact Bar Harbor.  Bar Harbor may take in revenue from cruise ships and their passengers, but those ships impact the bay and the surrounding communities. As noted their exhaust blows our way.  The ships are an eyesore. They destroy lobstermen's gear. The engines disrupt harbor porpoise feeding areas.  I watched a town council meeting regarding the American Aquaculture proposal and council members blithely blew off questions from folks who were not residents.  Not very neighborly of them and awareness of how decisions are affecting others should be part of the process of weighing pros and cons as your neighbors, especially many of us in Sorrento have made the beauty of the bay a possibility by conserving the island in your view shed, or Stave, Dram, Prebble, and Bean.  The view is your business and we protect it.  How about you reciprocate those efforts? |
| The current situation helps the tee shirt and souvenir shops and not much else.  Please consider greatly reducing the number and size of cruise ships allowed. |
| The dollars spent by cruise passengers are not limited to the passengers actual stop in Bar Harbor as many like the area so much they return for visits by land. |
| The economic impact of cruise ships really seems small compared to land-based tourism. Keep that in perspective. |
| The fact that cruise ship passengers are also a population of people that will come visit again and stay longer |
| the fewer the better - pressure the cruise ship industry to improve or lower their environmental impact |
| The industry is "lawyering up" and will try to land as many people as possible. I suggest consulting with some lawyers in other cruise ship ports about coordinated efforts, and try to see how state legislators are being influenced by the industry. |
| The issue is so two-sided. I'd like to see more education around befits of this type of tourism, especially in the shoulder season. |
| The job provided by cruise ships are low paying seasonal jobs with housing shortages, making an unhealthy year-round place to live. |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| The key word here is management. I recommend maintaining the 2019 status quo, to the extent feasible, while working on a long-term plan. A plan should not, however, eliminate cruise ships as a source of town and local business revenue. |
| The large cruise ships really sour the small-town feel for people who are visiting/lodging and spending time here. |
| The main problem with cruise tourism in BH is overcrowding and congestion downtown and in the Town wharf area.  Resolution of this problem requires reducing daily passenger caps.  To determine appropriate caps (and to better plan for land based tourism), the following is recommended:  a) Determine the tourist carrying capacity of downtown BH (ie how many visitors can be comfortably and safely accommodated at one time?).  b) Determine the number of land based visitors coming to BH each month and per year.  c) Balance land based tourist (and local) business lost because of cruise overcrowding into determining passenger caps (land based tourism is far and away the major tourist revenue generator in BH). |
| The number of cruise passengers going ashore each day should be reduced. Only small buses should be used ot meet passengers for tours. A shuttle service for slow movers would help. |
| the number of visitors already exceeds capacity by a wide margin. The quality of life has degraded |
| The overarching issue remains affordable, year-round housing. |
| the overwhelming presence of ships and passengers is the worst thing that's happened to quality of life. Especially in town. During my 30+ years here. The views had from places like cadillac is ruining on cruise ship days. People don't come here to see paper mill sized machines. |
| The park has enough land-based traffic to drive the local economy. Weighing cruise ship benefits vs. the myriad negative impacts from them, one can only draw the following conclusion: do you want your children to remember Bar Harbor as an overcrowded, polluted, tourist trap with an okay economy and rude tourists or do you want your children to remember Bar Harbor as we remember it today - a beautiful, wild place with wonderful local people. |
| The problem isn't cruise ships. It's seasonal residents and Air BnB. Too much real estate speculation is making it impossible to live here. If you don't live here year-round, you shoudn't be allowed to rent short-term. |
| The recent level is unsustainable. Please do something. |
| The ships provide jobs for locals , collect fees and they are generally outta hear by 4pm . Better management of tendering and buses . |
| the town council needs a longer term vision for bar harbor as a living year round and summer community. There is too much emphasis on financial gains for a small group of interested parties |
| The Town Council needs to stop the acceptance of cruise ship passengers to our docks and the waters of Frenchman Bay that we have jurisdiction over. Businesses that have depended upon cruise ship passengers in the past need support to develop new business models that access land based tourists. |
| The town council should consider keeping Bar Harbor a vibrant fun port of call. |
| The town council should consider the impact to the year round population more. |
| The town has done such a poor job with this! The almighty dollar is not the businesses care ???? Ships in -- no parking -- you can't walk through town, but it will not charge because ??? Talks to the business owners. No parking plan and the curretn one sucks! |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| The town is over capacity when mega cruise ships suddenly disgorge thousands of people onto the streets at once. Something needs to be done to either regulate or better accommodate the sudden influx of tourists. |
| there are loud voices calling to end cruise ships and the complete removal would be entirely detrimental. Now there some ??? Days with too many people? Sure. It was rare and impact a small area. Please find a balance. Extremes are never the answer. |
| There are too many selfish people. Ships are great! Too many, no! Too few, no! Just compromise and regulate. It's easy, it's your job :) |
| there has to be another way to support local businesses and townspeople without dealing with ugly ships and ignorant tourists |
| There is already so much waste from lobster boats going into the waters. Money should not be consdireed before thinking about Acadia and the planet. |
| There is going to have to be a compromise between no cruise ships and the maximum number of cruise ships. How big an economic impact do cruise ships have for the businesses? |
| There is no answer that will make everyone happy but the cruise ship business needs to continue to directly benefit those who directly contribute to its success and help draw in the revenue |
| There seems to be some idea that it's completely natural for tourist numbers to increase year over year without end, but any move that might even arrest these numbers is an extreme idea. Bar Harbor will not be the Bar Harbor it is right now again no matter what happens, so either envision a future of higher quality, nature-focused tourism with less T-shirt shops and air pollution, or abdicate that responsibility and we'll see what kind of town we'll live in. |
| There would need to be serious overhaul of the streets and parking if cruise ships continue, including the popular attractions outside of Bar Harbor. If these improvements are made, then the charm of Bar Harbor will be lost which could be devastating to all the businesses both in Bar Harbor, but also the surrounding towns |
| They are beneficial to the overall economic health of the community, especially as yearround residents are forced out from due to lack of housing. We need the cruise ships to help fund this town |
| They are defacing Bar Harbor |
| They block the view! The reason people come up here! Should charge more for port fees. 1 million dollars is nothing. |
| They did not arise as a problem until the visits increased by almost double the amount then when they started visiting |
| They have taken over the town, a mess to try to get through buses and tour guides act like they own the town. |
| they should consider banning cruise ships |
| They should continue to come. |
| Think about all taxpayers and not just business owners who are the ones making the money off ships. Small island, too many people. |
| think about allowing landings in the early spring season and some during the fall when the population of BH is not so high. figure out a better way to disembark passengers - maybe a larger dedicated boat |

TOWN06100

# Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| instead of the small ones used by the cruise ship and let them pull into the motor lodge dock instead of messing  up the town pier area for the entire day. |
| Think about the people that live year-round. |
| Think big picture on how the cruise ships help the entire community, and work on being more pro business, as cruise ships and tourism is what makes Bar Harbor thrive. |
| Think hard. |
| think more of the quality of life than the bottom line |
| think of locals first, NOT money |
| Thinking broadly, Bar Harbor could again Become a fascinating town and destination in itself, and not just an adjunct to the park. There would be more businesses, more jobs, and more money. The cruise ships are throwing around big numbers, but in the end they cost the town and its residents and businesses a good deal more money than they provide. |
| this is not a black and white issue, it is one where a balance needs to be achieved between having ships visit and the local experience.   cruise ships provide an important economic impact to the town and business, however cutting back some of the passenger numbers with each visit can lessen the impact on land based tourists and to locals alike |
| this past year gave us a chance to remember what town was like before cruise ships. the future of continued increases in car tourists PLUS returning cruise ships will be untenable. |
| This questionnaire is a good idea. Monitor Frenchman's Bay ecosystem to ensure mineral degradation. |
| This survey contains many leading questions that are biased toward the cruise ship industry.     The questions regarding quality of life in BH  are difficult to answer in a multiple choice format.   During the "off season", BH is a wonderful place to live and raise children. Quality of life in BH is very bad in the summer.     The cruise ships impact and harm to our environment is tremendous. |
| this survey only reflects my own opinions, not my spouse's. you should have sent two, since we are both residents |
| This survey should have been addressed to the voters of Bar Harbor, with their name and a number assigned to each survey, for the purpose of tracking the accurate sentiment of each person that actually lives here. The way this has been sent to Current Occupant, with a code for others in the household. It looks like a recipe for inaccuracy, and fraud. |
| those who live in center Bar Harbor are likely more impacted than those who do not |
| To work with one another instead of against each other. Important to listen to you residents and businesses alike. |
| Too many passengers from cruise ships on the heaviest days create an atmosphere downtown that could be perceived as overcrowded and unpleasant |
| Too many people, cars no room for year-round residents. |
| Tour buses should park at Ferry Terminal and disburse from there. |
| Town Council is a bunch of corrupt people. Everyone knows this. |

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| Town council should strive to preserve and grow the local community in Bar Harbor and prevent it from becoming and unlivable year-round tourist destination. People don't want to have families here any more. |
| Track their return. We must get an idea of if/when tourists come back to Bar Harbor once they do a cruise. |
| Try to find a Balance between No Ships and Too many!  Fewer and smaller ships would be nice... |
| Try to manage the sheer volume. They are good for the economy and add a certain "flair" to the area, but too much of anything is never good. |
| Unload out of town. 2 ships max at any one time. |
| Use bluenose pier |
| Use cruise ship revenue to lower property taxes!!! |
| Use Ferry Terminal for tenders to and from ships; Have continuous Island Explorer shuttle pier to Village Green |
| use old ferry terminal more as a public space or park rather than business; more for residents w/ boats than tourists, make it green space, like Agamont Park |
| Use the ferry terminal--hop the bus and Hulls Cove entrance right there. Shoppers come in on town pier. |
| Use the income from cruise ship tourism to improve other roads such as Crooked Road and make better bicycle paths for resident and tourist bicyclists. Crooked Road is now very dangerous for bicyclists. |
| Using funds to lower property taxes from Q10 only rewards property owners, which obviously from the housing shortage is less than the number of year-round residents and think of something that will benefit more people. |
| Using the pandemic to attack cruise ships is sad |
| Utilize the ferry terminal for buses and cruise ships |
| Very concerned about the influence that cruise ship lobbyists are buying at the local and state level. |
| Very few businesses gain substantially from cruise ship passengers |
| wait please!! My family and I are long standing local residents & business owners |
| We all know there is a problem!! That's why you are doing a survey. Less people, ships and buses. It all centers around greed. |
| We are a thriving coastal community without cruise ships, and the presence of cruise ships only detracts from what makes Bar Harbor a special place. |
| we are a tourism town, so there will be people and ships. Take parking money and ship money buy parking land |
| We are a tourist destination. We all know that without the tourists the town wouldn't be as financially robust. We need to continue to have the cruise ships but manage town a bit better when they are here. We are fortunate that Bar Harbor is a destination - it brings many people to our town and they allow our shops to thrive. We know we must deal with some inconvenience during the busy months bc that's what makes BH what it is today. |

DX323.322

App. 626

TOWN06102

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| We are a town. Not everyone who cares or the loudest voices. Who does the council serve? Voters? Residents? Taxpayers? Businesses? |
| We are already a tourist destination. I believe tourists who come for ANP are more desirable for our community. |
| We are already overcrowded each summer; cruise ships make this worse. |
| We are not Disney World. |
| We believe cruise tourism is a very positive thing for the economy of our little town.  All tourism is important for the few months that it exists each year.  The improvements that are needed evolve around better distribution of the tourists while they are visiting us.  The new ferry wharf (on the edge of town) should be used as tourist transportation hub for the cruise passengers to be filtered thru in addition to making sure that the downtown wharf continues to be used as well to encourage shopping and eating at the in town businesses.  There should be 2 tender stops in Bar Harbor.  One for buses to meet passengers and one for downtown shops. |
| We can choose between being a community that shares a portal into amazing experiences of nature with visitors ready to grow and pay good money for a good experience or a cheap storefront for crowds of people gawking at us and inexpensive souvenirs which they buy before returning to their massive carbon footprint boats. |
| We can't control number of land visitors, but we can meter number of ship passengers. Don't ban, but [illegible] peak seasons. |
| We feel cruise ships are important to our economy and bring tourists who may revisit our town. |
| We feel that Oli's Trolley and NPTours do an outstnaidng job with having a "place" to load and unload that is not just in the street. |
| We have a housing problem- not a cruise ship problem |
| We have been concentrating on the quantity of visitors, let's concentrate on the quality of visitors who will be more enduring. |
| We have so many land travel tourists. Let's do that well and not add so much we destroy this beautiful town. |
| We have to decide whether it is more important to increase out town budget by inviting more cruise ships, or to maintain the quality of life for our year round residents.  I think we're willing to share what we have here.  And I realize how important the tourism industry is to us.  But there needs to be a balance for both.    industry is |
| we know the town counts on the cruise ships, but ther eneeds to be a lot less of them and smaller ships - not so many peple |
| We need a bus system [illegible] - separate from Island Explorer |
| We need higher passenger fees and af ocus on quality over quantity. We should be hesitant to extrapolate too much from the Umaine study. |
| We need to consider the feelings of us who aren't economically vested in the tourism industry. This is our town, too. |
| We should limit the size of the cruise ships. The large ships (over 4,000 passengers) are way too big for a small town like Bar Harbor. |

# Appendix B – Verbatim Responses to Open-Ended Questions

Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| we should not get dependent on cruise ship money |
| We think Bar Harbor has made a serious mistake in encouraging large cruise ships. |
| We took a cruise ship to Bar Harbor once. It was a positive experience. We took a tender in and walked ot our condo, took our bikes out and took a bike ride. The whole thing was fun, rather than coming into town by car. |
| We understand its a tough balance, but also remember years and years when Bar Harbor/MDI did fine without the cruise ship industry. Not worth sacrificing our waters, land, etc. |
| We used to own a business on Cape Cod. We would have loved the 'problem' of having too many tourists. Stop complaining. We have all winter to have the streets to ourselves. |
| we wish for bar harbor to be a comfortable place to live - less congestion, a place to park - being able to shop locally we've had to shop at hannaford in ellsworth - no a and b naturals, no sherman's bookstore, too crosded. I miss shopping locally, but no parking |
| We worked so diligently on getting the shoulder season to be more robust. Businesses have grown, staff have longer more profitable income in the spring and fall, and staff are staying longer through out the year.  If the outcome of this investigation is to reduce to remove cruise PAX from the local economy then the town should begin working on a substitute so that the community can continue to have a more full year source of income and businesses available to them. |
| We would like to have a type of 30-minute in-town parking for "pick-ups," etc. for locals. |
| Weigh both sides and don't pay complete attention to vocal minority of anti-cruise people.  Bar Harbor businesses, as well as the town, rely on ships. |
| Weigh the expenses caused by the many cruise ships to balance out the so called benefits that seem inflated. |
| we've become a tee-shirt town, cruise ship passengers are cash cows for businesses near waterfront, outer areas of cottage st and main street don't get the flow - tour bus fees to town for lost revenue to town parking meters - less cars able to use them. locals aren't able to enjoy the their own town! |
| what happened to the international ferry terminal? |
| When managing, always have as the highest priority Bar Harbor's multifaceted beauty and village image. |
| When tour buses take passengers to places of interests. Town individuals make big bucks. Should be limited. |
| When will you act for the next generation rather than your own? |
| While cruise ships undeniably bring revenue to the town, it is not worth it.  The damage to the oceans and the town in general overwhelmingly weigh against allowing cruise ships. |
| while stale contributions have increased, they should not be 100% dependant, as COVID showed. Distributing cruise arrival, places on different parts of the island, while scheduling bar harbor visit might manage the environs. |
| Why not limit size and number of ships this summer and see how it goes? |
| Wish I had the magic solution. Appreciate council trying, but it's divided too. |
| With Covid still here and Cruise Ships not returning this year I think this topic can wait |

DX323.324

# Appendix B – Verbatim Responses to Open-Ended Questions

## Q18: Do you have any other suggestions for the Town Council as they consider the management of cruise ship tourism in Bar Harbor?

| |
|---|
| With increasing (global) carbon regulations, it's a dying industry, make policy to shift away from reliance on it. |
| without cruise ships, more people were willing to come to BH. In many ways it was a fantastic year (2020) |
| Work together and try to solve problems when they appear--this town is built on tourism!! |
| Work with NPS to better manage Loop Road plan. Access should not be heavily restricted to locals and businesses. |
| Worry more about the locals! |
| Worst time in history to attack businesses. |
| would be more supportive if local business (locally owned and operated) benefited too many seasonal ships |
| Would like the ferry to NS back |
| X |
| Yep, get rid of Gary Friedman and Matthew Hochman. Cruise ships are vital to our local economy. |
| yes, don't have any! If we must, see #14 and use ferry terminal to tender, and anchor behind BAR Island. Keep buses from clogging up our scenic waterfront. |
| Yes, let the cruise ships come. |
| Yes, lots of public forums, but not in the summer. |
| Yes, put your personal opinions aside. You work for us!!! |
| Yes, to please eliminate cruise ships. The extra 2-3% in taxpayer cost is worth not having cruise ships here. I believe that their are other ways the the lost cruise ship revenue can  be duplicated. I think town should focus on bringing better paying jobs to town. Cruise ship tourism does not provide middle income year round wages with benefits to our residents. |
| Yes, Town Council residents only, should make a decision for all year-round taxpayers. Not for their personal gains |
| Yes. Do not let these COVID factories invade our home this year. And ban the larger(200+passenger) ships. |
| You are blaming cruise ships for what vacation rentals are doing to the Town |
| You can not only "probably ban cruise ship visitations," you have already done so and are encouraged to continue. |
| you have a golden egg, and you are killing the goose- imagine what you want for your future, and imagine it as sustainable, ecologically sound, and in your own control, not in an ever more crowded harmful cycle of hundreds upon hundreds of ships, the town being completely dependent upon and existing solely for the benefit of the cruise ship industry. Because this is the future as it is now. What a beautiful and culturally rich area this- what a precious place MDI is. You really don't need them. The pandemic has shown how dangerous for human health cruise ships are, and how people from all  over want to live as well as and recreate in Maine- |
| You should ask the churches if they notice that the ships were missing. |

DX323.325

# Appendix C

*Statistical Cross-Tabulations*

# Statistical Cross-Tabulations - Town of Bar Harbor Survey

*Pan Atlantic Research*

*June, 2021*

## Introductory Questions

Table 1: As a member of the Bar Harbor community, how would you rate the Town of Bar Harbor on each of the following?
OVERALL QUALITY OF LIFE (Q3a)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Total | **1378** | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Very poor** | 7 | 6 | 1 | 7 | 0 | 0 | 0 | 6 |
| | **0.5%** | 0.5% | 0.6% | 0.7% | 0.0% | 0.0% | 0.0% | 1.2% |
| **2** | 21 | 11 | 6 | 16 | 2 | 3 | 6 | 7 |
| | **1.5%** | 1.0% | 3.4% | 1.6% | 1.0% | 1.9% | 1.0% | 1.4% |
| **3** | 175 | 122 | 36 | 135 | 12 | 22 | 71 | 56 |
| | **12.7%** | 11.2% | 20.3% | 13.7% | 5.8% | 13.9% | 11.3% | 11.3% |
| **4** | 571 | 453 | 73 | 416 | 82 | 62 | 255 | 212 |
| | **41.4%** | 41.5% | 41.2% | 42.2% | 39.6% | 39.2% | 40.5% | 42.7% |
| **5 - Excellent** | 582 | 486 | 58 | 400 | 105 | 67 | 286 | 211 |
| | **42.2%** | 44.5% | 32.8% | 40.6% | 50.7% | 42.4% | 45.4% | 42.5% |
| **Don't know** | 8 | 3 | 1 | 2 | 3 | 3 | 4 | 1 |
| | **0.6%** | 0.3% | 0.6% | 0.2% | 1.4% | 1.9% | 0.6% | 0.2% |
| **No response** | 14 | 11 | 2 | 9 | 3 | 1 | 8 | 4 |
| | **1.0%** | 1.0% | 1.1% | 0.9% | 1.4% | 0.6% | 1.3% | 0.8% |

*Pan Atlantic Research: June, 2021*

Table 2: As a member of the Bar Harbor community, how would you rate the Town of Bar Harbor on each of the following?
OVERALL QUALITY OF LIFE (Q3a)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | **1378** | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Very poor** | 7 | 2 | 4 | 1 | 2 | 4 | 0 | 1 | 5 | 1 |
| | **0.5%** | 1.0% | 0.7% | 0.2% | 0.9% | 1.0% | 0.0% | 0.3% | 1.2% | 0.2% |
| **2** | 21 | 6 | 10 | 2 | 2 | 8 | 3 | 6 | 7 | 4 |
| | **1.5%** | 2.9% | 1.8% | 0.4% | 0.9% | 2.0% | 0.7% | 2.0% | 1.7% | 0.8% |
| **3** | 175 | 41 | 61 | 51 | 29 | 44 | 45 | 45 | 42 | 61 |
| | **12.7%** | 20.1% | 11.1% | 9.8% | 13.2% | 10.8% | 10.6% | 15.1% | 10.0% | 11.4% |
| **4** | 571 | 87 | 225 | 211 | 90 | 176 | 158 | 117 | 183 | 218 |
| | **41.4%** | 42.6% | 41.0% | 40.7% | 41.1% | 43.0% | 37.2% | 39.1% | 43.5% | 40.9% |
| **5 - Excellent** | 582 | 66 | 243 | 242 | 90 | 174 | 211 | 121 | 183 | 240 |
| | **42.2%** | 32.4% | 44.3% | 46.7% | 41.1% | 42.5% | 49.6% | 40.5% | 43.5% | 45.0% |
| **Don't know** | 8 | 1 | 4 | 2 | 1 | 1 | 5 | 3 | 0 | 5 |
| | **0.6%** | 0.5% | 0.7% | 0.4% | 0.5% | 0.2% | 1.2% | 1.0% | 0.0% | 0.9% |
| **No response** | 14 | 1 | 2 | 9 | 5 | 2 | 3 | 6 | 1 | 4 |
| | **1.0%** | 0.5% | 0.4% | 1.7% | 2.3% | 0.5% | 0.7% | 2.0% | 0.2% | 0.8% |

*Pan Atlantic Research: June, 2021*

Table 3: Mean of Q3a

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| **Mean** | **4.25** | 4.30 | 4.04 | 4.22 | 4.44 | 4.25 | 4.33 | 4.25 |
| **Std Error** | **0.02** | 0.02 | 0.06 | 0.03 | 0.05 | 0.06 | 0.03 | 0.04 |
| **Valid N** | **1356** | 1078 | 174 | 974 | 201 | 154 | 618 | 492 |

*Pan Atlantic Research: June, 2021*

DX323.327

App. 631

TOWN06107

Table 4: Mean of Q3a

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | *18-44* | *45-64* | *65+* | *<50k* | *$50k-100k* | *100k+* | *Less than 4-year degree* | *4-year degree* | *Post-graduate degree* |
| **Mean** | **4.25** | 4.03 | 4.28 | 4.36 | 4.24 | 4.25 | 4.38 | 4.21 | 4.27 | 4.32 |
| **Std Error** | **0.02** | 0.06 | 0.03 | 0.03 | 0.05 | 0.04 | 0.03 | 0.05 | 0.04 | 0.03 |
| **Valid N** | **1356** | 202 | 543 | 507 | 213 | 406 | 417 | 290 | 420 | 524 |

*Pan Atlantic Research: June, 2021*

Table 5: As a member of the Bar Harbor community, how would you rate the Town of Bar Harbor on each of the following? AS A PLACE TO RAISE CHILDREN (Q3b)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | *Own* | *Rent* | *Year-round resident* | *Seasonal resident* | *Business-owner (resident or non-resident)* | *Female* | *Male* |
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Very poor** | 7 | 4 | 1 | 5 | 0 | 2 | 1 | 5 |
| | **0.5%** | 0.4% | 0.6% | 0.5% | 0.0% | 1.3% | 0.2% | 1.0% |
| **2** | 22 | 9 | 7 | 15 | 1 | 5 | 8 | 6 |
| | **1.6%** | 0.8% | 4.0% | 1.5% | 0.5% | 3.2% | 1.3% | 1.2% |
| **3** | 108 | 84 | 18 | 82 | 16 | 8 | 39 | 40 |
| | **7.8%** | 7.7% | 10.2% | 8.3% | 7.7% | 5.1% | 6.2% | 8.0% |
| **4** | 386 | 304 | 51 | 294 | 37 | 46 | 168 | 137 |
| | **28.0%** | 27.8% | 28.8% | 29.8% | 17.9% | 29.1% | 26.7% | 27.6% |
| **5 - Excellent** | 573 | 484 | 51 | 428 | 64 | 69 | 276 | 219 |
| | **41.6%** | 44.3% | 28.8% | 43.5% | 30.9% | 43.7% | 43.8% | 44.1% |
| **Don't know** | 269 | 199 | 45 | 155 | 87 | 24 | 133 | 87 |
| | **19.5%** | 18.2% | 25.4% | 15.7% | 42.0% | 15.2% | 21.1% | 17.5% |
| **No response** | 13 | 8 | 4 | 6 | 2 | 4 | 5 | 3 |
| | **0.9%** | 0.7% | 2.3% | 0.6% | 1.0% | 2.5% | 0.8% | 0.6% |

*Pan Atlantic Research: June, 2021*

Table 6: As a member of the Bar Harbor community, how would you rate the Town of Bar Harbor on each of the following? AS A PLACE TO RAISE CHILDREN (Q3b)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | *18-44* | *45-64* | *65+* | *<50k* | *$50k-100k* | *100k+* | *Less than 4-year degree* | *4-year degree* | *Post-graduate degree* |
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Very poor** | 7 | 2 | 4 | 1 | 3 | 3 | 1 | 3 | 2 | 2 |
| | **0.5%** | 1.0% | 0.7% | 0.2% | 1.4% | 0.7% | 0.2% | 1.0% | 0.5% | 0.4% |
| **2** | 22 | 9 | 8 | 3 | 7 | 5 | 4 | 5 | 7 | 8 |
| | **1.6%** | 4.4% | 1.5% | 0.6% | 3.2% | 1.2% | 0.9% | 1.7% | 1.7% | 1.5% |
| **3** | 108 | 20 | 41 | 34 | 15 | 24 | 32 | 26 | 32 | 34 |
| | **7.8%** | 9.8% | 7.5% | 6.6% | 6.8% | 5.9% | 7.5% | 8.7% | 7.6% | 6.4% |
| **4** | 386 | 51 | 151 | 136 | 63 | 112 | 109 | 95 | 106 | 134 |
| | **28.0%** | 25.0% | 27.5% | 26.3% | 28.8% | 27.4% | 25.6% | 31.8% | 25.2% | 25.1% |
| **5 - Excellent** | 573 | 72 | 237 | 243 | 86 | 195 | 188 | 126 | 183 | 233 |
| | **41.6%** | 35.3% | 43.2% | 46.9% | 39.3% | 47.7% | 44.2% | 42.1% | 43.5% | 43.7% |
| **Don't know** | 269 | 49 | 103 | 97 | 42 | 68 | 86 | 40 | 88 | 120 |
| | **19.5%** | 24.0% | 18.8% | 18.7% | 19.2% | 16.6% | 20.2% | 13.4% | 20.9% | 22.5% |
| **No response** | 13 | 1 | 5 | 4 | 3 | 2 | 5 | 4 | 3 | 2 |
| | **0.9%** | 0.5% | 0.9% | 0.8% | 1.4% | 0.5% | 1.2% | 1.3% | 0.7% | 0.4% |

*Pan Atlantic Research: June, 2021*

Table 7: Mean of Q3b

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | *Own* | *Rent* | *Year-round resident* | *Seasonal resident* | *Business-owner (resident or non-resident)* | *Female* | *Male* |
| **Mean** | **4.36** | 4.42 | 4.12 | 4.37 | 4.39 | 4.35 | 4.44 | 4.37 |
| **Std Error** | **0.02** | 0.02 | 0.08 | 0.03 | 0.07 | 0.08 | 0.03 | 0.04 |
| **Valid N** | **1096** | 885 | 128 | 824 | 118 | 130 | 492 | 407 |

*Pan Atlantic Research: June, 2021*

DX323.328

App. 632  TOWN06108

Table 8: Mean of Q3b

|  | *Total* | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  | *18-44* | *45-64* | *65+* | *<50k* | *$50k-100k* | *100k+* | *Less than 4-year degree* | *4-year degree* | *Post-graduate degree* |
| **Mean** | **4.36** | 4.18 | 4.38 | 4.48 | 4.28 | 4.45 | 4.43 | 4.32 | 4.40 | 4.43 |
| **Std Error** | **0.02** | 0.08 | 0.04 | 0.03 | 0.07 | 0.04 | 0.04 | 0.05 | 0.04 | 0.04 |
| **Valid N** | **1096** | 154 | 441 | 417 | 174 | 339 | 334 | 255 | 330 | 411 |

*Pan Atlantic Research: June, 2021*

Table 9: As a member of the Bar Harbor community, how would you rate the Town of Bar Harbor on each of the following? AS A PLACE TO LIVE (Q3c)

|  | *Total* | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
|  |  | *Own* | *Rent* | *Year-round resident* | *Seasonal resident* | *Business-owner (resident or non-resident)* | *Female* | *Male* |
| **Total** | **1378** | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
|  | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Very poor** | **6** | 2 | 2 | 4 | 0 | 2 | 1 | 3 |
|  | **0.4%** | 0.2% | 1.1% | 0.4% | 0.0% | 1.3% | 0.2% | 0.6% |
| **2** | **33** | 19 | 6 | 23 | 2 | 6 | 8 | 11 |
|  | **2.4%** | 1.7% | 3.4% | 2.3% | 1.0% | 3.8% | 1.3% | 2.2% |
| **3** | **174** | 118 | 35 | 128 | 15 | 25 | 82 | 55 |
|  | **12.6%** | 10.8% | 19.8% | 13.0% | 7.2% | 15.8% | 13.0% | 11.1% |
| **4** | **528** | 420 | 66 | 376 | 81 | 61 | 217 | 203 |
|  | **38.3%** | 38.5% | 37.3% | 38.2% | 39.1% | 38.6% | 34.4% | 40.8% |
| **5 - Excellent** | **618** | 523 | 66 | 451 | 100 | 58 | 310 | 221 |
|  | **44.8%** | 47.9% | 37.3% | 45.8% | 48.3% | 36.7% | 49.2% | 44.5% |
| **Don't know** | **11** | 5 | 1 | 0 | 7 | 4 | 9 | 1 |
|  | **0.8%** | 0.5% | 0.6% | 0.0% | 3.4% | 2.5% | 1.4% | 0.2% |
| **No response** | **8** | 5 | 1 | 3 | 2 | 2 | 3 | 3 |
|  | **0.6%** | 0.5% | 0.6% | 0.3% | 1.0% | 1.3% | 0.5% | 0.6% |

*Pan Atlantic Research: June, 2021*

Table 10: As a member of the Bar Harbor community, how would you rate the Town of Bar Harbor on each of the following? AS A PLACE TO LIVE (Q3c)

|  | *Total* | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  | *18-44* | *45-64* | *65+* | *<50k* | *$50k-100k* | *100k+* | *Less than 4-year degree* | *4-year degree* | *Post-graduate degree* |
| **Total** | **1378** | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
|  | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Very poor** | **6** | 3 | 1 | 1 | 2 | 3 | 0 | 2 | 3 | 1 |
|  | **0.4%** | 1.5% | 0.2% | 0.2% | 0.9% | 0.7% | 0.0% | 0.7% | 0.7% | 0.2% |
| **2** | **33** | 9 | 17 | 3 | 6 | 13 | 2 | 8 | 15 | 3 |
|  | **2.4%** | 4.4% | 3.1% | 0.6% | 2.7% | 3.2% | 0.5% | 2.7% | 3.6% | 0.6% |
| **3** | **174** | 45 | 68 | 41 | 31 | 43 | 46 | 32 | 51 | 65 |
|  | **12.6%** | 22.1% | 12.4% | 7.9% | 14.2% | 10.5% | 10.8% | 10.7% | 12.1% | 12.2% |
| **4** | **528** | 79 | 209 | 190 | 75 | 163 | 152 | 117 | 151 | 209 |
|  | **38.3%** | 38.7% | 38.1% | 36.7% | 34.2% | 39.9% | 35.8% | 39.1% | 35.9% | 39.2% |
| **5 - Excellent** | **618** | 63 | 249 | 276 | 102 | 186 | 218 | 133 | 195 | 252 |
|  | **44.8%** | 30.9% | 45.4% | 53.3% | 46.6% | 45.5% | 51.3% | 44.5% | 46.3% | 47.3% |
| **Don't know** | **11** | 5 | 3 | 3 | 1 | 1 | 4 | 5 | 4 | 1 |
|  | **0.8%** | 2.5% | 0.5% | 0.6% | 0.5% | 0.2% | 0.9% | 1.7% | 1.0% | 0.2% |
| **No response** | **8** | 0 | 2 | 4 | 2 | 0 | 3 | 2 | 2 | 2 |
|  | **0.6%** | 0.0% | 0.4% | 0.8% | 0.9% | 0.0% | 0.7% | 0.7% | 0.5% | 0.4% |

*Pan Atlantic Research: June, 2021*

Table 11: Mean of Q3c

|  | *Total* | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
|  |  | *Own* | *Rent* | *Year-round resident* | *Seasonal resident* | *Business-owner (resident or non-resident)* | *Female* | *Male* |
| **Mean** | **4.26** | 4.33 | 4.07 | 4.27 | 4.41 | 4.10 | 4.34 | 4.27 |
| **Std Error** | **0.02** | 0.02 | 0.07 | 0.03 | 0.05 | 0.07 | 0.03 | 0.04 |
| **Valid N** | **1359** | 1082 | 175 | 982 | 198 | 152 | 618 | 493 |

*Pan Atlantic Research: June, 2021*

## Table 12: Mean of Q3c

|  | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  | *18-44* | *45-64* | *65+* | *<50k* | *$50k-100k* | *100k+* | *Less than 4-year degree* | *4-year degree* | *Post-graduate degree* |
| **Mean** | **4.26** | 3.95 | 4.26 | 4.44 | 4.25 | 4.26 | 4.40 | 4.27 | 4.25 | 4.34 |
| **Std Error** | **0.02** | 0.07 | 0.04 | 0.03 | 0.06 | 0.04 | 0.03 | 0.05 | 0.04 | 0.03 |
| **Valid N** | **1359** | 199 | 544 | 511 | 216 | 408 | 418 | 292 | 415 | 530 |

*Pan Atlantic Research: June, 2021*

## Table 13: As a member of the Bar Harbor community, how would you rate the Town of Bar Harbor on each of the following? AS A PLACE TO RETIRE (Q3d)

|  | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
|  |  | *Own* | *Rent* | *Year-round resident* | *Seasonal resident* | *Business-owner (resident or non-resident)* | *Female* | *Male* |
| **Total** | **1378** | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
|  | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Very poor** | **26** | 11 | 7 | 20 | 1 | 5 | 4 | 11 |
|  | **1.9%** | 1.0% | 4.0% | 2.0% | 0.5% | 3.2% | 0.6% | 2.2% |
| **2** | **84** | 61 | 9 | 65 | 2 | 16 | 30 | 36 |
|  | **6.1%** | 5.6% | 5.1% | 6.6% | 1.0% | 10.1% | 4.8% | 7.2% |
| **3** | **243** | 195 | 26 | 169 | 34 | 33 | 105 | 93 |
|  | **17.6%** | 17.9% | 14.7% | 17.2% | 16.4% | 20.9% | 16.7% | 18.7% |
| **4** | **357** | 292 | 36 | 254 | 53 | 45 | 150 | 129 |
|  | **25.9%** | 26.7% | 20.3% | 25.8% | 25.6% | 28.5% | 23.8% | 26.0% |
| **5 - Excellent** | **489** | 407 | 53 | 340 | 95 | 43 | 250 | 182 |
|  | **35.5%** | 37.3% | 29.9% | 34.5% | 45.9% | 27.2% | 39.7% | 36.6% |
| **Don't know** | **168** | 118 | 45 | 131 | 21 | 14 | 87 | 43 |
|  | **12.2%** | 10.8% | 25.4% | 13.3% | 10.1% | 8.9% | 13.8% | 8.7% |
| **No response** | **11** | 8 | 1 | 6 | 1 | 2 | 4 | 3 |
|  | **0.8%** | 0.7% | 0.6% | 0.6% | 0.5% | 1.3% | 0.6% | 0.6% |

*Pan Atlantic Research: June, 2021*

## Table 14: As a member of the Bar Harbor community, how would you rate the Town of Bar Harbor on each of the following? AS A PLACE TO RETIRE (Q3d)

|  | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  | *18-44* | *45-64* | *65+* | *<50k* | *$50k-100k* | *100k+* | *Less than 4-year degree* | *4-year degree* | *Post-graduate degree* |
| **Total** | **1378** | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
|  | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Very poor** | **26** | 7 | 11 | 2 | 8 | 10 | 0 | 10 | 7 | 4 |
|  | **1.9%** | 3.4% | 2.0% | 0.4% | 3.7% | 2.4% | 0.0% | 3.3% | 1.7% | 0.8% |
| **2** | **84** | 12 | 43 | 20 | 6 | 28 | 26 | 18 | 30 | 25 |
|  | **6.1%** | 5.9% | 7.8% | 3.9% | 2.7% | 6.8% | 6.1% | 6.0% | 7.1% | 4.7% |
| **3** | **243** | 29 | 110 | 84 | 33 | 65 | 83 | 63 | 64 | 92 |
|  | **17.6%** | 14.2% | 20.0% | 16.2% | 15.1% | 15.9% | 19.5% | 21.1% | 15.2% | 17.3% |
| **4** | **357** | 34 | 136 | 147 | 50 | 112 | 100 | 73 | 118 | 129 |
|  | **25.9%** | 16.7% | 24.8% | 28.4% | 22.8% | 27.4% | 23.5% | 24.4% | 28.0% | 24.2% |
| **5 - Excellent** | **489** | 43 | 179 | 247 | 87 | 141 | 161 | 108 | 137 | 217 |
|  | **35.5%** | 21.1% | 32.6% | 47.7% | 39.7% | 34.5% | 37.9% | 36.1% | 32.5% | 40.7% |
| **Don't know** | **168** | 78 | 68 | 13 | 34 | 51 | 50 | 25 | 64 | 62 |
|  | **12.2%** | 38.2% | 12.4% | 2.5% | 15.5% | 12.5% | 11.8% | 8.4% | 15.2% | 11.6% |
| **No response** | **11** | 1 | 2 | 5 | 1 | 2 | 5 | 2 | 1 | 4 |
|  | **0.8%** | 0.5% | 0.4% | 1.0% | 0.5% | 0.5% | 1.2% | 0.7% | 0.2% | 0.8% |

*Pan Atlantic Research: June, 2021*

## Table 15: Mean of Q3d

|  | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
|  |  | *Own* | *Rent* | *Year-round resident* | *Seasonal resident* | *Business-owner (resident or non-resident)* | *Female* | *Male* |
| **Mean** | **4.00** | 4.06 | 3.91 | 3.98 | 4.29 | 3.74 | 4.14 | 3.96 |
| **Std Error** | **0.03** | 0.03 | 0.10 | 0.04 | 0.06 | 0.09 | 0.04 | 0.05 |
| **Valid N** | **1199** | 966 | 131 | 848 | 185 | 142 | 539 | 451 |

*Pan Atlantic Research: June, 2021*

DX323.330

App. 634

TOWN06110

DX323.331

Table 16: Mean of Q3d

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| **Mean** | **4.00** | 3.75 | 3.90 | 4.23 | 4.10 | 3.97 | 4.07 | 3.92 | 3.98 | 4.13 |
| **Std Error** | **0.03** | 0.11 | 0.05 | 0.04 | 0.08 | 0.06 | 0.05 | 0.07 | 0.06 | 0.04 |
| **Valid N** | **1199** | 125 | 479 | 500 | 184 | 356 | 370 | 272 | 356 | 467 |

*Pan Atlantic Research: June, 2021*

Table 17: As a member of the Bar Harbor community, how would you rate the Town of Bar Harbor on each of the following? AS A GOOD PLACE TO MAKE A LIVING (Q3e)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Very poor** | **37** | 29 | 3 | 29 | 4 | 3 | 18 | 9 |
| | **2.7%** | 2.7% | 1.7% | 2.9% | 1.9% | 1.9% | 2.9% | 1.8% |
| **2** | **207** | 153 | 39 | 161 | 27 | 13 | 86 | 66 |
| | **15.0%** | 14.0% | 22.0% | 16.3% | 13.0% | 8.2% | 13.7% | 13.3% |
| **3** | **407** | 312 | 64 | 301 | 48 | 49 | 176 | 158 |
| | **29.5%** | 28.6% | 36.2% | 30.6% | 23.2% | 31.0% | 27.9% | 31.8% |
| **4** | **367** | 302 | 34 | 269 | 34 | 58 | 181 | 122 |
| | **26.6%** | 27.7% | 19.2% | 27.3% | 16.4% | 36.7% | 28.7% | 24.5% |
| **5 - Excellent** | **186** | 145 | 23 | 136 | 14 | 33 | 83 | 84 |
| | **13.5%** | 13.3% | 13.0% | 13.8% | 6.8% | 20.9% | 13.2% | 16.9% |
| **Don't know** | **161** | 144 | 10 | 80 | 78 | 1 | 81 | 52 |
| | **11.7%** | 13.2% | 5.6% | 8.1% | 37.7% | 0.6% | 12.9% | 10.5% |
| **No response** | **13** | 7 | 4 | 9 | 2 | 1 | 5 | 6 |
| | **0.9%** | 0.6% | 2.3% | 0.9% | 1.0% | 0.6% | 0.8% | 1.2% |

*Pan Atlantic Research: June, 2021*

Table 18: As a member of the Bar Harbor community, how would you rate the Town of Bar Harbor on each of the following? AS A GOOD PLACE TO MAKE A LIVING (Q3e)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| **Total** | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Very poor** | 37 | 8 | 18 | 8 | 6 | 12 | 12 | 6 | 14 | 14 |
| | **2.7%** | 3.9% | 3.3% | 1.5% | 2.7% | 2.9% | 2.8% | 2.0% | 3.3% | 2.6% |
| **2** | 207 | 43 | 80 | 67 | 35 | 58 | 56 | 42 | 53 | 80 |
| | **15.0%** | 21.1% | 14.6% | 12.9% | 16.0% | 14.2% | 13.2% | 14.0% | 12.6% | 15.0% |
| **3** | 407 | 73 | 170 | 136 | 66 | 127 | 121 | 77 | 137 | 163 |
| | **29.5%** | 35.8% | 31.0% | 26.3% | 30.1% | 31.1% | 28.5% | 25.8% | 32.5% | 30.6% |
| **4** | 367 | 45 | 151 | 136 | 60 | 112 | 113 | 89 | 114 | 124 |
| | **26.6%** | 22.1% | 27.5% | 26.3% | 27.4% | 27.4% | 26.6% | 29.8% | 27.1% | 23.3% |
| **5 - Excellent** | 186 | 27 | 88 | 65 | 27 | 64 | 63 | 55 | 63 | 61 |
| | **13.5%** | 13.2% | 16.0% | 12.5% | 12.3% | 15.6% | 14.8% | 18.4% | 15.0% | 11.4% |
| **Don't know** | 161 | 8 | 40 | 97 | 19 | 35 | 57 | 24 | 37 | 89 |
| | **11.7%** | 3.9% | 7.3% | 18.7% | 8.7% | 8.6% | 13.4% | 8.0% | 8.8% | 16.7% |
| **No response** | 13 | 0 | 2 | 9 | 6 | 1 | 3 | 6 | 3 | 2 |
| | **0.9%** | 0.0% | 0.4% | 1.7% | 2.7% | 0.2% | 0.7% | 2.0% | 0.7% | 0.4% |

*Pan Atlantic Research: June, 2021*

Table 19: Mean of Q3e

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| **Mean** | **3.38** | 3.40 | 3.21 | 3.36 | 3.21 | 3.67 | 3.41 | 3.47 |
| **Std Error** | **0.03** | 0.03 | 0.08 | 0.03 | 0.09 | 0.08 | 0.04 | 0.05 |
| **Valid N** | **1204** | 941 | 163 | 896 | 127 | 156 | 544 | 439 |

*Pan Atlantic Research: June, 2021*

App. 635 TOWN06111

Table 20: Mean of Q3e

|  | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Mean | **3.38** | 3.20 | 3.42 | 3.44 | 3.35 | 3.42 | 3.44 | 3.54 | 3.42 | 3.31 |
| Std Error | **0.03** | 0.08 | 0.05 | 0.05 | 0.07 | 0.05 | 0.05 | 0.06 | 0.05 | 0.05 |
| Valid N | **1204** | 196 | 507 | 412 | 194 | 373 | 365 | 269 | 381 | 442 |

*Pan Atlantic Research: June, 2021*

Table 21: As a member of the Bar Harbor community, how would you rate the Town of Bar Harbor on each of the following? OPPORTUNITIES TO PARTICIPATE IN COMMUNITY MATTERS (Q3f)

|  | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
|  |  | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Total | **1378** | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
|  | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Very poor | **22** | 16 | 2 | 12 | 5 | 5 | 2 | 9 |
|  | **1.6%** | 1.5% | 1.1% | 1.2% | 2.4% | 3.2% | 0.3% | 1.8% |
| 2 | **58** | 42 | 10 | 42 | 5 | 10 | 21 | 18 |
|  | **4.2%** | 3.8% | 5.6% | 4.3% | 2.4% | 6.3% | 3.3% | 3.6% |
| 3 | **252** | 188 | 41 | 183 | 34 | 25 | 102 | 96 |
|  | **18.3%** | 17.2% | 23.2% | 18.6% | 16.4% | 15.8% | 16.2% | 19.3% |
| 4 | **525** | 419 | 69 | 389 | 65 | 62 | 242 | 199 |
|  | **38.1%** | 38.4% | 39.0% | 39.5% | 31.4% | 39.2% | 38.4% | 40.0% |
| 5 - Excellent | **437** | 368 | 43 | 325 | 63 | 45 | 225 | 147 |
|  | **31.7%** | 33.7% | 24.3% | 33.0% | 30.4% | 28.5% | 35.7% | 29.6% |
| Don't know | **67** | 48 | 8 | 24 | 31 | 9 | 35 | 20 |
|  | **4.9%** | 4.4% | 4.5% | 2.4% | 15.0% | 5.7% | 5.6% | 4.0% |
| No response | **17** | 11 | 4 | 10 | 4 | 2 | 3 | 8 |
|  | **1.2%** | 1.0% | 2.3% | 1.0% | 1.9% | 1.3% | 0.5% | 1.6% |

*Pan Atlantic Research: June, 2021*

Table 22: As a member of the Bar Harbor community, how would you rate the Town of Bar Harbor on each of the following? OPPORTUNITIES TO PARTICIPATE IN COMMUNITY MATTERS (Q3f)

|  | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Total | **1378** | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
|  | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Very poor | **22** | 4 | 9 | 4 | 2 | 5 | 5 | 1 | 7 | 8 |
|  | **1.6%** | 2.0% | 1.6% | 0.8% | 0.9% | 1.2% | 1.2% | 0.3% | 1.7% | 1.5% |
| 2 | **58** | 12 | 25 | 12 | 7 | 11 | 18 | 17 | 14 | 16 |
|  | **4.2%** | 5.9% | 4.6% | 2.3% | 3.2% | 2.7% | 4.2% | 5.7% | 3.3% | 3.0% |
| 3 | **252** | 54 | 99 | 76 | 39 | 62 | 79 | 58 | 69 | 89 |
|  | **18.3%** | 26.5% | 18.0% | 14.7% | 17.8% | 15.2% | 18.6% | 19.4% | 16.4% | 16.7% |
| 4 | **525** | 76 | 211 | 205 | 84 | 182 | 153 | 114 | 173 | 199 |
|  | **38.1%** | 37.3% | 38.4% | 39.6% | 38.4% | 44.5% | 36.0% | 38.1% | 41.1% | 37.3% |
| 5 - Excellent | **437** | 47 | 177 | 188 | 72 | 132 | 142 | 93 | 137 | 184 |
|  | **31.7%** | 23.0% | 32.2% | 36.3% | 32.9% | 32.3% | 33.4% | 31.1% | 32.5% | 34.5% |
| Don't know | **67** | 9 | 27 | 24 | 9 | 15 | 24 | 10 | 19 | 32 |
|  | **4.9%** | 4.4% | 4.9% | 4.6% | 4.1% | 3.7% | 5.6% | 3.3% | 4.5% | 6.0% |
| No response | **17** | 2 | 1 | 9 | 6 | 2 | 4 | 6 | 2 | 5 |
|  | **1.2%** | 1.0% | 0.2% | 1.7% | 2.7% | 0.5% | 0.9% | 2.0% | 0.5% | 0.9% |

*Pan Atlantic Research: June, 2021*

Table 23: Mean of Q3f

|  | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
|  |  | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Mean | **4.00** | 4.05 | 3.85 | 4.02 | 4.02 | 3.90 | 4.13 | 3.97 |
| Std Error | **0.03** | 0.03 | 0.07 | 0.03 | 0.07 | 0.08 | 0.03 | 0.04 |
| Valid N | **1294** | 1033 | 165 | 951 | 172 | 147 | 592 | 469 |

*Pan Atlantic Research: June, 2021*

DX323.332

App. 636

TOWN06112

### Table 24: Mean of Q3f

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | *18-44* | *45-64* | *65+* | *<50k* | *$50k-100k* | *100k+* | *Less than 4-year degree* | *4-year degree* | *Post-graduate degree* |
| **Mean** | **4.00** | 3.78 | 4.00 | 4.16 | 4.06 | 4.08 | 4.03 | 3.99 | 4.05 | 4.08 |
| **Std Error** | **0.03** | 0.07 | 0.04 | 0.04 | 0.06 | 0.04 | 0.05 | 0.05 | 0.05 | 0.04 |
| **Valid N** | **1294** | 193 | 521 | 485 | 204 | 392 | 397 | 283 | 400 | 496 |

*Pan Atlantic Research: June, 2021*

### Table 25: As a member of the Bar Harbor community, how would you rate the Town of Bar Harbor on each of the following? QUALITY OF TOWN GOVERNANCE (Q3g)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | *Own* | *Rent* | *Year-round resident* | *Seasonal resident* | *Business-owner (resident or non-resident)* | *Female* | *Male* |
| **Total** | **1378** | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Very poor** | **51** | 35 | 9 | 36 | 3 | 12 | 15 | 22 |
| | **3.7%** | 3.2% | 5.1% | 3.7% | 1.4% | 7.6% | 2.4% | 4.4% |
| **2** | **154** | 121 | 24 | 117 | 17 | 13 | 52 | 65 |
| | **11.2%** | 11.1% | 13.6% | 11.9% | 8.2% | 8.2% | 8.3% | 13.1% |
| **3** | **425** | 325 | 56 | 313 | 47 | 56 | 197 | 138 |
| | **30.8%** | 29.8% | 31.6% | 31.8% | 22.7% | 35.4% | 31.3% | 27.8% |
| **4** | **460** | 380 | 51 | 347 | 53 | 51 | 219 | 183 |
| | **33.4%** | 34.8% | 28.8% | 35.2% | 25.6% | 32.3% | 34.8% | 36.8% |
| **5 - Excellent** | **156** | 136 | 11 | 109 | 33 | 14 | 76 | 58 |
| | **11.3%** | 12.5% | 6.2% | 11.1% | 15.9% | 8.9% | 12.1% | 11.7% |
| **Don't know** | **123** | 90 | 24 | 59 | 52 | 10 | 66 | 28 |
| | **8.9%** | 8.2% | 13.6% | 6.0% | 25.1% | 6.3% | 10.5% | 5.6% |
| **No response** | **9** | 5 | 2 | 4 | 2 | 2 | 5 | 3 |
| | **0.7%** | 0.5% | 1.1% | 0.4% | 1.0% | 1.3% | 0.8% | 0.6% |

*Pan Atlantic Research: June, 2021*

### Table 26: As a member of the Bar Harbor community, how would you rate the Town of Bar Harbor on each of the following? QUALITY OF TOWN GOVERNANCE (Q3g)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | *18-44* | *45-64* | *65+* | *<50k* | *$50k-100k* | *100k+* | *Less than 4-year degree* | *4-year degree* | *Post-graduate degree* |
| **Total** | **1378** | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Very poor** | **51** | 10 | 22 | 12 | 8 | 13 | 12 | 10 | 12 | 17 |
| | **3.7%** | 4.9% | 4.0% | 2.3% | 3.7% | 3.2% | 2.8% | 3.3% | 2.9% | 3.2% |
| **2** | **154** | 30 | 62 | 41 | 17 | 39 | 42 | 44 | 47 | 38 |
| | **11.2%** | 14.7% | 11.3% | 7.9% | 7.8% | 9.5% | 9.9% | 14.7% | 11.2% | 7.1% |
| **3** | **425** | 65 | 176 | 151 | 76 | 121 | 126 | 94 | 123 | 174 |
| | **30.8%** | 31.9% | 32.1% | 29.2% | 34.7% | 29.6% | 29.6% | 31.4% | 29.2% | 32.6% |
| **4** | **460** | 57 | 174 | 201 | 83 | 154 | 128 | 106 | 158 | 167 |
| | **33.4%** | 27.9% | 31.7% | 38.8% | 37.9% | 37.7% | 30.1% | 35.5% | 37.5% | 31.3% |
| **5 - Excellent** | **156** | 10 | 70 | 69 | 18 | 51 | 70 | 23 | 47 | 76 |
| | **11.3%** | 4.9% | 12.8% | 13.3% | 8.2% | 12.5% | 16.5% | 7.7% | 11.2% | 14.3% |
| **Don't know** | **123** | 30 | 42 | 41 | 13 | 30 | 45 | 19 | 32 | 59 |
| | **8.9%** | 14.7% | 7.7% | 7.9% | 5.9% | 7.3% | 10.6% | 6.4% | 7.6% | 11.1% |
| **No response** | **9** | 2 | 3 | 3 | 4 | 1 | 2 | 3 | 2 | 2 |
| | **0.7%** | 1.0% | 0.5% | 0.6% | 1.8% | 0.2% | 0.5% | 1.0% | 0.5% | 0.4% |

*Pan Atlantic Research: June, 2021*

### Table 27: Mean of Q3g

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | *Own* | *Rent* | *Year-round resident* | *Seasonal resident* | *Business-owner (resident or non-resident)* | *Female* | *Male* |
| **Mean** | **3.41** | 3.46 | 3.21 | 3.41 | 3.63 | 3.29 | 3.52 | 3.41 |
| **Std Error** | **0.03** | 0.03 | 0.08 | 0.03 | 0.08 | 0.09 | 0.04 | 0.05 |
| **Valid N** | **1246** | 997 | 151 | 922 | 153 | 146 | 559 | 466 |

*Pan Atlantic Research: June, 2021*

DX323.333

App. 637   TOWN06113

Table 28: Mean of Q3g

|  | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Mean | **3.41** | 3.16 | 3.41 | 3.58 | 3.43 | 3.51 | 3.53 | 3.32 | 3.47 | 3.52 |
| Std Error | **0.03** | 0.07 | 0.04 | 0.04 | 0.06 | 0.05 | 0.05 | 0.06 | 0.05 | 0.04 |
| Valid N | **1246** | 172 | 504 | 474 | 202 | 378 | 378 | 277 | 387 | 472 |

*Pan Atlantic Research: June, 2021*


Table 29: How do you feel about the cruise ship industry as a whole, apart from its impact on Bar Harbor? (Q4)

|  | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
|  |  | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Total | **1378** | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
|  | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Very negative** | **342** | 275 | 47 | 257 | 46 | 34 | 174 | 99 |
|  | **24.8%** | 25.2% | 26.6% | 26.1% | 22.2% | 21.5% | 27.6% | 19.9% |
| **2** | **278** | 217 | 44 | 225 | 28 | 20 | 128 | 95 |
|  | **20.2%** | 19.9% | 24.9% | 22.8% | 13.5% | 12.7% | 20.3% | 19.1% |
| **3** | **351** | 299 | 37 | 250 | 53 | 38 | 159 | 131 |
|  | **25.5%** | 27.4% | 20.9% | 25.4% | 25.6% | 24.1% | 25.2% | 26.4% |
| **4** | **192** | 152 | 24 | 125 | 43 | 22 | 82 | 81 |
|  | **13.9%** | 13.9% | 13.6% | 12.7% | 20.8% | 13.9% | 13.0% | 16.3% |
| **5 - Very positive** | **189** | 133 | 22 | 115 | 32 | 40 | 70 | 84 |
|  | **13.7%** | 12.2% | 12.4% | 11.7% | 15.5% | 25.3% | 11.1% | 16.9% |
| **Don't know** | **20** | 13 | 3 | 11 | 4 | 3 | 14 | 6 |
|  | **1.5%** | 1.2% | 1.7% | 1.1% | 1.9% | 1.9% | 2.2% | 1.2% |
| **No response** | **6** | 3 | 0 | 2 | 1 | 1 | 3 | 1 |
|  | **0.4%** | 0.3% | 0.0% | 0.2% | 0.5% | 0.6% | 0.5% | 0.2% |

*Pan Atlantic Research: June, 2021*


Table 30: How do you feel about the cruise ship industry as a whole, apart from its impact on Bar Harbor? (Q4)

|  | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Total | **1378** | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
|  | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Very negative** | **342** | 66 | 124 | 120 | 66 | 99 | 94 | 63 | 92 | 153 |
|  | **24.8%** | 32.4% | 22.6% | 23.2% | 30.1% | 24.2% | 22.1% | 21.1% | 21.9% | 28.7% |
| **2** | **278** | 52 | 113 | 97 | 42 | 97 | 75 | 49 | 81 | 123 |
|  | **20.2%** | 25.5% | 20.6% | 18.7% | 19.2% | 23.7% | 17.6% | 16.4% | 19.2% | 23.1% |
| **3** | **351** | 39 | 134 | 145 | 49 | 107 | 112 | 84 | 114 | 124 |
|  | **25.5%** | 19.1% | 24.4% | 28.0% | 22.4% | 26.2% | 26.4% | 28.1% | 27.1% | 23.3% |
| **4** | **192** | 25 | 81 | 77 | 30 | 54 | 68 | 44 | 64 | 67 |
|  | **13.9%** | 12.3% | 14.8% | 14.9% | 13.7% | 13.2% | 16.0% | 14.7% | 15.2% | 12.6% |
| **5 - Very positive** | **189** | 20 | 86 | 68 | 26 | 46 | 69 | 51 | 61 | 58 |
|  | **13.7%** | 9.8% | 15.7% | 13.1% | 11.9% | 11.2% | 16.2% | 17.1% | 14.5% | 10.9% |
| **Don't know** | **20** | 2 | 8 | 8 | 6 | 5 | 4 | 8 | 6 | 5 |
|  | **1.5%** | 1.0% | 1.5% | 1.5% | 2.7% | 1.2% | 0.9% | 2.7% | 1.4% | 0.9% |
| **No response** | **6** | 0 | 3 | 3 | 0 | 1 | 3 | 0 | 3 | 3 |
|  | **0.4%** | 0.0% | 0.5% | 0.6% | 0.0% | 0.2% | 0.7% | 0.0% | 0.7% | 0.6% |

*Pan Atlantic Research: June, 2021*


Table 31: Mean of Q4

|  | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
|  |  | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Mean | **2.71** | 2.68 | 2.60 | 2.60 | 2.94 | 3.09 | 2.59 | 2.91 |
| Std Error | **0.04** | 0.04 | 0.10 | 0.04 | 0.10 | 0.12 | 0.05 | 0.06 |
| Valid N | **1352** | 1076 | 174 | 972 | 202 | 154 | 613 | 490 |

*Pan Atlantic Research: June, 2021*

DX323.334

App. 638   TOWN06114

Table 32: Mean of Q4

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | *18-44* | *45-64* | *65+* | *<50k* | *$50k-100k* | *100k+* | *Less than 4-year degree* | *4-year degree* | *Post-graduate degree* |
| **Mean** | **2.71** | 2.41 | 2.80 | 2.76 | 2.57 | 2.63 | 2.86 | 2.90 | 2.81 | 2.53 |
| **Std Error** | **0.04** | 0.09 | 0.06 | 0.06 | 0.09 | 0.06 | 0.07 | 0.08 | 0.07 | 0.06 |
| **Valid N** | **1352** | 202 | 538 | 507 | 213 | 403 | 418 | 291 | 412 | 525 |

*Pan Atlantic Research: June, 2021*

DX323.335

App. 639    TOWN06115

# Impact of Land-based and Cruise Ship Tourism

Table 33: How would you rate the impact of land-based tourism (cars, bus tours, etc.) on the overall quality of life for Bar Harbor residents? (Q5)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Total | **1378** | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Very negative** | **116** | 90 | 21 | 92 | 13 | 10 | 54 | 31 |
| | **8.4%** | 8.2% | 11.9% | 9.3% | 6.3% | 6.3% | 8.6% | 6.2% |
| **2** | **280** | 223 | 46 | 229 | 30 | 15 | 132 | 91 |
| | **20.3%** | 20.4% | 26.0% | 23.2% | 14.5% | 9.5% | 21.0% | 18.3% |
| **3** | **435** | 354 | 52 | 323 | 68 | 34 | 207 | 156 |
| | **31.6%** | 32.4% | 29.4% | 32.8% | 32.9% | 21.5% | 32.9% | 31.4% |
| **4** | **346** | 275 | 40 | 234 | 54 | 50 | 155 | 136 |
| | **25.1%** | 25.2% | 22.6% | 23.8% | 26.1% | 31.6% | 24.6% | 27.4% |
| **5 - Very positive** | **180** | 135 | 14 | 98 | 34 | 46 | 73 | 77 |
| | **13.1%** | 12.4% | 7.9% | 9.9% | 16.4% | 29.1% | 11.6% | 15.5% |
| **Don't know** | **7** | 5 | 1 | 2 | 2 | 3 | 3 | 2 |
| | **0.5%** | 0.5% | 0.6% | 0.2% | 1.0% | 1.9% | 0.5% | 0.4% |
| **No response** | **14** | 10 | 3 | 7 | 6 | 0 | 6 | 4 |
| | **1.0%** | 0.9% | 1.7% | 0.7% | 2.9% | 0.0% | 1.0% | 0.8% |

*Pan Atlantic Research: June, 2021*

Table 34: How would you rate the impact of land-based tourism (cars, bus tours, etc.) on the overall quality of life for Bar Harbor residents? (Q5)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | **1378** | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Very negative** | **116** | 22 | 45 | 35 | 22 | 31 | 24 | 30 | 26 | 42 |
| | **8.4%** | 10.8% | 8.2% | 6.8% | 10.0% | 7.6% | 5.6% | 10.0% | 6.2% | 7.9% |
| **2** | **280** | 46 | 118 | 97 | 38 | 98 | 86 | 52 | 96 | 106 |
| | **20.3%** | 22.5% | 21.5% | 18.7% | 17.4% | 24.0% | 20.2% | 17.4% | 22.8% | 19.9% |
| **3** | **435** | 57 | 158 | 186 | 75 | 132 | 120 | 85 | 125 | 187 |
| | **31.6%** | 27.9% | 28.8% | 35.9% | 34.2% | 32.3% | 28.2% | 28.4% | 29.7% | 35.1% |
| **4** | **346** | 51 | 136 | 132 | 54 | 97 | 123 | 79 | 117 | 128 |
| | **25.1%** | 25.0% | 24.8% | 25.5% | 24.7% | 23.7% | 28.9% | 26.4% | 27.8% | 24.0% |
| **5 - Very positive** | **180** | 26 | 85 | 58 | 29 | 44 | 68 | 48 | 54 | 60 |
| | **13.1%** | 12.7% | 15.5% | 11.2% | 13.2% | 10.8% | 16.0% | 16.1% | 12.8% | 11.3% |
| **Don't know** | **7** | 0 | 3 | 4 | 1 | 0 | 2 | 3 | 1 | 3 |
| | **0.5%** | 0.0% | 0.5% | 0.8% | 0.5% | 0.0% | 0.5% | 1.0% | 0.2% | 0.6% |
| **No response** | **14** | 2 | 4 | 6 | 0 | 7 | 2 | 2 | 2 | 7 |
| | **1.0%** | 1.0% | 0.7% | 1.2% | 0.0% | 1.7% | 0.5% | 0.7% | 0.5% | 1.3% |

*Pan Atlantic Research: June, 2021*

Table 35: Mean of Q5

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| **Mean** | **3.14** | 3.13 | 2.88 | 3.02 | 3.33 | 3.69 | 3.10 | 3.28 |
| **Std Error** | **0.03** | 0.03 | 0.09 | 0.04 | 0.08 | 0.09 | 0.05 | 0.05 |
| **Valid N** | **1357** | 1077 | 173 | 976 | 199 | 155 | 621 | 491 |

*Pan Atlantic Research: June, 2021*

Table 36: Mean of Q5

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| **Mean** | **3.14** | 3.06 | 3.18 | 3.16 | 3.14 | 3.06 | 3.30 | 3.21 | 3.18 | 3.11 |
| **Std Error** | **0.03** | 0.08 | 0.05 | 0.05 | 0.08 | 0.06 | 0.06 | 0.07 | 0.05 | 0.05 |
| **Valid N** | **1357** | 202 | 542 | 508 | 218 | 402 | 421 | 294 | 418 | 523 |

*Pan Atlantic Research: June, 2021*

DX323.336

App. 640   TOWN06116

Table 37: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism? FIRST RESPONSE (Q6-1)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Car traffic / congestion | 337 | 275 | 39 | 228 | 76 | 29 | 166 | 111 |
| | 24.5% | 25.2% | 22.0% | 23.1% | 36.7% | 18.4% | 26.3% | 22.3% |
| Impact of tour buses | 34 | 27 | 4 | 24 | 4 | 6 | 13 | 14 |
| | 2.5% | 2.5% | 2.3% | 2.4% | 1.9% | 3.8% | 2.1% | 2.8% |
| Impact on parking availability | 303 | 236 | 36 | 204 | 43 | 46 | 152 | 111 |
| | 22.0% | 21.6% | 20.3% | 20.7% | 20.8% | 29.1% | 24.1% | 22.3% |
| Foot traffic / Overcrowding | 151 | 124 | 17 | 116 | 13 | 20 | 71 | 49 |
| | 11.0% | 11.4% | 9.6% | 11.8% | 6.3% | 12.7% | 11.3% | 9.9% |
| Environmental concerns / Pollution | 16 | 14 | 1 | 13 | 2 | 0 | 8 | 2 |
| | 1.2% | 1.3% | 0.6% | 1.3% | 1.0% | 0.0% | 1.3% | 0.4% |
| Town too touristy | 11 | 8 | 3 | 10 | 1 | 0 | 6 | 3 |
| | 0.8% | 0.7% | 1.7% | 1.0% | 0.5% | 0.0% | 1.0% | 0.6% |
| Negative impact on Acadia National Park | 2 | 1 | 1 | 1 | 1 | 0 | 2 | 0 |
| | 0.1% | 0.1% | 0.6% | 0.1% | 0.5% | 0.0% | 0.3% | 0.0% |
| Balance tourism, quality of life, economics | 20 | 16 | 2 | 15 | 4 | 1 | 9 | 11 |
| | 1.5% | 1.5% | 1.1% | 1.5% | 1.9% | 0.6% | 1.4% | 2.2% |
| Housing market challenges (inc. Airbnb) | 64 | 41 | 17 | 51 | 4 | 6 | 29 | 21 |
| | 4.6% | 3.8% | 9.6% | 5.2% | 1.9% | 3.8% | 4.6% | 4.2% |
| Too much tourism / Too many tourists | 42 | 34 | 7 | 33 | 6 | 2 | 21 | 14 |
| | 3.0% | 3.1% | 4.0% | 3.4% | 2.9% | 1.3% | 3.3% | 2.8% |
| Other | 150 | 126 | 12 | 114 | 14 | 20 | 54 | 65 |
| | 10.9% | 11.5% | 6.8% | 11.6% | 6.8% | 12.7% | 8.6% | 13.1% |
| N/A - No Negatives | 7 | 5 | 1 | 3 | 1 | 3 | 2 | 3 |
| | 0.5% | 0.5% | 0.6% | 0.3% | 0.5% | 1.9% | 0.3% | 0.6% |
| No response | 241 | 185 | 37 | 173 | 38 | 25 | 97 | 93 |
| | 17.5% | 16.9% | 20.9% | 17.6% | 18.4% | 15.8% | 15.4% | 18.7% |

*Pan Atlantic Research: June, 2021*

Table 38: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism? FIRST RESPONSE (Q6-1)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Car traffic / congestion | 337 | 44 | 138 | 129 | 52 | 94 | 126 | 50 | 111 | 150 |
| | 24.5% | 21.6% | 25.1% | 24.9% | 23.7% | 23.0% | 29.6% | 16.7% | 26.4% | 28.1% |
| Impact of tour buses | 34 | 1 | 18 | 12 | 7 | 8 | 12 | 10 | 12 | 10 |
| | 2.5% | 0.5% | 3.3% | 2.3% | 3.2% | 2.0% | 2.8% | 3.3% | 2.9% | 1.9% |
| Impact on parking availability | 303 | 51 | 109 | 120 | 46 | 89 | 98 | 64 | 88 | 131 |
| | 22.0% | 25.0% | 19.9% | 23.2% | 21.0% | 21.8% | 23.1% | 21.4% | 20.9% | 24.6% |
| Foot traffic / Overcrowding | 151 | 26 | 61 | 51 | 25 | 53 | 35 | 26 | 57 | 55 |
| | 11.0% | 12.7% | 11.1% | 9.8% | 11.4% | 13.0% | 8.2% | 8.7% | 13.5% | 10.3% |
| Environmental concerns / Pollution | 16 | 2 | 9 | 4 | 3 | 7 | 2 | 3 | 4 | 8 |
| | 1.2% | 1.0% | 1.6% | 0.8% | 1.4% | 1.7% | 0.5% | 1.0% | 1.0% | 1.5% |
| Town too touristy | 11 | 3 | 3 | 4 | 4 | 2 | 3 | 2 | 3 | 5 |
| | 0.8% | 1.5% | 0.5% | 0.8% | 1.8% | 0.5% | 0.7% | 0.7% | 0.7% | 0.9% |
| Negative impact on Acadia National Park | 2 | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 1 | 1 |
| | 0.1% | 0.5% | 0.2% | 0.0% | 0.5% | 0.2% | 0.0% | 0.0% | 0.2% | 0.2% |
| Balance tourism, quality of life, economics | 20 | 2 | 6 | 12 | 3 | 6 | 9 | 4 | 10 | 5 |
| | 1.5% | 1.0% | 1.1% | 2.3% | 1.4% | 1.5% | 2.1% | 1.3% | 2.4% | 0.9% |
| Housing market challenges (inc. Airbnb) | 64 | 19 | 26 | 15 | 11 | 18 | 21 | 17 | 19 | 24 |
| | 4.6% | 9.3% | 4.7% | 2.9% | 5.0% | 4.4% | 4.9% | 5.7% | 4.5% | 4.5% |
| Too much tourism / Too many tourists | 42 | 5 | 20 | 16 | 3 | 14 | 13 | 6 | 14 | 18 |
| | 3.0% | 2.5% | 3.6% | 3.1% | 1.4% | 3.4% | 3.1% | 2.0% | 3.3% | 3.4% |
| Other | 150 | 23 | 61 | 55 | 26 | 44 | 43 | 37 | 40 | 54 |
| | 10.9% | 11.3% | 11.1% | 10.6% | 11.9% | 10.8% | 10.1% | 12.4% | 9.5% | 10.1% |
| N/A - No Negatives | 7 | 1 | 2 | 3 | 2 | 1 | 2 | 3 | 2 | 1 |
| | 0.5% | 0.5% | 0.4% | 0.6% | 0.9% | 0.2% | 0.5% | 1.0% | 0.5% | 0.2% |
| No response | 241 | 26 | 95 | 97 | 36 | 72 | 61 | 77 | 60 | 71 |
| | 17.5% | 12.7% | 17.3% | 18.7% | 16.4% | 17.6% | 14.4% | 25.8% | 14.3% | 13.3% |

*Pan Atlantic Research: June, 2021*

DX323.337

App. 641    TOWN06117

Table 39: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism? SECOND RESPONSE (Q6-2)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | *Own* | *Rent* | *Year-round resident* | *Seasonal resident* | *Business-owner (resident or non-resident)* | *Female* | *Male* |
| Total | **1378** | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Car traffic / congestion | **40** | 35 | 3 | 35 | 4 | 1 | 17 | 16 |
| | **2.9%** | 3.2% | 1.7% | 3.6% | 1.9% | 0.6% | 2.7% | 3.2% |
| Impact of tour buses | **27** | 27 | 0 | 20 | 5 | 2 | 13 | 6 |
| | **2.0%** | 2.5% | 0.0% | 2.0% | 2.4% | 1.3% | 2.1% | 1.2% |
| Impact on parking availability | **139** | 116 | 15 | 92 | 31 | 12 | 69 | 46 |
| | **10.1%** | 10.6% | 8.5% | 9.3% | 15.0% | 7.6% | 11.0% | 9.3% |
| Foot traffic / Overcrowding | **104** | 85 | 14 | 78 | 15 | 8 | 50 | 32 |
| | **7.5%** | 7.8% | 7.9% | 7.9% | 7.2% | 5.1% | 7.9% | 6.4% |
| Environmental concerns / Pollution | **18** | 15 | 3 | 11 | 4 | 2 | 7 | 8 |
| | **1.3%** | 1.4% | 1.7% | 1.1% | 1.9% | 1.3% | 1.1% | 1.6% |
| Town too touristy | **10** | 7 | 2 | 8 | 2 | 0 | 5 | 2 |
| | **0.7%** | 0.7% | 1.1% | 0.8% | 1.0% | 0.0% | 0.8% | 0.4% |
| Negative impact on Acadia National Park | **2** | 1 | 0 | 1 | 0 | 1 | 0 | 1 |
| | **0.1%** | 0.1% | 0.0% | 0.1% | 0.0% | 0.6% | 0.0% | 0.2% |
| Balance tourism, quality of life, economics | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Housing market challenges (inc. Airbnb) | **16** | 10 | 2 | 11 | 2 | 3 | 8 | 5 |
| | **1.2%** | 0.9% | 1.1% | 1.1% | 1.0% | 1.9% | 1.3% | 1.0% |
| Too much tourism / Too many tourists | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other | **9** | 5 | 2 | 5 | 2 | 2 | 5 | 3 |
| | **0.7%** | 0.5% | 1.1% | 0.5% | 1.0% | 1.3% | 0.8% | 0.6% |
| N/A - No Negatives | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| No response | **1013** | 790 | 136 | 724 | 142 | 127 | 456 | 378 |
| | **73.5%** | 72.3% | 76.8% | 73.5% | 68.6% | 80.4% | 72.4% | 76.1% |

*Pan Atlantic Research: June, 2021*

Table 40: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism? SECOND RESPONSE (Q6-2)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | *18-44* | *45-64* | *65+* | *<50k* | *$50k-100k* | *100k+* | *Less than 4-year degree* | *4-year degree* | *Post-graduate degree* |
| Total | **1378** | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Car traffic / congestion | **40** | 6 | 17 | 13 | 8 | 8 | 14 | 3 | 12 | 22 |
| | **2.9%** | 2.9% | 3.1% | 2.5% | 3.7% | 2.0% | 3.3% | 1.0% | 2.9% | 4.1% |
| Impact of tour buses | **27** | 3 | 10 | 11 | 2 | 6 | 6 | 2 | 8 | 13 |
| | **2.0%** | 1.5% | 1.8% | 2.1% | 0.9% | 1.5% | 1.4% | 0.7% | 1.9% | 2.4% |
| Impact on parking availability | **139** | 26 | 60 | 40 | 20 | 38 | 59 | 17 | 54 | 60 |
| | **10.1%** | 12.7% | 10.9% | 7.7% | 9.1% | 9.3% | 13.9% | 5.7% | 12.8% | 11.3% |
| Foot traffic / Overcrowding | **104** | 17 | 36 | 42 | 17 | 31 | 32 | 18 | 26 | 49 |
| | **7.5%** | 8.3% | 6.6% | 8.1% | 7.8% | 7.6% | 7.5% | 6.0% | 6.2% | 9.2% |
| Environmental concerns / Pollution | **18** | 3 | 7 | 8 | 3 | 5 | 8 | 2 | 6 | 10 |
| | **1.3%** | 1.5% | 1.3% | 1.5% | 1.4% | 1.2% | 1.9% | 0.7% | 1.4% | 1.9% |
| Town too touristy | **10** | 1 | 2 | 5 | 1 | 2 | 4 | 2 | 1 | 7 |
| | **0.7%** | 0.5% | 0.4% | 1.0% | 0.5% | 0.5% | 0.9% | 0.7% | 0.2% | 1.3% |
| Negative impact on Acadia National Park | **2** | 1 | 0 | 1 | 0 | 1 | 0 | 0 | 2 | 0 |
| | **0.1%** | 0.5% | 0.0% | 0.2% | 0.0% | 0.2% | 0.0% | 0.0% | 0.5% | 0.0% |
| Balance tourism, quality of life, economics | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Housing market challenges (inc. Airbnb) | **16** | 5 | 9 | 2 | 4 | 5 | 6 | 1 | 6 | 9 |
| | **1.2%** | 2.5% | 1.6% | 0.4% | 1.8% | 1.2% | 1.4% | 0.3% | 1.4% | 1.7% |
| Too much tourism / Too many tourists | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other | **9** | 3 | 5 | 1 | 1 | 5 | 2 | 1 | 6 | 2 |
| | **0.7%** | 1.5% | 0.9% | 0.2% | 0.5% | 1.2% | 0.5% | 0.3% | 1.4% | 0.4% |
| N/A - No Negatives | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| No response | **1013** | 139 | 403 | 395 | 163 | 308 | 294 | 253 | 300 | 361 |
| | **73.5%** | 68.1% | 73.4% | 76.3% | 74.4% | 75.3% | 69.2% | 84.6% | 71.3% | 67.7% |

*Pan Atlantic Research: June, 2021*

Table 41: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism? THIRD RESPONSE (Q6-3)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Total | **1378** | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Car traffic / congestion | **4** | 2 | 2 | 3 | 1 | 0 | 2 | 1 |
| | **0.3%** | 0.2% | 1.1% | 0.3% | 0.5% | 0.0% | 0.3% | 0.2% |
| Impact of tour buses | **5** | 5 | 0 | 4 | 0 | 1 | 3 | 1 |
| | **0.4%** | 0.5% | 0.0% | 0.4% | 0.0% | 0.6% | 0.5% | 0.2% |
| Impact on parking availability | **6** | 6 | 0 | 4 | 2 | 0 | 4 | 2 |
| | **0.4%** | 0.5% | 0.0% | 0.4% | 1.0% | 0.0% | 0.6% | 0.4% |
| Foot traffic / Overcrowding | **13** | 13 | 0 | 10 | 2 | 1 | 6 | 5 |
| | **0.9%** | 1.2% | 0.0% | 1.0% | 1.0% | 0.6% | 1.0% | 1.0% |
| Environmental concerns / Pollution | **9** | 8 | 0 | 6 | 2 | 0 | 3 | 5 |
| | **0.7%** | 0.7% | 0.0% | 0.6% | 1.0% | 0.0% | 0.5% | 1.0% |
| Town too touristy | **3** | 1 | 1 | 2 | 0 | 1 | 2 | 1 |
| | **0.2%** | 0.1% | 0.6% | 0.2% | 0.0% | 0.6% | 0.3% | 0.2% |
| Negative impact on Acadia National Park | **2** | 2 | 0 | 2 | 0 | 0 | 1 | 1 |
| | **0.1%** | 0.2% | 0.0% | 0.2% | 0.0% | 0.0% | 0.2% | 0.2% |
| Balance tourism, quality of life, economics | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Housing market challenges (inc. Airbnb) | **8** | 6 | 1 | 7 | 0 | 1 | 3 | 3 |
| | **0.6%** | 0.5% | 0.6% | 0.7% | 0.0% | 0.6% | 0.5% | 0.6% |
| Too much tourism / Too many tourists | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other | **7** | 6 | 1 | 7 | 0 | 0 | 2 | 2 |
| | **0.5%** | 0.5% | 0.6% | 0.7% | 0.0% | 0.0% | 0.3% | 0.4% |
| N/A - No Negatives | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| No response | **1321** | 1043 | 172 | 940 | 200 | 154 | 604 | 476 |
| | **95.9%** | 95.5% | 97.2% | 95.4% | 96.6% | 97.5% | 95.9% | 95.8% |

*Pan Atlantic Research: June, 2021*

Table 42: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of land-based tourism? THIRD RESPONSE (Q6-3)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Total | **1378** | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Car traffic / congestion | **4** | 1 | 2 | 1 | 0 | 1 | 1 | 1 | 1 | 1 |
| | **0.3%** | 0.5% | 0.4% | 0.2% | 0.0% | 0.2% | 0.2% | 0.3% | 0.2% | 0.2% |
| Impact of tour buses | **5** | 0 | 2 | 2 | 0 | 1 | 2 | 1 | 0 | 3 |
| | **0.4%** | 0.0% | 0.4% | 0.4% | 0.0% | 0.2% | 0.5% | 0.3% | 0.0% | 0.6% |
| Impact on parking availability | **6** | 0 | 4 | 2 | 0 | 2 | 2 | 1 | 2 | 2 |
| | **0.4%** | 0.0% | 0.7% | 0.4% | 0.0% | 0.5% | 0.5% | 0.3% | 0.5% | 0.4% |
| Foot traffic / Overcrowding | **13** | 1 | 4 | 7 | 0 | 4 | 3 | 1 | 5 | 6 |
| | **0.9%** | 0.5% | 0.7% | 1.4% | 0.0% | 1.0% | 0.7% | 0.3% | 1.2% | 1.1% |
| Environmental concerns / Pollution | **9** | 1 | 6 | 2 | 0 | 1 | 5 | 0 | 3 | 6 |
| | **0.7%** | 0.5% | 1.1% | 0.4% | 0.0% | 0.2% | 1.2% | 0.0% | 0.7% | 1.1% |
| Town too touristy | **3** | 2 | 0 | 1 | 1 | 0 | 2 | 0 | 2 | 1 |
| | **0.2%** | 1.0% | 0.0% | 0.2% | 0.5% | 0.0% | 0.5% | 0.0% | 0.5% | 0.2% |
| Negative impact on Acadia National Park | **2** | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 2 |
| | **0.1%** | 0.5% | 0.0% | 0.2% | 0.0% | 0.0% | 0.2% | 0.0% | 0.0% | 0.4% |
| Balance tourism, quality of life, economics | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Housing market challenges (inc. Airbnb) | **8** | 1 | 7 | 0 | 0 | 2 | 5 | 1 | 2 | 5 |
| | **0.6%** | 0.5% | 1.3% | 0.0% | 0.0% | 0.5% | 1.2% | 0.3% | 0.5% | 0.9% |
| Too much tourism / Too many tourists | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other | **7** | 2 | 3 | 1 | 0 | 3 | 3 | 1 | 2 | 2 |
| | **0.5%** | 1.0% | 0.5% | 0.2% | 0.0% | 0.7% | 0.7% | 0.3% | 0.5% | 0.4% |
| N/A - No Negatives | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| No response | **1321** | 195 | 521 | 501 | 218 | 395 | 401 | 293 | 404 | 505 |
| | **95.9%** | 95.6% | 94.9% | 96.7% | 99.5% | 96.6% | 94.4% | 98.0% | 96.0% | 94.7% |

*Pan Atlantic Research: June, 2021*

DX323.339

App. 643    TOWN06119

**Table 43:** How would you rate the impact of cruise ship tourism on the overall quality of life for Bar Harbor residents? (Q7)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Very negative | 433 | 341 | 64 | 336 | 53 | 37 | 212 | 131 |
| | 31.4% | 31.2% | 36.2% | 34.1% | 25.6% | 23.4% | 33.7% | 26.4% |
| 2 | 301 | 246 | 38 | 231 | 38 | 27 | 142 | 99 |
| | 21.8% | 22.5% | 21.5% | 23.5% | 18.4% | 17.1% | 22.5% | 19.9% |
| 3 | 265 | 220 | 29 | 196 | 39 | 21 | 123 | 109 |
| | 19.2% | 20.1% | 16.4% | 19.9% | 18.8% | 13.3% | 19.5% | 21.9% |
| 4 | 179 | 145 | 14 | 99 | 44 | 33 | 81 | 78 |
| | 13.0% | 13.3% | 7.9% | 10.1% | 21.3% | 20.9% | 12.9% | 15.7% |
| 5 - Very positive | 173 | 122 | 26 | 111 | 24 | 36 | 61 | 68 |
| | 12.6% | 11.2% | 14.7% | 11.3% | 11.6% | 22.8% | 9.7% | 13.7% |
| Don't know | 13 | 7 | 3 | 3 | 7 | 3 | 7 | 4 |
| | 0.9% | 0.6% | 1.7% | 0.3% | 3.4% | 1.9% | 1.1% | 0.8% |
| No response | 14 | 11 | 3 | 9 | 2 | 1 | 4 | 8 |
| | 1.0% | 1.0% | 1.7% | 0.9% | 1.0% | 0.6% | 0.6% | 1.6% |

*Pan Atlantic Research: June, 2021*

**Table 44:** How would you rate the impact of cruise ship tourism on the overall quality of life for Bar Harbor residents? (Q7)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Very negative | 433 | 75 | 154 | 157 | 76 | 126 | 116 | 83 | 118 | 183 |
| | 31.4% | 36.8% | 28.1% | 30.3% | 34.7% | 30.8% | 27.3% | 27.8% | 28.0% | 34.3% |
| 2 | 301 | 48 | 112 | 118 | 47 | 103 | 80 | 62 | 98 | 120 |
| | 21.8% | 23.5% | 20.4% | 22.8% | 21.5% | 25.2% | 18.8% | 20.7% | 23.3% | 22.5% |
| 3 | 265 | 27 | 106 | 118 | 41 | 93 | 84 | 55 | 83 | 111 |
| | 19.2% | 13.2% | 19.3% | 22.8% | 18.7% | 22.7% | 19.8% | 18.4% | 19.7% | 20.8% |
| 4 | 179 | 21 | 77 | 71 | 24 | 42 | 67 | 51 | 65 | 53 |
| | 13.0% | 10.3% | 14.0% | 13.7% | 11.0% | 10.3% | 15.8% | 17.1% | 15.4% | 9.9% |
| 5 - Very positive | 173 | 27 | 87 | 47 | 26 | 39 | 67 | 41 | 49 | 54 |
| | 12.6% | 13.2% | 15.8% | 9.1% | 11.9% | 9.5% | 15.8% | 13.7% | 11.6% | 10.1% |
| Don't know | 13 | 3 | 4 | 5 | 3 | 2 | 6 | 1 | 5 | 7 |
| | 0.9% | 1.5% | 0.7% | 1.0% | 1.4% | 0.5% | 1.4% | 0.3% | 1.2% | 1.3% |
| No response | 14 | 3 | 9 | 2 | 2 | 4 | 5 | 6 | 3 | 5 |
| | 1.0% | 1.5% | 1.6% | 0.4% | 0.9% | 1.0% | 1.2% | 2.0% | 0.7% | 0.9% |

*Pan Atlantic Research: June, 2021*

**Table 45: Mean of Q7**

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Mean | 2.52 | 2.50 | 2.42 | 2.40 | 2.74 | 3.03 | 2.41 | 2.70 |
| Std Error | 0.04 | 0.04 | 0.11 | 0.04 | 0.10 | 0.12 | 0.05 | 0.06 |
| Valid N | 1351 | 1074 | 171 | 973 | 198 | 154 | 619 | 485 |

*Pan Atlantic Research: June, 2021*

**Table 46: Mean of Q7**

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Mean | 2.52 | 2.38 | 2.68 | 2.48 | 2.43 | 2.42 | 2.73 | 2.67 | 2.59 | 2.38 |
| Std Error | 0.04 | 0.10 | 0.06 | 0.06 | 0.09 | 0.06 | 0.07 | 0.08 | 0.07 | 0.06 |
| Valid N | 1351 | 198 | 536 | 511 | 214 | 403 | 414 | 292 | 413 | 521 |

*Pan Atlantic Research: June, 2021*

DX323.340

App. 644

TOWN06120

14

Table 47: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism? FIRST RESPONSE (Q8-1)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | *Total* | *Own* | *Rent* | *Year-round resident* | *Seasonal resident* | *Business-owner (resident or non-resident)* | *Female* | *Male* |
| Total | **1378** | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Impact of tour buses | **80** | 66 | 8 | 53 | 13 | 12 | 31 | 34 |
| | **5.8%** | 6.0% | 4.5% | 5.4% | 6.3% | 7.6% | 4.9% | 6.8% |
| Foot traffic / Overcrowding | **356** | 284 | 48 | 273 | 48 | 30 | 186 | 106 |
| | **25.8%** | 26.0% | 27.1% | 27.7% | 23.2% | 19.0% | 29.5% | 21.3% |
| Environmental concerns / Pollution | **126** | 102 | 21 | 97 | 17 | 9 | 57 | 40 |
| | **9.1%** | 9.3% | 11.9% | 9.8% | 8.2% | 5.7% | 9.0% | 8.0% |
| Impact on harbor views | **22** | 15 | 4 | 14 | 4 | 4 | 16 | 5 |
| | **1.6%** | 1.4% | 2.3% | 1.4% | 1.9% | 2.5% | 2.5% | 1.0% |
| Poor quality of tourist | **22** | 15 | 5 | 14 | 4 | 3 | 9 | 9 |
| | **1.6%** | 1.4% | 2.8% | 1.4% | 1.9% | 1.9% | 1.4% | 1.8% |
| Town is too touristy | **19** | 14 | 2 | 12 | 2 | 5 | 11 | 6 |
| | **1.4%** | 1.3% | 1.1% | 1.2% | 1.0% | 3.2% | 1.7% | 1.2% |
| Negative impact on ANP | **1** | 1 | 0 | 1 | 0 | 0 | 0 | 0 |
| | **0.1%** | 0.1% | 0.0% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% |
| Impact on parking | **11** | 9 | 1 | 7 | 3 | 1 | 4 | 6 |
| | **0.8%** | 0.8% | 0.6% | 0.7% | 1.4% | 0.6% | 0.6% | 1.2% |
| Too many ships/tourists | **220** | 185 | 15 | 149 | 31 | 34 | 107 | 80 |
| | **16.0%** | 16.9% | 8.5% | 15.1% | 15.0% | 21.5% | 17.0% | 16.1% |
| Quality of life | **3** | 2 | 1 | 2 | 1 | 0 | 1 | 2 |
| | **0.2%** | 0.2% | 0.6% | 0.2% | 0.5% | 0.0% | 0.2% | 0.4% |
| Traffic congestion | **25** | 20 | 2 | 12 | 7 | 3 | 11 | 11 |
| | **1.8%** | 1.8% | 1.1% | 1.2% | 3.4% | 1.9% | 1.7% | 2.2% |
| Balance tourism, quality of life, economics | **27** | 22 | 3 | 21 | 1 | 4 | 10 | 12 |
| | **2.0%** | 2.0% | 1.7% | 2.1% | 0.5% | 2.5% | 1.6% | 2.4% |
| Covid-19 | **10** | 7 | 3 | 8 | 2 | 0 | 7 | 2 |
| | **0.7%** | 0.6% | 1.7% | 0.8% | 1.0% | 0.0% | 1.1% | 0.4% |
| Improve management/governance | **20** | 16 | 2 | 15 | 1 | 4 | 9 | 7 |
| | **1.5%** | 1.5% | 1.1% | 1.5% | 0.5% | 2.5% | 1.4% | 1.4% |
| Other | **203** | 161 | 25 | 143 | 30 | 27 | 80 | 80 |
| | **14.7%** | 14.7% | 14.1% | 14.5% | 14.5% | 17.1% | 12.7% | 16.1% |
| Don't know | **2** | 0 | 2 | 2 | 0 | 0 | 2 | 0 |
| | **0.1%** | 0.0% | 1.1% | 0.2% | 0.0% | 0.0% | 0.3% | 0.0% |
| N/A - No negatives | **32** | 22 | 3 | 18 | 7 | 6 | 14 | 12 |
| | **2.3%** | 2.0% | 1.7% | 1.8% | 3.4% | 3.8% | 2.2% | 2.4% |
| No response | **199** | 151 | 32 | 144 | 36 | 16 | 75 | 85 |
| | **14.4%** | 13.8% | 18.1% | 14.6% | 17.4% | 10.1% | 11.9% | 17.1% |

*Pan Atlantic Research: June, 2021*

DX323.341

App. 645    TOWN06121

Table 48: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism? FIRST RESPONSE (Q8-1)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Impact of tour buses | 80 | 8 | 24 | 40 | 18 | 21 | 23 | 18 | 24 | 32 |
| | 5.8% | 3.9% | 4.4% | 7.7% | 8.2% | 5.1% | 5.4% | 6.0% | 5.7% | 6.0% |
| Foot traffic / Overcrowding | 356 | 59 | 142 | 125 | 50 | 119 | 108 | 66 | 99 | 160 |
| | 25.8% | 28.9% | 25.9% | 24.1% | 22.8% | 29.1% | 25.4% | 22.1% | 23.5% | 30.0% |
| Environmental concerns / Pollution | 126 | 23 | 54 | 37 | 25 | 35 | 41 | 14 | 39 | 64 |
| | 9.1% | 11.3% | 9.8% | 7.1% | 11.4% | 8.6% | 9.6% | 4.7% | 9.3% | 12.0% |
| Impact on harbor views | 22 | 3 | 10 | 8 | 3 | 8 | 6 | 2 | 9 | 10 |
| | 1.6% | 1.5% | 1.8% | 1.5% | 1.4% | 2.0% | 1.4% | 0.7% | 2.1% | 1.9% |
| Poor quality of tourist | 22 | 7 | 9 | 5 | 5 | 6 | 7 | 4 | 7 | 10 |
| | 1.6% | 3.4% | 1.6% | 1.0% | 2.3% | 1.5% | 1.6% | 1.3% | 1.7% | 1.9% |
| Town is too touristy | 19 | 6 | 7 | 4 | 2 | 8 | 6 | 3 | 4 | 10 |
| | 1.4% | 2.9% | 1.3% | 0.8% | 0.9% | 2.0% | 1.4% | 1.0% | 1.0% | 1.9% |
| Negative impact on ANP | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.3% | 0.0% | 0.0% |
| Impact on parking | 11 | 0 | 5 | 6 | 2 | 2 | 3 | 3 | 5 | 3 |
| | 0.8% | 0.0% | 0.9% | 1.2% | 0.9% | 0.5% | 0.7% | 1.0% | 1.2% | 0.6% |
| Too many ships/tourists | 220 | 18 | 81 | 108 | 38 | 65 | 59 | 58 | 78 | 66 |
| | 16.0% | 8.8% | 14.8% | 20.8% | 17.4% | 15.9% | 13.9% | 19.4% | 18.5% | 12.4% |
| Quality of life | 3 | 0 | 1 | 2 | 0 | 1 | 1 | 1 | 0 | 2 |
| | 0.2% | 0.0% | 0.2% | 0.4% | 0.0% | 0.2% | 0.2% | 0.3% | 0.0% | 0.4% |
| Traffic congestion | 25 | 5 | 12 | 7 | 2 | 10 | 8 | 4 | 7 | 13 |
| | 1.8% | 2.5% | 2.2% | 1.4% | 0.9% | 2.4% | 1.9% | 1.3% | 1.7% | 2.4% |
| Balance tourism, quality of life, economics | 27 | 6 | 11 | 8 | 2 | 10 | 8 | 4 | 12 | 10 |
| | 2.0% | 2.9% | 2.0% | 1.5% | 0.9% | 2.4% | 1.9% | 1.3% | 2.9% | 1.9% |
| Covid-19 | 10 | 1 | 3 | 5 | 3 | 3 | 1 | 5 | 3 | 1 |
| | 0.7% | 0.5% | 0.5% | 1.0% | 1.4% | 0.7% | 0.2% | 1.7% | 0.7% | 0.2% |
| Improve management/governance | 20 | 7 | 8 | 3 | 5 | 1 | 9 | 3 | 9 | 6 |
| | 1.5% | 3.4% | 1.5% | 0.6% | 2.3% | 0.2% | 2.1% | 1.0% | 2.1% | 1.1% |
| Other | 203 | 32 | 90 | 67 | 25 | 59 | 74 | 39 | 60 | 82 |
| | 14.7% | 15.7% | 16.4% | 12.9% | 11.4% | 14.4% | 17.4% | 13.0% | 14.3% | 15.4% |
| Don't know | 2 | 1 | 0 | 1 | 2 | 0 | 0 | 0 | 1 | 1 |
| | 0.1% | 0.5% | 0.0% | 0.2% | 0.9% | 0.0% | 0.0% | 0.0% | 0.2% | 0.2% |
| N/A - No negatives | 32 | 6 | 9 | 12 | 5 | 7 | 11 | 5 | 13 | 10 |
| | 2.3% | 2.9% | 1.6% | 2.3% | 2.3% | 1.7% | 2.6% | 1.7% | 3.1% | 1.9% |
| No response | 199 | 22 | 83 | 80 | 32 | 54 | 60 | 69 | 51 | 53 |
| | 14.4% | 10.8% | 15.1% | 15.4% | 14.6% | 13.2% | 14.1% | 23.1% | 12.1% | 9.9% |

*Pan Atlantic Research: June, 2021*

DX323.342

App. 646    TOWN06122

Table 49: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism? SECOND RESPONSE (Q8-2)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Total | **1378** | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Impact of tour buses | **31** | 28 | 2 | 26 | 1 | 4 | 16 | 8 |
| | **2.2%** | 2.6% | 1.1% | 2.6% | 0.5% | 2.5% | 2.5% | 1.6% |
| Foot traffic / Overcrowding | **87** | 69 | 11 | 56 | 17 | 14 | 41 | 30 |
| | **6.3%** | 6.3% | 6.2% | 5.7% | 8.2% | 8.9% | 6.5% | 6.0% |
| Environmental concerns / Pollution | **66** | 52 | 9 | 48 | 11 | 5 | 39 | 15 |
| | **4.8%** | 4.8% | 5.1% | 4.9% | 5.3% | 3.2% | 6.2% | 3.0% |
| Impact on harbor views | **15** | 12 | 2 | 9 | 5 | 1 | 13 | 1 |
| | **1.1%** | 1.1% | 1.1% | 0.9% | 2.4% | 0.6% | 2.1% | 0.2% |
| Poor quality of tourist | **16** | 9 | 5 | 10 | 4 | 2 | 6 | 7 |
| | **1.2%** | 0.8% | 2.8% | 1.0% | 1.9% | 1.3% | 1.0% | 1.4% |
| Town is too touristy | **14** | 13 | 1 | 11 | 1 | 1 | 8 | 4 |
| | **1.0%** | 1.2% | 0.6% | 1.1% | 0.5% | 0.6% | 1.3% | 0.8% |
| Negative impact on ANP | **2** | 1 | 1 | 2 | 0 | 0 | 1 | 1 |
| | **0.1%** | 0.1% | 0.6% | 0.2% | 0.0% | 0.0% | 0.2% | 0.2% |
| Impact on parking | **6** | 5 | 0 | 3 | 0 | 3 | 4 | 1 |
| | **0.4%** | 0.5% | 0.0% | 0.3% | 0.0% | 1.9% | 0.6% | 0.2% |
| Too many ships/tourists | **12** | 8 | 2 | 8 | 2 | 1 | 8 | 3 |
| | **0.9%** | 0.7% | 1.1% | 0.8% | 1.0% | 0.6% | 1.3% | 0.6% |
| Quality of life | **2** | 2 | 0 | 2 | 0 | 0 | 1 | 0 |
| | **0.1%** | 0.2% | 0.0% | 0.2% | 0.0% | 0.0% | 0.2% | 0.0% |
| Traffic congestion | **8** | 7 | 1 | 7 | 1 | 0 | 2 | 5 |
| | **0.6%** | 0.6% | 0.6% | 0.7% | 0.5% | 0.0% | 0.3% | 1.0% |
| Balance tourism, quality of life, economics | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Covid-19 | **3** | 1 | 2 | 1 | 1 | 1 | 2 | 1 |
| | **0.2%** | 0.1% | 1.1% | 0.1% | 0.5% | 0.6% | 0.3% | 0.2% |
| Improve management/governance | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other | **1** | 1 | 0 | 1 | 0 | 0 | 0 | 0 |
| | **0.1%** | 0.1% | 0.0% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% |
| Don't know | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| N/A - No negatives | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| No response | **1115** | 884 | 141 | 801 | 164 | 126 | 489 | 421 |
| | **80.9%** | 81.0% | 79.7% | 81.3% | 79.2% | 79.7% | 77.6% | 84.7% |

*Pan Atlantic Research: June, 2021*

DX323.343

App. 647    TOWN06123

Table 50: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism? SECOND RESPONSE (Q8-2)

| | *Total* | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | *18-44* | *45-64* | *65+* | *<50k* | *$50k-100k* | *100k+* | *Less than 4-year degree* | *4-year degree* | *Post-graduate degree* |
| Total | **1378** | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Impact of tour buses | **31** | 2 | 13 | 9 | 5 | 10 | 8 | 6 | 9 | 13 |
| | **2.2%** | 1.0% | 2.4% | 1.7% | 2.3% | 2.4% | 1.9% | 2.0% | 2.1% | 2.4% |
| Foot traffic / Overcrowding | **87** | 8 | 40 | 34 | 10 | 31 | 31 | 11 | 31 | 43 |
| | **6.3%** | 3.9% | 7.3% | 6.6% | 4.6% | 7.6% | 7.3% | 3.7% | 7.4% | 8.1% |
| Environmental concerns / Pollution | **66** | 14 | 20 | 28 | 10 | 28 | 12 | 10 | 18 | 34 |
| | **4.8%** | 6.9% | 3.6% | 5.4% | 4.6% | 6.8% | 2.8% | 3.3% | 4.3% | 6.4% |
| Impact on harbor views | **15** | 4 | 6 | 5 | 2 | 4 | 4 | 0 | 6 | 9 |
| | **1.1%** | 2.0% | 1.1% | 1.0% | 0.9% | 1.0% | 0.9% | 0.0% | 1.4% | 1.7% |
| Poor quality of tourist | **16** | 4 | 9 | 2 | 2 | 6 | 5 | 3 | 7 | 4 |
| | **1.2%** | 2.0% | 1.6% | 0.4% | 0.9% | 1.5% | 1.2% | 1.0% | 1.7% | 0.8% |
| Town is too touristy | **14** | 3 | 7 | 3 | 3 | 3 | 5 | 1 | 5 | 8 |
| | **1.0%** | 1.5% | 1.3% | 0.6% | 1.4% | 0.7% | 1.2% | 0.3% | 1.2% | 1.5% |
| Negative impact on ANP | **2** | 0 | 1 | 1 | 1 | 0 | 1 | 0 | 0 | 2 |
| | **0.1%** | 0.0% | 0.2% | 0.2% | 0.5% | 0.0% | 0.2% | 0.0% | 0.0% | 0.4% |
| Impact on parking | **6** | 2 | 3 | 1 | 0 | 4 | 2 | 2 | 4 | 0 |
| | **0.4%** | 1.0% | 0.5% | 0.2% | 0.0% | 1.0% | 0.5% | 0.7% | 1.0% | 0.0% |
| Too many ships/tourists | **12** | 2 | 4 | 5 | 1 | 4 | 5 | 1 | 3 | 7 |
| | **0.9%** | 1.0% | 0.7% | 1.0% | 0.5% | 1.0% | 1.2% | 0.3% | 0.7% | 1.3% |
| Quality of life | **2** | 0 | 0 | 1 | 1 | 0 | 0 | 1 | 0 | 0 |
| | **0.1%** | 0.0% | 0.0% | 0.2% | 0.5% | 0.0% | 0.0% | 0.3% | 0.0% | 0.0% |
| Traffic congestion | **8** | 2 | 2 | 3 | 1 | 1 | 3 | 0 | 2 | 5 |
| | **0.6%** | 1.0% | 0.4% | 0.6% | 0.5% | 0.2% | 0.7% | 0.0% | 0.5% | 0.9% |
| Balance tourism, quality of life, economics | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Covid-19 | **3** | 0 | 3 | 0 | 0 | 2 | 1 | 0 | 1 | 2 |
| | **0.2%** | 0.0% | 0.5% | 0.0% | 0.0% | 0.5% | 0.2% | 0.0% | 0.2% | 0.4% |
| Improve management/governance | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other | **1** | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| | **0.1%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.3% | 0.0% | 0.0% |
| Don't know | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| N/A - No negatives | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| No response | **1115** | 163 | 441 | 426 | 183 | 316 | 348 | 263 | 335 | 406 |
| | **80.9%** | 79.9% | 80.3% | 82.2% | 83.6% | 77.3% | 81.9% | 88.0% | 79.6% | 76.2% |

*Pan Atlantic Research: June, 2021*

DX323.344

App. 648

TOWN06124

Table 51: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism? THIRD RESPONSE (Q8-3)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Total | **1378** | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Impact of tour buses | **6** | 5 | 1 | 4 | 0 | 2 | 3 | 3 |
| | **0.4%** | 0.5% | 0.6% | 0.4% | 0.0% | 1.3% | 0.5% | 0.6% |
| Foot traffic / Overcrowding | **8** | 8 | 0 | 5 | 3 | 0 | 5 | 3 |
| | **0.6%** | 0.7% | 0.0% | 0.5% | 1.4% | 0.0% | 0.8% | 0.6% |
| Environmental concerns / Pollution | **9** | 7 | 0 | 4 | 2 | 3 | 3 | 4 |
| | **0.7%** | 0.6% | 0.0% | 0.4% | 1.0% | 1.9% | 0.5% | 0.8% |
| Impact on harbor views | **12** | 11 | 0 | 10 | 1 | 1 | 6 | 4 |
| | **0.9%** | 1.0% | 0.0% | 1.0% | 0.5% | 0.6% | 1.0% | 0.8% |
| Poor quality of tourist | **5** | 4 | 1 | 2 | 3 | 0 | 3 | 2 |
| | **0.4%** | 0.4% | 0.6% | 0.2% | 1.4% | 0.0% | 0.5% | 0.4% |
| Town is too touristy | **7** | 6 | 1 | 6 | 0 | 1 | 4 | 1 |
| | **0.5%** | 0.5% | 0.6% | 0.6% | 0.0% | 0.6% | 0.6% | 0.2% |
| Negative impact on ANP | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Impact on parking | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Too many ships/tourists | **2** | 2 | 0 | 2 | 0 | 0 | 1 | 0 |
| | **0.1%** | 0.2% | 0.0% | 0.2% | 0.0% | 0.0% | 0.2% | 0.0% |
| Quality of life | **3** | 2 | 1 | 2 | 1 | 0 | 1 | 1 |
| | **0.2%** | 0.2% | 0.6% | 0.2% | 0.5% | 0.0% | 0.2% | 0.2% |
| Traffic congestion | **3** | 1 | 2 | 2 | 0 | 1 | 3 | 0 |
| | **0.2%** | 0.1% | 1.1% | 0.2% | 0.0% | 0.6% | 0.5% | 0.0% |
| Balance tourism, quality of life, economics | **1** | 1 | 0 | 0 | 1 | 0 | 0 | 1 |
| | **0.1%** | 0.1% | 0.0% | 0.0% | 0.5% | 0.0% | 0.0% | 0.2% |
| Covid-19 | **1** | 1 | 0 | 1 | 0 | 0 | 0 | 0 |
| | **0.1%** | 0.1% | 0.0% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% |
| Improve management/governance | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other | **1** | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| | **0.1%** | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.0% |
| Don't know | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| N/A - No negatives | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| No response | **1320** | 1043 | 171 | 947 | 196 | 150 | 600 | 478 |
| | **95.8%** | 95.5% | 96.6% | 96.1% | 94.7% | 94.9% | 95.2% | 96.2% |

*Pan Atlantic Research: June, 2021*

DX323.345

App. 649    TOWN06125

Table 52: In your opinion, what are the principal challenges which Bar Harbor faces with regard to its management of cruise ship tourism? THIRD RESPONSE (Q8-3)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | *Total* | *18-44* | *45-64* | *65+* | *<50k* | *$50k-100k* | *100k+* | *Less than 4-year degree* | *4-year degree* | *Post-graduate degree* |
| Total | **1378** | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Impact of tour buses | **6** | 0 | 3 | 3 | 1 | 3 | 1 | 0 | 2 | 4 |
| | **0.4%** | 0.0% | 0.5% | 0.6% | 0.5% | 0.7% | 0.2% | 0.0% | 0.5% | 0.8% |
| Foot traffic / Overcrowding | **8** | 0 | 3 | 4 | 0 | 2 | 1 | 2 | 3 | 3 |
| | **0.6%** | 0.0% | 0.5% | 0.8% | 0.0% | 0.5% | 0.2% | 0.7% | 0.7% | 0.6% |
| Environmental concerns / Pollution | **9** | 1 | 4 | 4 | 1 | 3 | 4 | 0 | 3 | 6 |
| | **0.7%** | 0.5% | 0.7% | 0.8% | 0.5% | 0.7% | 0.9% | 0.0% | 0.7% | 1.1% |
| Impact on harbor views | **12** | 2 | 5 | 3 | 2 | 4 | 3 | 1 | 6 | 4 |
| | **0.9%** | 1.0% | 0.9% | 0.6% | 0.9% | 1.0% | 0.7% | 0.3% | 1.4% | 0.8% |
| Poor quality of tourist | **5** | 2 | 2 | 1 | 0 | 1 | 3 | 0 | 2 | 3 |
| | **0.4%** | 1.0% | 0.4% | 0.2% | 0.0% | 0.2% | 0.7% | 0.0% | 0.5% | 0.6% |
| Town is too touristy | **7** | 1 | 4 | 0 | 0 | 2 | 3 | 1 | 1 | 4 |
| | **0.5%** | 0.5% | 0.7% | 0.0% | 0.0% | 0.5% | 0.7% | 0.3% | 0.2% | 0.8% |
| Negative impact on ANP | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Impact on parking | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Too many ships/tourists | **2** | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 1 | 1 |
| | **0.1%** | 0.0% | 0.2% | 0.2% | 0.0% | 0.2% | 0.2% | 0.0% | 0.2% | 0.2% |
| Quality of life | **3** | 0 | 1 | 1 | 0 | 0 | 1 | 0 | 1 | 1 |
| | **0.2%** | 0.0% | 0.2% | 0.2% | 0.0% | 0.0% | 0.2% | 0.0% | 0.2% | 0.2% |
| Traffic congestion | **3** | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 1 | 2 |
| | **0.2%** | 1.0% | 0.0% | 0.0% | 0.9% | 0.0% | 0.0% | 0.0% | 0.2% | 0.4% |
| Balance tourism, quality of life, economics | **1** | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.1%** | 0.0% | 0.2% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Covid-19 | **1** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.1%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Improve management/governance | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other | **1** | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| | **0.1%** | 0.0% | 0.2% | 0.0% | 0.0% | 0.0% | 0.2% | 0.0% | 0.0% | 0.2% |
| Don't know | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| N/A - No negatives | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| No response | **1320** | 196 | 524 | 501 | 213 | 393 | 407 | 295 | 401 | 504 |
| | **95.8%** | 96.1% | 95.4% | 96.7% | 97.3% | 96.1% | 95.8% | 98.7% | 95.2% | 94.6% |

*Pan Atlantic Research: June, 2021*

DX323.346

App. 650    TOWN06126

Table 53: In your opinion, how important is this overall economic impact [of the cruise ship industry] to: THE TOWN OF BAR HARBOR AS A WHOLE (Q9a)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all important | 141 | 112 | 14 | 113 | 11 | 13 | 54 | 50 |
| | 10.2% | 10.3% | 7.9% | 11.5% | 5.3% | 8.2% | 8.6% | 10.1% |
| 2 | 253 | 199 | 46 | 204 | 26 | 20 | 113 | 89 |
| | 18.4% | 18.2% | 26.0% | 20.7% | 12.6% | 12.7% | 17.9% | 17.9% |
| 3 | 279 | 221 | 40 | 195 | 38 | 36 | 138 | 90 |
| | 20.2% | 20.2% | 22.6% | 19.8% | 18.4% | 22.8% | 21.9% | 18.1% |
| 4 | 237 | 199 | 28 | 176 | 36 | 22 | 116 | 92 |
| | 17.2% | 18.2% | 15.8% | 17.9% | 17.4% | 13.9% | 18.4% | 18.5% |
| 5 - Very important | 403 | 313 | 39 | 252 | 80 | 64 | 175 | 163 |
| | 29.2% | 28.7% | 22.0% | 25.6% | 38.6% | 40.5% | 27.8% | 32.8% |
| Don't know | 48 | 34 | 9 | 34 | 11 | 3 | 28 | 12 |
| | 3.5% | 3.1% | 5.1% | 3.5% | 5.3% | 1.9% | 4.4% | 2.4% |
| No response | 17 | 14 | 1 | 11 | 5 | 0 | 6 | 1 |
| | 1.2% | 1.3% | 0.6% | 1.1% | 2.4% | 0.0% | 1.0% | 0.2% |

*Pan Atlantic Research: June, 2021*

Table 54: In your opinion, how important is this overall economic impact [of the cruise ship industry] to: THE TOWN OF BAR HARBOR AS A WHOLE (Q9a)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all important | 141 | 19 | 54 | 44 | 26 | 41 | 32 | 25 | 34 | 60 |
| | 10.2% | 9.3% | 9.8% | 8.5% | 11.9% | 10.0% | 7.5% | 8.4% | 8.1% | 11.3% |
| 2 | 253 | 46 | 92 | 96 | 43 | 75 | 71 | 43 | 79 | 104 |
| | 18.4% | 22.5% | 16.8% | 18.5% | 19.6% | 18.3% | 16.7% | 14.4% | 18.8% | 19.5% |
| 3 | 279 | 41 | 104 | 114 | 44 | 106 | 63 | 73 | 82 | 104 |
| | 20.2% | 20.1% | 18.9% | 22.0% | 20.1% | 25.9% | 14.8% | 24.4% | 19.5% | 19.5% |
| 4 | 237 | 24 | 99 | 99 | 45 | 72 | 72 | 58 | 75 | 91 |
| | 17.2% | 11.8% | 18.0% | 19.1% | 20.5% | 17.6% | 16.9% | 19.4% | 17.8% | 17.1% |
| 5 - Very important | 403 | 60 | 185 | 138 | 52 | 95 | 167 | 91 | 133 | 143 |
| | 29.2% | 29.4% | 33.7% | 26.6% | 23.7% | 23.2% | 39.3% | 30.4% | 31.6% | 26.8% |
| Don't know | 48 | 12 | 11 | 20 | 8 | 17 | 17 | 7 | 13 | 25 |
| | 3.5% | 5.9% | 2.0% | 3.9% | 3.7% | 4.2% | 4.0% | 2.3% | 3.1% | 4.7% |
| No response | 17 | 2 | 4 | 7 | 1 | 3 | 3 | 2 | 5 | 6 |
| | 1.2% | 1.0% | 0.7% | 1.4% | 0.5% | 0.7% | 0.7% | 0.7% | 1.2% | 1.1% |

*Pan Atlantic Research: June, 2021*

Table 55: Mean of Q9a

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Mean | 3.39 | 3.39 | 3.19 | 3.27 | 3.77 | 3.67 | 3.41 | 3.47 |
| Std Error | 0.04 | 0.04 | 0.10 | 0.04 | 0.09 | 0.11 | 0.05 | 0.06 |
| Valid N | 1313 | 1044 | 167 | 940 | 191 | 155 | 596 | 484 |

*Pan Atlantic Research: June, 2021*

Table 56: Mean of Q9a

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Mean | 3.39 | 3.32 | 3.50 | 3.39 | 3.26 | 3.27 | 3.67 | 3.51 | 3.48 | 3.30 |
| Std Error | 0.04 | 0.10 | 0.06 | 0.06 | 0.09 | 0.07 | 0.07 | 0.08 | 0.07 | 0.06 |
| Valid N | 1313 | 190 | 534 | 491 | 210 | 389 | 405 | 290 | 403 | 502 |

*Pan Atlantic Research: June, 2021*

DX323.347

App. 651    TOWN06127

**Table 57:** In your opinion, how important is this overall economic impact [of the cruise ship industry] to: YOU (Q9b)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all important | 711 | 579 | 88 | 533 | 102 | 59 | 319 | 250 |
| | 51.6% | 53.0% | 49.7% | 54.1% | 49.3% | 37.3% | 50.6% | 50.3% |
| 2 | 205 | 168 | 26 | 153 | 28 | 18 | 96 | 74 |
| | 14.9% | 15.4% | 14.7% | 15.5% | 13.5% | 11.4% | 15.2% | 14.9% |
| 3 | 154 | 120 | 20 | 107 | 25 | 21 | 78 | 55 |
| | 11.2% | 11.0% | 11.3% | 10.9% | 12.1% | 13.3% | 12.4% | 11.1% |
| 4 | 102 | 81 | 15 | 71 | 20 | 10 | 50 | 40 |
| | 7.4% | 7.4% | 8.5% | 7.2% | 9.7% | 6.3% | 7.9% | 8.0% |
| 5 - Very important | 165 | 113 | 22 | 96 | 19 | 48 | 65 | 68 |
| | 12.0% | 10.3% | 12.4% | 9.7% | 9.2% | 30.4% | 10.3% | 13.7% |
| Don't know | 19 | 15 | 3 | 10 | 7 | 2 | 11 | 5 |
| | 1.4% | 1.4% | 1.7% | 1.0% | 3.4% | 1.3% | 1.7% | 1.0% |
| No response | 22 | 16 | 3 | 15 | 6 | 0 | 11 | 5 |
| | 1.6% | 1.5% | 1.7% | 1.5% | 2.9% | 0.0% | 1.7% | 1.0% |

*Pan Atlantic Research: June, 2021*


**Table 58:** In your opinion, how important is this overall economic impact [of the cruise ship industry] to: YOU (Q9b)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all important | 711 | 108 | 266 | 274 | 107 | 222 | 209 | 133 | 197 | 316 |
| | 51.6% | 52.9% | 48.5% | 52.9% | 48.9% | 54.3% | 49.2% | 44.5% | 46.8% | 59.3% |
| 2 | 205 | 31 | 76 | 83 | 33 | 66 | 54 | 47 | 65 | 77 |
| | 14.9% | 15.2% | 13.8% | 16.0% | 15.1% | 16.1% | 12.7% | 15.7% | 15.4% | 14.4% |
| 3 | 154 | 17 | 73 | 53 | 25 | 45 | 53 | 35 | 50 | 58 |
| | 11.2% | 8.3% | 13.3% | 10.2% | 11.4% | 11.0% | 12.5% | 11.7% | 11.9% | 10.9% |
| 4 | 102 | 17 | 40 | 40 | 24 | 27 | 37 | 35 | 31 | 28 |
| | 7.4% | 8.3% | 7.3% | 7.7% | 11.0% | 6.6% | 8.7% | 11.7% | 7.4% | 5.3% |
| 5 - Very important | 165 | 29 | 83 | 43 | 24 | 41 | 61 | 38 | 67 | 42 |
| | 12.0% | 14.2% | 15.1% | 8.3% | 11.0% | 10.0% | 14.4% | 12.7% | 15.9% | 7.9% |
| Don't know | 19 | 1 | 5 | 12 | 3 | 4 | 7 | 5 | 5 | 6 |
| | 1.4% | 0.5% | 0.9% | 2.3% | 1.4% | 1.0% | 1.6% | 1.7% | 1.2% | 1.1% |
| No response | 22 | 1 | 6 | 13 | 3 | 4 | 4 | 6 | 6 | 6 |
| | 1.6% | 0.5% | 1.1% | 2.5% | 1.4% | 1.0% | 0.9% | 2.0% | 1.4% | 1.1% |

*Pan Atlantic Research: June, 2021*


**Table 59:** Mean of Q9b

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Mean | 2.11 | 2.04 | 2.16 | 2.00 | 2.10 | 2.81 | 2.09 | 2.18 |
| Std Error | 0.04 | 0.04 | 0.11 | 0.04 | 0.10 | 0.14 | 0.06 | 0.07 |
| Valid N | 1337 | 1061 | 171 | 960 | 194 | 156 | 608 | 487 |

*Pan Atlantic Research: June, 2021*


**Table 60:** Mean of Q9b

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Mean | 2.11 | 2.15 | 2.25 | 1.98 | 2.18 | 2.00 | 2.24 | 2.30 | 2.28 | 1.85 |
| Std Error | 0.04 | 0.11 | 0.06 | 0.06 | 0.10 | 0.07 | 0.07 | 0.09 | 0.07 | 0.06 |
| Valid N | 1337 | 202 | 538 | 493 | 213 | 401 | 414 | 288 | 410 | 521 |

*Pan Atlantic Research: June, 2021*

DX323.348

App. 652    TOWN06128

Table 61: In your opinion, how important is this overall economic impact [of the cruise ship industry] to: YOUR FRIENDS, FAMILIES, AND NEIGHBORS (Q9c)

| | | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | Total | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all important | 469 | 382 | 55 | 346 | 75 | 35 | 213 | 164 |
| | 34.0% | 35.0% | 31.1% | 35.1% | 36.2% | 22.2% | 33.8% | 33.0% |
| 2 | 244 | 192 | 41 | 190 | 26 | 24 | 112 | 89 |
| | 17.7% | 17.6% | 23.2% | 19.3% | 12.6% | 15.2% | 17.8% | 17.9% |
| 3 | 230 | 185 | 30 | 165 | 33 | 28 | 109 | 80 |
| | 16.7% | 16.9% | 16.9% | 16.8% | 15.9% | 17.7% | 17.3% | 16.1% |
| 4 | 157 | 126 | 20 | 115 | 23 | 17 | 74 | 64 |
| | 11.4% | 11.5% | 11.3% | 11.7% | 11.1% | 10.8% | 11.7% | 12.9% |
| 5 - Very important | 179 | 129 | 20 | 106 | 27 | 43 | 73 | 72 |
| | 13.0% | 11.8% | 11.3% | 10.8% | 13.0% | 27.2% | 11.6% | 14.5% |
| Don't know | 75 | 62 | 7 | 46 | 19 | 9 | 36 | 23 |
| | 5.4% | 5.7% | 4.0% | 4.7% | 9.2% | 5.7% | 5.7% | 4.6% |
| No response | 24 | 16 | 4 | 17 | 4 | 2 | 13 | 5 |
| | 1.7% | 1.5% | 2.3% | 1.7% | 1.9% | 1.3% | 2.1% | 1.0% |

*Pan Atlantic Research: June, 2021*

Table 62: In your opinion, how important is this overall economic impact [of the cruise ship industry] to: YOUR FRIENDS, FAMILIES, AND NEIGHBORS (Q9c)

| | | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | Total | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all important | 469 | 68 | 171 | 187 | 74 | 148 | 134 | 83 | 128 | 214 |
| | 34.0% | 33.3% | 31.1% | 36.1% | 33.8% | 36.2% | 31.5% | 27.8% | 30.4% | 40.2% |
| 2 | 244 | 43 | 85 | 98 | 41 | 88 | 60 | 56 | 69 | 101 |
| | 17.7% | 21.1% | 15.5% | 18.9% | 18.7% | 21.5% | 14.1% | 18.7% | 16.4% | 18.9% |
| 3 | 230 | 29 | 106 | 80 | 35 | 69 | 75 | 54 | 73 | 85 |
| | 16.7% | 14.2% | 19.3% | 15.4% | 16.0% | 16.9% | 17.6% | 18.1% | 17.3% | 15.9% |
| 4 | 157 | 24 | 70 | 54 | 29 | 39 | 58 | 44 | 53 | 48 |
| | 11.4% | 11.8% | 12.8% | 10.4% | 13.2% | 9.5% | 13.6% | 14.7% | 12.6% | 9.0% |
| 5 - Very important | 179 | 31 | 93 | 46 | 23 | 45 | 70 | 47 | 65 | 48 |
| | 13.0% | 15.2% | 16.9% | 8.9% | 10.5% | 11.0% | 16.5% | 15.7% | 15.4% | 9.0% |
| Don't know | 75 | 7 | 19 | 40 | 13 | 15 | 23 | 10 | 27 | 30 |
| | 5.4% | 3.4% | 3.5% | 7.7% | 5.9% | 3.7% | 5.4% | 3.3% | 6.4% | 5.6% |
| No response | 24 | 2 | 5 | 13 | 4 | 5 | 5 | 5 | 6 | 7 |
| | 1.7% | 1.0% | 0.9% | 2.5% | 1.8% | 1.2% | 1.2% | 1.7% | 1.4% | 1.3% |

*Pan Atlantic Research: June, 2021*

Table 63: Mean of Q9c

| | | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | Total | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Mean | 2.48 | 2.44 | 2.45 | 2.40 | 2.46 | 3.06 | 2.45 | 2.55 |
| Std Error | 0.04 | 0.04 | 0.11 | 0.05 | 0.11 | 0.13 | 0.06 | 0.07 |
| Valid N | 1279 | 1014 | 166 | 922 | 184 | 147 | 581 | 469 |

*Pan Atlantic Research: June, 2021*

Table 64: Mean of Q9c

| | | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | Total | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Mean | 2.48 | 2.52 | 2.67 | 2.30 | 2.44 | 2.34 | 2.67 | 2.70 | 2.63 | 2.22 |
| Std Error | 0.04 | 0.10 | 0.06 | 0.06 | 0.10 | 0.07 | 0.08 | 0.09 | 0.07 | 0.06 |
| Valid N | 1279 | 195 | 525 | 465 | 202 | 389 | 397 | 284 | 388 | 496 |

*Pan Atlantic Research: June, 2021*

DX323.349

App. 653      TOWN06129

Table 65: In your opinion, how important is this overall economic impact [of the cruise ship industry] to: YOUR BUSINESS OR PLACE OF EMPLOYMENT, AS APPLICABLE (Q9d)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all important | 629 | 512 | 71 | 475 | 75 | 64 | 283 | 236 |
| | 45.6% | 46.9% | 40.1% | 48.2% | 36.2% | 40.5% | 44.9% | 47.5% |
| 2 | 118 | 89 | 21 | 91 | 8 | 16 | 51 | 41 |
| | 8.6% | 8.2% | 11.9% | 9.2% | 3.9% | 10.1% | 8.1% | 8.2% |
| 3 | 103 | 73 | 20 | 75 | 10 | 15 | 45 | 42 |
| | 7.5% | 6.7% | 11.3% | 7.6% | 4.8% | 9.5% | 7.1% | 8.5% |
| 4 | 77 | 67 | 9 | 58 | 8 | 10 | 34 | 33 |
| | 5.6% | 6.1% | 5.1% | 5.9% | 3.9% | 6.3% | 5.4% | 6.6% |
| 5 - Very important | 165 | 106 | 28 | 95 | 19 | 48 | 72 | 61 |
| | 12.0% | 9.7% | 15.8% | 9.6% | 9.2% | 30.4% | 11.4% | 12.3% |
| Don't know | 156 | 133 | 15 | 95 | 56 | 3 | 75 | 56 |
| | 11.3% | 12.2% | 8.5% | 9.6% | 27.1% | 1.9% | 11.9% | 11.3% |
| No response | 130 | 112 | 13 | 96 | 31 | 2 | 70 | 28 |
| | 9.4% | 10.3% | 7.3% | 9.7% | 15.0% | 1.3% | 11.1% | 5.6% |

*Pan Atlantic Research: June, 2021*

Table 66: In your opinion, how important is this overall economic impact [of the cruise ship industry] to: YOUR BUSINESS OR PLACE OF EMPLOYMENT, AS APPLICABLE (Q9d)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all important | 629 | 100 | 285 | 199 | 93 | 201 | 203 | 115 | 186 | 278 |
| | 45.6% | 49.0% | 51.9% | 38.4% | 42.5% | 49.1% | 47.8% | 38.5% | 44.2% | 52.2% |
| 2 | 118 | 26 | 52 | 33 | 24 | 40 | 32 | 32 | 34 | 41 |
| | 8.6% | 12.7% | 9.5% | 6.4% | 11.0% | 9.8% | 7.5% | 10.7% | 8.1% | 7.7% |
| 3 | 103 | 21 | 45 | 30 | 16 | 39 | 34 | 30 | 35 | 31 |
| | 7.5% | 10.3% | 8.2% | 5.8% | 7.3% | 9.5% | 8.0% | 10.0% | 8.3% | 5.8% |
| 4 | 77 | 12 | 34 | 28 | 20 | 15 | 28 | 26 | 27 | 19 |
| | 5.6% | 5.9% | 6.2% | 5.4% | 9.1% | 3.7% | 6.6% | 8.7% | 6.4% | 3.6% |
| 5 - Very important | 165 | 32 | 81 | 42 | 23 | 44 | 58 | 37 | 65 | 44 |
| | 12.0% | 15.7% | 14.8% | 8.1% | 10.5% | 10.8% | 13.6% | 12.4% | 15.4% | 8.3% |
| Don't know | 156 | 9 | 32 | 98 | 20 | 38 | 43 | 31 | 37 | 72 |
| | 11.3% | 4.4% | 5.8% | 18.9% | 9.1% | 9.3% | 10.1% | 10.4% | 8.8% | 13.5% |
| No response | 130 | 4 | 20 | 88 | 23 | 32 | 27 | 28 | 37 | 48 |
| | 9.4% | 2.0% | 3.6% | 17.0% | 10.5% | 7.8% | 6.4% | 9.4% | 8.8% | 9.0% |

*Pan Atlantic Research: June, 2021*

Table 67: Mean of Q9d

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Mean | 2.11 | 2.02 | 2.34 | 2.00 | 2.07 | 2.75 | 2.09 | 2.13 |
| Std Error | 0.05 | 0.05 | 0.13 | 0.05 | 0.14 | 0.14 | 0.07 | 0.07 |
| Valid N | 1092 | 847 | 149 | 794 | 120 | 153 | 485 | 413 |

*Pan Atlantic Research: June, 2021*

Table 68: Mean of Q9d

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Mean | 2.11 | 2.21 | 2.14 | 2.04 | 2.18 | 2.00 | 2.17 | 2.33 | 2.28 | 1.81 |
| Std Error | 0.05 | 0.11 | 0.07 | 0.08 | 0.11 | 0.08 | 0.08 | 0.10 | 0.09 | 0.07 |
| Valid N | 1092 | 191 | 497 | 332 | 176 | 339 | 355 | 240 | 347 | 413 |

*Pan Atlantic Research: June, 2021*

Table 69: When considering future management of cruise ships, how important is this economic benefit [of collected Passenger Service and Development Fees] to the Town? (Q10)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | *Own* | *Rent* | *Year-round resident* | *Seasonal resident* | *Business-owner (resident or non-resident)* | *Female* | *Male* |
| Total | **1378** | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Not at all important** | **206** | 163 | 30 | 164 | 20 | 17 | 85 | 70 |
| | **14.9%** | 14.9% | 16.9% | 16.6% | 9.7% | 10.8% | 13.5% | 14.1% |
| **2** | **254** | 208 | 34 | 196 | 33 | 21 | 117 | 97 |
| | **18.4%** | 19.0% | 19.2% | 19.9% | 15.9% | 13.3% | 18.6% | 19.5% |
| **3** | **227** | 185 | 27 | 168 | 30 | 26 | 115 | 72 |
| | **16.5%** | 16.9% | 15.3% | 17.1% | 14.5% | 16.5% | 18.3% | 14.5% |
| **4** | **187** | 156 | 22 | 143 | 28 | 12 | 89 | 72 |
| | **13.6%** | 14.3% | 12.4% | 14.5% | 13.5% | 7.6% | 14.1% | 14.5% |
| **5 - Very important** | **426** | 326 | 48 | 265 | 80 | 73 | 183 | 172 |
| | **30.9%** | 29.9% | 27.1% | 26.9% | 38.6% | 46.2% | 29.0% | 34.6% |
| **Don't know** | **68** | 45 | 15 | 42 | 15 | 7 | 39 | 12 |
| | **4.9%** | 4.1% | 8.5% | 4.3% | 7.2% | 4.4% | 6.2% | 2.4% |
| **No response** | **10** | 9 | 1 | 7 | 1 | 2 | 2 | 2 |
| | **0.7%** | 0.8% | 0.6% | 0.7% | 0.5% | 1.3% | 0.3% | 0.4% |

*Pan Atlantic Research: June, 2021*

Table 70: When considering future management of cruise ships, how important is this economic benefit [of collected Passenger Service and Development Fees] to the Town? (Q10)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | *18-44* | *45-64* | *65+* | *<50k* | *$50k-100k* | *100k+* | *Less than 4-year degree* | *4-year degree* | *Post-graduate degree* |
| Total | **1378** | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Not at all important** | **206** | 41 | 79 | 65 | 36 | 50 | 69 | 31 | 54 | 101 |
| | **14.9%** | 20.1% | 14.4% | 12.5% | 16.4% | 12.2% | 16.2% | 10.4% | 12.8% | 18.9% |
| **2** | **254** | 41 | 92 | 101 | 39 | 91 | 67 | 42 | 80 | 110 |
| | **18.4%** | 20.1% | 16.8% | 19.5% | 17.8% | 22.2% | 15.8% | 14.0% | 19.0% | 20.6% |
| **3** | **227** | 26 | 93 | 90 | 38 | 78 | 56 | 61 | 57 | 90 |
| | **16.5%** | 12.7% | 16.9% | 17.4% | 17.4% | 19.1% | 13.2% | 20.4% | 13.5% | 16.9% |
| **4** | **187** | 22 | 67 | 85 | 36 | 58 | 53 | 46 | 68 | 62 |
| | **13.6%** | 10.8% | 12.2% | 16.4% | 16.4% | 14.2% | 12.5% | 15.4% | 16.2% | 11.6% |
| **5 - Very important** | **426** | 61 | 197 | 147 | 56 | 112 | 163 | 98 | 140 | 147 |
| | **30.9%** | 29.9% | 35.9% | 28.4% | 25.6% | 27.4% | 38.4% | 32.8% | 33.3% | 27.6% |
| **Don't know** | **68** | 12 | 18 | 27 | 12 | 17 | 15 | 19 | 19 | 21 |
| | **4.9%** | 5.9% | 3.3% | 5.2% | 5.5% | 4.2% | 3.5% | 6.4% | 4.5% | 3.9% |
| **No response** | **10** | 1 | 3 | 3 | 2 | 3 | 2 | 2 | 3 | 2 |
| | **0.7%** | 0.5% | 0.5% | 0.6% | 0.9% | 0.7% | 0.5% | 0.7% | 0.7% | 0.4% |

*Pan Atlantic Research: June, 2021*

Table 71: Mean of Q10

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | *Own* | *Rent* | *Year-round resident* | *Seasonal resident* | *Business-owner (resident or non-resident)* | *Female* | *Male* |
| **Mean** | **3.29** | 3.26 | 3.15 | 3.16 | 3.60 | 3.69 | 3.29 | 3.37 |
| **Std Error** | **0.04** | 0.05 | 0.12 | 0.05 | 0.10 | 0.12 | 0.06 | 0.07 |
| **Valid N** | **1300** | 1038 | 161 | 936 | 191 | 149 | 589 | 483 |

*Pan Atlantic Research: June, 2021*

Table 72: Mean of Q10

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | *18-44* | *45-64* | *65+* | *<50k* | *$50k-100k* | *100k+* | *Less than 4-year degree* | *4-year degree* | *Post-graduate degree* |
| **Mean** | **3.29** | 3.11 | 3.40 | 3.30 | 3.18 | 3.23 | 3.43 | 3.50 | 3.40 | 3.09 |
| **Std Error** | **0.04** | 0.11 | 0.07 | 0.06 | 0.10 | 0.07 | 0.08 | 0.08 | 0.07 | 0.07 |
| **Valid N** | **1300** | 191 | 528 | 488 | 205 | 389 | 408 | 278 | 399 | 510 |

*Pan Atlantic Research: June, 2021*

DX323.351

App. 655   TOWN06131

Table 73: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? CAR TRAFFIC CONGESTION FROM CRUISE SHIP PASSENGERS (Q11a)

|  | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
|  |  | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
|  | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all concerned | 408 | 308 | 52 | 279 | 54 | 65 | 165 | 159 |
|  | 29.6% | 28.2% | 29.4% | 28.3% | 26.1% | 41.1% | 26.2% | 32.0% |
| 2 | 201 | 163 | 21 | 136 | 37 | 25 | 84 | 87 |
|  | 14.6% | 14.9% | 11.9% | 13.8% | 17.9% | 15.8% | 13.3% | 17.5% |
| 3 | 195 | 159 | 21 | 142 | 24 | 25 | 92 | 76 |
|  | 14.2% | 14.6% | 11.9% | 14.4% | 11.6% | 15.8% | 14.6% | 15.3% |
| 4 | 143 | 119 | 21 | 103 | 30 | 7 | 72 | 49 |
|  | 10.4% | 10.9% | 11.9% | 10.5% | 14.5% | 4.4% | 11.4% | 9.9% |
| 5 - Very concerned | 381 | 301 | 57 | 289 | 53 | 32 | 192 | 115 |
|  | 27.6% | 27.6% | 32.2% | 29.3% | 25.6% | 20.3% | 30.5% | 23.1% |
| Don't know | 33 | 25 | 5 | 24 | 5 | 3 | 18 | 5 |
|  | 2.4% | 2.3% | 2.8% | 2.4% | 2.4% | 1.9% | 2.9% | 1.0% |
| No response | 17 | 17 | 0 | 12 | 4 | 1 | 7 | 6 |
|  | 1.2% | 1.6% | 0.0% | 1.2% | 1.9% | 0.6% | 1.1% | 1.2% |

*Pan Atlantic Research: June, 2021*

Table 74: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? CAR TRAFFIC CONGESTION FROM CRUISE SHIP PASSENGERS (Q11a)

|  | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
|  | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all concerned | 408 | 66 | 174 | 132 | 52 | 113 | 141 | 68 | 156 | 140 |
|  | 29.6% | 32.4% | 31.7% | 25.5% | 23.7% | 27.6% | 33.2% | 22.7% | 37.1% | 26.3% |
| 2 | 201 | 30 | 79 | 84 | 36 | 60 | 70 | 48 | 63 | 79 |
|  | 14.6% | 14.7% | 14.4% | 16.2% | 16.4% | 14.7% | 16.5% | 16.1% | 15.0% | 14.8% |
| 3 | 195 | 29 | 86 | 69 | 34 | 61 | 64 | 44 | 51 | 88 |
|  | 14.2% | 14.2% | 15.7% | 13.3% | 15.5% | 14.9% | 15.1% | 14.7% | 12.1% | 16.5% |
| 4 | 143 | 24 | 49 | 59 | 22 | 38 | 43 | 37 | 40 | 55 |
|  | 10.4% | 11.8% | 8.9% | 11.4% | 10.0% | 9.3% | 10.1% | 12.4% | 9.5% | 10.3% |
| 5 - Very concerned | 381 | 47 | 144 | 157 | 70 | 126 | 89 | 96 | 99 | 144 |
|  | 27.6% | 23.0% | 26.2% | 30.3% | 32.0% | 30.8% | 20.9% | 32.1% | 23.5% | 27.0% |
| Don't know | 33 | 7 | 12 | 9 | 4 | 7 | 12 | 3 | 6 | 22 |
|  | 2.4% | 3.4% | 2.2% | 1.7% | 1.8% | 1.7% | 2.8% | 1.0% | 1.4% | 4.1% |
| No response | 17 | 1 | 5 | 8 | 1 | 4 | 6 | 3 | 6 | 5 |
|  | 1.2% | 0.5% | 0.9% | 1.5% | 0.5% | 1.0% | 1.4% | 1.0% | 1.4% | 0.9% |

*Pan Atlantic Research: June, 2021*

Table 75: Mean of Q11a

|  | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
|  |  | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Mean | 2.92 | 2.94 | 3.06 | 2.99 | 2.95 | 2.45 | 3.07 | 2.74 |
| Std Error | 0.04 | 0.05 | 0.13 | 0.05 | 0.11 | 0.13 | 0.07 | 0.07 |
| Valid N | 1328 | 1050 | 172 | 949 | 198 | 154 | 605 | 486 |

*Pan Atlantic Research: June, 2021*

Table 76: Mean of Q11a

|  | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Mean | 2.92 | 2.78 | 2.83 | 3.05 | 3.10 | 3.01 | 2.68 | 3.15 | 2.67 | 2.97 |
| Std Error | 0.04 | 0.11 | 0.07 | 0.07 | 0.11 | 0.08 | 0.08 | 0.09 | 0.08 | 0.07 |
| Valid N | 1328 | 196 | 532 | 501 | 214 | 398 | 407 | 293 | 409 | 506 |

*Pan Atlantic Research: June, 2021*

DX323.352

App. 656

TOWN06132

Table 77: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? BUS TRAFFIC CONGESTION FROM CRUISE SHIP PASSENGERS (Q11b)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all concerned | 117 | 80 | 18 | 75 | 15 | 26 | 36 | 49 |
| | 8.5% | 7.3% | 10.2% | 7.6% | 7.2% | 16.5% | 5.7% | 9.9% |
| 2 | 150 | 111 | 18 | 93 | 24 | 29 | 68 | 64 |
| | 10.9% | 10.2% | 10.2% | 9.4% | 11.6% | 18.4% | 10.8% | 12.9% |
| 3 | 211 | 168 | 29 | 145 | 43 | 18 | 90 | 78 |
| | 15.3% | 15.4% | 16.4% | 14.7% | 20.8% | 11.4% | 14.3% | 15.7% |
| 4 | 250 | 200 | 36 | 175 | 42 | 27 | 119 | 95 |
| | 18.1% | 18.3% | 20.3% | 17.8% | 20.3% | 17.1% | 18.9% | 19.1% |
| 5 - Very concerned | 632 | 519 | 74 | 487 | 77 | 56 | 305 | 207 |
| | 45.9% | 47.5% | 41.8% | 49.4% | 37.2% | 35.4% | 48.4% | 41.6% |
| Don't know | 11 | 7 | 2 | 7 | 2 | 2 | 10 | 1 |
| | 0.8% | 0.6% | 1.1% | 0.7% | 1.0% | 1.3% | 1.6% | 0.2% |
| No response | 7 | 7 | 0 | 3 | 4 | 0 | 2 | 3 |
| | 0.5% | 0.6% | 0.0% | 0.3% | 1.9% | 0.0% | 0.3% | 0.6% |

*Pan Atlantic Research: June, 2021*

Table 78: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? BUS TRAFFIC CONGESTION FROM CRUISE SHIP PASSENGERS (Q11b)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all concerned | 117 | 21 | 56 | 31 | 22 | 23 | 41 | 25 | 45 | 29 |
| | 8.5% | 10.3% | 10.2% | 6.0% | 10.0% | 5.6% | 9.6% | 8.4% | 10.7% | 5.4% |
| 2 | 150 | 25 | 64 | 50 | 20 | 37 | 58 | 30 | 51 | 58 |
| | 10.9% | 12.3% | 11.7% | 9.7% | 9.1% | 9.0% | 13.6% | 10.0% | 12.1% | 10.9% |
| 3 | 211 | 37 | 88 | 73 | 33 | 64 | 72 | 44 | 72 | 80 |
| | 15.3% | 18.1% | 16.0% | 14.1% | 15.1% | 15.6% | 16.9% | 14.7% | 17.1% | 15.0% |
| 4 | 250 | 45 | 95 | 96 | 37 | 74 | 88 | 49 | 80 | 104 |
| | 18.1% | 22.1% | 17.3% | 18.5% | 16.9% | 18.1% | 20.7% | 16.4% | 19.0% | 19.5% |
| 5 - Very concerned | 632 | 75 | 238 | 262 | 105 | 208 | 157 | 150 | 168 | 253 |
| | 45.9% | 36.8% | 43.4% | 50.6% | 47.9% | 50.9% | 36.9% | 50.2% | 39.9% | 47.5% |
| Don't know | 11 | 1 | 5 | 4 | 2 | 2 | 5 | 1 | 3 | 6 |
| | 0.8% | 0.5% | 0.9% | 0.8% | 0.9% | 0.5% | 1.2% | 0.3% | 0.7% | 1.1% |
| No response | 7 | 0 | 3 | 2 | 0 | 1 | 4 | 0 | 2 | 3 |
| | 0.5% | 0.0% | 0.5% | 0.4% | 0.0% | 0.2% | 0.9% | 0.0% | 0.5% | 0.6% |

*Pan Atlantic Research: June, 2021*

Table 79: Mean of Q11b

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Mean | 3.83 | 3.90 | 3.74 | 3.93 | 3.71 | 3.37 | 3.95 | 3.70 |
| Std Error | 0.04 | 0.04 | 0.10 | 0.04 | 0.09 | 0.12 | 0.05 | 0.06 |
| Valid N | 1360 | 1078 | 175 | 975 | 201 | 156 | 618 | 493 |

*Pan Atlantic Research: June, 2021*

Table 80: Mean of Q11b

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Mean | 3.83 | 3.63 | 3.73 | 3.99 | 3.84 | 4.00 | 3.63 | 3.90 | 3.66 | 3.94 |
| Std Error | 0.04 | 0.10 | 0.06 | 0.06 | 0.09 | 0.06 | 0.07 | 0.08 | 0.07 | 0.05 |
| Valid N | 1360 | 203 | 541 | 512 | 217 | 406 | 416 | 298 | 416 | 524 |

*Pan Atlantic Research: June, 2021*

DX323.353

App. 657          TOWN06133

Table 81: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? PEDESTRIAN CONGESTION FROM CRUISE SHIP PASSENGERS (Q11c)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all concerned | 147 | 107 | 17 | 89 | 24 | 31 | 50 | 55 |
| | 10.7% | 9.8% | 9.6% | 9.0% | 11.6% | 19.6% | 7.9% | 11.1% |
| 2 | 122 | 100 | 12 | 76 | 26 | 19 | 42 | 67 |
| | 8.9% | 9.2% | 6.8% | 7.7% | 12.6% | 12.0% | 6.7% | 13.5% |
| 3 | 173 | 140 | 17 | 113 | 29 | 22 | 80 | 74 |
| | 12.6% | 12.8% | 9.6% | 11.5% | 14.0% | 13.9% | 12.7% | 14.9% |
| 4 | 229 | 176 | 38 | 166 | 38 | 21 | 102 | 96 |
| | 16.6% | 16.1% | 21.5% | 16.9% | 18.4% | 13.3% | 16.2% | 19.3% |
| 5 - Very concerned | 695 | 561 | 91 | 533 | 88 | 64 | 348 | 202 |
| | 50.4% | 51.4% | 51.4% | 54.1% | 42.5% | 40.5% | 55.2% | 40.6% |
| Don't know | 5 | 1 | 2 | 4 | 0 | 0 | 5 | 0 |
| | 0.4% | 0.1% | 1.1% | 0.4% | 0.0% | 0.0% | 0.8% | 0.0% |
| No response | 7 | 7 | 0 | 4 | 2 | 1 | 3 | 3 |
| | 0.5% | 0.6% | 0.0% | 0.4% | 1.0% | 0.6% | 0.5% | 0.6% |

*Pan Atlantic Research: June, 2021*

Table 82: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? PEDESTRIAN CONGESTION FROM CRUISE SHIP PASSENGERS (Q11c)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all concerned | 147 | 22 | 76 | 39 | 18 | 35 | 61 | 27 | 52 | 47 |
| | 10.7% | 10.8% | 13.8% | 7.5% | 8.2% | 8.6% | 14.4% | 9.0% | 12.4% | 8.8% |
| 2 | 122 | 18 | 49 | 46 | 16 | 33 | 43 | 25 | 45 | 42 |
| | 8.9% | 8.8% | 8.9% | 8.9% | 7.3% | 8.1% | 10.1% | 8.4% | 10.7% | 7.9% |
| 3 | 173 | 25 | 81 | 59 | 30 | 54 | 57 | 40 | 61 | 64 |
| | 12.6% | 12.3% | 14.8% | 11.4% | 13.7% | 13.2% | 13.4% | 13.4% | 14.5% | 12.0% |
| 4 | 229 | 40 | 73 | 98 | 32 | 72 | 75 | 56 | 63 | 99 |
| | 16.6% | 19.6% | 13.3% | 18.9% | 14.6% | 17.6% | 17.6% | 18.7% | 15.0% | 18.6% |
| 5 - Very concerned | 695 | 98 | 267 | 270 | 121 | 212 | 186 | 146 | 198 | 278 |
| | 50.4% | 48.0% | 48.6% | 52.1% | 55.3% | 51.8% | 43.8% | 48.8% | 47.0% | 52.2% |
| Don't know | 5 | 1 | 0 | 3 | 2 | 1 | 0 | 2 | 1 | 1 |
| | 0.4% | 0.5% | 0.0% | 0.6% | 0.9% | 0.2% | 0.0% | 0.7% | 0.2% | 0.2% |
| No response | 7 | 0 | 3 | 3 | 0 | 2 | 3 | 3 | 1 | 2 |
| | 0.5% | 0.0% | 0.5% | 0.6% | 0.0% | 0.5% | 0.7% | 1.0% | 0.2% | 0.4% |

*Pan Atlantic Research: June, 2021*

Table 83: Mean of Q11c

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Mean | 3.88 | 3.91 | 3.99 | 4.00 | 3.68 | 3.43 | 4.05 | 3.65 |
| Std Error | 0.04 | 0.04 | 0.10 | 0.04 | 0.10 | 0.13 | 0.05 | 0.06 |
| Valid N | 1366 | 1084 | 175 | 977 | 205 | 157 | 622 | 494 |

*Pan Atlantic Research: June, 2021*

Table 84: Mean of Q11c

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Mean | 3.88 | 3.86 | 3.74 | 4.00 | 4.02 | 3.97 | 3.67 | 3.91 | 3.74 | 3.98 |
| Std Error | 0.04 | 0.10 | 0.06 | 0.06 | 0.09 | 0.07 | 0.07 | 0.08 | 0.07 | 0.06 |
| Valid N | 1366 | 203 | 546 | 512 | 217 | 406 | 422 | 294 | 419 | 530 |

*Pan Atlantic Research: June, 2021*

DX323.354

App. 658    TOWN06134

Table 85: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? LACK OF ADEQUATE PARKING DUE TO CRUISE SHIP PASSENGERS (Q11d)

| | | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | *Total* | *Own* | *Rent* | *Year-round resident* | *Seasonal resident* | *Business-owner (resident or non-resident)* | *Female* | *Male* |
|---|---|---|---|---|---|---|---|---|
| Total | **1378** | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Not at all concerned** | **394** | 302 | 48 | 264 | 60 | 63 | 158 | 152 |
| | **28.6%** | 27.7% | 27.1% | 26.8% | 29.0% | 39.9% | 25.1% | 30.6% |
| **2** | **191** | 153 | 26 | 139 | 29 | 20 | 81 | 86 |
| | **13.9%** | 14.0% | 14.7% | 14.1% | 14.0% | 12.7% | 12.9% | 17.3% |
| **3** | **209** | 165 | 28 | 152 | 28 | 21 | 99 | 84 |
| | **15.2%** | 15.1% | 15.8% | 15.4% | 13.5% | 13.3% | 15.7% | 16.9% |
| **4** | **135** | 114 | 15 | 97 | 22 | 15 | 63 | 51 |
| | **9.8%** | 10.4% | 8.5% | 9.8% | 10.6% | 9.5% | 10.0% | 10.3% |
| **5 - Very concerned** | **376** | 300 | 53 | 282 | 53 | 34 | 188 | 109 |
| | **27.3%** | 27.5% | 29.9% | 28.6% | 25.6% | 21.5% | 29.8% | 21.9% |
| **Don't know** | **53** | 39 | 7 | 36 | 10 | 5 | 29 | 11 |
| | **3.8%** | 3.6% | 4.0% | 3.7% | 4.8% | 3.2% | 4.6% | 2.2% |
| **No response** | **20** | 19 | 0 | 15 | 5 | 0 | 12 | 4 |
| | **1.5%** | 1.7% | 0.0% | 1.5% | 2.4% | 0.0% | 1.9% | 0.8% |

*Pan Atlantic Research: June, 2021*

Table 86: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? LACK OF ADEQUATE PARKING DUE TO CRUISE SHIP PASSENGERS (Q11d)

| | | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | *Total* | *18-44* | *45-64* | *65+* | *<50k* | *$50k-100k* | *100k+* | *Less than 4-year degree* | *4-year degree* | *Post-graduate degree* |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | **1378** | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Not at all concerned** | **394** | 63 | 175 | 124 | 56 | 105 | 138 | 75 | 139 | 138 |
| | **28.6%** | 30.9% | 31.9% | 23.9% | 25.6% | 25.7% | 32.5% | 25.1% | 33.0% | 25.9% |
| **2** | **191** | 30 | 71 | 79 | 29 | 58 | 61 | 30 | 68 | 84 |
| | **13.9%** | 14.7% | 12.9% | 15.3% | 13.2% | 14.2% | 14.4% | 10.0% | 16.2% | 15.8% |
| **3** | **209** | 26 | 98 | 77 | 36 | 71 | 74 | 46 | 63 | 91 |
| | **15.2%** | 12.7% | 17.9% | 14.9% | 16.4% | 17.4% | 17.4% | 15.4% | 15.0% | 17.1% |
| **4** | **135** | 22 | 50 | 54 | 18 | 39 | 42 | 31 | 37 | 54 |
| | **9.8%** | 10.8% | 9.1% | 10.4% | 8.2% | 9.5% | 9.9% | 10.4% | 8.8% | 10.1% |
| **5 - Very concerned** | **376** | 52 | 132 | 153 | 71 | 118 | 89 | 103 | 96 | 133 |
| | **27.3%** | 25.5% | 24.0% | 29.5% | 32.4% | 28.9% | 20.9% | 34.4% | 22.8% | 25.0% |
| **Don't know** | **53** | 11 | 21 | 16 | 5 | 14 | 18 | 8 | 14 | 26 |
| | **3.8%** | 5.4% | 3.8% | 3.1% | 2.3% | 3.4% | 4.2% | 2.7% | 3.3% | 4.9% |
| **No response** | **20** | 0 | 2 | 15 | 4 | 4 | 3 | 6 | 4 | 7 |
| | **1.5%** | 0.0% | 0.4% | 2.9% | 1.8% | 1.0% | 0.7% | 2.0% | 1.0% | 1.3% |

*Pan Atlantic Research: June, 2021*

Table 87: Mean of Q11d

| | | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | *Total* | *Own* | *Rent* | *Year-round resident* | *Seasonal resident* | *Business-owner (resident or non-resident)* | *Female* | *Male* |
|---|---|---|---|---|---|---|---|---|
| **Mean** | **2.93** | 2.96 | 2.99 | 2.99 | 2.89 | 2.59 | 3.07 | 2.75 |
| **Std Error** | **0.04** | 0.05 | 0.12 | 0.05 | 0.12 | 0.13 | 0.07 | 0.07 |
| **Valid N** | **1305** | 1034 | 170 | 934 | 192 | 153 | 589 | 482 |

*Pan Atlantic Research: June, 2021*

Table 88: Mean of Q11d

| | | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | *Total* | *18-44* | *45-64* | *65+* | *<50k* | *$50k-100k* | *100k+* | *Less than 4-year degree* | *4-year degree* | *Post-graduate degree* |
|---|---|---|---|---|---|---|---|---|---|---|
| **Mean** | **2.93** | 2.84 | 2.80 | 3.07 | 3.09 | 3.02 | 2.71 | 3.20 | 2.71 | 2.92 |
| **Std Error** | **0.04** | 0.12 | 0.07 | 0.07 | 0.11 | 0.08 | 0.08 | 0.10 | 0.08 | 0.07 |
| **Valid N** | **1305** | 193 | 526 | 487 | 210 | 391 | 404 | 285 | 403 | 500 |

*Pan Atlantic Research: June, 2021*

Table 89: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? OVERCROWDING DUE TO CRUISE SHIP PASSENGERS, WHICH PREVENTS RESIDENTS FROM ACCESSING THE TOWN PIER, PARKS, AND LOCAL BUSINESSES AT CERTAIN TIMES (Q11e)

| | | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | Total | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all concerned | 167 | 117 | 20 | 103 | 24 | 38 | 58 | 68 |
| | 12.1% | 10.7% | 11.3% | 10.5% | 11.6% | 24.1% | 9.2% | 13.7% |
| 2 | 110 | 84 | 13 | 69 | 19 | 20 | 46 | 55 |
| | 8.0% | 7.7% | 7.3% | 7.0% | 9.2% | 12.7% | 7.3% | 11.1% |
| 3 | 123 | 107 | 8 | 71 | 32 | 16 | 52 | 51 |
| | 8.9% | 9.8% | 4.5% | 7.2% | 15.5% | 10.1% | 8.3% | 10.3% |
| 4 | 185 | 151 | 19 | 135 | 31 | 16 | 75 | 79 |
| | 13.4% | 13.8% | 10.7% | 13.7% | 15.0% | 10.1% | 11.9% | 15.9% |
| 5 - Very concerned | 780 | 625 | 114 | 598 | 100 | 66 | 390 | 241 |
| | 56.6% | 57.2% | 64.4% | 60.7% | 48.3% | 41.8% | 61.9% | 48.5% |
| Don't know | 9 | 5 | 2 | 6 | 0 | 2 | 7 | 2 |
| | 0.7% | 0.5% | 1.1% | 0.6% | 0.0% | 1.3% | 1.1% | 0.4% |
| No response | 4 | 3 | 1 | 3 | 1 | 0 | 2 | 1 |
| | 0.3% | 0.3% | 0.6% | 0.3% | 0.5% | 0.0% | 0.3% | 0.2% |

*Pan Atlantic Research: June, 2021*

Table 90: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? OVERCROWDING DUE TO CRUISE SHIP PASSENGERS, WHICH PREVENTS RESIDENTS FROM ACCESSING THE TOWN PIER, PARKS, AND LOCAL BUSINESSES AT CERTAIN TIMES (Q11e)

| | | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | Total | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all concerned | 167 | 27 | 88 | 40 | 23 | 40 | 63 | 31 | 64 | 47 |
| | 12.1% | 13.2% | 16.0% | 7.7% | 10.5% | 9.8% | 14.8% | 10.4% | 15.2% | 8.8% |
| 2 | 110 | 13 | 41 | 49 | 18 | 29 | 44 | 31 | 34 | 39 |
| | 8.0% | 6.4% | 7.5% | 9.5% | 8.2% | 7.1% | 10.4% | 10.4% | 8.1% | 7.3% |
| 3 | 123 | 11 | 53 | 53 | 15 | 33 | 45 | 28 | 45 | 44 |
| | 8.9% | 5.4% | 9.7% | 10.2% | 6.8% | 8.1% | 10.6% | 9.4% | 10.7% | 8.3% |
| 4 | 185 | 25 | 77 | 72 | 25 | 58 | 64 | 40 | 47 | 89 |
| | 13.4% | 12.3% | 14.0% | 13.9% | 11.4% | 14.2% | 15.1% | 13.4% | 11.2% | 16.7% |
| 5 - Very concerned | 780 | 127 | 285 | 299 | 134 | 246 | 205 | 164 | 228 | 310 |
| | 56.6% | 62.3% | 51.9% | 57.7% | 61.2% | 60.1% | 48.2% | 54.8% | 54.2% | 58.2% |
| Don't know | 9 | 1 | 3 | 4 | 3 | 3 | 2 | 4 | 2 | 3 |
| | 0.7% | 0.5% | 0.5% | 0.8% | 1.4% | 0.7% | 0.5% | 1.3% | 0.5% | 0.6% |
| No response | 4 | 0 | 2 | 1 | 1 | 0 | 2 | 1 | 1 | 1 |
| | 0.3% | 0.0% | 0.4% | 0.2% | 0.5% | 0.0% | 0.5% | 0.3% | 0.2% | 0.2% |

*Pan Atlantic Research: June, 2021*

Table 91: Mean of Q11e

| | | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | Total | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Mean | 3.95 | 4.00 | 4.11 | 4.08 | 3.80 | 3.33 | 4.12 | 3.75 |
| Std Error | 0.04 | 0.04 | 0.11 | 0.04 | 0.10 | 0.13 | 0.05 | 0.07 |
| Valid N | 1365 | 1084 | 174 | 976 | 206 | 156 | 621 | 494 |

*Pan Atlantic Research: June, 2021*

Table 92: Mean of Q11e

| | | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | Total | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Mean | 3.95 | 4.04 | 3.79 | 4.05 | 4.07 | 4.09 | 3.72 | 3.94 | 3.82 | 4.09 |
| Std Error | 0.04 | 0.10 | 0.07 | 0.06 | 0.10 | 0.07 | 0.07 | 0.08 | 0.07 | 0.06 |
| Valid N | 1365 | 203 | 544 | 513 | 215 | 406 | 421 | 294 | 418 | 529 |

*Pan Atlantic Research: June, 2021*

DX323.356

App. 660    TOWN06136

Table 93: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? NEGATIVE IMPACTS ON LOCAL AIR AND WATER QUALITY DUE TO CRUISE SHIPS (Q11f)

| | | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | *Total* | *Own* | *Rent* | *Year-round resident* | *Seasonal resident* | *Business-owner (resident or non-resident)* | *Female* | *Male* |
| Total | **1378** | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Not at all concerned** | **173** | 129 | 20 | 111 | 21 | 38 | 50 | 86 |
| | **12.6%** | 11.8% | 11.3% | 11.3% | 10.1% | 24.1% | 7.9% | 17.3% |
| **2** | **105** | 86 | 7 | 69 | 18 | 18 | 44 | 50 |
| | **7.6%** | 7.9% | 4.0% | 7.0% | 8.7% | 11.4% | 7.0% | 10.1% |
| **3** | **156** | 123 | 17 | 104 | 31 | 18 | 66 | 64 |
| | **11.3%** | 11.3% | 9.6% | 10.6% | 15.0% | 11.4% | 10.5% | 12.9% |
| **4** | **186** | 155 | 23 | 131 | 31 | 23 | 81 | 78 |
| | **13.5%** | 14.2% | 13.0% | 13.3% | 15.0% | 14.6% | 12.9% | 15.7% |
| **5 - Very concerned** | **702** | 548 | 108 | 534 | 91 | 58 | 361 | 200 |
| | **50.9%** | 50.2% | 61.0% | 54.2% | 44.0% | 36.7% | 57.3% | 40.2% |
| **Don't know** | **49** | 44 | 2 | 31 | 14 | 3 | 25 | 16 |
| | **3.6%** | 4.0% | 1.1% | 3.1% | 6.8% | 1.9% | 4.0% | 3.2% |
| **No response** | **7** | 7 | 0 | 5 | 1 | 0 | 3 | 3 |
| | **0.5%** | 0.6% | 0.0% | 0.5% | 0.5% | 0.0% | 0.5% | 0.6% |

*Pan Atlantic Research: June, 2021*

Table 94: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? NEGATIVE IMPACTS ON LOCAL AIR AND WATER QUALITY DUE TO CRUISE SHIPS (Q11f)

| | | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | *Total* | *18-44* | *45-64* | *65+* | *<50k* | *$50k-100k* | *100k+* | *Less than 4-year degree* | *4-year degree* | *Post-graduate degree* |
| Total | **1378** | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Not at all concerned** | **173** | 21 | 88 | 49 | 21 | 42 | 68 | 41 | 57 | 48 |
| | **12.6%** | 10.3% | 16.0% | 9.5% | 9.6% | 10.3% | 16.0% | 13.7% | 13.5% | 9.0% |
| **2** | **105** | 15 | 41 | 43 | 12 | 26 | 37 | 27 | 43 | 30 |
| | **7.6%** | 7.4% | 7.5% | 8.3% | 5.5% | 6.4% | 8.7% | 9.0% | 10.2% | 5.6% |
| **3** | **156** | 21 | 63 | 64 | 25 | 50 | 56 | 46 | 42 | 59 |
| | **11.3%** | 10.3% | 11.5% | 12.4% | 11.4% | 12.2% | 13.2% | 15.4% | 10.0% | 11.1% |
| **4** | **186** | 24 | 78 | 72 | 27 | 64 | 52 | 49 | 51 | 75 |
| | **13.5%** | 11.8% | 14.2% | 13.9% | 12.3% | 15.6% | 12.2% | 16.4% | 12.1% | 14.1% |
| **5 - Very concerned** | **702** | 119 | 265 | 257 | 126 | 211 | 196 | 125 | 212 | 299 |
| | **50.9%** | 58.3% | 48.3% | 49.6% | 57.5% | 51.6% | 46.1% | 41.8% | 50.4% | 56.1% |
| **Don't know** | **49** | 3 | 12 | 30 | 7 | 15 | 13 | 10 | 13 | 20 |
| | **3.6%** | 1.5% | 2.2% | 5.8% | 3.2% | 3.7% | 3.1% | 3.3% | 3.1% | 3.8% |
| **No response** | **7** | 1 | 2 | 3 | 1 | 1 | 3 | 1 | 3 | 2 |
| | **0.5%** | 0.5% | 0.4% | 0.6% | 0.5% | 0.2% | 0.7% | 0.3% | 0.7% | 0.4% |

*Pan Atlantic Research: June, 2021*

Table 95: Mean of Q11f

| | | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | *Total* | *Own* | *Rent* | *Year-round resident* | *Seasonal resident* | *Business-owner (resident or non-resident)* | *Female* | *Male* |
| **Mean** | **3.86** | 3.87 | 4.10 | 3.96 | 3.80 | 3.29 | 4.09 | 3.54 |
| **Std Error** | **0.04** | 0.04 | 0.10 | 0.05 | 0.10 | 0.13 | 0.05 | 0.07 |
| **Valid N** | **1322** | 1041 | 175 | 949 | 192 | 155 | 602 | 478 |

*Pan Atlantic Research: June, 2021*

Table 96: Mean of Q11f

| | | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | *Total* | *18-44* | *45-64* | *65+* | *<50k* | *$50k-100k* | *100k+* | *Less than 4-year degree* | *4-year degree* | *Post-graduate degree* |
| **Mean** | **3.86** | 4.03 | 3.73 | 3.92 | 4.07 | 3.96 | 3.66 | 3.66 | 3.79 | 4.07 |
| **Std Error** | **0.04** | 0.10 | 0.07 | 0.06 | 0.09 | 0.07 | 0.08 | 0.09 | 0.07 | 0.06 |
| **Valid N** | **1322** | 200 | 535 | 485 | 211 | 393 | 409 | 288 | 405 | 511 |

*Pan Atlantic Research: June, 2021*

DX323.357

App. 661   TOWN06137

Table 97: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? IMPACT ON HARBOR VIEWS DUE TO CRUISE SHIPS (Q11g)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all concerned | 297 | 230 | 27 | 188 | 50 | 54 | 113 | 133 |
| | 21.6% | 21.1% | 15.3% | 19.1% | 24.2% | 34.2% | 17.9% | 26.8% |
| 2 | 174 | 144 | 13 | 114 | 28 | 28 | 59 | 91 |
| | 12.6% | 13.2% | 7.3% | 11.6% | 13.5% | 17.7% | 9.4% | 18.3% |
| 3 | 202 | 165 | 29 | 149 | 33 | 15 | 98 | 69 |
| | 14.7% | 15.1% | 16.4% | 15.1% | 15.9% | 9.5% | 15.6% | 13.9% |
| 4 | 182 | 148 | 28 | 137 | 28 | 15 | 90 | 61 |
| | 13.2% | 13.6% | 15.8% | 13.9% | 13.5% | 9.5% | 14.3% | 12.3% |
| 5 - Very concerned | 502 | 387 | 78 | 380 | 66 | 45 | 259 | 138 |
| | 36.4% | 35.4% | 44.1% | 38.6% | 31.9% | 28.5% | 41.1% | 27.8% |
| Don't know | 13 | 11 | 1 | 11 | 1 | 0 | 8 | 2 |
| | 0.9% | 1.0% | 0.6% | 1.1% | 0.5% | 0.0% | 1.3% | 0.4% |
| No response | 8 | 7 | 1 | 6 | 1 | 1 | 3 | 3 |
| | 0.6% | 0.6% | 0.6% | 0.6% | 0.5% | 0.6% | 0.5% | 0.6% |

*Pan Atlantic Research: June, 2021*

Table 98: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? IMPACT ON HARBOR VIEWS DUE TO CRUISE SHIPS (Q11g)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all concerned | 297 | 39 | 146 | 90 | 37 | 71 | 120 | 70 | 104 | 93 |
| | 21.6% | 19.1% | 26.6% | 17.4% | 16.9% | 17.4% | 28.2% | 23.4% | 24.7% | 17.4% |
| 2 | 174 | 25 | 58 | 80 | 23 | 52 | 60 | 46 | 53 | 63 |
| | 12.6% | 12.3% | 10.6% | 15.4% | 10.5% | 12.7% | 14.1% | 15.4% | 12.6% | 11.8% |
| 3 | 202 | 29 | 75 | 88 | 32 | 70 | 54 | 43 | 58 | 83 |
| | 14.7% | 14.2% | 13.7% | 17.0% | 14.6% | 17.1% | 12.7% | 14.4% | 13.8% | 15.6% |
| 4 | 182 | 21 | 72 | 71 | 33 | 51 | 51 | 42 | 51 | 76 |
| | 13.2% | 10.3% | 13.1% | 13.7% | 15.1% | 12.5% | 12.0% | 14.0% | 12.1% | 14.3% |
| 5 - Very concerned | 502 | 87 | 191 | 182 | 90 | 158 | 135 | 92 | 149 | 211 |
| | 36.4% | 42.6% | 34.8% | 35.1% | 41.1% | 38.6% | 31.8% | 30.8% | 35.4% | 39.6% |
| Don't know | 13 | 2 | 6 | 3 | 3 | 5 | 2 | 3 | 3 | 6 |
| | 0.9% | 1.0% | 1.1% | 0.6% | 1.4% | 1.2% | 0.5% | 1.0% | 0.7% | 1.1% |
| No response | 8 | 1 | 1 | 4 | 1 | 2 | 3 | 3 | 3 | 1 |
| | 0.6% | 0.5% | 0.2% | 0.8% | 0.5% | 0.5% | 0.7% | 1.0% | 0.7% | 0.2% |

*Pan Atlantic Research: June, 2021*

Table 99: Mean of Q11g

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Mean | 3.31 | 3.30 | 3.67 | 3.42 | 3.16 | 2.80 | 3.52 | 2.96 |
| Std Error | 0.04 | 0.05 | 0.11 | 0.05 | 0.11 | 0.13 | 0.06 | 0.07 |
| Valid N | 1357 | 1074 | 175 | 968 | 205 | 157 | 619 | 492 |

*Pan Atlantic Research: June, 2021*

Table 100: Mean of Q11g

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Mean | 3.31 | 3.46 | 3.19 | 3.34 | 3.54 | 3.43 | 3.05 | 3.14 | 3.21 | 3.47 |
| Std Error | 0.04 | 0.11 | 0.07 | 0.07 | 0.10 | 0.08 | 0.08 | 0.09 | 0.08 | 0.07 |
| Valid N | 1357 | 201 | 542 | 511 | 215 | 402 | 420 | 293 | 415 | 526 |

*Pan Atlantic Research: June, 2021*

DX323.358

App. 662

TOWN06138

Table 101: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? NEGATIVE IMPACTS ON MARINE ACTIVITIES, INCLUDING FISHING AND OTHER HARBOR TRAFFIC (Q11h)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all concerned | 152 | 115 | 15 | 95 | 22 | 33 | 47 | 73 |
| | 11.0% | 10.5% | 8.5% | 9.6% | 10.6% | 20.9% | 7.5% | 14.7% |
| 2 | 116 | 93 | 10 | 81 | 15 | 20 | 38 | 59 |
| | 8.4% | 8.5% | 5.6% | 8.2% | 7.2% | 12.7% | 6.0% | 11.9% |
| 3 | 173 | 138 | 18 | 114 | 28 | 27 | 73 | 76 |
| | 12.6% | 12.6% | 10.2% | 11.6% | 13.5% | 17.1% | 11.6% | 15.3% |
| 4 | 206 | 167 | 26 | 141 | 37 | 23 | 95 | 82 |
| | 14.9% | 15.3% | 14.7% | 14.3% | 17.9% | 14.6% | 15.1% | 16.5% |
| 5 - Very concerned | 649 | 505 | 104 | 496 | 86 | 53 | 342 | 178 |
| | 47.1% | 46.2% | 58.8% | 50.4% | 41.5% | 33.5% | 54.3% | 35.8% |
| Don't know | 76 | 68 | 4 | 54 | 17 | 2 | 34 | 26 |
| | 5.5% | 6.2% | 2.3% | 5.5% | 8.2% | 1.3% | 5.4% | 5.2% |
| No response | 6 | 6 | 0 | 4 | 2 | 0 | 1 | 3 |
| | 0.4% | 0.5% | 0.0% | 0.4% | 1.0% | 0.0% | 0.2% | 0.6% |

*Pan Atlantic Research: June, 2021*

Table 102: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? NEGATIVE IMPACTS ON MARINE ACTIVITIES, INCLUDING FISHING AND OTHER HARBOR TRAFFIC (Q11h)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all concerned | 152 | 17 | 77 | 45 | 17 | 27 | 66 | 33 | 51 | 44 |
| | 11.0% | 8.3% | 14.0% | 8.7% | 7.8% | 6.6% | 15.5% | 11.0% | 12.1% | 8.3% |
| 2 | 116 | 17 | 46 | 45 | 19 | 32 | 39 | 26 | 48 | 34 |
| | 8.4% | 8.3% | 8.4% | 8.7% | 8.7% | 7.8% | 9.2% | 8.7% | 11.4% | 6.4% |
| 3 | 173 | 19 | 74 | 71 | 25 | 52 | 62 | 47 | 54 | 62 |
| | 12.6% | 9.3% | 13.5% | 13.7% | 11.4% | 12.7% | 14.6% | 15.7% | 12.8% | 11.6% |
| 4 | 206 | 36 | 75 | 84 | 30 | 68 | 61 | 56 | 51 | 91 |
| | 14.9% | 17.6% | 13.7% | 16.2% | 13.7% | 16.6% | 14.4% | 18.7% | 12.1% | 17.1% |
| 5 - Very concerned | 649 | 109 | 252 | 228 | 115 | 206 | 176 | 121 | 198 | 265 |
| | 47.1% | 53.4% | 45.9% | 44.0% | 52.5% | 50.4% | 41.4% | 40.5% | 47.0% | 49.7% |
| Don't know | 76 | 6 | 22 | 43 | 13 | 23 | 18 | 15 | 17 | 35 |
| | 5.5% | 2.9% | 4.0% | 8.3% | 5.9% | 5.6% | 4.2% | 5.0% | 4.0% | 6.6% |
| No response | 6 | 0 | 3 | 2 | 0 | 1 | 3 | 1 | 2 | 2 |
| | 0.4% | 0.0% | 0.5% | 0.4% | 0.0% | 0.2% | 0.7% | 0.3% | 0.5% | 0.4% |

*Pan Atlantic Research: June, 2021*

Table 103: Mean of Q11h

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Mean | 3.84 | 3.84 | 4.12 | 3.93 | 3.80 | 3.28 | 4.09 | 3.50 |
| Std Error | 0.04 | 0.04 | 0.10 | 0.05 | 0.10 | 0.12 | 0.05 | 0.07 |
| Valid N | 1296 | 1018 | 173 | 927 | 188 | 156 | 595 | 468 |

*Pan Atlantic Research: June, 2021*

Table 104: Mean of Q11h

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Mean | 3.84 | 4.03 | 3.72 | 3.86 | 4.00 | 4.02 | 3.60 | 3.73 | 3.74 | 4.01 |
| Std Error | 0.04 | 0.09 | 0.07 | 0.06 | 0.09 | 0.07 | 0.08 | 0.08 | 0.07 | 0.06 |
| Valid N | 1296 | 198 | 524 | 473 | 206 | 385 | 404 | 283 | 402 | 496 |

*Pan Atlantic Research: June, 2021*

DX323.359

33

Table 105: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? CAR TRAFFIC CONGESTION FROM LAND-BASED TOURISTS (Q12a)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all concerned | 72 | 53 | 8 | 42 | 11 | 19 | 28 | 29 |
| | 5.2% | 4.9% | 4.5% | 4.3% | 5.3% | 12.0% | 4.4% | 5.8% |
| 2 | 86 | 65 | 6 | 49 | 17 | 19 | 27 | 41 |
| | 6.2% | 6.0% | 3.4% | 5.0% | 8.2% | 12.0% | 4.3% | 8.2% |
| 3 | 230 | 180 | 21 | 150 | 38 | 34 | 102 | 102 |
| | 16.7% | 16.5% | 11.9% | 15.2% | 18.4% | 21.5% | 16.2% | 20.5% |
| 4 | 316 | 252 | 39 | 215 | 54 | 43 | 140 | 121 |
| | 22.9% | 23.1% | 22.0% | 21.8% | 26.1% | 27.2% | 22.2% | 24.3% |
| 5 - Very concerned | 664 | 533 | 102 | 524 | 83 | 43 | 329 | 201 |
| | 48.2% | 48.8% | 57.6% | 53.2% | 40.1% | 27.2% | 52.2% | 40.4% |
| Don't know | 3 | 3 | 0 | 2 | 1 | 0 | 1 | 1 |
| | 0.2% | 0.3% | 0.0% | 0.2% | 0.5% | 0.0% | 0.2% | 0.2% |
| No response | 7 | 6 | 1 | 3 | 3 | 0 | 3 | 2 |
| | 0.5% | 0.5% | 0.6% | 0.3% | 1.4% | 0.0% | 0.5% | 0.4% |

*Pan Atlantic Research: June, 2021*

Table 106: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? CAR TRAFFIC CONGESTION FROM LAND-BASED TOURISTS (Q12a)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all concerned | 72 | 8 | 38 | 22 | 15 | 21 | 17 | 25 | 22 | 15 |
| | 5.2% | 3.9% | 6.9% | 4.2% | 6.8% | 5.1% | 4.0% | 8.4% | 5.2% | 2.8% |
| 2 | 86 | 12 | 36 | 28 | 7 | 24 | 28 | 21 | 23 | 29 |
| | 6.2% | 5.9% | 6.6% | 5.4% | 3.2% | 5.9% | 6.6% | 7.0% | 5.5% | 5.4% |
| 3 | 230 | 28 | 97 | 92 | 32 | 66 | 86 | 56 | 82 | 81 |
| | 16.7% | 13.7% | 17.7% | 17.8% | 14.6% | 16.1% | 20.2% | 18.7% | 19.5% | 15.2% |
| 4 | 316 | 48 | 132 | 115 | 55 | 92 | 104 | 66 | 106 | 128 |
| | 22.9% | 23.5% | 24.0% | 22.2% | 25.1% | 22.5% | 24.5% | 22.1% | 25.2% | 24.0% |
| 5 - Very concerned | 664 | 106 | 243 | 258 | 109 | 203 | 187 | 127 | 188 | 276 |
| | 48.2% | 52.0% | 44.3% | 49.8% | 49.8% | 49.6% | 44.0% | 42.5% | 44.7% | 51.8% |
| Don't know | 3 | 1 | 0 | 2 | 0 | 1 | 1 | 2 | 0 | 1 |
| | 0.2% | 0.5% | 0.0% | 0.4% | 0.0% | 0.2% | 0.2% | 0.7% | 0.0% | 0.2% |
| No response | 7 | 1 | 3 | 1 | 1 | 2 | 2 | 2 | 0 | 3 |
| | 0.5% | 0.5% | 0.5% | 0.2% | 0.5% | 0.5% | 0.5% | 0.7% | 0.0% | 0.6% |

*Pan Atlantic Research: June, 2021*

Table 107: Mean of Q12a

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Mean | 4.03 | 4.06 | 4.26 | 4.15 | 3.89 | 3.46 | 4.14 | 3.86 |
| Std Error | 0.03 | 0.04 | 0.08 | 0.04 | 0.08 | 0.11 | 0.04 | 0.05 |
| Valid N | 1368 | 1083 | 176 | 980 | 203 | 158 | 626 | 494 |

*Pan Atlantic Research: June, 2021*

Table 108: Mean of Q12a

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Mean | 4.03 | 4.15 | 3.93 | 4.09 | 4.08 | 4.06 | 3.99 | 3.84 | 3.99 | 4.17 |
| Std Error | 0.03 | 0.08 | 0.05 | 0.05 | 0.08 | 0.06 | 0.05 | 0.07 | 0.06 | 0.05 |
| Valid N | 1368 | 202 | 546 | 515 | 218 | 406 | 422 | 295 | 421 | 529 |

*Pan Atlantic Research: June, 2021*

DX323.360

App. 664    TOWN06140

Table 109: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? BUS TRAFFIC CONGESTION FROM LAND-BASED TOURISTS (Q12b)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all concerned | 113 | 83 | 13 | 63 | 21 | 28 | 45 | 42 |
| | 8.2% | 7.6% | 7.3% | 6.4% | 10.1% | 17.7% | 7.1% | 8.5% |
| 2 | 177 | 134 | 24 | 116 | 30 | 29 | 75 | 73 |
| | 12.8% | 12.3% | 13.6% | 11.8% | 14.5% | 18.4% | 11.9% | 14.7% |
| 3 | 327 | 255 | 41 | 221 | 57 | 37 | 156 | 121 |
| | 23.7% | 23.4% | 23.2% | 22.4% | 27.5% | 23.4% | 24.8% | 24.3% |
| 4 | 291 | 242 | 32 | 209 | 45 | 32 | 129 | 123 |
| | 21.1% | 22.2% | 18.1% | 21.2% | 21.7% | 20.3% | 20.5% | 24.7% |
| 5 - Very concerned | 454 | 367 | 64 | 367 | 49 | 31 | 217 | 135 |
| | 32.9% | 33.6% | 36.2% | 37.3% | 23.7% | 19.6% | 34.4% | 27.2% |
| Don't know | 8 | 5 | 2 | 5 | 3 | 0 | 4 | 1 |
| | 0.6% | 0.5% | 1.1% | 0.5% | 1.4% | 0.0% | 0.6% | 0.2% |
| No response | 8 | 6 | 1 | 4 | 2 | 1 | 4 | 2 |
| | 0.6% | 0.5% | 0.6% | 0.4% | 1.0% | 0.6% | 0.6% | 0.4% |

*Pan Atlantic Research: June, 2021*

Table 110: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? BUS TRAFFIC CONGESTION FROM LAND-BASED TOURISTS (Q12b)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all concerned | 113 | 23 | 44 | 35 | 18 | 28 | 38 | 28 | 36 | 36 |
| | 8.2% | 11.3% | 8.0% | 6.8% | 8.2% | 6.8% | 8.9% | 9.4% | 8.6% | 6.8% |
| 2 | 177 | 32 | 86 | 47 | 29 | 54 | 55 | 32 | 60 | 71 |
| | 12.8% | 15.7% | 15.7% | 9.1% | 13.2% | 13.2% | 12.9% | 10.7% | 14.3% | 13.3% |
| 3 | 327 | 49 | 127 | 135 | 54 | 90 | 126 | 68 | 111 | 135 |
| | 23.7% | 24.0% | 23.1% | 26.1% | 24.7% | 22.0% | 29.6% | 22.7% | 26.4% | 25.3% |
| 4 | 291 | 39 | 121 | 115 | 51 | 91 | 90 | 60 | 96 | 116 |
| | 21.1% | 19.1% | 22.0% | 22.2% | 23.3% | 22.2% | 21.2% | 20.1% | 22.8% | 21.8% |
| 5 - Very concerned | 454 | 59 | 167 | 179 | 64 | 142 | 112 | 103 | 118 | 171 |
| | 32.9% | 28.9% | 30.4% | 34.6% | 29.2% | 34.7% | 26.4% | 34.4% | 28.0% | 32.1% |
| Don't know | 8 | 1 | 1 | 5 | 1 | 3 | 1 | 5 | 0 | 1 |
| | 0.6% | 0.5% | 0.2% | 1.0% | 0.5% | 0.7% | 0.2% | 1.7% | 0.0% | 0.2% |
| No response | 8 | 1 | 3 | 2 | 2 | 1 | 3 | 3 | 0 | 3 |
| | 0.6% | 0.5% | 0.5% | 0.4% | 0.9% | 0.2% | 0.7% | 1.0% | 0.0% | 0.6% |

*Pan Atlantic Research: June, 2021*

Table 111: Mean of Q12b

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Mean | 3.58 | 3.63 | 3.63 | 3.72 | 3.35 | 3.06 | 3.64 | 3.48 |
| Std Error | 0.04 | 0.04 | 0.10 | 0.04 | 0.09 | 0.11 | 0.05 | 0.06 |
| Valid N | 1362 | 1081 | 174 | 976 | 202 | 157 | 622 | 494 |

*Pan Atlantic Research: June, 2021*

Table 112: Mean of Q12b

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Mean | 3.58 | 3.39 | 3.52 | 3.70 | 3.53 | 3.65 | 3.43 | 3.61 | 3.48 | 3.60 |
| Std Error | 0.04 | 0.10 | 0.06 | 0.05 | 0.09 | 0.06 | 0.06 | 0.08 | 0.06 | 0.05 |
| Valid N | 1362 | 202 | 545 | 511 | 216 | 405 | 421 | 291 | 421 | 529 |

*Pan Atlantic Research: June, 2021*

DX323.361

App. 665

TOWN06141

Table 113: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? PEDESTRIAN CONGESTION FROM LAND-BASED TOURISTS (Q12c)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all concerned | 200 | 147 | 18 | 110 | 35 | 51 | 89 | 69 |
| | 14.5% | 13.5% | 10.2% | 11.2% | 16.9% | 32.3% | 14.1% | 13.9% |
| 2 | 200 | 158 | 26 | 133 | 43 | 21 | 81 | 80 |
| | 14.5% | 14.5% | 14.7% | 13.5% | 20.8% | 13.3% | 12.9% | 16.1% |
| 3 | 375 | 306 | 39 | 262 | 63 | 40 | 163 | 161 |
| | 27.2% | 28.0% | 22.0% | 26.6% | 30.4% | 25.3% | 25.9% | 32.4% |
| 4 | 270 | 215 | 42 | 214 | 30 | 23 | 123 | 101 |
| | 19.6% | 19.7% | 23.7% | 21.7% | 14.5% | 14.6% | 19.5% | 20.3% |
| 5 - Very concerned | 322 | 256 | 51 | 258 | 34 | 23 | 169 | 82 |
| | 23.4% | 23.4% | 28.8% | 26.2% | 16.4% | 14.6% | 26.8% | 16.5% |
| Don't know | 2 | 2 | 0 | 2 | 0 | 0 | 2 | 0 |
| | 0.1% | 0.2% | 0.0% | 0.2% | 0.0% | 0.0% | 0.3% | 0.0% |
| No response | 9 | 8 | 1 | 6 | 2 | 0 | 3 | 4 |
| | 0.7% | 0.7% | 0.6% | 0.6% | 1.0% | 0.0% | 0.5% | 0.8% |

*Pan Atlantic Research: June, 2021*

Table 114: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? PEDESTRIAN CONGESTION FROM LAND-BASED TOURISTS (Q12c)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all concerned | 200 | 30 | 97 | 60 | 26 | 53 | 66 | 48 | 62 | 70 |
| | 14.5% | 14.7% | 17.7% | 11.6% | 11.9% | 13.0% | 15.5% | 16.1% | 14.7% | 13.1% |
| 2 | 200 | 32 | 72 | 78 | 36 | 58 | 60 | 34 | 68 | 81 |
| | 14.5% | 15.7% | 13.1% | 15.1% | 16.4% | 14.2% | 14.1% | 11.4% | 16.2% | 15.2% |
| 3 | 375 | 50 | 142 | 155 | 46 | 119 | 139 | 75 | 117 | 163 |
| | 27.2% | 24.5% | 25.9% | 29.9% | 21.0% | 29.1% | 32.7% | 25.1% | 27.8% | 30.6% |
| 4 | 270 | 44 | 110 | 100 | 56 | 88 | 69 | 61 | 79 | 107 |
| | 19.6% | 21.6% | 20.0% | 19.3% | 25.6% | 21.5% | 16.2% | 20.4% | 18.8% | 20.1% |
| 5 - Very concerned | 322 | 47 | 124 | 121 | 52 | 88 | 89 | 75 | 95 | 110 |
| | 23.4% | 23.0% | 22.6% | 23.4% | 23.7% | 21.5% | 20.9% | 25.1% | 22.6% | 20.6% |
| Don't know | 2 | 0 | 1 | 1 | 1 | 0 | 1 | 2 | 0 | 0 |
| | 0.1% | 0.0% | 0.2% | 0.2% | 0.5% | 0.0% | 0.2% | 0.7% | 0.0% | 0.0% |
| No response | 9 | 1 | 3 | 3 | 2 | 3 | 1 | 4 | 0 | 2 |
| | 0.7% | 0.5% | 0.5% | 0.6% | 0.9% | 0.7% | 0.2% | 1.3% | 0.0% | 0.4% |

*Pan Atlantic Research: June, 2021*

Table 115: Mean of Q12c

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Mean | 3.23 | 3.25 | 3.47 | 3.39 | 2.93 | 2.66 | 3.32 | 3.10 |
| Std Error | 0.04 | 0.04 | 0.10 | 0.04 | 0.09 | 0.11 | 0.05 | 0.06 |
| Valid N | 1367 | 1082 | 176 | 977 | 205 | 158 | 625 | 493 |

*Pan Atlantic Research: June, 2021*

Table 116: Mean of Q12c

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Mean | 3.23 | 3.23 | 3.17 | 3.28 | 3.33 | 3.25 | 3.13 | 3.28 | 3.18 | 3.20 |
| Std Error | 0.04 | 0.10 | 0.06 | 0.06 | 0.09 | 0.06 | 0.06 | 0.08 | 0.07 | 0.06 |
| Valid N | 1367 | 203 | 545 | 514 | 216 | 406 | 423 | 293 | 421 | 531 |

*Pan Atlantic Research: June, 2021*

DX323.362

App. 666

TOWN06142

Table 117: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? LACK OF ADEQUATE PARKING DUE TO LAND-BASED TOURISTS (Q12d)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all concerned | 80 | 58 | 7 | 53 | 11 | 15 | 30 | 33 |
| | 5.8% | 5.3% | 4.0% | 5.4% | 5.3% | 9.5% | 4.8% | 6.6% |
| 2 | 100 | 84 | 9 | 67 | 16 | 16 | 35 | 44 |
| | 7.3% | 7.7% | 5.1% | 6.8% | 7.7% | 10.1% | 5.6% | 8.9% |
| 3 | 202 | 156 | 25 | 138 | 35 | 24 | 88 | 75 |
| | 14.7% | 14.3% | 14.1% | 14.0% | 16.9% | 15.2% | 14.0% | 15.1% |
| 4 | 294 | 229 | 42 | 206 | 46 | 37 | 130 | 119 |
| | 21.3% | 21.0% | 23.7% | 20.9% | 22.2% | 23.4% | 20.6% | 23.9% |
| 5 - Very concerned | 688 | 552 | 93 | 508 | 98 | 66 | 340 | 223 |
| | 49.9% | 50.5% | 52.5% | 51.6% | 47.3% | 41.8% | 54.0% | 44.9% |
| Don't know | 7 | 7 | 0 | 7 | 0 | 0 | 4 | 1 |
| | 0.5% | 0.6% | 0.0% | 0.7% | 0.0% | 0.0% | 0.6% | 0.2% |
| No response | 7 | 6 | 1 | 6 | 1 | 0 | 3 | 2 |
| | 0.5% | 0.5% | 0.6% | 0.6% | 0.5% | 0.0% | 0.5% | 0.4% |

*Pan Atlantic Research: June, 2021*

Table 118: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? LACK OF ADEQUATE PARKING DUE TO LAND-BASED TOURISTS (Q12d)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Not at all concerned | 80 | 11 | 36 | 27 | 16 | 23 | 23 | 21 | 27 | 21 |
| | 5.8% | 5.4% | 6.6% | 5.2% | 7.3% | 5.6% | 5.4% | 7.0% | 6.4% | 3.9% |
| 2 | 100 | 7 | 46 | 38 | 8 | 37 | 33 | 22 | 25 | 45 |
| | 7.3% | 3.4% | 8.4% | 7.3% | 3.7% | 9.0% | 7.8% | 7.4% | 5.9% | 8.4% |
| 3 | 202 | 34 | 88 | 70 | 30 | 51 | 68 | 50 | 63 | 68 |
| | 14.7% | 16.7% | 16.0% | 13.5% | 13.7% | 12.5% | 16.0% | 16.7% | 15.0% | 12.8% |
| 4 | 294 | 52 | 119 | 98 | 47 | 88 | 101 | 48 | 98 | 126 |
| | 21.3% | 25.5% | 21.7% | 18.9% | 21.5% | 21.5% | 23.8% | 16.1% | 23.3% | 23.6% |
| 5 - Very concerned | 688 | 97 | 255 | 280 | 113 | 207 | 198 | 149 | 208 | 270 |
| | 49.9% | 47.5% | 46.4% | 54.1% | 51.6% | 50.6% | 46.6% | 49.8% | 49.4% | 50.7% |
| Don't know | 7 | 2 | 2 | 3 | 2 | 2 | 1 | 6 | 0 | 1 |
| | 0.5% | 1.0% | 0.4% | 0.6% | 0.9% | 0.5% | 0.2% | 2.0% | 0.0% | 0.2% |
| No response | 7 | 1 | 3 | 2 | 3 | 1 | 1 | 3 | 0 | 2 |
| | 0.5% | 0.5% | 0.5% | 0.4% | 1.4% | 0.2% | 0.2% | 1.0% | 0.0% | 0.4% |

*Pan Atlantic Research: June, 2021*

Table 119: Mean of Q12d

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Mean | 4.03 | 4.05 | 4.16 | 4.08 | 3.99 | 3.78 | 4.15 | 3.92 |
| Std Error | 0.03 | 0.04 | 0.08 | 0.04 | 0.08 | 0.11 | 0.05 | 0.06 |
| Valid N | 1364 | 1079 | 176 | 972 | 206 | 158 | 623 | 494 |

*Pan Atlantic Research: June, 2021*

Table 120: Mean of Q12d

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Mean | 4.03 | 4.08 | 3.94 | 4.10 | 4.09 | 4.03 | 3.99 | 3.97 | 4.03 | 4.09 |
| Std Error | 0.03 | 0.08 | 0.05 | 0.05 | 0.08 | 0.06 | 0.06 | 0.08 | 0.06 | 0.05 |
| Valid N | 1364 | 201 | 544 | 513 | 214 | 406 | 423 | 290 | 421 | 530 |

*Pan Atlantic Research: June, 2021*

DX323.363

App. 667

TOWN06143

Table 121: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? OVERCROWDING LAND-BASED TOURISTS, WHICH PREVENTS RESIDENTS FROM ACCESSING THE TOWN PIER, PARKS, AND LOCAL BUSINESSES AT CERTAIN TIMES (Q12e)

| | | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | *Total* | *Own* | *Rent* | *Year-round resident* | *Seasonal resident* | *Business-owner (resident or non-resident)* | *Female* | *Male* |
|---|---|---|---|---|---|---|---|---|
| **Total** | **1378** | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Not at all concerned** | **148** | 103 | 14 | 80 | 24 | 39 | 68 | 52 |
| | **10.7%** | 9.4% | 7.9% | 8.1% | 11.6% | 24.7% | 10.8% | 10.5% |
| **2** | **157** | 122 | 16 | 99 | 29 | 29 | 54 | 74 |
| | **11.4%** | 11.2% | 9.0% | 10.1% | 14.0% | 18.4% | 8.6% | 14.9% |
| **3** | **266** | 219 | 28 | 180 | 51 | 27 | 123 | 102 |
| | **19.3%** | 20.1% | 15.8% | 18.3% | 24.6% | 17.1% | 19.5% | 20.5% |
| **4** | **265** | 218 | 31 | 192 | 41 | 29 | 111 | 104 |
| | **19.2%** | 20.0% | 17.5% | 19.5% | 19.8% | 18.4% | 17.6% | 20.9% |
| **5 - Very concerned** | **531** | 420 | 87 | 425 | 61 | 34 | 267 | 162 |
| | **38.5%** | 38.5% | 49.2% | 43.1% | 29.5% | 21.5% | 42.4% | 32.6% |
| **Don't know** | **4** | 4 | 0 | 4 | 0 | 0 | 4 | 0 |
| | **0.3%** | 0.4% | 0.0% | 0.4% | 0.0% | 0.0% | 0.6% | 0.0% |
| **No response** | **7** | 6 | 1 | 5 | 1 | 0 | 3 | 3 |
| | **0.5%** | 0.5% | 0.6% | 0.5% | 0.5% | 0.0% | 0.5% | 0.6% |

*Pan Atlantic Research: June, 2021*

Table 122: How would you rate your level of concern relating to each one of these as it impacts the Town of Bar Harbor? OVERCROWDING LAND-BASED TOURISTS, WHICH PREVENTS RESIDENTS FROM ACCESSING THE TOWN PIER, PARKS, AND LOCAL BUSINESSES AT CERTAIN TIMES (Q12e)

| | | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | *Total* | *18-44* | *45-64* | *65+* | *<50k* | *$50k-100k* | *100k+* | *Less than 4-year degree* | *4-year degree* | *Post-graduate degree* |
|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | **1378** | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **1 - Not at all concerned** | **148** | 24 | 76 | 38 | 24 | 41 | 44 | 35 | 46 | 51 |
| | **10.7%** | 11.8% | 13.8% | 7.3% | 11.0% | 10.0% | 10.4% | 11.7% | 10.9% | 9.6% |
| **2** | **157** | 23 | 62 | 63 | 20 | 45 | 59 | 36 | 45 | 61 |
| | **11.4%** | 11.3% | 11.3% | 12.2% | 9.1% | 11.0% | 13.9% | 12.0% | 10.7% | 11.4% |
| **3** | **266** | 34 | 103 | 108 | 35 | 79 | 91 | 54 | 83 | 113 |
| | **19.3%** | 16.7% | 18.8% | 20.8% | 16.0% | 19.3% | 21.4% | 18.1% | 19.7% | 21.2% |
| **4** | **265** | 38 | 106 | 98 | 31 | 94 | 86 | 50 | 79 | 111 |
| | **19.2%** | 18.6% | 19.3% | 18.9% | 14.2% | 23.0% | 20.2% | 16.7% | 18.8% | 20.8% |
| **5 - Very concerned** | **531** | 84 | 197 | 207 | 106 | 147 | 142 | 117 | 168 | 194 |
| | **38.5%** | 41.2% | 35.9% | 40.0% | 48.4% | 35.9% | 33.4% | 39.1% | 39.9% | 36.4% |
| **Don't know** | **4** | 0 | 1 | 3 | 1 | 1 | 1 | 4 | 0 | 0 |
| | **0.3%** | 0.0% | 0.2% | 0.6% | 0.5% | 0.2% | 0.2% | 1.3% | 0.0% | 0.0% |
| **No response** | **7** | 1 | 4 | 1 | 2 | 2 | 2 | 3 | 0 | 3 |
| | **0.5%** | 0.5% | 0.7% | 0.2% | 0.9% | 0.5% | 0.5% | 1.0% | 0.0% | 0.6% |

*Pan Atlantic Research: June, 2021*

Table 123: Mean of Q12e

| | | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | *Total* | *Own* | *Rent* | *Year-round resident* | *Seasonal resident* | *Business-owner (resident or non-resident)* | *Female* | *Male* |
|---|---|---|---|---|---|---|---|---|
| **Mean** | **3.64** | 3.67 | 3.91 | 3.80 | 3.42 | 2.94 | 3.73 | 3.51 |
| **Std Error** | **0.04** | 0.04 | 0.10 | 0.04 | 0.09 | 0.12 | 0.05 | 0.06 |
| **Valid N** | **1367** | 1082 | 176 | 976 | 206 | 158 | 623 | 494 |

*Pan Atlantic Research: June, 2021*

Table 124: Mean of Q12e

| | | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | *Total* | *18-44* | *45-64* | *65+* | *<50k* | *$50k-100k* | *100k+* | *Less than 4-year degree* | *4-year degree* | *Post-graduate degree* |
|---|---|---|---|---|---|---|---|---|---|---|
| **Mean** | **3.64** | 3.67 | 3.53 | 3.73 | 3.81 | 3.64 | 3.53 | 3.61 | 3.66 | 3.63 |
| **Std Error** | **0.04** | 0.10 | 0.06 | 0.06 | 0.10 | 0.07 | 0.07 | 0.08 | 0.07 | 0.06 |
| **Valid N** | **1367** | 203 | 544 | 514 | 216 | 406 | 422 | 292 | 421 | 530 |

*Pan Atlantic Research: June, 2021*

DX323.364

App. 668        TOWN06144

# Perceptions and Suggestions Regarding Cruise Ships

Table 125: In your opinion, does Bar Harbor's status as a cruise ship destination enhance or detract from the town's image and attraction? (Q13)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Enhance | 373 | 288 | 39 | 233 | 72 | 63 | 147 | 161 |
| | 27.1% | 26.4% | 22.0% | 23.7% | 34.8% | 39.9% | 23.3% | 32.4% |
| Detract | 754 | 598 | 110 | 571 | 93 | 76 | 378 | 231 |
| | 54.7% | 54.8% | 62.1% | 58.0% | 44.9% | 48.1% | 60.0% | 46.5% |
| Makes no difference | 162 | 133 | 16 | 110 | 30 | 15 | 60 | 76 |
| | 11.8% | 12.2% | 9.0% | 11.2% | 14.5% | 9.5% | 9.5% | 15.3% |
| Don't know | 73 | 60 | 10 | 60 | 10 | 2 | 38 | 23 |
| | 5.3% | 5.5% | 5.6% | 6.1% | 4.8% | 1.3% | 6.0% | 4.6% |
| No response | 16 | 13 | 2 | 11 | 2 | 2 | 7 | 6 |
| | 1.2% | 1.2% | 1.1% | 1.1% | 1.0% | 1.3% | 1.1% | 1.2% |

*Pan Atlantic Research: June, 2021*

Table 126: In your opinion, does Bar Harbor's status as a cruise ship destination enhance or detract from the town's image and attraction? (Q13)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Enhance | 373 | 41 | 179 | 130 | 45 | 98 | 143 | 80 | 126 | 131 |
| | 27.1% | 20.1% | 32.6% | 25.1% | 20.5% | 24.0% | 33.6% | 26.8% | 29.9% | 24.6% |
| Detract | 754 | 129 | 276 | 283 | 134 | 239 | 196 | 161 | 220 | 306 |
| | 54.7% | 63.2% | 50.3% | 54.6% | 61.2% | 58.4% | 46.1% | 53.8% | 52.3% | 57.4% |
| Makes no difference | 162 | 20 | 63 | 67 | 23 | 48 | 54 | 38 | 45 | 64 |
| | 11.8% | 9.8% | 11.5% | 12.9% | 10.5% | 11.7% | 12.7% | 12.7% | 10.7% | 12.0% |
| Don't know | 73 | 11 | 26 | 32 | 16 | 22 | 26 | 18 | 25 | 26 |
| | 5.3% | 5.4% | 4.7% | 6.2% | 7.3% | 5.4% | 6.1% | 6.0% | 5.9% | 4.9% |
| No response | 16 | 3 | 5 | 6 | 1 | 2 | 6 | 2 | 5 | 6 |
| | 1.2% | 1.5% | 0.9% | 1.2% | 0.5% | 0.5% | 1.4% | 0.7% | 1.2% | 1.1% |

*Pan Atlantic Research: June, 2021*

DX323.365

App. 669   TOWN06145

Table 127: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts? FIRST RESPONSE (Q14-1)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Ban cruise ships entirely | 124 | 92 | 18 | 93 | 15 | 12 | 60 | 37 |
| | 9.0% | 8.4% | 10.2% | 9.4% | 7.2% | 7.6% | 9.5% | 7.4% |
| Reduce overall number of ships | 336 | 272 | 46 | 244 | 44 | 37 | 179 | 101 |
| | 24.4% | 24.9% | 26.0% | 24.8% | 21.3% | 23.4% | 28.4% | 20.3% |
| Reduce size of ships | 120 | 97 | 17 | 95 | 14 | 9 | 68 | 30 |
| | 8.7% | 8.9% | 9.6% | 9.6% | 6.8% | 5.7% | 10.8% | 6.0% |
| Limit number of ships per day | 72 | 56 | 8 | 54 | 7 | 10 | 34 | 25 |
| | 5.2% | 5.1% | 4.5% | 5.5% | 3.4% | 6.3% | 5.4% | 5.0% |
| Reduce passengers per day or per season | 47 | 41 | 4 | 36 | 5 | 5 | 16 | 24 |
| | 3.4% | 3.8% | 2.3% | 3.7% | 2.4% | 3.2% | 2.5% | 4.8% |
| More days without cruise ships | 9 | 7 | 2 | 8 | 1 | 0 | 6 | 2 |
| | 0.7% | 0.6% | 1.1% | 0.8% | 0.5% | 0.0% | 1.0% | 0.4% |
| Shorten cruise ship season | 14 | 12 | 1 | 7 | 5 | 2 | 6 | 7 |
| | 1.0% | 1.1% | 0.6% | 0.7% | 2.4% | 1.3% | 1.0% | 1.4% |
| Move tendering or disembarking to another location | 111 | 95 | 8 | 78 | 17 | 14 | 38 | 56 |
| | 8.1% | 8.7% | 4.5% | 7.9% | 8.2% | 8.9% | 6.0% | 11.3% |
| Raise ship or passenger fees | 26 | 22 | 2 | 19 | 6 | 1 | 4 | 14 |
| | 1.9% | 2.0% | 1.1% | 1.9% | 2.9% | 0.6% | 0.6% | 2.8% |
| Positive comment about cruise ships/management | 43 | 34 | 2 | 22 | 9 | 11 | 18 | 18 |
| | 3.1% | 3.1% | 1.1% | 2.2% | 4.3% | 7.0% | 2.9% | 3.6% |
| Minimize environmental impact / pollution | 14 | 10 | 2 | 11 | 1 | 1 | 7 | 4 |
| | 1.0% | 0.9% | 1.1% | 1.1% | 0.5% | 0.6% | 1.1% | 0.8% |
| Limit tour buses | 10 | 9 | 0 | 5 | 2 | 3 | 3 | 5 |
| | 0.7% | 0.8% | 0.0% | 0.5% | 1.0% | 1.9% | 0.5% | 1.0% |
| Other | 184 | 148 | 21 | 127 | 29 | 26 | 66 | 81 |
| | 13.4% | 13.6% | 11.9% | 12.9% | 14.0% | 16.5% | 10.5% | 16.3% |
| Don't know | 11 | 6 | 2 | 5 | 3 | 2 | 6 | 5 |
| | 0.8% | 0.5% | 1.1% | 0.5% | 1.4% | 1.3% | 1.0% | 1.0% |
| No response | 257 | 191 | 44 | 181 | 49 | 25 | 119 | 88 |
| | 18.7% | 17.5% | 24.9% | 18.4% | 23.7% | 15.8% | 18.9% | 17.7% |

*Pan Atlantic Research: June, 2021*

Table 128: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts? FIRST RESPONSE (Q14-1)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Ban cruise ships entirely | 124 | 25 | 51 | 31 | 23 | 32 | 36 | 16 | 32 | 58 |
| | 9.0% | 12.3% | 9.3% | 6.0% | 10.5% | 7.8% | 8.5% | 5.4% | 7.6% | 10.9% |
| Reduce overall number of ships | 336 | 48 | 121 | 146 | 56 | 115 | 93 | 65 | 111 | 141 |
| | 24.4% | 23.5% | 22.0% | 28.2% | 25.6% | 28.1% | 21.9% | 21.7% | 26.4% | 26.5% |
| Reduce size of ships | 120 | 19 | 33 | 58 | 22 | 31 | 29 | 18 | 30 | 63 |
| | 8.7% | 9.3% | 6.0% | 11.2% | 10.0% | 7.6% | 6.8% | 6.0% | 7.1% | 11.8% |
| Limit number of ships per day | 72 | 7 | 31 | 29 | 13 | 22 | 17 | 17 | 27 | 18 |
| | 5.2% | 3.4% | 5.6% | 5.6% | 5.9% | 5.4% | 4.0% | 5.7% | 6.4% | 3.4% |
| Reduce passengers per day or per season | 47 | 4 | 15 | 25 | 4 | 19 | 16 | 8 | 12 | 24 |
| | 3.4% | 2.0% | 2.7% | 4.8% | 1.8% | 4.6% | 3.8% | 2.7% | 2.9% | 4.5% |
| More days without cruise ships | 9 | 1 | 5 | 3 | 1 | 3 | 2 | 2 | 4 | 3 |
| | 0.7% | 0.5% | 0.9% | 0.6% | 0.5% | 0.7% | 0.7% | 0.7% | 1.0% | 0.6% |
| Shorten cruise ship season | 14 | 3 | 5 | 6 | 0 | 6 | 6 | 1 | 6 | 6 |
| | 1.0% | 1.5% | 0.9% | 1.2% | 0.0% | 1.5% | 1.4% | 0.3% | 1.4% | 1.1% |
| Move tendering or disembarking to another location | 111 | 14 | 49 | 40 | 12 | 41 | 36 | 34 | 34 | 37 |
| | 8.1% | 6.9% | 8.9% | 7.7% | 5.5% | 10.0% | 8.5% | 11.4% | 8.1% | 6.9% |
| Raise ship or passenger fees | 26 | 6 | 10 | 8 | 2 | 7 | 11 | 2 | 8 | 12 |
| | 1.9% | 2.9% | 1.8% | 1.5% | 0.9% | 1.7% | 2.6% | 0.7% | 1.9% | 2.3% |
| Positive comment about cruise ships/management | 43 | 3 | 20 | 14 | 8 | 8 | 18 | 10 | 11 | 17 |
| | 3.1% | 1.5% | 3.6% | 2.7% | 3.7% | 2.0% | 4.2% | 3.3% | 2.6% | 3.2% |
| Minimize environmental impact / pollution | 14 | 3 | 8 | 3 | 2 | 5 | 5 | 2 | 4 | 8 |
| | 1.0% | 1.5% | 1.5% | 0.6% | 0.9% | 1.2% | 1.2% | 0.7% | 1.0% | 1.5% |
| Limit tour buses | 10 | 0 | 6 | 2 | 1 | 2 | 4 | 0 | 4 | 5 |
| | 0.7% | 0.0% | 1.1% | 0.4% | 0.5% | 0.5% | 0.9% | 0.0% | 1.0% | 0.9% |
| Other | 184 | 39 | 87 | 46 | 26 | 49 | 67 | 34 | 56 | 75 |
| | 13.4% | 19.1% | 15.8% | 8.9% | 11.9% | 12.0% | 15.8% | 11.4% | 13.3% | 14.1% |
| Don't know | 11 | 3 | 3 | 5 | 2 | 3 | 3 | 1 | 4 | 6 |
| | 0.8% | 1.5% | 0.5% | 1.0% | 0.9% | 0.7% | 0.7% | 0.3% | 1.0% | 1.1% |
| No response | 257 | 29 | 105 | 102 | 47 | 66 | 81 | 89 | 78 | 60 |
| | 18.7% | 14.2% | 19.1% | 19.7% | 21.5% | 16.1% | 19.1% | 29.8% | 18.5% | 11.3% |

*Pan Atlantic Research: June, 2021*

DX323.366

App. 670    TOWN06146

Table 129: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts? SECOND RESPONSE (Q14-2)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | *Own* | *Rent* | *Year-round resident* | *Seasonal resident* | *Business-owner (resident or non-resident)* | *Female* | *Male* |
| Total | **1378** | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Ban cruise ships entirely | **5** | 4 | 1 | 5 | 0 | 0 | 1 | 2 |
| | **0.4%** | 0.4% | 0.6% | 0.5% | 0.0% | 0.0% | 0.2% | 0.4% |
| Reduce overall number of ships | **48** | 41 | 5 | 42 | 3 | 3 | 26 | 14 |
| | **3.5%** | 3.8% | 2.8% | 4.3% | 1.4% | 1.9% | 4.1% | 2.8% |
| Reduce size of ships | **110** | 90 | 15 | 80 | 17 | 13 | 70 | 26 |
| | **8.0%** | 8.2% | 8.5% | 8.1% | 8.2% | 8.2% | 11.1% | 5.2% |
| Limit number of ships per day | **49** | 38 | 6 | 38 | 7 | 1 | 23 | 18 |
| | **3.6%** | 3.5% | 3.4% | 3.9% | 3.4% | 0.6% | 3.7% | 3.6% |
| Reduce passengers per day or per season | **57** | 47 | 5 | 44 | 4 | 8 | 23 | 24 |
| | **4.1%** | 4.3% | 2.8% | 4.5% | 1.9% | 5.1% | 3.7% | 4.8% |
| More days without cruise ships | **23** | 17 | 4 | 15 | 1 | 6 | 12 | 9 |
| | **1.7%** | 1.6% | 2.3% | 1.5% | 0.5% | 3.8% | 1.9% | 1.8% |
| Shorten cruise ship season | **12** | 9 | 3 | 9 | 3 | 0 | 3 | 6 |
| | **0.9%** | 0.8% | 1.7% | 0.9% | 1.4% | 0.0% | 0.5% | 1.2% |
| Move tendering or disembarking to another location | **21** | 17 | 3 | 16 | 3 | 1 | 10 | 7 |
| | **1.5%** | 1.6% | 1.7% | 1.6% | 1.4% | 0.6% | 1.6% | 1.4% |
| Raise ship or passenger fees | **14** | 8 | 5 | 9 | 1 | 2 | 4 | 6 |
| | **1.0%** | 0.7% | 2.8% | 0.9% | 0.5% | 1.3% | 0.6% | 1.2% |
| Positive comment about cruise ships/management | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Minimize environmental impact / pollution | **9** | 9 | 0 | 6 | 2 | 1 | 4 | 3 |
| | **0.7%** | 0.8% | 0.0% | 0.6% | 1.0% | 0.6% | 0.6% | 0.6% |
| Limit tour buses | **4** | 4 | 0 | 2 | 1 | 1 | 0 | 2 |
| | **0.3%** | 0.3% | 0.6% | 0.2% | 0.5% | 0.6% | 0.0% | 0.4% |
| Other | **5** | 5 | 0 | 3 | 1 | 1 | 3 | 2 |
| | **0.4%** | 0.5% | 0.0% | 0.3% | 0.5% | 0.6% | 0.5% | 0.4% |
| Don't know | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| No response | **1021** | 804 | 129 | 716 | 164 | 121 | 451 | 378 |
| | **74.1%** | 73.6% | 72.9% | 72.7% | 79.2% | 76.6% | 71.6% | 76.1% |

*Pan Atlantic Research: June, 2021*

Table 130: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts? SECOND RESPONSE (Q14-2)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | *18-44* | *45-64* | *65+* | *<50k* | *$50k-100k* | *100k+* | *Less than 4-year degree* | *4-year degree* | *Post-graduate degree* |
| Total | **1378** | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Ban cruise ships entirely | **5** | 2 | 2 | 0 | 0 | 1 | 2 | 1 | 2 | 2 |
| | **0.4%** | 1.0% | 0.4% | 0.0% | 0.0% | 0.2% | 0.5% | 0.3% | 0.5% | 0.4% |
| Reduce overall number of ships | **48** | 8 | 16 | 20 | 8 | 15 | 17 | 6 | 10 | 28 |
| | **3.5%** | 3.9% | 2.9% | 3.9% | 3.7% | 3.7% | 4.0% | 2.0% | 2.4% | 5.3% |
| Reduce size of ships | **110** | 13 | 41 | 50 | 18 | 47 | 24 | 18 | 31 | 56 |
| | **8.0%** | 6.4% | 7.5% | 9.7% | 8.2% | 11.5% | 5.6% | 6.0% | 7.4% | 10.5% |
| Limit number of ships per day | **49** | 8 | 13 | 24 | 8 | 15 | 14 | 9 | 16 | 18 |
| | **3.6%** | 3.9% | 2.4% | 4.6% | 3.7% | 3.7% | 3.3% | 3.0% | 3.8% | 3.4% |
| Reduce passengers per day or per season | **57** | 5 | 24 | 24 | 4 | 19 | 22 | 10 | 25 | 19 |
| | **4.1%** | 2.5% | 4.4% | 4.6% | 1.8% | 4.6% | 5.2% | 3.3% | 5.9% | 3.6% |
| More days without cruise ships | **23** | 3 | 10 | 10 | 7 | 11 | 2 | 9 | 7 | 6 |
| | **1.7%** | 1.5% | 1.8% | 1.9% | 3.2% | 2.7% | 0.5% | 3.0% | 1.7% | 1.1% |
| Shorten cruise ship season | **12** | 3 | 5 | 3 | 1 | 5 | 3 | 2 | 4 | 4 |
| | **0.9%** | 1.5% | 0.9% | 0.6% | 0.5% | 1.2% | 0.7% | 0.7% | 1.0% | 0.8% |
| Move tendering or disembarking to another location | **21** | 3 | 11 | 6 | 3 | 7 | 5 | 4 | 7 | 8 |
| | **1.5%** | 1.5% | 2.0% | 1.2% | 1.4% | 1.7% | 1.2% | 1.3% | 1.7% | 1.5% |
| Raise ship or passenger fees | **14** | 2 | 5 | 6 | 1 | 5 | 5 | 1 | 2 | 8 |
| | **1.0%** | 1.0% | 0.9% | 1.2% | 0.5% | 1.2% | 1.2% | 0.3% | 0.5% | 1.5% |
| Positive comment about cruise ships/management | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Minimize environmental impact / pollution | **9** | 1 | 4 | 3 | 1 | 4 | 3 | 0 | 3 | 5 |
| | **0.7%** | 0.5% | 0.7% | 0.6% | 0.5% | 1.0% | 0.7% | 0.0% | 0.7% | 0.9% |
| Limit tour buses | **4** | 0 | 0 | 2 | 0 | 0 | 3 | 0 | 1 | 2 |
| | **0.3%** | 0.0% | 0.0% | 0.4% | 0.0% | 0.0% | 0.7% | 0.0% | 0.2% | 0.4% |
| Other | **5** | 1 | 2 | 2 | 0 | 1 | 3 | 1 | 0 | 4 |
| | **0.4%** | 0.5% | 0.4% | 0.4% | 0.0% | 0.2% | 0.7% | 0.3% | 0.0% | 0.8% |
| Don't know | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| No response | **1021** | 155 | 416 | 368 | 168 | 279 | 322 | 238 | 313 | 373 |
| | **74.1%** | 76.0% | 75.8% | 71.0% | 76.7% | 68.2% | 75.8% | 79.6% | 74.3% | 70.0% |

*Pan Atlantic Research: June, 2021*

DX323.367

App. 671

TOWN06147

Table 131: What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?  THIRD RESPONSE (Q14-3)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | *Total* | *Own* | *Rent* | *Year-round resident* | *Seasonal resident* | *Business-owner (resident or non-resident)* | *Female* | *Male* |
| Total | **1378** | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Ban cruise ships entirely | **2** | 2 | 0 | 2 | 0 | 0 | 2 | 0 |
| | **0.1%** | 0.2% | 0.0% | 0.2% | 0.0% | 0.0% | 0.3% | 0.0% |
| Reduce overall number of ships | **2** | 2 | 0 | 1 | 0 | 1 | 1 | 1 |
| | **0.1%** | 0.2% | 0.0% | 0.1% | 0.0% | 0.6% | 0.2% | 0.2% |
| Reduce size of ships | **8** | 6 | 2 | 4 | 3 | 1 | 3 | 2 |
| | **0.6%** | 0.5% | 1.1% | 0.4% | 1.4% | 0.6% | 0.5% | 0.4% |
| Limit number of ships per day | **17** | 13 | 2 | 15 | 1 | 1 | 11 | 4 |
| | **1.2%** | 1.2% | 1.1% | 1.5% | 0.5% | 0.6% | 1.7% | 0.8% |
| Reduce passengers per day or per season | **11** | 9 | 1 | 7 | 1 | 3 | 4 | 5 |
| | **0.8%** | 0.8% | 0.6% | 0.7% | 0.5% | 1.9% | 0.6% | 1.0% |
| More days without cruise ships | **9** | 8 | 1 | 7 | 2 | 0 | 5 | 2 |
| | **0.7%** | 0.7% | 0.6% | 0.7% | 1.0% | 0.0% | 0.8% | 0.4% |
| Shorten cruise ship season | **6** | 4 | 1 | 6 | 0 | 0 | 4 | 2 |
| | **0.4%** | 0.4% | 0.6% | 0.6% | 0.0% | 0.0% | 0.6% | 0.4% |
| Move tendering or disembarking to another location | **4** | 4 | 0 | 4 | 0 | 0 | 1 | 1 |
| | **0.3%** | 0.4% | 0.0% | 0.4% | 0.0% | 0.0% | 0.2% | 0.2% |
| Raise ship or passenger fees | **4** | 4 | 0 | 1 | 1 | 1 | 1 | 2 |
| | **0.3%** | 0.4% | 0.0% | 0.1% | 0.5% | 0.6% | 0.2% | 0.4% |
| Positive comment about cruise ships/management | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Minimize environmental impact / pollution | **3** | 2 | 1 | 2 | 0 | 0 | 1 | 1 |
| | **0.2%** | 0.2% | 0.6% | 0.2% | 0.0% | 0.0% | 0.2% | 0.2% |
| Limit tour buses | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other | **1** | 1 | 0 | 1 | 0 | 0 | 1 | 0 |
| | **0.1%** | 0.1% | 0.0% | 0.1% | 0.0% | 0.0% | 0.2% | 0.0% |
| Don't know | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| No response | **1311** | 1037 | 169 | 935 | 199 | 151 | 596 | 477 |
| | **95.1%** | 95.0% | 95.5% | 94.9% | 96.1% | 95.6% | 94.6% | 96.0% |

*Pan Atlantic Research: June, 2021*

Table 132:  What changes do you think the town should consider to improve its management of cruise ship tourism and to ameliorate potential negative impacts?  THIRD RESPONSE (Q14-3)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | *Total* | *18-44* | *45-64* | *65+* | *<50k* | *$50k-100k* | *100k+* | *Less than 4-year degree* | *4-year degree* | *Post-graduate degree* |
| Total | **1378** | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Ban cruise ships entirely | **2** | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 1 |
| | **0.1%** | 0.0% | 0.2% | 0.0% | 0.0% | 0.2% | 0.0% | 0.0% | 0.2% | 0.2% |
| Reduce overall number of ships | **2** | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 1 | 1 |
| | **0.1%** | 0.0% | 0.2% | 0.2% | 0.0% | 0.2% | 0.2% | 0.0% | 0.2% | 0.2% |
| Reduce size of ships | **8** | 1 | 3 | 2 | 1 | 2 | 2 | 0 | 5 | 1 |
| | **0.6%** | 0.5% | 0.5% | 0.4% | 0.5% | 0.5% | 0.5% | 0.0% | 1.2% | 0.2% |
| Limit number of ships per day | **17** | 4 | 8 | 5 | 5 | 9 | 2 | 4 | 8 | 5 |
| | **1.2%** | 2.0% | 1.5% | 1.0% | 2.3% | 2.2% | 0.5% | 1.3% | 1.9% | 0.9% |
| Reduce passengers per day or per season | **11** | 3 | 2 | 5 | 2 | 5 | 3 | 3 | 2 | 5 |
| | **0.8%** | 1.5% | 0.4% | 1.0% | 0.9% | 1.2% | 0.7% | 1.0% | 0.5% | 0.9% |
| More days without cruise ships | **9** | 1 | 4 | 3 | 2 | 2 | 1 | 1 | 2 | 5 |
| | **0.7%** | 0.5% | 0.7% | 0.6% | 0.9% | 0.5% | 0.5% | 0.3% | 0.5% | 0.9% |
| Shorten cruise ship season | **6** | 2 | 2 | 2 | 2 | 2 | 2 | 0 | 4 | 2 |
| | **0.4%** | 1.0% | 0.4% | 0.4% | 0.9% | 0.5% | 0.5% | 0.0% | 1.0% | 0.4% |
| Move tendering or disembarking to another location | **4** | 0 | 1 | 2 | 0 | 1 | 2 | 2 | 1 | 0 |
| | **0.3%** | 0.0% | 0.2% | 0.4% | 0.0% | 0.2% | 0.5% | 0.7% | 0.2% | 0.0% |
| Raise ship or passenger fees | **4** | 0 | 0 | 3 | 0 | 1 | 2 | 1 | 0 | 2 |
| | **0.3%** | 0.0% | 0.0% | 0.6% | 0.0% | 0.2% | 0.5% | 0.3% | 0.0% | 0.4% |
| Positive comment about cruise ships/management | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Minimize environmental impact / pollution | **3** | 0 | 1 | 2 | 0 | 1 | 1 | 0 | 0 | 2 |
| | **0.2%** | 0.0% | 0.2% | 0.4% | 0.0% | 0.2% | 0.2% | 0.0% | 0.0% | 0.4% |
| Limit tour buses | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other | **1** | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 |
| | **0.1%** | 0.0% | 0.0% | 0.2% | 0.5% | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% |
| Don't know | **0** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **0.0%** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| No response | **1311** | 193 | 526 | 492 | 206 | 384 | 408 | 288 | 397 | 508 |
| | **95.1%** | 94.6% | 95.8% | 95.0% | 94.1% | 93.9% | 96.0% | 96.3% | 94.3% | 95.3% |

*Pan Atlantic Research: June, 2021*

DX323.368

App. 672    TOWN06148

Table 133: Thinking back to 2019, which of the following best captures your opinion about the amount of cruise ship tourism in that year, as a member of the Bar Harbor community? NUMBER OF DAYS WITH CRUISE SHIPS (Q15a)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Total | **1378** | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Too many days | **870** | 702 | 118 | 661 | 111 | 78 | 422 | 283 |
| | **63.1%** | 64.3% | 66.7% | 67.1% | 53.6% | 49.4% | 67.0% | 56.9% |
| Too few days | **114** | 77 | 10 | 65 | 12 | 34 | 41 | 60 |
| | **8.3%** | 7.1% | 5.6% | 6.6% | 5.8% | 21.5% | 6.5% | 12.1% |
| About the right number of days | **252** | 207 | 28 | 175 | 43 | 30 | 93 | 111 |
| | **18.3%** | 19.0% | 15.8% | 17.8% | 20.8% | 19.0% | 14.8% | 22.3% |
| Don't know | **122** | 89 | 19 | 72 | 35 | 15 | 67 | 35 |
| | **8.9%** | 8.2% | 10.7% | 7.3% | 16.9% | 9.5% | 10.6% | 7.0% |
| No response | **20** | 17 | 2 | 12 | 6 | 1 | 7 | 8 |
| | **1.5%** | 1.6% | 1.1% | 1.2% | 2.9% | 0.6% | 1.1% | 1.6% |

*Pan Atlantic Research: June, 2021*


Table 134: Thinking back to 2019, which of the following best captures your opinion about the amount of cruise ship tourism in that year, as a member of the Bar Harbor community? NUMBER OF DAYS WITH CRUISE SHIPS (Q15a)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Total | **1378** | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Too many days | **870** | 125 | 329 | 342 | 149 | 271 | 235 | 193 | 254 | 343 |
| | **63.1%** | 61.3% | 59.9% | 66.0% | 68.0% | 66.3% | 55.3% | 64.5% | 60.3% | 64.4% |
| Too few days | **114** | 20 | 65 | 19 | 15 | 37 | 42 | 23 | 45 | 40 |
| | **8.3%** | 9.8% | 11.8% | 3.7% | 6.8% | 9.0% | 9.9% | 7.7% | 10.7% | 7.5% |
| About the right number of days | **252** | 36 | 98 | 106 | 33 | 70 | 94 | 55 | 87 | 80 |
| | **18.3%** | 17.6% | 17.9% | 20.5% | 15.1% | 17.1% | 22.1% | 18.4% | 20.7% | 15.0% |
| Don't know | **122** | 22 | 50 | 43 | 17 | 28 | 48 | 25 | 31 | 61 |
| | **8.9%** | 10.8% | 9.1% | 8.3% | 7.8% | 6.8% | 11.3% | 8.4% | 7.4% | 11.4% |
| No response | **20** | 1 | 7 | 8 | 5 | 3 | 6 | 3 | 4 | 9 |
| | **1.5%** | 0.5% | 1.3% | 1.5% | 2.3% | 0.7% | 1.4% | 1.0% | 1.0% | 1.7% |

*Pan Atlantic Research: June, 2021*


Table 135: Thinking back to 2019, which of the following best captures your opinion about the amount of cruise ship tourism in that year, as a member of the Bar Harbor community? NUMBER OF CRUISE SHIP PASSENGERS, ON AVERAGE (Q15b)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Total | **1377** | 1091 | 177 | 984 | 207 | 158 | 629 | 497 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Too many passengers | **914** | 740 | 125 | 692 | 119 | 82 | 448 | 298 |
| | **66.4%** | 67.8% | 70.6% | 70.3% | 57.5% | 51.9% | 71.2% | 60.0% |
| Too few passengers | **98** | 62 | 9 | 53 | 12 | 32 | 35 | 50 |
| | **7.1%** | 5.7% | 5.1% | 5.4% | 5.8% | 20.3% | 5.6% | 10.1% |
| About the right number of passengers | **205** | 167 | 23 | 140 | 36 | 26 | 69 | 97 |
| | **14.9%** | 15.3% | 13.0% | 14.2% | 17.4% | 16.5% | 11.0% | 19.5% |
| Don't know | **127** | 97 | 14 | 76 | 34 | 15 | 68 | 40 |
| | **9.2%** | 8.9% | 7.9% | 7.7% | 16.4% | 9.5% | 10.8% | 8.0% |
| No response | **33** | 25 | 6 | 23 | 6 | 3 | 9 | 12 |
| | **2.4%** | 2.3% | 3.4% | 2.3% | 2.9% | 1.9% | 1.4% | 2.4% |

*Pan Atlantic Research: June, 2021*

DX323.369

App. 673    TOWN06149

Table 136: Thinking back to 2019, which of the following best captures your opinion about the amount of cruise ship tourism in that year, as a member of the Bar Harbor community? NUMBER OF CRUISE SHIP PASSENGERS, ON AVERAGE (Q15b)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Total | 1377 | 204 | 549 | 517 | 219 | 409 | 424 | 299 | 420 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Too many passengers | 914 | 139 | 343 | 354 | 148 | 293 | 253 | 193 | 268 | 373 |
| | 66.4% | 68.1% | 62.5% | 68.5% | 67.6% | 71.6% | 59.7% | 64.5% | 63.8% | 70.0% |
| Too few passengers | 98 | 16 | 57 | 17 | 14 | 29 | 35 | 22 | 39 | 30 |
| | 7.1% | 7.8% | 10.4% | 3.3% | 6.4% | 7.1% | 8.3% | 7.4% | 9.3% | 5.6% |
| About the right number of passengers | 205 | 26 | 80 | 91 | 30 | 52 | 84 | 44 | 74 | 63 |
| | 14.9% | 12.7% | 14.6% | 17.6% | 13.7% | 12.7% | 19.8% | 14.7% | 17.6% | 11.8% |
| Don't know | 127 | 20 | 58 | 44 | 17 | 31 | 44 | 33 | 30 | 57 |
| | 9.2% | 9.8% | 10.6% | 8.5% | 7.8% | 7.6% | 10.4% | 11.0% | 7.1% | 10.7% |
| No response | 33 | 3 | 11 | 11 | 10 | 4 | 8 | 7 | 9 | 10 |
| | 2.4% | 1.5% | 2.0% | 2.1% | 4.6% | 1.0% | 1.9% | 2.3% | 2.1% | 1.9% |

*Pan Atlantic Research: June, 2021*

Table 137: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you? FIRST RESPONSE (Q16-1)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Positive - less crowded, less traffic | 267 | 217 | 37 | 209 | 35 | 17 | 134 | 86 |
| | 19.4% | 19.9% | 20.9% | 21.2% | 16.9% | 10.8% | 21.3% | 17.3% |
| Positive - impact on my business / business environment | 22 | 14 | 3 | 10 | 1 | 11 | 11 | 6 |
| | 1.6% | 1.3% | 1.7% | 1.0% | 0.5% | 7.0% | 1.7% | 1.2% |
| Positive - encouraged higher quality visitors | 19 | 12 | 3 | 14 | 0 | 4 | 13 | 3 |
| | 1.4% | 1.1% | 1.7% | 1.4% | 0.0% | 2.5% | 2.1% | 0.6% |
| Positive - environmental impact | 22 | 21 | 1 | 19 | 3 | 0 | 12 | 5 |
| | 1.6% | 1.9% | 0.6% | 1.9% | 1.4% | 0.0% | 1.9% | 1.0% |
| Positive - impact on views | 33 | 30 | 2 | 27 | 5 | 1 | 20 | 7 |
| | 2.4% | 2.7% | 1.1% | 2.7% | 2.4% | 0.6% | 3.2% | 1.4% |
| Negative - Impact on business environment in general | 65 | 49 | 7 | 38 | 15 | 10 | 25 | 31 |
| | 4.7% | 4.5% | 4.0% | 3.9% | 7.2% | 6.3% | 4.0% | 6.2% |
| Negative - Loss of job/income/revenue/customers | 81 | 48 | 12 | 40 | 5 | 35 | 38 | 32 |
| | 5.9% | 4.4% | 6.8% | 4.1% | 2.4% | 22.2% | 6.0% | 6.4% |
| No impact on my business/business environment | 30 | 24 | 4 | 20 | 2 | 7 | 18 | 9 |
| | 2.2% | 2.2% | 2.3% | 2.0% | 1.0% | 4.4% | 2.9% | 1.8% |
| No impact at all | 239 | 195 | 25 | 159 | 45 | 28 | 98 | 111 |
| | 17.3% | 17.9% | 14.1% | 16.1% | 21.7% | 17.7% | 15.6% | 22.3% |
| Other positive or positive in general | 324 | 266 | 44 | 252 | 42 | 27 | 152 | 101 |
| | 23.5% | 24.4% | 24.9% | 25.6% | 20.3% | 17.1% | 24.1% | 20.3% |
| Other negative or negative in general | 39 | 31 | 5 | 33 | 2 | 2 | 13 | 12 |
| | 2.8% | 2.8% | 2.8% | 3.4% | 1.0% | 1.3% | 2.1% | 2.4% |
| Other neutral | 60 | 46 | 11 | 46 | 10 | 2 | 22 | 27 |
| | 4.4% | 4.2% | 6.2% | 4.7% | 4.8% | 1.3% | 3.5% | 5.4% |
| Not sure | 10 | 10 | 0 | 7 | 2 | 1 | 4 | 3 |
| | 0.7% | 0.9% | 0.0% | 0.7% | 1.0% | 0.6% | 0.6% | 0.6% |
| Not present in 2020 | 20 | 13 | 4 | 7 | 11 | 1 | 6 | 8 |
| | 1.5% | 1.2% | 2.3% | 0.7% | 5.3% | 0.6% | 1.0% | 1.6% |
| No response | 147 | 116 | 19 | 104 | 29 | 12 | 64 | 56 |
| | 10.7% | 10.6% | 10.7% | 10.6% | 14.0% | 7.6% | 10.2% | 11.3% |

*Pan Atlantic Research: June, 2021*

DX323.370

App. 674    TOWN06150

Table 138:  Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020.  What impact, if any, did this have on you? FIRST RESPONSE (Q16-1)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Positive - less crowded, less traffic | 267 | 42 | 104 | 99 | 45 | 83 | 81 | 43 | 75 | 131 |
| | 19.4% | 20.6% | 18.9% | 19.1% | 20.5% | 20.3% | 19.1% | 14.4% | 17.8% | 24.6% |
| Positive - impact on my business / business environment | 22 | 7 | 9 | 3 | 4 | 6 | 6 | 3 | 10 | 6 |
| | 1.6% | 3.4% | 1.6% | 0.6% | 1.8% | 1.5% | 1.4% | 1.0% | 2.4% | 1.1% |
| Positive - encouraged higher quality visitors | 19 | 6 | 6 | 6 | 4 | 6 | 4 | 3 | 3 | 9 |
| | 1.4% | 2.9% | 1.1% | 1.2% | 1.8% | 1.5% | 0.9% | 1.0% | 0.7% | 1.7% |
| Positive - environmental impact | 22 | 2 | 10 | 8 | 3 | 5 | 9 | 3 | 2 | 14 |
| | 1.6% | 1.0% | 1.8% | 1.5% | 1.4% | 1.2% | 2.1% | 1.0% | 0.5% | 2.6% |
| Positive - impact on views | 33 | 4 | 13 | 11 | 5 | 10 | 10 | 5 | 11 | 14 |
| | 2.4% | 2.0% | 2.4% | 2.1% | 2.3% | 2.4% | 2.4% | 1.7% | 2.6% | 2.6% |
| Negative - Impact on business environment in general | 65 | 11 | 30 | 22 | 11 | 17 | 21 | 13 | 28 | 20 |
| | 4.7% | 5.4% | 5.5% | 4.2% | 5.0% | 4.2% | 4.9% | 4.3% | 6.7% | 3.8% |
| Negative - Loss of job/income/revenue/customers | 81 | 21 | 32 | 20 | 14 | 25 | 20 | 22 | 34 | 18 |
| | 5.9% | 10.3% | 5.8% | 3.9% | 6.4% | 6.1% | 4.7% | 7.4% | 8.1% | 3.4% |
| No impact on my business/business environment | 30 | 8 | 16 | 5 | 5 | 8 | 14 | 2 | 15 | 12 |
| | 2.2% | 3.9% | 2.9% | 1.0% | 2.3% | 2.0% | 3.3% | 0.7% | 3.6% | 2.3% |
| No impact at all | 239 | 20 | 103 | 106 | 33 | 73 | 86 | 73 | 73 | 78 |
| | 17.3% | 9.8% | 18.8% | 20.5% | 15.1% | 17.8% | 20.2% | 24.4% | 17.3% | 14.6% |
| Other positive or positive in general | 324 | 43 | 108 | 140 | 50 | 102 | 87 | 64 | 94 | 133 |
| | 23.5% | 21.1% | 19.7% | 27.0% | 22.8% | 24.9% | 20.5% | 21.4% | 22.3% | 25.0% |
| Other negative or negative in general | 39 | 6 | 20 | 10 | 9 | 11 | 14 | 6 | 14 | 13 |
| | 2.8% | 2.9% | 3.6% | 1.9% | 4.1% | 2.7% | 3.3% | 2.0% | 3.3% | 2.4% |
| Other neutral | 60 | 11 | 22 | 22 | 11 | 20 | 15 | 13 | 11 | 29 |
| | 4.4% | 5.4% | 4.0% | 4.2% | 5.0% | 4.9% | 3.5% | 4.3% | 2.6% | 5.4% |
| Not sure | 10 | 2 | 6 | 2 | 0 | 3 | 5 | 2 | 3 | 4 |
| | 0.7% | 1.0% | 1.1% | 0.4% | 0.0% | 0.7% | 1.2% | 0.7% | 0.7% | 0.8% |
| Not present in 2020 | 20 | 4 | 7 | 8 | 3 | 1 | 7 | 3 | 3 | 12 |
| | 1.5% | 2.0% | 1.3% | 1.5% | 1.4% | 0.2% | 1.6% | 1.0% | 0.7% | 2.3% |
| No response | 147 | 17 | 63 | 56 | 22 | 39 | 46 | 44 | 45 | 40 |
| | 10.7% | 8.3% | 11.5% | 10.8% | 10.0% | 9.5% | 10.8% | 14.7% | 10.7% | 7.5% |

*Pan Atlantic Research: June, 2021*

Table 139:  Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020.  What impact, if any, did this have on you? SECOND RESPONSE (Q16-2)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Positive - less crowded, less traffic | 20 | 17 | 2 | 16 | 2 | 2 | 11 | 5 |
| | 1.5% | 1.6% | 1.1% | 1.6% | 1.0% | 1.3% | 1.7% | 1.0% |
| Positive - impact on my business / business environment | 1 | 0 | 1 | 1 | 0 | 0 | 1 | 0 |
| | 0.1% | 0.0% | 0.6% | 0.1% | 0.0% | 0.0% | 0.2% | 0.0% |
| Positive - encouraged higher quality visitors | 6 | 5 | 1 | 5 | 0 | 1 | 5 | 0 |
| | 0.4% | 0.5% | 0.6% | 0.5% | 0.0% | 0.6% | 0.8% | 0.0% |
| Positive - environmental impact | 18 | 17 | 1 | 12 | 5 | 0 | 9 | 4 |
| | 1.3% | 1.6% | 0.6% | 1.2% | 2.4% | 0.0% | 1.4% | 0.8% |
| Positive - impact on views | 32 | 16 | 2 | 17 | 3 | 2 | 15 | 4 |
| | 1.7% | 1.5% | 1.1% | 1.7% | 1.4% | 1.3% | 2.4% | 0.8% |
| Negative - Impact on business environment in general | 15 | 14 | 0 | 9 | 3 | 3 | 10 | 4 |
| | 1.1% | 1.3% | 0.0% | 0.9% | 1.4% | 1.9% | 1.6% | 0.8% |
| Negative - Loss of job/income/revenue/customers | 14 | 8 | 1 | 4 | 3 | 7 | 1 | 11 |
| | 1.0% | 0.7% | 0.6% | 0.4% | 1.4% | 4.4% | 0.2% | 2.2% |
| No impact on my business/business environment | 7 | 6 | 1 | 6 | 0 | 1 | 1 | 2 |
| | 0.5% | 0.5% | 0.6% | 0.6% | 0.0% | 0.6% | 0.2% | 0.4% |
| No impact at all | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other positive or positive in general | 6 | 5 | 0 | 4 | 1 | 1 | 4 | 2 |
| | 0.4% | 0.5% | 0.0% | 0.4% | 0.5% | 0.6% | 0.6% | 0.4% |
| Other negative or negative in general | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other neutral | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Not sure | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Not present in 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| No response | 1268 | 1004 | 168 | 911 | 190 | 141 | 573 | 465 |
| | 92.0% | 91.9% | 94.9% | 92.5% | 91.8% | 89.2% | 91.0% | 93.6% |

*Pan Atlantic Research: June, 2021*

DX323.371

App. 675    TOWN06151

Table 140: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you? SECOND RESPONSE (Q16-2)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Positive - less crowded, less traffic | 20 | 5 | 6 | 6 | 4 | 9 | 3 | 6 | 8 | 5 |
| | 1.5% | 2.5% | 1.1% | 1.2% | 1.8% | 2.2% | 0.7% | 2.0% | 1.9% | 0.9% |
| Positive - impact on my business / business environment | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 0.1% | 0.5% | 0.0% | 0.0% | 0.5% | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% |
| Positive - encouraged higher quality visitors | 6 | 3 | 1 | 1 | 1 | 1 | 3 | 0 | 2 | 3 |
| | 0.4% | 1.5% | 0.2% | 0.2% | 0.5% | 0.2% | 0.7% | 0.0% | 0.5% | 0.6% |
| Positive - environmental impact | 18 | 2 | 7 | 6 | 1 | 4 | 5 | 0 | 2 | 13 |
| | 1.3% | 1.0% | 1.3% | 1.2% | 0.5% | 1.0% | 1.2% | 0.0% | 0.5% | 2.4% |
| Positive - impact on views | 23 | 4 | 9 | 7 | 4 | 6 | 7 | 1 | 4 | 15 |
| | 1.7% | 2.0% | 1.6% | 1.4% | 1.8% | 1.5% | 1.6% | 0.3% | 1.0% | 2.8% |
| Negative - Impact on business environment in general | 15 | 1 | 6 | 8 | 3 | 5 | 5 | 3 | 4 | 8 |
| | 1.1% | 0.5% | 1.1% | 1.5% | 1.4% | 1.2% | 1.2% | 1.0% | 1.0% | 1.5% |
| Negative - Loss of job/income/revenue/customers | 14 | 3 | 6 | 4 | 3 | 4 | 6 | 3 | 6 | 5 |
| | 1.0% | 1.5% | 1.1% | 0.8% | 1.4% | 1.0% | 1.4% | 1.0% | 1.4% | 0.9% |
| No impact on my business/business environment | 7 | 1 | 3 | 1 | 0 | 3 | 1 | 1 | 3 | 0 |
| | 0.5% | 0.5% | 0.5% | 0.2% | 0.0% | 0.7% | 0.2% | 0.3% | 0.7% | 0.0% |
| No impact at all | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other positive or positive in general | 6 | 0 | 5 | 1 | 2 | 1 | 1 | 4 | 1 | 1 |
| | 0.4% | 0.0% | 0.9% | 0.2% | 0.9% | 0.2% | 0.2% | 1.3% | 0.2% | 0.2% |
| Other negative or negative in general | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other neutral | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Not sure | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Not present in 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| No response | 1268 | 184 | 506 | 484 | 200 | 376 | 394 | 281 | 391 | 482 |
| | 92.0% | 90.2% | 92.2% | 93.4% | 91.3% | 91.9% | 92.7% | 94.0% | 92.9% | 90.4% |

*Pan Atlantic Research: June, 2021*

Table 141: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020. What impact, if any, did this have on you? THIRD RESPONSE (Q16-3)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Positive - less crowded, less traffic | 3 | 3 | 0 | 3 | 0 | 0 | 1 | 1 |
| | 0.2% | 0.3% | 0.0% | 0.3% | 0.0% | 0.0% | 0.2% | 0.2% |
| Positive - impact on my business / business environment | 1 | 1 | 0 | 1 | 0 | 0 | 1 | 0 |
| | 0.1% | 0.1% | 0.0% | 0.1% | 0.0% | 0.0% | 0.2% | 0.0% |
| Positive - encouraged higher quality visitors | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Positive - environmental impact | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Positive - impact on views | 5 | 5 | 1 | 4 | 2 | 0 | 3 | 1 |
| | 0.4% | 0.5% | 0.6% | 0.4% | 1.0% | 0.0% | 0.5% | 0.2% |
| Negative - Impact on business environment in general | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Negative - Loss of job/income/revenue/customers | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| No impact on my business/business environment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| No impact at all | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other positive or positive in general | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other negative or negative in general | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other neutral | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Not sure | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Not present in 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| No response | 1368 | 1083 | 176 | 977 | 205 | 158 | 625 | 495 |
| | 99.3% | 99.2% | 99.4% | 99.2% | 99.0% | 100.0% | 99.2% | 99.6% |

*Pan Atlantic Research: June, 2021*

DX323.372

App. 676    TOWN06152

Table 142: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020.  What impact, if any, did this have on you? THIRD RESPONSE (Q16-3)

| | Total | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **Age of Respondent** | | | **Household Income Level** | | | **Level of Education** | | |
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Positive - less crowded, less traffic | 3 | 1 | 1 | 1 | 0 | 0 | 3 | 0 | 0 | 3 |
| | 0.2% | 0.5% | 0.2% | 0.2% | 0.0% | 0.0% | 0.7% | 0.0% | 0.0% | 0.6% |
| Positive - impact on my business / business environment | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 |
| | 0.1% | 0.5% | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.0% | 0.2% | 0.0% |
| Positive - encouraged higher quality visitors | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Positive - environmental impact | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Positive - impact on views | 6 | 2 | 1 | 1 | 1 | 1 | 2 | 0 | 1 | 3 |
| | 0.4% | 1.0% | 0.2% | 0.2% | 0.5% | 0.2% | 0.5% | 0.0% | 0.2% | 0.6% |
| Negative - Impact on business environment in general | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Negative - Loss of job/income/revenue/customers | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| No impact on my business/business environment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| No impact at all | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other positive or positive in general | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other negative or negative in general | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Other neutral | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Not sure | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Not present in 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| No response | 1368 | 200 | 547 | 516 | 218 | 408 | 419 | 299 | 419 | 527 |
| | 99.3% | 98.0% | 99.6% | 99.6% | 99.5% | 99.8% | 98.6% | 100.0% | 99.5% | 98.9% |

*Pan Atlantic Research: June, 2021*


Table 143: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020.  What impact, if any, did this have on you? OVERALL ATTITUDE, COMBINING Q16-1, Q16-2, AND Q16-3

| | Total | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| | | **Home ownership** | | **Relationship to Bar Harbor** | | | **Respondent Gender** | |
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Positive | 670 | 544 | 90 | 522 | 82 | 56 | 333 | 202 |
| | 48.6% | 49.8% | 50.8% | 53.0% | 39.6% | 35.4% | 52.9% | 40.6% |
| Negative | 182 | 126 | 23 | 109 | 21 | 47 | 75 | 73 |
| | 13.2% | 11.5% | 13.0% | 11.1% | 10.1% | 29.7% | 11.9% | 14.7% |
| Mixed/Neutral | 349 | 283 | 41 | 236 | 62 | 41 | 148 | 155 |
| | 25.3% | 25.9% | 23.2% | 24.0% | 30.0% | 25.9% | 23.5% | 31.2% |
| No response / Not sure / NA | 177 | 139 | 23 | 118 | 42 | 14 | 74 | 67 |
| | 12.8% | 12.7% | 13.0% | 12.0% | 20.3% | 8.9% | 11.7% | 13.5% |

*Pan Atlantic Research: June, 2021*


Table 144: Due to the COVID-19 pandemic, Bar Harbor experienced a summer without cruise ships in 2020.  What impact, if any, did this have on you? OVERALL ATTITUDE, COMBINING Q16-1, Q16-2, AND Q16-3

| | Total | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **Age of Respondent** | | | **Household Income Level** | | | **Level of Education** | | |
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Positive | 670 | 102 | 243 | 259 | 108 | 207 | 189 | 118 | 190 | 298 |
| | 48.6% | 50.0% | 44.3% | 50.0% | 49.3% | 50.6% | 44.5% | 39.5% | 45.1% | 55.9% |
| Negative | 182 | 37 | 82 | 50 | 34 | 51 | 55 | 39 | 76 | 50 |
| | 13.2% | 18.1% | 14.9% | 9.7% | 15.5% | 12.5% | 12.9% | 13.0% | 18.1% | 9.4% |
| Mixed/Neutral | 349 | 42 | 148 | 143 | 52 | 108 | 123 | 93 | 104 | 129 |
| | 25.3% | 20.6% | 27.0% | 27.6% | 23.7% | 26.4% | 28.9% | 31.1% | 24.7% | 24.2% |
| No response / Not sure / NA | 177 | 23 | 76 | 66 | 25 | 43 | 58 | 49 | 51 | 56 |
| | 12.8% | 11.3% | 13.8% | 12.7% | 11.4% | 10.5% | 13.6% | 16.4% | 12.1% | 10.5% |

*Pan Atlantic Research: June, 2021*

DX323.373

App. 677    TOWN06153

Table 145: Overall, do you feel that cruise ship tourism is more positive or more negative for Bar Harbor? (Q17)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Very negative | 462 | 359 | 74 | 358 | 56 | 40 | 229 | 142 |
| | 33.5% | 32.9% | 41.8% | 36.3% | 27.1% | 25.3% | 36.3% | 28.6% |
| 2 - Somewhat negative | 301 | 252 | 36 | 227 | 39 | 28 | 143 | 98 |
| | 21.8% | 23.1% | 20.3% | 23.0% | 18.8% | 17.7% | 22.7% | 19.7% |
| 3 - Neutral | 102 | 80 | 14 | 75 | 14 | 13 | 42 | 46 |
| | 7.4% | 7.3% | 7.9% | 7.6% | 6.8% | 8.2% | 6.7% | 9.3% |
| 4 - Somewhat positive | 221 | 186 | 22 | 142 | 51 | 21 | 102 | 91 |
| | 16.0% | 17.0% | 12.4% | 14.4% | 24.6% | 13.3% | 16.2% | 18.3% |
| 5 - Very positive | 259 | 190 | 27 | 162 | 40 | 52 | 101 | 111 |
| | 18.8% | 17.4% | 15.3% | 16.4% | 19.3% | 32.9% | 16.0% | 22.3% |
| Don't know | 13 | 8 | 1 | 6 | 4 | 3 | 6 | 4 |
| | 0.9% | 0.7% | 0.6% | 0.6% | 1.9% | 1.9% | 1.0% | 0.8% |
| No response | 20 | 17 | 3 | 15 | 3 | 1 | 7 | 5 |
| | 1.5% | 1.6% | 1.7% | 1.5% | 1.4% | 0.6% | 1.1% | 1.0% |

*Pan Atlantic Research: June, 2021*

Table 146: Overall, do you feel that cruise ship tourism is more positive or more negative for Bar Harbor? (Q17)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1 - Very negative | 462 | 87 | 165 | 165 | 85 | 143 | 119 | 76 | 131 | 211 |
| | 33.5% | 42.6% | 30.1% | 31.9% | 38.8% | 35.0% | 28.0% | 25.4% | 31.1% | 39.6% |
| 2 - Somewhat negative | 301 | 44 | 124 | 112 | 46 | 94 | 88 | 72 | 96 | 109 |
| | 21.8% | 21.6% | 22.6% | 21.6% | 21.0% | 23.0% | 20.7% | 24.1% | 22.8% | 20.5% |
| 3 - Neutral | 102 | 10 | 45 | 39 | 15 | 36 | 34 | 30 | 28 | 37 |
| | 7.4% | 4.9% | 8.2% | 7.5% | 6.8% | 8.8% | 8.0% | 10.0% | 6.7% | 6.9% |
| 4 - Somewhat positive | 221 | 21 | 82 | 109 | 37 | 65 | 69 | 56 | 68 | 85 |
| | 16.0% | 10.3% | 14.9% | 21.0% | 16.9% | 15.9% | 16.2% | 18.7% | 16.2% | 15.9% |
| 5 - Very positive | 259 | 39 | 126 | 77 | 32 | 64 | 104 | 59 | 91 | 79 |
| | 18.8% | 19.1% | 23.0% | 14.9% | 14.6% | 15.6% | 24.5% | 19.7% | 21.6% | 14.8% |
| Don't know | 13 | 2 | 2 | 7 | 3 | 2 | 5 | 2 | 4 | 4 |
| | 0.9% | 1.0% | 0.4% | 1.4% | 1.4% | 0.5% | 1.2% | 0.7% | 1.0% | 0.8% |
| No response | 20 | 1 | 5 | 9 | 1 | 5 | 6 | 4 | 3 | 8 |
| | 1.5% | 0.5% | 0.9% | 1.7% | 0.5% | 1.2% | 1.4% | 1.3% | 0.7% | 1.5% |

*Pan Atlantic Research: June, 2021*

Table 147: Mean of Q17

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
|---|---|---|---|---|---|---|---|---|
| Mean | 2.64 | 2.62 | 2.38 | 2.51 | 2.90 | 3.11 | 2.52 | 2.86 |
| Std Error | 0.04 | 0.05 | 0.11 | 0.05 | 0.11 | 0.13 | 0.06 | 0.07 |
| Valid N | 1345 | 1067 | 173 | 964 | 200 | 154 | 617 | 488 |

*Pan Atlantic Research: June, 2021*

Table 148: Mean of Q17

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
|---|---|---|---|---|---|---|---|---|---|---|
| Mean | 2.64 | 2.41 | 2.78 | 2.64 | 2.47 | 2.53 | 2.88 | 2.83 | 2.74 | 2.45 |
| Std Error | 0.04 | 0.11 | 0.07 | 0.07 | 0.10 | 0.07 | 0.08 | 0.09 | 0.08 | 0.07 |
| Valid N | 1345 | 201 | 542 | 502 | 215 | 402 | 414 | 293 | 414 | 521 |

*Pan Atlantic Research: June, 2021*

DX323.374

App. 678

TOWN06154

# Demographics

### Table 149: What is your age? (Q19)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| **Total** | **1378** | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **18-34** | **76** | 21 | 50 | 65 | 8 | 2 | 37 | 23 |
| | **5.5%** | 1.9% | 28.2% | 6.6% | 3.9% | 1.3% | 5.9% | 4.6% |
| **35-44** | **128** | 82 | 35 | 99 | 7 | 18 | 69 | 37 |
| | **9.3%** | 7.5% | 19.8% | 10.1% | 3.4% | 11.4% | 11.0% | 7.4% |
| **45-54** | **213** | 174 | 21 | 154 | 19 | 37 | 99 | 83 |
| | **15.5%** | 15.9% | 11.9% | 15.6% | 9.2% | 23.4% | 15.7% | 16.7% |
| **55-64** | **336** | 278 | 21 | 221 | 52 | 56 | 163 | 126 |
| | **24.4%** | 25.5% | 11.9% | 22.4% | 25.1% | 35.4% | 25.9% | 25.4% |
| **65+** | **518** | 445 | 42 | 368 | 106 | 31 | 240 | 220 |
| | **37.6%** | 40.8% | 23.7% | 37.4% | 51.2% | 19.6% | 38.1% | 44.3% |
| **No response** | **21** | 19 | 1 | 15 | 4 | 2 | 4 | 2 |
| | **1.5%** | 1.7% | 0.6% | 1.5% | 1.9% | 1.3% | 0.6% | 0.4% |
| **Prefer not to answer** | **86** | 73 | 7 | 63 | 11 | 12 | 18 | 6 |
| | **6.2%** | 6.7% | 4.0% | 6.4% | 5.3% | 7.6% | 2.9% | 1.2% |

*Pan Atlantic Research: June, 2021*

### Table 150: What is your age? (Q19)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| **Total** | **1378** | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **18-34** | **76** | 76 | 0 | 0 | 37 | 19 | 12 | 17 | 35 | 20 |
| | **5.5%** | 37.3% | 0.0% | 0.0% | 16.9% | 4.6% | 2.8% | 5.7% | 8.3% | 3.8% |
| **35-44** | **128** | 128 | 0 | 0 | 20 | 52 | 34 | 19 | 58 | 44 |
| | **9.3%** | 62.7% | 0.0% | 0.0% | 9.1% | 12.7% | 8.0% | 6.4% | 13.8% | 8.3% |
| **45-54** | **213** | 0 | 213 | 0 | 20 | 68 | 91 | 39 | 87 | 73 |
| | **15.5%** | 0.0% | 38.8% | 0.0% | 9.1% | 16.6% | 21.4% | 13.0% | 20.7% | 13.7% |
| **55-64** | **336** | 0 | 336 | 0 | 38 | 106 | 140 | 84 | 98 | 135 |
| | **24.4%** | 0.0% | 61.2% | 0.0% | 17.4% | 25.9% | 32.9% | 28.1% | 23.3% | 25.3% |
| **65+** | **518** | 0 | 0 | 518 | 95 | 152 | 142 | 133 | 124 | 238 |
| | **37.6%** | 0.0% | 0.0% | 100.0% | 43.4% | 37.2% | 33.4% | 44.5% | 29.5% | 44.7% |
| **No response** | **21** | 0 | 0 | 0 | 3 | 2 | 4 | 2 | 4 | 4 |
| | **1.5%** | 0.0% | 0.0% | 0.0% | 1.4% | 0.5% | 0.9% | 0.7% | 1.0% | 0.8% |
| **Prefer not to answer** | **86** | 0 | 0 | 0 | 6 | 10 | 2 | 5 | 15 | 19 |
| | **6.2%** | 0.0% | 0.0% | 0.0% | 2.7% | 2.4% | 0.5% | 1.7% | 3.6% | 3.6% |

*Pan Atlantic Research: June, 2021*

### Table 151: For tabulation purposes, which of the following income ranges best approximates your annual household income for 2020 from all sources? (Q20)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| **Total** | **1378** | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| **Under $25,000** | **61** | 22 | 35 | 55 | 1 | 5 | 36 | 18 |
| | **4.4%** | 2.0% | 19.8% | 5.6% | 0.5% | 3.2% | 5.7% | 3.6% |
| **$25,000 - $49,999** | **158** | 103 | 50 | 133 | 9 | 14 | 105 | 40 |
| | **11.5%** | 9.4% | 28.2% | 13.5% | 4.3% | 8.9% | 16.7% | 8.0% |
| **$50,000-$74,999** | **206** | 160 | 29 | 159 | 17 | 24 | 99 | 79 |
| | **14.9%** | 14.7% | 16.4% | 16.1% | 8.2% | 15.2% | 15.7% | 15.9% |
| **$75,000 - $99,999** | **203** | 170 | 18 | 162 | 18 | 19 | 98 | 78 |
| | **14.7%** | 15.6% | 10.2% | 16.4% | 8.7% | 12.0% | 15.6% | 15.7% |
| **$100,000 or more** | **425** | 371 | 18 | 262 | 97 | 56 | 183 | 197 |
| | **30.8%** | 34.0% | 10.2% | 26.6% | 46.9% | 35.4% | 29.0% | 39.6% |
| **No response** | **29** | 23 | 3 | 18 | 5 | 4 | 7 | 5 |
| | **2.1%** | 2.1% | 1.7% | 1.8% | 2.4% | 2.5% | 1.1% | 1.0% |
| **Prefer not to answer** | **296** | 243 | 24 | 196 | 60 | 36 | 102 | 80 |
| | **21.5%** | 22.3% | 13.6% | 19.9% | 29.0% | 22.8% | 16.2% | 16.1% |

*Pan Atlantic Research: June, 2021*

DX323.375

App. 679     TOWN06155

Table 152: For tabulation purposes, which of the following income ranges best approximates your annual household income for 2020 from all sources?  (Q20)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Under $25,000 | 61 | 14 | 14 | 29 | 61 | 0 | 0 | 31 | 14 | 10 |
| | 4.4% | 6.9% | 2.6% | 5.6% | 27.9% | 0.0% | 0.0% | 10.4% | 3.3% | 1.9% |
| $25,000 - $49,999 | 158 | 43 | 44 | 66 | 158 | 0 | 0 | 55 | 49 | 49 |
| | 11.5% | 21.1% | 8.0% | 12.7% | 72.1% | 0.0% | 0.0% | 18.4% | 11.6% | 9.2% |
| $50,000-$74,999 | 206 | 40 | 77 | 83 | 0 | 206 | 0 | 59 | 72 | 70 |
| | 14.9% | 19.6% | 14.0% | 16.0% | 0.0% | 50.4% | 0.0% | 19.7% | 17.1% | 13.1% |
| $75,000 - $99,999 | 203 | 31 | 97 | 69 | 0 | 203 | 0 | 36 | 73 | 91 |
| | 14.7% | 15.2% | 17.7% | 13.3% | 0.0% | 49.6% | 0.0% | 12.0% | 17.3% | 17.1% |
| $100,000 or more | 425 | 46 | 231 | 142 | 0 | 0 | 425 | 61 | 137 | 218 |
| | 30.8% | 22.5% | 42.1% | 27.4% | 0.0% | 0.0% | 100.0% | 20.4% | 32.5% | 40.9% |
| No response | 29 | 1 | 9 | 6 | 0 | 0 | 0 | 5 | 2 | 7 |
| | 2.1% | 0.5% | 1.6% | 1.2% | 0.0% | 0.0% | 0.0% | 1.7% | 0.5% | 1.3% |
| Prefer not to answer | 296 | 29 | 77 | 123 | 0 | 0 | 0 | 52 | 74 | 88 |
| | 21.5% | 14.2% | 14.0% | 23.7% | 0.0% | 0.0% | 0.0% | 17.4% | 17.6% | 16.5% |

*Pan Atlantic Research: June, 2021*

Table 153: What is the highest level of education you have achieved?  (Q21)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Less than HS | 4 | 2 | 2 | 4 | 0 | 0 | 2 | 1 |
| | 0.3% | 0.2% | 1.1% | 0.4% | 0.0% | 0.0% | 0.3% | 0.2% |
| High school | 79 | 56 | 17 | 66 | 4 | 5 | 40 | 27 |
| | 5.7% | 5.1% | 9.6% | 6.7% | 1.9% | 3.2% | 6.3% | 5.4% |
| Vocational / Trade school | 19 | 12 | 3 | 12 | 2 | 3 | 5 | 14 |
| | 1.4% | 1.1% | 1.7% | 1.2% | 1.0% | 1.9% | 0.8% | 2.8% |
| Some college / Two-year college degree | 197 | 142 | 36 | 150 | 12 | 32 | 94 | 82 |
| | 14.3% | 13.0% | 20.3% | 15.2% | 5.8% | 20.3% | 14.9% | 16.5% |
| Four-year college degree | 421 | 329 | 59 | 295 | 51 | 66 | 213 | 156 |
| | 30.6% | 30.1% | 33.3% | 29.9% | 24.6% | 41.8% | 33.8% | 31.4% |
| Post-graduate work | 533 | 449 | 46 | 365 | 123 | 36 | 259 | 202 |
| | 38.7% | 41.1% | 26.0% | 37.1% | 59.4% | 22.8% | 41.1% | 40.6% |
| No response | 22 | 21 | 0 | 13 | 5 | 3 | 7 | 0 |
| | 1.6% | 1.9% | 0.0% | 1.3% | 2.4% | 1.9% | 1.1% | 0.0% |
| Prefer not to answer | 103 | 81 | 14 | 80 | 10 | 13 | 10 | 15 |
| | 7.5% | 7.4% | 7.9% | 8.1% | 4.8% | 8.2% | 1.6% | 3.0% |

*Pan Atlantic Research: June, 2021*

Table 154: What is the highest level of education you have achieved?  (Q21)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Less than HS | 4 | 0 | 2 | 2 | 2 | 0 | 0 | 4 | 0 | 0 |
| | 0.3% | 0.0% | 0.4% | 0.4% | 0.9% | 0.0% | 0.0% | 1.3% | 0.0% | 0.0% |
| High school | 79 | 11 | 31 | 35 | 25 | 28 | 15 | 79 | 0 | 0 |
| | 5.7% | 5.4% | 5.6% | 6.8% | 11.4% | 6.8% | 3.5% | 26.4% | 0.0% | 0.0% |
| Vocational / Trade school | 19 | 2 | 9 | 8 | 2 | 9 | 4 | 19 | 0 | 0 |
| | 1.4% | 1.0% | 1.6% | 1.5% | 0.9% | 2.2% | 0.9% | 6.4% | 0.0% | 0.0% |
| Some college / Two-year college degree | 197 | 23 | 81 | 88 | 57 | 58 | 42 | 197 | 0 | 0 |
| | 14.3% | 11.3% | 14.8% | 17.0% | 26.0% | 14.2% | 9.9% | 65.9% | 0.0% | 0.0% |
| Four-year college degree | 421 | 93 | 185 | 124 | 63 | 145 | 137 | 0 | 421 | 0 |
| | 30.6% | 45.6% | 33.7% | 23.9% | 28.8% | 35.5% | 32.2% | 0.0% | 100.0% | 0.0% |
| Post-graduate work | 533 | 64 | 208 | 238 | 59 | 161 | 218 | 0 | 0 | 533 |
| | 38.7% | 31.4% | 37.9% | 45.9% | 26.9% | 39.4% | 51.3% | 0.0% | 0.0% | 100.0% |
| No response | 22 | 1 | 4 | 5 | 5 | 0 | 1 | 0 | 0 | 0 |
| | 1.6% | 0.5% | 0.7% | 1.0% | 2.3% | 0.0% | 0.2% | 0.0% | 0.0% | 0.0% |
| Prefer not to answer | 103 | 10 | 29 | 18 | 6 | 8 | 8 | 0 | 0 | 0 |
| | 7.5% | 4.9% | 5.3% | 3.5% | 2.7% | 2.0% | 1.9% | 0.0% | 0.0% | 0.0% |

*Pan Atlantic Research: June, 2021*

DX323.376

App. 680

TOWN06156

Table 155: What is your gender? (Q22)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Total | **1378** | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Female | **630** | 485 | 102 | 456 | 101 | 59 | 630 | 0 |
| | **45.7%** | 44.4% | 57.6% | 46.3% | 48.8% | 37.3% | 100.0% | 0.0% |
| Male | **497** | 409 | 43 | 342 | 77 | 66 | 0 | 497 |
| | **36.1%** | 37.5% | 24.3% | 34.7% | 37.2% | 41.8% | 0.0% | 100.0% |
| Non-binary | **5** | 2 | 1 | 3 | 1 | 1 | 0 | 0 |
| | **0.4%** | 0.2% | 0.6% | 0.3% | 0.5% | 0.6% | 0.0% | 0.0% |
| No response | 44 | 39 | 3 | 28 | 11 | 4 | 0 | 0 |
| | **3.2%** | 3.6% | 1.7% | 2.8% | 5.3% | 2.5% | 0.0% | 0.0% |
| Prefer not to answer | **202** | 157 | 28 | 156 | 17 | 28 | 0 | 0 |
| | **14.7%** | 14.4% | 15.8% | 15.8% | 8.2% | 17.7% | 0.0% | 0.0% |

*Pan Atlantic Research: June, 2021*

Table 156: What is your gender? (Q22)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Total | **1378** | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Female | **630** | 106 | 262 | 240 | 141 | 197 | 183 | 141 | 213 | 259 |
| | **45.7%** | 52.0% | 47.7% | 46.3% | 64.4% | 48.2% | 43.1% | 47.2% | 50.6% | 48.6% |
| Male | **497** | 60 | 209 | 220 | 58 | 157 | 197 | 124 | 156 | 202 |
| | **36.1%** | 29.4% | 38.1% | 42.5% | 26.5% | 38.4% | 46.4% | 41.5% | 37.1% | 37.9% |
| Non-binary | **5** | 2 | 2 | 1 | 1 | 2 | 1 | 1 | 2 | 2 |
| | **0.4%** | 1.0% | 0.4% | 0.2% | 0.5% | 0.5% | 0.2% | 0.3% | 0.5% | 0.4% |
| No response | 44 | 4 | 6 | 17 | 4 | 9 | 8 | 4 | 9 | 14 |
| | **3.2%** | 2.0% | 1.1% | 3.3% | 1.8% | 2.2% | 1.9% | 1.3% | 2.1% | 2.6% |
| Prefer not to answer | **202** | 32 | 70 | 40 | 15 | 44 | 36 | 29 | 41 | 56 |
| | **14.7%** | 15.7% | 12.8% | 7.7% | 6.8% | 10.8% | 8.5% | 9.7% | 9.7% | 10.5% |

*Pan Atlantic Research: June, 2021*

Table 157: Do you own or rent your home in Bar Harbor? (Q1)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Total | **1378** | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Own | **1092** | 1092 | 0 | 805 | 187 | 88 | 485 | 409 |
| | **79.2%** | 100.0% | 0.0% | 81.7% | 90.3% | 55.7% | 77.0% | 82.3% |
| Rent | **177** | 0 | 177 | 162 | 10 | 3 | 102 | 43 |
| | **12.8%** | 0.0% | 100.0% | 16.4% | 4.8% | 1.9% | 16.2% | 8.7% |
| Other | **23** | 0 | 0 | 12 | 9 | 1 | 11 | 7 |
| | **1.7%** | 0.0% | 0.0% | 1.2% | 4.3% | 0.6% | 1.7% | 1.4% |
| N/A - Nonresident business owner | **65** | 0 | 0 | 0 | 0 | 65 | 24 | 27 |
| | **4.7%** | 0.0% | 0.0% | 0.0% | 0.0% | 41.1% | 3.8% | 5.4% |
| No response | **21** | 0 | 0 | 6 | 1 | 1 | 8 | 11 |
| | **1.5%** | 0.0% | 0.0% | 0.6% | 0.5% | 0.6% | 1.3% | 2.2% |

*Pan Atlantic Research: June, 2021*

Table 158: Do you own or rent your home in Bar Harbor? (Q1)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Total | **1378** | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | **100%** | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Own | **1092** | 103 | 452 | 445 | 125 | 330 | 371 | 212 | 329 | 449 |
| | **79.2%** | 50.5% | 82.3% | 85.9% | 57.1% | 80.7% | 87.3% | 70.9% | 78.1% | 84.2% |
| Rent | **177** | 85 | 42 | 42 | 85 | 47 | 18 | 58 | 59 | 46 |
| | **12.8%** | 41.7% | 7.7% | 8.1% | 38.8% | 11.5% | 4.2% | 19.4% | 14.0% | 8.6% |
| Other | **23** | 4 | 8 | 9 | 4 | 9 | 4 | 4 | 5 | 11 |
| | **1.7%** | 2.0% | 1.5% | 1.7% | 1.8% | 2.2% | 0.9% | 1.3% | 1.2% | 2.1% |
| N/A - Nonresident business owner | **65** | 9 | 39 | 13 | 4 | 17 | 25 | 20 | 20 | 21 |
| | **4.7%** | 4.4% | 7.1% | 2.5% | 1.8% | 4.2% | 5.9% | 6.7% | 4.8% | 3.9% |
| No response | **21** | 3 | 8 | 9 | 1 | 6 | 7 | 5 | 8 | 6 |
| | **1.5%** | 1.5% | 1.5% | 1.7% | 0.5% | 1.5% | 1.6% | 1.7% | 1.9% | 1.1% |

*...arch: June, 2021*

DX323.377

App. 681

TOWN06157

Table 159: Which of the following best describes your relationship with the Town of Bar Harbor?  (Q2)

| | Total | Home ownership | | Relationship to Bar Harbor | | | Respondent Gender | |
|---|---|---|---|---|---|---|---|---|
| | | Own | Rent | Year-round resident | Seasonal resident | Business-owner (resident or non-resident) | Female | Male |
| Total | 1378 | 1092 | 177 | 985 | 207 | 158 | 630 | 497 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Year-round resident | 985 | 805 | 162 | 985 | 0 | 0 | 456 | 342 |
| | 71.5% | 73.7% | 91.5% | 100.0% | 0.0% | 0.0% | 72.4% | 68.8% |
| Seasonal resident | 207 | 187 | 10 | 0 | 207 | 0 | 101 | 77 |
| | 15.0% | 17.1% | 5.6% | 0.0% | 100.0% | 0.0% | 16.0% | 15.5% |
| Resident business owner | 93 | 88 | 3 | 0 | 0 | 93 | 35 | 39 |
| | 6.7% | 8.1% | 1.7% | 0.0% | 0.0% | 58.9% | 5.6% | 7.8% |
| Non-resident business owner | 65 | 0 | 0 | 0 | 0 | 65 | 24 | 27 |
| | 4.7% | 0.0% | 0.0% | 0.0% | 0.0% | 41.1% | 3.8% | 5.4% |
| No response | 28 | 12 | 2 | 0 | 0 | 0 | 14 | 12 |
| | 2.0% | 1.1% | 1.1% | 0.0% | 0.0% | 0.0% | 2.2% | 2.4% |

*Pan Atlantic Research: June, 2021*

Table 160: Which of the following best describes your relationship with the Town of Bar Harbor?  (Q2)

| | Total | Age of Respondent | | | Household Income Level | | | Level of Education | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-44 | 45-64 | 65+ | <50k | $50k-100k | 100k+ | Less than 4-year degree | 4-year degree | Post-graduate degree |
| Total | 1378 | 204 | 549 | 518 | 219 | 409 | 425 | 299 | 421 | 533 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Year-round resident | 985 | 164 | 375 | 368 | 188 | 321 | 262 | 232 | 295 | 365 |
| | 71.5% | 80.4% | 68.3% | 71.0% | 85.8% | 78.5% | 61.6% | 77.6% | 70.1% | 68.5% |
| Seasonal resident | 207 | 15 | 71 | 106 | 10 | 35 | 97 | 18 | 51 | 123 |
| | 15.0% | 7.4% | 12.9% | 20.5% | 4.6% | 8.6% | 22.8% | 6.0% | 12.1% | 23.1% |
| Resident business owner | 93 | 11 | 54 | 18 | 15 | 26 | 31 | 20 | 46 | 15 |
| | 6.7% | 5.4% | 9.8% | 3.5% | 6.8% | 6.4% | 7.3% | 6.7% | 10.9% | 2.8% |
| Non-resident business owner | 65 | 9 | 39 | 13 | 4 | 17 | 25 | 20 | 20 | 21 |
| | 4.7% | 4.4% | 7.1% | 2.5% | 1.8% | 4.2% | 5.9% | 6.7% | 4.8% | 3.9% |
| No response | 28 | 5 | 10 | 13 | 2 | 10 | 10 | 9 | 9 | 9 |
| | 2.0% | 2.5% | 1.8% | 2.5% | 0.9% | 2.4% | 2.4% | 3.0% | 2.1% | 1.7% |

*Pan Atlantic Research: June, 2021*

DX323.378

App. 682   TOWN06158

# Appendix D

*Details of Mailing List Generation, Data Collection, and Data Cleansing Procedures*

TOWN06159

# Appendix D

- In order to reach the maximum number of town residents (full-time and seasonal), businesses, and property owners, Pan Atlantic merged the town's voting registry and property taxpayer list to create the distribution list for the mail survey.

- In order to minimize duplication in merged lists, the following cleansing procedures were followed:

  1. If an address appeared multiple times in the database, only one survey was sent to that address.

  2. If a name appeared attached to multiple addresses in the database, a survey was sent to only one of those addresses (using date of birth info from the voter file to distinguish same-name residents).

  3. The resulting list was then run through software which matches address information to the USPS database and again removes duplicate addresses based on the cleansed results.

  4. Each household in the database was assigned a unique numerical identifier.

# Appendix D

- In order to maximize the overall response level, to allow adult members of a household to submit separate responses, and to reach those who did not receive a survey instrument in the mail, Pan Atlantic also programmed and hosted an online version of the survey.

- Online respondents to the survey were encouraged to enter their household's numeric code to connect their survey to their household. However, this was not required to complete the online survey.

- Residents and business owners could request either a paper survey or a numeric code from Pan Atlantic. Pan Atlantic worked with both the Town Manager and also the Chamber of Commerce to inform town residents and business owners of this option.

# Appendix D

- Pan Atlantic fulfilled 66 requests to send or assign a code, to mail a new survey instrument, or to retroactively match an "uncoded" online response to a household's code.

- The final postmarked date for returned surveys was originally April 26th; however, in order to give more time to publicize the survey, and due to delays in mail delivery, surveys were accepted through May 14th.

- Pan Atlantic had targeted 400-500 completed responses to allow for a sufficient sample size to reflect the opinions of the Bar Harbor community with a strong degree of statistical significance. Instead, Pan Atlantic received 1,533 surveys before the cutoff date (1,028 by mail, 505 online).

DX323.382
Report to Town of Bar Harbor
June, 2021

App. 686                    TOWN06162

PAN ATLANTIC
RESEARCH

# Appendix D

- Mail surveys were entered manually, with verbatim responses to open-ended questions coded (categorized), and transcribed (see Appendix B to this report). Verbatim responses to open-ended questions submitted online were also hand-coded.

- In cleansing the responses submitted online, the following procedure was developed in order to balance accessibility to all members of the target populations with the importance of maintaining the integrity of the data collected.

- First, responses were flagged for each of six categories, detailed on the following page.

# Appendix D

- **No Code Flag** - These were responses submitted without a code.

- **Duplicate Code Flag** – These were responses submitted using the same code as another response in the database.

- **Duplicate IP Flag** – These were responses submitted that originated from the same IP address, whether or not they used the same code.

- **Time of Survey Flag** – These were responses submitted in less than 5 minutes, suggesting a respondent's already being familiar with the survey.

- **Identical Response Flag** – These were responses submitted with substantial similarity in verbatim responses and/or near-identical numeric responses.

- **Out of Sampling Universe Flag** – These were responses in which the respondent self-identified as not in the target populations (i.e., "Vacation to visit family in Sorrento.").

- **Fake Code Flag** – These were responses submitted with a code that did not match any code in the database (and had not been assigned by request).

# Appendix D

- Once responses had been flagged, they were cleansed according to the following procedure:

1. Responses flagged with either "Out of Sampling Universe" or "Fake Code" were removed.
2. Responses flagged with both "No Code" and "Duplicate IP Address" were removed.
3. Responses flagged with both "No Code" and "Identical Response" were removed.
4. Responses flagged with both "No Code" and "Time of Survey" were removed.
5. For responses that were flagged with any 3 of the following flags, only the first survey received from that code and/or IP address was included: "Duplicate Code," "Duplicate IP Address," "Time of Survey", and "Duplicate Response."

# Appendix D

- This procedure resulted in the removal of 155 responses from the dataset, yielding a final dataset of 1378 responses.

- Given this sample size of 1378, the margin of sampling error for this research is ±2.0% at the 95% confidence level. This is a very high response level to a survey of this nature given the size of the target population.

- The 1378 responses include 1076 codes that were used exactly once, 71 codes that were used twice, 16 codes that were used three times, 3 codes that were used four times, and 100 responses submitted with no code.

TOWN06166

PAN RESEARCH

**CERTIFICATE OF SERVICE**

I hereby certify that on July 30, 2024, I filed the foregoing

Appendix with the United States Court of Appeals for the First Circuit

and served it upon all counsel receiving electronic service through the

Court's CM/ECF system.


*/s/ Kathleen E. Kraft*