**United States Court of Appeals for the First Circuit**

ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS;
B.H. PIERS, L.L.C.; GOLDEN ANCHOR, L.C., d/b/a Harborside Hotel;
B.H.W.W., L.L.C.; DELRAY EXPLORER HULL 495 LLC; DELRAY
EXPLORER HULL 493 LLC; ACADIA EXPLORER 492, LLC,
*Plaintiffs-Appellants / Cross-Appellees,*

PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION,
*Plaintiff Intervenor-Appellant / Cross-Appellee,*

v.

CHARLES SIDMAN,
*Defendant-Appellee / Cross-Appellant,*

TOWN OF BAR HARBOR, a Municipal Corporation of the State of Maine,
*Defendant-Appellee*

On Appeal from the United States District Court for the District of Maine
Civil Action No. 1:22-cv-416-LEW

**BRIEF OF APPELLANTS / CROSS-APPELLEES ASSOCIATION TO
PRESERVE AND PROTECT LOCAL LIVELIHOODS, B.H. PIERS, LLC,
GOLDEN ANCHOR, L.C., d/b/a Harborside Hotel, B.H.W.W, L.L.C.,
ACADIA EXPLORER 492, LLC, DELRAY EXPLORER HULL 493 LLC,
AND DEL RAY EXPLORER HULL 495 LLC**

Timothy C. Woodcock
P. Andrew Hamilton
EATON PEABODY
80 Exchange Street (04401)
Post Office Box 1210
Bangor, Maine 04402-1210
*Counsel of Record, Plaintiffs-Appellants*

# CORPORATE DISCLOSURE STATEMENT

Association to Preserve and Protect Local Livelihoods, is a Maine 501(c)(6) entity formed as a business league to support and protect local livelihoods. No individuals or companies hold a 10% or greater interest in this entity.

Golden Anchor L.C. is a Florida limited liability company authorized to do business in Maine. B.H. Piers, L.L.C. and B.H.W.W., L.L.C. are both Maine limited liability companies. These limited partnerships own a 10% interest or more of Golden Anchor L.C., B.H. Piers, L.L.C. and B.H.W.W., L.L.C.: Michael P. Walsh Family Limited Partnership; Mark T. Walsh Family Limited Partnership; William J. Walsh Family Limited Partnership; Patrick F. Walsh Family Limited Partnership; Suzanne Walsh-Lanigan Family Limited Partnership.

Delray Explorer Hull 493 LLC and Delray Explorer Hull 495 LLC are Florida limited liability companies authorized to do business in Maine. Sunset Key Trans Holdings Corp. is a Florida corporation and is the parent company of Delray Explorer Hull 493, LLC and Delray Explorer Hull 495 LLC. The following individuals own a 10% interest or more of Delray Explorer Hull 493 LLC and Delray Explorer Hull 495 LLC by virtue of their individual membership interests in the parent corporation (Sunset Key Trans Holdings Corp.): Michael P. Walsh (20% Member or "20%"); Mark T. Walsh (20%); William J. Walsh (20%); Patrick F. Walsh (20%); Suzanne Walsh-Lanigan (20%).

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT OF THE ISSUES....................................................................1

STATEMENT OF THE CASE.......................................................................2

INTRODUCTION ...........................................................................................5

PROCEDURAL HISTORY.........................................................................11
      District Court Amended Decision and Order .................................13

SUMMARY OF ARGUMENT ...................................................................14

ARGUMENT .................................................................................................15

I.      THE DISTRICT COURT ERRED WHEN IT MISDESCRIBED THE CHARACTER OF APPELLANTS' CHALLENGE TO THE ORDINANCE .......................................................................................15

II.     THE DISTRICT COURT ERRED IN DENYING APPELLANTS' CLAIMS THAT THE ORDINANCE VIOLATED THE DORMANT COMMERCE CLAUSE................................................................18

        A.     DORMANT COMMERCE CLAUSE IN GENERAL ................18

        B.     SUMMARY OF DISTRICT COURT'S RULING ON APPELLANTS' AND PILOTS' DORMANT COMMERCE CLAUSE CLAIMS .....................................................................20

        C.     THE DISTRICT COURT ERRED IN DENYING APPELLANTS' AND PILOTS' CLAIMS THAT THE ORDINANCE VIOLATED THE COMMERCE CLAUSE'S PROTECTION OF THE "FLOW OF COMMERCE".................22
            1.    District Court Rulings on Flow of Commerce Claims..........................................................................22
            2.    Review of Flow of Commerce Jurisprudence ................25

3. The district court erred in denying Appellants' flow of commerce claims under the dormant Commerce Clause.............................................................33

III. THE DISTRICT COURT ERRED IN DENYING APPELLANTS' CLAIM THAT THE ORDINANCE VIOLATED THE RIGHT TO TRAVEL AS PROTECTED BY THE DORMANT COMMERCE CLAUSE.......................................................................................39

1. The District Court erred in finding that the Complaint did not plead the right to travel under the Commerce Clause ........................39

2. The Ordinance violates the right to travel under the Commerce Clause .................................................................................41

IV. THE DISTRICT COURT ERRED IN DENYING APPELLANTS' CLAIM THAT THE ORDINANCE VIOLATED DORMANT COMMERCE CLAUSE STANDARDS AS SET FORTH IN *PIKE V. BRUCE CHURCH* ...........................................................................42

V. THE DISTRICT COURT ERRED IN FAILING TO GRANT INJUNCTIVE RELIEF ON APPELLANTS' SEAFARER PREEMPTION CLAIM ...................................................................45

VI. THE DISTRICT COURT ERRED IN DENYING APPELLANTS' CLAIM THAT THE ORDINANCE WAS PREEMPTED BY FEDERAL LAWS GOVERNING THE ADMISSION OF FOREIGN NATIONALS ...........................................................................47

VII. THE DISTRICT COURT ERRED WHEN IT DENIED APPELLANTS' DUE PROCESS CLAIM ...................................................50

VIII. CONCLUSION...........................................................................51

CERTIFICATE OF COMPLIANCE WITH RULE 32...........................................53

CERTIFICATE OF SERVICE .................................................................54

# TABLE OF AUTHORITIES

*American Trucking Associations, Inc. v. Michigan Public Service Comm'n*
545 U.S. 429, 433 (2005) ...............................................................19

*Arizona v. United States*
567 U.S. 387, 394 (2012) ...............................................................48

*Ayotte v. Planned Parenthood of N. New Engl.*
546 U.S. 320, 329 (2006) ...............................................................46

*Bayley's Campground, Inc. v. Mills*
463 F.Supp.3d 22, 34 (D. Me. 2020)............................................41

*Bayley's Campground v. Mills*
985 F.3d 153, 159-60 (1st Cir. 2021) ........................24, 36, 38, 41

*Bibb v. Navajo Freight Lines, Inc.*
359 U.S. 520, 529-530 (1959) .......................................................27

*Bowman v. Chicago & N.W. Ry Co.*
125 U.S. 465 (1888).......................................................................32

*Buck v. Kuykendall*
267 U.S. 307, 315-316 (1925) .......................................................22

*Camps Newfound/Owattanna, Inc. v. Town of Harrison*
520 U.S. 564. 581 (1997) ...............................................................26

*Chy Lung v. Freeman*
92 U.S. 275 (1875)...................................................................35, 48

*Citizens United v. F.E.C.*
558 U.S. 310, 359 (2010) ...............................................................37

*Cooley v. Board of Wardens*
53 U.S. (12 How.) 299, 319 (1851)...........................29, 30, 31, 34

*Edwards v. California*
314 U.S. 160, 176 (1941) ...................................30, 34, 40, 41, 42

iv

*Elkins v. Moreno*
435 U.S. 647, 664 (1978) ...............................................................48

*Exxon v. Governor of Maryland*
437 U.S. 11, 128 (1978) .............................................28, 29, 33, 35, 37

*General Motors Corp. v. Tracy*
519 U.S. 278, 278, 298, n. 12 (1997) ............................................27

*Gibbons v. Ogden*
22 U.S. (9 Wheat.) 1 (1824) .........................................................30

*Graham v. Richardson*
403 U.S. 365, 379 (1971) ..............................................................49

*Granholm v. Heald*
544 U.S. 460, 477 (2005) ..............................................................20

*Hannibal & St. Jos. R. Co. v. Husen*
95 U.S. 465, 472 (1877) ............................... 23, 24, 31, 35, 36, 38

*Henderson v. Mayor of New York*
92 U.S. 259 (1875)..............................................................32, 35, 38

*Hennington v. Georgia*
163 U.S. 299 (1896)......................................................................24

*Hughes v. Oklahoma*
441 U.S. 332 (1979)......................................................................42

*Hunt v. Washington State Apple Advert. Comm'n*
432 U.S. 333, 350 (1977) ..............................................................19

*Huron Portland Cement Co. v. Detroit*
362 U.S. 443 (1960)......................................................................19

*Kassel v. Consolidated Freightways Corp. of Delaware*
450 U.S. 662, 671 (1981) ..............................................................22

*Lake Shore & M.S.R. Co. v. Ohio*
    173 U.S. 285, 292-298 (1899) ......................................................24

*Leisy v. Hardin*
    135 U.S. 100 (1890).......................................................25, 30, 31, 32

*Lewis v. BTS Investment Managers, Inc.*
    447 U.S. 27, 35 (1980) ...............................................................19

*Maine v. Taylor*
    477 U.S. 131 (1986).....................................................................19

*Maine Forest Prod. Council v. Cormier*
    586 F. Supp. 3d 22, 38 (D. Me.), *aff'd,* 51 F.4th 1 (1st Cir. 2022)...............48

*Memphis v. Greene*
    451 U.S. 100, 126-127 (1981) ...............................................36, 44

*Milk Control Board v. Eisenberg Farm Products*
    306 U.S. 346, 351 (1939) ...........................................................31

*Missouri ex rel. Barrett v. Kansas Natural Gas Co.*
    265 U.S. 298, 307-308 (1926) ....................................................32

*Morgan v. Virginia*
    328 U.S. 373, 386 (1946) ...........................................................38

*National Pork Producers Council v. Ross*
    598 U.S. 356 (2023)..................................... 20, 26, 27, 28, 33, 35, 38, 42, 43

*Oklahoma Tax Commission v. Jefferson,*
    514 U.S. 175, 18179-185 (1995) ................................................32

*Pike v. Bruce Church, Inc.*
    397 U.S. 137, 142 (1970) ..................................... 1, 20, 27, 36, 42, 43, 44, 45

*Quill Corp. v. North Dakota*
    504 U.S. 298 (1992).....................................................................32

*Raymond Transport Motor Co., Inc. v. Rice*
    434 U.S. 429, 447 (1978) ................................................................27

*South-Central Timber Development, Inc. v. Wunnicke*
    467 U.S. 82, 87 (1984) ..................................................................18

*South Dakota* v. *Wayfair, Inc.*
    585 U.S. 162, 173 (2018) ................................................19, 20, 32

*Southern Pacific Company v. Arizona ex rel. Sullivan*
    325 U.S. 761, 767 (1945) ................................................19, 27, 30

*Takahashi v. Fish & Game Comm'n*
    334 U.S. 410, 419 (1948) ..............................................................49

*Tart v. Massachusetts*
    949 F.2d 490, 501 (1st Cir. 1991) ................................................38

*Tennessee Wine and Spirits Retailers Association v. Tennessee*
    588 U.S. 504, 518 (2017) ........................................................20, 32

*Toll v. Moreno*
    458 U.S. 1, 11 (1982)....................................................................48

*Vaqueria Tres Monjitas, Inc. v. Irizarry*
    587 F.3d 464, 483 (1st Cir. 2009) ................................................51

*Wabash, St. L. & Pac.  Ry Co. v. Illinois*
    118 U.S. 567 (1886)....................................................25, 26, 29, 30

*Western Union Telegraph Co. v. Foster*
    247 U.S. 105, 1113 (1918) ............................................................32

## OTHER AUTHORITIES

33 C.F.R. § 105 ..................................................................................7

33 C.F.R. § 105.237 ....................................................................13, 45

Federal Rules of Civil Procedure, Rule 8 ................................39, 40

The Federalist No. 3, 39 (C. Rossiter ed. 2003) (J. Jay)...........................................48

Town of Bar Harbor, Land Use Ordinance § 125-9 .................................................11

U.S. Const., Art. I, § 8................................................................................................18

# STATEMENT OF THE ISSUES

1.    Whether the district court erred when it misdescribed the character Appellants' challenge to the Ordinance?

2.    Whether the district court erred in denying Appellants' claim that the ordinance violated the protection by the dormant Commerce Clause of the flow of commerce?

3.    Whether the district court erred in denying Appellants' claim that the ordinance violated the right to travel as protected by the dormant Commerce Clause?

4.    Whether the district court erred in denying Appellants' claim that the ordinance violated the dormant Commerce Clause standards as set forth in *Pike v. Bruce Church?*

5.    Whether the district court erred in failing to grant injunctive relief on Appellants' seafarer preemption claim?

6.    Whether the district court erred in denying Appellants' claim that the ordinance was preempted by Federal Laws governing the admission of foreign nationals?

## STATEMENT OF THE CASE

At issue is an Ordinance adopted by voters in the Town of Bar Harbor ("the Town") which amended the Town Land Use Ordinance to impose a ceiling of no more than 1,000 on the number of persons who could disembark from a cruise ship in a given day. The Ordinance applies without exception to every day of the year.

The Ordinance constitutes an initiative effort in a municipality to impose local, idiosyncratic, and potentially ever-changing limitations on a particular sector of the nation's maritime transportation—the movement of persons from port to port via cruise ship. Invoking the purported rationale of managing "land use", the Ordinance seeks to stem the flow of cruise ship visits for the ostensible objective of reducing sidewalk "congestion". In purpose and effect, the Ordinance is no land use measure. To the contrary, its purpose and effect is to bar cruise ships with lower berth capacities of more than 1,000 persons from ever calling at Bar Harbor. Cruise lines will not pick and choose which cruise vessel passengers can come ashore.

Although supposedly directed at reducing pedestrian "congestion" in general, the Ordinance is actually directed solely at cruise ship visitors, approximately 7-10% of all those who visit the Bar Harbor area in a given year, leaving wholly unaddressed the vast majority of the nearly 4,000,000 or so persons who arrive in Acadia National Park and Bar Harbor by all other means of transportation. The "congestion" rationale for this Ordinance is mere pretense.

In addition, applying to every day of the year, the Ordinance in no way accounts for the longstanding, historic variability of tourist visitation in which July and August have been the most popular months, flanked by the less tourist-intense months of April-June and September-October.

No public municipal official testified that cruise ship visits jeopardized the delivery of essential services, including public safety services. Accordingly, the district court made no such finding.

Grounded as it is in the Town's Land Use Ordinance, there is no end to its application in other contexts. If a municipality can limit the number of persons disembarking from cruise ships to manage sidewalk traffic, it can do the same with those arriving by tour bus, airplane, or private vehicle. In short, as a land use measure limiting cruise ship disembarkation and, thereby, effectively barring cruise ships with capacities of 1,000 persons or more, the Ordinance claims a power that, if found valid, as did the district court, would admit of no limiting principle in that field of commerce engaged in the transport of persons.

The Ordinance reaches too far. It trenches on fields of policymaking that the Constitution has reserved for the federal government alone to assure uniformity of the flow of transportation in general, and maritime transportation in particular, and is preempted thereby; it violates particular federal rules and conventions (as in one instance, the district court recognized) and is preempted thereby; it claims the

practical authority to rigorously and comprehensively limit the numbers of persons who may travel to Bar Harbor by cruise ship in violation of the Commerce Clause; and, it lacks a rational nexus between its objective and the means the Ordinance employs to meet that objective in violation of the Due Process Clause.

The practical barrier that the Ordinance erects to preclude visits by cruise ships with capacities over 1,000 persons threatens the economic interests of each of the Appellants, whose businesses are dependent on cruise ship visits; the owners of private piers who serve those disembarking from cruise ships (the Pier Owners); the owners of tender vessels who transport persons to and from the cruise ships (the Tender Owners); and, those businesses who accommodate and serve cruise ship visitors, which have joined together as the Association to Preserve and Protect Local Livelihoods ("APPLL"). In addition, relying on its invalid "land use" rationale, the Ordinance subjects the Pier Owners, and only the Pier Owners, to civil fines of up to $5,000 per "excess unauthorized persons" arriving by cruise ship, who have already been cleared by Customs, to set foot on the tender piers and then into the Town.

At all times, the constitutional challenges brought by these Appellants have been squarely directed at the particular terms of **this** Ordinance—its 1,000-person per day ceiling, applied cumulatively, and its rigid application of this ceiling as a uniform year-round rule. This entire Ordinance targets only one industry and one

mode of transportation without constitutionally sufficient justification. They challenge **this** Ordinance's rationale; they challenge its actual purpose and its ostensible purpose; and, they challenge its effect—all of which violate bedrock constitutional standards and principles.

## INTRODUCTION

Since the nineteenth century, Bar Harbor, Maine has been a summer tourist destination. For much of that time, however, the summer season was brief with July and August constituting the bulk of the season, with some but lesser activity in the "shoulder months" of June and September. For decades, cruise ships have called at Bar Harbor. Situated adjacent to Acadia National Park, Bar Harbor is a popular tourist destination and the only "marquee port" in Maine for cruise itineraries in the New England/Canada cruise line trade. District Court's March 1 Amended Order ("Order") Addendum ("Add.") at 6; *see also* the Joint Proposed Findings of Facts (Appendix "App." at 227-280). These proposed findings were submitted jointly by Plaintiff Appellants and Plaintiff-Intervenor Appellant with their initial Post-Trial Briefs in September 2023 (herein "PFF") at ¶¶ 30, 41-47, 57-58 [1]. Bar Harbor is

---

[1] As a cruise ship port of call, Bar Harbor is part of an international cruise ship itinerary including New England, extending south to Boston, New York and New Jersey and north and east to the Maritimes, including, at times, Halifax, and north and west to the St. Lawrence Seaway and Montreal. PFF at ¶¶ 36, 125-126. In this international itinerary, Bar Harbor stands out as Maine's only "marquee" port. PFF at ¶¶ 30-36. A marquee port has exceptional attributes that attract visitors and "help sell tickets." PFF at ¶¶ 30-36.

also geographically well-located between Boston and Halifax and a good location to permit Customs processing of cruise passengers on itineraries that include ports of call in Canada and other foreign nations. PFF at ¶¶125-126.

For decades, the Town of Bar Harbor ("the Town") actively promoted the growth of cruise ship visitation and worked cooperatively with the State of Maine to grow as a tender port to serve cruise ship visitation, in alignment with efforts of the Department of Transportation (later CruiseMaine in the Maine Office of Tourism), and the cruise lines. Add. at 6-7. The Pier Owners made investments in significant pier upgrades, the Tender Owners made investments in barges and new tender vessels, and APPLL members (and other businesses) expanded their capabilities so that they could serve the cruise ship visitors. Add. at 2-3; PFF at ¶¶ 52-59, 61-75, 78-116, 163-167.

Specifically, relying on and sharing the mutual Town and State commitments to create a safe and efficient tender port, the Tender Owners invested in the design and operation of customized barges and tender ships to safely tender the cruise passengers into the two private tender piers at the Bar Harbor waterfront. Add. at 3, 8; PFF at ¶¶ 8-82; 103-116.[2] The Pier Owners redesigned and reconstructed their

---

[2] In recent years, the tender duties have been performed by tender vessels which the Tender Owners had specially designed and constructed for this task. PFF at ¶163. Each vessel has been licensed by the U.S. Coast Guard. PFF at ¶¶ 163-167. They can accommodate up to 149 passengers. *See e.g.* PFF at ¶¶ 12-14, 80. The tender vessels provide a shuttle service bringing people to and from the cruise ships in

two private piers and also aligned with federal maritime security requirements for cruise vessel disembarkation facilities. Those two piers are likewise the subject of Coast Guard oversight for requisite maritime transportation security planning and review for this purpose. Add. at 3; PFF at ¶ 83, 109; App. at 67-68.[3]

The Penobscot Bay and River Pilots Association ("Pilots") also made investments, including the purchase of specialized vessels and equipment, to ensure that they could serve visiting cruise ships and safely guide them to the designated federal anchorages. Add. at 3-4; PFF at ¶¶ 99-105, 318-325.

In addition to these private initiatives, the Town, the State of Maine, and the federal government all took steps to accommodate cruise ship visitation. Add. at 6-7. U.S. Customs and Border Protection designated Bar Harbor a "Class A" port of entry and has routinely provided clearance services for cruise ship visitors arriving from visits to foreign ports[4], and the U.S. Coast Guard designated two anchorages—

---

shifts. *Id.* There is a time gap between these trips which can range from 20 to 45 minutes. *See* PFF at ¶ 111. This means that persons arriving from cruise ships do not arrive at the piers all at once.

[3] The piers, themselves, are also reviewed and approved for adequacy of federal maritime security under the MTSA by the U.S. Coast Guard. PFF at ¶¶ 82-83. To obtain these approvals, the Pier Owners fulfilled the Coast Guard's requirements under 33 C.F.R. Part 105. *See Id*; App. at 067-068.

[4] Bar Harbor has long been a Class A port of entry for foreign-flagged cruise vessels re-entering the United States (Add. at 4) on the southern arm of cruise itineraries on the East Coast, including the New England – Canada cruise itinerary. PFF at ¶¶ 117-126. Those cruise ships include the larger domestic and foreign-flagged cruise vessels (with a lower berth capacity above 1,000 passengers and crew) owned by lines like Norwegian, Carnival and Royal Caribbean that are active in New England

Anchorages A and B—for use by cruise ships. PFF at ¶¶ 83, 86-88, 90-116, 117-123, 297-298.

For its part, the Town instituted measures to manage the flow of buses and other commercial vehicles picking up cruise ship visitors for trips to Acadia National Park and back to Bar Harbor. PFF at ¶¶ 75,112-114,195. To defray the cost of municipal services to support cruise visits, the Town imposed fees on visiting cruise ships which eventually reached $1,000,000 annually. Add. at 7; PFF at ¶¶ 63, 71-72.

The result was a much-expanded tourist season running from May through the end of October. Add. at 7; PFF at ¶¶ 59-61, 63, 135-136. During this period of growth, the Town worked cooperatively with cruise line owners as well as the State of Maine to manage the cruise ship visits. PFF at ¶¶ 20-25, 40-49,61-75. A principal concern was that the volume of cruise ship visitors accord with Bar Harbor's scale and community interests. PFF at ¶193.

Their solution was a system of "voluntary caps" which the Town, with the agreement of the cruise lines, adopted in 2008. Add. at 7; PFF at ¶¶ 61-63, 168-177. The voluntary daily caps on cruise ship visits were tied to the ship's lower berth

---

and predominates the cruise line itineraries that include Bar Harbor. Add. at 5; PFF at ¶¶ 258-290.

capacity.[5]  These caps followed the rhythm of the tourist season with higher caps allowed for April through June and from September into November and with lower caps imposed for the intense tourist months of July and August. PFF at ¶175.  Each year a nonlegislative committee reviewed the caps, and they were then reported to the Town Council for approval.  PFF at ¶¶178-179.

In 2020 and 2021, cruise ship visits to Bar Harbor ceased with the imposition of restrictions imposed as a result of COVID-19.  PFF at ¶¶138-140.  In 2021, with the public health crisis easing, public concern about the cruise ships' return began to grow with particular concern for the volume of cruise ship visits and visitors.  PFF at ¶¶180-193.[6]

Continuing with the Town's longstanding cooperative and balanced approach, the Town Council addressed this concern by developing Memoranda of Agreements (MOAs) with the cruise lines significantly lowering the volume of cruise ship

---

[5] The term "lower berth capacity" generally refers to the passenger capacity of the cruise vessels and is calculated based on the number of "lower berths" or beds on the vessel.  PFF at ¶¶169-173.

[6] As the district court found, although most all cruise vessels each carry more than 1,000 passengers and hundreds of crew, such disembarking persons "account for a limited portion of the total number of annual visitors to greater Bar Harbor and Mount Desert Island." Add. at 8; PFF at ¶¶ 54, 129-130 (cruise visitors to Bar Harbor account for about 7 to 10% of total visitors; for Acadia National Park, that is 4 million annually (Add. at 8); the approximate 90 to 93% remainder are visitors by land-based transportation).

visitors. The MOAs were contractual, and the Town and each affected cruise line signed them. Add. at 10-11; PFF at ¶¶ 180-189.

On a track parallel to the MOAs, a local petition for an initiated ordinance was drafted and presented to the Town Council for approval of a warrant article to place the initiated ordinance before Bar Harbor voters. PFF at ¶¶196-240. The primary advocate for and co-author of this initiative was Charles Sidman, who later became a Defendant-Intervenor in this litigation. The Initiative was supplemented by a "Purpose" section[7] which claimed that cruise ship visits jeopardized the delivery of police, fire, EMS, and other essential services; the district court did not find that cruise visits jeopardized essential services. Order, *passim*. The "Purpose" section also claimed congestion from cruise ship visitors; that claim was inconsistent with a comprehensive pedestrian study conducted by Todd Gabe, Ph.D. Add. at 79.

The initiative proposed to amend the Town's Land Use Ordinance by limiting the number of persons who could disembark (without penalty) from a cruise ship in a given day to no more than 1,000.[8] The 1000-person cumulative daily ceiling

---

[7] The purpose of Mr. Sidman and the petitioners also included getting "rid of the biggies," referring to larger cruise ships. Add. at 80.

[8] The Initiative measure proposed on March 16, 2022, proposed to target "passengers" for the disembarkation limit (App. at 297-300), but the Initiative Petitioners conferred, and given that "cruise ships carry a great many crewmembers as well as passengers" who all come into Bar Harbor, the March 17, 2022 measure proposed to target all "persons" disembarking from a cruise ship and coming into Bar Harbor. App. at 295-296. The Town Council placed that March 17 version of

applied without exception to every day of the year.   In compliance with the Town's

Charter (Add. at 69-73) and the provision governing amendments to its Land Use

Ordinance ("LUO" at § 125-9, Add. at 73-75), the initiated ordinance was presented

to Bar Harbor voters for adoption as an amendment to the Land Use Ordinance and

the Bar Harbor voters approved the initiative ("the Ordinance") at a secret ballot

vote acting as Town Meeting on November 8, 2022.

The Ordinance's passage prompted the formation of APPLL, a coalition of

local businesses and employees, to oppose the ordinance and to protect the local

livelihoods of business owners and their employees.  APPLL then joined with the

Pier Owners and the Tender Owners (the "APPLL Appellants") to file their verified

complaint against the Town in the U.S. District Court seeking declaratory and

injunctive relief on the grounds that the Ordinance was preempted under the

Supremacy Clause, that it violated the Commerce Clause, and that it violated the

Due Process Clause.

## PROCEDURAL HISTORY

The APPLL Appellants, as Plaintiffs, commenced this litigation with a

complaint filed on December 30, 2022 alleging that the Ordinance violated the

Supremacy Clause (Count I), the Commerce Clause (Count II), and the Due Process

---

the Ordinance on the Warrant calling the voters to gather on November 8, 2022, to
vote on that March 17 Initiative.  App. at 301-304; Add. at 12.

Clause (Count III) of the U.S. Constitution, seeking declaratory and injunctive relief. App. at 026-079. Appellants supplemented their complaint with a motion for a preliminary injunction.

All three Plaintiffs alleged that the Ordinance would cause large cruise ships to terminate their visits to Bar Harbor and that, in turn, the Plaintiffs would suffer a decline in revenues caused by the absence of cruise ship patrons. *Id.*, ¶¶ 28-32, 57-58, 62-64, 77, 88-89. In addition, the Tender Vessel Owners alleged that their special-purpose tender vessels, designed and built to ferry passengers and crew to and from cruise ships, would effectively become obsolete. *Id.* ¶¶ 57-58, 63, 88-89. The Pier Owners alleged further that the Ordinance placed them particularly at risk because, in the event that more than 1,000 persons disembarked from cruise ships and entered into Bar Harbor over their piers, they alone could be sanctioned under a penalty system directed at the Pier Owners. *Id.* ¶¶ 43-44.

Pilots later moved to intervene as a Plaintiff-Intervenor, which was granted. App. at 80-117. Later still, Charles Sidman, the principal Bar Harbor voter behind the initiative, moved to intervene as a Defendant-Intervenor. *See* ECF 45. His motion was also granted. App. at 160-167.

In admitting Mr. Sidman as a Defendant-Intervenor, the district court suggested that the litigation in this matter ("constitutional challenges to popular enactments") could be decided on an expedited basis. App. at 166. Shortly thereafter,

the court issued an Expedited Scheduling Order. At the same time, the Town committed that it would not enforce the Ordinance until the district court had adjudicated its validity. With this assurance, Plaintiffs withdrew their Motion for a Preliminary Injunction. As discovery proceeded, Mr. Sidman filed a motion to dismiss which was denied. App. at 168-169.

Upon the conclusion of discovery, the case was tried at a bench trial from July 11-13. Post-trial briefing on the merits concluded on October 27, 2023. On March 1, 2024, the district court issued its Amended Decision and Order ("Order"). Add. at 1-61. APPLL Appellants and Pilots filed their appeal with this Court on March 29, 2024. App. at 281-284.

## District Court Amended Decision and Order

The court found that the ordinance would greatly reduce cruise ship visitation. (Add. at 17; the ordinance "will reduce passenger visitation volume by a significant percentage, likely north of 80 and possibly as high as 90 percent"). Despite this, in its Order, with one exception, the district court denied all of Appellants' claims as well as all of Pilots' claims. The sole exception concerned preemption of the Ordinance by a U.S. Coast Guard rule—33 C.F.R. § 105.237—which guarantees shore access to disembarking crew members, also term "seafarers." Add. at 28.

Otherwise, the district court rejected Appellants' and Pilots' preemption claims based on federal regulation of maritime matters, customs and immigration,

and the federal anchorages and federally sanctioned tender piers. Add. at 25-35. The district court also denied Appellants' Due Process claim. Add. at 35-41.[9] It then denied the full spectrum of Appellants' and the Pilots' Commerce Clause claims. Add. at 42-60.

Although finding for Appellants and the Pilots on their seafarer preemption claim, the Order concluded that they did not warrant "any meaningful relief" with respect to what it termed the seafarer rule's "limited (and hypothetical) preemption." Add. at 29. Accordingly, the district court denied Appellants and Pilots any relief and, in entering judgment for them on the seafarer preemption issue, observed that, in doing so, it was "by no means self-evident that any material alteration of the relationship of the parties has thereby been achieved." Add. at 60.

## SUMMARY OF ARGUMENT

At a Town Meeting held on November 8, 2022, Bar Harbor voters approved an ordinance limiting to 1,000 the number of persons who could, without penalty, disembark from cruise ships in a single calendar day. The Ordinance provided that penalties would be imposed on privately-owned piers that serve as the entry point to Bar Harbor for most cruise ship visitors.

---

[9] The Pilots did not bring a Due Process claim against the Ordinance.

The Ordinance was drafted to effectively bar cruise ships with lower berth capacities greater than 1,000 persons from coming to Bar Harbor. Following a bench trial, the district court found that the Ordinance would have that effect.

Appellants contend that the district court erred in denying their claims that, in several ways, the Ordinance violates the dormant Commerce Clause; that the district court also erred in denying most, but not all of Appellants' preemption claims; and, that the district court erred in denying Appellants' due process claims.

The district court determined that the Ordinance was preempted by a federal rule guaranteeing shoreside access to seafarers, but the court erred in not awarding Appellants' any relief on this aspect of their claim.

## ARGUMENT

I. **THE DISTRICT COURT ERRED WHEN IT MISDESCRIBED THE CHARACTER OF APPELLANTS' CHALLENGE TO THE ORDINANCE**

At the outset of the Order, the district court framed the legal question before it, asserting that it, "chiefly asks whether a municipality with privately owned port facilities can restrain interstate cruise ship commerce for local welfare ends or must make way to permit whatever level of commerce the local market can support." Add. at 2. At other points in the Order and in slightly different ways, the district

court repeated this formulation of the central legal issue it had been called upon to decide.[10]

These characterizations conveyed the clear message that Appellants and Pilots were seeking a sweeping ruling that the Town could never limit cruise ship visitation in any way or under any circumstances; that, instead, the Town must accommodate whatever expansion suited the economic interests of cruise ship operators and the local persons and entities that served their needs. In fact, neither Appellants nor Pilots ever made any such claims. Nor were such claims ever presented to the district court for decision.

At all times, Appellants challenged the particular terms of, and means employed by **this** Ordinance and the effect of **this** Ordinance on cruise ship

---

[10] For example, the district court said that the "pilotage system" was not "an implicit statutory surrogate for compulsory, maximal municipal participation in cruise tourism." Add. at 20. In the same vein, the Order reflected that, "if the maximization of commerce were compulsory, a vast body of zoning and land use regulation would not be worth the paper it is written on." Add. at 21. Again, the Order characterized the Town's interest in the Ordinance as "modestly in tension with the highest marginal commercial harvest" (a goal which it attributed to the "tourism office".) Add. at 22. At another point, the district court speculated that validating the Ordinance might "encourage more municipalities to consider participation, knowing that they will not thereby be compelled to accommodate whatever level of traffic cruise lines and their local partners wish to impose." Add. at 44. Still further, the Order characterized Appellants as claiming a "constitutional right to maximize the burden their commerce imposes on the commons, at least up a level that approaches to their capacity to serve [but that] they have not cited any authority for that proposition." Add. at 39. "What this case really involves is the contention that cruise lines are able to compel local accommodation of their private assessment of the ideal economies of scale for cruise tourism." Add. at 45.

visitation. At no point did Appellants ask the district court to rule more broadly. The Appellants concentrated their challenge on the Ordinance's particular terms for the simple reason that it the purpose and effect of the terms, conditions, and procedures of **this** Ordinance, and not some other law, was effectively barring cruise ships with lower berth capacities of more than 1,000 persons from calling at Bar Harbor and that was, thereby, threatening grievous injury to Appellants and Pilots.

The focused character of this challenge was evident in the Complaint. App. at 026-79; ¶¶ 1-5; 39 (including Exhibit B to the Complaint, attaching the specific March 17 version of the Initiated Ordinance targeting only "passengers"); 40-65 (including Exhibits C and D, attaching the final March 17 version of the Ordinance targeting all "persons," and the Clerk's report of both the voted Initiative and the vote tally); *see also* ¶¶ 77, 82, 88-89; 96-105; 119-123; 125-128; Prayers for Relief, ¶¶ 1-4. All of the Complaint is directed at this Ordinance and the means employed in the Ordinance – namely, prohibiting through local land use regulation the disembarkation of more than 1,000 persons per day cumulatively across property into Bar Harbor.

During trial, Mr. Sidman's counsel contended that Appellants were seeking such a broad ruling; a contention which Appellants' counsel emphatically denied. Add. at 89-91. To put this matter to rest, in Plaintiffs' post-trial Reply Brief, they

reaffirmed the focused character of their challenge only to this Ordinance.    ECF
198.

In sum, the district court framed and decided a legal question regarding the
constitutionality of the Ordinance that neither Appellants nor Pilots ever raised.    In
doing so, the district court erred.

## II. THE DISTRICT COURT ERRED IN DENYING APPELLANTS' CLAIMS THAT THE ORDINANCE VIOLATED THE DORMANT COMMERCE CLAUSE

### A. DORMANT COMMERCE CLAUSE IN GENERAL

The dormant Commerce Clause protects commerce in a variety of ways.
Appellants and Pilots brought separate but related claims under that clause.  The
district court denied them all.  Before turning to the district court's rulings on those
claims, some background on the dormant Commerce Clause may be of value.

The Commerce Clause invests in Congress the power to "regulate Commerce
with foreign Nations, among the several States, and with Indian Tribes."   U.S.
Const., Art. I, § 8.  The Supreme Court has held that the Commerce Clause has its
own motive force in defense of the national economy that the Constitution itself had
made possible. "Although the Commerce Clause is by its text an affirmative grant
of power to Congress to regulate interstate and foreign commerce, the Clause has
long been recognized to be a self-executing limitation on the power of the States to
enact laws imposing substantial burdens on such commerce." *South-Central Timber*

*Development, Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984) (citing *Lewis v. BTS Investment Managers, Inc*., 447 U.S. 27, 35 (1980)).

This constitutional force, the "dormant" or "negative" Commerce Clause, acts as a "negative command" creating "an area of trade free from interference by the States." *American Trucking Associations, Inc. v. Michigan Public Service Comm'n,* 545 U.S. 429, 433 (2005) (internal citations omitted).

While vesting in the Constitution power sufficient to vindicate the interests and defense of a national economy, the Commerce Clause did not, thereby, divest the States of all power to legislate on economic matters. As the Supreme Court has explained, "[i]n the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or, to some extent, regulate it." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 350 (1977) (*quoting Southern Pacific Company v. Arizona ex rel. Sullivan,* 325 U.S. 761, 767 (1945)). Therefore, although the Constitution mandates a national economy, States may enact valid laws addressing matters of local or statewide significance. *South Dakota* v. *Wayfair, Inc*., 585 U.S. 162, 173 (2018) (reviewing case law on State authority over local matters); *see e.g., Maine v. Taylor*, 477 U.S. 131 (1986) (State may ban potentially diseased out-of-state baitfish); *Huron Portland Cement Co. v. Detroit,* 362 U.S. 443 (1960) (city may regulate air quality).

Absent a compelling state interest, the dormant Commerce Clause bars States from enacting laws that discriminate against interstate commerce. *Tennessee Wine and Spirits Retailers Association v. Tennessee*, 588 U.S. 504, 518 (2017). Even if not discriminatory, State laws may not impose an undue burden on commerce. *Id.* at 532-33 (*citing Granholm v. Heald,* 544 U.S. 460, 477 (2005)). "State laws that 'regulat[e] even-handedly to effectuate a legitimate local public interest ... will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Wayfair*, 585 U.S. at 173 (*quoting Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970)).

Finally, and importantly, the dormant Commerce Clause protects the flow of commerce—the interstate and foreign transportation of goods and persons—and the instrumentalities and arteries essential to it. *National Pork Producers Council v. Ross*, 598 U.S. 356, 379-380, n. 2 (2023)

### B. SUMMARY OF DISTRICT COURT'S RULING ON APPELLANTS' AND PILOTS' DORMANT COMMERCE CLAUSE CLAIMS

The district court rejected all of Appellants' and Pilots' contentions that, in different ways and for different reasons, the Ordinance violated the dormant Commerce Clause. Add. at 42-60. The district court rejected the Appellants' and Pilots' foreign commerce clause claim because the Ordinance was "indifferent" to whether the cruise ships from which visitors disembarked were foreign-flagged or

the visitors, themselves, were from other counties and the Ordinance was "silent on the subject of foreign navigation." Add. at 43.

The district court also rejected the notion that this was an area of commerce that required uniformity, noting that Congress had not legislated and "it was not at all apparent or even probable that" municipal control of cruise line visitation would "undermine the ability of any of the several coastal states to participate fully in cruise tourism involving every size of cruise ship imaginable and bearing whatever flag." Add. at 45.[11]

In addition, the district court rejected Appellants' and Pilots' economic discrimination claims under the Commerce Clause concluding that the Ordinance had a nondiscriminatory purpose in that it is directed at cruise ship traffic that "hampered the experience of local welfare." Add. at 48. It concluded that the Ordinance was not "isolationist" because, except for visitation by cruise ship, Bar Harbor remained open to the world. Add. at 48-49.

Finally, the district court rejected Appellants' and Pilots' arguments that the Ordinance impeded the "flow of commerce" and "instrumentalities and arteries of commerce." Add. at 50-55.

---

[11] The district court closed its discussion of the foreign Commerce Clause claims noting that three Supreme Court decisions cited by the Appellants and Pilots were "distinguishable" but did not explain in what respects it had distinguished any of them. Add. at 45, n. 27.

**C.  THE DISTRICT COURT ERRED IN DENYING APPELLANTS' AND PILOTS' CLAIMS THAT THE ORDINANCE VIOLATED THE COMMERCE CLAUSE'S PROTECTION OF THE "FLOW OF COMMERCE"**

As Plaintiffs, Appellants' and Pilots, claimed that the Ordinance violated the dormant Commerce Clause's protection of the "flow of commerce" and the "instrumentalities" and "arteries of commerce". The district court rejected these claims.  Add. at 50-55; *see also* Add. at 42-60.

**1.  District Court Rulings on Flow of Commerce Claims**

In addressing the flow of commerce claims, the district court advised that there were  two categories of such cases.   The first category comprised "classic 'free-flow' cases [as] cases in which a state enacts a law evenhandedly to regulate in-state economic activity" but that law is inconsistent with those of "neighboring or surrounding states, effectively halting interstate transportation through that state." Add. at 50-51. As examples of this category of cases, the district court cited *Kassel v. Consolidated Freightways Corp. of Delaware*, 450 U.S. 662, 671 (1981) and *Southern Pacific.  Id*. at 51.

The second category, which the district court described as  "less common", "arise out of a state's creation of a monopolistic enterprise that prohibits competition."  Add. at 51 (*citing Buck v. Kuykendall*, 267 U.S. 307, 315-316 (1925)).

The district court concluded, however, that "[t]he Ordinance does not fit into either category." Add. at 51.[12]

In rejecting these free-flow arguments the district court found that "[t]he record in this case demonstrates that the Ordinance does indeed stem the flow of interstate commercial activity by reducing the daily volume of persons disembarked into Bar Harbor from cruise ships." Add. at 51.[13]  In denying Appellants' and Pilots' motion for injunctive relief (addressing their seafarer preemption claim), the district court observed that "the end for which the Ordinance was drawn [was to] stem[] the tide of daily cruise ship visitation to vessels with lower berth capacities of 1,000 or less."  App. at 290.

In their motion for an injunction pending appeal, Appellants and Pilots raised their flow of commerce claims as a basis for injunctive relief.  The district court noted their reliance on the standard set forth in *Hannibal & St. Jos. R. Co. v. Husen,* which held that states and local governments could not interfere with the flow of commerce "beyond [what] is absolutely necessary for [Bar Harbor's] self-protection."  App. at 290-291 (*citing* 95 U.S. 465, 472 (1877)).  The district court

---

[12] As is discussed further below, flow of commerce jurisprudence  is not limited to these two categories of decisional law.

[13] In its Order denying Appellants' and Pilots' joint motion for an injunction pending appeal, the district court found that "the end for which the Ordinance was drawn [was] stemming the tide of daily cruise visitation to vessels with lower berth capacities of 1,000 or less."  App. at 290.

also noted this Court's quoted reference to the *Husen* standard in *Bayley's Campground v. Mills,* 985 F.3d 153, 159-60 (1st Cir. 2021). App. at 291.

In denying their motion, the district court appeared to assert that *Husen*'s "absolutely necessary" standard was no longer good law saying that it "briefly emerged" and, in that undefined period of vitality, was limited to state and local laws "that had as their very object 'to obstruct inter-state commerce, and to discriminate between the property of one State and that of citizens of other states.'" App. at 291 (citing 95 U.S. 465, 470).

The district court found more pertinent the Supreme Court decisions in *Hennington v. Georgia*, 163 U.S. 299 (1896) (upholding a state law banning railroad operation on Sundays) and *Lake Shore & M.S.R. Co. v. Ohio*, 173 U.S. 285, 292-298 (1899) (upholding a state law requiring that the first three trains operated by railroads stop at every town with a population of over 3,000). App. at 291-293; *see also* App. at 292, n. 2.

The district court then explained that the "primary point" of its Amended Decision and Order was that "the Commerce Clause does not protect the cruise lines industry's 'particular structure [and] methods of operation.'" App. at 291 (*citing* Add. at 58). As to this point, the district court said the Plaintiffs were "silent".

Another point, apparently decisive in the district court's analysis, was its conclusion that, "Congress is simply not in the exclusive position to regulate the

standards by which small port communities' interface with cruise line tourism." App. at 293. The district court's emphasis on this point was consistent with its earlier determination on this same point.  Add. at 55 ("reject[ing] the contention" that "only Congress" can provide national uniformity for local cruise ship visitation).

The district court accused Appellants and Pilots of "attempt[ing] to sidestep" this principle by reliance on *Wabash, St. L. & Pac.  Ry Co. v. Illinois,* 118 U.S. 567 (1886), which it concluded was limited to state "price regulation" (App. at 293), and *Leisy v. Hardin,* 135 U.S. 100 (1890), which it characterized as "puzzling Probation Era jurisprudence" and which it found "unhelpful."  App. at 293-294.

### 2.    Review of Flow of Commerce Jurisprudence

In limiting *Wabash* to "price regulation", confining *Leisy* to "the Probation Era" (while also finding *Leisy* "puzzling"), and, implying that the *Husen* standard for state interference with the flow of commerce was only briefly valid, the district court fundamentally misconstrued the body of case law that comprises the flow of commerce principle under the dormant Commerce Clause as well as the protection that it extends to "instrumentalities" and "arteries of commerce."

Protection of the movement of persons and goods in interstate and foreign commerce has long been a distinct and essential function of the dormant Commerce Clause.  As will be seen below, prohibited state or local "restraints" on the flow of commerce may take many different forms, obscuring, at times, the common thread

of Commerce Clause decisions that unite Supreme Court decisions invalidating them.  Moreover, as the Supreme Court, itself, has recognized, even as particular jurisprudential rationales shift, the underlying objective of insuring that the transport of persons and goods in interstate and foreign commerce remains unchanged. That this is so, requires a broad review of Supreme Court decisions on this principle.

As the Supreme Court succinctly put it, "[i]t  cannot be too strongly insisted upon that the right of continuous transportation, from one end of the country to the other, is essential in modern times, to that freedom of commerce, from **restraints** which the states might choose to impose upon it, that the commerce clause was intended to secure." *Wabash,* 118 U.S. at 572-573 (emphasis supplied).  As is readily apparent, and as the case law demonstrates, such "restraints" may take many forms and serve many purposes from economic discrimination to revenue-raising, to morals legislation, and more, but, if they significantly impede continuous interstate or foreign commerce, they will run afoul of the dormant Commerce Clause.

Recently, in *National Pork Producers Council v. Ross,* 598 U.S. 356 (2023), the Supreme Court recognized and confirmed this very point. The *National Pork* Court first reviewed the history of dormant Commerce Clause jurisprudence.  *Id.* at 368-71.  The Court observed that, "[t]oday, [the] antidiscrimination principle lies at 'the very core' of our dormant Commerce Clause jurisprudence." *Id.* at 370 (*quoting Camps Newfound/Owattanna, Inc. v. Town of Harrison*, 520 U.S. 564. 581 (1997)).

Although emphasizing the dormant Commerce Clause's focus on state or local laws that discriminate economically, the *National Pork* majority also recognized a distinct line of Supreme Court decisions in which the Court "expressed special concern with certain state regulation of the instrumentalities of interstate transportation." *National Pork,* 598 U.S. at 380; *see also Id.* at 379-380, n, 2; *accord Id.* at 392, Sotomayor, J., concurring (dormant Commerce Clause protects "arteries of commerce", citing to *id.* at 379-380, n. 2).

Footnote 2, cited by the majority and again by Justice Sotomayor in her concurring opinion, warrants further discussion. The *National Pork* Court prefaced footnote 2 with a reference to *General Motors Corp. v. Tracy*, 519 U.S. 278, 278, 298, n. 12 (1997), for the point that "a small number of our cases have invalidated state laws...that appear to have been genuinely nondiscriminatory." *Id.* at 379-80.

Footnote 2, noted that *Tracy* had "alluded to [] a line of cases that originated before *Pike* in which this Court refused to enforce certain state regulations on instrumentalities of interstate commerce—trucks, trains and the like." *Id.* Footnote 2, itself, went further, adding more cases to those cited in the *Tracy* footnote, all concerning state laws burdening transportation of goods and persons. *See Raymond Transport Motor Co., Inc. v. Rice,* 434 U.S. 429, 447 (1978) (trucks); *Bibb v. Navajo Freight Lines, Inc*., 359 U.S. 520, 529-530 (1959); (trucks); *Southern Pacific Co. v. Arizona ex rel. Sullivan,* 325 U.S. 761, 763-782 (1945) (passenger and freight trains).

Footnote 2 quoted *Exxon v. Governor of Maryland*, for the point that the Supreme Court "has only rarely held that the Commerce Clause, itself, pre-empts an entire field from state regulation, and then only when a lack of national uniformity would impede the flow of interstate goods." *Id.* (*quoting* 437 U.S. 11, 128 (1978)) (italics supplied in *National Pork*). Footnote 2 closed with the observation that California's pork production standards did not "impede the flow of commerce" because "[p]igs are not trucks or trains." *National Pork*, 598 U.S. at 379-380, n. 2.

Footnote 2's recognition of the distinct character of the flow-of-commerce/instrumentalities-of-commerce line of cases, reinforced, as it was, by its emphatic quote from *Exxon* requires particular attention to *Exxon*'s isolation and treatment of this point. The *Exxon* decision will be discussed further below, at this point it suffices to say that *Exxon* did not concern the interstate transportation of goods—there, petroleum products. 437 U.S. at 119-120. Indeed, *Exxon* expressly found that the Maryland statute would **not** limit or impede the interstate flow of such products. *Id* at 127 ("there is no reason to assume that [the petroleum producers and refiners] share of the entire supply will not be promptly replaced by other interstate refiners.").

Even so, the refiners and producers argued that because the petroleum products retail market was national, no State could regulate it. It was in response to this argument that *Exxon* observed (as *National Pork* noted) that only "rarely" had

the Supreme Court held that "the Commerce Clause itself preempts an **entire field** from state regulation" but that the Supreme Court had done just that for state laws that would "impede the flow of interstate goods." *Id.* at 128 (emphasis supplied). In other words, *Exxon* was explaining that the "flow of goods", itself, constituted an "entire field" which the states could not regulate so as to impede that flow.

For this point, *Exxon* cited two decisions: *Wabash, St. L. & P. R. Co. v. Illinois,* 118 U.S. 557 (1886) and *Cooley v. Board of Wardens*, 53 U.S. (12 How.) 299, 319 (1851). *Exxon*'s citation to these two decisions is telling.

Taking them in reverse order, *Exxon* cited *Cooley* for the point that, although the States could exercise some power over some matters that affected interstate commerce, there were some subjects which, by their very nature, required the application of a unform rule. *Id.* at 319. This principle is a fundamental and recurring element of subsequent flow of commerce decisions.

*Wabash* concerned a state law attempting to set rates for the Wabash, St. Louis & Pacific Railway Company's interstate transport of goods. 118 U.S. at 561. In invalidating this law, the *Wabash* Court plainly explained the protection that the dormant Commerce Clause accords to "the right of continuous" interstate transport. *Id.* at 572-573. *Wabash* explained further that, under this rule, it made no difference whether the state law was intended "to prevent discrimination in rates, or permit it [because] the deleterious influence on the freedom of commerce among the states,

and upon the transit of goods through those states cannot be overestimated." *Id.* at 577. Echoing *Cooley* on this point, the *Wabash* concluded, "this species of regulation is one which must be, **if established at all**, of a general and national character, and cannot be safely and wisely remitted to local rules and regulations." *Id.* (emphasis supplied).

The Supreme Court returned to these principles in *Southern Pacific Co*. v. *Arizona ex rel. Sullivan* where the Court acknowledged that the Commerce Clause left the states with a 'residuum of power" over matters of "local concern" that might "affect interstate commerce, or to some extent, even regulate it." 325 U.S. 761, 767. But the *Southern Pacific* Court then went on to observe that, "ever since *Gibbons v. Ogden*, [22 U.S. (9 Wheat.) 1 (1824)], the states have not been deemed to have authority to substantially impede the flow of commerce from state to state, or to regulate those phases of national commerce which, because of the need of national uniformity demand that their regulation, **if any**, be prescribed by a single authority." *Id.* at 767-768 (emphasis supplied). As authority for this principle, *inter alia*, *Southern Pacific* cited, *Cooley*, 53 U.S. at 319; *Leisy,* 135 U.S. at 108-109, and, *Edwards v. California*, 314 U.S. 160, 176 (1941).[14]

---

[14] At the point cited, *Edwards, inter alia*, observed, "[t]his court has repeatedly declared that the grant (the commerce clause) established immunity of interstate commerce from the control of the states respecting those subjects embraced within the grant which are of such a nature as to demand that, **if regulated at all**, their regulation must be prescribed by a single authority." 314 U.S. at 176 (emphasis

Protection of the flow of interstate and foreign commerce in the transportation of goods and persons did not leave the states without recourse. As *Husen* acknowledged, states could adopt self-defensive measures, where "vital necessity" required it. *Husen,* 95 U.S. at 473.

*Cooley,* then, expressed the point that the Commerce Clause, of its own force, protected some areas of commerce, even where Congress had failed to act, and that, by their nature, these areas of commerce required that Congress either prescribe a rule or there should be no rule at all. This rule, then, expresses the preemptive effect of the dormant Commerce Clause in the field comprehended by the interstate and foreign movement of persons and goods.

*Southern Pacific* noted the enduring character of this principle even in the face of changing jurisprudential rationales stating, "[w]hether or not this long recognized distribution of power between the national and state governments is predicated upon the implications of the commerce clause itself, [citations omitted] or the presumed intention of Congress, where Congress has not spoken, [citations omitted], the result is the same." *Id.* at 768.

*Leisy v. Hardin,* which prohibited "dry" states from barring alcohol at the state border, but allowing its importation until such time its delivery was complete and it

---

supplied) (*citing Milk Control Board v. Eisenberg Farm Products*, 306 U.S. 346, 351 (1939)).

joined the common mass of property. 135 U.S. at 124-125. *Leisy* supported this holding by citing *Bowman v. Chicago & N.W. Ry Co*., 125 U.S. 465 (1888), which had decided the same point. *Id.* at 119. *Leisy* also relied on decisions involving other commodities including the transport of cattle (*Hannibal and St. Jos. R. Co. v. Husen*) and the transport of persons. (*Henderson v. Mayor of New York*, 92 U.S. 259 (1875)). *Id.* at 120.[15]

Following *Leisy,* the Supreme Court extended dormant Commerce Clause protection for point-to-point interstate transportation of goods and persons in other cases. *See, e.g., Missouri ex rel. Barrett v. Kansas Natural Gas Co*., 265 U.S. 298, 307-308 (1926) (interstate transportation of natural gas "ends" with delivery to distribution companies); *Western Union Telegraph Co. v. Foster*, 247 U.S. 105, 1113 (1918) (Holmes, J.) (interstate transmission of telegraphic communications).

To be sure, over time the Supreme Court has trimmed some applications of this principle. *See South Dakota v. Wayfair, Inc.,* 585 U.S. 162, 164-65 (2018) (overturing *Quill Corp. v. North Dakota*, 504 U.S. 298 (1992)); *Oklahoma Tax Commission v. Jefferson*, 514 U.S. 175, 181-185 (1995) (reviewing dormant

---

[15] The district court correctly noted that in *Tennessee Wine & Spirits Association v. Tennessee,* the Supreme Court reviewed the "original package" rule for the shipment of alcohol that arose out of *Leisy* and similar decisions. App. at 294 (*citing* 588 U.S. at 523-524). However, the *Tennessee Wine* Court did not discuss the application of the *Leisy* rule to other commodities or the transport of persons. Nor did it suggest that it had been overruled; rather, in the case of alcohol, Congress legislated around it. *Id.*

Commerce Clause case law and interstate taxation). Even so, as both *National Pork* and *Exxon* recognized, notwithstanding those decisions, the dormant Commerce Clause continues to protect the interstate transport of goods and persons from point to point against substantial restraint by state laws. *See Southern Pacific*, 325 U.S. at 767.

It was, then, this distinct line of dormant Commerce Clause cases protecting the continuous transport or "flow" of goods and persons interstate and foreign commerce that *Exxon* recognized and determined was not impeded by the Maryland law and that, in footnote 2, *National Pork* confirmed. And it is this line of cases that applies to the Ordinance and its impact on the interstate and international movement of persons by cruise ships.

### 3. The district court erred in denying Appellants' flow of commerce claims under the dormant Commerce Clause.

In considering the district court's ruling on Appellants' and Pilots' flow of commerce claims, it should be noted what is not in dispute.

There is no dispute that the cruise lines in this case are engaged in the transportation of persons in interstate and foreign commerce. The record evidence showed that the typical cruise itinerary of which Bar Harbor is a part includes stops at ports of other states and those of Canadian provinces as well. There is also no dispute that the Ordinance effectively precludes visits to Bar Harbor. Add. at 17, 56-58.

As for the Ordinance's effect, the district court found that "[t]he record in this case demonstrates that the Ordinance does indeed stem the flow of interstate commercial activity by reducing the daily volume of persons disembarked into Bar Harbor from cruise ships." Add. at 51.[16] The district court also found that the Ordinance intended this very effect, finding that "the end for which [the Ordinance] was drawn [was to] stem[] the tide of daily cruise ship visitation to vessels with lower berth capacities of 1,000 or less." App. at 290.[17]

The district court asserted that either Congress must legislate or the states could regulate—and, some issues, such as pedestrian congestion, were so local in their character that federal legislation was impracticable. App. at 294; Add. at 55. But this stark choice misconceives the preemptive effect of the Commerce Clause where the flow of commerce is concerned.

As *Cooley, Husen, Edwards*, and *Southern Pacific* made clear, there were some areas of endeavor that were so inherently national in their scope and effect that, if they were to be regulated at all, only Congress could do so. As has been seen, the preservation of the flow of interstate and foreign commerce is one of those fields.

---

[16] *See also* (Order) Add. at 17, 57-58 (finding Ordinance will cause dramatic reduction in cruise ship visits, as high as a 90% reduction).

[17] At the close of its decision, the district court acknowledged that the Ordinance imposes "some burden on the 'free flow' of commerce" but concluded that "that burden is impossible to quantify." Add. at 59. This clashes with the district court's finding of the precipitous declines in visits to Bar Harbor by cruise ships with capacities of more than 1,000 persons. Add. at 17, 57-57.

That is the point that both *National Pork* in footnote 2 and *Exxon*, in its reference to the "flow of commerce", recognized and confirmed. The Ordinance imposes a significant impediment on the interstate and foreign movement of persons and, therefore, by force of the Commerce Clause alone, is invalid.

On this point, it should be added that, flow of commerce case law has established that, when a passenger commences interstate or international travel, the trip is not complete until the passenger has set foot at his or her destination. As the Supreme Court put it, "[t]he transportation of a passenger from Liverpool to the city of New York is one voyage. It is not completed until the passenger is disembarked at the pier in the latter city." *Henderson*, 92 U.S. at 271; *see also Chy Lung v. Freeman*, 92 U.S. 275 (1875).[18]

From the foregoing, it is evident that, by design and effect, the Ordinance significantly, even catastrophically, burdens the interstate and international flow of commerce based on the transport of persons by cruise ships. *cf., Southern Pacific*,

---

[18] The district court found *Henderson* inapplicable to the instant because the decision was based on "our Nation's immigration policy." Add. at 44, n. 25. A close reading of *Henderson* cannot sustain this characterization. It is evident that the holding is based on the Foreign Commerce Clause, preceded by broad references to the Commerce Clause in general. 92 U.S. 270-276. Moreover, of *Henderson* and *Chy Lung,* the Supreme Court later said, "[t]he two latter cases refer to obstructions against the admission of persons into a State, but the principles asserted are equally applicable to all subjects of commerce." *Husen,* 95 U.S. at 470.

325 U.S. at 767 ("impede substantially").[19]    But that does not mean that the Ordinance is automatically invalid. As *Husen* made clear, if the Ordinance meets a "vital necessity" (95 U.S. at 473; *see also Bayley's Campground*, 985 F.3d at 159), it might yet be sustained but on this point the Ordinance fails entirely.

Although the Purpose section of the Ordinance as an initiative asserted that cruise ship visits jeopardized the effective provision of police, fire, EMS, and even hospital services (App. at 299), no evidence supporting risks to these services was adduced and the district court did not so find.   Instead, the district court found that the Ordinance served the municipal interests of "lessening congestion and conserving municipal resources," *citing Memphis v. Greene,* for the "unquestionably legitimate" municipal objective of the "residential interest in comparative tranquility." Add. at 58 (*citing* 451 U.S. 100, 126-127 (1981)).[20]

By any measure, as a rationale for impeding substantially the flow of commerce, the local public interest as determined by the district court sets the bar so

---

[19] The district court found that "in terms of the volume of visitors disembarking from cruise ships, the likely avoidance of the large vessels will reduce passenger visitation volume by a significant percentage, likely north of 80 and possibly as high as 90 percent (in the short term) compared with the peak numbers experienced in 2022 and 2023." Add. at 17; *see also* Add. at 56-57.

[20] As authority for "legitimate local public interest" under Commerce Clause standards (*see Pike*, 397 U.S. 142), *Memphis v. Greene* is inapposite.  It did not involve a Commerce Clause claim.  There was no claim that the ordinance impeded the flow of commerce or otherwise damaged interests protected by the dormant Commerce Clause.

low it is effectively no bar at all. If "comparative tranquility" can justify local or state laws shutting off a whole sector of interstate and foreign transport of persons (or, potentially, goods), there would be no practical limit on such initiatives. In other words, as framed and justified by the district court, this legal standard carries no limiting principle. *Cf., Citizens United v. F.E.C.*, 558 U.S. 310, 359 (2010). Under flow-of-commerce case law, the public purpose of the Ordinance, as found by the district court, cannot support its catastrophic impact on the interstate and foreign movement of persons by cruise ship.

Before leaving this point, it should be noted that in its order denying an injunction pending appeal, the district court faulted Appellants and Pilots for their "silence" on "the primary point of the Amended Decision and Order"—that is, that "the Commerce Clause does not protect the cruise line industry's particular structure [and] methods of operation. [] (quoting *Exxon Corp. v. Governor of Maryland*, 437 U.S. [at] 127 [])." App. at 291(citing Add. at 58). Appellants agree.

As *Exxon* made clear, the Commerce Clause does not protect "markets" just because they are national in character, but, as *Exxon* also made clear, it does, of its own force, protect the interstate and foreign transportation of goods and persons within those markets. 437 U.S. at 127.[21]

---

[21] *Exxon* was not a flow-of-commerce decision. The Court made that clear when it found that the Maryland law would not inhibit the delivery of petroleum products to that state. 437 U.S. at 127.

Similarly, *National Pork* was not a flow-of-commerce case. That Court succinctly captured that point by its observation that "[p]igs are not trucks or trains." 598 U.S. at 379, n. 2. As footnote 2 indicated, had *National Pork* concerned state regulations attempting to regulate the **transport** of pigs or pork products very different Commerce Clause questions would have been raised. *Cf., Husen* 95 U.S. at 468-69 (invalidating state law restricting the interstate transport of cattle).

The district court found that the Ordinance greatly impeded the movement of persons by cruise ship by up to 90%. Add. at 17. Without a compelling justification, that kind of local rule is barred by the Commerce Clause. The justification for the Ordinance, as found by the district court, fails to meet that standard. *See Southern Pacific*, 325 U.S. at 767; *Husen*, 95 U.S. at 472-473; *Bayley's Campground*, 985 F.3d at 159.

For the reasons set forth above, the Ordinance unjustifiably impedes the interstate and foreign movement of persons in violation of the Commerce Clause and, therefore, is unconstitutional. *Henderson*, 92 U.S. at 271; *Morgan v. Virginia*, 328 U.S. 373, 386 (1946).[22]

---

[22] The district court also cited *Tart v. Massachusetts*, 949 F.2d 490, 501 (1st Cir. 1991) for the "legitimate local interest of promoting public health." Add. at 58-59. But, there was no evidence that cruise ship visitors posed any risk to public health and the district court made no such finding. Beyond that, *Tart* concerned a state law governing the landing of raw fish. 949 F.2d at 493. For purposes of invoking health-based police powers, persons disembarking from cruise ships cannot reasonably be equated with raw fish, as the district court has tacitly done.

### III. THE DISTRICT COURT ERRED IN DENYING APPELLANTS' CLAIM THAT THE ORDINANCE VIOLATED THE RIGHT TO TRAVEL AS PROTECTED BY THE DORMANT COMMERCE CLAUSE

As part of their dormant Commerce Clause challenge, Appellants argued that the Ordinance also would impede the rights of third persons to travel to Bar Harbor via large cruise ship, a right Appellants argued was guaranteed to those persons under by the Commerce Clause. ECF 191 at 27; ECF 198 at 31, 32; Add. at 79.

The district court refused to consider this claim because "[p]laintiffs did not assert that the Ordinance violates the right to travel in their complaint and, instead, raise it for the first time in their brief in a perfunctory fashion." Add. at 37, n. 23. In so ruling that the district court provided no explanation either for its decision that the Commerce Clause right to travel claim failed Rule 8 or for its determination that the argument in support of that right was "perfunctory" and, therefore, unworthy.

#### 1. The District Court erred in finding that the Complaint did not plead the right to travel under the Commerce Clause

The district court provided no explanation why the Plaintiffs' Complaint failed to sufficiently allege a right to travel claim under the Commerce Clause to meet the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure. Add. at 37, n. 23. Nonetheless, the district court erred in so ruling.

The Complaint clearly alleged that the Ordinance violated the Commerce Clause and, in particular, violated the Commerce Clause in a variety of ways

including that it excessively burdened and restricted interstate and foreign commerce. App. at 26-78 (complaint) at ¶ 94, ¶¶ 106-124. In particular, the Complaint alleged that the Ordinance "does not advance any public health or safety purpose and creates substantial barriers to the free flow of commerce." *Id.* at ¶ 108. Finally, the Complaint asked the Court to declare that the Ordinance violated the Commerce Clause. *Id.*, Prayer for Relief, at ¶ 2.

Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief" and a "demand for the relief sought." Rule 8, F.R.Civ.Pro. With respect to the right to travel claim under the Commerce Clause, the Complaint meets that standard.

To begin with, in their post-trial briefs, Plaintiffs clearly stated that they were not basing their claim that the Ordinance violated the right to travel under any constitutional provision other than the Commerce Clause. ECF 191 and 198.

In addition, although separately identified as protected by the dormant Commerce Clause, as has been seen above, the right to travel is encompassed within the general protection that the Commerce Clause extends to the free flow of commerce. See, *e.g., Southern Pacific,* 325 U.S. at 767-768 (*citing, inter alia, Edwards v. California* for the principal that states cannot "impede substantially" the free flow of commerce or "regulate" those areas of commerce where, if any regulation is applied, it must be national). As a Commerce Clause principle, then,

the right to travel is a particular application of the protection that clause extends to the free flow of commerce and the primacy of national authority in that field. This being so, the Complaint sufficiently pled that the Ordinance violated that right.

## 2. The Ordinance violates the right to travel under the Commerce Clause

Appellants have been injured by the severe limitations on the right to travel as protected by the Commerce Clause in the same way they have been injured by the limitations that the Ordinance has imposed on cruise ship lines to transport persons in interstate and foreign commerce. Moreover, so the point is clear, Appellants incorporate by reference the Commerce Clause arguments they have raised above as if fully incorporated herein.

As has been noted above, in *Edwards v. People of California*, without undermining other constitutional sources of the right to travel, the Supreme Court placed it squarely within the dormant Commerce Clause. 314 U.S. at173-174 (1941). The district court had earlier recognized the Commerce Clause as the basis for the *Edwards* decision. *Bayley's Campground, Inc. v. Mills*, 463 F.Supp.3d 22, 34 (D. Me. 2020). This Court has done so as well. *Bayley's Campground, Inc. v. Mills*, 985 F.3d 153, 159-160 (1st Cir. 2021).[23]

---

[23] The district court acknowledged that Plaintiffs and Pilots relied on *Edwards v. California* in support of their claims that Ordinance improperly burdened the movement of "vessels and persons" but discounted *Edwards*' application to this case because "[t]he analogy between Dust Bowl migration and cruise tourism is strained

For these reasons, the Ordinance violates the right to travel as protected by the Commerce Clause.

## IV. THE DISTRICT COURT ERRED IN DENYING APPELLANTS' CLAIM THAT THE ORDINANCE VIOLATED DORMANT COMMERCE CLAUSE STANDARDS AS SET FORTH IN *PIKE V. BRUCE CHURCH*

*Pike v. Bruce Church*, set forth a distinct analytical framework for review under the Commerce Clause of a wide spectrum of state and local restrictions on commerce. *Pike* has been broadly applied and has not, as Chief Justice Roberts noted, been limited solely to "instrumentalities of transportation." *National Pork*, 598 U.S. at 396 (Roberts, C.J., concurring and dissenting).

The *Pike* test is as follows: "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . . . If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Hughes v. Oklahoma*, 441 U.S. 332 (1979) (*quoting Pike*, 397

---

to say the least." Add. at 59, n. 4. Nothing in *Edwards* suggests that when the Supreme Court considered the Commerce Clause-based right to travel, it confined its decision to Dust Bowl migrants. *Edwards, passim.*

U.S. at 142). Justice Barrett put this test more bluntly in her concurring opinion in *National Pork*, "[a] state law that burdens interstate commerce in clear excess of its putative local benefits flunks *Pike* balancing." 598 U.S. at 393 (Barrett, J., concurring). [24]

Applying these standards to the Ordinance, out of the gate it fails the "even-handedness" test. That is because, as its principal author, Mr. Sidman said, and as the district court found, although neutral on its face, it was intended to keep cruise ships with capacities in excess of 1,000 persons out of Bar Harbor. App. at 290; Add. at 80.[25]

Second, although the "Purpose" appended to the initiative claimed that cruise ship visitors jeopardized the provision of essential services, including police, fire and EMS services, the trial record did not support these claims and the district court made no such findings.[26] Reducing pedestrian "congestion" in the quest to obtain

---

[24] Although the plurality portion of the opinion, *National Pork* characterized *Pike* as having "traditionally served as another way to test purposeful discrimination against out-of-state economic interests" (598 U.S. at 380), in his concurring opinion, Justice Kavanaugh observed of *Pike* that, "[i]n today's fractured opinion, six justices affirmatively retain the longstanding *Pike* balancing test for analyzing challenges to state economic regulations." *Id.* at 403.

[25] Mr. Sidman stated: "we're only getting rid of the biggies (and 930 pax is still a honking large boat!), with the much proposed alternative being to welcome the smaller, generally wealthier-passengered, "boutique" ships that might contribute to, rather than destroying life for BH taxpayers, many businesses and most visitors."

[26] Mr. Sidman testified that passengers from large cruise ships somehow prevented other customers from reaching the art gallery in downtown Bar Harbor that he operates. ECF 191 at 40-41.

"comparative tranquility" (Add. at 58, quoting *Memphis*, 451 U.S. at 126-127) is not a "legitimate local public interest" under *Pike* for Commerce Clause purposes—that is, as has been noted above, it is simply too vague an interest to be applied with any consistency to Commerce Clause cases.

Assuming, *arguendo*, that Ordinance meets the local standard requirement, the district court decision shows that its effects on cruise line visitation to Bar Harbor is not "incidental" within the meaning of *Pike*. To begin with, as the district court found, the barrier it erects to cruise ship visits was intentional. App. at 290.

Assuming, again, *arguendo*, that the Ordinance's effect on cruise ship commerce is incidental, the burden that the Ordinance imposes on cruise ship visits—that is, the total exclusion of cruise ships with 1,000+ capacities—is "clearly excessive" when compared to the public interests of reducing sidewalk congestion and promoting "comparative tranquility." This becomes starkly clear when placed in the broader context of Bar Harbor's longstanding role as a land-based tourist destination due to its proximity to Acadia National Park which draws nearly 4,000,000 visitors a year, many of whom visit Bar Harbor. Add. at 8. The Ordinance does nothing whatsoever to address the influx of such land-based visitors.[27]

Where a local law has a legitimate local purpose, under *Pike,* the question becomes whether that interest "could be promoted as well with a lesser impact on

_____

[27] This is yet another way in which the Ordinance is not "even-handed."

interstate activities." *Pike,* 397 U.S. at 142.  On this record, the Town itself, has already provided the answer.  The Town's development and adoption of the voluntary caps as well as the Town's later adoption of the MOAs shows that Bar Harbor can accommodate cruise ship visitors under either regime while retaining its essential qualities and capacities as a distinct community.

For these reasons, as Justice Barrett put it, the Ordinance flunks *Pike* balancing.

## V.  THE DISTRICT COURT ERRED IN FAILING TO GRANT INJUNCTIVE RELIEF ON APPELLANTS' SEAFARER PREEMPTION CLAIM

The district court ruled that the Ordinance's comprehensive prohibition on more than 1,000 "persons" disembarking from cruise ships into Bar Harbor in single calendar day necessarily included crew members of such ships and that the entry such persons into ports was guaranteed by 33 C.F.R. § 105.237, and, as applied to these seafarers, the Ordinance was preempted by the federal rule.  Add. at 28-32. Despite having so ruled, the district court concluded that Appellants and Pilots were not entitled to "any meaningful relief" (Add. at 29), reinforcing this same finding in its entry of judgment.  Add. at 60.  In failing to grant Appellants and Pilots injunctive relief on seafarer preemption, the district court erred.

With the Ordinance having been found unconstitutional, consideration of injunctive relief was in order. In this instance, the question of injunctive relief was

and remains governed by *Ayotte v. Planned Parenthood of N. New England,* 546 U.S. 320 (2006).

In brief, *Ayotte* found that before entering a comprehensive injunction, a court should consider whether it might fashion a more selective injunction. In considering this more limited remedy, *Ayotte,* emphasized two factors: 1) "how easily" a selective injunction could be articulated (546 U.S. at 329), and 2) whether that limited remedy would be consistent with the intent of the enacting body. *Id.* at 331. Taking these in reverse order, a selective injunction—that is, one that would admit seafarers and exclude all others—would not be consistent with legislative intent because, by approving the word "persons" as the Ordinance's controlling concept, Bar Harbor voters clearly intended that the Ordinance apply to everyone without exception.

Beyond that, articulating a selective injunction would not come easily because the court would have to formulate its own standards by which Pier Owners, who are subject to penalties for "excess unauthorized persons" could reliably and consistently differentiate between seafarers and all others. For these reasons, the district court should have issued a comprehensive injunction.

## VI. THE DISTRICT COURT ERRED IN DENYING APPELLANTS' CLAIM THAT THE ORDINANCE WAS PREEMPTED BY FEDERAL LAWS GOVERNING THE ADMISSION OF FOREIGN NATIONALS.

The extensive federal regulatory regime overseeing cruise ships is not limited to the Coast Guard. Other federal agencies, including Customs and Border Protection, regulate aspects of the passenger cruise line industry, including the admission or readmission of foreign national passengers after inspection. Relevant to the Port of Bar Harbor, this is especially true of the foreign-flagged large cruise ships, which cover ports extending from the mid-Atlantic states through New England, the Maritime provinces, and Quebec. A vessel re-entering the United States in Maine must call at a Class A port. Bar Harbor stands out as a "first port of entry" and Class A port under U.S. Customs, where foreign nationals and U.S. citizens returning to the United States may clear customs and immigration before entering the United States.

Foreign national and U.S. citizen passengers arriving from a Canadian port may be readmitted to the United States, but only after inspection aboard the ship on its arrival in federal anchorage at Bar Harbor. However, the Ordinance imposes another condition of entry—that the disembarking person is not above the 1,000-person daily limit. The Ordinance treats all such numerically offensive persons as having failed to qualify for admission into the United States (at least via Bar Harbor)

thereby, in effect, supplementing federal criteria for admission with one imposed by this Maine municipality.

The Supreme Court has long recognized that "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Maine Forest Prod. Council v. Cormier*, 586 F. Supp. 3d 22, 38 (D. Me.), *aff'd,* 51 F.4th 1 (1st Cir. 2022) (quoting *Arizona v. United States,* 567 U.S. 387, 394 (2012)). Underlying the justification for this power, "[i]t is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Id*. (quoting *Arizona*, 567 U.S. at 395 (*citing Chy Lung v. Freeman*, 92 U.S. 275, 279-280 (1876)); The Federalist No. 3, 39 (C. Rossiter ed. 2003) (J. Jay)).

The federal government's immigration authority permits it to "determine[e] what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization."[28] *Toll v. Moreno,* 458 U.S. 1, 11 (1982). This power inherently limits that of the states:

---

[28]  In 1952 Congress enacted the Immigration and Nationality Act (INA), which is a "comprehensive and complete code covering all aspects of admission of aliens to this country, whether for business or pleasure, or as immigrants seeking to become permanent residents." *Toll*, 458 U.S. at 13-14 (quoting *Elkins v. Moreno*, 435 U.S. 647, 664 (1978)).

> Under the Constitution the states are granted no such powers; they can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states. *State laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with this constitutionally derived federal power to regulate immigration, and have accordingly been held invalid.*

*Id.* (emphasis in original) (quoting *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948)).

The Ordinance imposes discriminatory burdens upon the entrance of foreign national passengers to the United States; a "burden not contemplated" by Congress or the federal system of border controls. *See, e.g.*, *Graham v. Richardson,* 403 U.S. 365, 379 (1971) (invalidating state restrictions on receipt of welfare benefits by lawful resident aliens as an "auxiliary burden" on entry or residence not contemplated by Congress). The federal government's occupation of the field for entrance of foreign nationals to the United States is manifest, as is the conflict between the Ordinance and federal law.

## VII. THE DISTRICT COURT ERRED WHEN IT DENIED APPELLANTS' DUE PROCESS CLAIM

Appellants challenged the Ordinance on the grounds that it lacked a reasonable relation to its ostensible purpose. App. at 27-79 (Complaint) at ¶¶ 126-128; *see also*, *id.* Prayer for Relief at ¶ 3.[29]

In sum, Appellants' asserted that, among other things, the following particular terms of the Ordinance lacked a rational relationship to its purported goal of effectively lessening sidewalk congestion. First, the Ordinance singled out persons arriving by cruise ship and excluded persons arriving by any other means of transportation. Second, the Ordinance did so, even though the volume of overall tourist visitation, including cruise ship visitation, was governed by seasonal factors. Third, the Ordinance imposed a single, unyielding ceiling applicable every day of the year, even days on which no cruise ship has ever called at Bar Harbor.

It should be noted that, as must be the case given the nature of this claim, Appellants' due process challenge was directed at the Ordinance's particular terms and the lack of a rational nexus between those terms and the Ordinance's supposed

---

[29] In considering Appellants' due process claim, the district court expressed "surprise" (and, it would appear, some frustration) with Appellants for having presented a "liberty of contract" claim which the court dedicated several pages to addressing. Add. at 35-38. Appellants' surprise equals, if it does not exceed, that of the district court because Appellants never pled a liberty of contract claim (App 27-79, complaint *passim*) or argue such a claim, either openly or, as the district court implied "without com[ing] right out and say[ing] it." Add. at 37. "Liberty of contract" was no part of this case.

objectives. Evidence adduced in the course of trial explained why the Ordinance lacked the required rational nexus—that was because the Ordinance's real purpose was not the simple reduction of sidewalk traffic but was, rather, in service to Mr. Sidman's objective to "keep the biggies out." Add. at 80. Following trial, the district court reached this very conclusion. App. at 290. Further evidence of the lack of rational nexus is that in effect the Ordinance simply eliminated the vast majority – as much as 90% – of the historic cruise ship visits.

Given this evidence and the district court's finding it is now clear why the terms of the Ordinance lack "a reasonable relationship to a proper legislative purpose". *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 483 (1st Cir. 2009).

For the reasons set forth above, the district court erred when it denied Appellants' due process claim.

## VIII. CONCLUSION

Appellants ask this Court to find that the district court erred in denying Appellants' claim that Ordinance violates the Commerce Clause; that the Ordinance is preempted by federal laws governing the admission of foreign nationals into the United States; that the Ordinance lacks a rational nexus between its purported purpose and the means it employs to achieve that purpose; and, that, although Appellants' prevailed on their seafarer preemption claim, the district court erred in

awarding them no relief from the application of the Ordinance against them and others.

Respectfully submitted,

/s/ *Timothy C. Woodcock*
Timothy C. Woodcock
P. Andrew Hamilton

EATON PEABODY
80 Exchange Street (04401)
Post Office Box 1210
Bangor, Maine 04402-1210
(207) 947-0111

twoodcock@eatonpeabody.com
ahamilton@eatonpeabody.com

# CERTIFICATE OF COMPLIANCE WITH RULE 32

1.     This brief complies with the page length limitation of Fed. R. App. P. 32(a)(7)(A) because this brief contains 52 pages, and Fed. R. App. P. 32(a)(7)(B) as it contains 12,610 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Standard in Times New Roman 14-point font.

*/s/Timothy C. Woodcock*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 30, 2024, I electronically filed the foregoing with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

/s/*Timothy C. Woodcock*