No. 24-1317, 24-1318, 24-1385

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

—

# ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, B.H. PIERS, LLC, GOLDEN ANCHOR, LLC d/b/a Harborside Hotel, BHWW LLC, DELRAY EXPLORER HULL 495 LLC, DELRAY EXPLORER HULL 493, LLC, ACADIA EXPLORER 492, LLC,

Plaintiffs-Appellants/Cross Appellees,

## PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION,

Plaintiff Intervenor-Appellant/Cross-Appellee,

vs.

## CHARLES SIDMAN,

Defendant-Appellee/Cross-Appellant,

**TOWN OF BAR HARBOR**, a Municipal Corporation of the State of Maine,

Defendant-Appellee

—

On Appeal from a Judgment of the
United States District Court for the District of Maine

—

# BRIEF OF THE PIONEER PUBLIC INTEREST LAW CENTER AS AMICUS CURIAE IN SUPPORT OF THE APPELLANTS

—

John C. La Liberte (No. 115846)
PIONEER LEGAL, LLC
185 Devonshire St.
Boston, Mass. 02110
(617) 410-5200
john.laliberte@pioneerlegal.com

Theodore J. Folkman (No. 81828)
RUBIN AND RUDMAN, LLP
53 State Street
Boston, Mass. 02109
(617) 330-7000
tfolkman@rubinrudman.com

# DISCLOSURE STATEMENT

Amicus Curiae Pioneer Public Interest Law Center ("PLC" or "Pioneer Law Center") is a non-profit, non-partisan, legal research and litigation entity organized under Massachusetts law. Pioneer Institute, Inc., a Massachusetts non-profit corporation, is the parent of PLC. PLC has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

3966323_2

# TABLE OF CONTENTS

Disclosure Statement ................................................................i

Table of Authorities.................................................................iii

Interest of the Amicus Curiae ................................................... 1

Introduction ............................................................................ 1

Statement of the Case.............................................................2

Argument ................................................................................6

    A.     The Appellants adequately preserved their argument that the Ordinance violates the constitutionally ....................................6

    B.     The constitutional right to travel is fundamental. ............................7

    C.     The Town does not have a compelling reason to restrict the right to travel ...........................................................................9

        1.     State action that impedes the right to travel is subject to strict scrutiny and requires a compelling state interest..................................9

        2.     The Town's interest in limiting congestion is not compelling. ..... 11

Conclusion ............................................................................ 16

Certificate of Compliance ....................................................... 17

Addendum

    Federal Maritime Commission, *East Coast Interim Report* (Final Report), Report No. FF No. 30 (2024) ...................................... Add. 1[*]

---

[*] The amicus has attached this report as an addendum because it is not available on the Internet.

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..........................................................6

*Att'y Gen. of N.Y. v. Soto-Lopez,* 476 U.S. 898 (1986)......................... 7, 8, 10

*Bayley's Campground, Inc. v. Mills*, 463 F. Supp. 3d 22 (D. Me. 2020),
    *aff'd,* 985 F.3d 153 (1st Cir. 2021)...........................................................12

*Bayley's Campground, Inc. v. Mills,* 985 F.3d 153 (1st Cir. 2021) ..............13

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................6

*Busic v. Transp. Sec. Admin.*, 62 F.4th 547 (D.C. Cir. 2023).......................15

*Cole v. Hous. Auth. of Newport*, 435 F.2d 807, 810 (1st Cir. 1970) .............11

*Crandall v. Nevada*, 73 U.S. (6 Wall.) 35 (1867) ...........................................9

*Dunn v. Blumstein,* 405 U.S. 330 (1972).................................................8, 10

*Edwards v. California,* 314 U.S. 160 (1941) ............................................9, 13

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) ....................................11, 12

*Johnson v. City of Shelby*, 574 U.S. 10 (2014).................................................6

*Jones v. Helms*, 452 U.S. 412 (1981) .............................................................14

*Marston v. Lewis,* 410 U.S. 679 (1973)..........................................................14

*Mem'l Hosp. v. Maricopa County*, 415 U.S. 250 (1974)................................10

*Passenger Cases*, 48 U.S. (7 How.) 283 (1849) ..............................................8

*Pelland v. Rhode Island*, 317 F. Supp. 2d 86 (D.R.I. 2004)..........................14

*R.R. Co. v. Husen*, 95 U.S. 465 (1877)...........................................................13

*Saenz v. Roe*, 526 U.S. 489 (1999).............................................................9, 10

iii

*Shapiro v. Thompson*, 394 U.S. 618 (1969) ............................................... 8, 10

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ....................................... 7

*U.S. v. Guest*, 383 U.S. 745 (1966) ............................................................ 7, 9

*Zemel v. Rusk*, 381 U.S. 1 (1965) ................................................................ 12

## Other Authorities

Cruise Lines Int'l Assoc., *Open for Business: Cruise Resumes in Maine* (July 31, 2024), https://cruising.org/en/news-and-research/press-room/2022/april/open-for-business-cruise-resumes-in-maine ................. 5

Federal Maritime Commission, *East Coast Interim Report* (Final Report), Report No. FF No. 30 (2024) .................................................................. 5

Gillian Birch, *The Ultimate Guide to Cruises from Boston,* Avid Voyagers (Jul. 30, 2020), *available at* https://avidvoyagers.com/guide-to-cruises-from-boston/. ....................................................................................................... 3

Massachusetts Port Authority, *Comprehensive Annual Financial Report for the Fiscal Year Ended June 30, 2019* (2023), *available at* https://www.massport.com/sites/default/files/2023-10/mpa-fy19-cafr-final.pdf ............................................................................................................................. 3

iv

**INTEREST OF THE AMICUS CURIAE**

PLC is a non-profit, non-partisan, legal research and litigation entity that defends and promotes freedom of association, freedom of speech, accountable government, economic opportunity, and educational opportunities across New England and the United States. Through legal action and public education, PLC works to preserve and enhance constitutional and civil liberties.

**INTRODUCTION**

The Town of Bar Harbor's Ordinance ("the Ordinance"), which limits the number of people allowed to disembark from a cruise ship into Bar Harbor each day to 1,000, is an unconstitutional infringement of the right to travel. If it stands, it will have an enormous negative effect on cruise ship travel and the economic benefits the industry brings to ports in New England and other communities.

The right to travel is fundamental to the union of the United States as one nation. A state (or, as in this case, a political subdivision of a state) may not infringe upon it without a compelling state interest. The Town of Bar Harbor does not have one. Reducing congestion to address local "inconvenience" concerns is not a compelling state interest. While the Town's interest is weak, the Ordinance it adopted is strong medicine: it

3966323_2

restricts and deters interstate travel, burdening the economies of other New England ports and Bar Harbor itself.

## STATEMENT OF THE CASE

In 2022, Bar Harbor enacted the Ordinance, motivated by feelings of inconvenience, annoyance, disaffection, and "angst". (Penobscott Bay & River Pilot's Ass'n Add. ("Pilot's Add.") 9, n.5). As argued below, this Ordinance, though on its face a local land-use regulation, impermissibly infringes on the constitutional right to travel. And that infringement harms not just the people who want to travel to Bar Harbor, or to travel through Bar Harbor to other destinations, but also harms the economies of New England ports including Bar Harbor itself.

The Town is only one port of call, but perhaps the most critical one, on a cruise ship's route through New England to Canada or elsewhere. Appellants' Appendix ("App.") 240, ¶¶ 76-78 ("Bar Harbor is not a turn-around port for the cruise industry. A turn-around port is a port where passengers begin or end their cruises"); App. 235, ¶ 36 (explaining "[t]he vast majority of Maine's cruise traffic is part of the Canada/New England region, which … includes New England, the eastern Canadian provinces, the Maritimes, as well as the province of Quebec"). Boston, a common turn-around port for cruise ships heading to or returning from the Town, will feel the effect of the Ordinance. The Town is an indispensable port of call on

2

many Boston cruises. Ten of the eighteen popular cruises leaving from Flynn Cruiseport Boston include Bar Harbor as a notable stop, according to a well-regarded guidebook. *See* Gillian Birch, *The Ultimate Guide to Cruises from Boston,* Avid Voyagers (Jul. 30, 2020), *available at* https://avidvoyagers.com/guide-to-cruises-from-boston/. As the lower court observed, given that many New England cruise itineraries "feature Bar Harbor as a marquee port" and that "foreign-flagged lines see Bar Harbor as the most convenient and desirable port of entry when coming from foreign waters," any restrictions on Bar Harbor are certain to impact Boston's cruise industry. (Pilot's Add. 5-6; App. 237, ¶ 57 ("[I]n the Canada/New England context, Bar Harbor is the Marquee Port").

The cruise ship industry is a significant economic contributor in New England. Flynn Cruiseport Boston, Boston's main port accessed by major cruise lines, "contributes over $135 million to the Massachusetts tourism industry by accommodating homeport and port-of-call cruises. In a recent year for which data is available, "Flynn Cruiseport Boston served 396,000 passengers and 144 ships." *See* Massachusetts Port Authority, *Comprehensive Annual Financial Report for the Fiscal Year Ended June 30, 2019* (2023), *available at* https://www.massport.com/sites/default/files/2023-10/mpa-fy19-cafr-final.pdf. According to a 2019 Massport report, the cruise industry contributed to 2,187 jobs at Boston Harbor and provided a total of $116.09 million in personal income to Boston area workers. Massachusetts

3

Port Authority, *Massport Final Report* (June 3, 2019),

https://www.massport.com/sites/default/files/2023-09/massport_final_report_6-03-2019-report-final.pdf (noting the cruise industry's rapid growth between 2012 and 2018, adding 225 jobs (+11.4%), $36,547,000 (+45.9%) in added personal income, and $38,682,000 (+69%) in added business revenue).

The Ordinance's negative effect on travel and commerce in the Town and surrounding communities is well documented in the record below. The plaintiffs asserted passenger visits would fall by 95% (App. 268, ¶ 283), and the judge found that the reduction would be "likely north of 80 and possibly as high as 90 percent." (Pilot's Add. 17). Because Maine relies heavily on tourism, the expected reduction in passenger visits is concerning. (App. 233, ¶¶ 20-22. According to one study, cruise passengers visit Maine "from a broader geographical region than Maine's typical land based visitation," and "30 percent of cruise visitors intended to return on a land-based vacation and 29 percent planned to return on another cruise." (App. 233, 235, ¶¶ 24, 41, 45. Limiting disembarkations to 1,000 passengers will thus likely reduce first time and repeat visitors to Maine and discourage many passengers from booking cruises originating from turn-around ports such as Boston.

Indeed, the trial judge acknowledged the Ordinance will lead to a vast reduction in visitors: "the likely avoidance of the large vessels will reduce passenger visitation volume by a significant percentage, It is beyond dispute that this dramatic reduction will have a serious negative effect on the Town's

economy, and a concomitant effect on other port cities. *See, e.g.,* Cruise Lines Int'l Assoc., *Open for Business: Cruise Resumes in Maine* (July 31, 2024), https://cruising.org/en/news-and-research/press-room/2022/april/open-for-business-cruise-resumes-in-maine (explaining that "[p]rior to the pandemic, the cruise industry contributed $68 million in direct economic spend and created over 1,000 jobs in Maine amounting to $36 million in wages"). The Town will suffer a loss of revenue and jobs. *See* Federal Maritime Commission, *East Coast Interim Report* (Final Report), Report No. FF No. 30 (2024), explaining "[d]irect spending from cruise visitors in 2016 was almost $15 million and resulted in 329 jobs and $3.8 million in income"). In short, given the lower court's finding that the number of passengers will plunge, the Ordinance will have a serious adverse effect on the economies of Maine and of turn-around ports such as Boston.

While the negative economic impact of the Ordinance is strong, Bar Harbor's "nuisance" justification for adopting the Ordinance is weak or even illusory. At trial, the Town's Chief of Police, James Willis, and the Harbor Master, Christopher Wharff, both testified that there were no public safety problems from cruise ship visits that could not be adequately managed using currently available resources. (App. 359-60, ¶¶ 226, 227). Disembarkation by cruise visitors and their entry onto buses near the piers pose management challenges, but the Town's public safety officials have met those challenges. The Fire Chief, Matt Bartlett, testified that cruise ship visits did

not strain fire or EMS services. App. at 359-60, ¶¶ 226, 227. The Town Council Chair, Valerie Peacock, testified that the Town could accommodate the higher levels of cruise ship visitors under the levels set in memoranda of agreement between the Town and cruise ship operators. App. 255, ¶ 193.

These negative economic consequences, when weighed against the Town's weak justification for imposing those consequences on the region, should inform the Court's analysis.

## ARGUMENT

**A.     The Appellants adequately preserved their argument that the Ordinance violates the constitutionally protected right to travel.**

The lower court erred in declining to consider the Appellants' argument that the Ordinance violates the constitutionally protected right to travel. Plaintiffs may argue issues not exhaustively detailed in the complaint. *See, e.g., Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007); *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014). While complaints must meet a threshold of plausibility, intricate factual allegations and detailed legal theories are not requisite at the pleading stage; the specifics can come later in the processes. *See Bell Atl. Corp.*, 550 U.S. at 1966; *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Johnson*, 574 U.S. at 11.

A complaint need only provide enough information so that the defendant can understand the nature of the claims presented in order to

6

respond. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002) (holding that plaintiffs are not required to meet heightened standards because detailed evidence and legal theories are not required at initial pleading stage). In short, the Appellants were not required to use specified words in their pleadings in order to preserve the constitutional issue. The Appellees understood the constitutional claims against them.

### B.   The constitutional right to travel is fundamental.

The right to travel is fundamental. The Constitution does not expressly mention it, but that is because the right is "so elementary [that it] was conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created." *U.S. v. Guest*, 383 U.S. 745, 759 (1966) (explaining "the Articles of Confederation provided that 'the people of each State shall have free ingress and regress to and from any other State'") (citing Articles of Confederation art. IV (1778)). The right to travel has been located within the Privileges and Immunities Clause in the Fourteenth Amendment and Art. IV, and the Commerce Clause, and it has been "inferred from the federal structure of government adopted by our Constitution." *Att'y Gen. of N.Y. v. Soto-Lopez,* 476 U.S. 898, 902 (1986) (noting that "in light of the *unquestioned historic acceptance* of the principle of free interstate migration, and of the important role that principle has played in transforming many States into a single Nation, we have not felt impelled to locate this

3966323_2

right definitively in any particular constitutional provision") (emphasis added). Thus, the Supreme Court has long recognized the right to travel as a "basic right under the Constitution." *Soto-Lopez*, 476 U.S. at 902.

The right to travel is fundamentally tied to the unity of the United States, for "[w]e are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States." *Passenger Cases*, 48 U.S. (7 How.) 283 (1849). If states could easily impede this right, they "could produce nothing but discord and mutual irritation." That is why states "very clearly do not possess" the power to impede the right to travel. *Id.* at 492 (striking down taxes that infringed on interstate travel and commerce). The Court returned to this idea more than a hundred years later:

> This Court long ago recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement.

*Shapiro v. Thompson*, 394 U.S. 618, 629 (1969).

The Supreme Court has protected the right to travel in several factual circumstances: durational residence laws for voters. For example, in *Dunn v. Blumstein,* 405 U.S. 330 (1972), the Court struck down a thirty-day residency requirement for voting on the grounds that it infringed the right to travel. *See id.* at 341 ("The right to travel is an unconditional personal right,

a right whose exercise may not be conditioned") (quotation omitted). In *Saenz v. Roe*, 526 U.S. 489 (1999), the Court struck down a law limiting the entitlement of new Californians to public welfare benefits for one year after their arrival in the state for the same reason. *See id.* at 500 (explaining "[i]t was the right to go from one place to another, including the right to cross state borders while en route, that was vindicated in *Edwards v. California*" and reaffirmed in *United States v. Guest* when striking down durational residency requirement for benefits) (citing *Edwards v. California,* 314 U.S. 160 (1941) and *Guest*, 383 U.S. at 86). And the Court has specifically noted the right to access to seaports among the rights that make up the right to travel. *See Crandall v. Nevada*, 73 U.S. (6 Wall.) 35, 44 (1867) (striking down statute imposing tax on interstate travelers and noting each citizen "has a right to free access to its sea-ports, through which all the operations of foreign trade and commerce are conducted…."). Bar Harbor's restriction on passengers' ability to enter Bar Harbor by sea ignores these precedents and restricts one of the most basic rights the Constitution protects.

**C.  The Town does not have a compelling reason to restrict the right to travel.**

**1.  State action that impedes the right to travel is subject to strict scrutiny and requires a compelling state interest.**

Given the importance and fundamental nature of the right to travel, state action that deters or impedes the right of ingress and egress to a state is

9

subject to strict scrutiny. *Soto-Lopez*, 476 U.S. at 903 ("[O]ur cases have also established that only where a State's law 'operates to penalize those persons ... who have exercised their constitutional right of interstate migration' is heightened scrutiny triggered") (citing *Mem'l Hosp. v. Maricopa County*, 415 U.S. 250, 258 (1974)). The right may not be infringed absent a compelling state interest. *See Soto-Lopez*, 476 U.S. at 903 (noting "in several cases" where the Court found a burden on the right to migrate, it "required the State to come forward with a compelling justification"); *Shapiro,* 394 U.S. at 638 (explaining, "[s]ince the classification here touches on the fundamental right of interstate movement, its constitutionality must be judged by the stricter standard of whether it promotes a compelling state interest"); *Dunn* 405 U.S. at 339 (reaffirming the "compelling-state-interest" test when the right to travel is penalized); *Memorial Hosp.*, *supra* (finding statute unconstitutional where the compelling state interest standard was not met).

The most recent Supreme Court case on the right to travel reinforced the strict scrutiny standard of review. *Saenz*, 526 U.S. at 504-05 (stating that "neither mere rationality nor some intermediate standard of review should be used to judge the constitutionality of a state rule" that creates a classification that deters the right to travel). A legitimate interest is not necessarily a compelling one. *Id. at 507*. ("[T]he State's legitimate interest in saving money provides no justification....").

3966323_2

The First Circuit has recognized the requirement of a compelling-state-interest to justify abridgement of a citizen's right to travel. *Cole v. Hous. Auth. of Newport*, 435 F.2d 807, 810 (1st Cir. 1970) (explaining defendant could "successfully defend its residency requirement only by demonstrating that the requirement furthers a compelling state interest.") Because the Ordinance specifically intends to impede travel, and also deters individuals from interstate travel, the Town must show a compelling interest in its restriction.

### 2. The Town's interest in limiting congestion is not compelling.

Though a state may exercise its police powers to protect the public health, safety and morals, it may not do so in a way that "has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905). Thus, police powers may only restrain the fundamental rights of individuals in compelling circumstances. *Id.* at 29 ("[T]he rights of the individual in respect of his liberty may at times, under the pressure of *great dangers*, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand") (emphasis added). These "great dangers" have historically been limited to (1) natural disasters, such as disease requiring quarantines, (2) the protection of other fundamental rights, such as the right to vote, and (3) laws that affect

11

the right of convicted criminals to travel. *See, e.g., id.* at 28 (explaining States' ability "to prevent persons and animals suffering under contagious or infectious diseases, or convicts, from coming within its borders"). The Town is not experiencing "great dangers" of any kind. Cruise ship passengers are not convicts, and the Ordinance does not seek to protect a constitutional right. Nor does the Town claim it is protecting any interest of comparable importance. Consequently, the Ordinance should be struck down as an unconstitutional impediment to the right to travel.

Natural disasters can justify restrictions on the right to travel, though they do not give states carte blanche. For example, after recognizing the "constitutionally protected" right to travel, the Court in *Zemel v. Rusk* found that the freedom "does not mean that areas ravaged by flood, fire or pestilence cannot be quarantined when it can be demonstrated that unlimited travel to the area would directly and materially interfere with the safety and welfare of the area or the Nation as a whole." *Zemel v. Rusk*, 381 U.S. 1, 15–16 (1965). But as the court in *Bayley's Campground, Inc. v. Mills,* a recent COVID quarantine case, held, "a restriction that is inherently prejudicial to interstate traffic regardless of circumstance can only be condoned in the face of a dire hazard and, even then, tolerated only so long as the hazard is paramount." *Bayley's Campground, Inc. v. Mills*, 463 F. Supp. 3d 22, 33 (D. Me. 2020), *aff'd,* 985 F.3d 153 (1st Cir. 2021) (noting that "[a]ny other approach would not be a narrowly tailored exercise of the police power").

3966323_2

The recent pandemic presented a compelling justification for limiting travel. *See ,e.g., Bayley's Campground, Inc. v. Mills,* 985 F.3d 153, 159 (1st Cir. 2021) (upholding travel restriction because "protecting Maine's population from further spread of the COVID-19 virus and preventing Maine's health care system from being overwhelmed by those infected with it are compelling state interests")); *cf. Edwards,* 314 U.S. at 185 (Jackson, J., concurring) (the right to travel may be limited when citizens "endanger others by carrying contagion about"); *R.R. Co. v. Husen*, 95 U.S. 465, 472 (1877) (a state "may establish quarantine" but "may not interfere with transportation into or through the State, beyond what is absolutely necessary for its self-protection"). But there is no precedent for treating congestion and the inconvenience it brings like the real threat of contagious disease.

The Ordinance is much less like pandemic cases than it is like *Edwards,* in which California tried and failed to justify a ban on traveling with indigent people into the state by citing "problems of health, morals, and especially finance, the proportions of which are staggering." *Edwards*, 314 U.S. at 173. This case is even weaker than *Edwards:* the Town's public safety officials testified that cruise ship passengers pose no public safety problems. App. at 260-61, ¶¶ 229, 236. And the Fire Chief testified that the cruise ship visits did not unduly strain fire or EMS services. App. at 359-60, ¶¶ 226, 227.

3966323_2

The Court has also upheld laws requiring a certain period of residency before one can register to vote despite their infringement of the right to travel. Like the ability to restrict travel based on national security, however, restrictions on voting rights that deter travel are viewed as compelling only when they serve to protect the electoral process. *See, e.g., Marston v. Lewis,* 410 U.S. 679, 680 (1973) ("States have valid and sufficient interests in providing for some period of time—prior to an election—in order to prepare adequate voter records and protect its electoral processes from possible frauds"). But the right to travel is so important that even a state's attempt to protect voting rights and the electoral process is not guaranteed to meet the compelling state interest test. *Id.* (noting that voting residency requirements, which deter travel, were too long at "even three months"). Bar Harbor's Ordinance is unlike these cases, for it is not seeking to protect a fundamental right or a process, like the electoral system, that is critical to the functioning of our system of government.

Finally, the state can have a compelling justification for restricting the right to travel of people convicted of crimes. *See, e.g., Jones v. Helms*, 452 U.S. 412, 419 (1981) ("[d]espite the fundamental nature of this right [to interstate travel], there nonetheless are situations in which a State may prevent a citizen from leaving. Most obvious is the case in which a person has been convicted of a crime within a State"); *Pelland v. Rhode Island*, 317 F. Supp. 2d 86, 93 (D.R.I. 2004) ("[t]he compelling governmental interest

standard is used when the freedom to travel interstate is abridged as to those who have not committed crimes"). Such restrictions may be proper even when the person whose right to travel is infringed has not been convicted of a crime, but the safety of the nation is threatened. *Busic v. Transp. Sec. Admin.*, 62 F.4th 547, 550 (D.C. Cir. 2023) (finding No Fly List valid for "[t]he TSA's compelling interest in protecting national security outweigh[ed]" the defendants right to travel). Again, the inconvenience congestion may cause in Bar Harbor is hardly the kind of compelling interest that the state has in limiting the right to travel of persons convicted of crimes.

3966323_2

## CONCLUSION

For these reasons, and for the reasons set forth in the Appellants' briefs, the Court should reverse the lower court's decision and hold that the Ordinance, which impermissibly infringes on the right to travel, is unconstitutional.

Respectfully submitted,

John C. La Liberte (No. 115846)
PIONEER LEGAL, LLC
185 Devonshire St.
Boston, Mass. 02110
(617) 410-5200
john.laliberte@pioneerlegal.com

Theodore J. Folkman (No. 81828)
RUBIN AND RUDMAN, LLP
53 State Street
Boston, Mass. 02109
(617) 330-7000
tfolkman@rubinrudman.com

*Counsel to the Amicus Curiae*

3966323_2

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3,508 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Supra.

*/s/ Theodore J. Folkman*

Theodore J. Folkman
*Counsel to the Amicus Curiae*

Dated:       August 6, 2024

3966323_2

3966323_2

**FEDERAL MARITIME COMMISSION**

_____

**FACT FINDING INVESTIGATION NO. 30**

_____

**COVID-19 IMPACT ON CRUISE INDUSTRY**

_____

**INTERIM REPORT: ECONOMIC IMPACT OF COVID-19 ON THE CRUISE
INDUSTRY ON THE EAST COAST**

**August 2, 2021**

_____

# Table of Contents

I.    Executive Summary ................................................................................................ 3

II.   Fact Finding Method ............................................................................................. 4

III.  Observations ......................................................................................................... 6

   A.   Charleston ...................................................................................................... 6

   B.   Norfolk ........................................................................................................... 8

   C.   Baltimore ....................................................................................................... 9

   D.   Bayonne ........................................................................................................ 12

   E.   New York ...................................................................................................... 13

   F.   Boston ........................................................................................................... 16

   G.   Portland, Maine ........................................................................................... 19

   H.   Bar Harbor ................................................................................................... 20

IV.   Conclusion ........................................................................................................... 24

Add. 2

## I.  Executive Summary



Source: © OpenStreetMaps contributors,
https://www.openstreetmap.org/#map=5/38.543/-81.229 (Bar Harbor, Portland, Boston, New York/New Jersey, Baltimore, Norfolk, and Charleston added).

This is the last in a series of economic reports examining the fiscal impact of the cessation of cruise activity from the United States upon ports and port communities.  This report will examine those cruise ports along the U.S. eastern seaboard from Bar Harbor, Maine to Charleston, South Carolina.[1]

In April 2020, the Federal Maritime Commission (Commission) initiated a fact-finding investigation (Fact Finding 30 or FF30). The Order of Investigation[2] directed Commissioner Louis E. Sola to investigate and respond to the current challenges impacting the cruise industry and the U.S. ports that rely on it. Commissioner Sola, as the Fact-Finding Officer, has been engaging cruise industry stakeholders, including passenger vessel operators (PVOs), cruise passengers, and marine terminal operators, in public and non-public discussions to identify possible solutions to COVID-19-related issues that interfere with the operation of the cruise industry. Commissioner Sola also established consultative panels comprised of representatives from various port authorities, marine terminal operators, cruise lines, trade associations, consumer advocates, and the financial industry. The culmination of this process is a series of reports with each report dedicated to either a particular concern or to the ports of a designated region. As per the Commission's Fact Finding 30 Order, this report will focus on the economic impact of the inability of the cruise lines to sail. This report will not address such items as crew member repatriation or the environmental impact of the cessation of passenger vessel sailings; nor will it address the various health related issues which must be attended to prior to the resumption of travel.

On March 13, 2020, members of the Cruise Lines International Association (CLIA) announced a pause in the operations of its members to assess and address the risks posed by the COVID-19 pandemic. On March 14, 2020, the Centers for Disease Control and Prevention (CDC) issued a No Sail Order and Suspension of Further Embarkation applicable to PVOs whose vessels carry 250 or more individuals (passengers and crew) with an itinerary anticipating an overnight stay

---

[1] Florida is not included in this report as a separate report focused exclusively on Florida.
[2] Order of Investigation, Fact Finding Investigation No. 30, COVID-19 Impact on Cruise Industry (FMC April 30, 2020), https://www2.fmc.gov/readingroom/docs/FFno30/ffno30_ord.pdf/.

Add. 3

onboard or a 24 hour stay onboard for either passengers or crew.[3] Both voluntary suspension of operation by CLIA and cruise lines, and extensions of the CDC No Sail Order continued through most of 2020.[4] Although the CDC's No Sail Order was not extended at the end of October 2020, the CDC released on October 30, 2020 a Framework for Conditional Sailing Order. Since then, additional guidance has been issued by the CDC regarding steps needed before cruise lines might embark or disembark passengers and crew at any port under United States jurisdiction. These guidelines continue to be modified by the CDC based on public health considerations and as new information becomes available.[5] As of this writing, the CDC has authorized both simulated cruises and passenger cruises for several lines operating out of U.S. ports, and limited cruise operations are also taking place outside of North American waters. Some confusion currently exists due to various pending court actions. Nevertheless, as CDC authority and various State statutes are being litigated, more cruise lines are cautiously initiating operations. These operations are being monitored by the cruise lines and the CDC to determine the efficacy of the newly established safety protocols.

To understand the effect of these events on the regional economy, Commissioner Sola examined the fiscal impact of the cruise industry on regional economies and included those figures in this report. It should be noted that the dataset for this interim report was obtained and compiled prior to the recently initiated passenger cruise activity.


## II.  Fact Finding Method

**Meetings with Government, Port, and Industry Leaders**

Commissioner Sola communicated with port directors, government officials, cruise industry leaders, business executives, and labor leaders in the region examined in this report. The Commissioner appreciates all those who contributed their valuable insight to this review.

---

[3] The CDC's No Sail Order applies to vessels with a capacity to carry 250 passengers and crew anticipating to stay overnight or for over 24 hours. The Commission's requirements apply to vessels with berth/stateroom capacity to carry 50 or more passengers. So, there could be small PVOs the Commission regulates that are not subject to the CDC's No Sail Order (with vessels carrying more than 50 passengers but less than 250 passengers and crew).

[4] On April 9, 2020, the CDC extended the termination date of the order to July 24, 2020. On June 19, 2020, CLIA announced that the major cruise lines have agreed to voluntarily extend a suspension of operations out of U.S. ports until September 15, 2020. On July 16, 2020, the CDC extended the termination date of its order to September 30, 2020. On August 5, 2020, CLIA voluntarily extended its suspension of operations until October 31, 2020. (https://cruising.org/en/news-and-research/press-room/2020/august/clia-announces-third-voluntary-suspension-of-us-cruise-operations).  On September 30, the CDC extended again the order until October 31, 2020.

[5] "On May 5, 2021, CDC released the next two phases of the Framework for Conditional Sailing Order (CSO) for cruise ships operating or seeking to operate in U.S. waters. CDC published technical instructions for cruise ship operators preparing to conduct simulated ("trial") voyages in advance of restricted passenger voyages under a COVID-19 Conditional Sailing Certificate.", Centers for Disease Control and Prevention, CDC COVID-19 Orders for Cruise Ships (May 5, 2021), https://www.cdc.gov/quarantine/cruise/covid19-cruiseships.html (last visited May 17, 2021).

**Open-Source Information**

A variety of open-source information is used in this report. These include annual reports by ports and studies by various research firms.[6] Port websites, industry association websites, industry-related magazines and news sources were also considered.

**Individual Port Analysis**

This report presents brief observations related to individual cruise ports in the region examined and attempts to provide a consistent format for each individual port review. Due to the unique nature of each port and the variety of source material available from one port to another, each segment will vary to some degree.

**Terminology**

This report discusses direct, indirect, and induced impact as found in various documents, especially in job and wage numbers. In general, these terms can be defined as follows:

> ***Direct jobs*** are those that would not exist if activity at the Port's cargo and cruise facilities were to cease… Direct employees created by the cruise operations include the jobs with the firms providing the direct vessel services – chandlers, pilots, longshoremen, line handlers, local advertising firms, caterers, liquor wholesalers, linen companies, security firms, waste disposal firms, parking, local transportation -- as well as the firms providing services to the passengers on the vessels.[7]

> ***Indirect jobs*** are created throughout the state as the result of purchases for goods and services by the firms directly impacted by the port activity, including the tenants, terminal operators and the firms providing services to cargo – which includes…cruise passenger operations.[8]

> ***Induced jobs*** are jobs created in the state by the purchases of goods and services by those individuals directly employed by each of the lines of business at each port…The induced jobs are jobs with grocery stores, restaurants, health care providers, retail stores, local housing/construction industry, and transportation services, as well as with wholesalers providing the goods to the retailers.[9]

---

[6] More information on methodology used for the studies can be found in the studies, provided in footnotes or text.
[7] Florida Seaport Transportation and Economic Development Council, The Statewide Economic Impacts of Florida Seaports (Dec. 2016) at 2, http://scdn.flaports.org/wp-content/uploads/EconomicImpactsofFloridaSeaports.pdf (last visited Aug. 17, 2020).
[8] *Id. at 3.*
[9] *Id. at 3.*

## III.  Observations

Leading up to the cessation of cruise activity due to the pandemic, several cruise ports had a slight decrease in cruise embarkations and/or visitors in 2019 compared to 2018 (New York, New Jersey, Baltimore). Others saw cruise passengers slightly increase (Charleston, Boston).

According to Cruise Lines International Association (CLIA)'s report, *The Economic Contribution of the International Cruise Industry in the United States in 2019* (2019 Cruise Industry Economic Report),[10] 6.5% of U.S. cruise embarkations are out of New York or New Jersey.

Ports will be discussed from south to north.

### A.  Charleston

Charleston is within 5.5 hours and 350 driving miles of 33 major metropolitan areas.[11] The cruise terminal in Charleston is part of the South Carolina Ports Authority (SCPA). According to the port's website,[12] Charleston is both homeport and an in-transit port. Cruise ships sail to the Bahamas, Bermuda, and the Caribbean. Several major cruise lines have had ships stop in Charleston. One major cruise line has a ship homeported in Charleston.[13]

During FY 2020,[14] Charleston had almost 217,700 cruise visitors.[15] This was a 2.2% increase from the previous year, despite no cruises during the last several months of the fiscal year due to the pandemic.[16]

> The state of South Carolina has proposed a new cruise terminal that will better accommodate cruise ships. The current terminal, which opened in the 70s, was designed for the smaller cruise ships of that era.[17]

---

[10] Cruise Lines International Association, The Economic Contribution of the International Cruise Industry in the United States in 2019 (Nov. 2020), https://cruising.org/-/media/research-updates/research/2019-usa-cruise-eis.ashx (last visited Feb. 6, 2021).

[11] South Carolina Ports, Cruise Operators, http://scspa.com/cruise-operators/ (last visited Feb. 7, 2021).

[12] *Id.*

[13] Maritime Executive, Charleston Progress on New Container Terminal; Cruise Project Stalled (Aug. 13, 2020), https://www.maritime-executive.com/article/charleston-progress-on-new-container-terminal-cruise-project-stalled (last visited Feb. 7, 2021).

[14] Fiscal year runs from July to June. South Carolina Ports, SC Ports remains resilient at start of FY21 (Jul. 15, 2020), http://scspa.com/news/sc-ports-remains-resilient-at-start-of-fy21/ (last visited Feb. 7, 2021).

[15] South Carolina Ports, 2020 Annual Report, https://scspa.com/about/publications/2020-annual-report/ (last visited Feb. 7, 2021).

[16] South Carolina Ports, SC Ports remains resilient at start of FY21 (Jul. 15, 2020), http://scspa.com/news/sc-ports-remains-resilient-at-start-of-fy21/ (last visited Feb. 7, 2021).

[17] Maritime Executive, Charleston Progress on New Container Terminal; Cruise Project Stalled (Aug. 13, 2020), https://www.maritime-executive.com/article/charleston-progress-on-new-container-terminal-cruise-project-stalled (last visited Feb. 7, 2021).

**Direct economic impact**

According to the Charleston Regional Development Alliance,[18] in 2010, when 53 homeport ship calls and 16 in-transit ship calls were scheduled, the cruise industry at the Port of Charleston was responsible for the infusion of $37 million into the region. The cruise industry was also responsible for 407 jobs, $16.2 million in salaries and wages, and $3.5 million in state sales and income taxes. Top sectors benefiting from the cruise industry included restaurants, hotels, transportation, and the retail and wholesale trades. The 2010 study further noted that half of all passengers who left the ship took organized excursions/tours, while the other half explored on their own and that two-thirds of all cruise passengers "actively contribute[d] to the local economy." [19]

**Indirect economic impact**



International Cruise Industry Economic Impact on the State of South Carolina

■ Manufacturing - $36.7 million
■ Wholesale & Retail Trade - $6.3 million
■ Transportation - $63.7 million
■ Finance, Insurance, Real Estate, & Leasing - $6.8 million
■ Services & Government - $64.8 million

The international cruise industry's economic impact to the economy in South Carolina extends beyond vessel maintenance, staff wages, and ticket sales. The 2019 Cruise Industry Economic Report estimated that in 2019, the international cruise industry brought in an estimated $178 million in direct purchases, 3,474 jobs, and $142 million in personal income. A breakdown of the economic impact can be seen on the chart to the left.

**Current status**

As of June 2021, no cruise ships have been docked at the SCPA since April 2020, nor are there plans for any cruise ships to stop for logistical purposes.[20]

---

[18] Charleston Regional Development Alliance, South Carolina Ports Authority News Release: Cruises Float $37 Million to Charleston Area Economy (Feb. 1, 2010), https://www.crda.org/news/local_news/cruises-float-37-million-to-charleston-area-economy/ (last visited Feb. 7, 2021).
[19] *Id.*
[20] Email from Manager, Cruise and Tariffs, South Carolina Ports Authority, email to FF30 (June 10, 2021).

7

**Preparing for reopening**

The SCPA is preparing for cruises in the future:

> The SCPA has partnered with a local janitorial and disinfecting vendor to service all SCPA buildings as needed. The SCPA has purchased PPE (gloves and masks) for its employees working with and around cruise passengers. Additional cleaning and contamination mitigation supplies have also been purchased. The SCPA has created a detailed disinfecting plan as well for its cruise related and occupied facilities. The SCPA is actively taking input from its contracted cruise operator and local health officials to begin drafting the CDC mandated Cruise Ship Operator's Agreement. This agreement is between the Port, Cruise Operator (cruise line), and local health officials and is required under the CDC's Framework for Conditional Sailing Order.[21]

## B. Norfolk

The Peter G. Decker Jr. Half Moone Cruise Terminal, part of the Nauticus Campus, is owned by the city of Norfolk.[22] In general, the Nauticus Foundation, a non-profit organization, operates the campus, with the city retaining functions not delegated to the Nauticus.[23] The terminal is often rented out for special events, with proceeds going to Nauticus.[24]

Multiple cruise lines have sailed from/to Norfolk. It is both homeport and an in-transit port.[25]

No cruises are currently scheduled for 2021 out of Norfolk, but as of February 2021, from May to October 2022, eleven cruises are scheduled to travel to the Bahamas, Bermuda, or the Caribbean, from four to eight days each.[26] All anticipated excursions are with the same cruise line.[27] The port has also had cruises to nowhere, short cruises out into the ocean and back without stopping at any other ports.[28]

---

[21] Email from Manager, Cruise and Tariffs, South Carolina Ports Authority, email to FF30 (June 10, 2021).
[22] City of Norfolk, Recommendation to City of Norfolk Council (May 14, 2019), https://www.norfolk.gov/DocumentCenter/View/55506/R-06-Agreement-between-the-City-of-Norfolk-and-Nauticus-Foundation (last visited Feb. 7. 2021).
[23] *Id.*
[24] *Id.*
[25] Norfolk Visitor, Cruise Lines out of Norfolk VA, https://www.norfolkvisitor.com/norfolkcruises/ (last visited Feb. 7, 2021).
[26] Norfolk Visitor, Cruises from Norfolk VA, https://www.norfolkvisitor.com/cruisesfromnorfolkva.html (last visited Feb. 7, 2021).
[27] *Id.*
[28] Norfolk Visitor, Norfolk Cruise Destinations, https://www.norfolkvisitor.com/destinations.html (last visited Feb. 7, 2021).

> According to a Press Release by Nauticus (Nauticus Press Release),[29] in February 2020, a major cruise line signed an agreement to have cruises sail out of Norfolk through 2025. A ship with capacity for over 4,000 cruise passengers was supposed to begin sailing out of Norfolk in 2021 with twelve sailings that year.

**Direct economic impact**

The agreement with a major cruise line for 2021-2025 comes with improvement costs to the city. The revenue brought in, however, from the cruise terminal is anticipated to produce a net increase of $960,000 in revenue for the city.[30]

With the commitment by a major cruise line and larger ship sailing out of Norfolk, an estimated $12.5 million in spending and economic impact had been expected in 2021, per the Nauticus Press Release.

**Indirect economic impact**

The international cruise industry has a noticeable economic impact on the commonwealth of Virginia. According to the 2019 Cruise Industry Economic Report, in 2019 the international cruise industry was responsible for $262 million in direct purchases, 3,812 jobs, and $231 million in wages.

### C. Baltimore

The Helen Delich Bentley Port of Baltimore (Port of Baltimore) is primarily a cargo port. The Cruise Maryland Terminal at the Port of Baltimore is part of the Maryland Port Administration.[31]

The Port of Baltimore has been primarily a homeport but also a port of call. According to the Maryland Port Administration's 2017 Economic Impact of the Port of Baltimore in Maryland (2017 Baltimore Economic Impact Report),[32] the port had 86 homeport ship calls and 10 in-transit ship calls. Cruises sailing out of Baltimore sail to a variety of places, including Canada,

---

[29] Press Release, Nauticus, Carnival Cruise Line Makes Five-Year Commitment to Norfolk (Feb. 20, 2020), https://nauticus.org/2020/02/20/carnival-cruise-line-makes-five-year-commitment-to-norfolk/ (last visited Feb. 7, 2021).

[30] City of Norfolk, Recommendation to City of Norfolk Council (Feb. 25, 2020), https://www.norfolk.gov/DocumentCenter/View/59375/R-7-Cruise-Ship-Operating-Agreement (last visited Feb. 7, 2021).

[31] Maryland Port Administration, The 2017 Economic Impact of the Port of Baltimore in Maryland (Oct. 15, 2018), https://mpa.maryland.gov/Documents/EconommicimpactofPOBMaryland2017_101518.pdf (last visited Feb. 6, 2021).

[32] *Id.*

Bermuda, the Bahamas, and the Caribbean.[33] In 2019, the two homeported ships had 94 ship calls scheduled.[34]

Most cruise visitors embark on their cruise in Baltimore, although the port does receive some in-transit cruise visitors as well. In 2017, the port had 195,743 embarking cruise visitors and an additional 14,879 in-transit cruise visitors, according to the 2017 Baltimore Economic Impact Report. More recently, the 2019 Cruise Industry Economic Report estimated that in 2019, the port had 215,600 embarking cruise visitors, higher than the 2017 numbers, but a slight decline from 2018. As shown on the chart below, there has been little fluctuation over the past decade.[35]



The cruise terminal at the Port of Baltimore is primarily a drive-to port. According to the Port of Baltimore's 2014 Economic Impact of the Port of Baltimore (2014 Port of Baltimore Report),[36], almost a quarter of cruise visitors were from Maryland. Of the cruise visitors from outside Maryland, 88% arrived by personal car, 6% by air, 4% by motorcoach, 1% by rail, and less than 1% by limousine.

**Direct economic impact**

The local area benefits from the cruise industry at the port. Per the 2014 Port of Baltimore Report, the two main industries that benefit from the cruise industry at the Port of Baltimore are the maritime services sector and the visitor industry sector. The maritime services sector includes harbor pilots, stevedoring services, and parking for cruise visitors as well as local retailers and wholesalers who provide food, beverages, and supplies to the ship. Hotels, restaurants, bars, retail, and entertainment establishments are considered to be part of the visitor industry sector. Baltimore cruise ships stopping in Florida often get their supplies there availing themselves of a well-established, more cost-effective supply chain system servicing those ports. Cruise ships not stopping in Florida generally receive supplies from the New York cruise ship supply chain.

---

[33] Port of Baltimore, The 2014 Economic Impact of the Port of Baltimore (Oct. 6, 2015), https://mpa.maryland.gov/Documents/EconomicImpactOct15.pdf (last visited Feb. 6, 2021).
[34] Cruise Maryland, 2019 Schedule, https://cruise.maryland.gov/Documents/Cruise2019.pdf (last visited Feb. 7, 2021).
[35] Cruise Lines International Association, Contribution of the International Cruise Industry to the U.S. Economy in 2018 (Nov. 2019), https://cruising.org/-/media/research-updates/research/contribution-of-the-international-cruise-industry-to-the-us-economy-2018.ashx (last visited Feb. 7, 2021).
[36] Port of Baltimore, The 2014 Economic Impact of the Port of Baltimore (Oct. 6, 2015), https://mpa.maryland.gov/Documents/EconomicImpactOct15.pdf (last visited Feb. 6, 2021).

> Each ship call brings in an estimated $500,000-$550,000 in services including bunkering, wharfage and dockage, water, trash removal, security, pilotage, and stevedoring.[37]

Cruise visitor spending contributes to the regional economy. According to the 2014 Port of Baltimore Report, cruise visitors spent an average of $22 in Baltimore, not including parking. Just over a third of cruise visitors, or 34%, spent the night in Baltimore before their cruise, most at a hotel or motel (90%). Cruise visitors staying overnight in Baltimore spent an average of $64.

Crew members also spend in port. The 2014 Port of Baltimore Report estimated that in 2014, approximately 72% of crew members disembarked in Baltimore, and each crew member spent around $106 per call. They visit retailers and buy items such as electronics, clothes, food, and beverages.

The cruise industry brings in hundreds of jobs and millions in wages and business revenue to the area. According to the 2017 Baltimore Economic Impact Report, an estimated 209 jobs were directly related to the cruise industry at the Port of Baltimore. The cruise industry at the port also accounts for $62.2 million in business revenue, $5 million in local purchases, $2.8 million in state and local taxes, and $8 million in direct personal income.

**Indirect and induced economic impact**

In addition to observations related to direct jobs and income the 2017 Baltimore Economic Impact Report noted that the cruise industry contributed 88 induced jobs and 81 indirect jobs, to the port community. The cruise industry at the port also created $2.7 million in indirect personal income and $6.3 million in induced personal income. When adding the $8 million in income from direct jobs, the cruise industry at the port generated a total of $17 million in personal income.



**Jobs from the Cruise Industry at the Port of Baltimore (2017)**

378 Jobs from the Cruise Industry at the Port of Baltimore

■ Direct Jobs  ■ Indirect Jobs
■ Induced Jobs

**Personal Income from the Cruise Industry at the Port of Baltimore (2017) (in millions)**

$17 Million in Personal Income from the Cruise Industry at the Port of Baltimore

■ Re-Spending/Local Consumption Personal Income
■ Indirect Personal Income
■ Direct Personal Income

---

[37] *Id.*

The international cruise industry provides further economic impact to the state of Maryland as a whole (not just from the Port of Baltimore). In 2019, an estimated $242 million in direct purchases, 3,890 jobs, and $223 million in wages could be attributed to the international cruise industry, per the 2019 Cruise Industry Economic Report.

Preparations for the eventual return of cruising out of Baltimore include plexiglass partitions, distancing signage, and hand sanitizer stations.[38]

As of November 2020, William P. Doyle, the Executive Director of the Maryland Port Administration, expected the cruise industry to open up elsewhere, specifically Florida, before cruises resume at other ports.[39]

### D. Bayonne

The Cape Liberty Cruise Port (Cape Liberty), in Bayonne, New Jersey is controlled by the Port Authority of New York and New Jersey.[40] It is managed and operated by the Cape Liberty Cruise Port LLC,[41] and is a homeport for ships from several major cruise lines.[42]

Ships sailing from Cape Liberty travel to a variety of destinations. According to the 2019 Cruise Industry Economic Report, ships are generally sailing to Canada, Bermuda, the Bahamas, and the Caribbean. Cruises to Canada and Bermuda are seasonal, and cruises to the Bahamas and Caribbean are year-round.

Cape Liberty has a sizeable number of cruise visitors each year, both embarking and in-transit. The 2019 Cruise Industry Economic Report states that in 2019, New Jersey had 348,000 cruise embarkations, a slight decrease from 2018. This was 2.5% of all passenger embarkations in the U.S. Including in-transit cruise visitors and crew, 533,000 cruise visitors and crew members arrived in New Jersey in 2019.

**Direct economic impact**

Crew and passenger spending brings in millions of dollars to the local economy each year. The 2019 Cruise Industry Economic Report estimates that cruise visitors and crew from ships docked at Cape Liberty spend an average of $58 per visit, totaling $25.1 million in New Jersey during 2019.

---

[38] McKenna Oxenden, Baltimore Sun, Carnival cruises won't return to Baltimore until at least March as coronavirus cases continue to rise (Nov. 18, 2020), https://www.baltimoresun.com/coronavirus/bs-md-ci-cruise-ships-to-return-to-baltimore-20201102-dxomdxuhprddxhjzrlhmaxlwey-story.html (last visited Feb. 7, 2021).
[39] *Id.*
[40] Port of New York and New Jersey, Cruise Terminals, https://www.panynj.gov/port/en/our-port/cruise-terminals.html (last visited Feb. 6, 2021).
[41] *Id.*
[42] Cruise Lines International Association, The Economic Contribution of the International Cruise Industry in the United States in 2019 (Nov. 2020), https://cruising.org/-/media/research-updates/research/2019-usa-cruise-eis.ashx (last visited Feb. 6, 2021).



**International Cruise Industry Economic Impact on the State of New Jersey**

- ■ Manufacturing - $75.8 million
- ■ Wholesale & Retail Trade - $17.1 million
- ■ Transportation - $144.9 million
- ■ Information Services - $12.8 million
- ■ Finance, Insurance, Real Estate, & Leasing - $31.9 million
- ■ Services & Government - $242.8 million
- ■ Agriculture, Mining, Utilities, & Construction - $0.1 million

**Indirect economic impact**

In addition to direct spending by cruise visitors and crew, the cruise industry as a whole provides a greater overall economic impact for New Jersey. Per the 2019 Cruise Industry Economic Report, the international cruise industry provides for an estimated $526 million in direct purchases, over 9,600 jobs, and $581 million in wages in New Jersey. Around 58% of the direct expenditures, or $302 million, was for tourism-related businesses. Other industries that benefited from the international cruise industry include petroleum refiners and distributors within the manufacturing sector, advertising agencies, insurance companies, consulting firms, and computer service companies. A breakdown of industry sectors can be seen on the chart to the left.

### E. New York

New York City has two cruise terminals, the Manhattan Cruise Terminal and the Brooklyn Cruise Terminal. The Manhattan Cruise Terminal is managed by the New York City Economic Development Corporation (NYCEDC), and the Brooklyn Cruise Terminal is controlled by the Port Authority of New York and New Jersey.[43] Ports America, Inc. is contracted to operate both cruise terminals through 2029.[44]

> Cruises sail to a variety of places from New York, including New England, Canada, Bermuda, Europe, the Bahamas, and the Caribbean.

---

[43] Port of New York and New Jersey, Cruise Terminals, https://www.panynj.gov/port/en/our-port/cruise-terminals.html (last visited Feb. 6, 2021).

[44] Press Release, New York Economic Development Corporation, NYCEDC Announces Single Operator and $38.5M in Capital Improvements for Manhattan and Brooklyn Cruise Terminals (May 26, 2017), https://edc.nyc/press-release/nycedc-announces-single-operator-and-385-million-capital-improvements-manhattan-and-0 (last visited Feb. 5, 2021).

New York is a homeport for several ships. According to the 2019 Cruise Industry Economic Report, New York had 550,000 cruise embarkations and 843,000 passenger and crew arrivals. Cruise embarkation slightly declined in 2019 from 2018. Passenger embarkations in New York represent 4% of all embarkations in the U.S. That year, 84% of cruise visitors went through the Manhattan Cruise Terminal, and 16% went through the Brooklyn Cruise Terminal.

The New York City Economic Development Corporation explains in the 2017 NYCruise Economic Impact Study (New York Economic Report)[45] that over three-quarters of cruise passengers that sail out of or through New York City are not from the local area. Only 23% of cruise passengers are residents of New York, New Jersey, or Connecticut.

**Direct economic impact**

The cruise industry at the Brooklyn cruise terminal alone is responsible for over 1,000 jobs, including in the maritime, security, retail, and hospitality sectors.[46]

Passenger and crew spending contributed to the local economy. Per the New York Economic Report, in 2017, crew and passenger spending totaled around $171.1 million. Of this, most was from passengers embarking on their cruise in New York City. An additional $6.2 million was spent by transit passengers, and $17.3 million by crew members. Spending breakdowns of passengers and crew can be seen on the charts below. The 2019 Cruise Industry Economic Report estimates that average onshore spending per cruise visitor in 2019 was $234.



---

[45] New York City Economic Development Corporation, 2017 NYCruise Economic Impact Study, https://www.nycruise.com/wp-content/uploads/2018/03/2017-NYCruise-EconStudy.pdf (last visited Feb. 2, 2021).
[46] Press Release, New York Economic Development Corporation, NYCEDC and Borough President Adams Tour Brooklyn Cruise Terminal to Celebrate New Investments, Modernization (Oct. 27, 2017), https://edc.nyc/press-release/nycedc-and-borough-president-adams-tour-brooklyn-cruise-terminal-celebrate-new (last visited Feb. 6, 2021).

Add. 14



Crew Spending - 2017

- Food & Beverages at Restaurants & Bars - $3.3 million
- Taxis/Ground Transportation - $0.8 million
- Watches & Jewelry - $0.5 million
- Clothing - $3.7 million
- Entertainment/Night Clubs/Casinos - $0.5 million
- Museums - $0.2 million
- Tours - $0.3 million
- Other Purchases - $7.8 million

Cruise visitors staying overnight in the area contribute to the local economy. According to the New York Economic Report, half of cruise visitors stayed overnight before and/or after their cruise. Of those, more than half stayed more than one night: 40% stayed one night, 20% stayed two nights, 20% stayed three nights, 11% stayed four nights, and 9% stayed five nights. Cruise visitors staying overnight spent an average of $547. The $547 includes $304 on lodging and $75 on food and beverages.

**Indirect economic impact**

The New York Economic Report estimates that in 2017, the total economic impact of the cruise industry in New York City was $228 million.

The international cruise industry continues to increase its economic impact on the State of New York. Per the 2019 Cruise Industry Economic Report, the international cruise industry resulted in an estimated $1.3 billion in direct purchases, over 17,000 jobs, and almost $1.2 billion in wages. Only three states have a larger economic impact from the international cruise industry than New York.[47]

---

[47] Three states with a larger economic impact are Florida, California, and Texas.

Add. 15



**International Cruise Industry Economic Impact on the State of New York**

- ■ Agriculture, Mining, Utilities, & Construction - $1.2 million
- ■ Manufacturing - $146.5 million
- ■ Wholesale & Retail Trade - $36.3 million
- ■ Transportation - $159.6 million
- ■ Information Services - $3.8 million
- ■ Finance, Insurance, Real Estate, & Leasing - $274.4 million
- ■ Services & Government - $687.4 million

The 2019 Cruise Industry Economic Report estimates that of the $1.3 billion in direct purchases, around $507 million went to tourism-related businesses. Other types of businesses that benefited from the international cruise industry include petroleum refiners and distributors, advertising agencies, financial services, law firms, software consulting, and security equipment. A breakdown of industry sectors can be seen on the chart to the left.

## F.   Boston

The Flynn Cruiseport Boston is owned and operated by the Massachusetts Port Authority.[48] The Massachusetts Port Authority is an independent public authority that also includes a cargo terminal and the airports.[49]

Sailings from the Flynn Cruiseport Boston are seasonal, from March through November.[50] The port has homeport ship calls and in-transit ship calls.[51] Ships homeported in Boston sail to Bermuda, Canada, and New England.[52]

The most commonly used method of transportation to the port depends on the type of cruise. About 70% of cruise visitors on New England/Canada cruises arrive via air, but 95% of cruise visitors taking a Bermuda cruise or repositioning cruises to Mexico or Florida live within a 5-hour drive of Boston.[53]

---

[48] Massachusetts Port Authority, Flynn Cruiseport Boston FACT SHEET, http://www.massport.com/media/c11hsdgi/cruiseport-boston-profile-sheet-2020-with-pictures-update-6220.pdf (last visited Feb. 7, 2021).
[49] Commonwealth of Massachusetts, Overview of the Massachusetts Port Authority (Jul. 19, 2018), https://www.mass.gov/info-details/overview-of-the-massachusetts-port-authority (last visited Feb. 7, 2021).
[50] Massachusetts Port Authority, Flynn Cruiseport Boston FACT SHEET, http://www.massport.com/media/c11hsdgi/cruiseport-boston-profile-sheet-2020-with-pictures-update-6220.pdf (last visited Feb. 7, 2021).
[51] Massachusetts Port Authority, Economic Impact of the Port of Boston (Jun. 3, 2019), https://www.massport.com/media/3213/massport_final_report_6-03-2019-report-final.pdf (last visited Feb. 7, 2021).
[52] Massachusetts Port Authority, Flynn Cruiseport Boston FACT SHEET, http://www.massport.com/media/c11hsdgi/cruiseport-boston-profile-sheet-2020-with-pictures-update-6220.pdf (last visited Feb. 7, 2021).
[53] *Id.*

16

According to the Massachusetts Port Authority's Economic Impact of the Port of Boston report (Boston Economic Impact Report),[54] in 2018, Boston had 151 ship calls. Sixty-four of these were homeport ship calls, and 87 were in-transit ship calls. That year, the port had 390,000 cruise visitors. In 2019, ship calls declined but cruise passengers increased. In 2019, Boston had 138 ship calls but 402,346 cruise visitors.[55] About 115,000 of the cruise visitors in 2019 embarked on their cruise in Boston.[56]

**Direct economic impact**

Many types of businesses benefit from the cruise industry in Boston. Per the Boston Economic Impact Report, the two primary sectors that benefit from the cruise industry in Boston are the maritime service sector and the visitor industry sector. The maritime service sector includes retailers and wholesalers who provide food, beverages, and flowers to the ships; transportation bringing supplies to the ship; towing services, pilot services, stevedoring services, line-handling services, parking, security services, linen and waste removal; and maintenance and repair services. The visitor industry sector includes hotels and motels, restaurants and bars, retail, and entertainment establishments.

The cruise industry in Boston is responsible for 1,102 direct jobs in the area, $34 million in direct personal income, over $94 million in business revenue, over $36 million in local purchases, $11 million in state and local taxes, and almost $30 million in federal taxes annually, according to the Boston Economic Impact Report.

---

[54] Massachusetts Port Authority, Economic Impact of the Port of Boston (Jun. 3, 2019), https://www.massport.com/media/3213/massport_final_report_6-03-2019-report-final.pdf (last visited Feb. 7, 2021).
[55] Massachusetts Port Authority, Flynn Cruiseport Boston FACT SHEET, http://www.massport.com/media/c11hsdgi/cruiseport-boston-profile-sheet-2020-with-pictures-update-6220.pdf (last visited Feb. 7, 2021).
[56] Cruise Lines International Association, The Economic Contribution of the International Cruise Industry in the United States in 2019 (Nov. 2020), https://cruising.org/-/media/research-updates/research/2019-usa-cruise-eis.ashx (last visited Feb. 6, 2021).

**Indirect economic impact**

The Boston Economic Impact Report estimated that in addition to the direct jobs, the cruise industry at Boston also generated an additional 596 indirect jobs and 490 induced jobs, totaling 2,187 jobs. In addition to the $34 million in direct personal income, there was almost $41 million in indirect personal income and almost $41 million in re-spending/consumption personal income, totaling $116 million in personal income.





Expanding the economic impact of the cruise industry beyond the port in Boston, the 2019 Cruise Industry Economic Report stated that the international cruise industry was responsible for $388 million in direct purchases, 4,830 jobs, and $427 million in personal income in Massachusetts.

**Current status**

In November 2020, the Massachusetts Port Authority announced it would be laying off 25% of its workforce due to financial difficulties resulting from the pandemic.[57]

---

[57] Boston 25 News, Massport implementing new financial plan, cutting workforce (Nov. 19, 2020), https://www.boston25news.com/news/massport-implementing-new-financial-plan-cutting-workforce/J6AHNDVJP5AU7JHPJCJ5ORXXD4/ (last visited Feb. 7, 2021).

Add. 18

### G.  Portland, Maine

The cruise terminal in Portland, Maine, is part of the city and is operated by the city's Public Buildings & Waterfront Department.[58]

Portland is a seasonal cruise port. In 2019, it had ship calls from May to November.[59]
In 2019, Portland had 107 ship calls, with ships of all sizes ranging from 58 passengers to 4,716 passengers.[60]

It is primarily an in-transit port, but one small-ship cruise line uses Portland as a homeport.[61]



According to Maine.Portcall.com,[62] as of February 2021, 113 ship calls are scheduled from May to November. All ship calls from May to July are small ships having between 96 and 210 passengers. Forty-six ship calls from August to November hold over 2,000 guests for each ship.

**Direct economic impact**

The most recent study of the economic impact of the cruise industry in Portland examined the industry in 2008. According to that report, the Economic Impact of Cruise Ship Passengers in Portland, Maine,[63] in 2008, cruise visitors spent an average of $109.68 in port, which included expenditures on ship-sponsored tours. Not including ship-sponsored tours, cruise visitors spent an average of $80.51 in port, and a breakdown of that spending can be seen on the chart to the left. That year Portland had almost 48,000

[58] City of Portland, Maine, Municipal Budget (Jul. 1, 2019 - Jun. 30, 2020), http://www.portlandmaine.gov/ArchiveCenter/ViewFile/Item/1054 (last visited Feb. 10, 2021).
[59] Port of Portland, Maine, 2019 Berthing Schedule, http://www.portlandmaine.gov/DocumentCenter/View/27427/2019-Cruise-Schedule (last visited Feb. 8, 2021).
[60] *Id.*
[61] City of Portland, Home Porting, http://www.portlandmaine.gov/2056/Home-Porting (last visited Feb. 8, 2021).
[62] Maine.Portcall.Com, Portland, https://maine.portcall.com/#!?tab=2&port=Portland (last visited Feb. 10, 2021).
[63] Todd Gabe and James McConnon, University of Maine, Economic Impact of Cruise Ship Passengers in Portland, Maine (Jul. 2009), https://mpra.ub.uni-muenchen.de/65918/1/MPRA_paper_65918.pdf (last visited Feb. 8, 2021).

cruise visitors with an estimated the economic impact of passenger spending, including multiplier effects, between $5.8 and $8 million. This supported somewhere between 69 and 96 jobs and provided $2 million to $3.2 million in wages.

The cruise industry provides approximately a third of the work for the longshoremen in Portland.[64]

> The local area benefits from providing some provisions to cruise ships. Though they primarily only do provisioning for smaller cruise ships, the area is also capable of providing lobster and produce from local farms to larger ships.[65]

The increase in passengers between FY 2019 and FY 2020 resulted in the city's Waterfront Maintenance division revenues growing by 3.7%.[66]

**Preparing for reopening**

Due to the continued closure of Canadian ports to cruise traffic, it seems unlikely cruise ships will be visiting Portland, Maine in 2021.

## H. Bar Harbor

Cruise ships arriving in Bar Harbor generally anchor offshore and tender passengers to Town Pier. Town Pier is owned and operated by the municipality.[67]

Bar Harbor is a popular tourist destination, however, very few of the total visitors arrive via cruise ship. About 4% of visitors to Bar Harbor are cruise visitors.[68] According to the Economic Impact of Cruise Ship Passengers Visiting Bar Harbor (Maine) (Bar Harbor Passenger Report),[69] almost all cruise visitors are from outside Maine, and most come from outside New England.

---

[64] Jenny Ibsen, The Portland Phoenix, On the waterfront: Coronavirus costs Portland cruise ships, but containers keep coming (May 6, 2020), https://portlandphoenix.me/on-the-waterfront-coronavirus-costs-portland-cruise-ship-business-but-containers-keep-coming/ (last visited Feb. 8, 2021).

[65] City of Portland, Provisions, http://www.portlandmaine.gov/2055/Provisions (last visited Feb. 8, 2021).

[66] City of Portland, Maine, Municipal Budget (Jul. 1, 2019 - Jun. 30, 2020), http://www.portlandmaine.gov/ArchiveCenter/ViewFile/Item/1054 (last visited Feb. 10, 2021).

[67] Bar Harbor, Maine, The Waterfront, https://www.barharbormaine.gov/395/The-Waterfront (last visited Feb. 15, 2021).

[68] Bar Harbor Cruise Ship Committee, Meeting Minutes (Dec. 16, 2020), https://www.barharbormaine.gov/AgendaCenter/ViewFile/Minutes/_12162020-2625 (last visited Feb. 15, 2021).

[69] Todd Gabe, Dominic Gayton, Patrick Robinson, James McConnon and Sean Larkin, University of Maine, School of Economics Staff Paper #629, Economic Impact of Cruise Ship Passengers Visiting Bar Harbor (Maine) in 2016 (Feb. 2017), https://www.barharbormaine.gov/DocumentCenter/View/2162/Bar-Harbor-Cruise-Ship-Report-FINAL-Feb-2017-2-002?bidId= (last visited Feb. 11, 2021).

Per the Bar Harbor Passenger Report, in 2016, Bar Harbor had around 138,285 cruise visitors and 117 ship calls. The majority of ship calls occurred in September and October. In March 2020, prior to the onset of the pandemic, there were 198 ship calls scheduled for that year.[70]

If cruising resumes in 2021, ships are scheduled to stop in Bar Harbor. As of January 2021, only small ship calls are scheduled before the end of August.[71] As of February 2021, according to Maine.Portcall.com,[72] 120 ship calls are scheduled in 2021 from May to November, ranging in size from 100 to 3,963 guests for each ship.

Thanks to advanced bookings, 2022 has 145 ship calls scheduled, 2023 has 87 scheduled, 2024 has 41 scheduled, and 2025 and 2026 each already has 25 ship calls scheduled.[73]

**Direct economic impact**

Funds the town brings in from cruise ships go towards services and projects enhancing safety, efficiency of services, and cruise visitor experience, such as pier improvements and preserving the waterfront's natural beauty.[74]

Cruise visitors take part in a variety of activities. According to the Bar Harbor Passenger Report, in 2016, more than 96% of cruise visitors visited at least one store, restaurant, or bar. Around 93% of cruise visitors spent money in at least one shop, restaurant, or bar, and about 14% of cruise visitors spent money in five or more shops, restaurants, or bars. Of those who took a ship-sponsored excursion, around 86% also shopped and 72% dined in Bar Harbor. Around 60% of cruise visitors visited Acadia National Park.

---

[70] Bar Harbor Cruise Ship Committee, Meeting Minutes (Mar. 12, 2020), https://www.barharbormaine.gov/AgendaCenter/ViewFile/Minutes/_03122020-2486 (last visited Feb. 15, 2021).
[71] Bar Harbor Cruise Ship Committee, Meeting Agenda( for Jan. 14, 2021, https://www.barharbormaine.gov/AgendaCenter/ViewFile/Agenda/_02112021-2655 (last visited Feb. 17, 2021).
[72] Maine.Portcall.com, Bar Harbor, https://maine.portcall.com/#!?tab=2&port=Bar%20Harbor (last visited Feb. 15, 2021).
[73] Bar Harbor Cruise Ship Committee, Meeting Minutes (for Mar. 4, 2021), https://www.barharbormaine.gov/AgendaCenter/ViewFile/Agenda/_04012021-2687 last visited Apr. 19, 2021).
[74] Town of Bar Harbor, Cruise Ship Fee Policy (Sep. 21, 2010), https://www.barharbormaine.gov/DocumentCenter/View/28/Cruise-Ship-Fee-Policy (last visited Feb. 15, 2021).



**AVERAGE CRUISE VISITOR SPENDING IN BAR HARBOR - $108.21 (2016)**

- Cruise-line sponsored tours - $34.10
- Meals and drinks - $24.60
- Clothing - $14.36
- Souvenirs - $11.83
- Art and jewelry - $8.02
- Recreation and transportation - $5.34
- Groceries and pharmacy items - $2.44
- Books and paper goods - $2.17
- Home furnishings - $1.70
- Other - $3.64

Cruise visitor spending contributes to the economic health of the area. Per the Bar Harbor Passenger Report, cruise visitors spent an average of $74 in port, or $108 including ship-sponsored tours. A breakdown can be seen on the chart to the left. Direct spending from cruise visitors in 2016 was almost $15 million and resulted in 329 jobs and $3.8 million in income. These figures do not include cruise line spending such as ship repairs, pilot services, and docking fees.

The town collects fees associated with cruise ship visits. According to the town's website,[75] in FY 2019, it brought in over $1 million in passenger service fees and port development fees. The town collected just over $930,000 in fees in FY 2020. As of February 2021, revenues from fees are projected to be $174,000 at the end of the calendar year.[76] Revenues for FYs 2015-2020 can be seen on the chart below.

---

[75] Cruise Ship Fund, https://www.barharbormaine.gov/AgendaCenter/ViewFile/Agenda/_12162020-2625 (last visited Feb. 17, 2021).

[76] Bar Harbor Cruise Ship Committee, Meeting Minutes draft (for Feb. 11,2021), https://www.barharbormaine.gov/AgendaCenter/ViewFile/Minutes/_02112021-2655 (last visited Apr. 19, 2021).



**Indirect economic impact**

In 2016, the economic impact of cruise visitor spending, including multiplier effects, resulted in $20.2 million in local spending, 379 jobs, and $5.4 million in income, according to the Bar Harbor Passenger Report.

**Current status**

A Bar Harbor Chamber of Commerce report[77] estimates that cruise ship revenue lost in 2020 was between $20-$25 million. Retail stores that generally rely on cruise visitors were down around 50% in revenue compared to 2019 and restaurants that tend to rely on cruise visitors were down as much as 50-70%. Several businesses in the area closed earlier than usual, and some did not operate at all, at least partially due the lack of cruise visitors.

**Preparing for reopening**

Various organizations, including the Maine CDC, Coast Guard, and Acadia National Park met to discuss cruise logistics for 2021. The various groups want to be aligned so that the many ports and partners can be consistent in areas like cruise signage and processes in ports, and if possible, to be consistent with Boston, New York, and eastern Canada.[78]

---

[77] Bar Harbor Chamber of Commerce, Meeting Agenda for Dec. 16, 2020, https://www.barharbormaine.gov/AgendaCenter/ViewFile/Agenda/_12162020-2625 (last visited Feb. 17, 2021).
[78] *Id.*

Bar Harbor's Cruise Ship Committee, established in 2008 to help manage the visitation of cruise ships to Bar Harbor, reviews all aspects of cruise ship visitation and advises the Town Council annually on any recommended policy needs.[79] According to recent meeting minutes,[80] the COVID-19 shut down has caused an increased level of concern regarding the cruise industry. The Town has commissioned a company to conduct a survey about cruise ships and their impact on Bar Harbor to identify local sentiment and further manage this particular segment of Bar Harbor's tourism.[81] Per the recent meeting minutes, the Committee plans to mail surveys to residents, hold public hearings, and possibly consider further operational improvements. According to the town's 2020 cruise ship standard operating procedures, in 2020, the cruise passenger cap would have been 5,500 in May, June, September, and October, and 3,500 in July and August.[82] These daily passenger caps have been in place since 2009.[83]

## IV. Conclusion

The international cruise industry brings in over a billion dollars to the economy annually on the east coast, not including Florida. Passenger spending, totaling hundreds of millions of dollars annually, supports local businesses. Thousands of jobs are directly related to the cruise industry, and even more are an indirect result of the cruise industry.

As we have discussed in other Fact Finding 30 reports, the significance of the cruise industry's economic impact is unique to each state or region. This report, being specific to the cruise ports located on the East Coast (excluding Florida), is designed simply to provide an overview as to the financial impact being experienced by those states due to the cessation of cruise operations. Though none of the areas discussed in the report are solely dependent on the cruise industry, it does play an important part in their economy, and is crucial to those whose jobs do depend on it. The cruise industry is opening up again, with cruise ships conducting simulated runs and some lines having resumed passenger sailings in mid-July, both out of the southeast and pacific northwest. Many cruise ships sailing south to Florida and the Caribbean from the East Coast either have or are about to resume operations. Ships sailing north out of New York City and Boston, stopping in Maine, are still on hold due to Canada's restrictions on cruise ships. The Northeast & Canada cruise ship season, as described in this report, is short, mainly operating only during the summer and fall. The Alaska Tourism Restoration Act, allowing cruises to Alaska to bypass Canada, does not apply to cruises in the Northeast.[84]

---

[79] Email from Chair, Bar Harbor Cruise Ship Committee, email to FF30 (June 11, 2021).
[80] Bar Harbor Cruise Ship Committee, Meeting Minutes (Dec. 16, 2020), https://www.barharbormaine.gov/AgendaCenter/ViewFile/Minutes/_12162020-2625 (last visited Feb. 17, 2021).
[81] Email from Chair, Bar Harbor Cruise Ship Committee, email to FF30 (June 11, 2021).
[82] Bar Harbor Cruise Ship Committee, Meeting Agenda for Dec. 16, 2020, https://www.barharbormaine.gov/AgendaCenter/ViewFile/Agenda/_12162020-2625 (last visited Feb. 17, 2021).
[83] Email from Chair, Bar Harbor Cruise Ship Committee, email to FF30 (June 11, 2021).
[84] Andrea Sachs, Washington Post, What to know about summer cruises and the industry's comeback (June 8, 2021), https://www.washingtonpost.com/travel/2021/06/08/summer-cruises-faq/ (last visited June 21, 2021).

We have also observed that the challenges being posed by the current pandemic are fluid and not easily met. Although the lower spring COVID-19 cases in the U.S. and increasing vaccination rate are encouraging, the appearance of new variants continues to cast uncertainty. It is hoped that this report will not only draw attention to the importance of the cruise industry, but also encourage and assist appropriate authorities to do what is necessary to continue relaunching the cruise industry in a timely and safe manner that will build confidence among cruise consumers. As Fact Finding Officer, Commissioner Sola continues to explore options to achieve these goals.