# United States Court of Appeals

*for the*

# First Circuit

Case Nos. 24-1317,
24-1318 & 24-1385

ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS;
B.H. PIERS, L.L.C.; GOLDEN ANCHOR, L.C., d/b/a Harborside Hotel;
B.H.W.W., L.L.C.; DELRAY EXPLORER HULL 495 LLC; DELRAY
EXPLORER HULL 493 LLC; ACADIA EXPLORER 492, LLC; PENOBSCOT
BAY AND RIVER PILOTS ASSOCIATION,

*Plaintiffs-Appellants/Cross-Appellees,*

v.

CHARLES SIDMAN,

*Defendant-Appellee/Cross-Appellant,*

TOWN OF BAR HARBOR, a Municipal Corporation of the State of Maine,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MAINE, BANGOR, IN CASE NO. 1:22-CV-00416-LEW
HONORABLE LANCE E. WALKER, U.S. DISTRICT JUDGE

## BRIEF OF *AMICUS CURIAE* CRUISE LINES INTERNATIONAL ASSOCIATION, INC. IN SUPPORT OF PLAINTIFFS-APPELLANTS/CROSS-APPELLEES AND AFFIRMANCE IN PART AND REVERSAL IN PART

DEREK L. SHAFFER
CHRISTOPHER G. MICHEL
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
1300 I Street NW
Suite 900
Washington, D.C. 20005
(202) 538-8000

*Counsel for Amicus Curiae Cruise
Lines International Association, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1(a) and 29(a)(4)(A), amicus curiae certifies that it is an incorporated trade association, and it has no parent corporations or any publicly held corporations owning 10% or more of its stock.

# TABLE OF CONTENTS

Page

STATEMENT OF INTEREST PURSUANT TO FED R. APP. P. 29 .....................1

SUMMARY OF THE ARGUMENT ......................................................................2

ARGUMENT ........................................................................................................5

I.   The Ordinance Violates Cruise Passengers' Constitutional Right To
     Travel. ........................................................................................................5

II.  The District Court Erred By Dismissing The Ordinance's Regulation
     Of Facilities And Instrumentalities Of Interstate Commerce.......................12

     A.   The district court should have applied Commerce Clause cases
          involving restrictions on interstate transportation of persons. ............13

     B.   The district court failed to properly consider the Ordinance's
          impact on instrumentalities of interstate transportation. .....................15

     C.   The Ordinance serves isolationist purposes by intentionally
          discriminating against interstate and foreign commerce....................19

III. The Ordinance Is Preempted By Federal Law And Treaty Obligations. .......21

     A.   Federal immigration and customs laws...............................................23

     B.   International maritime conventions.....................................................25

CONCLUSION ..................................................................................................27

CERTIFICATE OF COMPLIANCE......................................................................29

CERTIFICATE OF SERVICE .............................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska v. Kerry*,
   972 F. Supp. 2d 1111 (D. Alaska 2013) ..............................................26

*Am. Ins. Ass'n v. Garamendi*,
   539 U.S. 396 (2003)..............................................22, 23, 25, 27

*Aptheker v. Sec'y of State*,
   378 U.S. 500 (1964)..............................................6

*Att'y Gen. of New York v. Soto-Lopez*,
   476 U.S. 898 (1986)..............................................9

*Baltimore & O.R. Co. v. Maryland*,
   88 U.S. 456 (1874)..............................................15

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
   520 U.S. 564 (1997)..............................................20, 21

*City of Philadelphia v. New Jersey*,
   437 U.S. 617 (1978)..............................................20

*Cole v. Hous. Auth. of City of Newport*,
   435 F.2d 807 (1st Cir. 1970)..............................................12

*Crandall v. Nevada*,
   73 U.S. 35 (1867)..............................................8, 9, 14, 24

*Currie v. Grp. Ins. Comm'n*,
   290 F.3d 1 (1st Cir. 2002)..............................................10

*Edwards v. California*,
   314 U.S. 160 (1941)..............................................8, 9, 14

*Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*,
   405 U.S. 707 (1972)..............................................9, 14

*Fiallo v. Bell*,
   430 U.S. 787 (1977)..............................................23

*Gibbons v. Ogden*,
22 U.S. 1 (1824).................................................................8

*Gingery v. City of Glendale*,
831 F.3d 1222 (9th Cir. 2016) .......................................22

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952).......................................................23

*Henderson v. Mayor of City of New York*,
92 U.S. 259 (1875).............................................9, 16, 19, 24

*Kelly v. Washington ex rel. Foss Co.*,
302 U.S. 1 (1945)...........................................................18

*Magill v. Lynch*,
560 F.2d 22 (1st Cir. 1977)............................................9

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023)...........................................14, 15, 16

*Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Maine*,
45 F.4th 542 (1st Cir. 2022).....................................19, 20

*Negrete-Ramirez v. Holder*,
741 F.3d 1047 (9th Cir. 2014) .......................................24

*Nw. Airlines, Inc. v. Cnty. of Kent*,
510 U.S. 355 (1994).................................................9, 14

*Ott v. Miss. Val. Barge Line Co.*,
336 U.S. 169 (1949).......................................................17

*Port Richmond & Bergen Point Ferry Co. v. Bd. of Chosen Freeholders*,
234 U.S. 317 ..................................................................19

*Posos-Sanchez v. Garland*,
3 F.4th 1176 (9th Cir. 2021) ..........................................24

*Sabri v. United States*,
541 U.S. 600 (2004).........................................................9

*Saenz v. Roe*,
526 U.S. 489 (1999)............................................................7, 8, 13

*Shapiro v. Thompson*,
394 U.S. 618 (1969)................................................................10, 14

*Smith v. Turner*,
48 U.S. 283 (1849)........................................................................19

*Southern Pacific Co. v. Arizona ex rel. Sullivan*,
325 U.S. 761 (1945)............................................4, 5, 17, 18, 19

*Trump v. Hawaii*,
585 U.S. 667 (2018)......................................................................23

*United States v. Guest*,
383 U.S. 745 (1966)..............................................................4, 7, 9

*United States v. Locke*,
529 U.S. 89 (2000)........................................................................22

*United States v. Pink*,
315 U.S. 203 (1942)......................................................................27

*URI Student Senate v. Town Of Narragansett*,
631 F.3d 1 (1st Cir. 2011)........................................................6, 12

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982)........................................................................6

*We the People PAC v. Bellows*,
40 F.4th 1 (1st Cir. 2022)............................................................11

## Rules & Statutes

8 C.F.R. § 100.4(a)..............................................................................23

8 C.F.R. § 235.1(a)..............................................................................24

8 C.F.R. § 235.1(f)(1)..........................................................................24

19 C.F.R. § 101.3..................................................................................23

33 C.F.R. § 105.237..............................................................................27

8 U.S.C. § 1225(b)(2)(A) ...................................................................24

46 U.S.C. § 2101, *et seq.*................................................................22

46 U.S.C. § 3507 .............................................................................22

46 U.S.C. § 3508 .............................................................................22

46 U.S.C. § 5109 .............................................................................22

46 U.S.C. § 14306 ...........................................................................22

46 U.S.C. § 14514 ...........................................................................22

46 U.S.C. § 55103 ...........................................................................22

Cruise Vessel Security and Safety Act of 2010, Pub. L. No. 111-207,
    124 Stat. 2243 ............................................................................22

Fed. R. App. P. 26.1(a) .....................................................................1

Fed. R. App. P. 29 .............................................................................1

Passenger Vessel Services Act of 1886, Pub. L. No. 49-421,
    24 Stat. 79 ..................................................................................22

## Other Authorities

Convention on Facilitation of International Maritime Traffic, Art. I,
    Mar. 9, 1967, 18 U.S.T. 410, 591 U.N.T.S. 8556........................25, 26

Articles of Confederation of 1781, art. IV ....................................7

International Convention for Prevention of Pollution from Ships,
    1973, S. Exec. Doc. C, 93-1, 1340 U.N.T.S. 62 .........................22

International Convention for the Safety of Life at Sea, Aug. 15, 1978,
    32 U.S.T. 47, T.I.A.S. No. 9700 ...............................................22

*Pratique*, Black's Law Dictionary (12th ed. 2024) ......................26

United Nations Convention on the Law of the Sea, Dec. 10, 1982,
    S. Treaty Doc. No. 103-39, 1833 U.N.T.S. 397 .........................22

## STATEMENT OF INTEREST PURSUANT TO FED R. APP. P. 29

The Cruise Lines International Association (CLIA) is the world's largest cruise industry trade association. CLIA represents a diverse, comprehensive group of industry stakeholders ranging from premier cruise lines to travel agents to ports and destinations. CLIA's mission is to sponsor policies and practices enabling a secure, healthy, and sustainable cruise ship environment. Through its efforts, CLIA has fostered positive travel experiences for the more than 30 million passengers who have cruised annually. CLIA's 50-plus cruise line members service 95% of the world's ocean-going cruise capacity.[1]

---

[1] Appellees did not consent to CLIA filing this amicus curiae brief. Pursuant to Fed. R. App. P. 29(a)(2), CLIA has filed a motion for leave to file this brief. As required by Fed. R. App. P. 29(a)(4)(E), counsel certify that this brief was not authored, in whole or in part, by counsel to a party, and further, that no person or entity other than amicus curiae, its members, or its counsel made any monetary contribution to the preparation or submission of this brief.

# SUMMARY OF THE ARGUMENT

Cruise ships are instrumentalities of interstate and foreign transportation and commerce. They further the federal government's interest in the free flow of persons and commerce along with passengers' core constitutional right to travel. Cruise ships offer an inimitable travel experience. In addition to the well-known comfort, convenience, and affordability that cruise-line travel offers, this form of travel is safer than virtually all others.[2] Cruise lines also afford unparalleled access to travel for passengers with disabilities and medical conditions who might otherwise forgo travel altogether.[3] The cruise-line industry's commitment to safe and sustainable travel earned the trust of 16.9 million U.S.-based passengers in 2023 alone, yielding substantial benefits to the national and local economies.[4] Indeed, cruise lines injected over $100 million and 1,000 jobs to the local economies of Maine in 2022.[5]

---

[2] CLIA, *Report on Operational Incidents 2009 to 2019* (Mar. 2020), https://cruising.org/-/media/research-updates/report_operational_incidents_2019-v-1.ashx.

[3] *See generally* CLIA, *Cruise Ship Accessibility for Persons with Disabilities*, https://cruising.org/en/about-the-industry/policy-priorities/cruise-ship-accessibility-for-persons-with-disabilities (last visited July 17, 2024); CLIA, *Public Health and Medical*, https://cruising.org/en/about-the-industry/policy-priorities/health (last visited July 17, 2024).

[4] CLIA, *State of the Cruise Industry Report*, (May 8, 2024), https://cruising.org/-/media/clia-media/research/2024/2024-state-of-the-cruise-industry-report_updated-050824_web.ashx.

[5] CLIA, *Economic Contribution of Cruise Tourism to the United States 2022* (Dec. 2023), https://cruising.org/-/media/clia-media/research/2024/economic-impact-of-cruise-in-united-states-2022_final_high-res.ashx.

Cruise lines calling on Bar Harbor facilitate "the transportation of persons free to travel as they see fit." Amended Decision and Order ("Order"), Dkt. 206 at 51. Before they even board a cruise ship bound for Bar Harbor, many passengers have already traveled interstate and internationally to reach the port of disembarkation. Thus, large cruise ships are able to "introduce[] many first-time visitors to Maine from a broader geographical region as compared to visitors who travel by land, most of whom are from east coast states and Canada." *Id.* at 5. For more than a decade, CLIA and the cruise lines have worked closely with the State of Maine and the Town of Bar Harbor to promote safe and sustainable cruise tourism within the local economy. *Id.* at 6–11. But the Ordinance at issue here severely restricts passengers' ability to enter Bar Harbor by "establish[ing] a disembarkation cap of 1,000 persons per day." *Id.* at 13. The Ordinance thereby regulates conduct and passenger choices far beyond the Town's boundaries.

This Ordinance is the first of its kind. It is not a maritime navigational regulation intended to promote safe passage through Bar Harbor waters. Nor is it a regulation intended to ensure the seaworthiness of vessels. Rather, it is a land-use ordinance that targets purely private uses of private property, threatening the owners of private waterfront piers with a "$100 minimum penalty per excess unauthorized disembarkation." *Id.* at 11.

Although the Ordinance's purported purpose is to reduce waterfront congestion and promote public safety, the district court found that the primary sponsor of the Ordinance "expressed a preference for smaller cruise ships because the passengers on smaller cruise ships tend to be more well-to-do," and, conversely, expressed "a dislike of . . . the larger cruise ships." *Id.* at 13. Additionally, the district court found that the Ordinance would have the intended effect of reducing "passenger visitation volume by a significant percentage, likely north of 80 and possibly as high as 90 percent." *Id.* at 17.

The district court nevertheless largely upheld the Ordinance as a garden-variety local economic regulation. In doing so, the court overlooked multiple constitutional and other federal-law provisions that warrant a more searching review of the Town's unprecedented, disruptive effort to restrict access to its port. To begin, the Ordinance severely restricts cruise passengers' freedom to travel, which has long been recognized as a fundamental constitutional right. *See, e.g.*, *United States v. Guest*, 383 U.S. 745, 757 (1966). The Ordinance also unconstitutionally cuts the Town off from interstate and foreign commerce and impermissibly impedes instrumentalities of transportation, in violation of the Commerce Clause. Indeed, this case is materially indistinguishable from *Southern Pacific Co. v. Arizona ex rel. Sullivan*, in which the Supreme Court invalidated an Arizona statute that unconstitutionally burdened interstate commerce and transportation by limiting the

capacity of passenger and freight trains entering the state. 325 U.S. 761, 783–84 (1945).

Moreover, the Ordinance conflicts with the intricate web of federal regulations and treaty obligations governing the operation of foreign-flagged cruise ships calling on U.S. ports, thereby interfering with delicate foreign-policy decisions made by the President and by Congress.  In particular, the Ordinance conflicts with the federal government's determination that passengers are entitled to enter the U.S. at its Bar Harbor port of entry.  The Ordinance similarly conflicts with U.S. treaty commitments designed to facilitate the speedy and unimpaired flow of passenger vessels into U.S. ports.  Because the Ordinance trespasses on delicate foreign policy decisions reflected in federal laws and treaties, it is preempted under the Supremacy Clause.

## **ARGUMENT**

### I.    **The Ordinance Violates Cruise Passengers' Constitutional Right To Travel.**

The district court ignored the core constitutional right implicated by the Ordinance:  cruise passengers' fundamental right to travel.  Appellants properly raised below the Ordinance's intrusion on passengers' rights:  because "freedom of travel is a constitutional liberty closely related to rights of free speech and association," courts "appraising a statute's inhibitory effect" on the right should "not hesitate[] to take into account possible applications of the statute, in other factual

5

contexts besides that at bar." *Aptheker v. Sec'y of State*, 378 U.S. 500, 516–17 (1964). Accordingly, the district court's "first task" below was "to determine whether the [Ordinance] reaches a substantial amount of constitutionally protected conduct." *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 12 (1st Cir. 2011) (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 (1982)).

In a cursory footnote, however, the district court declined to consider the Ordinance's effect on passengers' right to travel, explaining "[p]resumably the freedom to travel is no more sacrosanct than the freedom to contract." Order at 37 n.23.[6] In actuality, that presumption defies black-letter constitutional law. "The

---

[6] Despite noting that Appellants had "asserted that the Ordinance unlawfully restrains . . . passengers' right to travel," Order at 37 n. 23; *see also id.* at 59 n.41, the court intimated that Appellants may have forfeited such arguments because they "did not assert that the Ordinance violates individuals' right to travel in their complaint" and "had raised this issue for the first time in their post-trial brief in a perfunctory fashion." *Id.* at 37 n.23. In fact, both complaints invoked passengers' right to travel: for example, the verified complaint alleged that the Ordinance implicates "the interstate and foreign travel of passengers" and would "prevent foreign and (out-of-state) travelers on international vessels from disembarking," thereby "threaten[ing] the nation's ability to maintain an integrated maritime transportation system." *See, e.g.*, App. 44 at ¶ 77; 51 at ¶¶ 104, 107; 53 at ¶¶ 114–16; 54–55 at ¶¶ 118, 120; *see also* App. 91 at ¶ 38; 106 at ¶¶ 104–05. Likewise, Appellants' *pretrial* briefing expressly tied their Commerce Clause arguments to passengers' right to travel. Dkt. 164 at 6 n.5 ("When Commerce Clause cases involve restrictions on the movement of persons, as is the case here, they also implicate the right of individuals to move freely between the states."); *see also id.* at 6–7; Dkt. 160 at 7; *see also* Order at 51 ("Plaintiff-Intervenors observe that the Commerce Clause exists in part to ensure . . . the free flow of persons[.]").

constitutional right to travel from one State to another, and necessarily to use the highways and other instrumentalities of interstate commerce in doing so, occupies a position fundamental to the concept of our Federal Union.  It is a right that has been firmly established and repeatedly recognized." *Guest*, 383 U.S. at 757.

Indeed, this right predates the Constitution itself:  "[T]he Articles of Confederation provided that 'the people of each State shall have *free ingress and regress* to and from any other State.'" *Id.* at 758 (emphasis added) (quoting Articles of Confederation of 1781, art. IV, para. 1).  Freedom to travel "finds no explicit mention in the Constitution" because it was considered "so elementary" that it "was conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created." *Id.*

The right to travel has several "components," including "the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State," and—as directly relevant here—the right to use "*facilities* and other *instrumentalities* of interstate commerce." *Saenz v. Roe*, 526 U.S. 489, 500–01 (1999) (citation omitted) (emphasis added).  It is a "*virtually unconditional* personal right, guaranteed by the Constitution to us all." *Id.* at 498 (citation omitted) (emphasis added).

"The right to move freely from State to State is an incident of national citizenship," securing vital federal interests indispensable to the union itself. *Edwards v. California*, 314 U.S. 160, 178 (1941) (Douglas, J., concurring). For example, the federal government may "demand[] the services of its citizens, and is entitled to bring them to [federal enclaves] from all quarters of the nation." *Crandall v. Nevada*, 73 U.S. 35, 44 (1867). "On the sea-coasts and on the rivers it has its ports of entry," and "no power can exist in a State to obstruct" Americans' right to access and use those ports.[7] *Id.* Thus, the right to travel resides at a constitutional crossroads: The "nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel." *Saenz*, 526 U.S. at 499 (citation omitted).

As passenger vessels transporting U.S. citizens across America's navigable waterways, cruise ships facilitate these interests no less than any other method of travel. Indeed, the Supreme Court recognized the federal government's vital interest in the "transportation of passengers" by "vessels" on its waters long before the advent of trains or busses. *Gibbons v. Ogden*, 22 U.S. 1, 84 (1824). It was grave error, therefore, for the district court to conclude that "the freedom to travel is no more sacrosanct than the freedom to contract." Order at 37 n.23.

---

[7] Relevant here, the district court found that cruise ships primarily call on Bar Harbor due to its proximity to a "national asset," Acadia National Park. Order at 6.

Just as the district court failed to recognize the fundamental import of passengers' right to travel, it failed to recognize how the Ordinance severely restricts that right. The freedom to travel is among those "few" constitutional rights protected by the overbreadth doctrine. *Sabri v. United States*, 541 U.S. 600, 609 (2004). Accordingly, the district court should have considered whether the Ordinance "unconstitutionally regulates others" in addition to Appellants, *Magill v. Lynch*, 560 F.2d 22, 29 (1st Cir. 1977), particularly by restricting passengers' fundamental right to "ingress and regress" and to use the affected private "facilities" and "instrumentalities" of interstate transportation, *Guest*, 383 U.S. at 757–58.[8]

"A state law implicates the right to travel when it actually deters such travel [or] when impeding travel is its primary objective." *Att'y Gen. of New York v. Soto-Lopez*, 476 U.S. 898, 903 (1986) (cleaned up). Here, the district court made very clear in its findings that the Ordinance "actually deters such travel." Specifically, it found that the Ordinance by purpose and effect would "reduce passenger visitation volume by a significant percentage, likely north of 80 and possibly as high as 90

---

[8] It makes no difference that the Ordinance here penalizes dock owners. Unconstitutional restrictions on the right to travel often target those who facilitate travel rather than the travelers themselves. *See, e.g.*, *Crandall*, 73 U.S. at 40; *Edwards*, 314 U.S. at 170; *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 712 (1972), *superseded by statute on other grounds in Nw. Airlines, Inc. v. Cnty. of Kent*, 510 U.S. 355, 366 (1994); *Henderson v. Mayor of City of New York*, 92 U.S. 259, 274 (1875) (tax on shipmaster will be passed to passenger).

percent." Order at 17. And the district court found that "the Ordinance does indeed stem the flow of interstate commercial activity by reducing the daily volume of persons disembarked into Bar Harbor from cruise ships." *Id.* at 51.

Upon finding that the Ordinance would severely restrict passengers' right to travel to Bar Harbor, the district court should have applied strict scrutiny to assess the Ordinance's constitutionality. *Currie v. Grp. Ins. Comm'n*, 290 F.3d 1, 9 (1st Cir. 2002) ("A state policy that has the effect of penalizing the exercise of a fundamental right must be justified by a compelling state interest in order to survive" due process scrutiny. (citing *Shapiro v. Thompson*, 394 U.S. 618, 634–38 (1969) (holding statutes that "penalize the . . . right" to travel must "be necessary to promote a compelling governmental interest"))). The district court incorrectly applied the rational basis test, however, because it viewed Appellants' "due process challenge to the Bar Harbor Ordinance" as pitting only "freedom to contract against restrictions imposed in the interest of the community" of Bar Harbor. Order at 37, 37 n.23. Had the district court afforded due weight to the constitutional right to travel, it would have recognized that the Ordinance slices into interests deeper than purely commercial and economic ones. That is, the district court's threshold misconception that passengers' right to travel deserves no more protection than the freedom to contract infected its larger analysis of the Ordinance's constitutionality.

Notably, the district court's own findings preclude a determination that the Ordinance "serves a compelling state interest in a narrowly tailored manner." *We the People PAC v. Bellows*, 40 F.4th 1, 19 (1st Cir. 2022). Although, the Ordinance purportedly serves the Town's "interests in lessening congestion and conserving municipal resources," Order at 58, the court found that "to date there does not appear to be an incident illustrating any past failure in the delivery of public services occasioned by passenger congestion," *id.* at 14. And it also found that "congestion in Bar Harbor can be "pronounced" and "particularly bad . . . despite the absence of cruise ship passengers." *Id.* That leaves the Ordinance arbitrarily discriminating against cruise-ship passengers, even as the Town was unable to supply any "empirical data to enable a fact finder to allocate responsibility for a degradation in overall municipal public safety between cruise and land-based tourism." *Id.* Tellingly, the Ordinance's principal sponsor testified "that the fixed restriction to 1,000 persons daily was not the product of 'a rigorously defensible finding or study or calculation,' and that his group 'just didn't want to get into various limits at different times of the year.'" *Id.* at 38 (internal citations omitted). Finally, the district court found that cruise lines and their passengers have actually increased Town staffing and resources by supplying "roughly $1 million per year[] to fund" municipal initiatives. *Id.* at 7 n.3.

These findings preclude any determination that the Ordinance promotes compelling purposes or is narrowly tailored, as it must be. Rather than continue to work collaboratively with cruise lines to introduce policies and procedures that promote sustainable tourism in Bar Harbor, the Ordinance imposes arbitrary and indefensible burdens on passengers' fundamental rights. The Ordinance simply cannot survive strict scrutiny on this record, with these findings.

Because the record below contained an "empirical demonstration that" the Ordinance would have a "significant deterrent effect" on individuals "when they decide to travel interstate," and is not justified by any compelling need, it unconstitutionally burdens their right to travel. *Cole v. Hous. Auth. of City of Newport*, 435 F.2d 807, 810 (1st Cir. 1970). Had it properly credited the fundamental nature of the right to travel, the district court would have necessarily concluded that the Ordinance "reaches a substantial amount of constitutionally protected conduct," *URI Student Senate*, 631 F.3d at 12, and cannot withstand the attendant scrutiny.

## II. The District Court Erred By Dismissing The Ordinance's Regulation Of Facilities And Instrumentalities Of Interstate Commerce.

The district court also failed to appreciate the unique threat the Ordinance poses to the federal government's interests in the free movement of travelers. Its analysis of the Commerce Clause went astray in this respect, too, causing it to incorrectly rely on cases involving interstate transportation of commodities, different

from persons. And the district court overlooked the heightened constitutional scrutiny that attaches specifically to regulations that impede the flow of interstate commerce by targeting *instrumentalities* of transportation. Even assuming the applicability of Commerce Clause cases involving commodities, however, the district court failed to apply those cases properly here because the Ordinance in purpose and effect unconstitutionally cuts the Town off from consumers engaging in interstate and foreign commerce.

### A. The district court should have applied Commerce Clause cases involving restrictions on interstate transportation of persons.

Although Appellants urged the district court to analyze their Commerce Clause arguments in light of the Ordinance's impact on "persons" exercising rights to travel, the district court expressly declined to do so. Order at 59 n.41. Rejecting an analogy between "cruise tourism" and Commerce Clause cases involving interstate "migration," *id.* (declining to apply *Edwards*),[9] the court instead considered the relevance of cases primarily involving local restrictions on

---

[9] Nor was the district court correct that the right to travel protects only interstate migration. Order at 59 n.41. To the contrary, the Supreme Court has explained that the right to travel "embraces at least three different components." *Saenz*, 526 U.S. at 500. While one component protects permanent migration, the others protect "the right of a citizen of one State to enter and to leave another State" and "the right to be treated as a welcome visitor rather than an unfriendly alien" in that State. *Id.* It is similarly erroneous to confine *Edwards* to travel relating to "Dust Bowl migration" or similarly dramatic reasons for resettling. *See id.* (explaining *Edwards* vindicated "the right to cross state borders").

commodities and articles such as "pork" and "hazardous waste." Order at 47. As a result, the district court's Commerce-Clause analysis rested on a faulty assumption: according to the district court, laws restricting interstate "traffic in persons" are no more suspect than those restricting "traffic in certain food products" under the Commerce Clause. Order at 48 (citing *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023)). [10] But the Ordinance should have been "judged by . . . stricter . . . standard[s]" because it "touches on the fundamental right of interstate movement." *Shapiro*, 394 U.S. at 638, *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651, 671 (1974).

Although "transportation of persons is 'commerce', within the meaning of" the Commerce Clause, the Supreme Court has historically singled out local restrictions on the interstate flow of *persons* as differing fundamentally from restrictions on commodities. *See, e.g.*, *Edwards*, 314 U.S. at 172; *Crandall*, 73 U.S. at 43. Local regulations like this one, which restrict "passengers traveling interstate by privately owned transportation, such as railroads," and using privately owned facilities, are even more suspect under the Commerce Clause as compared to traditional local restrictions on commodities. *Evansville-Vanderburgh Airport Auth. Dist.*, 405 U.S. at 712–14; *see also Edwards*, 314 U.S. at 174 (holding statute

---

[10] *Nat'l Pork Producers Council* did not involve transportation of persons or products but a law governing the humane treatment of pork. 598 U.S. at 366.

restraining interstate transportation of indigent persons "must fail under any known test of the validity of State interference with interstate commerce").

Cruise ships are equally, if not more, protected by the Commerce Clause because "commerce by water was principally in the minds of those who framed and adopted the Constitution." *Baltimore & O.R. Co. v. Maryland*, 88 U.S. 456, 470 (1874). Such "vehicles of commerce by water being instruments of intercommunication with other nations, the regulation of them is assumed by the National legislature. So that State interference with transportation by water, and especially by sea, is at once clearly marked and distinctly discernible." *Id.* (noting the historically local nature of transportation by land). It follows that the court below erred by disregarding constitutional standards specifically governing restrictions on the interstate and international movement of persons, as opposed to commodities.

**B.    The district court failed to properly consider the Ordinance's impact on instrumentalities of interstate transportation.**

The district court also erred by discounting the Supreme Court's recent affirmation of its longstanding "line of cases that . . . refuse[] to enforce certain state regulations on instrumentalities of interstate transportation—trucks, trains, and the like." *Nat'l Pork Producers Council*, 598 U.S. at 380 n.2. Despite the fractured nature of the opinions, the Court in *National Pork Producers Council* agreed that "state regulation of the instrumentalities of interstate transportation" are of "special concern" to the Commerce Clause. *See id.* at 380 nn.2 & 4, 392, 395–96. The Court

indicated that, in cases where a "state regulation . . . impede[s] the flow of interstate goods," the "Commerce Clause itself pre-empts [the] entire field." *Id.* at 380 n.2; *see also id.* at 392 (Sotomayor, J., concurring in part) (noting even nondiscriminatory "state laws that impose burdens on the arteries of commerce, on 'trucks, trains, and the like,'" are often invalidated).

While noting (correctly) that laws obstructing instrumentalities of interstate transportation are invalid even if they are non-discriminatory, the court held (incorrectly) that the "Ordinance does not fit into [this] category." Order at 50–52. The court so held because it "reject[ed] the contention that the" Ordinance implicated "aspect[s] of the national commerce that requires the national uniformity that only Congress can provide." *Id.* at 53. By the district court's account, the Ordinance involved only "a hyperlocal concern that is not well suited to a one-size-fits-all regulatory approach at the federal level." *Id.* at 54. To the contrary, however, the federal government has an overriding interest in the uniform treatment of instrumentalities of interstate transportation at its ports of entry. *See Henderson*, 92 U.S. at 273 ("The laws which govern the right to land passengers in the United States from other countries ought to be the same in New York, Boston, New Orleans, and San Francisco."); *Nat'l Pork Producers Council*, 598 U.S. at 399 (Roberts, C.J., concurring in part and dissenting in part) (noting regulation of "interstate

transportation" presents "a strong interest in 'national uniformity'" (citation omitted)).

Tellingly, this case is materially indistinguishable from *Southern Pacific Co.*, where the Supreme Court held that an Arizona statute limiting the capacity of passenger trains unconstitutionally burdened interstate commerce. 325 U.S. at 771. Similar to the Ordinance here, the Arizona statute prohibited train companies from entering Arizona with more than 14 passenger cars. *Id.* The Court invalidated that statute because it impeded the flow of commerce, interfered with the federal government's need for uniformity, and exceeded what was necessary to protect safety. *Id.* at 781–84. Although the Arizona statute was directed only to intrastate activities, the Court observed that it had "[t]he practical effect of . . . control[ling] train operations beyond" the state because trains passing through Arizona often originated across the country. *Id.* at 775. The Court also noted that "[i]f one state may regulate train lengths, so may all the others, and they need not prescribe the same maximum limitation." *Id.* As a result, the risk of "confusion and difficulty" under such a "varied system of state regulation" was "evident." *Id.* at 774.

There is "no practical difference so far as . . . the Commerce Clause is concerned whether it is vessels or railroad cars that are moving in interstate commerce." *Ott v. Miss. Val. Barge Line Co.*, 336 U.S. 169, 174 (1949). Indeed, the Court in *Southern Pacific Co.* relied on a previous case "point[ing] out that when a

state . . . attempts to impose particular standards as to structure, design, equipment, and operation (of vessels plying interstate), which . . . pass beyond what is *plainly essential to safety and seaworthiness*," such laws are invalid under the Commerce Clause. *Id.* at 781 (emphasis added) (quoting *Kelly v. Washington ex rel. Foss Co.*, 302 U.S. 1, 15 (1945)). Accordingly, cruise ships, as passenger vessels, are no less deserving of Commerce Clause protection than trains or trucks.

Here, cruise ships "are engaged in the transportation of persons free to travel as they see fit." Order at 51. These ships are undeniably instrumentalities of both interstate and foreign transportation.[11] So too are the piers, pilots, and tender vessels that provide essential services to cruise ship operations. The district court expressly found that "[t]he record in this case demonstrates that the Ordinance does indeed stem the flow of interstate commercial activity by reducing the daily volume of persons disembarked into Bar Harbor from cruise ships" by as much as "90 percent." Order at 17, 51. Given that the Ordinance effectively precludes large cruise ships from calling on Bar Harbor, as found below, *id.* at 17, it is no more constitutional than a statute limiting the capacity of passenger buses or trains entering a jurisdiction. Moreover, if Bar Harbor can pass a land-use ordinance restricting

_____

[11] CLIA, *Economic Contribution of Cruise Tourism to the United States 2022*, *supra*.

cruise-ship disembarkation, so too can every other port along the eastern seaboard, effectively imperiling interstate transportation by large vessels.

The unconstitutionality of the Ordinance follows inexorably, because this restriction goes far "beyond what is plainly essential to safety and seaworthiness" and the Town's "interest cannot be preserved at the expense of the national interest." *S. Pac. Co.*, 325 U.S. at 782; s*ee also, e.g.*, *Port Richmond & Bergen Point Ferry Co. v. Bd. of Chosen Freeholders*, 234 U.S. 317, 331 (indicating "where the ferriage is part of a longer and continuous transportation" states have no power to regulate); *Smith v. Turner*, 48 U.S. 283, 449 (1849) (head taxes imposed on disembarking passengers void under Commerce Clause); *Henderson*, 92 U.S. at 271 (holding local regulation "which prescribes terms or conditions on which [a] vessel can discharge its passengers" was an unconstitutional "regulation of commerce").

### C. The Ordinance serves isolationist purposes by intentionally discriminating against interstate and foreign commerce.

Even assuming the district court properly derived its analysis from cases dealing only with goods and services, its analysis still veered astray. The district court primarily considered whether the Ordinance was unconstitutionally *protectionist*, finding the Ordinance harmless because its "primary consequence . . . is to frustrate local" waterfront businesses. Order at 45, 48. But "the negative aspect of the Commerce Clause" also "protects interstate commerce from 'the evils of economic *isolation*.'" *Ne. Patients Grp. v. United Cannabis*

*Patients & Caregivers of Maine*, 45 F.4th 542, 546 (1st Cir. 2022) (emphasis added) (quoting *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978)). Impermissible isolationism can "include attempts to give local consumers an advantage over consumers in other States"—in this case out-of-state passengers seeking to consume local goods and services. *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 577–78 (1997) (citation omitted). The Ordinance answers to precisely that description, as it privileges an unlimited horde of in-state visitors over those who would be coming ashore.

There is no dispute that "Bar Harbor's voters have decided to regulate traffic in persons." Order at 48. As the district court observed, "80% of the cruise ships . . . plying the Atlantic seaboard" (i.e., making interstate and international stops) have a lower berth capacity in excess of 1,000. *Id.* at 56–57. On its face, the Ordinance targets passenger disembarkation from large cruise ships engaged in interstate commerce by limiting disembarkations to 1,000 persons per day. *Id.* at 12–13. And the district court found that the Ordinance's sponsors intended to discriminate against the "biggies." *Id.* at 13. The Ordinance's sponsors also noted that "Town residents" must compete with "cruise ship passengers" for "municipal services," "parks and public spaces," and "local amenities and attractions." *Id.* at 12 (citation omitted). In other words, the Ordinance is designed to wall the Town off from certain out-of-state consumers. But cruise line passenger fees have paid their

share for those services and attractions, contributing "roughly $1 million per year[] to fund town salaries and enlarge its police force, among other things." Order at 7 n.3.

The Ordinance undoubtedly "encourag[es] economic isolationism" by "prohibiti[ng] . . . out-of-state access to in-state resources," which is "the very evil that the dormant Commerce Clause was designed to prevent." *Camps Newfound/Owatonna, Inc.*, 520 U.S. at 578; *see also* Order at 59 (noting the Ordinance would likely "reduce[] the number of persons who visit Bar Harbor by cruise ship" in exchange for "advanc[ing] Bar Harbor's local interest"). The Ordinance will have its desired effect by precluding visits by large cruise ships, *id.* at 56–57, 17, even as it does *nothing* to curb visitation and congestion from *in-state* visitors, who can continue to flock to the same destination in unlimited numbers.

In sum, the district court's own findings effectively establish that the Ordinance is designed to protect local consumers and residents by isolating the Town from passengers engaged in interstate travel and commerce. That suffices to require reversal of the district court's conclusion that the Ordinance does "not discriminate based on the interstate or international character of those persons." *Id.* at 48.

## III. The Ordinance Is Preempted By Federal Law And Treaty Obligations.

Because large cruise ships calling on Bar Harbor are mostly foreign-flagged vessels transporting foreign passengers between U.S. and Canadian ports, Order at

5–6, they must navigate an intricate web of federal laws, regulations, and treaty obligations.[12]  These laws and treaties govern every aspect of cruise-line operation, including the admission of foreign vessels and passengers into U.S. ports.  These federal regulations often "depend[] upon the principle of reciprocity" with the flag state, implicating delicate foreign policy considerations.  *United States v. Locke*, 529 U.S. 89, 102 (2000); *see also, e.g.*, 46 U.S.C. §§ 5109, 14514, 14306.  "Under the foreign affairs doctrine, state laws that intrude on [such] exclusively federal power are preempted, under either the doctrine of conflict preemption or the doctrine of field preemption."  *Gingery v. City of Glendale*, 831 F.3d 1222, 1228 (9th Cir. 2016).  In short, a local regulation that has "more than incidental effect in conflict with express foreign policy of the National Government would require preemption."  *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420 (2003).  By targeting large cruise ships engaged in international trade and travel and restricting disembarkation of foreign passengers, the Ordinance impermissibly "touches on foreign relations [and] must yield to the National Government's policy."  *Id.* at 413.

---

[12] *See generally, e.g.*, United Nations Convention on the Law of the Sea, Dec. 10, 1982, S. Treaty Doc. No. 103-39, 1833 U.N.T.S. 397; International Convention for the Safety of Life at Sea, Aug. 15, 1978, 32 U.S.T. 47, T.I.A.S. No. 9700; International Convention for Prevention of Pollution from Ships, 1973, S. Exec. Doc. C, 93–1, 1340 U.N.T.S. 62; Cruise Vessel Security and Safety Act of 2010, Pub. L. No. 111-207, 124 Stat. 2243 (codified at 46 USC §§ 3507, 3508); Passenger Vessel Services Act of 1886, Pub. L. No. 49-421, 24 Stat. 79 (codified as amended at 46 U.S.C. § 55103); 46 U.S.C. §§ 2101 *et seq.*

## A.    Federal immigration and customs laws.

"For more than a century, [the Supreme] Court has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the'" President and by Congress.  *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)); *see also Harisiades v. Shaughnessy*, 342 U.S. 580, 588–589 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] the war power.").  Because decisions regarding the exclusion of foreign nationals "implicate relations with foreign powers, or involve classifications defined in the light of changing political and economic circumstances, such judgments are frequently of a character more appropriate to either the Legislature or the Executive."  *Trump*, 585 U.S. at 702 (internal citations and quotations omitted).

Insomuch as Bar Harbor has been designated as a Class A port of entry by the Secretary of Homeland Security and is serviced by the United States Customs and Border Protection agency (CBP), "the port is a designated Port-of-Entry for *all* aliens."  8 C.F.R. § 100.4(a) (emphasis added); *see also* 19 C.F.R. § 101.3.  Upon arrival to Bar Harbor, passengers must apply "to lawfully enter the United States . . . in person to an immigration officer at [the] port-of-entry."  8 C.F.R. 235.1(a).  If, after "inspection and authorization by an immigration officer," the

passenger is "admitted," they are entitled "to entry into the United States, denoting by its plain terms passage into the country from abroad at a port of entry." *Posos-Sanchez v. Garland*, 3 F.4th 1176, 1182–83 (9th Cir. 2021) (quoting *Negrete-Ramirez v. Holder*, 741 F.3d 1047, 1051 (9th Cir. 2014)); *see also* 8 C.F.R. § 235.1(f)(1) (admitted aliens have proven they are "*entitled*, under all of the applicable provisions of the immigration laws . . . to enter the United States" at the port of entry (emphasis added)).  Once admitted, CBP has no authority to detain or impede a foreign national's entry into the United States.  8 U.S.C. § 1225(b)(2)(A).

By declaring disembarking cruise passengers exceeding 1,000 to be "unauthorized persons," the Ordinance conflicts with CBP's determination that those passengers are both "authorized" and "entitled" to enter the United States through its Bar Harbor port of entry.  The upshot is no different than if a southern border town restricted the number of foreign nationals (or asylees) that could enter via a port of entry adjacent to that town.  The Constitution is clear, however, that "no power can exist in a State to obstruct" the federal government's operations of "its ports of entry." *Crandall*, 73 U.S. at 44; *see also Henderson*, 92 U.S. at 273.  Although the district court dismissed this as an "imagined" conflict, the Ordinance clearly has "more than incidental effect" on determinations grounded in foreign policy, at which point it is preempted. *Garamendi*, 539 U.S. at 420.

**B.      International maritime conventions.**

Beyond federal customs and immigration laws, foreign cruise ships calling on Bar Harbor are governed by international maritime conventions reflecting the foreign policy of the federal government.  Most relevant here, the United States is a signatory to the Convention on Facilitation of International Maritime Traffic ("FAL Convention"), which provides standards and best practices "to facilitate and expedite international maritime traffic and to prevent unnecessary delays to ships and to persons and property on board."  Art. I, Mar. 9, 1967, 18 U.S.T. 410, 591 U.N.T.S. 8556.  The FAL Convention governs every aspect "concerning the formalities required by public authorities from crew and passengers on the arrival or departure of a ship."  FAL Convention, Annex, § 3.[13]  Signatories "shall, without unreasonable delay, accept persons present on board a ship for examination as to their admissibility into the State."  *Id.* § 3.14.  And they are advised to "take appropriate

_____

[13] The FAL Convention has been amended over time, and these amendments have been accepted by the United States.  *See* International Maritime Organization, *Status of IMO Treaties* at 214–18 (July 24, 2024), https://wwwcdn.imo.org /localresources/en/About/Conventions/StatusOfConventions/Status%202024.pdf. Amendments become domestic law when explicitly or tacitly accepted by the Secretary of State.  *See generally Alaska v. Kerry*, 972 F. Supp. 2d 1111 (D. Alaska 2013).  The Office of Treaty Affairs does not publish updated versions of the FAL Convention and recommended that amicus curiae cite to the International Maritime Organization's copy.  Accordingly, these citations refer to the 2022 amendments at: International Maritime Organization, *Amendments to the Annex to the Convention on Facilitation of international Maritime Traffic* (May 12, 2022), https://wwwcdn.imo.org/localresources/en/KnowledgeCentre/IndexofIMOResoluti ons/FALDocuments/FAL.14%2846%29.pdf.

measures . . . so that passengers, crew and baggage can be cleared rapidly, should provide adequate personnel, and should ensure that adequate installations are provided" for transit through the port of entry. *Id.* § 3.11. Authorities should also "take all necessary measures so that . . . easy and speedy access for passengers and their baggage, to and from local transport, is provided." *Id.* § 3.11.1(b).

The FAL Convention expressly applies these principles to cruise ships. Signatories "shall authorize granting of pratique[14] by electronic means to a cruise ship when" it does not pose a risk of disease. *Id.* § 3.20. And "[c]ruise passengers shall not be unduly delayed by the control measures exercised by public authorities." *Id.* § 3.25. The Convention also recommends that, "[t]o facilitate their prompt disembarkation, the inward control of passengers on a cruise ship, where practicable, should be carried out on board before arrival at the place of disembarkation," *id.* § 3.28, as is the case at the Bar Harbor port of entry, Order at 32 (noting "immigration and customs inspection . . . transpires aboard the ship while it is anchored in Frenchman Bay").

The Convention is unquestioningly designed to facilitate the transport of passengers by vessel and to promote their speedy admission and disembarkation into

---

[14] Pratique is defined as: "A license allowing a vessel to trade in a particular country or port after complying with quarantine requirements or presenting a clean bill of health." *Pratique*, Black's Law Dictionary (12th ed. 2024).

the receiving country. By signing, the federal government has expressed its foreign policy towards foreign-flagged vessels calling on Bar Harbor. By restricting disembarkations to 1,000 persons per day, in contrast, the Ordinance puts Bar Harbor at odds with the Convention's purposes. This is a conflict. And the Ordinance must "yield" because "it is inconsistent with [and] impairs . . . the superior Federal policy evidenced by" the FAL Convention. *Garamendi*, 539 U.S. at 419 (quoting *United States v. Pink*, 315 U.S. 203, 231 (1942)).

The Ordinance is preempted as interfering with the federal government's treaty obligations concerning the treatment of foreign passenger vessels and the disembarkation of foreign nationals from such vessels.

## CONCLUSION

This Court should affirm the district court's conclusion that the Ordinance is preempted under 33 C.F.R. § 105.237 and reverse the remainder of its decision denying a preliminary injunction.

Dated: August 6, 2024

Respectfully submitted,

s/ Derek L. Shaffer
Derek L. Shaffer
Christopher G. Michel
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202) 538-8000
derekshaffer@quinnemanuel.com
christophermichel@quinnemanuel.com

*Counsel for Amicus Curiae Cruise Lines International Association*

## CERTIFICATE OF COMPLIANCE

I certify that this brief (1) complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 6,496 words; and (2) complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). As permitted by Fed. R. App. P. 32(g)(1), in preparing this certificate, the undersigned has relied upon the word-count feature of the word-processing system used to prepare this document.

Dated: August 6, 2024         *s/ Derek L. Shaffer*

## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: August 6, 2024                    *s/ Derek L. Shaffer*