# United States Court of Appeals
## For the First Circuit

Nos.  24-1317, 24-1318, 24-1385

_____

ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS;
B.H. PIERS, L.L.C.; GOLDEN ANCHOR, L.C., d/b/a Harborside Hotel;
B.H.W.W., L.L.C.; DELRAY EXPLORER HULL 495 LLC; DELRAY
EXPLORER HULL 493 LLC; ACADIA EXPLORER 492, LLC; PENOBSCOT
BAY AND RIVER PILOTS ASSOCIATION,

*Plaintiffs-Appellants / Cross-Appellees,*

v.

CHARLES SIDMAN,

*Defendant-Appellee / Cross-Appellant,*

TOWN OF BAR HARBOR, a Municipal Corporation of the State of Maine,

*Defendant-Appellee*

_____

**BRIEF OF APPELLANTS / CROSS-APPELLEES ASSOCIATION TO
PRESERVE AND PROTECT LOCAL LIVELIHOODS, B.H. PIERS, LLC,
GOLDEN ANCHOR, L.C., d/b/a Harborside Hotel, B.H.W.W, L.L.C.,
ACADIA EXPLORER 492, LLC, DELRAY EXPLORER HULL 493 LLC,
AND DELRAY EXPLORER HULL 495 LLC**

_____

<div align="right">

Timothy C. Woodcock
P. Andrew Hamilton
EATON PEABODY
80 Exchange Street (04401)
Post Office Box 1210
Bangor, Maine 04402-1210
*Counsel of Record, Plaintiffs-Appellants*

</div>

# CORPORATE DISCLOSURE STATEMENT

Association to Preserve and Protect Local Livelihoods, is a Maine 501(c)(6) entity formed as a business league to support and protect local livelihoods. No individuals or companies hold a 10% or greater interest in this entity.

Golden Anchor L.C. is a Florida limited liability company authorized to do business in Maine. B.H. Piers, L.L.C. and B.H.W.W., L.L.C. are both Maine limited liability companies. These limited partnerships own a 10% interest or more of Golden Anchor L.C., B.H. Piers, L.L.C. and B.H.W.W., L.L.C.: Michael P. Walsh Family Limited Partnership; Mark T. Walsh Family Limited Partnership; William J. Walsh Family Limited Partnership; Patrick F. Walsh Family Limited Partnership; Suzanne Walsh-Lanigan Family Limited Partnership.

Delray Explorer Hull 493 LLC and Delray Explorer Hull 495 LLC are Florida limited liability companies authorized to do business in Maine. Sunset Key Trans Holdings Corp. is a Florida corporation and is the parent company of Delray Explorer Hull 493, LLC and Delray Explorer Hull 495 LLC. The following individuals own a 10% interest or more of Delray Explorer Hull 493 LLC and Delray Explorer Hull 495 LLC by virtue of their individual membership interests in the parent corporation (Sunset Key Trans Holdings Corp.): Michael P. Walsh (20% Member or "20%"); Mark T. Walsh (20%); William J. Walsh (20%); Patrick F. Walsh (20%); Suzanne Walsh-Lanigan (20%).

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .........................................................i

TABLE OF AUTHORITIES ...............................................................................iv

JURISDICTIONAL STATEMENT ......................................................................1

STATEMENT OF THE ISSUES.........................................................................2

STATEMENT OF THE CASE.............................................................................3

INTRODUCTION .................................................................................................6

PROCEDURAL HISTORY.................................................................................12

       District Court Amended Decision and Order ................................................14

SUMMARY OF ARGUMENT ..........................................................................15

ARGUMENT .......................................................................................................16

I.     THE DISTRICT COURT ERRED WHEN IT MISDESCRIBED THE CHARACTER OF APPELLANTS' CHALLENGE TO THE ORDINANCE ..........................................................................................16

II.    THE DISTRICT COURT ERRED IN DENYING APPELLANTS' CLAIMS THAT THE ORDINANCE VIOLATED THE DORMANT COMMERCE CLAUSE...........................................................................19

        A.     DORMANT COMMERCE CLAUSE IN GENERAL ..................19

        B.     SUMMARY OF DISTRICT COURT'S RULING ON APPELLANTS' AND PILOTS' DORMANT COMMERCE CLAUSE CLAIMS ......................................................................21

        C.     THE DISTRICT COURT ERRED IN DENYING APPELLANTS' AND PILOTS' CLAIMS THAT THE ORDINANCE VIOLATED THE COMMERCE CLAUSE'S PROTECTION OF THE "FLOW OF COMMERCE"..................23

        1.     District Court Rulings on Flow of Commerce Claims ........................................................... 23

        2.     Review of Flow of Commerce Jurisprudence ................ 26

        3.     The district court erred in denying Appellants' flow of commerce claims under the dormant Commerce Clause. ....................................................... 34

III.    THE DISTRICT COURT ERRED IN DENYING APPELLANTS' CLAIM THAT THE ORDINANCE VIOLATED THE RIGHT TO TRAVEL AS PROTECTED BY THE DORMANT COMMERCE CLAUSE .................................................................................... 40

        1.     The District Court erred in finding that the Complaint did not plead the right to travel under the Commerce Clause ........................ 40

        2.     The Ordinance violates the right to travel under the Commerce Clause ................................................. 42

IV.    THE DISTRICT COURT ERRED IN DENYING APPELLANTS' CLAIM THAT THE ORDINANCE VIOLATED DORMANT COMMERCE CLAUSE STANDARDS AS SET FORTH IN *PIKE V. BRUCE CHURCH* ........................................................................ 43

V.     THE DISTRICT COURT ERRED IN FAILING TO GRANT INJUNCTIVE RELIEF ON APPELLANTS' SEAFARER PREEMPTION CLAIM ...................................................................... 46

VI.    THE DISTRICT COURT ERRED IN DENYING APPELLANTS' CLAIM THAT THE ORDINANCE WAS PREEMPTED BY FEDERAL LAWS GOVERNING THE ADMISSION OF FOREIGN NATIONALS ........................................................................... 48

VII.   THE DISTRICT COURT ERRED WHEN IT DENIED APPELLANTS' DUE PROCESS CLAIM .................................... 51

VIII.  CONCLUSION .................................................................................. 52

CERTIFICATE OF COMPLIANCE WITH RULE 32 ........................... 54

CERTIFICATE OF SERVICE ................................................................ 55

# TABLE OF AUTHORITIES

*American Trucking Associations, Inc. v. Michigan Public Service Comm'n*
  545 U.S. 429, 433 (2005) ..............................................................20

*Arizona v. United States*
  567 U.S. 387, 394 (2012) ..............................................................49

*Ayotte v. Planned Parenthood of N. New Engl.*
  546 U.S. 320, 329 (2006) ..............................................................47

*Bayley's Campground, Inc. v. Mills*
  463 F.Supp.3d 22, 34 (D. Me. 2020).............................................42

*Bayley's Campground v. Mills*
  985 F.3d 153, 159-60 (1st Cir. 2021) .........................................25, 37, 39, 42

*Bibb v. Navajo Freight Lines, Inc.*
  359 U.S. 520, 529-530 (1959) ......................................................28

*Bowman v. Chicago & N.W. Ry Co.*
  125 U.S. 465 (1888)......................................................................33

*Buck v. Kuykendall*
  267 U.S. 307, 315-316 (1925) ......................................................23

*Camps Newfound/Owattanna, Inc. v. Town of Harrison*
  520 U.S. 564. 581 (1997) ..............................................................27

*Chy Lung v. Freeman*
  92 U.S. 275 (1875)...................................................................36, 49

*Citizens United v. F.E.C.*
  558 U.S. 310, 359 (2010) ..............................................................38

*Cooley v. Board of Wardens*
  53 U.S. (12 How.) 299, 319 (1851)..........................................30, 31, 32, 35

*Edwards v. California*
  314 U.S. 160, 176 (1941) ...................................................31, 35, 41, 42, 43

iv

*Elkins v. Moreno*
    435 U.S. 647, 664 (1978) ...............................................................49

*Exxon v. Governor of Maryland*
    437 U.S. 11, 128 (1978) ...............................29, 30, 34, 36, 38

*General Motors Corp. v. Tracy*
    519 U.S. 278, 278, 298, n. 12 (1997) ...........................................28

*Gibbons v. Ogden*
    22 U.S. (9 Wheat.) 1 (1824) ...........................................................31

*Graham v. Richardson*
    403 U.S. 365, 379 (1971) ...............................................................50

*Granholm v. Heald*
    544 U.S. 460, 477 (2005) ...............................................................21

*Hannibal & St. Jos. R. Co. v. Husen*
    95 U.S. 465, 472 (1877) ................................... 24, 25, 26, 32, 33, 35, 37, 39

*Henderson v. Mayor of New York*
    92 U.S. 259 (1875) .............................................................33, 36, 39

*Hennington v. Georgia*
    163 U.S. 299 (1896) .......................................................................25

*Hughes v. Oklahoma*
    441 U.S. 332 (1979) .......................................................................43

*Hunt v. Washington State Apple Advert. Comm'n*
    432 U.S. 333, 350 (1977) ...............................................................20

*Huron Portland Cement Co. v. Detroit*
    362 U.S. 443 (1960) .......................................................................20

*Kassel v. Consolidated Freightways Corp. of Delaware*
    450 U.S. 662, 671 (1981) ...............................................................23

*Lake Shore & M.S.R. Co. v. Ohio*
173 U.S. 285, 292-298 (1899) ....................................................25

*Leisy v. Hardin*
135 U.S. 100 (1890)..........................................................26, 32, 33

*Lewis v. BTS Investment Managers, Inc.*
447 U.S. 27, 35 (1980) ...........................................................20

*Maine v. Taylor*
477 U.S. 131 (1986)...............................................................20

*Maine Forest Prod. Council v. Cormier*
586 F. Supp. 3d 22, 38 (D. Me.), *aff'd,* 51 F.4th 1 (1st Cir. 2022)...............50

*Memphis v. Greene*
451 U.S. 100, 126-127 (1981) ..............................................37, 45

*Milk Control Board v. Eisenberg Farm Products*
306 U.S. 346, 351 (1939) ........................................................32

*Missouri ex rel. Barrett v. Kansas Natural Gas Co.*
265 U.S. 298, 307-308 (1926) ...............................................33

*Morgan v. Virginia*
328 U.S. 373, 386 (1946) ........................................................40

*National Pork Producers Council v. Ross*
598 U.S. 356 (2023)................................ 21, 27, 28, 29, 30, 34, 36, 39, 43, 44

*Oklahoma Tax Commission v. Jefferson,*
514 U.S. 175, 18179-185 (1995) ..............................................34

*Pike v. Bruce Church, Inc.*
397 U.S. 137, 142 (1970) ...................................... 2, 21, 28, 37, 43, 44, 45, 46

*Quill Corp. v. North Dakota*
504 U.S. 298 (1992)..............................................................34

*Raymond Transport Motor Co., Inc. v. Rice*
 434 U.S. 429, 447 (1978) ...............................................................28

*South-Central Timber Development, Inc. v. Wunnicke*
 467 U.S. 82, 87 (1984) .................................................................20

*South Dakota* v. *Wayfair, Inc.*
 585 U.S. 162, 173 (2018) ...............................................20, 21, 34

*Southern Pacific Company v. Arizona ex rel. Sullivan*
 325 U.S. 761, 767 (1945) ........................ 20, 29, 31, 34, 37, 39, 42

*Takahashi v. Fish & Game Comm'n*
 334 U.S. 410, 419 (1948) ...............................................................51

*Tart v. Massachusetts*
 949 F.2d 490, 501 (1st Cir. 1991) ...............................................40

*Tennessee Wine and Spirits Retailers Association v. Tennessee*
 588 U.S. 504, 518 (2017) .......................................................21, 33

*Toll v. Moreno*
 458 U.S. 1, 11 (1982)......................................................................50

*Vaqueria Tres Monjitas, Inc. v. Irizarry*
 587 F.3d 464, 483 (1st Cir. 2009) ...............................................53

*Wabash, St. L. & Pac. Ry Co. v. Illinois*
 118 U.S. 567 (1886)........................................................26, 27, 30, 31

*Western Union Telegraph Co. v. Foster*
 247 U.S. 105, 1113 (1918) ...........................................................33

**OTHER AUTHORITIES**

33 C.F.R. § 105 ...........................................................................8

33 C.F.R. § 105.237 ..............................................................14, 46

Federal Rules of Civil Procedure, Rule 8 ........................................40, 41

The Federalist No. 3, 39 (C. Rossiter ed. 2003) (J. Jay)............................................50

Town of Bar Harbor, Land Use Ordinance § 125-9 ..........................................11, 12

U.S. Const., Art. I, § 8................................................................................19

# JURISDICTIONAL STATEMENT

The United States District Court for the District of Maine exercised jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts over actions arising under the Constitution or laws of the United States, and 28 U.S.C. § 1367, which confers supplemental jurisdiction on federal district courts over all other claims that are so related to claims in the action within the court's original jurisdiction that they form part of the same case or controversy under Article III of the Constitution. The Association to Preserve and Protect Local Livelihoods ("APPLL"), B.H. Piers, L.L.C. and Golden Anchor, L.C., d/b/a Harborside Hotel (collectively the "Pier Owners") and B.H.W.W., L.L.C., Delray Explorer Hull 495 LLC, Delray Explorer Hull 493 LLC and Delray Explorer Hull 495 LLC (collectively, the "Tender Owners") brought claims arising under the Supremacy Clause, Article VI of the Constitution, the Commerce Clause, Article I, Section 8 of the Constitution, and, the Due Process Clause of the Fourteenth Amendment to the Constitution, seeking vindication of those rights pursuant to 42 U.S.C. § 1983.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, which confers jurisdiction on courts of appeal for appeals from all final decisions of the district courts of the United States. On March 1, 2024, the district court entered judgment on all counts. (Addendum ("Add.") 001.) On March 29, 2024, APPLL, the

Pier Owners and Tender Owners filed a timely Notice of Appeal in the district court. (Appendix ("App.") 281-82.) Plaintiff-Intervenors in the district court action, the Penobscot Bay and River Pilots Association, also filed a timely Notice of Appeal on the same day. (App. 283-84.)

## STATEMENT OF THE ISSUES

1.    Whether the district court erred when it misdescribed the character Appellants' challenge to the Ordinance?

2.    Whether the district court erred in denying Appellants' claim that the ordinance violated the protection by the dormant Commerce Clause of the flow of commerce?

3.    Whether the district court erred in denying Appellants' claim that the ordinance violated the right to travel as protected by the dormant Commerce Clause?

4.    Whether the district court erred in denying Appellants' claim that the ordinance violated the dormant Commerce Clause standards as set forth in *Pike v. Bruce Church?*

5.    Whether the district court erred in failing to grant injunctive relief on Appellants' seafarer preemption claim?

6.    Whether the district court erred in denying Appellants' claim that the ordinance was preempted by Federal Laws governing the admission of foreign nationals?

## STATEMENT OF THE CASE

At issue is an Ordinance adopted by voters in the Town of Bar Harbor ("the Town") which amended the Town Land Use Ordinance to impose a ceiling of no more than 1,000 on the number of persons who could disembark from a cruise ship in a given day. The Ordinance applies without exception to every day of the year.

The Ordinance constitutes an initiative effort in a municipality to impose local, idiosyncratic, and potentially ever-changing limitations on a particular sector of the nation's maritime transportation—the movement of persons from port to port via cruise ship. Invoking the purported rationale of managing "land use", the Ordinance seeks to stem the flow of cruise ship visits for the ostensible objective of reducing sidewalk "congestion". In purpose and effect, the Ordinance is no land use measure. To the contrary, its purpose and effect is to bar cruise ships with lower berth capacities of more than 1,000 persons from ever calling at Bar Harbor. Cruise lines will not pick and choose which cruise vessel passengers can come ashore.

Although supposedly directed at reducing pedestrian "congestion" in general, the Ordinance is actually directed solely at cruise ship visitors, approximately 7-10% of all those who visit the Bar Harbor area in a given year, leaving wholly unaddressed the vast majority of the nearly 4,000,000 or so persons who arrive in Acadia National Park and Bar Harbor by all other means of transportation. The "congestion" rationale for this Ordinance is mere pretense.

In addition, applying to every day of the year, the Ordinance in no way accounts for the longstanding, historic variability of tourist visitation in which July and August have been the most popular months, flanked by the less tourist-intense months of April-June and September-October.

No public municipal official testified that cruise ship visits jeopardized the delivery of essential services, including public safety services. Accordingly, the district court made no such finding.

Grounded as it is in the Town's Land Use Ordinance, there is no end to its application in other contexts. If a municipality can limit the number of persons disembarking from cruise ships to manage sidewalk traffic, it can do the same with those arriving by tour bus, airplane, or private vehicle. In short, as a land use measure limiting cruise ship disembarkation and, thereby, effectively barring cruise ships with capacities of 1,000 persons or more, the Ordinance claims a power that, if found valid, as did the district court, would admit of no limiting principle in that field of commerce engaged in the transport of persons.

The Ordinance reaches too far. It trenches on fields of policymaking that the Constitution has reserved for the federal government alone to assure uniformity of the flow of transportation in general, and maritime transportation in particular, and is preempted thereby; it violates particular federal rules and conventions (as in one instance, the district court recognized) and is preempted thereby; it claims the

practical authority to rigorously and comprehensively limit the numbers of persons who may travel to Bar Harbor by cruise ship in violation of the Commerce Clause; and, it lacks a rational nexus between its objective and the means the Ordinance employs to meet that objective in violation of the Due Process Clause.

The practical barrier that the Ordinance erects to preclude visits by cruise ships with capacities over 1,000 persons threatens the economic interests of each of the Appellants, whose businesses are dependent on cruise ship visits; the owners of private piers who serve those disembarking from cruise ships (the Pier Owners); the owners of tender vessels who transport persons to and from the cruise ships (the Tender Owners); and, those businesses who accommodate and serve cruise ship visitors, which have joined together as the Association to Preserve and Protect Local Livelihoods ("APPLL"). In addition, relying on its invalid "land use" rationale, the Ordinance subjects the Pier Owners, and only the Pier Owners, to civil fines of up to $5,000 per "excess unauthorized persons" arriving by cruise ship, who have already been cleared by Customs, to set foot on the tender piers and then into the Town.

At all times, the constitutional challenges brought by these Appellants have been squarely directed at the particular terms of **this** Ordinance—its 1,000-person per day ceiling, applied cumulatively, and its rigid application of this ceiling as a uniform year-round rule. This entire Ordinance targets only one industry and one

mode of transportation without constitutionally sufficient justification. They challenge **this** Ordinance's rationale; they challenge its actual purpose and its ostensible purpose; and, they challenge its effect—all of which violate bedrock constitutional standards and principles.

## INTRODUCTION

Since the nineteenth century, Bar Harbor, Maine has been a summer tourist destination. For much of that time, however, the summer season was brief with July and August constituting the bulk of the season, with some but lesser activity in the "shoulder months" of June and September. For decades, cruise ships have called at Bar Harbor. Situated adjacent to Acadia National Park, Bar Harbor is a popular tourist destination and the only "marquee port" in Maine for cruise itineraries in the New England/Canada cruise line trade. District Court's March 1 Amended Order ("Order") Addendum ("Add.") at 6; *see also* the Joint Proposed Findings of Facts (Appendix "App." at 227-280). These proposed findings were submitted jointly by Plaintiff Appellants and Plaintiff-Intervenor Appellant with their initial Post-Trial Briefs in September 2023 (herein "PFF") at ¶¶ 30, 41-47, 57-58 [1]. Bar Harbor is

---

[1] As a cruise ship port of call, Bar Harbor is part of an international cruise ship itinerary including New England, extending south to Boston, New York and New Jersey and north and east to the Maritimes, including, at times, Halifax, and north and west to the St. Lawrence Seaway and Montreal. PFF at ¶¶ 36, 125-126. In this international itinerary, Bar Harbor stands out as Maine's only "marquee" port. PFF at ¶¶ 30-36. A marquee port has exceptional attributes that attract visitors and "help sell tickets." PFF at ¶¶ 30-36.

also geographically well-located between Boston and Halifax and a good location to permit Customs processing of cruise passengers on itineraries that include ports of call in Canada and other foreign nations. PFF at ¶¶125-126.

For decades, the Town of Bar Harbor ("the Town") actively promoted the growth of cruise ship visitation and worked cooperatively with the State of Maine to grow as a tender port to serve cruise ship visitation, in alignment with efforts of the Department of Transportation (later CruiseMaine in the Maine Office of Tourism), and the cruise lines. Add. at 6-7. The Pier Owners made investments in significant pier upgrades, the Tender Owners made investments in barges and new tender vessels, and APPLL members (and other businesses) expanded their capabilities so that they could serve the cruise ship visitors. Add. at 2-3; PFF at ¶¶ 52-59, 61-75, 78-116, 163-167.

Specifically, relying on and sharing the mutual Town and State commitments to create a safe and efficient tender port, the Tender Owners invested in the design and operation of customized barges and tender ships to safely tender the cruise passengers into the two private tender piers at the Bar Harbor waterfront. Add. at 3, 8; PFF at ¶¶ 8-82; 103-116.[2] The Pier Owners redesigned and reconstructed their

---

[2] In recent years, the tender duties have been performed by tender vessels which the Tender Owners had specially designed and constructed for this task. PFF at ¶163. Each vessel has been licensed by the U.S. Coast Guard. PFF at ¶¶ 163-167. They can accommodate up to 149 passengers. *See e.g.* PFF at ¶¶ 12-14, 80. The tender vessels provide a shuttle service bringing people to and from the cruise ships in

two private piers and also aligned with federal maritime security requirements for cruise vessel disembarkation facilities. Those two piers are likewise the subject of Coast Guard oversight for requisite maritime transportation security planning and review for this purpose. Add. at 3; PFF at ¶ 83, 109; App. at 67-68.[3]

The Penobscot Bay and River Pilots Association ("Pilots") also made investments, including the purchase of specialized vessels and equipment, to ensure that they could serve visiting cruise ships and safely guide them to the designated federal anchorages. Add. at 3-4; PFF at ¶¶ 99-105, 318-325.

In addition to these private initiatives, the Town, the State of Maine, and the federal government all took steps to accommodate cruise ship visitation. Add. at 6-7. U.S. Customs and Border Protection designated Bar Harbor a "Class A" port of entry and has routinely provided clearance services for cruise ship visitors arriving from visits to foreign ports[4], and the U.S. Coast Guard designated two anchorages—

---

shifts. *Id.* There is a time gap between these trips which can range from 20 to 45 minutes. *See* PFF at ¶ 111. This means that persons arriving from cruise ships do not arrive at the piers all at once.

[3] The piers, themselves, are also reviewed and approved for adequacy of federal maritime security under the MTSA by the U.S. Coast Guard. PFF at ¶¶ 82-83. To obtain these approvals, the Pier Owners fulfilled the Coast Guard's requirements under 33 C.F.R. Part 105. *See Id*; App. at 067-068.

[4] Bar Harbor has long been a Class A port of entry for foreign-flagged cruise vessels re-entering the United States (Add. at 4) on the southern arm of cruise itineraries on the East Coast, including the New England – Canada cruise itinerary. PFF at ¶¶ 117-126. Those cruise ships include the larger domestic and foreign-flagged cruise vessels (with a lower berth capacity above 1,000 passengers and crew) owned by lines like Norwegian, Carnival and Royal Caribbean that are active in New England

Anchorages A and B—for use by cruise ships. PFF at ¶¶ 83, 86-88, 90-116, 117-123, 297-298.

For its part, the Town instituted measures to manage the flow of buses and other commercial vehicles picking up cruise ship visitors for trips to Acadia National Park and back to Bar Harbor. PFF at ¶¶ 75,112-114,195. To defray the cost of municipal services to support cruise visits, the Town imposed fees on visiting cruise ships which eventually reached $1,000,000 annually. Add. at 7; PFF at ¶¶ 63, 71-72.

The result was a much-expanded tourist season running from May through the end of October. Add. at 7; PFF at ¶¶ 59-61, 63, 135-136. During this period of growth, the Town worked cooperatively with cruise line owners as well as the State of Maine to manage the cruise ship visits. PFF at ¶¶ 20-25, 40-49,61-75. A principal concern was that the volume of cruise ship visitors accord with Bar Harbor's scale and community interests. PFF at ¶193.

Their solution was a system of "voluntary caps" which the Town, with the agreement of the cruise lines, adopted in 2008. Add. at 7; PFF at ¶¶ 61-63, 168-177. The voluntary daily caps on cruise ship visits were tied to the ship's lower berth

_____

and predominates the cruise line itineraries that include Bar Harbor. Add. at 5; PFF at ¶¶ 258-290.

capacity.[5]  These caps followed the rhythm of the tourist season with higher caps allowed for April through June and from September into November and with lower caps imposed for the intense tourist months of July and August. PFF at ¶175.  Each year a nonlegislative committee reviewed the caps, and they were then reported to the Town Council for approval.  PFF at ¶¶178-179.

In 2020 and 2021, cruise ship visits to Bar Harbor ceased with the imposition of restrictions imposed as a result of COVID-19.  PFF at ¶¶138-140.  In 2021, with the public health crisis easing, public concern about the cruise ships' return began to grow with particular concern for the volume of cruise ship visits and visitors.  PFF at ¶¶180-193.[6]

Continuing with the Town's longstanding cooperative and balanced approach, the Town Council addressed this concern by developing Memoranda of Agreements (MOAs) with the cruise lines significantly lowering the volume of cruise ship

---

[5] The term "lower berth capacity" generally refers to the passenger capacity of the cruise vessels and is calculated based on the number of "lower berths" or beds on the vessel.  PFF at ¶¶169-173.

[6] As the district court found, although most all cruise vessels each carry more than 1,000 passengers and hundreds of crew, such disembarking persons "account for a limited portion of the total number of annual visitors to greater Bar Harbor and Mount Desert Island." Add. at 8; PFF at ¶¶ 54, 129-130 (cruise visitors to Bar Harbor account for about 7 to 10% of total visitors; for Acadia National Park, that is 4 million annually (Add. at 8); the approximate 90 to 93% remainder are visitors by land-based transportation).

visitors. The MOAs were contractual, and the Town and each affected cruise line signed them. Add. at 10-11; PFF at ¶¶ 180-189.

On a track parallel to the MOAs, a local petition for an initiated ordinance was drafted and presented to the Town Council for approval of a warrant article to place the initiated ordinance before Bar Harbor voters. PFF at ¶¶196-240. The primary advocate for and co-author of this initiative was Charles Sidman, who later became a Defendant-Intervenor in this litigation. The Initiative was supplemented by a "Purpose" section[7] which claimed that cruise ship visits jeopardized the delivery of police, fire, EMS, and other essential services; the district court did not find that cruise visits jeopardized essential services. Order, *passim*. The "Purpose" section also claimed congestion from cruise ship visitors; that claim was inconsistent with a comprehensive pedestrian study conducted by Todd Gabe, Ph.D. Add. at 79.

The initiative proposed to amend the Town's Land Use Ordinance by limiting the number of persons who could disembark (without penalty) from a cruise ship in a given day to no more than 1,000.[8] The 1000-person cumulative daily ceiling

---

[7] The purpose of Mr. Sidman and the petitioners also included getting "rid of the biggies," referring to larger cruise ships. Add. at 80.

[8] The Initiative measure proposed on March 16, 2022, proposed to target "passengers" for the disembarkation limit (App. at 297-300), but the Initiative Petitioners conferred, and given that "cruise ships carry a great many crewmembers as well as passengers" who all come into Bar Harbor, the March 17, 2022 measure proposed to target all "persons" disembarking from a cruise ship and coming into Bar Harbor. App. at 295-296. The Town Council placed that March 17 version of

applied without exception to every day of the year.   In compliance with the Town's
Charter (Add. at 69-73) and the provision governing amendments to its Land Use
Ordinance ("LUO" at § 125-9, Add. at 73-75), the initiated ordinance was presented
to Bar Harbor voters for adoption as an amendment to the Land Use Ordinance and
the Bar Harbor voters approved the initiative ("the Ordinance") at a secret ballot
vote acting as Town Meeting on November 8, 2022.

The Ordinance's passage prompted the formation of APPLL, a coalition of
local businesses and employees, to oppose the ordinance and to protect the local
livelihoods of business owners and their employees.  APPLL then joined with the
Pier Owners and the Tender Owners (the "APPLL Appellants") to file their verified
complaint against the Town in the U.S. District Court seeking declaratory and
injunctive relief on the grounds that the Ordinance was preempted under the
Supremacy Clause, that it violated the Commerce Clause, and that it violated the
Due Process Clause.

## PROCEDURAL HISTORY

The APPLL Appellants, as Plaintiffs, commenced this litigation with a
complaint filed on December 30, 2022 alleging that the Ordinance violated the
Supremacy Clause (Count I), the Commerce Clause (Count II), and the Due Process

---

the Ordinance on the Warrant calling the voters to gather on November 8, 2022, to
vote on that March 17 Initiative.  App. at 301-304; Add. at 12.

Clause (Count III) of the U.S. Constitution, seeking declaratory and injunctive relief. App. at 026-079. Appellants supplemented their complaint with a motion for a preliminary injunction.

All three Plaintiffs alleged that the Ordinance would cause large cruise ships to terminate their visits to Bar Harbor and that, in turn, the Plaintiffs would suffer a decline in revenues caused by the absence of cruise ship patrons. *Id.*, ¶¶ 28-32, 57-58, 62-64, 77, 88-89. In addition, the Tender Vessel Owners alleged that their special-purpose tender vessels, designed and built to ferry passengers and crew to and from cruise ships, would effectively become obsolete. *Id.* ¶¶ 57-58, 63, 88-89. The Pier Owners alleged further that the Ordinance placed them particularly at risk because, in the event that more than 1,000 persons disembarked from cruise ships and entered into Bar Harbor over their piers, they alone could be sanctioned under a penalty system directed at the Pier Owners. *Id.* ¶¶ 43-44.

Pilots later moved to intervene as a Plaintiff-Intervenor, which was granted. App. at 80-117. Later still, Charles Sidman, the principal Bar Harbor voter behind the initiative, moved to intervene as a Defendant-Intervenor. *See* ECF 45. His motion was also granted. App. at 160-167.

In admitting Mr. Sidman as a Defendant-Intervenor, the district court suggested that the litigation in this matter ("constitutional challenges to popular enactments") could be decided on an expedited basis. App. at 166. Shortly thereafter,

the court issued an Expedited Scheduling Order. At the same time, the Town committed that it would not enforce the Ordinance until the district court had adjudicated its validity. With this assurance, Plaintiffs withdrew their Motion for a Preliminary Injunction. As discovery proceeded, Mr. Sidman filed a motion to dismiss which was denied.  App. at 168-169.

Upon the conclusion of discovery, the case was tried at a bench trial from July 11-13.  Post-trial briefing on the merits concluded on October 27, 2023.  On March 1, 2024, the district court issued its Amended Decision and Order ("Order").  Add. at 1-61.  APPLL Appellants and Pilots filed their appeal with this Court on March 29, 2024.  App. at 281-284.

## District Court Amended Decision and Order

The court found that the ordinance would greatly reduce cruise ship visitation. (Add. at 17; the ordinance "will reduce passenger visitation volume by a significant percentage, likely north of 80 and possibly as high as 90 percent").  Despite this, in its Order, with one exception, the district court denied all of Appellants' claims as well as all of Pilots' claims.  The sole exception concerned preemption of the Ordinance by a U.S. Coast Guard rule—33 C.F.R. § 105.237—which guarantees shore access to disembarking crew members, also term "seafarers."  Add. at 28.

Otherwise, the district court rejected Appellants' and Pilots' preemption claims based on federal regulation of maritime matters, customs and immigration,

and the federal anchorages and federally sanctioned tender piers. Add. at 25-35. The district court also denied Appellants' Due Process claim. Add. at 35-41.[9] It then denied the full spectrum of Appellants' and the Pilots' Commerce Clause claims. Add. at 42-60.

Although finding for Appellants and the Pilots on their seafarer preemption claim, the Order concluded that they did not warrant "any meaningful relief" with respect to what it termed the seafarer rule's "limited (and hypothetical) preemption." Add. at 29. Accordingly, the district court denied Appellants and Pilots any relief and, in entering judgment for them on the seafarer preemption issue, observed that, in doing so, it was "by no means self-evident that any material alteration of the relationship of the parties has thereby been achieved." Add. at 60.

## SUMMARY OF ARGUMENT

At a Town Meeting held on November 8, 2022, Bar Harbor voters approved an ordinance limiting to 1,000 the number of persons who could, without penalty, disembark from cruise ships in a single calendar day. The Ordinance provided that penalties would be imposed on privately-owned piers that serve as the entry point to Bar Harbor for most cruise ship visitors.

---

[9] The Pilots did not bring a Due Process claim against the Ordinance.

The Ordinance was drafted to effectively bar cruise ships with lower berth capacities greater than 1,000 persons from coming to Bar Harbor. Following a bench trial, the district court found that the Ordinance would have that effect.

Appellants contend that the district court erred in denying their claims that, in several ways, the Ordinance violates the dormant Commerce Clause; that the district court also erred in denying most, but not all of Appellants' preemption claims; and, that the district court erred in denying Appellants' due process claims.

The district court determined that the Ordinance was preempted by a federal rule guaranteeing shoreside access to seafarers, but the court erred in not awarding Appellants' any relief on this aspect of their claim.

## ARGUMENT

## I. THE DISTRICT COURT ERRED WHEN IT MISDESCRIBED THE CHARACTER OF APPELLANTS' CHALLENGE TO THE ORDINANCE

At the outset of the Order, the district court framed the legal question before it, asserting that it, "chiefly asks whether a municipality with privately owned port facilities can restrain interstate cruise ship commerce for local welfare ends or must make way to permit whatever level of commerce the local market can support." Add. at 2. At other points in the Order and in slightly different ways, the district

court repeated this formulation of the central legal issue it had been called upon to decide.[10]

These characterizations conveyed the clear message that Appellants and Pilots were seeking a sweeping ruling that the Town could never limit cruise ship visitation in any way or under any circumstances; that, instead, the Town must accommodate whatever expansion suited the economic interests of cruise ship operators and the local persons and entities that served their needs. In fact, neither Appellants nor Pilots ever made any such claims. Nor were such claims ever presented to the district court for decision.

At all times, Appellants challenged the particular terms of, and means employed by **this** Ordinance and the effect of **this** Ordinance on cruise ship

---

[10] For example, the district court said that the "pilotage system" was not "an implicit statutory surrogate for compulsory, maximal municipal participation in cruise tourism." Add. at 20. In the same vein, the Order reflected that, "if the maximization of commerce were compulsory, a vast body of zoning and land use regulation would not be worth the paper it is written on." Add. at 21. Again, the Order characterized the Town's interest in the Ordinance as "modestly in tension with the highest marginal commercial harvest" (a goal which it attributed to the "tourism office".) Add. at 22. At another point, the district court speculated that validating the Ordinance might "encourage more municipalities to consider participation, knowing that they will not thereby be compelled to accommodate whatever level of traffic cruise lines and their local partners wish to impose." Add. at 44. Still further, the Order characterized Appellants as claiming a "constitutional right to maximize the burden their commerce imposes on the commons, at least up a level that approaches to their capacity to serve [but that] they have not cited any authority for that proposition." Add. at 39. "What this case really involves is the contention that cruise lines are able to compel local accommodation of their private assessment of the ideal economies of scale for cruise tourism." Add. at 45.

visitation.  At no point did Appellants ask the district court to rule more broadly. The Appellants concentrated their challenge on the Ordinance's particular terms for the simple reason that it the purpose and effect of the terms, conditions, and procedures of **this** Ordinance, and not some other law, was effectively barring cruise ships with lower berth capacities of more than 1,000 persons from calling at Bar Harbor and that was, thereby, threatening grievous injury to Appellants and Pilots.

The focused character of this challenge was evident in the Complaint.  App. at 026-79; ¶¶ 1-5; 39 (including Exhibit B to the Complaint, attaching the specific March 17 version of the Initiated Ordinance targeting only "passengers"); 40-65 (including Exhibits C and D, attaching the final March 17 version of the Ordinance targeting all "persons," and the Clerk's report of both the voted Initiative and the vote tally); *see also* ¶¶ 77, 82, 88-89; 96-105; 119-123; 125-128; Prayers for Relief, ¶¶ 1-4.  All of the Complaint is directed at this Ordinance and the means employed in the Ordinance – namely, prohibiting through local land use regulation the disembarkation of more than 1,000 persons per day cumulatively across property into Bar Harbor.

During trial, Mr. Sidman's counsel contended that Appellants were seeking such a broad ruling; a contention which Appellants' counsel emphatically denied. Add. at 89-91. To put this matter to rest, in Plaintiffs' post-trial Reply Brief, they

reaffirmed the focused character of their challenge only to this Ordinance.   ECF 198.

In sum, the district court framed and decided a legal question regarding the constitutionality of the Ordinance that neither Appellants nor Pilots ever raised.   In doing so, the district court erred.

## II.   THE DISTRICT COURT ERRED IN DENYING APPELLANTS' CLAIMS THAT THE ORDINANCE VIOLATED THE DORMANT COMMERCE CLAUSE

### A.   DORMANT COMMERCE CLAUSE IN GENERAL

The dormant Commerce Clause protects commerce in a variety of ways. Appellants and Pilots brought separate but related claims under that clause.   The district court denied them all.   Before turning to the district court's rulings on those claims, some background on the dormant Commerce Clause may be of value.

The Commerce Clause invests in Congress the power to "regulate Commerce with foreign Nations, among the several States, and with Indian Tribes."   U.S. Const., Art. I, § 8.   The Supreme Court has held that the Commerce Clause has its own motive force in defense of the national economy that the Constitution itself had made possible. "Although the Commerce Clause is by its text an affirmative grant of power to Congress to regulate interstate and foreign commerce, the Clause has long been recognized to be a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." *South-Central Timber*

*Development, Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984) (citing *Lewis v. BTS Investment Managers, Inc*., 447 U.S. 27, 35 (1980)).

This constitutional force, the "dormant" or "negative" Commerce Clause, acts as a "negative command" creating "an area of trade free from interference by the States." *American Trucking Associations, Inc. v. Michigan Public Service Comm'n,* 545 U.S. 429, 433 (2005) (internal citations omitted).

While vesting in the Constitution power sufficient to vindicate the interests and defense of a national economy, the Commerce Clause did not, thereby, divest the States of all power to legislate on economic matters. As the Supreme Court has explained, "[i]n the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or, to some extent, regulate it." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 350 (1977) (*quoting Southern Pacific Company v. Arizona ex rel. Sullivan,* 325 U.S. 761, 767 (1945)). Therefore, although the Constitution mandates a national economy, States may enact valid laws addressing matters of local or statewide significance. *South Dakota* v. *Wayfair, Inc*., 585 U.S. 162, 173 (2018) (reviewing case law on State authority over local matters); *see e.g., Maine v. Taylor*, 477 U.S. 131 (1986) (State may ban potentially diseased out-of-state baitfish); *Huron Portland Cement Co. v. Detroit,* 362 U.S. 443 (1960) (city may regulate air quality).

Absent a compelling state interest, the dormant Commerce Clause bars States from enacting laws that discriminate against interstate commerce. *Tennessee Wine and Spirits Retailers Association v. Tennessee*, 588 U.S. 504, 518 (2017). Even if not discriminatory, State laws may not impose an undue burden on commerce. *Id.* at 532-33 (*citing Granholm v. Heald,* 544 U.S. 460, 477 (2005)). "State laws that 'regulat[e] even-handedly to effectuate a legitimate local public interest ... will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Wayfair*, 585 U.S. at 173 (*quoting Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970)).

Finally, and importantly, the dormant Commerce Clause protects the flow of commerce—the interstate and foreign transportation of goods and persons—and the instrumentalities and arteries essential to it. *National Pork Producers Council v. Ross*, 598 U.S. 356, 379-380, n. 2 (2023)

### B. SUMMARY OF DISTRICT COURT'S RULING ON APPELLANTS' AND PILOTS' DORMANT COMMERCE CLAUSE CLAIMS

The district court rejected all of Appellants' and Pilots' contentions that, in different ways and for different reasons, the Ordinance violated the dormant Commerce Clause. Add. at 42-60. The district court rejected the Appellants' and Pilots' foreign commerce clause claim because the Ordinance was "indifferent" to whether the cruise ships from which visitors disembarked were foreign-flagged or

the visitors, themselves, were from other counties and the Ordinance was "silent on the subject of foreign navigation." Add. at 43.

The district court also rejected the notion that this was an area of commerce that required uniformity, noting that Congress had not legislated and "it was not at all apparent or even probable that" municipal control of cruise line visitation would "undermine the ability of any of the several coastal states to participate fully in cruise tourism involving every size of cruise ship imaginable and bearing whatever flag." Add. at 45.[11]

In addition, the district court rejected Appellants' and Pilots' economic discrimination claims under the Commerce Clause concluding that the Ordinance had a nondiscriminatory purpose in that it is directed at cruise ship traffic that "hampered the experience of local welfare." Add. at 48. It concluded that the Ordinance was not "isolationist" because, except for visitation by cruise ship, Bar Harbor remained open to the world. Add. at 48-49.

Finally, the district court rejected Appellants' and Pilots' arguments that the Ordinance impeded the "flow of commerce" and "instrumentalities and arteries of commerce." Add. at 50-55.

---

[11] The district court closed its discussion of the foreign Commerce Clause claims noting that three Supreme Court decisions cited by the Appellants and Pilots were "distinguishable" but did not explain in what respects it had distinguished any of them. Add. at 45, n. 27.

## C. THE DISTRICT COURT ERRED IN DENYING APPELLANTS' AND PILOTS' CLAIMS THAT THE ORDINANCE VIOLATED THE COMMERCE CLAUSE'S PROTECTION OF THE "FLOW OF COMMERCE"

As Plaintiffs, Appellants' and Pilots, claimed that the Ordinance violated the dormant Commerce Clause's protection of the "flow of commerce" and the "instrumentalities" and "arteries of commerce". The district court rejected these claims. Add. at 50-55; *see also* Add. at 42-60.

### 1. District Court Rulings on Flow of Commerce Claims

In addressing the flow of commerce claims, the district court advised that there were two categories of such cases. The first category comprised "classic 'free-flow' cases [as] cases in which a state enacts a law evenhandedly to regulate in-state economic activity" but that law is inconsistent with those of "neighboring or surrounding states, effectively halting interstate transportation through that state." Add. at 50-51. As examples of this category of cases, the district court cited *Kassel v. Consolidated Freightways Corp. of Delaware*, 450 U.S. 662, 671 (1981) and *Southern Pacific. Id.* at 51.

The second category, which the district court described as "less common", "arise out of a state's creation of a monopolistic enterprise that prohibits competition." Add. at 51 (*citing Buck v. Kuykendall*, 267 U.S. 307, 315-316 (1925)).

The district court concluded, however, that "[t]he Ordinance does not fit into either category." Add. at 51.[12]

In rejecting these free-flow arguments the district court found that "[t]he record in this case demonstrates that the Ordinance does indeed stem the flow of interstate commercial activity by reducing the daily volume of persons disembarked into Bar Harbor from cruise ships." Add. at 51.[13] In denying Appellants' and Pilots' motion for injunctive relief (addressing their seafarer preemption claim), the district court observed that "the end for which the Ordinance was drawn [was to] stem[] the tide of daily cruise ship visitation to vessels with lower berth capacities of 1,000 or less." App. at 290.

In their motion for an injunction pending appeal, Appellants and Pilots raised their flow of commerce claims as a basis for injunctive relief. The district court noted their reliance on the standard set forth in *Hannibal & St. Jos. R. Co. v. Husen,* which held that states and local governments could not interfere with the flow of commerce "beyond [what] is absolutely necessary for [Bar Harbor's] self-protection." App. at 290-291 (*citing* 95 U.S. 465, 472 (1877)). The district court

---

[12] As is discussed further below, flow of commerce jurisprudence is not limited to these two categories of decisional law.

[13] In its Order denying Appellants' and Pilots' joint motion for an injunction pending appeal, the district court found that "the end for which the Ordinance was drawn [was] stemming the tide of daily cruise visitation to vessels with lower berth capacities of 1,000 or less." App. at 290.

also noted this Court's quoted reference to the *Husen* standard in *Bayley's Campground v. Mills,* 985 F.3d 153, 159-60 (1st Cir. 2021).  App. at 291.

In denying their motion, the district court appeared to assert that *Husen*'s "absolutely necessary" standard was no longer good law saying that it "briefly emerged" and, in that undefined period of vitality, was limited to state and local laws "that had as their very object 'to obstruct inter-state commerce, and to discriminate between the property of one State and that of citizens of other states.'"  App. at 291 (citing 95 U.S. 465, 470).

The district court found more pertinent the Supreme Court decisions in *Hennington v. Georgia*, 163 U.S. 299 (1896) (upholding a state law banning railroad operation on Sundays) and *Lake Shore & M.S.R. Co. v. Ohio*, 173 U.S. 285, 292-298 (1899) (upholding a state law requiring that the first three trains operated by railroads stop at every town with a population of over 3,000). App. at 291-293; *see also* App. at 292, n. 2.

The district court then explained that the "primary point" of its Amended Decision and Order was that "the Commerce Clause does not protect the cruise lines industry's 'particular structure [and] methods of operation.'" App. at 291 (*citing* Add. at 58).  As to this point, the district court said the Plaintiffs were "silent".

Another point, apparently decisive in the district court's analysis, was its conclusion that, "Congress is simply not in the exclusive position to regulate the

standards by which small port communities' interface with cruise line tourism." App. at 293. The district court's emphasis on this point was consistent with its earlier determination on this same point. Add. at 55 ("reject[ing] the contention" that "only Congress" can provide national uniformity for local cruise ship visitation).

The district court accused Appellants and Pilots of "attempt[ing] to sidestep" this principle by reliance on *Wabash, St. L. & Pac. Ry Co. v. Illinois,* 118 U.S. 567 (1886), which it concluded was limited to state "price regulation" (App. at 293), and *Leisy v. Hardin,* 135 U.S. 100 (1890), which it characterized as "puzzling Probation Era jurisprudence" and which it found "unhelpful." App. at 293-294.

## 2. Review of Flow of Commerce Jurisprudence

In limiting *Wabash* to "price regulation", confining *Leisy* to "the Probation Era" (while also finding *Leisy* "puzzling"), and, implying that the *Husen* standard for state interference with the flow of commerce was only briefly valid, the district court fundamentally misconstrued the body of case law that comprises the flow of commerce principle under the dormant Commerce Clause as well as the protection that it extends to "instrumentalities" and "arteries of commerce."

Protection of the movement of persons and goods in interstate and foreign commerce has long been a distinct and essential function of the dormant Commerce Clause. As will be seen below, prohibited state or local "restraints" on the flow of commerce may take many different forms, obscuring, at times, the common thread

of Commerce Clause decisions that unite Supreme Court decisions invalidating them. Moreover, as the Supreme Court, itself, has recognized, even as particular jurisprudential rationales shift, the underlying objective of insuring that the transport of persons and goods in interstate and foreign commerce remains unchanged. That this is so, requires a broad review of Supreme Court decisions on this principle.

As the Supreme Court succinctly put it, "[i]t  cannot be too strongly insisted upon that the right of continuous transportation, from one end of the country to the other, is essential in modern times, to that freedom of commerce, from **restraints** which the states might choose to impose upon it, that the commerce clause was intended to secure." *Wabash,* 118 U.S. at 572-573 (emphasis supplied).  As is readily apparent, and as the case law demonstrates, such "restraints" may take many forms and serve many purposes from economic discrimination to revenue-raising, to morals legislation, and more, but, if they significantly impede continuous interstate or foreign commerce, they will run afoul of the dormant Commerce Clause.

Recently, in *National Pork Producers Council v. Ross,* 598 U.S. 356 (2023), the Supreme Court recognized and confirmed this very point. The *National Pork* Court first reviewed the history of dormant Commerce Clause jurisprudence.  *Id.* at 368-71.  The Court observed that, "[t]oday, [the] antidiscrimination principle lies at 'the very core' of our dormant Commerce Clause jurisprudence." *Id.* at 370 (*quoting*

*Camps Newfound/Owattanna, Inc. v. Town of Harrison*, 173520 U.S. 564. 581 (1997)).

Although emphasizing the dormant Commerce Clause's focus on state or local laws that discriminate economically, the *National Pork* majority also recognized a distinct line of Supreme Court decisions in which the Court "expressed special concern with certain state regulation of the instrumentalities of interstate transportation." *National Pork,* 598 U.S. at 380; *see also Id.* at 379-380, n, 2; *accord Id.* at 392, Sotomayor, J., concurring (dormant Commerce Clause protects "arteries of commerce", citing to *id.* at 379-380, n. 2).

Footnote 2, cited by the majority and again by Justice Sotomayor in her concurring opinion, warrants further discussion. The *National Pork* Court prefaced footnote 2 with a reference to *General Motors Corp. v. Tracy*, 519 U.S. 278, 278, 298, n. 12 (1997), for the point that "a small number of our cases have invalidated state laws...that appear to have been genuinely nondiscriminatory." *Id.* at 379-80.

Footnote 2, noted that *Tracy* had "alluded to [] a line of cases that originated before *Pike* in which this Court refused to enforce certain state regulations on instrumentalities of interstate commerce—trucks, trains and the like." *Id.* Footnote 2, itself, went further, adding more cases to those cited in the *Tracy* footnote, all concerning state laws burdening transportation of goods and persons. *See Raymond Transport Motor Co., Inc. v. Rice,* 434 U.S. 429, 447 (1978) (trucks); *Bibb v. Navajo*

*Freight Lines, Inc*., 359 U.S. 520, 529-530 (1959); (trucks); *Southern Pacific Co. v. Arizona ex rel. Sullivan,* 325 U.S. 761, 763-782 (1945) (passenger and freight trains).

Footnote 2 quoted *Exxon v. Governor of Maryland*, for the point that the Supreme Court "has only rarely held that the Commerce Clause, itself, pre-empts an entire field from state regulation, and then only when a lack of national uniformity would impede the flow of interstate goods." *Id. (quoting* 437 U.S. 11, 128 (1978)) (italics supplied in *National Pork*). Footnote 2 closed with the observation that California's pork production standards did not "impede the flow of commerce" because "[p]igs are not trucks or trains." *National Pork*, 598 U.S. at 379-380, n. 2.

Footnote 2's recognition of the distinct character of the flow-of-commerce/instrumentalities-of-commerce line of cases, reinforced, as it was, by its emphatic quote from *Exxon* requires particular attention to *Exxon*'s isolation and treatment of this point. The *Exxon* decision will be discussed further below, at this point it suffices to say that *Exxon* did not concern the interstate transportation of goods—there, petroleum products. 437 U.S. at 119-120. Indeed, *Exxon* expressly found that the Maryland statute would **not** limit or impede the interstate flow of such products. *Id* at 127 ("there is no reason to assume that [the petroleum producers and refiners] share of the entire supply will not be promptly replaced by other interstate refiners.").

Even so, the refiners and producers argued that because the petroleum products retail market was national, no State could regulate it. It was in response to this argument that *Exxon* observed (as *National Pork* noted) that only "rarely" had the Supreme Court held that "the Commerce Clause itself preempts an **entire field** from state regulation" but that the Supreme Court had done just that for state laws that would "impede the flow of interstate goods." *Id.* at 128 (emphasis supplied). In other words, *Exxon* was explaining that the "flow of goods", itself, constituted an "entire field" which the states could not regulate so as to impede that flow.

For this point, *Exxon* cited two decisions: *Wabash, St. L. & P. R. Co. v. Illinois,* 118 U.S. 557 (1886) and *Cooley v. Board of Wardens*, 53 U.S. (12 How.) 299, 319 (1851). *Exxon*'s citation to these two decisions is telling.

Taking them in reverse order, *Exxon* cited *Cooley* for the point that, although the States could exercise some power over some matters that affected interstate commerce, there were some subjects which, by their very nature, required the application of a uniform rule. *Id.* at 319. This principle is a fundamental and recurring element of subsequent flow of commerce decisions.

*Wabash* concerned a state law attempting to set rates for the Wabash, St. Louis & Pacific Railway Company's interstate transport of goods. 118 U.S. at 561. In invalidating this law, the *Wabash* Court plainly explained the protection that the dormant Commerce Clause accords to "the right of continuous" interstate transport.

*Id.* at 572-573. *Wabash* explained further that, under this rule, it made no difference whether the state law was intended "to prevent discrimination in rates, or permit it [because] the deleterious influence on the freedom of commerce among the states, and upon the transit of goods through those states cannot be overestimated." *Id.* at 577. Echoing *Cooley* on this point, the *Wabash* concluded, "this species of regulation is one which must be, **if established at all**, of a general and national character, and cannot be safely and wisely remitted to local rules and regulations." *Id.* (emphasis supplied).

The Supreme Court returned to these principles in *Southern Pacific Co*. v. *Arizona ex rel. Sullivan* where the Court acknowledged that the Commerce Clause left the states with a 'residuum of power" over matters of "local concern" that might "affect interstate commerce, or to some extent, even regulate it." 325 U.S. 761, 767. But the *Southern Pacific* Court then went on to observe that, "ever since *Gibbons v. Ogden*, [22 U.S. (9 Wheat.) 1 (1824)], the states have not been deemed to have authority to substantially impede the flow of commerce from state to state, or to regulate those phases of national commerce which, because of the need of national uniformity demand that their regulation, **if any**, be prescribed by a single authority." *Id.* at 767-768 (emphasis supplied). As authority for this principle, *inter alia*,

*Southern Pacific* cited, *Cooley*, 53 U.S. at 319; *Leisy,* 135 U.S. at 108-109, and, *Edwards v. California*, 314 U.S. 160, 176 (1941).[14]

Protection of the flow of interstate and foreign commerce in the transportation of goods and persons did not leave the states without recourse. As *Husen* acknowledged, states could adopt self-defensive measures, where "vital necessity" required it. *Husen,* 95 U.S. at 473.

*Cooley,* then, expressed the point that the Commerce Clause, of its own force, protected some areas of commerce, even where Congress had failed to act, and that, by their nature, these areas of commerce required that Congress either prescribe a rule or there should be no rule at all. This rule, then, expresses the preemptive effect of the dormant Commerce Clause in the field comprehended by the interstate and foreign movement of persons and goods.

*Southern Pacific* noted the enduring character of this principle even in the face of changing jurisprudential rationales stating, "[w]hether or not this long recognized distribution of power between the national and state governments is predicated upon the implications of the commerce clause itself, [citations omitted] or the presumed

---

[14] At the point cited, *Edwards, inter alia*, observed, "[t]his court has repeatedly declared that the grant (the commerce clause) established immunity of interstate commerce from the control of the states respecting those subjects embraced within the grant which are of such a nature as to demand that, **if regulated at all**, their regulation must be prescribed by a single authority." 314 U.S. at 176 (emphasis supplied) (*citing Milk Control Board v. Eisenberg Farm Products*, 306 U.S. 346, 351 (1939)).

intention of Congress, where Congress has not spoken, [citations omitted], the result is the same." *Id.* at 768.

*Leisy v. Hardin,* which prohibited "dry" states from barring alcohol at the state border, but allowing its importation until such time its delivery was complete and it joined the common mass of property. 135 U.S. at 124-125. *Leisy* supported this holding by citing *Bowman v. Chicago & N.W. Ry Co.*, 125 U.S. 465 (1888), which had decided the same point. *Id.* at 119. *Leisy* also relied on decisions involving other commodities including the transport of cattle (*Hannibal and St. Jos. R. Co. v. Husen*) and the transport of persons. (*Henderson v. Mayor of New York*, 92 U.S. 259 (1875)). *Id.* at 120.[15]

Following *Leisy,* the Supreme Court extended dormant Commerce Clause protection for point-to-point interstate transportation of goods and persons in other cases. *See, e.g., Missouri ex rel. Barrett v. Kansas Natural Gas Co.*, 265 U.S. 298, 307-308 (1926) (interstate transportation of natural gas "ends" with delivery to distribution companies); *Western Union Telegraph Co. v. Foster*, 247 U.S. 105, 1113 (1918) (Holmes, J.) (interstate transmission of telegraphic communications).

---

[15] The district court correctly noted that in *Tennessee Wine & Spirits Association v. Tennessee,* the Supreme Court reviewed the "original package" rule for the shipment of alcohol that arose out of *Leisy* and similar decisions. App. at 294 (*citing* 588 U.S. at 523-524). However, the *Tennessee Wine* Court did not discuss the application of the *Leisy* rule to other commodities or the transport of persons. Nor did it suggest that it had been overruled; rather, in the case of alcohol, Congress legislated around it. *Id.*

To be sure, over time the Supreme Court has trimmed some applications of this principle. *See South Dakota v. Wayfair, Inc.,* 585 U.S. 162, 164-65 (2018) (overturing *Quill Corp. v. North Dakota*, 504 U.S. 298 (1992)); *Oklahoma Tax Commission v. Jefferson*, 514 U.S. 175, 181-185 (1995) (reviewing dormant Commerce Clause case law and interstate taxation).  Even so, as both *National Pork* and *Exxon* recognized, notwithstanding those decisions, the dormant Commerce Clause continues to protect the interstate transport of goods and persons from point to point against substantial restraint by state laws.  *See Southern Pacific*, 325 U.S. at 767.

It was, then, this distinct line of dormant Commerce Clause cases protecting the continuous transport or "flow" of goods and persons interstate and foreign commerce that *Exxon* recognized and determined was not impeded by the Maryland law and that, in footnote 2, *National Pork* confirmed.  And it is this line of cases that applies to the Ordinance and its impact on the interstate and international movement of persons by cruise ships.

### 3. The district court erred in denying Appellants' flow of commerce claims under the dormant Commerce Clause.

In considering the district court's ruling on Appellants' and Pilots' flow of commerce claims, it should be noted what is not in dispute.

There is no dispute that the cruise lines in this case are engaged in the transportation of persons in interstate and foreign commerce.  The record evidence

showed that the typical cruise itinerary of which Bar Harbor is a part includes stops at ports of other states and those of Canadian provinces as well. There is also no dispute that the Ordinance effectively precludes visits to Bar Harbor. Add. at 17, 56-58.

As for the Ordinance's effect, the district court found that "[t]he record in this case demonstrates that the Ordinance does indeed stem the flow of interstate commercial activity by reducing the daily volume of persons disembarked into Bar Harbor from cruise ships." Add. at 51.[16] The district court also found that the Ordinance intended this very effect, finding that "the end for which [the Ordinance] was drawn [was to] stem[] the tide of daily cruise ship visitation to vessels with lower berth capacities of 1,000 or less." App. at 290.[17]

The district court asserted that either Congress must legislate or the states could regulate—and, some issues, such as pedestrian congestion, were so local in their character that federal legislation was impracticable. App. at 294; Add. at 55. But this stark choice misconceives the preemptive effect of the Commerce Clause where the flow of commerce is concerned.

---

[16] *See also* (Order) Add. at 17, 57-58 (finding Ordinance will cause dramatic reduction in cruise ship visits, as high as a 90% reduction).

[17] At the close of its decision, the district court acknowledged that the Ordinance imposes "some burden on the 'free flow' of commerce" but concluded that "that burden is impossible to quantify." Add. at 59. This clashes with the district court's finding of the precipitous declines in visits to Bar Harbor by cruise ships with capacities of more than 1,000 persons. Add. at 17, 57-57.

As *Cooley, Husen, Edwards*, and *Southern Pacific* made clear, there were some areas of endeavor that were so inherently national in their scope and effect that, if they were to be regulated at all, only Congress could do so. As has been seen, the preservation of the flow of interstate and foreign commerce is one of those fields. That is the point that both *National Pork* in footnote 2 and *Exxon*, in its reference to the "flow of commerce", recognized and confirmed. The Ordinance imposes a significant impediment on the interstate and foreign movement of persons and, therefore, by force of the Commerce Clause alone, is invalid.

On this point, it should be added that, flow of commerce case law has established that, when a passenger commences interstate or international travel, the trip is not complete until the passenger has set foot at his or her destination. As the Supreme Court put it, "[t]he transportation of a passenger from Liverpool to the city of New York is one voyage. It is not completed until the passenger is disembarked at the pier in the latter city." *Henderson*, 92 U.S. at 271; *see also Chy Lung v. Freeman*, 92 U.S. 275 (1875).[18]

---

[18] The district court found *Henderson* inapplicable to the instant because the decision was based on "our Nation's immigration policy." Add. at 44, n. 25. A close reading of *Henderson* cannot sustain this characterization. It is evident that the holding is based on the Foreign Commerce Clause, preceded by broad references to the Commerce Clause in general. 92 U.S. 270-276. Moreover, of *Henderson* and *Chy Lung,* the Supreme Court later said, "[t]he two latter cases refer to obstructions against the admission of persons into a State, but the principles asserted are equally applicable to all subjects of commerce." *Husen,* 95 U.S. at 470.

From the foregoing, it is evident that, by design and effect, the Ordinance significantly, even catastrophically, burdens the interstate and international flow of commerce based on the transport of persons by cruise ships. *cf., Southern Pacific*, 325 U.S. at 767 ("impede substantially").[19]   But that does not mean that the Ordinance is automatically invalid. As *Husen* made clear, if the Ordinance meets a "vital necessity" (95 U.S. at 473; *see also Bayley's Campground*, 985 F.3d at 159), it might yet be sustained but on this point the Ordinance fails entirely.

Although the Purpose section of the Ordinance as an initiative asserted that cruise ship visits jeopardized the effective provision of police, fire, EMS, and even hospital services (App. at 299), no evidence supporting risks to these services was adduced and the district court did not so find.   Instead, the district court found that the Ordinance served the municipal interests of "lessening congestion and conserving municipal resources," *citing Memphis v. Greene,* for the "unquestionably legitimate" municipal objective of the "residential interest in comparative tranquility." Add. at 58 (*citing* 451 U.S. 100, 126-127 (1981)).[20]

_____

[19] The district court found that "in terms of the volume of visitors disembarking from cruise ships, the likely avoidance of the large vessels will reduce passenger visitation volume by a significant percentage, likely north of 80 and possibly as high as 90 percent (in the short term) compared with the peak numbers experienced in 2022 and 2023." Add. at 17; *see also* Add. at 56-57.

[20] As authority for "legitimate local public interest" under Commerce Clause standards (*see Pike*, 397 U.S. 142), *Memphis v. Greene* is inapposite.  It did not involve a Commerce Clause claim.  There was no claim that the ordinance impeded

By any measure, as a rationale for impeding substantially the flow of commerce, the local public interest as determined by the district court sets the bar so low it is effectively no bar at all. If "comparative tranquility" can justify local or state laws shutting off a whole sector of interstate and foreign transport of persons (or, potentially, goods), there would be no practical limit on such initiatives. In other words, as framed and justified by the district court, this legal standard carries no limiting principle. *Cf., Citizens United v. F.E.C.*, 558 U.S. 310, 359 (2010). Under flow-of-commerce case law, the public purpose of the Ordinance, as found by the district court, cannot support its catastrophic impact on the interstate and foreign movement of persons by cruise ship.

Before leaving this point, it should be noted that in its order denying an injunction pending appeal, the district court faulted Appellants and Pilots for their "silence" on "the primary point of the Amended Decision and Order"—that is, that "the Commerce Clause does not protect the cruise line industry's particular structure [and] methods of operation. [] (quoting *Exxon Corp. v. Governor of Maryland*, 437 U.S. [at] 127 []." App. at 291(citing Add. at 58). Appellants agree.

As *Exxon* made clear, the Commerce Clause does not protect "markets" just because they are national in character, but, as *Exxon* also made clear, it does, of its

_____

the flow of commerce or otherwise damaged interests protected by the dormant Commerce Clause.

own force, protect the interstate and foreign transportation of goods and persons within those markets. 437 U.S. at 127.[21]

Similarly, *National Pork* was not a flow-of-commerce case. That Court succinctly captured that point by its observation that "[p]igs are not trucks or trains." 598 U.S. at 379, n. 2. As footnote 2 indicated, had *National Pork* concerned state regulations attempting to regulate the **transport** of pigs or pork products very different Commerce Clause questions would have been raised. *Cf., Husen* 95 U.S. at 468-69 (invalidating state law restricting the interstate transport of cattle).

The district court found that the Ordinance greatly impeded the movement of persons by cruise ship by up to 90%. Add. at 17. Without a compelling justification, that kind of local rule is barred by the Commerce Clause. The justification for the Ordinance, as found by the district court, fails to meet that standard. *See Southern Pacific*, 325 U.S. at 767; *Husen*, 95 U.S. at 472-473; *Bayley's Campground*, 985 F.3d at 159.

For the reasons set forth above, the Ordinance unjustifiably impedes the interstate and foreign movement of persons in violation of the Commerce Clause

---

[21] *Exxon* was not a flow-of-commerce decision. The Court made that clear when it found that the Maryland law would not inhibit the delivery of petroleum products to that state. 437 U.S. at 127.

and, therefore, is unconstitutional.  *Henderson*, 92 U.S. at 271; *Morgan v. Virginia*, 328 U.S. 373, 386 (1946).[22]

## III. THE DISTRICT COURT ERRED IN DENYING APPELLANTS' CLAIM THAT THE ORDINANCE VIOLATED THE RIGHT TO TRAVEL AS PROTECTED BY THE DORMANT COMMERCE CLAUSE

As part of their dormant Commerce Clause challenge, Appellants argued that the Ordinance also would impede the rights of third persons to travel to Bar Harbor via large cruise ship, a right Appellants argued was guaranteed to those persons under by the Commerce Clause.  ECF 191 at 27; ECF 198 at 31, 32; Add. at 79.

The district court refused to consider this claim because "[p]laintiffs did not assert that the Ordinance violates the right to travel in their complaint and, instead, raise it for the first time in their brief in a perfunctory fashion."  Add. at 37, n. 23. In so ruling that the district court provided no explanation either for its decision that the Commerce Clause right to travel claim failed Rule 8 or for its determination that the argument in support of that right was "perfunctory" and, therefore, unworthy.

### 1. The District Court erred in finding that the Complaint did not plead the right to travel under the Commerce Clause

---

[22] The district court also cited *Tart v. Massachusetts*, 949 F.2d 490, 501 (1st Cir. 1991) for the "legitimate local interest of promoting public health." Add. at 58-59. But, there was no evidence that cruise ship visitors posed any risk to public health and the district court made no such finding. Beyond that, *Tart* concerned a state law governing the landing of raw fish. 949 F.2d at 493.  For purposes of invoking health-based police powers, persons disembarking from cruise ships cannot reasonably be equated with raw fish, as the district court has tacitly done.

The district court provided no explanation why the Plaintiffs' Complaint failed to sufficiently allege a right to travel claim under the Commerce Clause to meet the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure. Add. at 37, n. 23. Nonetheless, the district court erred in so ruling.

The Complaint clearly alleged that the Ordinance violated the Commerce Clause and, in particular, violated the Commerce Clause in a variety of ways including that it excessively burdened and restricted interstate and foreign commerce. App. at 26-78 (complaint) at ¶ 94, ¶¶ 106-124. In particular, the Complaint alleged that the Ordinance "does not advance any public health or safety purpose and creates substantial barriers to the free flow of commerce." *Id.* at ¶ 108. Finally, the Complaint asked the Court to declare that the Ordinance violated the Commerce Clause. *Id.*, Prayer for Relief, at ¶ 2.

Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief" and a "demand for the relief sought." Rule 8, F.R.Civ.Pro. With respect to the right to travel claim under the Commerce Clause, the Complaint meets that standard.

To begin with, in their post-trial briefs, Plaintiffs clearly stated that they were not basing their claim that the Ordinance violated the right to travel under any constitutional provision other than the Commerce Clause. ECF 191 and 198.

In addition, although separately identified as protected by the dormant Commerce Clause, as has been seen above, the right to travel is encompassed within the general protection that the Commerce Clause extends to the free flow of commerce. See, *e.g., Southern Pacific,* 325 U.S. at 767-768 (*citing, inter alia, Edwards v. California* for the principal that states cannot "impede substantially" the free flow of commerce or "regulate" those areas of commerce where, if any regulation is applied, it must be national). As a Commerce Clause principle, then, the right to travel is a particular application of the protection that clause extends to the free flow of commerce and the primacy of national authority in that field. This being so, the Complaint sufficiently pled that the Ordinance violated that right.

## 2. The Ordinance violates the right to travel under the Commerce Clause

Appellants have been injured by the severe limitations on the right to travel as protected by the Commerce Clause in the same way they have been injured by the limitations that the Ordinance has imposed on cruise ship lines to transport persons in interstate and foreign commerce. Moreover, so the point is clear, Appellants incorporate by reference the Commerce Clause arguments they have raised above as if fully incorporated herein.

As has been noted above, in *Edwards v. People of California*, without undermining other constitutional sources of the right to travel, the Supreme Court placed it squarely within the dormant Commerce Clause. 314 U.S. at 173-174

(1941). The district court had earlier recognized the Commerce Clause as the basis for the *Edwards* decision. *Bayley's Campground, Inc. v. Mills*, 463 F.Supp.3d 22, 34 (D. Me. 2020). This Court has done so as well. *Bayley's Campground, Inc. v. Mills*, 985 F.3d 153, 159-160 (1st Cir. 2021).[23]

For these reasons, the Ordinance violates the right to travel as protected by the Commerce Clause.

## IV. THE DISTRICT COURT ERRED IN DENYING APPELLANTS' CLAIM THAT THE ORDINANCE VIOLATED DORMANT COMMERCE CLAUSE STANDARDS AS SET FORTH IN *PIKE V. BRUCE CHURCH*

*Pike v. Bruce Church*, set forth a distinct analytical framework for review under the Commerce Clause of a wide spectrum of state and local restrictions on commerce. *Pike* has been broadly applied and has not, as Chief Justice Roberts noted, been limited solely to "instrumentalities of transportation." *National Pork*, 598 U.S. at 396 (Roberts, C.J., concurring and dissenting).

The *Pike* test is as follows: "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce

---

[23] The district court acknowledged that Plaintiffs and Pilots relied on *Edwards v. California* in support of their claims that Ordinance improperly burdened the movement of "vessels and persons" but discounted *Edwards'* application to this case because "[t]he analogy between Dust Bowl migration and cruise tourism is strained to say the least." Add. at 59, n. 4. Nothing in *Edwards* suggests that when the Supreme Court considered the Commerce Clause-based right to travel, it confined its decision to Dust Bowl migrants. *Edwards, passim.*

are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . . . If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Hughes v. Oklahoma*, 441 U.S. 332 (1979) (*quoting Pike*, 397 U.S. at 142). Justice Barrett put this test more bluntly in her concurring opinion in *National Pork*, "[a] state law that burdens interstate commerce in clear excess of its putative local benefits flunks *Pike* balancing." 598 U.S. at 393 (Barrett, J., concurring). [24]

Applying these standards to the Ordinance, out of the gate it fails the "even-handedness" test. That is because, as its principal author, Mr. Sidman said, and as the district court found, although neutral on its face, it was intended to keep cruise ships with capacities in excess of 1,000 persons out of Bar Harbor. App. at 290; Add. at 80.[25]

---

[24] Although the plurality portion of the opinion, *National Pork* characterized *Pike* as having "traditionally served as another way to test purposeful discrimination against out-of-state economic interests" (598 U.S. at 380), in his concurring opinion, Justice Kavanaugh observed of *Pike* that, "[i]n today's fractured opinion, six justices affirmatively retain the longstanding *Pike* balancing test for analyzing challenges to state economic regulations." *Id.* at 403.

[25] Mr. Sidman stated: "we're only getting rid of the biggies (and 930 pax is still a honking large boat!), with the much proposed alternative being to welcome the

Second, although the "Purpose" appended to the initiative claimed that cruise ship visitors jeopardized the provision of essential services, including police, fire and EMS services, the trial record did not support these claims and the district court made no such findings.[26] Reducing pedestrian "congestion" in the quest to obtain "comparative tranquility" (Add. at 58, quoting *Memphis*, 451 U.S. at 126-127) is not a "legitimate local public interest" under *Pike* for Commerce Clause purposes—that is, as has been noted above, it is simply too vague an interest to be applied with any consistency to Commerce Clause cases.

Assuming, *arguendo*, that Ordinance meets the local standard requirement, the district court decision shows that its effects on cruise line visitation to Bar Harbor is not "incidental" within the meaning of *Pike*. To begin with, as the district court found, the barrier it erects to cruise ship visits was intentional. App. at 290.

Assuming, again, *arguendo*, that the Ordinance's effect on cruise ship commerce is incidental, the burden that the Ordinance imposes on cruise ship visits—that is, the total exclusion of cruise ships with 1,000+ capacities—is "clearly excessive" when compared to the public interests of reducing sidewalk congestion and promoting "comparative tranquility." This becomes starkly clear when placed

---

smaller, generally wealthier-passengered, "boutique" ships that might contribute to, rather than destroying life for BH taxpayers, many businesses and most visitors."
[26] Mr. Sidman testified that passengers from large cruise ships somehow prevented other customers from reaching the art gallery in downtown Bar Harbor that he operates. ECF 191 at 40-41.

in the broader context of Bar Harbor's longstanding role as a land-based tourist destination due to its proximity to Acadia National Park which draws nearly 4,000,000 visitors a year, many of whom visit Bar Harbor. Add. at 8. The Ordinance does nothing whatsoever to address the influx of such land-based visitors.[27]

Where a local law has a legitimate local purpose, under *Pike,* the question becomes whether that interest "could be promoted as well with a lesser impact on interstate activities." *Pike,* 397 U.S. at 142. On this record, the Town itself, has already provided the answer. The Town's development and adoption of the voluntary caps as well as the Town's later adoption of the MOAs shows that Bar Harbor can accommodate cruise ship visitors under either regime while retaining its essential qualities and capacities as a distinct community.

For these reasons, as Justice Barrett put it, the Ordinance flunks *Pike* balancing.

## V. THE DISTRICT COURT ERRED IN FAILING TO GRANT INJUNCTIVE RELIEF ON APPELLANTS' SEAFARER PREEMPTION CLAIM

The district court ruled that the Ordinance's comprehensive prohibition on more than 1,000 "persons" disembarking from cruise ships into Bar Harbor in single calendar day necessarily included crew members of such ships and that the entry such persons into ports was guaranteed by 33 C.F.R. § 105.237, and, as applied to

---

[27] This is yet another way in which the Ordinance is not "even-handed."

these seafarers, the Ordinance was preempted by the federal rule. Add. at 28-32. Despite having so ruled, the district court concluded that Appellants and Pilots were not entitled to "any meaningful relief" (Add. at 29), reinforcing this same finding in its entry of judgment. Add. at 60. In failing to grant Appellants and Pilots injunctive relief on seafarer preemption, the district court erred.

With the Ordinance having been found unconstitutional, consideration of injunctive relief was in order. In this instance, the question of injunctive relief was and remains governed by *Ayotte v. Planned Parenthood of N. New England,* 546 U.S. 320 (2006).

In brief, *Ayotte* found that before entering a comprehensive injunction, a court should consider whether it might fashion a more selective injunction. In considering this more limited remedy, *Ayotte,* emphasized two factors: 1) "how easily" a selective injunction could be articulated (546 U.S. at 329), and 2) whether that limited remedy would be consistent with the intent of the enacting body. *Id.* at 331. Taking these in reverse order, a selective injunction—that is, one that would admit seafarers and exclude all others—would not be consistent with legislative intent because, by approving the word "persons" as the Ordinance's controlling concept, Bar Harbor voters clearly intended that the Ordinance apply to everyone without exception.

Beyond that, articulating a selective injunction would not come easily because the court would have to formulate its own standards by which Pier Owners, who are subject to penalties for "excess unauthorized persons" could reliably and consistently differentiate between seafarers and all others. For these reasons, the district court should have issued a comprehensive injunction.

## VI.    THE DISTRICT COURT ERRED IN DENYING APPELLANTS' CLAIM THAT THE ORDINANCE WAS PREEMPTED BY FEDERAL LAWS GOVERNING THE ADMISSION OF FOREIGN NATIONALS.

The extensive federal regulatory regime overseeing cruise ships is not limited to the Coast Guard. Other federal agencies, including Customs and Border Protection, regulate aspects of the passenger cruise line industry, including the admission or readmission of foreign national passengers after inspection. Relevant to the Port of Bar Harbor, this is especially true of the foreign-flagged large cruise ships, which cover ports extending from the mid-Atlantic states through New England, the Maritime provinces, and Quebec. A vessel re-entering the United States in Maine must call at a Class A port. Bar Harbor stands out as a "first port of entry" and Class A port under U.S. Customs, where foreign nationals and U.S. citizens returning to the United States may clear customs and immigration before entering the United States.

Foreign national and U.S. citizen passengers arriving from a Canadian port may be readmitted to the United States, but only after inspection aboard the ship on its arrival in federal anchorage at Bar Harbor. However, the Ordinance imposes another condition of entry—that the disembarking person is not above the 1,000-person daily limit. The Ordinance treats all such numerically offensive persons as having failed to qualify for admission into the United States (at least via Bar Harbor)

thereby, in effect, supplementing federal criteria for admission with one imposed by this Maine municipality.

The Supreme Court has long recognized that "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Maine Forest Prod. Council v. Cormier*, 586 F. Supp. 3d 22, 38 (D. Me.), *aff'd,* 51 F.4th 1 (1st Cir. 2022) (quoting *Arizona v. United States,* 567 U.S. 387, 394 (2012)). Underlying the justification for this power, "[i]t is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Id*. (quoting *Arizona*, 567 U.S. at 395 (*citing Chy Lung v. Freeman*, 92 U.S. 275, 279-280 (1876)); The Federalist No. 3, 39 (C. Rossiter ed. 2003) (J. Jay)).

The federal government's immigration authority permits it to "determine[e] what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization."[28] *Toll v. Moreno,* 458 U.S. 1, 11 (1982). This power inherently limits that of the states:

---

[28]  In 1952 Congress enacted the Immigration and Nationality Act (INA), which is a "comprehensive and complete code covering all aspects of admission of aliens to this country, whether for business or pleasure, or as immigrants seeking to become permanent residents." *Toll*, 458 U.S. at 13-14 (quoting *Elkins v. Moreno*, 435 U.S. 647, 664 (1978)).

> Under the Constitution the states are granted no such powers; they can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states. *State laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with this constitutionally derived federal power to regulate immigration, and have accordingly been held invalid.*

*Id.* (emphasis in original) (quoting *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948)).

The Ordinance imposes discriminatory burdens upon the entrance of foreign national passengers to the United States; a "burden not contemplated" by Congress or the federal system of border controls. *See, e.g.*, *Graham v. Richardson,* 403 U.S. 365, 379 (1971) (invalidating state restrictions on receipt of welfare benefits by lawful resident aliens as an "auxiliary burden" on entry or residence not contemplated by Congress). The federal government's occupation of the field for entrance of foreign nationals to the United States is manifest, as is the conflict between the Ordinance and federal law.

## VII. THE DISTRICT COURT ERRED WHEN IT DENIED APPELLANTS' DUE PROCESS CLAIM

Appellants challenged the Ordinance on the grounds that it lacked a reasonable relation to its ostensible purpose. App. at 27-79 (Complaint) at ¶¶ 126-128; *see also*, *id.* Prayer for Relief at ¶ 3.[29]

In sum, Appellants' asserted that, among other things, the following particular terms of the Ordinance lacked a rational relationship to its purported goal of effectively lessening sidewalk congestion. First, the Ordinance singled out persons arriving by cruise ship and excluded persons arriving by any other means of transportation. Second, the Ordinance did so, even though the volume of overall tourist visitation, including cruise ship visitation, was governed by seasonal factors. Third, the Ordinance imposed a single, unyielding ceiling applicable every day of the year, even days on which no cruise ship has ever called at Bar Harbor.

It should be noted that, as must be the case given the nature of this claim, Appellants' due process challenge was directed at the Ordinance's particular terms

---

[29] In considering Appellants' due process claim, the district court expressed "surprise" (and, it would appear, some frustration) with Appellants for having presented a "liberty of contract" claim which the court dedicated several pages to addressing. Add. at 35-38. Appellants' surprise equals, if it does not exceed, that of the district court because Appellants never pled a liberty of contract claim (App 27-79, complaint *passim*) or argue such a claim, either openly or, as the district court implied "without com[ing] right out and say[ing] it." Add. at 37. "Liberty of contract" was no part of this case.

and the lack of a rational nexus between those terms and the Ordinance's supposed objectives. Evidence adduced in the course of trial explained why the Ordinance lacked the required rational nexus—that was because the Ordinance's real purpose was not the simple reduction of sidewalk traffic but was, rather, in service to Mr. Sidman's objective to "keep the biggies out." Add. at 80. Following trial, the district court reached this very conclusion. App. at 290.  Further evidence of the lack of rational nexus is that in effect the Ordinance simply eliminated the vast majority – as much as 90% – of the historic cruise ship visits.

Given this evidence and the district court's finding it is now clear why the terms of the Ordinance lack "a reasonable relationship to a proper legislative purpose". *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 483 (1st Cir. 2009).

For the reasons set forth above, the district court erred when it denied Appellants' due process claim.

## VIII. CONCLUSION

Appellants ask this Court to find that the district court erred in denying Appellants' claim that Ordinance violates the Commerce Clause; that the Ordinance is preempted by federal laws governing the admission of foreign nationals into the United States; that the Ordinance lacks a rational nexus between its purported purpose and the means it employs to achieve that purpose; and, that, although Appellants' prevailed on their seafarer preemption claim, the district court erred in

awarding them no relief from the application of the Ordinance against them and others.

Respectfully submitted,

/s/*Timothy C. Woodcock*
Timothy C. Woodcock
P. Andrew Hamilton

EATON PEABODY
80 Exchange Street (04401)
Post Office Box 1210
Bangor, Maine 04402-1210
(207) 947-0111

twoodcock@eatonpeabody.com
ahamilton@eatonpeabody.com

## CERTIFICATE OF COMPLIANCE WITH RULE 32

1.     This brief complies with the page length limitation of Fed. R. App. P. 32(a)(7)(A) because this brief contains 53 pages, and Fed. R. App. P. 32(a)(7)(B) as it contains 12,890 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Standard in Times New Roman 14-point font.

/s/*Timothy C. Woodcock*

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2024, I electronically filed the foregoing with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

/s/*Timothy C. Woodcock*

# United States Court of Appeals
# For the First Circuit

Nos.  24-1317, 24-1318, 24-1385

ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS;
B.H. PIERS, L.L.C.; GOLDEN ANCHOR, L.C., d/b/a Harborside Hotel;
B.H.W.W., L.L.C.; DELRAY EXPLORER HULL 495 LLC; DELRAY
EXPLORER HULL 493 LLC; ACADIA EXPLORER 492, LLC; PENOBSCOT
BAY AND RIVER PILOTS ASSOCIATION,

*Plaintiffs-Appellants / Cross-Appellees,*

v.

CHARLES SIDMAN,

*Defendant-Appellee / Cross-Appellant,*

TOWN OF BAR HARBOR, a Municipal Corporation of the State of Maine,

*Defendant-Appellee*

## ADDENDUM

Timothy C. Woodcock
P. Andrew Hamilton
EATON PEABODY
80 Exchange Street (04401)
Post Office Box 1210
Bangor, Maine 04402-1210
*Counsel of Record, Plaintiffs-Appellants*

## TABLE OF CONTENTS

Amended Decision and Order, ECF No. 206 .............................................. ADD. 001

District Court Judgment, ECF No. 207 ...................................................... ADD. 062

33 C.F.R. § 101.112 ................................................................................. ADD. 064

33 C.F.R. § 105.200 ................................................................................. ADD. 065

33 C.F.R. § 105.237 ................................................................................. ADD. 067

Bar Harbor Charter §§ C-6 and 10 .......................................................... ADD. 069

Bar Harbor Land Use Ordinance § 125-9 ................................................ ADD. 073

Bar Harbor Land Use Ordinance § 125-77 .............................................. ADD. 076

Bar Harbor Land Use Ordinance § 125-109 (Definition of Person) ......... ADD. 078

USDC Trial Exhibit DX 319.001 (Gabe Article) ....................................... ADD. 079

USDC Trial Exhibit DX 357.001 (Sidman Email) ..................................... ADD. 080

USDC Trial Transcript Excerpts, July 13, 2023
    Cover Page ....................................................................................... ADD. 081
    Pages 127 – 134 .............................................................................. ADD. 082
    Pages 172 – 174 .............................................................................. ADD. 089

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, B.H. PIERS, L.L.C., GOLDEN ANCHOR L.C., B.H.W.W., L.L.C., DELRAY EXPLORER HULL 495 LLC, DELRAY EXPLORER HULL 493 LLC, and ACADIA EXPLORER 492 LLC,<br><br>        Plaintiffs,<br><br><br>PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION,<br><br>        Plaintiff-Intervenor,<br><br>    v.<br><br>TOWN OF BAR HARBOR,<br><br>        Defendant,<br><br><br>CHARLES SIDMAN,<br><br>        Defendant-Intervenor | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No. 1:22-cv-00416-LEW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### AMENDED[1] DECISION AND ORDER

    In this action, a group of Bar Harbor businesses and business owners who seek to preserve commercial relationships with cruise lines and their passengers challenge a local exercise of popular sovereignty by the people of Bar Harbor who seek to curtail cruise ship

---

[1] This Amended Decision and Order exclusively corrects typographical errors.

visitation to maintain a certain quality of local life. The resulting controversy is of constitutional dimension and tenders a host of questions, but chiefly asks whether a municipality with privately owned port facilities can restrain interstate cruise ship commerce for local welfare ends or must make way and permit whatever level of commerce the local market can support.

The matter proceeded to a bench trial following the Court's issuance of an expedited schedule and Plaintiffs' withdrawal of a motion for preliminary injunction. The Town of Bar Harbor has agreed not to enforce the challenged land use ordinance pending the outcome of litigation. Following a three-day trial in July 2023, the parties submitted closing arguments in writing. Based on my consideration of the evidentiary record, the arguments of counsel, and the law, judgment will enter in favor of the Defendant Town of Bar Harbor on every count but one, and even as to that one count, judgment will enter partially for the Town, as only limited declaratory relief is awarded in recognition of a partial preemption problem, without affording Plaintiffs and Plaintiff-Intervenor the relief they are seeking.

## FINDINGS

### The Parties

The Plaintiffs in this action are the Association to Preserve and Protect Local Livelihoods ("APPLL"); B.H. Piers, L.L.C.; Golden Anchor, L.C., doing business as Harborside Hotel; BHWW LLC, doing business as Bar Harbor Whale Watch; Delray Explorer Hull 495 LLC; Delray Explorer Hull 493 LLC; and Acadia Explorer 492, LLC.

APPLL is a business league comprised of members who own or operate businesses in Bar Harbor and seek to capitalize on the economic opportunities associated with the provision of goods and services to cruise ship passengers.  APPLL members include owners and employees of local restaurants, retail stores, and tour-related businesses.

The Delray Explorer Hulls and the Acadia Explorer are tender vessels owned by similarly named limited liability companies.  The vessels carry cruise ship passengers from cruise ships anchored in Frenchman Bay to Bar Harbor.  B.H. Piers and Golden Anchor own piers in Bar Harbor where the tender vessels disembark and embark cruise ship passengers.  BH Piers operates the pier located at 1 West Street, known as Harbor Place.  Golden Anchor operates the pier located at 55 West Street.  The pier owners have received approval from the Coast Guard for the use of the piers for this purpose.

BHWW is a limited liability company doing business as Bar Harbor Whale Watch Company.  BHWW coordinates whale watching tours to cater to the cruise lines' passengers.

The Penobscot Bay and River Pilots Association appears in this matter as Intervenor-Plaintiff.  The Pilots Association is a private corporation that provides pilotage services in a region that extends 75 miles from Boothbay Harbor to Frenchman Bay and 75 miles from the west pilot station on Penobscot Bay to the Penobscot River Port of Brewer.  By law, foreign-flagged and certain domestic cruise ships must be piloted within Frenchman Bay by a local pilot who is familiar with the Bay and its channels.  Pilots board cruise ships (and other large vessels) eight to twelve miles offshore and direct navigation to anchorage grounds in Frenchman Bay (or to other destinations in Penobscot Bay).  The

3

anchorage grounds in Frenchman Bay are roughly two miles from the Bar Harbor waterfront and piers.  The Pilots Association's pilotage operations are regulated by the Maine Pilotage Commission.  In response to the expansion of cruise vessel traffic, the Pilots Association has invested in vessels and has expanded its employment of pilots.  In particular, the Pilots Association now has a dedicated crew and purpose-built vessel to handle the piloting demands associated with cruise vessel traffic in Frenchman Bay.  Fees for piloting services are established by law and are a function of the size of the vessel.  Ex. 39.  The larger the ship, the greater the fee.

The Defendant is the Town of Bar Harbor.  Bar Harbor is, among other things, a Class A port of entry for foreign-flagged cruise vessels reentering the United States and a popular port-of-call on North Atlantic cruise ship itineraries.  Bar Harbor is governed by a Town Council.  The Bar Harbor Town Council has sponsored a cruise ship committee for more than a dozen years, but recently disbanded the committee.  The Town of Bar Harbor has a year-round population of roughly 5,500 persons, a number comparable to the lower berth capacity (a rough measure of passenger capacity) of a solitary large cruise ship.

One of the residents of Bar Harbor is Charles Sidman, Intervenor Defendant.  Mr. Sidman owns an art gallery in town.  Mr. Sidman was a primary proponent and co-author of the initiative that resulted in the land use ordinance challenged in this case.

## Non-Parties of Note

Among the cruise lines that visit Bar Harbor are several lines owning foreign-flagged cruise vessels.  When they call, these vessels typically spend about nine hours at

ADD. 004

anchorage, enough time for passengers to clear customs and participate in a shore visit of reasonable duration.

The State of Maine has two other Class A ports of entry, Eastport and Portland. Neither is as proximate to Acadia National Park as Bar Harbor. If a cruise ship called in Eastport or Portland, travel by motor coach to reach and return from Acadia National Park would consume much of the day.

The Maine Office of Tourism is a marketing agency for the State of Maine. CruiseMaine, part of the Maine Office of Tourism, promotes cruise communities in Maine and Maine-based cruise ship tourism in general. CruiseMaine engages with cruise lines and the cruise industry trade association and sometimes functions as a municipality-to-cruise-line liaison. The Maine Office of Tourism and CruiseMaine perceive cruise travel as a positive type of tourism for Maine because it introduces many first-time visitors to Maine from a broader geographical region as compared to visitors who travel by land, most of whom are from east coast states and Canada. CruiseMaine maintains a software platform called the PortCall system, https://maine.portcall.com. Through the PortCall system, CruiseMaine posts real-time data related to vessel movements and port operations. State funding supports CruiseMaine.

Carnival, Royal Caribbean, and Norwegian are among the cruise line companies that are active in New England and market cruise itineraries that feature Bar Harbor as a marquee port. These three cruise lines are noted because they operate foreign-flagged vessels and operate some of the largest cruise vessels that call in Bar Harbor and elsewhere

5

along the Maine coast.[2]  The foreign-flagged lines see Bar Harbor as the most convenient

and desirable port of entry when coming from foreign waters (such as Canadian waters).

<u>Background Facts</u>

The Town of Bar Harbor lies on the shores of Frenchman Bay in the North Atlantic

on the eastern side of Mount Desert Island.  The Town is nestled in an area of great scenic

beauty abutting Acadia National Park, a national asset that the Park Service refers to as the

Crown Jewel of the North Atlantic Coast.  Given Bar Harbor and Acadia National Park's

placement and prominence among other North Atlantic attractions accessible by sea, the

cruise ship industry regards Bar Harbor as a marquee destination, the kind which appeals

to customers and around which an appealing cruise itinerary can be built.

Although Bar Harbor had long experienced healthy tourist seasons, in the 2000s

there was room for growth.  Additionally, the season was limited to the period between

Memorial Day and Labor Day.  Local businesses and their representatives on the Town

Council hoped to expand the tourist season and saw cruise tourism as one means of doing

so.

In 2006, the Maine Department of Transportation, the Maine Port Authority, and

the Town of Bar Harbor joined in a task force to commission a cruise tourism destination

management plan for Bar Harbor.  The authors of the management plan proposed

architectural and engineering improvements to develop the Town to facilitate expanded

---

[2] MSC Cruises is a fourth cruise line that fits the description.  The executive director of CruiseMaine characterized the domestic cruise lines as "smaller."  In addition to Bar Harbor, Eastport, Portland, and Rockland have ports suited to larger foreign vessels.  Only Bar Harbor and Portland have significant traffic involving foreign cruise vessels seeking a Class A port of entry, with Bar Harbor and Portland having roughly 60% and 40%, respectively.

cruise ship passenger access, chiefly by means of improved pier facilities.  Ex. 260.  In 2008, the Town accepted a recommendation from the task force to embody a cruise ship committee and establish a policy of daily cruise passenger caps of 3,500 passengers for the peak-tourism, summer months of July and August, and 5,500 passengers for the shoulder-season months of May, June, September, October, and November.  The cruise ship lines were receptive to the invitation and amenable to the passenger caps, and cruise ships began to call in Frenchman Bay in ever-increasing numbers.  Local enterprise and investment gradually expanded to meet the increased demand for passenger tendering and other local services.

The Town established its daily passenger caps largely by reference to the lower berth capacities of existing cruise vessels.  The caps were understood to be "voluntary" in that they were mutually acceptable to the then-existing Council and the cruise lines.  The Council and the cruise line industry were able to agree that cruise line passengers generally would not be well served in Bar Harbor if two or more cruise ships each with an especially large lower berth capacity were to disembark on the same day, even during the quieter shoulder season.  They also recognized that it was sensible to lower the cap during Bar Harbor's peak summer season, given the competing demand for local services generated by peak, land-based tourism.  The progenitors of Bar Harbor's cruise ship management plan also understood that cruise ship visitations impose certain municipal burdens,[3]

---

[3] Bar Harbor maintains a per-passenger fee structure for cruise ship visits.  Ex. 29.  The Town has used the fees generated in this manner (roughly $1 million per year) to fund town salaries and enlarge its police force, among other things.  The increase in personnel, particularly law enforcement, is itself indicative of the localized impacts of increased traffic.

including congestion, that can detract from the character of the Town and reduce the quality of life for residents.  To manage the cap, the Town instituted a reservation system overseen by its harbormaster.  When the new reservation system was first instituted, cruise ship visits were not yet a daily phenomenon, despite the reference to "daily" caps.

Over the past 15 years, Bar Harbor has experienced a steady growth in its tourist season, due chiefly to its proximity to Acadia National Park.  In 2021, Acadia National Park attracted roughly four million visitors.  For many of these visitors, a trip to Acadia includes a visit to downtown Bar Harbor.  Meanwhile, more and larger cruise ships anchored in Frenchman Bay and cruise ship passenger visitation levels started to approach or meet the established daily caps on an ever-increasing and consistent basis.  Although cruise ship passengers account for a limited portion of the total number of annual visitors to greater Bar Harbor and Mount Desert Island, they arrive at a destination that is already blessed and burdened by land-based tourism and at a waterfront of rather limited area.  Cruise ship passenger traffic also has a pronounced impact on and near the waterfront, including the eastern portion of West Street and the northern portion of Main Street.

Over the same period of years, the process of tendering passengers to shore has become a more efficient operation.  In the early years, the Tender Parties (i.e., the pier owners, tender-vessel LLCs, and BHWW) would augment the cruise lines' tender operations so that passengers came ashore in a variety of ships, including whale watch ships.  In 2017, the Tender Parties designed and built three vessels dedicated to tendering cruise ship passengers.  They also invested in barges to facilitate the movement of passengers from the cruise ships to the tender vessels.  While these developments are

commendable from the standpoint of market efficiency, part of the transactional cost is that the demand for tender operations means that cruise ship tenders have become the dominant harbor traffic during the expanded cruising season.[4]

For some, the expansion of tourism resulted in a return on planning and investment. For others, it resulted in a growing disaffection with municipal life. Increasingly, town leaders heard from constituents who were experiencing this disaffection.[5] Then came COVID. During the visitation-hiatus brought about by COVID quarantine orders—which restrictions impacted both land and sea visitation to Bar Harbor and Acadia National Park—some residents of Bar Harbor were reminded that there are measures of a municipality's success other than its volume of business.

In January of 2021, Bar Harbor commissioned a marketing research firm to perform a quantitative study and write a report concerning local opinions.[6] Ex. 323. The survey

---

[4] Each of the three tender vessels is licensed to hold 149 passengers and they steadily rotate into and out of the harbor in roughly 30-minute intervals, primarily disembarking passengers onto the piers mid-morning and embarking them again in the afternoon, though passengers move back and forth throughout the day. Consequently, there are times of day that involve more intense movement of people in either direction, not unlike the tide, albeit more regular in terms of timing. Foreign-flagged vessels, for example, arrive mid-morning and spend on average nine hours at anchorage. Their passengers spend on average six to seven hours on land in various locations, including downtown Bar Harbor. In the morning, passengers congregate near the piers and waterfront, including at motor coach staging areas, while some passengers walk into the Town. Passengers may be in any number of locations during the day, such as on a whale watch tour or an Acadia bus tour, or at a local restaurant or business. In the afternoon, passengers (and their assorted conveyances) again congregate near the piers to obtain passage back to their cruise ship.

[5] Town Council Chair Valerie Peacock testified that in 2020 and continuing residents of Bar Harbor have expressed strong feelings of angst over the perceived negative impact of the cruise ship industry, but also concern over the expansion of tourism in general. July 13 Tr. at 112–13, 121–25.

[6] Pan Atlantic Research's study surveyed year-round and seasonal residents, property owners, and business owners of Bar Harbor to examine what they thought about sea-based tourism. *See generally* Ex. 323. Overcrowding, too many ships/tourists, and environmental concerns ranked among the most popular answers to Bar Harbor's greatest challenges in managing cruise ship tourism. Ex. 323 at 29; *see also* July 13 Tr. at 212:14–214:9 (describing the increased street traffic and congestion at the waterfront when cruise ships arrive).

had a healthy response rate.  Many respondents voiced concern for the congestion[7] caused by cruise ship visits and ranked cruise ship tourism a net negative for the Town.  The growing concern over popular sentiment was also acknowledged by the cruise industry.  In July of 2021, the president of the Cruise Lines International Association proposed new passenger caps as part of a "negotiation" with the Town.  The proposal, accepted by the Town Council, involved a daily passenger reduction for the shoulder season[8] and a new monthly cap of 65,000 visitors specifically to address concerns of capacity.  Although public pressure was growing, the Bar Harbor Town Council, ultimately, was not then constituted to provide the pressure relief that many citizens hoped for.[9]

On February 15, 2022, the Council approved the formation and membership of a new working group to explore the modification of the daily passenger limits for the 2023 and 2024 cruise seasons.[10]  On August 16, 2022, the Town Council accepted the task force's recommendation to enter into a memorandum of agreement ("MOA") with each

---

[7] Congestion is not exclusively a matter of pedestrian congestion on sidewalks.  Congestion includes vehicular congestion and overcrowding of stores, parks, and other public spaces.

[8] By 2019, it was a misnomer to describe the months of September and October as a "shoulder season" when describing the volume of cruise ship passengers coming ashore in Bar Harbor.  In fact, over 60 percent of Bar Harbor's annual cruise ship passenger visits occur in September and October.  September and October are also the months that see the most visitation by the very largest vessels (>3,500 passengers). *See*, *e.g.*, Ex. 165.  According to CruiseMaine's director, the number of cruise visitors entering Bar Harbor in September and October is roughly equivalent to the number of tourists on town streets in June and July.

[9] At trial, counsel for Plaintiffs worried that testimony concerning public disaffection and council activities (much of Chair Peacock's testimony) was an attempt to construct a false legislative history in support of the Ordinance.  I have not interpreted the testimony in that fashion.  Rather, the testimony related some of the contemporaneous local history that set the stage for the success of the Initiative.

[10] Separately, the Bar Harbor Cruise Ship Committee was already corresponding with the Cruise Lines International Association to explore ways of reducing cruise visitation.  Ex. 214.

ADD. 010

cruise line and directed the preparation of a form MOA for circulation.[11]   The resulting MOA withdrew the months of April and November from the Town's reservation system, lowered daily passenger caps from 5,500 to 3,800 for the months of May, June, September, and October (with a +200-passenger leeway), and instituted a new monthly cap of 65,000. In September and October of 2022, the Town entered into MOAs with American Cruise Lines, Disney Cruise Lines, Holland America Line, Hurtigruten Expeditions, Norwegian Cruise Line, Pearl Seas Cruises, Princess Cruises, Rogay Caribbean Cruises, Seabourn Cruise Line, Viking Cruises, and Windstar Cruises Marshall Islands.

While the Town Council publicly pursued its voluntary measures, a group of local residents formed a petitioning committee to advance a citizens' initiative that would achieve more significant reductions by mandatory means.   Their initiative proposed amending the Bar Harbor Code to require a permit to disembark cruise ship passengers "on, over, or across any property located within the Town of Bar Harbor."  Ex. 243A.  It also specified that "no more than 1,000 passengers, in the aggregate, may disembark on a single calendar day."   *Id.*   The Initiative called for a $100 minimum penalty per excess unauthorized disembarkation, which would be assessed against the property owners (the Pier Operators).   The Initiative states that the harbormaster shall develop rules and regulations to establish a reservation system for disembarkation, a mechanism for counting and tracking disembarkations, a procedure for reporting violations, and "any other

---

[11] Two weeks prior, on August 2, 2022, the Town Council went into executive session to discuss the citizens' petition that would become the Ordinance but was, at that time, still in need of voter approval. Exs. 207–210.  The Town Council also conducted a workshop on that date to discuss the future of cruise tourism in Bar Harbor.  Among other matters under consideration were cautionary litigation warnings from the Cruise Lines International Association.  Ex. 211.

provisions" deemed necessary.  *Id.*  By the time the Initiative went to vote, the citizens'

group had revised it by substituting the word "persons" for "passengers."  Ex. 243B.  They

did this based on a group member's observation that cruise ships carry a great many

crewmembers as well as passengers.  The group decided it would be best to use the term

persons to capture both passengers and crew.  Ex. 230.

The Initiative included a lengthy statement of purpose focusing on quality of life,

but also expressing concern for public safety and the commercial interests of businesses

other than those seeking the patronage of cruise ship passengers.

Concerning quality of life, the Initiative's sponsors wrote:

> Underlying this proposed amendment is the fact that, in recent years, the
> Town has been a popular port of call for cruise ships of varying sizes, from
> which passengers disembark via tender boats that offload passengers directly
> into the downtown area. The large numbers of passengers have overwhelmed
> the downtown area, resulting in excessive congestion and traffic on public
> streets and sidewalks, frequent overcrowding of parks and other public
> spaces, and inundating local amenities and attractions, all of which result in
> a diminished quality of life for Town residents.

Ex. 243A.  Concerning public safety and other business interests, the sponsors wrote:

> The unchecked and continued influx of disembarking cruise ship passengers
> in the downtown area jeopardizes the Town's ability to deliver municipal
> services to Town residents and visitors (for example, cruise ship passengers),
> including the provision of public safety services (police and fire), emergency
> medical services (EMS), in-patient and out-patient services at local hospitals,
> pandemic control measures, and public sanitation services, and also impacts
> the ability of local shops, restaurants, and other businesses to attract and
> serve customers.

*Id.*  The sponsors then summarized:

> A town-wide survey was conducted in 2021, showing that a majority of
> respondents believe that the volume of disembarking cruise ship passengers
> is too high and has a negative impact on the Town and the health, safety and
> welfare of its residents.

**ADD. 012**

*Id.*

The Initiative was listed as an article on the warrant for Bar Harbor's November 8, 2022, special town meeting.  A majority of the registered voters who voted supported the article.  Bar Harbor now has a land use ordinance that establishes a disembarkation cap of 1,000 persons per day.

During trial, Mr. Sidman testified that the 1,000-person cap was not the product of "a rigorously defensible finding or study or calculation."  July 13 Tr. at 312:20–21.  The group proposed various caps, some higher, but ultimately arrived at 1,000 persons.  In communication with other members of his group, Mr. Sidman expressed a preference for smaller cruise ships because the passengers on smaller cruise ships tend to be more well-to-do.  He also expressed a dislike of "the biggies," meaning the larger cruise ships.

<u>Subsequent Rulemaking</u>

A variety of details remain for purposes of sorting out the best approach to implementing the Ordinance.  These include proposed rulemaking to exclude crew from the 1,000-person limit (for reasons that will be explained shortly), determining how best to monitor passenger volume, and determining how to proceed in the event the limit is disregarded by the Pier Owners.  *See*, *e.g.*, Exs. 66, 204.  However, at present implementation and rulemaking are suspended pending this immediate facial challenge to the Ordinance.

<u>Findings Concerning the Initiative's Stated Purposes</u>

To the extent the Initiative expresses concern for public safety due to congestion located anywhere other than the waterfront, West Street and lower Main Street, there is no

empirical data to enable a fact finder to allocate responsibility for a degradation in overall municipal public safety between cruise and land-based tourism. But at the waterfront, the press of cruise ship passengers is sufficient to raise safety concerns. Indeed, the initiative sponsors' stated concern for public safety is echoed by the cruise industry. Ex. 32 §§ 5.3, 5.4. However, at least to date there does not appear to be an incident illustrating any past failure in the delivery of public services occasioned by passenger congestion at the waterfront.

Where the stated purposes have greater significance is in regard to congestion and all that congestion entails, such as overtaxed public facilities, long lines, crowded sidewalks and businesses, slowed traffic, and the like. To be fair, some days with pronounced congestion in Bar Harbor may occur when a cruise ship is not at anchorage. Nighttime congestion may be particularly bad on some evenings, despite the absence of cruise ship passengers. But the idea proposed by Plaintiffs and Plaintiff-Intervenor that cruise ship traffic has a negligible impact on local conditions is disingenuous. What video evidence was presented by Plaintiffs or Plaintiff-Intervenor was more in the nature of pro-cruise marketing material that was not representative of the daily impact of cruise-related visitation and, instead, depicted quieter moments on quieter days.

It is not the fault of cruise ship passengers that the area is congested; it simply is the reality of conditions existing on the ground. Cruise ship passengers come ashore in an area of limited space nestled between the Public Pier and Harborside Hotel. One of the piers over which cruise ship passengers travel sits at the east end the harbor, adjacent to the Public Pier, near the juncture of Main Street and West Street. The other pier sits at the

west end of the harbor.  Between them is a short stretch of commercialized waterfront along West Street.  The passengers' impact on the relatively confined waterfront area is marked,[12] though their spillover impact on the Town more widely is best described as cumulative. But even further up Main Street and in public areas the impact is real and tangible to locals who visit the downtown.

As attested to by witnesses Dr. Bill Horner, Nathan Young, and Seth Libby, the press of people in the downtown intensifies on cruise ship days.  Dr. Horner described it as a dramatic growth in the press of people with a tremendous amount of traffic, particularly in the waterfront area.  Mr. Young described sidewalks busy enough that he prefers to walk in the street when he has to go downtown on a cruise ship day.  Mr. Libby described the scene similarly, stating that cruise ship visits produce greater crowding.  The witnesses also testified that they avoid the downtown on cruise ship days due to the extent of the congestion.  Horner, Libby, and Young all testified that they voted in favor of the initiative because they felt that elected officials had failed to act in a timely or meaningful manner to curtail the impact of cruise ship visits.  I find that these witnesses provided a fair and accurate assessment of the impact of cruise ship visits in terms of both the intensification of congestion and the undesirability of a trip downtown for many residents on "cruise ship days," which increasingly means most days of the cruise ship season.[13]

---

[12] *See*, *e.g.*, Ex. 32 § 5.3.  Congestion is bad enough that the Cruise Line Industry Association has proposed that Bar Harbor give over to cruise passenger traffic most of the public pier as well.  *Id.* at §§ 5.3, 5.8.  This would effectively give over the vast majority of Bar Harbor's waterfront to the primary function of facilitating cruise ship passenger arrival and departure during the cruising season.

[13] Plaintiffs and Plaintiff-Intervenor offered the testimony of Professor Todd Gabe, Ph.D., of the University of Maine, who studied congestion in Bar Harbor's tourist district.  One study occurred at the tail end of August and essentially concluded that allowing 680 *additional* cruise ship passengers (i.e., more than the

15

Congestion in downtown Bar Harbor is a seasonal fact of life, but it is empirically exacerbated by the regular morning and afternoon pulse of cruise ship passengers and the tour buses and other vehicles[14] that arrive to cater to them.  In addition, fall congestion is largely a function of cruise ship visitation, resulting in an undeniable change to the annual rhythm of municipal life.  Cruise ship passenger visitations may well be viewed by rational voters as indulgent and burdensome surplusage in an already taxed ecosystem.  In this sense, the initiative sponsors' stated concern for generalized welfare and quality-of-life considerations is neither unsubstantiated nor unrelated to the unique congestion problem associated with high-berth cruise tourism, let alone arbitrary and irrational.[15]

<u>Findings Concerning the Ordinance's Impacts</u>

Most of the cruise lines that schedule visits to Bar Harbor plan visits in cruise ships having a lower berth capacity in excess of 1,000.  Only 27 of the 134 ships scheduled to make calls in the 2023 season would be able to disembark their entire complement of passengers without exceeding the cap.  It appears unlikely that a cruise line will schedule

---

daily 3,500 passenger cap for August) would result in only a negligible *further* experience of congestion in a town already impacted by land-based tourism and the baseline 3,500 cruise ship passengers.  Ex. 319 at 2.  Professor Gabe also spent a number of days walking about Bar Harbor and recording his subjective experience at various times and locations.  About half of the walks he took were "at times early in the morning, during months outside the peak tourism seasons and in inclement weather, or at places located on the outskirts of the tourism district."  Ex. 319 at 6.  I did not find Professor Gabe's testimony or reports to be helpful in terms of achieving whatever finding Plaintiffs and Plaintiff-Intervenor intended me to draw.

[14] *See, e.g.*, Ex 12A; Ex. 32 § 4.2.  In addition to tour buses, there are vans, minibuses, motor coaches, taxis, and bike tours.  While the pulses of congestion are most keen in the mid-morning and afternoon, there is a greater mid-day press as well, which the restaurateur members of APPLL seek to capitalize on.

[15] Plaintiffs insist that the Town of Bar Harbor must prove that the Ordinance can be based on a finding that the one-thousand-and-first passenger disembarked and every passenger who follows is somehow a "noxious" or "toxic" threat to the well-being of the Town.  *See, e.g.*, Pls.' Reply Br. at 6, 16, 20, 34.  I do not believe that is the test.  The Ordinance is obviously designed to draw a line between levels of impact occasioned by the berth capacities of cruise ships, not the relative innocuousness or noxiousness of individuals.

16

a port call for purposes of a shore visit if it cannot disembark its ship's entire complement of passengers on a single day. Consequently, in terms of the volume of visitors disembarking from cruise ships, the likely avoidance of the large vessels will reduce passenger visitation volume by a significant percentage, likely north of 80 and possibly as high as 90 percent (in the short term) compared with the peak numbers experienced in 2022 and 2023.

Cruise lines with large ships will, necessarily, adjust their itineraries and reroute high-berth ships to other ports. Plaintiffs would likely feel a financial impact occasioned by reduced cruise passenger patronage. The pier and tender boat operators will likely lose fees, the APPLL members will likely experience a reduction in business and will perhaps close during the shoulder season or retain fewer employees in those months, and the Pilots Association will have decisions to make related to maintaining personnel, vessels, and equipment without the revenue generated by regular piloting of the largest cruise ships into and out of Frenchman Bay.

Because no ecosystem is static, presumably some cruise lines will adjust practices to maximize utilization of the new caps. However, the record does not contain evidence that would allow for a reliable calculation on that score, nor would I expect it to.[16] There is no evidence to suggest, for example, that the cruise lines with the smaller ships have

---

[16] The cruise industry stated in 2019 that it "is poised to continue its overall expansion, adding new ships faster than retiring them." Ex. 32 § 6. "The demographics of the passengers seeking cruises in a given area will largely dictate the size and amenities of vessels. Vessels should be considered moveable high-value assets for generating shareholder profits. To this end, cruise companies will evaluate the yield achievable by a ship assignment in a given market." *Id.* Conceivably, if, as the cruise lines evidently fear, more municipalities impose capacity restrictions, then certain cruise lines will reconsider their decision to focus on maximization of economies of scale in cruise ship design.

ADD. 017

either a sufficient number of ships or that their cruises are in sufficient demand to approach the caps on a regular daily basis. Even if visitation is eventually maximized under the Ordinance, the overall number of cruise ship passenger visits would be significantly less than the level of visitation experienced in 2022 and 2023 and less than a third of the level authorized under the recent MOAs.

<div align="center">DISCUSSION</div>

Plaintiffs allege in their Complaint (ECF No. 1) that Bar Harbor's new Ordinance is preempted by operation of the United States Constitution's Supremacy Clause (Count 1), violates the Commerce Clause (Count 2), and offends "substantive due process" (Count 3). Plaintiff-Intervenors similarly allege in their Complaint-in-Intervention (ECF No. 43) that the ordinance violates the Supremacy Clause (Count 1) and the Commerce Clause (Count 2), but additionally allege that the ordinance is preempted under the Maine Constitution based on alleged conflict with Maine's statutory pilotage system (Count 3) and its statutory economic and community development program (Count 4).

I address the Maine Constitution first before turning to the federal claims.

## A.    The Maine Constitution

The Maine Constitution affords municipalities home rule authority. "The inhabitants of any municipality shall have the power to alter and amend their charters on all matters, not prohibited by Constitution or general law, which are local and municipal in character. The Legislature shall prescribe the procedure by which the municipality may so act." Me. Const. art. VIII, pt. 2, § 1. Home rule authority has been conferred on Maine municipalities by the Maine Legislature to the maximum extent of the Legislature's power

to grant it, excepting only home rule authority that is elsewhere denied expressly or by clear implication in Maine law, *see* 30-A M.R.S. § 3001, or where "the municipal ordinance in question would frustrate the purpose of any state law," *id.* § 3001(3). When the exercise of home rule is challenged, the municipal power authorized under Maine law is to be "liberally construed to effect its purposes" and courts must apply a "rebuttable presumption that any ordinance . . . is a valid exercise of a municipality's home rule authority." *Id.* § 3001(1), (2).

The Maine Constitution also extends to each Maine municipality the authority to provide for their electors to exercise "the direct initiative . . . in regard to its municipal affairs." Me. Const. art IV, pt. 3, § 21. The authority of municipal electors (i.e., voters) to legislate by means of a direct initiative is coextensive with the authority of the municipality to exert its home rule authority. *Portland Reg'l Chamber of Commerce v. City of Portland*, 253 A.3d 586, 592–93 (Me. 2021). It was thus an exercise of home rule authority when the petition committee circulated the initiative that resulted in Bar Harbor's challenged Ordinance.

Plaintiff-Intervenor does not contend that the petition process and resulting initiative exceeded any state or municipal law or rule insofar as the Ordinance's enactment is concerned. Nor does it contend that the initiative is not an exercise of home rule authority involving municipal affairs. Instead, Plaintiff-Intervenor contends that the Ordinance prevents the accomplishment of state priorities articulated in state laws respecting the establishment of a system of pilotage and a program of economic and community development. Challenges involving the "implied" prohibition "must be evaluated on a

case-by-case basis by examining the language of the ordinance and any statutes enacted by the Legislature." *Id.* at 593.

In Maine Revised Statutes Title 38 the Maine Legislature has declared a policy and purpose "to provide for a system of state pilotage in order to provide maximum safety from the dangers of navigation," "to maintain a state pilotage system devoted to the preservation and protection of lives, property, the environment and vessels," and "to insure the availability of pilots" 38 M.R.S. § 85. The pilotage statute then goes on to define terms, outline jurisdiction, specify the vessels that must take pilots, prohibit piloting without a license, establish a pilotage commission and outline its duties, and set up a system of licensure for pilots. None of these statutory provisions prohibits a municipality from enacting an ordinance that restricts local passage from private piers onto municipal property. Nor does the Ordinance conflict with the objective of the Legislature when it comes to pilotage. Pilots remain free to conduct their profession and to pilot vessels within the region, including by piloting them to Frenchman Bay anchorages. Nothing in the pilotage statute can reasonably be construed as a legislative intention, express or implied, to divest municipalities of home rule authority over local, land-based, police power concerns whenever the exercise of that authority could foreseeably impact the volume of business available to pilots. The establishment of a pilotage system is not an implicit statutory surrogate for compulsory, maximal municipal participation in cruise tourism.

Plaintiff-Intervenor also argues that Maine's statutory intention of "formulat[ing] and implement[ing] economic development policies and programs" that are coordinated among the State's several agencies and various "municipal and regional economic efforts,"

5 M.R.S. § 13052, will not tolerate an exercise in municipal home rule that curtails cruise tourism. With the statute in question, the Maine Legislature organized a Department of Economic and Community Development. *Id.* §§ 13054, 13055. The Department is empowered to, among other things, implement policies and programs, work with other organization including municipalities, conduct planning and research, communicate with the private sector, prepare and distribute publications, and implement programs assigned to it by the Governor or Legislature. *Id.* § 13056. The Department's Office of Tourism is empowered to engage in promotional and informational activities, encourage development, review and comment activities, and similar activities. *Id.* §§ 13090-C, 13090-E. However, it has no power to compel or even regulate municipal engagement with cruise line tourism.

While the Department and the Office have rule-making authority, Plaintiff-Intervenor does not rely on any rules to support its preemption claim. Instead, Plaintiff-Intervenor argues that any municipal action inconsistent with greater economic development necessarily prevents coordination as well as economic and community development. The argument is essentially that through declaration of an economic and community development goal and creation of a related department and tourism office, the Maine Legislature has imposed a duty on every municipality and political subdivision to act in the best interest of the Chamber of Commerce. Of course, if the maximization of commerce were compulsory, a vast body of zoning and land use regulation would not be worth the paper it is written on. To be certain, most municipalities yearn for the types of burdens of fortune that Bar Harbor experiences. The broad and undifferentiated aspiration toward commercial health made manifest by the Legislature's creation of the Office of

Tourism and CruiseMaine is sensible and one supposes is in league with the desires of most municipalities most of the time.  However, the picture of commercial development is not painted in primary colors alone but rather exists in a pastiche of other municipal considerations.  A municipality that rationally exercises its home rule authority in a manner which is modestly in tension with the highest marginal commercial harvest, the type which is the sine qua non of the tourism office, is not an outlaw.

The fact is that the Legislature has not empowered these instrumentalities to override municipal home rule authority.  The Legislature has not even empowered these instrumentalities to wield the interstitial power of a special master or an ombudsman in matters of municipal and cruise line conflict.  If it had, then some manner of administrative process would have preceded before or alongside this litigation.  Yes, CruiseMaine may support, educate, promote, and play the part of a sales broker when it comes to cruise tourism, but decidedly missing from the enumerated powers is the power to trump home rule authority to dictate acceptable levels of municipal participation in cruise tourism.

Nor can the mere existence of the Department or its tourism-focused instrumentalities be regarded as an implied prohibition against a local municipal determination to reduce engagement with the cruise line industry.  Public bodies may exercise only the powers conferred upon them by law.  The conferral of powers must be found "in the enabling statute either expressly or by necessary inference as an incidence essential to the full exercise of powers specifically granted." *Hallissey v. Sch. Admin. Dist. No. 77*, 755 A.2d 1068, 1072 (Me. 2000).  The derogation of home rule authority must rest on something more immediate and direct than the Legislature's pro-commerce

22

**ADD. 022**

proclamations and the institution of a body tasked with broadly supporting and promoting, but not regulating, tourism.  If home rule authority is to be overcome it ought to be based on something with a little more starch, such as the text of the law.  As is so often the case, when textual (i.e., legal) support for a challenge to home rule authority is lacking, an invitation is made to the court to begin at the intellectual equivalent of divining legislative intent from high upon the pillars, which is to say, an appeal toward sophistry.  To be certain, for some there is an intoxicating appeal to wielding such authority, acting as a sort of judicial "God of the gaps" and the line is long of those only too eager to cast their light upon the unwashed masses to shepherd us through the darkness left by the democratic process.  For ease of analysis, this case does not present a close call of implied prohibition of home rule.  Any argument of implied prohibition of municipal home rule authority must be attended by a particularly muscular example of how the purpose of the enabling legislation is at cross purposes with the home rule.  The analysis cannot be one of contingencies or at least if it is, must ultimately be tethered to the noncontingent, a prime mover example in the law that demonstrates how home rule errs.

The Legislature should not be viewed as having impliedly prohibited the exercise of municipal home rule authority in an area that the Legislature has not even attempted to regulate in any direct manner.  Even in areas that the Legislature has regulated directly, municipal home rule authority is not so easily preempted.  *See*, *e.g.*, *Portland Reg'l Chamber*, 253 A.3d at 591 (upholding Portland's minimum wage ordinance despite existence of state minimum wage statute); *Portland Pipe Line Corp. v. City of S. Portland*, 240 A.3d 364, 368 (Me. 2020) (holding that Maine Coastal Conveyance Act, which

involved the State's exercise of police power in matters of oil transfers, did not preempt a local ordinance that prohibited an activity even though the Maine Department of Environmental Protection ("DEP") had issued an approval that allowed for but did not require the activity in question); *E. Perry Iron & Metal Co.*, *Inc. v. City of Portland*, 941 A.2d 457, 463 (Me. 2008) (upholding municipal regulation of junkyard in absence of evidence that it frustrated the purposes of Maine's Solid Waste Act); *Smith v. Town of Pittston*, 820 A.2d 1200, 1201 (Me. 2003) (4-3) (upholding municipal ordinance banning the spread of septage in the Town of Pittston despite existence of DEP rules establishing minimal performance criteria for such spreading, DEP's award of permit application to conduct such spreading, and legislative intent to encourage development of affordable, environmentally suitable waste disposal sites). When it comes to the growth of tourism in Maine there simply is no state-sanctioned regulatory scheme to frustrate, only a broadly worded aspirational objective of regional economic coordination and an associated initiative of the Office of Tourism to support, educate, and promote cruise communities.

Plaintiff-Intervenor's claims of preemption under the Maine Constitution (Complaint in Intervention Counts 3 and 4) fail.

## B. The United States Constitution

Plaintiffs and Plaintiff-Intervenor mount challenges to Bar Harbor's Ordinance based on the Supremacy Clause and the Commerce Clause. Pls.' Compl. Counts 1–2; Compl. in Intervention Counts 1–2. Plaintiffs add a claim under the Due Process Clause. Pls.' Compl. Count 3. I begin my review with the Supremacy Clause, move on to the Due Process Clause, and finish with the Commerce Clause.

### 1.    *The Supremacy Clause*

The Supremacy Clause provides that "the Laws of the United States . . . and all Treaties made . . . under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  Due to the Supremacy Clause, when Congress enacts a statute, state law is preempted to the extent of any conflict with the federal statute.  *Haaland v. Brackeen*, 599 U.S. 255, 287 (2023).  Sometimes a federal statute will expressly preempt state law, but preemption also can arise "by virtue of restrictions or rights that are inferred from statutory law." *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020).  Preemption can result, for example, based on the inference that Congress has effectively occupied the field in a certain area of regulation even though Congress has not announced a preemptive intention.  *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 633 (1973).  Preemption can also result based on the existence of competing commands, allowances, or standards in federal and state law.  "If federal law 'imposes restrictions or confers rights on private actors' and 'a state law confers rights or imposes restrictions that conflict with the federal law,' 'the federal law takes precedence and the state law is preempted.'"  *Garcia*, 140 S. Ct. at 801 (quoting *Murphy v. National Collegiate Athletic Assn.*, 138 S. Ct. 1461, 1480 (2018)).  However, "[i]nvoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law."  *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019).

"'[T]he basic question involved in [Supremacy Clause] cases . . . is never one of

interpretation of the Federal Constitution but inevitably one of comparing two statutes." *Swift & Co. v. Wickham*, 382 U.S. 111, 120 (1965). "[F]or the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws." *Hillsborough Cnty.*, *Fla. v. Automated Med. Laboratories*, *Inc.*, 471 U.S. 707, 713 (1985).

### a. Federal regulation of maritime matters

Plaintiffs point to the many ways in which federal law applies to vessels, seafarers, and ports or "maritime terminal facilities" to argue that there is no room for a municipality to restrict shore access via port facilities. The cited federal law, rules, and regulations, however, do nothing to legislate in the area of cruise tourism (or even—with one exception—landward passage). Plaintiffs cite the Federal Maritime Transportation Security Act, 46 U.S.C. §§ 70101-70132, which governs "port security," and the entire Coast Guard Authorization Act, Pub. L. 111-281, 124 Stat. 2905 (Oct. 15, 2010), which as the title suggests authorizes appropriations for the Coast Guard. Bar Harbor's Ordinance clearly does not compete with federal law in the area of port security or Coast Guard operations.[17]

Plaintiff-Intervenor advances similar preemption arguments to those pressed by Plaintiffs but shifts the focus slightly to contemplate the regulatory burdens imposed on

---

[17] In Plaintiffs' rundown of federal law touching on vessels and maritime facilities, they cite 33 C.F.R. § 105.105(a)(2) for the proposition that Coast Guard regulations under the Maritime Transportation Security Act are intended to be preemptive. Pls.' Br. at 20. The reference is perplexing because it merely states that the requirements of maritime security for facilities apply to the owner or operator of a facility that receives vessels certified to carry more than 150 passengers, yet Plaintiffs have elsewhere informed the Court that the tender vessels are licensed to hold 149 passengers. In any event, clearly the Bar Harbor Ordinance was not drawn to impose competing security standards for maritime facilities.

cruise lines and pilots.  The Pilots Association argues that because "[t]he federal presence in the area of navigation, safety, and environmental protection is extensive, pervasive, demanding, and complex," and "follows a vessel from its design phase through its ultimate scrapping," and "link[s with] a series of international agreements dependent upon the predictability of access to ports," and involves oversight by the Coast Guard, Customs and Border Protection, the Centers for Disease Control and Prevention, the Environmental Protection Agency, and the Federal Maritime Commission, "[l]ocal restrictions on vessel operations . . . pose a direct threat to the necessary uniformity of federal oversight and the efficient operation of cruise . . . vessels."  Pl.-Int.'s Br. at 9–10 (ECF No. 190).  This language checks off the lawyerly rhetoric box but fails to tease out any actual conflict.  The Ordinance simply does not purport to regulate vessel requirements or make the operation or navigation of cruise vessels any less safe, environmentally sound, or efficient.  Nor does it interfere in any way with the performance of cruise line oversight by the Coast Guard, CBP, CDC, EPA, or the FMC.  Nor can it be said that any one of the identified agencies has attempted to occupy the regulatory field when it comes to balancing competing interests related to a municipality's participation in cruise tourism.  Federal regulation in this arena is not even extant, let alone pervasive. *City of Burbank v. Lockheed Air Terminal Inc*., 411 U.S. 624, 633 (1973) ("It is the pervasive nature of the scheme of federal regulation of aircraft noise that leads us to conclude that there is pre-emption.").

Plaintiffs and Plaintiff-Intervenor's invocation of all the many ways that federal law touches upon maritime traffic is precisely the kind of "brooding federal interest" mentioned in *Hillsborough*, 471 U.S. at 713.  As such, it does not suffice to support the preemption of

27

**ADD. 027**

Bar Harbor's disembarkation restriction.[18]

>   b.  Seafarer shore access

When Plaintiffs and Plaintiff-Intervenors do dive down into the maritime regulations to retrieve something specific, the palatable[19] oyster they surface with is a preemptive maritime security regulation that requires the owners or operators of maritime facilities (such as Plaintiff Pier Owners) to ensure shore access for seafarers who wish to transit from a vessel through or over regulated facilities.  33 C.F.R. § 105.237.[20]

> (a) Access required.  Each facility owner or operator must implement a system . . . for providing access through the facility that enables individuals to transit to and from a vessel moored at the facility and the facility gate in accordance with the requirements in this section.  The system must provide timely access as described in paragraph (c) of this section and incorporate the access methods described in paragraph (d) of this section at no cost to the individuals covered.
>
> (b) Individuals covered.  The individuals to whom the facility owner or operator must provide the access described in this section include—

---

[18] Plaintiffs muse in their post-trial brief that the Ordinance is unenforceable because the Pier Owners lack the authority to stop or turn back cruise ship passengers who arrive at the pier. Pls.' Br. at 31 n.27 (also noting that this point is "not part of this legal challenge").  The idea that the Pier Owners cannot lawfully comply ignores the reality that cruise ship passengers (and crew) arrive at the piers pursuant to a prearranged reservation system and have long done so with the understanding that a free-for-all would result in chaos and passenger dissatisfaction with the shoreside experience.  Besides, compliance should present no difficulty as we are assured by Plaintiffs and Plaintiff-Intervenor that oversized cruise ships will no longer call at Bar Harbor.

[19] Plaintiff-Intervenor also cites 33 U.S.C. § 5, which prohibits the levying of tolls "or any other impositions whatever," upon vessels, water craft, or their passengers or crew, by "any non-Federal interest, if the vessel or water craft is operating on any navigable waters subject to the authority of the United States." Pl.-Int.'s Reply Br. at 12.  This oyster has spoiled.  The argument is waived for purposes of this litigation since it was first raised in a reply brief.  But in any event, the Ordinance is designed to prevent excessive disembarkations from cruise ships, subject to a fine imposed against the pier owner to ensure compliance. It is not a toll, fee, or other imposition directed toward cruise ships or their passengers and crew associated with their use or enjoyment of navigable waters.

[20] The regulations provide that part 105 has preemptive effect "insofar as a State or local law or regulation applicable to the facilities . . . would conflict with the regulations in part 105, either by actually conflicting or by frustrating an overriding Federal need for uniformity."  33 C.F.R. § 101.112(b).

28

**ADD. 028**

(1) Seafarers assigned to a vessel at that facility;

(2) Pilots; and

(3) Representatives of seafarers' welfare and labor organizations.

*Id.* § 105.237.  Cruise ship passengers are not seafarers.  Seafarers are persons "assigned to a vessel" (i.e., crew) or "pilots" or "[r]epresentatives of seafarers' welfare and labor organizations."  *Id.* § 105.237(b); *see also id.* § 96.250(f)(4) (providing that safety management systems include personnel procedures ensuring that "[e]ach vessel is properly crewed with qualified, certificated and medically fit seafarers").

Because the Bar Harbor Ordinance is drawn as a restriction on the numbers of "persons" and not just "passengers" who may be disembarked on or over municipal land, Plaintiffs and Plaintiff-Intervenor proclaim a victory.  I agree with Plaintiffs and Plaintiff-Intervenor (and evidently with Defendant and Defendant-Intervenor) that the Ordinance cannot stand as a barrier to seafarers' shore access when a seafarer is assigned to a vessel moored at either pier facility owned by the Plaintiff Pier Owners.  To the extent the Ordinance might be read to require a different conclusion, it cannot be enforced.  However, it does not follow that the entire Ordinance is invalidated or that any meaningful relief is to be awarded in this litigation as a result of the limited (and hypothetical) preemption occasioned by the seafarers' access regulation.

The scope of preemption "is guided by the rule that the purpose of Congress is the ultimate touchstone in every pre-emption case."  *Altria Group*, *Inc. v. Good*, 555 U.S. 70, 76 (2008) (cleaned up).  "That approach is consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety."  *Medtronic, Inc. v.*

29

*Lohr*, 518 U.S. 470, 485 (1996); *see also Consumer Data Indus. Ass'n v. Frey*, 26 F.4th 1, 12 (1st Cir. 2022) (remanding for district court to analyze the scope of a federal law's preemptive impact), *cert. denied*, 143 S. Ct. 777 (2023). Here, the purpose of the federal regulation is to assure seafarer access to shore when seafarers are aboard and assigned to a vessel moored at the regulated facility. Consequently, the preemptive reach of the federal seafarers' access regulation extends no farther than to a controversy involving an attempt by Bar Harbor to deny shore access to a seafarer on a vessel moored at either facility.

This case does not present any actual controversy of that (or any other actual) kind. Moreover, even if the conflict preemption associated with the seafarers' access regulation is appropriately resolved in the context of this litigation, it would not achieve the result that Plaintiffs and Plaintiff-Intervenor seek, which is total invalidation of the Ordinance. A limited invalidation of the Ordinance for purposes of seafarers' access would not render the Ordinance an ineffective instrument to impose a disembarkation cap against cruise ship passengers, since passengers are not seafarers.

Plaintiffs and Plaintiff-Intervenor insist nonetheless that invalidation of the Ordinance based on its use of the word "persons" instead of "passengers" should be total. I digress to address this assertion, though it is unavailing. The genesis of the digression is the fact that Bar Harbor has indicated that it will author a rule that limits the Ordinance by recognizing an exception for shore access for seafarers. When a state, municipality or local agency interprets or enforces a law in a manner that avoids a conflict with federal law, ordinarily mere facial constitutional challenges are effectively deflected. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 456 (2008); *Ward v. Rock Against*

30

**ADD. 030**

*Racism*, 491 U.S. 781, 795–96 (1989); *McGuire v. Reilly*, 386 F.3d 45, 58 (1st Cir. 2004). However, here the Ordinance's use of "persons" unambiguously extends to seafarers, so it is "not readily susceptible to a narrowing construction." *Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 35 (1st Cir. 1999).

Plaintiffs also cite Maine Supreme Judicial Court opinions that they say preclude efforts by a municipality to confine the reach of a citizen initiative by means of a rulemaking process. They contend that the only available fix requires an initiative and election do-over. The cases Plaintiffs cite do not support the proposition. *See Wawenock, LLC v. Dep't of Transp.*, 187 A.3d 609, 618 (Me. 2018) (discussing methods of interpreting the "will of the people" when construing citizen initiatives); *Davis v. SBA Towers II, LLC*, 979 A.2d 86, 92–93 (Me. 2008) ("Although Gridcom argues that the Planning Board's decision to redefine the term was also procedurally improper, we need not address this claim."). And while Plaintiffs correctly observe that Maine law requires that an ordinance be revised "only by following the procedure required for its original enactment," 30-A M.R.S. § 3004(4), it does not compel that an ordinance be invalidated *in toto* based on a limited conflict with federal law. The default rule of constitutional jurisprudence is to the contrary, and here it takes little imagination to appreciate that the voters of Bar Harbor intended and would prefer that the Ordinance remain operative as to passengers rather than be invalidated as to passengers. *See Town of Windham v. LaPointe*, 308 A.2d 286, 292 (Me. 1973); *see also Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329–30 (2006).

In summary, yes, the Ordinance has the potential to conflict with the preemptive

31

**ADD. 031**

seafarers' access regulation and requires that Bar Harbor avoid any application of the Ordinance that would run afoul of 33 C.F.R. § 105.237. However, the limited conceptual conflict does not achieve the result that Plaintiffs and Plaintiff-Intervenor are after, which is total invalidation of the Ordinance.[21]

<div style="text-align:center"><u>c.</u>  <u>Customs and immigration</u></div>

Plaintiff-Intervenor also argues that the Ordinance "obstructs customs and immigration screening of entrants to the United States." Pl.-Int.'s Br. at 14. The idea is that cruise itineraries in the North Atlantic often include calls in Canadian ports before returning to U.S. waters, so if the first port of call in the U.S. chosen by the cruise ship's captain is Bar Harbor, then Bar Harbor must permit unrestricted disembarkation from the cruise ship as a logical consequence of any immigration and customs inspection that transpires aboard the ship while it is anchored in Frenchman Bay.

The conflict is imagined, not real. The Ordinance does not prohibit or otherwise prevent entry to the United States. Anyone admitted to the United States by CPB through a process that transpires aboard ship in Frenchman Bay may enter the United States, including in Bar Harbor. The Ordinance does not impose an additional condition for admission or otherwise purport to supply a basis for exclusion from the United States, it

---

[21] Plaintiffs and Plaintiff-Intervenor fail to articulate a set of circumstances in which an as-applied challenge by a seafarer necessarily would arise and hypothetical notions about what might transpire do not suffice since "litigants mounting a facial challenge to a statute normally 'must establish that *no set of circumstances* exists under which the [statute] would be valid.'" *United States v. Hansen*, 599 U.S. 762, 769 (2023) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987), and discussing the exception for overbroad restraints on free speech)). Assuming reservations are booked and tendering arrangements are made such that a combined total of more than 1,000 passengers and seafarers would be disembarked on a given day, further constitutional litigation based on the preemptive force of 33 C.F.R. § 105.237 is susceptible to avoidance when the Court is assured that the handling of any such scenario will be addressed in advance by the Town's rulemaking process in recognition of the partial preemption of the Ordinance. The facial challenge presented in this litigation should not prevent that process from unfolding.

imposes only a limitation on local disembarkations and a fine for excessive disembarkations, regardless of the admission status of persons disembarked.[22] Nevertheless, Plaintiff-Intervenor likens this case to *Takashi v. Fish & Game Commission*, 334 U.S. 410 (1948), and *Maine Forest Products Council v. Cormier*, 586 F. Supp. 3d 22 (D. Me. 2022).  Pl.-Int.'s Br. at 14–16.  This case is unlike either.

In *Takashi*, the Supreme Court invalidated, on a variety of grounds, a discriminatory California law that banned lawful residents ineligible for citizenship from engaging in commercial fishing.  334 U.S. at 413–415, 422.  Plaintiff-Intervenor says the Ordinance similarly discriminates.  The discrimination argument relies on the fact that the largest cruise ships are all foreign-flagged vessels and the fact that all cruise ships customarily carry passengers who are foreign nationals.  However, the Ordinance is not drawn in discriminatory language and nothing that transpired at trial betrayed a discriminatory purpose to exclude foreign-flagged vessels or the citizens of other nations.  The Ordinance is drawn with the passenger capacity of ships in mind, not the nationality of the ships' owners or passengers.

In *Cormier*, Judge Woodcock issued a preliminary injunction enjoining enforcement of a protectionist state statute designed to prevent foreign workers from

---

[22] It bears repeating that cruise ships with passenger capacities in excess of 1,000 will likely not have Bar Harbor on their itineraries.  Visitation at a port is arranged many months in advance, with local, daily passenger caps in mind.  Consequently, the imagined conflict between an admission decision and a refusal to allow disembarkation (or imposition of a fine on the Pier Owners for excessive disembarkations) is entirely at odds with the actual practices long observed in Bar Harbor in relation to pre-scheduled port calls. Plaintiff-Intervenor also neglected to call an expert witness to substantiate its hypothetical customs scenario of a cruise ship returning from foreign waters intent on making an appointment with CPB in Frenchman Bay as a means of forcing an unreserved port call in Bar Harbor (assuming CBP would even condone such a maneuver).

engaging in the intrastate transportation of forest products.  There, the federal regulatory regime for alien work visas resulted in the issuance of work visas for the performance of specific jobs identified as part of a certification process and based on the Department of Labor's specific findings that domestic workers were not available in sufficient numbers and employment of the aliens would not negatively impact local wages and work conditions.  *Id.* at 39–41 & n.12.  In that context, the federal government's occupation of the field of foreign worker authorization was manifest, as was the conflict between the Maine act and federal law.  *Id.* at 46.  That is not the situation in this case.  There is no evidence in this case or cited law demonstrating that cruise lines obtain advance federal authorization to disembark their entire complement of passengers specifically in Bar Harbor.  Cruise lines present their passengers for inspection when they arrive at the Class A port designated on their own itineraries.  Cruise lines are not required by federal law to apply for preauthorization to call at a particular port, let alone to disembark every passenger upon arrival.  Nor does CPB make specific findings based on any federal law or regulation that cruise line passengers may disembark in any particular location in any particular numbers based on the cruise ship's passenger capacity and local conditions.

Plaintiff-Intervenor's customs- and immigration-based arguments for preemption fail to make way.

### d.  Anchorages

Finally, Plaintiff-Intervenor argues that because the Secretary of Homeland Security has established federal anchorages in Frenchman Bay for purposes of safe navigation, *see* 46 U.S.C. § 70006; 33 C.F.R. § 110.130, the Ordinance's regulation of onshore

disembarkation is preempted since large cruise ships with North Atlantic itineraries will otherwise have rare occasion to use the anchorages.  Pl.-Int.'s Br. at 17–18.  This final Supremacy Clause challenge is like the others.  It fails to support an inference of federal field preemption expansive enough to blockade local regulation in matters of cruise line passenger shore access.  It also fails to expose any actual conflict between federal and state law as the Ordinance imposes no restriction whatsoever on Frenchman Bay anchorage access.  Cruise ships of whatever size are free to anchor in Frenchman Bay.  If cruise lines chose not to anchor in Frenchman Bay because of the Ordinance, that is a function of the cruise lines' own cost and benefit calculations.  By the mere act of establishing anchorages the Secretary of Homeland Security has not conferred a charter of privileges on cruise lines to disembark their entire complement of passengers in any municipality in which there are pier operators who would welcome them.   Like the other shots fired in Plaintiff-Intervenor's Supremacy Clause fusillade, the final shot fails to sink the Ordinance.

### 2.    *The Due Process Clause*

Plaintiffs, but not Plaintiff-Intervenor, claim that the Ordinance offends the Due Process Clause.  The Fourteenth Amendment prohibits the States from "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  Around the dawn of the Twentieth Century—an era sometimes described as the "*Lochner* era" by Supreme Court historians—the Supreme Court instilled in the Due Process Clause substantive overtones based on a natural-law preoccupation with the freedom to contract.  Essentially, if two parties were willing to engage in a commercial relationship, an expression of their individual liberty, what should stand in their way or interfere with their

decisions about how to structure the relationship?  According to the Court, not the majority of their peers acting through their elected representatives.  *See*, *e.g.*, *Allgeyer v. Louisiana*, 165 U.S. 578 (1897) (invalidating a law regulating marine insurance); *Lochner v. New York*, 198 U.S. 45 (1905) (invalidating a labor law designed to limit the hours worked by bakers); *Adkins v. Children's Hosp. of the D.C.*, 261 U.S. 525 (1923) (invalidating a law establishing a board and an investigative and consultative process to establish minimum wages for women).

When we speak of the *Lochner* Era's substantive due process jurisprudence today, it is mostly to express bewilderment that the Court engaged in such a freehanded practice of judicial policymaking in favor of those having commercial advantage in the marketplace, or else to extol the noteworthy dissents of the era, such as the work of Justice Oliver Wendell Holmes in *Lochner* and the work of Justice Holmes and Chief Justice William Howard Taft in *Adkins*.  It reminds us, and is worthy of perennial reminding, that judicial policymaking is an insidious, antidemocratic, and narcissistic instinct still very much alive that must be resisted.  Lessons from the *Lochner*-era season of judicial mischief making that are worthy of mention include the observance that "[t]he 14th Amendment does not enact Mr. Herbert Spencer's Social Statics," *Lochner*, 198 U.S. at 75; that a court should avoid "pricking out a line in successive cases" when the process is akin to legislative policymaking, *Adkins*, 261 U.S. at 562 (Taft, C.J., dissenting); that the substantive "contours" of the Due Process Clause are decidedly "vague" in relation to the freedom to contract, *id.* at 568 (Holmes, J., dissenting); that when it comes to liberty "pretty much all law consists in forbidding men to do some things that they want to do," *id.*; and that

deciding whether a law's benefits are worth its costs is a matter assigned to the legislative rather than the judicial branch of government, *id.* at 571.

When the Supreme Court finally abandoned using the freedom to contract as an antidemocratic talisman, it reaffirmed what a great many of its other decisions had long established, summing up the concern over individual liberty as follows:

> [F]reedom of contract is a qualified, and not an absolute, right.  There is no absolute freedom to do as one will or to contract as one chooses.  The guarantee of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to the government the power to provide restrictive safeguards.  Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulation and prohibitions imposed in the interest of the community.

*W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 392 (1937).

And so it comes as something of a surprise that I now consider a due process challenge to the Bar Harbor Ordinance that pits the Plaintiffs' freedom to contract[23] against restrictions imposed in the interest of the community.  But to their credit, Plaintiffs do not come right out and say it.  Instead, they adopt the language of modern due process standards, contending that there is no "rational nexus" between the Ordinance's "purpose and standards and the processes . . . employe[ed] to achieve [them]."  Pls.' Br. at 52 (ECF No. 191) (citing *Pennell v. City of San Jose*, 485 U.S. 1, 11 (1988) (upholding municipal rent control ordinance over a due process challenge)).

When it comes to the evaluation of the existence of a rational nexus, "courts should

---

[23] Plaintiffs have also asserted that the Ordinance unlawfully restrains the non-party cruise lines' and their passengers' right to travel.  Presumably the freedom to travel is no more sacrosanct than the freedom to contract.  I can see no reasons why natural law would elevate one over the other.  Plaintiffs did not assert that the Ordinance violates individuals' right to travel in their complaint; instead, they raised this issue for the first time in their post-trial brief in a perfunctory fashion.  Consequently, I do not consider the freedom to travel in this Decision and Order.

refrain from substituting their regulatory wisdom for that of the legislature. *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 483 (1st Cir. 2009). "[A] court's Due Process inquiry should be satisfied '[i]f the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory.'" *Id.* (quoting *Nebbia v. New York*, 291 U.S. 502, 537 (1934)). "This inquiry should focus on whether a program's procedures are inadequate or whether, overall, a program is arbitrary, discriminatory or irrelevant to a legitimate legislative goal." *Id.* (internal quotation marks omitted).

Plaintiffs argue that the Ordinance defies the rational nexus requirement because it imposes a strict limit of 1,000 persons per day "for every single day of the year," without accounting for seasonal variation in the congestion experienced in Bar Harbor as the result of tourism. Pls.' Br. at 53. In support of their position, Plaintiffs emphasize that Mr. Sidman testified that the fixed restriction to 1,000 persons daily was not the product of "a rigorously defensible finding or study or calculation," July 13 Tr. at 312:20–21, and that his group "just didn't want to get into various limits at different times of the year." *Id.* at 313:24–25.

Plaintiffs' argument is that because Bar Harbor long employed different summer-season and shoulder-season caps it is now irrational for Bar Harbor to do otherwise. I am not convinced that adopting this rationale would be any different than imposing by judicial fiat the rule that a fixed cap is unwise policy and therefore unconstitutional because it fails to maximize tourism—because, in effect, it is my opinion or another judge's opinion that the Ordinance's local benefits are not worth their costs. That might as well be said about

fixing a minimum wage or imposing rent control.  It is of course rational to propose that passenger caps rise and fall inversely to land-based tourism, but it does not follow that a fixed cap is therefore irrational.[24]  The Constitution "is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar, or novel, and even shocking, ought not to conclude our judgment upon the question." *Lochner*, 198 U.S. at 75–76 (1905) (Holmes, J., dissenting).  The Due Process Clause does not compel Bar Harbor to eliminate visitation lulls during the shoulder season by means of increased cruise ship visitation.  Nor, to my knowledge, does the Due Process Clause forbid municipalities from enacting ordinances that have the effect of preserving seasonal fluctuations in the blessings and burdens of tourism.  Though Plaintiffs evidently see it as their constitutional right to maximize the burden that their commercial activity imposes on the commons, at least up to a level that approaches their capacity to serve, they have not cited any authority for that proposition.

The Ordinance's 1,000-person daily cap reduces the profit that can be achieved from commercial engagement with cruise lines and cruise ship passengers, but it also preserves that engagement to a degree.  Is it irrational for the citizens of Bar Harbor to desire a passenger cap that enhances their own relative enjoyment of their community during the summer and shoulder seasons while maintaining a measure of cruise tourism commerce?  I cannot say that it is.  If I were to conclude otherwise, I would simply be ratifying the

---

[24] I am not concerned here with the alleged irrationality of a "year-round" cap because this case does not involve year-round cruise ship traffic.  When the Ordinance came into being, the MOAs between the Town and the cruise lines involved a season beginning in May and ending in October.  The cruise lines have voluntarily passed on visitation between November 1 and April 30.

Plaintiffs' policy preference as being in league with my own, not because the Ordinance is discordant with the Due Process Clause. I adhere to an antiquated notion that judges should not allow robes to suffocate a sense of judicial humility by steering wildly outside their lane into the role delegated to elected representatives. Whether the Ordinance is the wisest expression of democratic will is a question for which the Constitution does not hold the answer. What may seem like a sensible policy today may strike voters as needing some renovation down the road. This is merely a *Schoolhouse Rock*-level civics lesson that nevertheless bears repeating in constitutional challenges that more appear to challenge the marginal wisdom of the law than satisfy the more capacious test of whether it offends the Constitution. Even if I were equipped to play the role of the Oracle of Delphi to answer the question of whether the Ordinance is sensible, which I am not, that is not the role assigned to me by the Constitution, contemporary trends notwithstanding.

Plaintiffs argue that it is discriminatory that the amelioration of congestion falls exclusively on them, without imposing restrictions on other accommodations or tourists who contribute to the problem. Based on my review of the record, I am not persuaded that the Ordinance discriminates in an irrational manner. Congestion in Bar Harbor is real and is experienced throughout the summer and fall months. When the Pier Owners and Tender LLCs disembark several thousand persons on a daily basis, they substantially burden Bar Harbor's waterfront and intensify the experience of congestion more widely.

Cruise line passenger traffic stands out as worthy of special consideration for a variety of reasons. For purposes of this context, among these reasons are the industry's own longstanding selective and voluntary approach to municipal engagement and its

40

acknowledged need for management by means of a reservation system that employs caps. Land-based tourism is not equally amenable to management and Plaintiffs have not suggested any ready means of stemming that particular stream of visitation. Cruise-based tourism is also unlike land-based tourism in that cruise ships carry passengers in numbers quite unlike any land-based conveyance. While cruise lines evidently consider local conditions in terms of the capacity of the area to provide their passengers with goods and services, they are not deterred by local "no vacancy" conditions that would deter land-based visitors. Upon arrival, cruise line passengers congregate in volume, in relatively intense morning and afternoon waves, though they also enhance congestion throughout the day. When they arrive, they are joined by a caravan of the vehicles that cater to them, congesting the waterfront area with buses, minibuses, vans, motor coaches, and taxis. Their arrival demands significant attention by municipal authorities, mostly law enforcement personnel hired to manage the press of people and conveyances. Cruise lines also have the relatively unique ability to transform the shoulder season, calling in Bar Harbor on a near daily basis in especially large cruise ships. These are distinct features of cruise tourism in Bar Harbor that make differential treatment rational.

Ultimately, the costs and benefits of the various features of cruise tourism and the 1000-person daily passenger cap do not boil down to a neat finding of arbitrariness, irrationality, irrelevance, or discrimination. A rational voter could take these features into consideration and conclude that a 1,000-passenger cap is an appropriate means of recalibrating the Town's approach to this very local concern.

### 3.      *The Commerce Clause*

Among the powers the Constitution vests in Congress is the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art I, § 8.  The conferral upon Congress of the power to regulate commerce clearly authorizes Congress to override competing regulations adopted by the states, but it also acts as a bulwark against state and local regulations that would, if permitted to stand, either discriminate against foreign and interstate commerce for local protectionist purposes or produce a Balkanized system in which commerce among the states and with other nations is overburdened by a need to satisfy multifarious regulations imposed by different states on the very same commercial activity.  *Camps Newfound/Owatonna*, *Inc. v. Town of Harrison*, *Me.*, 520 U.S. 564, 571, 576–77 (1997) (concerning discriminatory regulation); *Bibb v. Navajo Freight Lines*, *Inc.*, 359 U.S. 520, 523–530 (1959) (concerning regulation inimical to the orderly movement of good across state lines).  The bulwark against pernicious regulation is varyingly described as the "dormant" Commerce Clause or the "negative command" of the Commerce Clause.  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023).  Judicial decisions discussing the dormant Commerce Clause are legion and not all of the precedent fits neatly into the categories outlined above.

Plaintiff-Intervenor breaks its argument into three overarching assertions with subparts.  Pl.-Int.'s Br. at 18–44.  The first contention is that the Bar Harbor Ordinance is protectionist and discriminatory.  *Id.* at 22–38.  The second contention is that the burdens of the Ordinance far exceed the local benefits.  *Id.* at 38–43.  The third is that the Ordinance violates the Foreign Commerce Clause.  *Id.* at 43–44.  Plaintiffs, on the other hand, advance

their position under twelve headings, three of which are prefatory.  Pls.' Br. at 22–52.  The

resulting nine arguments cover a similar range of subjects and bounce back and forth

thematically.  I address Plaintiff-Intervenor's and Plaintiffs' arguments together but impose

my own outline.

### a.   Discrimination against foreign commerce

"'[T]he' Commerce Clause is really three distinct Clauses rolled into one: a Foreign

Commerce Clause, an Interstate Commerce Clause, and an Indian Commerce Clause."

*Haaland v. Brackeen*, 599 U.S. 255, 320 (2023) (Gorsuch, J., concurring).  Each clause is

construed to effectuate its purposes, resulting in differing applications.  *Id.*  Here, the

contention is that the Ordinance discriminates against foreign commerce because cruise

lines conduct an international operation, some utilizing exclusively foreign-flagged

vessels, and their vessels frequently call in the ports of two or more nations during a solitary

tour.  Plaintiffs assert that cruise lines have the right to call on any Class A port that is

convenient, such as the Port of Bar Harbor, and, consequently, the Ordinance disrupts the

flow of foreign commerce.  Pls.' Br. at 51.  Plaintiff-Intervenor agrees, arguing that the

Ordinance overwhelmingly burdens foreign commerce because the largest ships are

foreign-flagged, and it is essential that there be uniformity in regulation.  Pl.-Int.'s Br. at

43.

These assertions lack persuasive force.  The Ordinance does not discriminate on the

basis of a "foreign" attribute.  The Ordinance is indifferent to whether passengers arrive on

foreign-flagged vessels or are themselves citizens of foreign states.  The Ordinance also is

silent on the subject of foreign navigation.  The Ordinance imposes a capacity limitation

on the disembarkation of passengers regardless of the origin of the vessel carrying them or the itinerary that informs the vessel's movements.  The imposition of a restriction on local daily disembarkations into a small town does not meddle in an area of commerce that must of necessity be ironed out between nations.[25]

There is no cause to think that the ability of municipalities to govern the extent of their participation in cruise tourism for local welfare reasons will undermine the cruise tourism industry or result in cruise lines having to modify their vessels, crews, passenger capacities or anything else in order to continue plying the seas to visit whatever nations, states, and municipalities remain on their itineraries, of which there are, evidently, a great many.  If anything, permitting municipalities to establish terms and conditions on local participation in cruise tourism may encourage more municipalities to consider participation, knowing that they will not thereby be compelled to accommodate whatever level of traffic the cruise lines and their local partners wish to impose.  That more ports may be open to smaller vessels is to be expected rather than condemned on "constitutional" grounds.

The record fails to justify the notion that there is a need for uniformity[26] in the terms and conditions of municipal partnering with the cruise tourism industry, let alone that

---

[25] This case is unlike *Henderson v. Mayor of the City of New York*, in which the Supreme Court struck down a state statute that imposed certain financial obligations on ship owners whose ships carried foreign subjects migrating to the United States, explaining that the terms of our Nation's immigration policy, 92 U.S. 259, 270 (1875), "require exclusive legislation by Congress," as the subject "in an eminent degree . . . concerns our international relations."  *Id.* at 273.

[26] Plaintiffs assert: "No other significant port physically capable of disembarking passengers from similar-sized vessels restricts disembarkation in the same manner as the Ordinance." Pls.' Br. at 30.  The statement not only admits that other ports impose restrictions, but also is so laden with qualifiers that its meaning is uncertain.  No party introduced the kind of evidence that would enable me to unpack this assertion, let alone give it any weight in my analysis.

uniformity is necessary to foreign (or interstate) commerce.  Congress has not seen fit to regulate the terms and conditions of municipality and cruise line engagement and it is not at all apparent or even probable that allowing municipalities the ability to regulate their level of engagement will undermine the ability of any of the several coastal states to participate fully in cruise tourism involving every size cruise ship imaginable and bearing whatever flag.  What this case really involves is the contention that cruise lines are able to compel local accommodation of their private assessment of the ideal economies of scale for cruise tourism.  *See* Pl.-Int.'s Br. at 30–31; Pls.' Br. at 26.  The Foreign Commerce Clause does not demand such a result.[27]

### b.    Discrimination-qua-protectionism

At the "very core" of the Supreme Court's Commerce Clause jurisprudence lies an "anti-discrimination principle." *Nat'l Pork Producers Council*, 598 U.S. at 369.  The anti-discrimination principle "prohibits the enforcement of state laws driven by economic protectionism." *Id.* (cleaned up).  Protectionist state and local laws are those that impose restrictions or grant benefits that favor in-state or local economic interests and disadvantage their out-of-state competitors.  *Id.*  Such measures are barred by the negative command of the dormant Commerce Clause because the alternative would result in the existence of state-by-state protectionist initiatives and reprisals that would prevent the operation of a

---

[27] Cases cited in support of the "foreign commerce" argument are distinguishable.  *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) (holding that state law boycotting companies that do business with Burma violated Supremacy Clause); *United States v. Locke*, 529 U.S. 89 (2000) (holding Washington law regulating oil tankers was preempted in part by comprehensive federal regulatory regime and remanding for further consideration of certain state regulations); *Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue and Fin.*, 505 U.S. 71 (1992) (invalidating state corporate tax law that gave preferential tax treatment to dividend-income received from domestic subsidiaries versus dividends from foreign subsidiaries).

national, cohesive and competitive marketplace. *Id.* at 371–73 (discussing cases illustrating this core concern). Thus:

> We have understood this construction to serve the Commerce Clause's purpose of preventing a State from retreating into economic isolation or jeopardizing the welfare of the Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear. The provision thus "'reflect[s] a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.'"

*Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179–80 (1995); *see also H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 539 (1949); *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 522 (1935). The Framers feared interstate commercial strife, not impartial regulations enacted for local welfare ends, with which they were no doubt familiar.

State and local regulations that are not protectionist in purpose or effect are not prohibited by the negative command of the Commerce Clause simply because they impact an out-of-state economic interest associated with commerce. *Nat'l Pork Producers Council*, 598 U.S. at 374. After all, "[i]n our interconnected national marketplace, many (maybe most) state laws have the practical effect of controlling extraterritorial behavior," *id.* (internal quotation marks omitted), including "an immense mass of inspection laws, quarantine laws, and health laws of every description that have a considerable influence of commerce outside their borders." *Id.* at 375 (cleaned up, quotation marks omitted);[28] *see*

---

[28] In *National Pork Producers Council v. Ross*, the Supreme Court rejected a challenge to a California law requiring that all pork sold in California derived from breeding pigs or their offspring be raised according

*also Camps Newfound/Owatonna*, 520 U.S. at 596 ("In our zeal to advance [open markets] we must take care not to overstep our mandate, for the Commerce Clause was not intended 'to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country.'" (Scalia, J., dissenting) (quoting *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 443–444 (1960)).

Plaintiffs argue that Bar Harbor's Ordinance is facially and per se discriminatory and protectionist because it impacts only travelers arriving by sea, without attempting to regulate the congestive impact of land-based travelers. Pls.' Br. at 28 (citing *Chem. Waste Mgmt.*, *Inc. v. Hunt*, 504 U.S. 334, 344 n.6 (1992) (explaining that a per se rule of invalidity applies "not only to laws motivated solely by a desire to protect local industries from out-of-state competition, but also to laws that respond to legitimate local concerns by discriminating arbitrarily against interstate trade")).  In *Hunt*, the Supreme Court struck down an Alabama law that imposed fees on the deposit of out-of-state hazardous waste (but not in-state hazardous waste) in an in-state commercial landfill, classifying the law as a facial violation of the Commerce Clause.  504 U.S. at 336–37; *see Or. Waste Sys.*, *Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93, 98–99 (1994) (invalidating protectionist surcharge imposed on solid waste trucked from out of state destined for in-state landfill). However, unlike these protectionist circumstances, the circumstances here involve a

---

to certain standards.  598 U.S. at 365.  The law did not discriminate based on the state or country of origin of the pork, but the impact of the law was felt predominantly by producers operating outside of California, most if not all of whom want to access California's enormous marketplace.  *Id.* at 367.  The Supreme Court affirmed the dismissal of the case at the pleading stage for lack of any plausible inference of a discriminatory/protectionist purpose or effect.  *Id.* at 368, 391.

neutral regulation that applies regardless of the state of origin of those passengers arriving after exhaustion of the 1,000-person limitation.  Additionally, the supposed preference afforded to land-based travelers is not one that is conditioned on the state or national citizenship of land-based travelers.[29]

The burdens and benefits of Bar Harbor's Ordinance do not discriminate based on the interstate or international character of those persons seeking to participate in the local economy.  The burden is not imposed because of the interstate nature of the traffic but rather because of various features of that traffic, already discussed, that hamper the experience of local welfare.  Like Californians' decision to prohibit traffic in certain food products produced under locally disfavored conditions, *Nat'l Pork Producers Council*, 598 U.S. at 363, Bar Harbor's voters have decided to regulate traffic in persons based on that traffic's distinctive contribution to locally disfavored conditions.  Doing so, they have not advanced any discernable local commercial interest.  In fact, a primary consequence of the Ordinance is to frustrate local commercial interests.

Nor have the voters of Bar Harbor engaged in a parochial or isolationist exercise.  They have, instead, engaged in the exercise of imposing a restriction based on their first-hand experience of the relative deleterious impact of high-volume disembarkations at the waterfront while remaining open to the entire world's visitation.  In both purpose and effect, they have acted only to limit the extent to which Bar Harbor must be victim to its

---

[29] Another oft-cited precedent under the discrimination heading is *Hughes v. Oklahoma*, 441 U.S. 322 (1979), in which the Supreme Court invalidated a state law that prohibited the out-of-state sale of locally grown minnows, effectively hoarding them for local purchase.  *Id.* at 336–37.  This case is unlike *Hughes*. Bar Harbor is not hoarding local resources for local consumption.  Bar Harbor is open to global traffic.

own success, while continuing to welcome travelers from every corner of the world. These on-the-ground realities are quite unlike the isolationist and protectionist circumstances discussed in the expansive corpus of dormant Commerce Clause jurisprudence.

Plaintiffs and Plaintiff-Intervenor persist by arguing that the Ordinance is discriminatory and protectionist because it has the effect of favoring hotels and other land-based overnight accommodations. They explain that cruise lines are in competition with land-based accommodations because they are competing for the patronage of travelers seeking to visit a particular destination. Pl.-Int.'s Br. at 35–36; Pls.' Br. at 28, Pl.-Int.'s Reply Br. at 27–28 (ECF No. 199). However, the Ordinance is not drawn to effectuate an advantage for local hoteliers, and I do not find that the Ordinance in fact produces such a result.[30] I have no evidence from which to draw the conclusion other than the testimony of former or current cruise line executives who stated that cruise lines compete in the hospitality sector against land-based accommodations for the consumer's discretionary travel dollar. As interesting as the testimony was, it was reductionist in the extreme. The same comparison might be drawn between two non-Californian producers of pork products seeking to place their products in California stores, where one complies with California law and the other does not. Or we might compare a non-Californian producer of pork products with a Californian producer of beef products. In either example, the producers compete for dollars directed toward meat consumption, yet that obvious point did not

---

[30] Plaintiff-Intervenor also argues that the Ordinance is protectionist because reduced waterfront traffic will enable the Town to collect more paid parking revenue and because Mr. Sidman stated that he preferred smaller ships with their more well-to-do passengers. Pl.-Int.'s Br. at 26. The paid parking contention is a straw grasp and as such does not warrant serious consideration. As for Mr. Sidman's personal opinion about passengers arriving on smaller ships, there is no evidence to support a finding that his opinion informed the public's assessment of the Ordinance's merits or that his opinion is "protectionist" in nature.

inform the Supreme Court's evaluation of the merits in *National Pork Producers Council*.

I can see no reason why it should control here.  Reducing the constitutional inquiry so that

discrimination is found and heightened standards are imposed whenever one product or

service is impacted by a regulation but a competing product or service is not is a recipe for

widescale elimination of state and local regulations impacting the provision of goods and

services.[31]

### c.   Arteries of Commerce

Finally, the negative command of the Commerce Clause means that state and local

governments have restricted power to issue legislation or regulations that serve to slow or

obstruct the flow of commerce.  *South Dakota v. Wayfair, Inc*., 138 S. Ct. 2080, 2089–90

(2018).  Obstructions that are protectionist in nature are routinely struck down, as discussed

in the preceding section.  Like the concern over protectionist measures that stack the deck

in favor of in-state economic interests, the concern for the health of the Nation's arteries

ensures that the Nation avoids economic Balkanization, meaning the isolation of

neighboring states into separate economic units.  *Id.* at 2089.  Unlike discriminatory

scenarios, classic "free-flow" commerce cases are cases in which a state enacts a law

evenhandedly to regulate in-state economic activity (*e.g.*, trucking), but does so in a manner

that prevents operation of the enterprise within the enacting state according to a standard

observed in neighboring or surrounding states, effectively halting interstate transportation

---

[31] The argument also disregards the fact that travelers staying in hotels are dispersed throughout the Town and Mount Desert Island.  They do not impact the waterfront the same way that cruise lines and their passengers do.  Many land-based tourists intent upon visiting Acadia National Park may well avoid Bar Harbor's waterfront (and its downtown) for the same reason that local citizens do.

through that state.  *See Kassel v. Consolidated Freightways Corporation of Delaware*, 450 U.S. 662, 671 (1981) (invalidating Iowa law barring trucks longer than 60 feet); *S. Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761 (1945) (invalidating state law that prohibited the operation of interstate trains having more than a certain number of railroad cars).  Less common, but similarly concerning cases arise out of a state's creation of a monopolistic enterprise that prohibits competition.  *See*, *e.g.*, *Buck v. Kuykendall*, 267 U.S. 307, 315–16 (1925) (invalidating state law prohibiting common carriers from using highways to carry persons between Seattle, Washington and Portland, Oregon without first obtaining a certificate of public convenience and necessity from the State of Washington, where issuance of a certificate to one carrier for purposes of a given route precluded issuance of a certificate to another carrier for the same route).  The Ordinance does not fit into either category.

Plaintiffs argue that the Ordinance clogs "the arteries of commerce" by impeding "the ability of large cruise ships to move persons from port to port according to itineraries that are interstate and frequently international."  Pls.' Br. at 26.  They emphasize that cruise lines are engaged in the transportation of persons free to travel as they see fit.  *Id.* at 26–27.  Plaintiff-Intervenors observe that the Commerce Clause exists in part to ensure open access to the facilities of interstate traffic and the free flow of persons and property without undue restraint.  Pl.-Int.'s Br. at 19–23.

The record in this case demonstrates that the Ordinance does indeed stem the flow of interstate commercial activity by reducing the daily volume of persons disembarked into Bar Harbor from cruise ships.  However, the mere fact that a state or local law impedes the

51

free flow of commerce does not result in an automatic finding of invalidity. "State laws that 'regulat[e] even-handedly to effectuate a legitimate local public interest . . . will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Wayfair*, 138 S. Ct. at 2091 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). The burden-benefit calculus recognizes that, "in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it." *S. Pac. Co.*, 325 U.S. at 767.[32] When considering whether local regulation comes within the residuum of state power, courts may consider factors such as whether the matter regulated is a localized concern, the extent to which the regulation interferes with national commerce, and the incentive at the national level to attempt to regulate what would amount to multifarious and diverse local concerns. *Id.*; *Duckworth v. Arkansas*, 314 U.S. 390, 394 (1941); *see also Sproles v. Binford*, 286 U.S. 374, 390 (1932) (recognizing "the established principle that in matters admitting of diversity of treatment, according to the special requirements of local conditions, the states may act within their respective jurisdictions until Congress sees fit to act."). "But ever since *Gibbons v. Ogden*, [22 U.S. (9 Wheat.) 1 (1824)], the states have

---

[32] *See National Pork Producers Council*, 598 U.S. at 375 (recognizing "the usual legislative power of a State to act upon persons and property within the limits of its own territory, a feature of our constitutional order that allows different communities to live with different local standards" (internal quotation marks and citation omitted)); *Maine v. Taylor*, 477 U.S. 131, 151 (1986) ("The Commerce Clause significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce, but it does not elevate free trade above all other values. As long as a State does not needlessly obstruct interstate trade or attempt to place itself in a position of economic isolation, it retains broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources." (internal quotation marks omitted)).

**ADD. 052**

not been deemed to have authority to impede substantially the free flow of commerce from state to state, or to regulate those phases of the national commerce which, because of the need of national uniformity, demand that their regulation, if any, be prescribed by a single authority." *S. Pac. Co.*, 325 U.S. at 767.[33]

I reject the contention that the question of a local municipality's relative tolerance of cruise tourism based on local conditions is an aspect of the national commerce that requires the national uniformity that only Congress can provide.  There are a great many varieties of port facilities and communities that house them.  Cruise tourism, based on the record before me, is a function of cruise line and local community collaboration.[34]  *See*, *e.g.*, Exs. 32 & 161.  It has always proceeded on that basis in Bar Harbor.  *See*, *e.g.*, Ex. 260 at 1 (Bar Harbor Cruise Tourism Destination Management Plan, "prepared for the use of the Town of Bar Harbor residents, stakeholders, municipal agencies and cruise industry partners").  I have no reason to conclude that it does not proceed on a similar basis elsewhere.  The parties are agreed that different municipalities impose a variety of constraints, such as caps and limited cruise ship days, though no party has attempted to canvas the variety of measures employed by domestic municipalities for purposes of this litigation.[35]  In any event, this case illustrates that the impact of cruise tourism on local

---

[33] *Gibbons v. Ogden* is a formative Commerce Clause decision that struck down a New York enactment that granted one company the exclusive right to navigate coastal waters in vessels powered by steam, which enactment was in direct conflict with the federal government's grant of coasting licenses to other steamboat owners.  22 U.S. at 221.

[34] For example, Rockland has "a very limited number of slots that it allows for ships over a lower berth capacity of 500."  Ex. 195 at 56.  Rockland permits only "six bookings per year per season unless" it "authorize[s] a waiver to add any ships beyond that."  *Id.*

[35] This phenomenon may well suggest a nationwide interest among cruise tourism communities to impose restrictions.  *Cf. Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 128 (1978) ("The evil that appellants

living conditions is a hyperlocal concern that is not well suited to a one-size-fits-all regulatory approach at the federal level.

Furthermore, Bar Harbor is regulating a "matter[ ] of local concern" in both "character and effect." *S. Pac. Co.*, 325 U.S. at 767. The history of cruise tourism at Bar Harbor demonstrates the unique challenges that cruise tourism imposes on Bar Harbor. These challenges gave rise to a democratic effort, where the voters weighed the relevant local commercial and noncommercial interests and ultimately adopted the Ordinance. Modern-day, board-directed cruise practices (particularly those of foreign-flagged cruise lines[36]) do not allow much room for smaller municipalities to manage their local experiences based on daily limits on the number of passengers coming ashore. Cruise lines are utilizing ever larger vessels to achieve unprecedented economies of scale, principally for shareholder profit. At the same time, cruise lines will not call at a port unless the entire complement of passengers is permitted to come ashore.[37] These characteristics of cruise tourism make it unworthy of overly solicitous judicial action that would negate an exercise in democratic self-determination that is better informed of existing, localized conditions. Nothing in the Constitution dictates municipal obeisance to the economies of scale of cruise tourism. Nor, as far as I can tell, does the dormant Commerce Clause legislate adherence

---

perceive in this litigation is not that the several States will enact differing regulations, but rather that they will all conclude that divestiture provisions are warranted.").

[36] The representative voices of cruise tourism offered at trial, like Plaintiffs' and Plaintiff-Intervenor's briefing, did not speak to a need for moderation but rather have thematically favored catering to the interests of the cruise lines with the very largest capacity vessels. Those cruise lines happen to conduct their trade with foreign-flagged vessels.

[37] *But see* Ex. 193 at 8–9. Chris Martin, Director of Port Operations for Holland America, testified at his deposition that Holland America stops at ports that limit the number of passenger disembarkations, such as in Bergen, Norway. *Id.*

54

to neoclassical liberalism any more than the Due Process Clause compels observation of Mr. Herbert Spencer's Social Statics.

In the absence of federal or state law dictating the outcome, reasonable citizens at the municipal level will come to different conclusions about the proper balance between unabated cruise tourism and relative calm, and the outcome of their democratic process is the best measure of the polity's tolerance in light of local conditions. For this reason, I conclude that non-discriminatory and non-monopolistic state laws and local regulations that have the impact of restraining outsize cruise tourism do not deserve per se invalidation or a heightened standard of review through which judges rather than citizens become the final arbiters of the terms by which cruise tourism will be conducted in every port in the Nation. In other words, "[c]ompelling reasons justify treating these laws differently from laws favoring particular private businesses over their competitors." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 342 (2007) (relying, in part, on *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) ("The States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons" (internal quotation marks omitted))).

### d. Burdens versus benefits

Although the Bar Harbor Ordinance "regulates even-handedly to effectuate a legitimate local public interest" while imposing "incidental" effects on commerce, it remains necessary to determine whether "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. Under this

standard, "the extent of the burden that will be tolerated will . . . depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.*  But even so, "[p]reventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of 'extreme delicacy,' something courts should do only 'where the infraction is clear.'" *Nat'l Pork Producers Council*, 598 U.S. at 390 (quoting *Conway v. Taylor's Executor*, 66 U.S. (1 Black) 603 (1862)).

The parties disagree as to whether the Ordinance's burdens on commerce are clearly excessive in comparison to the local benefits.  Plaintiffs and Plaintiff-Intervenor view the Ordinance's benefits as purely speculative and Bar Harbor's interest in reducing cruise tourism as illegitimate.  On the other hand, Bar Harbor and Mr. Sidman characterize the Ordinance as imposing a burden on the cruise industry's business model rather than on interstate commerce.  To the extent that the Ordinance does affect commerce, they argue that its burdens are not clearly excessive in relation to the local benefits.

I first consider the Ordinance's burdens on commerce.  There is no doubt that the Ordinance will have some effect on commerce since almost 80% of the cruise ships that presently visit Bar Harbor have a lower berth capacity in excess of 1,000 and are thus unlikely to call at Bar Harbor.[38]  But it is impossible to predict the Ordinance's precise consequences.  The Ordinance continues to permit the daily disembarkation of persons traveling by cruise ship in large numbers, even if those numbers are inadequate to

---

[38] As of December 2022, 107 of the 134 cruise vessel calls for the 2023 cruise season were scheduled for vessels that have a lower birth capacity in excess of 1,000.  Ex. 8.

accommodate most of the cruise ships plying the Atlantic seaboard these days.  Milton Friedman and the Chicago school would recoil at the claim made by business interests that the free market economy of private actors cannot adapt to the limitation at the Bar Harbor waterfront, and who instead seek snug harbor behind a constitutional challenge that strikes me as not well fitted to the facts on the ground.  Given the attractiveness of the port of Bar Harbor, it is to be expected that cruise enthusiasts intent of reaching Bar Harbor will find a cruise line to carry them there.  Some cruise lines already offer suitable vessels with Bar Harbor itineraries.  Other cruise lines no doubt will adjust to serve the emerging market charted by municipalities interested in following Bar Harbor's example by accommodating cruise tourism subject to more constituency-pleasing passenger caps (something that is unlikely to develop so long as cruise lines and their proxies threaten constitutional litigation over limited access).  *See id.* at 385 (plurality opinion) ("But from all anyone can tell, *other* out-of-state competitors seeking to enhance their own profits may choose to modify their existing operations or create new ones to fill the void.").

Insofar as the Ordinance causes visitors to travel to Bar Harbor through other means, like smaller cruise ships, the Ordinance is best described as burdening the cruise line industry's business model, rather than interstate commerce.  *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127 (1978) (reasoning that Maryland's law prohibiting petroleum producers from operating retail gas stations in-state did not unduly burden commerce because "interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another" when "there [was] no reason to assume that their share of

the entire supply [would] not be promptly replaced" by other companies).  Unfortunately for Plaintiffs and Plaintiff-Intervenor, the Commerce Clause does not protect the cruise line industry's "particular structure [and] methods of operation." *Id.*  While the Ordinance will likely cause visitation to Bar Harbor to decrease, thereby affecting interstate commerce, it is impossible to know exactly how many fewer visitors will travel to Bar Harbor.  Thus, I conclude that the Ordinance will impose an uncertain burden on interstate commerce.

I next consider the Ordinance's local benefits.  I reject Plaintiffs and Plaintiff-Intervenor's arguments that Bar Harbor's proffered interests in lessening congestion and conserving municipal resources are illegitimate.[39]  Courts have held that similar local interests are legitimate in a variety of contexts.  *See*, *e.g.*, *Maine v. Taylor*, 477 U.S. 131, 151 (1986) ("The Commerce Clause significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce, but it does not elevate free trade above all other values" [because] States "retain[ ] broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources."); *Memphis v. Greene*, 451 U.S. 100, 126–27 (1981) (describing a city's "decision to reduce the flow of traffic" as "legitimate" and the "residential interest in comparative tranquility" as "unquestionably legitimate" in analyzing a claim under the Thirteenth Amendment);[40]

---

[39] On this point, they rely on *Young v. Coloma-Agaran*, No. 1:00-CV-00774-HG-BMK, 2001 WL 1677259, at *11 (D. Haw. Dec. 27, 2001) (stating that "[e]liminating the presence of tourists from the Bay is not a proper reason for the Ban as it directly contradicts the very purpose of the Commerce Clause"), *aff'd*, 340 F.3d 1053 (9th Cir. 2003).  The district court cited no authority for this proposition, and while the Ninth Circuit affirmed the district court, the Ninth Circuit decided the case on alternative grounds and thus did not opine on the Commerce Clause.

*Tart v. Massachusetts*, 949 F.2d 490, 501 (1st Cir. 1991) (discussing the legitimate local interest in promoting public health).  Insofar as the Ordinance reduces the number of persons who visit Bar Harbor by cruise ship, the Ordinance commensurably advances Bar Harbor's local interest in lessening congestion—particularly at the waterfront, over which the cruise industry will otherwise domineer.  This noneconomic benefit, while not precisely measurable, is both real and reasonably well calibrated to ameliorate the particularized excesses of modern cruise tourism and how it interfaces with Bar Harbor's waterfront.

In short, the Ordinance imposes some burden on the "free flow" of commerce, but that burden is impossible to quantify.  The 1,000-person limitation is a significant downshift from the passenger caps previously observed in Bar Harbor.  But that downshift also promotes noneconomic interests.[41]  Bar Harbor with the MOA passenger limits and Bar Harbor with the 1,000 daily passenger limit are significantly different places.  The voters of Bar Harbor "weigh[ed] the relevant 'political and economic' costs and benefits for themselves," and the voters evidently decided that the noneconomic benefits of the Ordinance favored adopting it.  *Nat'l Pork Producers Council*, 598 U.S. at 382 (plurality opinion) (quoting *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 279 (1978)).  Considering the

---

[40] The circumstances in *Greene* gave rise to a lively dissent based on the observation that the interest in comparative tranquility can be a pretext for walling off white communities from communities of color.  *Greene*, 451 U.S. at 136 (Marshall, J., dissenting).  Unlike *Greene*, this case has no undertones of invidious discrimination.

[41] Plaintiffs and Plaintiff-Intervenor see the impact on the movement of vessels and persons as burdens so weighty as to compel per se invalidation of the Ordinance.  Obviously, I have not viewed it the same way.  The lead authority they cite is *Edwards v. California*, 314 U.S. 160 (1941), in which California attempted to minimize the extent to which it would bear the burden of indigent migration secondary to the Dust Bowl—a "grave and perplexing social and economic dislocation" (i.e., the greatest natural disaster of our Nation's history), *id.* at 173.  The analogy between Dust Bowl migration and cruise tourism is strained, to say the least.

59

ADD. 059

intimate "nature of the local interest[s]" involved in Bar Harbor's decision to limit cruise tourism, I cannot say that the Ordinance imposes a burden on commerce that "is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142.[42]

## CONCLUSION

For the reasons set forth above, I conclude as follows:

The challenged Bar Harbor Ordinance, Bar Harbor Code Chapter 125, Article VII, Section 125-77, is a lawful exercise of home rule authority under the Maine Constitution and is not preempted by state law.

The Ordinance does not violate the Due Process Clause or the Commerce Clause of the United States Constitution.

The Ordinance is in part conflict preempted under the Supremacy Clause. Specifically, the 1,000-person cap is conflict preempted insofar as seafarer shore access is concerned. But insofar as cruise ship passengers are concerned, the 1,000-person cap survives challenge under the Supremacy Clause.

Based on these legal conclusions, judgment will enter for the Town of Bar Harbor on Counts II and III of Plaintiffs' Complaint and on Counts II, III, and IV of Plaintiff-Intervenor's Complaint in Intervention. As for the Supremacy Clause claims stated in the first counts of the Plaintiffs' Complaint and the Plaintiff-Intervenor's Complaint in Intervention, judgment will enter IN PART for the Town of Bar Harbor, as Plaintiffs and

---

[42] *Cf. Nat'l Pork Producers Council*, 598 U.S. at 382 (plurality opinion) (describing that weighing out-of-state producers' costs of compliance against the moral and health interests of California's residents as "a task no court is equipped to undertake" and stating that in "a functioning democracy, policy choices like these usually belong to the people and their elected representatives").

Plaintiff-Intervenor fail to demonstrate cause to invalidate the Ordinance insofar as it operates as a restriction on passenger disembarkations, and IN PART for Plaintiffs and Plaintiff-Intervenor, as they have demonstrated that the Ordinance is partially preempted in relation to seafarer shore access, although it is by no means self-evident that any material alteration of the legal relationship of the parties has thereby been achieved.

**SO ORDERED.**

Dated this 1st day of March, 2024.

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE

**ADD. 061**

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS, et al., Plaintiffs, ) ) ) ) ) | |
| PENOBSCOT BAY & RIVER PILOTS ASSOCIATION, Intervenor-Plaintiff ) ) ) ) | |
| v. ) ) | Civil No. 1:22-cv-00416-LEW |
| TOWN OF BAR HARBOR, Defendant, ) ) ) | |
| CHARLES SIDMAN Intervenor-Defendant ) ) | |

<u>JUDGMENT</u>

Pursuant to the Amended Decision and Order entered by U.S. District

Judge Lance E. Walker on March 1, 2024,

JUDGMENT is hereby entered IN PART for the Defendant, Town of Bar

Harbor, and IN PART for Plaintiffs, Association to Preserve and Protect Local

Livelihoods, B.H. Piers LLC, Golden Anchor LC, B.H.W.W. LLC, Delray Explorer

Hull 495 LLC, Delray Explorer Hull 493 LLC, Acadia Explorer 492 LLC and

Plaintiff Intervenor, Penobscot Bay and River Pilots Association, as to Count I.

JUDGMENT is hereby entered for Defendant, Town of Bar Harbor, on

Counts II and III of Plaintiffs' Complaint and on Counts II, III, and IV of Plaintiff-

Intervenor's Complaint in Intervention.

**ADD. 062**

CHRISTA K. BERRY
CLERK


By:      /s/ Meghan York
         Deputy Clerk


Dated: March 1, 2024


actions involving the movement of persons, cargo, vessel stores, or the provisions of port services to or from the vessel.

*Vessel Security Assessment (VSA)* means an analysis that examines and evaluates the vessel and its operations taking into account possible threats, vulnerabilities, consequences, and existing protective measures, procedures and operations.

*Vessel Security Plan (VSP)* means the plan developed to ensure the application of security measures designed to protect the vessel and the facility that the vessel is servicing or interacting with, the vessel's cargoes, and persons on board at the respective MARSEC Levels.

*Vessel Security Officer (VSO)* means the person onboard the vessel, accountable to the Master, designated by the Company as responsible for security of the vessel, including implementation and maintenance of the Vessel Security Plan, and for liaison with the Facility Security Officer and the vessel's Company Security Officer.

*Vessel stores* means—

(1) Materials that are on board a vessel for the upkeep, maintenance, safety, operation or navigation of the vessel; and

(2) Materials for the safety or comfort of the vessel's passengers or crew, including any provisions for the vessel's passengers or crew.

*Vessel-to-vessel activity* means any activity not related to a facility or port that involves the transfer of cargo, vessel stores, or persons from one vessel to another.

*Visual TWIC inspection* means the process by which the TWIC is authenticated, validated, and the individual presenting the TWIC is matched to the photograph on the face of the TWIC.

*Waters subject to the jurisdiction of the U.S.,* for purposes of this subchapter, includes all waters described in section 2.36(a) of this chapter; the Exclusive Economic Zone, in respect to the living and non-living resources therein; and, in respect to facilities located on the Outer Continental Shelf of the U.S., the waters superjacent thereto.

[USCG–2003–14792, 68 FR 39278, July 1, 2003]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting § 101.105, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.govinfo.gov*.

## § 101.110   Applicability.

Unless otherwise specified, this subchapter applies to vessels, structures, and facilities of any kind, located under, in, on, or adjacent to waters subject to the jurisdiction of the U.S.

## § 101.112   Federalism.

(a) The regulations in 33 CFR parts 101, 103, 104, and 106 have preemptive effect over State or local regulation within the same field.

(b) The regulations in 33 CFR part 105 have preemptive effect over State or local regulations insofar as a State or local law or regulation applicable to the facilities covered by part 105 would conflict with the regulations in part 105, either by actually conflicting or by frustrating an overriding Federal need for uniformity.

[USCG–2007–28915, 81 FR 57708, Aug. 23, 2016]

## § 101.115   Incorporation by reference.

(a) Certain material is incorporated by reference into this subchapter with the approval of the Director of the Federal Register under 5 U.S.C. 552(a) and 1 CFR part 51. To enforce any edition other than that specified in paragraph (b) of this section, the Coast Guard must publish notice of change in the FEDERAL REGISTER and the material must be available to the public. All approved material is on file at the Office of the Coast Guard Port Security Directorate (CG-5P), Coast Guard Headquarters, 2100 2nd St., SW., Stop 7581, Washington, DC 20593–7581, or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: *http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.* All material is available from the sources indicated in paragraph (b) of this section.

(b) The materials approved for incorporation by reference in this subchapter are as follows:

the requested waiver. The Commandant (CG–5P) may grant, in writing, a waiver with or without conditions only if the waiver will not reduce the overall security of the facility, its employees, visiting vessels, or ports.

[USCG–2003–14732, 68 FR 39322, July 1, 2003; 68 FR 41916, July 16, 2003; USCG–2008–0179, 73 FR 35009, June 19, 2008; USCG–2010–0351, 75 FR 36282, June 25, 2010; USCG–2013–0397, 78 FR 39173, July 1, 2013; USCG–2014–0410, 79 FR 38432, July 7, 2014]

### § 105.135  Equivalents.

For any measure required by this part, the facility owner or operator may propose an equivalent as provided in § 101.130 of this subchapter.

### § 105.140  Alternative Security Program.

(a) A facility owner or operator may use an Alternative Security Program approved under § 101.120 of this subchapter if:

(1) The Alternative Security Program is appropriate to that facility;

(2) The Alternative Security Program is implemented in its entirety.

(b) A facility owner or operator using an Alternative Security Program approved under § 101.120 of this subchapter must complete and submit to the cognizant COTP a Facility Vulnerability and Security Measures Summary (Form CG–6025). The form is available at *https://www.dcms.uscg.mil/forms/*.

[USCG–2003–14732, 68 FR 39322, July 1, 2003, as amended by USCG–2020–0304, 85 FR 58278, Sept. 18, 2020]

### § 105.145  Maritime Security (MARSEC) Directive.

Each facility owner or operator subject to this part must comply with any instructions contained in a MARSEC Directive issued under § 101.405 of this subchapter.

### § 105.150  Right to appeal.

Any person directly affected by a decision or action taken under this part, by or on behalf of the Coast Guard, may appeal as described in § 101.420 of this subchapter.

## Subpart B—Facility Security Requirements

### § 105.200  Owner or operator.

(a) Each facility owner or operator must ensure that the facility operates in compliance with the requirements of this part.

(b) For each facility, the facility owner or operator must—

(1) Define the organizational structure of the security personnel and provide each person exercising security duties and responsibilities the support needed to fulfill those obligations;

(2) Designate, in writing, by name or by title, a Facility Security Officer (FSO) and identify how the officer can be contacted at any time;

(3) Ensure that a Facility Security Assessment (FSA) is conducted;

(4) Ensure the development and submission for approval of a Facility Security Plan (FSP);

(5) Ensure that the facility operates in compliance with the approved FSP;

(6) Ensure that the Transportation Worker Identification Credential (TWIC) program is properly implemented as set forth in this subchapter, including—

(i) Ensuring that only individuals who hold a TWIC and are authorized to be in the secure area in accordance with the FSP are permitted to serve as an escort;

(ii) Identifying what action is to be taken by an escort, or other authorized individual, in the event that individuals under escort engage in activities other than those for which escorted access was granted; and

(iii) Notifying facility employees, and passengers if applicable, of which parts of the facility are secure areas and which are public access areas, as applicable, and ensuring such areas are clearly marked.

(7) Ensure that restricted areas are controlled and TWIC provisions are coordinated, if applied to such restricted areas;

(8) Ensure that adequate coordination of security issues takes place between the facility and vessels that call on it, including the execution of a Declaration of Security (DoS) as required by this part;

406

**ADD. 065**

(9) Ensure implementation of a system, in accordance with §105.237, coordinating shore leave for vessel personnel or crew change-out, as well as access through the facility for visitors to the vessel, as described in §105.237(b)(3), with vessel operators in advance of a vessel's arrival. In coordinating such leave, facility owners or operators may refer to treaties of friendship, commerce, and navigation between the U.S. and other nations;

(10) Ensure, within 12 hours of notification of an increase in MARSEC Level, implementation of the additional security measures required for the new MARSEC Level;

(11) Ensure security for unattended vessels moored at the facility;

(12) Ensure the report of all breaches of security and transportation security incidents to the National Response Center in accordance with part 101 of this chapter;

(13) Ensure consistency between security requirements and safety requirements;

(14) Inform facility personnel of their responsibility to apply for and maintain a TWIC, including the deadlines and methods for such applications, and of their obligation to inform Transportation Security Administration (TSA) of any event that would render them ineligible for a TWIC, or which would invalidate their existing TWIC;

(15) Ensure that protocols consistent with §101.550 of this subchapter, for dealing with individuals requiring access who report a lost, damaged, or stolen TWIC, or who have applied for and not yet received a TWIC, are in place; and

(16) If applicable, ensure that protocols consistent with §105.257, for dealing with newly hired employees who have applied for and not yet received a TWIC, are in place.

[USCG–2003–14732, 68 FR 39322, July 1, 2003, as amended at 68 FR 60541, Oct. 22, 2003; USCG–2006–24196, 72 FR 3582, Jan. 25, 2007; USCG–2013–0397, 78 FR 39173, July 1, 2013; USCG–2007–28915, 81 FR 57712, Aug. 23, 2016; USCG–2013–1087, 84 FR 12119, Apr. 1, 2019]

**§105.205 Facility Security Officer (FSO).**

(a) *General.* (1) The FSO may perform other duties within the owner's or operator's organization, provided he or she is able to perform the duties and responsibilities required of the FSO.

(2) The same person may serve as the FSO for more than one facility, provided the facilities are in the same COTP zone and are not more than 50 miles apart. If a person serves as the FSO for more than one facility, the name of each facility for which he or she is the FSO must be listed in the Facility Security Plan (FSP) of each facility for which or she is the FSO.

(3) The FSO may assign security duties to other facility personnel; however, the FSO retains the responsibility for these duties.

(4) The FSO must maintain a TWIC.

(b) *Qualifications.* (1) The FSO must have general knowledge, through training or equivalent job experience, in the following:

(i) Security organization of the facility;

(ii) General vessel and facility operations and conditions;

(iii) Vessel and facility security measures, including the meaning and the requirements of the different MARSEC Levels;

(iv) Emergency preparedness, response, and contingency planning;

(v) Security equipment and systems, and their operational limitations; and

(vi) Methods of conducting audits, inspections, control, and monitoring techniques.

(2) In addition to knowledge and training required in paragraph (b)(1) of this section, the FSO must have knowledge of and receive training in the following, as appropriate:

(i) Relevant international laws and codes, and recommendations;

(ii) Relevant government legislation and regulations;

(iii) Responsibilities and functions of local, State, and Federal law enforcement agencies;

(iv) Security assessment methodology;

(v) Methods of facility security surveys and inspections;

(vi) Instruction techniques for security training and education, including security measures and procedures;

(vii) Handling sensitive security information and security related communications;

407

(e) At MARSEC Level 3, in addition to the requirements in this part, a facility owner or operator may be required to implement additional measures, pursuant to 33 CFR part 6, 160, or 165, as appropriate, which may include but are not limited to:

(1) Use of waterborne security patrol;

(2) Use of armed security personnel to control access to the facility and to deter, to the maximum extent practical, a transportation security incident; and

(3) Examination of piers, wharves, and similar structures at the facility for the presence of dangerous substances or devices underwater or other threats.

**§ 105.235 Communications.**

(a) The Facility Security Officer must have a means to effectively notify facility personnel of changes in security conditions at the facility.

(b) Communication systems and procedures must allow effective and continuous communications between the facility security personnel, vessels interfacing with the facility, the cognizant COTP, and national and local authorities with security responsibilities.

(c) At each active facility access point, provide a means of contacting police, security control, or an emergency operations center, by telephones, cellular phones, and/or portable radios, or other equivalent means.

(d) Facility communications systems must have a backup means for both internal and external communications.

**§ 105.237 System for seafarers' access.**

(a) *Access required.* Each facility owner or operator must implement a system by June 1, 2020 for providing access through the facility that enables individuals to transit to and from a vessel moored at the facility and the facility gate in accordance with the requirements in this section. The system must provide timely access as described in paragraph (c) of this section and incorporate the access methods described in paragraph (d) of this section at no cost to the individuals covered. The system must comply with the Transportation Worker Identification

Credential (TWIC) provisions in this part.

(b) *Individuals covered.* The individuals to whom the facility owner or operator must provide the access described in this section include—

(1) Seafarers assigned to a vessel at that facility;

(2) Pilots; and

(3) Representatives of seafarers' welfare and labor organizations.

(c) *Timely access.* The facility owner or operator must provide the access described in this section without unreasonable delay, subject to review by the Captain of the Port (COTP). The facility owner or operator must consider the following when establishing timely access without unreasonable delay:

(1) Length of time the vessel is in port.

(2) Distance of egress/ingress between the vessel and facility gate.

(3) The vessel watch schedules.

(4) The facility's safety and security procedures as required by law.

(5) Any other factors specific to the vessel or facility that could affect access to and from the vessel.

(d) *Access methods.* The facility owner or operator must ensure that the access described in this section is provided through one or more of the following methods:

(1) Regularly scheduled escort between the vessel and the facility gate that conforms to the vessel's watch schedule as agreed upon between the vessel and facility.

(2) An on-call escort between the vessel and the facility gate.

(3) Arrangements with taxi services or other transportation services, ensuring that any costs for providing the access described in this section, above the service's standard fees charged to any customer, are not charged to the individual to whom such access is provided. If a facility provides arrangements with taxi services or other transportation services as the only method for providing the access described in this section, the facility is responsible to pay any fees for transit within the facility.

(4) Arrangements with seafarers' welfare organizations to facilitate the access described in this section.

**ADD. 067**

(5) Monitored pedestrian access routes between the vessel and facility gate.

(6) A method, other than those in paragraphs (d)(1) through (5) of this section, approved by the COTP.

(7) If an access method relies on a third party, a back-up access method that will be used if the third party is unable to or does not provide the required access in any instance. An owner or operator must ensure that the access required in paragraph (a) of this section is actually provided in all instances.

(e) *No cost to individuals.* The facility owner or operator must provide the access described in this section at no cost to the individual to whom such access is provided.

(f) *Described in the Facility Security Plan (FSP).* On or before February 3, 2020, the facility owner or operator must document the facility's system for providing the access described in this section in the approved FSP in accordance with § 105.410 or § 105.415. The description of the facility's system must include—

(1) Location of transit area(s) used for providing the access described in this section;

(2) Duties and number of facility personnel assigned to each duty associated with providing the access described in this section;

(3) Methods of escorting and/or monitoring individuals transiting through the facility;

(4) Agreements or arrangements between the facility and private parties, nonprofit organizations, or other parties, to facilitate the access described in this section; and

(5) Maximum length of time an individual would wait for the access described in this section, based on the provided access method(s).

[USCG-2013-1087, 84 FR 12119, Apr. 1, 2019]

## § 105.240 Procedures for interfacing with vessels.

The facility owner or operator must ensure that there are measures for interfacing with vessels at all MARSEC Levels.

## § 105.245 Declaration of Security (DoS).

(a) Each facility owner or operator must ensure procedures are established for requesting a DoS and for handling DoS requests from a vessel.

(b) At MARSEC Level 1, a facility receiving a cruise ship or a manned vessel carrying Certain Dangerous Cargo, in bulk, must comply with the following:

(1) Prior to the arrival of a vessel to the facility, the Facility Security Officer (FSO) and Master, Vessel Security Officer (VSO), or their designated representatives must coordinate security needs and procedures, and agree upon the contents of the DoS for the period of time the vessel is at the facility; and

(2) Upon the arrival of the vessel at the facility, the FSO and Master, VSO, or their designated representative, must sign the written DoS.

(c) Neither the facility nor the vessel may embark or disembark passengers, nor transfer cargo or vessel stores until the DoS has been signed and implemented.

(d) At MARSEC Levels 2 and 3, the FSOs, or their designated representatives, of facilities interfacing with manned vessels subject to part 104, of this subchapter must sign and implement DoSs as required in (b)(1) and (2) of this section.

(e) At MARSEC Levels 1 and 2, FSOs of facilities that frequently interface with the same vessel may implement a continuing DoS for multiple visits, provided that:

(1) The DoS is valid for a specific MARSEC Level;

(2) The effective period at MARSEC Level 1 does not exceed 90 days; and

(3) The effective period at MARSEC Level 2 does not exceed 30 days.

(f) When the MARSEC Level increases beyond that contained in the DoS, the continuing DoS is void and a new DoS must be executed in accordance with this section.

(g) A copy of all currently valid continuing DoSs must be kept with the Facility Security Plan.

(h) The COTP may require, at any time, at any MARSEC Level, any facility subject to this part to implement a DoS with the VSO prior to any vessel-

412

*Selected excerpts (highlighted for reference)*

*Town of Bar Harbor, ME*
*Wednesday, July 17, 2024*

# Chapter C. Charter

# Article II. Town Meetings

# § C-6. Powers and responsibilities.

A.   The Annual Town Meeting shall have the exclusive power and responsibility to:

    (1)   Elect all necessary Town officers and committees;

B.   The Annual and Special Town Meetings shall have the exclusive power and responsibility to:

    (1)   Act on the issuance of bonds and notes, except notes in anticipation of taxes to be paid within the fiscal year in which issued;

    (2)   Raise by taxation and appropriate monies so raised.

    (3)   Act on those ordinances placed on the warrant and on any initiative or referendum questions as provided for by this Charter;
    [Amended 11-3-2020]

    (4)   Act on the sale of Town-owned real estate other than that acquired through matured tax mortgage liens;

    (5)   Act on any amendments to this Charter pursuant to law;

    (6)   Approve Town budgets, except proprietary budgets for revenue producing facilities as defined by M.R.S.A. Title 30-A, Chapter 213, the Revenue Producing Municipal Facilities Act;

    (7)   Transact other Town business presented to it by warrant articles or required by law.

C.   Town Meeting shall act only on matters presented to it as warrant articles or as required by law.

D.   Any Town Meeting amendment made to the budget published in the Warrant or Town Report, shall be voted only by written or electronic ballot.
    [Amended 11-3-2020]

**ADD. 069**

*Selected excerpts (highlighted for reference)*

*Town of Bar Harbor, ME*
*Wednesday, July 17, 2024*

# Chapter C. Charter

# Article III. The Town Council

# § C-10. General powers and duties.

A.  The Council shall have the power to:

   (1)  Appoint:

      (a)  The Town Manager for a term not to exceed three years;

      (b)  The Town Attorney and an Auditor who shall serve at the will of the Council;

      (c)  The members of the Planning Board, Board of Appeals, and such other boards and committees for such terms of office with such powers and duties as are provided for by this Charter, Town ordinances and state statutes.

   (2)  Remove for cause during the term of office after hearing any person appointed pursuant to the provisions of this Charter except those persons who serve at the will of the Council.

   (3)  By ordinance create, change and abolish offices, departments and agencies, other than offices, departments and agencies established by this Charter. The Council by resolution may assign additional functions or duties to officers, departments or agencies established by this Charter but may not discontinue or assign to any other office, department or agency any function or duty assigned by this Charter to a particular office, department or agency. The Council may, however, vest in the Town Manager all or part of the duties of any office under this Charter, with the exception of that of the Town Clerk, Town Assessor or Town Attorney.

   (4)  Convey or authorize the conveyance of real estate acquired by mature tax mortgage liens and the lease or authorization for lease of Town-owned property for a term of not longer than 15 years including any renewal options.

   (5)  Adopt an annual budget which shall be presented to the Warrant Committee as provided by this Charter, and cause the detailed budget to be printed in the Town Report; provided, however, that the recommendations and comments of the Warrant Committee shall be printed and made available as required by provisions in § **C-36** for distribution prior to Town Meeting. At a minimum the detailed budget shall include:

      (a)  A budget message from the Town Manager explaining in narrative fashion the revenues, expenditures and fund balances;

      (b)  Calculation of the estimated tax rate;

      (c)  Budget summary by cost center;

      (d)  A narrative description of the Capital Improvement Program; and

**ADD. 070**

    (e) A spreadsheet showing five years of appropriations for the Capital Improvement Program.

(6) Borrow funds and provide for the execution of notes thereof in anticipation of taxes, said notes to be repaid within the fiscal year in which issued.

(7) Provide for an annual audit.

(8) Dispose of, by sale or otherwise, surplus Town personal property.

(9) Make, adopt, amend and repeal ordinances for any purpose permitted by statute with the exception of those pertaining to zoning except as provided below. In addition to such ordinances, the Council shall have the power to adopt ordinances which:
[Amended 11-3-2020]

    (a) Adopt or amend an administrative code.

    (b) Provide for a fine or other penalty or establish a rule or regulation for violation of which a fine or other penalty is imposed.

    (c) (Reserved)

    (d) Adopt land use ordinance amendments by supermajority vote as defined in §C-14C(3) when:

        [1] The land use ordinance change is procedural or minor in that it seeks to correct, modify, or reconcile inconsistencies, contradictions, and errors or to bring the land use ordinance into compliance with state statutes pertaining to municipal zoning; and

        [2] The land use ordinance change is first recommended to the Planning Board by the Planning Director and upon review and after a public hearing, the Planning Board recommends it to the Town Council by a supermajority vote [as defined in §C-14C(3)].

    (e) Provide for the compulsory attendance of witnesses, the administering of oaths and the compulsory production of evidence in connection with investigations into the affairs of the Town and the conduct of any Town department (including the School Department), office or agency or in connection with any hearing provided for by this Charter involving the forfeiture of office of any Councilor, Superintending School Committee member or Warrant Committee member, or the dismissal of any Town employee or member of any Town board.

    (f) Adopt or amend a Code of Ethics, governing all elected and appointed Town officials, including without exception the members of the Town Council, Superintending School Committee and Warrant Committee and their appointees. Any Code of Ethics adopted under this section shall be based on the following principles: that elected officials and their appointees be fair, impartial and responsive to the needs of the people and each other in the performance of their respective functions and duties; that decisions and policy be made in proper channels of the Town's governmental structure; that public office not be used for personal gain; and that members of the Town Council, Superintending School Committee, Warrant Committee and their appointees maintain a standard of conduct that will inspire public confidence in the integrity of the Town's government. Any Code of Ethics adopted under this section shall take precedence over §§ C-53 and C-54 of the Charter, in the event that an interpretational conflict arises in regard to these sections.

(10) Apply for grants and accept such grants, provided that no monetary or other obligation not authorized by Town Meeting is entailed or required.

**ADD. 071**

(11) Approve proprietary budgets for revenue producing facilities as defined by M.R.S.A. Title 30-A, Chapter 213, the Revenue Producing Municipal Facilities Act.

(12) Exercise all other powers of the Town of Bar Harbor not otherwise specifically reserved to the Town Meeting.

B.  Notwithstanding the foregoing, nothing contained herein shall diminish the right of the citizens of the Town of Bar Harbor at a Town Meeting to approve or disapprove acts of the Town Council, whether such acts be by ordinance or otherwise.

**§ 125-9. Amendment. [Amended 11-5-1991 ; 5-4-1992 ; 5-4-1998 ; 11-2-2010 ; 11-8-2011 ]**

There shall be four methods for proposing amendments to Bar Harbor's Land Use Ordinance, as follows:

A.  Amendments.

    (1)  Citizen petition. Upon the written petition of a number of registered voters equal to at least 10% of the number of votes cast in the Town at the last gubernatorial election, but in no case fewer than 10 registered voters, the Town Council shall automatically insert in the warrant for a regular or special Town Meeting an article to amend this chapter.

    (2)  Property owner. A property owner may submit a written request to the Planning Board to consider an amendment and the Planning Board shall consider this request at a public hearing. Notice of the public hearing shall be provided as set forth in § 125-9C below.

        (a)  The Planning Board, may, upon a written request from a property owner, submit a written request to the Town Council to insert in the warrant for a regular Town Meeting an article to amend this chapter.

        (b)  Such request shall contain at a minimum the following materials:

            [1]  An application form from the Planning Department;

            [2]  A map showing the existing neighborhood districts for the subject property and for properties within 600 feet;

            [3]  A map showing the existing land uses at the time of application for the above-mentioned subject property and area;

            [4]  A narrative and evidence of how the requested change meets the policies and strategies in the most recently adopted Comprehensive Plan (including the Land Use Plan);

            [5]  Other information necessary to illustrate the need for a change in the district or other standards in this chapter.

        (c)  Within 30 days of submission of the written request, together with fees and materials, the Planning Board shall meet to determine if the application is complete for their review. A public hearing will be held within 45 days of the Planning Board finding the application complete.

        (d)  Notification to abutters within 600 feet of the subject property and a notice to a newspaper of general circulation in the Town of Bar Harbor shall occur at least 10 days prior to the hearing.

        (e)  At the public hearing, the Planning Board shall hear the request, accept public comment on the request and deliberate to determine which of the following courses of action they will perform:

            [1]  Recommend to the Town Council the written request as submitted as per § 125-9A.

Downloaded from https://ecode360.com/BA1953 on 2024-07-29

          [2]   Recommend with amendments or conditions that would bring the proposal into conformance with the most recently adopted Comprehensive Plan.

          [3]   Take no action.

    (f)   If the Planning Board takes no action on the written request, the subject property owner may seek other alternatives outlined in § 125-9A. Planning Board action under § 125-9 is not the subject of appeal under § 125-103.

    (g)   The Planning Board shall submit its decision to the Town Council within 30 days of the close of the public hearing.

  (3)  Planning Board. The Planning Board may propose an amendment and the Planning Board shall consider this amendment at a public hearing. Notice of the public hearing shall be provided as set forth in § 125-9C below.

  (4)  Town Council. The Town Council may submit a written request to the Planning Board to consider an amendment, and the Planning Board shall consider this request at a public hearing. Notice of the public hearing shall be provided as set forth in § 125-9C below.

B.  Final public hearing. Following the conclusion of the Planning Board's public hearings, the Town Council shall hold a public hearing to accept or reject final amendments for the warrant. Notice of the public hearing shall be provided as set forth in § 125-9C below.

C.  Notice requirements.

  (1)  Notice of the hearing shall be posted in the municipal office at least 13 days prior to such hearing.

  (2)  Notice of the hearing shall be published at least two times in a newspaper that complies with 1 M.R.S.A. § 601 and that has a general circulation in the municipality. The date of the first publication must be at least 12 days before the hearing, and the date of the second publication must be at least seven days before the hearing.

  (3)  In addition to the notice required by the preceding two subsections, when an amendment is proposed to the existing Land Use Ordinance or the Neighborhood Districts Map of Bar Harbor that, within a geographically specific portion of the Town, will have the effect of either prohibiting all industrial, commercial or retail uses where any of such uses is permitted, or permitting such uses where any of such uses is prohibited, the following is required:

    (a)   The notice must contain a copy of the map indicating the portion of the Town affected by the proposed amendment.

    (b)   For each parcel within the Town that is in or abutting the portion of the Town affected by the proposed amendment, the notice must be mailed by first-class mail at least 13 days prior to the public hearing to the last-known address of the person to whom property tax on each parcel is assessed. The municipal officers shall prepare and file with the Town Clerk a written certificate indicating those persons to whom the notice was mailed and at what addresses, when it was mailed, by whom it was mailed and from what location it was mailed. This certificate shall

Downloaded from https://ecode360.com/BA1953 on 2024-07-29

constitute prima facie evidence that notice was sent to those persons named in the certificate. Notice is not required under this subsection for any type of zoning ordinance adopted under the laws governing growth management contained in Chapter 187, Subchapter II of 30-A M.R.S.A., as amended, or the laws governing shoreland zoning contained in Title 38, Chapter 3, Subchapter I, Article 2-B, as amended.[1]

D. Following a hearing conducted pursuant to the preceding subsection, the Planning Board shall, by majority vote, make a recommendation as to whether the proposed amendment ought to be adopted or ought not to be adopted. Such recommendation shall be printed on the warrant.

E. Such amendment may be adopted by a majority vote at a duly constituted Town Meeting. **[Amended 11-8-2022 ]**

F. Copies of amendments to this chapter related to shoreland regulation, attested and signed by the Town Clerk, shall be submitted to the Commissioner of the Department of Environmental Protection following adoption by the Town Meeting and shall not be effective unless approved by the Commissioner. If the Commissioner fails to act on any amendment within 45 days of his/her receipt of the amendment, the amendment is automatically approved. Any application for a permit submitted to the Town within the forty-five-day period shall be governed by the terms of the amendment, if such amendment is approved by the Commissioner.

---

1. **Editor's Note:** See 30-A M.R.S.A. § 4312 et seq. and 38 M.R.S.A. § 435 et seq., respectively.

Downloaded from https://ecode360.com/BA1953 on 2024-07-29

# ARTICLE VII
## Permits

## § 125-77. Permit required for certain activities. [Amended 5-7-1991 ; 11-2-1999 ]

After the effective date of this chapter, a written permit from the Code Enforcement Officer shall be required for the following activities, regardless of whether such activities have received site plan or subdivision approval or whether they also require review by the Design Review Board pursuant to Article XIII, Design Review:

A.  Flood hazard areas. All construction or earthmoving activities or other improvements within the one-hundred-year floodplain designated on the Flood Insurance Rate Maps published by the Federal Emergency Management Agency.

B.  New construction. New construction of buildings and structures.

C.  Alteration. Alteration of a building, structure, or land, or parts thereof, including but not limited to: [Amended 5-3-2004 ]

   (1)  Change in size of windows or doors;

   (2)  Repair of foundations, whether concrete, cinder block, granite and posts, or piles;

   (3)  Interior renovations for change in use;

   (4)  Remodeling interior walls to create new rooms;

   (5)  Enclosing open frame porch;

   (6)  Installing skylights;

   (7)  Erection of fences;

   (8)  Construction of new steps;

   (9)  Creation of roads or driveways;

   (10)  Erection of panels for winter closure or the erection of winter storm vestibules in the Downtown Village or Waterfront Development Districts; provided, however, that a permit need only be obtained in the first year of the useful life of the structure to be erected. [Amended 6-8-2010 ]

D.  Placement of signs. Placement of signs except temporary signs. [Amended 5-3-2004 ]

E.  Moving or demolition. All buildings or structures which are removed from or moved onto, or moved around within, a lot or demolished.

F.  Change of use. The change of any premises from one category of land use to any other land use.

G.  Activities. Any other activities described in Article III as requiring a permit from the Code Enforcement Officer.

Downloaded from https://ecode360.com/BA1953 on 2024-07-26

H.  Disembarking persons from cruise ships on, over, or across any property located within the Town of Bar Harbor. **[Added 11-8-2022 ]**

   (1)  For the purposes of this section, "cruise ship" has the same meaning as set forth in § 153-22B of the Town of Bar Harbor Code.

   (2)  As determined by the Harbor Master, no more than 1,000 persons, in the aggregate, may disembark on a single calendar day from any cruise ship(s) and come to shore on, over, or across any property located within the Town of Bar Harbor; provided, however, that this subsection shall not apply with regard to any cruise ship reservations that have been accepted by the Harbor Master prior to March 17, 2022.

   (3)  The Harbor Master shall develop rules and regulations in order to establish (a) a reservation system for cruise ships that transport persons by watercraft for disembarkation in the Town of Bar Harbor; (b) a mechanism for counting and tracking the number of persons disembarking each day; (c) a mandatory procedure for reporting violations to the Code Enforcement Officer; and (d) any other provisions that the Harbor Master deems necessary under this subsection. Any property owner issued a permit under this § 125-77H shall comply with all rules and regulations promulgated by the Harbor Master under this subsection.

   (4)  This subsection shall be enforced by the Code Enforcement Officer in accordance with § 125-100 of this chapter, based on information as to violations provided by the Harbor Master, and property owners in violation of this subsection shall be subject to such fines, penalties, actions and orders as are authorized by 30-A M.R.S. § 4452, as the same may be amended, provided that each disembarking person exceeding the permitted daily limit in § 125-77H(2) is a specific violation under 30-A M.R.S. § 4452(3)(B), resulting in a minimum $100 penalty per excess unauthorized person.

   (5)  Notwithstanding 1 M.R.S. § 302, and regardless of the date on which it is approved by the voters, this subsection will be applicable as of March 17, 2022, and shall govern any and all applications for permits or approvals required under this subsection that were or have been pending before any officer, board, or agency of the Town of Bar Harbor on or at any time after March 17, 2022; provided, however, that the Town will not take any enforcement action under this subsection with regard to any cruise ship visits occurring prior to the date of adoption by voters at Town Meeting.

## § 125-78. Prohibitions. [Amended 6-13-2006 [1] ]

A.  No activity or use requiring a permit under this article shall be commenced unless and until the property owner has received any required permits for the Code Enforcement Officer.

B.  No building permit shall be approved for a particular property if the property owner is in violation of this chapter or of any other previously approved subdivision or site plan on said property.

---

1.  **Editor's Note: This ordinance also provided that it shall apply retroactively to all proceedings, applications and/or petitions pending on or commenced after 9-6-2005, notwithstanding the provisions of 1 M.R.S.A. § 302.**

Downloaded from https://ecode360.com/BA1953 on 2024-07-26

located at ground level, with no railing or other structure above the level of the ground. In all shoreland districts a patio shall be considered a structure.**[Amended 6-8-2010 ]**

PERFORMANCE GUARANTEE — A financial guarantee to ensure that all improvements, facilities or work required by this chapter, regulations and the approved plans and specifications of a development.

PERFORMANCE STANDARD — A criterion established to control the use of land and structures. The purpose of performance standards is to provide detailed regulations and restrictions by means of minimum criteria which must be met by uses in order to protect neighbors from adverse impacts of adjoining land uses and to protect the general health, safety and welfare of citizens of Bar Harbor.

PERSON — An individual, corporation, governmental agency, municipality, trust, estate, partnership, association, two or more individuals having a joint or common interest, or other legal entity.**[Added 11-5-1991 ]**

PERSONAL PROPERTY — Property which is owned, utilized and maintained by an individual or members of his or her residence and acquired in the normal course of living in or maintaining a residence and is not attached to or affixed to the ground or a structure. It does not include merchandise which was purchased for resale or obtained on consignment.

PERSONAL SERVICES — A business which provides services but not goods, such as hairdressers, shoe repair, and the like.

PHOTO SIMULATION — A computer representation of the appearance of a building or scene showing how it currently looks or how it will look after specified activities (i.e., the construction of a building, renovations, landscaping, etc.) have occurred.**[Added 11-2-1999 ]**

PHOTOVOLTAIC (PV) — A semiconductor-based device that converts light directly into electricity.**[Added 11-2-2021 ]**

PIER — See "structure, water-related."

PLACE OF WORSHIP — **[Added 5-2-2005 ]**

A.  A church, synagogue, temple, mosque, or other facility that is used for prayer by persons of similar beliefs;

B.  A special purpose building that is architecturally designed and particularly adapted for the primary use of conducting formal religious services on a regular basis.

PLASTIC — Any group of synthetic or natural organic materials that may be shaped when soft and then hardened.**[Added 11-2-1999 ]**

POND — See "water bodies."[18]

PORTICO — A porch-like structure consisting of a roof supported by columns.**[Added 11-2-1999 ]**

PREMISES — One or more parcels of land which are in the same ownership and are contiguous, and including all buildings and other structures thereon.**[Added 11-2-1999 ]**

---

18.  **Editor's Note: See now the definition of "lakes and ponds."**

Downloaded from https://ecode360.com/BA1953 on 2024-07-29

Received: 24 June 2020 | Revised: 23 February 2021 | Accepted: 30 April 2021

DOI: 10.1111/grow.12499

ORIGINAL ARTICLE

growth and change WILEY

# Measurement and analysis of neighborhood congestion: Evidence from sidewalk pedestrian traffic and walking speeds

> EXHIBIT
>
> Gabe 7

## Todd Gabe 

School of Economics, University of Maine, Orono, ME, USA

**Correspondence**
Todd Gabe, School of Economics, University of Maine, 5782 Winslow Hall Orono, ME 04469-5782. USA
Email: todd.gabe@maine.edu

**Funding information**
USDA National Institute of Food & Agriculture, Grant/Award Number: Hatch Multistate Grant # ME 031808 (NE 1749)

### Abstract

Regional scientists and planners are interested in congestion, both vehicular and pedestrian. This paper examines pedestrian congestion on sidewalks in the tourism district of Bar Harbor, Maine, with a focus on the effects of cruise passengers. The analysis considers pedestrian counts and the effects of passengers on walking speeds. Cruise passengers increase sidewalk pedestrian traffic overall, but the effects on walking speeds are mixed. For both indicators of sidewalk congestion, cruise passenger impacts decrease at greater distances from the passenger point-of-entry into Bar Harbor. The methods presented in the paper can be applied to sidewalk congestion related to a wide range of facilities and events (e.g., transportation hubs, museums and concert halls, sporting events, large pilgrimage events).

## 1 | INTRODUCTION

Congestion can take on a lot of different forms. At the scale of a large city or metropolitan area, congestion can be represented by commuting times and the number of vehicles on a region's roadways (Broersma & van Dijk, 2008; Sweet, 2014). Past studies have examined the connection between congestion and the structure of urban areas (Gordon et al., 1989; Smeed, 1968; Tsekeris & Geroliminis, 2013). Likewise, researchers have analyzed the efficacy of using tolls to combat urban disamenities such as traffic congestion and sprawl (Anas & Rhee, 2006; Arnott, 1998; Leape, 2006; Small, 1983). At a much smaller scale of a neighborhood, congestion can be represented by the number of vehicles and pedestrians that cross a busy intersection or even the number of people walking along a particular stretch of sidewalk. Cities such as New York, San Francisco, Seattle, and Las Vegas experience crowded sidewalks, particularly in places around transportation hubs and major attractions

DX319.001

**ADD. 079**

**From:**    Charles Sidman
**To:**       Lincoln Millstein
**Subject:**  Re: Slightly revised BH Cruise Ship Petition resubmitted today (3/17/22)
**Date:**     Thursday, March 17, 2022 3:37:30 PM

Gary is entitled to his opinion but is factually just wrong. From a previous working paper of the Initiative group:

Of note, in the attached (internet-derived) list of ships currently planning to visit Bar Harbor over the next several years, the following would still be allowed with the cap at 1,000/day:

- Star Pride, 312 pax
- Silver Shadow, 466 pax
- Silver Whiper, 466 pax
- Seabourn Quest, 540 pax
- Seven Seas Navigator, 557 pax
- Seven Seas Mariner, 779 pax
- Oceana Insignia, 803 pax
- Viking Star, 930 pax
-
- Disallowed ships would start with
-
- Oceana Vista, 1200 pax
- Zaandam, 1718 pax
- …
- ranging up to
- Norwegian Escape, 5218 pax

So, we're only getting rid of the biggies (and 930 pax is still a honking large boat!), with the much proposed alternative being to welcome the smaller, generally wealthier-passengered, "boutique" ships that might contribute to rather than destroying life for BH taxpayers, many businesses and most visitors. With a single exception all respondents who have written to me already regret not banning cruise ships entirely, and only one expressed the view that the 1,000 disembarkation cap is too low. We'll see how the citizens vote, no matter what Gary and the apologists/gradualists on the Council say.

Cheers,

Charlie

**From:** Lincoln Millstein <lmillstein@gmail.com>
**Date:** Thursday, March 17, 2022 at 3:11 PM
**To:** Charles Sidman <csidman@acadia.net>
**Subject:** Re: Slightly revised BH Cruise Ship Petition resubmitted today (3/17/22)

"The petition effectively eliminates cruise ships, since very few are 1,000 passengers or less," said Garry Friedmann. "I do not agree that this precipitous severance is best for town taxpayers or businesses. A more

DX357.001



UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

_____

ASSOCIATION TO PRESERVE AND
PROTECT LOCAL LIVELIHOODS, et
al.,

                        CIVIL ACTION NUMBER:

       Plaintiffs,

                     1:22-cv-00416-LEW

PENOBSCOT BAY AND RIVER PILOTS
ASSOCIATION,                     BENCH TRIAL

       Plaintiff-Intervenor,

        -vs-

TOWN OF BAR HARBOR,

       Defendant,

CHARLES SIDMAN,

       Defendant-Intervenor.

_____
    Margaret Chase Smith United States Courthouse
    202 Harlow Street
    Bangor, Maine 04401
    July 13, 2023

**B E F O R E:**      **THE HONORABLE LANCE E. WALKER**
                     **UNITED STATES DISTRICT JUDGE**

**A P P E A R A N C E S:**

EATON PEABODY
BY:  TIMOTHY C. WOODCOCK, ESQUIRE
     P. ANDREW HAMILTON, ESQUIRE
     JANNA L. GAU, ESQUIRE
        and
     PATRICK W. LYONS, ESQUIRE
On behalf of the Plaintiffs, Association To Preserve and
Protect Livelihoods, et al.,

1    question?

2          MS. ECONOMY:  Certainly, your Honor.  We can't just

3    look at this ordinance in a vacuum.  There's quite a long

4    history within the Town leading up to it, and I think it's

5    important for the Town to be able to talk about all the

6    different steps it has taken throughout the years to get to

7    where we are today to help the Court to understand, you know,

8    why -- why it became a citizens' initiative that it did.

9          MR. WOODCOCK:  Your Honor, on that point, this is,

10    actually, I think a very interesting issue.

11          This ordinance was enacted through an initiative

12    process in which the proposed law was supplemented by what was

13    characterized as a purpose section.  And the ordinance itself

14    is enacted without legislative findings.  And as far -- as

15    best we can tell the legislative history, if that's what

16    really it is for the ordinance, is the purpose section of the

17    legislative history.

18          As the case unfolds, the trial unfolds, it will

19    become evident that there is largely a single author of the

20    purpose section of the initiative.  And I think what's going

21    on with this line of testimony -- and I think it's going to

22    start bleeding into some other areas as well -- I think this

23    is an attempt to create a legislative history that does not

24    exist.

25          Clearly, there's -- there are issues within the Town

1    with respect to cruise ships and there is evidently a

2    longstanding -- going at least back to the 2000 B & A study.

3    But we're talking about this ordinance and its legislative

4    history.  It has a particular rationale -- a series of

5    rationales that have been offered in it, and I am very

6    concerned that what we have here is an effort to create an

7    artificial legislative history to make up for the fact that

8    the ordinance itself has an insufficient legislative history.

9    And I might add in that particular, as I think the Court is

10   well aware, this relates to a couple of the legal points that

11   were raised in this case.

12          In the first place, we've raised the due process

13   count, as the Court is aware.  And essentially the gist of

14   that is there is an absence of a rational nexus between the

15   purposes to be served by the ordinance, the ostensible

16   purposes to be served by the ordinance, and the means employed

17   by the ordinance.  In particular, not a general thing, it's in

18   particular, 1,000 persons per day cap every day of the year.

19   And the singling out of cruise ship passengers as a distinct

20   category of persons as opposed to all other persons coming

21   into Bar Harbor as having particular effects and demands and

22   strains on town services, which we think are not supported by

23   the testimony of Town officials, by the way, some of which is

24   before the Court already at least in deposition form.  And

25   so -- also, this dovetails with the elements of the test for

1  interstate commerce violation.  Particularly, by the Supreme

2  Court in *Pike v. Bruce Church*, in particular.  The starting

3  standard which refers to a requirement that an ordinance be

4  even-handed and have a legitimate purpose.  The legitimate

5  purpose is tied into the rationale for the ordinance.  In our

6  view, the only real rationale for this ordinance, the one that

7  serves properly, perhaps, as part of the legislative history

8  is the purpose section.  And as the Court is aware when one

9  works down the *Pike* test, one ends up with -- if the ordinance

10  surveys that first series of hurdles, the Court has to

11  consider the ostensible purpose of the ordinance as compared

12  to its impact on interstate commerce and then consider whether

13  there are less burdensome ways to do it.

14      So we think both the due process argument and the

15  legitimate purpose standard of the Commerce Clause, those are

16  interrelated.  And I'm very concerned because that is the

17  underlying sort of context for these legal arguments, I am

18  extremely concerned about us getting into an area where we're

19  trying to manufacture an artificial legislative history for

20  what, in our view, is an ordinance that lacks a legally

21  sufficient legislative history.

22      So that's my long objection.

23      THE COURT:  Understood.

24      Ms. Economy, so let's try to tighten that focus just

25  a bit.  What is the precise issue to be resolved that this

1    line of testimony will inform?

2           MS. ECONOMY:  Your Honor, again, this is intended to

3    show -- this has been a process that the Town council has been

4    going through for some time now.

5           THE COURT:  And that's relevant to my resolving the

6    constant -- primarily the constitutional challenges how?

7           MS. ECONOMY:  Your Honor, we anticipate that the

8    plaintiffs are going to argue that there is no basis in fact

9    for the 1,000 person -- 1,000 passenger per day cap.  This

10   line of questioning is intended to show that while there were

11   voluntary caps in place for several years now, those caps

12   weren't full.  They weren't full on a daily basis up until the

13   2019 season, '22 season, which had a different effect on the

14   Town when those caps were consistently full on a daily basis.

15          A cap is just a cap.  It doesn't mean that that

16   many -- those many people were coming into Bar Harbor on a

17   daily basis.  They weren't.  Less people than the maximum caps

18   were coming in back in 2015.  So this is intended to show how

19   the cruise ship tourism has evolved over the years and how

20   that evolution has impacted the Town.

21          MR. WOODCOCK:  Your Honor, if I might be heard.

22          It's really quite important that this ordinance that

23   we have before us was adopted by popular initiative.

24          If -- if I could -- I might concede some relevance to

25   this if we actually had gone through a Town council process

1  and this was sort of a continuum of the Town council

2  continuing -- probably had the Town council actually enacted

3  this ordinance itself, there would be very clear legislative

4  history that probably would sweep in, perhaps, much of what

5  Ms. Peacock is testifying to.  But that's not what happened.

6  What happened, instead, was something entirely different.

7           In -- in the -- in February -- what Ms. Peacock, I

8  assume, shortly is going to testify to is that in February of

9  2022, the Town council itself took the initiative to setup a

10  working group.  And I think the Court heard that through the

11  testimony of Sarah Flink already.  And the working group was

12  tasked with looking at the issue of revising, among other

13  things, passenger caps.  So as that process was going along on

14  a parallel track, the ordinance began to emerge in an

15  initiative form.

16           So in March of 2022, the initiative begins to merge

17  as a parallel track.

18           In August of 2022, the Town council accepts the

19  recommendations of the working group.  And the working group

20  has, as you heard through Sarah Flink, and I'm sure Ms.

21  Peacock will testify to this, they endorsed a series of -- or

22  a process of reducing the passenger caps.  I think the total

23  reduction was in the range of 30 percent of the passengers.

24  And those then were embodied in a memorandum of understanding,

25  which Ms. Flink also testified to, and ultimately was signed

1  by the cruise ships toward the very end of October of 2022.

2  And those caps represent, in our view, they represent, at

3  least a Town policy as to what the Town could accommodate that

4  was a judgment of the Town council at the time of what the

5  Town could accommodate, just as we view the Town voluntary

6  caps for a period of 15 years as representing Town policy view

7  of what the Town could accommodate in terms of passengers.

8  And those do stand in contrast of the 1,000 person cap.

9       The 1,000 person per day cap originated from an

10  entirely different process.  It is not a Town council process.

11  And I would really very strongly object to any individual,

12  even a Town councilor, coming in and testifying as to what the

13  intent of the voters were when the voters decided to endorse

14  this on November 8th.  This is part of the popular process

15  that we recognize in Maine through our initiative process.

16  And essentially to have a Town councilor come in and testify

17  as to why the people of Bar Harbor enacted 1,000 person

18  ordinance on November 8, '22, it would be equivalent to having

19  a state legislature come in and testify why the people of

20  Maine voted an initiative in in a popular initiative.

21       This is not related to the legislative history of the

22  ordinance.  It's a very distinctive process, and we think that

23  process is set out sufficiently, appropriately, and solely in

24  the initiative process itself at least as far as legislative

25  history is concerned.

1  exchange that the plan is to take what's going on in front of

2  the council in 2021 and 2022 and somehow merge it in the

3  legislative history of the ordinance -- of the initiative, and

4  to then use that to defend the rational basis arguments that

5  we made and the legitimate purpose basis.  And I would simply

6  ask -- and I recognize the Court's ruling here -- that an

7  effort be made to keep these tracks separate.

8        The initiative process is a very distinctive process

9  under Maine law, and it is not governed by whatever the Town

10  council does or does not do.

11        Your Honor, the reason we have an initiative process

12  is precisely because the voters have the authority to act when

13  they are not satisfied with either the state legislative or

14  what Town council may be doing.

15        THE COURT:  It's argument that I'm happy to consider.

16  When the arguments are made -- and if you wish to cut off the

17  line of questioning -- feel free to object again, but it

18  really sounds to me like arguments I expect to hear in which

19  case I'll be able to divvy up the importance of those

20  arguments, I think, sufficiently clear.

21        Ms. Economy, if you can remember where you were in

22  your line of questioning, you're welcome to proceed.

23        MS. ECONOMY:  Thank you, your Honor.

24  BY MS. ECONOMY:

25  Q.   Taking note from the Court, Ms. Peacock, I would just

1  A.   Yeah, we were also looking at the trend of land-based

2  visitation versus -- that had also been increasing, so, you

3  know, we were looking at differentiating -- continuing to

4  differentiate between peak season and shoulder season.  We

5  also removed April and November from the season.  That was

6  mostly concerns for logistical.  For the Town being able to

7  actually provide a quality service to cruise ship visitors at

8  those times of the year.

9  Q.   Did you see reducing cruise ship passenger visitation as

10 an effective way of dealing with these issues?

11 A.   Yes.  I think that's what we were trying to do, yeah.

12 Q.   Great.  Were you concerned about being sued for entering

13 these MOAs?

14 A.   For entering the MOAs?

15         MR. KINGSTON:  Relevance, your Honor.

16         THE COURT:  I'm about to sustain.

17         MR. PAPAZIAN:  I'm just trying to establish that

18 these -- the MOAs set a cap.  And if a cap is sufficient for

19 the plaintiffs, who are not actually entering into these

20 contracts, they could have sued if they weren't happy with the

21 MOAs as well.

22         THE COURT:  Mr. Woodcock.

23         MR. WOODCOCK:  Your Honor, I think Mr. Papazian is

24 misconstruing our legal position with respect to the caps and

25 the MOAs.

1   I'll certainly join in Mr. Kingston's objection, but

2   to be clear, the issue before the Court is the 1,000 person

3   per day limit.  Our view of the way in which the MOA

4   limitation is relevant is that it is -- it comes into play if

5   the Court applies the *Pike versus Bruce Church* analysis.  It

6   comes into play at the last phase of that analysis where the

7   Court can weigh whether there are less burdensome ways of

8   doing -- we view the MOAs as representing Town policy on what

9   the Town finds, at least, manageable and acceptable at that

10  point.  But we're not here to endorse the MOA caps because

11  those are not the issue before the Court, except in the way in

12  which I believe they would become relevant in the *Pike*

13  analysis.

14          THE COURT:  Thank you.

15          Mr. Papazian, you want to be heard further?

16          MR. PAPAZIAN:  Yeah, they are arguing that all caps

17  are unconstitutional, right.  And so, if the MOA caps don't

18  result in an unconstitutional limit on cruise ship visitation,

19  then why would the ordinance be unconstitutional?

20          THE COURT:  There's a distinct possibility that I've

21  dramatically misapprehended the plaintiffs' case, but I don't

22  think by that wide of margin.  I don't think -- I don't think

23  that's the case that's being made by the plaintiffs.

24          Mr. Woodcock or Mr. Kingston, do you want to be

25  heard?

1    MR. WOODCOCK:  Two points on that, your Honor.  We're

2  not taking the position that no caps can ever be imposed

3  unilaterally because that's not the issue before the Court.

4  There's not a general question before the Court as to whether

5  the Town has this power.

6    The question before the Court is whether the Town has

7  a power to impose a 1,000 person per day cap every day of the

8  year that singles out -- for the invocation of its police

9  powers -- singles out cruise ship passengers as opposed to

10  persons coming in by all other means of conveyance as placing

11  some special jeopardy with respect to police, fire and

12  traditional exercise of police powers, that there is something

13  distinctive about that group of people.

14    With respect to the voluntary caps, they were

15  voluntary for a good reason.  They were accepted and not

16  contested by the shipping industry, so they never became a

17  legal issue for the Court or for any court.  Same thing with

18  respect to the memorandum of understanding, particularly, with

19  respect to the Pier and Tender and APPLL entities that we

20  represent.  We're not parties to these memoranda of agreement.

21  The parties of the memoranda of agreement are the Town and the

22  cruise ships.  If they want to enter into a voluntary

23  agreement, that's up to them.  So we're not -- as long as

24  those agreements are voluntary, they're not going to become an

25  issue before the Court.  We don't see ourselves as necessarily